IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KENNETH S. MITCHELL,

        Plaintiff,

   v.

WACHOVIA CORPORATION, t/a
   WACHOVIA SECURITIES,
WACHOVIA SECURITIES, L.L.C.,
WACHOVIA SERVICES, INC.,
WACHOVIA BANK OF DELAWARE, N.A.,
TODD D. GAUTHIER, LYNN G. MEYER,
CAROLYN J. BEAM, and
DOROTHY A. DIFEBO,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No. 06-725 (GMS)

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

P. Clarkson Collins, Jr., (Bar I.D. #739)
pcollins@morrisjames.com
David H. Williams (Bar I.D. #616)
dwilliams@morrisjames.com
James H. McMackin, III (Bar I.D. #4284)
jmcmackin@morrisjames.com

MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800

Dated: January 7, 2008

David Bennet Ross (admitted *pro hac vice*)
dross@seyfarth.com
Devjani Mishra (admitted *pro hac vice*)
dmishra@seyfarth.com
Tara Smith Williams (admitted *pro hac vice*)
tawilliams@seyfarth.com

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Attorneys for Defendants

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ................................. 2

SUMMARY OF ARGUMENT ............................................................. 3

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................... 4

    A.    Mitchell's Recruitment by Wachovia Securities. ...................... 4

    B.    Mitchell's Assignment to Capitol Trail and Prices Corner ......... 6

    C.    Mitchell's Working Relationship with Amini. ......................... 8

    D.    The "9/11 Incident" .......................................................... 10

    E.    Mitchell's Performance in 2004 .......................................... 12

    F.    Mitchell's January and February 2005 Complaints of
        Discrimination .................................................................. 15

    G.    Mitchell's Present Complaint of Retaliation ........................... 16

ARGUMENT ................................................................................... 17

  I.    THE SUMMARY JUDGMENT STANDARD ................................. 17

  II.    MITCHELL'S CLAIMS AGAINST WACHOVIA CORPORATION,
       WACHOVIA SERVICES, INC. AND WACHOVIA BANK OF
       DELAWARE SHOULD BE DISMISSED, BECAUSE ONLY
       WACHOVIA SECURITIES HAS EMPLOYED HIM. ...................... 20

    A.    Wachovia Securities and the other Corporate Defendants
        Do Not Constitute an Integrated Enterprise. ......................... 20

  III.    MITCHELL CANNOT ESTABLISH A *PRIMA FACIE* CASE OF
       RACE OR GENDER DISCRIMINATION OR RETALIATION ......... 22

    A.    Mitchell Cannot Establish A *Prima Facie* Case Of Hostile
        Work Environment Discrimination ....................................... 22

        1.    The "hostile" conduct of which Mitchell complains
            was not based on his race or gender ............................... 23

2. The hostile conduct of which Mitchell complains was not severe or pervasive. ......................... 25

B. Mitchell Cannot Show That The Decision To Keep Him At Capitol Trail Was Discriminatory. ....................... 27

C. Mitchell Cannot Establish A *Prima Facie* Case Of Retaliation Based On The Decision To Keep Him At Capitol Trail. ......... 28

1. Mitchell did not engage in a protected activity under the law. ................................................. 29

2. Mitchell was not deterred from making a complaint. ............... 31

3. Mitchell failed to allege retaliation in his Charge. ...................... 32

IV. THE INDIVIDUAL DEFENDANTS CANNOT BE HELD LIABLE UNDER EITHER TITLE VII OR § 1981 ................................ 32

A. No Individual Liability Exists Under Title VII. ................................ 32

B. The Individual Defendants Did Not Personally Or Intentionally Infringe Mitchell's § 1981 Rights. ....................... 33

1. There is no evidence that Meyer, Beam and DiFebo authorized, directed or participated in any alleged racial discrimination. ...................................... 33

2. There is no evidence that Gauthier acted with racial animus. ...................................................... 34

V. DEFENDANTS CANNOT BE FOUND LIABLE FOR CONSPIRACY UNDER § 1985, §1986 OR DELAWARE LAW ........................... 35

A. Mitchell Cannot Base His § 1985 Claim On A Violation Of § 1981. ...... 35

B. Because Mitchell's § 1985 Claim Fails, His § 1986 Claim Must Be Dismissed. .................................................. 36

C. Mitchell's State Law Conspiracy Claim Also Fails. ............................ 37

VI. MITCHELL LACKS FACTUAL AND LEGAL SUPPORT FOR HIS STATE LAW TORT CLAIMS ................................ 38

A. Mitchell's Fraud Claim Fails as a Matter of Law. ........................ 38

B. Delaware Law Does Not Recognize *Prima Facie* Tort As A Cause Of Action In The Employment Context. ......................... 39

CONCLUSION.................................................................................................... 40

## TABLE OF AUTHORITIES

### CASES

Pages

Al-Khazraji v. Saint Francis College,
    784 F.2d 505 (3d Cir. 1986)...........................................................................33

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986).................................................................................... 18

Arasteh v. MBNA America Bank, N.A.,
    No. 99-254-GMS, 2000 WL 672866 (D. Del. June 12, 2001) ..........................23

Balazs v. Liebenthal,
    32 F.3d 151 (4th Cir. 1994) ..........................................................................29

Barnes Found. v. Township of Lower Merion,
    242 F.3d 151 (3d Cir. 2001)...........................................................................35

Benette v. Cinemark U.S.A., Inc.,
    01-CV-6519L, 2003 U.S. Dist. LEXIS 22636 (S.D.N.Y. November 21, 2003) ..............25

Blozis v. Mellon Trust of Del. Nat'l Ass'n,
    494 F. Supp. 2d 258 (D. Del. 2007)................................................................28

Brooks v. Fiore,
    No. 00-803 GMS, 2001 U.S. Dist. LEXIS 16345 (D. Del. Oct. 11, 2001) ......................38

Brown v. Philip Morris Inc.,
    250 F.3d 789 (3d Cir. 2001)...........................................................................33

Burlington Northern & Santa Fe Ry. Co. v. White,
    126 S. Ct. 2405 (U.S. 2006)...........................................................................29

Calloway v. E.I. DuPont de Nemours & Co.,
    No. 98-669-SLR, 2000 U.S. Dist. LEXIS 12642 (D. Del. Aug. 8, 2000) ...................23-24

Carter v. Del. State Univ.,
    No. 99-642 GMS, 2002 U.S. Dist. LEXIS 3116 (D. Del. February 27, 2002)...........36, 37

Castro v. New York City Bd. of Educ.,
    96 Civ. 6314 (MBM), 1998 U.S. Dist. LEXIS 2863 (S.D.N.Y. Mar. 12, 1998)..............30

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986).......................................................................................18

Christoforou v. Ryder Truck Rental,
    668 F. Supp. 294 (S.D.N.Y. 1987) ...............................................................24

Cimino v. Del. Dep't of Labor,
    No. 01-458 GMS, 2002 U.S. Dist. LEXIS 2979 (D. Del. Feb 25, 2002) ........................36

Cole v. Del. Tech. & Cmty. College,
    459 F. Supp. 2d 296 (D. Del. 2006)................................................22, 23, 26, 29

Dixon v. Boscov's, Inc.,
    NO. 02-1222, 2002 U.S. Dist. LEXIS 13815 (E.D. Pa. July 17, 2002)............................36

Edwards v. Concord EFS, Inc.,
    No. 03-599 GMS , 2004 U.S. Dist. LEXIS 13942 (D. Del. July 20, 2004)......................37

Everett v. Hosp. Billing and Collection Svcs., Ltd.,
    No. 04-049 JJF, 2005 U.S. Dist. LEXIS 5249 (D. Del. March 31, 2005) ........................32

Fantazzi v. Temple Univ. Hosp., Inc.,
    NO. 00-CV-4175, 2002 U.S. Dist. LEXIS 16269 (E.D. Pa. Aug. 22, 2002)....................22

Faragher v. City of Boca Raton,
    524 U.S. 775 (1998).................................................................................. 25

First Nat'l Bank of Arizona v. Cities Services Co.,
    391 U.S. 253 (1968)...................................................................................28

Gant v. Aliquippa Borough,
    612 F. Supp. 1139 (W.D. Pa. 1985)...............................................................36

Giles v. Family Court,
    411 A.2d 599 (Del. 1980) ...........................................................................22

Gonzalez v. Comcast Corp.,
    No. 03-445-KAJ, 2004 U.S. Dist. LEXIS 14989
    (D. Del. Jul. 30, 2004).............................................................19, 31, 32, 34, 35

Goosby v. Johnson & Johnson Medical, Inc.,
    228 F.3d 313 (3d Cir. 2000)........................................................................27

Grady v. Affiliated Cent., Inc.,
    139 F.3d 553 (2d. Cir. 1997).......................................................................34

Great Am. Fed. Sav. & Loan Ass'n v. Novotny,
    442 U.S. 366 (1979)..................................................................................36

Hankins v. City of Philadelphia,
        No. 95-1449, 1998 U.S. Dist. LEXIS 5101 (E.D. Pa. April 9, 1998)................................35

Harris v. Forklift Sys., Inc.,
        510 U.S. 17, 114 S. Ct. 367 (1993)................................................................................25

Hong v. Children's Mem'l Hosp.,
        993 F.2d 1257 (7th Cir. 1993) ......................................................................................34

Katchmar v. SunGard Data Sys., Inc.,
        109 F.3d 173 (3d Cir. 1997)..........................................................................................32

Knabe v. Bourty,
        114 F.3d 407 (3rd Cir. 1997) ........................................................................................19

Koschoff v. Henderson,
        109 F. Supp. 2d 332 (E.D. Pa. 2000) .............................................................................23

Lacy v. AMTRAK,
        507 F. Supp 2d 438 (D. Del. 2007).................................................................................23

LaMarco v. New York State Nurses Assoc.,
        118 F. Supp. 2d 310 (N.D.N.Y. 2000) ............................................................................23

Lawrence v. Nat'l Westminister Bank,
        98 F.3d 61 (3d Cir. 1996)..............................................................................................18

Lord v. Souder,
        748 A. 2d 393 (Del. 2000) ............................................................................................39

Management Co. v. Transcon. Ins. Co.,
        78 F. Supp. 2d 320 (D. Del. 1999)..................................................................................37

Marzano v. Computer Sci. Corp., Inc.,
        91 F.3d 497 (3d Cir. 1996)............................................................................................20

McBride v. Hospital of the University of Pennsylvania,
        NO. 99-6501, 2001 U.S. Dist. LEXIS 15115 (E.D.Pa. Sept. 21, 2001) ............................30

McDonnell Douglas Corp. v. Green,
        411 U.S. 792 (1973).....................................................................................................22

McKay v. Delaware State Univ.,
        Civ. A. No. 99-219-SLR, 2000 U.S. Dist. LEXIS 14653 (D. Del. 2000).........................33

Miller v. State of Delaware Probation and Parole,
    41 Fed. Appx. 581 (3d Cir. 2002)............................................................27

Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.,
    491 F. Supp. 2d 467 (D. Del. 2007)........................................................30

Nelson v. Upsala Coll.,
    51 F.3d 383 (3d Cir. 1995)......................................................................29

Nesbit v. Gears Unlimited, Inc.,
    347 F.3d 72 (3d Cir. 2003)......................................................................20

Oncale v. Sundowner Offshore Servs., Inc.,
    523 U.S. 75 (1998)..................................................................................25

Parker v. Comcast Corp.,
    No. 04-344-KAJ, 2005 U.S. Dist. LEXIS 22612 (D. Del. Oct. 5, 2005) ........................39

Pearson v. Component Tech. Corp.,
    247 F.3d 471 (3d Cir. 2001)....................................................................20

Petrocelli v. DaimlerChrysler Corp.,
    No. 04-943-KAJ , 2006 U.S. Dist. LEXIS 11972 (D. Del. 2006) ......................................22

Phoenix Canada Oil Co. Ltd. v. Texaco Inc.,
    560 F. Supp. 1372 (D. Del. 1983)...........................................................37

Price v. Delaware Dept of Corr.,
    40 F. Supp. 2d 544 (D. Del 1999)...........................................................29

Pryor v. NCAA,
    288 F.3d 548 (3d Cir. 2002)....................................................................22

Rajoppe v. GMAC Corp. Holding Corp.,
    No. 05-2097, 2007 U.S. Dist. LEXIS 18956 (D. Pa. March 19, 2007) ...........................20

Reap v. Cont'l Cas. Co.,
    NO. 99-1239 (MLC), 2002 U.S. Dist. LEXIS 13845 (D. Pa. June 28, 2002) ..................34

Riley v. Del. River & Bay Auth,
    457 F. Supp. 2d. 505 (D. Del. 2006)........................................................33

Seldomridge v. Uni-Marts, Inc.,
    No. 99-496 GMS, 2001 U.S. Dist. LEXIS 9491 (D. Del. July 10, 2001)..........................18

Sheridan v. E.I. DuPont de Nemours & Co.,

100 F.3d 1061 (3d Cir. 1996)...................................................................................32

Sitkiewicz v. Initial Servs. U.S.A.,
    96 Civ. 8543 (DAB), 1999 U.S. Dist. LEXIS 14465 (S.D.N.Y. Sept. 17, 1999)..............29

Stephenson v. Capano Dev., Inc.,
    462 A.2d 1069 (Del. 1983) ..............................................................................38

Stewart v. Rutgers, the State University,
    120 F.3d 426 (3d Cir. 1997)............................................................................22

Taylor v. Potter,
    NO. 04-4066, 2005 U.S. App. LEXIS 17859 (3d Cir. August 18, 2005).........................27

Weston v. Pennsylvania,
    251 F.3d 420 (3d Cir. 2001)............................................................................31

## STATUTES

42 U.S.C. § 1986...........................................................................................35

42 U.S.C. § 2000e-3(a) ....................................................................................28

Wachovia Corporation, Wachovia Securities, LLC, Wachovia Services, Inc. (which merged into Wachovia Shared Resources, LLC, effective January 1, 2006), and Wachovia Bank of Delaware, N.A. (the "Corporate Defendants"), as well as Defendants Todd D. Gauthier ("Gauthier"), Lynn G. Meyer ("Meyer"), Carolyn J. Beam ("Beam"), and Dorothy A. DiFebo ("DiFebo") (the "Individual Defendants") (collectively, "Defendants"), by and through their undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Local Rules of this Court, hereby submit this Brief in Support of their Motion for Summary Judgment on Plaintiff Kenneth Mitchell's claims of racial and sexual discrimination, harassment, retaliation and other wrongful conduct under Title VII, 42 U.S.C. §§ 2000e, 1981, 1985 and 1986, as well as his state law claims under 19 Del. C. § 710 and common law tort claims.

## INTRODUCTION

This case presents the familiar tale of an employee who, unable to accept responsibility for his own performance deficiencies, seeks to obscure them by pleading discrimination where none in fact exists. While Plaintiff Kenneth Mitchell is reckless with the jargon of employment discrimination – tossing about terms such as "harass," "hostile," "discriminate" and "retaliate" – such loaded terms cannot obscure the lack of evidentiary and legal support for his claims of gender or racial discrimination, retaliation, conspiracy, fraud or deceit in this case. To the contrary, the undisputed evidence shows that Defendants not only treated Mitchell fairly throughout his employment (and continue to do so), but that Defendant Todd Gauthier, Mitchell's supervisor during the relevant period, personally recruited him at great expense to Wachovia Securities and repeatedly went the extra mile to help Mitchell succeed. Meanwhile, it is clear that Mitchell allowed a simple personality conflict with a co-worker to fester to the point that Mitchell himself refused to do his job. Therefore, when Wachovia Securities implemented a policy that all Financial Advisors be assigned to one branch, Mitchell, like many other FAs

outside of his protected class, continued to be assigned to a branch that was the best fit for him and from which the overwhelming majority of his compensation originated.

At no point during his employment was Mitchell exposed to any abusive language or adverse employment action that would support his extremely serious allegations in this case. Despite Mitchell's assertions, the undisputed record confirms that Defendants neither treated Mitchell differently from other Financial Advisors because of his gender or race, nor retaliated against him in any way. Indeed, most of the named Defendants had no power to take *any* employment action against him: Mitchell admits that he did not work for three of the four corporate Defendants (Wachovia Corporation, Wachovia Services and Wachovia Bank of Delaware), and that three of the four individual Defendants (Carolyn Beam, Dorothy DiFebo and Lynn Meyer) were not employed by Wachovia Securities and did not supervise him at any time.

Mitchell has cast far too wide a net, and nonetheless come up empty. The personality conflicts and trivial disputes of which Mitchell complains cannot save his claims in this case, and accordingly the Court should grant summary judgment in full to Defendants.

## NATURE AND STAGE OF THE PROCEEDINGS

Mitchell alleges that Wachovia Securities' December 2004 decision to assign him to only one of the two branches he had previously serviced as a Financial Advisor gives rise to claims of racial and sexual discrimination, harassment, retaliation and other wrongful conduct under Title VII, 42 U.S.C. §§ 2000e, 1981, 1985 and 1986 and 19 Del. C. § 710 as well as claims of fraud, *prima facie* tort and civil conspiracy under Delaware law. On December 1, 2006, Mitchell filed a Complaint alleging each of the foregoing claims. On February 23, 2007, Defendants answered the Complaint and asserted affirmative defenses thereto. Factual discovery is complete. This is Defendants' brief in support of their motion for summary judgment.

## SUMMARY OF ARGUMENT

1. Mitchell's claims against Wachovia Corporation, Wachovia Services, Inc. and Wachovia Bank of Delaware, N.A. should be dismissed because Mitchell admits that he was never employed by any of those entities and the record does not support any theory of joint liability.

2. Mitchell's allegations do not support claims of racial or gender discrimination, as the conduct complained of had nothing to do with his race or gender. Similarly situated employees outside of Mitchell's protected class were also assigned to service only one branch, and the personality conflicts and trivial business disputes of which he complains cannot support a claim of employment discrimination.

3. Mitchell cannot pursue a claim of hostile work environment, because the "harassment" of which he complains was not sufficiently severe and pervasive to support such a claim as a matter of law.

4. Mitchell cannot state a claim of retaliation because he engaged in no protected activity that can be causally linked to any subsequent adverse action. First, Mitchell's complaint about being falsely accused of making an ethnically insensitive comment to Ladan Amini does not constitute a protected activity under any applicable civil rights laws. Second, Wachovia's decision to keep Mitchell in the Capitol Trail branch occurred *before* his first complaint of discrimination, and Mitchell admits that he suffered no adverse employment action following this complaint. Therefore, Wachovia could not have retaliated against Mitchell as a matter of either law or logic.

5. Mitchell's federal and state law conspiracy claims must be dismissed as a matter of law, because they fail to state any viable cause of action.

6. Mitchell's claims of fraud, deceit, and *prima facie* tort should be dismissed because Mitchell cannot meet the legal prerequisites of these claims under Delaware law.

7. The Individual Defendants cannot be found liable both as a matter or law, and because Mitchell is unable to show that they - individually or collectively – engaged in unlawful conduct that would support any individual liability.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Except where otherwise indicated, the deposition testimony, exhibits and documents referenced herein are contained in the accompanying Appendix, dated January 7, 2008.

**A.     Mitchell's Recruitment by Wachovia Securities.**

Mitchell, an African-American male, resides in the State of Delaware and is currently employed by Wachovia Securities, L.L.C. (Complaint ¶ 1). Since 1997, Mitchell has held Series 7, 63 and 65 securities investment licenses, as well as a life and health insurance license. (Deposition of Kenneth Mitchell ("Mitchell Tr.") at 24:21-25:22).

In mid-2000, Suzanne Dwyer, a sales manager for First Union Corporation's securities brokerage business ("First Union"), contacted Mitchell and invited him to apply for a position as a securities investment advisor with First Union. (Mitchell Tr. 35:8-36:16). At the time, Mitchell was employed as a financial investment advisor with Merrill Lynch. (Mitchell Tr. 33:14-34:14). In July 2000, Mitchell submitted a formal written employment application to First Union. (Mitchell Tr. 37:10-38:2; Mitchell Dep. Ex. 1). In August 2000, First Union offered Mitchell a position as Vice President and Personal Investment Counselor, but Mitchell chose not to pursue that opportunity and stayed with Merrill Lynch instead. (Mitchell Tr. 38:13-19).

In 2001, First Union's brokerage operations were merged into what was Wachovia Securities, Inc. (Deposition of Ladan Amini ("Amini Tr.") at 11:23-12:5; Deposition of Frank Consalo ("Consalo Tr.") at 5:10-14, 6:13-17). In 2003, Wachovia Securities, Inc. became Wachovia Securities, L.L.C., a joint venture by Wachovia Corporation and Prudential Financial, Inc. (Consalo Tr. at 5:19-6:6).

Even though Mitchell had turned down First Union's offer, Wachovia Securities continued its efforts to recruit Mitchell. (Mitchell Tr. 38:24-40:12). Specifically, Todd Gauthier, who had worked for First Union and subsequently worked for Wachovia Securities as

a Regional Sales Manager, continued to recruit Mitchell through both phone and in-person contact. (Mitchell Tr. 42:8-43:24, 44:16-18, 49:16-50:4; Deposition of Todd Gauthier ("Gauthier Tr.") 52:15-24). During an in-person interview, Mitchell disclosed to Gauthier that his NASD Form U-4 reflected two unfavorable items: (i) a customer complaint of unauthorized trading; and (ii) a felony charge of assault. (Mitchell Tr. 50:10-52:14). Gauthier neither expressed any reservations concerning either item nor suggested that either would prevent Mitchell's application from being successful. (Mitchell Tr. 52:19-53:3; Gauthier Tr. 129:18-20).

Wachovia Securities offered Mitchell a position as Vice President and Financial Advisor ("FA"), reporting to Gauthier, by letter dated August 6, 2002. (Mitchell Dep. Ex. 3). Gauthier was the hiring manager for Mitchell's position, and Mitchell does not recall meeting with anyone other than Gauthier during the hiring process. (Mitchell Tr. 46:7-12, 62:4-6; Gauthier Tr. 52:25-53:2). Mitchell left Merrill Lynch and became employed with Wachovia Securities in August 2002. (Mitchell Tr. 47:9-17).

Mitchell has never been employed by Wachovia Corporation, Wachovia Services or Wachovia Bank of Delaware, N.A ("Wachovia Bank" or the "Bank"). (Mitchell Tr. 44:6-44:15). These three entities are entirely separate from Wachovia Securities, and maintain distinct management hierarchies and Human Resources Departments. (Consalo Tr. at 22:19-21).

As reflected in Mitchell's offer letter, his compensation package included an initial three-month draw, commission-based pay, a forgivable front-end loan of $40,000 and eligibility for a back-end bonus. (Mitchell Tr. 57:4-58:1, 159:24-160:1; Mitchell Dep. Ex. 3). Mitchell's offer letter did not guarantee him a position in any specific Wachovia Securities branch office. (Mitchell Dep. Ex. 3).

At the time that Mitchell left Merrill Lynch, he and another FA were enjoined from commencing work at Wachovia Securities based upon a legal dispute between Merrill Lynch and Wachovia Securities. (Mitchell Dep. Ex. 4). In April 2003, Wachovia Securities paid Merrill Lynch a settlement of more than $150,000 to resolve the dispute and allow Mitchell and the other FA to work for Wachovia Securities. (Mitchell Tr. 59:22-60:21; Mitchell Dep. Ex. 4; Gauthier Tr. 129:16-17).

**B.**     **Mitchell's Assignment to Capitol Trail and Prices Corner.**

Upon commencing work as an FA, Mitchell was assigned to work out of the Capitol Trail and Prices Corner branch offices, which were located less than a mile from each other on Kirkwood Highway in Wilmington, Delaware. (Mitchell Tr. 62:10-13; Gauthier Tr. 53:7-10, 140:24-141:2; Amini Tr. 59:4-14). These branch offices had previously been serviced by Ed Duffy, a white male. (Mitchell Tr. 62:14-16).

As an FA, Mitchell was the only employee of Wachovia Securities assigned to work at the Capitol Trail and Prices Corner branch offices, and was responsible for providing investment services to clients at both branches. (Mitchell Tr. 63:9-15, 66:4-6, 69:9-15). Mitchell was also specifically responsible for working with the employees of Wachovia Bank assigned to each branch concerning the investment products that Wachovia Securities offered, and partnering with these employees to identify Bank customers that might be interested in Wachovia Securities' investment services. (Mitchell Tr. 63:9-15, 73:9-22; Gauthier Tr. 54:10-18). In particular, Mitchell was expected to partner closely with the Financial Specialist or "FS" assigned to each branch. The FSs were employees of Wachovia Bank who were licensed to sell certain Bank products, but were not licensed to sell the full range of Wachovia Securities' investment products. (Mitchell Tr. 65:8-66:3, 69:5-8; Amini Tr. 13:20-14:2, 15:25-16:15; Deposition of Carolyn Beam ("Beam Tr.") 11:16-12:18; Deposition of Lynn Meyer ("Meyer Tr.") 10:2-11:25).

6

Those FSs who held any securities investment licenses were dually employed by Wachovia Securities solely with respect to those licenses, but did not report to any Wachovia Securities personnel. (Gauthier Tr. 54:3-14, 56:1-6; Amini Tr. 22:18-23:4).

Where a licensed FS referred a client to an FA and the referral generated new business for the FA, the FS would earn "team brokerage" or "TBRK" compensation for the referral. (Mitchell Tr. 67:2-20; Amini Tr. 31:1-11; Beam Tr. 19:1-12). An FS could not refer new business to anyone other than the FA assigned to the FS's own branch and could not earn any TBRK compensation without referring new business to the FA assigned to the branch. (Mitchell Tr. 66:4-67:1, 67:24-68:3; Gauthier Tr. 102:21-103:9, 103:17-25).

During the relevant time period, the FS assigned to Capitol Trail was Lynn Montgomery, and the FS assigned to Prices Corner was Ladan Amini. (Mitchell Tr. 65:2-7, 75:14-17). Montgomery and Amini reported to Carolyn Beam, who was a Financial Sales Leader for Wachovia Bank. (Gauthier Tr. 65:11-16; Amini Tr. 23:6-10; Beam Tr. 11:10-15). Beam in turn reported to Lynn Meyer, who was a Regional Bank Director for Wachovia Bank, and later to Sandy McAnally, also a Regional Bank Director for Wachovia Bank. (Gauthier Tr. 56:11-17, 57:3-8; Beam Tr. 14:9-14; Meyer Tr. 20:11-25). Both Capitol Trail and Prices Corner also had Financial Center Managers who were responsible for certain aspects of customer service: Gloria Sharp and Dorothy DiFebo, respectively. (Gauthier Tr. 69:8-71:4; 82:13-20; Deposition of Dorothy DiFebo ("DiFebo Tr." 7:25-8:14). All of these individuals were employed solely by Wachovia Bank except with regard to any securities licenses that they held, which were maintained through Wachovia Securities. (Amini Tr. 5:1-3; Meyer Tr. 25:25-26:9). None of these individuals had any supervisory authority over Mitchell. (Mitchell Tr. 192:6-8; Gauthier Tr. 57:8-18; Amini Tr. 28:6-13; DiFebo Tr. 26:18-27:2; Meyer Tr. 12:6-9, 60:7-8).

While working at Capitol Trail and Prices Corner, Mitchell reported only to Gauthier, whose office was located in Philadelphia, and Mitchell saw Gauthier "maybe once a month." (Mitchell Tr. 63:16-20, 69:20-22). At this time, Gauthier's title was Senior Vice President and Regional Sales Manager for the Investment Services Group within Wachovia Securities. (Gauthier Tr. 49:18-20). In turn, Gauthier reported to Frank Consalo, a Regional President for Wachovia Securities also located in Philadelphia. (Gauthier Tr. 56:20-57:2; Consalo Tr. 4:21-24). Mitchell did not report to anyone located at either Capitol Trail or Prices Corner, and was not responsible for managing any employee in either branch as those employees reported to Wachovia Bank. (Mitchell Tr. 69:16-22; Gauthier Tr. 54:15-55:4). Mitchell did have authority to review certain securities transactions that an FS put together, but no FS had authority to review any of his transactions. (Mitchell Tr. 75:6-13; Gauthier Tr. 64:15-65:17).

### C.    **Mitchell's Working Relationship with Amini.**

Mitchell had a regular office at the Capitol Trail branch, but there was no office space available for him at Prices Corner. (Gauthier Tr. 74:8-22, 84:12-16). Mitchell spent most of his time at the Capitol Trail branch, and only went to the Prices Corner branch when he had a joint appointment there with Amini and a customer, which he described as a "very sporadic" occurrence. (Mitchell Tr. 64:17-65:1, 76:17-77:5; Amini Tr. 61:15-19; DiFebo Tr. 36:6-12).

Mitchell states that during 2002 and "going into 2003," his working relationship with Amini was "very nice, very cordial" and that "everything was going great." (Mitchell Tr. 75:18-76:13). During 2003, however, Mitchell and Amini had a number of conflicts concerning various workplace issues.

One such conflict involved a Bank customer named Richard Herrmann. According to both Mitchell and Amini, Herrmann was "upset" that he had been charged a $6.00 administrative fee in connection with the purchase of a mutual fund. (Amini Tr. 65:10-67:4). Mitchell

instructed Amini to rebate the fee to Herrmann, and when Amini said that she could not do so, Mitchell attempted to resolve the situation by giving Herrmann $6.00 cash from his own pocket. (Mitchell Tr. 82:13-84:24; Amini 66:17-68:3). Both applicable NASD rules and Wachovia Securities' compliance rules forbid employees from giving cash to clients as Mitchell attempted to do with Herrmann. (Mitchell Tr. 85:12-86:17, 88:6-9, 89:21-90:9; Gauthier Tr. 58:7-25; Consalo Tr. 10:14-18). Amini was upset by this incident based upon her familiarity with the rules against giving cash to clients. (Amini Tr. 67:10-24). Gauthier discussed this matter and the applicable policies with Mitchell but took no formal disciplinary action against him, even though Consalo observed that giving cash to a client was a terminable offense. (Gauthier Tr. 62:18-63:13; Consalo Tr. 10:10-18).

Meyer learned of this incident separately, and telephoned Mitchell to tell him that he should not engage in similar behavior again because it did not exhibit proper customer service. (Meyer Tr. 37:2-38:14, 40:17-41:1). Meyer's phone call was not a formal disciplinary action. (Meyer Tr. 60:3-20). Shortly thereafter, Meyer was displaced due to a Bank reorganization, and thereafter had no responsibility with regard to any Bank operations in Mitchell's region. (Meyer Tr. 5:1-6:15).

Mitchell and Amini's working relationship was also affected by the fact that Mitchell would not promptly review certain trades that Amini set up. (Mitchell Tr. 88:14-22; Amini Tr. 73:20-74:17, 86:1-89:2). Mitchell admits that he did not always tell Amini why he had not allowed certain trades. (Mitchell Tr. 92:11-93:2). In cases where Mitchell did not promptly sign off on Amini's trades, such trades would be referred to Wachovia Securities' Compliance Department, which would notify Amini's supervisor, review the delayed trade and determine whether it complied with the applicable rules. (Mitchell Tr. 92:15-18; Amini Tr. 74:3-75:12,

88:14-89:2, 94:4-11). In at least one instance, Mitchell himself advised Amini that he was referring a trade she had set up to the Compliance Department. (Mitchell Tr. 94:18-24). Mitchell does not know whether the fact that he referred Amini's trades to the Compliance Department had any negative repercussions for Amini and never discussed this issue with her. (Mitchell Tr. 98:20-99:11). Amini reports that after Compliance was contacted with respect to a trade that Mitchell did not promptly sign off on, she was contacted by her manager, Beam, who wanted to know why Mitchell was not signing off. (Amini Tr. 75:7-76:7). Subsequently, Amini decided that she would no longer do trades, because she was upset about being contacted by Compliance and did not feel confident in her work. (Amini Tr. 82:7-21, 88:14-24, 123:13-21).

**D.      The "9/11 Incident".**

Mitchell and Amini also had a disagreement following a conversation concerning Amini's Wachovia Bank employee number. According to Mitchell, he asked Amini for her employee number so that he could credit her for a trade. (Mitchell Tr. 99:12-100:1; Amini Tr. 102:15-23). As it happens, Amini's employee number begins with the digits "911." (Mitchell Tr. 100:6-8; Amini Tr. 102:19-23). Although Mitchell and Amini disagree about what transpired next, it is undisputed that Amini, who is of Iranian descent, subsequently communicated to her manager, Carolyn Beam, that Mitchell had somehow commented on the fact that her employee number included the digits "911," and that Amini found Mitchell's comment offensive and upsetting. (Amini Tr. 103:1-104:4; Beam Tr. 56:6-59:3). In turn, Beam advised Gauthier, as Mitchell's manager, that Amini had said she and Mitchell had a conversation involving "a 9/11 comment" that Amini found offensive. (Beam Tr. 59:22-61:4; Gauthier Tr. 27:12-28:15).

Subsequently, according to Mitchell, Gauthier telephoned him at home at approximately 7:00 a.m. on July 16, 2003 and asked him whether he had said to Amini "that it was her people, Iranian, that destroyed the World Trade Center buildings in New York." (Mitchell Tr. 102:1-11;

Gauthier 30:6-23). Mitchell responded by telling Gauthier that he "remember[ed] a meeting about [Amini's] production number," but also that he never made the comment that Gauthier was asking about, and did not tell Gauthier anything else about the meeting. (Mitchell Tr. 102:14-103:1; Gauthier Tr. 31:22-32:9). Mitchell further told Gauthier that he would not go back to work at the Prices Corner branch because "it appear[ed] somebody was trying to make trouble" for him and "accusing [him] of saying something that [he] didn't say." (Mitchell Tr. 103:20-104:5). According to Mitchell, Gauthier said that he would call back after he had spoken with Amini. (Mitchell Tr. 105:8-11).

Following Gauthier's conversation with Mitchell, Gauthier and Beam spoke to Amini in person at Prices Corner. (Gauthier Tr. 32:11-15, 33:11-25). In that conversation, Amini did not confirm or complain that Mitchell had said that Iranians destroyed the World Trade Center. (Gauthier Tr. 32:21-25).

According to Mitchell, at 12:15 p.m. the very same day, Gauthier called Mitchell back, advised him that Amini had denied that Mitchell had made any comment about her people destroying the World Trade Center, and stated that Mitchell had been "exonerated" and should continue working in the branch. (Mitchell Tr. 105:14-106:16; 118:2-4; Gauthier Tr. 34:11-14, 38:23-39:15). Mitchell replied that he still would not go back to the Prices Corner branch, and by his own account did not go to work at that branch at any time from July 16, 2003 to "sometime in November or December of 2003." (Mitchell Tr. 108:23-109:1). Importantly, Mitchell never personally spoke to Amini, Beam or DiFebo about the conflict over what had been said concerning Amini's employee number. (Mitchell Tr. 107:19-108:6).

Following Gauthier's statement to Mitchell that he had been "exonerated," no one ever again accused Mitchell of stating that Amini's people were responsible for the destruction of the

World Trade Center.  (Mitchell Tr. 111:17-23).  Nonetheless, Mitchell subsequently complained to Wachovia Securities' Human Resources Department ("HR") that he had been accused of making a comment to Amini regarding the destruction of the World Trade Center.  (Mitchell Tr. 108:19-109:1).  Mitchell does not allege that anyone discriminated against him by accusing him of making a comment concerning the World Trade Center, and never advised HR that he thought this accusation was itself discriminatory.  (Mitchell Tr. 166:7-17).

After investigating the matter, HR concluded that Gauthier should not have asked Mitchell whether such comment had been made based upon the information that Gauthier had at the time, and so advised Mitchell on or about July 24, 2003.  (Mitchell Tr. 119:8-19).  On or about July 31, 2003, Gauthier apologized to Mitchell in person for having asked him about the comment to Amini prior to personally verifying the facts.  (Complaint ¶ 38; Gauthier Tr. 46:20-47:19).  In November 2003, both Gauthier and Beam apologized to Mitchell in person for the fact that Mitchell had been accused in July 2003 of making the comment to Amini, and Mitchell states that he accepted their apologies.  (Mitchell Tr. 192:22-193:21; Beam Tr. 65:11-16).  Ultimately, Mitchell does not know who accused him of making the comment to Amini concerning the World Trade Center, and in fact does not know whether anyone did so accuse him.  (Mitchell Tr. 116:20-117:7; 117:21-119:2, 119:20-120:19).

**E.**     **Mitchell's Performance in 2004.**

In late 2003, Consalo and Gauthier extended the date for Mitchell to meet his performance goals by several months.  This extension allowed Mitchell to recover a back-end bonus of $62,000 for which he would not otherwise have been eligible.  (Consalo Tr. 23:14-25:1; Gauthier Tr. 129:20-25).

In February 2004, Gauthier and Beam held a meeting with Mitchell and various Bank employees from both the Capitol Trail and Prices Corner branches to discuss performance

expectations and develop an "investment prospecting and referral strategy" for improving
securities investment performance at each branch. (Mitchell Tr. 133:15-135:14; Mitchell Dep.
Ex. 6). Mitchell did not request any specific assistance with improving his performance during
this meeting, other than to ask that a regular office space be assigned to him at Prices Corner.
(Mitchell Tr. 136:1-21; Gauthier Tr. 118:1-12). Had any space been available at Prices Corner,
the Bank would have charged rent to Wachovia Securities in order for Mitchell to use the office.
(Gauthier Tr. 121:2-18).

   In March 2004, Gauthier suggested to Mitchell that he hire a broker-funded sales
assistant to help him work with prospects and clients at both branches, but Mitchell refused to
consider it. (Mitchell Tr. 181:5-20, 182:18-21, Gauthier Tr. 156:6-157:7). Other than requesting
an office, Mitchell did not take any specific steps to pursue the investment prospecting and
referral strategy at Prices Corner in the months following the February 2004 meeting. (Mitchell
Tr. 138:11-20).

   In July 2004, Gauthier and Beam met with Mitchell in person to discuss the fact that 80%
of his production as an FA was coming from the Capitol Trail branch, where he was exceeding
his sales goals, and only 20% of his production was coming from the Prices Corner branch.
(Mitchell Tr. 131:24-133:3). Gauthier was concerned about the discrepancy in Mitchell's
performance figures at the two branches and the fact that Mitchell was not as engaged in
activities at Prices Corner as at Capitol Trail. (Gauthier Tr. 96:14-97:22, 99:3-23, 102:11-20,
115:25-116:7). Mitchell admits that at this meeting, both Gauthier and Beam congratulated him
on his performance at Capitol Trail and asked what they could do to assist him in improving his
performance at Prices Corner. (Mitchell Tr. 132:18-133:3). Mitchell again replied that he
wanted a regular office space at Prices Corner, and asked Gauthier and Beam to facilitate this,

but took no other steps to pursue the investment prospecting and referral strategy. (Mitchell Tr. 138:6-10, 139:4-14, 140:11-141:14).

According to Mitchell, he did not have any appointments with clients at Prices Corner at any time between November 2003 and December 2004. (Mitchell Tr. 130:24-131:12). Indeed, Mitchell estimates that he was only at the Prices Corner branch "two to three times" between November 2003 and December 2004. (Mitchell Tr. 142:5-14). Mitchell never approached Amini to discuss the fact that he had no client appointments scheduled at Prices Corner between November 2003 and December 2004. (Mitchell Tr. 130:11-14, 131:13-23). Mitchell admits there is no evidence that Amini referred new business to any FA other than himself during the time that he was assigned to Prices Corner. (Mitchell Tr. 126:21-127:20, 128:13-129:10).

Mitchell admits that on November 18, 2004, Gauthier explained to him that based on Wachovia Securities' business goal of assigning only one branch to each FA, Mitchell had to choose which branch he wanted to retain. (Mitchell Tr. 149:20-150:10; Gauthier Tr. 105:15-106:7, 109:5-10; Consalo Tr. 48:11-19; 49:21-50:11, 61:21-62:14). Mitchell further admits that during this conversation, Gauthier again advised him that 80% of his production was attributable to clients at the Capitol Trail branch, and only 20% to the Prices Corner branch. (Mitchell Tr. 150:18-22; Gauthier Tr. 111:23-112:15). On or about December 9, 2004, Gauthier advised Mitchell that while Mitchell would retain responsibility for his existing accounts at Prices Corner, he would only be assigned to Capitol Trail for new business going forward. (Mitchell Tr. 145:17-146:13; Consalo Tr. 47:3-15). Gauthier assigned the Prices Corner branch to James Meehan, a new FA. (Gauthier Tr. 25:18-26:18). Gauthier was the ultimate decisionmaker with regard to this change of assignment, which he made because the Prices Corner branch was underperforming. (Gauthier Tr. 122:19-123:5, 133:12-20).

F.    **Mitchell's January and February 2005 Complaints of Discrimination.**

In January 2005, Mitchell made an internal complaint of discrimination to HR, alleging that Gauthier had removed him from Prices Corner because he is African-American. Mitchell admits that he had never complained of discrimination prior to January 2005. (Mitchell Tr. 166:18-21). Despite complaining of "discrimination," Mitchell admits that Gauthier never said anything to him concerning his or anyone else's race at any time, and never committed any gender discrimination. (Mitchell Tr. 122:13-16, 160:5-20, 161:21-23, 189:6-8). Further, Mitchell admits that prior to Gauthier hiring him, the FA at both Capitol Trail and Prices Corner was Ed Duffy, a white male. (Mitchell Tr. 160:21-161:4). Additionally, Mitchell admits that Gauthier took branches away from other FAs in or around 2004, including Nancy Sorg and Beatrice Dufort, both white females, and Ed Duffy and Lou Pannucci, both white males. (Mitchell Tr. 153:19-155:5, 183:10-184:3). At various times during Mitchell's employment, there have been numerous FAs in his region who are not assigned to any branch at all. (Gauthier Tr. 105:24-106: 20, 111:10-17; Consalo Tr. 49:3-20).

Likewise Mitchell admits that neither Amini, Beam, Consalo, DiFebo, Meyer nor any other employee of any Wachovia entity ever said anything to him about his or anyone else's race or gender. (Mitchell Tr. 161:24-162:23, 170:7-20, 193:24-194:5, 206:13-16). Mitchell concedes that no one at Prices Corner said anything negative or derogatory to him on the few occasions when he was at that branch between November 2003 and December 2004. (Mitchell Tr. 145:10-16). Nor can Mitchell recall any conduct by any person at Prices Corner that he would describe as "harassment," other than the accusation that he had made a comment to Amini concerning the destruction of the World Trade Center in July 2003. (Mitchell Tr. 166:22-168:9).

Ultimately, Mitchell admits that his only reason for alleging race discrimination in connection with the decision to remove him from new account responsibility at Prices Corner is

that "I can't think of any other reason." (Mitchell Tr. 159:5-14, 162:24-163:4). Similarly, Mitchell states that his reason for alleging gender discrimination is that "I just felt that [DiFebo] didn't want to have a male in the office" and that DiFebo and Amini allegedly "resented the fact that I was a male figure in a supervisory position," but admits that neither DiFebo nor Amini ever said anything to indicate that either of them actually felt this way. (Mitchell Tr. 189:14-23, 190:14-192:1).

On January 27, 2005, an HR representative advised Mitchell that HR had investigated his complaint and had not found any evidence of unfair treatment or discrimination. (Mitchell Tr. 173:3-18). HR subsequently confirmed this conclusion by letter dated February 12, 2005. (Mitchell Dep. Ex. 8).

On or about February 1, 2005, while Mitchell was on leave from Wachovia in order to fulfill his military reserve obligations, he filed a Charge of Discrimination with the Delaware Department of Labor (the "Charge"), alleging that Gauthier had removed him from Prices Corner because he is both African American and male. (Mitchell Tr. 157:5-158:2; Mitchell Dep. Ex. 7).

**G.    Mitchell's Present Complaint of Retaliation.**

Mitchell's Charge did not allege retaliation of any kind. (Mitchell Dep. Ex. 7). Although Mitchell makes retaliation claims herein, he admits that Gauthier never said anything to him at any time concerning either his January 2005 internal complaint to HR or his February 2005 Charge. (Mitchell Tr. 171:16-21, 172:22-173:2). Mitchell also admits that Gauthier did not do anything retaliatory following either his January 2005 internal complaint or the February 2005 filing of his Charge. (Mitchell Tr. 188:19-189:5). Likewise, Mitchell does not allege that Beam or DiFebo did anything that was retaliatory following either his January 2005 internal complaint or the February 2005 filing of his Charge. (Mitchell Tr. 194:6-195:7). The only purported "retaliation" of which Mitchell complains is that he was accused by an unknown person of

16

making a comment to Amini concerning the destruction of the World Trade Center in July 2003, six months before his first complaint of discrimination to HR. (Mitchell Tr. 194:6-16).

In March 2005, Gauthier approached Mitchell and inquired whether he would be willing to cover Wachovia Securities' Rodney Square or Meadowood branches, which were unassigned following the departure of another FA, while Gauthier attempted to recruit new FAs for those branches. (Mitchell Dep. Exs. 9 & 10; Gauthier Tr. 110:4-14, 133:1-5). Gauthier noted that Mitchell would be allowed to retain any new business that he generated at either branch, as Wachovia Securities does not take existing relationships from an advisor. (Mitchell Dep. Exs. 9 & 10; Consalo Tr. 47:3-15). Mitchell refused to take either assignment, and has refused to take on a second branch at any time since then. (Mitchell Tr. 179:1-7, 204:1-206:12; Gauthier Tr. 132:5-25).

In approximately April 2005, Gauthier voluntarily stepped down to the position of Financial Advisor and transferred to a branch office in Biloxi, Mississippi, and since then has had no supervisory authority with regard to Mitchell. (Mitchell Tr. 185:5-23; Gauthier Tr. 134:9-135:23; Consalo Tr. 65:21-67:18). Mitchell admits that Jeffrey Springer, who currently supervises him, has never said anything to him concerning his ongoing claims against Wachovia Securities. (Mitchell Tr. 213:8-214:19).

Mitchell admits that no one at Wachovia Securities has ever subjected him to any corrective action, discipline or counseling at any time. (Mitchell Tr. 196:22-197:4). In October 2005, Wachovia closed the Capitol Trail branch and transferred Mitchell to the Meadowood branch, where he has worked since that time. Mitchell does not allege that this transfer was discriminatory or retaliatory.

## ARGUMENT

## I.    THE SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment when the evidence demonstrates that there is no genuine issue as to any material fact. Summary judgment is designed to "isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986). In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the Supreme Court stated "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." 447 U.S. at 247-48. As such, summary judgment is appropriate where there is no "genuine issue" of the type that would require a trial. Anderson, 477 U.S. at 248; Lawrence v. Nat'l Westminister Bank, 98 F.3d 61, 65 (3d Cir. 1996).

While the nonmoving party is entitled to all inferences in his favor, those inferences must be justifiable inferences from the evidence. Anderson, 477 U.S. at 255. "[T]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. Further, the non-movant may not prevail by relying on mere speculation or allegations in the pleadings but instead must identify specific material facts in the record creating a genuine issue for trial. Celotex, 477 U.S. at 324. This requires the opposing party to "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Seldomridge v. Uni-Marts, Inc., No. 99-496 GMS, 2001

U.S. Dist. LEXIS 9491, *13 (D. Del. July 10, 2001) (quoting <u>Knabe v. Bourty</u>, 114 F.3d 407, 410 n.4 (3rd Cir. 1997)).[1]

At his deposition in this case, Mitchell made clear that his claims rest on little more than self-serving assumptions and conclusory speculation. Because Mitchell cannot adduce any evidence to create a *genuine* issue as to any material fact, this Court should grant summary judgment to Defendants and dismiss the Complaint in its entirety.

---

[1] The cases cited in this Memorandum that are reported on LEXIS are provided in the accompanying Compendium of Unreported Cases Cited in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment.

**II.    MITCHELL'S CLAIMS AGAINST WACHOVIA CORPORATION, WACHOVIA SERVICES, INC. AND WACHOVIA BANK OF DELAWARE SHOULD BE DISMISSED, BECAUSE ONLY WACHOVIA SECURITIES HAS EMPLOYED HIM.**

In this action, Mitchell not only asserts claims against his employer, Wachovia Securities, but also names Wachovia Corporation, Wachovia Services, Inc. and Wachovia Bank of Delaware, N.A., as defendants. However, Mitchell admits he has never worked for any of these entities, and does not genuinely allege that any of them played any role in any employment decisions relating to him or otherwise jointly employed him. As such, Mitchell's claims against these entities should be dismissed.

**A.    Wachovia Securities and the other Corporate Defendants
Do Not Constitute an Integrated Enterprise.**

The Third Circuit, citing fundamental principles of corporate law, has made it clear that in the context of an employment discrimination case, the separation of corporate entities could only be ignored when those entities are "so interrelated and integrated in their activities, labor relations and management that it is clear that … they may be treated as a single employer." Marzano v. Computer Sci. Corp., Inc., 91 F.3d 497, 513 (3d Cir. 1996). This "integrated enterprise" test requires the Court to consider four factors, namely: (1) inter-relation of operations, (2) common management, (3) centralized control of labor or employee relations and (4) common ownership or financial control. Gonzalez v. Comcast Corp., No. 03-445-KAJ, 2004 U.S. Dist. LEXIS 14989 (D. Del. July 30, 2004). Although no single factor in this analysis is dispositive, the majority of courts analyzing this standard focus on the third factor: centralized control of labor or employment relations. Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 84 (3d Cir. 2003); Rajoppe v. GMAC Corp. Holding Corp., No. 05-2097, 2007 U.S. Dist. LEXIS 18956, *18-19 (E.D. Pa. March 19, 2007) (explaining that the centralized control of labor relations factor is the most important of the four factors). In Pearson v. Component Tech. Corp.,

247 F.3d 471 (3d Cir. 2001) cert. denied, 534 U.S. 950 (2001), the court analyzed this four factor

test in determining whether a parent corporation would be held liable for the acts of a subsidiary.

Id. at 487.  As part of its analysis, the court reviewed other courts' application of this test and

concluded that the test is a sliding scale.  "[If] the parent has sufficiently overwhelmed its

subsidiary in taking the challenged action, such a showing is sufficient to create liability; if the

parent was involved to a lesser degree, there must be some demonstration of the presence of the

other aspects of the integrated enterprise test."  Id.

   Although Wachovia Securities is a joint venture of Wachovia Corporation and another

entity, the undisputed evidence shows that the four named Wachovia entities do not share

centralized control of employment relations.   To the contrary, Mitchell admitted that he is an

employee only of Wachovia Securities, and that he was never employed by the retail bank or by

Wachovia Services.  (See pp. 4-5, supra.)  Mitchell further admits that he was recruited, hired,

and assigned to the Capitol Trail branch solely by Gauthier, who worked only for Wachovia

Securities, and can identify no evidence that Wachovia Corporation, Wachovia Services, Inc. or

Wachovia Bank of Delaware, N.A. were involved in the recruiting, hiring or branch assignment

of any Wachovia Securities employee.  (Id.)  The record contains no evidence that Wachovia

Corporation, Wachovia Services, Inc. and Wachovia Bank of Delaware, N.A. either control

Wachovia Securities' employment relations generally or were involved in any aspect of

Mitchell's employment that is at issue.  To the contrary, each of these companies maintains its

own organizational structure, management hierarchy and human resources department.  (See pp.

6-8, supra).

   Based on this record, no rational juror could conclude that Wachovia Corporation,

Wachovia Services, Inc. and Wachovia Bank of Delaware, N.A "control the day to day

employment decisions of" Wachovia Securities.  Fantazzi v. Temple Univ. Hosp., Inc., NO. 00-CV-4175, 2002 U.S. Dist. LEXIS 16269, *13 (E.D. Pa. Aug. 22, 2002) (holding the labor relations were insufficiently centralized where the "controlling" entity lacked the ability to discipline or terminate employees of the "controlled" entity).  Mitchell thus cannot obtain a finding of employer liability against Wachovia Corporation, Wachovia Services, Inc. and Wachovia Bank of Delaware, N.A., and summary judgment should be granted dismissing his claims against each of those entities with prejudice.

## III.  MITCHELL CANNOT ESTABLISH A *PRIMA FACIE* CASE OF RACE OR GENDER DISCRIMINATION OR RETALIATION

Mitchell's claims of discrimination and retaliation, whether pursuant to Title VII, 42 U.S.C. § 1981 or Section 710 of the Delaware Code, are reviewed in accordance with the evidentiary framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny.  Pryor v. NCAA, 288 F.3d 548, 569 (3d Cir. 2002) (holding that the standard for establishing an "intent to discriminate on the basis of race" is identical in the Title VI and § 1981 contexts); Stewart v. Rutgers, the State University, 120 F.3d 426, 432 (3d Cir. 1997) (recognizing that racial discrimination claims under § 1981 must be evaluated according to the burden-shifting analysis set forth by the Supreme Court in McDonnell Douglas"); Petrocelli v. DaimlerChrysler Corp., No. 04-943-KAJ , 2006 U.S. Dist. LEXIS 11972 (D. Del. 2006) (discussing Delaware Code) (citing Giles v. Family Court, 411 A.2d 599, 601-02 (Del. 1980)). Mitchell cannot meet his burden of showing that he was subject to discriminatory conduct at any time, and his claims therefore must be dismissed.

## A.  Mitchell Cannot Establish A *Prima Facie* Case Of Hostile Work Environment Discrimination.

To establish a claim of a hostile work environment, Mitchell must show: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and

regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." <u>Cole v. Del. Tech. & Cmty. College</u>, 459 F. Supp. 2d 296, 307 (D. Del. 2006). Mitchell cannot meet this burden, because the undisputed material evidence demonstrates that the conduct of which he complains (i) did not occur because of his race or gender; (ii) was not pervasive or regular; and (iii) did not detrimentally affect Mitchell.

**1.    The "hostile" conduct of which Mitchell complains was not based on his race or gender.**

To claim actionable harassment, Mitchell must show that he would not have been treated the same way if he were not a man or African American. <u>See Arasteh v. MBNA America Bank, N.A.</u>, No. 99-254-GMS, 2000 WL 672866, *12 (D. Del. June 12, 2001) (citation omitted). Importantly, so called "harassing conduct" that is in fact "motivated by a bad working relationship, by a belief that the plaintiff has in some way acted improperly, or even by personal animosity is not actionable under Title VII." <u>Seldomridge</u>, 2001 U.S. Dist. LEXIS 9491 at *8 (internal citations omitted). Like many complainants, Mitchell fails to understand that "Title VII does not protect employees from personality conflicts unrelated to invidious discrimination." <u>Lacy v. AMTRAK</u>, 507 F. Supp 2d 438, 447 (D. Del. 2007) (internal citations omitted); <u>Seldomridge</u>, 2001 U.S. Dist. LEXIS 9491, *31 (citing <u>Koschoff v. Henderson</u>, 109 F. Supp. 2d 332, 345-46 (E.D. Pa. 2000)) ("Allegedly harassing conduct that is motivated by a bad working relationship, by a belief that the plaintiff has in some way acted improperly, or even by personal animosity is not actionable under Title VII"). <u>See also LaMarco v. New York State Nurses Assoc.</u>, 118 F. Supp. 2d 310, 317-18 (N.D.N.Y. 2000) (granting summary judgment and noting that long list of incidents were not reasonably gender-related; while relationship between male supervisor and female employee "could be characterized as hostile or less than cordial, it was not

sexually harassing . . . simply stated, the interpersonal problems between [the supervisor] and

Plaintiff, even though between a male and a female, do not rise to the level of a hostile work

environment"); Christoforou v. Ryder Truck Rental, 668 F. Supp. 294, 303 (S.D.N.Y. 1987)

("there is a crucial difference between a personality conflict and sexual harassment ... the former,

which is unpleasant but legal [and] the latter, which is despicable and illegal. The law does not

require an employer to like his employees, or to conduct himself in a mature or professional

manner, or unfortunately, even to behave reasonably and justly when he is peeved.").

        Here, Mitchell cannot meet his burden because there is no evidence that the interpersonal

conflicts he experienced at Prices Corner or the false accusation that he engaged in improper

conduct were linked in any way to his race or gender.  Mitchell himself admits that none of the

individual defendants or employees in the Prices Corner office said anything to Mitchell about

his race or gender, much less anything that was derogatory.  (See pp. 14-15, supra).  At best,

Mitchell alleges he was told the employees at Prices Corner "did not like" or "did not want to

work with him," but can offer no admissible evidence either that these employees actually did

not like him or that the reason they did not like him was based on any discrimination.

(Complaint ¶ 51).  Crucially, Mitchell's own self-serving statement that he subjectively assumes

his race or gender guided these alleged sentiments is not sufficient to sustain a *prima facie* claim

of discriminatory harassment.  See Cole, 459 F. Supp. 2d at 307 (dismissing hostile work

environment claim where plaintiff stated "he *felt* that he was 'talked down to and belittled

because he [is] African-American, that nothing he said made any difference,' and that he was

'degraded each day he [went] to work'") (emphasis added); Calloway v. E.I. DuPont de

Nemours & Co., No. 98-669-SLR, 2000 U.S. Dist. LEXIS 12642, *17 n. 8 (D. Del. Aug. 8,

2000) (holding that plaintiff's interpretation that supervisor's comments were sexual, without evidence of objective and explicit sexual language, was insufficient to state claim).

> **2.     The hostile conduct of which Mitchell complains was not severe or pervasive.**

In order to determine whether a work environment is hostile or abusive, courts must look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1993). The United States Supreme Court "[has] emphasized . . . that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" including "careful consideration of the social context in which particular behavior occurs and is experienced by its target." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1003 (1998) (quoting Harris, 510 U.S. at 23); Benette v. Cinemark U.S.A., Inc., 01-CV-6519L, 2003 U.S. Dist. LEXIS 22636, at *13-*14 (S.D.N.Y. November 21, 2003) ("A 'hostile' environment is not synonymous with an unpleasant, harsh, combative or difficult work environment."); Harris, 510 U.S. at 21 (to establish a claim of hostile work environment sexual harassment, plaintiff must establish a work environment that was "permeated with 'discriminatory intimidation, ridicule, and insult'" that was sufficiently "severe or pervasive" to alter the conditions of the employee's employment). In short, the harassment must be "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment" (internal citations omitted). Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). Further, the work environment must be one that a reasonable person would find abusive or hostile, and one that the plaintiff did, in fact, perceive to be abusive or hostile.

Harris, 510 U.S. at 21-22.  That means that things like "simple teasing, offhand comments, and isolated incidents will not amount to discriminatory changes in the terms and conditions of employment."  Faragher, 524 U.S. at 788 (internal citations omitted).

When asked what made the Prices Corner environment "chilly," Mitchell merely complained that two individuals in that office, Dorothy DiFebo and a teller manager did not reciprocate his greeting on two occasions.  (Mitchell Tr. 142:15-143:16).  This is hardly the kind of conduct that Title VII was intended to protect employees against; indeed, it is precisely the sort of trivial allegation that courts should not entertain.  Apart from this, Mitchell complains that the false accusations regarding his comment to Amini were "harassing" (see p. 15, supra), though he acknowledges, as he must, that he was "exonerated" within a few short hours and that both his own manager, Gauthier and Beam, a Wachovia Bank manager, personally apologized to him for the accusation more than once.  (See pp. 10-12, supra).

Again, Mitchell's subjective reaction to a temporary misunderstanding is not enough to establish a hostile work environment; there must also be objective evidence.  Cole, 459 F. Supp. 2d at 307 (dismissing hostile work environment claim where plaintiff stated "he *felt* that he was 'talked down to and belittled because he [is] African-American, that nothing he said made any difference,' and that he was 'degraded each day he [went] to work'").  Here, there are no allegations of racially or sexually derogatory comments or teasing.  The lack of even one objectively severe and pervasive discriminatory comment is fatal to Mitchell's claims; courts routinely dismiss far more serious allegations than Mitchell raises on summary judgment. Mitchell's isolated allegations are grossly insufficient to establish a hostile work environment claim.  Faragher, 524 U.S. at 788 ("Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not create a hostile work environment).

**B.  Mitchell Cannot Show That The Decision To**
**Keep Him At Capitol Trail Was Discriminatory.**

In order to challenge Wachovia Securities' decision to keep him at Capitol Trail as

discriminatory, Mitchell must first establish a prima facie case of discrimination. "To do so he

must offer sufficient evidence that … nonmembers of the protected class were treated more

favorably." Miller v. State of Delaware Probation and Parole, 41 Fed. Appx. 581, 583 (3d Cir.

2002) (quoting Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 318-19 (3d Cir.

2000)).  Mitchell cannot meet this burden because the record shows that individuals outside the

protected class were treated similarly with regard to branch assignments, such that there was no

disparate treatment.

It is undisputed that Wachovia Securities had a business goal of placing one FA at each

branch and that Mitchell's supervisor, Gauthier, advised Mitchell of this policy and asked him to

choose the branch at which he wanted to remain.  (See p. 14, supra).  The record amply shows

that both white FAs and female FAs, were also assigned to only one branch based upon the

corporate mandate; in fact, Mitchell himself admitted knowing of at least three other FAs outside

his protected class who had lost branch assignments.  (See p. 14, supra).  This admission defeats

any claim of disparate treatment.  Taylor v. Potter, NO. 04-4066, 2005 U.S. App. LEXIS 17859,

*4 (3d Cir. August 18, 2005) (holding that the Delaware District Court correctly concluded that

Taylor failed to respond to Potter's motion for summary judgment with evidence that could

establish that employees outside the protected class were treated more favorably.)

Even assuming *arguendo* that Mitchell could establish a *prima facie* case of

discrimination based on his race and gender, Wachovia Securities had legitimate non-

discriminatory reasons for assigning Mitchell solely to the Capitol Trail branch.  First, as stated

above, Wachovia continues to pursue a policy of placing one FA at each branch and many FAs

were assigned to only one branch or even none.  (See pp. 14-15, supra).  Second, as between Capitol Trail and Prices Corner, Mitchell had been performing significantly better at Capitol Trail and his supervisor had discussed this with him throughout 2004, advising Mitchell that eighty percent of his sales were coming from Capitol Trail and that his production at Prices Corner was far below expectations.  (See pp. 12-14, supra).  Wachovia Securities was well within its rights to make branch assignments based upon performance, and it is not within this Court's "purview to second-guess defendants' decision" with respect to the management of its business and employees.  Blozis v. Mellon Trust of Del. Nat'l Ass'n, 494 F. Supp. 2d 258, 271 (D. Del. 2007).

Nor can Mitchell present anything other than speculation that Defendants' proffered reason was a pretext for unlawful discrimination.  At his deposition, Mitchell admitted that his race was not a part of any discussion about his employment in the Prices Corner branch.  Indeed, Mitchell admitted that he "can only assume" that his race was the reason he was directed to remain at Capitol Trail and that he "can't think of any other reason ... other that the fact that [he is] Black."  Mitchell also advances no evidence whatsoever that his gender was the basis for any decision involving his employment, and admits that no one ever referenced his race or gender at any time during his employment.  (See pp. 14-15, supra).  Rule 56 does not "permit Plaintiffs to get to the jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations."  First Nat'l Bank of Arizona v. Cities Servs. Co., 391 U.S. 253, 289-290 (1968).

Therefore, Mitchell's claims of discrimination should be dismissed.

**C.    Mitchell Cannot Establish A *Prima Facie* Case Of Retaliation Based On The Decision To Keep Him At Capitol Trail.**

To state a *prima facie* case of retaliation under Title VII, § 1981 or Delaware law, Mitchell must show that (1) he participated in an activity protected under law; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. Burlington Northern & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (U.S. 2006); Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995); Price v. Delaware Dept of Corr., 40 F. Supp. 2d 544, 551-2 (D. Del 1999). Mitchell cannot meet this prima facie burden because the undisputed material evidence demonstrates that he did not engage in any protected activity prior to Wachovia Securities' decision to keep him at Capitol Trail.

### 1.    Mitchell did not engage in a protected activity under the law.

At the outset, Mitchell's unhappiness at being temporarily accused of making an insensitive comment does not constitute a "protected activity." The law defines a "protected activity" as an instance in which an employee has "opposed any practice made an unlawful employment practice by this [subchapter], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [subchapter].." 42 U.S.C. § 2000e-3(a). This Court, like numerous other federal courts, has made it clear that "general complaints of unfair treatment do not constitute an explicit charge of illegal race discrimination." Cole, 459 F. Supp. 2d at 306. See Balazs v. Liebenthal, 32 F.3d 151, 159 (4th Cir. 1994) (being accused unjustly of sexual harassment "ha[s] nothing to do with [the employee's] race, color, religion, sex or national origin," so the plaintiff was not a protected individual. "The EEOC had no more jurisdiction over this claim than it would have had of a charge that defendant had falsely accused him of reckless driving in the company parking lot"); Sitkiewicz v. Initial Servs. U.S.A., 96 Civ. 8543 (DAB), 1999 U.S. Dist. LEXIS 14465 at *19, (S.D.N.Y. Sept. 17, 1999) (employee's grievances alleging that supervisor "harassed" him did not constitute protected activity because none of the grievances included charges of

29

discrimination); <u>Castro v. New York City Bd. of Educ.</u>, 96 Civ. 6314 (MBM), 1998 U.S. Dist. LEXIS 2863 at *24 (S.D.N.Y. Mar. 12, 1998) (lodging grievances without reference to discrimination was not protected activity).  In this Circuit, a complaint that does not mention discrimination will not suffice for purposes of establishing protected activity.  <u>McBride v. Hospital of the University of Pennsylvania</u>, No. 99-6501, 2001 U.S. Dist. LEXIS 15115 at *22 (E.D.Pa. September 21, 2001) (holding that complaining about "poor treatment" did not constitute a protected activity for Title VII purposes).

 Here, Mitchell claims that Defendants "retaliated" against him by refusing to allow him to continue working in Prices Corner in December 2004 after he complained of being falsely accused of making an insensitive comment to Ladan Amini in July 2003, eighteen months earlier.  (<u>See</u> p. 16, <u>supra</u>).   Yet, Mitchell admits that his complaint about the false accusation was not a complaint of discrimination, and that he did not make his first complaint of discrimination until January 2005, *after* he was removed from new account responsibility at Prices Corner.  (<u>See</u> pp. 11, 14-15, <u>supra</u>).  As such, Mitchell's complaint regarding the mishandling of the false accusation is not a cognizable protected activity.  In <u>Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.</u>, 491 F. Supp. 2d 467, 483 (D. Del. 2007), this court rejected plaintiff's argument that her complaint about students' inappropriate behavior towards her constituted a protected activity.  Similarly by simply voicing a grievance about what he perceived as management ineptitude but *not alleging discrimination*, Mitchell did not engage in a protected activity.  As such, Mitchell's placement at the Capitol Trail office, which occurred nearly 18 months later, cannot be recognized as retaliatory behavior.  <u>See</u> <u>id.</u>

 Nor can Mitchell treat his January 2005 complaint to Wachovia's Employee Relations department as the premise of a retaliation claim.  Mitchell admits that his complaint in January

2005 was the first time that he complained of discrimination.  (See p. 14, supra.)  Mitchell,

however, admitted that he voiced that complaint *after* Wachovia Securities placed Mitchell at

Capitol Trail.  Mitchell further admits that he has suffered no retaliation at any time following

his January 2005 internal complaint or even his February 2005 charge.  (See pp. 16-17, supra).

These admissions vitiate any possible claim of retaliation, as protected activity necessarily must

*precede* any allegedly retaliatory conduct.  See Weston v. Pennsylvania, 251 F.3d 420, 430 (3d

Cir. 2001).

### 2.    Mitchell was not deterred from making a complaint.

Finally, Mitchell has not shown that Wachovia Securities' decision to keep Mitchell at

Capitol Trail branch, where he had already worked for two years and earned over 80% of his

revenue in 2004, deterred him from making a complaint such that it could be considered adverse.

The White Court recently noted that in retaliation cases, the "standard for judging harm must be

objective.  An objective standard is judicially administrable.  It avoids the uncertainties and

unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective

feelings." 126 S. Ct. at 2415.  The White Court further instructed that whether a challenged

action could be considered objectively "adverse" must depend in part upon whether such action

would "dissuade a reasonable worker from making or supporting a charge of discrimination."  Id.

Here, Mitchell cannot possibly meet this standard; indeed, the fact that he complained of

discrimination following the reassignment belies any contention that a reasonable worker could

have been dissuaded from complaining of discrimination.

Even assuming *arguendo* that Mitchell could establish that there was a materially adverse

action, Defendants have advanced legitimate non-discriminatory reasons for assigning Mitchell

permanently to the Capitol Trail branch as stated above.  Mitchell cannot logically argue that this

31

assignment constituted retaliation for a protected activity that he had not yet engaged in, and his illogical retaliation claims therefore should be dismissed.

### 3.    Mitchell failed to allege retaliation in his Charge.

Lastly, Mitchell's Charge did not allege retaliation of any kind.  (Mitchell Dep. Ex. 7). As a matter of law, a Title VII retaliation claim fails unless a claimant exhausts his administrative remedies.  Gonzalez v. National R.R. Passenger Corp., 49 FEP 1135, 1135 (E.D. Pa. 1989).  Mitchell's failure to identify retaliation in the Charge bars his Title VII retaliation claim, and the Court should dismiss such claim on this basis as well.

## IV.    THE INDIVIDUAL DEFENDANTS CANNOT BE HELD LIABLE UNDER EITHER TITLE VII OR § 1981

Mitchell inartfully asserts each of his causes of action against all of the Defendants.  The undisputed record, however, lacks any evidence that the Individual Defendants, Gauthier, Meyer, Beam and DiFebo, either: (1) employed Mitchell; (2) acted in a racially or sexually discriminatory way toward him; or (3) took any adverse employment action against him.  As such, Mitchell's Title VII and § 1981 claims against these individuals must be dismissed as a matter of law.

### A.    No Individual Liability Exists Under Title VII.

It is well-known that individuals, including managers and supervisors, cannot be personally liable under Title VII.  Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061 (3d Cir. 1996); Katchmar v. SunGard Data Sys., Inc., 109 F.3d 173, 184 (3d Cir. 1997) (holding that Congress did not intend to hold individual employees liable under Title VII); Everett v. Hosp. Billing and Collection Svcs., Ltd., No. 04-049 JJF, 2005 U.S. Dist. LEXIS 5249, * 4 (D. Del. March 31, 2005) ("Individual employees cannot be held liable under Title VII").  As such, Mitchell cannot advance Title VII claims against Gauthier, Meyer, Beam or DiFebo.

**B.    The Individual Defendants Did Not Personally Or Intentionally Infringe Mitchell's § 1981 Rights.**

To establish a right to relief under § 1981, Mitchell must show that (1) he belongs to a racial minority; (2) defendant intended to discriminate on the basis of his race; and (3) defendant discriminated concerning one or more of the activities enumerated in § 1981, including the right to make and enforce contracts. Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001). In order to show intentional discrimination by the Individual Defendants under the second prong, Mitchell "must point to facts of record which, if proved, would 'establish that defendants' actions were racially motivated and intentionally discriminatory,' or, at least, 'support an inference that defendants intentionally and purposefully discriminated' against [him] on the basis of [his] race." McKay v. Delaware State Univ., Civ. A. No. 99-219-SLR, 2000 U.S. Dist. LEXIS 14653, *38 (D. Del. 2000) (internal citations omitted). Mitchell cannot meet this burden.

**1.    There is no evidence that Meyer, Beam and DiFebo authorized, directed or participated in any alleged racial discrimination.**

The Third Circuit has declared that individuals may be held liable under § 1981 only where they are "personally involved in the [challenged] discrimination …, and if they intentionally caused the [infringement of] … Section 1981 rights, or if they authorized, directed, or participated in the alleged discriminatory conduct, they may be held liable." Gonzalez, 2004 U.S. Dist. LEXIS 14989 at *9-10 (citing Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518 (3d Cir. 1986) (holding that only named defendants who were at meeting to terminate plaintiff's employment could possibly be liable under § 1981, and that there was no basis for liability by remaining defendant who simply "showed some interest in the events surrounding" plaintiff's termination). See also Riley v. Del. River & Bay Auth, 457 F. Supp. 2d. 505, 515 (D. Del. 2006).

Here, there is no evidence whatsoever that Meyer, Beam or DiFebo were involved in the decision to assign Mitchell to Capitol Trail exclusively, as Gauthier was the only decisionmaker. (See p. 14, supra). To the contrary, Mitchell admitted that none of them had any supervisory authority over him at any time. (See p. 7, supra). Moreover, with respect to the conduct of which Mitchell complains at Prices Corner, he admits that he does not know who made false accusations about him or whether anyone even did. (See p. 12, supra). Mitchell also admits that he never spoke directly to Beam, DiFebo or Meyer about his race and that none of them made any inappropriate or derogatory comments about his race at any time. (See p. 15, supra).

2.    **There is no evidence that Gauthier acted with racial animus.**

It is undisputed that only Gauthier made the decision to assign Mitchell solely to Capitol Trail. Gauthier did so, however, for the legitimate business reasons stated above. Further, Gauthier also hired Mitchell at significant expense to Wachovia Securities and helped Mitchell on various occasions, including by enabling him to earn a sizable bonus to which he otherwise would not have been entitled. (See pp. 12, supra). Federal courts have recognized that "[w]hen the person contributing to the challenged employment action "was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." Reap v. Cont'l Cas. Co., NO. 99-1239 (MLC), 2002 U.S. Dist. LEXIS 13845, *45-46 (D. Pa. June 28, 2002) (citing Grady v. Affiliated Cent., Inc., 139 F.3d 553, 560 (2d Cir. 1997)). Therefore, "favorable conduct by a named defendant completely belies any inference of discrimination." Hong v. Children's Mem'l Hosp., 993 F.2d 1257, 1266 (7th Cir. 1993) (it is "implausible that [plaintiff's supervisor] would begin to treat the plaintiff in a pejorative manner because of plaintiff's national origin after … a basically satisfactory and uneventful working relationship" and treating plaintiff favorably over the years), cert. denied, 511 U.S. 1005 (1994). Here, it makes no sense at all to conclude that Gauthier, who clearly

knew Mitchell's race when he recruited and hired him in 2002, would have become biased by 2004, and Mitchell can offer no evidence to support this far-fetched notion.

As such, the record lacks sufficient evidence to find any of the individual defendants liable under §1981, and such claims must be dismissed.

## V.    DEFENDANTS CANNOT BE FOUND LIABLE FOR CONSPIRACY UNDER § 1985, §1986 OR DELAWARE LAW

### A.    Mitchell Cannot Base His § 1985 Claim On A Violation Of § 1981.

Section 1985(3) provides a cause of action if: (1) two or more persons conspire to deprive any person of the equal protection of the law; (2) one or more of the conspirators performs or causes to be performed any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States. Barnes Found. v. Township of Lower Merion, 242 F.3d 151, 162 (3d Cir. 2001). In short, § 1985 forbids any conspiracy to deprive, either directly or indirectly, any person of the equal protection of the laws, or of equal privileges and immunities under the laws. Gonzalez, 2004 U.S. Dist. LEXIS 14989, *16 (citing Brown, 250 F.3d at 805).

However, "the statute itself does not create any substantive right; rather, it serves only as a vehicle for vindicating federal rights and privileges which have been defined elsewhere." Id. In an effort to establish a viable claim, Mitchell specifically alleges in his Complaint that the Individual Defendants conspired "to violate plaintiff's rights guaranteed by 42 U.S.C. § 1981, and thus, are in violation of 42 U.S.C. § 1985." Complaint ¶ 81. However, the Third Circuit has ruled that "the conspiracy provision of § 1985(3) provides a cause of action under rather limited circumstances." Gonzalez, 2004 U.S. Dist. LEXIS 14989, *16 (citing Brown, 250 F.3d at 805). Specifically, the Third Circuit has held that "in the context of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under

§ 1985(3): the right to be free from involuntary servitude and the right to interstate travel." Id. (citing Brown, 250 F.3d at 805). Obviously, neither of these rights are at issue here.

Further, "the Supreme Court explicitly rejected an attempt to employ § 1985(3) as an adjunct to a Title VII employment discrimination claim." Id. (citing Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 376 (1979)). Interpreting such precedent, the Third Circuit has stated that, "in order to prevent the use of § 1985(3) as a general federal tort law, courts have been careful to limit causes of action thereunder to conspiracies that deprive persons of constitutionally protected rights, privileges and immunities ...." Id. at *17 (citing Brown, 250 F.3d at 805). Therefore, *"alleged violations of statutory rights under § 1981, by themselves, cannot be a foundation for a conspiracy claim under § 1985(3)."* Id.; Dixon v. Boscov's, Inc., NO. 02-1222, 2002 U.S. Dist. LEXIS 13815 at *7 (E. D. Pa. July 17, 2002) (holding that the Third Circuit's decision in Brown compels conclusion "that statutory rights pursuant to §1981 cannot be the basis of a §1985 remedy."). Therefore, even if Mitchell's § 1981 race discrimination claim were viable – which it is not – Mitchell's § 1985 claim must be dismissed as a matter of law.[2]

**B.    Because Mitchell's § 1985 Claim Fails, His § 1986 Claim Must Be Dismissed.**

Mitchell's § 1986 claim similarly fails. In Carter v. Del. State Univ., No. 99-642 GMS, 2002 U.S. Dist. LEXIS 3116 (D. Del. Feb. 27, 2002), the court granted summary judgment on plaintiff's claims under § 1985 and § 1986 and his civil conspiracy claim. Id. at *24-26. The

---

[2] Importantly, district courts in this Circuit have recognized that § 1985 liability cannot be imputed to an employer using *respondeat superior* theory. Cimino v. Del. Dep't of Labor, No. 01-458 GMS, 2002 U.S. Dist. LEXIS 2979, *9 (D. Del. Feb 25, 2002); See also Hankins v. City of Philadelphia, No. 95-1449, 1998 U.S. Dist. LEXIS 5101 *38 n.10 (E.D. Pa. April 9, 1998); [*9] see also Gant v. Aliquippa Borough, 612 F. Supp. 1139, 1142 (W.D. Pa. 1985) (holding that "an employer may not be subject to a conspiracy claim by the doctrine of *respondeat superior*."). Nor may an employer be found to "conspire" with one of its own employees acting in his official capacity. See Gant, 612 F. Supp. at 1142.

court initially held that there was no violation of § 1985, and then explained that because there is

no violation of § 1985, there can be no violation of § 1986. Id.; see 42 U.S.C. § 1986 (limiting

liability to those who fail to prevent any of the wrongs "mentioned in section 1985 of this title.");

Gonzalez, 2004 U.S. Dist. LEXIS 14989, *18-9.  Mitchell's § 1986 claim is similarly deficient.

**C.    Mitchell's State Law Conspiracy Claim Also Fails.**

Should the court dismiss Mitchell's §§ 1985 and 1986 claims, then it must also dismiss

the civil conspiracy claim under Delaware law because such claims, like federal conspiracy

claims, "cannot stand alone without some independent statutory violation." Carter, 2002 U.S.

Dist. LEXIS 3116 at *25; see also Phoenix Canada Oil Co. Ltd. v. Texaco Inc., 560 F. Supp.

1372, 1388 (D. Del. 1983) (explaining, "Delaware courts do not recognize independent actions

for civil conspiracies").

Moreover, the record cannot support Mitchell's civil conspiracy claim in any case.  Here,

Mitchell fundamentally alleges that the Individual Defendants conspired to commit common law

torts and discriminate against him. Under Delaware law, a civil conspiracy claim requires proof

of three elements: "(1) an agreement between two or more individuals; (2) an unlawful act done

to further the conspiracy; and (3) damages to the plaintiff. " Edwards v. Concord EFS, Inc., No.

03-599 GMS , 2004 U.S. Dist. LEXIS 13942, *21-22 (D. Del. July 20, 2004); Mgmt. Co. v.

Transcon. Ins. Co., 78 F. Supp. 2d 320, 331 (D. Del. 1999).

Mitchell can only speculate who conspired to discriminate against him, and the record

fails to show how and when any "conspiracy" came into being or for what purpose.  The record

does not establish that any of the Individual Defendants "agreed" to spread untruthful rumors, as

alleged in the Complaint, or to malign Mitchell based on his race or gender or retaliate against

him.  (See p. 14-16, supra).  Mitchell does not, and cannot, state which if any of the Individual

Defendants made false accusations, and has no evidence that any of them even consulted each

other for any reason relating to his employment, much less that they worked in concert for

unlawful purposes. As such, Mitchell cannot show that that these individuals had a "meeting of

the minds" to harm Mitchell in any way, and this claim must also be dismissed.

## VI.   MITCHELL LACKS FACTUAL AND LEGAL SUPPORT
FOR HIS STATE LAW TORT CLAIMS

### A.   Mitchell's Fraud Claim Fails as a Matter of Law.

The elements of fraud under Delaware law are well established. A party claiming fraud

must demonstrate: "(1) a false representation, usually one of fact, made by the defendant; (2) the

defendant's knowledge or belief that the representation was false, or was made with reckless

indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting;

(4) the plaintiff's actions or inaction taken in justifiable reliance upon the representation; and

(5) damage to the plaintiff as a result of such reliance." Brooks v. Fiore, No. 00-803 GMS, 2001

U.S. Dist. LEXIS 16345, *19 (D. Del. Oct. 11, 2001), aff'd, 53 Fed. Appx. 662 (3d Cir. 2002)

(citing Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983)). Because the

undisputed material facts do not support a showing that Defendants knowingly or recklessly

made any false representation to Mitchell, or that Mitchell relied in any way on such a false

representation, Mitchell's fraud and deceit claim should be dismissed.

In Count 6 of his Complaint, Mitchell claims that Defendants made a false representation

when they informed him that "his removal from Prices Corner was ... [due] to the fact that he

was not liked by, and did not get along with, other Wachovia employees at the branch." Compl.

at ¶ 88. Mitchell contends that such stated reasons "were false in that the true reason for [his]

removal from Prices Corner was wrongful and discriminatory conduct perpetrated by defendants

based on plaintiff's race and gender." Id. Despite these bold accusations, Mitchell relies on

nothing more than speculation to support his contention that Defendants acted with

discriminatory animus and with reckless indifference to the truth. In fact, the record is replete with evidence that Mitchell himself believed he had interpersonal conflicts with his co-workers at Prices Corner based on various business matters. (See pp. 8-9).

Moreover, Mitchell cannot possibly establish the element of detrimental reliance. According to Mitchell's own testimony, the alleged interpersonal conflicts were so obvious to him that he himself did not want to work in the Prices Corner office from July 2003 to December 2004 and did not go there. Wachovia Securities did not foster Mitchell's self-selected course of action; to the contrary, Gauthier repeatedly offered him assistance in building up his business at Prices Corner, but Mitchell took no steps of any kind to improve his performance. (See pp. 12-14, supra). On this record, Mitchell's "fraud" claim fails to meet the basic requirements of such a claim under Delaware law, and accordingly should be dismissed.

**B.    Delaware Law Does Not Recognize *Prima Facie* Tort As A Cause Of Action In The Employment Context.**

Finally, under Delaware law, *prima facie* tort requires an "intentional infliction of harm, resulting in damage, without excuse or justification, by an act or series of acts which would otherwise be lawful and which acts do not fall within the categories of traditional tort." Lord v. Souder, 748 A. 2d 393, 402-03 (Del. 2000). However, in Lord, the Delaware Supreme Court held that a claim for *prima facie* tort was *not available in the employment context* because such a claim would be inconsistent with Delaware's employment at-will doctrine. Id. at 403 (emphasis added); Parker v. Comcast Corp., No. 04-344-KAJ, 2005 U.S. Dist. LEXIS 22612, *9 (D. Del. Oct. 5, 2005) (dismissing plaintiff-employee's *prima facie* tort claim because it was brought in the employment context); Brooks, 2001 U.S. Dist. LEXIS 16345 at *29-30 (explaining, under Delaware law, claims for prima facie tort are not permitted in the employment context). Therefore, Mitchell's *prima facie* tort claims are not viable, and should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment, dismiss each of Mitchell's claims, with prejudice, and grant such other relief as the Court may deem just and proper.

MORRIS JAMES LLP

P. Clarkson Collins, Jr. (#739)
pcollins@morrisjames.com
David H. Williams (#616)
dwilliams@morrisjames.com
James H. McMackin, III (#4284)
jmcmackin@morrisjames.com
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800

- and -

SEYFARTH SHAW LLP

David Bennet Ross (admitted *pro hac vice*)
Devjani Mishra (admitted *pro hac vice*)
Tara Smith Williams (admitted *pro hac vice*)
620 Eighth Avenue, Suite 3100
New York, NY 10018
(212) 218-5500

Attorneys for Defendants

Dated: January 7, 2008

1648612/1

40