IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X
                                                                      :
KENNETH S. MITCHELL,                                                  :
                                                                      :
               Plaintiff,                                             :
                                                                      :          Civil Action No. 06-725 (GMS)
          v.                                                          :
                                                                      :
WACHOVIA CORPORATION, t/a                                             :
     WACHOVIA SECURITIES,                                             :
WACHOVIA SECURITIES, L.L.C.,                                          :
WACHOVIA SERVICES, INC.,                                              :
WACHOVIA BANK OF DELAWARE, N.A.,                                      :
TODD D. GAUTHIER, LYNN G. MEYER,                                      :
CAROLYN J. BEAM, and                                                  :
DOROTHY A. DIFEBO,                                                    :
                                                                      :
               Defendants.                                           :
                                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

## COMPENDIUM OF UNREPORTED CASES
## CITED IN BRIEF IN SUPPORT OF DEFENDANTS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

P. Clarkson Collins, Jr., (Bar I.D. #739)      David Bennet Ross (admitted *pro hac vice*)
pcollins@morrisjames.com                       dross@seyfarth.com
David H. Williams (Bar I.D. #616)              Devjani Mishra (admitted *pro hac vice*)
dwilliams@morrisjames.com                      dmishra@seyfarth.com
James H. McMackin, III (Bar I.D. #4284)        Tara Smith Williams (admitted *pro hac vice*)
jmcmackin@morrisjames.com                      tawilliams@seyfarth.com

MORRIS JAMES LLP                               SEYFARTH SHAW LLP
500 Delaware Avenue, Suite 1500                620 Eighth Avenue
P.O. Box 2306                                  New York, New York 10018-1405
Wilmington, DE  19899                          (212) 218-5500
          (302) 888-6800


Dated: January 7, 2008

**CASE**                                                                                              **TAB NO.**

Arasteh v. MBNA America Bank, N.A.,
    No. 99-254-GMS, 2000 WL 672866 (D. Del. June 12, 2001) ...........................................1

Benette v. Cinemark U.S.A., Inc.,
    01-CV-6519L,
    2003 U.S. Dist. LEXIS 22636 (S.D.N.Y. November 21, 2003).........................................2

Brooks v. Fiore,
    No. 00-803 GMS, 2001 U.S. Dist. LEXIS 16345 (D. Del. Oct. 11, 2001) ........................3

Calloway v. E.I. DuPont de Nemours & Co.,
    No. 98-669-SLR, 2000 U.S. Dist. LEXIS 12642 (D. Del. Aug. 8, 2000) .........................4

Carter v. Del. State Univ.,
    No. 99-642 GMS,
    2002 U.S. Dist. LEXIS 3116 (D. Del. February 27, 2002)................................................5

Castro v. New York City Bd. of Educ.,
    96 Civ. 6314 (MBM),
    1998 U.S. Dist. LEXIS 2863 (S.D.N.Y. Mar. 12, 1998) ..................................................6

Cimino v. Del. Dep't of Labor,
    No. 01-458 GMS, 2002 U.S. Dist. LEXIS 2979 (D. Del. Feb 25, 2002) ..........................7

Dixon v. Boscov's, Inc.,
    NO. 02-1222, 2002 U.S. Dist. LEXIS 13815 (E. D. Pa. July 17, 2002).............................8

Edwards v. Concord EFS, Inc.,
    No. 03-599 GMS , 2004 U.S. Dist. LEXIS 13942 (D. Del. July 20, 2004).......................9

Everett v. Hosp. Billing and Collection Svcs., Ltd.,
    No. 04-049 JJF, 2005 U.S. Dist. LEXIS 5249 (D. Del. March 31, 2005) ........................10

Fantazzi v. Temple Univ. Hosp., Inc.,
    NO. 00-CV-4175, 2002 U.S. Dist. LEXIS 16269 (E.D. Pa. Aug. 22, 2002)....................11

Gonzalez v. Comcast Corp.,
    No. 03-445-KAJ,
    004 U.S. Dist. LEXIS 14989 (D. Del. July 30, 2004) ......................................................12

Hankins v. City of Philadelphia,
    No. 95-1449, 1998 U.S. Dist. LEXIS 5101 (E.D. Pa. April 9, 1998)...............................13

i

McBride v. Hospital of the University of Pennsylvania,
     NO. 99-6501, 2001 U.S. Dist. LEXIS 15115 (E.D.Pa. September 21, 2001) ...................14

McKay v. Delaware State Univ.,
     Civ. A. No. 99-219-SLR, 2000 U.S. Dist. LEXIS 14653 (D. Del. 2000).........................15

Parker v. Comcast Corp.,
     No. 04-344-KAJ, 2005 U.S. Dist. LEXIS 22612 (D. Del. Oct. 5, 2005) .........................16

Petrocelli v. DaimlerChrysler Corp.,
     No. 04-943-KAJ , 2006 U.S. Dist. LEXIS 11972 (D. Del. 2006) .....................................16

Rajoppe v. GMAC Corp. Holding Corp.,
     No. 05-2097, 2007 U.S. Dist. LEXIS 18956 (D. Pa. March 19, 2007) .............................18

Reap v. Cont'l Cas. Co.,
     NO. 99-1239 (MLC), 2002 U.S. Dist. LEXIS 13845 (D. Pa. June 28, 2002) ...................19

Seldomridge v. Uni-Marts, Inc.,
     No. 99-496 GMS, 2001 U.S. Dist. LEXIS 9491 (D. Del. July 10, 2001)..........................20

Sitkiewicz v. Initial Servs. U.S.A.,
     96 Civ. 8543 (DAB), 1999 U.S. Dist. LEXIS 14465 (S.D.N.Y. Sept. 17, 1999).............21

Taylor v. Potter,
     NO. 04-4066, 2005 U.S. App. LEXIS 17859 (3d Cir. August 18, 2005).........................22

**COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW**

# TAB 1

1 of 1 DOCUMENT

**LISA R. ARASTEH, Plaintiff v. MBNA AMERICA BANK, N.A., Defendant.**

**Case No. 99-254-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*146 F. Supp. 2d 476; 2001 U.S. Dist. LEXIS 14301*

**June 12, 2001, Decided**

**DISPOSITION:**     [**1] MBNA's motion for summary judgment on Arasteh's sex discrimination claim granted but denied as to her retaliation claim.

**COUNSEL:** For Plaintiff: Gary W. Aber, Esq., HEIMAN, ABER, GOLDLUST & BAKER, Wilmington, Delaware.

For Defendant: Sheldon N. Sandler, Esq., Barry M. Willoughby, Esq., YOUNG, CONAWAY, STARGATT & TAYLOR, LLP, Wilmington, Delaware.

**JUDGES:** SLEET, District Judge.

**OPINION BY:** SLEET

**OPINION**

[*479] **AMENDED MEMORANDUM OPINION**

June 12, 2001

Wilmington, Delaware.

**SLEET, District Judge**

**I. INTRODUCTION**

On April 21, 1999, Lisa R. Arasteh filed a complaint against MBNA America Bank, N.A. ("MBNA") alleging, inter alia, two violations of Title VII of the Civil Rights Act of 1964, as amended, *codified at* 42 U.S.C. § 2000 et seq (D.I. 1). [1] First, [*480] she claims that she was sexually harassed by her supervisor. Second, she avers that MBNA retaliated against her for complaining of discrimination and sexual harassment. MBNA filed a

motion for summary judgment on June 6, 2000 (D.I. 84). Arasteh timely answered (D.I. 102) and MBNA timely filed a reply brief (D.I.112). [2] Upon reviewing the record and considering the [**2] parties' submissions, the courtwill grant MBNA's motion for summary judgment on Arasteh's sex discrimination claim but deny it as to her retaliation claim since there are genuine issues of material fact regarding her transfer.

1     Arasteh's original complaint also included claims of (1) sex and national origin discrimination and (2) breach of an implied covenant of good faith and fair dealing. These claims, however, were dismissed with prejudice via stipulation. *See* D.I. 83 and 108.

2     After requesting and receiving leave of the court, the parties filed supplemental answering and reply briefs on the issue of retaliation (D.I. 117 and 118). Subsequently, the parties submitted ten letters to the court between November 13, 2000 and May 11, 2001 (D.I. 120-129). Although the letters purportedly only discuss new authority issued after the close of briefing, the submissions are primarily additional argument on the applicable facts and law of the case. Local Rule 7.1.2(c) states, in pertinent part, "a party may call to the Court's [sic] attention and *briefly* discuss pertinent cases decided after a party's final brief is filed or after oral argument" (emphasis added). Lengthy attorney argument regarding the meaning of cases and restatement of issues highlighted in the briefing is not allowed without specific leave of the court. The cumulative effect of the parties' letters is an abuse of Local Rule 7.1.2(c) and reflects a tit for tat which is largely unhelpful to the court in deciding the instant motion. Since

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 6 of 218

Page 2

146 F. Supp. 2d 476, *480; 2001 U.S. Dist. LEXIS 14301, **2

both parties improperly submitted additional material, the court will only examine the letters to the extent they conform to the literal words of Local Rule 7.1.2(c).

[**3] **II. STANDARD OF REVIEW**

"Summary judgment is appropriate under *Federal Rule of Civil Procedure 56(c)* when the moving party establishes that there is no genuine issue of material fact that can be resolved at trial and that the moving party is entitled to judgment as a matter of law." *House v. New Castle County, 824 F. Supp. 477, 481 (D. Del. 1993)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)).* In evaluating whether there are any genuine issues of material fact, "materiality is determined by the substantive law that governs the case." *See id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).* In this inquiry, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *See id.* (internal quotations omitted). A dispute is 'genuine' only if a reasonable jury could return a verdict for the nonmoving party. *See id.* When considering a motion for summary judgment, the court must view all facts and inferences [**4] in the light most favorable to the party opposing the motion. *See Stephens v. Kerrigan, 122 F.3d 171, 176-77 (3d Cir. 1997).* Moreover, "if the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary judgment." *See House, 824 F. Supp. at 481-82* (citing *In re Japanese Elec. Prod. Antitrust Litig., 723 F.2d 238, 258 (3d Cir. 1983), rev'd on other grounds, 475 U.S. 574 (1986)).* Finally, at this stage of the process, "the judge's function is not himself [sic] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *See Lewis v. State of Delaware Dept. of Pub. Instruct., 948 F. Supp. 352, 357 (D. Del. 1996)* (quoting *Anderson, 477 U.S. at 249)* (internal quotations omitted).

[*481]

**III. BACKGROUND**

The record before the court is voluminous and describes actions over several years. Arasteh's removal of her sex discrimination and state law claims, however, significantly narrows the issues before the court. [**5]

Therefore, the court will confine its statement of facts those which are pertinent to the allegations of sexual harassment and retaliation rather than detailing the entire relationship between the parties. Even with this limitation, however, this case -- like all Title VII actions -- is intensely fact driven and requires a lengthy background recitation. Although the court has not discussed all the facts and arguments identified by the parties, it has reviewed the record to the extent necessary. [3]

> 3    Numerous courts have found that a district court need not "comb the record" on summary judgment in order to find a genuine issue of material fact which has not otherwise been brought to its attention by the party opposing the motion. *See Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001)* (citing cases).

Arasteh began working for MBNA in March, 1988 as an Internal Control Analyst in the Compliance Section. Through the years, she advanced through the ranks and was eventually [**6] promoted to Vice President in 1994. Although she has worked in several different departments at MBNA, she joined Industry Relations -- a newly created department -- in October, 1995. Joseph Stemmy was the first head of the department.

**A. Sexual Harassment**

In February, 1996, John Doe [4] replaced Stemmy as head of Industry Relations, making him Arasteh's manager. Arasteh claims that Doe began sexually harassing her soon after he became her manager. There is no record evidence that Arasteh contemporaneously recorded instances of sexual harassment by Doe. [5] Nevertheless, in deposition testimony Arasteh describes several instances of what she considered to be sexual harassment. [6]

> 4    Subsequent to the publication of the court's memorandum opinion (D.I 132), MBNA requested that the court use a pseudonym to protect the privacy of the individual in question (D.I. 133). The court does not believe that Arasteh has any objection. The court will therefore refer to Arasteh's former supervisor as "John Doe" throughout its amended memorandum opinion. Aside from the use of a pseudonym, this amended memorandum opinion is identical to the court's

Case 1:06-cv-00725-GMS     Document 39     Filed 01/07/2008     Page 7 of 218

Page 3
146 F. Supp. 2d 476, *481; 2001 U.S. Dist. LEXIS 14301, **6

previous memorandum opinion.

[**7]

5    At some point prior to Doe becoming the head of Industry Relations, Arasteh began keeping a contemporaneous work diary in Farsi (she was born in Iran) regarding incidents at MBNA. Arasteh provided her attorney with a translation which included "additional comments" which were not written in her diary. According to Arasteh, her entry for August 25, 1996 literally translates as "stupid idiot". Underneath the translation, Arasteh included additional comments stating "I had a meeting with Jim . . . . He was staring at me and touching my legs and it made me very uncomfortable . . . . I usually did not note these things. To me they were immaterial and I would handle them." Although MBNA had a portion of Arasteh's notes independently translated by an interpreter, his affidavit does not include a translation of Arasteh's August 26, 1996 entry. Rather than engage in semantic or credibility arguments, the court merely notes that neither party disputes the exact translation of the August 26, 1996 entry and that Arasteh has not provided any record evidence to suggest how or why the "additional comments" are implicit in her entry. Therefore, there is no record evidence of Arasteh describing any examples of sexual harassment in her contemporaneous work diary.

[**8]

6    MBNA's brief provides more specific examples of sexual harassment allegations than does Arasteh's. *Compare* Pl. Br. Sum. J. at 6-8 *with* Def. Ans. Br. Sum. J. at 10-12. In addition, the "Sexual Harassment Questionnaire" Arasteh filled out for the Equal Employment Opportunity Commission ("E.E.O.C.") includes still more alleged incidents. The only allegations not mentioned below which could be construed as sexual harassment are (1) on April 26, 1996, Doe asked Arasteh to buy flowers for his secretary and (2) an undated allegation that one night on a business trip to St. Louis, Missouri with Doe and others, Arasteh heard a knock at her hotel room door around midnight. Since Arasteh "had a feeling it was [Doe]" she did not open the door. The rest of the allegations deal more with the effects the other alleged incidents. Indeed, Arasteh cites many of these incidents (also mentioned in the "Sexual Harassment

Questionnaire") as examples of retaliation by Doe for rejecting his alleged sexual advances. *See* Def. Ans. Br. Sum. J. at 13.

[*482]  First, Arasteh claims that while on a business [**9]  trip to Purchase, NY in April, 1996, Doe generally inquired about her relationship with her husband and told her that he had been married for five years. During the conversation, Arasteh testified that Doe said, in substance, "after five years, it's [sic] kind of more friendship than a marital [relationship]. [7] Arasteh stated at her deposition that she believed this exchange constituted sexual harassment. After the trip, Arasteh felt that Doe's attitude toward her changed; he would call her into his office frequently to ask her questions. At his deposition, Doe denied that he has ever had a conversation with Arasteh about her husband and specifically denied such a conversation during the April, 1996 business trip.

        7    Later in her deposition, Arasteh said her response to the comment was "I made a joke out of it. I said, Well, [sic] Jim, I guess we're [Arasteh and her husband] still in the first five years . . . ." According to Arasteh, that was the end of the conversation "on that topic."

Second, Arasteh [**10]  claims that since she was the only employee in the department, Doe made her feel uncomfortable since he "kept asking me to lunch". Although she attended "work-related lunches" with Doe and association representatives, Arasteh stated that she never went to lunch alone with Doe. Arasteh also testified that Doe also told her that she "should learn to socialize because this is a marketing environment and you have to be friendly with people." Doe does not appear to dispute that he asked her to lunch or made a comment about her socializing.

Third, Arasteh testified that Doe rubbed her legs with his legs under the table at an unspecified number of meetings. About six months after Doe's arrival in Industry Relations, Arasteh stated that she began arriving at meetings late so as to avoid having to sit next to Doe. [8] Despite employing this avoidance tactic, [9] she would sometimes wind up sitting next to Doe, but it "didn't [sic] happen often." Although Arasteh testified that Doe rubbed her legs on one occasion "in 1997," it appears that the rest of the incidents occurred between May and December, 1996. Arasteh also stated that Doe would stare at her chest and breasts, making her feel uncomfortable.

146 F. Supp. 2d 476, *482; 2001 U.S. Dist. LEXIS 14301, **11

[**11] The record is not clear when these incidents occurred, but it appears from Arasteh's deposition that these incidents occurred around the same time as the leg rubbing during meetings. [10] Arasteh testified [*483] that she did not remember if Doe stared at her breasts in 1997.

> 8    Although Arasteh does not give a date, Doe began working in Industry Relations in February, 1996. Based on Arasteh's testimony, it is logical to assume that she did not begin her avoidance strategy until at least August, 1996.
> 9    Arasteh's co-worker, Eric R. Nelson, stated that Arasteh was often the last to arrive at meetings. Arasteh testified that her "strategy" was to wait outside the meeting room until everyone else was seated and then enter.
> 10   At his deposition, Nelson testified that "Jim had a tendency to stare at [Arasteh] for whatever reason, when we would be in meetings, and I have no idea why." He characterized Doe staring as opposed to "just letting his eyes wander the room." Nelson also stated that Arasteh once told him that she had to sit next to Doe in a meeting, and that he had rubbed her leg "continually". Nelson does not supply the date of the incident or the conversation.

[**12] Fourth, Nelson testified that Doe indirectly asked him if Arasteh was a lesbian. At his deposition, Nelson stated, "he [Doe] had made kind of a, I thought it was a rude comment outside the men's room in the hallway . . . he said something that he didn't [sic] know what was wrong with . . . [Arasteh], that he thought she might be a lesbian." Although Nelson could not recall the specific context of the comment, he stated "it was a kind of a guy type of a thing" and the conversation was generally about women in the office. Arasteh was not present during the discussion, but Nelson told her about it afterwards since he thought it unusual. Nelson does not provide a date of this incident.

The record also contains several other vague and undated references to alleged sexual harassment. Arasteh testified that Doe "would talk about the color of my clothes" and that certain outfits looked good on her. Although Doe did not specifically deny each and every allegation of sexual harassment, he stated at his deposition that her "whole harassment suit" was untrue.

Arasteh stated that she spoke to Doe about his sexual harassment in June, 1996. According to Arasteh, after

their conversationDoe's [**13] sexual harassment turned into "abusive treatment." Arasteh claims this treatment manifested itself in several ways. First, Doe told her to do things that "belittled" her in meetings. Second, he suggested that she not move to a different department since she would get promoted faster in Industry Relations (she never got promoted). Third, in her 1997 "year end" evaluation, Doe "downgraded" her overall performance level from the "superior" rating she received in her 1996 year end evaluation to "excellent". Although in absolute terms this may be lower, it is not clear what impact the June, 1996 conversation had on her evaluation; a longer and more complete look at her reviews suggest an up and down pattern.

In her "mid year" 1997 "Officer Goal Assessment," Arasteh received two "exceeded" ratings and two "achieved" ratings in the "Results and Assessments" category and three "superior" and six "excellent" ratings in the "Management Factors" category. Her overall performance level was "achieved." In her 1997 year end review, Arasteh received three "exceeded" and one "achieved" ratings in the "Results and Assessments Category" and one "superior," seven "exceeded," and one "good" inthe "Management [**14] Factors Category". Her overall performance level was "exceeded." In 1996, Arasteh received a "excellent" for overall performance at her mid year and an "superior" at year end. Although it is true that Arasteh's overall evaluation went from "superior" at the end of 1996 to "exceeded" at the end of 1997, her interim performance evaluations (mid 1996 and mid 1997) were lower than her year end evaluations. Therefore, it is not clear that Arasteh's claimed confrontation with Doe in June, 1996 was the reason for the lower review at the end of 1997.

Fourth, Roszowski told Arasteh to attend an "Elements in Writing Class" even though she had preciously attended it and had received high evaluations on her written communications skills. While directing Arasteh to attend a "basic" class, he denied her request to attend a management level seminar. [11]

> 11   Although Arasteh states Roszowski's actions are examples of retaliating against her for her June, 1996 conversation, she discusses them in her deposition in the context of gender discrimination and her retaliation claims. *See* note 6, *supra*.

[**15] [*484] There is a bit of a dispute over

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 9 of 218

Page 5

146 F. Supp. 2d 476, *484; 2001 U.S. Dist. LEXIS 14301, **15

whether Arasteh properly utilized MBNA's sexual harassment policies. The record does indicate, however, that during the time of the alleged incidents Arasteh did not file a formal grievance with MBNA. At her deposition, Arasteh testified although she regarded Doe's 'lesbian' query to Nelson as inappropriate, she did not file a complaint since "you have to keep in mind that I am a vice-president of the company, it wouldn't have looked appropriate for me to walk into personnel every time Mr. [Doe] touched my legs or made comments like this." At another point in her deposition, Arasteh stated she did not talk to the personnel department because she "did not feel it would be appropriate at my level, as an officer of the company, to go to a personnel office. I didn't [sic] want to end my employment at MBNA. I wanted to address the problems that I had."

Additionally, Arasteh claims to have had a general conversation with Peter A. Dimsey, Doe's superior, regarding the harassment. She did not, however, testify that she informed Dimsey of specific times or incidents. Finally, although she sent a letter to senior management at MBNA detailing [**16] various instances of alleged discrimination, she did not expressly complain about sexual harassment by Doe.

The parties spend much time discussing Arasteh's job performance and attendance in Industry Relations during 1997. Arasteh and MBNA read different motivations in requiring her to sign out and having MBNA staff keep track of her whereabouts. MBNA attributes Arasteh's actions in 1997 to "signs of psychic impairment." Arasteh vehemently denies that any psychiatric or medical problems interfered with her work and states that MBNA is attempting to smear her. Although the parties dispute the cause, it is clear that Arasteh had several important issues in her life that either distracted her at work or caused her to be absent. For example, her father had medical problems that required her attention and she has medical problems that necessitated enrollment at a MBNA physical therapy facility. Additionally, she had to care for her young children. Regardless of whether MBNA's "precepts" regarded these circumstances as legitimate reasons for not being at work, both parties appear not to dispute that Arasteh was occasionally out of her office during regular business hours. Finally, although [**17] the parties contest the extent and the reasons for the absences, there is no disagreement that there were several of them.

### B. Retaliation

On January 8, 1998, Arasteh sent MBNA Senior Vice Chairman Lance Weaver a personal and confidential memorandum through interoffice mail detailing both general and specific events from 1995 until approximately August, 1997 that demonstrate that she was treated "unfairly" in violation of MBNA "precepts." The memorandum's stated intent was to "provide [Weaver] with some insight into the current environment." At the conclusion of the memorandum, Arasteh states "I also recommend that you share this information with our Legal [sic] department as I feel there are situations which deviates [sic] from various Labor Law [sic] requirements." Although Arasteh showed Nelson a copy of the letter and he was with her when she put it in the mail, Weaver claims that he never received it. [12] Indeed, he testified at his deposition that he was not [*485] aware of the memorandum until after the instant lawsuit was filed. [13]

> 12  At his deposition, Weaver stated that he was generally familiar with the contents of Arasteh's memorandum and his impression was "that I certainly would have remembered receiving it." [**18]
>
> 13  Although MBNA's Vice President in charge of Mail Services could did not specifically testify regarding Arasteh's memorandum to Weaver, he stated that mail is generally reported as not received either because it was never mailed or it is received but forgotten.

Shortly after Arasteh sent her memorandum to Weaver, her former attorney sent MBNA's Chief Executive Officer, Charles Cawley, a letter on Arasteh's behalf on January 21, 1998. Like the original complaint filed with the court, the letter describes broader allegations than the ones currently asserted in this case; it focuses on sex and national origin discrimination. The letter, however, does not mention sexual harassment explicitly. [14] The letter concludes, "while she does not wish to make the reason for her leaving public, my client [Arasteh] has given me the authority to file a complaint with the State Labor Board and the Equal Employment Opportunity Commission Office. To bypass these options, my client has also given me the authority to attempt to negotiate a settlement with MBNA, [sic] that would place her as close to the position she [**19] would be in if MBNA's discriminatory practices had never

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 10 of 218

Page 6

146 F. Supp. 2d 476, *485; 2001 U.S. Dist. LEXIS 14301, **19

existed."

> 14   The only allegation in the letter that could be taken as a complaint about sexual harassment is an alleged comment by Doe that "it is the wife's responsibility to take care of 'home' matters." In context, however, the court does not find this statement to be evidence of sexual harassment. Interestingly, in the letter there are allegations that Arasteh was compelled to "physically deliver[] flowers to my manager's [Doe's] secretary" and made to attend elementary writing courses while not being allowed to participate in other courses. These are cited as examples of discrimination. In her brief, however, Arasteh contends that these incidents are examples of Doe's retaliation for Arasteh complaining to him about his sexual harassment. *Compare* Cawley Letter, App. Def. Br. Opp. Sum. J. at B-446 *with* Def. Ans. Br. Opp. Sum. J. at 13; *see also* note 6, *supra*.

Upon reading the January 21 letter, Cawley gave it to Weaver — whowas [**20] in Cawley's office at the time "just by coincidence" -- to read since he was Arasteh's "first removed supervisor" (Doe was her direct supervisor). After questioning Weaver "a little bit" about Arasteh, Cawley called Ken Boehl to his office. Boehl was involved in the discussion because of his background and his familiarity with Arasteh -- he was her former supervisor. Although he could not remember the specifics of the meeting, Weaver stated that Cawley was "confused and frustrated" with the letter and expressed a desire to look into the allegations. According to Weaver, Cawley did not seem concerned about Arasteh's well being. Basically, the meeting consisted of Cawley asking Weaver and Boehl questions about Arasteh. Apparently, Doe was not present since he was "accused of doing some things that were wrong."

According to Weaver, the January 21 letter "was turned over immediately to our legal department and, beyond that . . . [he] was not involved in the investigation." Weaver stated that he believed the reason for this was that generally "[once] someone goes to a lawyer, it is turned over to the legal department." 15 Weaver is not aware of any further discussions about theletter [**21] or Arasteh's allegations after the matter was referred to the legal department. Furthermore, he testified that he [*486] does not know of any internal investigation into Arasteh's complaints or any attempt by MBNA to counsel her in any way. To Weaver, the reason for this stance was that once someone files a complaint against MBNA, they are treated differently than those who do not file a formal complaint (either in court or with an administrative agency).

> 15   Arasteh attacks Weaver's credibility by pointing out that Weaver spoke to Nelson subsequent to his filing of a complaint against MBNA. Weaver stated that at the time he spoke to Nelson, he was "not aware of any lawsuit" or that he had filed a charge with the E.E.O.C. This point, however, is immaterial to the court's resolution of the issues at this stage in the case since it cannot make credibility determinations.

On or about January 26, 1998, Dimsey replaced Doe as head of Industry Relations, thereby becoming Arasteh's direct supervisor. The record [**22] is silentas to the reason for this shift but there is no evidence that the personnel move was in any way related to Arasteh or her allegations. Upon becoming the head of Industry Relations, Doe and Dimsey had "take over" discussions in about how the department ran. During the course of these conversations, Dimsey stated Doe told him that "there was some litigation between the company and . . . Arasteh and that since it didn't [sic] involve me nobody was going to -- it had been suggested I didn't [sic] become aware of any more details than that." This was the only conversation Doe and Dimsey had regarding Arasteh's complaints. Dimsey also spoke with other MBNA personnel about Arasteh's complaint and was told "to approach this with a totally open mind and not be involved in that [the dispute]." 16 Other than these conversations, Dimsey did not know anything else about Arasteh's complaint or dealings with the company. To him, the matter was between Arasteh's and MBNA's attorneys.

> 16   Dimsey testified that he spoke with "Mr. Spartin". Elsewhere, the record indicates that Mr. Spartin oversaw Dimsey in some capacity.

[**23] On February 2, 1998, MBNA's outside counsel sent a letter in response to the January 21 letter to Cawley. The letter states:

> I have completed my investigation into the allegations contained in your letter of January 21, 1998. In sum, please be advised that there has been no

146 F. Supp. 2d 476, *486; 2001 U.S. Dist. LEXIS 14301, **23

confirmation of any of the claims of discrimination and harassment . . . . What I have learned is that your client is a competent performer who has resisted MBNA's good faith efforts to help her overcome her shortcomings that were holding her back from achieving even more. The assignment about which she is apparently unhappy was designed to give her an opportunity to improve in those areas where she is weakest.

Arasteh contends that the statements in the letter contradict Boehl's testimony to the effect that when Arasteh left his department she was "improving". Furthermore, Arasteh points to Doe's statement that as of January, 1998 "there was noting prohibiting . . . [Arasteh] from getting promoted". [17] Contrary to Arasteh's assertions, Doe's 1997 year end review states that there were areas that "needed improving" and that she needed to "step back at times and evaluate priorities." Althoughhis [**24] review does not mention her opportunity for advancement at MBNA, in a November 26, 1997 file memorandum, Doe stated he felt "[Arasteh's] results were not overly exceptional and did not warrant a promotion at this time . . . [but] this did not preclude her from a possible promotion in 1998 . . . ."

17 At his deposition, Arasteh's counsel asked Doe if Arasteh had any "shortcomings." Although Doe stated he did not know what Arasteh's counsel meant by "shortcomings," he testified that he was "not aware of any" in January, 1998.

The parties dispute the propriety of Arasteh's conduct in Industry Relations during Dimsey's tenure and the reasons for her behavior. MBNA contends that Arasteh [*487] took frequent breaks and left work for several appointments, including visits to the physical therapist, her doctor and her psychiatrist, as well as attending to her ailing father. Although Arasteh's brief does not specifically separate her attendance issues under Doe and Dimsey, she states that in 1998 she worked [**25] more hoursin Industry Relations than she was required. Additionally, the parties contest whether Arasteh was present in the office when Dimsey was traveling for business. Again, the court will not detail each party's allegations and the facts supporting them. In order to resolve the instant motion, it is sufficient to note that during this time Arasteh was out of the office for

various reasons and that Dimsey believed that it adversely affected the performance of the department. [18] Additionally, Dimsey testified that "around the end of the first quarter," he and Arasteh discussed "how things were going." Although Arasteh prepared a list of goals, he disagreed with her assessment and he "indicated that there were some things that needed attending to."

18 In his deposition, Dimsey stated, "all I know is when I called in and tried to reach her and questions came in and they tried to reach her, that there were many occasions where she couldn't [sic] be located."

On April 29, 1998, Arasteh and Dimsey went to lunch. [**26] Arastehshowed him a copy of the memorandum she had written to Weaver which detailed her complaints against MBNA. Arasteh told Dimsey that she was "extremely angry with Mr. Boehl for his treatment of her and she had some complaints against Mr. [Doe]." Dimsey replied that since Arasteh had decided to bring a legal action, she needed to talk to "the lawyers" rather than to him. During lunch, Dimsey commented that he was surprised that Arasteh still wanted to work at MBNA, given her "strong negative feelings" about the company. According to Dimsey, Arasteh responded by stating, in substance, that:

she was only staying with the company because it was a better place to sue . . . from and she had no interest in doing a good job, she had no interest in supporting officer goals, and . . . that she was sorry for me because I was put in this position, which I took [to mean] that I was going to have to put up with her not being particularly motivated because that's [sic] the way she wanted it to be.

Arasteh does not dispute these statements. Instead, Arasteh confirmed that she was not leaving MBNA since she believed that she had not done anything wrong and that staying at [**27] the companywould put her in a better position to "focus on . . . [her] case".

As her immediate supervisor, Dimsey prepared a 1998 mid year evaluation of Arasteh. [19] Neither party disputes that the evaluation was dramatically lower than her previous one. [20] In the "Manager's Comments" section of Arasteh's evaluation, Dimsey wrote:

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 12 of 218

Page 8

146 F. Supp. 2d 476, *487; 2001 U.S. Dist. LEXIS 14301, **27

[Arasteh] has been in Industry Relations for three years and should be able to do the job very well. However, she has decided to do the minimum she believes is necessary to do the job. She shows little enthusiasm, or desire to do things well. She tries to shift responsibility to others, rather than assuming it herself. She initiates very little on her own. Although she knows, and I have [*488] made it clear, that it is important someone be in the office or readily available, she takes considerable time off to handle personal matters during business hours. She should try harder to schedule her absences at other times. Breaks for lunch and coffee tend to be long. As a result, she is not able to adequately support the Industry Relations Department and assist me when I am out of the office. Her attitude and absence from work place [sic] contributes [**28] to projects notgetting done properly or on time. She is not receptive to direction. Her manner of treating . . . my Executive Assistant is on occasion insensitive and unprofessional. She does not meet the expectations of an officer of MBNA.

In the past month, she has shown much more diligence and follow through [sic] in completing assignments. She can clearly do the job if she wants to, but she must decide to do it on a continuing basis. To perform better just prior to an evaluation is not enough.

Prior to delivering his evaluation to Arasteh on July 31, 1998, Dimsey spoke with Doe and the legal department. 21 Based on these conversations, Dimsey decided to have a witness present at Arasteh's evaluation and a security guard in the area who would, if necessary, escort her "out of the area". 22 Arasteh neither saw -- nor did Dimsey utilize -- the security guard. White testified that she did not recall Arasteh raising her voice or otherwise acting inappropriately. Arasteh signed the evaluation. She made no written comments and there was no discussion between Arasteh and Dimsey about the evaluation at that time or subsequently.

19    The evaluation covered the period from January to June, 1998.

[**29]

20    Arasteh received five "not achieved" ratings in the "Results and Assessments" category. In the "Management Factors" category, Arasteh received one "satisfactory" ranking and nine "unsatisfactory" rankings. Attached to the "Officer Global Assessment" form was a brief reason for each ranking.

21    Dimsey stated that he decided to speak to Doe "because I was surprised that the performance of . . . [Arasteh] was in my view so far from what I would have expected that I asked him what his perceptions were when he worked with her in terms of her performance. And he told me about the rating he had given her [in 1997] which apparently displeased her and the emotional reaction to the conversation." After giving Arasteh her 1997 year end evaluation, Doe wrote a file memorandum detailing what he felt was unprofessional conduct by Arasteh during the evaluation. *See supra.*

22    The third party present at the evaluation, Marsha M. White of the Personnel department, stated that she had never been at an evaluation where a security guard was stationed nearby.

At some point during the summerof [**30] 1998, Arasteh was transferred from Industry Relations to the Quality Assurance department. MBNA characterizes the move as lateral while Arasteh contends it was "organizationally a demotion" since she was "further removed" from senior management and her assignments were "less significant". Arasteh's new supervisor, Cynthia Rydel, testified that she did not ask for a new employee but that the department was "backlogged." Further, the backlog related assignments involved data input work, which was not something a vice president would normally do. Arasteh testified that Rydel told her she did not have a vice president position open at the time but that she was "just told to give me projects." Arasteh maintains that an insurance project which "excited her" was taken away after one week. When she asked why the project was stopped, Rydel told her that a change in management in the insurance department meant the project was put on hold. 23

23    The record does not indicate whether the project continued or whether Arasteh resumed

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 13 of 218

Page 9

146 F. Supp. 2d 476, *488; 2001 U.S. Dist. LEXIS 14301, **30

working on it.

[**31] There is scant evidence in the record regarding the impact of Arasteh's transfer. Although the parties contest whether she received a smaller bonus or salary raise in response to Dimsey's evaluation, there is [*489] no record evidence to suggest that Arasteh's salary was reduced or that there was any change to her bonus or salary after her transfer to Quality Assurance. Indeed, Arasteh maintained her classification as a vice president. Although the record is less than clear, it suggests that it is "possible [but] not likely" that Arasteh will ever receive a promotion. Weaver testified on this issue at his deposition. Both parties overstate Weaver's testimony. Arasteh characterizes Weaver's testimony as "it is possible . . . [but] unlikely that she [Arasteh] will be promoted in the remainder of her career." MBNA, in contrast, argues that Weaver offers nothing more than a personal opinion that is nothing more than "speculation". At his deposition, Weaver actually stated that he was not aware of any executive vice presidents "in the company" who have sued MBNA. [24] At a certain point in time, however, Arasteh was "happy" with her new responsibilities in Quality Assurance. [**32] [25]

> [24] Weaver's deposition errata sheet slightly clarifies this statement by averring that he understood the question to be whether Arasteh could be promoted after suing MBNA. In addition to reiterating his testimony from the deposition, Weaver stated that he was "just speculating about her future prospects". Weaver did not specifically testify about Arasteh's prospects for promotion after her transfer to Quality Assurance.
>
> [25] At her deposition, Arasteh stated that after her positive 1999 evaluation she received additional responsibilities. She was allowed to design her own goals and was put in charge of two major systems -- the group exclusions list system and the suppression system -- which she viewed as better responsibilities than she previously had. Arasteh also went on disability leave for approximately four months beginning in early 1999. MBNA gave her 100% of her compensation while she was out. Upon her return, nothing changed -- "it was like picking up from where I had left off."

On September 21, 1998, Arasteh [**33] sent Dimsey a letter which responded to the criticisms articulated in his 1998 mid year evaluation. In the letter, Arasteh stated that she had documentation to refute Dimsey's negative comments and that she believed that the evaluation was in retaliation for her filing a charge with the E.E.O.C. The parties dispute the purpose of the letter. At the bottom of each page of the letter, Arasteh stated "Information presented in this package is deemed 'CONFIDENTIAL' [sic] and should only be used in relationto my allegations against my employer, MBNA American Bank, N.A." Although the letter was addressed to Dimsey, the letter indicates that copies were sent to Cawley, Weaver, Boehl, John Scheflen (MBNA's General Counsel), Arasteh's attorney and the E.E.O.C. On October 7, 1998, White sent Arasteh a letter stating that Dimsey was out of the country but he would provide her with an "appropriate response" when he returned. [26] White testified that someone at MBNA told her to send the letter and what information to include.

> [26] It appears that Arasteh forwarded her copy of White's letter to her attorney. At the bottom of the letter, there is a handwritten note from Arasteh dated October 13, 1998, which states ". . . FYI I just rec'd [sic] this memo from MBNA."

[**34] Upon his return, Dimsey wrote a response to Arasteh's letter and submitted it to MBNA's legal department rather than passing it on to either Arasteh or his manager. Dimsey stated that although this was not his usual procedure, since "there was litigation in process, I believe [sic] that was the correct thing to do." Although no one specifically told him to submit his comments to the legal department, Dimsey had, on a prior occasion, been instructed that he was to inform the legal department of all issues and complaints related to Arasteh. After sending his response to the legal department, Dimsey [*490] never communicated with Arasteh, either verbally or in writing, regarding his evaluation. Arasteh never received a written response to her letter rebutting Dimsey's "negative comments" from anyone at MBNA.

Arasteh filed her charge of discrimination against MBNA with the E.E.O.C. on May 12, 1998. She appended a long attachment which appears to be comprised of excerpts of her memorandum to Weaver and a "Sexual Harassment Questionnaire". The E.E.O.C. issued a right to sue letter on January 21, 1999, stating that it was "unable to conclude that the information obtained establishes [**35] violations of the statutes."

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 14 of 218

Page 10

146 F. Supp. 2d 476, *490; 2001 U.S. Dist. LEXIS 14301, **35

Arasteh timely filed this action. It appears from the record that as of approximately May 11, 2000, Arasteh continued to work at MBNA in the "communications area."

## IV. DISCUSSION

Although the factual background is somewhat involved thecourt's analysis is relatively straightforward. Arasteh's sexual harassment claim cannot succeed since (1) she is barred, on statute of limitations grounds, from asserting her allegations and (2) her allegations fail substantively. Nevertheless, the presence of a genuine issue of material fact prevents the court from granting MBNA summary judgment on Arasteh's retaliation claim since a reasonable jury could find for her.

### A. Sexual Harassment

In its motion, MBNA claims that it is entitled to summary judgment both on procedural and substantive grounds. The court agrees with MBNA that Arasteh's allegations of sex discrimination are both time-barred and fail to satisfy her prima facie burden. The court will, therefore, enter judgment in MBNA's favor on this claim. The court will discuss these issues in turn.

### 1. Procedural Grounds

A claim of employment discrimination under Title VII must be filed with [**36] the E.E.O.C. within 180 days of the last alleged discriminatory act. *See 42 U.S.C. § 2000e-5(e)*. There is an exception, however, to the 180 day E.E.O.C. filing period. If a state elects to defer to the E.E.O.C., then the 300 day statute of limitationsperiod becomes applicable for claims filed with that federal agency. *See Seredinski v. Clifton Precision Products, Co., 776 F.2d 56, 61 (3d Cir. 1985)* (quoting *42 U.S.C. § 2000e-5(d)*). Delaware allows claimants who file either with the E.E.O.C. or the Delaware Department of Labor to rely on the 300 day statute of limitations. *See 29 C.F.R. § 1601.13(a)(3)(iii)*. Since Arasteh filed a claim with the E.E.O.C., she is entitled (and limited) to pursuing claims of sexual harassment which occurred no more than 300 days prior to the date of her filing. *See Davis v. Calgon Corp., 627 F.2d 674, 677 (3d Cir. 1980)* (citing *Bean v. Crocker Nat'l Bank, 600 F.2d 754, 757-59 (9th Cir. 1979))*.

Arasteh filed her charge of discrimination with the E.E.O.C. on May 12, 1998. MBNA argues that she may not assert a claim [**37] for any incident alleged to have occurred before July 17, 1997 -- 300 days before the May 12 filing date. In response to this contention, Arasteh asserts that the 'continuing violation' doctrine allows her to include incidents prior to July 17, 1997. As the Third Circuit stated, "thecontinuing violation theory allows a plaintiff [to] pursue a Title VII claim for discriminatory conduct that began prior to the filing period if . . . [she] can demonstrate that the act is part of an ongoing practice or pattern of discrimination." *Rush v. Scott Specialty Gases, Inc. v. Philadelphia Elec. Co., 113 F.3d 476, 481 (3d Cir. 1997)* (internal quotations omitted).

[*491] To take advantage of this theory, however, Arasteh must demonstrate that Doe committed at least one act of sexual harassment within the 300 day filing window. *See id.* Moreover, the harassment cannot be an isolated or sporadic act of discrimination; it must be part of a continuing pattern. *See id.* The key factors for the court are (1) the similarity of the subject matter of the alleged acts of discrimination before and after the relevant date, (2) the frequency and/or the occurrence of the alleged [**38] acts, and (3) the degree of permanence "which should trigger an employee's awareness of and duty to assert . . . [her] rights." *See id. at 481-82; see also Parker v. Delaware Dep't of Pub. Safety, 11 F. Supp. 2d 467, 473 (D. Del. 1998)* (citing *Rush* and othercases). Therefore, the crucial questions before the court are (1) whether the record reveals that Doe sexually harassed Arasteh on or after July 17, 1997, and (2) whether the incident was part of a pattern of sexual harassment that began before that date. If Arasteh is able to adduce evidence to answer both of these questions affirmatively, she can recover damages for the entire violation, and more important, the 300 day filing period will not act as a bar.

Arasteh's brief does little more than offer the conclusory argument that the continuing violation theory applies to her case. In support of her position, Arasteh merely states that Doe began rubbing her legs and staring at her breasts "between March and June 1996 . . . and continued . . . by the time she received her end of the year 1996 evaluation." [27] Arasteh also makes two vague allegations that (1) the harassment was continuous between [**39] June and December 1996 and (2) "it continued into 1997." As noted above, however, the 1996 incidents are irrelevant since they only apply once a continuing violation is established. Arasteh neither states when in 1997 Doe allegedly sexually harassed her or

146 F. Supp. 2d 476, *491; 2001 U.S. Dist. LEXIS 14301, **39

describes the incident(s) with anyparticularity. [28] Since the court must construe any ambiguities in the record in Arasteh's favor, the court will assume -- without deciding -- that whatever happened in 1997 occurred after the 17th of July.

27    In her brief, Arasteh argues that Nelson's testimony establishes that he witnessed Doe rubbing her leg during a meeting. Regardless of whether Arasteh accurately characterizes Nelson's testimony, he did not state when the conversation or the meeting occurred.

28    Arasteh states that she does not remember if Doe stared at her breasts in 1997. She explains her failure to make a note of the 1997 incident(s) as an attempt "to stay professional." Additionally, it appears that any incident of Doe rubbing Arasteh's legs may have happened well before July 17, 1997. At her deposition, Arasteh stated that she did not have any notes about such a 1997 incident since "[they occurred] during 1996, and I didn't make notes about things like that at the time." See supra (describing Arasteh's reasoning for not reporting alleged sexual harassment).

[**40] Determining the character of the allegations, however, is a different matter. Arasteh's papers filed in opposition to the instant motion contain little description of the incident(s). The court will, therefore, examine the record in an attempt to decipher Arasteh's vague allegations of harassment in 1997. Arasteh filled out a "Charge Questionnaire" on April 24, 1998. Although she alleged other discriminatory acts aside from sexual harassment, she stated that the most recent alleged harm occurred on November 19, 1997. [29] Elsewhere [*492] in the record, a "Sexual Harassment Questionnaire" describes an incident on November 19, 1997, in which Doe yelled at her and directed her to sign out when she left the department. Arasteh stated that the consequence of this incident was that Doe and his secretary began losing respect for her. In addition to the incident on November 19, 1997, the addendum to the E.E.O.C. charge also includes two allegations concerning incidents after July 17, 1997. The allegations are that (1) on November 7, 1997, Doe paged her, used an "insulting tone" in front of Arasteh's "peers," asked her where she was and told her she should be at the office to discuss [**41] an office matter, and (2) on November 4 and 13, 1997, Arasteh attended a basic writing course but was not invited to an upper level seminar on December 10, 1997.

29    Although the Charge Questionnaire states "see attached sheets for details," Arasteh did not include additional sheets in her papers. See Pl. Ans. Br. Sum. J, App. Vol. 2, at B-377. MBNA's materials include a "Sexual Harassment Questionnaire" dated April 19, 1998 which may or may not be the relevant addendum. See Def. Br. Sum. J., App. Vol. 2, at A-307-51. Given the uncertainty, the court is unsure whether this document was attached to the E.E.O.C. Charge of Discrimination or the Charge Questionnaire. Moreover, the document in question appears to be little more than excerpts of the letter Arasteh sent to Weaver in January, 1998.

Despite the difficulties in characterizing these allegations as acts of sexual harassment, the court consider whether the interaction on November 19, 1997 (or other incidents in 1997) was part of a pattern or practice [**42] of sexual harassmentthat began earlier. An examination of all the above described incidents which allegedly occurred after July 17, 1997 reveals that none of them, even taken together, are sufficient to find a continuing violation.

The post July 17, 1997 incidents are not similar to the other earlier incidents (and are unrelated to each other). In November and December, 1997, Doe chastised Arasteh for being late, instructed her to sign out of the office, and required her to attend certain seminars. These acts are completely different, both in terms of subject matter and motivation, than inquiring about Arasteh's marriage, discussing with a co-worker whether Arasteh was a lesbian, asking her to lunch, staring at Arasteh's chest or breasts or rubbing her legs under the table at meetings. Although the alleged pre July 17, 1997 incidents did not occur within a work context or involved non-work related issues, the later situations were entirely employment related. Indeed, Arasteh concedes as much in her brief by identifying several of the post July 17, 1997 incidents as examples of Doe's retaliation rather than sexual harassment. See Pl. Ans. Br. Sum. J., at 13. Affording Arasteh [**43] every inference, thecourt concludes that, at best, the post July 17, 1997 incidents are retaliation for earlier charges of sexual harassment, not harassment itself. [30]

30    At her deposition, Arasteh stated that the main problem in 1997 was that Doe "made my life miserable" and that most of the harassment

146 F. Supp. 2d 476, *492; 2001 U.S. Dist. LEXIS 14301, **43

was in 1996.

Interestingly, Arasteh's contention that Doe's harassment was part of a pattern that began in 1996, and "continued into 1997," serves to undermine her reliance on the continuing violation theory. More specifically, given Arasteh's comments regarding the frequency and the tenor of the alleged incidents, there is no dispute that she was aware of the harassment well before July 17, 1997, but merely chose not to file until much later. The continuing violation doctrine was not developed to allow plaintiffs unlimited time to file a discrimination claim. *See Parker, 11 F. Supp. 2d at 473* (citing cases). The purpose of the doctrine is to afford a plaintiff time to "appreciate that [she [**44] is] being discriminated against . . . [by] living through a series of discriminatory acts and is thereby able to perceive the overall discriminatory pattern." *See id.* According to Arasteh's own testimony, the bulk of the harassment took place in 1996. *See* note [*493] 30, *supra*. If the harassment was as severe and pervasive as she alleges, Arasteh should have filed a complaint with the E.E.O.C. at the beginning of 1997, at the absolute latest. *See Parker, 11 F. Supp. 2d at 473* (citing *Stewart v. CPC International, Inc., 679 F.2d 117, 120 (7th Cir. 1982)* (stating that "a violation of Title VII occurs and triggers the time limit for filing a charge when the employee knew or should have known that he or she was discriminated against") (internal citations and quotations omitted).

Under any scenario, the court cannot transform Arasteh's statement that Doe's sexual harassment "continued into 1997" into the quantity or quality of evidence that establishes that there was at least one discriminatory act within the relevant 300 day period. Since Arasteh cannot overcome this procedural hurdle, the court must enter judgment in favor of MBNA [**45] on her sexual harassment claim.

**2. Substantive Grounds**

Even if the court were to excuse Arasteh's procedural defects, her sexual harassment claim must still fail. Her claim is predicated upon the alleged existence of a hostile work environment. [31] The determination of whether a hostile environment exists is made on a case-by-case basis after considering the totality of the circumstances. *See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482-84 (3d Cir. 1990); see also 29 C.F.R. § 1604.11(b)*. The *Andrews* court announced five elements plaintiffs

must meet to assert such claims: (1) the employee suffered intentional discrimination because of her sex, (2) the pervasiveness and regularity of the discrimination, [32] (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position and (5) the existence of respondeat superior liability. *See Andrews, 895 F.2d at 1482; see also Calloway v. E.I. duPont de Nemours and Co., 2000 U.S. Dist. LEXIS 12642, *11, C.A. 98-66- SLR, 2000 WL 1251909, [**46] at *3-*4 (D. Del. Aug. 8, 2000).* The court finds that the incidents Arasteh describes fail to meet the first two elements of the *Andrews* test. Since she cannot satisfy these two "essential elements" of her prima facie case, the court need not address the other three parts of the *Andrews* test. *See id.* at *7 & n.11.

31    The other type of sexual harassment claim -- quid pro quo harassment -- is not present in this case.

32    The *Andrews* court stated the harassment must be severe and pervasive. *See infra* for discussion on whether this test is correct in light of Supreme Court precedent.

**a. Arasteh's Discrimination Claims Are Not Gender Based**

Sexual harassment is not limited to explicit sexual advances or remarks. *See Andrews, 895 F.2d at 1485* (stating "to constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female [**47] employee"). Gender, however, must be a substantial factor in the discrimination; Arasteh must show that she would not have been treated the same way if she were a man. *See id.; see also Calloway, 2000 U.S. Dist. LEXIS 12642, 2000 WL 1251909, at *4* (citing cases). Such a determination is obvious where the allegations involve sexual propositions, innuendo, pornographic materials or sexually derogatory language. *See Andrews, 895 F.2d at 1482, n.3*. Nevertheless, the "mere utterance of an epithet, joke, or inappropriate taunt that may cause offense" is not actionable under Title VII. *See Weston v. Pennsylvania, 251 F.3d 420, 428, 2001 WL 539470, at *5 (3d Cir. [*494] 2001); see also Breeden v. Clark Cty. Sch. Dist., 532 U.S. 268, 121 S. Ct. 1508, 1510, 149 L. Ed. 2d 509 (per curiam); Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81-82, 140*

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 17 of 218

Page 13

146 F. Supp. 2d 476, *494; 2001 U.S. Dist. LEXIS 14301, **47

*L. Ed. 2d 201, 118 S. Ct. 998 (1998)*. Where the claims are not sexual by nature, the court must engage in an intensively factual analysis. *See Andrews, 895 F.2d at 1482* & n.3.

In this case, most of Arasteh's allegations of sexual harassment [**48] are not "sexual by nature." Doe's inquiry regarding the state of Arasteh's marriage and the recounting of his was general and Arasteh did not appear to take offense at the time. [33] His lunch invitation and his statement that Arasteh should socialize more appear to be work related. [34] The fact that Doe required Arasteh to sign in and out of the department and denied of her request to attend one seminar while making her attend a different one will not support a finding that these acts were born of gender related animus. Certainly, Arasteh has not adduced any evidence in the record to the contrary. Giving every inference to Arasteh, the only allegation which could conceivably be based in gender-related animus is Doe's alleged query to Nelson regarding Arasteh's sexual orientation. [35] Considering the totality of the circumstances, the other allegations are both too vague and not sufficiently sexual in nature to allow the court to find that they were motivated by perceptions about womanhood or gender stereotypes of appropriate female behavior. *See Andrews, 895 F.2d at 1483-83.*

33    In her deposition, Arasteh stated that she made a joking response to Rozkowski's alleged statement.

[**49]

34    Indeed, Doe suggested Arasteh socialize more since she was in a marketing environment. Other courts have rejected similar comments as evidence of gender based animus. *See Calloway, 2000 U.S. Dist. LEXIS 12642, *17, 2000 WL 1251909 at *5 & n.8* (finding supervisor's statement that plaintiff should be "more social" did not raise triable issue even where plaintiff interpreted comment to mean that she should "flirt" with her male co-workers).

35    The court notes that Nelson's testimony did not establish the context or the motivation behind the alleged question. In the absence of any motivation ascribed to Doe for asking the question, the court assumes -- without deciding -- that it had some gender-related animus. The isolated question, however, is not enough to permit Arasteh's claim to proceed. *See infra* at

section IVA(2)(b).

**b. Arasteh's Claimed Sexual Harassment Was not Pervasive or Regular**

As an initial matter, the parties dispute whether Arasteh must demonstrate both the frequency and the severity of the sexual harassment. [**50] The Supreme Court has recently reaffirmed its position that "sexual harassment is actionable under Title VII only if it is so severe *or* pervasive as to alter the conditions of the victim's employment and create an abusive working environment." [36] *See Breeden, 121 S. Ct. at 1509* (emphasis added and internal quotations and brackets omitted) (citing cases). In this case, however, Arasteh fails to meet even the more lenient standard for her claims.

36    Several courts have noted the apparent confusion and conflict in the Third Circuit. *See, e.g. Newsome v. Admin. Off. of the Courts of New Jersey, 103 F. Supp. 2d 807, 817, n.12 (D.N.J. 2000)*, The *Calloway* court decided to apply the "severe and pervasive," following a then-recent Third Circuit opinion which, in turn, relied on Supreme Court case law. *See Calloway, 2000 U.S. Dist. LEXIS 12642, *18, 2000 WL 1251909, at *5, n.9.* Since *Breeden* is a more recent pronouncement from the Court (and states it is in line with precedent), the court will apply the "severe or pervasive" standard.

[**51] To determine whether a hostile work environment is sufficiently severe or pervasive, the court must look at all the [*495] relevant circumstances surrounding the discriminatory conduct *See Harris v. Forklift Sys., 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).* The court should judge the objective severity of the harassment and can consider (1) the frequency, (2) the severity (3) whether it is physically threatening or humiliating (rather than an offensive utterance), (4) whether it unreasonably interferes with employee's work performance and (5) the effect on employee's psychological well-being. *See id.* No single factor is required or dispositive. *See id.* As the Court stated,

the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 18 of 218

Page 14

146 F. Supp. 2d 476, *495; 2001 U.S. Dist. LEXIS 14301, **51

not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts . . . to distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find [**52] severely hostile or abusive.

*Oncale, 523 U.S. at 81-82.*

Considering all the facts and circumstances surrounding Arasteh's claims of sexual harassment, the court concludes that no reasonable person could find them "severely hostile or abusive." Doe's comments about Arasteh's relationship with her husband and his suggestion she socialize more were merely casual statements. Indeed, Arasteh brushed them off and thought nothing of them at the time. Doe's question about Arasteh's sexual orientation was not made in her presence; it was merely repeated to her by a co-worker.

The allegation which gives the court greatest pause -- that Doe rubbed her legs and stared at her chest or breasts in meetings an unspecified number of times -- is also not sufficiently severe or pervasive. As to severity, Arasteh's own "additional comments" from her translated diary notes state, "he [Doe] was staring at me and touching my legs and it made me very uncomfortable. . . . I usually did not note these things. To me they were immaterial and I would handle them." [37] Arasteh's vague allegations make it difficult to determine the frequency of the alleged actions by Doe. As to pervasiveness, [**53] Arasteh alleges that soon after Doe began rubbing her legs at meetings, she began arriving at meetings late so as to avoid sitting next to him. Although she would sometimes find herself sitting next to Doe, it "didn't [sic] happen often." This type of sexual harassment allegation is not enough to fall within the strict frequency requirements of relevant precedent. Finally, Arasteh's claim that Doe stared at her chest and/or breasts is too vague, undated, and unsupported for the court to find that it, alone, could constitute sexual harassment under the circumstances.

[37]  *See* note 5, *supra* for a discussion on when these notations were made. Although it appears that they were made after the fact, they also seem to be an explanation to her attorney of her feelings at the time.

Given the current state of the record and weighing all the relevant circumstances, the court finds that no reasonable person could conclude that Doe's actions constituted sexual harassment. Arasteh cannot demonstrate that much of Doe's [**54] conduct was explicitly sexual. *See Calloway, 2000 U.S. Dist. LEXIS 12642, 2000 WL 1251909*, at *6 (describing cases which found hostile work environments) *see also Oncale, 523 U.S. at 80* (stating "we have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex [*496] merely because the words used have sexual content or connotations"). Based on the evidence in the record, the two allegations that come the closest -- asking Nelson whether she was a lesbian and rubbing her legs and staring at her chest or breasts -- were not sufficiently "severe or pervasive" to constitute sexual harassment within the meaning of Title VII. Although the court must, at this stage of the proceedings, grant Arasteh every inference, it will not engage in the kind of speculation necessary to overcome the significant factual gaps in the record.

**B. Retaliation**

To establish a prima facie case of discriminatory retaliation, Arasteh must demonstrate that (1) she engaged in a protected activity under Title VII, (2) MBNA took an adverse employment action against her, and (3) there is a causal connection [**55] between Arasteh's protected activity and MBNA's action. *See Weston, 251 F.3d 420, 2001 WL 539470* at *7 (citing cases); *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir. 1997)* (citing cases). Once Arasteh makes out a prima facie case, the burden shifts to MBNA to clearly establish, through the introduction of admissible evidence, legitimate, non-discriminatory reasons for the adverse employment action. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*. The burden then shifts back to Arasteh to rebut MBNA's proffered evidence as pretextual. *See id.* Although both parties agree that Arasteh engaged in protected activity (she sent letters to Weaver and Cawley as well as filed an E.E.O.C. complaint), they disagree as to whether she can satisfy the second and third elements of her prima facie case.

An "adverse employment action" other than discharge or refusal to hire must alter the employee's "compensation, terms, conditions, or privileges of

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 19 of 218

Page 15

146 F. Supp. 2d 476, *496; 2001 U.S. Dist. LEXIS 14301, **55

employment, deprives him or her of employment opportunities or adversely affects his or her status as an employee". *See Robinson, 120 F.3d at 1300* [**56] (internal quotations, brackets and citations omitted); *see also Burlington Indus. v. Ellerth, 524 U.S. 742, 761, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)* (stating that "[a] tangible employment action constitutes a significant change in employment status such as hiring, firing, *failing to promote, reassignment with significantly different responsibilities* or a decision causing a significant change in benefits) (emphasis added).

The parties spend a significant amount of time discussing Dimsey's 1998 mid year evaluation of Arasteh. The record, however, is largely silent on her transfer to Quality Assurance in the summer of 1998. MBNA contends that Arasteh's transfer was lateral, that she suffered no loss of pay or classification, and continued to receive raises and bonuses. As mentioned above, MBNA paints Arasteh as an employee who was merely complaining that the transfer resulted in her reporting to a less senior manager and that her new assignments were less interesting. To support its position, MBNA cites numerous cases which hold that undesirable work assignments and lateral transfers are not "tangible employment actions." *See* Def. Br. Sum. J. at 33-34.

[**57] The record, however, is not as clear as MBNA would lead the court to believe and raises other possible issues. Although Arasteh may be complaining about undesirable work, she has also adduced evidence which could lead a reasonable jury to determine that she was reassigned with significantly different responsibilities and that her chances of advancement or promotion at MBNA are restricted. As mentioned above, the record reveals that (1) Rydel, Arasteh's new supervisor in Quality Assurance, [*497] stated at her deposition that she did not ask for an additional employee, (2) at the time of the transfer there were no openings for vice presidents in Quality Assurance, (3) the character of the work available was things that a vice president would not normally do and (4) someone at MBNA told Rydel to "just give . . . [Arasteh] projects." These facts could suggest that Arasteh was not merely complaining about assignments but that there was a substantial negative -- and lasting -- change in her responsibilities, and that this change may have been in response to her complaints of harassment.

Furthermore, Weaver's testimony regarding Arasteh's

chances for promotion raises more questions [**58] than it answers. As noted earlier, although both parties would have the court believe that Weaver's comments unequivocally support its position, the record is not so clear. Weaver actually stated that (1) he believed it was "possible [but] not likely" that Arasteh would ever receive a promotion, and (2) he was not aware of any executive vice presidents "in the company" who have sued MBNA. [38] Since Weaver does not fully explain his comments further, [39] the court would have to speculate as to both his reasons for believing Arasteh was unlikely to get promoted and the meaning of his testimony regarding executive vice presidents who have sued MBNA. Since, at this stage in the proceedings, the court cannot fill in the evidentiary gaps with its own view, it finds that there are genuine issues of material fact whether Arasteh suffered an adverse employment action.

> 38   Since Arasteh is a vice president, it appears that her next promotion would be to the executive vice president level.
> 39   *See* note 24, *supra* (describing Weaver's errata sheet from his deposition)

[**59] There are also genuine issues of material facts surrounding the third step of the prima facie test -- a casual connection between Arasteh's protected actions and the possible adverse employment consequences. As with the second prima facie element, the parties do not sufficiently discuss Arasteh's transfer to Quality Assurance. Although it is true that temporal proximity must be "very close" to establish a causal connection, *Breeden, 121 S. Ct. at 1511* (citing cases), the facts, as demonstrated by the record, could support other inferences. For example, Weaver -- who is organizationally above Arasteh at MBNA -- stated his doubts about her chances of future promotion. Given Weaver's long involvement in the case and his failure to explain his reasoning, a reasonable jury could determine that there is a causal link above and beyond mere timing. Furthermore, the record is unclear on who ordered Arasteh's transfer, when the decision was made, and why it was made.

In addition to the record raising genuine issues of material fact regarding Arasteh's prima facie case, the court also believes that there are open questions regarding MBNA's reason for the transfer. Put simply, [**60] MBNA has not offered any evidence as to why Arasteh was transferred. Although a possible inference may be

Case 1:06-cv-00725-GMS     Document 39     Filed 01/07/2008     Page 20 of 218

Page 16

146 F. Supp. 2d 476, *497; 2001 U.S. Dist. LEXIS 14301, **60

because of Arasteh's alleged poor performance in the prior months, there is no evidence of this. Indeed, there is no testimony from anyone at MBNA regarding how and why the decision to transfer Arasteh was made. In the absence of such an explanation, the instructions to Rydel could appear suspect to a trier of fact.

By declining to grant MBNA summary judgment on Arasteh's retaliation claim, the court will not comment on the strength or weakness of either party's additional contentions and declines to evaluate the [*498] other evidence in the record. Most important, the court will not discuss Arasteh's claim that Dimsey's 1998 mid year evaluation was retaliatory or otherwise characterize the record on that issue. Rather, the court concludes that Arasteh has adduced sufficient specific evidence that could result in a finder of fact determining that her transfer to Quality Assurance was retaliatory. *Cf. Shelton v. Univ. of Med & Dentistry of N.J., 223 F.3d 220, 227 (3d Cir. 2000)* (agreeing with district court that plaintiff's "generic speculation that lateral [**61] transfers may

resultin long term economic consequences as to . . . [her] career prospects" was insufficient to raise factual dispute on failure to reasonably accommodate claim under Title VII).

## V. CONCLUSION

The duty of the court, at this stage of the proceedings, is to determine whether there are genuine issues for trial, not to impose its view of the evidence on the parties. After reviewing the record and analyzing it in light of the relevant law, the court concludes that Arasteh cannot, as a matter of law succeed on her sexual harassment claims since they are either time-barred or do not rise to the level of sexual harassment under Title VII. The court, however, finds that there are genuine issues of material fact which preclude it from ruling, as a matter of law, that MBNA did not retaliate against Arasteh by transferring her from one department to another. The court issued an order in anticipation of this memorandum opinion on May 24, 2001 (D.I. 131).

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 2

LEXSEE 2003 U.S. DIST. LEXIS 22636

**RISA A. BENETTE, et al., Plaintiffs, v. CINEMARK U.S.A., INC., d/b/a MOVIES 10, Defendant.**

**01-CV-6519L**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK**

*295 F. Supp. 2d 243*; *2003 U.S. Dist. LEXIS 22636*

**November 21, 2003, Decided**

**DISPOSITION:**     [**1] Defendant's motion for summary judgment was granted and plaintiffs' complaint was dismissed in its entirety with prejudice.

**COUNSEL:** For Risa A Benette, Roberto Rodriguez, PLAINTIFFS: Nira T Kermisch, Rochester, NY USA.

For Cinemark USA, Inc DBA Movies 10, DEFENDANT: Daniel J Moore, Harris Beach LLP, Pittsford, NY USA.

**JUDGES:** DAVID G. LARIMER, United States District Judge.

**OPINION BY:** DAVID G. LARIMER

**OPINION**

 [*246] DECISION AND ORDER

**INTRODUCTION**

    Plaintiff Risa Benette brought this action against defendant Cinemark U.S.A., Inc. d/b/a Movies 10 ("Cinemark") asserting a claim for hostile work environment based on sex, in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* Plaintiff Roberto Rodriguez brought this action against Cinemark asserting a claim for hostile work environment based on disability, in violation of the Americans with Disabilities Act, *42 U.S.C. § 12101 et seq.* ("ADA"). Plaintiffs also assert that Cinemark retaliated against them after they complained to Cinemark about the hostile

work environments and filed charges of discrimination with the New York State Division of Human Rights ("SDHR").

    [**2] Before the Court is Cinemark's motion for summary judgment (Dkt. # 12). For the reasons set forth below, Cinemark's motion is granted in its entirety.

**I. Benette's Claims**

**A. Hostile Work Environment**

    In order to prevail on a claim that sexual harassment has caused a hostile work environment in violation of Title VII, a plaintiff must establish two elements. First, plaintiff must show that her workplace was permeated with "discriminatory intimidation, ridicule, and insult ... that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)* (internal quotation marks and citations omitted). Second, plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003)*; *Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)*; *Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)*.

    [*247] To meet the first requirement, plaintiff must demonstrate "either [**3] that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)* (internal

Case 1:06-cv-00725-GMS     Document 39     Filed 01/07/2008     Page 23 of 218

Page 2

295 F. Supp. 2d 243, *247; 2003 U.S. Dist. LEXIS 22636, **3

quotation marks omitted). Plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton, 524 U.S. 775, 787, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998).*

In *Harris,* the Supreme Court set forth a non-exhaustive list of factors relevant to determining whether a given workplace is permeated with discrimination so "severe or pervasive" as to support a Title VII claim. These include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance"; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted to the plaintiff. *Harris, 510 U.S. at 23.*

The Second Circuit [**4] has instructed that the Court should consider the totality of the circumstances in determining whether plaintiff has submitted evidence sufficient to support a finding that a hostile work environment relating to discrimination existed. *See Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997)* (citing *Harris, 510 U.S. at 23).* Thus, the factors outlined above must be considered "cumulatively," so that the Court can "obtain a realistic view of the work environment." *Id.* (quoting *Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 444 (7th Cir. 1994)).* This includes evaluating the "quantity, frequency, and severity" of the incidents. *Id.* (citing *Vore v. Indiana Bell Tel. Co., 32 F.3d 1161, 1164 (7th Cir. 1994)).*

Applying these principles, I find that Benette's claim for hostile work environment must fail. Benette's claims principally relate to the language used by Derek Jones, her supervisor, an African-American male. There is no evidence in the record that Jones's conduct occurred because Benette was a woman. Although there is evidence of rude, boorish behavior by Jones, there is insufficient evidence that such [**5] conduct occurred because of Benette's gender or that she was treated any differently with respect to offensive language than her male counterparts. Moreover, when the Court views Benette's complaints and Jones's conduct in the context of the overall work environment that existed at Cinemark at the relevant time, there is little evidence of a gender-based or sexually-charged hostile work environment.

Jones was appointed General Manager of Movies 10 Theater in September, 1997. Both Benette and Rodriguez worked at the same theater as assistant managers. Jones was not a popular choice as general manager, at least among a cadre of employees. The former Acting General Manager, a woman, was passed over for the job of General Manager. She was preferred by Benette and other employees, and they did little to hide their dissatisfaction with Jones's appointment.

Brian Chapin, an employee at the theater, advised Cinemark managers, when addressing complaints about Jones, that Benette had decided she did not like Jones before he even assumed his duties because she believed that he should not have received the Manager's job. Benette even discussed activities that might get Jones fired. (Statement [**6] of Brian Chapin, Ex. 11, Statement of Facts Not In Dispute [hereafter "Statement of Facts"]). According [*248] to Chapin, Benette claimed that Jones got preferential treatment because he was black. Chapin described an intense "rivalry" between Jones and Benette at the theater. Benette denies that she held any animus towards Jones or believed that he received preferential treatment because of his race. She claims the former Acting General Manager and Chapin held these beliefs instead. Further, she denies discussing or planning activities that would get Jones fired, and claims that at one point during the investigation she actively discouraged Jones from resigning. (Deposition of Benette at pp. 69-74, Ex. 4, Statement of Facts; Benette Aff. at 57-62, Dkt. # 25).

Although there is some dispute regarding the infighting among the managers at Cinemark, Cinemark does not dispute that Jones engaged in the conduct about which Benette complains. Benette's primary complaints about Jones related to his vulgar and offensive language. Jones's vocabulary was peppered with invective against most employees and his own supervisors. Jones described the former acting general manager (a female) as "fucking [**7] ugly" and a "whore." He described his own supervisor, Charly Street (a male), as a "fucking asshole" and a person who "kisses corporate ass." Jones also frequently used the word "fuck" when speaking to employees and was often rude and abrupt with certain employees. This invective and Jones's rude behavior occurred in the presence of customers of the theater as well. In her letter to management describing Jones's behavior, Benette describes Jones's use of foul language within earshot of customers. (Ex. 13, Statement of Facts).

295 F. Supp. 2d 243, *248; 2003 U.S. Dist. LEXIS 22636, **7

Although Benette described the foul language, it appears that none of the profane language was directed to Benette in her presence. After Benette complained to Cinemark officials about Jones's behavior, she overheard him through the wall of Jones's office describe her to another assistant manager as a "fucking asshole" and a "trouble-making bitch." (Ex. 13, Statement of Facts).

There were also inappropriate comments made about other female employees and their anatomy. Benette claims she heard Jones refer to another female as having a "nice ass." Benette was also told that Jones had commented to another male employee that Benette had "big tits." Finally, Benette [**8] was told by a fellow male employee, Kocienski, that Jones had made certain lascivious comments relating to that male employee having sex with a particular female employee who Jones referred to as a "dog." Jones also asked Kocienski whether he an Benette were having a sexual relationship.

Because of Jones's conduct, Benette complained directly to Cinemark. Benette called Charly Street, a regional manager, and complained about Jones's conduct and his language. (Deposition of Benette at p. 88-96, Ex. 4, Statement of Facts). Because of these complaints, an investigator from Cinemark was sent to Rochester to interview all of the affected employees. In the process, Benette submitted a detailed, seven-page summary concerning the conduct that she found offensive (Ex. 13, Statement of Facts). In that letter, Benette described Jones as "unprofessional." She noted that he used rude and derogatory language with employees. She described Jones's use of vulgar and profane language concerning his superiors and the employees at the theater. She complained that Jones showed favoritism toward certain employees and was harsh to those he did not favor. In this submission though, Benette did not claim [**9] that the actions she complained of were taken against her on account of her gender, or that she had [*249] been treated different than male employees.

The investigator sent by Cinemark, Mario Gonzalez, interviewed eighteen employees, including Jones. Jones denied the allegations against him and claimed that his accusers had engaged in misconduct themselves (Ex. 15, Statement of Facts). Gonzalez's report noted problems with Jones's conduct and other employees at the facility, including Benette. (Ex. 12, Statement of Facts). Gonzalez's conclusion was that Jones was guilty of using "inappropriate language" and conducting himself in an unprofessional manner toward customers and employees. But, he also found fault with Benette and others.

The conclusion to Gonzalez's report contained the following summary:

In interviewing the assistant managers at Movies 10, it was obvious that there is a problem between them and Jones. For whatever reason, they dislike each other. The assistants that complained against Jones seemed to be doing everything possible to make it hard to work with him. They reported that Jones uses inappropriate language, and he admitted that he has used bad language, but [**10] claimed they are just as guilty. When I interviewed assistant managers from Tinseltown Movies 16 [the site of Jones's prior employment], Jones has had a history [of] inappropriate language and conducting himself [in an] unprofessional [manner] .... I also believe that ... Rodriguez and Benette have instigated many of the problems that exist, and are responsible for not getting along with Jones, or allowing the operation of the theater to function as smooth as it should be. (Ex. 12, Statement of Facts).

Based on the investigation, Jones was counseled and given a written reprimand concerning use of abusive language and engaging in unprofessional behavior. (Ex. 17, Statement of Facts). He was placed on "probation" and warned that "immediate termination" would result if the conduct continued.

Benette complained again to Street about Jones. (Ex. 20, Statement of Facts). Cinemark responded and sent another investigator, Danny Myers, who conducted interviews and concluded that much of what Benette had reported should be discounted. (Ex. 21, Statement of Facts). According to Myers' report, Jones's behavior had improved "a lot." According to Myers, the majority of assistant managers [**11] acknowledged Jones's improvements. Although Benette had marshaled several complaints, when the affected employees were contacted, they had no direct personal knowledge of the matters at issue. According to Myers, even Benette acknowledged

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 25 of 218

Page 4

295 F. Supp. 2d 243, *249; 2003 U.S. Dist. LEXIS 22636, **11

that Jones's behavior had improved "since they sat down and talked through their issues." In fact, Benette had apparently called Street and told him that it was unnecessary to send Myers to conduct the investigation. (Ex. 21, Statement of Facts).

On January 14, 1998, Benette, together with Rodriguez and Kocienski, filed separate claims of discrimination with the State Division of Human Rights ("SDHR") (Exs. 32, 33, 34, Statement of Facts). All of the claims related to the language and conduct of Derek Jones. Benette claimed discrimination on account of her gender and for retaliation for complaining about discrimination. (Ex. 32, Statement of Facts). Kocienski complained of discrimination on account of his gender (male) and retaliation. (Ex. 33, Statement of Facts). Rodriguez claimed discrimination on account of a disability and for retaliation. (Ex. 34, Statement of Facts).

After conducting an investigation, the SDHR found no probable cause that [**12] Cinemark engaged in discriminatory conduct as [*250] to any of the complainants. (Exs. 37, 38 and 39, Statement of Facts). The SDHR examined Benette's hostile work environment claim in depth. It found that Jones's language was vulgar but determined that his behavior was not based on gender. It found that the incidents lacked any "sexual intent or motivation" (Ex. 38, p. 2, Statement of Facts) and did not rise to the level of "severity and pervasiveness" as to constitute sexual harassment. The SDHR noted that the respondent company promptly investigated Benette's complaints and took disciplinary action against Jones for his "disrespectful attitude" toward employees and customers. (Ex. 38, p. 3, Statement of Facts). In addition, the SDHR found fault on Benette's part, as well. The SDHR noted the following concerning Benette's actions:

> The investigation revealed strong evidence from different employees, which were not effectively rebutted by the Complainant [Benette], that she herself, engaged in behaviors that appear orchestrated at undermining the new manager, for personal reasons. The record shows incidents of Complainant calling co-workers derogatory names because they would not [**13] participate in backing her in her claiming sexual harassment against the manager .... The

investigation revealed that the staff at the theater was demoralized for some time, even before arrival of Derek Jones, and that there was infighting among the assistant managers, including the complainant, which had a detrimental effect on the theater's operations .... The division notes information in the record that Risa Benette and Rodriguez had a racial bias against the manager because he is black ...

I find, as did the SDHR, the conduct complained of here is not sufficient to constitute a "hostile work environment" as that term is defined in the law of employment discrimination. First of all, "hostile" work environment has a particular meaning in the field of employment discrimination. The conduct is deemed "hostile" if it relates to discriminatory conduct, *i.e.* involves treating a particular employee or class of employees different than others. A "hostile" work environment is not synonymous with an unpleasant, harsh, combative or difficult work environment. The nation's workplace is most likely populated with abusive, banal, profane and vulgar supervisors. No doubt they, like Jones, [**14] use insensitive, profane and vulgar language toward employees. Such evidence, though, is insufficient to make out a claim for discrimination. In assessing hostile work environment claims, the Court must be mindful that "Title VII is not a 'general civility code.'" *Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999)* (citing *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998).* Although Title VII "protects employees from improper discriminatory intimidation[,] it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors." *Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234, 250 (S.D.N.Y. 2000).* Rather, plaintiff must produce evidence that she was treated differently than others because of her sex. *Oncale, 523 U.S. at 79-80.*

What becomes apparent after reviewing the record is that Jones uttered his vulgarities to most people that he came into contact with, both male and female alike. There is no evidence that Jones would have treated Benette any differently concerning his language if she had been a male. "In the [**15] absence of evidence suggesting that a plaintiff's sex was relevant, the fact that

295 F. Supp. 2d 243, *250; 2003 U.S. Dist. LEXIS 22636, **15

both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex." *Brown v.* [*251] *Henderson, 257 F.3d 246, 254, (2d Cir. 2001)*. Although Benette described many instances of tasteless use of vulgar language by Jones, including repeated use of the word "fuck," the record shows that Jones used this language to all who were in earshot, irrespective of their gender. In addition, Jones did not limit his derogatory remarks to women. In her statement to Cinemark complaining of the conduct, Benette describes Jones's use of profanity when referring to male managers. (Ex. 13, Statement of Facts). The evidence is clear that Jones's conduct was not occasioned by the gender of the recipient of his invective. Importantly, "this inference is not necessarily eliminated even if some of the harassment has sexual content." *Id. at 254* (citing *Butler v. Ysleta Ind. Sch. Dist., 161 F.3d 263, 270-71 (5th Cir. 1998)* (affirming grant of summary judgment to defendants where a [**16] school principal sent lewd and insulting letters to both men and women)); *see also Petrosino v. Bell Atl., 2003 U.S. Dist. LEXIS 4616, No. 99 CV 4072, 2003 WL 1622885 (E.D.N.Y. Mar. 20, 2003)* (granting summary judgment on sexual harassment hostile work environment claim where there was no evidence that foul language and sexually explicit graffiti that depicted men and women, including plaintiff, were motivated by plaintiff's sex).

Plaintiff has failed to establish the requisite discriminatory animus to constitute a viable hostile environment claim. Although direct evidence of discriminatory animus is not necessary to survive summary judgment, plaintiff must produce at least some circumstantial evidence that shows discriminatory animus. *See Schwapp, 118 F.3d at 110*. Here, as clarified at oral argument, Benette relies on the fact that Jones used certain profane words that have a sexual connotation. However, this is not enough to prove discrimination based on sex. In this regard, the Supreme Court has held:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discrimination ... because of ... sex.' We have never held [**17] that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual

> content or connotations. 'The critical issue, Title VII indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'

*Oncale, 523 U.S. at 80* (citations omitted).

In any event, even if there was evidence suggesting that Jones's actions were based on Benette's sex, the conduct described above is insufficient to meet the objective component of a hostile work environment claim. Considering the factors to determine whether actions are sufficiently severe or pervasive to be actionable under Title VII, I find that Jones's conduct does not rise to the requisite level. The incidents occurred over a relatively short period of time, just over three months. [1] Although there is no threshold time period a plaintiff must surpass to make out a hostile work environment claim, three months is insufficient given the nature of the conduct here. Importantly, no one incident described by Benette is sufficiently severe itself to be [**18] actionable. *See Alfano, 294 F.3d at 380*. Rather, the majority of the offensive conduct is the boorish or offensive use of language by Jones in everyday conversation.

> 1    Jones began working at Movies 10 on September 24, 1997. Benette took a new position at a different theater on January 14, 1998.

Furthermore, most of the incidents were not directed at Benette herself or they did [*252] not happen in her presence. Instead, Jones's comments were heard 'second-hand' through other employees or his conduct was directed at other employees at Cinemark. Here, the so-called hearsay harassment and comments directed at others make up the majority of the conduct about which Benette complains. In fact, the record does not reveal a single comment or incident by Jones with a sexual connotation directed at Benette that occurred in her presence.

In sum, Benette has not produced sufficient evidence that the workplace environment was permeated with such discriminatory intimidation, ridicule, and insult based on her sex [**19] that a reasonable person would find that the terms and conditions of employment were altered. *See Kotcher v. Rosa & Sullivan Appliance Ctr., 957 F.2d 59, 62 (2d Cir. 1992)* ("The incidents must be repeated and

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 27 of 218

Page 6

295 F. Supp. 2d 243, *252; 2003 U.S. Dist. LEXIS 22636, **19

continuous; isolated acts or occasional episodes will not merit relief."); *Hayut v. State Univ. of New York, 217 F. Supp. 2d 280, 287 (N.D.N.Y. 2002)* (applying Title VII standards to educational setting and holding that "sporadic use of abusive language, gender related jokes, or occasional episodes of harassment will not constitute actionable hostile educational environment."); *see also Alfano, 294 F.3d at 379-81* (collecting cases) (reversing jury verdict for plaintiff on hostile work environment claim where five incidents were not sufficient to meet severity or pervasiveness standard); *Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 872-75 (5th Cir.1999)* (summary judgment granted on hostile work environment claim, where, in a two-year period, coworker made lewd comments about plaintiff's anatomy, tried to look down her shirt, and touched her numerous times); *Black v. Zaring Homes, Inc., 104 F.3d 822, 823-24 (6th Cir. 1997)* [**20] (granting judgment as a matter of law after trial to employer on hostile work environment claim where repeated sexual jokes and no fewer than five other sexually offensive remarks were made in a four-month period); *Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir. 1995)* (nine sexually offensive incidents in a seven-month period, including repeated references to plaintiff as a "pretty girl," grunting noises when plaintiff wore a particular skirt, and an episode of simulated masturbation did not create an objectively hostile environment). As such, Cinemark is entitled to summary judgment on Benette's hostile work environment claim. [2]

> 2   To prevail on her claim, Benette must also show that she subjectively perceived Jones's conduct as being hostile and abusive such that it altered the conditions of her working environment. Here, however, the record shows that during the investigation by Cinemark into Jones's conduct, Jones indicated that he wanted to resign. Plaintiff admitted at her deposition that she encouraged him not to do so, stating that his resignation would not have solved the problem. (Deposition of Benette at pp. 144-45, Ex. 4, Statement of Facts). Although the Court does not reach this issue, I have grave doubts about whether Benette could prove the subjective component of the hostile work environment claim based on this record.

[**21] **B. Benette's Retaliation Claim**

Benette also alleges that Cinemark retaliated against her. In January 1998, Benette asked for and was granted a promotion to a position at another theater in Rochester (Tinseltown) as the Supervisor of Janitorial Services. Her pay increased and she took on greater responsibilities. In spite of this promotion, Benette claims that Cinemark retaliated against her in her new position because she previously complained about Jones's conduct to management and to the SDHR. I find insufficient evidence of such conduct.

Claims of retaliation are analyzed under the familiar *McDonnell Douglas* burden-shifting [*253] rules. *Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 443 (2d Cir. 1999)*. To make out a *prima facie* claim for retaliation, a plaintiff must show: (1)that she participated in a protected activity; (2) that the defendant knew of the protected activity; (3) that she suffered an adverse employment action; and (4) that a causal connection exists between plaintiff's protected activity and the adverse employment action. *Gordon v. New York City Bd. of Educ., 232 F.3d 111, 113 (2d Cir. 2000)*. Once plaintiff [**22] makes out a *prima facie* case of retaliation, the burden shifts back to the employer to show that there was a legitimate, non-retaliatory reason for its actions. If the employer meets its burden, the burden shifts back to the plaintiff to show that "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." *Richardson, 180 F.3d at 443* (citing *Gallagher v. Delaney, 139 F.3d 338, 348 (2d Cir. 1998)*). Here, the parties do not dispute that plaintiff engaged in protected activity or that Cinemark knew of that activity. I find that Benette has failed to establish that the legitimate reasons advanced by Cinemark for the alleged adverse actions were merely a pretext for impermissible retaliation. Benette has failed to establish any causal connection between the adverse actions and the complaints that she made several months earlier against Jones.

Benette claims that she was eventually fired by Cinemark and, prior to that, the conditions of her employment at the new theater were made onerous and difficult. I find neither situation to constitute retaliation. First of all, Benette was [**23] one of over one hundred janitorial employees that were laid off by Cinemark in June, 1998 when the company decided to use outside contractors rather than employees for its janitorial services. Benette does not dispute that the layoff occurred

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 28 of 218

Page 7

295 F. Supp. 2d 243, *253; 2003 U.S. Dist. LEXIS 22636, **23

and that approximately one hundred co-workers were also terminated. Plaintiff has failed to offer any admissible evidence to suggest that this broad reduction in force was occasioned by Benette's complaints several months earlier about Jones. Plaintiff has failed to establish any causal connection whatsoever.

Benette also claims that retaliation occurred when limitations were placed on her work in her new position at Tinseltown. Specifically, she objects to the fact that the keys to the office at the theater were taken from her. As for Benette's allegations that Cinemark made her new job difficult, plaintiff has submitted her own affidavit and that of her former supervisor at Tinseltown, Ted Jackson, explaining why, in the context of this job, taking her keys away could be considered adverse. (Dkt. # # 25 & 27). Jackson explained that he and Benette used the office to do paperwork, to contact employees when they did not show up for work, to prepare [**24] schedules and new hire packages, to discipline employees in private, and to call 911 in case of an emergency. Assuming, without deciding, that taking Benette's keys to the office and the theater could be considered adverse employment actions sufficient to state a *prima facie* case, Cinemark has provided satisfactory non-retaliatory reasons for its conduct. (*See* Dkt. # 30, PP 45-64).

Shortly after Benette took the new position, the Democrat and Chronicle published an article rating area theaters. Tinseltown was given very poor ratings in the area of theater and restroom cleanliness. After investigating these reports with the Tinseltown's general manager, Cinemark learned that managers were using the office as a "late night hang out" instead of supervising the larger janitorial staff. Street was surprised that the janitorial managers at Tinseltown had access to the [*254] office because it was not company policy to allow office access. Of the twenty-three other theaters in the Northeast Region, twenty-two did not provide office access to janitorial staff. Therefore, Jackson was instructed to retrieve the office keys from Benette so as to come into compliance with company policy. Also, [**25] Cinemark asserts that Benette did not need keys to the theater itself do her job because she was required to be at the theater before it closed and was let in by the daytime staff.

Having found that Cinemark met its burden of offering legitimate non-retaliatory reasons for its conduct, the burden shifts to Benette to produce some evidence

that the proffered reasons are merely a pretext for discrimination.

I find that Benette has failed to show that "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reasons merely a pretext for impermissible retaliation." *Richardson, 180 F.3d at 443*. No reasonable jury could find on this evidence that the reasons for taking her keys away or terminating her were pretextual. The evidence advanced by Benette is insufficient to raise a jury issue concerning the legitimacy of the proffered reasons. All that we have, essentially, is Benette's own speculation that her termination and job restrictions were caused by the complaint she lodged earlier. Such speculation is insufficient. Plaintiff has failed completely to make any showing of a causal connection between the job action and her prior complaints. [**26] Therefore, the retaliation claim must fail.

## II. Rodriguez's Claims

### A. Hostile Work Environment Claim Under the ADA

Plaintiff, Roberto Rodriguez, claims that he was discriminated against because of a disability - a hearing impairment. He claims that his supervisor, Jones, created a hostile work environment by ridiculing him and not accommodating his disability by not speaking more clearly or repeating himself when necessary. Rodriguez claims that Jones frequently called him "the deaf one" and otherwise derided him by calling him a "deaf fucking idiot." Jones apparently complained to others about having to work with Rodriguez and Rodriguez claims Jones deliberately spoke softly to frustrate Rodriguez. This claim must be dismissed.

The Second Circuit analyzes claims of intentional discrimination under the ADA also using the *McDonnell Douglas* burden-shifting analysis. See *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown ("RECAP"), 294 F.3d 35, 48-49 (2d Cir. 2002)*. Thus, the initial burden is on plaintiff to establish a *prima facie* case. *Id.* To demonstrate a *prima facie* case of employment discrimination under the ADA, [**27] a plaintiff must show: (1) that he is an individual with a disability within the meaning of the ADA; (2) that his employer is subject to the ADA and had notice of the disability; (3) that the plaintiff was otherwise qualified to perform the essential functions of his position, with or without reasonable accommodation; and (4) that he was fired or suffered

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 29 of 218

Page 8

295 F. Supp. 2d 243, *254; 2003 U.S. Dist. LEXIS 22636, **27

adverse employment action because of the disability. *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999); Reeves v. Johnson Controls World Servs., 140 F.3d 144, 149-50 (2d Cir. 1998); Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998).* The Court finds that Rodriguez's ADA claim must fail because did not establish that he is disabled within the meaning of the ADA.

The ADA defines "disability" as: "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"; "a record of such an impairment"; or "being regarded as having such an impairment." *42 U.S.C. § 12102(2).* [*255] Here, plaintiff alleges that he is disabled under the first [**28] definition because he has a hearing impairment. [3] There is no dispute that hearing is a major life activity *per se. See Reeves, 140 F.3d at 152* (noting that the Courts and the EEOC treat hearing as major life activities *per se); see also 29 C.F.R. § 1630.2(i)* (major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"). Therefore, whether Rodriguez is disabled within the meaning of the ADA turns on whether his impairment substantially limits his ability to hear. *See Toyota Motor Mfg, Ky., Inc. v. Williams, 534 U.S. 184, 195-97, 151 L. Ed. 2d 615, 122 S. Ct. 681 (2002)* ("To qualify as disabled, a claimant must ... show that the limitation on the major life activity is 'substantia[l]'").

> 3   At oral argument, plaintiff's counsel indicated that plaintiff was not relying on the third definition of disability - being regarded as disabled.

A major life activity is substantially limited [**29] when an individual cannot perform an activity that an average person in the general population could perform, or faces significant restrictions in the "condition, manner, or duration under which the individual can ... perform [the] activity." *29 C.F.R. § 1630.2(j)(1)(i)-(ii).* To determine whether an impairment substantially limits a major life activity, the regulations suggest that the following factors be considered: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact of or resulting from the impairment. *29 C.F.R. § 1630.2(j)(2).*

Here, Rodriguez has submitted no evidence that his hearing impairment substantially limits his ability to hear. In fact, there is scant evidence in the record regarding Rodriguez's hearing impairment at all to which the Court can apply the factors outlined above. Rodriguez produced no evidence regarding the duration or permanency of his impairment. The only evidence regarding the nature and severity of his impairment comes from ambiguous descriptions in his deposition testimony and affidavit.

At his August [**30] 2002 deposition, Rodriguez was asked how his hearing affected his ability to hear conversations. He testified that he can hear conversations if there is no other noise in the room. If, however, there are a lot of people talking at the same time, he would have a "problem" hearing the conversation. He further testified that his impairment has never prevented him from performing any job he has held, and that he has never sought an accommodation from an employer because of his impairment. He also testified that the last time he saw a physician for his hearing was seven years earlier, in 1995. (Deposition of Rodriguez at pp. 18-19, Ex. 6, Statement of Facts).

The only medical evidence in the record regarding his impairment was filed by Cinemark and consists of an uncertified copy of an October 8, 2002, Pure Tone Audiogram Frequency test performed on Rodriguez. However, neither party (nor the medical record itself) explains the results of this exam or discusses what the exam results indicate about the nature or severity of Rodriguez's ability to hear. Furthermore, the 2002 exam results are not necessarily determinative of whether Rodriguez was disabled when he worked at Cinemark in 1997 [**31] and 1998.

As discussed above, Rodriguez has the burden of proving that he is disabled within the meaning of the ADA. He cannot meet that burden by showing merely that he has some type of hearing impairment. *See Toyota, 534 U.S. at 195* [*256] ("Merely having an impairment does not make one disabled for purposes of the ADA."). Rather, his hearing impairment has to substantially limit his hearing. The Supreme Court has stated that "'substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree'" when defining an impairment under the ADA. *Toyota, 534 U.S. at 196.* Therefore, a hearing impairment that only mildly or moderately affects Rodriguez's ability to hear would not define him as disabled under the ADA. *Id. at 197* ("The

word 'substantial' thus clearly precludes impairments that interfere in only a minor way with [a major life activity] from qualifying as disabilities.").

Rodriguez does not allege that his impairment substantially limits his ability to hear, and the evidence summarized above is insufficient to support such a finding. Accordingly, Cinemark is entitled to summary judgment on Rodriguez's [**32] ADA claim. *Ryan, 135 F.3d at 871-72* (affirming summary judgment to employer where employee failed to establish that disability substantially affected her ability to engage in a major life activity); *Manessis v. N.Y. City DOT, 2003 U.S. Dist. LEXIS 1921, 02 Civ. 359, 2003 WL 289969, *16 (S.D.N.Y. Feb. 10, 2003)* (summary judgment granted to employer where plaintiff failed to produce evidence that hearing impairment was substantially limiting within the meaning of the ADA); *see also Clemente v. Exec. Airlines, Inc., 213 F.3d 25, 31 (1st Cir. 2000)* (affirming summary judgment to employer where employee produced evidence that she suffered from hearing impairment, but failed to submit evidence that her hearing impairment substantially interfered with her ability to speak or hear).

### B. Retaliation and Constructive Discharge

To the extent that Rodriguez asserts a claim for retaliation and constructive discharge, that claim must also fail. [4] In March 1998, Jones gave Rodriguez a poor performance evaluation and an action plan regarding certain areas in which he needed improvement. The next day that Rodriguez was scheduled to work, Rodriguez fell [**33] ill and called in sick to work for one day. When Rodriguez returned to work, Jones requested that Rodriguez provide medical documentation for his absence. When Rodriguez could provide none, Jones wrote a disciplinary memo for Rodriguez and suspended him for one week. Rodriguez did not return to work after being suspended. Street contacted Rodriguez requesting that he return to work, but Rodriguez refused, claiming that Jones was retaliating against him and creating a hostile work environment.

[4]    Although Rodriguez asserted a retaliation claim in his complaint against Cinemark, he did not assert that he was constructively discharged. Nevertheless, his affidavit and deposition testimony suggest that he is claiming that Jones retaliated against him by, essentially, forcing him to resign. Rodriguez included this claim in his

SDHR charge. Therefore, the Court assumes that Rodriguez's retaliation claim is based on his constructive discharge.

To establish a constructive discharge, plaintiff must show that his employer [**34] deliberately made his working conditions so intolerable that he was forced to resign. *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73 (2d Cir. 2000); Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993); Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983)*. This burden is not an easy one to carry. The Second Circuit has hhhheld that a constructive discharge cannot be established simply through evidence that the "employee was dissatisfied with the nature of his [*257] assignments," "the employee feels that the quality of his work has been unfairly criticized," or "the employee's working conditions were difficult or unpleasant." *Stetson, 995 F.2d at 360*. Therefore, "a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id. at 361* (quoting *Pena, 702 F.2d at 325*).

I find that no rational [**35] trier of fact could conclude reasonably from these facts that the incidents about which Rodriguez complains made his working conditions so difficult or unpleasant that he felt compelled to resign. *Pena, 702 F.2d at 325*. Rodriguez claims that he quit because he could no longer tolerate the hostile work environment created by Jones and that Jones was out to get him. (Deposition of Rodriguez at p. 110, Ex. 6, Statement of Facts; Rodriguez Aff. at P71, Dkt. # 26). Specifically, he alleges that Jones gave him an undeserved negative employee evaluation and then disciplined him wrongly when he could not provide a medical excuse. However, this kind of employee concern does the not meet the stringent standard for demonstrating constructive discharge. *Stetson, 995 F.2d at 361-62* (finding that no rational trier of fact could conclude that employee was constructively discharged where employee was dissatisfied with work assignments, believed he was being unfairly criticized, and that he was undercompensated); *Gray v. York Newspapers, Inc., 957 F.2d 1070 (3d Cir. 1992)* (employee's subjective interpretation that continued employment would be uncomfortable [**36] and demeaning and would lead to demotion or termination in the future does not constitute

295 F. Supp. 2d 243, *257; 2003 U.S. Dist. LEXIS 22636, **36

constructive discharge).

It is not enough that a reasonable person would have "preferred not to continue working for that employer." *Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993)*. Rodriguez must show that his job had become "intolerable" to the point that he was "forced into an involuntary resignation." *Pena, 702 F.2d at 325*; *Stetson, 995 F.2d at 360* (quoting *Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1162 (3d Cir. 1993)* (even "hypercritical supervision" and "unfair and unwarranted treatment [are] by no means the same as constructive discharge.")). In addition, the record shows that Street contacted Rodriguez after he failed to report to work following his one week suspension and asked that he come back to Cinemark. Evidence that an employer wanted an employee to remain in its employ seriously undermines a claim of constructive discharge. *See*

*Whidbee, 223 F.3d at 74*. Based on this record, Rodriguez cannot make the requisite showing for constructive discharge. Accordingly, his retaliation [**37] claim is dismissed.

**CONCLUSION**

For the foregoing reasons, Cinemark's motion for summary judgment (Dkt. # 12) is granted and plaintiffs' complaint is dismissed in its entirety with prejudice.

IT IS SO ORDERED.

DAVID G. LARIMER

United States District Judge

Dated: November 21, 2003.

**COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW**

# TAB 3

LEXSEE 2001 U.S. DIST. LEXIS 16345

**NORMAN H. BROOKS, JR., Plaintiff, v. ROBERT G. FIORE and the NATIONWIDE MUTUAL INSURANCE CO., Defendants.**

**C.A.No. 00-803 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2001 U.S. Dist. LEXIS 16345*

**October 11, 2001, Decided**

**DISPOSITION:** [*1] Defendants' motion for summary judgment was granted. Judgment was entered in favor of the defendants on all claims. Defendants' motion to dismiss was declared moot.

**COUNSEL:** For NORMAN H. BROOKS, JR., plaintiff: Norman H. Brooks, Jr., Norman H. Brooks, Jr., Esq., Middletown, DE.

For ROBERT G. FIORE, NATIONWIDE MUTUAL INSURANCE COMPANY, defendants: Kathleen Furey McDonough, Wendy K. Voss, Erica L. Niezgoda, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

Plaintiff, Norman H. Brooks, Jr. ("Brooks"), filed suit against his former employer, Nationwide Mutual Insurance Co. ("Nationwide") and his supervisor Robert G. Fiore ("Fiore") (collectively "the defendants") for violating various state and federal laws. In total, Brooks has alleged eleven claims relating to his employment contract, his duties as a Staff Judge Advocate in the United States Air Force, and his subsequent termination from Nationwide.

On July 20, 2000, Brooks [*2] filed his original complaint in the Superior Court of Delaware, alleging violation of his rights under OSHA and retaliation by the defendants in response to his filing a complaint with the regional OSHA administrator. The action was removed to this court on August 30, 2000 on the basis of diversity jurisdiction. Brooks amended his original Complaint on January 8, 2001 to add various state law and statutory claims. Based on the amended complaint, the defendants filed a pre-answer motion to dismiss, or in the alternative for summary judgment, on January 22, 2001. They subsequently filed this motion for summary judgment on June 13, 2001.

Presently before the court is the defendants' motion for summary judgment on all eleven claims [1]. The court will grant the motion in its entirety because there are no genuine issues of material fact to be resolved by a factfinder.

> 1    January 22, 2001, the defendants filed a motion to dismiss for failure to state a claim under *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. Because the court will now rule on the defendants' subsequent motion for summary judgment on the same issues, the January 22, 2001 motion to dismiss is rendered moot and will not be ruled upon.

[*3] **II. STANDARD OF REVIEW**

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavts, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." *Fed. R.Civ. P. 56(c)*; *see also Boyle v. County of Allegheny, Pennsylvania,139 F.3d 386, 392 (3d Cir. 1998)*. Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle,139 F.3d at 392*. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* Indeciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assafv. Fields, 178 F.3d 170, 173-174 (3d Cir. 1999)*. [*4]

With these standards in mind, the court will briefly describe the facts and procedural history that led to the motion presently before the court.

## III. BACKGROUND

Brookswas employed by Nationwide as an attorney in its Delaware Trial Division office from February 1993 until November 9, 2000. While employed at Nationwide, Brookswas also a reserve Staff Judge Advocate in the United States Air Force.

During Brooks' interviews with Nationwide in 1993, he learned that it was Nationwide'spractice to conduct a performance evaluation after one year of employment and then annually thereafter. These performance evaluations were used in determining whether the employee received a pay raise. Nationwide did not, however, guarantee its employees would receive a post-evaluation raise, regardless of the outcome of an evaluation. Nationwide also assured Brooks, prior to his accepting employment with them, that his job responsibilities would not interfere with his reserve military commitments. These policies were also contained in an employee handbook, which Brooks has acknowledged he received and read. The handbook further clarifies that Nationwide's relationship with its employees is [*5] an at-will relationship.

During the first three years of Brooks' employment with Nationwide, Ransford Palmer was his supervisor. Palmer completed annual performance reviews for Brooks. These reviews always resulted in an increase in compensation. In 1997, Fiore was appointed the

managing attorney of the Delaware Trial Division office and, therefore, became Brooks' direct supervisor. In May 1997, the first time that Fiore served as Brooks' rater, Brooks again received a raise. The following April, Brooks and Fiore discussed his performance, which resulted in a raise and a promotion. On this occasion, Fiore did not do a written performance evaluation. After complaining to John Flynn, Fiore's supervisor, Fiore completed a written performance evaluation, giving Brooks marks indicating that he "consistently achieved performance standards." Brooks then sent a memorandum entitled "Employee Response to Performance Evaluation" to John Jones, the Division Vice President. In that memorandum, Brooks asserted that his performance evaluation was "nothing more than an act of reprisal" due to Brooks'original complaint to Flynn about the late written evaluation.

Beginning in September 1998, the [*6] Delaware Trial Divisionattorneys were required to input their time records using a new computer system. Brooks refused to comply with that requirement. Moreover, Brooks asserts that when he typed on his office computer, he experienced pain in his wrists. Brooks believed that this problem was caused by an ergonomically incorrect work station. On November 9, 1998, Brooks filed a complaint with the regional OSHA office regarding his work station configuration. In response, Nationwide flew an occupational health nurse from Ohio to Delaware. The nurse recommended, and Flynn approved, the purchase of a new chair and computer stand for Brooks. Brooks withdrew his OSHA complaint.

In 1998, Nationwide also experienced problems with Brooks' lack of documentation with regard to his time away from the office for military service, which Nationwide paid for. Under Nationwide'spolicies, a member of the military could receive up to two weeks salary "differential" in a given year for time spent performing required duty. To qualify for the salary differential, however, the employee had to provide notice and documentation in regard to such benefits and/or the allocation of leave. Brooks failed to provide [*7] such documentation and, indeed, threatened to sue the office manager when she asked for the records.

Brooks' performance as an attorney for Nationwide was also suffering during this time. Flynn reviewed Brooks' files and noted severe deficiencies in his cases. Therefore, Flynn assigned Tom Bouchelle to monitor

Brooks' work on an ongoing basis. Fiore also advised Brooks that failure to heed future directives would result in immediate termination for insubordination.

In Spring 1999, Fiore informed Brooks that due to his performance deficiencies and interpersonal problems during the prior year, Brooks would not be receiving a salary increase. Fiore also asserted that he would not prepare a written performance evaluation for Brooks because it would be quite negative. Fiore finally put Brooks on a minimum of one year "probation" before any salary increase would even be considered. On October 21, 1999, however, Brooks again asked for a written performance review and salary increase for 1999. Fiore denied this request.

Brooks was called to military duty in April 2000. At that time, he again expressed concern that he had not received a written performance review in two years. When Brooks [*8] brought this concern to the Human Resources representative, Julie Blankenship, she informed him that records indicated that his most recent performance review had been conducted in April 1999. Brooks informed Flynn via e-mail that he had not received a review then. He concluded the e-mail by mentioning that Fiore must have retaliated against him for filing the OSHA complaint in November 1998. Flynn then confirmed with Fiore that, in fact, Brooks' last formal evaluation had been in September 1998.

Additionally, Fiore initially imposed certain conditions in connection with Brooks' April 2000 military leave. Among them was the requirement that Brooks use his vacation time for military service, before he would allow Brooks to leave. However, within one day, and prior to Brooks' leaving for duty, Fiore's instructions to Brooks were countermanded. Thereafter, all that remained for Brooks to do was to comply with Nationwide's normal documentation procedures regarding absences for which the employee is seeking paid leave.

Brooks filed another complaint with OSHA in April 2000. In this second complaint, Brooks alleged that both Fiore and Nationwide had retaliated against him for filing his [*9] November 1998 OSHA complaint by withholding subsequent performance reviews and salary adjustments. Brooks further asserted that Fiore's initial response to his impending military leave was in retaliation for the original OSHA complaint. Brooks twice offered to hold the retaliation complaint in abeyance if Flynn would intercede on his behalf with regard to his compensation and performance reviews. Flynn declined on both occasions to do so. Brooks later withdrew the April 2000 OSHA suit.

Brooks returned from his military leave in mid-May 2000. At that time, the office manager once again attempted to obtain the required documentation from him. Brooks refused and accused her of harassment. Brooks finally submitted the paperwork three months later.

On July 20, 2000, Brooks filed his initial lawsuit against Nationwide in the Superior Court of Delaware. Nationwide terminated Brooks' employment on November 9, 2000. Flynn decided to do so after Nationwide's General Counsel recommended that Brooks be terminated for filing a frivolous lawsuit against the company. The General Counsel stated that such a lawsuit constituted disruptive behavior and unprofessional conduct.

With this background [*10] in mind, the court will discuss each of Brooks' eleven claims in turn.

## IV. DISCUSSION

### A. Retaliation

Brooks has indicated that he is no longer pursuing Count One of his amended complaint. Accordingly, the court need not address Count One.

### B. Breach of Contract

Count Two of Brooks' amended complaint alleges that the defendants breached an employment contract between the defendants and Brooks. Brooks conceded during his deposition on May 29, 2001 that he never had a contract for employment with the defendant Fiore. Therefore, the court will grant summary judgment on Count Two as to the defendant Fiore.

With regard to the defendant Nationwide, Brooks has also failed to prove the existence of an employment contract between himself and the defendant Nationwide. Absent a contract of employment, an employee under Delaware law is considered to be an at-will employee. *See Heideck v. Kent Gen. Hosp., Inc., 446 A.2d 1095, 1096 (Del. 1982).* As such, he or she may be terminated with or without cause at any time. *See id.* Delaware law is clear that "written or oral statements to a prospective employee concerning the conditions of [the prospective

employee's] [*11] employment are not enforceable against the employer without some basic contract consideration, i.e. detrimental reliance by the employee upon the representations made by the employer." *Asher v. A.I. duPont Inst. of the Nemours Found., 1987 Del. Super. LEXIS 1206, 1987 WL 14876*, at *3 (Del.Super. June 19, 1997) (citing 9 WILLISTON ON CONTRACTS § 1017 (3d ed.).

Brooks' breach of contract claim rests first upon the theory that the pre-hire oral statements made to him formed a valid oral employment contract. As previously noted, these alleged statements include statements that Brooks would receive annual performance reviews and would be permitted to continue serving in the U.S. Air Force reserve without detriment to his position with Nationwide. Such statements, which merely reiterated Nationwide policy, are not sufficient to create enforceable contractual obligations under Delaware law. *See Avallone v. Wilmington Med. Ctr., Inc., 553 F. Supp. 931, 936 (D. Del. 1982)*; *Asher* 1987WL 14876, at *3. Brooks has presented no evidence that at the time of hire, there was any negotiation, much less consideration, for Nationwide's alleged oral promises. Indeed, Brooks testified [*12] during his deposition that he did not condition his acceptance of Nationwide's employment offer in any way. As such, the court finds no valid oral contract.

Alternatively, Brooks argues that a written contract embodying the terms of his employment was created by a series of documents, including Nationwide's Employee Handbook, a document entitled "Total Compensation Statement," several annual performance evaluations, pay stubs and a statement that Brooks signed, in which he agreed to limit his private practice of law during the time of his employment with Nationwide. This argument too must fail.

Brooks acknowledged that he received an employee handbook in 1993. At his deposition, upon being shown a copy of an employee handbook dated April 1993, Brooks agreed that the book was the one given to him when he began his employment at Nationwide. That handbook clearly states as follows:

> The philosophies, policies, procedures and benefits contained in this handbook are not conditions of employment, *nor do they imply, create or constitute an*

> *employment contract. Nationwide has an employment at will relationship with its employees.*This means both Nationwide and each employee have [*13] the right to terminate employment at any time, with or without reason. (emphasis added)

This language leaves no doubt as to the nature of the employment relationship Nationwide and its employees shared. Further, Delawarelaw is well-settled that an employee handbook containing a unilateral expression of company policies, does not create an employment contract. *See Heideckv. Kent Gen. Hosp., Inc., 446 A.2d 1095, 1096 (Del. 1982)*; *Asher*, 1987WL 14876, at *2-3. Furthermore, none of the other documents which Brooks cites, taken alone, or in conjunction with others, in any way changed his status as an employee at will.

Prior to beginning his employment with Nationwide, Brooks filled out and signed a formal employment application, which stated as follows:

> If I am granted employment, I agree to conform to the rules and regulations of Nationwide, and my employment and compensation can be terminated, with or without cause, and with or without notice, at any time, at the option of either Nationwide or me. I understand no supervisor or representative of Nationwide, other than the General Chairmanof Nationwide, has the authority to make any representation [*14] for employment for any specified period of time, or to make any representations contrary to the foregoing. The policies, procedures and statements contained on this application do not imply, create, or constitute, an employment contract.

It is undisputed that Brooks never had any conversations with the General Counsel of Nationwide regarding his employment, nor did they exchange any correspondence. Similarly, the Total Compensation Statement upon which Brooks relies also contains explicit language warning that the document does not "imply, create or constitute an employment contract." As for the document Brooks signed limiting his practice of law during his employment with Nationwide, that document contains no language

indicating that Brooks' employment was anything but at-will. Additionally, it does not contain any language related to performance evaluations, military service, or any of the other alleged "terms" of Brooks' employment "contract."

Therefore, and in light of the fact that Brooks failed to address this claim in his answering brief dated July 23, 2001, the court finds that there is no disputed issue as to Nationwide's assertion that there was no contract as a [*15] matter of law. Accordingly, summary judgment in favor of the defendants is granted on Count Two.

## C. Promissory Estoppel

In order to succeed on a claim for promissory estoppel, a plaintiff must prove (i) the making of a promise; (ii) with the intent to induce action or forbearance based on the promise; (iii) reasonable reliance; and (iv) injury. *See Scott-Douglas Corp. v. Greyhound Corp., 304 A.2d 309, 319 (Del. Super. 1973).* Mere expressions of opinion, expectation, or assumption are insufficient. *See Borish v. Graham, 655 A.2d 831, 835 (Del. Super. 1994).* Finally, a "unilateral expression" by an employer of its employment policy does not modify an employee's at-will status. Such expression is insufficient to give rise to a cause of action for at-will employees. *See Rizzo v. E.I. duPont de Nemours & Co., 1989 Del. Super. LEXIS 450, 1989 WL 135651,* at *2 (Del. Super. Oct. 31, 1989).

With regard to the defendant Fiore, Brooks points to no evidence of any promises made by Fiore. The court thus grants summary judgment on this count in favor of Fiore.

With regard to Nationwide, Brooks first alleges that Palmer made promises to him during the interview process. [*16] Contrary to Brooks' allegations, however, the record shows that the statements made by Palmer during the interview process merely reiterated standard Nationwide policies. Brooks further acknowledges that he cannot remember the exact language used by Palmer during that time. Rather, Brooks seeks to rely only on the conclusory allegations in his affidavit that Palmer used "promise-like language." As such, he cannot as a matter of law meet his burden of proving that any such statements made to him during the interview process were in promissory form. *See Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)* (noting that summary judgment shall be granted if, in opposition, the non-moving party rests solely "upon mere allegations, general denials, or . . . vague statements."); *see also Reeder v. Sanford School, Inc., 397 A.2d 139, 141 (Del. 1979)* (requiring promissory form unless there is evidence of fraud of falsity).

Moreover, Brooks has also failed to point to any evidence of reasonable and detrimental reliance on the alleged promises. As proof of reliance, Brooks argues that he detrimentally relied on Nationwide's promises by leaving his prior [*17] employment, with which he was "content." However, during Brooks' deposition, he freely admitted he was actively seeking other employment of exactly the type offered by Nationwide. The defendants also argue in response that, if accepting new employment alone could support a claim for promissory estoppel, the at-will doctrine would be effectively abolished. The court finds the defendants' argument to be persuasive.

Brooks further argues that Nationwide breached its "promise" to him that he could remain employed as a Staff Judge Advocate in the United States AirForce. [2] However, the alleged "promise" was nothing more than a restatement of Nationwide's duty under federal law to permit the military service of its employees. Promissory estoppel cannot be predicated upon a promise to do that which the promisor is already obliged to do. *Danby v. Osteopathic Assn. of Delaware, 34 Del. Ch. 427, 104 A.2d 903, 907 (Del. Super. 1954).* Moreover, on the present facts, Brooks does not deny that Nationwide in fact permitted him to fulfill his military obligation, thus making this argument moot.

> 2   Brooks argues for the first time in his Answer Brief that his real grievance with regard to statements made concerning his military service is, in fact, Nationwide's alleged promise of differential pay during military service. However, Brooks did not raise this issue in any way in his amended complaint. As such, the court will disregard this argument.

[*18] Next, Brooks argues that he was "hired" on January 15, 1993, and that Nationwide's disclaimers regarding, among other things, the at-will employment, were not provided until after he resigned from his previous employer. This argument is also unpersuasive because it is undisputed that Brooks was provided with Nationwide's handbook at or immediately after his interview, and that he signed an application for employment containing explicit disclaimers prior to

leaving his former employer.

Finally, Brooks contends that, because he did not receive any formal performance reviews in 1999 and 2000, he suffered an actionable injustice. This argument too must fail. While Brooks was clearly unhappy with the turn of events, his grievances with Nationwide did not amount to the sort of "injustice" that permits the invocation of the doctrine of promissory estoppel. There is ample evidence to show that Brooks was aware that he was not guaranteed a salary increase each year, was well appraised of his supervisor's opinion of his performance during the relevant time period, and was aware that any formal performance evaluations prepared during the relevant time period would not have led to a salary increase.

[*19] The court finds that Brooks failed to adduce sufficient evidence of reliance and injury to sustain Count Three and will, therefore, grant summary judgment for the defendants.

**D. Fraud**

The elements of fraud under Delaware law are well established. A party claiming fraud must demonstrate (1) a false representation, usually one of fact, made by the defendant;(2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's actions or inaction taken in justifiable reliance upon the representation; and (5)damage to the plaintiff as a result of such reliance. *See Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983).*

In the present case, Brooks alleges that the defendants committed fraud against him by falsifying company records to show that his most recent performance evaluation had been conducted in April 1999, when, in fact, he had not received a written performance evaluation since 1998. The court rejects this contention.

The evidence of record establishes unequivocally that the defendants did [*20] not possess the intent to deceive Brooks. To the contrary, Brooks himself admitted that Fiore informed him, prior to the time that the incorrect record was created, that he would receive no written performance evaluation in 1999. Brooks also acknowledged that Fiore advised him that he would not

receive a raise then, nor in the foreseeable future. Further, as soon as Nationwide's human resources representative learned that the company records erroneously showed that a performance evaluation had been performed in April 1999, Fiore had the record corrected. Fiore also directly informed Flynn that no evaluation had occurred in April 1999.

Additionally, Brooks never relied on the accuracy of the company record. The record evidence amply demonstrates that as soon as Brooks became aware of the inaccurate company record, he promptly sent Flynn an e-mail stating that the record was wrong and no such evaluation existed. Brooks, therefore, cannot now claim that he was misled by the incorrect record.

Finally, no harm resulted to Brooksas a result of the alleged fraud. Brooks argues that he waited until July 2000 to file his OSHA suit because in April 2000, the company records reflected that [*21] a performance evaluation had been completed in April 1999. However, even if Brooks were made to wait as a result of the erroneous entry, he alleges no cognizable harm resulting from that three month stay.

Brooks cannot establish the elements for a valid cause of action for fraud. As such, summary judgment is granted in favor of the defendants on Count Four.

**E. Breach of Implied Covenant of Good Faith and Fair Dealing**

In this portion of Brooks' claims, he argues that the defendants breached their duty to him to act in good faith and deal fairly by committing acts of fraud, deceit, or misrepresentation.

With respect to Fiore, Brooks admits he never had a contractual relationship with him. To the extent Brooks contends that Fiore acted as an agent of Nationwide,this claim must also fail. Under Delaware law, where a principle is disclosed in a breach of contract action, only the principle is liable for the breach and not the agent. *See Harris v. Dependable Used Cars, Inc.,1997 Del. Super. LEXIS 142, 1997 WL 358302,* at *1 (Del. Super. March 20, 1997).*Therefore, Fiore cannot be held liable either in his personal capacity or as the agent of Nationwide.

With respect to Nationwide, the court [*22] again finds that Brooks' argument is meritless. The Delaware Supreme Court has strictly limited the application of the

implied covenant in the employment context, holding that a plaintiff must establish that he or she falls into one of four exclusive categories. *See Lord v. Souder, 748 A.2d 393, 401 (Del. 2000)*. The four categories are: (1) where the termination violates public policy and no other remedial scheme exists; (2) where the employer misrepresented an important fact and the employee relied thereon to either accept a new position or remain in a present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation earned through the employee's past service; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination. *See E.I. duPont de Nemours & Co. v. Pressman, 679 A.2d 436, 442-44 (Del. 1996)*.

As the defendant stresses, however, irrespective of the category implicated, a claim for the breach of duty of good faith and fair dealing requires employer conduct amounting to fraud, deceit, or misrepresentation. *See Peterson v. Beebe Med. Ctr., Inc., 1992 Del. Super. LEXIS 454, 1992 WL 354087, [*23] at *5 (Del. Nov. 13, 1992), aff'd, 1993 Del. LEXIS 142 (Del. 1993)*. Thus, the traditional elements of fraud must be present in a claim for breach of an implied covenant of good faith. *See Hudson v. Wesley College, Inc., 1998 Del. Ch. LEXIS 235, 1998 WL 939712, at *13 (Del. Ch. Dec. 23, 1998) aff'd 734 A.2d 641 (Del. 1999)*.

In Count Five of his complaint, Brooks argues that the defendants breached the implied covenant of good faith and fair dealing by falsifying Nationwide computer records to show that he received an evaluation in September 1999. Brooks has, however, failed to bring forth any evidence that the incorrect record was in any way related to Nationwide's decision to terminate his employment. In fact, there is no dispute that Brooks' termination occurred as a direct result of his filing a meritless lawsuit against Nationwide. Thus, because no fraud or misrepresentation occurred here, summary judgment in favor of the defendants will be granted as to Count Five.

In Count Seven, Brooks bases his retaliation claim on a violation of public policy. Such a public policy, however, must be recognized by some legislative, administrative, or judicial authority. [*24] *See Shearin v. E.F. Hutton Group, Inc., 652 A.2d 578, 587-589 (Del. Ch. 1994)*. The employee asserting the claim must also be able to show that she was responsible in her capacity as

an employee for implementing the recognized public interest. *See E.I. duPont de Nemours & Co. v. Pressman, 679 A.2d 436, 441-442 (Del.1996)*.

Brooks argues that the defendants breached the duty of good faith and fair dealing when Fiore allegedly retaliated against him for reporting to senior management Fiore's purported inappropriate imposition of conditions on Brooks' military service. For Brooks to be protected by this implied covenant, however, he must, in his capacity as an employee of the defendant, occupy a position with responsibility for reporting misconduct. *See Lord v. Souder, 748 A.2d 393, 401 (Del. 2000)*. Brooks contends he occupied such a position because he is a Staff Judge Advocate in the Air National Guard. However, as the defendants correctly point out, the relevant inquiry is the nature of Brooks' duties *with the defendant employer*. There is no evidence that Nationwide charged Brooks with the responsibility of reporting his supervisor's [*25] allegedly improper actions with regard to his military leave. Furthermore, Brooks offers no legal support for his contention that his position as a Staff Judge Advocate conferred upon him a position of responsibility for reporting any purported misconduct of Nationwide.

For the above reasons, the court will grant summary judgment in favor of the defendants as to both Counts Five and Seven.

## F. Employment Rights of Members of the Uniformed Services

Brooks alleges that his rights under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), were violated from 1998-2000 by the defendants. [3] *See 38 U.S.C. § 4301 et seq. (2001)*. Specifically, Brooks argues that the defendants refused to permit him to serve his military duty and required him to seek pre-approval of any military service. Further, Brooks alleges that he did not receive a performance evaluation or pay increase as retaliation for exercising his rights under USERRA. It is clear from the record before the court that he was not prevented from serving military duty and was not subjected to conditions violating USERRA.

> 3   As a preliminary matter, it is clear from settled law that Fiore is not covered by USERRA. *See 38 U.S.C. § 4303(4)(A) (2001)*. Thus, he can not be held individually liable. Courts have recognized

that USERRA applies only to employers, or those individuals who have the power to hire or fire the employee. *See Satterfield v. Borough of Schuylkill Haven, 12 F. Supp. 2d 423, 438 (E.D. Pa. 1998).* Here, it is undisputed that, while Fiore carried out orders to fire Brooks, he did not initiate that decision, nor did he have the power to do so.

[*26] Brooks first alleges that his USERRA rights were violated because the defendants prevented him from serving military duty from 1998-2000. *See 38 U.S.C. § 4301 et seq. (2001).* The record clearly indicates, however, that the defendants not only permitted Brooks to fulfill his military commitments, they permitted him to receive CLE time and full pay for extended periods of military service for which Brooks was also receiving military pay. Brooks himself testified at his deposition that, in 1998, he and Fiore resolved their issues related to his military service and he did in fact serve.

Brooks argues next that the violation of his USERRA rights relate to Connie Peterson's attempts to have him properly document his military service time. He does not dispute, however, that this was done in order to account for any pay differential for which he might be eligible under Nationwide's *voluntary* policy of paying its employees the difference between any military pay received and their usual pay during periods of military service. However, there is no requirement under USERRA that Nationwide provide such differential pay to its employees. Further, USERRA does not [*27] prohibit employers from requiring certain notification procedures or documentation of military leave. In fact, USERRA specifically states that an individual wishing to perform military service is protected by the statute only if "the person...has given advance written or verbal notice of such service to such person's employer." *38 U.S.C. § 4312(a) (2001).* Thus, it is clear that the problems Brooks contends are related to the notification and pay procedures are not actionable under USERRA.

Brooks next alleges that he was penalized from 1998-2000 because the defendants held him to the same billable hour requirements as other attorneys and forced him to use vacation time for his military leave. There is, however, no record evidence that demonstrates any action was taken against Brooks as a result of his billable hours deficiency. To the contrary, in 2000, Brooks' billable hour goal was explicitly reduced to account for time spent on military leave. Even prior to 2000, there is no

evidence in the record that action was ever taken against Brooks for having a deficiency in his hours. Further, Brooks' contention that he was required to use vacation time for military [*28] duty is unsupported in the record. In fact, while Fiore was initially confused in April 2000 about the requirements of the law when he required Brooks to use his vacation time, that misunderstanding was promptly resolved. Thereafter, Brooks completed his military leave as scheduled.

Finally, Brooks argues that Fiore retaliated against him for reporting Fiore's mistaken April 2000 directive to Nationwide management by refusing to perform an annual review or salary increase. In the defendants' briefs, they point out that Brooks has twice changed this allegation. First Brooks alleged that the lack of a performance evaluation and salary increase were caused by Fiore's retaliation since Brooks went over Fiore's head to force him into action. Secondly, he attributed the lack of a performance evaluation and salary increase to retaliation for filing his OSHA complaint. He now claims it was retaliation for exercising his rights under USERRA. The court thus agrees with defendants that this claim is clearly a post-hac claim, and there is no evidence to support it.

## G. Unreimbursed Client Expenses

Brooks alleges that defendants failed to reimburse him for expenditures related to his employment [*29] at Nationwide. Specially, Brooks testified at his deposition that he is seeking reimbursement for expenditures that occurred from January 2000 through August 3, 2000.

Brooks has identified no basis for holding Fiore personally liable for these expenses. Thus, summary judgment will be granted as to Fiore.

With regard to Nationwide, the record clearly indicates that Brooks never submitted any receipts or requests for reimbursement for these alleged expenses during his employment. Nor has Brooks identified any specific expenses during the course of this litigation and, indeed, has failed to disclose an actual amount of money due him. As such, the court will grant summary judgment on Count Eight in favor of the defendants.

## H. Prima Facie Tort

Under Delaware law, claims for prima facie tort are not permitted in the employment context. *See Lord v. Souder, 748 A.2d 393, 403 (Del. 2000).* In *Lord,* the

Delaware Supreme Court considered a claim alleging prima facie tort (in addition to claims for breach of contract, promissory estoppel, violation of public policy, and fraud) based upon an at-will employee's termination. The Court concluded that the tort claim must [*30] be dismissed as inconsistent with the employment-at-will doctrine. The Court there viewed the tort claim as an effort to maintain an action for wrongful discharge in contravention of the exclusive categories established by *E.I. duPont de Nemours& Co. v. Pressman* (See discussion section B, *supra*). Contrary to Brooks' position, it is clear that *Lord* governs situations both arising during employment and at termination. *748 A.2d at 400*. As such, *Lord* controls Count Nine of Brooks' amended complaint. The court will follow this precedent and grant summary judgment in favor of the defendants on Count Nine.

### I. Wrongful Discharge

Brookstestified at his deposition that he believed there was no basis for his termination on November 9, 2000, other than Fiore's "knee-jerk reaction and wrongful perception" that Brooks' lawsuit was without merit. As previously noted, however, Fiore was not responsible for the decision to terminate Brooks' employment. That decision was in fact made by Flynn, upon the advice of Nationwide's General Counsel. Brooks further concedes that, even if Fiore had been the decision-maker, Brooks did not have an employment contract with [*31] Fiore. Thus, Fiore can not be held liable for wrongful termination. *See Harris v. Dependable Used Cars, Inc., 1997 Del. Super. LEXIS 142, 1997 WL 358302*, at *1 (Del. Super. 1997) (citing Delaware Rule that "where the principal is disclosed, only the principle is liable...not the agent.").

With respect to Nationwide's liability on this claim, Delaware courts have noted that nothing is "to be construed as limiting an employer's freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons." *See Layfield v. Beebe Med. Ctr, Inc., 1997 Del. Super. LEXIS 472, *11, 1997 WL 716900*, at *5 (Del.Super. July 18, 1997) (citing *E.I. duPont de Nemours & Co. v Pressman, 679 A.2d 436, 441 (Del. Super.1996))*. Indeed, these courts have further recognized that, due to the personal nature of an employment relationship, causes of action should not be based solely on personal motivations such as dislike, hatred, or ill-will alone. *See id.* at *11. Thus,

the employer's conduct must rise to the level of fraud, deceit, or misrepresentation. *See id.* Courts in other jurisdictions have followed this rationale, and held that an action for wrongful termination [*32] does not lie where the at-will employee was terminated for suing the employer. *See e.g., Tynes v. Shoney's, Inc.,867 F. Supp. 330, 334 (D. Md. 1994); Deiters v. Home Depot U.S.A., Inc.,842 F. Supp. 1023, 1028 (M.D. Tenn. 1993)*.

Asin Counts Five and Seven of Brooks' complaint, the court here finds no evidence of fraud, deceit, or misrepresentation on Nationwide's part sufficient to sustain a charge of wrongful discharge. Nationwide has made no attempt to hide the reason it fired Brooks, namely that its General Counselhad found the lawsuit to be frivolous and disruptive to the office, while also calling into question Brooks' professional integrity and judgment. On these facts, the court will not find Nationwide acted beyond its legal rights when dealing with such an at-will employee.

For the above reasons, the court will grant summary judgment with regard to Count Ten.

### J. Consolidated Omnibus Budget Reconciliation Act

Thecourt will grant summary judgment on Count Eleven, although it was not briefed by the defendants until they filed their reply brief on July 23, 2001, because Brooks has voluntarily withdrawn this claim in his answer to [*33] interrogatory question number 14. As there is no longer a dispute as to this issue, summary judgment will be granted.

### V.CONCLUSION

For these reasons, IT IS HEREBY ORDERED that:

1.The Pre-Answer Motion to Dismiss (D.I. 21) filed by Nationwide Mutual InsuranceCompany and Robert G. Fiore is declared moot;

2. The Motionfor Summary Judgment (D.I. 59) filed by Nationwide Mutual Insurance Companyand Robert G. Fiore is GRANTED.

3. Judgment BE AND IS HEREBYENTERED in favor of the defendants on all claims against them.

2001 U.S. Dist. LEXIS 16345, *33

UNITEDSTATES DISTRICT JUDGE

Date: October 11, 2001

Gregory M. Sleet

**COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW**

# TAB 4

LEXSEE 2000 U.S. DIST. LEXIS 12642

**CATHERINE L. CALLOWAY, Plaintiff, v. E.I. DUPONT DE NEMOURS AND
COMPANY, a Delaware corporation, Defendant.**

**C.A. No. 98-669-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2000 U.S. Dist. LEXIS 12642*

**August 8, 2000, Decided**

**NOTICE:**          [*1]    FOR    ELECTRONIC
PUBLICATION ONLY

**DISPOSITION:**    Defendant's motion for summary
judgment granted.

**COUNSEL:** Catherine L. Calloway, Pro se.

For defendant: Kathleen Furey McDonough, Esquire,
William J. Dorgan, Esquire, Potter Anderson & Corroon
LLP, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, Chief Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

**Dated: August 8, 2000**

**Wilmington, Delaware**

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

Plaintiff, Catherine L. Calloway, filed this action on
December 2, 1998 against defendant E.I. DuPont de
Nemours and Company ("DuPont"), asserting a claim
under the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)
et seq., for hostile work environment and retaliation. (D.I.
1) Plaintiff alleges that her co-workers' and supervisors'
actions were willful and intentional, were based on

discriminatory animus, and resulted in emotional and
psychological stress that disabled her from work. (D.I. 1)
Plaintiff further alleges that she was subject to retaliation
because of her complaints to supervisors about
harassment. (D.I. 1) Plaintiff began her employment with
DuPont on March 26, 1990 and, on November 18, 1993,
was [*2] assigned to the Textile Department in DuPont's
nylon plant in Seaford, Delaware, where she became a
qualified spinning machine operator ("SMO"). [1] (D.I. 99
at A19) Her employment with DuPont was terminated on
July 31, 1997, when her health care provider refused to
release her to return to work after six months of disability
leave. (D.I. 90 at A10) The court has jurisdiction over
this action pursuant to *28 U.S.C. § 1331.*

> 1   The spinning machines at the Seaford Nylon
> Plant turn nylon thread into nylon yarn. Each
> spinning machine has a variety of positions, and
> the SMOs are assigned a series of positions along
> a particular spinning machine. (D.I. 90 at
> A151-52) The SMOs are responsible for the
> operation of their assigned spinning machine.
> Their job duties include performing routine
> preventive maintenance work, performing quality
> checks, packing the completed yarn, and keeping
> required records of break delay time. (D.I. 90 at
> A89-92, A145)

Currently before the court is defendant's motion [*3]
for summary judgment. (D.I. 88) For the reasons that
follow, the court shall grant defendant's motion.

**II. STANDARD OF REVIEW**

A court shall grant summary judgment only if "the
pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a [*4] genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)*. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most [*5] favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993)* (quoting *Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987))*.

## III. DISCUSSION

## A. Plaintiff's Allegations of Harassment and Retaliation

On December 29, 1997, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against her former employer, defendant. In her complaint, plaintiff asserted the following:

> I. After complaining of sexual harassment in November of 1996, I was continuously harassed by supervision up until my discharge. On July 31, 1997, I was discharged from E.I. DuPont.

> II. I was informed by the personnel office that I was discharged because my six months of disability had run out.

> III. I believe I have been discriminated against based upon my race (white), sex (female), age (44), disability, and retaliated against, because:

> 1. I was verbally harassed by my supervisors after making a sexual harassment complaint against [*6] a co-worker in 1996.

> 2. In January of 1997, I was taken out of work by my physician and placed on disability for one year. On July 31, 1997, I was discharged. I believe my disability time was cut short due to my sex (female), race (white), age (44), the type of disability I have, and because I placed a sexual harassment complaint against a co-worker.

(D.I. 90 at A149) She further asserted that the alleged discrimination took place, at the "earliest," in November 1996 and, at the "latest," on July 31, 1997. (D.I. 90 at A149)

Taking her EEOC complaint as the framework for this litigation, [2] the record assembled for these summary judgment proceedings, taken in a light most favorable to plaintiff, demonstrates that the following incidents took place during the time period November 1, 1996 through July 31, 1997: [3]

> . On a number of occasions, individuals, both male and female, used plaintiff's payroll number without apparent authorization when making entries into the

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 46 of 218

Page 3
2000 U.S. Dist. LEXIS 12642, *6

Textile Spinning Information System ("TSIS") [4] and when operating plaintiff's assigned spinning machine. (D.I. 99 at A104-08)

. Plaintiff's supervisor reprimanded her on a number of occasions for "writing [*7] notes" in the spinning machine aisles despite the fact that she had been instructed to do so by another supervisor. (D.I. 90 at A21, A39-40; D.I. 99 at A162)

. Plaintiff's supervisors were unresponsive to her complaints of harassment and misuse of her payroll number. [5] (D.I. 90 at A11, A22, A43)

. A co-worker, whose employment with DuPont was terminated as a result of his actions, used plaintiff's payroll number to enter an offensive comment [6] into TSIS. [7] (D.I. 99 at A43, A49, A92)

. On approximately six (6) different occasions, derogatory remarks (calling out her name followed by either "boo hoo" or "cry baby") directed at plaintiff were announced over the intercom system. (D.I. 90 at A53-56)

. On December 14, 1996, plaintiff and her husband were placed on probation for falsification of records. (D.I. 90 at A13; D.I. 99 at A122, A124, A126, A129)

. On or about December 18, 1996, a female co-worker hit plaintiff's back with her fist. (D.I. 90 at A19, A36-37, A47, A61-62; D.I. 99 at A63, A159)

. One of the co-workers plaintiff had identified as harassing her kept wandering around the spinning machine aisles near her machine although he was not assigned [*8] to the area. (D.I. 90 at A47, A58-61)

. A card bearing the image of a crying baby and the words "Cry Baby" was left on plaintiff's tool belt. (D.I. 90 at A28, A52, A63; D.I. 99 at A52)

. On one occasion, plaintiff's waste

tub was moved out of position, requiring her to leave her assignment unattended while she realigned the tub. (D.I. 90 at A49, A62)

. A co-worker plaintiff had identified as harassing her was assigned to a nearby work station. (D.I. 90 at A20; D.I. 99 at A160)

. When plaintiff's supervisor directed her to return a copy of the job assignment chart, which she had removed "to study," two of her co-workers laughed at her. (D.I. 90 at A46-47, A57; D.I. 99 at A55-56)

. Plaintiff returned from lunch one day and discovered a hole in the palm of her leather work glove; she suspects the glove was cut by a co-worker. (D.I. 90 at A20, A50-51; D.I. 99 at A160)

. Plaintiff received an unsatisfactory performance rating on January 14, 1997. (D.I. 90 at A38; D.I. 99 at A123, A125)

. In contravention of her counselor's alleged instructions, plaintiff's supervisors attempted to contact her to inquire when she would be returning to work approximately [*9] four or five times between January 14, 1997 and July 31, 1997 (while she was out on disability leave). (D.I. 90 at A14, A25; D.I. 99 at A59, A153)

2   See the court's December 1, 1999 order. (D.I. 56)

3   The court notes that plaintiff filed discovery requests and received responses from defendant. Although not satisfied with said responses, the court has reviewed the discovery material and denies plaintiff's motions to compel (D.I. 85, 91), given her refusal to discuss with defendant and the court the entry of a protective order in this case, as well as the parameters of the case established by her EEOC complaint and the court's December 1, 1999 order. The court notes as well that plaintiff's hostile work environment

and retaliation claims are based particularly on her observations and experiences, as she has related them on the record.

4  TSIS is a computer system that tracks the efficiency of each spinning machine and SMO. (D.I. 90 at A151) It identifies each spinning machine by number and each SMO by his or her payroll number. (D.I. 90 at A151-52) TSIS can be used to generate reports that detail spinning machine downtime by machine number, position number, and payroll number of the SMO credited with the downtime as well as reports that provide the total downtime, average break delay time, and total number and types of breaks for each identified SMO. (D.I. 90 at A152)

[*10]

5  Plaintiff contends that on approximately six (6) different occasions her supervisor told her she was the "problem" and instructed her to be "more social." (D.I. 90 at A16-17, A22-24; D.I. 99 at A50-51, A155-58)

6  The comment at issue read: "Can't operate without my old man!!!!!"

7  Although other profane comments were entered into TSIS during the relevant time period, these comments were neither directed at plaintiff nor entered using her payroll number.

## B. Hostile Work Environment

In her complaint, plaintiff contends that the aforementioned conduct created a hostile and abusive work environment. Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. The Supreme Court has construed Title VII as covering more than "'terms' and 'conditions' [*11] in the narrow contractual sense," *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998)*, finding the statute "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment," *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)* (citations and internal quotation marks omitted). Consequently, a plaintiff may establish a violation of Title VII by proving

that gender-based discrimination was so pervasive it created a hostile or abusive work environment. *See id. at 66*. Consistent with this standard, in order for a plaintiff to succeed in a hostile work environment claim, the Court of Appeals for the Third Circuit requires a plaintiff to prove five elements:

> (1) the employee suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior [*12] liability.

*Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)* (footnote omitted); *accord Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999)*.

## 1. Gender-Based Discrimination

In the instant action, defendant contends that plaintiff's allegations do not amount to sexual harassment within the purview of Title VII. In so arguing, defendant focuses on the non-sexual nature of the conduct in question, contending that plaintiff's allegations are "not the types of claims that Title VII was enacted to address." (D.I. 89 at 20)

The Supreme Court has interpreted Title VII as affording "employees the right to work in an environment free from discriminatory intimidation, ridicule and insult." *Meritor, 477 U.S. at 65*. Contrary to defendant's argument, prevailing case law does not limit this right to freedom from ridicule or intimidation of only an explicitly sexual nature. *See, e.g., Andrews, 895 F.2d at 1485* ("To constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently [*13] severe to detrimentally affect a female employee."); *Hall v. Gus Constr. Co., 842 F.2d 1010, 1014 (8th Cir. 1988)* ("Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances."). As the Supreme Court recently recognized,

the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*523 U.S. at 81-82.* The Third Circuit has noted that "intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Andrews, 895 F.2d at 1485* (internal citations and quotations omitted). According to the Third Circuit, "there are no talismanic expressions which must be invoked as a [*14] condition-precedent to the application of laws designed to protect against discrimination. The words themselves are only relevant for what they reveal--the intent of the speaker." *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996).*

A plaintiff, therefore, need not allege overt sexual harassment in order to establish a hostile work environment claim under Title VII. However, a plaintiff does need to "'show that gender is a **substantial factor** in the discrimination, and that if the plaintiff had been a man she would not have been treated in the same manner." *Andrews, 895 F.2d at 1485* (internal citations and quotations omitted) (emphasis added). Thus, harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women may serve as evidence of a hostile or abusive work environment. *See, e.g., Andrews, 895 F.2d at 1485* (holding that "the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment"); *see also Williams v. General Motors Corp., 187 F.3d 553, 564-65 (6th Cir. 1999)* [*15] (holding that "**any** unequal treatment of an employee **that would not occur but for the employee's gender** may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII"); *Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 441 (1st Cir.*

*1997)* (stating that "many forms of offensive behavior may be included within the definition of hostile environment sexual harassment. . . . However, the overtones of such behavior must be, at the very least, sex-based so as to be a recognizable form of sex discrimination."); *Lipsett v. University of Puerto Rico, 864 F.2d 881, 905 (1st Cir. 1988)* (stating that a "[verbal] attack, although not explicitly sexual, was nonetheless charged with anti-female animus, and therefore could be found to have contributed significantly to the hostile environment"); *McKinney v. Dole, 246 U.S. App. D.C. 376, 765 F.2d 1129, 1138 (D.C. Cir. 1985)* (holding "that any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or [*16] pervasive, comprise an illegal condition of employment under Title VII"). The Supreme Court has cautioned, however, that

Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "discrimination . . . because of . . . sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical issue, Title VII's test indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

*Oncale, 523 U.S. at 80* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 25, 126 L. Ed. 2d 295, 114 S. Ct. 367*).

In the instant action, plaintiff has failed to demonstrate that gender was a substantial factor in the alleged discrimination. The Third Circuit has directed that discrimination on the basis of sex "is implicit, and thus should be recognized as a matter of course," where a case involves sexual propositions, innuendo, pornographic materials, or sexual derogatory language, but that "[a] more fact intensive analysis [is] necessary [*17] where the actions are not sexual by their very nature." *Andrews, 895 F.2d at 1482 n.3.* It is apparent from the allegations at bar that plaintiff did not get along

with co-workers or supervision and that she was the target of unwelcome attention. There is no evidence in the record, however, indicating that the facially gender-neutral conduct [8] plaintiff alleges was based on perceptions about womanhood or gendered stereotypes of appropriate female behavior rather than factors individual to plaintiff. Although plaintiff alleges instances of unprofessional and spiteful behavior on the part of her co-workers and supervisors, her allegations are devoid of any incidents wherein she was confronted with negative, gender-related comments. Nor does she complain of the use of insulting or derogatory language relating to women generally or herself as a women specifically. Evaluating the record as a whole and in a light most favorable to plaintiff, the court finds no evidence from which a reasonable jury could infer that the harassment plaintiff suffered was motivated by gender-based animus.

[8] None of the conduct plaintiff has identified concerned overtly offensive, sexually-oriented behavior. The only conduct plaintiff considered to be sexual in nature was her supervisor's admonishment that she be "more social." Although she interpreted this comment as implying she should "flirt" with her male co-workers, plaintiff concedes that her supervisor never explicitly said such.

[*18] **2. Pervasive and Regular**

Even if the court were to assume that the alleged conduct was motivated by gender-based animus, that conduct is not sufficiently "pervasive and regular" [9] to constitute a hostile work environment. To be actionable under Title VII, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)* (citations and internal quotation marks omitted). In considering whether a work environment is hostile or abusive, courts are directed not to examine the scenario on an incident-by-incident basis but to consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 23; see also Andrews, 895 F.2d at 1485; Williams, 187 F.3d*

at 563 [*19] ("The totality-of-the-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation."). The Supreme Court has cautioned, however, that Title VII is not meant to be a "general civility code for the workplace." *Oncale, 118 S. Ct. at 1002.* The statute, therefore, provides no redress for "'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'" *Faragher v. Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662* (quoting *Oncale, 118 S. Ct. at 1003*). Nor does it protect an individual from occasional teasing, sporadic use of abusive language or gender-related jokes, offhand comments, or isolated or single incidents of harassment (unless "extremely serious"). *118 S. Ct. at 2283-84.* As the Supreme Court has "made . . . clear[,] . . . conduct must be extreme to amount to a change in the terms and conditions of employment." *Id. at 2284.*

[9] The court recognizes that the "pervasive and regular" requirement of *Andrews* differs slightly from that set forth in *Meritor*, wherein the Supreme Court stated that alleged sexual harassment must be "severe or pervasive." *Meritor, 477 U.S. at 67* (emphasis added). In light of the fact that the Third Circuit has recently cited *Andrews* with approval in *Kunin* and *Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997)*, the court will assume that the *Andrews* "pervasive and regular" test is the governing standard for Title VII cases in this Circuit. In the case at bar, the distinction is not significant, however, as plaintiff has failed to meet the standards of either *Andrews* or *Meritor*.

[*20] While the comments and conduct of plaintiff's co-workers and supervisors may have been unprofessional and offensive, they collectively do not rise to the level of unlawfulness within the purview of Title VII. Unlike other cases involving hostile work environments, there is no evidence here that plaintiff was subjected to inquiries into her sex life, unwanted sexual propositioning, the display of sexual or pornographic material, significantly intrusive obscene language or gestures, improper touching, unreasonable criticism, pervasive antifemale commentary, or misogynist epithets. *Compare Andrews*, 895 at 1486 (holding that the court on

remand should view name calling, pornography, displaying sexual objects on desks, recurrent disappearance of plaintiffs' work product, anonymous phone calls, and destruction of property when considering whether the work environment was hostile); *Gares v. Willingborough Township, 90 F.3d 720, 723-24 (3d Cir. 1996)* (upholding jury verdict for plaintiff where supervisor referred to her as "Township slut" and "tramp," touched her in a degrading manner, referred to her breasts as "bazooka-size," and laughed when her co-worker joked about [*21] plaintiff's "dildo"); *Spain v. Gallegos, 26 F.3d 439, 449-50 (3d Cir. 1994)* (holding *Andrews* requirements were satisfied where plaintiff alleged she was the subject of pervasive rumors that she was involved in a sexual relationship with her superior which arose due to the superior's conduct); *Glickstein v. Neshaminy Sch. Dist., 1999 U.S. Dist. LEXIS 727,* No. Civ. A. 96-6236, 1999 WL 58578, at *8 (E.D. Pa. Jan. 26, 1999) (finding that evidence was sufficient to raise genuine issue of material fact as to whether conduct was pervasive and regular where plaintiff alleged that she was subjected to a nearly daily routine of harassment, including inappropriate sexual advances, being kissed against her will, having her buttocks grabbed and threatening behavior that interfered with her ability to perform her job); *Konstantopoulos v. Westvaco Corp., 893 F. Supp. 1263, 1277 (D. Del. 1994)* (upholding jury verdict for plaintiff where plaintiff offered evidence that her locker was vandalized, that she endured crude gestures and remarks, and that she received sexually demeaning letters from co-workers) *with Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 715-18 (3d Cir. 1997)* [*22] (finding that a hostile or abusive working environment did not exist where plaintiff was required to work in the proximity of employees who had previously harassed her and was subjected to mute gestures, squinting stares, and shaking fists); *Gautney v. Amerigas Propane, Inc., 107 F. Supp. 2d 634, 2000 U.S. Dist. LEXIS 10664, 2000 WL 1053563 (E.D. Pa. 2000)* (allegations that plaintiff was subjected to "unprofessional, offensive, and callow" conduct and comments, including discussions concerning the size of a male co-worker's "sex organs and his escapades with other women" and comments "that men did not like aggressive women, that [plaintiff] was only using 1/3 of her assets and that she should dress in a skirt and heels," did not amount to severe and pervasive harassment); *Bishop v. National R.R. Passenger Corp., 66 F. Supp. 2d 650, 664 (E.D. Pa. 1999)* (finding inactionable under Title VII conduct "consisting merely of staring, leering

and 'stud muffin' comments, with no physical touching or threats and no sexual overtones"); *Pittman v. Continental Airlines, Inc., 35 F. Supp. 2d 434, 442 (E.D. Pa. 1999)* (allegations that plaintiff occasionally encountered [*23] individuals who inquired about her personal life and extended conversations about relationships to a "graphic" level did not rise to the level of sexual hostility proscribed by Title VII); *LaRose v. Philadelphia Newspapers, Inc., 21 F. Supp. 2d 492, 500 (E.D. Pa. 1998)* (allegations that supervisor raised hand at plaintiff, followed her into an office, denied her overtime and computer training, and stood too close to her were insufficient to establish hostile work environment); *McGraw v. Wyeth-Ayerst Labs., Inc., 1997 U.S. Dist. LEXIS 20813,* No. Civ. A. 96-5780, 1997 WL 799437, at *6 (E.D. Pa. Dec. 30, 1997) (allegation that supervisor repeatedly asked plaintiff out on dates and kissed her against her will insufficient to establish hostile work environment); *Cooper-Nicholas v. City of Chester, 1997 U.S. Dist. LEXIS 20810,* No. Civ. A. 95-6493, 1997 WL 799443 (E.D. Pa. Dec. 30, 1997) (finding plaintiff's work environment not severely hostile although plaintiff's supervisor consistently made disparaging, vulgar, and offensive comments in public). At most, the evidence shows that over a two-month period [10] plaintiff was subjected to sporadic, unwelcome conduct and disparaging utterances. In sum, [*24] a rational factfinder could not reasonably conclude that the conduct complained of amounts to the "pervasive and regular" harassment that Title VII was enacted to redress.

> 10   In fact, according to plaintiff, the majority of the alleged incidents occurred during a one week period in December.

Having determined that plaintiff has failed to present a triable issue of fact with respect to two essential elements of the *prima facie* case for her hostile work environment claim, summary judgment as to this claim is appropriate. [11]

> 11   Having so decided, the court need not address defendant's argument that plaintiff has failed to establish the fifth element of the *prima facie* case, respondeat superior liability.

**B. Retaliation**

Plaintiff further alleges that after she complained to supervision of harassment by a co-worker she suffered [*25] reprisals at work. Title VII prohibits discrimination

against an employee who has exercised her rights under the Act:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because she [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title.

*42 U.S.C. § 2000e-3(a)*. Claims of retaliation brought pursuant to the Act are analyzed under a burden-shifting framework, the particulars of which vary depending on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Since review of the record does not reveal any direct evidence of retaliation and plaintiff does not purport to assert such, the court will analyze plaintiff's retaliation claim using the burden-shifting framework for "pretext" suits set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* and *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*. [*26] *See Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)*.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case for retaliation under Title VII. In order to do so, a plaintiff must demonstrate by a preponderance of the evidence that: (1) she engaged in protected activity; (2) that defendant took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action. *See Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1999)*. Once plaintiff has established a *prima facie* case, the burden shifts to defendant to "clearly set forth through the introduction of admissible evidence" reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. *See Burdine, 450 U.S. at 254-55*. If defendant rebuts the *prima facie* showing by demonstrating a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination drops from the case, and plaintiff must present [*27] sufficient evidence for a reasonable factfinder to reject the employer's

nondiscriminatory explanation for its decision. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*; *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 L. Ed. 2d 105, 120 S. Ct. 2097, 2106 (2000)*. To successfully rebut the defendant's proffered explanation, "the plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination." *Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997)* (citations omitted); *see also Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)* (in banc) ("The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible.").

In the instant action, defendant does not dispute that plaintiff engaged in protected activity within the purview of Title [*28] VII when she reported acts of harassment to supervision. Defendant argues, however, that the retaliatory acts alleged by plaintiff do not amount to "adverse employment actions" as that term has been defined by the Third Circuit. In *Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)*, the Third Circuit held that the "adverse employment element" of a retaliation claim requires that the "retaliatory conduct rise to the level of a violation of *42 U.S.C. § 2000e-2(a)(1) or (2)*." *Id. at 1300-01*. That provision makes it "an unlawful employment practice for an employer"

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . .;
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's . . . sex . . . .

*42 U.S.C. § 2000e-2* [*29] *(a)*. As interpreted in *Robinson*, this provision proscribes retaliatory conduct other than discharge or refusal to rehire "only if it alters

the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect[s] his [or her] status as an employee.'" *Robinson, 120 F.3d at 1300*; *see Burlington Indus. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998)* ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Consistent with this interpretation, the *Robinson* court found that allegations of "unsubstantiated oral reprimands" and "unnecessary derogatory comments" did not rise to the level of "adverse employment action" required for a retaliation claim because, while such conduct might constitute harassment, it did not affect the "terms, conditions, or privileges of employment" or future employment opportunities. *120 F.3d at 1301*.

Plaintiff [*30] at bar alleges she was retaliated against by her co-workers and supervisors because she complained about harassment at work. (D.I. PP 9, 12, 14) For the most part, the acts that plaintiff identifies as retaliatory are the same as those she claims constitute harassment. They include: (1) being reprimanded for excessive downtime; (2) being reprimanded for "writing notes" in the machine aisle; (3) being told she was the "problem"; (4) being placed on probation for falsifying records; (5) being forced to work adjacent to a co-worker she felt harassed her; (6) being given an "unsatisfactory" rating on January 14, 1997 while on probation; and (7) being terminated from employment with DuPont. (D.I. 90 at A39-43) She also cites as retaliatory behavior supervision's perceived failure to stop the harassment. (D.I. 90 at A39-43) Of these allegations, only those relating to plaintiff's probation and termination could rise to the level of an "adverse employment action" as defined by the Third Circuit. Plaintiff's remaining allegations, although they may constitute harassment, are not sufficient to qualify as retaliation under Title VII. As the Third Circuit has noted, "'not everything that makes [*31] an employee unhappy' qualifies as retaliation, for 'otherwise, minor and even trivial employment actions that an 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Id.* (quoting *Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996)*). Plaintiff's allegations of oral reprimands and minor employment actions constitute "trivial employment actions" not "serious and tangible

enough" to cause a significant change in employment status. [12] *Id.*

> 12     Whether plaintiff's placement on probation constitutes a "significant change in employment status" is a question the court need not address at this juncture since defendant does not dispute plaintiff's characterization of this act as an "adverse employment action."

To the extent that plaintiff's allegations concerning her probation and termination constitute adverse employment actions, defendant has come forward with evidence which, if taken as true, demonstrates there were legitimate, [*32] nonretaliatory reasons for both actions. Specifically, defendant contends that plaintiff and her husband were place on probation for falsifying records. Plaintiff was terminated because she was not released to return to work after six months of disability leave. In reply, plaintiff contends that she has proffered evidence sufficient to create a genuine issue of material fact by demonstrating that defendant's putative justifications are unworthy of credence and that retaliation for her complaints of harassment in fact motivated both decisions.

Defendant's intent in terminating plaintiff's employment and placing her on probation is a factual question. *See Walton v. Mental Health Assoc., 168 F.3d 661, 668 (3d Cir. 1999)*. Therefore, plaintiff can call into question defendant's intent only if she "'raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment.'" *Id.* (quoting *Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 899 (3d Cir. 1987)* (in banc)). In the case at bar, however, plaintiff's evidence is insufficient to meet this burden. In her attempt to show that defendant's enunciated reason for placing her on probation [*33] was pretextual, plaintiff first questions the accuracy of TSIS, proffering the affidavit of a former colleague at the Seaford Nylon Plant who avers that TSIS "had many problems," was inaccurate, and was not password protected. Regardless of the veracity of these allegations, plaintiff's collateral attack on the reliability of TSIS does not raise a triable issue of fact concerning the issue of retaliation. When questioned by DuPont management, plaintiff's husband admitted that on a number of occasions he had substituted his payroll number for that of his wife's and that these substitutions often occurred with respect to lengthy break delay periods. (D.I. 99 at 201) Therefore, the accuracy of TSIS

is not an issue. Nor does plaintiff's assertion that others used her payroll number without reprisal demonstrate that defendant's treatment of plaintiff was inconsistent with its treatment of other spinning machine operators. There is no indication in the record that any of the individuals cited by plaintiff used her payroll number for the purpose of creating a false impression as to her efficiency as a spinning machine operator, the charge levied by DuPont management against plaintiff and [*34] her husband and which formed the basis for plaintiff's probation. Consequently, comparison with these alleged instances of misuse does not raise an issue of material fact sufficient to preclude summary judgment.

Similarly, plaintiff has failed to demonstrate that defendant's enunciated reason for terminating her employment was pretextual. Plaintiff does not dispute that DuPont's disability plan provides for a "maximum period [of] six months for any single disability." (D.I. 90 at A119) Nor does she contest that her health care provider refused to release her to return to work after six months of disability leave. (D.I. 90 at A10; D.I. 99 at A136) Instead, she asserts that there were many instances where employees at the Seaford Nylon Plant "received additional benefits of disability or special treatment." (D.I. 99 at 33-35) The record, however, is devoid of any objective evidence in support of this allegation. Likewise, there is no evidence in the record to support plaintiff's claim that her low performance review in January 1997 was unwarranted. Thus, there is no evidence of record from which a reasonable jury could infer that plaintiff's probationary review and termination were [*35] the result of retaliation for her filing complaints of harassment.

In sum, the evidence demonstrates that plaintiff was placed on probation because she falsified records and her employment was terminated because she was not released to return to work after her disability leave. The court concludes that plaintiff has failed to demonstrate directly or circumstantially any "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in defendant's enunciated legitimate reasons for plaintiff's probation and termination from which a reasonable factfinder could rationally find the reasons "'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non[retaliatory] reasons.'" *Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)* (internal citations omitted). Consequently, summary judgment in favor of defendant is proper because plaintiff has failed to present evidence raising a triable issue of material fact concerning the issue of retaliation.

## IV. CONCLUSION

For the reasons stated above, the court concludes that there are no genuine issues of material fact relating to plaintiff's claims of hostile work environment [*36] and retaliation under Title VII. Therefore, defendant's motion for summary judgment shall be granted. An appropriate order shall issue.

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 5

LEXSEE 2002 U.S. DIST. LEXIS 3116

**DR. KATHLEEN CARTER, Plaintiff, v. DELAWARE STATE UNIVERSITY, DR. WILLIAM B. DELAUDER, PRESIDENT, DR. JOHNNY TOLLIVER, DEAN JACQUELYN W. GORUM, DR. ALETA HANNAH and DELAWARE STATE UNIVERSITY BOARD OF TRUSTEES, Defendants.**

**C.A. No. 99-642 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 3116*

**February 27, 2002, Decided**

**SUBSEQUENT HISTORY:** *Affirmed by Carter v. Del. State Univ., 2003 U.S. App. LEXIS 7219 (3d Cir. Del., Apr. 16, 2003)*

**DISPOSITION:**    [*1] Plaintiff's Motion for Partial Summary Judgment DENIED. Defendant's Motion for Summary Judgment GRANTED in part and DENIED in part. Summary Judgment ENTERED in favor of defendants in part.

**COUNSEL:** For KATHLEEN CARTER, Dr., plaintiff: Laurence V. Cronin, Smith, Katzenstein, & Furlow, Wilmington, DE.

For DELAWARE STATE UNIVERSITY, WILLIAM H. DELAUDER, Dr., JOHNNY TOLLIVER, Dr., JACQUELYNE W. GORUM, ALETA HANNAH, Dr., DELAWARE STATE UNIVERSITY BOARD OF TRUSTEES, defendants: John D. Balaguer, White & Williams, Wilmington, DE.

For DELAWARE STATE UNIVERSITY, WILLIAM H. DELAUDER, Dr., JOHNNY TOLLIVER, Dr., JACQUELYNE W. GORUM, defendants: Christian J. Singewald, White & Williams, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On September 28, 1999, Dr. Kathleen Carter filed a [*2] complaint alleging that her employer, Delaware State University ("DSU"), and the above named defendants improperly denied her application for tenure at the university. Carter's complaint asserts various causes of action. Count One alleges race and gender discrimination under Title VII, *42 U.S.C. § 2000e, et seq.* Counts II and III allege causes of action under *42 U.S.C. § 1981* and *42 U.S.C. § 1983*. Count IV asserts claims under *42 U.S.C. §§ 1985* and *1986*, as well as civil conspiracy. In Count V, Carter alleges that the defendants violated the Delaware Discrimination in Employment Act. Count VI asserts a violation of *Fourteenth Amendment*, based on a lack of due process in the tenure decision. Count VII alleges violations of the Delaware Constitution. Count VIII asserts breach of contract based on Carter's allegation that the defendants failed to adhere to the procedures in the collective bargaining agreement ("CBA"). Count IX alleges intentional infliction of emotional distress against all defendants. Finally, Count X requests punitive damages against all defendants.

Presently before [*3] the court are two motions - Carter's motion for partial summary judgment on Count VIII and the defendants' motion for summary judgment on all claims. In her motion for partial summary judgment, Carter asserts that the CBA clearly states that only "documented" evidence may be considered in granting or denying tenure. Carter argues that the defendants violated the terms of the CBA by considering

oral, hearsay evidence in making their tenure decision. The defendants argue that Carter's claim is barred by the *Eleventh Amendment's* prohibition of pendent state law claims, or alternatively, that the CBA permits the consideration of oral evidence.

In their motion for summary judgment, the defendants assert that the remaining claims should be dismissed for various reasons. First, they argue that Count I should be dismissed because there is no direct evidence of racial or gender animus on the part of the university. Moreover, the defendants assert that there were valid, non-discriminatory reasons for the denial of tenure, such as Carter's deficiencies on certain projects. Second, the defendants assert that the *Eleventh Amendment* limits the claims under *sections 1981, 1983, 1985,* and *1986* to [*4] prospective injunctive relief against the individual defendants. The defendants further argue that the *§ 1983* claims should be dismissed because state officers cannot be sued in their official capacity under *§ 1983*. Moreover, the defendants assert that the civil conspiracy claims under *§ 1985* and *§ 1986* should be dismissed because there is no racially motivated conspiracy, and a conspiracy cannot exist where only one state agency is implicated.

The defendants also assert that Counts V and VII are legally invalid. [1] The defendants defend Count VI by noting that there was no due process violation because Carter was not guaranteed tenure, and the tenure process is inherently subjective. The defendants argue that the court should dismiss the intentional infliction of emotional distress claim in Count IX because pendent state law claims against state entities are barred by the *Eleventh Amendment*. Finally, the defendants argue there is no malice present that would justify the award of punitive damages.

> 1  In her answering brief, the Plaintiff concedes that the claims under Counts V and VII are invalid. (D.I. 107 at 33, 37.) Thus, summary judgment for the defendants is appropriate on these claims. The court will not, therefore, discuss these claims.

[*5]  Upon review of the briefs, the record, and the law, the court agrees with the defendants that certain of the claims should be dismissed. The court will, therefore, grant the defendants' motion for summary judgment for DSU on all claims. However, the court will only grant summary judgment for the individual defendants on

Count I and Counts IV-X. Summary judgment is not appropriate for Counts II and III as to the individual defendants. Nevertheless, the court accepts the view of both parties that the *§ 1981* and *§ 1983* claims in Counts II and III must be limited to prospective injunctive relief. [2] Thus, after the grant of summary judgment, all that will remain are *§ 1981* and *§ 1983* claims against the individual defendants in their official capacities for prospective injunctive relief. The court will now explain the reasoning for its ruling.

> 2  The plaintiff concedes that the claims under *§ 1981* and *§ 1983* are not viable against DSU and must be limited to prospective injunctive relief against the individual defendants. (D.I. 107 at 33.)

[*6] **II. FACTS**

In 1993, Dr. Kathleen Carter was hired as an Associate Professor of Education at DSU. DSU is a land grant college. It is, therefore, a public university operated by the State of Delaware. DSU is also a Historically Black College or University ("HBCU"). Thus, the majority of the administrators, faculty, and students at DSU are African American. Carter is white.

In 1995, Carter was appointed as chair of the DSU Education Department. According to Carter, several of her African American colleagues did not appreciate the fact that she, a white woman, was appointed to that position. Carter claims that she was told she was "usurping black persons' rights to govern themselves," and that she was "trying to make the black people [in the department] look bad." (D.I. 107 at 4.) Carter also alleges that Dr. Aleta Hannah accused her of polarizing the department along racial lines. Hannah alleges that during one department meeting, Carter told all of the professors - African American and white - that they should put everything in writing. Although Carter denies she made the statement, all parties agree that Hannah felt there was a racial overtone to the statement.

In September [*7] of 1995, Carter evaluated Hannah and the other professors in her department. Using a 1 to 5 scale, Carter gave Hannah a score of 3. Carter alleges that Hannah felt there was a racial bias involved in the evaluation.

At some point after the meeting and the evaluation, the six African American faculty members met and decided that Dr. Hannah should be chair. Dr. Hannah

prepared an anonymous memo - "Concerns about the Chair." The memo listed several concerns about Carter's leadership. Carter's race is not mentioned in the memo. However, the memo does note the faculty's belief that Carter "fostered dissension within the department, something along the lines of race." Soon after, Carter met with the dean of her school, Dr. Jacquelyne Gorum, who told Carter that she did not believe she was racist. The department then had a meeting to remove Carter as chair. Although Carter won the "no-confidence" vote, she resigned shortly thereafter.

After a brief time with an interim chair, Hannah was appointed as chair. On October 15, 1997, with Dr. Hannah as chair, Carter filed her initial application for tenure. Hannah recommended Carter for tenure and promotion. Her application was then forwarded [*8] to the Departmental Promotion and Tenure Committee, which also recommended her for tenure, but not promotion. The application was then forwarded to Dean Gorum for review. Dean Gorum also recommended Carter for tenure. The application was then forwarded to Provost Johnny Toliver, who added his positive recommendation. The application was finally given to President DeLauder.

According to Carter, Hannah then met with President DeLauder multiple times, and gave the president negative information about Carter. Carter alleges that Hannah told DeLauder that Carter was difficult to work with and had said negative things about the university and the department to her students while class was in session. (Carter admits that statements were made regarding course scheduling and registration.) Additionally, Dr. Tossie Taylor told DeLauder that Carter was perceived to be racist by some members of the department. DeLauder did not investigate these allegations, defendants state, because he felt there was no basis for the allegations. DeLauder maintains that the unfounded allegations of racism in no way influenced his review of Carter's application.

Also during this time, Dr. Tolliver told DeLauder [*9] that Carter's performance on the National Council for Accreditation of Teacher Education program ("NCATE") was insufficient. The NCATE committee was required to prepare an accreditation report for review. Dr. Tommy Frederick was the chair of the NCATE committee. Carter admits that the entire report - including her portion - was heavily criticized by a mock

review board. Although Carter asserts that her portion received fewer criticisms, Frederick noted that Carter's portion of the accreditation report was inadequate and needed to be rewritten. Carter does not refute this fact.

DeLauder admits that he considered the statements of Frederick, Tolliver, Taylor, and Hannah. According to section 8.1.2 of the CBA, however, although value judgments are permissible in the tenure process and persons other than the candidate may be consulted, "documented evidence" must be used to support the decision. (D.I. 99, Ex. A at 22.) None of the statements DeLauder considered were placed in writing. Section 8.2.4 of the CBA further states that "where oral testimony contradicts written evaluations, the affected [tenure applicant] shall be informed of the unit testimony and given an opportunity to respond [*10] to it." (Id. at 24.) Carter was apparently not given an opportunity to respond to the statements of the other three professors.

In light of all of the evidence, including the oral statements of the three professors, DeLauder remanded - but did not deny - Carter's application for tenure. Upon remand, Hannah, Tolliver, and Gorum all reversed their positive recommendations, based in part on DeLauder's assurance that they could consider the totality of their experience with Carter. Carter was subsequently denied tenure. When Carter met with DeLauder, he informed her that his decision was based upon ineffective service as chair of her department, ineffective service on the NCATE committee, and the fact that she was rated as "3" on her evaluation. Although these are the official reasons, Carter alleges that DeLauder told Tolliver that tenure was denied because Carter said negative things about the university. Carter further asserts that the "3" she received on her evaluation was a direct product of Dr. Hannah's racism. Carter exhausted her appeals process at the university, and the decision to deny tenure was upheld. Carter subsequently filed this lawsuit.

### III. STANDARD OF REVIEW

[*11] Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. See In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S.

*242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999)*. The nonmoving party, however, must demonstrate the existence of a material fact -- not mere allegations -- supplying sufficient evidence for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996)* (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not [*12] match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)* (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson, 477 U.S. at 249-50*.

## IV. DISCUSSION

The facts related above are either undisputed, or where disputed, the non-moving party's (Carter) version of the facts. Nevertheless, the court concludes that, even accepting plaintiff's version of the facts as true, she cannot prevail as a matter of law on Count I or Counts IV-X. The court will discuss each of the remaining claims in turn.

## A. Count I - Title VII Racial and Gender Discrimination

Carter claims disparate treatment under Title VII. A case for racial discrimination under Title VII can be made in one of two ways. In the *PriceWaterhouse* analysis, a plaintiff must produce direct evidence that race was a motivating factor in the employment decision. *See Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994)*. [*13] "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Nixon v. Runyon, 856 F. Supp. 977, 983 (E.D. Pa. 1994)*.

Carter has not proven that race was directly involved in her tenure decision. Although Carter alleges that she has direct evidence to prove that both Hannah and DeLauder were racist, the record does not support her contention. Carter urges that the court should find DeLauder was racist because he believed Hannah - an

African American woman - over Carter and because he failed to investigate the allegations by Dr. Taylor that Carter was racist. Carter maintains that had he investigated, he would have discovered that Hannah was the true racist. First, as noted above, direct evidence does not permit inferences. It is a large leap of logic to conclude that DeLauder believed Hannah simply because she is African American. There are a number of reasons why a person might believe another person, and there is scant evidence in this record to support the conclusion that race was the only factor - if it was a factor at all - in DeLauder's decision to credit Hannah's statements. Moreover, the fact that DeLauder did not investigate [*14] the allegations of racism against Carter does not prove that he is a racist. He simply could have believed that the allegations were unfounded. [3] Again, direct evidence does not permit speculation, and there are any number of non-racial reasons why DeLauder might have declined to investigate. [4]

> 3 In fact, if DeLauder wanted to show true racial animus, he could have used the allegations of racism as a slim excuse to launch into a wholesale investigation of Carter, discredit her, and dredge up reasons to deny her tenure, if that was his goal. Rather, DeLauder wisely decided to take with a grain of salt allegations from faculty that apparently had difficult experiences with Carter.
>
> 4 Moreover, even if DeLauder had investigated the allegations as Carter suggests he should have, there is no guarantee that he would have "uncovered" Hannah's racism as Carter suggests. His focus would have been on *Carter's* alleged racism, not Hannah's. Any discovery of bigotry on Hannah's part would likely have been fortuitous, at best.

[*15] Carter has similarly failed to present direct evidence of Hannah's racism. The gist of Carter's allegation against Hannah rests on the fact that Hannah interpreted Carter's alleged statements regarding "putting things in writing" as racist. Carter alleges that Hannah's interpretation was unreasonable and "shows that Hannah's primary focus when considering Carter was her race." (D.I.. 107 at 23.) Hannah's interpretation of Carter's words cannot be considered direct evidence that she harbored racism animus. The court supposes that it is possible that one might infer that simply because an individual identifies a particular trait or tendency in another, they must also possess that trait or tendency.

Again, however, this would only be an inference -- and, perhaps, an unreasonable one at that. Moreover, it seems entirely reasonable that a person might be able to point out the racism of another without being racist herself. Thus, Carter's argument is logically flawed because, if accepted, it would mean that an employer could never take a bigoted employee to task about his or her behavior without running afoul of Title VII. This is a result that the court is unwilling to sanction. [5]

> 5    The court notes that Carter's brief focuses solely on racial discrimination and that the record is completely devoid of any facts that would permit the court to conclude that gender was implicated here. For instance, Carter has not alleged that white men or other non-African American men were promoted while she was not. (The only man she mentions is also African American.) Carter has also failed to provide one shred of evidence that would permit the court to properly conclude that any of the parties involved considered gender in their decision making process. Therefore, summary judgment on the gender discrimination claims under Title VII is appropriate.

[*16] Finally, Carter asserts that the fact that four white women left the department during Hannah's term as chair is direct evidence of Hannah's racism. The record contains no testimony from any of these women regarding their relationship with Dr. Hannah. The only evidence on this point is Carter's affidavit. However, in her own affidavit, Carter acknowledges that one of the professors retired, another professor was denied tenure, and another did not want to accept the assignment Hannah gave her upon return from sabbatical. (D.I. 108 at B-120.) Carter has failed to adduce any evidence of record that demonstrates that any of these women's decisions were directly influenced by Hannah in any way whatsoever - proper or improper. Thus, Carter is essentially asking the court to assume that Hannah was motivated by racism and that these white professors left as a result of that racism. The court is not permitted to, and will not, assume that Hannah's actions were racist in the absence of direct evidence, which Carter has failed to provide. For all of the foregoing reasons, Carter has failed to demonstrate direct evidence of racial animus. [6]

> 6    The court further notes that Carter's brief is completely devoid of authority that would permit

the court to find that either DeLauder or Hannah's actions were racially motivated.

[*17] Alternatively, under the *McDonell-Douglas* analysis, the plaintiff can attempt to demonstrate, through indirect evidence, that the defendants' actions were racially motivated. Under the *McDonell-Douglas*, or "pretext" framework, Carter must first establish a prima facie case of disparate treatment. To prove a prima facie case, Carter must establish that: (1) she is a member of a protected class; (2) she was qualified for the position; and (3) she was subject to an unfavorable employment action "under circumstances that give rise to an inference of unlawful discrimination." *Waldron v. SL Industries, Inc., 56 F.3d 491, 494 (3rd Cir.1995).* Once Carter has established this, "the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision." *Id.* If the DSU defendants can offer such a non-discriminatory reason, "the presumption of discrimination created by establishment of the prima facie case is dispelled, and the plaintiff must prove that the employer's proffered reason or reasons were pretextual -- that is, that they are false and that the real reason for the employment decision was discriminatory. [*18] " *Id.*

The Court will assume that Carter can make out her prima facie case. Thus, the burden shifts to DSU to demonstrate non-discriminatory reasons for the decision. At least four reasons were given for the denial of Carter's tenure; her ineffectiveness as department chair, her unfavorable classroom commentary on the university, her ineffectiveness on the NCATE committee, and her neutral evaluation. These reasons have nothing to do with Carter's race in particular, and would be relevant to the tenure of a candidate of any race. Thus, DSU has provided non-discriminatory reasons for its decision.

Since DSU has provided non-discriminatory reasons, Carter must demonstrate that DSU's explanations were false, and the decision was actually improperly motivated by racial considerations. Carter has failed to do so. Carter alleges that pretext can be found based upon: (1) the fact that DeLauder inappropriately considered her service as department chair; (2) DeLauder's conflicting reasons for denying tenure; (3) the fact that African Americans were tenured with performance evaluations similar to hers; (4) the fact that Dr. Hannah acted with racial animus in evaluating her; and (5) the fact [*19] that the president lauded her for her participation on the NCATE

committee, and then "reversed himself."

First, the court will accept Carter's contention that DeLauder could not consider her service as chair. [7] The court might be concerned if this were the only basis for the denial of tenure. However, DeLauder considered at least three other factors in making his decision. Second, the mere fact that DeLauder asserted three reasons for the denial of tenure to Carter and allegedly added another in a conversation Tolliver will not - standing alone - create pretext. This is so because Carter has yet to prove that any of the reasons are related to her race, or that these factors could not properly be taken into consideration when evaluating an African American candidate.

> [7] The court will accept this contention although it is based upon deposition testimony and not a written university policy. (D.I. 108 at B-77.)

Third, Carter's contention that African Americans with similar evaluations were tenured is without merit. [*20] Assuming that Carter's allegations are true, the fact that an equally qualified candidate - or even a less qualified candidate - was promoted while she was not is insufficient to support a finding of pretext. *See e.g., Odom v. Frank, 3 F.3d 839, 845 (5th Cir. 1993)* ("Generally, a court's belief that an unprotected applicant who has been promoted is less qualified than a protected applicant who has been passed over, will not, in and of itself support a finding of pretext for discrimination."); *Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988)* (same). Moreover, as defendants point out, tenure is not an entirely objective process. Both parties agree that the tenure process also contains a subjective element. Indeed, the CBA clearly states that judgmental factors may be considered. (D.I. 99, Ex. A at 24.) The CBA further states that "promotion and tenure are not automatic." (*Id.* at 23.) Thus, assuming Carter met all of the objective criteria, DSU was not obligated to grant her tenure. It was free to base its decision on subjective criteria.

Fourth, there is no reason to believe that Dr. Hannah's evaluation of Dr. Carter was racially [*21] motived. If Carter was given an exceedingly poor evaluation, a "1" or a "2" perhaps, the court might be inclined to consider whether racial animus was involved. However, all parties agree that an evaluation of "3" is considered neutral. An evaluation is an inherently subjective mechanism, and Carter has failed to demonstrate that DSU evaluations were based on objective criteria. Moreover, Carter has failed to demonstrate why the "3" was deserved or undeserved. The court did not work with Dr. Carter on a daily basis. Thus, in the absence of some evidence to suggest that the "3" was clearly unwarranted, and therefore may have been racially motivated, the court will not second guess Hannah's assessment. Most important, Carter herself admits that persons with neutral, "3" evaluations were tenured. In light of this fact, Hannah's neutral evaluation cannot be considered as a deliberate attempt to hinder Carter's career at the university based on her race.

Finally, the fact that President DeLauder commended Carter on her NCATE efforts does not outweigh the fact that her end product was apparently inadequate. If DeLauder's letters had expressly commented on the quality of Carter's work, or [*22] if he had supervised her on the project, the court might take his "reversal" more seriously. However, the facts do not indicate that DeLauder worked with, supervised, or otherwise had reason to know of the allegedly defective nature of the plaintiff's work product. At the time he was writing his note of thanks, he had no reason to know that Dr. Frederick had to re-write Carter's portion of the project. Once DeLauder was made aware of this information, he changed his recommendation. Thus, DeLauder's changed assessment was based upon newly acquired - and relevant - information, rather than racial bias. [8]

> [8] The court notes that Dr. Hannah's work on the NCATE project was also criticized, as was the work of the entire NCATE committee. However, what distinguishes Carter from Hannah is that there is no record evidence indicating that Hannah's portion had to be completely rewritten as was Carter's.

In sum, the court concludes based on the record before it, there is no direct evidence of racial animus. Furthermore, [*23] DSU has provided non-discriminatory reasons for its tenure decision. Carter has failed to prove that these reasons were a mere pretext. Thus, she has also failed to prove indirect racial animus. Therefore, the court will grant summary judgment for the defendants on this claim.

**B. Counts II, III, and IV -** *Section 1981, Section 1983, Section 1985, Section 1986* **and Civil Conspiracy**

The plaintiff concedes that the *Eleventh Amendment* prevents her from suing DSU on any of the statutory

claims. The court will, therefore, grant summary judgment for DSU on these claims. However, the *Eleventh Amendment* will not prevent Carter from obtaining prospective, injunctive relief against the individual defendants in their official capacity. The court must therefore determine whether the individual defendants are entitled to summary judgment on any of these claims. [9]

> [9] The individual defendants have not moved for summary judgment on the *section 1981* claims. Thus, the court will not discuss this claim or grant summary judgment for the defendants on this claim.

[*24] 1. *Section 1983*

The *§ 1983* claims are not barred. The *Eleventh Amendment* bars *§ 1983* claims against state entities and state officials sued in their official capacity. *See Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989)*. This is because only "persons" can be sued under *§ 1983*, and the state is not considered a person. However, where the plaintiff is seeking prospective injunctive relief against defendants in their official capacities, the defendant will be considered a person. *See id.* n. 10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under *§ 1983* because official-capacity actions for prospective relief are not treated as actions against the State."). In the present case, the parties agree that the *§ 1983* claim is for prospective injunctive relief against the defendants in their official capacity. Thus, according to the Supreme Court's reasoning in *Will*, those claims should be allowed to proceed. The court will, therefore, deny summary judgment on this claim.

2. *Section 1985*, *Section 1986* & Civil Conspiracy

The defendants are entitled [*25] to summary judgment on the *§ 1985*, *§ 1986*, and civil conspiracy claims. At the outset, the court notes that if there is no violation of *§ 1985*, there can be no violation of *§ 1986*. *See 42 U.S.C. § 1986* (limiting liability to those who fail to prevent any of the wrongs "mentioned in *section 1985* of this title."). *See also Boykin v. Bloomsburg University of Pennsylvania, 893 F. Supp. 409, 418 (M.D. Pa.1995)* (noting that *§ 1986* violation is premised on violation of *§ 1985*). Similarly, if neither of these statutes are implicated, the claim for civil conspiracy must be dismissed because civil conspiracy claims cannot stand

alone without some independent statutory violation. *See Phoenix Canada Oil Co. Ltd. v. Texaco Inc., 560 F. Supp. 1372, 1388 (D.Del. 1983)* ("Delaware courts do not recognize independent actions for civil conspiracies."); *Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 2001 Del. Ch. LEXIS 154, 2001 WL 1671441, at *18 (Del.Ch. 2001)* ("Civil conspiracy is not an independent cause of action, but requires proof of underlying wrong that would be actionable absent conspiracy."). Since the viability of all three [*26] claims turns on the validity of the *§ 1985* claim, the court will focus on that issue.

The *§ 1985* claim is not viable for two reasons. First, assuming that Carter could prove that a conspiracy took place, "a conspiracy claim [under *§ 1985*] requires a clear showing of invidious, purposeful and intentional discrimination between classes or individuals." *Johnson v. University of Pittsburgh, 435 F. Supp. 1328, 1370 (W.D. Pa. 1977)*. Additionally, that intentional discrimination must occur on the basis of an impermissible criterion such as race or gender. *See id.* (noting that gender is an acceptable form of animus). For the reasons discussed above, however, Carter has failed to clearly demonstrate that racial animus motivated the defendants' decision. Since Carter cannot meet this burden, her claim must fail.

Additionally, assuming Carter could prove a racially motivated conspiracy, in order to be actionable under *§ 1985*, a conspiracy must involve more than one state or private agency. *See id.* ("[A] person cannot conspire with himself and therefore for the agents of a single corporation to conspire among themselves and not with outsiders does not state a [*27] cause of action under 1985(3).") *Id.* In the present case, each of the defendants is a member of the same institution - DSU. There are no allegations that other state officials or private persons were involved in this alleged conspiracy. Therefore, the court finds that the defendants are entitled to summary judgment on the *§ 1985* claim, as well as the *§ 1986* and civil conspiracy claims.

C. Count VI - *Fourteenth Amendment*/Due Process

The gist of Carter's claim is that DSU failed to follow established procedure, and in so doing deprived her of constitutional due process rights. Again, Carter's claim must fail. As the Carter notes, in order to establish a procedural due process violation, she must prove that she was objectively entitled to tenure and did not merely

have an expectation of promotion. Carter cites *Gronowicz v. Pennsylvania State University, 1997 U.S. Dist. LEXIS 20811*, No. 97-656, 1997 WL 799438 (E.D. Pa. 1997), in support of her argument.

The record does not reveal that Carter was objectively entitled to tenure. The defendants point out that the *Gronowicz* court also stated that a plaintiff must demonstrate that "the procedures at issue so limit the University's discretion [*28] that he was objectively entitled to tenure and did not merely subjectively expect a promotion." *1997 U.S. Dist. LEXIS 20811*, [WL] at *5. As previously noted, the DSU tenure process permitted subjective, judgmental decisions. Again, the CBA specifically mentions judgmental factors and notes that "promotion and tenure are not automatic." (D.I. 99, Ex. A at 23). Thus, the court cannot conclude that the DSU tenure process was so objective as to give plaintiff more than a mere, subjective expectancy of tenure. The court will, therefore, grant summary judgment on this issue.

## D. Count VIII - Breach of Contract Count IX - Intentional Infliction of Emotional Distress

Counts VIII and IX will be considered together because they present the same issue - namely whether state law claims such as breach of contract and intentional infliction of emotional distress are barred by the *Eleventh Amendment*. The court concludes that they are. As the defendants note, "pendent state law claims against state entities and officers are barred by the *Eleventh Amendment*." *McKay v. Delaware State University, 2000 U.S. Dist. LEXIS 14653*, C.A.No. 99-219, 2000 WL 1481018, at *12 (D. Del. Sept. 29, 2000). The claims for intentional infliction of [*29] emotional distress and breach of contract clearly arise under state law. Although plaintiff asserts that the *Eleventh Amendment* will not bar prospective injunctive relief on these claims, a district court may only order prospective injunctive relief for claims arising under the Constitution or a federal statute. *See Halderman v. Pennhurst State School & Hospital, 673 F.2d 647, 656 (3d Cir. 1982)*, rev'd on other grounds, *465 U.S. 89, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984)* ("[The] *Eleventh Amendment* is no bar to the prospective injunctive relief which was ordered by the district court insofar as that relief is predicated on *constitutional* or *federal statutory* claims.") (emphasis added). As previously mentioned, these claims do not arise under federal statutory or constitutional law, and therefore do not fit into this narrow exception. Thus, the court will grant summary judgment for all defendants on both claims. [10]

> 10  The court notes that Carter suggests that there has been insufficient discovery and therefore, the defendants' motion for summary judgment is premature. Although a court can reserve judgement on a motion for summary judgment under *Federal Rule of Civil Procedure 56(f)*, the party seeking such relief must request present affidavits to the court explaining why further discovery is necessary. *See Mid-South Grizzlies v. National Football League, 720 F.2d 772, 779 (3d Cir. 1983)* ("Where *Rule 56(f)* affidavits have been filed, setting forth specific reasons why the moving party's affidavits in support of a motion for summary judgment cannot be responded to, and the facts are in the possession of the moving party, we have held that a continuance of the motion for purposes of discovery should be granted almost as a matter of course."). In the present case, Carter has failed to submit affidavits demonstrating why more discovery is necessary. Thus, the court sees no bar to the grant of summary judgment.

## [*30] E. Count X - Punitive Damages

Carter is not eligible for punitive damages. As the defendants noted, in order to recover punitive damages, Carter must show that DSU and the defendants "acted with malice or reckless indifference to [her] federally protected rights." *Lafate v. Chase Manhattan Bank (USA), 123 F. Supp. 2d 773, 784 (D. Del. 2000)*. The record is devoid of any facts that would permit the court to find that the defendants acted maliciously. In fact, Carter did not brief this issue, and therefore has failed to direct the court to facts that would support a finding of malice. A careful review of the record shows that it does not support a finding that the defendants acted with racial animus, and thus purposefully deprive Carter of her constitutional rights. Therefore, Carter cannot recover punitive damages.

## V. CONCLUSION

For all of the foregoing reasons, Carter's motion for summary judgment is denied. The court will, therefore, grant summary judgment for all defendants on Count I and Counts IV-X. Although DSU is also entitled to summary judgment on Counts II and III, the court will

deny summary judgment on those claims as to the individual [*31] defendants. Nevertheless, the *§ 1981* and *§ 1983* claims in Counts II and III will be limited to prospective injunctive relief against the individual defendants in their official capacities.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

    1. The plaintiff's Motion for Partial Summary Judgment (D.I. 98) is DENIED;

    2. The defendant's Motion for Summary Judgment (D.I. 95) is GRANTED in part and DENIED in part;

    3. Summary Judgment BE AND HEREBY IS ENTERED in favor of the defendant Delaware State University on all claims;

    4. Summary Judgement BE AND HEREBY IS ENTERED in favor of the defendants DeLauder, Tolliver, Hannah, and Gorum, the Board of Trustees on all claims EXCEPT the *section 1981* claims stated in Count II of the complaint and the *section 1983* claims stated in Count III of the complaint;

    5. The claims in Count II and Count III will be limited to prospective injunctive relief.

Dated: February 27, 2002

    Gregory M. Sleet

    UNITED STATES DISTRICT JUDGE

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 6

2 of 2 DOCUMENTS

**AUGUSTA CASTRO, Plaintiff, -against- NEW YORK CITY BOARD OF
EDUCATION PERSONNEL DIRECTOR, Defendant.**

**96 Civ. 6314 (MBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*1998 U.S. Dist. LEXIS 2863*

**March 11, 1998, Decided
March 12, 1998, Filed**

**DISPOSITION:**     [*1]  Board's motion for summary judgment granted.

**COUNSEL:** DAVID M. FISH, ESQ., New York, NY, for Plaintiff.

PAUL A. CROTTY, ESQ., Corporation Counsel of the City of New York, KERRI L. JEW, ESQ., Assistant Corporation Counsel, New York, NY, for Defendant.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION & ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Augusta Castro, a former public school teacher, sues the New York City Board of Education (the "Board") for violation of her federal rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, *42 U.S.C. § 2000e, et seq. (1994)*, and § 4(a) of the Age Discrimination in Employment Act ("ADEA"), as amended, *29 U.S.C. § 621, et seq. (1994)*, and for violation of her state rights under New York's Human Rights Law (the "State Human Rights Law"), *N.Y. Executive Law § 209, et seq.* (McKinney 1993), New York City's Human Rights Law (the "City Human Rights Law"), Administrative Code of the City of New York § 8-101, *et seq.*, and the common law doctrine of

intentional infliction of emotional distress. The Board moves for summary judgment dismissing the complaint under *Fed. R. Civ. P. 56(c)*. [*2]  For the reasons stated below, this motion is granted.

I.

The following facts, viewed in the light most favorable to plaintiff, are relevant to this motion: Plaintiff is a female of Puerto Rican descent born in 1937. (Compl. P 5) [1] In 1982, she was hired to teach on a substitute, or "per diem," basis at Public School 207 in Manhattan. (*Id.* P 9) In 1983, she transferred to Public School 192 ("P.S. 192") in Manhattan, where she began teaching in the second grade as a per diem bilingual teacher in Spanish. (Compl. P 10; Castro Dep. at 19) The school district in which P.S. 192 is located has a large Latino population. (Amato Dep. at 43)

> 1     "Compl." refers to the amended complaint filed on April 15, 1997.

On October 1, 1987, after taking and passing a licensing examination, plaintiff was certified as an appointed bilingual teacher in Spanish. (Jew Decl. Ex. A) The certificate stated that her appointment was contingent on plaintiff's fulfillment of certain post-graduate education requirements by October 1, 1992. [*3]  (*Id.*) These requirements consisted of 24 credits in six specified areas of bilingual education, to be completed at a college or university with a bilingual program approved by the New York State Education Department ("Department of Education"). (*Id.* Ex. B) At the time plaintiff obtained her certificate, she had received 21

Case 1:06-cv-00725-GMS     Document 39     Filed 01/07/2008     Page 66 of 218

Page 2
1998 U.S. Dist. LEXIS 2863, *3

credits from the City College of New York, whose bilingual program had been approved by the Department of Education, and three from Boricua College, whose program had not. (*Id.* Exs. C-E) Plaintiff states that Board personnel told her at the time she received her certificate that she had satisfied all the necessary education requirements. (Castro Dep. at 25, 140)

Beginning in 1992 or 1993, Lydia Silva took over as principal of P.S. 192. (*Id.* at 28) Like plaintiff, Silva is of Puerto Rican descent, although, unlike plaintiff, she was not born in Puerto Rico. (Castro Dep. at 28) As principal, Silva was responsible for assigning teachers to grade levels at the beginning of each school year. (Amato Dep. at 38) These assignments were based on preferences expressed by the teachers, who were guaranteed to receive one of their top three choices of class assignments. [*4] (Amato Dep. at 38; Def. 56.1 Statement P 21) In practice, teachers generally received their first choice, although a principal could assign a teacher to her second or third choice upon finding that she was better suited to that grade level. (Amato Dep. at 38)

Plaintiff listed kindergarten as her first choice of class assignment for the 1993-94 school year. (Jew Decl. Ex. I) However, Silva assigned plaintiff to teach second grade, plaintiff's third choice. (*Id.*) Plaintiff claims that the teacher whom Silva assigned to teach kindergarten was younger and less experienced than plaintiff. (Castro Dep. 182) Plaintiff claims also that Silva placed a disproportionate number of special education and hyperactive children into this second grade class and into other classes that plaintiff taught, something Silva did not do in classes taught by non-Latino teachers. (Castro Dep. at 183-93) In response to a grievance submitted by plaintiff in objection to her class assignment, Silva explained that plaintiff's first preference "had been honored for the past three years" and that she "was assigned her third preference because her skills and experience [were] commensurate with the academic needs [*5] of the second grade bilingual class." (Jew Decl. Ex. I)

At the end of the 1993-94 school year, Silva gave plaintiff a "U," or "unsatisfactory," rating on her annual performance evaluation. (Jew Decl. Ex. L) Such evaluations were completed for each teacher based on information gathered during both scheduled and unannounced observations. (Castro Dep. at 49, 136) The evaluations contained a signature line on which the evaluated teacher could acknowledge receipt. (Jew Decl. Exs. L, M) Plaintiff refused to acknowledge receipt of Silva's evaluation on the ground that it was untrue. (Castro Dep. at 50)

Plaintiff's unsatisfactory rating was the first such rating she had received while working for the Board. She claims that the rating was the product of Silva's hostility toward her, a hostility Silva also expressed by yelling at her in front of her class on one occasion (*id.* at 32) and by frequently sending administrators to monitor her classes. (*Id.* at 136-37) However, because plaintiff was still an appointed teacher in 1993-94, the unsatisfactory rating did not affect her employment status.

In May 1994, the Board notified plaintiff that the Department of Education had not accepted [*6] her credits from Boricua College and, therefore, that she had not completed the necessary educational requirements. (Jew Decl. Exs. C, D) Accordingly, it revoked plaintiff's teaching appointment, effective July 1994. (*Id.* Ex. F) The revocation did not affect plaintiff's ability to work as a substitute teacher, and, in November 1994, the Board authorized her to resume teaching on a per diem basis. (*Id.* Ex. G) However, per diem teachers receive smaller salaries than appointed teachers (Castro Dep. at 94), and plaintiff's salary was reduced accordingly. At least five other bilingual teachers who had not completed the education requirements also were demoted to per diem status and received a corresponding pay decrease. (*Id.* at 37) Plaintiff attributes her demotion and subsequent pay decrease to Silva, who, plaintiff claims, told the teaching staff at P.S. 192 that she "only wanted teachers that were from 18 to 30 [years old] working in the school." (*Id.* at 104)

On April 27, 1995, plaintiff filed a complaint with the New York City Commission on Human Rights ("Human Rights Commission") alleging that Board officials, and Silva in particular, had discriminated against her [*7] on the basis of her age and national origin by "reducing [her] salary and downgrading her classroom assignments." (Jew Decl. Ex. J) In a November 16, 1995, decision, the Commission concluded that there was no probable cause to sustain these allegations and that the Board had "provided ample documentation that [its] employment decisions were made pursuant to state law." (*Id.*) The Commission found that, despite having received several extensions of time, plaintiff had "failed

to obtain the necessary certification and credentials to maintain her status as [an appointed] bi-lingual teacher." (*Id.*) This decision was upheld on appeal. (*Id.* Ex. K)

During the 1994-95 school year, while Silva was principal, plaintiff resumed teaching kindergarten, her first choice. (Castro Dep. at 201) At the end of that year, Silva gave plaintiff a second unsatisfactory evaluation. (Jew Decl. Ex. M) Plaintiff again refused to sign the evaluation, noting in the margin that the evaluation was "all lies" and that she had heard that Silva would give her similar ratings until she left P.S. 192. (*Id.*; Castro Dep. at 67) Plaintiff successfully challenged this second unsatisfactory evaluation [*8] on administrative appeal when Silva failed to provide the office of appeals with the proper supporting documentation. (Jew Decl. Ex. N)

Sometime during the 1995-96 school year, Lorraine Pacheco took over as principal of P.S. 192. (Castro Dep. at 30; Jew Decl. Ex. Q) Pacheco, who is also of Puerto Rican descent, conducted a scheduled observation of plaintiff's kindergarten classroom on April 1, 1996. (Jew Decl. Ex. Q) In her observation report, Pacheco criticized plaintiff for ineffectively planning her lesson, and for failing to emphasize the principal themes of the storybook she had read to the students or to relate the story to previous material. (*Id.*) Plaintiff refused to sign Pacheco's report on the ground that it was inaccurate. (*Id.*; Castro Dep. at 80) In response to the report, plaintiff filed another grievance with the teachers' union. (Castro Dep. at 82)

On May 16-17, 1996, Sandra Litrico, an assistant principal at P.S. 192, also observed plaintiff's classroom performance. (Jew Decl. Ex. R) In her observation report, Litrico found that plaintiff had not created a lesson plan or established proper "classroom management routines." (*Id.*) Litrico also criticized [*9] plaintiff for continuing to read aloud from a storybook after the students had stopped paying attention. (*Id.*) She advised plaintiff that "despite the help that [plaintiff had] received from other supervisors and staff developers, as well as unsatisfactory lesson observations, problems persist." (*Id.*) She also warned plaintiff that "failure to correct these deficiencies could lead to further disciplinary action, and a U rating." (*Id.*) Plaintiff refused to sign Litrico's report, in part because she claimed to have prepared a lesson plan that had been erased from the chalkboard (Castro Dep. at 86; Pl. Rule 56.1 statement P 11), and again filed a grievance with the teachers' union. (Castro Dep. at 87)

By the end of the 1995-96 school year, Steven Buchsbaum had replaced Pacheco as supervisor-in-charge of P.S. 192. (Jew Decl. Ex. S) On June 19, 1996, Buchsbaum sent a letter to plaintiff expressing his concern about plaintiff's "unprofessional and inappropriate conduct on the morning of June 3, 1996." (*Id.*) He stated that, on that date, plaintiff had been seen asking her kindergarten class to sign a petition concerning one of the lessons Litrico had observed, and had been [*10] heard calling Litrico a "maldita," or bad woman, and an "habladora," or chatterbox, in front of the class. (*Id.*) Buchsbaum noted that plaintiff had refused to assure him that she would leave her students out of any future employment disputes. (*Id.*) Accordingly, he found it necessary to reassign plaintiff to non-teaching duties in the school library. (*Id.*) Plaintiff refused to sign Buchsbaum's letter, and claims that she never used the term "habladora" to describe Litrico. (Castro Dep. at 96)

In a performance evaluation issued at the end of the 1995-96 school year, Buchsbaum gave plaintiff an unsatisfactory rating, her third such rating. (*Id.* Ex. O) Because plaintiff was teaching on a per diem basis at the time, and because per diem teachers could be fired for receiving one unsatisfactory rating (Castro Dep. at 66), Buchsbaum informed plaintiff in a separate letter that she was dismissed effective June 26, 1996. (Jew Decl. Ex. T) Nevertheless, plaintiff, acting on the advice of a teachers' union representative, returned to P.S. 192 at the beginning of the 1996-97 school year. (Castro Dep. at 116) When she remained at the school after being instructed to leave, school [*11] officials called police to escort her off school grounds. (*Id.*)

In a right-to-sue letter issued following plaintiff's dismissal on August 26, 1996, the Equal Employment Opportunity Commission ("EEOC") informed plaintiff that it had reviewed the charges raised before the Human Rights Commission and had found that the evidence "did not establish violations of the statutes." Thereafter, plaintiff filed the present action.

In her complaint, plaintiff alleges that the Board, through the officials at P.S. 192, subjected her to adverse employment actions, including demotion and dismissal, in violation of her federal rights under Title VII and the ADEA, and her state rights under the State and City Human Rights Laws. (Compl. PP 20-39) Plaintiff alleges also that Board officials retaliated against her for filing grievances with her union and a complaint with the

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 68 of 218

Page 4
1998 U.S. Dist. LEXIS 2863, *11

Human Rights Commission. (*Id.* PP 40-42) Finally, she claims that officials at P.S. 192 subjected her to intentional infliction of emotional distress by fostering a humiliating work environment and calling police to escort her off school grounds. (*Id.* P 43-46) The Board moves for summary judgment dismissing the entire action [*12] under *Rule 56(c)*.

II.

A. *Discrimination*

Plaintiff argues first that the Board discriminated against her on the basis of her age and national origin. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." *42 U.S.C. § 2000e-2(a)(1) (1994)*. The ADEA makes it unlawful for any employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *29 U.S.C. § 623 (a)(1) (1994)*. Section 296(1)(a) of the State Human Rights Law and § 8-107 of City Human Rights Law contain provisions comparable to those contained in Title VII and the ADEA. *See Alie v. Nynex Corp., 158 F.R.D. 239, 244 n.2 (E.D.N.Y. 1994)*; *see also Pace College v. Commission on Human Rights, 38 N.Y.2d 28, 33, 377 N.Y.S.2d 471, 474, 339 N.E.2d 880 (1975).*

Courts decide cases under Title VII and the ADEA using the three-step analytical framework set forth [*13] in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* and refined in later cases. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*; *see also Stern v. Trustees of Columbia University, 131 F.3d 305, 311-12 (2d Cir. 1997)*. This same framework applies to lawsuits brought under the State and City Human Rights laws. *See Song v. Ives Laboratories, Inc., 957 F.2d 1041, 1046 (2d Cir. 1992)*; *Alie, 158 F.R.D. at 244*. Under *McDonnell Douglas*, the plaintiff bears the initial burden of producing evidence sufficient to support a prima facie case of discrimination. *411 U.S. at 802*. If the plaintiff carries this burden, the employer must produce evidence showing "some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas, 411 U.S. at 802*. If the

employer makes such a showing, the case will be dismissed unless a rational finder of fact could find that the employer's proffered reason is pretextual and that the employer was more likely motivated, in whole or in part, by discrimination. *Hicks, 509 U.S. at 515-16*; *Stern, 131 F.3d at 312*. The familiar [*14] principles governing motions for summary judgment apply at each step of this analysis. *See Rule 56(c)*; *Stern, 131 F.3d at 312*.

To establish a prima facie case of discrimination under Title VII, a plaintiff must present evidence that: (1) she belongs to a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. *See McDonnell Douglas, 411 U.S. at 802*; *Stern, 131 F.3d at 311-12*. The Supreme Court has recognized that the burden of proving a prima facie case is "not onerous." *See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).*

In this case, the Board does not dispute that plaintiff is a member of a protected class or that she suffered certain adverse employment actions, including her demotion to per diem status and her eventual dismissal. (Def. Mem. at 15) However, it argues that plaintiff has failed to establish a prima facie case because these adverse employment actions either resulted from plaintiff's own poor job performance or did not take place under conditions giving [*15] rise to an inference of discrimination. (*Id.* at 15-16) I agree with this argument as far as it goes.

Drawing all reasonable inferences and resolving all ambiguities in plaintiff's favor, the evidence shows that the only official at P.S. 192 who even arguably discriminated against plaintiff on the basis of age or national origin was Silva. However, Silva played no part in the two main adverse employment actions that plaintiff claims to have suffered -- her demotion from appointed to substitute teacher and her eventual dismissal. With respect to her demotion, plaintiff concedes that the Department of Education, not Silva or other Board officials, determines whether a teacher has satisfied the necessary educational requirements. (Castro Dep. 38; *see also* Amato Dep. at 15) She also acknowledges that teachers whose licenses were revoked for failure to obtain the minimum number of credits automatically received a lower salary if they chose to stay on in a per diem capacity. (*Id.* at 94) Plaintiff concedes that these policies

were not enforced on a subjective basis, but rather in accordance with objective regulations over which Silva had no control. (*Id. at 39, 41*) Indeed, [*16] plaintiff's entire argument appears to be based on a belief that she was discriminated against because someone at the Board -- not Silva -- allegedly misinformed her that she had completed all the educational requirements necessary to maintain her appointed status. It suffices to point out that there is absolutely no evidence to support such a belief.

Similarly, Silva played no part in plaintiff's eventual dismissal. At the time plaintiff was dismissed, Buchsbaum was serving as supervisor in charge of the school, and it was Buchsbaum who reassigned plaintiff to non-teaching duties and eventually terminated her employment. Moreover, Buchsbaum took these actions, not on the basis of any criticisms previously voiced by Silva, but rather because of the negative observation reports issued by Pacheco and Litrico, and because plaintiff had told Buchsbaum that she would not leave her students out of her employment dispute. Notwithstanding the above, plaintiff argues that, if permitted to confront and cross-examine Board officials such as these administrators, she "will conceivably be able to show to a jury that [they] engaged in unlawful discrimination." (Pl. Mem. at 11) However, this sort [*17] of speculation, unsupported by concrete particulars, is not enough to satisfy even the minimal burden of proving a prima facie case. *See Meiri v. Dacon, 759 F.2d 989, 997-98* (2d Cir.) ("to allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases"), *cert. denied, 474 U.S. 829, 88 L. Ed. 2d 74, 106 S. Ct. 91 (1985); see also Lediju v. New York City Dep't of Sanitation, 173 F.R.D. 105, 114 (S.D.N.Y. 1997)* ("plaintiff's speculation and generalities . . . [are] insufficient even to state a prima facie case" of discrimination).

Thus, the Board is correct in observing that plaintiff has failed to establish a prima facie case that her demotion and dismissal were motivated by discrimination. However, plaintiff's complaint includes more than those claim. Plaintiff also argues that Silva subjected her to less salient forms of discrimination when Silva was principal of P.S. 192 by, for example, assigning her to teach second grade during the 1993-94 school year and placing a disproportionate number of special education and hyperactive children [*18] in her classroom. She argues that these actions also give rise to

a claim of discrimination.

The difficulty with this argument is that establishing a prima facie case under Title VII or the ADEA requires a plaintiff to show that her employer's discriminatory actions caused a "materially adverse change" in the terms and conditions of her employment. *Davis v. City University of New York, 1996 U.S. Dist. LEXIS 6345,* No. 94 Civ. 7277, 1996 WL 243256, at *7 (S.D.N.Y. May 9, 1996) (Title VII); *see also Monica v. New York City Off-Track Betting Corp., 1995 U.S. Dist. LEXIS 3350,* No. 93 Civ. 6371, 1995 WL 117879, at *3 (S.D.N.Y. Mar. 20, 1995) (Title VII, ADEA, and retaliation claims), *aff'd, 100 F.3d 941 (2d Cir. 1996)* (table). "A materially adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity," *Campbell v. Grayline Air Shuttle, Inc., 930 F. Supp. 794, 802 (E.D.N.Y. 1996)* (quotations omitted), and is typically indicated by dismissal, demotion, diminution of wages, or diminished opportunities for professional growth. *See id.; see also Preda v. Nissho Iwai American Corp., 128 F.3d 789, 791 (2d Cir. 1997)* (materially adverse change occurred where employer excluded plaintiff [*19] from meetings, reduced his job duties and gave him largely clerical tasks); *de La Cruz v. New York City Human Resources Admin. D.S.S., 82 F.3d 16, 21 (2d Cir. 1996)* (plaintiff "arguably" experienced materially adverse chance when employer transferred him from elite position to less prestigious position); *Monica*, 1995 WL 117879, at *4 (forcing employee to move to undesirable location or transferring employee to isolated corner of workplace may constitute materially adverse change).

Measured by these principles, Silva's actions did not cause a materially adverse change in the conditions of plaintiff's employment. Silva's decision to assign plaintiff to teach second grade and to place students with special needs in her class neither deprived plaintiff of an opportunity nor caused her to suffer any attendant negative result such as demotion, suspension or loss of wages. Nor did Silva's actions force plaintiff to perform duties outside the scope of her teaching contract or mark her as a less capable teacher. In this respect, it is important to note two things: first, plaintiff was not transferred to a stigmatizing or less prestigious position but merely given a class assignment [*20] that she had listed last among her top three choices; and second, to the extent Silva placed difficult students in plaintiff's classes, plaintiff concedes that Silva did this at least in part because plaintiff had done "so well" teaching such

students in the past. (Castro Dep. at 90) At bottom, it appears that what plaintiff really resents is the responsibilities and inconveniences that came with being required to teach second grade at a time when she had adjusted to kindergarten and with being asked to cope with troubled students who, in her own words, almost made her "crazy." (*Id. at 183*) However, in order to be materially adverse, a change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady, 993 F.2d 132 at 136*; *accord Campbell, 930 F. Supp. at 802*; *Monica*, 1995 WL 117879, at *4.

Similarly, that Silva may have given plaintiff unsatisfactory ratings, reprimanded her on one occasion, or closely monitored her classroom performance does not support an inference that the conditions of plaintiff's employment were materially changed. "While adverse employment actions extend beyond readily quantifiable [*21] losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)*; *see also Taylor v. Federal Deposit Insurance Corp., 328 U.S. App. D.C. 52, 132 F.3d 753, 764 (D.C. Cir. 1997)* ("the federal courts cannot be wheeled into action for every workplace slight"). Courts have held that negative evaluations -- like those given by Silva -- that are unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions. *See Smart, 89 F.3d at 442-43*; *see also Angara v. Illinois Masonic Med. Ctr., 1997 U.S. Dist. LEXIS 11496, No. 96 C 6207, 1997 WL 441319, at *7 (N.D. Ill. July 30, 1997).* In this case, where plaintiff received a negative evaluation even after Silva had left P.S. 192, that rule operates with particular clarity. Moreover, although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions. *See Henriquez v. Times Herald Record, 1997 U.S. Dist. LEXIS 18760, No. 97 Civ. 6176, 1997 WL 732444, at *6 (S.D.N.Y. Nov. 25, 1997)* (plaintiff subject to criticism and threats of disciplinary action); *Angara*, 1997 [*22] WL 441319, at *7 (reprimand not a materially adverse action even if it is "undeservedly negative" or "humiliating"); *Davis*, 1996 WL 243256, at *8 (plaintiff experienced anxiety when her tenure application delayed). This rule too operates with particularly force here, where plaintiff admits that no one at P.S. 192 ever made derogatory comments to her about her age or ethnicity and no claim has been made

that the Board created a hostile work environment under Title VII. *See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996)*. Accordingly, because plaintiff has failed to establish a prima facie case that the Board discriminated against her on the basis of either her age or national origin, her discrimination claims under Title VII, the ADEA, the State and City Human Rights Laws are dismissed.

### B. *Retaliation*

Plaintiff claims next that the Board violated Title VII and the State and City Human Rights Laws by retaliating against her for engaging in protected activity. (Compl. PP 40-42; Pl. Mem. at 13) To establish a prima facie case of retaliation, a plaintiff must show that: (1) she was engaged in an activity protected under the discrimination laws; (2) [*23] the employer was aware of this fact; (3) the employer subjected her to an adverse employment action; and (4) there is a causal connection between these events. *See Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996)*; *see also Garber v. New York City Police Dep't, 1997 U.S. Dist. LEXIS 12590, No. 95 Civ. 2516, 1997 WL 525396, at *6 (S.D.N.Y. Aug. 22, 1997)* (applying same standard to claims under State and City Human Rights Laws); *King v. Metropolitan Life Ins. Co., 1997 U.S. Dist. LEXIS 8636, No. 96 Civ. 0476, 1997 WL 337472, at *6 (S.D.N.Y. June 19, 1997)* (applying same standards to claim under State Human Rights Law).

In this case, plaintiff claims that she engaged in protected activity by submitting multiple grievances to the teachers' union and by filing a discrimination claim with the Human Rights Commission on April 27, 1995. (Pl. Mem. at 12-13) She argues that officials at P.S 192 knew of these activities and retaliated against her by "harassing" her, giving her unsatisfactory evaluations and negative observation reports, and eventually dismissing her. (Compl. PP 40-42; Pl. Mem. at 13)

This claim fails for two reasons. First, contrary to plaintiff's argument, the only "protected activity" in which she [*24] engaged was the filing of the complaint with the Human Rights Commission. It is true that plaintiff sent grievances to her union representative on at least one occasion before and two occasions after complaining to the Commission. However, it appears that none of plaintiff's union grievances included charges of discrimination. (Castro Dep. at 174) Accordingly, the lodging of these grievances does not constitute a "protected activity" within the meaning of the

discrimination laws and, therefore, does not give rise to a claim of retaliation. *See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 512 n.4 (3rd Cir. 1997), cert. denied, 118 S. Ct. 1516, 140 L. Ed. 2d 669 (U.S. 1998); Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995); see also Brands-Kousaros v. Banco Di Napoli S.P.A., 1997 U.S. Dist. LEXIS 20345,* No. 97 Civ. 1673, 1997 WL 790748, at *5 (S.D.N.Y. Dec. 23, 1997) ("the protected activity must involve some sort of complaint about a type of discrimination that Title VII forbids").

Second, plaintiff has failed to demonstrate a causal connection between the one protected activity in which she did engage -- her complaint to the Human Rights Commission [*25] on April 27, 1995 -- and the conduct about which she now sues. Generally speaking, a plaintiff may establish a causal connection through either direct or indirect evidence, the latter usually consisting of proof that the exercise of a protected right was followed closely in time by an adverse employment action. *See DeCintio v. Westchester County Medical Ctr., 821 F.2d 111, 115* (2d Cir.), *cert. denied, 484 U.S. 965, 98 L. Ed. 2d 395, 108 S. Ct. 455 (1987).* Here, plaintiff does not purport to have direct evidence of retaliation. Rather, she claims that indirect evidence of a causal connection exists because the filing of her complaint with the Human Rights Commission was followed closely by the adverse employment actions to which she was subjected. The facts do not support her.

As the Board correctly points out, Silva gave plaintiff her first unsatisfactory rating, denied her the first choice in class assignment, and placed a large number of challenging students in her class all beginning in or during the 1993-94 school year, at least a full year before plaintiff filed her complaint with the Commission. Similarly, although plaintiff claims that Silva generally "treated [her] [*26] bad" (Castro Dep. at 32), she testified that this poor treatment began in Silva's second year at P.S. 192, before plaintiff complained to the Commission. (*Id.*) Although plaintiff received a second unsatisfactory rating from Silva in June 1995, by then Silva was dissatisfied with plaintiff or her teaching abilities, or both. It is unreasonable to infer that the continuation of behavior that had preceded the filing of the plaintiff's complaint was somehow motivated by that complaint. Moreover, assuming *arguendo* that this second rating was causally connected to plaintiff's complaint to the Commission, that rating was overturned

on administrative appeal and therefore did not cause a "materially adverse change" in the terms of plaintiff's employment. *See Mattern v. Eastman Kodak Co., 104 F.3d 702, 708 (5th Cir.), cert. denied, 139 L. Ed. 2d 260, 118 S. Ct. 336 (1997); Smart v. Ball State Univ., 89 F.3d 437, 442 (7th Cir. 1996); see also Angara, 1997 WL 441319, at *7* ("A negative evaluation, by itself, cannot constitute an actionable adverse action.").

Further, the filing of plaintiff's complaint is not causally connected with either the negative observation reports [*27] issued by Pacheco and Litrico or with Buchsbaum's ultimate decision to give plaintiff her third and final unsatisfactory rating. Each of these events took place over a year after plaintiff filed her complaint. Such a long delay between protected conduct and adverse action precludes an inference of causal connection. *See Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990)* (no causal connection even though only three and one-half months passed between protected activity and adverse employment action); *see also Zenni v. Hard Rock Cafe Int'l, Inc., 903 F. Supp. 644, 656 (S.D.N.Y. 1995)* (plaintiff failed to establish prima facie case of discrimination when "full year passed between the filing of the charge and this allegation of retaliatory conduct"); *Fitch v. R.J. Reynolds Tobacco Co., 675 F. Supp. 133, 138 (S.D.N.Y. 1987)* (that plaintiff received lowest performance evaluation seven months after he filed EEOC charge "is insufficient to make out a prima facie case of retaliatory discrimination"). Accordingly, plaintiff's claim for retaliatory discrimination is dismissed.

## C. *Intentional Infliction of Emotional Distress*

Plaintiff's final claim is for intentional [*28] infliction of emotional distress. She alleges that officials at P.S. 192 subjected her "to a work environment wherein she [was] humiliated, degraded, and ultimately fired and forced out of her place of employment by police officers . . . ." (Compl. P 44) This claim is meritless.

Under New York law, a claim for intentional infliction of emotional distress requires proof of acts "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Products Corp., 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983)* (quotations omitted). Courts generally will not permit such a claim "absent a

'deliberate and malicious campaign of harassment or intimidation.'" *Herlihy v. Metropolitan Museum of Art, 214 A.D.2d 250, 263, 633 N.Y.S.2d 106, 114* (1st Dep't 1995) (quoting *Nader v. General Motors Corp., 25 N.Y.2d 560, 569, 307 N.Y.S.2d 647, 654, 255 N.E.2d 765 (1970)).*

The facts in this case fall far short of these standards. As noted, the only official at P.S. 192 who even arguably discriminated against plaintiff was Silva. However, [*29] Silva's acts, viewed in a light most favorable to plaintiff, did not rise to the level of extreme and outrageous conduct necessary to support a claim for intentional infliction of emotional distress. *See Spence v. Maryland Cas. Co., 995 F.2d 1147, 1158 (2d Cir. 1993)* (rejecting claim based on allegations that employer criticized, harassed, intimidated and threatened to fire plaintiff on the basis of his age); *Martin v. Citibank, N.A., 762 F.2d 212, 220 (2d Cir. 1985)* (rejecting claim based on allegations that employer forced plaintiff, on the basis of her race, to take a polygraph in connection with investigation into stolen property); *see generally Mariani v. Consolidated Edison Co. of New York, 982 F. Supp. 267, 277-79 (S.D.N.Y. 1997)* (collecting cases rejecting such claims, almost all of which involve facts more egregious than those alleged here).

Nor does the fact that the police escorted plaintiff off school grounds support her claim. By plaintiff's own admission, school officials summoned the police only after she refused to comply with their requests to leave. (Castro Dep. at 116) Under similar circumstances, New York courts have rejected claims for intentional [*30] infliction of emotional distress. *See Navarro v. Federal Paper Bd. Co., 185 A.D.2d 590, 593-94, 586 N.Y.S.2d 381, 384 (3rd Dep't 1992)* (former employee handcuffed and arrested in front of former co-workers after failing to comply with requests to leave place of business); *Murphy v. American Home Products Corp., 112 Misc. 2d 507, 447 N.Y.S.2d 218, 220 (Sup. Ct. New York County)* (former employee "placed under guard, barred from saying goodbye to his colleagues, told that his belongings had been taken from his desk . . . and publicly escorted out of building"), *aff'd in relevant part, 88 A.D.2d 870, 871, 451 N.Y.S.2d 770, 771 (1st Dep't 1982), aff'd in relevant part, 58 N.Y.2d at 303, 461 N.Y.S.2d at 236; see also Impastato v. Hellman Enterprises, Inc., 147 A.D.2d 788, 789, 537 N.Y.S.2d 659, 661 (3rd Dep't 1989)* (theater patrons arrested and scoffed at by theater crowd after they refuse to comply with theater employee's lawful requests to leave theater). Moreover, even if school officials acted hastily in calling the police, their action was neither part of a campaign of harassment and intimidation nor so outrageous or extreme "as to go beyond all bounds of decency." [*31] *Murphy, 58 N.Y.2d at 303, 461 N.Y.S.2d at 236.* Accordingly, this claim too is dismissed.

For the above reasons, the Board's motion for summary judgment is granted.

SO ORDERED:

Dated: New York, New York

March 11, 1998

Michael B. Mukasey,

U.S. District Judge

**COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW**

# TAB 7

LEXSEE 2002 U.S. DIST. LEXIS 2979

**FRANCIS H. CIMINO, et al., Plaintiffs, v. DELAWARE DEPARTMENT OF LABOR, et al., Defendants.**

**C.A. No. 01-458 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 2979*

**February 25, 2002, Decided**

**DISPOSITION:** [*1] Defendants' motions to dismiss were granted in part and denied in part.

**COUNSEL:** For FRANCIS H. CIMINO, PROFESSIONAL CONSULTING SOLUTIONS, INC., plaintiffs: Richard R. Wier, Jr., Law Offices of Richard R. Wier, Jr., Wilmington, DE.

For DELAWARE DEPARTMENT OF LABOR, DIVISION OF UNEMPLOYMENT INSURANCE, THOMAS MACPHERSON, KAREN PASQUALE, defendants: Thomas H. Ellis, Department of Justice, Wilmington, [*2] DE.

For FUTURTECH CONSULTING, LLC, defendant: Kathleen Jennings, Karen S. VanHoy Sullivan, Oberly & Jennings, Wilmington, DE.

For DAVID CASTETTER, CORK SCREW WILLOW LTD., defendants: Roy S. Shiels, Brown, Sheils, Beauregard & Chasanov, Dover, DE.

For DELAWARE DEPARTMENT OF LABOR, DIVISION OF UNEMPLOYMENT INSURANCE, THOMAS MACPHERSON, KAREN PASQUALE, cross-claimants: Thomas H. Ellis, Department of Justice, Wilmington, DE.

For FUTURTECH CONSULTING, LLC cross-defendant: Kathleen Jennings, Karen S. VanHoy Sullivan, Oberly & Jennings, Wilmington, DE.

For DAVID CASTETTER, CORK SCREW WILLOW LTD., cross-defendants: Roy S. Shiels, Brown, Sheils, Beauregard & Chasanov, Dover, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

MEMORANDUM AND ORDER

I. INTRODUCTION

The plaintiffs, Francis H. Cimino ("Cimino") and his wholly-owned corporation, Professional Consulting Solutions ("PCS"), filed the above-captioned action against the Delaware Department of Labor, Division of Unemployment Insurance and W. Thomas MacPherson ("MacPherson"), Director of the Division of Unemployment Insurance (the "state defendants"), in both his personal [*3] and official capacities. Cimino also named David Castetter ("Castetter"), Cork Screw Willow, Ltd. ("Cork Screw") and FuturTech Consulting LLC ("FuturTech") as defendants. In his complaint, Cimino alleges civil rights violations of *42 U.S.C. §§ 1981, 1983* and *1985(3)*. He also alleges state law claims.

Presently before the court are the defendants' motions to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons that follow, the court will grant these motions in part and deny them in part.

II. STANDARD OF REVIEW

The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,*

*1 F.3d 176, 183 (3d Cir. 1993)*. Thus, in deciding a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, the court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them." *Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir.1990)*. In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is [*4] not frivolous, and to provide defendants with adequate notice to frame an answer." *Colburn v. Upper Darby Tp., 838 F.2d 663, 666 (3d Cir.1988)*. However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3rd Cir.1997)*. The court will only dismiss a complaint if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249-50, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)* (quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984))*. Thus, in order to prevail, a moving party must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*.

## III. BACKGROUND

On October 5, 1998, the state defendants contracted with FuturTech for computer programming services until June 30, 1999. FuturTech entered into a subcontract with Cork Screw, which would allow Cork Screw's employee Castetter to work [*5] on FuturTech's computer programming services contract with the state. Castetter was assigned to work on the Department of Labor's Y2K project. Cimino alleges that Castetter had the power to hire and fire the employees he supervised on that project. In accordance with that alleged power, Castetter hired Cimino, and PCS to work on the Y2K project until September 1999. However, Castetter terminated Cimino and PCS on August 6, 1999. Castetter also laid off three additional subcontractors on August 6, 1999. Two of these individuals were black and the other white. Cimino is also white.

In his complaint, Cimino alleges that the defendants terminated him solely because of his race. Specifically, he alleges that the state defendants delegated the job of terminating the two black employees to Castetter. The state defendants, including MacPherson, then allegedly conspired to terminate Cimino and the other white employee because the state defendants feared that the two black employees would sue them.

FuturTech filed a motion to dismiss on August 22, 2001. The state defendants filed a motion to dismiss on November 5, 2001. Cork Screw and Castetter filed a motion to dismiss on November 30, 2001. The [*6] court will now address each of these motions in turn.

## IV. DISCUSSION

### A. FuturTech's Motion to Dismiss

Cimino's complaint does not allege any active role on FuturTech's part in depriving him of his rights. Rather, the complaint alleges liability on FuturTech's part based on actions taken by its subcontractor, Castetter.

For the following reasons, the court will grant FuturTech's motion with regard to the *Section 1983, 1985(3)* and Third-Party Beneficiary claims. It will deny the motion with regard to the *Section 1981* and breach of an implied covenant of good faith and fair dealing claims.

#### 1. *Section 1981* Liability

The first issue the court must address with respect to FuturTech is whether *Section 1981* supports a respondeat superior theory of liability for non-government defendants.

The Supreme Court has suggested that, in order to impose liability on a defendant under *Section 1981* for the actions of a third party, an agency relationship between the defendant and the third party must exist. *See General Building Contractors Assoc. v. Pennsylvania United Engineers and Constructors, 458 U.S. 375, 394, 73 L. Ed. 2d 835, 102 S. Ct. 3141 (1982); see also Blair v. Philadelphia Housing Authority, 609 F. Supp. 276, 279 (E.D. Pa. 1985); [*7] Choice v. Easton Hospital 1988 U.S. Dist. LEXIS 1319*, at *2 (E.D. Pa. Feb. 22 1988); *Malone v. Schenk, 638 F. Supp. 423, 425 (C.D. Ill. 1985)*. Agency is a fiduciary relationship which results in the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control. *See General Building Contractor's Assoc., 458 U.S. at 391*. Therefore, to establish an agency relationship between Castetter and FuturTech, Cimino must allege that FuturTech gave its consent for Castetter to act on its

2002 U.S. Dist. LEXIS 2979, *7

behalf, and that Castetter is in FuturTech's control.

Cimino has alleged that FuturTech paid Castetter directly, and that Castetter had full authority to manage personnel for FuturTech. [1] Based on these allegations, the court concludes that Cimino has alleged sufficient information to establish the possibility of an agency relationship. Accordingly, it will not grant FuturTech's motion to dismiss the 1981 claim.

> 1    The court recognizes that FuturTech denies that Castetter was their agent. However, when deciding a motion to dismiss, the court will not examine the merits of the claims.

[*8] 2. *Section 1983* Liability

Cimino's complaint purports to hold FuturTech liable for *Section 1983* violations as well. However, in defending his *Section 1981* claims, Cimino acknowledges that the theory of respondeat superior cannot support a *Section 1983* claim. *See Gibbs v. Hargett*, 1986 WL 12129, at *2 (D. Del. Oct. 27, 1986) (noting that *Section 1983* claims require "willful participation or joint action."); *see also Powell v. Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982)* (holding that neither municipal nor private corporations may be held liable on the theory of respondeat superior under *Section 1983*). Thus, because Cimino has not alleged any active role that FuturTech played in the alleged discrimination, the court will dismiss the *Section 1983* claim against it.

3. *Section 1985(3)* Liability

Cimino finally alleges that FuturTech violated *Section 1985(3)*. While the Third Circuit has not addressed this issue, district courts in this Circuit have held that *Section 1985(3)* liability may not be premised on a respondeat superior theory. *See Hankins v. City of Philadelphia, 1998 U.S. Dist. LEXIS 5101, 1998 WL 175600*, at *14 (E.D. Pa. April 9, 1998); [*9] *see also Gant v. Aliquippa Borough, 612 F. Supp. 1139, 1142 (W.D. Pa. 1985)* (holding that "an employer may not be subject to a conspiracy claim by the doctrine of respondeat superior."). Nor may an employer be held to conspire with one of its own employees acting in his official capacity. *See Gant, 612 F. Supp. at 1142*. Moreover, even to the extent that Cimino could argue that there was a conspiracy between Castetter and the other named defendants in which FuturTech acquiesced, this argument must also fail. Cimino has clearly stated that,

"Castetter testified that he complained to a FuturTech employee . . . that there had been this racially motivated layoff." Thus, while FuturTech may have had knowledge of the alleged conspiracy after the fact, that is insufficient to hold it responsible for the actual conspiracy.

Accordingly, the court will dismiss Cimino's *Section 1985(3)* claim against FuturTech.

4. State Law Claim: Breach of the Covenant of Good Faith and Fair Dealing

Cimino argues that the defendants breached his contract with them by engaging "in fraud, deceit and misrepresentation in their administration of and termination of [his] [*10] employment [] contract."

The Delaware Supreme Court has strictly limited the application of the implied covenant in the employment context, holding that a plaintiff must establish that he or she falls into one of four exclusive categories. *See Lord v. Souder, 748 A.2d 393, 401 (Del. 2000)*. The four categories are: (1) where the termination violates public policy and no other remedial scheme exists; (2) where the employer misrepresented an important fact and the employee relied thereonto either accept a new position or remain in a present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation earned through the employee's past service; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination. *See E.I. duPont de Nemours & Co. v. Pressman, 679 A.2d 436, 442-44 (Del. 1996)*. The implied covenant of good faith and fair dealing does, however, permit a cause of action against an employer for the deceitful acts of its agent when the latter manufactures false grounds to cause an employee's dismissal. *See id. at 437*. [*11]

Finally, irrespective of the category implicated, a claim for the breach of duty of good faith and fair dealing requires employer conduct amounting to fraud, deceit, or misrepresentation. *See Peterson v. Beebe Med. Ctr., Inc., 1992 Del. Super. LEXIS 454, 1992 WL 354087*, at *5 (Del. Nov. 13, 1992), *aff'd, 1993 Del. LEXIS 142 (Del. 1993)*. Thus, the traditional elements of fraud must be present in a claim for breach of an implied covenant of good faith. *See Hudson v. Wesley College, Inc., 1998 Del. Ch. LEXIS 235, 1998 WL 939712*, at *13 (Del. Ch. Dec. 23, 1998) *aff'd 734 A.2d 641 (Del. 1999)*.

As discussed *supra* in Section IVA1, the court concludes that Cimino has alleged sufficient facts demonstrating that Castetter may have been FuturTech's agent. Cimino further points to the deposition testimony of Nicholas P. Marica ("Marica"). In that deposition, Marica testified that Castetter admitted to firing Cimino due to his race. Accordingly, the court declines to dismiss this state law claim against FuturTech.

5. State Law Claim: Third-Party Beneficiary Rights

Cimino finally alleges that he and PCS were third-party beneficiaries of the contract between the Division of [*12] Unemployment Insurance and FuturTech.

The Delaware Supreme Court has noted that is it axiomatic that either party to an agreement may enforce its terms if it is breached. *See Triple C Railcar Service v. Wilmington, 630 A.2d 629, 633 (Del. 1993).* "Equally well-settled is the principle that a third-party who is, in effect, a stranger to the agreement, may enforce a contractual promise in his own right if the contract has been made for his benefit." *Id.* However, essential to a third-party's right of enforceability, is the contracting parties' intention to view the stranger as either a creditor or donee beneficiary. *See id.* Thus, a third party has no rights under a contract that did not, by itself, manifest an intention to benefit the third party. *See id.*

In the present case, Cimino has failed to allege any language in the Division of Unemployment Insurance/FuturTech contract that manifests an intention to benefit strangers to their contract. As the court cannot assume that Cimino will prove facts which he has not alleged, it will dismiss this count as to all the named defendants. *See City of Pittsburgh v. West Penn Power Co., 147 F.3d 256 (3d Cir. 1998).* [*13]

B. The State Defendants' Motion to Dismiss

Cimino's complaint also names the Delaware Department of Labor, the Division of Unemployment Insurance and W. Thomas MacPherson (MacPherson), Director of the Division of Unemployment Insurance, in his official, as well as individual, capacity, as defendants.

1. *Eleventh Amendment* Immunity Against Damages

The state defendants, including MacPherson in his official capacity, assert that the *Eleventh Amendment* deprives the court of jurisdiction to adjudicate Cimino's civil rights claims for damages pursuant to *42 U.S.C. §§ 1981, 1983,* and *1985(3).* The court agrees.

Cimino's complaint alleges that the Delaware Department of Labor, Division of Unemployment Insurance, a state agency, violated his civil rights. As a result, he requests both monetary and injunctive relief. However, under the *Eleventh Amendment*, private parties cannot sue states in federal court for monetary damages. *See Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 121 S. Ct. 955, 962, 148 L. Ed. 2d 866 (2001).* A state is not entitled to this immunity if it has waived its immunity or if Congress has abrogated the state's immunity through [*14] a valid exercise of its power. *See Lavia v. Comm. of Pennsylvania, 224 F.3d 190, 195 (3d Cir. 2000).*

Neither of the two above conditions are met here. First, the state has not waived its *Eleventh Amendment* immunity. A waiver will be found only where it has been stated "by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Space Age Products, Inc. v. Gilliam, 488 F. Supp. 775, 780 (D. Del. 1980)* (citing *Edelman v. Jordan, 415 U.S. 651, 673, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974)).* Such an express waiver may be made through clear constitutional or statutory language. *See Lavia, 224 F.3d at 195* Neither the constitution nor the code of Delaware expressly waives Delaware's *Eleventh Amendment* sovereign immunity. *See Ospina v. Department of Corrections, 749 F. Supp. 572, 579 (D. Del. 1990).* Therefore, Delaware has not clearly waived its immunity.

Moreover, Congress has not abrogated the states' immunity for claims under *Sections 1981, 1983* and *1985(3). See Quern v. Jordan, 440 U.S. 332, 345, 59 L. Ed. 2d 358, 99 S. Ct. 1139 (1979); Henry v. Texas Tech Univ., 466 F. Supp. 141, 146 (N.D. Texas 1979);* [*15] *Carmen v. San Francisco Unified School Dist., 982 F. Supp. 1396, 1404 (N.D. Cal. 1997).* Since Delaware's immunity has not been waived or abrogated, Cimino cannot sue the State agency for money damages.

Furthermore, Cimino may not assert a claim for injunctive relief against the state. In *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy*, the Supreme Court noted that, although prospective (injunctive) relief is available against state officials, it is not available against state agencies. *506 U.S. 139, 146,*

*113 S. Ct. 684, 121 L. Ed. 2d 605 (1993)*. Since the Delaware Department of Labor, Division of Unemployment Insurance, is a state agency, it cannot be sued for injunctive relief under the *Eleventh Amendment*.

It is clear, however, that a claim for injunctive relief would be available against MacPherson. *See Green v. Mansour, 474 U.S. 64, 68-69, 88 L. Ed. 2d 371, 106 S. Ct. 423 (1985)*. The state defendants do not dispute this.

Accordingly, the court will dismiss each of the claims against the Delaware Department of Labor, Division of Unemployment Insurance and MacPherson in his official capacity.

2. MacPherson's Individual Liability Under *Section 1981*

MacPherson claims that he cannot [*16] be individually liable under *Section 1981* because he was not a party to a contract with Cimino and PCS. The court finds this argument unpersuasive.

A third party may be liable under *Section 1981* if that party "intentionally interferes, on the basis of race, with another's right to make and enforce contracts, regardless of whether the employer or anyone else may also be liable." *Olumuyiwa v. Harvard Protection Servs, Inc., 2000 U.S. Dist. LEXIS 6364*, at *14 (E.D.N.Y. May 12, 2000); *see also Daniels v. Pipefitters' Ass'n Local Union No. 597, 945 F.2d 906, 914 (7th Cir. 1991)* (holding that "this kind of race-based impediment to contract formation constitutes exactly the sort of racially discriminatory interference with the right to contract that remains actionable under § 1981."); *Pryor v. National Collegiate Athletic Ass'n, 153 F. Supp. 2d 710, 718 (E.D. Pa. 2001)*.

In the present action, Cimino has alleged that MacPherson was directly involved with the decision to terminate Cimino because of his race. He further alleges that MacPherson's intentional involvement actually resulted in Cimino's termination, thus interfering with his [*17] employment contract. Accordingly, the court will not dismiss the *Section 1981* claim against MacPherson in his individual capacity.

3. MacPherson's Individual Liability Under *Section 1983*

To establish personal liability in a *Section 1983* action, the plaintiffs must show that MacPherson: (1) was

acting under color of state law; and (2) caused the deprivation of a federal constitutional right enjoyed by the plaintiffs. *See Kentucky v. Graham, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985)*. The state defendants argue that Cimino was an at-will employee, and thus could be fired at any time. Thus, they contend that he has failed to allege any constitutional deprivation. 2 However, Cimino clearly alleges that he was denied equal protection of the laws due to discrimination. Accordingly, the court will not dismiss the *Section 1983* claim against MacPherson in his individual capacity.

    2    MacPherson does not state that he takes exception with a finding that he was acting under color of state law. Accordingly, the court will not discuss this element.

[*18] 4. MacPherson's Individual Liability Under *Section 1985(3)*

In order to establish a claim under *Section 1985(3)*, the Supreme Court requires the following elements: (1) that two or more defendants conspired; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the law; (3) that one or more of the conspirators acted in furtherance of the conspiracy; and (4) that such an act injured a person or his property or deprived him of exercising any right or privilege of a citizen of the United States. *See Griffin v. Breckenridge, 403 U.S. 88, 102-103, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971)*.

In his complaint, Cimino pled that "McPherson [sic] and Castetter agreed to fire the two white employees . . . to make it look like the terminations [of the two black employees] were not because of the race of the black employees." Cimino further alleges that Castetter subsequently terminated him.

Based on these allegations, the court concludes that dismissal for failure to state a claim would be inappropriate.

5. State LawClaim: Breach of Implied Covenant of Good Faith and Fair Dealing

[*19] Castetter, perhaps as an agent of FuturTech, entered into a contract with Cimino. MacPherson was not a party to this contract. Accordingly, his actions could not have breached an implied covenant of good faith and fair

dealing in the Castetter/Cimino contract. This claim will be dismissed.

C. Castetter's and Cork Screw's Motion to Dismiss

As an initial matter, the court will dismiss all of Cimino' claims against Cork Screw. Cimino has alleged only that FuturTech subcontracted with Castetter, through Castetter's employer Cork Screw. Cork Screw was not a party to the FuturTech/Division of Unemployment Insurance contract. It had no involvement with the type of work Castetter performed, how he performed the work, the hours he worked, or the amount he was paid for his work. Indeed, Cork Screw's only involvement was to receive a set payment from FuturTech for the number of hours that Castetter worked. Cimino has not alleged any facts from which the court can assume the existence of an agency relationship, [3] or that Cork Screw itself engaged in any intentional discrimination, or a conspiracy to commit intentional discrimination. Accordingly, as Cimino's complaint alleges nothing [*20] more, there can be no basis under any of the theories he has advanced for Cork Screw's liability.

> [3] Notably, Cimino has failed to allege facts demonstrating that Cork Screw in any way controlled Castetter.

Cimino does not state that he is suing Castetter in an official capacity as a representative of the state. The following analysis thus addresses only Castetter's personal liability.

1. Castetter's *Section 1981* Liability

Cimino alleges that Castetter terminated his employment due to his race. These allegations are sufficient to withstand a motion to dismiss for failure to state a claim. Accordingly, the court will not dismiss Cimino's *Section 1981* claim.

2. Castetter's *Section 1983* Liability

Cimino next alleges that Castetter acted at the "express direction of the Department and the Division through MacPherson" when Castetter terminated him due to his race. The court thus concludes that, for the purposes of a motion to dismiss, Cimino has alleged that Castetter was acting under color of state [*21] law when he deprived him of a constitutional right. *See Kentucky v. Graham, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct.*

*3099 (1985).*

3. Castetter's *Section 1985(3)* Liability

Cimino's complaint alleges that Castetter and MacPherson conspired to terminate Cimino due to his race, and that they did in fact terminate him. As discussed above in conjunction with MacPherson's individual liability, this allegation will suffice for the purpose of a motion to dismiss.

4. State Law Claim: Breach of Implied Covenant of Good Faith and Fair Dealing

It is undisputed that Cimino and Castetter entered into an employment contract. Cimino now alleges that Castetter fired him because of his race, and falsified the reasons for that termination. Accordingly, the court declines to dismiss this claim against Castetter.

V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

> 1. FuturTech's motion to dismiss (D.I. 9) is GRANTED with respect to the *Section 1983, 1985(3)* and Third-Party Beneficiary claims. It is DENIED with respect to all other claims;

> 2. The Department of Labor, Division of Unemployment Insurance, and MacPherson's motion to dismiss (D.I. 24) is GRANTED on [*22] all claims with respect to the Department of Labor, Division of Unemployment Insurance and MacPherson in his official capacity. It is GRANTED with respect to MacPherson in his individual capacity as to both of the state law claims. It is DENIED with respect to MacPherson in his individual capacity as to all other claims, including claims for injunctive relief;

> 3. Cork Screw's and Castetter's motion to dismiss (D.I. 30) is GRANTED with respect to Cork Screw on all claims. It is GRANTED with respect to Castetter on the Third-Party Beneficiary claim. It is DENIED with respect to Castetter as to all

2002 U.S. Dist. LEXIS 2979, *22

other claims.

Gregory M. Sleet

Date: February 25, 2002

UNITED STATES DISTRICT JUDGE

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 8

LEXSEE 2002 U.S. DIST. LEXIS 13815

**OLIVIA DIXON, Plaintiff, v. BOSCOV'S, INC. f/k/a Boscov's Department Store, Inc. and/or Boscov's Department Store, LLC and/or Ports of the World, Inc. and/or Ports of the World LLC, BOSCOV'S DEPARTMENT STORE, INC., BOSCOV'S DEPARTMENT STORE, LLC, PORTS OF THE WORLD, INC., AND PORTS OF THE WORLD LLC, Defendants.**

**CIVIL ACTION NO. 02-1222**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2002 U.S. Dist. LEXIS 13815*

**July 17, 2002, Decided**
**July 17, 2002, Filed**

**DISPOSITION:**    Defendants' motion was granted in part and denied in part.

**COUNSEL:**  [*1]  For OLIVIA DIXON, PLAINTIFF: ALBERT L. DEUTSCH, PHILA, PA USA.

For BOSCOV'S, INC., BOSCOV'S DEPARTMENT STORE INC., BOSCOV'S DEPARTMENT LLC, PORTS OF THE WORLD INC., PORTS OF THE WORLD LLC, TERRY STEWARD, DEFENDANTS: GLEN D. KIMBALL, REGER & RIZZO, KING OF PRUSSIA, PA USA.

**JUDGES:** LOWELL A. REED, JR., S.J.

**OPINION BY:** LOWELL A. REED, JR.

**OPINION**

**MEMORANDUM**

This action arises out of an altercation between plaintiff and a security guard at a store of defendants in the Franklin Mills Mall in Philadelphia, Pennsylvania. Plaintiff asserts federal civil rights claims under *42 U.S.C. §§ 1981*, *1985*, and *1986*, and a claim of intentional infliction of emotional distress under state law. Now before the Court is the motion of defendants Boscov's Inc., Boscov's Department Store, Inc., Boscov's

Department Store, LLC, Ports of the World, Inc., Ports of the World LLC (collectively, "Boscov's") to dismiss for failure to state a claim pursuant to *Rule 12 (b) (6)*, for a more definite statement pursuant to *Rule 12 (e)*, and to strike pursuant to *Rule 12 (f) of the Federal Rules of Civil Procedure* (Document No. 6), and the response of plaintiff Dixon thereto (Document No. 10). For [*2]  the reasons set forth below, the motion will be granted in part and denied in part.

**A. Background** [1]

    1    All facts are taken as true from the amended complaint, as required by law.

Plaintiff, an African-American woman, and her daughter were waiting in the check-out line of Boscov's, when they were accosted by Terry Steward, an employee of the defendants' store. Steward represented herself as head of store security and accused plaintiff of engaging in illegal or fraudulent acts, including the use of a fraudulent credit card. Specifically, Steward remarked, "I don't know why they [plaintiff and her daughter] are waiting, the sale is not going to go through." Steward then approached plaintiff, stating "They aren't going to give you those items, I put a stop to that." Steward continued, "You're not going to take this out of the store, your card is fraudulent." Steward ordered the cashier to void the sale, took plaintiff's shopping bags and emptied their contents onto the floor. When plaintiff's daughter [*3]  bent down to pick up the merchandise, Steward ordered,

"Get the f__k away from that merchandise." She commented, "I see black people come in here all of the time stealing. All of you are thieves." Another employee of Boscov's approached the companion of plaintiff's daughter and threatened to "f__k [him] up." When plaintiff left the store, Steward followed her into the parking lot and stated, "If you don't get out of her [sic] right now, there's a cop waiting in the alley for you." Steward produced a cellular phone and stated that she was calling the police. The instant suit ensued.

**B. Legal Standard**

*Rule 12 (b) of the Federal Rules of Civil Procedure* provides that "the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted." In deciding a motion to dismiss under *Rule 12 (b) (6)*, a court must take all well pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. See *Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969)*. Because the Federal Rules of Civil Procedure require only notice pleading, the complaint [*4] need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8 (a)*. A motion to dismiss should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*.

**C. Analysis**

**1. *Sections 1985 and 1986***

*Section 1985* of the federal civil rights provisions prohibits conspiracies to deprive a U.S. citizen of his constitutional rights based on invidious class-based discrimination. See *42 U.S.C. § 1985*. [2] To state a claim under *section 1985* for private conspiracy, a plaintiff must allege:

> (a) that a racial or other class-based invidious discriminatory animus lay behind the coconspirators' actions, (b) that the coconspirators intended to deprive the victim of a right guaranteed by the Constitution against private impairment, and (c) that that right was consciously targeted and not just incidentally affected.

*Brown v. Philip Morris, Inc., 250 F.3d 789, 805 (3d Cir. 2001)* [*5] (citing *Spencer v. Casavilla, 44 F.3d 74, 77 (2d Cir. 1994)*; citing also *Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993)*). While *Section 1985(3)* provides a remedy for purely private conspiracies involving no state action, see *Griffin v. Breckenridge, 403 U.S. 88, 100, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971)*, it does so only when the rights aimed at by the conspiracy are protected against private encroachment. See *United Bhd. of Carpenters & Joiners, Local 610 v. Scott, 463 U.S. 825, 833, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983)*. Only two rights have hitherto been recognized by the Supreme Court as protected against private conspirators under *section 1985(3)*: the right to be free from involuntary servitude and the right to interstate travel. See *Brown, 250 F.3d at 805* (citing *Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 278, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993)*). In *Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 378, 60 L. Ed. 2d 957, 99 S. Ct. 2345 (1979)*, the Supreme Court held that rights pursuant to Title VII could not be the basis [*6] for a *section 1985(3)* claim. In their concurring opinions, Justices Stevens and Powell extended this holding to state that *section 1985* was intended to provide a remedy only for the violation of rights protected by the Constitution and not for the violation of statutory rights. See *Novotny, 442 U.S. at 379-85*.

    2  *Section 1985(3)* provides, in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; . . . [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for recovery of the

damages, occasioned by such injury or deprivation against any one or more of the conspirators.

*42 U.S.C. § 1985(3).*

[*7] Plaintiff contends that her allegation of a *section 1981* violation supports her claim under *section 1985(3)*. [3] There is conflicting authority among the district courts on whether *section 1981* may be the basis of a *section 1985* claim. See, e.g., *Weeks v. Coury, 951 F. Supp. 1264, 1277 (S.D. Tex. 1996)* ("The courts have recognized that *Section 1985(3)* claims may be supported by rights created under *Section 1981*") (citing *Vakharia v. Swedish Covenant Hosp., 824 F. Supp. 769 (N.D. Ill.1993)*; *Alder v. Columbia Historical Society, 690 F. Supp. 9 (D.D.C. 1988))*. Nevertheless, although stated in dictum, the Third Circuit Court of Appeals in Brown rejected the same argument posed by plaintiff. [4] Without expressly adopting the concurring positions of Justices Stevens and Powell in Novotny, the Brown court set forth a legal standard which required the rights protected by *section 1985* to be guaranteed by the Constitution. See *Brown, 250 F.3d at 804*. Accordingly, the Brown court observed that statutory rights pursuant to *section 1981* cannot be the basis of a *section 1985* remedy. *Id. at 805*. [*8] The court further stated:

[Plaintiffs] Black Smokers attempt to salvage their *§ 1985(3)* claims by arguing that defendants' alleged violations of *§§ 1981* and *1982* may support a claim under *§ 1985(3)*. In light of the overwhelming preponderance of authority on the question, this argument too must fail. Contrary to Black Smokers' claims, [the Supreme Court opinion in] Bray[, *506 U.S. at 278*,] does not support the proposition that *§§ 1981* or *1982* claims can form the basis of a *§ 1985(3)* claim or the notion that the contract and property rights protected by *§§ 1981* and *1982* fall within the category of "involuntary servitude" violations that may support a *§ 1985(3)* claim.

*250 F.3d at 805-06* (internal citations and footnote omitted). Thus, the strong language used indicates how the Third Circuit Court of Appeals would resolve this issue. Because plaintiff has failed to allege that

defendants conspired to violate her fundamental rights protected by the Constitution against private encroachment, her *section 1985(3)* claim cannot stand.

3  Plaintiff correctly notes that defendants have failed to move to dismiss her *section 1981* claim. Defendants have not filed a reply brief nor moved to add the *section 1981* claim to their motion for dismissal.

[*9]

4  The Brown court ultimately reserved the issue, noting that it "need not [] resolve the question whether violations of *§§ 1981* and *1982* can support a *§ 1985(3)* claim because [plaintiffs] have failed to state a claim under either *§ 1981* or *§ 1982*." *Brown, 250 F.3d at 806*. Nevertheless, the direction provided by the dictum is persuasive. See *Harden v. RR Donnelly, C.A. No. 01-6147, 2002 U.S. Dist. LEXIS 12124*, at **4-5 (E.D. Pa. April 1, 2002) (denying motion for reconsideration on *section 1985* claim based on Brown dictum).

*Section 1986* constitutes an additional safeguard against the wrongs prohibited by *section 1985*. [5] *Clark v. Clabaugh, 20 F.3d 1290, 1295 (3d Cir. 1994)*. It provides a cause of action for recovery against anyone who with knowledge of a *section 1985* conspiracy and the power to prevent its violation, neglects or refuses to do so. To state a claim under *section 1986*, plaintiffs must show the existence of a *section 1985* conspiracy. Id. As discussed above, plaintiff has failed to state a cause of action under [*10] *section 1985*; consequently, her *section 1986* claim is untenable.

5  *Section 1986* provides, in relevant part:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in *section 1985* of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act,

which such person by reasonable diligence could have prevented . . .

.

*42 U.S.C. § 1986.*

I therefore conclude that the claims under *sections 1985* and *1986* will be dismissed.

### 2. *Intentional Infliction of Emotional Distress*

The tort of intentional infliction of emotional distress is defined under Pennsylvania law as "'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability [*11] for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'" *Shaner v. Synthes*, 204 F.3d 494, 507 (3d Cir. 2000) (quoting *Hoy v. Angelone*, 554 Pa. 134, 150, 720 A.2d 745, 753 (1998) (quoting *Restatement (Second) of Torts § 46)). [6] "'Courts have been chary to allow recovery for a claim of intentional infliction of emotional distress. Only if conduct which is extreme or clearly outrageous is established will a claim be proven.'" Id. (quoting *Hoy, 720 A.2d at 753-54)*. In addition, the complaint must allege physical injury in order to support a claim for intentional infliction of emotional distress. See *Atkinson v. City of Philadelphia, C.A. No. 99-1541, 2000 U.S. Dist. LEXIS 8500*, at **19-21 (E.D. Pa. June 20, 2000); *Corbett v. Morgenstern, 934 F. Supp. 680, 684 (E.D. Pa. 1996)* (citing *Rolla v. Westmoreland Health Sys., 438 Pa. Super. 33, 38, 651 A.2d 160, 163 (1994); Armstrong v. Paoli Memorial Hosp., 430 Pa. Super. 36, 43, 633 A.2d 605, 608 (1993); Abadie v. Riddle Memorial Hosp., 404 Pa. Super. 8, 13, 589 A.2d 1143, 1146 (1991))*. [*12] The complaint here fails to allege any physical injury suffered by plaintiff. Therefore, I conclude that plaintiff has failed to state a claim for intentional infliction of emotional distress.

[6] The Court of Appeals for the Third Circuit has noted that the Pennsylvania Supreme Court has not explicitly adopted the Restatement; however, the court assumed the existence of the tort and appeared to have relied on the Restatement. See *Shaner, 204 F.3d at 508 n.18* (citing *Hoy, 720 A.2d at 753 n.10).*

### 3. *Defunct Corporate Defendants*

Defendant has moved to dismiss the claims against the corporate defendants that are now defunct. Plaintiff has expressly stated that she has no objection to this dismissal. Therefore, the motion of defendants to dismiss the claims against all defendants other than those against defendant Boscov's Department Stores, LLC will be granted.

### 4. *Paragraphs 20, 21 and 23 of the Complaint*

Defendant has moved to strike paragraphs 20, [*13] 21 and 23 from the complaint as immaterial, impertinent and scandalous material. *Rule 12(f)* permits a court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *FED. R. CIV. P. 12(f)*. "While courts possess considerable discretion in weighing *Rule 12(f)* motions, such motions are not favored and will be generally be denied unless the material bears no possible relation to the matter at issue and may result in prejudice to the moving party." *Miller v. Group Voyagers, Inc., 912 F. Supp. 164, 168 (E.D. Pa. 1996)* (citing *North Penn Transfer v. Victaulic Co. of Am., 859 F. Supp. 154, 158 (E.D. Pa. 1994); Great W. Life Assurance Co. v. Levithan, 834 F. Supp. 858, 864 (E.D. Pa. 1993))*; see also CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1380 at 647 (2d ed. 1995). Paragraphs 20, 21 and 23 describe the actions of Steward towards plaintiff's daughter and the threats of an unidentified security guard towards the companion of plaintiff's daughter. Defendants have demonstrated no prejudice that would result should the allegations remain. Accordingly, [*14] the motion to strike paragraphs 20, 21, and 23 will be denied.

### 5. *Injunctive Relief, Medical Expenses, Lost Wages*

Defendant has further moved to strike plaintiff's request for injunctive relief, medical expenses, and lost wages as unavailable under the asserted causes of action and facts alleged. Plaintiff has failed to address this request in her response. Equitable relief is not available when a plaintiff has an adequate remedy at law. *Barnes v. Am. Tobacco Co., 989 F. Supp. 661, 667 (E.D. Pa. 1997); Doe v. Provident Life & Accident Ins. Co., 936 F. Supp. 302, 305 (E.D. Pa. 1996)*. Plaintiff has not alleged any facts that would warrant the grant of injunctive relief, nor has she alleged that she has either incurred medical expenses or lost any wages as a result of the alleged incident. Accordingly, defendant's motion to strike the requested injunctive relief, medical damages and lost wages will be granted.

### 6. *Amended Complaint*

Defendants have requested that plaintiff file an amended complaint pursuant to *Federal Rule of Civil Procedure 12(e)* repleading all averments concerning damages. "If a pleading to which a responsive [*15] pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." *FED. R. CIV. P. 12(e).* "The class of pleadings that are appropriate subjects for a motion under *Rule 12(e)* is quite small - the pleading must be sufficiently intelligible for the court to be able to make out one or more potentially viable legal theories on which the claimant might proceed." *Sun Co. v. Badger Design & Constructors, 939 F. Supp. 365, 368 (E.D. Pa. 1996)* (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1376 (1990)). Granting the motion is appropriate only when the pleading is "so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith, without prejudice to itself." Id. (citation and internal brackets omitted). I find that even with the requested remedies of injunctive relief, medical expenses and lost wages stricken from the complaint, the pleading is not so vague or ambiguous that defendants could not respond. Accordingly, the request for an amended complaint [*16] is denied.

### D. Conclusion

For the foregoing reasons, I conclude that plaintiff has failed to state a claim for relief under *sections 1985(3)* and *1986* and under Pennsylvania law for intentional infliction of emotion distress. Consequently, paragraphs 29 and 30 of Count I and all of Count II of the complaint will be dismissed. Further, all claims against the defendants other than those against Boscov's Department Stores, LLC, will be dismissed, as will plaintiff's request for injunctive relief, medical expenses and lost wages. The motion of defendants to strike paragraphs 20, 21 and 23 from the complaint and for an

amended complaint will both be denied.

An appropriate Order follows.

**ORDER** - ENTERED JULY 17, 2002

**AND NOW**, this 17th day of July, 2002, upon consideration of the motion of defendants Boscov's Inc., Boscov's Department Store, Inc., Boscov's Department Store, LLC, Ports of the World, Inc., Ports of the World LLC to dismiss for failure to state a claim pursuant to *Rule 12 (b) (6)*, for a more definite statement pursuant to *Rule 12 (e)*, and to strike pursuant to *Rule 12 (f) of the Federal Rules of Civil Procedure* (Document No. 6), and the response of plaintiff Olivia Dixon [*17] thereto (Document No. 10), and for the reasons set forth in the foregoing memorandum, **IT IS HEREBY ORDERED** that the motion of defendants to dismiss plaintiff's claims under *42 U.S.C. §§ 1985* and *1986* and under Pennsylvania law for intentional infliction of emotional distress is **GRANTED**; to dismiss the claims against all defendants other than defendant Boscov's Department Store, LLC, is **GRANTED**; to strike plaintiff's request for injunctive relief, medical expenses and lost wages is **GRANTED**; to strike paragraphs 20, 21 and 23 from plaintiff's complaint is **DENIED**; and for an amended complaint is **DENIED**. Accordingly, plaintiff's claims under *42 U.S.C. §§ 1985* and *1986* in paragraphs 29 and 30 of Count I and for intentional infliction of emotion distress in Count II of the complaint are **DISMISSED** as to all defendants and plaintiff's claim under *42 U.S.C. § 1981* in paragraph 31 of Count I of the complaint is **DISMISSED** as to defendants Boscov's Inc., Boscov's Department Store, Inc., Ports of the World, Inc., and Ports of the World LLC.

**IT IS FURTHER ORDERED** that defendant [*18] Boscov's Department Store, LLC, shall answer the remaining allegations of a violation under *42 U.S.C. § 1981* in the complaint no later than August 19, 2002.

**LOWELL A. REED, JR., S.J.**

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 9

LEXSEE 2004 U.S. DIST. LEXIS 13942

**RHONDA I. EDWARDS, Plaintiff, v. CONCORD EFS, INC., JOANNE FREIDEL, and MARY BERGES, Defendants.**

**Civil Action No. 03-599 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 13942*

**July 20, 2004, Decided**

**DISPOSITION:**      [*1] Summary judgment was granted granted in part and denied in part.

**COUNSEL:** For RHONDA I. EDWARDS, plaintiff: Victor F. Battaglia, Sr., Biggs & Battaglia, Wilmington, DE.

For CONCORD EFS INC., JOANNE FREIDEL, MARY BERGES, defendants: David H. Williams, Morris, James, Hitchens & Williams, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, United States District Judge.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM**

**I. INTRODUCTION**

On June 24, 2003, the plaintiff, Rhonda I. Edwards ("Edwards"), filed the above-captioned action against her employer, Concord EFS, Inc. ("Concord") and supervisors, Joanne Freidel ("Friedel") and Mary Berges ("Berges"), alleging race and gender discrimination under to *42 U.S.C. § 2000e-2*, retaliation pursuant to *42 U.S.C. § 2000e-3*, violation of equal rights pursuant to *42 U.S.C. § 1981*, federal civil conspiracy claims under *42 U.S.C. § 1985* and *§ 1986*, a state law employment discrimination claim pursuant to 10 Del. C. § 701, *et seq.,* and a common law breach of the covenant of [*2] good faith and fair dealing contract claim.

On April 8, 2004, the defendants filed a motion for summary judgment. Edwards subsequently conceded that her sex discrimination claim could not survive the motion, dropped her state law claim pursuant to 10 De. C. § 701, *et seq.* for lack of a private right of action for damages under that statute, and also dropped her federal civil conspiracy claims pursuant to *sections 1985* and *1986* because those claims are based on the same set of facts as her action under Title VII and *42 U.S.C. § 1981*. In place of her federal civil conspiracy claim, Edwards asserts a Delaware common law conspiracy claim in her answering brief in opposition to the defendant's motion for summary judgment.

On June 24, 2004, the court held oral argument on the defendants' motion for summary judgment with regard to Edwards' race discrimination claim, retaliation claim, *section 1981* claim, Delaware common law civil conspiracy claim, and breach of covenant of good faith and fair dealing claim. Having considered the parties' arguments and submissions, the court will grant summary judgment in favor of the defendants on the Title VII race discrimination [*3] claim, but it will deny summary judgment on the remaining claims. The reasons for the court's ruling are set forth below.

**II. STANDARD OF REVIEW**

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 392 (3d Cir. 1998)*. Thus, the court may grant summary

2004 U.S. Dist. LEXIS 13942, *3

judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle, 139 F.3d at 392*. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe [*4] all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields, 178 F.3d 170, 173-174 (3d Cir. 1999)*. With these standards in mind, the court will describe the facts that led to the present motion.

### III. BACKGROUND

#### A. Edwards' Job Responsibilities

Concord is a financial services company. Edwards, who is African-American, began employment at Concord in 1997 as an Administrative Assistant in the Customer Service Department. In 1999, she became an HR Assistant in the Human Resources Department. As an HR Assistant, Edwards was responsible for assisting Recruiters with all aspects of hiring, such as processing new hire paperwork, including pre-employment drug testing. During her tenure as an HR Assistant, Edwards processed paperwork for at least 50 new hires.

In March 2001, Edwards was promoted to Recruiter in the HR Department. As a Recruiter, Edwards' responsibility was to fill open positions in the various departments at Concord. The process worked as follows. A Recruiter would receive a requisition that a manager in a particular department needed to fill certain positions. The Recruiter then would place [*5] newspaper ads or other advertisements, attend job fairs or do whatever was necessary to find suitable employees. After identifying candidates, the Recruiter would review their resumes, and if a candidate was qualified, submit his or her resume to the hiring manger. If the hiring manager was interested, he or she would instruct the Recruiter to schedule an interview. If the hiring was for the Customer Service Department, the candidate was required to appear and pass a written test before going through the interview process.

If the hiring manager wanted to bring the employee on board, he would send the Recruiter a Concord Offer Request Form ("Offer Request Form") asking that an offer be made to the potential candidate. The Offer Request Form would show when the candidate would start employment and name any current employee entitled to a hiring bonus for referring the candidate. The Offer Request Form also has three signature lines, one for "Approval of Hiring Manager," one for "Approval of Second Level Manager," and one for "Approval of Human Resources." At the bottom of the Offer Request Form there is a note that states, "Offer of employment outside of standard hiring guidelines will [*6] require a third level of signature."

After receiving an Offer Request Form for a candidate, the Recruiter would then make a verbal offer and tell the candidate that she would have to pass a background screen and drug test. The same day the verbal offer was made, the Recruiter would send an offer packet to the prospective employee by overnight mail (or the candidate would come in to pick up the packet). Once the candidate signed the offer, the Recruiter then gave the paperwork to an HR Assistant and informed the employee that she had forty-eight hours to appear at one of the listed laboratories to submit a sample for drug screening. The letter given to prospective employees would state that the background check could take five to seven days to complete and that the offer was conditional upon a successful background check and negative drug test results. Under normal circumstances, the drug test results would be received two business days after the sample was given by the candidate. At all relevant times, it was the policy of Concord that an applicant may not start employment without successfully completing a drug screen and background check.

#### B. Edwards Complains to Her Supervisors [*7] About Discriminatory Practices

At the time Edwards was promoted to Recruiter, Therese Williams was the Director of Staffing and Training and Edwards' supervisor. Later, in May 2001, Berges replaced Williams and became Edwards' supervisor. Friedel is Berges' supervisor in the Human Resources Department. Friedel was one of the people who recommended Edwards for promotion to her position as a Recruiter.

After her promotion to Recruiter, Edwards began to bring to the attention of Berges and Friedel instances where she perceived that employees and prospective employees were being treated differently because of race.

For example, she notified Berges and Friedel that a current white employee, Mr. Lichman, had received a referral bonus for referring a white prospective employee but that a current black employee, Ms. Kinslow had not received a referral bonus for referring a prospective black employee under similar circumstances. She also told Berges and Friedel that an exception to the hiring policy concerning relatives had been made for a white employee, Ms. Besak, but not for a black employee, Mr. Ross. After Edwards raised these concerns, her relationship with Berges and Friedel became [*8] strained. The last time Edwards complained to her supervisors about racial inequities in hiring was in mid September of 2001.

**C. The Hiring and Termination of Krista Mann**

From February of 2001 through the end of the year, the need for employees was very great, and Recruiters at Concord were extremely busy. By July of 2001, the Customer Service Department had developed an urgent need to hire permanent employees. Accordingly, Edwards scheduled ten interviews (including that of a prospective employee Krista Mann) for the week of July 9 in order to fill the training class which was to begin on Monday July 16, 2001. Mann took the written test and interviewed on July 9, 2001. On July 10, 2001, the hiring manager for Customer Service Department, Greg Kaznowsky, completed an Offer Request Form authorizing Edwards to make an offer of employment to Mann. Mann's Offer Request Form indicated a start date of July 16, 2001, i.e., the date of the training class for the Customer Service Department. The Offer Request Form was signed by Kaznowsky, Chuck Cluff, a higher level manager in the Customer Service Department, and also by Berges.

Because of the time constraints, Edwards asked Mann to [*9] come pick up her paperwork instead of using overnight mail. Mann came in to pick up the paperwork on July 11, 2001. While at the office, she signed the offer letter and informed Edwards that she would not be able to provide a sample for the drug test until Thursday, July 12, 2001, still within the criteria of the offer which requires a drug test within forty-eight hours.

When the results of Mann's drug test had not been reported by Friday, July 13, 2001, Edwards called the upper level manager of the Customer Service Department, Joseph Biener, and told him that Mann's background check would not be complete in time to start

her in the July 16th training class. Edwards did not tell Mr. Biener, however, that it was the drug test results that had not been received. (Edwards Dep. at 95:8-19). Biener instructed Edwards to start Mann in the training program on Monday, July 16, 2001, and said that if there were any problems, he would cover her. Biener denies having had any such conversation with Edwards. Biener is not Edwards' supervisor.

Edwards contacted Mann and asked her if there was any reason why she would not have passed the drug test. When Mann responded, "no," Edwards told her that [*10] she could start on July 16, 2001. Edwards did not tell Berges, or any other supervisor in the HR Department, that she allowed Mann to begin work without having received her drug screen results.

Mann started employment on July 16, 2001. On July 17, 2001, her drug screen came back positive. Edwards confronted Mann and told her that she could no longer work at Concord and had security escort Mann from the premises. Edwards then went to HR Assistant Jamie Fairchild and requested that she send a letter to Mann rescinding the offer of employment. Edwards also instructed HR Assistant Lisbeth Fiesler to process the paperwork which would ensure the individual who referred Mann, Yvette Walker, would not receive a referral bonus.

Edwards then called Biener and told him that Mann did not pass the background check. Edwards told Biener that he should process the paperwork to make sure that Mann was officially terminated from employment. A Recruiter does not have the authority to terminate an employee in the Customer Service Department, and Edwards was aware of this policy. It is the responsibility of a manager in the Customer Service Department to process termination paperwork for employees and [*11] trainees of that department. At no point did Edwards tell Berges, or any other supervisor in the HR Department, about Mann's drug screen results and termination.

**D. Edwards' Termination**

Biener did not process the termination, and Mann ended up getting paid for three weeks of work even though she was only at Concord for a day and a half. On or about September 20, 2001, Concord's payroll department notified the Human Resources Department that Mann had remained on the payroll for several weeks after her termination. Initially, Ms. Hamilton, the

Employee Relations Representative, spoke with Edwards about the situation, and later Berges did the same. Edwards explained to both of them what happened, claiming that Biener told her it was alright to start Mann's training without the results of the drug screen. After consulting with Biener and then again amongst each other, Hamilton, Berges, and Friedel decided to terminate Edwards and did so on September 20, 2001. They told Edwards that she was being fired because she had violated Concord's hiring and termination policies with respect to the recruitment and termination of Mann.

### E. Concord's Disciplinary Procedures

Concord's [*12] disciplinary procedures are outlined in the Associates' Reference Guide to Human Resources Policies and Procedures, which provides a four-step process for corrective action. The document goes on to provide for "accelerated corrective action, up to and including termination," which may be "used when one or more corrective action steps are bypassed," and then explicitly states that "Concord retains the **unconditional** right to determine the circumstances in which accelerated corrective action will be used." Edwards never had any corrective employment action taken against her during her tenure at Concord.

### F. Treatment of Similarly Situated Employees

Edwards admits that she did make a mistake with regard to the Krista Mann incident, (Edwards Dep. at 173:17-18), and concedes that disciplinary action may have been warranted (Edwards Dep. at 171:7-8). She contends, however, that she was disciplined too harshly for her mishap, particularly when compared to other similarly situated white Recruiters. In support of this assertion, Edwards reports instances where two white Recruiters, Tina Akin and Derek Studer, made exceptions to the hiring policy by starting employees in training [*13] before receiving drug screen results. While working in her previous position as an HR Assistant, Edwards recalls being asked by the former Director of Staffing and Training in the HR Department, Williams, to input data for two different recruits of Akin to start before the drug tests results were returned. When Edwards inquired, Williams informed her that they were making an exception. Later, Edwards remembers a similar incident where one of Studer's recruits was allowed to start before the drug test. Studer, however, had received Friedel's permission to start the employee without having received the drug screening results.

### G. Greg Kaznowsky

Greg Kaznowsky was a Manager in the Customer Service Department during the time Edwards worked for Concord. Kaznowsky reports that, about a month before Edwards was fired, Biener asked him to compile a list of complaints regarding Edwards' failure to return phone calls, even though it appeared this was not, in fact, a problem..

After Edwards' termination, the Delaware Department of Labor Unemployment Board (the "Board") held a hearing on her claim. Kaznowsky was scheduled to testify at that hearing, and Hamilton and Berges approached him [*14] to ascertain what he would say. He recounted being in Biener's office on July 13, 2001, and hearing Biener tell Edwards on speaker phone to do whatever she had to do to fill the training class on July 16, 2001, and that he would "cover her back." Berges and Hamilton then told Kaznowsky that his recollection was not consistent with the position the company was taking and asked him to testify as if he did not remember what Biener said. Kaznowsky never testified before the Board.

## IV. DISCUSSION

### A. Racial Discrimination Claim

In the absence of any direct evidence of racial discrimination, Edwards attempts to prove through indirect evidence, that the defendants' actions were racially motivated pursuant to the *McDonnell Douglas* burden shifting framework. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case by demonstrating that she is a member of a protected class. She must then establish that she was qualified for an employment position, but was not hired or was fired from the position "under circumstances that give rise to an inference of unlawful [*15] discrimination." *See Waldron v. SL Industries, Inc., 56 F.3d 491, 494 (3d Cir. 1995).* When the plaintiff establishes this prima facie showing, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. *Id.* If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons were pretextual-that is, that they are false and that the real reason for the employment

decision was discriminatory. *Id.*

Edwards' claim fails under the burden-shifting regimen of *McDonnell Douglas,* as she cannot establish a prima facie case of race discrimination. Although Edwards is a member of a protected class and was qualified for the Recruiter position she held, the circumstances surrounding her dismissal do not give rise to an inference of unlawful discrimination. As an initial matter, Edwards' admits that she made a mistake warranting discipline with regard to the Krista Mann situation. Indeed, it was Concord's policy that no candidate may begin employment until the HR Department has been notified that she passed [*16] the drug screen. The note on the standard Offer Request Form explicitly requires the approval of a third level supervisor before any exception to this policy may be made. Berges, not Beiner, was Edwards' supervisor. Edwards allowed Mann to begin employment at Concord before having received Mann's drug screen results and without notifying Berges of this fact. Not only did Edwards fail to obtain approval from her supervisor, Berges, before deviating from the hiring policy, but she never told Berges of the Krista Mann hiring and termination situation until they confronted her about it two months after the incident.

In view of her violation of the hiring policy and in combination with Concord's unconditional discretion to bypass progressive discipline, the crux of Edwards' position is that she was disciplined more harshly than other similarly situated, white Recruiters. Circumstantial evidence of discrimination may include evidence "that the employer treated other, similarly situated persons out of his protected class more favorably." *Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).* "In determining whether similarly situated nonmembers of a protected class were treated [*17] more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998)* (citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1993)).* To survive summary judgment, "the plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion." *Simpson 142 F.3d at 639* (citing *Fuentes, 32 F.3d at 767*)).

Edwards fails to point to any concrete examples or instances in which any other Recruiters committed a violation of the hiring policy without prior approval from one of their supervisors. Edwards admits that Williams asked her to input the data for Akin's excepted recruits and thereby confirms that Williams, the then relevant supervisor, knew of and approved the exception to the hiring policy. In Studer's case, he also had advance permission from an HR Department supervisor, [*18] Friedel. The fact that Akin and Studer received permission from their supervisors to make exceptions to the hiring policy stands in sharp contrast to the conduct of Edwards, who never asked or informed her supervisors before deviating from the policy. In this regard, Edwards is not similarly situated to Akin or Studer. In the absence of further evidence, Edwards cannot establish a prima facie case that her termination occurred under circumstances giving rise to an inference of racial discrimination. The court will grant summary judgment to the defendants on Edwards' Title VII race discrimination claim and in part on her *section 1981* claim as it relates to racial discrimination.

**B. Retaliation Claim**

In contrast, the court finds disputed issues of material fact so as to preclude summary judgment on Edwards's retaliation claim. To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. *Weston v. Commonwealth of Pa., 251 F.3d 420, 430 (3d Cir. 2001);* [*19] *Childress v. Dover Downs, Inc., 2000 U.S. Dist. LEXIS 4881, No. 98-206-SLR, 2000 WL 376419, at *11 (D. Del. Mar. 31, 2000), aff'd without op., 263 F.3d 157 (3d Cir. 2001).* Once a plaintiff establishes a prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse action. *Weston, 251 F.3d at 430.* The burden then shifts back to the plaintiff to show that the proffered reason is pretext. *Id.*

Edwards has adduced sufficient evidence to support a prima facie case of retaliation. She clearly suffered an adverse employment action in that she was fired from her job. Moreover, informal protests against discrimination, including verbal complaints to management, may be considered protected activities. *See Abramson v. William*

*Paterson College*, 260 F.3d 265, 287-88 (3d Cir. 2001) (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) (citing *Summer v. U.S. Postal Servs.*, 899 F.2d 203, 209 (2d Cir. 1990))). Edwards claims she complained to Berges and Friedel about racial discrimination in hiring on at least two occasions. Such incidents, if believed, could [*20] sustain a jury finding that Edwards engaged in protected activity. Edwards also sets forth sufficient evidence to create an issue of material fact on the causation element of her prima facie case, in that she was terminated just days after her last complaint to her supervisors but over two months after the incident for which she was allegedly fired. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000) (finding that the ultimate determination of causation depends on "how proximate the events actually were, and the context in which the issue [arose]").

Although the defendants can certainly set forth a legitimate reason for Edwards' termination--that she violated Concord's hiring policy--the court nonetheless finds disputed issues of fact with regard to whether or not this reason is pretextual. Specifically, Kaznowsky testified that Biener, a member of Concord's management, asked him to fabricate complaints about Edwards. According to Kaznowsky, Berges, another management employee at Concord, also pressured him to lie in the hearing before the Board. If believed, Kaznowsky's testimony, in conjunction with Edwards' claim that her relationship with [*21] Friedel and Berges became strained after her complaints, would create a genuine issue of material fact as to the defendants' true motive in terminating Edwards. Kaznowsky's credibility is an issue for the jury to decide, and not appropriate for determination on summary judgment. Given that Title VII and section 1981 retaliation claims are analyzed under the same substantive standard, the court will also deny summary judgment on both of these counts.

### C. Civil Conspiracy Claim

The defendants argue that Edwards is barred from now bringing a civil conspiracy claim in lieu of her original *section 1985* and *1986* claims. In view of the *Federal Rules of Civil Procedure Rule 8(a)*'s liberal notice pleading requirements, the court does not agree and with defendants and will consider Edwards' civil conspiracy claim. The court determines that there are genuine issue of material fact with regard to the civil conspiracy claim.

Edwards claims that Berges and Friedel had an agreement to unlawfully fire her due to her complaints about racial discrimination. Under Delaware law, a civil conspiracy requires three elements: (1) an agreement between two or more [*22] individuals; (2) an unlawful act done to further the conspiracy; and (3) damages to the plaintiff. *See Capano Mgmt. Co. v. Transcontinental Ins. Co.*, 78 F. Supp. 2d 320, 331 (D. Del. 1999); *S&R Assocs., LP v. Shell Oil Co.*, 725 A.2d 431, 440 (Del. 1998). Sufficient facts exist to support a claim that Berges and Friedel had an agreement, in that, at the very least, they met on September 20, 2001 and discussed Edwards' termination. As already noted, there exist genuine issues of material fact as to whether the defendants' proffered reason for terminating Edwards is really a pretext for retaliation. In this regard, the court also finds a disputed issue of material fact as to whether Berges and Friedel unlawfully acted in furtherance of a conspiracy. Finally, given that Edwards was terminated from her job, she could certainly establish damages. The court therefore will deny summary judgment on Edwards' civil conspiracy claim.

### D. Breach of the Covenant of Good Faith and Fair Dealing

Edwards argues that because her termination was due to the defendants' retaliation, it was in violation of public policy and therefore breaches the covenant of good [*23] faith and fair dealing. Under Delaware law, an employer breaches the covenant of good faith and fair dealing when he fires and employees in violation of some public policy. *Schatzman v. Martin Newark Dealership, Inc.*, 158 F. Supp. 2d 392, 398 (D. Del. 2001); *Schuster v. Derocili*, 775 A.2d 1029, 1039 (Del. 2001). Furthermore, it is clear under Delaware law that a plaintiff can maintain a common law claim for breach of the covenant due to discriminatory conduct or retaliation for reporting discriminatory conduct. *See Schatzman, 158 F. Supp. 2d at 399.* Again, because the court has found genuine issues of material fact on Edwards' retaliation claim, it finds the same with regard to whether or not the defendants violated public policy in terminating Edwards. The court therefore will deny summary judgment on the breach of the covenant of good faith and fair dealing claim.

### V. CONCLUSION

Because the facts show that Edwards violated Concord's hiring policy and in the absence of any evidence that she was disciplined more harshly than

similarly situated employees, Edwards cannot demonstrate that she was terminated under circumstances [*24] that give rise to an inference of unlawful discrimination. In this regard, Edwards cannot establish a prima facie case of race discrimination, and the court therefore will grant summary judgment on this claim. Nevertheless, as set forth above, the court finds genuine issues of material fact with regard to Edwards' remaining claims and will deny summary judgment on them accordingly.

Date: July 20, 2004

Gregory M. Sleet

United States District Court Judge

**ORDER**

For the reasons set forth in the court's memorandum issued contemporaneously herewith, IT IS HEREBY ORDERED that:

1. The Defendants' Motion for Summary Judgment (D.I. 30) is GRANTED IN PART and DENIED IN PART.

2. Counts One, Four, Five and Six of the plaintiff's complaint (D.I. 1) are DISMISSED.

3. Count Three of the complaint is dismissed IN PART, as it relates to racial discrimination.

4. The plaintiff is granted leave to refile her complaint to properly allege a common law civil conspiracy count.

Dated: July 20, 2004

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 10

LEXSEE 2005 U.S. DIST. LEXIS 5249

**GEORGE EVERETT, Plaintiff, v. HOSPITAL BILLING AND COLLECTION
SERVICE, LTD., et al., Defendants.**

**Civil Action No. 04-049 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 5249*

**March 31, 2005, Decided**

**DISPOSITION:**    [*1]

**COUNSEL:** William J. Rhodunda, Jr., Esquire,
OBERLY, JENNINGS & RHODUNDA, P.A.,
Wilmington, Delaware, Attorney for Plaintiff.

Gregory V. Varallo, Esquire, Jennifer C. Jauffret,
Esquire, and Kelly A. Green, Esquire, RICHARDS,
LAYTON & FINGER, P.A., Wilmington, Delaware,
Attorneys for Defendants.

**JUDGES:** Joseph Farnan, UNITED STATES DISTRICT
JUDGE.

**OPINION BY:** Joseph Farnan

**OPINION**

**MEMORANDUM OPINION**

**Farnan, District Judge.**

Pending before the Court are Defendants' Motion To
Dismiss (D.I. 7) and Defendants' Motion To Strike
Portions Of Plaintiff's Answering Brief, Or In The
Alternative, For Leave To Take Discovery (D.I. 12). For
the reasons discussed, the Motion To Dismiss (D.I. 7)
will be granted in part and denied in part and the Motion
To Strike (D.I. 12) will be granted.

**I. Background**

On January 23, 2004, Plaintiff filed five-count
complaint against his former employer, Hospital Billing
and Collection Service, Ltd. ("Hospital Billing"), and two

of its employees, President Jack T. Byrnes ("Byrnes")
and Director of Information Services and Technology
Victoria Ostrow [*2] ("Ostrow"). Plaintiff claims that
Defendants violated the *Americans With Disabilities Act*
(ADA), *Title VII of the Civil Rights Act of 1964*, and *42
U.S.C. § 1981*. Plaintiff further alleges intentional
infliction of emotional distress and conspiracy.

**II. Legal Standard**

A motion to dismiss tests the legal sufficiency of the
complaint. In reviewing a motion to dismiss pursuant to
*Rule 12(b)(6)*, courts "must accept as true the factual
allegations in the complaint and all reasonable inferences
that can be drawn therefrom." *Langford v. Atlantic City,
235 F.3d 845, 847 (3d Cir. 2000)*. A court will grant a
motion to dismiss only when it appears that a plaintiff
could prove no set of facts that would entitle him or her
to relief. Id.

**III. Discussion**

*A. Release*

Defendants contend that the Court should dismiss
Plaintiff's Complaint because Plaintiff knowingly and
willingly executed a valid release in which he expressly
waived his right to file any and all claims or causes of
action arising from his employment or separation from
employment against Defendants. In response, Plaintiff
contends, first, that the release issue [*3] is improperly
before the Court because the Complaint does not rely on
the release. Further, Plaintiff contends that he signed the
release under duress, and that the release lacked
consideration because it decreased Plaintiff's benefits. In
response, Defendants have filed a Motion To Strike

Portions Of Plaintiff's Answering Brief, Or In The Alternative, For Leave To Take Discovery (D.I. 12) asking the Court not to consider, in deciding the Motion to Dismiss, any allegations regarding the alleged release that were made for the first time in Plaintiff's Answering Brief and Affidavit.

As noted above, a motion to dismiss tests the legal sufficiency of the complaint. In this case, the alleged release was not attached to Plaintiff's Complaint, and therefore, the Court concludes that it cannot consider the release in assessing Defendants' motion to dismiss. For this reason, the Court will grant Defendants' Motion To Strike (D.I. 12).

*B. Plaintiff's ADA Claim (Count I)*

Defendants contend that Plaintiff's ADA claim (Count I) should be dismissed in its entirety because Plaintiff failed to properly plead a "regarded as" claim. In response, Plaintiff contends that he was "regarded as" [*4] having a disability because he has a physical or mental impairment that does not substantially limit major life activities but was treated by Hospital Billing as having such a limitation.

Accepting Plaintiff's factual allegations as true, the Court concludes that Plaintiff has properly pled a "regarded as" claim under the ADA.

*C. Plaintiff's ADA Claim (Count I) and Title VII Claim (Count II) regarding Defendants Byrnes and Ostrow*

Defendants Byrnes and Ostrow contend that Plaintiff cannot allege individual liability against Byrnes and Ostrow in Count I (ADA claim) and Count II (Title VII claim). In response, Plaintiff contends that Defendants were personally involved in his unlawful termination.

Individual employees cannot be held liable under Title VII or the ADA See *Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1077 (3d Cir. 1996)*; *Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002)*. Thus, the Court will dismiss Plaintiff's claims against Byrnes and Ostrow pled in Counts I and II.

*D. Plaintiff's Section 1981 Claim (Count III) regarding Defendant Byrnes*

Defendant Byrnes contends that Count III must be dismissed [*5] because Plaintiff's Complaint does not

allege that Byrnes committed any discriminatory acts. In response, Plaintiff contends that Byrnes, in his supervisory position, was involved in the scheme to wrongfully discharge Plaintiff. Plaintiff contends that Defendant Ostrow confirmed this allegation when stating to him, regarding the termination, "they made me do it." (D.I. 10 at 15.)

Based on Plaintiff's contested allegations, the Court concludes, at this juncture, that Plaintiff has sufficiently pled a claim against Byrnes.

*E. Plaintiff's IIED Claim (Count IV)*

Defendants contend that Plaintiff's intentional infliction of emotional distress ("IIED") claim (Count IV) is barred by the Delaware Worker's Compensation Act, which provides the exclusive remedy for employees injured at work. *19 Del. C. § 2304*. Further, Defendants contend that Plaintiff failed to plead all the elements of IIED against all Defendants. In response, Plaintiff contends that the "personal dispute exception" of *19 Del. C. § 2301(15)(b)* excludes coverage under the Worker's Compensation Act.

The personal dispute exception cited by Plaintiff applies to a "wilful act of another employee directed against the [*6] employee by reasons personal to such employee and not directed against the employee as an employee or because of the employee's employment." *19 Del. C. § 2301(15)(b)*. In making this determination,

> courts generally look to the time, place, and circumstances of the injury, with a focus on three factors: (1) the employee's act causing the injury was willful; (2) the injury must not have been directed against plaintiff as an employee or because of plaintiff's employment; and (3) the assault was directed against the plaintiff because of personal reasons.

*Lloyd v. Jefferson, 53 F. Supp. 2d 643, 690 (D. Del. 1999)*.

Because the reasons for Everett's termination are fact-sensitive, the Court cannot, at this stage of the proceedings, conclude whether Everett was fired for non-personal reasons. Therefore, the Court will not dismiss Plaintiff's IIED claims against Byrnes and Ostrow on the basis of the exclusivity provision of the

Delaware Worker's Compensation Act. The Court, however, will dismiss the IIED claim against Hospital Billing because the personal dispute exception applies only to fellow employees. Plaintiff's claim and remedy against Hospital Billing, [*7] therefore, can only be pursued pursuant to the Delaware Worker's Compensation Act.

*F. Plaintiff's Conspiracy Claim (Count V)*

Defendants contend that Plaintiff's conspiracy claim (Count V) fails to plead the required elements of such a claim.

A civil conspiracy claim requires a plaintiff to allege "(1) [a] confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage." *Nicolet, Inc. v. Nutt, 525 A.2d 146, 149-50 (Del. 1987)* (citations omitted).

The Court has reviewed the allegations of Count V in the Complaint and measured those allegations against the elements required to prove a civil conspiracy under Delaware law and concludes that Plaintiff's factual allegations are sufficient to survive Defendants' Motion To Dismiss.

**IV. Conclusion**

In sum, the Court will (1) grant in part and deny in part Defendants' Motion To Dismiss (D.I. 7) and (2) grant Defendants' Motion To Strike Portions Of Plaintiff's Answering Brief, Or In The Alternative, For Leave To Take Discovery (D.I. 12).

An appropriate Order will be entered.

**ORDER**

At Wilmington, this 31 day of March 2005, [*8] for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED THAT:

1) Defendants' Motion To Dismiss (D.I. 7) is **GRANTED** in part and **DENIED** in part, specifically:

a. Plaintiff's claims against Byrnes and Ostrow in Counts I and II are dismissed;

b. Plaintiff's IIED claim against Hospital Billing in Count IV is dismissed;

c. All remaining claims are not dismissed;

2) Defendants' Motion To Strike Portions Of Plaintiff's Answering Brief, Or In The Alternative, For Leave To Take Discovery (D.I. 12) is **GRANTED.** The Court has not considered any of Plaintiff's allegations concerning Defendants' release contentions.

March 31, 2005

DATE

Joseph Farnan

UNITED STATES DISTRICT JUDGE

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 11

LEXSEE 2002 U.S. DIST. LEXIS 16269

**ANTHONY FANTAZZI and GAIL FANTAZZI v. TEMPLE UNIVERSITY HOSPITAL, INC. and LILLA CERVINO**

**CIVIL ACTION NO. 00-CV-4175**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2002 U.S. Dist. LEXIS 16269*

**August 21, 2002, Decided**
**August 22, 2002, Filed; August 22, 2002, Entered**

**DISPOSITION:**    [*1] Motion DENIED.

**COUNSEL:** For ANTHONY FANTAZZI, GAIL FANTAZZI, PLAINTIFFS: RALPH DAVID SAMUEL, LYNN MALMGREN, RALPH D. SAMUEL & CO., P.C., PHILADELPHIA, PA USA.

For LILLA CERVINO, TEMPLE UNIVERSITY HOSPITAL, INC., DEFENDANTS: YVONNE Y. BARNES, JOE H. TUCKER, JR., WENDY M. STATON, BOOTH & TUCKER, LLP, PHILADELPHIA, PA USA.

**JUDGES:** BRUCE W. KAUFFMAN, J.

**OPINION BY:** BRUCE W. KAUFFMAN

**OPINION**

***MEMORANDUM AND ORDER***

**Kauffman, J.**

**August 21, 2002**

When Plaintiffs Anthony Fantazzi and Gail Fantazzi commenced this employment discrimination action, they named Temple University ("the University") and Lilla Cervino as defendants. On June 13, 2001, with the approval of the Court, the parties stipulated to the substitution of Temple University Hospital, Inc. ("the Hospital") for the University. Now before the Court is

Plaintiffs' Motion to Vacate Order of June 13, 2001 Approving a Stipulation and to Designate Both Temple University and Temple University Hospital, Inc. as Named Defendants. For the following reasons, [*2] the Court will deny the Motion.

I. *Background*

On January 25, 2001, Plaintiffs filed a First Amended Complaint, naming the University and Lilla Cervino as defendants. [1] The Amended Complaint asserted twelve causes of action: violation of *42 U.S.C. § 1983* (Count One); discrimination, harassment, and retaliation in violation of the Pennsylvania Human Relations Act ("PHRA"), *43 Pa. Cons. Stat. § 951, et seq.* (Counts Two, Four, Seven, and Nine); discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e, et seq.* (Counts Three, Five, and Six); discrimination, harassment, and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 621, et seq.* (Count Eight); loss of consortium (Count Ten); intentional infliction of emotional distress (Count Eleven); and Negligent Supervision and Retention (Count Twelve).

> 1   Plaintiffs had filed their original Complaint, which also named Temple University and Lilla Cervino as defendants, on August 16, 2000.

[*3]  On February 14, 2001, Defendants filed a Motion to Dismiss Count Twelve as well as an Answer to the First Amended Complaint. In their Answer, Defendants stated that "the correct name of the defendant

2002 U.S. Dist. LEXIS 16269, *3

is Temple University-Of the Commonwealth System of Higher Education." (Answer P 3.) On April 2, 2001, however, counsel for Defendants wrote a letter to counsel for Plaintiffs:

> Please be advised that in reviewing the Complaint and our Answer to the Complaint, I noted that you sued the wrong entity. Additionally, my Answer to your Complaint further identifies the wrong entity. The correct corporate Defendant that employs Mr. Fantazzi is Temple University Hospital, Inc. Please advise if you will allow me to amend our Answer to paragraphs three (3) and eight (8) of your Amended Complaint by Stipulation instead of seeking leave of Court so that we may correctly identify the appropriate Defendant in this matter.

(Mot. Ex. 3.)

By Order dated June 8, 2001, the Court granted Defendants' Motion to Dismiss Count Twelve of the First Amended Complaint. [2] On June 13, 2001, the Court approved the parties' Stipulation to Amend Caption of Complaint and References in Defendants' Answer [*4] to Reflect Proper Corporate Defendant, which substituted the Hospital for the University in the caption and Defendants' Answer.

> 2    A Motion for Reconsideration of this Order was denied on November 1, 2001.

Extensive discovery concluded on March 15, 2002. Discovery included Plaintiffs' depositions of two employees of the University, Sandra Foehl and Richard Lutman, which were conducted between May 24, 2001 and June 15, 2001.

On April 1, 2002, the parties filed cross-motions for summary judgment. On May 23, 2002, after oral argument, the Court allowed Defendants to file an Amended Answer, denied the pending motions as moot, and permitted limited additional discovery. [3] This additional discovery is scheduled to end on September 30, 2002, and the case will enter the Court's trial pool on December 6, 2002.

> 3    In their Motion for Summary Judgment, Defendants asserted the affirmative defense set

forth in *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)* and *Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)*. This affirmative defense was not raised in Defendants' original Answer, but the Court allowed Defendants to plead it in their Amended Answer. The Court also permitted additional discovery limited to the *Ellerth-Faragher* defense.

[*5]  On June 4, 2002, Plaintiffs filed this Motion to Vacate Order of June 13, 2001 Approving a Stipulation and to Designate Both Temple University and Temple University Hospital, Inc. as Named Defendants. In the Motion, Plaintiffs assert that "the deposition testimony of Ms. Foehl and Mr. Lutman show that Temple University, not Temple University Hospital, Inc., assumes responsibility for and jurisdiction over matters of employment discrimination and labor relations for Temple University Hospital, Inc." (Mot. P 9.) The parties attempted to reach a new stipulation, but were unsuccessful, and Defendants filed a Response in Opposition to the Motion on July 26, 2002. Defendants contend that the University is not Anthony Fantazzi's employer, and as such is not subject to liability in this case. (Resp. P 12.) Plaintiffs filed a Reply on August 6, 2002, and Defendants filed a Sur-Reply on August 14, 2002.

II. *Analysis*

"Valid stipulations entered into freely and fairly should not be lightly set aside." *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 n.7 (3d Cir. 2000)*. "Allowing parties easily to set aside or [*6] modify stipulations would defeat this purpose, wasting judicial resources and undermining future confidence in such agreements." *Waldorf v. Shuta, 142 F.3d 601, 616 (3d Cir. 1998)*. Still, "in exceptional circumstances,' courts will free a party from a stipulation to prevent a manifest injustice." *Id. at 617* (quoting *Kohn v. Am. Metal Climax, Inc., 458 F.2d 255, 307 (3d Cir. 1972)*).

> In determining whether there will be manifest injustice unless a party is relieved from a stipulation, courts have focused on such factors as: (1) the effect of the stipulation on the party seeking to withdraw the stipulation; (2) the effect on

the other parties to the litigation; (3) the occurrence of intervening events since the parties agreed to the stipulation; and (4) whether evidence contrary to the stipulation is substantial.

*Id. at 617-18* (citations omitted).

Upon review of these factors, the Court concludes that manifest injustice would not result if Plaintiffs are not relieved from their Stipulation. If Plaintiffs are not allowed to withdraw the Stipulation, and if they prevail in this action, they will be able to enforce [*7] a judgment only against the Hospital, not the University. They have not alleged any reason why the Hospital could not provide them with complete relief.

Withdrawal of the Stipulation would, however, have a significant effect on the University, which would again become a party to an action from which it was removed over one year ago. Although Plaintiffs argue that "Temple University cannot claim prejudice because it had notice as the named defendant in the original complaint in August of 2000" (Mot. P 15), Defendants assert that if the Stipulation is withdrawn, "discovery will have to be opened so that [the University] will be able to properly defend itself in this matter" (Resp. P 15).

With regard to intervening events that occurred since the parties agreed to the Stipulation, Defendants note that "the alleged knowledge of the 'appropriate' Defendant has been known to Plaintiffs" since June 15, 2001, after the depositions of Foehl and Lutman. (Resp. P 12.) The only intervening event identified by Plaintiffs is Defendants' new assertion of the *Ellerth-Faragher* affirmative defense, "which specifically places at issue in this case the conduct of Temple University," in that Foehl [*8] conducted the investigation into Anthony Fantazzi's allegations of sexual harassment. (Mot. P 13.) Plaintiffs, however, have known about Foehl's involvement in the sexual harassment investigation at least since her deposition, long before Defendants raised their affirmative defense.

Finally, there is not substantial evidence contrary to the Stipulation. "Title VII authorizes a cause of action only against employers, employment agencies, labor organizations, and training programs . . . ." *Fullman v. Philadelphia Int'l Airport, 49 F. Supp. 2d 434, 441 (E.D. Pa. 1999).* The same is true for the ADEA. *See Ziegler v. Del. County Daily Times, 128 F. Supp. 2d 790, 794 n.11*

*(E.D. Pa. 2001).* [4] Plaintiffs argue that the University and the Hospital are "so interrelated and integrated in their activities, labor relations, and management" that they should be treated as a single employer. *See Marzano v. Computer Sci. Corp. Inc., 91 F.3d 497, 513, 514 (3d Cir. 1996)* (quoting *Ratcliffe v. Ins. Co. of N. Am., 482 F. Supp. 759, 764 (E.D. Pa. 1980)).*

4    The PHRA does include provisions that impose liability on non-employers. *See 43 Pa. Cons. Stat. §§ 955(d), (e); see also Dici v. Pennsylvania, 91 F.3d 542, 552-53 (3d Cir. 1996)*; *Phillips v. Heydt, 197 F. Supp. 2d 207, 223 (E.D. Pa. 2002).* Plaintiffs, however, urge that the University is liable as Anthony Fantazzi's employer, not as a non-employer.

-

[*9]

To determine whether an integrated enterprise exists, a court should consider these factors:

(1) Interrelation of operations, i.e. common offices, common record keeping, shared bank accounts and equipment.

(2) Common management, common directors and boards.

(3) Centralized control of labor relations.

(4) Common ownership and financial control.

*Kemether v. Pa. Interscholastic Athletic Ass'n, 15 F. Supp. 2d 740, 749 n.5 (E.D. Pa. 1998)* (citing *Stair v. Lehigh Valley Carpenters Local Union No. 600, Civ. A. No. 91-1507, 1993 U.S. Dist. LEXIS 8668, at *65-*66 (E.D. Pa. July 24, 1993), aff'd, 43 F.3d 1463 (3d Cir. 1994)).*

The University and the Hospital are separate corporate entities with separate articles of incorporation and bylaws. [5] (Resp. Exs. A, B.) Plaintiffs, however, allege that (1) the University and the Hospital have an integrated telephone directory; (2) the Hospital is subject to the University's sexual harassment policy; (3) the Hospital's human resources department is part of the

University's human resources department; (4) the University and the Hospital have the same labor relations staff; (5) [*10] Anthony Fantazzi's job is covered by a collective bargaining agreement with the University, not the Hospital; and (6) legal counsel for the University, not the Hospital, has coordinated this action with Defendants' outside counsel. (Reply at 7.)

> 5    The Hospital's Articles of Incorporation provide that in the event of the Hospital's dissolution, its assets shall be distributed to the University. (Resp. Ex. A at 3.) At most, this establishes that the University is a parent corporation of the Hospital.

Upon examination, however, the facts do not support a finding of an integrated enterprise. The Hospital is not subject to the University's sexual harassment policy; rather, the Hospital independently adopted the same policy as the University. (Koob Aff. P 12.) Also, the Hospital's human resources department is separate from the University's human resources department. (Koob Aff. P 13.) Furthermore, it is the Hospital's Chief Counsel, Beth C. Koob, who is "ultimately responsible for the handling of the instant litigation. [*11] " (Koob Aff. P 4.)

It is true that University and Hospital employees are listed in an integrated telephone directory. (Mot. Ex. 1.) Additionally, Defendants concede that labor relations for the University and Hospital "are coordinated and handled by the same persons, some of whom currently are Temple Hospital employees and some of whom are Temple University employees," and that "in certain instances, Temple Hospital utilizes the services of Temple University's Office of Affirmative Action and Sandra Foehl to investigate formal complaints of sexual harassment." (Moore Aff. PP 16-17.)

The existence of an integrated telephone directory, however, does not establish a sufficient degree of "interrelation of operations," especially considering that the University and the Hospital have separate payroll, benefits, and human resources departments and separate financial records and budgets. (Koob Aff. PP 12-13; Moore Aff. PP 12-13, 16.) Indeed, only certain aspects of labor relations are centralized, and, as discussed below, this centralization does not rise to the level required for an integrated enterprise. Finally, the fact that Foehl conducted an investigation on the Hospital's behalf does [*12] not give rise to an employment relationship

between Anthony Fantazzi and the University: employers often retain outside individuals to conduct investigations into alleged discrimination. *See, e.g., Steff v. Township of Salisbury, Civ. A. No. 99-2931, 2000 U.S. Dist. LEXIS 1777*, at *1 (E.D. Pa. Feb. 14, 2000), *aff'd, 261 F.3d 493 (3d Cir. 2001).*

The University and the Hospital have separate boards and officers. (Koob Aff. P 8; Moore Aff. PP 9, 11.) Defendants concede that "the Hospital may have Board members who are employed by the University" (Sur-Reply at 3), but even so, "the fact that two corporations share a manager is insufficient evidence of an integrated enterprise." *Martin v. Safeguard Scientifics, Inc., 17 F. Supp. 2d 357, 368 (E.D. Pa. 1998).* [6]

> 6    The Hospital's Bylaws provides that the University's President shall be an ex-officio member of the Hospital's Board. (Resp. Ex. A at 8.) This fact alone, however, does not make Anthony Fantazzi an employee of the University any more than the fact that there is also an ex-officio seat for the Mayor of Philadelphia (Resp. Ex. A. at 8) makes Anthony Fantazzi a city employee.

[*13] As noted above, there is some centralization of labor relations, presumably including the collective bargaining agreement. Despite this fact, "Temple University can neither discipline nor terminate a Temple Hospital employee for violation of Temple Hospital's policies or procedures." (Koob Aff. P 19.) "To satisfy the 'centralized control of labor' prong of the 'integrated enterprises' test, 'a parent must control the day to day employment decisions of the subsidiary." *Martin, 17 F. Supp. 2d at 367* (quoting *Frank v. U.S. West, Inc., 3 F.3d 1357, 1363 (10th Cir. 1993)).* Because the University lacks authority to control the Hospital's day to day employment decisions, any centralized labor relations functions do not support a finding of an integrated enterprise.

Finally, the University and Hospital do not have "common ownership and financial control." Rather, they are separate corporate entities with separate budgets. (Resp. Exs. A, B; Koob Aff. P 7; Moore Aff. PP 11 - 14.) Indeed, "if neither of the entities is a sham then the [common ownership and financial control] test is not met." *Kemether, 15 F. Supp. 2d at 749 n.5* (quoting [*14] *EEOC v. Wooster Brush Co. Employees Relief Ass'n, 727 F.2d 566, 572 (6th Cir. 1984)).*

Thus, there is not substantial evidence contrary to the Stipulation. Considering this along with the other *Waldorf* factors, the Court concludes that manifest injustice would not result from enforcement of the Stipulation. Accordingly, the Court will not vacate its Order approving the Stipulation.

Even were it not for the Stipulation, however -- if Plaintiffs merely sought to amend the caption to add a party defendant -- the Court would not grant Plaintiffs' request. "[C]ourts may deny leave to amend on grounds such as undue delay, dilatory motive, bad faith, prejudice, and futility." *Breyer v. Meissner, 214 F.3d 416, 431 (3d Cir. 2000)*(citing *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1413 (3d Cir. 1997)).* [7]

> [7]    In addition to arguing that an amendment would be futile and unduly delayed, Defendants claim that Plaintiffs' Motion was made in bad faith. (Mem. Opp. Mot. at 2.) Because Defendants offer no evidence of bad faith apart from their conclusory allegation, the Court will disregard this argument. *But see Fed. R. Civ. P. 11(b)*("By presenting to the court . . . a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for futher investigation or discovery. . . .").

"Leave to amend may be denied . . . if amendment would be futile." *Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000)*. As discussed above, because Plaintiffs cannot establish that the University and the Hospital should be treated as an integrated employer, amendment of the caption would ultimately prove futile.

Additionally, Plaintiffs' delay in moving for an amendment weighs against allowing a change. "The mere passage of time does not require that a motion to amend a complaint be denied on grounds of delay. In fact, delay alone is an insufficient ground to deny leave to amend."

*Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001)*(citations omitted). "However, 'at some point, the delay will become undue, placing an unwarranted burden on the court, or will become prejudicial, placing an unfair burden on the opposing party." *Id.* (quoting *Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984)* (internal quotation marks omitted)). "Delay may become undue when a movant has had previous opportunities to amend a complaint." *Id.*

As Defendants observe, Plaintiffs could have requested a change to the caption as early as June 2001. (Resp. P 12.) Yet, Plaintiffs waited until nearly one year later -- until after the close of discovery and after summary judgment motions were filed -- to file their Motion. They have provided no explanation for their delay other than their accusation that they were misled by counsel for Defendants. (Reply at 2.) Even if Plaintiffs were misled -- and the above discussion shows that they were not -- they realized their mistake, at the very latest, two days after the Stipulation was approved. Thus, any imagined deception on the part of Defendants' [*15] counsel does not excuse Plaintiffs' delay.

III. *Conclusion*

For the foregoing reasons, the Court will deny Plaintiffs' Motion to Vacate Order of June 13, 2001 Approving a Stipulation and to Designate Both Temple University and Temple University Hospital, Inc. as Named Defendants. An appropriate Order follows.

ORDERAND NOW, this 21st day of August, 2002, upon consideration of Plaintiffs' Motion to Vacate Order of June 13, 2001 Approving a Stipulation and to Designate Both Temple University and Temple University Hospital, Inc. as Named Defendants (docket no. 120), Defendants' Response thereto (docket no. 124), Plaintiffs' Reply (docket no. 127), and Defendants' Sur-Reply (docket no. 130), for the reasons stated in the accompanying Memorandum, **IT IS ORDERED** that the Motion is DENIED.

**BY THE COURT:**

**BRUCE W. KAUFFMAN, J.**

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 12

LEXSEE 2004 U.S. DIST. LEXIS 14989

**EDWIN GONZALEZ, DONNA ANN MINOR, KARA PIETROWICZ and ALBERINA ZIEMBA, Plaintiffs, v. COMCAST CORPORATION, a Pennsylvania corporation, COMCAST CABLEVISION OF WILLOW GROVE, a Pennsylvania corporation, COMCAST CABLE COMMUNICATIONS, INC., a Delaware corporation, SUZANE KEENAN, ALLEN R. PEDDRICK, RICHARD GERMANO, JAMES SULLIVAN, E. MARK CONNELL, DINA GALEOTAFIORE, AL CALHOUN, STEVE TREVISON, PHILIP ANNONE, JOHN MCGOWAN, VINCENT JOHNSON, and MICHAEL A. DOYLE, Defendants.**

**Civil Action No. 03-445-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 14989*

**July 30, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *Gonzalez v. Comcast Corp., 2004 U.S. Dist. LEXIS 17896 (D. Del., Aug. 25, 2004)*

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted in part and denied in part.

**COUNSEL:** Victor F. Battaglia, Esquire, Philip B Bartoshesky, Esquire, Biggs and Battaglia, Wilmington, Delaware; Counsel for Plaintiffs.

William M. Kelleher, Esquire, Ballard Spahr Andrews & Ingersoll, LLP, Wilmington, Delaware; Counsel for Defendants.

Michael P. Kelly, Esquire, McCarter & English, LLP, Wilmington, Delaware; Counsel for Defendants.

Charisse R. Lillie, Esquire, David E. Brier, Esquire, Farrah Gold, Esquire, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania; Counsel for Defendants.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent A. Jordan

**OPINION**

**MEMORANDUM OPINION**

Wilmington, Delaware

**JORDAN, District Judge**

### I. INTRODUCTION

The [*2] plaintiffs, Edwin Gonzalez, Donna Ann Minor, Kara Pietrowicz, and Alberina Ziemba, are former employees of one or more [1] of the Comcast family of companies named as defendants in this suit (collectively "Comcast") and have brought this employment discrimination action against Comcast and the individual defendants, who hold a variety of supervisory and management positions within Comcast. (*See* Docket Item ["D.I."] 45 at 5-12.) The defendants have filed a Motion for Partial Summary Judgment (D.I. 153; the "Motion") which challenges (1) the plaintiffs' Title VII claims against the individual defendants (D.I.154 at 5); (2) the plaintiffs' claims under *42 U.S.C. § 1981* against defendants Doyle, Connell, Calhoun, Keenan, Comcast Corporation, and Comcast Cable of Willow Grove (*id.* at 5-7); (3) the plaintiffs' claims under *42 U.S.C. § 1985* (*id.* at 7-10); (4) the Plaintiffs' claims under *42 U.S.C. § 1986* (*id.* at 10-11); and (5) the plaintiffs' claims under Delaware state contract law for breach of the covenant of good faith and fair dealing (*id.* at 11-12).

1  It is not clear from the pleadings or the briefing in this matter which of the four business entities named as defendants was the company that employed the plaintiffs. In fact, one of the matters in dispute is whether the four entities should be treated as a single employer for purposes of this case. *See infra* at 7-9. The defendants' briefing asserts that two of the four companies, namely Comcast Corporation and Comcast Cablevision of Willow Grove, were not the plaintiffs' employers (*see* D.I. 154 at 2, 5), which implies that, from the defendants' perspective, one or both of the other entities did employ the plaintiffs. That apparent concession is muddied, however, by the defendants' assertion that only Comcast Cablevision of New Castle County, LLC or its predecessor in interest had an employment contract with the plaintiffs. (*See id.* at 11-12.)

[*3] For the reasons that follow, the defendants' Motion will be granted as to item (1), will be granted in part as to item (2), but only insofar as summary judgment will be granted for defendant Keenan, and will be granted as to items (3) and (4). In all other respects, the Motion will be denied.

## II. BACKGROUND [2]

2  Since I am obligated to view the facts pertinent to this Motion in the light most favorable to the non-moving party, *see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986),* the following rendition of background information is based largely upon the allegations in the First Amended Complaint (D.I. 45), but also includes reference to certain evidence supplied by the parties in connection with their briefing. It does not represent findings of fact.

The plaintiffs were all employed at the New Castle office of one of the Comcast entities, working under the supervision of a woman named Angela Wilson. [3] (D.I. 45 at PP 39, 41, 43, 45.) Ms. Wilson, an [*4] African-American, was a Human Resources Manager and had sought but was denied the opportunity to apply for a promotion to the position of Human Resources Director. (*Id.* at PP 15-19.) The plaintiffs allege that the defendants denied Ms. Wilson that opportunity because of her race and gender. (*Id.* at P 19.) Ms. Wilson filed a complaint

with the Equal Employment Opportunity Commission ("EEOC") and the Delaware Division of Labor, charging Comcast with discrimination. (*Id.* at P 21.) The complaint was served on the defendants on January 2, 2002. (*Id.* at P 22.) According to the plaintiffs, the defendants then retaliated against Ms. Wilson and her staff, including the plaintiffs, by firing them all two days later. (*Id.*) More specifically, the plaintiffs assert that, when they expressed their opposition to the treatment Ms. Wilson received at the hands of the defendants and further expressed their belief that Ms. Wilson was being discriminated against on the basis of her race and gender, the defendants fired them in retaliation. (*See id.* at PP 60-61, 65, 79, 85-86, 90, 104, 110-11, 115, 129, 135-36, 140, 154.)

3  Ms. Wilson is the plaintiff in a separate employment discrimination suit against Comcast in this court, [add case caption and Civ. Action No.]

[*5] The First Amended Complaint in this case contains a total of twenty counts, consisting of four sets of five counts, each set pertaining to one of the four plaintiffs. Each set of five counts is, except for the name of the specific plaintiff, virtually identical with every other set. The five counts are as follows: (1) a count alleging discrimination and retaliation under *42 U.S.C. § 2000e, et seq.,* commonly referred to as "Title VII", (2) a count alleging "violation of equal rights under the law" and citing *42 U.S.C. § 1981,* (3) a count citing *42 U.S.C. § 1985(3)* and alleging that the defendants conspired to interfere with the plaintiffs' civil rights, (4) a count citing *42 U.S.C. § 1986* and alleging that individual Comcast supervisors failed to prevent the aforementioned conspiracy, and (5) a count alleging that the defendants breached their implied covenant under Delaware contract law to act in good faith and deal fairly in their employment relationship with the named plaintiff.

## III. STANDARD FOR SUMMARY JUDGMENT

The well known rule governing summary judgment provides [*6] that such judgment shall be entered if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The "availability of summary judgment turn[s] on whether a proper jury question [has been] presented." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* "The judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making that determination, one must believe the non-moving parties' evidence and draw all inferences from the evidence in the non-moving parties' favor. *Id. at 255*; *Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)*. In particular, in an employment discrimination case, "'a trial court must be cautious about granting summary judgment to an employer when ... intent is at issue.'" *Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 321 (3d Cir. 2000)* (quoting *Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994))*. [*7] Nevertheless, the party bearing the burden of persuasion in the litigation, must, in opposing a summary judgment motion, "identify those facts of record which would contradict the facts identified by the movant." *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)*(internal quotes omitted).

## IV. **DISCUSSION**

### A. *Title VII*

Among other things, Title VII prohibits employment discrimination on the basis of race or sex. *42 U.S.C. § 2000e-2* ("It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his ... employment, because of such individual's race, color, religion, sex, or national origin ...."). The defendants note that Title VII does not provide for individual liability of fellow employees who may discriminate; it makes only employers themselves liable. (*See* D.I.154 at 5.) Therefore, say the defendants, the plaintiffs' claims against the individual defendants under Title VII cannot stand. (*Id.*) In this they are correct, as the plaintiffs have conceded (D.I. 159 at 14). *See Sheridan v. E.I. duPont de Nemours & Co., 100 F.3d 1061, 1077-78 (3d Cir. 1996)* [*8] ("We are persuaded that Congress did not intend to hold individual employees liable under Title VII.") Judgment will therefore be entered [4] for the individual defendants on all of the Title VII counts. [5]

> [4]   Though couched as a motion for summary judgment, this and other aspects of the defendants' Motion do not rely in any measure on evidence beyond the First Amended Complaint and the defendants' Answers (*see* D.I. 46-61) and are, in essence, requests for judgment on the pleadings.

*See Fed. R. Civ. P. 12(c)* (2004).

> [5]   The counts in the First Amended Complaint are misnumbered, but the Title VII counts bear the roman numerals I, VI, XII (which is actually the eleventh count), and XVII (which is actually the sixteenth count).

### B. *Section 1981*

*Section 1981* of Title 42 of the United States Code provides that all persons within our nation's jurisdiction will receive "the full and equal benefit of all laws and proceedings ...." The plaintiffs assert that they [*9] have been deprived of those equal rights because the defendants retaliated against them for opposing unlawful discrimination against Ms. Wilson. (*See, e.g.,* D.I. 45 at PP 65-67.)

#### i. *Defendants Doyle, Calhoun, Connell, and Keenan*

The defendants argue that summary judgment should be granted against the plaintiffs on the *§ 1981* claims against Messrs. Doyle, Calhoun, and Connell and Ms. Keenan because those individuals were not involved in the decision to fire the plaintiffs and Ms. Wilson. (D.I. 154 at 5-6.) The plaintiff responds that inferences from the present record fairly implicate each of those four defendants in the firing. (D.I. 159 at 14-18.)

The Third Circuit has declared that, "if individuals are personally involved in the [challenged] discrimination ..., and if they intentionally caused the [infringement of] ... *Section 1981* rights, or if they authorized, directed, or participated in the alleged discriminatory conduct, they may be held liable." *Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518 (3d Cir. 1986)*. The evidence cited by the plaintiffs is sufficient, under the strictures of summary judgment review, to hold Messrs. Doyle, Calhoun, [*10] and Connell in the case, but not Ms. Keenan.

If all reasonable inferences are drawn in the plaintiffs' favor, one could conclude, as plaintiffs do, that Calhoun and Connell were actively involved in the firing decision, as evidenced by their presence at a meeting in which Comcast executives are alleged to have met to discuss the most effective way to cover-up unlawful discrimination against Ms. Wilson. (*See id.* at 16.) Similarly, one could conclude that, because Calhoun's and Connell's presence at the meeting was at the express direction of Doyle, Doyle was "in the loop" and had in

some meaningful sense authorized the allegedly discriminatory course of conduct. (*See id.*) There are thus issues of material fact which remain to be resolved with respect to the liability of Messrs. Doyle, Calhoun, and Connell, and the Motion must be denied as to those individual defendants.

As to Ms. Keenan, however, even the plaintiffs admit that her involvement "was a bit different." (*Id.* at 17.) Indeed, the most that the plaintiffs are able to muster against Ms. Keenan is that she showed some interest in the events surrounding the shake-up at the New Castle Call Center. (*See id.* at [*11] 17-18.) That is not a basis for liability. Accordingly, the Motion will be granted as to Ms. Keenan. [6]

> [6] The counts containing the *§ 1981* allegations bear the roman numerals II, VIII (which is actually the seventh count), XIII (which is actually the twelfth count), and XVIII (which is actually the seventeenth count).

### ii. *Defendants Comcast Corporation and Comcast Cable of Willow Grove*

The defendants also argue that summary judgment should be entered for two of the corporate defendants, Comcast Corporation and Comcast Cable of Willow Grove, because they did not employ the plaintiffs and because the plaintiffs have not provided evidence that would warrant ignoring the corporate veils separating those entities from the other corporate defendants. (*See* D.I. 154 at 6-7.) The plaintiffs respond by asserting that they have adduced evidence to at least raise a material issue of fact on the question of whether Comcast Corporation and Comcast Cable of Willow Grove are sufficiently integrated with the other [*12] corporate defendants for all of them to be treated as a joint employer of the plaintiffs. (*See* D.I. 159 at 18-19.)

In *Marzano v. Computer Science Corp. Inc., 91 F.3d 497 (3d Cir. 1996)*, the Third Circuit, citing fundamental principles of corporate law, [7] stated in the context of an employment discrimination case that the veil separating corporate entities could only be ignored when those entities are "so interrelated and integrated in their activities, labor relations, and management, [that] it is clear ... they may be treated as a single employer." *Id. at 513* (quoting *Ratcliff v. Insurance Co. of North America, 482 F. Supp. 759, 764 (E. D. Pa. 1980)*). This "integrated enterprise" test has been interpreted to require review of

the related entities to consider "(1) inter-relation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial controls." *McNeal v. Maritank Phila., Inc., 1999 U.S. Dist. LEXIS 895, 1999 WL 80268 at *7 (E. D. Pa. Jan. 29, 1999)*; *see also Johnson v. Cook Composites & Polymers, Inc., 2000 U.S. Dist. LEXIS 2330, 2000 WL 249251 at *3 (D.N.J. Mar. 3, 2000)* (same); [*13] *Brown v. Vitelcom, Inc., 41 V.I. 253, 47 F. Supp. 2d 595, 600 (D.V.I. 1999)* (listing factors as: "(1) the degree to which ... operations were integrated ..., (2) whether ... [there was] centralized control over ... labor relations, and (3) whether ... [the entities] were commonly owned and managed").

> [7] The Court in that case was applying New Jersey's corporation law, but the principles at issue, i.e., the doctrine of limited liability and its corollary that separate corporate entities ought generally to be treated as such, are basic.

The plaintiffs emphasize two types of evidence which they assert raise a material issue of fact as to the integration of the corporate defendants. First, they point to the federal W-2 wage and tax forms issued to the plaintiffs during various years. [8] Each of the W-2 forms submitted with the briefing lists the employer as Comcast Cablevision of Willow Grove. [9]

> [8] Examples were given for the years 2000 (D.I. 160 at B-24), 2001 (*id.* at B-23, B-26), and 2002 (*id.* at B-25).

[*14]

> [9] The precise abbreviation for the entity varies slightly, but in all cases it is clearly identifying Comcast Cablevision of Willow Grove. One of the W-2s is for Ms. Pietrowicz (D.I. 160 at B-23), one for Ms. Minor (*id.* at B-24), one for Ms. Ziemba (*id.* at B-25), and one for Mr. Gonzalez (*id.* at B-26).

Second, they refer to the "General Respondent Questionnaire" filed by Comcast with the Delaware Department of Labor's Office of Labor Enforcement in response to the plaintiffs' administrative complaint before that body. Prior to commencing the present suit, the plaintiffs pursued administrative remedies, including filing an administrative action before the Delaware Department of Labor. (*See* D.I. 160 at B-27 through B-30.) The named Respondent in that administrative action was "Comcast Cablevision of New Castle County,

Inc." In response to a question requiring the full name of the complainants' employer, the defendants' counsel wrote "Comcast Cablevision of New Castle County, Inc." (*Id.* at B-27.) However, when asked to identify those responsible for the management of the Respondent, [*15] the answer given was "Not Applicable. The employer is ultimately owned by a publicly traded company, Comcast Corporation." (*Id.*) Other responses on the questionnaire either expressly or by implication identify Comcast Corporation as the employer of the plaintiffs. (*See id.* at B-28, responses to questions 3 and 4.) Thus, Comcast Corporation chose to identify itself as the employer, essentially ignoring the separate existence of Comcast Cablevision of New Castle County, Inc. One might therefore infer that Comcast treats other members of the Comcast family of companies similarly, all being integrated units, at least for employment purposes.

Despite the defendants' protestations that these points of evidence are insufficient to pierce the corporate veil (D.I. 163 at 3-4), the evidence does raise a general issue of material fact as to the inter-relation of operations among the defendant corporations, their common management, and centralized control of their labor relations. [10] Accordingly, the defendants' efforts to have Comcast Corporation and Comcast Cable of Willow Grove eliminated from the case fail.

> [10]    The fourth factor in the "integrated enterprise" test, the extent of common ownership or financial controls, does not appear to be disputed. All the corporate defendants are apparently tightly interconnected under the Comcast ownership structure. If this point is subject to dispute, however, the same evidence raises an issue of fact as to that factor as well. (*Cf.* D.I. 160 at B-27 (noting ownership by Comcast Corporation) and B-28 (identifying Comcast Corporation as the employer and "ultimate parent of the Respondent", and describing itself as a nationwide company with over 20,000 employees)).

[*16]  C. *Section 1985(3)*

*Section 1985(3) of Title 42* forbids any conspiracy to "deprive, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ...." The statute "does not itself create any substantive rights; rather, it serves only as a vehicle for vindicating federal rights and privileges which have been defined elsewhere." *Brown v. Philip Morris Inc.,* 250 F.3d 789, 805 (3d Cir. 2001) (citing *Great Am. Fed. Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 376, 60 L. Ed. 2d 957, 99 S. Ct. 2345 (1979)). The plaintiffs allege that the individual defendants conspired to violate their "civil rights guaranteed by *42 U.S.C. § 1981,* and thus are [in] ... violation of *42 U.S.C. § 1985.*" (*E.g.,* D.I. 45 at P 71.) The defendants respond that a claim under *§ 1985(3)* cannot lie for alleged violations of *§ 1981.* (D.I. 154 at 7-9.)

"The conspiracy provision of *§ 1985(3)* provides a cause of action under rather limited circumstances ...." *Brown,* 250 F.3d at 805. While other courts may have approved the use of *§ 1985(3)* [*17] as a basis for claims alleging a conspiracy to violate *§ 1981* (*see* D.I. 159 at 21), the Third Circuit has noted that "in the context of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under *§ 1985(3)*: the right to be free from involuntary servitude and the right to interstate travel." *Brown,* 250 F.3d at 805. In an employment discrimination context, like that facing the court here, the Supreme Court explicitly rejected an attempt to employ *§ 1985(3)* as an adjunct to a Title VII employment discrimination claim. *See Great Am. Fed. Sav. & Loan Ass'n,* 442 U.S. at 376. In view of such precedent, the Third Circuit has stated that, "in order to prevent the use of *§ 1985(3)* as a general federal tort law, courts have been careful to limit causes of action thereunder to conspiracies that deprive persons of constitutionally protected rights, privileges and immunities ...." *Brown,* 250 F.3d at 805. Consequently, I agree with precedent holding that alleged violations of statutory rights under *§ 1981,* by themselves, cannot be a foundation for a conspiracy claim under *§ 1985(3).* [*18] *See Dixon v. Boscov's, Inc.,* 2002 U.S. Dist. LEXIS 13815, 2002 WL 1740583 at *2 (E. D. Pa. July 17, 2002) (holding that the Third Circuit's decision in *Brown* compels conclusion "that statutory rights pursuant to *section 1981* cannot be the basis of a *section 1985* remedy."). Judgment will therefore be entered for the individual defendants on the plaintiffs' *§ 1985(3)* claims. [11]

> [11]    The counts containing the *§ 1985(3)* claims bear the roman numerals III, IX (which is actually the eighth count), XIV (which is actually the thirteenth count), and XIV (which is actually the eighteenth count).

D. *Section 1986*

*Section 1986 of Title 42* makes liable "every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in *section 1985* of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do ...." Because *§ 1986* by its terms depends upon a violation of *§ 1985*, the parties agree that, if I determine, as I have, [*19] that the plaintiffs have no cause of action under *§ 1985*, then the plaintiffs' *§ 1986* claims must also fail. (*See* D.I. 154 at 10; D.I. 159 at 22.) Accordingly, judgment will also be entered for the individual defendants on the plaintiffs' *§ 1986* claims. [12]

> 12 The counts containing the *§ 1986* claims bear the roman numerals IV, X (which is actually the ninth count), XV (which is actually the fourteenth count), and XV (which is actually the nineteenth count).

E. *Good Faith and Fair Dealing*

Under Delaware law, it has long been the case that a covenant of good faith and fair dealing is implied as a part of every contract. *See E.I. DuPont de Nemours and Co. v. Pressman, 679 A.2d 436, 440 (Del. Supr. 1996)* ("The Covenant, perhaps in less robust form and by a different name, also has a long history."). The plaintiffs and the defendants agree (D.I. 154 at 11-12; D.I. 159 at 23) that, because the individual defendants were not parties to the employment contracts with the plaintiffs, those [*20] defendants cannot be subject to the plaintiff's breach of contract claims. *See Castetter v. Del. Dep't of Labor, 2002 Del. Super. LEXIS 300, 2002 WL 819244 at *3 (Del. Super. Apr. 30, 2002)* (dismissing breach of good faith and fair dealing claim against individual defendant because "only a party to a contract can breach the implied covenant"). Accordingly, judgment will be entered for the individual defendants on those claims. [13]

> 13 The counts containing the claims for breach of the covenant of good faith and fair dealing bear the roman numerals V, XI (which is actually the tenth count), XVI (which is actually the fifteenth count), and XVI (which is actually the twentieth count).

The defendants also argue that summary judgment should be entered on those claims to the extent they are asserted against Comcast Corporation, Comcast Cablevision of Willow Grove, and Comcast Cable Communications, Inc. "because these entities were not parties to any contract with the Plaintiffs." (D.I. 154 at 11-12.) For the same reasons [*21] discussed in section IV.B.ii. of this Opinion, the defendants motion in this regard will be denied.

V. **CONCLUSION**

Based on the foregoing reasons and authorities, the defendants' Motion will be granted in part and denied in part. It will be granted to the extent that judgment will be entered in favor of the individual defendants on the Title VII claim; that summary judgment will be entered for defendant Keenan on the plaintiffs' *§ 1981* claims; and that judgment will be entered in favor of the individual defendants on the plaintiffs' claims under *§§ 1985and 1986*. The Motion will be denied in all other respects. An appropriate order will follow.

**ORDER**

For the reasons set forth today in the Memorandum Opinion in this case,

IT IS HEREBY ORDERED that the defendants' Motion for Summary Judgment (D.I. 153; the "Motion") is GRANTED to the extent that judgment is entered in favor of the individual defendants on the plaintiffs' Title VII claims; that judgment is entered for defendant Keenan on the plaintiffs' claims under *42 U.S.C. § 1981*; and that judgment is entered in favor of the individual defendants on the plaintiffs' claims under [*22] *42 U.S.C. §§ 1985* and *1986*. In all other respects, the Motion is DENIED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

July 30, 2004

Wilmington, Delaware

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 13

LEXSEE 1998 U.S. DIST. LEXIS 5101

**CECIL HANKINS v. CITY OF PHILADELPHIA, AMERICAN FEDERATION OF
STATE, CITY AND MUNICIPAL EMPLOYEES AND AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES
DISTRICT COUNCIL 47, LOCAL 2187**

**CIVIL ACTION No. 95-1449**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

*1998 U.S. Dist. LEXIS 5101*

**April 9, 1998, Decided
April 9, 1998, Filed; April 10, 1998, Entered**

**DISPOSITION:** [*1] Defendants' motions for summary judgment granted.

**COUNSEL:** For CECIL HANKINS, PLAINTIFF: REBECCA J. HOULDING, RICHARD J. SILVERBERG AND ASSOCIATES, PHILADELPHIA, PA USA. RICHARD J. SILVERBERG, PHILADELPHIA, PA USA.

For CITY OF PHILADELPHIA, DEFENDANT: RAYMOND A. KRESGE, PEPPER, HAMILTON & SCHEETZ, PHILADELPHIA, PA USA. CHRISTOPHER I. MC CABE, CITY OF PHILADELPHIA LAW DEPT., PHILADELPHIA, PA USA. E. JANE HIX, ASST. CITY SOLICITOR, PHILADELPHIA, PA USA. HOWARD LEBOFSKY, DEPUTY CITY SOLICITOR, CITY OF PHILA. LAW DEPT., PHILADELPHIA, PA USA.

For AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 47, LOCAL 2187, DEFENDANTS: WAYNE WYNN, WILLIG, WILLIAMS & DAVIDSON, PHILADELPHIA, PA USA.

**JUDGES:** JAY C. WALDMAN, J.

**OPINION BY:** JAY C. WALDMAN

**OPINION**

*MEMORANDUM*

WALDMAN, J.

April 9, 1998

*Background*

Presently before the court are defendants' Motions for Summary Judgment. In his Third Amended Complaint, plaintiff asserts claims against the defendant City under Title VII, PHRA and *42 U.S.C. § 1983* for employment discrimination based upon race and under *§ 1985* for conspiracy to discriminate [*2] on the basis of race. [1] He asserts claims against the defendant unions for conspiracy under *§ 1985(3)*, civil conspiracy, fraudulent misrepresentation, breach of contract and tortious interference with prospective contractual relations. [2]

> 1 Plaintiff also asserted a claim against the City for breach of contract which was dismissed earlier.
> 2 Plaintiff also asserted claims against the unions for intentional infliction of emotional distress and tortious interference with contractual relations which were dismissed earlier.

*Legal Standard*

In considering a motion for summary judgment, the

court must determine whether the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c). Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Arnold Pontiac-GMC,* [*3] *Inc. v. General Motors Corp., 786 F.2d 564, 568 (3d Cir. 1986).* Only facts that may affect the outcome of a case under applicable law are "material." *Anderson, 477 U.S. at 248.* A dispute over a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

All reasonable inferences from the record are drawn in favor of the non-movant. *Id. at 256.* Although the movant has the initial burden of demonstrating an absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which he bears the burden of proof. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991)*(citing *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

From the evidence of record, as uncontroverted or viewed in the light most favorable to plaintiff, the pertinent facts are as follow.

*Facts*

1. *General Background*

Plaintiff is a black male. He started his employment with the defendant City in December of 1978 in the Department of Human [*4] Services as a Children and Youth Counselor. Plaintiff subsequently began to work for the City Health Department. By December of 1987 plaintiff had held the positions of Social Worker II and Program Analyst in the Office of Mental Health/Mental Retardation. At this time, plaintiff became a Program Analyst in the Health Department's AIDS Activities Coordinating Office ("AACO").

Plaintiff was promoted to AIDS Program Analyst Supervisor in June of 1988. Plaintiff was temporarily promoted to Acting Director of AIDS Agency Services, a position within AACO, in March 1989. At this time plaintiff carried out the duties of this position as well as

the duties of AIDS Program Analyst Supervisor. This was not a permanent position and plaintiff later resumed his regular position.

2. *The Promotion of Mara Natkins*

On September 4, 1991, the City Personnel Department completed an audit of the position of AIDS Policy and Planning Associate Director then held by Mara Natkins, a white female. This audit revealed that Ms. Natkins was doing work outside of the responsibilities of her position. It was recommended by one Stephen W. Kurtiz that Ms. Natkins' position be changed to AIDS Policy and [*5] Planning Director to correspond with the duties she was performing.

Plaintiff was told in February of 1992 that Ms. Natkins had been promoted to the position of Director of Policy and Planning in AACO. Plaintiff then spoke with a representative of the Philadelphia Commission on Human Relations about possibly filing a complaint with the Commission regarding the "promotion" received by Ms. Natkins. Plaintiff believed that his position should have been audited as well.

Plaintiff did not file a complaint with the Philadelphia Human Rights Commission, however, he did file a complaint with the EEOC regarding the "promotion" of Ms. Natkins in April of 1992. Plaintiff felt that he was entitled to a "desk audit" of his position as well and that the City has acted in a discriminatory manner. Plaintiff later dropped this complaint.

3. *Plaintiff's Transfer to the Charles R. Drew Mental Health/Mental Retardation Center ("the Center") and Michael Reardon's Promotion at the Center*

The Center was a privately owned neighborhood mental health facility which provided services for the City on a contract basis. The Center was experiencing operating difficulties at this time. In March 1992, [*6] Deputy Health Commissioner Estelle Richman advised the executives of the Center that the City was taking over the day to day operations and that Michael Reardon would serve as the Director of the Center. Prior to this, Mr. Reardon has served as the Acting Director. Mr. Reardon is black.

After the takeover, City Health Commissioner Robert K. Ross, M.D., wanted someone from the City to work at the Center and to serve as a liaison between the

Center and the City. Plaintiff had previously been a member of the Board of the Drew Center and had expressed to Dr. Ross a concern about finding other career opportunities as well as a desire to work in the mental health field. Dr. Ross is black.

Plaintiff was transferred to the Center in March 1992 on an emergency basis by Dr. Ross to oversee day to day operations. When plaintiff arrived at the Center, however, Mr. Reardon and another individual were running the center. Plaintiff received a fax from Dr. Ross' office stating that plaintiff's role at the Center was to be a monitor. This was not the role that plaintiff had anticipated for himself.

On June 8, 1992 plaintiff was reassigned to work in the Commissioner's Office, a position viewed as [*7] a "plum" assignment.

4. *The City's Failure to Promote Plaintiff to the Position of AIDS Program Services Manager (aka Director of AIDS Agency Services)*

The City published the results of the civil service examination for the position of AIDS Program Services Manager on June 18, 1992. Philadelphia Civil Service Regulation 11.01 provides that only individuals with the two highest scores on an examination may be selected by the appointing authority for the position being filled. Plaintiff had the fifth highest score on the exam. He was not appointed to the position.

On July 15, 1992, plaintiff tendered his notice of resignation to the City. Dr. Ross and Ms. Richman tried to discourage plaintiff from resigning. They asked him to reconsider. Plaintiff decided to hold to his decision to resign from City employment and did so effective August 21, 1992.

5. The Naming of Richard Scott as Acting Program Director In 1993 the AACO program was experiencing difficulties. The City had trouble locating and keeping properly qualified employees in the position of AIDS Program Director ("Program Director") which carries with it the responsibility for AACO. Five different individuals have [*8] been executive managers of AACO during its six or seven years of existence. AACO was an under-funded office with a high profile. Because the struggle for AIDS funding was perceived as having racial and ethnic overtones, Dr. Ross wanted to insure that the process of getting funds was as fair and objective as possible.

In mid-1993, Dr. Ross asked Anola Vance to assume the duties of Program Director. Ms. Vance is black. Dr. Ross believed that Ms. Vance had good people management skills which were needed in AACO. Ms. Vance, a City employee, in her previous position worked on AIDS prevention and education. After she became Acting Program Director, she continued to maintain the responsibilities of her previous position as well. Ms. Vance informed Dr. Ross that she would only accept the position on a temporary basis and he would have to find someone else permanently to fill it.

Dr. Ross discussed with Deputy Health Commissioner Barry Savitz the Program Director position. Mr. Savitz suggested that the eligibility requirements be broadened to attract more applicants. The City, however, had financial difficulties and the salary level for Program Director could not be increased. Dr. Ross made [*9] it clear to Mr. Savitz that he wanted to encourage minority candidates to apply for the position. Dr. Ross had appointed four blacks to senior management positions in his department.

Mr. Savitz suggested that Richard Scott would be a good candidate for the position of Program Director. Mr. Scott had been serving for eight years as an elected union agent for American Federation of State, County, and Municipal Employees (AFSCME) District Counsel 47, Local 2187 while on a leave of absence from City employment. Mr. Savitz had observed Mr. Scott perform his role as a union agent and was impressed with his fairness and objectivity. Over the years Mr. Scott had developed AIDS information and training programs; coordinated AIDS programs with City officials, community groups and service providers; consulted on AIDS related issues with ten local unions; had lobbied at all three levels of government for AIDS funding and services; served as President and Chairman of the Philadelphia AIDS Advocacy Coalition; and, coordinated efforts of numerous agencies in activities in response to the AIDS crisis. Dr. Ross and Mr. Savitz did not discuss Mr. Scott's race or sexual preference.

In the fall of 1992, [*10] Dr. Ross telephoned Richard Scott to ask if he would consider the position of Program Director. Mr. Scott informed Dr. Ross that he would be unable to take the position at that time. Dr. Ross also approached three other individuals about the Director's position, two of whom were black. None were

interested.

In January 1993, Dr. Ross again telephoned Mr. Scott to ask if he would reconsider the Program Director position and he agreed. While considering whether to take the position, Mr. Scott spoke with Barry Savitz and Dorothy Mann, a community activist. Both encouraged Mr. Scott to accept the position because they thought he possessed the ability, experience, knowledge and commitment necessary to do the work. Mr. Scott asked Dr. Ross if a gay white male taking over a position previously held by a black female would present any difficulties. Dr. Ross said it should not, particularly as the two of them would work together on AIDS issues.

Mr. Scott at some point inquired about the Civil Service job specifications ("specs") and told Dr. Ross that he needed to know that his qualifications matched the specs. Dr. Ross indicated that he would see if the job could be made available to Mr. [*11] Scott which Mr. Scott interpreted to mean that the job description could be changed.

Mr. Savitz worked with Joseph McNally, the Health Department Personnel Officer, to broaden the qualifications for the position of Program Director so that Richard Scott would be able to compete for the position. Mr. McNally requested that the job specifications for the position be revised by memorandum dated January 13, 1993.

On January 18, 1993, the Health Department completed the paperwork necessary to request that the Personnel Department take action to fill the position of Program Director. The Personnel Action Data form, which is prepared for all positions, stated, inter alia, that "we now have the opportunity to fill it with a qualified individual who has interest in the position."

Michael McAnally, the City Personnel Department's Chief of Classification, completed the revised job description for the position of AIDS Program Director on January 26, 1993. The next day, a draft of the revised job description was submitted to the Philadelphia Civil Service Commission which approved it. In late January 1993, Mr. Scott informed Dr. Ross that he would accept the position of Program Director.

[*12] At her request, Ms. Vance was reassigned to the duties of Mental Health/Mental Retardation Services Director on February 15, 1993. Richard Scott ended his

leave of absence and resumed active employment with the City on February 16, 1993. He was assigned the duties of managing AACO and was given the working title of Acting Aids Program Director. Dr. Ross regarded Mr. Scott's appointment to this position as permanent.

In late April 1993, the changes in the eligibility requirements for Program Director position were approved by the Administrative Board.

6. *Plaintiff's Reemployment With the City*

Sometime in January 1993 plaintiff learned Ms. Vance was vacating her position as Program Director. Plaintiff thereafter contacted Dr. Ross to express interest in the position. Plaintiff avers that Dr. Ross told him the position was reserved for a member of the gay white community and specifically identified Richard Scott as that person. Dr. Ross denies plaintiff's version. At this juncture, of course, the court must accept plaintiff's account. [3]

> 3   Plaintiff cites to a statement in the deposition of Dr. Ross to suggest that he said Mr. Scott's race would be a positive attribute in running AACO. This is disingenuous. A review of the transcript shows that after initially misunderstanding what he had been asked, Dr. Ross actually said the opposite. He said that Mr. Scott's appointment might be less well received because he was white. Plaintiff at times seizes upon a fragment of testimony to make a point which is not supported when the deponent's statement is read in context.

[*13] Plaintiff again telephoned Dr. Ross and expressed a general desire to return to work for the City. Dr. Ross arranged for plaintiff to return to City employment on March 1, 1993. Plaintiff was assigned to CODAAP, the Coordinating Office for Drug and Alcohol Abuse Programs. He was given a fully funded grant position of Program Analyst in the Health Department's Mental Health/Mental Retardation Unit which he continues to hold.

This is a non-supervisory position. Plaintiff's last position with the City had been at a supervisory level. Civil Service Regulation 15.031 provides that an employee may be reinstated to a "lower position" than one previously held.

Pursuant to Civil Service Regulation 14.01, as a

reinstated City employee, plaintiff had to complete a six-month probationary period before he could obtain permanent Civil Service status.

7. *Plaintiff's Application and Rejection for the Position of Program Director*

A Promotional Opportunity Announcement for the AIDS Program Director position was issued on May 3, 1993. The minimum requirements included permanent Civil Service status, three years of second-level supervisory experience and a Masters Degree. This announcement [*14] did not reflect the changes that had been made to the qualifications. Plaintiff applied for this position in May 1993.

On his application, plaintiff stated that he had three years of second-level supervisory experience based on his employment in the Health Department from March 1, 1989 until March 1, 1992. Plaintiff, however, had not continuously performed the duties of a second level supervisor during this three year period. Rather, over the course of three years he temporarily assumed such duties when needed and then returned to his previous position. Plaintiff also noted that he had just received a Masters Degree in Health Administration in May 1993.

A new announcement with the amended qualifications was posted on June 14, 1993. Permanent Civil Service status was still required. This posting also provided that the following specific experience was necessary for the position:

3. Two years of administrative experience in a program involving the provision of HIV/AIDS programs and services in a paid or volunteer capacity.

and

4. Three years of administrative experience directing, through subordinate supervisors, a program involving delivery of HIV/AIDS programs and [*15] services which has included the responsibility for planning, developing and evaluating HIV/AIDS programs and services or educational, informational and counseling services for a large governmental jurisdiction;

or

5. Three years of administrative experience planning, developing and evaluating HIV/AIDS educational and informational services which has included the

development, administration, and coordination of a National HIV/AIDS program;

or

6. Any equivalent combination of education and experience determined to be acceptable by the Personnel Department that has included completion of a bachelor's degree program as a minimum.

Mr. Scott and Jeffrey Petraco, another City employee, then applied for this position.

City Personnel Department Personnel Analyst Marc O'Connor notified plaintiff by letter dated July 9, 1993 that his application for the position of AIDS Program Director had not been approved because he did not have the experience required. Mr. O'Connor had checked the department's computerized records system and determined that plaintiff was not in fact performing second level supervisory work continuously for three years as claimed. Plaintiff has now admitted [*16] that this is true. Mr. O'Connor did not determine whether or not plaintiff met the additional requirements for the job. Mr. O'Connor advised plaintiff that he could submit additional application materials if he desired. It was not part of Mr. O'Connor's duties to determine if applicants had permanent Civil Service status. This was the responsibility of an employee in the Central Personnel Office.

Plaintiff did not receive Mr. O'Connor's letter until July 16, 1993. On July 19, 1993, he submitted additional information regarding his qualifications for the position. Plaintiff stated that he held the position of Acting Director of AIDS Services from March 1990 until March 1992. Plaintiff did not include on his application in May or June 1993 or his letter of July 19, 1993 anything about his volunteer experience in 1988 as Director of AIDS Community Initiatives.

Plaintiff also noted in his letter to Mr. O'Connor that he had national experience. The experience he described, however, consisted of work done in Philadelphia for the federal AIDS Community Conference for AIDS Providers in Philadelphia. Plaintiff states that his work was used to design a two day training conference which was [*17] duplicated nationally. Plaintiff does not state, however, that he played any role in organizing or administering such conferences at the national level.

Mr. Scott was permanently appointed to the position of Program Director on July 19, 1993.

Plaintiff achieved permanent Civil Service status on September 1, 1993.

In response to a telephone inquiry by plaintiff, Mr. O'Connor sent him a letter on September 20, 1993 reiterating job requirements 3, 4, and 5 for the position of Program Director and stated that the information plaintiff submitted did not substantiate his claim that he met these requirements. The sixth alternative requirement provision, which permitted an applicant to satisfy the educational requirement with a bachelors degree plus experience deemed equivalent to a masters, was inapplicable to plaintiff who had a masters degree.

Mr. Scott was the first Program Director appointed under the "job specs." Previous individuals doing the work of Program Director held other titles or were working and getting paid "out of class."

8. *The City's Failure to Promote Plaintiff to the Position of Program Director when Richard Scott Was Assigned Other Duties*

Mr. Scott was [*18] relieved of his duties as Program Director in October of 1994 when it was discovered that a grant application impermissibly contained the names of four individuals who were HIV positive. Mr. Scott, however, continues to hold the Civil Service title of Program Director.

Estelle Richman became the Commissioner of Public Health in April 1994. Ms. Richman is black. She assumed the Program Director position herself from November 1994 until July 10, 1995. Although Mr. Scott was officially assigned to the Health Commissioner's Office as Acting Chief of Staff, he continued to perform duties of the Program Director. Although Ms. Richman felt burdened by the responsibility of running AACO while serving as Commissioner, she was reluctant to hire a new Program Director because she felt that the AACO office was dysfunctional.

Ms. Richman decided that responsibility for running the AACO office should be given to a neutral party who would be "able to give her a feel for why the department was so dysfunctional." She believed that having a "loaned executive" assume the Program Director's duties would meet her needs while not obligating her under the Civil

Service laws to make a permanent employment [*19] decision until she determined how to make the AACO function effectively.

In a letter dated March 6, 1995 addressed to Ms. Richman, plaintiff expressed interest in assuming the Program Director position. There is no evidence of a response to this letter. There is also no evidence of record that Ms. Richman herself ever saw this correspondence.

Ms. Richman spoke to Temple University President Peter Liacouris about the possibility of his "loaning" her someone for the position of Program Director. Mr. Liacouris suggested Jesse Milan whom Ms. Richman had met a few years prior. Mr. Milan is black.

As part of the executive loan agreement, Ms. Richman agreed to pay Temple whatever Mr. Milan's salary at the University was. Ms. Richman did not compare Mr. Milan's resume to the official qualifications for the position. Mr. Milan left the position in February of 1997. On April 16, 1997, Ms. Richman appointed Patricia Bass and Joe Cronauer to serve as "Interim Co-Directors" of the AACO. [4] Ms. Bass had been an outside consultant for AACO and Mr. Cronauer had served as executive director of "We the People," an AIDS advocacy group.

> 4  No evidence of the race of either of these appointees has been presented by the parties. According to a contemporaneous news account, Ms. Bass is black. *See* The Philadelphia Tribune, April 26, 1997, Vol. 113, p. 2-A.

[*20] Ms. Richman avers that she would not appoint plaintiff or anyone else with permanent Civil Service status to the position of Program Director because she does not want to be locked in before she can get a clear understanding of why AACO remained so dysfunctional and determine precisely what is needed to make it function effectively.

9. *The Involvement of the Unions*

Plaintiff was a member of AFSCME District Council 47, Local 2187, an affiliate of the national AFSCME. There is no evidence that the national union played any role in the events of which plaintiff complains. Thus, the term "union" is used only to designate the AFSCME local to which plaintiff belongs.

1998 U.S. Dist. LEXIS 5101, *20

Richard Scott was present, as a union agent, when the Civil Service Commission approved the changes to the qualification requirements for the Program Director position at a meeting at the end of January 1993. Mr. Scott was responsible for representing the union at these meetings on issues that dealt with bargaining unit positions. The position of Program Director is not a bargaining unit position. Neither Mr. Savitz nor Mr. McNally discussed the proposed changes to the job specs with Mr. Scott.

As a union member [*21] and agent, Mr. Scott was not prohibited from seeking a City position, including one for which other union members were competing, and was not required to inform other union members that he was seeking a particular position with the City.

In June of 1993, Mr. Elijah Morris, a union shop steward, encouraged plaintiff to initiate union action regarding the changing of the job qualifications for the Program Director position. Plaintiff was concerned that as a probationary employee he might be fired if he initiated such action against the City. Plaintiff instead decided to pursue the City's administrative procedures for resolving personnel disputes.

At a union meeting on June 22, 1993, Mr. Morris raised the issue of the Program Director position. He stated that two union members who were employed in the Health Department were upset about the perceived lowering of the job qualifications for the position so that Richard Scott could obtain the job and that the union had allowed that to happen. Cathy Scott, a union agent, agreed to look into this matter. She is not related to Richard Scott.

Ms. Scott prepared a report and submitted it to the union's Executive Board on August 12, 1993. Ms. [*22] Scott's report contained the following findings:

1. That Richard Scott's position as a union official gave him the responsibility for handling Civil Service agenda items on behalf of the union.

2. That the Program Director position training and experience requirements were revised on January 27, 1993 and that this was a non-represented position.

3. That January 27, 1993 was the last day Richard Scott filled out a union time sheet for that week and that the next three week days were partially filled out but are

not dated.

4. The last day that Richard Scott was on the union payroll was February 15, 1993.

5. The Administrative Board approved the Civil Service agenda of January 27, 1993 on April 22, 1993.

6. The City Personnel Department issued a copy of the Administrative Board's action taken on April 22, 1993 on May 5, 1993.

7. The City posted the position of Program Director on June 14, 1993.

Ms. Scott also noted that on February 4, 1993, the City announced that Richard Scott had been appointed acting Program Director and that he was approved on March 29, 1993 for the temporary promotion to that position. At this time Mr. Scott was still a Union [*23] member.

Ms. Scott asked the Executive Board to advise her of any actions that it wanted her to take. The Executive Board never instructed Ms. Scott to take further action.

During the summer of 1993, plaintiff told Ms. Scott that he did not wish to file a grievance concerning the appointment of Richard Scott because he feared retaliation from the City.

In September 1993, plaintiff called Ms. Patricia Walton, a union vice-president, to seek formation on how to file an appeal with the City regarding Richard Scott's appointment. Plaintiff told Ms. Walton that he was filing an appeal based on race as he thought the exam was discriminatory. Ms. Walton provided plaintiff with information on how to appeal. Plaintiff asked Ms. Walton if she had any information regarding Mr. Scott getting the job. She said yes and that she would send it to him. She then sent plaintiff the investigative report made by Cathy Scott.

By letter dated September 23, 1993, plaintiff notified Michael McAnally, the Chief of Classification and Examination for the City, that plaintiff wanted to appeal the Personnel Department's decision to amend the qualifications for the position of Program Director which allowed volunteer [*24] experience to be substituted for paid experience.

The Executive Board received an unsigned letter

dated September 22, 1993 asking that disciplinary action be taken against Mr. Scott for several purported infractions. These included collusion with management to the detriment of the union, failing to enforce the sick leave policy, failing to take action when members on a promotional list for Budget Assistant positions were not promoted and acting "in his own behalf against members of Local 2187 in regard to the AIDS Program Director position."

The Executive Board took no action in response to this letter because it was not signed. While the Board has the power to investigate an unsigned complaint, it is not required to do so. At the time the letter was received, Mr. Scott was no longer a union member since Program Director was not a bargaining unit position and thus he could not be disciplined by the union.

By letter dated November 1, 1993, Mr. McAnally responded to plaintiff's letter. Mr. McAnally stated that there was established precedent to accept non-paid experience for positions that dealt with AIDS issues as much of the early activity in this area came from grass roots and [*25] citizen groups.

After receiving Mr. McAnally's letter, plaintiff contacted Ms. Walton and discussed the volunteer experience allowance with her. She asked plaintiff to send her a copy of the McAnally letter and his response to it. Plaintiff sent this information to Ms. Walton by letter dated November 1, 1993. Ms. Walton responded by letter dated November 29, 1993 that she should be meeting with Cathy Scott to discuss the Program Director position that week and would get back to plaintiff. Ms. Walton noted in her letter that plaintiff should contact her if he had any further questions. Ms. Walton contacted plaintiff sometime in January 1994 and advised him that it was too late for the union to take action regarding the appointment of Mr. Scott.

Under the collective bargaining agreement between the union and the City, a grievance must be filed within ten days of the occurrence complained of or within ten days of the time the grievant reasonably should have been aware of the occurrence. There is no suggestion plaintiff was unaware of Mr. Scott's appointment as Program Director from the time it occurred on July 19, 1993.

### Discussion

Plaintiff claims that the union and [*26] City

conspired to deprive him of the Program Director position because of his race in violation of *§ 1985(3)*. Plaintiff claims that the city discriminated against him in filling this position with a "less qualified" white candidate in the spring of 1993. [5] Plaintiff claims the City racially discriminated and retaliated against him for filing a complaint when he was not appointed to the position after Mr. Scott was assigned to other duties in the fall of 1994. [6]

> [5] In a footnote in his brief, plaintiff states he is no longer pressing claims of racial discrimination against the City premised on his failure to receive a promotion to AIDS Program Services Manager, his assignment at the Drew Center or his reemployment in a lower level position than his previous one.
>
> [6] Plaintiff did not explicitly or discernibly plead a retaliation claim. In none of the four versions of his complaint is the word retaliation used. Plaintiff nevertheless argues in his brief that he seeks relief from the City under this theory as well. Because the City has not objected and has addressed in its brief the merits of a retaliation claim on the record presented, albeit summarily, the court also analyzes such a claim as if it had been properly pled. This is not the only instance in which plaintiff appears in his brief to recharacterize his claims as pled.

[*27] To sustain a *§ 1985(3)* claim, a plaintiff must prove a conspiracy motivated by a racial or comparable class based discriminatory animus designed to deprive a person or class of persons of the equal protection of the laws, an act in furtherance of the conspiracy, and resulting injury to the person or property or the deprivation of a right or privilege of a citizen of the United States. *Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997)* (citing *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983)*; *Griffin v. Breckenridge, 403 U.S. 88, 102-03, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971)*.

A plaintiff has the burden of establishing a prima facie case of employment promotion discrimination under Title VII. To do so, plaintiff must show that he is a member of a protected class, that he possessed the qualifications for the position in question, that he did not receive the position and the employer solicited or

accepted other applicants of similar or lesser qualifications. *Bray v. Marriott Hotels, 110 F.3d 986, 989-90 (3d Cir. 1997); Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).*

If a plaintiff [*28] does so, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment decision. *Hicks, 509 U.S. 502 at 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742; Fuentes, 32 F.3d at 763.* The plaintiff may then discredit the employer's articulated reason and show that it was pretextual from which a fact finder may infer that the real reason was discriminatory or otherwise present evidence from which one reasonably could find that unlawful discrimination was more likely than not a determinative or "but for" cause of the adverse employment action. *Hicks, 509 U.S. at 511 & n.4; Miller v. CIGNA Corp., 47 F.3d 586, 595-96 (3d Cir. 1995) (en banc); Fuentes, 32 F.3d at 763-64.*

To discredit a legitimate reason proffered by the employer, a plaintiff must present evidence demonstrating such weaknesses, implausibilities, inconsistencies, contradictions or incoherence in that reason that one reasonably could conclude it is incredible and unworthy of belief. *Fuentes, 32 F.3d 759 at 764-65; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992), cert. denied, 510 U.S. 826, 126 L. Ed. 2d 56, 114 S. Ct. 88 (1993).*

The ultimate burden of proving that [*29] a defendant engaged in intentional discrimination against the plaintiff remains at all times on the plaintiff. *Hicks, 509 U.S. 502 at 507, 511, 125 L. Ed. 2d 407, 113 S. Ct. 2742.*

The same analysis is employed in assessing a PHRA claim, *see Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir.), cert. denied, 510 U.S. 865, 126 L. Ed. 2d 145, 114 S. Ct. 186 (1993); Harley v. McCoach, 928 F. Supp. 533, 538 (E.D. Pa. 1996),* or a public employment discrimination claim asserted under *§ 1983. See Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1082 (11th Cir. 1996); Lewis v. University of Pittsburgh, 725 F.2d 910, 915 n.5 (3d Cir.), cert. denied, 469 U.S. 892, 83 L. Ed. 2d 202, 105 S. Ct. 266 (1984).* [7]

    7   Plaintiff states in his brief that he "is not alleging due process violations and an analysis of plaintiff's property interests is, therefore, irrelevant." Rather, plaintiff asserts that his *§ 1983*

claim is based on unequal treatment because of race when Mr. Scott was appointed to the Program Director position for which plaintiff was "better qualified."

[*30] To establish a prima facie case of retaliation, a plaintiff must show that he engaged in protected activity, that he was subsequently or contemporaneously subject to an adverse employment action, and that there was a casual link between the protected activity and the adverse action. *Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); Barber v. CSX Distribution Services, 68 F.3d 694, 701 (3d Cir. 1995); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), cert. denied, 493 U.S. 1023, 107 L. Ed. 2d 745, 110 S. Ct. 725 (1990).* Except perhaps in circumstances where the timing of the alleged retaliatory act is "unusually suggestive," timing alone is not sufficient to demonstrate a causal link. *Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). See also Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997); Delli Santi v. CNA Ins. Co., 88 F.3d 192, 199 n.10 (3d Cir. 1996).*

If the plaintiff establishes such a prima facie case, then with retaliation claims as well the burden shifts to the defendant to offer a legitimate reason for the adverse employment action. *Jalil, 873 F.2d 701 at 708.* The plaintiff must then discredit [*31] any legitimate reason proffered by the defendant by presenting evidence from which one may infer that the real reason was retaliatory or otherwise present evidence from which one reasonably can find that retaliation was more likely than not a determinative cause of the adverse employment action. *Lawrence v. National Westminster Bank of New Jersey, 98 F.3d 61, 66 (3d Cir. 1996); Charlton v. Paramus Board of Education, 25 F.3d 194, 201 (3d Cir.), cert. denied, 513 U.S. 1022, 130 L. Ed. 2d 503, 115 S. Ct. 590 (1994); Geary v. Visitation of the Blessed Virgin Mary Parish School, 7 F.3d 324, 329 (3d Cir. 1993).*

Defendants contend that plaintiff has failed to sustain a claim for employment discrimination because he cannot show that he had the qualifications for Program Director. They stress that plaintiff failed to meet the primary requirement of both Promotional Opportunity Announcements that the applicant have permanent Civil Service status within thirty days of the closing date of the announcement. Defendant City contends that plaintiff has also failed to demonstrate a causal connection between his filing a complaint and Ms. Richman not appointing

him to the position [*32] in 1994, and has failed to discredit the non-discriminatory and non-retaliatory reason she gave for her decision to make no permanent Civil Service appointment to head AACO.

Promotion competition is governed by Civil Service Regulation 9.026, which states:

SCOPE OF PROMOTION COMPETITION. Competition in any promotional examination shall be open to employees with permanent Civil Service status in such classes and in such departments as the Director in his discretion shall determine. Employees serving in a probationary period as a result of reinstatement following previous service with permanent status may also be admitted, provided, however, that such reinstated employees may not be certified for appointment until the probationary period has been completed.

Plaintiff admits that he lacked permanent Civil Service status, but presents several arguments why he nevertheless should have been appointed Program Director.

Plaintiff notes the City did not initially tell him this was the reason he was not appointed. Once Mr. O'Connor determined from his application that plaintiff lacked the required experience, however, he concluded there was no reason to further investigate plaintiff's [*33] qualifications. Also, as noted, he was not the person responsible for verifying applicants' Civil Service status.

Plaintiff argues that he could have taken the examination for Program Director while on probationary status and then temporarily be appointed or the City could have waited until he achieved permanent status and then appointed him. Plaintiff contends that the City frequently holds positions open in this manner. He does not, however, present any competent evidence whatsoever to support this assertion.

Plaintiff next argues that "given that the City has routinely manipulated the Civil Service Regulations to accomplish illicit goals, it should not be permitted to use them as a shield against liability for illegal conduct." The requirement that an employee have permanent Civil Services status, however, was always a criteria for the position. Moreover, plaintiff again presents absolutely no competent evidence to substantiate his serious accusation that the City routinely manipulates Civil Service Regulations to achieve illicit goals. Indeed, he has not presented evidence of any occasion on which the City was guilty of such misconduct. [8]

> [8]  In making his arguments, plaintiff often hypothesizes about nefarious cabals without competent supporting evidence. The testimony of Dr. Ross that plaintiff was a "conspiracy theorist" who in conversations frequently proffered conspiratorial explanations for events was not controverted.

[*34] Plaintiff finally argues that he should have been deemed eligible to take the examination for Program Director. He points to a section of Regulation 9.026 which provides that reinstated employees "may" also compete for a promotion and then argues that it should be read in conjunction with Civil Service Regulation 11.03 which provides that only the top two scoring applicants may be certified to the appointing authority. Taking these regulations in tandem, plaintiff argues he could have competed for the position when it was posted and then been certified for the position when he achieved permanent Civil Service status on September 1, 1993.

There is uncontroverted evidence, however, that the City Personnel Department has consistently interpreted the referenced language in Regulation 9.026 regarding reinstated employees to be permissive and not mandatory. Linda Seyda, the City Personnel Director, avers that it is the consistent policy and practice of the Personnel Department that individuals may not be appointed from a promotional eligible list if they do not have permanent Civil Service status and generally may not compete unless they can meet this and other qualifications within 30 [*35] days of the closing date for applications. Ms. Seyda's averment that she is not aware of any instance in the Philadelphia Civil Service where an individual was appointed from a promotional eligible list who lacked permanent Civil Service status is uncontroverted by any competent evidence of record.

The closing date for applications for the Program Director position was June 30, 1993. Plaintiff's probationary period ended on August 31, 1993. He could not have attained permanent Civil Service status within 30 days of the closing date for applications.

Dr. Ross denies ever making the statement that the position was set aside for a member of the gay white community. The court, of course, must accept plaintiff's averment that he did. Nevertheless, such a statement is

essentially factual rather than discriminatory. Dr. Ross had concluded by that time that Mr. Scott was the best available person for this position. Mr. Scott was a gay white man.

Dr. Ross had given plaintiff a "plum" position in the Commissioner's office. Dr. Ross had encouraged plaintiff to remain at the Department of Health. He had just recently accommodated plaintiff's request for reemployment. Dr. Ross appointed [*36] blacks to four senior management positions in his department. His first choice for the position in question was Ms. Vance, a black employee. He solicited two blacks for the position before Mr. Scott was appointed. Dr. Ross is himself a black man. It seems not only unreasonable for one to conclude but virtually inconceivable that he would intentionally discriminate against plaintiff because he is black.

In any event, plaintiff plainly lacked the qualifications for the position. He did not and within thirty days could not have permanent Civil Service status. He also failed to satisfy the experience requirements.

Plaintiff argues that the job specifications were amended to accommodate Mr. Scott. That Mr. Scott may have been helped does not show that plaintiff was harmed. The amendments made it easier for all applicants to qualify. Plaintiff did not qualify under the original specifications, which predate any expression of interest in the position by plaintiff or Mr. Scott, as well as under the amended specifications. There is absolutely no evidence from which one reasonably could find that the specifications were amended to exclude plaintiff because of his race or otherwise.

Plaintiff [*37] argues that Mr. O'Connor's determination regarding plaintiff's lack of requisite experience is "inherently suspect" in view of his "superior qualifications." Plaintiff's speculation not withstanding, there is no competent evidence that Mr. O'Connor even knew of the interest of Dr. Ross in Mr. Scott. Mr. O'Connor did not work for Dr. Ross. He was in the City Personnel Department. In any event, Mr. O'Connor cogently explained the review he undertook and the reasons he concluded plaintiff lacked the required experience. There is no evidence of record from which one reasonably could find these reasons incredible.

Plaintiff has failed to sustain his § 1983, Title VII or parallel PHRA claim against the City for employment

discrimination in declining to appoint him to the Program Director position in July 1993. 9

> 9  The City also argued that plaintiff had failed to exhaust the PHRA administrative process by refusing to cooperate with the agency after filing his complaint. The City points to a letter from the PHRC advising plaintiff that the agency was dismissing his claim because of his failure to respond to "repeated attempts" by PHRC to contact him for information. Plaintiff denies receiving the various letters sent by PHRC in an effort to communicate with him. In view of the substantive deficiencies in plaintiff's PHRA claim, the court need not resolve this point.

[*38] Even assuming plaintiff met the qualifications for the position by October 1994 and that Ms. Richman actually saw his letter of March 1995, there is no evidence from which one reasonably could find that Commissioner Richman lied about her reason for not appointing plaintiff or any permanent Civil Service employee as Program Director. The person who Ms. Richman retained to run AACO after Mr. Scott was reassigned was a black man. Plaintiff has shown nothing more than that he wrote to Ms. Richman expressing interest in the Program Director position with no response seventeen months after filing his EEOC complaint and a week before summonses were issued in this action. Plaintiff has not remotely sustained a claim of racial discrimination or retaliation by Ms. Richman.

Plaintiff's § 1985 claim is similarly deficient. Plaintiff has not shown that any union officer was motivated by racial animus to enter into a conspiracy with a City official to injure plaintiff, let alone an officer with final decisionmaking power or for whose conduct the union could otherwise be liable. 10 Plaintiff has not shown that he sustained any injury or was deprived of any right as a result of any conspiracy [*39] as he did not qualify for appointment to the Program Director position under the initial or amended specifications.

> 10    There is no respondeat superior liability under § 1985(3). See Bell v. City of Milwaukee, 746 F.2d 1205, 1272 (7th Cir. 1984); Owens v. Haas, 601 F.2d 1242, 1247 (2d Cir.), cert. denied, 444 U.S. 980, 62 L. Ed. 2d 407, 100 S. Ct. 483 (1979); Luke v. Abbott, 954 F. Supp. 202, 203 n.1 (C.D. Cal. 1997); Frazier v. City of Philadelphia, 927 F. Supp. 881, 887 (E.D. Pa. 1996); Carnegie

*v. Miller, 811 F. Supp. 907, 914 (S.D.N.Y. 1993); Callahan v. Commonwealth Land Title Ins. Co., 1990 U.S. Dist. LEXIS 14524, *33, 1990 WL 168273, *10 (E.D. Pa. Oct. 29, 1990); Gant v. Aliquippa Borough, 612 F. Supp. 1139, 1142 (W.D. Pa. 1985); Di Maggio v. O'Brien, 497 F. Supp. 870, 876 (E.D. Pa. 1980).*

Plaintiff's other claims against the union are also deficient. [11]

> 11  As noted, plaintiff has presented absolutely no evidence of any possible culpable conduct by the national AFSCME. He offers no argument in opposition to the national union's motion for summary judgment. The court thus uses the term "union to refer only to Local 2187.

[*40]  It appears from his brief that plaintiff's "breach of contract" claim against the union is actually a claim for breach of the fiduciary duty plaintiff correctly argues a union owes to its members under the Labor Management Reporting and Disclosure Act ("LMRDA"). [12] The defendant argues just as correctly that the LMRDA does not apply to public employee unions. *See 29 U.S.C. § 402(e); Local 1498 American Federation of Government Employees v. American Federation of Government Employees, AFL-CIO, 522 F.2d 486, 490 (3d Cir. 1975).* Moreover, plaintiff has not shown that he was deprived of the Program Director position as a result of a denial of "the honest and faithful services of union officials." *See U.S. v. Boffa, 688 F.2d 919, 931 (3d Cir. 1982).*

> 12  Plaintiff does not dispute the union's contention that he has identified no right under the collective bargaining agreement which he was denied by the union in bad faith of a type necessary to show a breach of the duty of fair representation under state law. There also is no private cause of action for money damages under the LMRDA or state law for a breach of fiduciary duty to a member by a union. *See Building Material and Dump Truck Drivers, Local 240 v. Traweek, 867 F.2d 500, 506 (9th Cir. 1989); International Longshoremen's Assoc., AFL-CIO v. Spear, 995 F. Supp. 564, 1998 U.S. Dist. LEXIS 2025, 1998 WL 83684, *4 (E.D. Pa. 1998); Waklet-Riker v. Sayre Area Educational Association, 440 Pa. Super. 494, 656 A.2d 138, 141 (Pa. Super.), app. denied, 542 Pa. 674, 668*

*A.2d 1136 (Pa. 1995).*

[*41]  Plaintiff was not even a union member at the time the Civil Service Commission approved the amended specifications for Program Director to which the union purportedly should have objected. Moreover, the union had no authority to lodge an objection as Program Director was not a bargaining unit position. It is uncontroverted that plaintiff asked the union not to file a grievance during the time allowed under the collective bargaining agreement and that the union did assist him in filing a protest with the City under its personnel dispute procedures.

To sustain a claim for intentional interference with prospective contractual relations, a plaintiff must prove the existence of a prospective contractual relationship; conduct by the defendant undertaken for the purpose of harming the plaintiff by preventing the relationship from occurring; the absence of any privilege or justification; and, actual damage resulting from the defendant's conduct. *Advent Systems Ltd. v. Unisys Corp., 925 F.2d 670, 673 (3d Cir. 1991); Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 471 (Pa. 1979).* The "gravamen of this tort is the lost pecuniary benefits flowing from the contract." [*42]  *Pelagatti v. Cohen, 370 Pa. Super. 422, 536 A.2d 1337, 1343 (Pa. Super. 1987).* A plaintiff must show that absent the wrongful conduct of the defendant, there was an "objectively reasonable probability" a contract would have been formed. *Schulman v. J.P. Morgan Im. Management, Inc., 35 F.3d 799, 808 (3d Cir. 1994); Glenn v. Point Park College, 441 Pa. 474, 272 A.2d 895, 898-99 (Pa. 1971).* Plaintiff has not shown that there was a reasonable probability he would have been selected for the Program Director position, without regard to any conduct of the union.

To sustain his fraud claim, plaintiff must prove by clear and convincing evidence that the defendant fraudulently made a misrepresentation with an intent to induce plaintiff to act thereon; that plaintiff justifiably relied on the misrepresentation; and, that he sustained actual damages as a proximate result. *Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 731 (3d Cir. 1991); Gibbs v. Ernst, 538 Pa. 193, 647 A.2d 882, 889 (Pa. 1994).* Plaintiff contends that he was misled by the union into believing Ms. Scott would do a more thorough investigation regarding Mr. Scott's appointment and by Ms. Walton when she [*43]  wrote she would "get back

to" plaintiff in her letter of November 29, 1993. Plaintiff testified that Ms. Walton did contact him about five weeks later. In any event, he contends that the union induced or lulled him into not challenging the Program Director appointment more promptly.

Plaintiff's fraud claim is untenable. It is uncontroverted that a union shop steward timely encouraged plaintiff to initiate action over his grievance regarding the Program Director appointment and that plaintiff declined. It is uncontroverted that plaintiff told Ms. Scott he did not want any grievance filed by the union on his behalf during his probationary period. It is uncontroverted that Ms. Walton provided plaintiff with the information he requested about how to file an administrative complaint with the City. By the time of Ms. Scott's investigation, Ms. Walton's promise to "get back to" plaintiff and the expiration of his probation the time allowed by contract for filing a grievance had lapsed. Moreover, plaintiff cannot prove by a preponderance, let alone by clear and convincing evidence, that there was any realistic prospect of his becoming Program Director even if a timely grievance had been filed. [*44] Plaintiff has failed to produce evidence to sustain a finding of detrimental reliance on or actual damages caused by any statement or omission of the union, fraudulent or otherwise.

To sustain a civil conspiracy claim, a plaintiff must prove that two or more persons combined or agreed with the intent to commit an unlawful act or an otherwise lawful act by unlawful means; that they did so with malice or an intent to injure the plaintiff; that an overt act was done in furtherance of the objective of the conspiracy; and, that plaintiff was damaged as a result. *See Pierce v. Montgomery County Opportunity Bd., Inc., 884 F. Supp. 965, 974 (E.D. Pa. 1995); Thompson Coal Co., 412 A.2d at 472; Smith v. Wagner, 403 Pa. Super. 316, 588 A.2d 1308, 1311-12 (Pa. Super. 1991); Cohen v. Pelagatti, 364 Pa. Super. 573, 528 A.2d 657, 658 (Pa. Super. 1987).* "A claim for civil conspiracy can proceed only when there is a cause of action for an underlying act." *Caplan v. Fellheimer Eichen Braverman Kaskey, 884 F. Supp. 181, 184 (E.D. Pa. 1995).*

Plaintiff states that the conspirators include Mr.

Scott, Mr. Savitz, Mr. McNally, Mr. McAnally, Mr. O'Connor, Dr. Ross and Mayor Rendell. Plaintiff [*45] contends that the conspiracy essentially involved an agreement to amend without challenge by the union the specifications for the Program Director position. In his complaint plaintiff asserts that the objective of the conspiracy was intentionally to interfere with plaintiff's prospective contractual relations. In his brief, however, plaintiff appears to suggest that the objective was to deny him the Program Director position because of his race. In any event, plaintiff has failed to sustain his civil conspiracy claim against the union.

Plaintiff was not even employed by the City when the specifications were amended. No reasonable person could find that the specifications were amended with malice toward or a specific intent to injure plaintiff because of race or otherwise. As further noted, the union had no standing to object to the specifications for non-bargaining unit positions. Also as noted, one cannot reasonably find from the competent evidence of record that there was a realistic probability plaintiff would have been appointed as Program Director even if the specifications had not been amended.

### Conclusion

For the reasons set forth above, defendants are entitled [*46] to summary judgment on plaintiff's claims against them. Accordingly, the court has entered an order granting defendants' motions and entering judgment in their favor.

### ORDER

AND NOW, this 9th day of April, 1998, consistent with the court's order of March 31, 1998 granting defendants' Motions for Summary Judgment, **IT IS HEREBY ORDERED** that the attached memorandum opinion be filed and made a part of the record in this case.

BY THE COURT:

JAY C. WALDMAN, J.

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 14

FOCUS - 1 of 1 DOCUMENT

**BEVERLY CAMPBELL MCBRIDE, PAULETTE MARTIN, ROSE ANDERSON v. HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, LISA MALLOY and ELAINE THOMPSON**

**CIVIL ACTION NO. 99-6501**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2001 U.S. Dist. LEXIS 15115*

**September 21, 2001, Decided**
**September 24, 2001, Filed; September 25, 2001, Entered**

**DISPOSITION:** [*1] Motion GRANTED and JUDGMENT ENTERED for defendants.

**COUNSEL:** For BEVERLY CAMPBELL MCBRIDE, ROSE ANDERSON, PAULETTE MARTIN, PLAINTIFFS: MERRI R. LANE, MERRI R. LANE, P.C., CHERRY HILL, NJ USA.

For HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, LISA MALLOY, ELAINE THOMPSON, DEFENDANTS: BARBARA RITTINGER RIGO, KRISTINE GRADY DEREWICZ, LITTLER MENDELSON, PHILADELPHIA, PA USA.

**JUDGES:** JAY C. WALDMAN, J.

**OPINION BY:** JAY C. WALDMAN

**OPINION**

*MEMORANDUM*

**WALDMAN, J.**

**September 21, 2001**

**I.** *Introduction*

Plaintiffs have asserted claims pursuant to 42 U.S.C.

*§§ 1981* and *1985(3)* for discrimination and conspiracy to discriminate in employment decisions because of race, creating a hostile work environment and retaliation. Presently before the court is defendants' motion for summary judgment.

**II.** *Legal Standard*

In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986);* [*2] *Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 568 (3d Cir. 1986).* Only facts that may affect the outcome of a case are "material." *See Anderson, 477 U.S. at 248.* All reasonable inferences from the record must be drawn in favor of the non-movant. *See id. at 256.*

Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. *See J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)),* cert. *denied, 499 U.S. 921 (1991).* A plaintiff cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather must present evidence from which a jury could reasonably find in his favor. *See Anderson, 477 U.S. at*

248; *Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989);* [*3] *Woods v. Bentsen, 889 F. Supp. 179, 184 (E.D. Pa. 1995).*

### III. *Facts*

From the evidence of record, as uncontroverted or otherwise viewed in a light most favorable to plaintiffs, the pertinent facts are as follow.

Plaintiffs are three African American women who worked as assistants in the Occupational and Physical Therapy Department ("OT/PT") at the Hospital of the University of Pennsylvania ("HUP").

Plaintiff McBride worked at HUP from January 1995 until July 1998 when she requested and received a medical leave of absence which continued to November 19, 2000 when she resigned.

Plaintiff Anderson worked at HUP from October 1989 until August 1998 when she requested and received a medical leave of absence which continued to October 28, 1998 when she resigned. [1]

> 1   At some point during her employment in the OT/PT Department, Ms. Anderson requested and received a transfer to another department. She was unhappy in the new position and transferred back to the OT/PT Department.

Plaintiff [*4] Martin was interviewed and hired by defendant Malloy in June 1994. She worked until August 10, 1998 when she requested and received a medical leave of absence which continued to October 26, 1998 when she resigned.

Defendant Malloy was employed by HUP from 1993 to 1999. She began her career at HUP as a Clinical Specialist. She then became the Outpatient Unit Supervisor for the Physical Therapy Department and in June 1994 became the Ambulatory Care Coordinator. The Physical Therapy Department merged with the Occupational Therapy Department in June 1996, creating the OT/PT Department which was relocated to a facility at 37th and Market Streets. Ms. Malloy was promoted to Director of Ambulatory Services for the OT/PT Department. She left HUP in June 1999.

Defendant Thompson was employed by HUP from 1992 to 2000. She was Director of the Physical Therapy Department from 1992 to 1995. From 1995 to 1997 Ms. Thompson was a hospital director and from 1997 to 2000 she was the chief administrative officer for the trauma network.

Plaintiffs' duties included scheduling patients' physical therapy appointments, maintaining the gym area, including stocking supplies, and sometimes assisting patients [*5] on the therapy equipment. After the merger of the Occupational and Physical Therapy Departments and the relocation to the new facility, plaintiffs' responsibilities changed. Plaintiffs were all situated at the front desk of the reception area and were responsible for answering the telephones, scheduling patient appointments and greeting the incoming patients. The OT/PT Department hired an athletic trainer to perform the patient care duties and as a result, the plaintiffs' patient care responsibilities were terminated.

At times never specified, Ms. Anderson applied for other "clerk positions" and some "patient care positions" which she did not receive. No other details are provided. At unspecified times, Ms. McBride applied for a nursing assistant position in a department she could not recall and clerk positions in departments she could not recall except for one which was in the otolaryngology department. She testified that she went to Human Resources "all the time" to see what positions were available. Ms. Martin applied for various patient registrar positions. The only one she could recall was in gynecology.

Ms. Anderson acknowledged that Ms. Malloy did not want her to transfer [*6] because Ms. Malloy depended on her in the OT/PT Department. Ms. McBride testified that Ms. Malloy did not want her to transfer out of OT/PT because of the "good job" Ms. McBride did. When plaintiffs complained sometime in 1997 to Ms. Malloy about their classification and salary, she approved their promotion from Clerk II to Clerk III. Ms. Malloy believed plaintiffs would receive some retroactive pay as a result. When they complained to Ms. Malloy that they had not received such pay, she advised them that she was too busy to deal with the matter.

Plaintiffs assert that defendants Malloy and Thompson acted in concert to discriminate against them in filling these other positions because of race and took actions which created a racially hostile work environment. These actions included not allowing plaintiffs to all have lunch hours at the same time; not providing plaintiffs with voice mail on their office

telephones; [2] installation of a security camera in the front reception area where plaintiffs' desks were located; locking of the thermostat at a set temperature in the front reception area; [3] failure to provide a coat rack for plaintiffs; [4] and, a prohibition on leaving personal belongings [*7] in the front reception area. [5] Plaintiffs assert that they were forced to resign because of the resulting hostile working environment created by these allegedly discriminatory acts.

> [2] There was no voice mail on the front reception desk telephones during hours of operations. Therapists with direct lines did have telephones with voice mail.
>
> [3] At plaintiffs' request, the thermostat would be unlocked and the temperature adjusted by Bob LaBelle who maintained a key. Mr. LaBelle was not always available.
>
> [4] Employees in the back sometimes hung their personal coats on racks provided for lab coats.
>
> [5] Plaintiffs were provided with lockers but complained to Ms. Malloy that they were not large enough when Ms. McBride's and Ms. Martin's leather coats were torn. Ms. Malloy noted that the plaintiffs all wore black leather coats and said she would try to get larger lockers to accommodate them. Because Ms. McBride's leather coat was brown, she thought "maybe [Ms.Malloy] wasn't talking about the black leather jackets but us black women." Ms. McBride also perceived as racist Ms. Malloy's reference to a black patient as "crazy." This patient "kept calling and calling" to press a complaint about having to wait too long in the lobby before receiving attention.

[*8] Plaintiffs assert that Ms. Thompson denied them other positions, and Ms. Malloy denied them retroactive pay for the promotion they received from Clerk II to Clerk III, in retaliation for "complaining to [HUP's] Human Resource Department." At an unspecified time, Ms. McBride complained to Diane Allen at Human Resources about not receiving interviews for positions she had applied for. Ms. McBride did not recall what else she may have said to Ms. Allen but assumes she would "have said something about race" because "I know Diane Allen's husband was black." Ms. Anderson complained to Marilyn Caldwell at Human Resources about being treated unfairly by Ms. Malloy. There is no competent evidence of record that Ms.

Anderson was any more specific or ever related that the alleged unfair treatment was because of race. Ms. Anderson could not recall when, even by year, she spoke with Ms. Caldwell.

## IV. *Discussion*

### A. § 1981 Claim for Intentional Discrimination

To sustain a *§ 1981* discrimination claim, a plaintiff must show that the defendant intentionally discriminated against her because of race in the making, performance, enforcement or termination of a contract or for such reason [*9] denied her the enjoyment of the benefits, terms or conditions of the contractual relationship. *See Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609, 95 L. Ed. 2d 582, 107 S. Ct. 2022 (1987)*; *Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 385 (3d Cir. 1999)*; *Green v. State Bar of Texas, 27 F.3d 1083, 1086 (5th Cir. 1994)*; *Mian v. Donaldson, Lufkin & Jenrette Securities, 7 F.3d 1085, 1087 (2d Cir. 1993)*; *Williams v. Carrier Corp., 889 F. Supp. 1528, 1530 (M.D. Ga. 1995)*; *Flagg v. Control Data, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992)*.

The *McDonnell Douglas* analytic framework for Title VII claims also applies to employment discrimination claims under *§ 1981*. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*; *Patterson v McLean Credit Union, 491 U.S. 164, 186, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989)* (applying *McDonnell Douglas* framework to claims under *42 U.S.C. § 1981*); *Pamintuan, 192 F.3d at 385* (same); *Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997)* [*10] (same); *Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 112 (3d Cir. 1996)* (same).

The plaintiff has the initial burden of establishing a prima facie case of employment discrimination. *See McDonnell Douglas, 411 U.S. at 802*; *Pamintuan, 192 F.3d at 385*. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *See McDonnell Douglas, 411 U.S. at 802*; *Hampton, 98 F.3d at 112*. The plaintiff may then discredit the defendant's articulated reason and show that it was pretextual from which a factfinder may infer that the real reason was discriminatory or otherwise present evidence from which one reasonably could find that unlawful discrimination was more likely than not a determinative cause of the adverse employment action.

*Id. at 112-3.*

To discredit a legitimate reason proffered by the employer, a plaintiff must present evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in that reason that one could rationally conclude it is incredible and unworthy [*11] of credence, and ultimately infer that the employer did not act for the asserted non-discriminatory reasons. *See Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).* The ultimate burden of proving that a defendant engaged in intentional discrimination remains at all times on the plaintiff. *See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 508, 113 S. Ct. 2742, 125 L. Ed. 2d 407.*

To establish a prima facie case of racial discrimination in the circumstances presented, a plaintiff must show that plaintiff belongs to a racial minority; that plaintiff applied and was qualified for a position for which the employer was seeking applicants; that plaintiff was rejected; and, that thereafter, the position was filled by another or remained open while the employer continued to seek applications from persons of plaintiff's qualifications. *See McDonnell Douglas, 411 U.S. at 802.*

Plaintiffs are members of a racial minority. Plaintiffs, however, have failed to show that they applied for any position which was filled by another with comparable or lesser qualifications, or that they were qualified for any position for which they did apply.

Ms. Anderson, an outpatient clerk at level two, claims that she applied [*12] for another clerk position which was given to someone else. There is no showing, however, that she was qualified for the level five inpatient position that she applied for. [6]

> 6  Plaintiff Anderson acknowledged that on one occasion she applied for and received a transfer to a desired position.

Ms. McBride testified that she applied for several clerk positions outside of the physical therapy department and never received an interview. She cannot recall which positions she applied for. She provides no evidence that any such position was filled with a person of comparable or lesser qualifications. An employer is not required to interview every applicant for a position. A mere failure to receive an interview is not sufficient to establish a prima facie case of intentional discrimination.

Ms. Martin states she applied for several patient registrar positions and only received one interview. Ms. Martin never asked why she did not get the position. She was simply told it was given to somebody else. Ms. Martin provides [*13] no evidence that the position was given to someone with comparable or lesser qualifications than hers. Indeed, she acknowledges that one position was filled by someone with a degree that Ms. Martin did not have.

That plaintiffs may have been qualified for positions within HUP filled by others, even others less qualified, would not satisfy the second requirement of a prima facie case that plaintiffs *applied* for and were qualified for particular positions. In response to defendants' argument that plaintiffs have provided no evidence they applied for other positions, plaintiffs state only that defendant HUP failed to provide notice of new positions. It appears, however, from Ms. McBride's testimony that she went to Human Resources "all the time" to see what positions were available that HUP did not withhold or obscure such information.

Plaintiffs assert that there is rarely direct evidence of discriminatory motive. This may be true, however, plaintiffs have failed to produce any evidence, direct or indirect, to demonstrate that defendants intentionally discriminated against them on the basis of race. [7] Indeed, there is no competent evidence of record that Ms. Malloy or Ms. Thompson [*14] had authority to place any plaintiff in any position for which she did apply or were involved in the pertinent decisionmaking.

> 7  One cannot reasonably or objectively find in context that Ms. Malloy's observation about black leather coats or characterization of a persistent complaining patient as "crazy" evince racial animus.

Conclusory assertions of discrimination are insufficient to raise an issue of material fact. *See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).* A prima facie case of discrimination cannot be established by conjecture or speculation. *See Bray v. L.D. Caulk Dentsply Int'l, 2000 U.S. Dist. LEXIS 11062, 2000 WL 1800527, *5 (D. Del. July 31, 2000).*

**B. *§ 1981* Hostile Work Environment Claim**

To sustain a racially hostile work environment claim, a plaintiff must prove that she suffered intentional

discrimination because of her race; the discrimination was pervasive and regular; the discrimination detrimentally affected her; the discrimination would detrimentally affect a reasonable [*15] person in the same position; and, respondeat superior liability. *See Andrews*, 895 F.2d at 1482; *Lanzot v. Sacred Heart Healthcare Sys.*, *2001 U.S. Dist. LEXIS 11009, 2001 WL 872685*, *4 (E.D. Pa. July 5, 2001).

An employer is subject to liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate, or successively higher, authority over the employee. *See Faragher v. City of Boca Raton, 524 U.S. 775, 808, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)*. When no tangible adverse employment action is taken, a defending employer may raise an affirmative defense that it exercised reasonable care to prevent and correct promptly any harassing behavior and that the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or otherwise to avoid harm. *See Id.*

A hostile work environment exists when a workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)*. [*16] *See also Kohn v. Lemmon Co., 1998 U.S. Dist. LEXIS 1737, 1998 WL 67540*, *4 (E.D. Pa. Feb. 19, 1998)*. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment is not actionable. *See Harris, 510 U.S. at 21*; *Kohn*, 1998 WL 67540, *4. Incidents of harassment are pervasive if they occur in concert or with regularity. *See Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)*.

In determining whether a work environment is hostile or abusive, the pertinent factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; [and] whether it unreasonably interferes with an employee's work performance." *Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001)* (quoting *Harris, 510 U.S. at 23*).

Defendants assert that the security camera was installed as a safety measure for the protection of the front desk employees and to record anyone who harmed

the employees to aid the police in apprehending the assailant. Plaintiffs have produced no evidence to show that the placement [*17] of the security cameras in the front lobby was for any reason other than security.

The only evidence proffered that the thermostat in the front waiting area was pre-set and locked because of plaintiffs' race is Ms. McBride's testimony that "most black people, by nature, are cold most of the time and most Caucasian people that I know are more warm-blooded" and thus she was were more comfortable with a warm temperature. Plaintiffs have presented no competent evidence to refute defendants' assertion that the thermostat was locked to control sharp fluctuations in temperature which had resulted when persons in the waiting area variously complained that it was too warm or too cold. Plaintiffs Anderson and McBride acknowledged that at plaintiffs' request, the thermostat would be unlocked by Bob LaBelle to adjust the temperature. Moreover, there is no evidence that the thermostat was set at an unusually low temperature, and no evidence to support a conclusion that the thermostat was locked as an act of intentional racial discrimination.

The only evidence proffered that plaintiffs' lunch hours were staggered in half hour increments for racial reasons is Ms. McBride's statement that she perceived [*18] this as a reversion "to slavery days" when "they never wanted African Americans to talk to each other because that means divide us and you can conquer us." It is uncontroverted that plaintiffs were the only employees who covered the reception area. Ms. Malloy avers that plaintiffs were unable to all take lunch together because someone always had to be available to answer the phones and interact with the patients as they entered the facility. Plaintiffs have presented no competent evidence to show that this was not the true reason or otherwise that lunch schedules were racially motivated. That other employees with different responsibilities may have been able to take lunch together is irrelevant.

There is no competent evidence that plaintiffs were not permitted to leave their personal belongings at the front desk or were required to keep their pocketbooks and coats in a locker for reasons of race. That professional staff in the back area may have put purses in their desks or placed coats on hooks in the professional offices for lab coats is simply not probative in connection with rules regarding security and appearances at the front desk and reception area.

Plaintiffs have presented [*19] no competent evidence from which one could find they did not receive voice mail on their telephones for reasons of race. They have presented no competent evidence to refute Ms. Malloy's testimony that there was no voice mail during hours of operation on the telephone lines covered by plaintiffs because all calls had to be handled as they came in and that the professional staff in the back offices had voice mail because there was no one to answer their direct lines when they were away from their desks.

Plaintiffs also suggest that racism may be inferred from their having to sit together and being physically separated from the other white employees in the OT/PT Department. This is fatuous. Plaintiffs performed reception functions at the front desk while the physical therapists and others in the department worked with the patients in the back area. [8]

8   At least one of the physical therapists, Nicole Holder, was African American.

A reasonable factfinder could not conclude from the competent evidence of record [*20] that plaintiffs were subjected to intentional racial discrimination, let alone on a regular and pervasive basis. *See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996).* Even assuming the acts complained of were racially motivated, they clearly did not 0reate an abusive working environment. *See Weston, 251 F.3d at 426.* Placing a security camera at the reception area of a busy urban hospital, pre-setting a thermostat, staggering lunch hours of those assigned to the reception area and requiring that personal belongings be secured were not remotely threatening, humiliating or disruptive to plaintiffs' work performance and would not detrimentally affect any reasonable person in the same position.

### C. *§ 1981* Retaliation Claim

A retaliation claim is also cognizable under *§ 1981.* *See Kohn*, 1998 WL 67540, *5. To make out a prima facie case of retaliation, a plaintiff must show that she engaged in protected conduct; the employer took adverse action against her; and, there was a causal link between the protected conduct and the adverse action. *See Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)*; [*21] *Twyman v. Dilks, 2000 U.S. Dist. LEXIS 12942, 2000 WL 1277917, *8 (E.D. Pa. Sept. 8, 2000).*

Plaintiffs claim that after complaining to HUP's Human Resources Department and Ms. Thompson about poor treatment by Ms. Malloy, they did not receive promotions or transfers from Ms. Thompson and were denied retroactive pay by Ms. Malloy for promotions they did receive from Clerk II to Clerk III.

Protected activity includes formal charges and informal complaints of unlawful discrimination to management. *See Abramson v. William Paterson College, 260 F.3d 265, 287-88 (3d Cir. 2001) EEOC v. L.B. Foster Co., 123 F.3d 746, 754 (3d Cir. 1997); Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)* (same). Expressions of dissatisfaction and grievances about working conditions, however, are not protected activity. *See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 n.4 (3d Cir. 1997); Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995).* There is no competent evidence of record that any plaintiff related a complaint to anyone at HUP to racial discrimination. The closest thing to such evidence is [*22] the testimony of Ms. McBride, who said "I don't recall" if I complained of racial discrimination, that she assumes she must "have said something about race" to Diane Allen because "I know [her] husband was black." This kind of assumption is not evidence.

Further, even if there were competent evidence of protected activity, there has been no showing of a causal link between plaintiffs' complaints and the allegedly retaliatory acts.

Plaintiffs provide no dates and there is otherwise no evidence of when they made complaints to Human Resources. In the absence of a pertinent time line, one cannot reasonably infer that Ms. Thompson declined to promote or transfer plaintiffs because of any complaints to Human Resources. [9] There is no competent evidence that Ms. Thompson had authority to promote or transfer plaintiffs at the pertinent time. Ms. Thompson was not connected to the OT/PT Department after 1995.

9   Plaintiffs incorrectly assert that Ms. Thompson was the Director of Human Resources. It is uncontroverted on the evidence that Ms. Thompson never held this position or any other position with Human Resources.

[*23] There is no competent evidence of record that Ms. Malloy promised or could have provided the retroactive pay sought by plaintiffs. Moreover, there is no

competent evidence of record that Ms. Malloy ever knew plaintiffs had complained about her. When plaintiffs complained to Ms. Malloy about their classification and salary, she approved a reclassification to Clerk III. It was Ms. Malloy's "understanding and belief that [plaintiffs] received retroactive pay increases" as a result of the reclassification. There is no evidence that she could ensure such pay or interfered with any plaintiff receiving it.

Plaintiffs state that when they complained to Ms. Malloy that they had not received retroactive pay, she said she was too busy to address the matter. There is no evidence that Ms. Malloy was not in fact busy with more pressing matters at the time and no evidence that plaintiffs were prevented from pursuing the retroactive pay issue directly with Human Resources or the Payroll Office.

**D. § 1985(3) Conspiracy Claim**

To sustain a claim of conspiracy under *§ 1985(3)*, a plaintiff must prove the existence of a conspiracy, motivated by racial discriminatory animus, for the purpose [*24] of depriving a person

or class of persons of the equal protection of the law or equal privileges and immunities under the laws, and an act in furtherance of the conspiracy whereby a person is injured. *See United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott, 463 U.S. 825, 829, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983). See also Jackson, 2000 U.S. Dist. LEXIS 6210, 2000 WL 562741, *5; Armstrong v. School Dist., 597 F. Supp. 1309, 1313 (E.D. Pa. 1984).*

Plaintiffs have failed to provide competent evidence from which one could reasonably find that Ms. Malloy or Ms. Thompson engaged in any racially discriminatory acts, let alone that they conspired to do so. There is no competent evidence to show an agreement or that the conduct complained of involved concerted action by these defendants. [10]

> [10] Although not argued by defendants, it appears that this claim may suffer from an even more fundamental deficiency. There is no showing or suggestion that HUP is not a private entity or that Ms. Thompson or Ms. Malloy were state actors. *See*, e.g., *Wells v. Thomas, 569 F. Supp. 426, 428 n.1 (E.D. Pa. 1983).* To sustain a *§ 1985(3)*

deprivation claim for a private conspiracy, a plaintiff must show that the conspirators intended to deprive her of a right protected by the Constitution against private infringement. *See Brown v. Philip Morris, Inc., 250 F.3d 789, 805 (3d Cir. 2001); Libertad v. Welch, 53 F.3d 428, 446-47 (1st Cir. 1995); Welch v. Board of Dir. of Wildwood Golf Club, 877 F. Supp. 955, 958-59 (W.D. Pa. 1995).* The Supreme Court has recognized only two such rights, the right against involuntary servitude and the right to interstate travel. *See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 278, 122 L. Ed. 2d 34, 113 S. Ct. 753 (1993).*

[*25] **V. CONCLUSION**

If there is evidence to support plaintiffs' claims, they have failed to adduce or produce it. Subjective perceptions, contrived or strained interpretations, suppositions and sheer speculation are not competent evidence.

One cannot reasonably conclude from the record presented to the court that any plaintiff applied for a position which was given to someone else with comparable or lesser qualifications. One cannot reasonably conclude from the record that the acts which purportedly constitute a hostile work environment were abusive, would detrimentally affect a reasonable person similarly situated or resulted from intentional racial discrimination. One cannot reasonably find that any plaintiff was a victim of retaliation. One cannot reasonably find from the record that Ms. Thompson or Ms. Malloy engaged in any act of intentional race discrimination, or that they entered into a conspiracy to deprive any plaintiff or a secured right.

Defendants are entitled to summary judgment. Their motion will be granted. An appropriate order will be entered.

***ORDER***

**AND NOW,** this 21st day of September, 2001, upon consideration of defendants' Motion for Summary [*26] Judgment (Doc. # 12) and plaintiffs' response thereto, consistent with the accompanying memorandum, **IT IS HEREBY ORDERED** that said Motion is **GRANTED** and accordingly, **JUDGMENT is ENTERED** in the above action for the defendants.

2001 U.S. Dist. LEXIS 15115, *26

**BY THE COURT:**                         **JAY C. WALDMAN, J.**

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 15

LEXSEE 2000 U.S. DIST. LEXIS 14653

**MARGARET MCKAY, Plaintiff, v. DELAWARE STATE UNIVERSITY, DR. WILLIAM B. DeLAUDER, HENRY TISDALE, DR. JOHNNY TOLLIVER, DR. TOSSIE TAYLOR, AND DR. WILLIAM FLAYHART, Defendants.**

**Civ. A. No. 99-219-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2000 U.S. Dist. LEXIS 14653*

**September 29, 2000, Decided**

**NOTICE:** [*1] FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendants' motion for summary judgment denied in part and granted in part.

**COUNSEL:** For Plaintiff: Laurence V. Cronin, Esquire, Smith, Katzenstein, & Furlow, Wilmington, Delaware.

For Plaintiff: Mark B. Frost, Esquire, Of Counsel, Frost & Zeff, Philadelphia, Pennsylvania.

For Defendants: John D. Balaguer, Esquire, Marc S. Casarino, Esquire, White & Williams, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, Chief Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

Dated: September 29, 2000

Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

Plaintiff Dr. Margaret McKay filed this action on April 7, 1999 against defendant Delaware State University [1] ("DSU"), its President, Dr. William B. DeLauder ("DeLauder"), its Vice President of Academic Affairs until 1994, Henry Tisdale ("Tisdale"), its Dean of the School of Arts and Sciences, Dr. Johnny Tolliver ("Tolliver"), its Vice President of Academic Affairs from 1994 to 1996, Dr. Tossie Taylor ("Taylor"), and Chairman of its History, Political Science and Philosophy Department, Dr. William Flayhart ("Flayhart"). Plaintiff alleges disparate treatment, discriminatory [*2] discharge and retaliation under *42 U.S.C. §§ 1981, 1983* and *1985*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.*, the Age Discrimination in Employment Act and the Delaware Discrimination in Employment Act. [2] Plaintiff also alleges breach of contract, civil conspiracy and violation of the Delaware Constitution. (D.I. 22) The court has jurisdiction over plaintiff's federal claims pursuant to *28 U.S.C. §§ 1331* and *1343*. The court has supplemental jurisdiction over plaintiff's state claims pursuant to *28 U.S.C. § 1367*. Currently before the court is defendants' motion for summary judgment on all counts of the complaint. (D.I. 74) For the reasons that follow, the court will grant in part and deny in part defendants' motion for summary judgment.

1   Prior to the fall of 1993, DSU was known as Delaware State College.
2   Plaintiff filed an Amended Complaint on September 13, 1999 in which she added claims under the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and the Delaware Discrimination in Employment Act. (D.I. 22)

[*3] **II. BACKGROUND**

This is a case of alleged employment discrimination brought by a former tenured professor against DSU and several members of its administration and faculty in their individual and official capacities. Plaintiff contends that she was discriminated against based on her race, gender, age and perceived disability in connection with her performance as a faculty member, her repeated requests for promotion and tenure, and her ultimate dismissal from DSU. In order to assess plaintiff's claims, a review of the facts is necessary.

## A. The Early Years of Employment

Plaintiff is a 71-year old Caucasian female. She was first employed in August 1983 as an Assistant Professor of Political Science by DSU, a predominantly African-American educational institution. Shortly after arriving at DSU, plaintiff received critical evaluations from her peers. On October 25, 1983, Associate Professor of Political Science Dr. Joseph Spina ("Spina") expressed his "extreme . . . disappointment" in plaintiff's performance, including her failure to begin developing the Political Science Internship Program ("Internship Program"), neglect in preparing a requested brochure for the Political [*4] Science curriculum, and her failure to post office hours and to spend sufficient time on campus. (D.I. 75 at A1) Spina also noted that the two classes plaintiff taught, Introduction to Political Science and Contemporary Political Ideologies, covered the same subject matter, and students had complained about plaintiff's disorganized teaching methods. (D.I. 75 at A2) Plaintiff received similar critical evaluations from Flayhart and Dr. James Valle ("Valle"), the Department Chair at that time. (D.I. 75 at A4-A10) Valle placed plaintiff on probationary status and postponed a recommendation for reappointment until the next scheduled evaluation in light of plaintiff's short time at DSU. (D.I. 75 at A10) In an October 31, 1983 letter, Valle informed plaintiff of the negative evaluation and provided her with suggestions on how to correct the deficiencies. [3] (D.I. 75 at A11)

> 3  Valle also informed plaintiff that "some of our disquiet is clearly rooted in intangible eccentricities of behavior, missed and cancelled appointments, apparent inability to grasp the importance of the cooperative efforts we are asking of you, bare minimum adherence to office hours, and a general lack of the professional maturity and self-starting abilities that we had

expected of a person of your experience and qualifications." (D.I. 75 at A12)

## [*5] B. Promotion to Associate Professor and First EEOC Complaint

In the fall of 1985, plaintiff sought promotion from Assistant to Associate Professor. On November 15, 1985, the Promotion and Tenure Committee of the History and Political Science Department ("Tenure Committee") recommended plaintiff for promotion to Associate Professor. In its report, the Tenure Committee, composed of Valle, Spina, Flayhart, and Chairman Dr. John Gardner ("Gardner"), noted that plaintiff is "willing to work with students far beyond her required office hours," "unusually vigilant in enforcing academic standards on such matters as plagiarism," "quite innovative in her teaching methods," and "interacts with her colleagues [and is] well-liked by members of the department." (D.I. 75 at A37-38) However, the Tenure Committee also cited three weaknesses: plaintiff's need to publish, her lack of organizational ability in the classroom, and her need to pursue long-term projects such as the Internship Program. (D.I. 75 at A38) The Tenure Committee concluded that plaintiff's strengths "substantially outweighed" her weaknesses and thus recommended her for a promotion. (*Id.*) Despite this recommendation, [*6] plaintiff's application for promotion was rejected by the DSU Board of Trustees in the spring of 1986 because of the negative teaching evaluations in her file. (D.I. 75 at A40)

Plaintiff reapplied for promotion in the fall of 1986. On November 10, 1986, plaintiff filed an EEOC complaint against DSU alleging age and sex discrimination in connection with the denial of her 1985 application. (D.I. 75 at A41) On November 14, 1986, then-Department Chair Dr. James Hartnett ("Hartnett") and the Department Personnel Committee ("Personnel Committee") consisting of Flayhart, Gardner and Spina, recommended plaintiff for promotion to Associate Professor pursuant to her 1986 request. (D.I. 75 at A43) The Board of Trustees agreed and promoted plaintiff to Associate Professor beginning on September 1, 1987. (D.I. 75 at A44)

In July of 1987, plaintiff added the charge of race discrimination to her EEOC complaint, alleging that some of her black colleagues had received tenure or promotion even while having negative evaluations in their files or not fulfilling the necessary requirements. (D.I. 75 at A46) On November 27, 1987, the EEOC

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 138 of 218

Page 3
2000 U.S. Dist. LEXIS 14653, *6

issued its decision on the complaint, finding no evidence of discrimination [*7] surrounding the denial of plaintiff's 1985 request for promotion. [4] (D.I. 75 at A54) This decision was later upheld by the EEOC upon review. (D.I. 75 at A57)

> 4    The EEOC found that during the same academic year, four others were considered for promotion: two black females over age 40 were promoted; one white male much younger than plaintiff was denied promotion for reasons of merit; and one white female under 40 was denied a promotion on technical grounds but was later granted the promotion on appeal. (D.I. 75 at A53-54)

## C. Tenure Application, First Federal Lawsuit and Second EEOC Complaint

In the fall of 1987, plaintiff applied for tenure. The Personnel Committee recommended that plaintiff be denied tenure, as did Hartnett, who cited plaintiff's lack of organizational ability [5] and combative temperament. (D.I. 75 at A52) Similarly, the Tenure Committee voted not to recommend plaintiff for tenure because of deficiencies in teaching and scholarly publication. [6] (D.I. 75 at A58) In response, plaintiff [*8] submitted a lengthy statement to Tisdale, who was then Vice President and Dean of Academic Affairs, rebutting the negative evaluation by Hartnett. [7] (D.I. 75 at A60) On June 9, 1988, an Ad Hoc Appeals Committee of plaintiff's peers ("Appeals Committee") voted to uphold the Tenure Committee's decision not to recommend her for tenure. [8] (D.I. 75 at A76) On July 7, 1988, the DSU Board of Trustees rejected plaintiff's tenure application. (D.I. 75 at A77)

> 5    Specifically, Hartnett referred to problems with students due to lack of communication and classroom organization, poor handling of the Internship Program, and failure to meet deadlines in administrative matters, such as textbook orders and submission of course syllabi. (D.I. 75 at A51-52)
>
> 6    The Tenure Committee specifically referred to Section 8.5.2a of the DSU Collective Bargaining Agreement ("CBA"), which states in part, "Competence in teaching is an absolute necessity for promotion or tenure," and Section 8.5.2b of the CBA, which states in part, "Publication of scholarly books, monographs, and articles in publications recognized by and within the discipline . . . are worthy of professional recognition." (D.I. 75 at A59)

[*9]

> 7    Plaintiff claimed that Hartnett directly contradicted his March 1987 chair evaluation, in which he gave plaintiff high scores in these areas. (D.I. 75 at A60)
>
> 8    The Appeals Committee, however, noticed many "disturbing" administrative factors, including a lack of department leadership to make plaintiff formally aware of inadequacies, poor counseling to assist plaintiff in remedying any deficiencies, an unwillingness by the Personnel Committee to share its reasons for a negative recommendation, and a conflict between written and verbal recommendations by the chair and faculty. (D.I. 75 at A76)

Meanwhile, on March 18, 1988, plaintiff filed a pro se lawsuit in federal court against DSU and several administrators and professors, claiming discrimination based on race, age and sex surrounding plaintiff's 1985 request for promotion. (D.I. 75 at A67) On February 2, 1989, plaintiff voluntarily withdrew the lawsuit. (D.I. 75 at A101) Plaintiff also filed a union grievance under the CBA regarding her denial of tenure. (D.I. 75 at A71)

In June 1988, plaintiff filed a second EEOC complaint, alleging [*10] that she was denied tenure in retaliation for filing her first EEOC complaint. (D.I. 75 at A78) The EEOC found this complaint also to be without merit. [9] (D.I. 75 at A79)

> 9    The EEOC determined that during the year in which plaintiff applied for tenure, there were eleven applicants for tenure, and only three, all white females and two over the age of 40, were granted tenure. Those who did not get tenure included 4 blacks and 3 whites (including plaintiff), and ten of the eleven were over age 40. (D.I. 75 at A79)

On January 9, 1989, plaintiff wrote a letter to President DeLauder requesting an alternate evaluation panel due to the allegedly "prejudicial" nature of the Personnel Committee. (D.I. 75 at A84) Plaintiff requested guidance on how to remedy the situation of "silence" from the Dean, "inactivity" from the Chair, and "hostility" from the Personnel Committee. (D.I. 75 at A84) On March 21, 1989, the Personnel Committee's

vote on whether to recommend plaintiff for reappointment resulted in a tie, but Department [*11] Chair Frederick Lauter supported reappointment so plaintiff remained on the faculty. [10] (D.I. 75 at A88)

> 10    Valle and Flayhart submitted negative evaluations, to which plaintiff offered rebuttal statements. Plaintiff characterized Valle's criticisms as conclusory, vague and in contradiction of good evaluations he gave her in prior years. (D.I. 75 at A90-93) Plaintiff also stated that her request for clarification from Valle was met with a repeat of the vague criticisms he already submitted. (D.I. 75 at A90) Plaintiff directly contradicted most of Flayhart's account of the class that he evaluated and attributed his criticisms to "the inappropriateness of having a historian assess the pedagogical and disciplinary substance of a political scientist's work." (D.I. 75 at A94)

**D. Second Federal Lawsuit**

In April 1989, plaintiff filed a second pro se lawsuit alleging discrimination in connection with the denial of her application for tenure. This lawsuit was dismissed in October of that year. (D.I. 75 at A103) [*12] On November 3, 1989, DeLauder found that technical procedural violations occurred in plaintiff's tenure review, so he ordered the process to be repeated in the fall of 1990. [11] (D.I. 75 at A105) Plaintiff's Union appealed this decision to binding arbitration as provided for in the CBA, but subsequently withdrew its request for arbitration. (D.I. 75 at A107) Plaintiff reapplied for tenure in 1991 and received it in 1992. (D.I. 78 at B112)

> 11    DeLauder determined that the chairperson's evaluation was not provided in a timely fashion, the Tenure Committee chairperson did not notify plaintiff that the file was in the office and it contained negative comments, and the Department did not develop criteria for promotion or tenure prior to considering all applications that year. (D.I. 75 at A105)

**E. Initial Applications for Promotion to Full Professor**

In the fall of 1992, plaintiff applied for promotion to full professor. The Personnel Committee (Department Chair Valle, Flayhart and Professor Jean Smith) supported [*13] the application, as did the Tenure Committee. (D.I. 75 at A110-A111) However, neither the Acting Dean of the School of Arts and Sciences, Warren Rhodes, nor Tisdale recommended plaintiff for promotion. [12] (D.I. 75 at A112, A116) On March 21, 1994, plaintiff's request for promotion was rejected by DeLauder, who cited lack of an "outstanding record in both teaching and research." (D.I. 75 at A118)

> 12    Rhodes specifically cited plaintiff's deficiency in scholarly publication. (D.I. 75 at A112)

Plaintiff applied again for promotion in the fall of 1993 and was again recommended by the Personnel Committee. (D.I. 75 at A119) Flayhart disagreed because of deficiencies in research, stating that "failure to provide specific evidence of this has blocked consideration for promotion for other members of the faculty." (D.I. 75 at A120) Although the Appeals Committee recommended promotion, the Tenure Committee, Tolliver and DeLauder agreed with Flayhart, and plaintiff was not promoted to professor that year. It was also at [*14] this time that Flayhart recommended plaintiff for an award for meritorious research for the 1992-93 academic year and, as a result, plaintiff was given a salary increase. (D.I. 75 at A122-A123)

Plaintiff applied for promotion to full professor again in fall 1995. The Personnel Committee supported her promotion, [13] as did the Appeals Committee upon review, but the Tenure Committee, Flayhart, Tolliver, Taylor and DeLauder disagreed, once again citing a lack of outstanding research. (D.I. A128-A139) On May 21, 1996, Flayhart sent plaintiff a memo explaining his reasons for not recommending her, specifically, his view that the CBA requirement of outstanding research for promotion refers to articles that are already published, not articles that are merely accepted for publication, like those plaintiff cited in her application. (D.I. 75 at A135)

> 13    The Personnel Committee lauded plaintiff's strengthening of the political science curriculum, especially as Pre-Law and Internship Coordinator, her "stimulating and challenging" teaching, her research that has led to "widespread professional recognition" and her "extensive" community involvement. (D.I. 75 at A128)

[*15] In June of 1995, plaintiff was awarded a parity salary increase, and on January 16, 1996, plaintiff was awarded professional development funds in support

of her project, "Sexual Harassment in the Workplace." (D.I. 75 at A132, A138)

**F. The Internship Program and Union Grievances**

Since the fall of 1993, Flayhart periodically encouraged plaintiff to accelerate development of the Internship Program. (D.I. 75 at A140-A145) In particular, Flayhart requested plaintiff to place an intern in Senator Biden's Washington office, which she was unable to do because of the expense of living in Washington and time that the intern would spend away from school. (D.I. 78 at B103) In the fall of 1995, Flayhart permitted a student who was the grandson of a former president of DSU to retroactively receive Internship Program credit for a summer internship, and plaintiff rejected this arrangement as against the policy of the Internship Program. (D.I. 75 at A146, D.I. 78 at B123) On November 28, 1995, Flayhart requested that all student files be submitted to him by the following day for review. (D.I. 75 at A147) Plaintiff failed to do this [14] and Flayhart removed her as director of the Internship [*16] Program on November 29, 1995. (D.I. 75 at A148)

14 Plaintiff alleges that upon receipt of the request for the documents, she sought guidance from the DSU grievance officer, who suggested that plaintiff ask for clarification of Flayhart's request. Plaintiff claims she sent a memorandum to Flayhart, but was removed from her position the next day and never received a response. (D.I. 78 at B125)

Flayhart then requested plaintiff to provide him with all grades for students in the Internship Program, and plaintiff did so in a memorandum in which she addressed herself as "Internship Coordinator." (D.I. 75 at A150) On January 2, 1996, Flayhart sent a letter to the DSU Office of Records stating that he was the only professor authorized to enter grades for the Internship Program and that "illegal" grades had been recorded into the system by plaintiff. [15] (D.I. 75 at A152)

15 According to Flayhart, plaintiff submitted grades for her students as well as students supervised by other professors. (D.I. 75 at A174) These grades were inconsistent with those she provided to Flayhart. (D.I. 75 at A155) Plaintiff alleges that other professors supervised interns while she was on sabbatical and would expect her to submit grades for those students when she

returned. (D.I. 78 at B119-120)

[*17] In April 1996, plaintiff filed two union grievances over her removal as Internship Director and her claim that Flayhart substituted grades. These grievances were denied at both levels of review. (D.I. 75 at A158-159) In October of 1996, the Union's Executive Committee denied plaintiff's request to advance the grievances to arbitration. (D.I. 75 at A161)

**G. Annual Reports, Student Complaints and Alleged Verbal Abuse**

DSU publishes annual reports in which department chairs list the achievements and development of their academic programs and faculty. Plaintiff alleges that Flayhart included false statements in the Department's annual reports, including that plaintiff was very ill during the 1993-1994 academic year which resulted in many incomplete grades, cancellation of over one-third of her classes, and numerous student complaints. [16] (D.I. 78 at B301, B306) Flayhart also included that plaintiff was removed as Internship Director and resigned as Pre-Law Advisor, and characterized her grants and research from Queen's University in Ireland as not recognized by DSU. (D.I. 78 at B306, B310)

16 In his deposition, Gardner states that he did not recall plaintiff having any more student complaints than her peers. (D.I. 78 at B57)

[*18] Plaintiff also alleges that Flayhart publicly berated her on several occasions. For instance, plaintiff claims that Flayhart ordered her to alphabetize the law catalogs, a job she felt was appropriate for a student worker, scolded her for cancelling a field trip at which only one student showed up, and humiliated her during departmental meetings by criticizing her for raising issues for discussion. (D.I. 78 at B185, B193, B298) Plaintiff described Flayhart's "pattern of discrimination, harassment and deliberate interference with [her] professional responsibilities" in a letter to DeLauder on December 18, 1996. [17] (D.I. 78 at B431) These alleged events were also brought to the attention of Tolliver and the DSU Affirmative Action Officer, Drexel Ball. (D.I. 78 at B434, B453)

17 In addition to the aforementioned incidents, plaintiff described Flayhart's refusal to recommend her for merit pay two years in a row (while recommending her peers), improperly

informing personnel of her sick days when she was not sick, forcing her to teach an overload of courses in order to accommodate his administrative error, scolding her in front of her students, refusing to meet with her to discuss his evaluations of her performance, demanding that she pay for incoming fax usage while not requiring her peers to do the same, and refusing to honor her requests for course preferences while doing so for other faculty members. (D.I. 78 at B431-432)

[*19]  **H. 1996 Request for Promotion to Full Professor**

Plaintiff applied again for promotion to Professor in fall 1996. As part of the application process, classroom evaluations were performed by plaintiff's peers. Although the evaluations by Dr. Samuel Hoff ("Hoff") and Gardner were favorable, Flayhart gave the plaintiff very low scores and did not recommend her for tenure, promotion or reappointment on the faculty. (D.I. 75 at A164) This evaluation was never placed in plaintiff's tenure file. (D.I. 75 at A192)

On October 9, 1996, the Personnel Committee recommended plaintiff for promotion, but without notice of Flayhart's negative recommendation. (D.I. 78 at B381) On October 14, 1996, Flayhart wrote to both the Tenure Committee and Tolliver, recommending against promotion. (D.I. 75 at A183)

On October 16, 1996, Flayhart met with the Union to discuss pending grievances, and the next day he composed two letters -- one to plaintiff and one to DeLauder -- outlining his intention to seek plaintiff's dismissal. (D.I. 75 at A172, A175) After consultation with the DSU attorney, however, the letters were never sent. (D.I. 75 at A178)

On November 20, 1996, the Tenure Committee informed [*20] plaintiff that it had voted not to recommend her for promotion. (D.I. 75 at A191) The Appeals Committee upheld the decision, and Tolliver agreed. (D.I. 75 at A193)

In late January 1997, DeLauder determined that certain procedural violations had occurred in plaintiff's 1996 promotion application process, [18] so he directed Flayhart to meet with plaintiff and review his classroom evaluation with her and then for the Tenure Committee to

reconsider the matter. [19] (D.I. 75 at A196) On March 4, 1997, plaintiff and Flayhart met for 1.5 hours to discuss the evaluation pursuant to DeLauder's request, and plaintiff subsequently expressed her dissatisfaction with the meeting and the entire process to the Union President and DSU's Contract Administrator. (D.I. 75 at A218) On April 10, 1997, plaintiff provided the Tenure Committee with a lengthy rebuttal to Flayhart's evaluation, repeatedly stating that his criticisms lacked "specific, concrete details." (D.I. 75 at 219)

18    The CBA violations included: Flayhart's failure to review the fall evaluation with plaintiff or provide her with a copy; Flayhart's failure to consult with plaintiff before making a negative recommendation; and failure of the Tenure Committee to inform plaintiff that she received a negative recommendation and to allow her to submit a rebuttal. (D.I. 75 at A196)

[*21]

19   Flayhart attributes not speaking to plaintiff to her request on April 1996 that he never speak to her again because he was the source of her work-related stress. (D.I. 75 at A192)

In response to plaintiff's objection to the reconsideration process, on September 30, 1997, the Union President advised plaintiff to either accept the process as is, or to appear directly before the DSU Board of Trustees. (D.I. 75 at A255) Plaintiff rejected both options and instead suggested recusal of those Tenure Committee members who were involved in the prior evaluations. (D.I. 75 at A265) The Union President rejected the suggestion of recusal without specific evidence of bias, and the reconsideration process continued as before. (D.I. 75 at A267)

**I. Events Leading to Dismissal**

On September 24, 1997, plaintiff removed two female students from her Introduction to Political Science class, allegedly due to their repeated disruptive behavior. The students were sent to counseling with Vice President of Student Affairs, Ms. Lowan Pitt ("Pitt"). The students were instructed to return to class on October 3, [*22] but when they did, plaintiff required them to make an apology and they refused. [20] After giving a quiz, plaintiff cancelled the remainder of the class. When class met again on October 6, plaintiff summoned a campus security officer and asked him to remove the two students, but he did not do so. The next day, plaintiff

requested assistance from Tolliver in addressing the disciplinary problem because her "effort . . . to resolve this problem through an informal process has failed" and she "feared for [her] own personal safety." (D.I. 78 at B471) Flayhart sent a memo requiring plaintiff to hold class, but when at least one of the two students arrived at the next class, she cancelled class again. (D.I. 75 at A269) Flayhart sent plaintiff another memo removing her from the class and reassigning it to Hoff. (D.I. 75 at A269) Plaintiff replied to Flayhart, challenging his authority to remove her as professor. [21] Flayhart wrote to Tolliver, then Acting Provost, recommending plaintiff's dismissal for cause. (D.I. 75 at A288) The class met again on October 10, 1997, and after plaintiff refused to leave the class, Flayhart directed a security officer to move the students to another classroom [*23] where Hoff continued teaching the class. (D.I. 75 at A291)

> 20   Plaintiff was under the mistaken impression that the students were required to apologize before returning to class as was the case with prior students whom she had removed from her class. This apparently was not the arrangement that Pitt made with the students here. (D.I. 75 at A296)
>
> 21   Plaintiff informed Flayhart that she intended to continue teaching the class since he, as a department chair/administrator, did not have the authority to remove instructors from classes, and would continue to teach until she received "written notification from a University administrator to the contrary." (D.I. 78 B476-477)

On October 7, 1997, Flayhart sent a memorandum to DeLauder regarding plaintiff's alleged deterioration, stating that "beyond a shadow of a doubt . . . the health of [the plaintiff] continues to deteriorate . . . [The plaintiff] represents a 'clear and present danger' to the Delaware State University academic community." (D.I. 75 at A256) [*24] On October 16, 1997, Tolliver wrote a letter to DeLauder recommending McKay's immediate suspension from DSU pending a hearing before the Ad Hoc Dismissal Committee ("Dismissal Committee") composed of fellow professors from throughout the University. (D.I. 75 at A292) On October 17, 1997, DeLauder suspended plaintiff with pay, pending appearance before the Dismissal Committee. (D.I. 75 at A293)

On November 24, 1997, plaintiff filed a union grievance alleging a violation of academic freedom which was later denied. (D.I. 75 at A295-297) On April 29, 1998, plaintiff filed a complaint with the Delaware Department of Labor and the EEOC alleging race and gender discrimination surrounding her suspension. (D.I. 75 at A298) On August 27, 1999, she filed a supplemental complaint with the EEOC expanding her allegations to include claims under the ADEA and ADA. (D.I. 75 at A300)

The hearing before the Ad Hoc Dismissal Committee was conducted over a period of four days on March 22-24 and March 29, 1999. In January 2000, the Committee issued a 51-page opinion recommending that plaintiff be dismissed from employment. (D.I. 75 at A303) On March 16, 2000, the DSU Board of Trustees accepted the Ad [*25] Hoc Dismissal Committee's recommendation and dismissed plaintiff from the faculty. [22] (D.I. 75 at A349)

> 22   DeLauder stated in a deposition that plaintiff was the first tenured professor suspended or terminated during his presidency, which began in 1987. (D.I. 78 at B213) Plaintiff's brief cited letters documenting alleged incidents where other professors physically assaulted students or yelled threats of bodily harm at their peers and were not ultimately terminated. (D.I. 78 at B420-428)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* [*26]   "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)*). The court will "view the underlying facts and

all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)*. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. If the nonmoving [*27] party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993)* (quoting *Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987))*.

## IV. DISCUSSION

As a preliminary matter, the court agrees that defendants Taylor and Tisdale were not served within 120 days of the filing of the complaint in this case, and dismisses them from this action pursuant to *Federal Rule of Civil Procedure 4(m).* [23]

> 23    *Federal Rule of Civil Procedure 4(m)* provides that "if service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate procedure." To this date, plaintiff has neither served Tolliver and Tisdale nor requested additional time for service from the court.

[*28] **A. Title VII Claims**

Plaintiff alleges that defendant DSU [24] discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964.

> 24    Although defendants argue, and plaintiff concedes, that there is no individual liability under Title VII, plaintiff has brought her Title VII claims against only DSU, making this issue moot. *See Dici v. Commonwealth of Pa., 91 F.3d 542, 552 (3d Cir. 1996)* (holding that there is no individual liability under Title VII).

**1. Race and Gender Discrimination** [25]

> 25    The anti-discrimination provision of Title VII provides: "It shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)*.

[*29]

Claims of discrimination brought pursuant to Title VII are analyzed under a burden-shifting framework, the particulars of which depend on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Since review of the record does not reveal any direct evidence of race or gender discrimination and plaintiff does not purport to assert such, the court will analyze plaintiff's discrimination claim using the burden-shifting framework for "pretext" suits set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* and *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)*.

Under this framework, plaintiff must first establish a prima facie case of race or gender discrimination under Title VII. In order to state a case based on discrimination, plaintiff must prove: (1) that she is a member of a

protected class; (2) that she suffered some form of adverse employment action; and (3) that this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly-situated person not of [*30] the protected class is treated differently. *See Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 409 (E.D. Pa. 2000)* (citing *Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999)*). The Third Circuit recognizes, however, that the elements of a prima facie case may vary depending on the facts and context of the particular situation. *See Pivirotto v. Innovative Sys. Inc., 191 F.3d 344, 352 (3d Cir. 1999).*

Once a plaintiff has established a prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas, 411 U.S. at 802.* If the defendant carries this burden, the presumption of discrimination drops from the case, and the plaintiff must "cast sufficient doubt" upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. *Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)* (en banc). *See also Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996)* (citations omitted) (stating that a plaintiff [*31] can demonstrate "sufficient doubt" by showing "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence").

Defendant at bar concedes that plaintiff has established a prima facie case of discrimination regarding her disparate treatment on the job, her applications for promotion and tenure, and her dismissal from DSU. (D.I. 74 at 29) Thus, the burden shifts to defendant, who has cited "legitimate" reasons for its actions, including numerous student complaints, plaintiff's disorganized teaching methods, neglect of the Internship Program, lack of scholarly research, a combative temperament, and the dispute over allegedly disruptive students that ultimately led to plaintiff's suspension and dismissal from DSU. (D.I. 75) Plaintiff has countered with evidence that casts doubt upon the legitimacy of these reasons. For instance, plaintiff received merit awards for her research at the same times she was denied promotion and tenure for deficiencies in that area. (D.I. 75 at A122, A132, A138) At every request for promotion or [*32] tenure, plaintiff

received contradicting evaluations from various DSU faculty and at least twice, technical procedural violations occurred during the review process. (D.I. 75 at A105, A196) Plaintiff also alleges that other tenured DSU professors committed more egregious behavior and were never terminated. (D.I. 78 at B420-428)

The court concludes, therefore, that there exist genuine issues of material fact as to whether DSU disparately treated and terminated plaintiff because of her race or gender. Accordingly, the court shall deny defendants' motion for summary judgment as to the Title VII discrimination claims.

### 2. Retaliation [26]

> [26]  The anti-retaliation section of Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3(a).*

[*33] Claims of retaliation brought pursuant to Title VII are analyzed under the same burden-shifting framework described above. In the present case, plaintiff has presented only indirect evidence of retaliation, thus, the *McDonnell-Douglas* pretext framework applies.

As with a discrimination claim, a plaintiff claiming retaliation must first establish a prima facie case for retaliation under Title VII. In order to do so, a plaintiff must demonstrate by a preponderance of the evidence: (1) that she engaged in protected activity; [27] (2) that the defendant took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action. *See Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1999).* Once a plaintiff has established a prima facie case, the burden shifts to the defendant to "clearly set forth through the introduction of admissible evidence" reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. *Burdine, 450 U.S. at 254-55.* If the defendant successfully [*34] rebuts the plaintiff's prima facie showing, the presumption of discrimination drops from

the case, and plaintiff must present sufficient evidence for a reasonable factfinder to conclude "that the proffered reason was not the true reason for the employment decision." *Id. at 256. See also Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997)* ("The plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination.").

> 27  Title VII defines a "protected activity" as an instance when an employee has "opposed any practice made an unlawful employment practice by this subchapter, or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3(a).*

In the instant action, defendant argues that plaintiff [*35] has not established a prima facie case of retaliation because she did not engage in any protected activity after the late 1980s, nor has she established a link between the protected activity and defendant's adverse employment action. (D.I. 74 at 29-30) On the contrary, the record indicates that plaintiff filed union grievances, an EEOC charge, a complaint with the Delaware Department of Labor, and various informal complaints in the late 1990s. (D.I. 75) Furthermore, plaintiff has sufficiently stated a causal link between her protected activities and her termination by DSU. According to the Third Circuit, this causal link is "not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus. Rather, it can be other evidence gleaned from the record as a whole from which causation can be inferred." *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).* Plaintiff alleges numerous instances of harassment, procedural violations and inconsistent evaluations by defendant after she filed her various complaints; therefore, a causal link can reasonably be inferred. Plaintiff has sufficiently stated a prima facie case of retaliation.

[*36]  The remaining analysis is similar to that of Title VII race and gender discrimination as stated above. The court concludes that there is sufficient evidence for a reasonable jury to find that the proffered reason for discharge was pretextual and that retaliation was the real reason for plaintiff's dismissal. Defendants' motion for summary judgment on the Title VII retaliation claim is denied.

## B.  Sections 1981, 1983, 1985 and Civil Conspiracy Claims

As an initial matter, the *Eleventh Amendment* limits the following claims against states and state officials to prospective injunctive relief. *See Edelman v. Jordan, 415 U.S. 651, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974).* Since DSU is a state institution, [28] the following claims against DSU and defendants in their official capacities are limited to prospective injunctive relief.

> 28  DSU is a corporation created and funded by the Delaware General Assembly, whose Board of Trustees is appointed by and includes the Governor. *See Del. Code Ann. tit. 14, § 6501, et seq.* Thus, DSU is an instrumentality of the State of Delaware for *11th Amendment* purposes. *See also Chapman v. Trs. of Del. State Coll., 101 F. Supp. 441, 444 (D. Del. 1951)* (dismissing complaint because "a Federal Court should not interfere with The Trustees of Delaware State College, a state agency, which is a body corporate of the State of Delaware"); *Lewis v. Del. State Coll., 455 F. Supp. 239, 245 (D. Del. 1978)* (Delaware State College's personnel decisions "constituted state action within the meaning of the *Fourteenth Amendment*" to the United States Constitution).

[*37] **1. *Section 1981* Claim**

*Section 1981* prohibits race-based discrimination in the making and enforcement of contracts. [29] Claimants are required to prove intentional discrimination under the same burden-shifting framework used in Title VII cases. Therefore, plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) plaintiff is a member of a racial minority; (2) defendants intended to discriminate against plaintiff on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in *Section 1981*. *See Lewis v. J.C. Penney Co., 948 F. Supp. 367, 371 (D. Del. 1996).* Upon a prima facie showing by plaintiff, the burden shifts to defendants to assert a "legitimate, nondiscriminatory" reason for their actions, which plaintiff may rebut with evidence of pretext. *See McDonnell Douglas, 411 U.S. at 802.*

> 29  *Section 1981*, as amended by the Civil Rights Act of 1991, provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make

and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." *42 U.S.C. § 1981(a)*. The coverage of the statute "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *42 U.S.C. § 1981(b)*. These rights are protected from encroachment by both private and state actors. *See 42 U.S.C. § 1981(c)*.

[*38] As a member of a racial minority at a predominantly African-American university, plaintiff satisfies the first prong of the prima facie case. In order to show intentional discrimination under the second prong, plaintiff "must point to facts of record which, if proved, would 'establish that defendants' actions were racially motivated and intentionally discriminatory,' or, at least, 'support an inference that defendants intentionally and purposefully discriminated' against her on the basis of her race." *Ackaa v. Tommy Hilfiger Co., 1998 U.S. Dist. LEXIS 3570, *8-9, No. 96-8262, 1998 WL 136522, at *3 (E.D. Pa. Mar. 24, 1998)* (citations omitted). Plaintiff's allegations that her black colleagues were treated differently, combined with defendants' inconsistent reasons for their denials of promotion and tenure, sufficiently support an inference of intentional racial discrimination. Finally, plaintiff satisfies the third prong of the prima facie showing because defendants' alleged discrimination resulted in plaintiff's dismissal from her tenured position at DSU.

The remaining analysis is similar to that under Title VII, thus, the court denies defendants' motion for summary judgment with regard to plaintiff's [*39] *Section 1981* claim.

### 2. *Section 1983* Claims

*Section 1983* imposes liability on any person who, under color of state law, deprives another of any rights secured by the Constitution or the laws of the United States. *See 42 U.S.C. § 1983*. Specifically, plaintiff asserts that defendants' discriminatory actions violated her rights under the *First Amendment* and *Equal Protection Clause of the Fourteenth Amendment*. (D.I. 20

at A16)

As an initial matter, the *Eleventh Amendment* bars *Section 1983* claims against state entities and state officials sued in their official capacities. *See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989)*. The court therefore grants summary judgment with respect to the *Section 1983* claims against DSU and defendants in their official capacities.

As for the claims against defendants in their individual capacities, the test for discriminatory intent under *Section 1983* is the same as that under Title VII. *See Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997)* (citation omitted). The court finds that there exist genuine issues of material fact as to whether defendants unconstitutionally [*40] discriminated against plaintiff so as to deprive her of her *Fourteenth Amendment* right to equal protection. Similarly, there is a genuine dispute as to whether defendants deprived plaintiff of her *First Amendment* right to petition by interfering with her right to file lawsuits and other grievances against defendants. Therefore, summary judgment is denied with respect to plaintiff's *Section 1983* claims against defendants in their individual capacities.

### 3. *Section 1985* and Civil Conspiracy Claims [30]

30    Plaintiff asserts a claim under *42 U.S.C. § 1985* and a separate "civil conspiracy" claim which the parties later characterize in their briefs as pursuant to *Sections 1983* and *1985*. For efficiency purposes, the court considers these claims together.

Defendants argue that plaintiff has insufficiently pled her conspiracy claims and, therefore, they should be dismissed. To plead a cognizable *Section 1985(3)* claim, a plaintiff must allege facts to show a conspiracy for the purpose of depriving [*41] a person or class of persons of equal protection of the laws or equal privileges and immunities, and an act in furtherance of the conspiracy whereby a party is injured in his person or property or is deprived of a right or privilege of a citizen of the United States. *See United Brotherhood of Carpenters & Joiners v. Scott, 463 U.S. 825, 829, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983)*. *Section 1985(3)* prohibits only conspiracies predicated on "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v.*

*Breckenridge, 403 U.S. 88, 102, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971).*

In her complaint, plaintiff alleges that defendants perpetrated an unlawful scheme to "fabricate false claims and poor teaching against [her]; . . . dismiss [her] due to her reporting the harassment by defendants; and . . . terminate [her] in retaliation for having opposed defendants' practice of harassment." (D.I. 20 at A19) To support these claims, plaintiff states that her requests for review of her denial of promotion were ignored by several of the defendants, that the many enumerated instances of harassment by Flayhart were "administratively sanctioned," and that the acts of retaliation against her were "known, [*42] authorized, and approved by . . . DeLauder, Tisdale, Taylor, Tolliver and Flayhart." (D.I. 20 at A7-9). In alleging the various instances of harassment by Flayhart and the indifference of the DSU administration that ultimately led to her termination, plaintiff's complaint sufficiently states a claim for conspiracy under *Section 1985(3)*. The court, therefore, denies summary judgment with respect to plaintiff's conspiracy claims.

## C. *Eleventh Amendment* Immunity Against the ADEA and ADA Claims

31

31    Although the parties argue the merits of an *Eleventh Amendment* bar of the ADA claim, the court finds no such claim in the Complaint or Amended Complaint. Since both parties address the issue in their briefs, the court will address it as well.

Plaintiff has conceded that her claims under the ADEA are barred by the *Eleventh Amendment* pursuant to the Supreme Court's decision in *Kimel v. Florida Board of Regents, 528 U.S. 62, 120 S. Ct. 631, 145 L. Ed. 2d 522 (2000)*. Although the issue of whether claims under the ADA against a [*43] state entity are barred by the *Eleventh Amendment* was not directly addressed by the Supreme Court, the Third Circuit has recently decided that they are so barred. *See Lavia v. Pennsylvania Dept. of Corrections, 224 F.3d 190, 2000 WL 1121553*, at *11 (3d Cir. 2000) (holding that Congress did not abrogate states' *Eleventh Amendment* sovereign immunity when enacting the ADA). Therefore, the court grants defendants' motion for summary judgment with respect to both the ADEA and the ADA claims. 32

32    Plaintiff has conceded that there is no individual liability under the ADEA or the ADA. These claims are also barred against defendants in their official capacities pursuant to the *Eleventh Amendment*. *See Hafer v. Melo, 502 U.S. 21, 26, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991)* (holding that when state official is sued in official capacity, real party in interest is government entity of which official is an agent).

## D. State Law Claims

Plaintiff also alleges state law claims of discrimination based on race, [*44] gender and age in violation of the Delaware Discrimination in Employment Act, *Del. Code Ann. tit. 19, § 710, et seq.*, violation of the Delaware Constitution, 33 and common law breach of contract. Pendent state law claims against state entities and officers are barred by the *Eleventh Amendment*. *See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984)*. Plaintiff may still bring these claims against defendants in their individual capacities, however. *See Lloyd v. Jefferson, 53 F. Supp. 2d 643, 680 (D. Del. 1999)* (holding that *Eleventh Amendment* sovereign immunity is no defense to state law claims brought against state officials in their individual capacities). Therefore, the court grants summary judgment as to plaintiff's state law claims against DSU and the remaining defendants in their official capacities.

33    Plaintiff mistakenly alleges a violation of Article XVI, Section 10 of the Delaware Constitution, which is a non-existent provision. The court assumes that plaintiff is alleging a violation of Article XV, Section 10, which provides, "No citizen of the State of Delaware shall be disqualified to hold and enjoy any office, or public trust, under the laws of this State, by reason of sex."

## [*45] E. Statute of Limitations

Defendants argue that several of plaintiff's claims are barred by their respective statutes of limitations. 34 Although defendants are technically correct, the Third Circuit recognizes a continuing violation exception to the timely filing requirement. *See West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995)*. Under this exception, a plaintiff may pursue a discrimination claim for "conduct that began prior to the filing period if [plaintiff] can

demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *Id.* "To successfully argue a continuing violation theory, the plaintiff will have to show a present violation, i.e., one within the statute of limitations period, that is reasonably related to previous discriminatory acts that, standing alone, would be barred by the statute of limitations." *Cuffy v. Getty Ref. & Mktg. Co., 648 F. Supp. 802, 810 (D. Del. 1986).*

34    Defendants argue that certain of plaintiff's claims arising under *Sections 1981* and *1983*, Delaware's Discrimination in Employment Act, and Title VII are barred by their statutes of limitations. (D.I. 74 at 35) Specifically, defendants contend that plaintiff's claims based on her failure to be promoted to full professor in 1993, 1994, 1995 and 1996, as well as her failure to receive merit pay in 1995 and 1996, are time-barred. (*Id.*)

[*46] Plaintiff's termination on March 16, 2000 falls within the statute of limitations. That decision was based on a 51-page report by the DSU Ad Hoc Dismissal Committee that discussed plaintiff's entire fourteen-year history at DSU. (D.I. 75 at A349) Moreover, at every denial of promotion or tenure, defendants have cited the same reasons for their decisions. It is fair to say that plaintiff's alleged disparate treatment was continuous and ongoing during her employment at DSU. The court concludes that plaintiff's claims are sufficient to constitute a "pattern of discrimination" and are not barred by any statute of limitations.

## V. CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied in part and granted in part. An appropriate order shall issue.

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 16

LEXSEE 2005 U.S. DIST. LEXIS 22612

**ERNESTINE PARKER, Plaintiff, v. COMCAST CORPORATION, a Pennsylvania corporation, COMCAST CABLE COMMUNICATIONS, INC., a Delaware corporation, COMCAST CABLEVISION OF NEW CASTLE COUNTY LLC, a Delaware limited liability corporation, successor-in-interest to Comcast Cablevision of New Castle County Inc., a Delaware corporation, PHILIP ANNONE, and WILLIAM G. MOSLEY, Defendants.**

**Civil Action No. 04-344-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 22612*

**October 5, 2005, Decided**

**SUBSEQUENT HISTORY:** Summary judgment granted by *Parker v. Comcast Corp., 2006 U.S. Dist. LEXIS 10700 (D. Del., Mar. 17, 2006)*

**COUNSEL:** [*1] Victor F. Battaglia, Philip B, Bartoshesky, Biggs and Battaglia, Wilmington, Delaware, for Plaintiff.

William M. Kelleher, Ballard Spahr Andrews & Ingersoll, LLP, Wilmigton, Delaware, for Defendants. Of Counsel: Charisse R. Lillie, David E. Brier, Farrah Gold, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania.

**JUDGES:** JORDAN, District Judge.

**OPINION BY:** Kent A Jordan

**OPINION**

**MEMORANDUM OPINION**

October 5, 2005

Wilmington, Delaware

Kent A Jordan

**JORDAN, District Judge**

**I. INTRODUCTION**

Plaintiff brought this action against: Comcast Corporation, Comcast Cable Communications, Inc. and Comcast Cablevision of New Castle County LLC (collectively, "Comcast"); the Director of Human Resources at Comcast Cablevision of New Castle County, Philip Annone ("Annone"): and the Manager of Human Resources at Comcast Cablevision of New Castle County, William G. Mosley ("Mosley"). Plaintiff alleges that Comcast, Annone, and Mosley discriminated against her in violation of the Americans with Disabilities Act ("ADA") (*42 U.S.C. § 12101, et seq.*); and, in addition, wrongfully terminated her employment, intentionally inflicted emotional distress, [*2] and committed a prima facie tort, all in violation of Delaware law. Before me is a Motion to Dismiss (Docket Item ["D.I."] 6; the "Motion") under *Fed. R. Civ. P. 12(b)(6)* by Comcast. Annone, and Mosley seeking dismissal of the ADA and wrongful termination claims against Annone and Moslely, and further seeking dismissal of the intentional infliction of emotional distress and prima facie tort claims against all defendants. The court has jurisdiction over the subject matter of this action under *28 U.S.C. §§ 1331* and *1334* for the ADA claim, and under *28 U.S.C. § 1367(a)* for the Delaware state law claims. Jurisdiction over the parties and venue for this action are uncontested. For the reasons that follow, the Motion to Dismiss will be granted.

**II. BACKGROUND** [1]

1    These facts are taken from plaintiff's allegations and are assumed to be true for the purposes of this 12(b)(6) motion.

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 151 of 218

Page 2
2005 U.S. Dist. LEXIS 22612, *2

From February 9, 1998 until she was [*3] fired on November 4, 2002, plaintiff worked as a receptionist at Suburban Cable Company, which was later taken over by Comcast, and as a receptionist and administrative assistant at Comcast. In late 2000 and early 2001, plaintiff began to suffer chronic headaches that caused her to take medical leaves of absence in 2001 and 2002. Plaintiff alleges that, beginning in July 2002, Comcast, Annone, and Mosley put "increasing pressure" on her (D.I. 1, P 15), which caused her to collapse at work on August 1, 2002. In September 2002, Annone and Mosley gave plaintiff an "ultimatum": either resign and take a severance package, or she would receive additional work assignments, be "written up," be disciplined, and eventually be terminated for cause. (*Id.* at P18.) Later, plaintiff was told that a file had been developed that showed her poor job performance since July 2002. Annone and Mosley "continually and without any justification criticized" her work. (*Id.* at P 35.) Finally, on November 4, 2002, plaintiff was fired.

Plaintiff sued Comcast, Annone, and Mosley, raising four causes of action. First, she claims that Comcast, Annone, and Mosley violated the ADA by failing to make reasonable [*4] accommodations to allow her to continue to work after she began to experience chronic headaches. Second, she claims that she was wrongfully terminated in violation of the Delaware state law implied covenant of good faith and fair dealing. Third, she claims that Annone and Mosley, acting as agents of Comcast, intentionally inflicted emotional distress on her in violation of Delaware state law. Fourth, she claims that Comcast, Annone, and Mosley have committed a prima facie tort in violation of Delaware state law.

### III. STANDARD OF REVIEW

*Fed. R. Civ. P. 12(b)(6)* requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)* (internal citation omitted). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiffs favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* (internal citation omitted). The moving party has the burden of persuasion. [*5] *See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).*

### IV. DISCUSSION

#### A. ADA and Wrongful Termination Claims Against Annone and Mosley

Plaintiff concedes that the ADA and wrongful termination claims must be dismissed as to Annone and Mosley because both of those claims may only be made against plaintiff's employer, Comcast. *See Maull v. Div. of State Police, 141 F. Supp. 2d 463, 472 (D. Del. 2001)* ("The ADA does not provide a cause of action against individual employees."); *Wallace v. Wood, 752 A.2d 1175, 1180 (Del. Ch. 1999)* ("Delaware law clearly holds that officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually."). Therefore, these claims against Annone and Mosley will be dismissed. The remaining discussion addresses the intentional infliction of emotional distress and prima facie tort claims.

#### B. Intentional Infliction of Emotional Distress

Comcast, Annone, and Mosley argue that plaintiff's claims for intentional infliction of emotional distress are precluded by the Delaware Workers' Compensation Act, which provides: [*6]

> Every employer and employee, adult and minor, except as expressly excluded in this chapter, shall be bound by this chapter respectively to pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies.

*Del. Code Ann. tit. 19, § 2304 (2005).* This statute precludes any tort claims for personal injury arising out of and in the course of employment, including for emotional distress. *See Brodsky v. Hercules, Inc., 966 F. Supp. 1337, 1353 (D. Del. 1997)* (holding that a claim for intentional infliction of emotional distress arising from discrimination was precluded): *Konstantopoulos v. Westvaco Corp., 690 A.2d 936, 938 (Del. 1996)* (holding that a claim for intentional infliction of emotional distress from sexual harassment was precluded). However, the Delaware Supreme Court has held that "those claims that involve a true intent by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort [*7] claims." *Rafferty v. Hartman Walsh Painting Co., 760*

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 152 of 218

Page 3
2005 U.S. Dist. LEXIS 22612, *7

*A.2d 157, 159 (Del. 2000).* To show such an intent and "to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show a deliberate intent to bring about an injury." *Id. at 160.*

This court addressed the preclusion of an intentional infliction of emotional distress claim under the Workers' Compensation Act in *EEOC v. Avecia Inc., 2003 U.S. Dist. LEXIS 19325, No. CIV.A.03-320, 2003 WL 22432911 (D. Del. Oct. 23, 2003).* There, the plaintiff alleged that, before she was fired, "her work was criticized, her vacation requests were scrutinized, and she was forced to take work breaks at her work station." *2003 U.S. Dist. LEXIS 19325, [WL] at \*4.* These allegations did not show that the defendant "set out to personally harm [plaintiff]." *2003 U.S. Dist. LEXIS 19325, [WL] at \*5.* Rather, as the court noted when it declined to reconsider the issue, "such scrutiny occurs in most employment situations and does not evidence a deliberate attempt lo injure [plaintiff]." *EEOC v. Avecia Inc., 2004 U.S. Dist. LEXIS 7995, No. CIV.A.03-320, 2004 WL 1077915, at \*2 (D. Del. Apr. 28, 2004).*

Here, [*8] plaintiff alleges that: (1) her work was criticized; (2) she was told to resign or face an increased workload, being "written up," other discipline, and eventually being fired for cause; (3) a file was developed that documented poor work performance; and (4) she was terminated. These events apparently constitute the pressure placed on plaintiff by Comcast, Annone, and Mosley, because no other specific facts are alleged. Even if true, however, these allegations do not "show a deliberate intent to bring about an injury." *Rafferty, 760 A.2d at 160.* As in *Avecia,* the actions taken here are not unusual in the employment environment and are insufficient to show deliberate intent to injure plaintiff. Therefore, plaintiff's claim for intentional infliction of emotional distress is precluded by the Workers' Compensation Act and will be dismissed as to all defendants.

C. Prima Facie Tort

Under Delaware law, prima facie tort is an intentional infliction of harm, "resulting in damage, without excuse or justification, by an act or series of acts which would otherwise be lawful and which acts do not fall within the categories of traditional tort." *Lord v. Souder, 748 A.2d 393, 402-03 (Del. 2000).* [*9] In *Lord,* the Delaware Supreme Court held that a claim for prima facie tort was not available in the employment context because allowing such a claim would be inconsistent with Delaware's employment at-will doctrine. *Id. at 403.* Instead, a plaintiff must make a claim for wrongful termination, with all the requirements imposed on such a claim under Delaware law. *See id; accord Brooks v. Fiore, 2001 U.S. Dist. LEXIS 16345, No. 00-803, 2001 WL 1218448, at \*11 (D. Del. Oct. 11, 2001).* Here, *Lord* is controlling, and plaintiff's prima facie tort claim will be dismissed as to all defendants.

V. CONCLUSION

For the reasons set forth, I will grant defendants' Motion to Dismiss under *Fed. R. Civ. P. 12(b)(6).* The ADA and wrongful termination claims will be dismissed as to Annone and Mosley, and the intentional infliction of emotional distress and prima facie tort claims will be dismissed as to all defendants. An appropriate order will issue.

ORDER

For the reasons set forth in the Memorandum Opinion (the "Opinion") issued in this matter today,

IT IS HEREBY ORDERED that the Motion to Dismiss (D.I. 6) is GRANTED, thus dismissing [*10] claims to the extent described in the Opinion.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

October 5, 2005

Wilmington, Delaware

**COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW**

# TAB 17

LEXSEE 2006 U.S. DIST. LEXIS 11972

**DINO G. PETROCELLI, Plaintiff, v. DAIMLERCHRYSLER CORPORATION, Defendant.**

**Civil Action No. 04-943-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 11972*

**March 22, 2006, Decided**

**PRIOR HISTORY:** *Petrocelli v. DaimlerChrysler Corp., 2005 U.S. Dist. LEXIS 39051 (D. Del., Sept. 28, 2005)*

**COUNSEL:** [*1] Dino G. Petrocelli, Plaintiff, Pro se.

Jennifer Gimler Brady, Esq., Sarah E. DiLuzio, Esq., Potter Anderson & Corroon LLP, Wilmington, Delaware, for Defendant. Of Counsel: William C. Martucci, Esq., Kristen Aggeler Page, Esq., Shook Hardy & Bacon LLP, Kansas City, Missouri.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent A. Jordan

**OPINION**

**MEMORANDUM OPINION**

March 22, 2006

Wilmington, Delaware

**JORDAN, District Judge**

**I. INTRODUCTION**

This is an employment discrimination case brought by Dino G. Petrocelli ("Petrocelli"), who is proceeding pro se, against his former employer, DaimlerChrysler Corporation ("DaimlerChrysler" or the "Company"). Petrocelli, a Hispanic American, claims that while he was working for DaimlerChrysler he was the target of discrimination based on his national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. §§ 2000e et seq.*, and of the Delaware Discrimination in Employment Act (the "Delaware Act"), *19 Del. Code § 711*. He also alleges that, in violation of Title VII, DaimlerChrysler retaliated against him for filing the first [*2] of two charges of discrimination and that the Company defamed him by accusing him of theft and by making derogatory statements about his work habits. Before me now is DaimlerChrysler's Motion for Summary Judgment. (Docket Item ["D.I."] 56; the "Motion".) This court has subject matter jurisdiction over the case pursuant to *28 U.S.C. §§ 1331, 1343*, and *1367*. For the reasons that follow, the Motion will be granted in part and denied in part.

**II. BACKGROUND** [1]

> 1 The following background information is taken from the parties' submissions and does not constitute findings of fact.

A. *Perceived Harassment During Petrocelli's Employment at DaimlerChrysler*

Petrocelli applied for employment with DaimlerChrysler on March 15, 1997 (D.I. 58 at A1-2), after being referred to the Company through the Latin American Community Center (*id.* at A8, 66:21-67:14). On his application, Petrocelli listed "Spanish" as one of his skills (*id.* at A1), and during his interview with DaimlerChrysler, [*3] he was asked to "say a few things in Spanish," because he "didn't look Hispanic" (*id.* at A9-10, 73:24-74:8, 74:23-75:3). In May 1997, Petrocelli began working at DaimlerChrysler's Parts Distribution Center in Newark, Delaware ("Newark PDC"). (*Id.* at A11, 81:2-4.) Petrocelli worked on the night shift at

Newark PDC, initially on the dock and later in the warehouse as a picker/packer. (*Id.* at A10-11, 77:12-78:10.)

Petrocelli testified at his deposition about several incidents at Newark PDC that he perceived to be harassment based on his national origin. First, he testified that his coworkers drew pictures of his "face with a beard . . . and [his] name under there and saying, 'Me no speak English' . . . [with] a sombrero . . . or a jail cell with a sombrero with [his] name." (*Id.* at A23, 140:7-11.) Those pictures were drawn with markers "in the bathrooms, on the work equipment, [and] out in the work area on boxes." (*Id.* at A23, 140:12-18.) One particular picture, drawn in the bathroom in October 2001, depicted "a snake with a sombrero, [Petrocelli's] name underneath of it, . . . bars of a jail cell around it, . . . [and] references to . . . [him] not [*4] speaking English." (*Id.* at A25, 169:21-24.) He further testified that "on several occasions," starting in January 2000, pictures and notes were left in work areas "referring to burritos and tacos . . . and references to [him] wearing a bandanna . . . being in gangs and calling [him] 'Esse'." (*Id.* at A26, 185:17-186:3.)

Petrocelli also testified that he was called "Spic" by coworkers on "numerous" occasions, including once in December 2001 in front of the control center at Newark PDC. (*Id.* at A26, 186:12-23.) Petrocelli testified that he was called "a lazy Latino," a "mushroom picker," and a "Spic" on other occasions in 1998 and 2000. (*Id.* at A34-35, 218:18-20, 220:16-221:1.) During some of those incidents, the speaker using those terms acted "like he was going to run [Petrocelli] over with his forklift." (*Id.* at A34-35, 220:23-221:1.)

According to Petrocelli, one of his supervisors saw him wearing a cross, asked if he was Catholic, and when Petrocelli said that he was, the supervisor "looked surprised . . . [and] said, 'Well, I thought you people practiced "Santaria" or Voodoo or something like that,' and laughed." (*Id.* at A31, 206:12-207:1; *see* [*5] *also id.* at A20, 121:4-17.)

Finally, Petrocelli testified that, starting in September 2001, coworkers made references about his relationship with a non-Hispanic white female coworker. (*Id.* at A26, 187:24-188:5.) Those references included sexually explicit drawings posted on billboards (*id.* at A26, 188:15-22), as well as a particular occasion where a coworker said to Petrocelli and the female coworker,

"Are you down with the brown tour?" (*id.* at A26-27, 188:9-15, 189:7-14).

B. *Events Leading Up to Petrocelli's Firing*

During his tenure at Newark PDC, which lasted from 1997 until January 2002, Petrocelli was disciplined many times for violating DaimlerChrysler's Standards of Conduct. Petrocelli's disciplinary record (*id.* at A99-119) includes, inter alia, violations for (1) leaving work during working hours without permission, or failing to return to work after lunch or relief without permission; (2) failing to exert normal work effort on the job, wasting time, loitering, loafing, or sleeping on the job; (3) failing to follow instructions from supervisors; (4) negligent or deliberate damage to DaimlerChrysler's property; and (5) threatening, intimidating, coercing, [*6] harassing, retaliating, or using abusive language to others. (*See also id.* at A96-97 (DaimlerChrysler Standards of Conduct).) Between April 14, 1999 and June 14, 2001, Petrocelli received four disciplinary layoffs, each lasting between five and thirty days. (*Id.* at A100-10.) On September 19, 2001, Petrocelli was suspended for attempting to steal DaimlerChrysler property. (*Id.* at A111-14.) Finally, on January 9, 2002, Petrocelli was suspended indefinitely for violating DaimlerChrysler's standards of conduct. (*Id.* at A115-17.) That suspension was modified to a discharge effective January 11, 2002. (*Id.* at A118.)

Petrocelli testified that twelve of his coworkers committed similar violations but were not punished as severely as he was. (*Id.* at A21-23, 130:9-138:9.) Those violations included sleeping, loafing, and playing board games (*id.* at A22-23, 136:10-138:9), as well as the more severe issue of working under the influence of drugs (*id.* at A21-22, 133:11-134:23). According to Petrocelli, some coworkers received no discipline for those violations (*id.* at A22, 136:10-137:2), while others received too little discipline (*id.* at A22-23, 134:17-23, 138: [*7] 1-9). Petrocelli also admitted, however, that he did not know precisely what discipline those coworkers received, although he perceived it to be less severe than what he received. (*Id.* at A22-23, 134:20-136:4, 138:1-9.)

After he was discharged in January 2002, Petrocelli filed a union grievance to appeal that decision. (*Id.* at A152-53.) That grievance addressed whether discharge was an appropriate response to Petrocelli's violations, but it did not include any allegations of discrimination based on national origin. (*Id.*) On April 11, 2002, the Appeal Board, which included representatives of

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 156 of 218

Page 3
2006 U.S. Dist. LEXIS 11972, *7

DaimlerChrysler and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), directed that Petrocelli be offered reinstatement, and that offer was extended in a letter to Petrocelli dated May 22, 2002. (*Id.* at A154-56.) The reinstatement offer required Petrocelli to report to Newark PDC on May 28, 2002. (*Id.* at A156.)

However, Petrocelli did not report as directed because, in March 2002, while his grievance was being considered, he had been arrested for possession of cocaine and he remained in custody. (*Id.* at A4, 33:2-5; [*8] *id.* at A157.) He was convicted of possession of a controlled substance and violation of probation, which had been imposed after an earlier conviction for offensive touching. (*Id.* at A5, 34:4-20, 35:24-36:15.) He was incarcerated for approximately eight months, beginning in March 2002. (*Id.* at A33, 213:22-214:3.) After failing to report by June 6, 2002, and failing to substantiate the reason for his failure, Petrocelli's seniority was terminated. (*Id.* at A158-59.)

C. *Procedural History*

On January 22, 2002, while his grievance was pending, Petrocelli filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor against DaimlerChrysler, alleging that he was subjected to discrimination and a hostile work environment in violation of Title VII and the Delaware Act. (*Id.* at A160.) On November 26, 2003, the Delaware Department of Labor issued a Reasonable Cause Finding that concluded there was evidence to support a finding of a hostile work environment but not a finding that the disciplinary actions and discharge resulted from discrimination. (*Id.* at A167-68.) The EEOC adopted those findings in [*9] a Notice of Right to Sue dated May 18, 2004. (*Id.* at A169.) The EEOC also issued a Notice of Right to Sue on January 6, 2005, stating that the EEOC found reasonable cause to believe that a violation had occurred, but that it had not obtained a settlement with DaimlerChrysler and would not bring suit. (*Id.* at A161.) That notice concluded the EEOC's processing of Petrocelli's first charge of discrimination against the Company. (*Id.*)

On April 3, 2003, Petrocelli filed with the EEOC a second Charge of Discrimination, alleging that DaimlerChrysler had retaliated against him for filing his first charge by offering him reinstatement when the Company knew that he was incarcerated and unable to report. (*Id.* at A162.) The EEOC issued a Dismissal and Notice of Right to Sue on September 10, 2003, stating that the retaliation charge could not be investigated because it was not filed within the statutory time limit. (*Id.*) That notice informed Petrocelli that he had ninety days to file a claim based on that second charge, or the right to sue would be lost. (*Id.*)

Based on the May 18, 2004 Notice of Right to Sue on the first charge of discrimination, Petrocelli filed this [*10] suit against DaimlerChrysler on August 16, 2004, alleging that he was fired, disciplined, and subjected to a hostile work environment in violation of Title VII and the Delaware Act. (*Id.* at A164-70.) On September 28, 2005, Petrocelli was granted leave to amend his complaint. (D.I. 53.) That amended complaint provided more explanation in support of Petrocelli's allegations of discrimination, as well as articulating his claims for retaliation and defamation. (D.I. 58 at A171-75.) Petrocelli seeks reinstatement, back pay, front pay, and compensatory and punitive damages. (*Id.* at A174.)

## III. STANDARD OF REVIEW

Pursuant to *Federal Rule of Civil Procedure 56(c)*, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. In determining whether there is a triable dispute of material fact, a court must review the evidence and construe all inferences in the light most favorable [*11] to the non-moving party. *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).* However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).* To defeat a motion for summary judgment, *Rule 56(c)* requires that the non-moving party "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(c).* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

there is no genuine issue for trial." *Matsushita, 475 U.S. at 587* (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

## IV. DISCUSSION

[*12] In his complaint, Petrocelli asserts that DaimlerChrysler violated both Title VII and the Delaware Act. (D.I. 58 at A164-70.) Since claims of employment discrimination under the Delaware Act are analyzed in the same way as claims under Title VII, *Giles v. Family Court, 411 A.2d 599, 601-02 (Del. 1980)*, the following analysis uses the Title VII framework, and the conclusions apply equally to the claims of hostile work environment and disparate treatment under the Delaware Act.

### A. *Hostile Work Environment*

A hostile work environment may form the basis of a Title VII discrimination claim against an employer. *Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001)* (citing *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-68, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)).* The inquiry into whether an environment is hostile requires a look into "all the circumstances . . . [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).* [*13] That analysis "must concentrate not on individual incidents, but on the overall scenario." *Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999).* To establish a Title VII claim based upon a hostile work environment, Petrocelli must show that "(1) he suffered intentional discrimination because of his national origin; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Cardenas, 269 F.3d at 260.*

For purposes of this Motion, DaimlerChrysler concedes four of those five elements, arguing only that the discrimination faced by Petrocelli was not pervasive and regular. (D.I. 57 at 28-32.) DaimlerChrysler first argues that the harassment discussed in Petrocelli's

deposition is a series of isolated incidents. In particular, according to DaimlerChrysler, the name-calling, including epithets like "spic," "mushroom picker," "lazy Latino," and references to "you people" practicing Santaria or voodoo, were sporadic, and, in any event, constituted mere offensive utterances. [*14] (*Id.* at 29.) Also, according to DaimlerChrysler, the picture of the snake with the sombrero in a jail cell with Petrocelli's name was a one-time occurrence, and that a "single item of graffiti" is not pervasive and regular discrimination. (*Id.* at 30.)

DaimlerChrysler's argument misses the mark, because it focuses on individual incidents in isolation and, unsurprisingly, finds that each is a one-time occurrence. To the contrary, the analysis must consider the circumstances as a whole and not focus on each event individually. *Durham Life, 166 F.3d at 149.* According to Petrocelli's unrebutted testimony, he was called a "spic" on "numerous" occasions during his time at Newark PDC. (D.I. 58 at A26, 186:12-23.) Other derogatory terms, such as "lazy Latino," and "mushroom picker," were allegedly directed at him. (*Id.* at A34-35, 218:18-20, 220:16-221:1.) The reference to the religion practiced by "you people" was also clearly addressed to Petrocelli's Hispanic origin. (*Id.* at A31, 206:12-207:1.) Those statements, taken as a group and according to Petrocelli's testimony, were not sporadic, and they constitute more than offensive utterances. *See Smith v. Leggett Wire Co., 220 F.3d 752, 767 (6th Cir. 2000)* [*15] (holding that the commonplace use of the word "nigger" constituted more than mere offensive utterances). Finally, according to Petrocelli, pictures directed at his national origin were drawn in the bathrooms, on the work equipment, and out in the work area on boxes. (D.I. 58 at A23, 140:7-18; *id.* at A25, 169:21-24.) DaimlerChrysler points to one such picture and calls it an isolated occurrence. (D.I. 57 at 30.) Again, by isolating individual events, DaimlerChrysler ignores the totality of Petrocelli's allegations.

DaimlerChrysler also argues that many events that were perceived by Petrocelli to constitute harassment, including the statements and drawings referring to Petrocelli's romantic relationship with a non-Hispanic white coworker, the request that he speak Spanish at his interview, and the discipline he received for violating the standards of conduct, were not actually directed at his national origin. (D.I. 57 at 28-31.) While I agree that each of those events, viewed in isolation, might not be obviously directed at Petrocelli's Hispanic origin, [2] when

they are considered along with the epithets and offensive graffiti, a reasonable jury might conclude that those acts were [*16] motivated by a discriminatory purpose. *See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996)* (interpreting less obvious incidents in light of other racially-motivated events). Therefore, the less overt incidents reported by Petrocelli are properly included in the totality of circumstances examined by the factfinder.

> 2   The "brown tour" comment does seem so directed, however. (*See* D.I. 58 at A26-27, 188:9-15, 189:7-14.)

DaimlerChrysler has failed to show that, viewing the evidence in the light most favorable to Petrocelli, the incidents of hostility were not "pervasive and regular" as required under Title VII. Petrocelli's unrebutted testimony raises a genuine issue of material fact concerning the frequency and severity of the hostility he experienced. Therefore, because that is the only issue raised by DaimlerChrysler, I will deny the Motion as to the hostile work environment claim.

### B. *Disparate Treatment*

Petrocelli alleges that when DaimlerChrysler disciplined [*17] him for violating the standards of conduct and eventually fired him, it discriminated against him based on his national origin. (D.I. 58 at A165.) Those disparate treatment claims are analyzed under the *McDonnell Douglas* burden shifting framework. *Jones v. Sch. Dist. Of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)* (referring to *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*). Under that framework, Petrocelli must establish a prima facie case of discrimination based on national origin by showing: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that that action occurred under circumstances that give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated differently. *Jones, 198 F.3d at 410-11*; *Boykins v. Lucent Techs., Inc., 78 F. Supp.2d 402, 409 (E.D. Pa. 2000)*. If Petrocelli succeeds in establishing a prima facie case, then DaimlerChrysler must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Jones, 198 F.3d at 410*. [*18] If DaimlerChrysler meets that burden, then Petrocelli must show by a preponderance of the evidence that those legitimate reasons were a pretext for

discrimination. *Id.* If DaimlerChrylser raises a legitimate nondiscriminatory reason for its actions, Petrocelli may overcome a summary judgment motion with evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)*.

Here, for both the claim based on disciplinary action and the claim based on discharge, DaimlerChrysler concedes, for purposes of this Motion, the first two elements of Petrocelli's prima facie case, but argues that he has not established the third element: that the circumstances give rise to an inference of unlawful discrimination. (D.I. 57 at 21-23, 25.) Furthermore, DaimlerChrysler argues that it had legitimate nondiscriminatory reasons for disciplining and firing Petrocelli, and Petrocelli has failed to establish that those reasons were pretextual. [*19] (*Id.* at 23-25, 26-27.) The arguments concerning the inference of unlawful discrimination and the showing of pretext both focus on Petrocelli's failure to show that similarly situated coworkers were treated differently than he was. (*Id.* at 22-25, 27.)

If Petrocelli's assertions about the discipline received by his coworkers were the only relevant evidence, I would agree that Petrocelli had failed to establish an inference that his discipline and firing were based on unlawful discrimination. Petrocelli admitted that he did not know precisely what discipline other employees received (D.I. 58 at A22-23, 134:20-136:4, 138:1-9), and his unsubstantiated belief that he was punished more severely is insufficient to support his prima facie case. *See Seabrook v. Gadow, 2003 U.S. Dist. LEXIS 10096, No. CIV.A.01-802, 2003 WL 21383719, at *7 (D. Del. June 10, 2003)*. Also, considering that DaimlerChrysler has articulated legitimate nondiscriminatory reasons for its actions by presenting the details of Petrocelli's disciplinary record (D.I. 58 at A99-119), Petrocelli's belief about the discipline given to other employees is insufficient to raise a genuine issue of material fact as to pretext. *See* [*20] *Seabrook, 2003 WL 21383719, at *7.*

However, for the claim based on disciplinary actions, Petrocelli has presented other relevant evidence. "Evidence of. . . a hostile work environment is relevant to whether one of the principal non-discriminatory reasons

asserted by an employer for its actions was in fact a pretext for discrimination." *Aman, 85 F.3d at 1086.* As discussed above, *supra* Section IV.A, Petrocelli has presented sufficient evidence to overcome DaimlerChrysler's summary judgment motion as to his hostile work environment claim. That general evidence of a hostile environment, viewed in the light most favorable to Petrocelli, raises genuine issues of material fact both as to open hostility at Newark PDC and as to the reasons underlying the disciplinary actions taken against Petrocelli by his supervisors. That evidence is relevant not only for Petrocelli's prima facie case of discrimination, but could also support a reasonable factfinder's belief that an invidious discriminatory reason was a motivating or determinative cause of those actions. *Fuentes, 32 F.3d at 764* Therefore, Petrocelli has presented sufficient evidence of [*21] pretext to survive a motion for summary judgment, and I will deny the Motion as to the disparate treatment claim based on the disciplinary actions taken against Petrocelli.

The evidence of a hostile work environment is not sufficient, however, to support Petrocelli's disparate treatment claim based on his discharge. DaimlerChrysler has articulated a legitimate nondiscriminatory reason for that action: Petrocelli failed to report to work after he was reinstated because he was incarcerated for possession of cocaine and violation of his probation. (D.I. 58 at A5, 34:4-20, 35:24-36:15; *id.* at A33, 213:22-214:3; *id.* at A157-59; *see also* D.I. 57 at 26.) While the evidence about the environment at Newark PDC raises a factual issue as to the motivation behind the discipline given to Petrocelli by his supervisors, a reasonable factfinder could not infer that the decision to discharge Petrocelli after he failed to report was motivated by discrimination. His failure to report was caused by his own actions in March 2002 and his subsequent arrest, conviction, and incarceration. Therefore, I will grant the Motion as to the disparate treatment claim based on Petrocelli's discharge. [3] [*22]

    3    In his claim that DaimlerChrysler retaliated against him for filing a discrimination charge, Petrocelli alleged that the Company knew that he was incarcerated and that the timing of his reinstatement was manipulated so that he would be unable to report. (D.I. 58 at A162.) As discussed below, *infra* Section IV.C, that retaliation claim is time-barred, and the allegations concerning the timing of his

reinstatement were not raised in the EEOC charge which provides the basis for this suit (*id.* at A160). Thus, those allegations may not be used to support the disparate treatment claim based on his discharge. In addition, as noted below, *infra* Section IV.C, Petrocelli has adduced no evidence to support his allegation that the timing of his reinstatement was actually manipulated.

## C. *Retaliation*

In his amended complaint, Petrocelli alleges that DaimlerChrysler discharged him in retaliation for filing his first Charge of Discrimination on January 22, 2002. (*Id.* at A172, (1)(c).) That allegation, [*23] made pursuant to Title VII, was first raised in a Charge of Discrimination filed by Petrocelli with the EEOC on April 3, 2003. (*Id.* at A162.) The EEOC issued a dismissal on September 10, 2003, giving Petrocelli notice that his right to sue on that charge would be lost after ninety days. (*Id.* at A163.)

DaimlerChrysler correctly points out (D.I. 57 at 33) that Petrocelli did not file his compliant until August 16, 2004 (D.I. 58 at A164-66), and so his claim of retaliation under Title VII was filed outside the ninety-day window and is therefore time-barred. *See 42 U.S.C. § 2000e-5(f)(1).* That time bar is subject to equitable tolling if the filing was untimely "due to sufficiently inequitable circumstances." *Grice v. U.S. Postal Serv.,* No. Civ.A.05-2404, 2005 WL 1528880, at *4 (D.N.J. June 29, 2005). No such circumstances have been presented here. Even though Petrocelli is proceeding pro se, he filed his complaint in a timely manner after the EEOC dismissed his disparate treatment and hostile work environment charges, and there is no apparent excuse for his failure to do so for his retaliation charge. (D.I. 58 at A164-66, A169.) [*24] Thus, I conclude that Petrocelli's retaliation claim is time-barred.

Even if that claim were not time-barred, Petrocelli has failed to demonstrate a causal link between his charge of discrimination and his discharge. *See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 286 (3d Cir. 2001)* (requiring such a demonstration to support a prima facie claim of retaliation). As already noted, *supra* Section IV.B, Petrocelli was discharged after failing to report to work because he was incarcerated. Petrocelli has produced no evidence to support the allegation that decision was caused by a retaliatory motive. Therefore, in addition to being time-barred, Petrocelli has failed to

establish a prima facie case of retaliation.

D. *Defamation*

Finally, in addition to his claims under Title VII and the Delaware Act, Petrocelli makes a defamation claim, apparently pursuant to Delaware common law. (D.I. 58 at A173.) In support of its Motion, DaimlerChrysler does not dispute whether Petrocelli has established a prima facie claim of defamation, but asserts that it is protected by the qualified privilege between employer and employee. (D.I. 57 at 35-36.)

DaimlerChrysler [*25] is correct that, under Delaware law, statements made in furtherance of the common interest of management and labor in operating a successful business are privileged. *Gonzales v. Avon Prods., Inc., 609 F. Supp. 1555, 1559 (D. Del. 1985)* (citing *Battista v. Chrysler Corp., 454 A.2d 286, 291 (Del. Super. Ct. 1982))*. The statements made about Petrocelli, including allegations of theft and loafing (D.I. 58 at A173), appear to fall within that common interest. However, the qualified privilege will be lost if the speaker knows the statement is false, or if the speaker acts with express malice, a desire to cause harm, or bad faith. *Gonzales, 609 F. Supp. at 1559.* The evidence raised by Petrocelli in support of his hostile work environment claim, when viewed in the light most favorable to him, also raises a genuine issue as to the motives behind the allegedly defamatory statements. Therefore, I will deny the Motion as to the defamation claim.

**V. CONCLUSION**

Accordingly, I will grant the Motion for Summary Judgment as to the disparate treatment claim based on Petrocelli's discharge and as to the retaliation claim. I will deny the [*26] Motion in all other respects. An appropriate order will follow.

**ORDER**

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that the Motion for Summary Judgment is GRANTED as to the disparate treatment claim based on Plaintiff's discharge, GRANTED as to the retaliation claim, and DENIED in all other respects.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

March 22, 2006

Wilmington, Delaware

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 18

LEXSEE 2007 U.S. DIST. LEXIS 18956

**ANTHONY RAJOPPE v. GMAC CORPORATION HOLDING CORP.**

**CIVIL ACTION NO. 05-2097**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2007 U.S. Dist. LEXIS 18956*

**March 19, 2007, Decided**

**COUNSEL:** [*1] ANTHONY RAJOPPE, AN INDIVIDUAL, Plaintiff, Pro se, SAN DIEGO, CA.

For GMAC COMMERCIAL HOLDING CORP, DAVID E. GREAMER, CHAIRMAN OF THE BOARD OF DIRECTORS GMAC COMMERCIAL HOLDING CORP, YOSHITOMO TAJIMA, EVP AND CHIEF OPERATING OFFICER OF GMAC COMMERCIAL MORTGAGE JAPAN, NIRAJ PATEL, EVP AND CIO, GMAC COMMERCIAL HOLDING CORP, Defendants: MICHAEL J. EAGLES, MORGAN, LEWIS & BOCKIUS LLP, PHILADELPHIA, PA.

**JUDGES:** MARY A. McLAUGHLIN, J.

**OPINION BY:** MARY A. McLAUGHLIN

**OPINION**

*MEMORANDUM AND ORDER*

McLaughlin, J.

This is an employment discrimination suit filed pro se by Anthony Rajoppe ("Rajoppe") against GMAC Commercial Holding Corp. ("GMACCH"). Rajoppe is a Caucasian male and United States citizen who was employed by GMAC Commercial Mortgage Japan, K.K. ("GMACCM Japan"), a foreign subsidiary of GMACCH. The plaintiff alleges that he was terminated based upon his race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.*

GMACCH has moved to dismiss the plaintiff's complaint for lack of subject-matter jurisdiction on the ground that the plaintiff was employed by GMACCM Japan, a foreign corporation to which Title VII does [*2] not apply. The plaintiff opposes the motion by arguing that Title VII does apply to the conduct of GMACCM Japan because GMACCM Japan is controlled by GMACCH, and therefore, any conduct by GMACCM Japan that violates Title VII will be attributed to GMACCH. In his opposition, the plaintiff also requests that the Court reconsider its previous dismissal of his age discrimination claim for failure to exhaust administrative remedies. The Court will deny both the defendant's motion to dismiss and the plaintiff's request for reconsideration.

I. *FACTS*

In July of 2002, the plaintiff was invited to GMACCM Japan's Tokyo office, where he was interviewed by various officers and employees. The plaintiff was also interviewed over the telephone by Niraj Patel ("Patel"), GMACCH's Executive Vice President and Chief Information Officer. On July 26, 2002, the plaintiff was offered the position of Vice President, Head of Technology, at GMACCM Japan. The plaintiff accepted the offer.

Before he began working at GMACCM Japan, the plaintiff traveled to GMACCH's headquarters in Horsham, Pennsylvania, to meet with Patel and to go over strategy with managers from GMACCH and its global subsidiaries. On [*3] September 1, 2002, the plaintiff began working at GMACCM Japan. Throughout his employment at GMACCM Japan, the plaintiff alleges that he reported to both Patel and Yoshitomo Tajima ("Tajima"), the Chief Operating Officer of GMACCM Japan.

2007 U.S. Dist. LEXIS 18956, *3

The plaintiff claims that, while serving as GMACCM Japan's Head of Technology, he received many complaints from his non-Japanese staff about racist attitudes at the corporation. The plaintiff also alleges that when he attempted to use disciplinary action against a Japanese staff member, Tajima responded by promoting the staff member to a manager position in the plaintiff's department.

On January 15, 2004, the plaintiff was summoned to an unscheduled morning meeting. At the meeting, Tajima allegedly informed the plaintiff that he could either accept a settlement or be fired. The plaintiff eventually accepted the settlement and resigned.

Shortly after the plaintiff was removed, Tajima allegedly removed all other non-Japanese managers at GMACCM Japan in an effort to promote company harmony. The plaintiff claims that most non-Japanese staff were also pressured into leaving.

Upon leaving GMACCM Japan, the plaintiff filed a complaint with the EEOC. The [*4] EEOC ruled that the plaintiff had accepted a settlement and declined to proceed further. The plaintiff responded by filing the present complaint, alleging various Title VII and state law claims against GMACCH, Tajima, Patel, and David Creamer, the chairman of GMACCH's board of directors.

On July 14, 2005, the Court dismissed all the plaintiff's claims except for his Title VII claim for race discrimination against GMACCH. The Court also granted a ninety-day period of limited discovery concerning the relationship between GMACCH and GMACCM Japan. The defendant has filed a renewed motion to dismiss, arguing that GMACCH does not "control" GMACCM Japan for purposes of Title VII, and therefore GMACCM Japan's conduct cannot be attributed to GMACCH.

## II. *STANDARD OF REVIEW*

This motion presents the threshold question of whether the applicability of Title VII to foreign corporations that are controlled by American employers constitutes an issue of subject-matter jurisdiction or an issue of the merits of the claim. The defendant has styled its motion as one to dismiss for lack of subject-matter jurisdiction. The Court, however, concludes that the control issue relates to the merits of [*5] the Title VII claim.

In 1991, Congress amended Title VII to extend its protections to American citizens working overseas for foreign corporations that are "controlled" by American employers. *See Asplundh Tree Expert Co. V. N.L.R.B., 365 F.3d 168, 174 n.5 (3d Cir. 2004)*. This amendment was prompted by the Supreme Court's decision in *EEOC v. Arabian American Oil Co., 499 U.S. 244, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991)*, where the Court concluded that Title VII did not apply to extraterritorial conduct. The amended statute provides that when an American employer "controls" a foreign corporation, any conduct by the foreign corporation that violates Title VII will be presumed to be engaged in by the American employer. [1] *See* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 1077 (1991) (codified as amended at *42 U.S.C. § 2000e-1(c)*).

1  The relevant provision of Title VII reads, in pertinent part:

(2) If an employer controls a corporation whose place of incorporation is a foreign country, any practice prohibited by section 2000e-2 or 2000e-3 of this title engaged in by such corporation shall be presumed to be engaged in by such employer. . . .

(3) For purposes of this subsection, the determination of whether an employer controls a corporation shall be based on --

(A) the interrelation of operations;

(B) the common management;

(C) the centralized control of labor relations;

(D) the common ownership or financial control, of the employer and the corporation. *42 U.S.C. § 2000e-1(c) (2006)*.

[*6] The Supreme Court recently set forth a test to determine whether a threshold limitation on a statute's scope, such as this one, constitutes a jurisdictional prerequisite or a substantive element of a claim. *Arbaugh v. Y & H Corp., 546 U.S. 500, 126 S. Ct. 1235, 1245, 163 L. Ed. 2d 1097 (2006)*. The issue before the Supreme

Court in *Arbaugh* was whether Title VII's fifteen-employee minimum is a jurisdictional requirement or a substantive element of a Title VII claim. *Id. at 1238*. The Court began its analysis by noting that Title VII contains its own jurisdiction-conferring provision, which makes no mention of the fifteen-employee minimum. *Id. at 1245*. That provision provides: "Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter." *42 U.S.C. § 2000e-5(f)(3) (2006)*. The Court explained that Congress could have made the employee-numerosity requirement expressly "jurisdictional," as it has expressly made the amount-in-controversy requirement an ingredient of federal subject-matter jurisdiction [*7] under § 1332, but Congress did not. *See id.* Congress placed the fifteen-employee minimum in the "definitions" section of Title VII -- a provision of Title VII that does not speak in jurisdictional terms or refer in any way to federal-court jurisdiction. *Id.* The Court, therefore, concluded that the numerosity requirement is not jurisdictional.

In the course of rendering this decision, the Supreme Court set out a bright line rule:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Id.* (internal citations omitted).

Applying this "readily administrable bright line," *id.*, to the present case, the Court concludes that Title VII's "control" requirement is not jurisdictional. Like the employee-numerosity requirement, the "control" requirement appears in a section of Title VII that does not refer in any way to federal-court jurisdiction. *See* [*8] *42 U.S.C. § 2000e-1(c) (2006)*. Nor does the control requirement speak in jurisdictional terms. It simply states that if an American employer "controls" a foreign corporation, conduct by the foreign corporation that violates Title VII will be attributed to the American

employer. [2] Indeed, when Congress extended Title VII's protections in 1991, it not only added the "control" requirement, but it also amended the "definitions" section -- the very same section that the *Arbaugh* court found to be substantive -- so that the term "employee" includes American citizens employed in foreign countries. *See* Civil Rights Act of 1991, 105 Stat. at 1077 (1991) (codified as amended at *42 U.S.C. § 2000e(f)*).

> [2]   Title VII's control requirement is fundamentally different from the provisions cited in *Arbaugh* as examples of Congressional restrictions of the subject matter jurisdiction of federal courts. *See id. at 1245 n.11*.

The defendant submits various [*9] arguments as to why Title VII's control requirement is jurisdictional. These arguments fail, however, because they ignore the bright-line rule announced in *Arbaugh*. The defendant's arguments also fail because they rely on cases decided prior to *Arbaugh* and cases that did not consider the precise issue of jurisdiction versus merits. This latter course of action was expressly foreclosed by *Arbaugh*, where the Supreme Court dismissed such cases as "drive-by jurisdictional rulings" that should be accorded no precedential effect on the question of whether the federal court has authority to adjudicate the claim. *Arbaugh, 126 S. Ct. at 1242-43*. The Court explained that cases such as *Arabian American Oil Co.* obscured the jurisdiction versus merits issue by stating that the Court was dismissing for "lack of jurisdiction" when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim. *Id. at 1242*.

The Court's decision that the control limitation is not jurisdictional has consequences for the Court's standard of review. When [*10] subject matter jurisdiction turns on contested facts, the Court may review the evidence and resolve the factual dispute. If, on the other hand, satisfaction of an essential element of a claim for relief is at issue, the jury is the proper trier of contested facts. *Arbaugh, 126 S. Ct. at 1244*. Consequently, if there are material issues of fact on the control issue in dispute, the Court must deny the motion and submit the issue to the jury. In effect, the Court must analyze this motion as if it were a motion for summary judgment. [3]

> [3]   Under *Fed. R. Civ. Pro. 56*, summary judgment may be granted if there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)* (2006). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The Court will review the record in the light most favorable to the plaintiff, non-moving party, who is entitled to all reasonable inferences that can be drawn therefrom. *Merkle v. Upper Dublin School Dist., 211 F.3d 782, 788 (3d Cir. 2000).*

[*11] III. *ANALYSIS*

A. *The Defendant's Motion*

Title VII sets forth four factors to be considered in assessing whether a foreign corporation is "controlled" by an American employer: (i) interrelation of operations, (ii) common management, (iii) centralized control of labor relations, and (iv) common ownership or financial control. *42 U.S.C. § 2000e-1(c)(3) (2006)*.

Although few courts have applied this provision of Title VII, there is a substantial body of case law applying the same four-factor test in other contexts. Most relevant to this case is the use of the four-factor test to determine whether related entities constitute an "integrated enterprise" for purposes of assessing liability under various other employment statutes. *Watson v. CSA, Ltd., 376 F. Supp. 2d 588, 594 (D. Md. 2005)*. The section of the EEOC Compliance Manual that discusses Title VII's "control" requirement uses "integrated enterprise" cases to illustrate how the requirement should be applied. *See* Enforcement Guidance on Application of Title VII and ADA to American Firms Overseas and to Foreign Firms in the United States, Notice 915.002, EEOC [*12] Compl. Man., at § I.B.2 (Oct. 20, 1993) [hereinafter EEOC Enforcement Guidance]. The Compliance Manual also indicates that the EEOC's policy statement on the concept of "integrated enterprise" can be consulted for guidance on applying the "control" requirement. *Id.* The Court will therefore look to authorities that apply the four-factor test in both the foreign employment and "integrated enterprise" contexts.

According to this body of law, the presence or absence of any single factor is not dispositive; rather, the approach is holistic, looking at all the circumstances of the case. *E.g., Ferrell v. Harvard Ind., Inc., No. CIV.A.*

00-2707, 2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461, at *22 (E.D. Pa. Oct. 23, 2001)*. Courts typically focus, however, on the third factor of this test --- centralized control of labor relations. *E.g., Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 84 (3d Cir. 2003)*; *see also* EEOC Enforcement Guidance at § I.A.2.

1. *Interrelation of Operations*

Under the "interrelation of operations" factor, courts typically examine whether the two corporations shared administrative or purchasing services, employees, equipment, and/or finances. [*13] *E.g., Ferrell, 2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461, at *22*. For example, in *Ferrell*, the court found the requisite interrelation of operations where the subsidiary's budget required the parent's approval, and the subsidiary's sales and marketing were handled by the parent. *2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461 at *23*. Likewise, in *Watson*, the court found this factor satisfied where the domestic parent and foreign subsidiary utilized the same offices, equipment, policies, procedures, business forms, and disciplinary proceedings. *Id. at 595*. The court also noted that many of the subsidiary's employees were "dual employees" of both the parent and the subsidiary. *Id.*

By contrast, courts have found that operations were insufficiently interrelated where the parent and subsidiary shared little or no infrastructure and few or no employees. *See, e.g., Fantazzi v. Temple Univ. Hosp., Inc., No. CIV.A. 00-CV-4175, 2002 U.S. Dist. LEXIS 16269, 2002 WL 32348277, at *3-*4 (E.D. Pa. Aug. 22, 2002)*. For example, in *Fantazzi*, the court held that the existence of an integrated telephone directory and the shared use of employees to investigate formal complaints of sexual harassment were not sufficient. *2002 U.S. Dist. LEXIS 16269, 2002 WL 32348277 at *3-*4.* [*14] Similarly, in *Duncan v. American International Group, Inc., No. 01 Civ. 9269, 2002 U.S. Dist. LEXIS 24552, 2002 WL 31873465 (S.D.N.Y. Dec. 31, 2002)*, the court found that operations were insufficiently interrelated where the foreign subsidiary provided administrative services to two other subsidiaries but not to the domestic parent. *2002 U.S. Dist. LEXIS 24552, 2002 WL 31873465 at *4*.

In the present case, the defendant relies heavily on the declaration of Linda Pickles ("Pickles"), its Executive Vice President, for its contention that the two companies are not sufficiently interrelated. Pickles states that GMACCM Japan operated independently from GMACCH and was run on a day-to-day basis by a

Tokyo-based executive management committee. Pickles Supp. Decl. P 3. [4]

> 4    A copy of Linda Pickles' supplemental declaration is attached to the defendant's motion to dismiss as Exhibit A and cited herein as "Pickles Supp. Decl. P   ."

The plaintiff responds by submitting evidence suggesting that GMACCH did, in fact, play a substantial role in the day-to-day operations [*15] of GMACCM Japan. According to the plaintiff's evidence, GMACCM Japan's budget required GMACCH's approval. Def. Ans. to Inter. No. 20. [5] GMACCM Japan was required to follow corporate information technology ("IT") guidelines. Pl. Dep. at 41-42. [6] And, all GMACCM Japan IT projects had to be entered into an American project database. Catalano Decl. P 5. [7]

> 5    A copy of the defendant's answers and objections to the plaintiff's first request for interrogatories is attached to the plaintiff's opposition as Exhibit N and cited herein as "Def. Ans. to Inter. No.   ."
> 6    A copy of the plaintiff's deposition is attached to the plaintiff's opposition as Exhibit F and cited herein as "Pl. Dep. at   ."
> 7    A copy of John Catalano's declaration is attached to the plaintiff's opposition as Exhibit L and cited herein as "Catalano Decl. P   ."

The plaintiff has also submitted evidence indicating that all GMACCH subsidiaries, including GMACCM Japan, were required to use GMACCH's Professional [*16] Services Agreement ("PSA") when doing business with IT contractors and consultants. 10/8/02 Email from Kim to Rajoppe. [8] And finally, the plaintiff's evidence shows that an employee of GMACCH managed GMACCM Japan's IT department for several months before Rajoppe assumed the position. Catalano Decl. at PP 3, 4.

> 8    A copy of Elizabeth Kim's October 8, 2002, email to Rajoppe and Charmaine Cheuk is attached to the plaintiff's opposition as Exhibit I and cited herein as "10/8/02 Email from Kim to Rajoppe."

## 2. *Common Management*

Under the "common management" factor, courts typically examine whether the two nominally separate corporations (i) have the same people occupying officer or director positions, (ii) repeatedly transfer management-level personnel between each other, or (iii) have officers and directors of one company occupying some sort of formal management position with respect to the other. *See, e.g., Ferrell, 2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461, at *24*. For example, in *Ferrell*, the court found [*17] this factor satisfied where the two corporations' officers were identical, and where the human resources officer in charge of most personnel decisions relevant to the case was transferred from the parent to the subsidiary. *Id.* Likewise, where the parent appointed all management members of the subsidiary's board, the court held that a genuine issue of material fact existed as to common management. *Lavrov v. NCR Corp., 600 F. Supp. 923, 928 (S.D. Ohio 1984)*.

By contrast, at least one court has found that two corporations do not share "common management" where the sole commonality consisted of one director from the parent exercising management responsibilities at the subsidiary. *See Duncan, 2002 U.S. Dist. LEXIS 24552, 2002 WL 318734465, at *4*. Similarly, in *Martin v. Safeguard Scientifics, Inc., 17 F. Supp. 2d 357 (E.D. Pa. 1998)*, the court found this factor lacking where the sole commonality consisted of a vice president of the parent acting as a consultant to the subsidiary. *Id. at 368*.

In the present case, the plaintiff has submitted undisputed evidence that two of GMACCM Japan's five directors were also directors of GMACCH and that GMACCM [*18] Japan's CEO was a member of GMACCH's executive committee. Def. Ans. to Inter. Nos. 3, 4, 16.

## 3. *Centralized Control of Labor Relations*

Under the "centralized control of labor relations" factor -- the most important factor of the "control" test -- courts typically look for situations where the parent either (i) controlled the day-to-day employment decisions of the subsidiary, or (ii) directed the subsidiary to take the employment action that gave rise to the discrimination claim. *See, e.g., Martin, 17 F. Supp. 2d at 367; Ferrell, 2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461, at *25*. In *Ferrell*, for example, the court found this factor satisfied where the parent promulgated the subsidiary's anti-discrimination and anti-harassment policies, and where the parent trained the subsidiary's employees regarding the relevant anti-discrimination policies. *2001*

*U.S. Dist. LEXIS 17358, 2001 WL 1301461 at \*26.* The court also noted that the parent controlled the subsidiary's employee benefits. *Id.* Likewise, in *Watson*, the court found this factor satisfied where the domestic parent retained full discretion to make exceptions to any of the foreign subsidiary's disciplinary procedures, established and approved [*19] the foreign subsidiary's compensation/benefits plans, and prescribed policies regarding outside training opportunities. *Watson, 376 F. Supp. 2d at 598.*

By contrast, courts have found this factor lacking where the parent only retains control over certain important employment decisions, but not over the day-to-day employment decisions of the subsidiary. *See, e.g., Fantazzi, 2002 U.S. Dist. LEXIS 16269, 2002 WL 32348277, at \*4.* For example, in *Fantazzi*, the court found that the control of labor relations was insufficiently centralized where the "controlling" entity lacked the ability to discipline or terminate employees of the "controlled" entity. *See id.* Similarly, in *Martin*, the court found this factor lacking where the subsidiary controlled all hiring and firing of employees, but where the CEO of the subsidiary consulted with the parent's attorneys before terminating the plaintiff. *See Martin, 17 F. Supp. 2d at 365.*

In this case, the defendant relies on Pickles' declaration for the argument that control over the two corporations' labor relations was not sufficiently centralized. In her declaration, Pickles states that GMACCM Japan controlled [*20] its own labor relations by maintaining its own human resources department and promulgating its own employment policies and benefit plans. Pickles Supp. Decl. P 4. Pickles also states that GMACCM Japan made its own personnel decisions relating to hiring and firing, as it did with respect to the plaintiff. *Id.* at PP 4-6.

The plaintiff responds by submitting evidence suggesting that GMACCH played a role both in the day-to-day employment decisions of GMACCM Japan, as well as in the corporation's hiring and firing of the plaintiff himself. The plaintiff stated in his deposition that before being hired by GMACCM Japan, he was interviewed by Patel, GMACCH's Executive Vice President and Chief Information Officer. Pl. Dep. at 14, 23. Patel was similarly consulted when the issue of the plaintiff's termination was being discussed. *See Pickles Supp. Decl. P 6.* The plaintiff has also submitted evidence

indicating that the human resources departments of the two corporations worked closely together. Catalano Decl. P 6 (stating that yearly reviews were required to be sent to GMACCH and that Pickles and other executives routinely traveled to the Japan office). And finally, the defendant has [*21] submitted evidence of various day-to-day labor relations issues that were controlled by GMACCH, including the payment of yearly bonuses to Rajoppe's staff, Def. Ans. to Inter. No. 21, and the ability to hire a new full-time employee in GMACCM Japan's IT department. *See* 3/26/03 Email from Wisniewski to Rajoppe. [9]

> 9    A copy of Wendy Wisniewski's March 26, 2003, email to Rajoppe and Stephen Lin is attached to the plaintiff's opposition as Exhibit Z-11 and cited herein as "3/26/03 Email from Wisniewski to Rajoppe."

### 4. *Common Ownership*

GMACCH concedes that it is the sole owner of GMACCM Japan. Def. Ans. to Inter. Nos. 1, 2.

### 5. *Weighing the Four Factors*

The Court concludes that the plaintiff has raised a genuine issue of material fact regarding whether GMACCH "controlled" GMACCM Japan for purposes of Title VII. The Court will accordingly deny the defendant's motion. [10]

> 10    The plaintiff argues that the Court should deny the motion because Pickles' employee relations directory was destroyed, thereby preventing the plaintiff from obtaining information that might have aided him in his attempt to show that GMACCH "controlled" GMACCM Japan. Because the Court will deny the motion on the merits, it will decline to consider this argument.

[*22] B.

### Rajoppe's Request for Reconsideration of Age Discrimination Claim

The plaintiff requests that the Court reconsider its July 14, 2005, dismissal of his age discrimination claim on the ground that he exhausted his administrative remedies by checking the box for "age discrimination" on his EEOC intake questionnaire. The Court will deny the

request.

To determine whether a plaintiff has exhausted his administrative remedies, courts examine whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the EEOC's formal charge of discrimination or the investigation arising therefrom. *See Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996).* Courts in this circuit have uniformly held that a plaintiff fails to exhaust where he checks off a claim on an intake questionnaire but then omits the claim from the formal EEOC formal charge. *See, e.g., Johnson v. Chase Home Fin., 309 F. Supp. 2d 667, 672 (E.D. Pa. 2004)*; *Rogan v. Giant Eagle, Inc., 113 F. Supp. 2d 777, 786 (W.D. Pa. 2000).* The Court agrees with these cases. Intake questionnaires do not serve the same function as the formal charge and are not part [*23] of the formal charge. A questionnaire, therefore, does not satisfy the exhaustion requirement where a claim marked off in the questionnaire is omitted from the charge and where the EEOC does not investigate the omitted claim.

The plaintiff did not include any allegations of age discrimination in his formal charge. *See* Formal Charge. 11 Indeed, the plaintiff does not argue, or even mention, that he was discriminated against because of his age in any of the supporting documents he submitted to the EEOC. *See* Docs. Sub. to EEOC. 12

    11   A copy of the plaintiff's formal charge of

discrimination is attached to the plaintiff's opposition as Exhibit C and cited herein as "Formal Charge."

    12   A copy of the documents submitted by the plaintiff to the EEOC is attached to the plaintiff's opposition to the defendant's June 23, 2005, motion to dismiss and cited herein as "Docs. Sub. to EEOC."

An appropriate Order follows.

*ORDER*

AND NOW, this 19th day of March, 2007, upon consideration of the defendant's [*24] motion to dismiss (Doc. No. 23), the plaintiff's opposition thereto (Doc. No. 27), the defendant's reply thereto (Doc. No. 28), and the defendant's supplemental brief pursuant to the court's December 4, 2006, order (Doc. No. 31), IT IS HEREBY ORDERED that the defendant's motion to dismiss is DENIED for the reasons stated in the accompanying memorandum. IT IS FURTHER ORDERED that the plaintiff's request for reconsideration is DENIED.

BY THE COURT:

/s/ Mary A. McLaughlin

J.

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 19

LEXSEE 2002 U.S. DIST. LEXIS 13845

**JUDITH B. REAP, Plaintiff, v. CONTINENTAL CASUALTY COMPANY d/b/a
CNA INSURANCE COMPANIES, Defendant.**

**CIVIL ACTION NO. 99-1239 (MLC)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2002 U.S. Dist. LEXIS 13845*

**June 28, 2002, Decided
June 28, 2002, Filed**

**DISPOSITION:**      [*1] Defendant's motion for summary judgment granted. All remaining claims against defendant dismissed with prejudice.

**COUNSEL:** For JUDITH B. REAP, plaintiff: RICHARD M. SCHALL, SCHALL & BARASCH, L.L.C., MOORESTOWN, NJ.

For JUDITH B. REAP, plaintiff: PETER R. ROSENZWEIG, SPECTOR, GADON & ROSEN, PC, PHILADELPHIA, PA.

For CONTINENTAL CASUALTY COMPANY, defendant: MARK DIANA, STANTON, HUGHES, DIANA, CERRA, MARIANI & MARGELLO, PC, MORRISTOWN, NJ.

**JUDGES:** MARY L. COOPER, United States District Judge.

**OPINION BY:** MARY L. COOPER

**OPINION**

　　**MEMORANDUM & ORDER**

　　**COOPER, District Judge**

　　This matter comes before the Court on the motion of defendant Continental Casualty Company ("Continental") for summary judgment pursuant to *Federal Rule of Civil Procedure 56*. Plaintiff Judith B. Reap ("Reap"), a former employee of Continental, alleges that she was denied two promotions because of her age and gender, and that after

she filed a charge with the Equal Employment Opportunity Commission to protest her nonpromotions, she was fired in retaliation. Continental currently moves for summary judgment on all remaining claims. For the reasons expressed in this Memorandum [*2] and Order, the Court will grant Continental's motion.

**BACKGROUND**

　　In this part of the Memorandum and Order, the Court describes the factual background and procedural history of the present matter. In deriving that factual background, the Court relies principally on the undisputed material facts that the parties submit to the Court. (See generally Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("Def. Undisp. Facts"); Pl.'s Resp. to Def.'s Statement of Undisputed Facts and Additional Undisputed Facts in Opp'n to Mot. for Summ. J. ("Pl. Undisp. Facts").)

**I.    Reap's Employment in Continental's Environmental Claims Division**

　　Plaintiff Judith Reap ("Reap") began working for defendant Continental Casualty Company ("Continental") on June 29, 1992, as a Director in the Environmental Claims Division ("ECD") in Cranbury, New Jersey. (Dep. of Judith B. Reap dated 9-8-99 "Reap Dep.") at 36-37.) The ECD was a specialized claims area with three general responsibilities: (1) hazardous waste claims handling (also called pollution claims and environmental claims); (2) toxic tort claims, which encompassed a variety of claims with long exposure [*3] periods, such as asbestos, lead paint, silica, hearing loss, and repetitive stress claims; and (3) coverage litigation arising out of

hazardous waste and toxic tort claims. (Aff. of Kevin Kelly dated 11-6-01 ("Kelly Aff.") P 6; Aff. of Frederick Jahn dated 11-15-01 ("Jahn Aff.") P 3.) Reap was hired to manage asbestos claims against Bendix, a Continental policyholder, and Reap's duties expanded to other asbestos and toxic tort claims over time. (Reap Dep. at 39-41; Kelly Aff. P 19.) Reap initially reported to Kevin Kelly ("Kelly"), Vice President of the ECD, who in turn reported to James Flood ("Flood"), Vice President of Corporate Claims. (Kelly Aff. PP 2, 18.)

In May 1995, CNA Financial Corporation acquired Continental, and all employees of Continental became employees of the Continental Casualty Company, a subsidiary of CNA Financial Corporation. (Aff. of James Flood dated 11-13-01 ("Flood Aff.") P 4.) As a result of the merger, the environmental claims operations of Continental and CNA were combined into a single Environmental Claims Division with three regional claims centers located in Cranbury, Chicago, and San Francisco. (Id. P 6.) Under the merger plan, an Assistant Vice [*4] President ("AVP") would lead each regional claims center, and the AVP would report to a Vice President of Environmental Claims ("VP") in Chicago. (Id.) The VP in turn would report to Flood, who had been named Senior Vice President Corporate Claims of the merged company. (Id.)

## II. The Selection of Rick Jahn as AVP of the Cranbury ECD

In early September 1995, Kelly resigned as AVP of the Cranbury ECD (his post-merger title). (Kelly Aff. PP 4-5.) Rick Jahn ("Jahn"), not Reap, was named to fill the AVP position effective September 15, 1995. Continental hired Jahn in 1986, and he held a number of positions within the ECD, each with increasing levels of responsibility, including Senior Adjuster, Senior Environmental Claims Analyst, Senior Claims Supervisor, Manager, and finally, Director of the Harbor and Hazardous Waste Unit. (Jahn Aff. PP 3-10.) According to Kelly and Flood, Kelly recommended Jahn based on his broad claims experience, excellent skills as a manager, and overall exemplary performance during his tenure of nearly nine years in the Cranbury ECD. (Flood Aff. P 10; Kelly Aff. PP 12-14.) According to Kelly and Jahn, Kelly has worked with Jahn in the ECD [*5] for nearly eight years and was personally familiar with his performance and capabilities. (Kelly Aff. P 11; Jahn Aff. P 21.) Flood ultimately selected Jahn for the Cranbury

AVP position because, according to Flood and Kelly, Jahn had a broad-based environmental claims background and a fine reputation as an effective and well-respected manager. (Flood Aff. PP 11-14; Kelly Aff. PP 12-14.) Flood states that he did not believe Reap was qualified to hold the AVP position of the Cranbury ECD mainly because she did not, in Flood's view, have the range of environmental claims experience that he deemed necessary for the AVP position. (Flood Aff. PP 17-18.)

Shortly before promoting Jahn to the AVP position of the Cranbury ECD, Flood promoted Karen Campbell ("Campbell") to the position of AVP of the Chicago ECD, and Flood promoted Helen Merrick ("Merrick") to the position of AVP of the San Francisco ECD in August 1996. (Flood Aff. P 15.) A law degree was not a requirement for the AVP position; Kelly, Jahn's predecessor, did not have a law degree (Kelly Aff. P 22), and neither Campbell nor Merrick had a law degree (id. P 19). Upon his promotion to AVP, Jahn promoted Leticia Diaz to his former [*6] position. (Jahn Aff. P 17.)

## III. The Selection of Thomas Aries as VP of the ECD

After promoting Jahn to the Cranbury AVP position, Flood and Judith Samuel ("Samuel"), Vice President of Human Resources, began a search for a candidate to fill the newly created position of VP of the ECD. (Flood Aff. P 23; Aff. of Judith Samuel dated 11-9-01 ("Samuel Aff.") P 4.) The person selected as VP would be based in Chicago and responsible for overseeing the three regional centers in Cranbury, Chicago, and San Francisco, with a total of 160 employees. (Flood Aff. P 23; Samuel Aff. P 4.) Given that responsibility, the main requirements for the position were prior experience managing a multi-location organization and environmental-claims experience. (Flood Aff. PP 24-25 & Ex. 1: Position Profile, Vice President Environmental Claims ("Position Profile"); Samuel Aff. P 11.)

According to Flood and Samuel, they determined that no internal candidates met all of the desired qualifications and engaged the services of Burkholder & Associates ("Burkholder"), a management recruiting firm specializing in the property and casualty insurance industry, to identify qualified external candidates. [*7] (Flood Aff. P 24; Samuel Aff. P 6.) Only one external candidate, according to Flood and Samuel, had both the technical knowledge and extensive managerial experience they were seeking. (Flood Aff. P 27; Samuel Aff. P 8.) Flood and Samuel offered the position to

Michael Stone, but he declined. (Flood Aff. P 27; Samuel Aff. P 8.)

Although Flood and Samuel did not identify Reap as an internal candidate for the VP position, she asked to be considered for it. (Flood Aff. P 40.) At Reap's request, Flood met with Reap to discuss the position in January 1996. (Flood Aff. P 43.)

Flood and Samuel offered the VP position to Thomas Aries ("Aries"), who was then serving as Assistant Vice President of Claims Litigation in the Staff Counsel area. (Flood Aff. P 28; Samuel Aff. P 10.) Aries started his employment with Continental in 1977 as a trial attorney in the Staff Counsel area. (Flood Aff. P 29.) For many years, Aries had been responsible for managing seven Staff Counsel offices in the Western United States, including Hawaii, with a total of approximately 120 employees. (Id. P 32.) After the merger, Aries had been responsible for approximately 155 employees in seven Staff Counsel offices [*8] in Eastern and Central United States. (Id. P 31.) Aries, therefore, had prior experience managing multiple, geographically diverse locations. (Flood Aff. P 30; Samuel Aff. P 11.) The prior reviews of Aries praised his ability to successfully manage a multi-office, geographically dispersed organization. (Flood Aff. P 33 & Exs.: 3-5: Performance Reviews.) Additionally, the executive recruiting firm Continental hired to identify and interview qualified VP candidates observed that Aries was "indeed a strong contender" for the position and that "he has successfully managed large groups of professionals across broad geography." (Flood Aff. P 35 & Ex. 2: Candidate Profile, Tom Aries.) Aries, however, did not have prior experience managing an environmental claims office, and his prior positions did not involve making coverage determinations. (Flood Aff. P 36; Samuel Aff. P 11.) According to Flood and Samuel, they selected Aries based on his prior experience managing multiple, geographically dispersed locations. (Flood Aff P 30; Samuel Aff. P 11.) Flood states that he did not believe that Reap was qualified to hold the position of VP of the ECD mainly because she did not have experience, [*9] in Flood's view, managing multiple, geographically diverse locations, either at Continental or any prior employer. (Flood Aff. PP 39, 45.)

Aries accepted the offer and became VP of the ECD effective May 1996. (Flood Aff. P 28.) At the time of Aries's promotion, Aries was 51 years old, and Reap was

54 years old. (Flood Aff. P 38; Compl. P 9.)

**IV. Reap's First EEOC Charge**

Reap did not complain to anyone in Continental management or Human Resources that she believed her nonpromotion to the AVP or VP positions was discriminatory. (Reap. Dep. at 218-19, 285.) In June 1996, however, Reap filed with the Equal Employment Opportunity Commission ("EEOC") a Charge of Discrimination, in which she alleged that she was not promoted to either position because of age and gender discrimination. (Aff. of Mark Diana in Supp. for Summ. J. ("Diana Aff."), Ex. 2: Charge of Discrimination.)

**V. The Alleged Deterioration of Reap's Work Performance**

Upon his promotion to AVP of the Cranbury ECD in September 1995, Jahn became Reap's direct supervisor, and thus became responsible for directing her work and evaluating her performance. (Jahn Aff. P 22.) Initially, Jahn did not observe [*10] any major deficiencies in Reap's work performance. (Id. P 23.)

According to Jahn, however, he became aware of various problems with Reap's work performance beginning in 1996. Jahn states that Reap missed deadlines he had set, ignored requests for information, and refused to follow directions he had given for proper procedures in the Cranbury ECD, and that he documented instances of poor performance. (Id. PP 23, 26-32.) In October 1997, Jahn gave Reap her annual Performance Review (id. P 32), and Jahn prepared the Performance Review in consultation with Samuel (Samuel Aff. P 17).

In December 1997, Reap submitted a written response to her Performance Review, in which she claimed that it had been issued in retaliation for her EEOC Charge 1 of June 1996. (Jahn Aff. PP 33-34.) According to Jahn, he continued to experience problems with Reap's work performance in 1998, including improper supervision, ignoring requests to follow procedures, and absences from the office without notice. (Id. PP 36-65.)

**VI. Reap's Performance Improvement Plan**

Jahn spoke with Human Resources personnel Samuel and Catherine Johnson ("Johnson") in early 1998 regarding whether Reap [*11] should be placed on a

Performance Improvement Plan ("PIP"), in accordance with Continental's Performance Improvement Program. (Jahn Aff. P 66; Aff. of Catherine Johnson dated 11-9-01 ("Johnson Aff.") P 6.) Under that Program, an employee is given assistance to reach and maintain a minimum level of performance. (Johnson Aff. P 1.) An employee may be placed on a PIP whenever an employee's work or adherence to company rules is identified as being less than competent. (Id.) The employee is notified in writing of the performance deficiencies and of the actions required to reach a competent level of performance. (Id.) Failure to improve according to the terms of the PIP may result in the employee being placed on probation or may subject the employee to termination. (Id.) Jahn and Johnson prepared a PIP for Reap, and Jahn and Johnson met with Reap on April 16, 1998, to present and discuss the PIP. (Jahn Aff. PP 67-69; Johnson Aff. PP 9-11.) Jahn and Johnson informed Reap that her performance must improve within 30 days and that absent such improvement, she could be placed on probation and her future employment with Continental could be threatened. (Jahn Aff. P 69; Johnson Aff. [*12] P 11.) On April 20, 1998, Reap submitted a reply to the PIP, claiming that it was unmerited, lacked specific guidance on how she might improve, and was retaliatory. (Jahn Aff. P 70; Johnson Aff. P 12.) In response, Jahn and Johnson again met with Reap. (Jahn Aff. P 70; Johnson Aff. P 12.)

## VII. The Termination of Reap's Employment

On April 21, 1998, Reap distributed a memorandum to all staff members of her Unit. (Reap Dep. at 172-77; Jahn Aff. P 72 & Ex. 35: Memorandum from Pl. to Special Litigation Unit ("Mem.").) In that memorandum, Reap quotes from the PIP Jahn and Johnson had given Reap and from her response to it. (Mem.) Reap also quotes from an e-mail Jahn sent to Reap concerning employee rankings he had requested and from Reap's response to Jahn's e-mail, and the memorandum also includes a disclosure about the specific performance review of one former employee. (Id.) Specifically, Reap shared with the staff the following from her e-mail to Jahn: "I analyzed the job performance of each of my employees and prepared individualized reports which were accepted by you without question (except in the case of Linda Sikora, whose Performance Review you re-wrote to [*13] justify your decision to terminate her[.])" (Id.) Jahn and Johnson discussed that incident, and they met with Reap on May 18, 1998, to confirm that she had distributed the memorandum to the members of her Unit, which Reap admitted. (Jahn Aff. P 76; Johnson Aff. P 17.) That same day, Jahn and Johnson discussed the matter with Aries and Samuel, and all agreed that the termination of Reap's employment was warranted. (Jahn Aff. P 76; Johnson Aff. P 17; Samuel Aff. PP 24-26.) Later that afternoon, Jahn and Johnson met with Reap and terminated her employment. (Jahn Aff. P 77; Johnson Aff. P 18.) After Reap's termination, Jahn appointed Leticia Diaz as Reap's replacement as Director. (Jahn Aff. P 78.)

## VIII. Reap's Second EEOC Charge

Reap filed a second charge of discrimination ("Charge 2") with the EEOC in May 1998, alleging that her termination was discriminatory and in retaliation for her filing Charge 1. (Diana Aff., Ex. 5: Charge of Discrimination.) On December 18, 1998, the EEOC dismissed Charge 1, determining that its investigation did not establish a violation of Title VII or the ADEA, and notified Reap of her right to file a lawsuit against Continental. (Diana [*14] Aff., Ex. 3: EEOC Letter, Ex. 4: EEOC Dismissal & Notice of Rights.) On January 29, 1999, Reap requested that the EEOC issue her a right-to-sue letter on Charge 2 without making a determination of the charge on its merits. (Id. Ex. 7: Letter from Pl. to EEOC.) On February 3, 1999, the EEOC dismissed Charge 2 as requested and issued Reap a right-to-sue letter in connection with that charge.

## IX. Filing of Complaint and Procedural History

Reap commenced the instant lawsuit on March 17, 1999, by filing a Class Action Complaint. Reap sought to represent a class "of all older female employees (over the age of 40) of the defendants [sic] who are now or have been employed by the defendant from 1992 to date. Upon information and belief, this class is comprised of approximately 5,000 persons employed at facilities throughout the United States." (Compl. P 12.) Reap alleged that she, and older women as a class, have received differential treatment vis-a-vis younger male employees in connection with the following terms and conditions of employment: salaries, benefits, merit increases, work assignments, training, performance evaluations, promotions, discipline, lay-offs and/or [*15] terminations. (Id. PP 1, 13, 35, 38, 43.) Reap further alleged that she, and older women as a class, have been retaliated against for complaining about alleged acts of discrimination. (Id. PP 1, 13, 35, 38, 39, 41, 43, 45.)

In the Complaint, Reap seeks various forms of relief pursuant to five different theories: (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. §§ 2000e et seq.*, based on sex discrimination; (2) Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. §§ 621 et seq.*; (3) Anti-Retaliation Provision of Title VII, *42 U.S.C. § 2000e-3(a)*; (4) Anti-Retaliation Provision of the ADEA, *29 U.S.C. § 623(d)*; and *(5)* Anti-Retaliation Provision of the New Jersey Law Against Discrimination ("NJLAD"), *N.J. Stat. Ann. § 10:5-12(d)*. [1]

> 1    Reap voluntarily withdrew age and gender discrimination claims based on the NJLAD, *N.J. Stat. Ann. § 10:5-1 et seq.* (Mem. & Order filed 10-20-99; Order filed 12-14-99.)

[*16]

In a Memorandum and Order filed on October 20, 1999, the Court, inter alia, denied Continental's motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. (Mem. & Order filed 10-20-99.) As indicated, Reap initially sought to proceed on a class action basis, representing a putative class of several thousand current and former female employees. The Court denied Reap's motion for class certification in an Opinion dated March 21, 2001. *Reap v. Cont'l Cas. Co., 199 F.R.D. 536 (D.N.J. 2001).*

Continental now moves for summary judgment on Reap's remaining claims: failure to promote in violation of Title VII (Count I) and the ADEA (Count II); and retaliation in violation of Title VII (Count III), the ADEA (Count IV), and NJLAD (Count VI).

## DISCUSSION

### I. Legal Standards

### A. Summary Judgment Standard

*Federal Rule of Civil Procedure 56(c)* provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)* [*17] . The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265,*

*106 S. Ct. 2548 (1986).* Once the moving party has met that initial burden, the non-moving party must present evidence that establishes that a genuine issue of material fact exists, making it necessary to resolve the difference at trial. *Id. at 324*; *Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985).* A non-moving party, rather than rely on mere allegations, must present actual evidence that creates a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).*

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* The role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether [*18] there is a genuine issue for trial. *Anderson, 477 U.S. at 249.* "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id. at 247-48.* Material facts are only those facts that might affect the outcome of the action under governing law. *Id. at 248*; *Boyd v. Ford Motor Co., 948 F.2d 283, 285 (6th Cir. 1991).* "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson, 477 U.S. at 249-50* (citations omitted).

### B. Burden-Shifting Framework

The parties do not dispute that Reap's age and gender discrimination claims as well as her retaliation claims require application of the burden-shifting framework the Supreme Court articulated in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973),* [*19] and later clarified in *Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981),* and *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).* The burden-shifting analysis proceeds in three stages.

First, plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. *Hicks, 509 U.S. at 506.* The plaintiff's task in establishing a prima

facie case, however, is not intended to be onerous. See, e.g., *Sempier v. Johnson & Higgins, 45 F.3d 724, 728* (3d Cir.), cert. denied, *515 U.S. 1159, 132 L. Ed. 2d 854, 115 S. Ct. 2611 (1995).*

If the plaintiff offers sufficient proof of the elements of a prima facie case, the court reaches step two. The burden of production, but not the burden of persuasion, shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the employment action. *Hicks, 509 U.S. at 506-07.* If the defendant cannot satisfy that burden, judgment must be entered for [*20] the plaintiff. *Id. at 509.* If, on the other hand, the defendant does satisfy that burden, then the court reaches step three.

Under step three, the plaintiff must then demonstrate by a preponderance of the evidence that the employer's explanation is pretextual, which, if shown, meets the plaintiff's burden of persuasion. *Id. at 507-08.*

## II. Claims for Failure to Promote Under Title VII and ADEA

Reap alleges that she was denied promotions to the positions of AVP and VP because of her gender in violation of Title VII and her age in violation of the ADEA. (Compl. Counts II & III.)

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must demonstrate that (1) she was over 40 at the time she applied for the position in question; (2) she was qualified for the position in question; (3) she was rejected despite her qualifications; and (4) the employer ultimately filled the position with a person sufficiently younger to permit an inference of age discrimination. *Narin v. Lower Merion Sch. Dist., 206 F.3d 323, 331 (3d Cir. 2000); Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 330 (3d Cir. 1995);* [*21] *Sempier, 45 F.3d at 728.* To establish a prima facie case of gender discrimination in a failure to promote case under Title VII, a plaintiff must demonstrate that (1) she belongs to a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected despite her qualifications; and (4) after her rejection, the job remained open and the employer continued to seek applicants from persons of complainant's qualifications. *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).* The defendant is entitled to summary judgment if the plaintiff is unable to establish a

genuine issue of material fact concerning at least one element of the prima facie case. *Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997).*

### A. AVP Position

Jahn was promoted to the position of AVP of the Cranbury ECD. Reap essentially contends that she should have received that promotion, and alleges that the denial of that promotion was unlawful on the basis of age and gender discrimination. Continental argues that Reap's claim that she was unlawfully denied promotion to the position of AVP of the Cranbury [*22] ECD fails because (1) she cannot establish the second prong of her prima facie case under either Title VII or ADEA, namely, that she was qualified for the AVP position, and (2) even if she could establish a prima facie case, Reap cannot establish that Continental's explanation for her nonpromotion is pretextual. (Def.'s Br. in Supp. of Mot. for Summ. J. ("Def. Br.") at 16-25.) The Court shall take each of those bases for summary judgment in turn.

1. Prima Facie Case: Whether Reap Was Qualified

Continental argues that it is entitled to summary judgment because Reap cannot establish that she was qualified for the position of AVP, and therefore that Reap cannot satisfy the second prong of a prima facie case under either Title VII or the ADEA. (Def. Br. at 16-19.) According to the testimony of Flood and Kelly, Flood selected Jahn (and Kelly recommended Jahn) for the AVP position in the Cranbury ECD because Jahn possessed a broad-based environmental claims background and a reputation as an effective and well-respected manager of people. (Flood Aff. PP 11-14; Kelly Aff. PP 12-14.) According to those same individuals, Reap, in contrast to Jahn, did not have Jahn's broad-based environmental [*23] claims background or sufficient management skills. (Flood Aff. PP 17-18; Kelly Aff. PP 19-21.) Continental maintains, therefore, that Reap cannot establish a prima facie case because she did not meet the objective qualifications for the AVP position -- broad-based environmental claims experience. (Def. Br. at 17.) [2] In response, Reap contends that "the evidence clearly shows that [she] was equally well-respected as a manager, has equally broad claims handling experience and, in addition, had a law degree and much more experience in the industry than Jahn." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. ("Pl. Br.") at 10.) [3]

2     Continental properly acknowledges that effective management skills is a subjective qualification and that Reap, therefore, need not show that she satisfied that qualification for purposes of her prima facie case (Def. Br. at 17). See *Sempier, 45 F.3d at 729* (stating that only objective qualifications are considered at prima facie stage and that subjective qualifications, such as management or leadership skill, are considered at pretext stage).

3     Reap explicitly argues that her reputation as a manager, her law degree, and her greater experience in the industry are factors indicating that she was qualified for the AVP position. (Pl. Br. at 12 (arguing those factors raise genuine issue of material fact concerning whether Reap "was objectively more qualified for the Assistant Vice President position than Jahn").) Without expressly linking those considerations to pretext, however, Reap seems to imply that those factors also speak to the issue of pretext. (Id. (stating that "further evidence of pretext is supplied by defendant's varying allegations regarding the selection process and reasons which led to Jahn's appointment") (emphasis added).) The Court shall grant Reap the benefit of the doubt by assuming that she has satisfied her prima facie case and by considering those factors in the context of the pretext analysis. Although "objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to consideration of whether the employer's nondiscriminatory reason for discharge is pretext." *Sempier, 45 F.3d at 729.*

[*24] The Court considers, therefore, whether the record indicates that a genuine issue of material fact exists concerning whether Reap met the AVP position's objective qualification of broad-based environmental claims experience. Continental contends that Reap's experience was limited to asbestos and other toxic tort claims, and that she had no experience handling hazardous waste claims. Given that gap in experience, according to Continental, Reap lacked the range of environmental claims experience Flood deemed necessary to serve as AVP of the Cranbury ECD.

Reap admits that she had no responsibility for handling hazardous-waste claims during her time with Continental. (Pl. Undisp. Facts P 4; see also Reap Dep. at 39-41.) Reap maintains, however, that she did in fact have broad-based environmental claims experience, including experience managing hazardous waste and right-to-know claims, that she gained in her position as Assistant Vice President of Industrial Claims at CIGNA, a prior employer of Reap. (Pl. Br. at 5-6, 10.) The portions of her deposition testimony to which Reap cites to support that assertion simply fail to provide such support. [4] Continental, in contrast, points to [*25] portions of Reap's deposition in which she states that her involvement with hazardous-waste issues at CIGNA was at best tangential:

Q You were at CIGNA from 1983 until 1990?

A That's right.

Q Did you do any work on pollution [i.e., hazardous waste] issues when you were at Cigna?

A Only tangentially. My assignment was in their what was called major claims area.

Q And major claims involved what?

A Major claims involved asbestos and mass torts.

* * * *

Q You did nothing on pollution [i.e., hazardous waste] issues when you were at Cigna, correct?

A That's correct. Only insofar as it involved my particular department. We would have other meetings where pollution issues would be discussed, and I was part of the team that would be involved in the decision making.

Q But you had no hands-on experience in managing pollution [i.e., hazardous waste] files, correct?

A That's correct.

(Reap Dep. at 18-20.) Although not cited in Reap's brief, Reap does state in another place in her deposition testimony that from 1983 to 1986 at CIGNA she handled professional "and other types of liability claims, hazardous waste, right-to-know laws, sexual [*26] abuse." (Id. at 114.) Contrary to Reap's contention, however, she gained that experience while she worked as a loss control specialist at CIGNA from 1983 to 1986, not while serving as Assistant Vice President of Industrial Claims at CIGNA from 1986 to 1991. (Reap Dep. at 21-22.)

> 4     Specifically, in her brief, Reap cites exclusively to her deposition testimony at pages 15, 20, and 113 to support her conclusion that she had broad-based environmental claims experience gained during her tenure as Assistant Vice President of Industrial Claims at CIGNA. (Pl. Br. at 5-6, 10.) At page 15 of her deposition testimony, Reap names two partners for whom she worked at a law firm, states that she was interviewing for her position at CIGNA while still employed at the law firm, and states that her first position for CIGNA was as a technical specialist in 1983, when she was 42 years old. (Reap Dep. at 15.) Page 20 of Reap's deposition testimony actually supports Continental's argument: Reap states, inter alia, that she had no hands-on experience managing pollution [i.e., hazardous waste] files at CIGNA. (Id. at 20.) And on page 113, Reap's only reference to CIGNA is the following response: "When I began with Cigna, I was an associate with the loss control department. And I was specifically brought in because of my professional background to do work on the liabilities of the professional groups that Cigna insured." (Id. at 113.) Contrary to Reap's argument, that cited evidence fails to support the conclusion or any inference that Reap gained broad-based environmental claims experience during her employment at CIGNA.

[*27] Specifically on the issue of an employer-deemed qualification in the context of nonpromotion, the Third Circuit has cautioned courts:

> Where an employer produces evidence that the plaintiff was not promoted because of its view that the plaintiff lacked a particular qualification the employer deemed essential to the position sought, a district court should focus on the qualification the employer found lacking in determining whether non-members of the protected class were treated more favorably. Without such a limitation, district courts would routinely be called upon to act as members of an employer's promotion board or committee. It would subjectively consider and weigh all the factors the employer uses in reaching a decision without the intimate knowledge of the history of the employer and its standards that the firm's decisionmakers use in judging the degree to which a candidate exhibits a particular qualification that the employer has decided is of significance or primary importance in its promotion process.

*Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992)*, cert. denied, *510 U.S. 826, 126 L. Ed. 2d 56, 114 S. Ct. 88 (1993)*. [*28] Although the evidence in the record to which Reap points fails to raise a genuine issue of material fact concerning whether she met the objective qualification for the AVP position, the Court shall assume that such qualification was satisfied and advance to the pretext stage of the analysis.

## 2. Pretext

Even if Reap established a prima facie case, to survive summary judgment when the employer has produced a legitimate, nondiscriminatory reason, [5] Reap must satisfy the pretext stage. The Court thus considers the third and final step of the burden-shifting analysis, which "is usually the determinative stage of the case." *Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999)*. At the final stage, the burden shifts back to the plaintiff to produce "sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional . . . discrimination." Id.

> 5     A defendant's burden at stage two "is relatively light:" that burden is satisfied if the defendant articulates any legitimate reason for the employment action, and the defendant need not prove that the articulated reason actually motivated that action. *Woodson v. Scott Paper,*

*109 F.3d 913, 920 n.2 (3d Cir. 1997)*. Reap does not contest that Continental has met its burden to articulate a legitimate, nondiscriminatory reason for the nonpromotion. Continental proffers that Jahn was better qualified than was Reap for the AVP position in that Jahn had broad-based environmental claims experience and a fine reputation as an effective and well-respected manager, and that reason satisfies Continental's burden under stage two. See, e.g., *Bazargani v. Haverford State Hosp., 90 F. Supp. 2d 643, 660 (E.D. Pa. 2000)*; *Pepe v. Rival Co., 85 F. Supp. 2d 349, 377 (D.N.J. 1999)*, aff'd, *254 F.3d 1078 (3d Cir. 2001)*.

[*29] In the Third Circuit, a plaintiff arguing pretext may defeat a motion for summary judgment by satisfying the Fuentes/Sheridan standard. *198 F.3d at 413*; see also *Keller v. Orix Credit Alliance, 130 F.3d 1101, 1108-09 (3d Cir. 1997)* (describing Fuentes/Sheridan standard). Under that standard, an employee may defeat a motion for summary judgment by pointing "to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes, 32 F.3d at 764*; see also *Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996)*. The Fuentes/Sheridan standard, therefore, involves a two-prong disjunctive test.

Under the first prong, an employee may defeat a motion for summary judgment by discrediting the employer's proffered reasons, either directly or circumstantially. *Fuentes, 32 F.3d at 764*. To discredit the employer's proffered reason, the plaintiff

cannot [*30] simply show that the employer's decision was wrong or mistaken, since the factual dispute at is issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its actions that a reasonable

factfinder could rationally find them unworthy of credence.

*Id. at 765* (citations omitted). Stated differently, the plaintiff may survive summary judgment under the first prong by demonstrating, through admissible evidence, "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller, 130 F.3d at 1109*. That required demonstration "places a difficult burden on the plaintiff[.]" *Fuentes, 32 F.3d at 765*.

Under the second prong of the Fuentes/Sheridan standard, a plaintiff alternatively may survive summary judgment by "adducing evidence, whether circumstantial or direct, that discrimination was more likely than [*31] not a motivating or determinative cause of the adverse employment action." *Id. at 764*. To satisfy that element, the plaintiff, for example, "may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998)*.

Reap appears to suggest that several professional attributes not only made her more qualified than Jahn for the AVP, but also imply that Continental's nonpromotion of her involved pretext. Reap contends specifically that, as compared to Jahn, she was equally well respected as a manager, had equally broad claims handling experience, and additionally had a law degree and much more experience in the industry. (Pl. Br. at 10.) Reap also argues that the Court should take into account a comparison between the 1992 Performance Evaluations of Reap and Jahn and between the 1995 Performance Appraisals of Reap and Jahn. (Id. at 10-12.) The [*32] Court will consider each of those contentions in determining whether Reap has demonstrated proof of pretext.

Reap argues that "the evidence clearly shows that Reap was equally well-respected as a manager[.]" (Id. at 10.) Precisely what "evidence clearly shows" such a characteristic is unclear, however, because Reap fails to point in her brief to such evidence in the record.

Outside of her brief, Reap appears to suggest that evidence of her equal respect as manager is located in a

comparison of performance evaluations of Reap and Jahn. (Pl. Undisp. Facts P 16.) The Court will next consider the significance, if any, of Reap's proffered comparisons. Reap argues that "[a] comparison of Reap's and Jahn's 1992 Performance Evaluations demonstrate Reap's superior performance": "Out of six Management Accountabilities, Jahn was rated 'Meets All Expectations' overall but was rated 'Exceeds Expectations in only two. In contrast, Reap, who was also rated 'Meets All Expectations' overall and was rated 'Exceeds Expectations' in three of six Management Accountabilities." (Pl. Br. at 10.) Reap also points out that between 1990 and 1992, "Jahn's performance evaluation fell from a 4 (Exceeds [*33] Expectations) overall to a 3 (Meets All Expectations) overall." (Pl. Undisp. Facts P 14.) Reap further suggests that her "superior performance and managerial skills were also recognized in her 1995 performance evaluation in which Reap was rated Reap was rated [sic] as "Achiever - Strong Contributor" overall." (Pl. Br. at 11.) [6] Reap also quotes comments from the Core Values portion of her 1995 Performance Evaluation. [7] In a purely conclusory fashion and without making any comparison, Reap then states that "Jahn's 1995 Performance Appraisal did not reflect a similar level of achievement or recognition from clients and other departments." (Id. at 12.)

6     Specifically, Reap quotes the following from the Key Results section of her 1995 Appraisal:

1. **Organize and coordinate efforts toward controlling legal costs through cost-sharing programs, and legal-file management techniques:**

Judy is to be credited with **leading industry initiatives** in organizing and implementing Joint Neutral Defense efforts among commonly situated defendants. She is also a Steering Committee member of the Joint Neutral Maritime Group

and is currently attending formation meetings on Lead Litigation Resources. She has assisted the Department in drafting defense billing guidelines, and evaluating auditing systems (LESN), and outside auditing firms.

2. **Manage the most significant asbestos exposures:**

In spite of the increasing numbers of claims, Judy's efforts on the Bendix account, through the establishment of strict billing guidelines and close oversight of defense firms, **have resulted in a reduction in Bendix LAE for the first time in five years.** Additionally, **she has been instrumental** in our improved working relationship with the Allied in-house staff which has enhanced our ability to secure a number of very favorable bulk settlements during 1994. Judy's advice and close coordination of the OFC account, have defeated their

efforts to have CIC pay policy limits prematurely.

3. **Manage the Special Litigation Unit in the oversight of handling of Silicone Implant, Noise-Induced Hearing Loss, Repetitive Stress, EMF, and AIDS cases:**

Judy's unit is **well trained and organized** in overseeing and handling the claim types designated as Special Litigation.

4. **Track developments and keep management informed of emerging issues and claim-types in toxic tort arena:**

Judy has shown that she is cognizant of the "need-to-know" threshold at the various senior management levels, and she continues to provide informative reports and news articles which relate to developments in potential claims which may impact future financial results.

(Pl. Br. at 11 (quoting Reap 1995 Performance Evaluation) (emphasis supplied in brief).)

[*34]

7  Reap quotes the following comments:

**Accountability:** Judy has a keen understanding of the key objectives

and priorities associated with the oversight of special litigation issues, **and very effectively manages** her staff to insure that the Corporation is well advised in advance of potential claims' concerns.

**Customer Focus:** Judy has **received high praise from the Actuary, Accounting, and Finance Departments** for keeping the appropriate individuals apprised of our present and estimated future exposures attendant to our most active asbestos accounts. **She was commended by Allied Signal's Chief Counsel for her superb efforts in managing and controlling the Bendix account.**

**Quality:** Judy's reports to senior management on emerging environmental claim-types **have always been timely (if not proactive),** and of the highest quality in presenting concise yet informative narratives regarding status and potential concerns.

(Id. at 12 (quoting Reap's 1995 Performance Evaluation) (emphasis supplied in brief).)

Reap's conclusory statement that Jahn's [*35] 1995 performance evaluation does not reflect the same "level of achievement or recognition" as Reap received is nothing more than her own subjective opinion. At the pretext stage of the analysis, an employee's own conclusory statements regarding her qualifications in relation to a competitor's qualifications are insufficient to defeat summary judgment. *Pepe v. Rival Co., 85 F. Supp. 2d 349, 379 (D.N.J. 1999),* aff'd, *254 F.3d 1078 (3d Cir. 2001).* [8]

8  In part II.B.2 of this Memorandum and Order, we discuss more fully that a plaintiff's subjective belief that she is more qualified for a position is insufficient to raise a genuine issue of material fact on pretext. Those principles apply equally to this part of the our opinion. See supra part II.B.2

at 45-49.

The proffered comparison, in any event, suffers from the deficiency that different reviewers prepared the 1995 Performance Evaluations of Reap and Jahn. (Reap Exs. C & D: Performance Evaluations of Reap & Jahn.) Further, [*36] Reap's suggestion that discrimination should be inferred because she received one more "Exceeds Expectations" rating in a rating three years before the promotion decision is untenable. Undoubtedly Reap received positive comments in her 1995 Performance Evaluation, but as the Third Circuit has indicated, "Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations." *Ezold, 983 F.2d at 528.*

The circumstances here find a parallel to those in *Johnson v. Penske Truck Leasing Co., 949 F. Supp. 1153 (D.N.J. 1996)*, in which the plaintiff contended, as does Reap here, that a performance-history comparison illustrates pretext. In Johnson, the plaintiff was denied a promotion, and she then came forward at summary judgment with a comparison between her performance appraisals and those of the person receiving the promotion. *Id. at 1175.* Assuming that a discrepancy in appraisals existed, the court reasoned that any variance is explained when it is considered that "different supervisors are rating different employees in different [*37] capacities." *Id. at 1175.* There, as here, different supervisors evaluated the respective employees. Id. (stating that evaluation procedure "is based upon standards which may be defined differently by the individual appraiser"). There, as here, any discrepancy between performance evaluations "appears to be the difference in the position or area of employment." Id. ("What is considered to be good work by an employee occupying a lower position, will not necessarily translate into good work by an employee at a higher position."). In Johnson, as here,

the proffered reasons for the adverse employment decision were not based on alleged poor work performance by [the plaintiff]. Accordingly, [the plaintiff's] reliance on her favorable Performance Appraisals fails to rebut or cast doubt upon the proffered reasons, giving rise to an inference of pretext. Unless [the defendant] relied on [the plaintiff's] poor

work performance as an articulated justification, evidence of good performance does not refute or cast doubt upon [the defendant's] legitimate, non-discriminatory reasons for the employment decision. The performance of [the plaintiff] was [*38] not an articulated reason for the adverse employment decision. On the contrary, the superior potential of [the person promoted], as documented at the time of the decision, was the basis for the decision.

*Id. at 1175-76* (citation omitted). The reasoning and ruling in Johnson undermines Reap's reliance on her performance-history comparison to establish pretext.

Reap also suggests that Continental has offered inconsistent accounts of the AVP selection process and inconsistent reasons for Jahn's ultimate appointment as AVP. (Pl. Br. at 12.) Reap contends, therefore, that those alleged inconsistencies supply further proof of pretext. (Id.) Certainly, a plaintiff's demonstration that the reasons given for her adverse employment action did not remain consistent may be viewed as evidence tending to show pretext. *Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 284 (3d Cir. 2001)*; see also *Fuentes, 32 F.3d at 765* (listing "inconsistencies" and "contradictions" in employer's reasons as ways plaintiff might establish pretext). Here, however, the premise for Reap's argument -- that Continental's explanations were inconsistent [*39] -- is flawed; no inconsistency exists.

Reap begins with Continental's Position Statement from October 1996 in response to Reap's EEOC Charge 1. That Statement refers, inter alia, to how Flood began the process of identifying candidates for the AVP position, was qualified to make the selection, and finally appointed Jahn. (October 17, 1996 Position Statement at 3-4.) [9] Pointing out the purported inconsistency, Reap maintains that Continental now "asserts that it was Kelly, not Flood, who identified and recommended Jahn for the position (even though Kelly did not supervise Jahn directly) and Flood only approved the recommendation." (Pl. Br. at 13 (citing Def. Undisp. Facts PP 9-11).) Reap suggests that "this discrepancy alone provides enough evidence for a jury to conclude that [Continental's] stated reasons for selecting Jahn over Reap for the Assistant Vice President position are pretextual." (Id. at 13.) But there is no such discrepancy. For this summary judgment

motion, Continental has provided additional consistent detail about the AVP selection process with regard to Kelly's participation in recommending a successor to Flood. [10] Nothing in the record contravenes Continental's [*40] contentions in its EEOC Position Statement that Flood led the selection process, was qualified to do so, and ultimately appointed Jahn. Continental has now described Kelly's role in, and reasons for, recommending Jahn as his (Kelly's) successor, but that does not contradict the position that Flood was responsible for the selection process. [11]

9    The exact language in Continental's Position Statement to which Reap refers is as follows (Pl. Br. at 13):

> In early September, 1995, Kevin Kelly, the Assistant Vice President of Environmental Claims in the Cranbury office (and Charging Party's manager:), informed the Senior Vice President of Corporate Claims, James Flood (DOB 9/01/50), he was leaving. Because of the importance of a smooth transition in the Cranbury office so soon after the merger, Flood immediately began the process of identifying candidates for the successor to the Assistant Vice President position.

> Flood was qualified to make this selection because, prior to the merger, he had been Vice President of Environmental Claims and thereafter Senior Vice President of the Corporate Claims Department at Continental Insurance in Cranbury. In those positions, he had become very familiar with the Cranbury Environmental Claims Organization and with the individuals working there. Flood knew he needed to fill the position quickly and hoped it would be filled internally. It was critical to Flood that the individual selected to fill the position be familiar with the organization and have good

"people skills" as well as strong technical skills to do the job.

> On September 15, 1995, Flood appointed Frederick Jahn (DOB:8/14/63) to the Assistant Vice President position. Flood appointed Jahn because he believed Jahn has excellent people skills and had the technical skills to do the job.

(Position Statement at 3-4.)

[*41]

10    The purported inconsistent explanation of Continental to which Reap refers is as follows:

> 9. In early September 1995, Kelly resigned as AVP of the Cranbury ECD (his post merger title). Flood asked him to recommend a successor, and Kelly recommended Rick Jahn ("Jahn"), another Director in the Cranbury ECD.

> 10. Kelly recommended Jahn based on his broad claims experience, excellent skills as a manager, and overall exemplary performance during his tenure of nearly nine years in the Cranbury ECD. Kelly worked with Jahn in the ECD for nearly eight years and was personally familiar with his performance and capabilities.

> 11. Flood agreed with Kelly's recommendation and, effective September 15, 1995, promoted Jahn to AVP of the Cranbury ECD.

(Def. Undisp. Facts PP 9-11.)

11    Even if the Court were to assume a degree of inconsistency between Continental's EEOC Position Statement and its subsequent description of the AVP selection process, a discrepancy between an employer's EEOC position statement and a subsequent explanation offered at summary judgment does not necessarily generate an

inference of pretext. See *Simpson, 142 F.3d at 639 n.15.* Because an employer's post hoc explanation does not alone produce a factual dispute about whether the explanation is pretextual and because a plaintiff must point to evidence that demonstrates a reason to disbelieve the employer's explanation, a court may decline "to bind defendants to 'positions they initially assert in state administrative proceedings by rendering any different position a per se pretext[.]'" Id. (quoting *McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 374 (7th Cir. 1992)).*

[*42] Reap has not satisfied her "difficult burden" to show pretext. See *Fuentes, 32 F.3d at 765.* Under the first prong of the Fuentes/Sheridan standard, Reap has not presented or pointed to sufficient evidence "to meaningfully throw into question, i.e., to cast substantial doubt upon" Continental's reasons for promoting Jahn. The record indicates that Jahn was qualified for the AVP position in that he met the objective qualification of broad-based environmental claims experience and the subjective qualification of a well-respected manager, [12] and Reap does not effectively contest those qualifications. Reap then has presented no evidence that Continental's stated reason for her nonpromotion to AVP -- its belief that Jahn was better qualified -- was not Continental's real reason. See *Martinez v. Quality Value Convenience, Inc., 37 F. Supp. 2d 384, 389 (E.D. Pa. 1999)* (granting summary judgment because plaintiff's recitation of qualifications does "nothing to rebut [the employer's] claim that it preferred a candidate with broader and more recent experience"). An employer "is not required to prove that those promoted are 'better qualified' than the [*43] plaintiff." *Ezold, 983 F.2d at 531 n.21.* Reap has not demonstrated that Continental's articulated qualifications "are so unrelated to [the AVP position] as to be pretext for intentional discrimination. *Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000).* Reap's allegation of pretext essentially rests on her disagreement with Flood that Jahn was more qualified for the AVP position and on her contention that she had other and more relevant qualifications. [13] Reap's assertions that she is more qualified "amount to nothing more than an attempt to displace [Continental's] business judgment with her own," and that attempt "is insufficient to overcome summary judgment. *Dungee v. Northeast Foods, Inc., 940 F. Supp. 682, 689 (D.N.J. 1996).*

12   That Flood based his decision to select Jahn

for the AVP position in part on a subjective qualification -- Jahn's management skills -- provides no ground to infer pretext. See, e.g., *Billet v. CIGNA Corp., 940 F.2d 812, 828 (3d Cir. 1991)* ("Barring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions."); *Johnson, 949 F. Supp. at 1172* (stating that "an employer must be granted substantial discretion to exercise subjective judgment in the rendering of employment decisions").

[*44]

13   Specifically, Reap points to her law degree and greater experience in the industry as proof of her superior qualifications. Those professional attributes, however, do not generate an inference of pretext. Reap admits that a law degree was never a qualification for the AVP position. (Pl. Undisp. Fact P 24.) A plaintiff's proffer of an irrelevant qualification engenders no inference of pretext. *Parry v. Jackson Nat'l Life Ins. Co., 54 F. Supp. 2d 473, 478 (E.D. Pa. 1999).* Reap also admits that Kelly, Jahn's predecessor, had no law degree, nor did Karen Campbell or Helen Merrick, the persons Flood promoted to the AVP positions in Chicago and San Francisco, respectively. (Pl. Undisp. Facts P 24.) Also, although Reap had been "in the industry" longer than Jahn, he had been employed at Continental for seven years as compared to three years for Reap. (Jahn Aff. P 2; Reap Dep. at 36-37.) Further, it is not for a district court to determine that a plaintiff's skills in areas other than the stated qualification area make her qualified for a position. See *Ezold, 983 F.2d at 528.*

[*45] Reap has not satisfied the second prong of the Fuentes/Sheridan pretext standard either. That is, Reap had not "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision[.]" *Fuentes, 32 F.3d at 765.* Reap has not shown, for example, that Continental has discriminated against other members of her protected class or other protected categories of persons. See id. Continental has produced evidence that the opposite is true. Not long before Flood promoted Jahn to the AVP position of the

Cranbury ECD, Flood promoted Karen Campbell to the AVP position of the Chicago ECD and, in August 1996, promoted Helen Merrick to the position of AVP of the San Francisco ECD. (Flood Aff. P 15.) Those promotions belie an inference that Flood harbored a discriminatory animus toward Reap on the basis of gender.

Further, Kelly initially hired Reap at Continental. When the person contributing to the challenged employment action "was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation [*46] that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997)*.

In addition, Kelly, who recommended Jahn, and Flood, who decided to promote Jahn, were 46 and 45 years old, respectively, at the time of that promotion decision. Kelly and Flood, therefore, were members of the protected group under the ADEA. Although evidence of the decisionmakers' membership in the protected group is not dispositive on whether discrimination occurred, the fact that the decisionmakers are members of a plaintiff's protected class weakens any possible inference of discrimination. *Dungee, 940 F. Supp. at 688 n.3*. The membership of Kelly and Flood in Reap's protected age group diminishes any possible inference of age discrimination.

Continental "may have been wrong in its perception of [Reap's qualifications] and, if so, its decision to pass over [Reap] would be unfair, but that is not for us to judge. Absent a showing that [Continental's] articulated reason . . . was used as a tool to discriminate on the basis of sex [or age], [Reap] cannot prevail." See *Ezold, 983 F.2d at 533*.

Because [*47] Reap has not produced or pointed to sufficient evidence to show that Continental's proffered reason was pretextual or that a discriminatory purpose motivated the employment decision, Continental is entitled to summary judgment on Reap's claims for age and gender discrimination as to the AVP nonpromotion. [14]

14   The Third Circuit has stated: "It is a sad fact of life in the working world that employees of ability are sometimes overlooked for promotion. . . . The law limits its protection against that unfairness to cases of invidious illegal discrimination." *Ezold, 983 F.2d at 542*.

**B. VP Position**

Aries was selected for the VP position. Reap contends that she should have received that promotion, and that the denial of that promotion is unlawful on the basis of age and gender discrimination. Continental argues that it is entitled to summary judgment on Reap's claim that she was unlawfully denied a promotion to the position of VP of the ECD on two main grounds: (1) Reap cannot establish a [*48] prima facie case of age discrimination because she cannot prove that Aries was "sufficiently younger," and cannot establish a prima facie case of age or gender discrimination because she cannot prove that she was qualified for the VP position; and (2) even if Reap could establish prima facie cases, she cannot establish that Continental's explanation for her nonpromotion is pretextual. (Def. Br. at 25-32.)

1. Prima Facie Case: "Sufficiently Younger" Element and Qualified Element

a. *"Sufficiently Younger" Element*

The Court addresses first Continental's argument that Reap cannot establish a prima facie case of age discrimination because she cannot prove the fourth element of the standard, namely, that Aries, the person promoted, was "sufficiently younger." Courts generally agree that satisfaction of the sufficiently younger element of a prima facie ADEA case requires proof of an age difference of at least five years. *Martin v. Healthcare Bus. Res., 2002 U.S. Dist. LEXIS 5117*, No. 00-3244, 2002 WL 467749, at *5 n.7 (E.D. Pa. Mar. 26, 2002) ("For purposes of a prima facie ADEA case, the fourth element contemplates an age difference of at least five years."); *Fakete v. Aetna, Inc., 152 F. Supp. 2d 722, 735 (E.D. Pa. 2001)* [*49] ("For satisfaction of the fourth element, courts generally require proof that the plaintiff was replaced by a person who is younger than he by at least seven years."); *Gutknecht v. SmithKline Beecham Clinical Labs., 950 F. Supp. 667, 672 (E.D. Pa. 1996)* (stating that "it is generally accepted that when the difference in age between the fired employee and his or her replacement is fewer than five or six years, the replacement is not considered 'sufficiently younger,' and thus no prima facie case is made"); *Bernard v. Bethenergy Mines, Inc., 837 F. Supp. 714, 716-17 (W.D. Pa. 1993)* (finding that seven-years and six-years differences are not sufficiently younger), aff'd, *31 F.3d 1170 (3d Cir. 1994)*; *Hill v. Bethlehem Steel Corp., 729 F. Supp. 1071, 1074 n.5 (E.D. Pa. 1989)* (same), aff'd,

*902 F.2d 1560 (3d Cir. 1990)*. The Third Circuit in Narin v. Lower Merion School District held that the plaintiff, age 56, failed to establish a prima facie case of age discrimination when the persons hired for the positions in question were 49 and 54 years old; the Court concluded that those age differences reflected [*50] that the positions were not filled with persons sufficiently younger to permit an inference of discrimination. *206 F.3d at 333 n.9*.

In this case, at the time Aries was promoted to the VP position, Reap was 54 and Aries was 50. (Reap Dep. at 131.) As a matter of law, therefore, that four-year age difference demands the conclusion that Aries was not sufficiently younger than Reap to permit an inference of discrimination. [15] Having failed to satisfy the fourth element, Reap thus fails to establish a prima facie case of age discrimination under the ADEA with regard to her claim concerning her nonpromotion to the VP position. Accordingly, Continental is entitled to summary judgment on that claim.

> 15    Although acknowledging the four-year age difference, Reap nonetheless argues, citing *Arnett v. Aspin, 846 F. Supp. 1234, 1241 (E.D. Pa. 1994)*, that courts "have recognized a hybrid protected class of 'older women,' recognizing that older women are discriminated against more often than younger men or older men." (Pl. Br. at 6.) Plaintiff concludes that "the age difference between Reap and Aries, together with the recognition of this hybrid type of discrimination, is sufficient to satisfy the age difference requirement for stating a *prima facie* case of age discrimination here." (Id.) In Arnett, the case upon which Reap relies, the court specifically stated that a "sex-plus-age" discrimination claim is cognizable only under Title VII, not ADEA. 846 F. Supp. at 1240 ("It is important to remember that . . . [the plaintiff's] complaint contains a claim for sex discrimination, not age discrimination."); see also *Kelly v. Drexel Univ., 907 F. Supp. 864, 875 n.8 (E.D. Pa. 1996)*. Because Reap seeks to invoke Arnett's hybrid theory of discrimination in support of her ADEA claim, that theory is inapplicable by Arnett's own terms.

[*51]  b. *Whether Reap Was Qualified*

The Court next addresses Continental's argument that it is entitled to summary judgment on the ground that Reap cannot establish a prima facie case of age or gender discrimination under ADEA or Title VII because she cannot prove that she was qualified for the VP position.

With regard to the VP hiring process, the parties do not dispute certain facts. After promoting Jahn to the Cranbury AVP position, Flood and Samuel, Vice President of Human Resources, began a search for a candidate to fill the newly created position of VP of the ECD. The person selected as VP would be based in Chicago and responsible for overseeing the three regional claims centers in Cranbury, Chicago, and San Francisco, which included 160 employees. Given that responsibility, the primary requirements for the VP position were prior experience managing a multi-location organization and environmental claims experience. Aries met the qualification of management experience of a multi-location organization through work performed at Continental/CNA. Aries, however, did not have experience managing an environmental claims office, and his prior positions did not involve making coverage [*52] determinations. Reap asked that Flood consider her (Reap) for the VP position, and at her request, Flood met with Reap in January 1996 to discuss the position. Flood offered the position to Aries, and Aries became VP of the ECD effective May 1996.

The parties do dispute whether Reap met the objective qualification of experience managing multi-location, geographically dispersed offices. Continental maintains that Reap had no such experience, either at Continental or any prior employer. (Def. Br. at 26.) Reap does not dispute that Aries had such experience or that she (Reap) had gained no such experience while working at Continental. Without citation to the record in her brief, Reap asserts, however, that Continental "ignore's [sic] the experience Reap gained as Assistant Vice President of Industrial Claims at CIGNA where she managed cases handled by employees located in multiple, geographically disparate locations." (Pl. Br. at 6) (emphasis added). As Continental correctly states (Def. Reply Br. in Supp. of Mot. for Summ. J. ("Def. Reply Br.") at 6), the management of "cases" or "claims" supervised by employees in multiple locations is different from managing multiple offices [*53] or supervising employees at multiple locations. Although she testified and still contends that she had responsibility at CIGNA for supervising "claims" received from other offices, Reap acknowledges that she did not have responsibility

for managing multiple offices or for supervising employees at multiple locations. [16] Based on that evidence, viewed in the light most favorable to Reap, there is no genuine issue of material fact that Reap lacked a required, objective qualification for the VP position, namely, prior experience managing multiple, geographically dispersed offices. See, e.g., *Narin, 206 F.3d at 332* (stating that plaintiff failed to prove prima facie case when she lacked teaching certification); *Parry v. Jackson Nat'l Life Ins. Co., 54 F. Supp. 2d 473, 477 (E.D. Pa. 1999)* (granting summary judgment when plaintiff lacked sales and marketing experience and thus lacked objective qualification). The Court, however, will assume nonetheless that Reap has satisfied her burden of establishing a prima facie case, and therefore we next consider the question of pretext.

16     Both parties refer to the same portion of Reap's deposition testimony:

Q Now, when you were the assistant vice president for industrial affairs, you were also located in the Philadelphia office?

A Yes, I was.

Q How many people did you supervise when you were the assistant vice president for industrial claims?

A I think probably - this is just to the best of my recollection - about 45 or 50.

Q And those people were all located in the Philadelphia office?

A The ones that I supervised directly, yes.

* * * *

Q You didn't have any responsibility at Cigna for supervising offices outside of the Philadelphia office, did you?

A They didn't report directly to me unless they were handling a claim of the type that I was

responsible for.

Q And you did not have any of the responsibilities that a manager would have for people outside the Philadelphia office, like doing performance reviews, doing terminations, hiring, that sort of thing?

A No.

Q And it was never in your job description that you managed an office outside of the Philadelphia office, correct?

A That's correct.

(Reap Dep. at 114-16.) That testimony supports Reap's contention that she managed "claims" from several offices at CIGNA, but it also supports Continental's argument that Reap had no experience managing multiple offices or for supervising employees at multiple, geographically dispersed locations.

[*54] 2. Pretext

As noted above, the principles related to the Fuentes/Sheridan standard apply to the pretext stage of the burden-shifting analysis. [17] Reap grounds her pretext argument on her belief that she was "clearly more qualified for the Vice President position than Aries." (Pl. Br. at 14.) According to plaintiff, Aries lacked environmental claims experience, a primary requirement for the position, while Reap, in addition to twelve years of experience managing all types of environmental claims, had managed claims handled by employees located in multiple, geographically dispersed offices. (Id. at 13-14.)

17     Again, Reap does not dispute that Continental has articulated a legitimate nondiscriminatory reason for the promotion of Aries, which is that Aries was the best qualified candidate in that he had experience managing multiple, dispersed offices.

Reap's pretext position, therefore, hinges on her contention that she was more qualified for the VP post

than was Aries. A deficiency in that position [*55] is that a plaintiff's belief that she is more qualified for a position, however sincere, does not generate a genuine issue of material fact. See *Dungee, 940 F. Supp. at 689*; see also *Holmes v. Fed. Aviation Admin., 1999 U.S. Dist. LEXIS 14955*, No. CIV. A. 98-5071 (JEI), 1999 WL 771594, *10 (D.N.J. Sept. 29, 1999). The Third Circuit has indicated that "'more than a denial of promotion as a result of a dispute over qualifications' must be shown to prove pretext[.]" *Ezold, 983 F.2d at 523* (quoting *Molthan v. Temple Univ., 778 F.2d 955, 962 (3d Cir. 1985))*. The decision maker's perception, not the plaintiff's perception of herself, is the relevant consideration, and a court's role is not "to second-guess an employer's business judgment as to who is more qualified for the job." *Dungee, 940 F. Supp. at 689*. Although a plaintiff's superior qualifications may be relevant to the question of pretext, evidence of such qualifications, standing alone, does not create a genuine issue of material fact concerning pretext. See *Simpson, 142 F.3d at 647* (holding that plaintiff's superior qualifications failed to raise genuine [*56] issue of material fact concerning pretext); *Ezold, 983 F.2d at 528* (same); *Farahmand v. Cohen, 1999 U.S. Dist. LEXIS 1314*, No. 97-7952, 1999 WL 80262, at *6 (E.D. Pa. Feb. 11, 1999); *Dungee, 940 F. Supp. at 689* (same). At the pretext stage of the analysis, an employee's own conclusory statements regarding her qualifications in relation to a competitor's qualifications are insufficient to defeat summary judgment. *Pepe, 85 F. Supp. 2d at 379*. That is all that Reap offers here.

It is undisputed that Aries had prior experience managing multiple locations. The record reveals no genuine dispute that Flood considered such prior management experience an important qualification for the VP position. The Position Profile that Flood and Samuels prepared emphasized the need for a candidate who could effectively manage and integrate three geographically dispersed organizations. (Position Profile) Additionally, Flood himself consistently told Reap the main criterion for the VP position is the ability to manage multiple locations. [18]

18    Prior to Reap's interview, Flood wrote to her:

> The main characteristic they [sic] we feel most internal candidates lack is extensive experience in managing multiple locations of

claims operations. The new VP will be managing three offices with over 150 people. We want someone who has done this or had equivalent experience, ideally. The one internal candidate that we have is not in the Environmental Claims operation presently but has this kind of background. There are other important characteristics that we are looking for in the candidates for the new VP job but this is the one that most people currently in the units lack.

(Flood Aff. P 41 & Ex. 6: E-Mail Messages between Reap and Flood.) After her interview, Flood again advised Reap that she did not have the "extensive managerial experience with emphasis on managing people and operations in multiple locations" that Flood was seeking. (Id.)

[*57] Further, Flood and Samuel jointly conducted the selection process for the VP position. As a 50-year-old woman at the time of the selection process, Samuel was a member of both of Reap's protected classes, age and gender. As noted above, a decisionmaker's membership in a plaintiff's protected class weakens any possible inference of discrimination. *Dungee, 940 F. Supp. at 688 n.3*. The membership of Samuel in Reap's protected age and gender groups diminishes any possible inference of age or gender discrimination.

Reap argues that Continental's explanation for her nonpromotion to VP is pretextual because "Aries lacked a primary requirement for the position, environmental claims experience." (Pl. Br. at 13.) The record indicates, however, that Continental chose to focus on the qualification of experience managing multiple offices, in the absence of a candidate possessing both preferred qualifications. Although that prioritization may or may have been preferable, it was one that Continental was entitled to make. A plaintiff does not demonstrate pretext by simply showing that the employer was mistaken in its business judgment, for "the question is not whether the employer [*58] made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Keller, 130 F.3d at 1109* (quoting *Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996))*; see also

*Hodgkins v. Kontes Chemistry & Life Sci. Prod., 2000 U.S. Dist. LEXIS 2293*, No. Civ. A. 98-2783 (JBS), 2000 WL 246422, at *14 (D.N.J. Mar. 6, 2000); *Grove v. H.E.F., Inc., 1998 U.S. Dist. LEXIS 2727*, No. CIV. A. 97- CV-373, 1998 WL 107179, at *3 (E.D. Pa. Mar. 11, 1998); *Weiss v. Parker Hannifan Corp., 747 F. Supp. 1118, 1128 (D.N.J. 1990)*. The Third Circuit "has indicated that absent a sufficient showing by the plaintiff, courts should not substitute their own judgment, or the judgment of anyone else, for that of the employer." *Pepe, 85 F. Supp. 2d at 367* (citing *Healy v. New York Life Ins. Co., 860 F.2d 1209, 1220)*; see also *Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991)* (stating that "barring discrimination, a company has the right to make business judgments on employee status"). Statutes prohibiting discrimination in employment "are designed to protect against discrimination, not to displace employers' discretion [*59] in making employment decisions." *Pepe, 85 F. Supp. 2d at 368*; see also *Burdine, 450 U.S. at 259* (stating that antidiscrimination statutes are not intended to "diminish traditional management prerogatives"); *Billet v. CIGNA Corp., 940 F.2d 812, 828* (stating that "Court will not interfere in an otherwise valid management decision" without evidence to cast doubt on employer's reason).

The Court concludes that Reap has failed to produce or point to evidence creating an inference of pretext with regard to the VP position.

### III. Claims for Retaliation Under Title VII, ADEA, and NJLAD

Reap alleges that CNA unlawfully retaliated against her in violation of Title VII, ADEA, and NJLAD by firing her for filing an EEOC Charge. (Compl. Counts Three, Four, Six.) The same burden-shifting framework applied to Reap's discrimination claim also applies to her retaliation claims. See, e.g., *Bazargani v. Haverford State Hosp., 90 F. Supp. 2d 643, 653 (E.D. Pa. 2000)*.

Reap first must establish a prima facie case. The parties agree that standards for establishing a prima facie retaliation claim under Title VII, ADEA, and NJLAD are the same [*60] (Pl. Br. at 15 n.4; Def. Br. at 33.) See *Horvath v. Rimtec Corp., 102 F. Supp. 2d 219, 234 (D.N.J. 2000)*. To establish a prima facie case of retaliation, a plaintiff must prove that (1) she engaged in protected activity; (2) she was subjected to adverse employment action contemporaneous with or subsequent to the protected activity; and (3) a causal link exists

between the protected activity and the adverse employment action. *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)*; *Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)*; *Delli Santi v. CNA Ins. Co., 88 F.3d 192, 198 (3d Cir. 1996)*; *Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)*, cert. denied, *493 U.S. 1023, 107 L. Ed. 2d 745, 110 S. Ct. 725 (1990)*.

Continental argues that Reap fails to establish a prima facie case of retaliation because she cannot demonstrate a causal link between her protected activity (i.e., filing an EEOC Charge) and the adverse employment action to which she was subjected (i.e., the termination of her employment). [19] (Def. Br. at 33.) Continental, therefore, acknowledges [*61] that Reap satisfies the first and second elements of a prima facie case, [20] but argues that Reap is unable to satisfy the third element.

> 19  Reap filed a second charge with the EEOC in May 1998. That second charge, filed after the adverse employment action, is irrelevant for purposes of Reap's retaliation claim. See *Bazargani, 90 F. Supp. 2d at 653 n.20*.
>
> 20  The filing of an EEOC Charge unquestionably is protected activity, see, e.g., *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)*; *Elwell v. PP & L, 2001 U.S. Dist. LEXIS 19725*, No. 99-2716, 2001 WL 1529063, at *8 (E.D. Pa. Nov. 28, 2001); *Hodgkins v. Kontes Chemistry & Life Sciences Product, 2000 U.S. Dist. LEXIS 2293*, No. Civ. A. 98-2783 (JBS), 2000 WL 246422, at *18 (D.N.J. Mar. 6, 2000), and termination of employment undeniably is an adverse employment action. At two points in her brief, Reap cursorily seems to suggest that the performance evaluations themselves and the PIP constitute adverse employment actions. (See Pl. Br. at 14 (arguing that in focusing on Reap's termination, Continental "takes an unduly narrow view of what can constitute an 'adverse employment action'"); id. at 15 (stating that Reap was "subjected to adverse employment activity, receiving written warnings regarding her performance, receiving a negative performance evaluation, being placed on a Performance Improvement Plan ("PIP"), and ultimately being discharged (although defendant ignores all but the last)").) Other than those thin

suggestions, Reap does nothing more with that argument. Reap, therefore, fails to argue, let alone point to evidence, as to how those allegedly adverse actions alter "the employee's compensation, terms, conditions, or privileges of employment," or deprive her "of employment opportunities." *Robinson, 120 F.3d at 1300*; see also *Weston v. Pennsylvania, 251 F.3d 420, 431* (holding that absence of evidence that written reprimands negatively affected terms and conditions of employment demonstrated that such reprimands were not adverse actions). Accordingly, the Court will consider the termination of Reap's employment the sole adverse employment action for purposes of this motion.

[*62] Reap filed her EEOC Charge in June 1996, and her employment with Continental was terminated in May 1998. The nearly two-year time span between the protected activity and the alleged retaliation is too long to justify an inference of retaliation. See *Weston v. Pennsylvania, 251 F.3d 420 (3d Cir. 2001)* (holding that inference of causation was not justified when, absent other evidence, the alleged retaliatory activity occurred more than one year after protected action); *Krouse, 126 F.3d at 504* (concluding that nineteen-month interval between protected activity and alleged retaliation, without other evidence of discriminatory animus in interim, was insufficient as matter of law to support inference of causation); *Holmes, 1999 U.S. Dist. LEXIS 14955, 1999 WL 771594*, at *11 (finding that period of thirteen months between protected activity and alleged retaliation "is just too great to justify an inference of retaliation"); *Woods v. Bentsen, 889 F. Supp. 179, 187 (E.D. Pa. 1995)* (stating that "courts generally hold that if at least four months pass after the protected action without employer reprisal, no inference of causation is created").

[*63] In the absence of temporal proximity, a court may look for other "evidence of intervening antagonism or retaliatory animus[.]" *Krouse, 126 F.3d at 504*. Temporal proximity and circumstantial evidence of a pattern of antagonism, however, "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Kachmar, 109 F.3d at 177*; see also *Farrell, 206 F.3d at 280-81* (stating that causation may be inferred from other circumstantial evidence gleaned from record as whole).

Reap argues that an intervening pattern of antagonism or animus took the form of "the continuous harassment to which Jahn subjected Reap by making repeated baseless complaints about her performance." (Pl. Br. at 14.) According to Reap, "Jahn began to build a file of alleged deficiencies in [Reap's] performance" from the time Jahn learned that Reap had filed an EEOC Charge. (Id. at 16.) Reap suggests that "Jahn's systematic, continuing course of harassment is precisely the type of pattern the courts have found to provide a causal link." (Id. at 18.)

As evidential support for those arguments, [*64] Reap points to e-mails from Jahn to Reap beginning in January 1997 and to a Performance Improvement Plan that Jahn presented to Reap in April 1998. (Id. at 16-17.) Reap suggests that (1) "beginning in January, 1997 [Jahn] issued an inordinate number of performance-related E-mails to Reap alone, many of which also contain hand-written notations further bolstering Jahn's 'case' against Reap" (id. at 16), (2) less than a week after the EEOC stepped up its investigation of Reap's Charge, Jahn transmitted to Reap via e-mail in late October 1997 a baseless evaluation critical of her job performance, (3) Jahn continued to issue baseless performance-related e-mails through the end of 1997 and into 1998, and (4) on April 16, 1998, Jahn presented Reap with a Performance Improvement Plan that was based on "erroneous factual suppositions" and "set forth vague, unmeasurable goals Reap would have to meet" or else her employment would be terminated. (Id. at 16-17.)

Continental correctly asserts that the predicate for Reap's retaliation argument -- that Jahn knew of Reap's EEOC Charge and began to "build a file of alleged deficiencies" -- lacks factual support. As Jahn outlined various [*65] deficiencies in Reap's work performance starting in January 1997 and through at least her October 1997 performance review, Jahn had no knowledge that Reap had filed an EEOC Charge. [21] Jahn did not come to know of Reap's EEOC Charge until December 1997, when Reap herself told Jahn about it. (Jahn Aff. PP 33-34.) That fact is uncontradicted, and Reap herself acknowledges that she has no evidence that Jahn knew of her Charge before December 1997. (Reap Dep. at 164-66.) Prior to December 1997, therefore, Jahn could not have been retaliating against Reap in her performance evaluations for an EEOC Charge about which he had no knowledge. [22] See *Jones, 198 F.3d at 415* (affirming grant of summary judgment in retaliation claim on the

basis that responsible persons had no information about underlying protected discrimination claim); *Anderson v. Deluxe Homes of Pa., Inc., 131 F. Supp. 2d 637, 656 (M.D. Pa. 2001)* ("The person who performed the adverse employment action against the plaintiff must have had knowledge of the plaintiff's protected activity."); *Bazargani, 90 F. Supp. 2d at 654* (stating that finding of causal connection depends on evidence [*66] that decisionmaker knew of protected activity); *Bedford v. Southeastern Pa. Transp. Auth., 867 F. Supp. 288, 293 (E.D. Pa. 1994)*.

21   Reap implies that Jahn prepared her October 17, 1997 Performance Review in retaliation for the EEOC's document request via letter dated October 22, 1997. (Pl. Br. at 16.) The Continental Law Department in Chicago only received the EEOC's document request on October 27 (Diana Supp. Aff. Ex. 2), and Jahn provided Reap her review in New Jersey at 11:56 a.m. that same day (Id. Ex. 3.) It defies logic that Jahn could have learned of the EEOC document request and then prepared Reap's detailed review all on the morning of October 27. But more importantly, Reap herself acknowledges that she has no evidence that Jahn knew of her EEOC Charge before Reap told Jahn about it in December 1997. (Reap Dep. at 164-66.)

22   Reap argues that "the fact that [Continental] raises the defense of lack of knowledge for the first time" in its opening brief and did not address it in its EEOC position statement "implies that that defense is a recent fabrication." (Pl. Br. at 16.) That argument appears inaccurate. Continental raised the issue of Jahn's knowledge in Reap's deposition, where she acknowledged that she has no evidence to support her claim that Jahn knew of her EEOC Charge before December 1997. (Reap Dep. at 6.)

[*67] Jahn's post-December 1997 evaluations were made with the knowledge that Reap had filed an EEOC Charge. By Reap's own account and theory, however, Jahn displayed a continuous pattern of negative evaluations of Reap, both before and after December 1997, when Jahn discovered Reap's EEOC Charge. That consistency belies a suggestion of retaliatory animus establishing a causal connection. In Shaner v. Synthes (USA), the Third Circuit held that an employee's negative performance evaluations did not evidence retaliation for

his filing of an EEOC charge. *204 F.3d 494, 504-05 (3d Cir. 2000)*. The record in that case showed that the employee's performance evaluations contained similar criticisms both before and after he filed his EEOC charge. Id. The Court concluded that the record did not support a finding that there was intervening retaliatory animus so as to establish a causal connection between the protected activity and the later performance evaluation, especially in view of the circumstance that the performance evaluations were consistent pre- and post-filing of the charge. *204 F.3d at 505.* [23] In this case, a similar consistency across Jahn's performance [*68] evaluations of Reap is found both before and after Jahn's acquiring knowledge of Reap's EEOC Charge in December 1997, and that consistency belies an inference of causal connection between the EEOC charge and the alleged retaliatory action. [24]

23      The Third Circuit added the following observation with respect to performance evaluations in Shaner:

> While it is possible that a manager might make a poor evaluation to retaliate against an employee for making an EEOC charge, still it is important that an employee not be dissuaded from making what he believes is an appropriate evaluation by a reason of a fear that the evaluated employee will charge that the evaluation was retaliatory. In this regard, we are well aware that some employees do not recognize their deficiencies and thus erroneously may attribute negative evaluations to an employer's prejudice. Accordingly, in a case like this in which the circumstances simply cannot support an inference that the evaluations were related to the EEOC charges, a court should not hesitate to say so.

*204 F.3d at 505.*

24   Reap argues that Jahn did not discipline or issue performance-related e-mails to another employee, Jeff Quixley ("Quixley"), for alleged

poor supervisory practices. (Pl. Br. at 16-17.) Reap, however, supports that assertion with only her own deposition testimony, in which she testifies that other employees told Reap about the alleged deficiencies in Quixley's job performance. (See Pl. Br. at 17 (citing Reap Dep. at 144-45, 292-92, 309-12).) Those alleged comments from other employees constitute hearsay and thus are insufficient to forestall summary judgment. *Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996).*

[*69] Even if a causal connection is assumed, however, intervening unprotected conduct may sever the putative causal connection between protected activity and an adverse action. See, e.g., *Agostinelli v. Christiana Health Care Sys., 2001 U.S. Dist. LEXIS 13098,* No. 98-217- GMS, 2001 WL 987538, at *10 (D. Del. Aug. 29, 2001). Here, undisputed facts show that intervening unprotected conduct of Reap severed any putative causal link. Jahn spoke with Human Resources personnel Samuel and Johnson in early 1998 regarding whether Reap should be placed on a Performance Improvement Plan ("PIP"), in accordance with Continental's Performance Improvement Program. Under that Program, an employee is given assistance to reach and maintain a minimum level of performance. An employee may be placed on a PIP whenever an employee's work or adherence to company rules is identified as being less than competent. The employee is notified in writing of the performance deficiencies and of the actions required to reach a competent level of performance. Failure to improve according to the terms of the PIP may result in the employee being placed on probation or may subject the employee to termination. Jahn and Johnson prepared [*70] a PIP for Reap, and Jahn and Johnson met with Reap on April 16, 1998, to present and discuss the PIP. Jahn and Johnson informed Reap that her performance must improve within 30 days and that absent such improvement, she could be placed on probation and her future employment with Continental could be threatened. On April 20, 1998, Reap submitted a reply to the PIP, claiming that it was unmerited, lacked specific guidance on how she might improve, and was retaliatory.

One day later, on April 21, 1998, Reap distributed a memorandum to all staff members of her Unit. In that memorandum, Reap quotes from the PIP Jahn and Johnson had given Reap and from her response to it. Reap also quotes from an e-mail Jahn sent to Reap

concerning employee rankings he had requested and from Reap's response to Jahn's e-mail, and the memorandum also includes a disclosure about the specific performance review of one former employee. Specifically, Reap shared with the staff the following from her e-mail to Jahn: "I analyzed the job performance of each of my employees and prepared individualized reports which were accepted by you without question (except in the case of Linda Sikora, whose Performance Review [*71] you re-wrote to justify your decision to terminate her[.])" Jahn and Johnson discussed that incident, and they met with Reap on May 18, 1998, to confirm that she had distributed the memorandum to the members of her Unit, which Reap admitted. That same day, Jahn and Johnson discussed the matter with Aries and Samuel, and all agreed that the termination of Reap's employment was warranted. Later that afternoon, Jahn and Johnson met with Reap and terminated her employment. After Reap's termination, Jahn appointed Leticia Diaz as Reap's replacement as Director.

Reap's defense of her action in distributing the memorandum is as follows: The memorandum contains "absolutely no confidential information whatsoever. While the memorandum discusses the ranking process, it does not reveal how any particular staff member was ranked. In addition, while the memorandum mentions a Performance Review given to Linda Sikora, it gives absolutely no details about that review except to state that Jahn re-wrote it[.]" (Pl. Br. at 19.) Whether the memorandum discloses technically confidential information is inconsequential, however. What is indisputable is that the distributed memorandum constituted provocative [*72] insubordination and publicly confrontational conduct on the part of an employee toward her supervisor. Even if Reap's other purported job performance problems are assumed to be untrue, that insubordination and defiant conduct immediately prior to termination are sufficient to sever any putative causal connection between the protected activity and retaliatory conduct. *Seaman v. CSPH, Inc., 179 F.3d 297, 301 (5th Cir. 1999)* (holding that termination was immediate result of insubordination despite employee's reference to protected complaint in argument); *Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)* (holding that argument immediately prior to termination cut any suggested causal connection); *Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991)* (holding that no causal link existed when "particularly provocative act in outright defiance"

occurred prior to termination and nine months following protected complaint); *Agostinelli, 2001 U.S. Dist. LEXIS 13098, 2001 WL 987538,* at *10 (finding that employee's antagonistic, confrontational, and insubordinate conduct severed any putative causal link between protected activity [*73] and retaliatory conduct); *Alston v. Rice, 825 F. Supp. 650, 655 (D. Del. 1993)* (holding that plaintiff was terminated for "insubordination," "causing discontent amongst [his] staff," and "poor work performance"). Soon after Reap widely distributed the memorandum, the group of four decisionmakers -- Jahn, Aires, Samuel, and Johnson -- unanimously decided that Reap's employment should be terminated, and plaintiff refers only to Jahn's knowledge of her EEOC Charge 1.

The ultimate burden of persuading the factfinder that retaliatory intent had "a determinative effect" on the employer's decision remains at all times with the plaintiff. Shaner, 204 F.3d at 501 n.8. Viewing the evidence in the light most favorable to Reap, the Court determines that she has not established her prima facie case of retaliation, and no reasonable factfinder could conclude that retaliatory intent had a determinative effect on Continental's decision to terminate her employment.

**CONCLUSION**

The Court concludes that defendant Continental Casualty Company is entitled to summary judgment. Even if the Court assumes that plaintiff Judith B. Reap has set forth prima facie [*74] cases of age and gender discrimination with regard to nonpromotions to the AVP and VP positions, she has failed to satisfy the pretext stage of the burden-shifting framework. Further, Reap has failed to establish a prima facie case of retaliation in that she does not demonstrate a causal connection between the protected activity and the adverse employment action. Accordingly, the Court will dismiss with prejudice Reap's Complaint against Continental.

**IT IS THEREFORE** on this 28th day of June, 2002, **ORDERED** that the summary judgment motion of Continental Casualty Company (no. 40-1 on the docket) be and hereby is **GRANTED;** and

**IT IS FURTHER ORDERED** that all remaining claims against defendant be and hereby are **DISMISSED WITH PREJUDICE,** and as this disposes of all of plaintiff's claims against defendant, the Clerk of the Court is hereby advised that this case may be designated as closed.

**MARY L. COOPER**

United States District Judge

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 20

LEXSEE 2001 U.S. DIST. LEXIS 9491

**SHIRLEY SELDOMRIDGE, Plaintiff, v. UNI-MARTS, INC., Defendant.**

**Civil Action No. 99-496 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2001 U.S. Dist. LEXIS 9491*

**July 10, 2001, Decided**

**DISPOSITION:**      [*1] Uni-Marts' Motion for Summary Judgment GRANTED. Summary Judgment ENTERED in favor of Uni-Marts and against Seldomridge on all claims in complaint.

**COUNSEL:** For SHIRLEY SELDOMRIDGE, plaintiff: Thomas S. Neuberger, Thomas S. Neuberger, P.A., Wilmington, DE.

For SHIRLEY SELDOMRIDGE, plaintiff: David Staats, Law Offices of David Staats, P.A., Wilmington, DE.

For UNI-MARTS INC., defendant: Michael F. Bonkowski, Saul Ewing LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On August 3, 1999, Shirley Seldomridge ("Seldomridge") filed this employment discrimination lawsuit against her former employer, Uni-Marts, Inc. ("Uni-Marts"), under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq. (1994)*, and the Civil Rights Act of 1991. *42 U.S.C. § 1981(a) (1994)*. In her complaint, Seldomridge alleges that she was sexually harassed when her supervisor stood naked before her as she was working one afternoon. As a result, Seldomridge claims that she experienced a hostile working environment and was subsequently constructively [*2] discharged from her position at Uni-Marts. Presently before the court is Uni-Marts' motion for summary judgment. After reviewing the record in the light most favorable to Seldomridge, the court concludes that she cannot establish her claims as a matter of law, and will therefore, grant Uni-Mart's motion for summary judgment.

The following sections explain the reasons for the court's decision more thoroughly.

**II. FACTS**

Shirley Seldomridge is a married woman who once worked at a Uni-Marts convenience store in Delaware. Seldomridge had been employed at Uni-Marts from December 5, 1997 until on or about February 11, 1998. On Friday, January 16, 1998, Seldomridge was working at the store with her supervisor, Robert A. Walsh ("Walsh"). At some time between 1 and 2 p.m. that day, Walsh told Seldomridge that he was going to go to the bathroom, but when he came out, he would be wearing "nothing but a cigarette." At first, Seldomridge thought her manager was joking, and thus, she paid his comment no mind. However, a few minutes later, she looked up and saw Walsh standing in the doorway to the storage area completely naked and "posing" approximately 36 steps away from where she was [*3] standing. According to Seldomridge, she glanced at Walsh for less than a second, promptly looked away, and stated, "Oh, my God." Walsh then ran into the bathroom of the workplace and stayed there for as long as Seldomridge remained in the store.

About ten to fifteen minutes after the incident,

Seldomridge called her husband to come and pick her up from the store. Within five minutes, he arrived and took her home. She yelled to Walsh that she was leaving and that she would not be back. Later that afternoon at around three o'clock, Seldomridge says that Walsh called her at home, but she would not talk to him.

On the day of the incident, Seldomridge referred to her employee handbook and telephoned a toll-free number at the Uni-Marts headquarters to complain about the incident. She spoke to someone, described what had happened to her, and was told she would be contacted. She also called this number after Walsh called her at home. There is evidence in the record that Seldomridge received a call from Uni-Marts offices at 4:25 that afternoon.

Seldomridge also approached a New Castle County Police Officer and advised him that Walsh had "exposed his genitals" to her. As a result, Walsh was [*4] charged with Indecent Exposure in The Second Degree in violation of Section 764(a) of Title 11 of the Delaware Code. Walsh pled guilty to the charge in March of 1998. Seldomridge further alleges that she was so upset by the incident that she consulted with a psychiatrist on the very next business day. Seldomridge states that she consulted the psychiatrist about the incident one time. The record indicates that Seldomridge had been consulting this psychiatrist since 1995 or 1996.

A. Uni-Marts' Conduct After Incident and Sexual Harassment Policy

As a result of Seldomridge's call to the toll-free number, a Uni-Marts attorney and a Uni-Marts regional manager contacted John C. Minchak ("Minchak"), a group supervisor at Uni-Marts responsible for monitoring the day-to-day operations of a group of Uni-Marts' stores. Minchak was advised to give Seldomridge time off with pay, and told to suspend Walsh until Uni-Marts completed its investigation.

Minchak attempted to contact Walsh on the evening of the incident, but did not have a chance to speak to him until some time between six and seven the next morning. At this time, Walsh admitted his actions. As a result, Minchak immediately terminated [*5] Walsh's employment with Uni-Marts.

Uni-Marts contacted Seldomridge to inform her that Walsh had been fired and that she could take time off

with pay. Although it is not clear from the record, it appears that Seldomridge returned to work approximately one to two weeks after the incident. In her deposition, Seldomridge acknowledged that Uni-Marts acted appropriately in terminating Walsh. There is no evidence in the record that Walsh contacted her after his termination.

It is undisputed that Uni-Marts had a sexual harassment and discrimination policy that was communicated to Seldomridge when she began her employment. This policy was communicated to employees through the employee handbook and a policy and procedures letter provided to each employee when hired. Seldomridge acknowledges that she received, read, and understood the company's policies by signing the acknowledgment page of the employee handbook and signing and initialing the company's policy and procedures letter. Seldomridge also acknowledges that she "called the sexual harassment number in that handbook." Thus, it is not disputed that she used the sexual harassment policy when she called the Grievance Committee to report [*6] Walsh's conduct on January 16, 1998.

The policy in effect during Seldomridge's employment was originally drafted in May of 1987. It was amended in October of 1991. The policy seeks to prevent sexual harassment and discrimination in the workplace. It clearly states that sexual harassment or discrimination will not be tolerated by Uni-Marts. The policy also sets forth a process for employees to complain and seek redress from the company in the event that an employee believes he or she is the victim of sexual harassment or is having any type of difficulty in the workplace. Specifically, the policy provides for a Grievance Committee to investigate and remedy any workplace problems.

B. Alleged Hostile Work Environment and Constructive Discharge

Before the incident, Seldomridge stated that Walsh made her uncomfortable at work by saying that he thought she was pretty, he would like to "rock her world," and by making other "stupid, off-the wall comments." The record indicates that Seldomridge never filed a grievance against Walsh for making any of these comments prior to the incident. As Seldomridge's supervisor, Walsh had the power to: set her work schedule, fire her, recommend an increase [*7] or

decrease in her wages, undertake or recommend tangible employment decisions affecting her, and direct her daily activities. There is no evidence in the record that Walsh made any negative employment decisions against Seldomridge.

After the incident, Seldomridge continued to work for Uni-Marts for approximately one month after Walsh's termination. During this time period, she alleges that she was subjected to comments by customers and a co-worker named Teddy [1] about the incident with Walsh. She stated that some customers would come into the store and make "really stupid comments." According to Seldomridge, Teddy would agree with customers by saying he did not believe that Walsh would do "anything like that." Besides Teddy, Seldomridge stated that other Uni-Marts' employees believed her. Seldomridge also stated that a customer who was friendly with Walsh did not believe her and that this customer did not want Seldomridge to wait on her. According to Seldomridge, this customer also made "smart comments behind her back." She also stated that one customer joked that he would take his clothes off, too. Seldomridge characterized the conduct by Teddy and certain customers as an "every [*8] day thing."

> 1    Although Seldomridge states that Teddy was "hostile" to her and would not speak to her, she does not provide any specific examples.

Seldomridge admits that she never used the phone number in the handbook to notify the Grievance Committee of the problems she was having in the store. She also admits that she never notified anyone in management at Uni-Marts about any problems in the store after the incident with Walsh. However, Seldomridge claims that the acting store manager at this time knew how she was being treated. There is no other evidence in the record supporting this claim. Within a month after returning to work, Walsh left her employment at Uni-Marts for another job at a place called the Eating Post.

C. Walsh's Employment At Uni-Marts

Walsh was hired by Uni-Marts on August 28, 1993. On his employment application, Walsh stated that the reason he left his prior position was "violation of company policy." Four months after being hired by Uni-marts, Walsh was promoted to store manager. On [*9] June 2, 1995, Walsh was promoted to supervisor. In connection with that promotion, Uni-Marts conducted a search of Walsh's driving record. The record showed a number of traffic violations. As a result, a Uni-Marts manager wrote a memo remarking that "His overall [sic] seems to indicate a disregard for rules and regulations." On March 22, 1996, Walsh was demoted from Supervisor to Store Manager.

Prior to exposing himself to Seldomridge, Walsh received a score of 188 out of a possible 200. This placed him in the top category of excellent, on a Management Personnel Performance Evaluation. The worksheet contains no evaluation criteria based on anti-discrimination or harassment prevention.

Prior to his employment with Uni-Marts, Walsh had a prior criminal history. [2] In 1995, an Information was filed by the Delaware Attorney General's Office charging Walsh with three counts of indecent exposure to girls under 16 years of age. The disposition of these charges is unavailable. In 1992, Walsh was charged with Felony Unlawful Sexual Contact Second Degree and Misdemeanor Indecent Exposure First Degree (indecent exposure to a girl under 16 years of age). He pled guilty to the misdemeanor charge [*10] and the Unlawful Sexual Contact charge was dismissed. In 1985, Walsh was charged with extortion. The disposition of this charge is unavailable. [3]

> 2    This information was retrieved through a criminal records check done at Seldomridge's request by Robert Shannon, a licensed private investigator.
>
> 3    A pre-trial services report made in the 1992 case, also indicates that 1) Walsh received six months of unsupervised probation for two counts of Lewdness in 1991, 2) Walsh pled guilty and was fined for six counts of Indecent Exposure in 1990, and 3) Walsh was arrested in 1986 for Indecent Exposure (disposition unavailable). Outside of the report, there is no other evidence documenting these charges. Thus, it is not clear where, or even if, these incidents occurred.

D. Prior Sexual Harassment Claims Against Walsh

After the incident, Seldomridge learned of a prior sexual harassment allegation against Walsh from Tina Eastlake and her husband. On or about February 3, 1997, Tina Eastlake filed a complaint with the Delaware [*11] Department of Labor ("DDOL") alleging that Walsh

sexually harassed her. Eastlake was a Uni-Marts employee who worked under Walsh. According to Eastlake the alleged harassment occurred on January 30, 1997. In her complaint, Eastlake stated that she and Walsh had enjoyed a casual dating relationship that ended in November of 1996. At that time, Eastlake informed Walsh that she did not wish to see him anymore. As a result of the relationship ending, Eastlake alleged that Walsh then subjected her to unfavorable treatment. In her complaint, Eastlake stated that she had advised Uni-Marts corporate officers of Walsh's conduct, however, she was not satisfied with their attempts to resolve the matter.

In response to Eastlake's allegations, Uni-Marts conducted its own investigation of her complaints. In a letter confirming a conversation with Eastlake on January 31, 1997, Amy Hunter ("Hunter"), Associate General Counsel for Uni-Marts, informed Eastlake that the grievance committee had met on several occasions regarding her grievance against Walsh. Hunter that stated that, "our final recommendation, after a thorough investigation is as follows. We would like to offer you a transfer to the Cecilton [*12] Store as an assistant manager. We understand that this will mean a longer commute for you. Therefore, we will also offer a fifty cent per hour wage increase to cover transportation costs."

In a letter from Hunter to Eastlake dated February 10, 1997, Hunter stated "We have tried for several weeks to address your concerns and come to some type of resolution." Hunter again offered Eastlake a transfer to the Cecilton store. She also offered Eastlake a full-time position in the same store, at the same pay rate, for the 11 p.m. to 7 a.m. shift. Hunter then stated that if Eastlake did not respond by February 14, 1997, the company would assume that she had resigned. In a position statement to the DDOL, Uni-Marts claimed that Walsh "felt there were some problems with Tina's job performance. Specifically, certain tasks were being left undone and paperwork was left uncompleted." The Grievance committee felt that a change in managers would not be an acceptable solution because this would have called for others to be transferred as well.

The DDOL found "no reasonable cause to believe that Uni-Marts discriminated against Eastlake with respect to her sex and that reasonable cause does not exist [*13] to believe that Uni-Marts engaged in unlawful employment practices."

## III. SUMMARY JUDGMENT STANDARD

The court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Life Save Co., 206 F.3d 271, 278 (3d Cir. 2000); Knabe v. Boury Corp., 114 F.3d 407, 409 n.4 (3d Cir. 1997)* (both citing *Fed. R. Civ. P. 56(c))*. An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, *see Charlton v. Paramus Board of Educ., 25 F.3d 194, 197 (3d Cir. 1997)*, and a fact is material if it could affect the outcome of the suit under governing law. *Id.* (citations omitted). For the non-moving party to prevail on a motion for summary judgment, the party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." [*14] *See Knabe v. Bourty, 114 F.3d at 409 n.4; Newsome v. Administrative Office of the Courts of the State of New Jersey, 103 F. Supp. 2d 807, 815 (D.N.J. 2000)* (stating that a failure to prove an essential element of the nonmoving party's case necessarily renders all other facts immaterial).

In deciding a motion for summary judgment, "a court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor." *Knabe v. Bourty, 114 F.3d at 409 n.4* (citing *Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir.1994))*. Moreover, it is not the province of the court to weigh the evidence and to decide the case on its merits; rather, the court shall simply determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202*.

With these standards in mind, the court will turn to the substance of Uni-Marts' motion for summary judgment.

## IV. DISCUSSION

In its briefing on the motion, Uni-Marts argues that it is entitled to summary judgment because Seldomridge cannot establish her claims for hostile work environment harassment or constructive [*15] discharge. In addition, Uni-Marts argues that Seldomridge cannot show that she is entitled to punitive damages. [4] In contrast,

Seldomridge alleges that there are sufficient facts in the record from which a reasonable jury could rule in her favor on all of these issues. The court will address these issues in turn.

> 4   Uni-Marts also argues that, even assuming that a hostile work environment existed, it still has an affirmative defense to liability. However, because the court concludes that Seldomridge's hostile work environment claims fail as a matter of law, it need not address Uni-Marts' affirmative defense.

A. Hostile Work Environment

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin." *42 U.S.C. § 2000e-2(a)(1)*. [5] Although the statute mentions specific employment [*16] decisions with immediate consequences, it covers more than "terms" and "conditions" in the narrow contractual sense. *See Faragher v. City of Boca Raton, 524 U.S. 775, 786, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)*. Thus, sexual harassment that is so "severe or pervasive" as to "'alter the conditions of [the victim's] employment and create an abusive working condition violates Title VII. *Id.* (quoting *Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986))*; *Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1999)* (stating that it is well established that a plaintiff can prove a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment).

> 5   According to her complaint, Seldomridge filed a charge of discrimination with the DDOL on April 16, 1998 and May 8, 1998. She received a "right to sue" letter from the Equal Employment Opportunity Commission on May 6, 1999, and subsequently filed her complaint eighty-nine days later on August 3, 1999. Thus, Seldomridge has established that she complied with all of Title VII's pre-filing requirements in a timely manner. *See 42 U.S.C. § 2000e-5(e)(1)* (affording a plaintiff 180 day to file a charge of discrimination with either the appropriate state or federal agency and 90 days to file suit after receiving a right to sue letter).

[*17]

Hostile work environment harassment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment. *Meritor Savs. Bank FSB v. Vinson, 477 U.S. 57, 65, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)*. In order to fall within the purview of Title VII, the conduct in question must be severe or pervasive enough to create both an "objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile," and an environment the victim-employee subjectively perceives as abusive or hostile. *See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 126 L. Ed. 2d 295, 114 S. Ct. 367, (1993).* [6]

> 6   The Supreme Court reaffirmed Harris' "severe and pervasive" test in *Faragher v. City of Boca Raton, 524 U.S. 775, 783, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)*, and *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)*.

In this case, [*18] Seldomridge argues that she was subjected to a hostile work environment when Walsh exposed himself to her on January 16, 1998. In addition, Seldomridge also argues that she was subjected to a hostile work environment when she returned to work after the incident. The court will address these arguments in turn.

1. Claim Based on the January 16, 1998 Incident

In deciding a hostile work environment claim, the court must examine the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 23*. In order to establish a hostile work environment claim, a plaintiff must show that:

> (1) the plaintiff suffered intentional discrimination because of their sex,

> (2) the discrimination was pervasive or regular, [7]

> (3) the discrimination detrimentally affected the plaintiff,

(4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and

(5) the existence of respondeat superior liability.

See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482-83 (3d Cir. 1990). [*19] See also Weston v. Pennsylvania, 251 F.3d 420, 2001 WL 539470, at *3-4 (3d Cir. 2001); Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir.1999).

> 7    Although the Andrews test states that the conduct must be "severe and pervasive," the Supreme Court's decisions in Faragher and Ellerth emphasize that actionable conduct can also be severe or pervasive. See, e.g., Pittman v. Continental Airlines, Inc., 35 F. Supp. 2d 434, 441 (E.D. Pa. 1999) (explaining same).

In this case, there is no dispute as to the first, third, and fifth factors of the Andrews test. As to the first prong, Walsh's conduct was motivated by Seldomridge's sex or gender. 8 As to the third prong, there is evidence in the record to support Seldomridge's claim that, from a subjective viewpoint, she was detrimentally affected. Specifically, Seldomridge claims that she sought the counsel of her therapist about the incident, and that she was troubled enough to immediately report [*20] the incident to the police. Finally, as to the fifth prong, because Walsh was Seldomridge's immediate supervisor, Uni-Marts would be vicariously liable for his conduct. 9 See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998); Faragher v. City of Boca Raton, 524 U.S. at 777-78 ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."). Therefore, the court will focus its inquiry on whether Walsh's conduct was sufficiently severe or pervasive and whether it would objectively detrimentally affect a reasonable person in Seldomridge's position.

> 8    For the purposes of Title VII, "sex" and "gender" are not considered to be distinct concepts. See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 148 (3d Cir. 1999).

> 9    As the court has stated, it is clear that under the

Supreme Court's decisions in Ellerth and Faragher, Uni-Marts would be vicariously liable for Walsh's conduct. However, Seldomridge also suggests that Uni-Marts is directly liable under Title VII because of its own negligence in hiring and retaining Walsh.

In Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257, the Supreme Court explained that an employer may be liable for a supervisor's harassing conduct either directly or indirectly. See id. at 758-760. An employer will be directly liable for a supervisor's harassment when the employer either intended, or negligently permitted, the tortious conduct to occur. Id. at 759. ("Thus, although a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment."); Dees v. Johnson Controls World Services, Inc,. 168 F.3d 417, 421 (11th Cir. 1999) (explaining same). See also Anderson v. Deluxe Homes of PA, Inc., 131 F. Supp. 2d 637, 647 n.10 (M.D. Pa. 2001) (explaining that respondeat superior liability could depend "on whose behavior is at issue, that of the supervisor or the employer itself").

The court need not address this issue, however, because it finds that Walsh's hostile work environment claim fails because the conduct was not severe enough to be actionable under Title VII. In addition, the court need not decide whether Uni-Marts was negligent in hiring Walsh because Seldomridge has failed to allege any state law claims for negligent hiring or retention. See e.g., A. R. Anthony & Sons v. All-State Investigation Sec. Agency, Inc., 1983 Del. Super. LEXIS 647, *5 (Del. Super. Ct. Sept. 27, 1983) (explaining that an employer is liable for negligent hiring when it has "reason to know or in the exercise of reasonable care should have known that an employee has an undue tendency to cause harm"). However, the court does note that Seldomridge has not cited to one case which interprets Title VII as mandating that an employer conduct a criminal background investigation into every employee. But see e.g., Bryant v. Better Business Bureau of Greater Maryland, 923 F.

*Supp. 720, 752 (D. Md. 1996)* (explaining that "Even where the employer knows of a criminal record and still hires the employee, this does not automatically make out a prima facie case of negligent hiring. Instead, it depends upon the nature of the criminal record and the surrounding circumstances.") (citations omitted). Thus, although there is evidence that Walsh had a criminal record, Seldomridge has failed to adduce any evidence which would demonstrate that Uni-Marts should have known about Walsh's background. *See id.* (granting summary judgment to defendants where a plaintiff failed to demonstrate with sufficient specificity that the defendants should have known about another employee's criminal background).

[*21] Uni-Marts maintains that because Walsh's exposure to Seldomridge was a single, isolated incident, she cannot establish a hostile work environment as a matter of law. In general, an isolated incident of sexual misconduct is not actionable under Title VII. *Clark Cty. School District v. Breeden, 532 U.S. 268, 149 L. Ed. 2d 509, 121 S. Ct. 1508, 1510 (2001)* (citing *Faragher, 524 U.S. at 788*); *Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 482 (3d Cir. 1997)*. In exceptional cases, however, an isolated incident may be actionable under Title VII if it is extremely serious such that it alters the terms and conditions of employment to create a hostile or abusive work environment. *See Meritor, 477 U.S. at 67.* In other words, a single incident may support a claim for hostile work environment sexual harassment if the incident is "of such a nature and occurs in such circumstances that it may reasonably be said to characterize the atmosphere in which a plaintiff must work . . . ." *LaRose v. Philadelphia Newspapers, Inc., 21 F. Supp. 2d 492*, (E.D. Pa. 1998). For example, a single incident of physical assault or offensive [*22] touching has been held to be sufficiently severe to support a hostile work environment claim. *See e.g., Grozdanich v. Leisure Hills Health Center, Inc., 25 F. Supp. 2d 953, 969-70 (D. Minn. 1998)* (holding that a reasonable jury could find that an isolated incident of sexual assault created a hostile work environment). [10] *See also Jones v. United States Gypsum, 2000 U.S. Dist. LEXIS 2700*, No. C99-3047-MWB; 2001 WL 196616, at *4 (N.D. Iowa Jan. 21, 2000) (holding that single incident of offensive touching may be severe enough to support a hostile work environment claim).

10 Citing *Todd v. Ortho Biotech, Inc., 138 F.3d 733, 736 (8th Cir. 1998)* (single attempted rape at national sales meeting held sufficiently severe misconduct to be actionable); *Guess v. Bethlehem Steel Corp., 913 F.2d 463, 464 (7th Cir. 1990)* (single incident where supervisor picked up plaintiff and forced her face against his crotch impliedly considered to create hostile environment); *Fall v. Indiana University Bd. of Trustees, 12 F. Supp. 2d 870, 879 (N.D. Ind. 1998)* (single assault, involving a groping of intimate areas, may create hostile environment).

[*23] Furthermore, in determining whether a plaintiff-employee has been subjected to a hostile work environment, the court not only looks to the regularity or severity of allegedly harassing conduct, but also must look to the fourth factor of the *Andrews* test, and determine whether the conduct would detrimentally affect a reasonable person. *See Anderson v. Deluxe Homes of Pa, Inc., 131 F. Supp. 2d 637, 646 (E.D. Pa. 2001).* [11] After all, "not all workplace conduct that may be described as harassment affects a '"term, condition or privilege of employment.'" *Kantar v. Baldwin Cooke Co., 1995 U.S. Dist. LEXIS 17330*, at *10, No. 93 C 6239 (N.D. Ill. Nov. 13, 1995) (citing *Harris v. Forklift Systems, Inc., 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).* The purpose of including the objective standard is to "protect[] the employer from the hypersensitive employee [while] still serving the goal of equal opportunity by removing the walls of discrimination that deprive women of self-respecting employment." *Andrews, 895 F.2d at 1483*; *see also Gupta v. Florida Bd. of Regents, 212 F.3d 571, 586 (11th Cir. 2000)* [*24] ("But a plaintiff's subjective feelings and personal reactions are not the complete measure of whether conduct is of a nature that it interferes with job performance. If it were, the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee, and the standard would not have an objective component.").

11 Evidence that others were harassed may serve to bolster the objective reasonableness of a plaintiff's claims. *Anderson, 131 F. Supp. 2d at 646* (citing *West v. Philadelphia Electric Co., 45 F.3d 744, 757 (1995).* Although there is evidence in the record concerning another complaint about Walsh, the court will not consider Tina Eastlake's allegations of harassment because Seldomridge

has stated that she did not learn of Eastlake's complaints until well after the incident. *See, e.g., Hirase-Doi v. U.S. West Comms., Inc., 61 F.3d 777, 782 (10th Cir. 1995)* (explaining that a plaintiff may rely only on evidence relating to harassment of which she was aware during her employment). In addition, considering that Eastlake's alleged *quid pro quo* harassment claim arose within the context of an affair she had with Walsh and did not involve the type of conduct at issue with Seldomridge (i.e. exposure), the court will not consider the Eastlake complaint in determining whether Seldomridge's claims are objectively reasonable.

[*25] Even construing the evidence in the record in Seldomridge's favor, the court concludes that Walsh's brief exposure to Seldomridge was not so severe that it altered the terms and conditions of her employment. [12] In determining whether Walsh's conduct was so severe that it changed the conditions of Seldomridge's employment, the court is mindful that it must look to the totality of the circumstances. Under the totality of the circumstances of this case, the court concludes that Seldomridge's claim must fail as a matter of law. In particular, the court notes that Seldomridge thought Walsh was joking when he said he would be coming out of the bathroom wearing "nothing but a cigarette." Although Seldomridge characterizes this conduct as offensive and inappropriate, she does not suggest that she felt threatened by Walsh's conduct leading up to the exposure. *See Slaughter v. Waubonsee Comm. Coll., 1995 U.S. Dist. LEXIS 14236,* *12, No. 94 C 2525 (N.D. Ill. Sept. 29, 1995). Also, Seldomridge stated that she only saw Walsh naked for a few seconds from about 30 feet away and Walsh immediately retreated to the store room area. Seldomridge does not allege that Walsh tried to [*26] keep her from leaving the store, or even that he tried to approach her. In addition, it is undisputed that Uni-Marts immediately and effectively dealt with Walsh's conduct. Thus, this brief incident, which Seldomridge concedes was quickly and effectively resolved, cannot be said to have unreasonably interfered with her work performance. *See Mathers v. Sherwin-Williams Co., 2000 U.S. Dist. LEXIS 3716, *28, Civ. A. NO. 97-5138 (E.D. Pa. Mar. 27, 2000)* (affirming an arbitrator's conclusion that the plaintiff failed to meet the objective prong of the *Andrews* test because a "reasonable person would [not] have found this one-time comment, in the context in which it occurred and as it was subsequently addressed

by [the defendant], to be severe and pervasive enough to have resulted in a hostile or abusive work environment.").

12    Seldomridge also stated that before the incident Walsh made her uncomfortable at work by saying that he thought she was pretty, he would like to "rock her world" and by making other "stupid, off-the wall comments." Interestingly, Seldomridge does not argue that these comments contributed to her hostile work environment claim. However, even if Seldomridge did argue that Walsh's comments and the one-time incident created a hostile work environment, the court concludes that under the totality of the circumstances, Seldomridge still cannot establish an actionable claim under Title VII. It is well established that "simple teasing, offhand comments, and isolated incidents will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher, 524 U.S. at 788* (citations omitted). *See e.g., Bishop v. National Railroad Passenger Corp., 66 F. Supp. 2d 650, 663 (E.D. Pa. 1999)* (holding that staring, leering and suggestive comments were neither severe nor pervasive, nor sufficiently detrimental to create a hostile work environment); *Pittman v. Continental Airlines, Inc., 35 F. Supp. 2d 434, 442 (E.D. Pa. 1999)* (holding that occasional encounters with graphic sexual conversation and personal questions failed to create an atmosphere that would have an "objectively detrimental effect on a reasonable person in her position").

[*27] In light of the evidence in the record, the court concludes that no reasonable fact finder could return a verdict for Seldomridge on her hostile work environment claim. Although Walsh's brief onetime exposure may have been offensive and inappropriate, it was not so severe or extremely serious, under the totality of the circumstances, that it altered the conditions of Seldomridge's employment. *See e.g., Bauder v. Wackenhut Corp., 2000 U.S. Dist. LEXIS 4044, Civ. A. 99-1232, 2000 WL 340191, at *4 (E.D. Pa. Mar. 23, 2000)* (holding that a one time incident where supervisor grabbed plaintiff employee's behind did not sufficiently support a hostile work environment claim); *DeCesare v. National Passenger Railroad Corp., 1999 U.S. Dist. LEXIS 7560, No. CNA 98-3851, 1999 WL 330258, at *3 (E.D. Pa. May 24, 1999)*; *Pittman, 35 F. Supp. 2d at 442; Bishop, 66 F. Supp. 2d at 664; Porta v. Dukes, 1998 U.S.*

*Dist. LEXIS 12325*, No. Civ. A 98-2721, 1998 WL 470146, at *2 (E.D. Pa. Aug. 11, 1998). [13] *See also Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998)* [14] (affirming grant of summary judgment to defendant where plaintiff's hostile work environment claim was based [*28] upon a single incident of breast touching and one lewd comment).

13    Both *DeCesare* and *Porta* cite to several other cases where a single incident was found to be insufficient to support a hostile work environment claim. These cases include: *Koelsch v. Beltone Electronics Corp., 46 F.3d 705, 708 (7th Cir. 1995)* (finding no hostile environment existed where the company president rubbed the plaintiff's leg, grabbed her buttocks, and asked her for dates); *Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 534-35 (7th Cir.1993)* (finding that there was no hostile environment where the plaintiff's supervisor put his hand on the plaintiff's leg and kissed her until she pushed him away, and on another occasion the supervisor lurched at the plaintiff and tried to grab her); *Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir.1993)* (holding that there was no hostile work environment where supervisor asked the plaintiff for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her); *Cooper-Nicholas v. City of Chester, 1997 U.S. Dist. LEXIS 20810*, No. 95-6493, 1997 WL 799443 (E.D.Pa. Dec. 30, 1997) (supervisor's sexual comments over nineteen months were not frequent or sufficiently severe to create a hostile work environment).

[*29]

14    In particular, the court in *Quinn* noted that: "Though the two incidents in question--[supervisor's] comment, apparently regarding [plaintiff's] posterior, and his use of papers held in his hand to touch her breasts--are obviously offensive and inappropriate, they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [plaintiff's] work environment. Nor are these incidents, together or separately, of sufficient severity to alter the conditions of [plaintiff's] employment without regard to frequency or regularity." *Id. at 768*

2. Claim Based on Conduct of Co-Workers and Customers After Seldomridge Returned to Work

Seldomridge also argues that the actions of a co-worker, Teddy, and certain customers after her return to work constituted actionable sexual harassment. Again, the court looks to the factors established by the Third Circuit to determine whether Seldomridge can establish a hostile work environment claim. In particular, the court must look to see if: (1) the plaintiff suffered intentional discrimination because of [*30] their sex, (2) the discrimination was pervasive or regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability. *See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).*

The parties dispute whether Seldomridge can establish the first prong of the test. In particular, Uni-Marts argues that, even accepting all facts in the record as true, Seldomridge cannot establish that the conduct of Teddy and the customers was motivated by Seldomridge's sex or gender. The court agrees. While sexual overtones are not necessary to show discrimination because of the plaintiff's sex, the offending conduct must nonetheless be motivated by a plaintiff's sex or gender. *See Durham Life Ins. Co. v. Evans, 166 F.3d at 148* (citing *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996)).* After all, Title VII is not a "general civility code." *Faragher, 524 U.S. at 788.* "Ordinary tribulations of the workplace, such as the sporadic use of abusive [*31] language, gender-related jokes, and occasional teasing" are not actionable. *See Id.* Moreover, "Title VII is not a shield against harsh treatment in the workplace; it protects only in instances of harshness disparately distributed." *Swingle v. Henderson, 142 F. Supp. 2d 625, 2001 WL 483317,* at *12 (D.N.J. 2001) (quoting *Jackson v. City of Killeen, 654 F.2d 1181, 1186 (5th Cir.1981)).* In particular, allegedly harassing conduct that is motivated by a bad working relationship, by a belief that the plaintiff has in some way acted improperly, or even by personal animosity is not actionable under Title VII. *See Koschoff v. Henderson, 109 F. Supp. 2d 332, 345-46 (E.D. Pa. 2000).* Based on the record before it, the court concludes that a reasonable jury could not find that the teasing Seldomridge suffered was motivated by her gender. [15]

15    Although the court will not address the second, third, and fourth factors articulated in *Andrews*, it notes that the conduct of Teddy and certain customers simply does not rise to the level of severity or pervasiveness that is required by Title VII. "A recurring point in these opinions is that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton, 524 U.S. 775, 788, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)* (citations omitted). Moreover, Title VII is not "designed to protect the overly sensitive plaintiff." *See Bishop, 66 F. Supp. 2d at 664* (citing *Harley v. McCoach, 928 F. Supp. 533, 539 (E.D. Pa. 1996))*.

[*32] In addition, Seldomridge's hostile work environment claim fails because she cannot establish respondeat superior liability. Although the Supreme Court has not address hostile work environment claims arising from the actions of a co-worker, the Third Circuit's decision in *Kunin v. Sears Roebuck and Co., 175 F.3d 289 (3d Cir. 1999)*, is controlling on this issue. *Kunin* examined the scope of respondeat superior liability for hostile work environment claims based on the actions of a co-worker. *Id. at 290.* Under *Kunin*, employer "liability exists where the defendant [employer] knew or should have known of the harassment and failed to take prompt remedial action." *175 F.3d at 293-94.* In this case, Seldomridge maintains that during the time period that the alleged harassing behavior of Teddy and the customers occurred, "the manager there already knew . . . . How Teddy was acting with me, how the customers were." Seldomridge Deposition, at 111. After carefully reading through the record, this appears to be Seldomridge's sole basis for her respondeat superior claim. Because Seldomridge has admitted that she did not attempt to lodge a complaint [*33] with anyone in management at Uni-Marts, it appears that Seldomridge is arguing that Uni-Marts had constructive notice of the allegedly harassing conduct.

Under *Kunin*, an employer would have constructive notice in two situations: 1) where an employee provides a supervisor with enough information to raise the probability of sexual harassment in the minds of a reasonable employer or 2) where harassment is so pervasive and open that a reasonable employer would have had to be aware of it. *See id. at 294* (citing

*Zimmerman v. Cook County Sheriff's Dep't, 96 F.3d 1017, 1018-19 (7th Cir. 1996))*. Even construing the facts in the record in the light most favorable to Seldomridge, the court cannot find that Uni-Marts had constructive notice of the alleged harassing conduct.

First, Seldomridge has provided no evidence in the record to show that she provided her supervisor with enough information to raise a probability of sexual harassment in the minds of a reasonable employer. In *Kunin*, the employee claimed that by asking whether "'cursing was allowed on the sales floor,'" she provided her employer with notice of sexual harassment. *Id.* There was also [*34] evidence in *Kunin* that the employee's supervisor heard rumors about "offensive language in his department but never investigated them." *Id.* The *Kunin* court held that this evidence could not establish that the employer had constructive notice of sexually harrasing behavior. *Id.* In particular, the court reasoned that because the employee's complaint did not communicate sexually offensive behavior and the evidence of rumor did not refer to gender-specific harassment, the employee had failed to establish that the employer was on constructive notice. *175 F.3d at 294-95.* In this case, Seldomridge admits that she failed to even lodge a complaint with her supervisor about the alleged harassment. Also, as the court has already discussed, the allegedly harassing conduct was not gender specific.

As for the second type of situation that can support a finding of constructive notice, Seldomridge simply has not alleged the type of open and pervasive harassment that would put a reasonable employer on constructive notice. Seldomridge has shown, at best, that she was subjected to off-hand teasing and that one co-worker and a customer failed to "believe her" about the Walsh incident. [*35] However, she has also clearly stated that all of her other co-workers believed her (including her supervisor) and were supportive of her regarding the incident with Walsh. Moreover, as the court has already noted, Seldomridge has not shown that this harassment was motivated by her gender. In light of these facts, Seldomridge cannot show that the conduct was so open and pervasive that a reasonable employer would have had constructive notice of a hostile working environment. *See Kunin*, 175 at 295 (holding management had little opportunity to discover the harassment because it was not open and pervasive). [16]

16    Moreover, it would be unreasonable to hold

Uni-Marts liable for the conduct of Teddy and certain customers in light of the record. It is undisputed that Seldomridge had already used Uni-Marts' sexual harassment policy regarding the Walsh incident. Thus, Seldomridge could have easily provided Uni-Marts with actual notice. *See Bishop, 66 F. Supp. 2d at 666-67* (holding that an employer could not be held liable for conduct of co-workers where there was a reasonable avenue for making a complaint available to the plaintiff, and the employer had no notice of co-worker's conduct).

[*36] Thus, because Seldomridge has failed to show that there are facts in the record which would show that Uni-Marts had either actual or constructive notice of the alleged harassing conduct, Seldomridge cannot establish that Uni-Marts is liable under a respondeat superior theory regarding the conduct of her co-worker, Teddy, and certain customers.

B. Constructive Discharge

Seldomridge has also alleged that she was constructively discharged from her position at Uni-Marts. 17 In particular, Seldomridge alleges that following the Walsh incident, the harassing conduct of her co-worker Teddy and certain customers was so severe that it forced her to quit her job approximately one month after returning to work. After quitting, Seldomridge went to work at an establishment called the Eating Post.

17    In her complaint, Seldomridge alleges that she suffered from harassment resulting in a tangible employment action. *See* D.I. 1, PP39-41. When a supervisor creates a hostile work environment and takes a tangible employment action against a victimized employee, the employer is not entitled to raise an affirmative defense. *See Faragher v. City of Boca Raton, 524 U.S. at 777-78.* In this case, Seldomridge argues that she suffered a tangible employment action in that she was constructively discharged from her position at Uni-Marts. The Third Circuit has held that in certain instances, a constructive discharge can be a tangible employment action. *See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 156 (3d Cir. 1999)* (declining to adopt a blanket rule that a constructive discharge constitutes a tangible employment action). Because the court has determined that Seldomridge cannot establish her

hostile work environment claims, it need not address whether Uni-Marts would be entitled to assert an affirmative defense. However, the court will still address Seldomridge's constructive discharge claim because she has also alleged, as a separate and independent cause of action, that she was constructively discharged. See D.I. 1, PP35-38.

[*37]

A plaintiff who voluntarily resigns may maintain a case of constructive discharge when the employer's allegedly discriminatory conduct creates an atmosphere that is the constructive equivalent of a discharge. *See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1075 (3d Cir. 1996)* (citing *Gray v. York Newspapers, Inc, 957 F.2d 1070, 1079 (3d Cir. 1992)).* In determining if a constructive discharge has occurred the court should apply an objective test. *Id.* That is, whether "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id.* (quoting *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996)* and *Goss v. Exxon Office Systems Co., 747 F.2d 885, 888 (3d Cir. 1984)).* Thus, a plaintiff must demonstrate that from an objective viewpoint, the employer condoned acts of discrimination which would violate Title VII. *See Maher v. Associated Services for the Blind, 929 F. Supp. 809, 814 (E.D. Pa. 1996).* However, "the mere fact that the plaintiff feels uncomfortable or considers her working [*38] environment unduly stressful is an insufficient basis for a constructive discharge claim." *Id.* (citing *Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)); see also McLaughlin v. Rose Tree Media School District, 52 F. Supp. 2d 484, 493 (E.D. Pa. 1999)* ("more than subjective perceptions of unfairness or harshness or a stress-filled work environment are required").

Viewing the record in the light most favorable, the court concludes that Seldomridge cannot establish that she was constructively discharged as a matter of law. First, as the court has already explained with regard to her hostile work environment claim, Seldomridge has not shown that Uni-Marts intentionally made her working conditions intolerable, or even that Uni-Marts should have been aware of the teasing. Second, it would not be reasonable in this case to assume that Seldomridge had no other option but to quit. *See Clowes v. Allegheny*

*Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)* (explaining that "a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option"). In [*39] light of Seldomridge's prior use of the sexual harassment policy, it is clear that she could have again called the toll-free number that she used to complain about Walsh. Although Seldomridge alleges that she didn't know she could use the number for the purpose of complaining about her co-worker's conduct, her mistaken belief cannot negate the fact that Uni-Marts was neither aware of, nor responsible for, the conduct of her co-workers. Finally, as the court has already stated, Seldomridge's vague descriptions of the allegedly harassing conduct simply cannot be construed as "intolerable" to a reasonable person. Based on this record, no reasonable trier of fact could determine that Uni-Marts knowingly made Seldomridge's working conditions intolerable, or that her working conditions were so intolerable that a reasonable person would have been forced to quit. *See e.g., Williams v. Caruso, 966 F. Supp. 287, 298 (D. Del. 1997)* (J. Schwartz) (holding that facts in the record did not support claim that employer knowingly permitted conditions of discrimination). [18]

18    In her complaint, Seldomridge also alleges that she is entitled to punitive damages as a separate cause of action. D.I. 1, PP 42-43. However, *42 U.S.C. § 1981a* "does not, either expressly or impliedly, create an additional, separate and independent cause of action for employment discrimination plaintiffs, but merely adds to the damages available to such plaintiffs under Title VII." *West v. Boeing Co., 851 F. Supp. 395, 398 (D. Kan. 1994). See also Singh v. Wal-Mart Stores, Inc., 1999 U.S. Dist. LEXIS 8531*, No. Civ. A. 98-1613, 1999 WL 374184, *8

(E.D. Pa. June 10, 1999). Thus, because Seldomridge cannot establish her Title VII claim, she is not entitled to punitive damages. *See also id. at 399* ("*section 1981a* clearly 'adds to the damages available to a plaintiff who shows, under Title VII, that she was the victim of intentional discrimination in employment.'") (citing *Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1994)*).

[*40] **V. CONCLUSION**

For the foregoing reasons, the court concludes that Uni-Marts is entitled to summary judgment because Seldomridge cannot establish her claims of hostile work environment harassment or constructive discharge as a matter of law.

For these reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:

1. Pursuant to *Rule 56(e) of the Federal Rules of Civil Procedure*, Uni-Marts' Motion for Summary Judgment (D.I. 79) is GRANTED.

2. Summary Judgment be and hereby is ENTERED in favor of Uni-Marts and against Seldomridge on all claims in the complaint.

Date: July 10, 2001

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW**

# TAB 21

1 of 1 DOCUMENT

**JAN SITKIEWICZ, Plaintiff, -against- INITIAL SERVICES U.S.A., Defendant.**

**96 Civ. 8543 (DAB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1999 U.S. Dist. LEXIS 14465; 81 Fair Empl. Prac. Cas. (BNA) 150*

**September 15, 1999, Decided
September 17, 1999, Filed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment GRANTED.

**COUNSEL:** JAN SITKIEWICZ, PLAINTIFF, PRO SE, Brooklyn, New York.

Harry Weinberg, Esq., Law Offices of Harry Weinberg, New York, New York, FOR DEFENDANT.

**JUDGES:** DEBORAH A. BATTS, United States District Judge.

**OPINION BY:** DEBORAH A. BATTS

**OPINION**

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, United States District Judge.

Plaintiff Jan Sitkiewicz, appearing *pro se*, filed suit against his employer alleging claims of retaliation and discrimination based on his national origin pursuant to Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. § 2000e et seq.*("Title VII"). Defendant moved for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. For the following reasons, Defendant's motion for summary judgment is granted. [1]

1 By Affirmation filed on April 27, 1998, long after the deadline for filing dispositive motions, Plaintiff expressed his "intention to move for summary judgment". Attached to this Affirmation, without explanation of any sort, is a series of letters from Plaintiff regarding photographs and measurements of 1211 Sixth Avenue. Most of these documents were included as exhibits to Plaintiff's Opposition to Defendant's summary judgment motion. To the extent that Plaintiff's submission was intended as a cross-motion for summary judgment, the Court denies it for the reasons set forth in this Memorandum and Order.

[*2] I. BACKGROUND

Plaintiff was employed as a porter by Initial Contract Services U.S.A. ("ICS" or "Defendant") [2] from February 26, 1975 until February, 1994. (Pl.'s 3(g) Stmt. P 1.) Throughout his tenure, Plaintiff worked primarily at 1211 Sixth Avenue in Manhattan. (Compl. P 3.) Over the course of his employment, Plaintiff's duties as a porter included among other things, sweeping, mopping, and buffing corridor floors, cleaning the bathrooms, slop sink, and parking area. (Pl.'s Dep. at 89-93.) On occasion, Plaintiff was also asked to chop ice and shovel snow from the sidewalks during the winter months. (*Id.* at 184-87.) Plaintiff was the only Polish ICS employee who worked at 1211 Sixth Avenue. (*Id.* at 190-91.)

2 Defendant points out that Plaintiff erroneously sued his employer under the name "Initial Services U.S.A." instead of the correct name "Initial Contract Services U.S.A." (Weinberg Cert. P 1.) Prior to 1993, ICS was known as Arcade Building Services. (Def.'s 3(g) Stmt. P 1; Pl.'s 3(g) Stmt. P 1.) For the purposes of this Memorandum and Order, ICS and Arcade are

collectively referred to as "ICS" or "Defendant".

[*3] During the first thirteen years of his employment, Plaintiff received three written warnings for substandard work performance: one for leaving the job early, one for sleeping on the job, and one for wearing his uniform in a sloppy manner. (Def.'s 3(g) Stmt. P 6; Def.'s Ex. D.) In 1988, the quality of Plaintiff's work began to quickly decline as he received the first of seven suspensions prior to his termination in 1994. *Id.* On October 27, 1988, Plaintiff was suspended for one day by his supervisor William Casasnovas for a dusty work area and for reading the newspaper while on duty. (Def.'s Ex. D.) On November 4, 1988, Plaintiff was suspended for three days by Casasnovas for urinating in a slop sink with the door open and for poorly cleaned bathrooms. *Id.* Plaintiff grieved this matter through his Union, and as a result, the three-day suspension was later reduced to two days. *Id.* Plaintiff was then suspended for three days on February 3, 1989 by Casasnovas for poorly cleaned bathrooms (including "offensive" toilet seats) and for insubordination ("lack of respect for . . . foreman by constantly shouting and talking back"). *Id.* Casasnovas suspended Plaintiff again on January 8, 1990 for [*4] one day for failing to submit his uniform for cleaning on a weekly basis. *Id.*

In the summer of 1993, Plaintiff took a vacation and a leave of absence from his position. (Pl.'s Dep. at 98.) He returned to the job five months later on October 4, 1993. (*Id.*) While Plaintiff was on vacation, Defendant reduced its workforce by five percent as a result of a collective bargaining agreement with Plaintiff's union. (*Id.* at 109.) The workers who remained on the job, including Plaintiff, were required to increase their workload accordingly. (*Id.* at 108-10.)

On October 13, 1993, Plaintiff was suspended for two days by a new supervisor, Mike Velija, for failing to complete his work assignments in a timely manner. (Def.'s Ex. D.) Two weeks later, on October 25, 1993, Velija and Louis Popovski [3], yet another of Plaintiff's supervisors, suspended Plaintiff for three days for consistently failing to complete his work assignments, noting that Plaintiff arrived at work late on a number of occasions and stated that he would finish his work "if I have time". (*Id.*) On January 14, 1994, Plaintiff was suspended for five days by Mr. Popovski for substandard work performance. (*Id.* [*5] ) Plaintiff was specifically directed to complete five tasks including cleaning Mr.

Popovski's office with clean water and soap "so that it doesn't smell like the bathrooms". (*Id.*) Plaintiff was warned that any further infractions would result in his removal from this job assignment. (*Id.*)

> 3    This individual is also known as "Mike Popovski", (Compl. at 5), "Popoovski", (Pl.'s Dep. at 58), and "Popuovski", (Pl.'s Dep. at 121.) For the purpose of clarity, the Court refers to him only as "Popovski".

On February 2, 1994, Plaintiff was issued a final infraction for failing to perform in a satisfactory manner. (Pl.'s Dep. at 165-66.) Defendant transferred Plaintiff from 1211 Sixth Avenue to "Building 18" pursuant to an agreement with the union. (Def.'s Ex. D.) After Plaintiff "refused to report" for work at his new assignment, Defendant terminated Plaintiff on February 23, 1994. (Def.'s Ex. D.)

Plaintiff filed a complaint with the New York State Division of Human Rights and the Equal Employment Opportunity [*6] Commission ("EEOC") on February 8, 1994. (Compl. P 10.) After investigation, the Division of Human Rights found that there was no probable cause to support Plaintiff's claim of discrimination. (*Id.*) It based its finding on Plaintiff's employment record which, prior to termination, included fifteen disciplinary warnings and seven suspensions for poor work performance. (*Id.*) The EEOC agreed with the state's conclusion and issued a notice of right to sue letter dated December 30, 1996. (*Id.*) Plaintiff filed the instant Complaint on November 14, 1996. [4]

> 4    On or about January 23, 1997, Defendant moved to dismiss the Complaint for Plaintiff's failure to obtain a notice of right to sue letter from the EEOC prior to filing the instant action. In opposition to Defendant's motion, however, Plaintiff submitted a copy of the EEOC's letter dated December 30, 1996. Accordingly, the Court denied Defendant's motion by Order dated February 5, 1997.

Plaintiff claims that he is the victim of discrimination by [*7] his Yugoslavian supervisors based upon his Polish national origin. [5] Plaintiff asserts that up until Louis Popovski became his supervisor in 1993, Plaintiff had no problem with management. (Pl.'s Dep. at 175-76.) He claims that his supervisors and foremen (Mr. Popovski, Mrs. Fatima, Mr. Dimo, and Mr. Velija), who

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 209 of 218

Page 3

1999 U.S. Dist. LEXIS 14465, *7; 81 Fair Empl. Prac. Cas. (BNA) 150

are all Yugoslavian, attempted to force Plaintiff off the job so that Defendant could replace him with another Yugoslavian, their friend Basiliga. [6] (Compl. P 8; Pl.'s Dep. at 46-47, 58, 61.) Basiliga was a porter who worked on another floor of Plaintiff's building. (Pl.'s Dep. at 47.) Plaintiff claims that on one occasion Basiliga was drunk at work and threatened to hurt Plaintiff with a screwdriver. (*Id.*) Basiliga also allegedly threatened to shoot Plaintiff. (*Id.* at 48; Compl. at P 8.) Plaintiff claims that because Basiliga lost his job on the 22nd floor, Plaintiff's supervisors wanted to force Plaintiff out of the building to give Basiliga Plaintiff's job. (Pl.'s Dep. at 47.) Towards this end, Plaintiff claims that he was brought up on phony disciplinary charges in an effort to justify his termination. (*Id.* at 62.)

5    Until 1993, William Casasnovas, a Hispanic man, was Plaintiff's supervisor. (Pl.'s Dep. at 176.) Plaintiff does not make any allegation that Casasnovas discriminated against him based upon his Polish national origin.

[*8]

6    This individual is also known as "Basalyga". (Compl. P 8.)

Plaintiff also alleges that as a result of unlawful discrimination he was given an unfair increase in his workload -- an increase of more than the five percent attributable to the workforce decrease. (Pl'.s Cert. P 5.) Furthermore, he states that Defendant fired him from his job in retaliation for the numerous grievances he filed with his Union. (Compl. P 4.)

Defendant filed the instant motion for summary judgment claiming that Plaintiff failed to establish a *prima facie* case for employment discrimination. Defendant rests its position primarily upon Plaintiff's poor work performance and progressively more serious disciplinary infractions. (Def.'s Mem. Law at 11.) [7]

7    By Order dated July 25, 1997, Magistrate Judge Eaton directed Defendants to provide Plaintiff with the full text of *Rule 56 of the Federal Rules of Civil Procedure* and to warn Plaintiff that he must present factual affidavits and exhibits to dispute any of Defendant's statements of facts. A copy of Magistrate Judge Eaton's Order was sent to Plaintiff. *See* Order dated July 25, 1997 at 3. This Order adequately notified Plaintiff of what he was required to submit to oppose summary judgment motion.

Moreover, Plaintiff responded to Defendant's motion with a statement of disputed facts, a certification in support of his position, and twenty-five exhibits, including, among other things, a worksheet calculating the amount of square footage Plaintiff was assigned to clean at 1211 Sixth Avenue, a listing of his duties effective January 20, 1992, a series of photographs and hand-drawn maps and diagrams of 1211 Sixth Avenue, a number of complaints Plaintiff submitted to his union over the years and correspondence from the union regarding his arbitration hearings, the collective bargaining agreement, and two video cassettes he made of the interior and exterior of 1211 Sixth Avenue. Based on Plaintiff's extensive submissions, it is "reasonably apparent that the litigant understood the nature of the adversary's summary judgment motion and the consequences of not properly opposing it." *Sawyer v. American Federation of Government Employees, 180 F.3d 31, 35 (2d Cir. 1999); see also Vital v. Interfaith Medical Ctr., 168 F.3d 615, 620-21 (2d Cir. 1999)* (finding that "the nature of the papers submitted by the litigant and the assertions made therein as well as the litigant's participation in the proceedings" may be considered to determine whether a *pro se* litigant understood the nature of the summary judgment process).

[*9] II. DISCUSSION

A. Summary Judgment Standard

The principles applicable to summary judgment are familiar and well-settled. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995).* "The plain language of *Rule 56(c)* mandates the entry of summary judgment, . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

To defeat the summary judgment motion, the

Case 1:06-cv-00725-GMS    Document 39    Filed 01/07/2008    Page 210 of 218

Page 4

1999 U.S. Dist. LEXIS 14465, *9; 81 Fair Empl. Prac. Cas. (BNA) 150

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* Instead, the nonmovant [*10] must "'come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely . . . on the basis of conjecture or surmise.'" *Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992)*(quoting *Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849, 116 L. Ed. 2d 117, 112 S. Ct. 152 (1991)).*

As a general rule, all ambiguities and all inferences drawn from the underlying facts must be resolved in favor of the party contesting the motion, and all uncertainty as to the existence of a genuine issue for trial must be resolved against the moving party. *LaFond v. General Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995).* As is often stated, "viewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. LILCO, 933 F.2d 187, 191 (2d Cir. 1991).*

Furthermore, plaintiffs who proceed *pro se* are entitled to have their pleadings held to a "less stringent [*11] standards than formal pleadings drafted by lawyers." *Haines v. Kerner, 404 U.S. 519, 521, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972). See also Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995)* (quoting *Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)); Ortiz v. Cornetta, 867 F.2d 146, 148 (2d Cir. 1989); Moorish Science Temple of Am., Inc. v. Smith, 693 F.2d 987, 989 (2d Cir. 1982).*

B. Title VII

To establish a prima facie case of employment discrimination under Title VII, the plaintiff must show 1) membership in a protected class, 2) satisfactory job performance, 3) termination from employment or other adverse employment action, and 4) that the discharge occurred in circumstances giving rise to an inference of unlawful discrimination. *Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995). See also Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997).* These elements are not intended to become rigid or mechanical, but rather to "promote the general principle that a Title VII plaintiff must carry the initial burden of offering

evidence adequate to raise [*12] an inference of discrimination." *Meiri v. Dacon, 759 F.2d 989, 996 (2d Cir.) cert. denied, 474 U.S. 829, 88 L. Ed. 2d 74, 106 S. Ct. 91 (1985)* (citing *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)).*

At the prima facie stage, the burden of proof for an employment discrimination plaintiff is *de minimis. Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).* If the plaintiff presents a prima facie case, a presumption is created that the employer unlawfully discriminated against the employee, and the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).* If the defendant succeeds in this burden, the plaintiff must then "point to sufficient evidence to reasonably support a finding that [she] was harmed by the employer's illegal discrimination." *Fisher, 114 F.3d at 1337.* The "ultimate issue [. . .] is whether the plaintiff has sustained its burden of proving that the adverse [*13] action was motivated by an impermissible reason." *Fields v. New York State Office of Mental Retardation, 115 F.3d 116, 119 (2d Cir. 1997).*

Summary judgment may be granted in employment discrimination actions, but this remedy must be applied with caution. *See e.g. Chambers, 43 F.3d at 40; Gallo v. Prudential Residential Serv., 22 F.3d 1219, 1224 (2d Cir. 1994)* ("a trial court must be cautious about granting summary judgment to an employer when . . . intent is at issue."); *Smith v. American Express Co., 853 F.2d 151, 154 (2d Cir. 1988)* ("summary judgment is ordinarily inappropriate in a Title VII action where a plaintiff has presented a prima facie case.").

A plaintiff cannot defeat summary judgment, however, by asserting merely conclusory allegations of discrimination. *Smith, 853 F.2d 151, 154* (unsupported allegations that employer's reasons were pretextual are insufficient to survive summary judgment motion); *Meiri, 759 F.2d at 998 (2d Cir. 1985)* ("mere incantation of intent or state of mind [cannot] operate as a talisman to defeat an otherwise valid motion"). Even a *pro se* [*14] litigant, such as Plaintiff, who is entitled to liberal treatment by the Court, must present the Court with more than a "scintilla of evidence" demonstrating the validity of the claim. *Tramble v. Columbia Univ., 1999 U.S. Dist. LEXIS 1274, No. 97 Civ. 1271 (RWS), 1999 WL 61826,*

at *13 (S.D.N.Y. Feb. 10, 1999). Therefore, once the defendant has offered legitimate nondiscriminatory reasons for the adverse employment actions, the plaintiff must meet the following burden to survive a summary judgment motion:

> . . . the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging [him] is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.

*Gallo, 22 F.3d at 1225.*

Plaintiff, whose national origin is Polish, has established that he is a member of a class protected from employment discrimination. *42 U.S.C. § 2000e-2(a).* Plaintiff has also shown that he suffered an adverse employment action when he was terminated. Defendant concedes both of these points. [*15] *See* Def.'s Mem. Law at 10.

To meet his burden of proof, however, Plaintiff must also show that his job performance was satisfactory and that he was terminated under circumstances giving rise to an inference of discrimination. *See Quaratino, 71 F.3d at 64.*

### 1. *Plaintiff's Job Performance*

In determining whether an employee's job performance was satisfactory, the Court may rely on "the employer's criteria for the performance of the job -- not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Publishing, Inc., 104 F.3d 26, 29 (2d Cir. 1997); see also Meiri, 759 F.2d at 995.* It is appropriate for courts to rely on supervisors' evaluations, as long the employee is allowed an opportunity to show that the employer's demands for the position were illegitimate, or made in bad faith. *Thornley, 104 F.3d at 29.* "The ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectation.'" *Meiri, 759 F.2d at 995* (quoting *Huhn v. Koehring Co., 718 F.2d 239, 244 (7th Cir. 1983)).*

Defendant presents many examples of Plaintiff's failure [*16] to perform his job satisfactorily over the course of his employment. Plaintiff was repeatedly warned about his substandard performance. Indeed, the record reveals that between 1988 and 1994, Plaintiff was suspended seven times from work, twice in the same month, for poor performance. *See* Def.'s 3(g) Stmt. P 6; Def.'s Ex. D. In addition, Plaintiff was given both verbal and written warnings that his poor job performance could result in further disciplinary sanctions or suspensions. *Id.* Moreover, the record suggests that Plaintiff was given ample opportunity to improve his performance, but failed to do so to the satisfaction of his employer. *See, e.g.,* Def.'s Ex. D (Employee Warning Notice dated Oct. 7, 1993: "if [plaintiff's] work performance dose [sic] not improve or be [sic] completed on [sic] the next 2 days . . . then he will be suspended."; Employee Warning Notice dated Jan. 14, 1994: "Jan -- we have given you plenty of chances to improve on your work performance. Every time I have spoken to you about this, your reply is suspend me for two weeks Mr. Louie").

Plaintiff flatly denies that he was a poor worker and claims that the numerous disciplinary infractions [*17] he was given during his tenure were all fabricated by his Yugoslavian supervisors and forepersons. *See* Pl.'s 3(g) Stmt. P 6; Pl.'s Opp. Ex. 3 at 2. Plaintiff, however, has not submitted any competent evidence to challenge Defendant's position that he was a poor worker. Plaintiff's allegation that his infractions were fabricated by his Yugoslavian supervisors is undermined by the fact that he received five written warnings and five suspensions prior to the time that he was supervised by Mr. Popovski or Mr. Velija. *See* Def.'s Ex. D. Additionally, Plaintiff's attempts to explain away several of his infractions do not raise material issues of fact. [8] More importantly, Plaintiff admitted that on a number of occasions he had failed to complete his work assignments or failed to clean his areas in compliance with company standards. *See, e.g.,* Pl.'s Dep. at 144 (admitting that he completed his assignments by doing "a sloppy job, not the way I should do it.").

8  For instance, regarding the January 27, 1983 charge for a sloppy uniform, Plaintiff conceded that he wore a uniform that was ripped, but explained that all the uniforms supplied by the company were old and damaged. *See* Pl.'s Dep. at 43. When questioned about his November 4, 1988 suspension for urinating in a slop sink with the door wide open, Plaintiff denied urinating in the sink, but admitted that he dropped his pants to fix

1999 U.S. Dist. LEXIS 14465, *17; 81 Fair Empl. Prac. Cas. (BNA) 150

his shirt which had become untucked. *Id. at 60-61*.

[*18] As to Plaintiff's claim that his disproportionate increase in work prevented him from performing satisfactorily, *see* Pl.'s 3(g) Stmt. P 15, the Court finds that Plaintiff has failed to provide any evidence that he received a greater work increase than his co-workers. Indeed, at his deposition he conceded that his co-workers also received an increase in their workload, *See* Pl.'s Dep. at 110, 131-32, that "everyone was unhappy" with the increased work, *id. at 130, 132*, and that he did not know the work assignments of his co-workers either before or after the increase, *id. at 128*.

Despite Plaintiff's protestations that he "is a good worker and did the best he could with the workload that he was given", *see* Pl.'s 3(g) Stmt. at P 6, the record reveals that Plaintiff's performance was deficient. Accordingly, the Court finds that no reasonable juror could find that Plaintiff's performance as a porter at 1211 Sixth Avenue was satisfactory to his employer.

2. *Inference of Discrimination*

Even if Plaintiff had satisfied the third element of a *prima facie* claim for employment discrimination by alleging that he performed his job in a satisfactory manner, Plaintiff [*19] has failed to allege sufficient facts to support an inference of discrimination on the basis of his national origin. As an initial matter, Plaintiff stated in a series of grievances he filed with his Union that he was harassed by a supervisor "for no reason", never mentioning that he believed Mr. Popovski discriminated against him because he was Polish. *See* Pl.'s Opp. Ex. 17, Arbitration Award dated November 26, 1996 at 2, Ex. 18. Additionally, Plaintiff admitted that he did not know if the first two warnings he received regarding his work performance had "anything to-do with the fact that [he is] Polish". *See* Pl.'s Dep. at 41. He also stated that he did not believe that the overtime rotation schedule or the problems he experienced with his appearance in uniform were discriminatory against him. *Id. at 77, 83*. [9] Plaintiff also conceded that the five percent increase in work (as a result of the five percent reduction in personnel) was a building-wide policy and did not just affect him. *Id. at 110, 132*.

9   Plaintiff claimed at his deposition that the overtime accrual system was generally discriminatory. He claimed that Dimo, who is

Yugoslavian, and Carlos, who is Colombian, were the only ones chosen to work overtime. *See* Pl.'s Dep. at 75-76. Plaintiff, however, eventually admitted that the system was not discriminatory towards him because he was Polish. *Id. at 77, 83*. In fact, Plaintiff conceded that he never worked, nor ever wanted to work, overtime. *Id. at 76*.

[*20] Most of Plaintiff's other references to discrimination consist of conclusory statements. Plaintiff has not alleged any facts which support his conclusion that he was discriminated against. The following exchange is illustrative of Plaintiff's vague allegations of discrimination:

Q: Mr. Sitkiewicz, what makes you think Mr. Popouvski was doing these things because you're Polish?

A: He hated me. He was doing everything that I should [sic] remove myself from this job.

Q: What makes you think that he was doing it because you are Polish and not because he just didn't like you?

A: Because I was Polish.

*Id. at 215*. When asked if Casasnovas "has something against Polish people", Plaintiff responded, "I am not saying that against the Polish people in particular. I am only saying discrimination in general." *Id. at 61*. [10]

10   One of the examples of Casasnovas' allegedly discriminatory treatment described by Plaintiff included Casasnovas' decision to allow Basiliga to hold a party during business hours. *See* Pl.'s Dep. at 54-55. Plaintiff, however, conceded that many office parties were held throughout the year, including those for Christmas, New Year's, "Muslim parties for the Yugoslavians", and anniversaries. *Id. at 57*. Plaintiff, himself, contributed $ 5.00 to Basiliga's party and even attended it. *Id. at 56-57*. The record reveals no connection between Casasnovas' decision to have the party and any discrimination towards Plaintiff based on his national origin. At best, the testimony shows only that Basiliga was friendly with his superiors. *Id. at 55* ("Q: What did Basiliga having a party have to do with you? A:

That he had connections, connections").

[*21]   The record reveals only two allegations that could even remotely raise the possibility of Polish animus by Defendant. First, Plaintiff testified that his Yugoslavian supervisors and forepersons referred to him, not by name, but by his nationality. *Id. at 173* ("operator number one Polacka"). Plaintiff did not assert this allegation in his Complaint nor in any of his opposition papers. Plaintiff does not appear to view this reference as a derogatory name. In response to Defense counsel's question regarding any additional derogatory remarks made to Plaintiff, Plaintiff responded: "It didn't upset me [sic] they called me Polack. Q: So the word Polack is not upsetting to you in this situation? A: No." *Id. at 189*. Plaintiff explained that he was called that name because he was "from Poland so they called me Polacka." *Id. at 173*; *see id. at 191* (Plaintiff acknowledged that the word "Polish" in Polish is "Polack").

Plaintiff, however, does assert that a conversation between Mr. Popovski and Ms. Fatima that he overheard in 1993 supports an inference of discrimination. *Id. at 132*; Compl. P 8. Plaintiff testified that Mr. Popovski and Ms. Fatima were talking about him [*22] in Yugoslavian, and that at one point Mr. Popovski said, "I'm going to fight. I'm going to screw him really well.'" *Id. at 133*. When asked again what Mr. Popovski had said, Plaintiff claimed that Mr. Popovski had stated "I'm going to screw that bitch pretty well." *Id. at 136*. When Defense counsel pointed out the inconsistency in Plaintiff's recollection of Mr. Popovski's statement, Plaintiff stated:

> A: In English it's going to be Polish, Pole.

> Q: Well, there is a difference between the word bitch and Pole.

> A: In Yugoslavian that way it sounds -- I am explaining how it sounds in Polish. He add [sic] additional words like --

> THE INTERPRETER: He is speaking Yugoslavia [sic].

> Q: We need to understand what was said.

> A: Again in Polish "I'm going to

screw him really bad. Again I'm going to screw him up very bad."

*Id. at 137*. Later, Plaintiff changed his recollection yet again, reporting that Mr. Popovski said "I'm going to screw his ass really bad . . . Until I will be a boss in this place, I will screw his ass really bad." *Id. at 140*.

None of Plaintiff's accounts of this conversation reveals Defendant's discriminatory animus. Indeed, when questioned [*23] specifically about whether Mr. Popovski said "bitch" or "Pole", Plaintiff withdrew both versions of the conversation, and returned to his first rendition, "I'm going to screw him really bad." *Id. at 137*. Thus, Plaintiff's testimony does not reveal any national origin discrimination at all.

Even if Mr. Popovski or Plaintiff's co-workers had referred to Plaintiff as a "Pole" or "Polack", these references are insufficient to support an inference of discrimination. Isolated discriminatory comments alone will not defeat an employer's summary judgment motion. *See Nawrocki v. Daeman College, 1997 U.S. Dist. LEXIS 5606*, No. 95 Civ. 0618E (SC), 1997 WL 211338, at *3 (W.D.N.Y. Apr. 25, 1997) (supervisor's two references to plaintiff as a "Polack" were isolated and unrelated to the adverse employment decision and, therefore, insufficient to imply discriminatory animus); *O'Connor v. Viacom Inc./Viacom Int'l Inc., 1996 U.S. Dist. LEXIS 5289*, No. 93 Civ. 2399 (LMM), 1996 WL 194299, at *4-5 (S.D.N.Y. Apr. 23, 1996) (three isolated remarks by supervisor insufficient to establish pretext; stray remarks without a demonstrated nexus to complained of personnel actions will not defeat employer's summary judgment motion), [*24] *aff'd, 104 F.3d 356 (2d Cir. 1996)*. Here, Plaintiff has provided no evidence to show that these comments were at all related to Defendant's decision to terminate Plaintiff. [11] Accordingly, the Court finds that Plaintiff has not established that his termination occurred in circumstances giving rise to an inference of discrimination.

> 11  While the reference to Plaintiff as a "Polack" or "operator number one Polacka" is not condoned as the proper way of addressing a co-worker, the Court notes that throughout his deposition testimony Plaintiff also referred to his co-workers by their respective nationalities. For instance, when talking about a female janitor, he referred to Lillian from Puerto Rico. *See* Pl's Dep.

at 123-24. Fellow janitors were "Mike Egyptian", *Id. at 125*, and "the Arab Boada", *Id. at 108*. A supervisor was "Puerto Rican supervisor", *Id. at 167*. In fact, Plaintiff refers to Ms. Fatima, a woman he worked with for twenty years and who became his forelady, as "Yugoslavian forelady". *Id. at 132*.

[*25] Because Plaintiff has failed to demonstrate that he performed his work satisfactorily and that his discharge occurred in circumstances giving rise to an inference of discrimination, the Court finds that Plaintiff has not established his *prima facie* burden. Even if Plaintiff had satisfied his *prima facie* burden, Defendant has asserted a legitimate, nondiscriminatory reason for discharging Plaintiff - his unsatisfactory work performance. Plaintiff has not offered sufficient evidence of discriminatory animus to show that Defendant's reason was pretextual and that Plaintiff's national origin was the real reason for his termination. Accordingly, Plaintiff's Title VII claim must be dismissed. *See St. Mary's Honor Ctr., 509 U.S. at 509-512*.

C. Retaliation

Plaintiff alleges that Defendant retaliated against him, (Compl. P 4), however, he offers no facts to support this claim. In his Complaint to the New York State Division of Human Rights, Plaintiff identified the basis of his discrimination charge as "National Origin", and he did not check the "Retaliation" box. *See* Def.'s Ex. A. In his two-page Affidavit supporting his agency charge, however, Plaintiff [*26] states in conclusory fashion, "Part of my problem has been my complaints to the union about [Popovski], in that he has harassed me, overworked me and fired me in retaliation for this as well as because of my national origin." *See id*. This one sentence is the sole reference to retaliation in the record. [12]

> 12    Defendant does not address Plaintiff's retaliation claim in its motion papers.

Granting Plaintiff the liberality afforded *pro se* litigants, the Court presumes for the purpose of this motion, that Plaintiff has exhausted his administrative remedies for filing a retaliation claim. *See Shah v. New York State Dep't of Civil Serv., 168 F.3d 610, 613-14 (2d Cir. 1999)* (claims not asserted before EEOC may be pursued in federal court if "reasonably related" to those filed with agency); *see also Butts v. City of New York Dep't of Housing Preservation & Dev., 990 F.2d 1397,* *1401 (2d Cir. 1993)*; *Malarkey v. Texaco, Inc., 983 F.2d 1204, 1208-09 (2d Cir. 1993)*. [*27]

In order to present a *prima facie* showing of retaliation, a plaintiff must show "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)* (quoting *Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995))*. Once plaintiff has met his burden, defendant "must demonstrate legitimate reasons for [its] actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive." *Van Zant, 80 F.3d at 714* (quoting *Tomka, 66 F.3d at 1308*).

Plaintiff's allegations fail to satisfy all of the elements of a *prima facie* retaliation claim. As to the first prong, engaging in a protected activity, Plaintiff alleges that he filed numerous grievances with his union regarding Mr. Popovski's conduct towards him. However, none of Plaintiff's union grievances included charges of discrimination. Instead, Plaintiff claimed in his grievances [*28] that Mr. Popovski harassed him "for no reason". *See* Pl.'s Opp. Ex. 18; Def.'s Ex. E. Thus, Plaintiff's filing of these grievances with his union does not give rise to a claim of retaliation. *See Castro v. New York City Bd. of Educ., 1998 U.S. Dist. LEXIS 2863*, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at *8 (S.D.N.Y. Mar. 12, 1998) (lodging of grievances without reference to discrimination does not constitute a "protected activity" within the meaning of the discrimination laws) (citing *Walden v. Georgia-Pacific Corp., 126 F.3d 506, 512 n.4 (3d Cir. 1997), cert. denied, 523 U.S. 1074, 118 S. Ct. 1516, 140 L. Ed. 2d 669 (1998)*; *see also Brands-Kousaros v. Banco Di Napoli S.P.A., 1997 U.S. Dist. LEXIS 20345, *14*, No. 97 Civ. 1673 (DLC), 1997 WL 790748, at *5 (S.D.N.Y. Dec. 23, 1997) ("the protected activity must involve some sort of complaint about a type of discrimination that Title VII forbids"). Since Plaintiff does not allege that he complained of discrimination in his union grievances, he cannot make out a *prima facie* case of retaliation.

III. CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED. [13] The Clerk of Court [*29] is directed to close the docket in this matter.

1999 U.S. Dist. LEXIS 14465, *29; 81 Fair Empl. Prac. Cas. (BNA) 150

13  In his papers opposing Defendant's summary judgment motion, Plaintiff raises for the first time employment discrimination claims under New York state laws ("New York State Human Rights Law, New York Executive Law, Article 15"). *See* Pl.'s Cert. P 2. Plaintiff did not state any state law claims in his Complaint, nor did Plaintiff at any time request to amend his Complaint to add these claims. Accordingly, the Court will not consider them. Even if the Court were to consider these claims, the Court, having dismissed Plaintiff's federal claim, would decline to exercise pendent jurisdiction and would dismiss the state law claims as well. *See Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466-67 (2d Cir. 1997)* (a district court may dismiss claims brought under New York Human Rights Law on ground that plaintiff failed to establish claim under federal law); *Pell v. Trustees of Columbia Univ., 1998 U.S. Dist. LEXIS 407*, No. 97 Civ. 0193, 1998 WL 19989 (S.D.N.Y. Jan. 21, 1998) (having dismissed the federal claim, court declined to exercise jurisdiction over plaintiff's state law claims).

 [*30]  SO ORDERED.

Dated: New York, New York

September *15*, 1999

DEBORAH A. BATTS

U.S.D.J.

COMPENDIUM OF CASES REPORTED ON LEXIS AND WESTLAW

# TAB 22

LEXSEE 2005 U.S. APP. LEXIS 17859

**SARAH C. TAYLOR v. JOHN E. POTTER, Postmaster General; U.S. POSTAL SERVICE; (D.C. No. 02-cv-01552); SARAH C. TAYLOR v. JOHN E. POTTER, Postmaster General; UNITED STATES POSTAL SERVICE; (D.C. No. 02-cv-01619); SARAH C. TAYLOR v. JOHN E. POTTER, Postmaster General; UNITED STATES POSTAL SERVICE; ANTHONY J. PRINCIPI, Department of Veterans Affairs; (D.C. No. 02-cv-01620); SARAH C. TAYLOR v. JOHN E. POTTER, Postmaster General; UNITED STATES POSTAL SERVICE; (D.C. No. 03-cv-01105); Sarah C. Taylor, Appellant**

**NO. 04-4066**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*146 Fed. Appx. 570*; *2005 U.S. App. LEXIS 17859*

**August 17, 2005, Submitted Under Third Circuit LAR 34.1(a)**
**August 18, 2005, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal From the United States District Court for the District of Delaware. District Judge: Honorable Kent A. Jordan.
*Taylor v. Potter, 2004 U.S. Dist. LEXIS 16629 (D. Del., Aug. 18, 2004)*

**COUNSEL:** SARAH C. TAYLOR, Appellant, Pro se, Sicklerville, NJ.

For POSTMASTER GENERAL OF THE UNITED STATES, Appellee: Rudolph Contreras, Office of United States Attorney, Wilmington, DE.

**JUDGES:** Before: SLOVITER, BARRY AND FISHER, Circuit Judges.

**OPINION**

[*570] PER CURIAM

Appellant, Sarah C. Taylor, appeals from the District Court's order granting appellee's motion for summary judgment. For the reasons set forth below, we will affirm.

[*571] In October 2002, Taylor filed a complaint in the U.S. District Court for the District of Delaware against the Postmaster General, John E. Potter, alleging discrimination and retaliation (No. 02-1552). During the next month, she filed two additional complaints against Potter, one asserting violations of the *Family and Medical Leave Act* ("FMLA") (No. 02-1619) and the other raising claims under the *Privacy Act of 1974* (No. 02-1620). [1] In December 2003, she filed another complaint, [**2] which raised claims against Potter under *Title VII of the Civil Rights Act of 1964* (No. 03-1105). The District Court granted the defendants' motion for judgment on the pleadings with respect to the Privacy Act complaint. The remaining actions were consolidated. On August 19, 2004, the District Court granted Potter's motion for summary judgment. Taylor appeals from that order. [2]

> 1   The Privacy Act complaint also named Anthony J. Principi of the Department of Veteran Affairs as a defendant.
> 2   Taylor is not appealing from the final order entered in her Privacy Act case. Her notice of appeal clearly would have been untimely with respect to that order.

We first address the question of our jurisdiction. A notice of appeal in a civil case in which the United States is a party is timely if it is filed within 60 days of the entry of the judgment being appealed. *Fed. R. App. P. 4(a).*

146 Fed. Appx. 570, *571; 2005 U.S. App. LEXIS 17859, **2

This 60-day time limit is "mandatory and jurisdictional." *Browder v. Director, Dep't of Corrections, 434 U.S. 257, 264, 54 L. Ed. 2d 521, 98 S. Ct. 556 (1978)* [**3] (citations omitted). The deadline for filing a notice of appeal in this matter was October 18, 2004. Taylor mailed her notice of appeal to this Court, in error. Pursuant to *Rule 4(d)*, the notice of appeal was forwarded to the District Court, where it was filed on October 19, 2004, one day beyond the time allowed to appeal. A letter dated October 18, 2004, that was sent to Taylor from the Office of the Clerk of this Court, however, indicates that Taylor's notice of appeal was received in this Court by the filing deadline. Accordingly, we have jurisdiction pursuant to *28 U.S.C. § 1291*.

We exercise plenary review over an order granting a motion for summary judgment. *See Coolspring Stone Supply v. American States Life Ins. Co., 10 F.3d 144, 146 (3d Cir. 1993)*. A grant of summary judgment will be affirmed if our review reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "We review the facts in the light most favorable to the party against whom summary judgment was entered." *Coolspring, 10 F. 3d at 146.* [**4]

Taylor's racial discrimination claim is properly analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, which requires, first, that the plaintiff set forth a prima facie case of discrimination. *Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318 (3d Cir. 2000)*. The plaintiff must demonstrate that (1) she is a member of a racial group, (2) she was qualified for the position, (3) she faced an adverse employment action, and (4) other employees, not in the protected class, were treated more favorably. *Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir.*

*1993)*. The District Court correctly concluded that Taylor failed to respond to Potter's motion for summary judgment with evidence that could establish that employees outside the protected class were treated more favorably. Depositions supported Potter's assertion that all employees were treated equally, and that minorities were [*572] not treated differently when management (specifically Patricia "Dawn" Podsiad) granted leave, assigned work, and engaged in interactions with employees.

The District Court also properly [**5] granted summary judgment in favor of Potter with respect to Taylor's retaliation claim. Taylor failed to provide evidence that could establish a causal link between any protected activity and the alleged adverse employment action. *See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085* (citing *Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989))*.

To establish a hostile work environment claim based on racial discrimination, Taylor was required to show that (1) she suffered intentional discrimination because of race, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person of the same race in that position, and (5) the existence of respondeat superior liability. *See Aman, 85 F.3d at 1081*. As discussed above, Taylor failed to submit any evidence that could establish racial discrimination.

Finally, to the extent that Taylor is appealing the District Court's denial of her motion for appointment of counsel, we discern no abuse of discretion. *See Tabron v. Grace, 6 F.3d 147, 155 n.4 (3d Cir. 1993)*. [**6]

For the foregoing reasons, we will affirm the judgment of the District Court.