IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                           :
KENNETH S. MITCHELL,                       :
                                           :
                    Plaintiff,             :
                                           :          Civil Action No. 06-725 (GMS)
          v.                               :
                                           :
WACHOVIA CORPORATION, t/a                  :
     WACHOVIA SECURITIES,                  :
WACHOVIA SECURITIES, L.L.C.,               :
WACHOVIA SERVICES, INC.,                   :
WACHOVIA BANK OF DELAWARE, N.A.,           :
TODD D. GAUTHIER, LYNN G. MEYER,           :
CAROLYN J. BEAM, and                       :
DOROTHY A. DIFEBO,                         :
                                           :
                    Defendants.            :
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**APPENDIX TO BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**


P. Clarkson Collins, Jr., (Bar I.D. #739)          David Bennet Ross (admitted *pro hac vice*)
pcollins@morrisjames.com                           dross@seyfarth.com
David H. Williams (Bar I.D. #616)                  Devjani Mishra (admitted *pro hac vice*)
dwilliams@morrisjames.com                          dmishra@seyfarth.com
James H. McMackin, III (Bar I.D. #4284)            Tara Smith Williams (admitted *pro hac vice*)
jmcmackin@morrisjames.com                          tawilliams@seyfarth.com

MORRIS JAMES LLP                                   SEYFARTH SHAW LLP
500 Delaware Avenue, Suite 1500                    620 Eighth Avenue
P.O. Box 2306                                      New York, New York 10018-1405
Wilmington, DE  19899                              (212) 218-5500
          (302) 888-6800


Dated: January 7, 2008

True and correct copies of the following exhibits supportive of Defendants' motion for summary

judgment are annexed hereto:

| Exhibit | Description |
|---------|-------------|
| A | The Complaint, filed in the United States District Court for the District of Delaware on December 1, 2006, bearing Docket No. 06-725. |
| B | Selected transcript pages from the Deposition of Kenneth Mitchell taken on December 14, 2007. |
| C | Relevant exhibits from the Deposition of Kenneth Mitchell taken on December 14, 2007. |
| D | Selected transcript pages from the Deposition of Ladan Amini taken on December 23, 2007. |
| E | Selected transcript pages from the Deposition of Frank Consalo taken on January 4, 2008. |
| F | Selected transcript pages from the Deposition of Todd Gauthier taken on December 18, 2007. |
| G | Selected transcript pages and exhibits from the Deposition of Carolyn Beam taken on December 28, 2007. |
| H | Selected transcript pages and exhibits from the Deposition of Lynn Meyer taken on December 20, 2007. |
| I | Selected transcript pages from the Deposition of Dorothy DiFebo taken on December 23, 2007. |

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

> DEPOSITION
> EXHIBIT
> Mitchell 5
> KAH 12/14/07

| | |
|---|---|
| KENNETH S. MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 06- |
| | ) |
| WACHOVIA CORPORATION, t/a | ) JURY TRIAL DEMANDED |
| WACHOVIA SECURITIES, | ) |
| WACHOVIA SECURITIES, L.L.C., | ) |
| WACHOVIA SERVICES, INC., | ) |
| WACHOVIA BANK OF DELAWARE, | ) |
| N.A., | ) |
| TODD D. GAUTHIER, | ) |
| LYNN G. MEYER, | ) |
| CAROLYN J. BEAM, and | ) |
| DOROTHY A. DIFEBO, | ) |
| | ) |
| Defendants. | ) |

.0 6 -- 7 2 5

2006 DEC -1  PM 3: 22

FILED U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## COMPLAINT

### The Parties

1.    Plaintiff Kenneth S. Mitchell is a citizen of, and resides in, the State of Delaware.

2.    Defendant Wachovia Corporation is an entity organized under the laws of the State of North Carolina which trades under the name "Wachovia Securities" and which engages in the banking, securities, and investment counseling services in Delaware.

3.    Defendant Wachovia Securities, L.L.C. is an entity organized under the laws of the State of Delaware which engages in the banking, securities, and investment counseling business in Delaware.

1

4.      Defendant Wachovia Services, Inc. is an entity organized under the laws of the State of Delaware which engages in the banking, securities, and investment counseling business in Delaware.

5.      Wachovia Bank of Delaware, N.A., a subsidiary of Wachovia Corporation, is an entity organized under laws of the State of Delaware which engages in the banking, securities, and investment counseling business in Delaware.

6.      Defendants Wachovia Corporation, Wachovia Securities, L.L.C., Wachovia Securities, Inc., and Wachovia Bank of Delaware, N.A. shall be referred to collectively as "Wachovia" unless otherwise specified individually.

7.      Defendant Todd D. Gauthier resides at 2660 Bethany Church Road, Alpharetta, Georgia 30004. Defendant Gauthier was an employee of Wachovia at all times relevant to the allegations in the complaint, and he was formerly the Regional Sales Manager for Wachovia in charge of Wachovia's Delaware branch offices, including the "Prices Corner" and "Capitol Trail" branch offices at which plaintiff has worked.

8.      Defendant Lynn G. Meyer resides a 125 Bells Walk Court, Holly Springs, North Carolina 27540. Defendant Meyer was an employee of Wachovia at all times relevant to the allegations in the complaint, and she is a Regional Bank Director for Wachovia.

9.      Defendant Carolyn J. Beam resides at 9 Sadsbury Lane, Gap, Pennsylvania 17527. Defendant Beam was an employee of Wachovia, serving as a Financial Services Leader, until she left the company in 2005.

10.     Defendant Dorothy A. DiFebo resides at 17 Champlain Avenue, Wilmington, Delaware 19804. Defendant DiFebo was an employee of Wachovia at all times relevant to the allegations in the complaint, and she remains the manager of Prices Corner.

2

### Jurisdiction and Venue

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, as well as under 42 U.S.C. §§1981, 1985, 1986, 1988, and 2000e.  Supplemental jurisdiction over the related state law claims asserted in this Complaint is based on 28 U.S.C. §1367.

12.    Venue in this Court is proper pursuant to 28 U.S.C. §1391(b).

### Wachovia's Structure and Employees

13.    In August 2002, plaintiff, an African-American male, was hired by Wachovia as a Financial Adviser.  Plaintiff was initially assigned to work out of Capitol Trail and Prices Corner.  These two offices were within minutes of each other on Kirkwood Highway between Wilmington, Delaware and Newark, Delaware.

14.    Prices Corner had client deposits in an amount that was roughly double that of Capitol Trail.  At the times during which the discriminatory conduct to be described below occurred, Prices Corner had approximately $57 million in client deposits as opposed to about $27 million in client deposits at Capitol Trail.

15.    In general, a branch with higher client deposits presents a Financial Advisor with greater opportunities for professional development and success than a branch with lower client deposits.

16.    The Wachovia chain of command at Prices Corner and Capitol Trail was divided into two hierarchies: banking and securities.

17.    Plaintiff, a Financial Advisor, worked in the securities aspect of Wachovia's activities.

18.    Defendant Gauthier was Wachovia's Regional Sales Manager and, as such, he was in charge of the securities aspects of branch offices in which plaintiff worked.  Defendant

3

Gauthier was plaintiff's direct supervisor although he worked out of an office in Pennsylvania and rarely traveled to Delaware.

19.     Defendant Meyer was Wachovia's Regional Bank Director and, as such, she was in charge of the banking aspects of the branch offices in which plaintiff worked.

20.     Defendant Beam was a Wachovia Financial Services Leader who reported to defendant Meyer.  Defendant Beam directly supervised other Wachovia employees, including Financial Specialist Ladan Amini, who worked with plaintiff.

21.     Defendant DiFebo was the Bank Branch Manager for Prices Corner, and as such she was in charge of the banking aspects of business at Prices Corner.  Defendant DiFebo had authority over the day-to-day workings of the branch including the handling of personnel matters between employees.

22.     Among the Wachovia employees reporting to defendants Beam and/or DiFebo was Ladan Amini, a Financial Specialist at Prices Corner.  As part of her normal job duties, Ms. Amini referred clients to plaintiff, a Financial Advisor, for advice on financial services available through Wachovia Securities.

23.     At all times relevant to the allegations in this action, plaintiff was the only black male Financial Advisor with Wachovia in the State of Delaware.

24.     At all times relevant to the allegations in this action, plaintiff worked exclusively with female employees with respect to his interactions with Wachovia's banking section.  All of the clients plaintiff came into contact with through Wachovia's banking section came from Ms. Amini, who worked in a branch managed by Ms. DiFebo, and whose next two level supervisors were Ms. Beam and Ms. Meyer.

4

### Discriminatory and Hostile Work Environment

25.    Plaintiff commenced work at Prices Corner and Capitol Trail in about August 2002. As a Financial Advisor, plaintiff engaged in investment and financial services advice for Wachovia's clients. In addition to bringing new clients to Wachovia, plaintiff would receive referrals of existing clients from Wachovia Financial Specialists such as Ms. Amini. To a large degree, plaintiff's ability to succeed as a Financial Advisor with Wachovia was dependent upon receiving referrals of Wachovia's existing clients.

26.    Plaintiff split his time between Prices Corner and Capitol Trail, but, as time passed, he spent more time at Prices Corner. Plaintiff was required to achieve certain production goals set by Wachovia management. The goals differed from branch to branch and, for plaintiff, they were higher at Prices Corner due in part to the higher level of client assets at that branch.

27.    Following the first few months of his start with Wachovia, plaintiff met or exceeded his target goals for production at both Prices Corner and Capitol Trail. For some period of time, plaintiff ranked third of twenty seven Financial Advisors in the region in terms of production. Plaintiff was motivated, working hard, and looking forward to a bright and successful future with Wachovia.

28.    Also in his first months with Wachovia, plaintiff had experienced cordial, if not actually friendly, working relationships with Ms. Amini and Ms. DiFebo. As he worked on a day-to-day basis almost exclusively with women, and as he was the only African-American male Wachovia Financial Advisor in Delaware, plaintiff perceived a somewhat chilly work atmosphere and a reluctance by the female defendants to accept him as part of the Wachovia "team."

5

29.    In particular, the Prices Corner manager, defendant DiFebo, with whom plaintiff was in contact on a nearly daily basis, rarely spoke to plaintiff, often glared at him, and in general gave him the impression that he was not welcome in her branch. Plaintiff noticed that Ms. DiFebo's relationship and interactions with Ms. Amini were much warmer and cordial.

30.    In or about May 2003, Ms. Amini scheduled a meeting with an existing client who had substantial funds (in excess of $400,000.00) in accounts with Wachovia. Plaintiff met the client and scheduled follow up appointments to address various investment opportunities that would be beneficial to the client.

31.    On or about June 20, 2003, at a meeting attended by the client, Ms. Amini, and plaintiff, the client expressed displeasure at a $6.00 charge on a mutual fund statement. Plaintiff asked Ms. Amini if Wachovia could delete the charge and she replied that such a change was not possible. Plaintiff offered to personally reimburse the client $6.00, and he even called Wachovia's Operations Manager to arrange the transaction. Ms. Amini expressed anger towards plaintiff for offering such an unconventional solution to a problem, but plaintiff was merely attempting to satisfy a client who had been a client for more than 40 years and who had substantial accounts with Wachovia.

32.    Approximately one week later, on or about June 26, 2003, plaintiff called Ms. Amini to discuss Ms. Amini's purchase of an annuity for a Wachovia client. Plaintiff was concerned that a disproportionate amount of the client's funds (in excess of 70%) were invested in annuities, thereby making the funds subject to penalties if amounts had to be withdrawn early. Ms. Amini became angry at plaintiff, and she contacted her supervisors to make complaints about plaintiff.

6

33.    On or about July 9, 2003, plaintiff received a telephone call from defendant Meyer in which she accused plaintiff of acting improperly towards Ms. Amini in connection with the annuity incident. Defendant Meyer also criticized plaintiff for his handling of the $6.00 client reimbursement incident even though he had saved a valuable client. It was apparent that Ms. Meyer was criticizing plaintiff without knowing the details of both incidents and without even asking for his side of the story.

34.    In addition to criticizing plaintiff, defendant Meyer contacted Frank Consalo, the manager above defendant Gauthier (two levels above plaintiff), reporting the allegations against plaintiff. That lead, on or about July 16, 2003, to plaintiff receiving a telephone call from defendant Gauthier, his direct supervisor.

35.    In that conversation, defendant Gauthier accused plaintiff of making an ethnic slur against Ms. Amini, an individual of Iranian descent. Plaintiff asked defendant Gauthier where this accusation had originated, and defendant Gauthier replied that he had learned of the accusation from defendant Beam who had purportedly heard it from defendant DiFebo who had purportedly heard it from Ms. Amini.

36.    When asked about the alleged ethnic slur, Ms. Amini denied that the incident had ever occurred, and confirmed that there had simply been a misunderstanding of an entirely innocuous nature. Notwithstanding the denial of the incident from the alleged victim, no one bothered to apologize to plaintiff for spreading a false and malicious rumor even though that rumor had been spread by management personnel themselves.

37.    On or about July 24, 2003, plaintiff received a telephone call from Marti Michalec, of Wachovia Human Resources, concerning the incidents described above. Ms. Michalec did not apologize, but she conceded that defendant Gauthier had jumped the gun and

7

had not checked the facts before accusing plaintiff of misconduct. Ms. Michalec concluded the conversation by saying that defendant Gauthier would be speaking to him shortly.

38.    On or about July 31, 2003, defendant Gauthier came to plaintiff's office and apologized for the incident involving the alleged slur against Ms. Amini. He admitted that he had spoken too soon, without checking the facts, and he broke down into tears and said that plaintiff should not leave Wachovia.

39.    About one week later, on or about August 5, 2003, defendant Gauthier again came to plaintiff's office and asked him not to leave Wachovia. It was apparent that his true concern was not about plaintiff, however, because he told plaintiff that if plaintiff left Wachovia, defendant Gauthier might lose his job. Defendant Gauthier broke down into tears again. Plaintiff stated that he did not know why these false accusations were being brought against him because his production numbers were exceeding goals and there was no reason for any discontent with him.

40.    On or about August 25, 2003, plaintiff spoke again with Ms. Michalec and reiterated his concerns that false and malicious accusations were being brought against him. He raised concerns that defendants Gauthier, Beam, and Meyer had acted without full knowledge of the facts and without even stopping to consider his position. By now, the environment at Prices Corner was distinctly hostile.

41.    By way of contrast, plaintiff experienced no such problems at Capitol Trail. Plaintiff was accepted by the employees at that branch, and he had good working relationships with them. Plaintiff's work ethic and methods did not change when he traveled between branches (they were less than one mile apart), and he perceived that his problems at Prices Corner were due to discriminatory practices engaged in by the individual defendants.

8

42.    On or about September 4, 2003, plaintiff met with defendant Gauthier. Plaintiff expressed concerns that he perceived a hostile environment at Prices Corner, despite his excellent production numbers and despite his lack of any such problems at the Capitol Trail branch. At no time did defendant Gauthier state that the motives of the other individual defendants would be investigated by Wachovia, and he completely ignored the fact that plaintiff faced an entirely benign environment at Capitol Trail. Plaintiff was frustrated by the blatantly disrespectful and discriminatory atmosphere at Prices Corner and Wachovia management's refusal to do anything about the situation.

43.    Following the June and July 2003 incidents with Ms. Amini, plaintiff received fewer referrals of business from her. Until July 2003, in excess of 60% of plaintiff's business was generated at the Prices Corner office with the balance being generated at Capitol Trail. Ms. Amini was the only Financial Specialist at Prices Corner, and apparently neither she nor her supervisors, the female individual defendants, had any inclination to correct their discriminatory conduct towards plaintiff. As a result, plaintiff's production figures at Prices Corner began to slip. Plaintiff's income was tied directly to his production, so he suffered direct financial harm through the discriminatory conduct of the individual defendants.

44.    In September 2003, plaintiff had several meetings with defendant Gauthier and Mr. Consalo who was defendant Gauthier's supervisor. Despite the possible adverse economic ramifications to him, plaintiff had expressed interest in leaving Prices Corner and accepting a position with Wachovia's "Wealth Management" office in Wilmington, Delaware.

45.    In early October 2003, Marti Mihalic of Wachovia's human resources department, told plaintiff that he "no longer had to worry about Lynn Meyer." Also around that time, defendants Gauthier and Beam apologized to plaintiff for making the accusations against him

9

several months earlier. Notwithstanding the verbal apologies, no actual changes were implemented by Wachovia and plaintiff's relationships with other employees, and the overall atmosphere at Prices Corner, remained exactly the same.

46.    In late October 2003, Mr. Consalo and defendant Gauthier informed plaintiff that he would not be receiving the transfer to the "Wealth Management" office. There was some discussion of moving plaintiff out of Prices Corner to another office, but no action was taken. Plaintiff mentioned that he intended to follow up with Wachovia's human resources department about the underlying problems at Prices Corner.

47.    On or about October 31, 2003, plaintiff spoke to a human resources representative about the discriminatory and wrongful conduct he was experiencing at Prices Corner, and he expressed dissatisfaction with the fact that human resources and management had, to date, done nothing to correct the problem other than to contemplate moving him to a different office.

48.    On or about November 17, 2003, plaintiff received a letter from Wachovia human resources stating that it was Wachovia's practice to maintain confidentiality concerning any actions taken with respect to the employees who had engaged in the discriminatory conduct towards him.

49.    During 2004, plaintiff continued to experience a hostile work environment. Despite all the meetings and conversations during 2003, Wachovia had essentially done nothing to correct the situation. Plaintiff struggled to produce at Prices Corner amidst the now frosty work environment. The female employees with whom he continued to work, namely, defendant DiFebo and Ms. Amini, barely spoke to him and his business referrals plummeted. Plaintiff continued to meet his production goals, but business was more difficult to generate due to the lack of cooperation from Wachovia's other employees. By contrast, as before, plaintiff

10

experienced no such problems at Capitol Trail. The Capitol Trail office represented less of an opportunity for a Financial Advisor, however, as its client deposits were only about one-half of the deposits at Prices Corner.

50.    At some time during 2004, defendant Gauthier informed plaintiff that a change was planned under which Financial Advisors would operate out of only one branch. Although the environment continued to be hostile at Prices Corner, plaintiff wished to stay there due to its superior financial asset base and, hence, greater opportunity for success.

51.    Until December 2004, plaintiff had not had an assigned physical office at Prices Corner. Plaintiff had operated at that branch by utilizing any office that happened to be vacant. On December 6, 2004, defendant was finally able to set up his own office at Prices Corner. On or about December 9, 2004, only three days after setting up his office at Prices Corner, defendant Gauthier took over direct control of operations at Prices Corner. Defendant Gauthier immediately notified plaintiff to cease his activities at Prices Corner. Plaintiff asked the reason for these changes, and defendant Gauthier expressly denied that the change had anything to do with plaintiff's performance. Instead, defendant Gauthier stated: "The staff at Prices Corner don't like you. That branch is not right for you."

52.    Plaintiff's replacement at Prices Corner was to be James Meehan, a white male. There was no legitimate business reason to replace plaintiff other than to replace the one African-American male Financial Advisor, who had never been accepted by that branch's white female personnel, with a white male. Wachovia had fixed the discrimination and hostile work environment at the Prices Corner branch by removing the victim and leaving the perpetrators in place. This act also constituted retaliation for plaintiff's attempts to get Wachovia management to address the fundamental issues involved in his discrimination.

11

53.    Following his involuntary removal from Prices Corner, plaintiff worked exclusively at Capitol Trail. His relationships with his coworkers at that branch remained good, and he experienced none of the discrimination he had undergone at Prices Corner. However, plaintiff suffered emotionally from Wachovia's wrongful treatment, as well as that office's inherently lower deposit base, and his production plunged precipitously. For the first time, plaintiff consistently failed to meet his production goals.

54.    As a direct result of the wrongful conduct he experienced, plaintiff needed psychiatric counseling to deal with depression. He had never before needed such treatment.

55.    In January 2005, plaintiff filed his charges of discrimination with the EEOC. Plaintiff continued to fail to meet his production goals throughout 2005 and 2006.

56.    During late 2005, plaintiff learned that defendant Beam had been demoted and that she subsequently left the company. Plaintiff also learned that defendant Gauthier had been demoted and transferred to a different region of the country. These internal changes had no effect whatsoever on plaintiff and served in no way to allay the discriminatory and wrongful conduct that he had suffered under the supervision of defendants Gauthier and Beam.

57.    In October 2006, Wachovia closed Capitol Trail and transferred its client accounts to Prices Corner. Despite the fact that those accounts represented many of his clients, including clients he brought to Wachovia from his previous position with another securities firm, plaintiff was not transferred back to Prices Corner. Instead, plaintiff was transferred to Wachovia's "Meadowood" office, another office on Kirkwood Highway located only a few miles from Prices Corner.

58.    Plaintiff has been accepted by the Wachovia employees at "Meadowood" just as he had been at "Capitol Trail." "Meadowood" is managed by an African-American woman. As

with Capitol Trail, however, the client deposits at Meadowood are not as large as at Prices Corner, so plaintiff has an inherently smaller economic foundation for his work.

<u>Requisites</u>

59.    At all times relevant to the allegations in the complaint, Wachovia continuously engaged in an industry affecting commerce within the meaning of 42 *U.S.C.* §2000e(g) and (h).

60.    Plaintiff has complied with all the requirements of 42 *U.S.C.* §2000e, *et seq*. and 19 *Del.C.* §710 *et seq.* for the filing of this legal action in that a charge of discrimination was filed with the Office of the Equal Employment Opportunity Commission ("EEOC") alleging that he had suffered discrimination and retaliation in violation of Title VII, 42 *U.S.C.* §2000e, *et seq* and 19 *Del.C.* §710 *et seq.*

61.    On or about December 29, 2005, the Division of Industrial Affairs of the Department of Labor of the State of Delaware issued a decision holding that there was reasonable cause to believe that an unlawful employment practice occurred with respect to plaintiff's employment with Wachovia. The matter was then submitted to the EEOC for review and, on about September 20, 2006, the EEOC issued a "right to sue" notice to plaintiff.

COUNT 1
DISCRIMINATION
(Title VII, 42 *U.S.C.* §2000e *et seq.* and 19 *Del.C.* §710 *et seq.*)

62.    Plaintiff reasserts the allegations in paragraphs 1-61 above.

63.    Defendants engaged in conduct and actions constituting discrimination against plaintiff based on his race and gender.

64.    Defendants created a hostile work environment through their wrongful and discriminatory conduct towards plaintiff.

13

65.    Defendants' wrongful and discriminatory conduct denied plaintiff the opportunity to continue working at Prices Corner where there were more customers, more assets, and a greater opportunity for advancement and, through such practices, created a hostile working environment for plaintiff.

66.    Defendants' wrongful actions against and conduct towards plaintiff were intentional, malicious, and/or made with reckless disregard of his rights.

67.    Defendants' wrongful actions against and conduct towards plaintiff were a proximate cause of plaintiff's suffering, *inter alia*, past, present, and future loss of income and emotional and mental distress and are a violation of Title VII, 42 U.S.C. ¶2000e, *et seq.* and 19 *Del.C.* §710 *et seq.*, entitling plaintiff to remedies and damages including, but not limited to, compensatory, equitable, and punitive damages as set forth below.

### COUNT 2
### RETALIATION
(Title VII, 42 *U.S.C.* §2000e *et seq.* and 19 *Del.C.* §710 *et seq.*)

68.    Plaintiff reasserts the allegations in paragraphs 1-67 above.

69.    Plaintiff was denied the opportunity to continue working at Prices Corner due to his race and his gender.

70.    Defendants retaliated against plaintiff for expressing concerns about the improper and disparate treatment he received from other Wachovia employees, including the named defendants in this action, as well as the hostile work environment created by such employees.

71.    Defendants retaliated against plaintiff by denying him the opportunity to continue working at Prices Corner where there were more customers, more assets, and a greater opportunity for advancement and, through such practices, created a hostile working environment for plaintiff.

14

72.    Defendants' wrongful actions against and conduct towards plaintiff were intentional, malicious, and/or made with reckless disregard of his rights.

73.    Defendants' wrongful actions against and conduct towards plaintiff were a proximate cause of plaintiff's suffering, *inter alia*, past, present, and future loss of income and emotional and mental distress and are a violation of Title VII, 42 U.S.C. ¶2000e, *et seq.* and 19 *Del.C.* §710 *et seq.*, entitling plaintiff to remedies and damages including, but not limited to, compensatory, equitable, and punitive damages as set forth below.

COUNT 3
VIOLATION OF EQUAL RIGHTS UNDER THE LAW
*(42 U.S.C. §1981)*

74.    Plaintiff reasserts the allegations in paragraphs 1-73 above.

75.    Defendants' wrongful actions against and conduct towards plaintiff, namely, defendants' refusal to let plaintiff continue working at Prices Corner, were motivated by plaintiff's race and, therefore, violated plaintiff's rights and privileges in connection with his relationship with defendant Wachovia.

76.    Defendants' wrongful actions against and conduct towards plaintiff were intentional, malicious, and/or made with reckless disregard of his rights.

77.    Defendants' wrongful actions against and conduct towards plaintiff were a proximate cause of plaintiff's suffering, *inter alia*, past, present, and future loss of income and emotional and mental distress and are a violation of Title VII, 42 U.S.C. ¶1981, *et seq.* entitling plaintiff to remedies and damages including, but not limited to, compensatory, equitable, and punitive damages as set forth below.

15

## COUNT 4
## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
### (42 U.S.C. §1985)

78.     Plaintiff reasserts the allegations in paragraphs 1-77 above.

79.     The Individual Defendants acted individually and in concert with each other, and in concert with other agents and employees of Wachovia, in order to deny him the opportunity to continue working at Prices Corner, to spread unsubstantiated and untruthful rumors about plaintiff, and to affect adversely plaintiff's ongoing employment relationship with Wachovia, based on plaintiff's race and gender.

80.     The Individual Defendants agreed between and among themselves that they would discriminate and retaliate against plaintiff because of his race and his gender, and because plaintiff had raised complaints to Wachovia's human resources and/or other management personnel about his improper and discriminatory treatment.

81.     Defendants' wrongful actions against and conduct towards plaintiff, which occurred in concert, were a proximate cause of plaintiff's suffering, *inter alia*, past, present, and future loss of income and emotional and mental distress and constitute a conspiracy to violate plaintiff's rights guaranteed by 42 U.S.C. ¶1981, and, thus, are a violation of 42 U.S.C. ¶1985. Such wrongful actions entitle plaintiff to remedies and damages including, but not limited to, compensatory, equitable, and punitive damages as set forth below.

## COUNT 5
## NEGLECT OR REFUSAL TO PREVENT CONSPIRACY
### 42 U.S.C. §1986

82.     Plaintiff reasserts the allegations in paragraphs 1-81 above.

16

83.    The Individual Defendants occupied supervisory and/or management level positions with defendant Wachovia, and each of them had the power and authority to prevent or aid in preventing the commission of the conspiracy to deprive plaintiff of his civil rights.

84.    The Individual Defendants had knowledge of the conspiracy to violate plaintiff's civil rights.

85.    The Individual Defendants refused, or neglected to prevent or aid in preventing, the conspiracy to violate plaintiff's civil rights.

86.    Individual Defendants' wrongful actions against and conduct towards plaintiff, or their failure to act, were a proximate cause of plaintiff's suffering, *inter alia*, past, present, and future loss of income and emotional and mental distress and are a violation of Title VII, 42 U.S.C. ¶1986, *et seq.* entitling plaintiff to remedies and damages including, but not limited to, compensatory, equitable, and punitive damages as set forth below.

## COUNT 6
## STATE LAW TORT - FRAUD AND DECEIT

87.    Plaintiff reasserts the allegations in paragraphs 1-86 above.

88.    Defendants, and other employees, servants, and agents of defendant Wachovia, including but not limited to Individual Defendant Gauthier, informed plaintiff that his removal from Prices Corner was not due to performance issues, but to the fact that he was not liked by, and did not get along with, other Wachovia employees at that branch, including defendant DiFebo.  Such purported grounds were false in that the true reason for plaintiff's removal from Prices Corner was wrongful and discriminatory conduct perpetrated by defendants based on plaintiff's race and gender.

17

89.    Defendant Gauthier's representations to plaintiff were fraudulent and deceitful in that the Individual Defendants were acting with the intent to wrongfully deny plaintiff the opportunity to continue working at Prices Corner due to his race and his gender as well as due to his complaints about wrongful conduct to Wachovia human resources personnel and/or other management level personnel.

90.    Defendants' wrongful actions against and conduct towards plaintiff, or their failure to act, were a proximate cause of plaintiff's suffering, *inter alia*, past, present, and future loss of income and emotional and mental distress entitling plaintiff to remedies and damages including, but not limited to, compensatory, equitable, and punitive damages as set forth below.

## COUNT 7
## STATE LAW CLAIM - *PRIMA FACIE* TORT

91.    Plaintiff reasserts the allegations in paragraphs 1-90 above.

92.    Defendants have committed *prima·facie* tort by intentionally, maliciously, and without justification harming plaintiff by:

    (a)    Falsely representing to him that he was being moved from Prices Corner for legitimate reasons when the real reason was due to his race and/or gender;

    (b)    Knowingly fabricated or manufactured false reasons for his transfer to a branch office other than Prices Corner;

    (c)    Engaged in employment practices and acts towards plaintiff based on his race and/or his gender;

18

     (d)     Retaliated against plaintiff due to his reporting of the wrongful conduct against him to Wachovia's human resources and/or other management level personnel; and

     (e)     Denying plaintiff the opportunity to continue working at the Prices Conner branch office in order to replace him with a white male.

93.    Defendants' wrongful, intentional, and malicious actions against and conduct towards plaintiff, or their failure to act, were a proximate cause of plaintiff's suffering, *inter alia*, past, present, and future loss of income and emotional and mental distress entitling plaintiff to remedies and damages including, but not limited to, compensatory, equitable, and punitive damages as set forth below.

COUNT 8
STATE LAW CLAIM - CONSPIRACY

94.    Plaintiff reasserts the allegations in paragraphs 1-93 above.

95.    The Individual Defendants agreed between and among themselves and other employees of defendant Wachovia that they would take actions that amount to:

     (a)     A breach of the covenant of good faith and fair dealing which is present in every employment contract in the State of Delaware;

     (b)     Intentional, deceitful, and fraudulent misrepresentation to plaintiff with respect to his job with Wachovia;

     (c)     Intentional infliction of harm on plaintiff without any excuse or justification;

     (d)     Intentional and wrongful replacement of plaintiff, at Prices Corner, with a white male.

19

96.    The Individual Defendants undertook overt acts in furtherance of their agreement to breach the covenant of good faith and fair dealing, commit *prima facie* tort against plaintiff; and engage in fraudulent and deceitful acts directed at plaintiff and with the aim of replacing him with a white male.

97.    The conspiracy between or among the defendants was a proximate cause of plaintiff's suffering, *inter alia*, past, present, and future loss of income and emotional and mental distress entitling plaintiff to remedies and damages including, but not limited to, compensatory, equitable, and punitive damages as set forth below.

THEREFORE, plaintiff demands that judgment be entered in his favor and against defendants, jointly and severally, as follows:

(1)    Compensatory damages for past, present, and future lost wages, bonuses, and other elements of income derived from his employment relationship with Wachovia, and for emotional and psychological harm;

(2)    Punitive damages;

(3)    Equitable relief in the form of reinstatement to his position at the Prices Corner branch office;

(4)    Costs of this action;

(5)    Reasonable attorneys fees;

(6)    Prejudgment and postjudgment interest at the applicable legal rate(s);

(7)    Such other relief as the Court deems just and appropriate.

20

BIGGS AND BATTAGLIA

Victor F. Battaglia, Sr. (Del. Bar No. 156)
Steven F. Mones (Del. Bar No. 2611)
921 N. Orange Street
P.O. Box 1489
Wilmington, DE  19899-1489
Tel:  302-655-9677
Fax:  302-655-7924
smones@batlaw.com
Attorneys for Plaintiff

December 1, 2006

21

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
KENNETH S. MITCHELL,          )
                              )
     Plaintiff,               )
                              )
        v.                    )  C.A. No. 06-725 (GMS)
                              )
WACHOVIA CORPORATION, t/a )
WACHOVIA SECURITIES,          )
WACHOVIA SECURITIES,          )
L.L.C., WACHOVIA SERVICES,)
INC., WACHOVIA BANK OF        )
DELAWARE, N.A., TODD D.       )
GAUTHIER, LYNN G. MEYER,      )
CAROLYN J. BEAM, and          )
DOROTHY A. DIFEBO,            )
                              )
     Defendants.              )
```

                Deposition of KENNETH S. MITCHELL taken
pursuant to notice at the law offices of Morris James,
500 Delaware Avenue, 15th Floor, Wilmington, Delaware,
beginning at 10:05 a.m., on Friday, December 14, 2007,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.
APPEARANCES:

        STEVEN F. MONES, ESQUIRE
        BIGGS & BATTAGLIA
          921 North Orange Street
          Wilmington, Delaware 19801
          for the Plaintiff

        DEVJANI H. MISHRA, ESQUIRE
        SEYFARTH SHAW, LLP
          620 Eighth Avenue
          New York, New York 10018-1405
          for the Defendants


                WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Kenneth S. Mitchell

24

    Q.    She still lives at home with you?

    A.    Occasionally she comes home.  She just finished
college.

    Q.    Do you belong to or participate in any
organizations or groups of any kind outside of work?

    A.    What kind of groups or organizations?

    Q.    For example, any social organizations or
community groups.

    A.    No.

    Q.    What is the highest level of education that you
have completed?

    A.    Graduate level.

    Q.    Was that a degree program?

    A.    Yes.

    Q.    What degree?

    A.    Business administration.

    Q.    Is that an M.B.A. degree?

    A.    M.B.A.

    Q.    When did you obtain that?

    A.    In 1991.

    Q.    Do you currently hold any professional licenses
or certificates?

    A.    The only licenses are the securities licenses.

    Q.    Which securities licenses do you hold?

Kenneth S. Mitchell

25

1     A.    Series 7, 65, and Series 63.

2     Q.    So that the record is clear, what are each of

3 those licenses?

4     A.    The Series 7 is a securities license, the

5 Series 65 is the state license, and the Series 63 is the

6 investment adviser license.

7     Q.    How long have you held each of those licenses?

8     A.    Since 1997, about 11 years.  Ten years.

9     Q.    During those 10 years has there ever been any

10 time that any of those licenses lapsed?

11    A.    No.

12    Q.    What did you have to do to obtain each of these

13 licenses?

14    A.    Study securities rules and regulations,

15 investments.

16    Q.    Other than these three licenses, have you ever

17 held any other licenses that you don't currently hold?

18    A.    Health -- life and health insurance license.

19    Q.    When did you hold that license?

20    A.    From 1997.  So about 10 years.

21    Q.    Do you still have that license or you don't?

22    A.    I do.

23    Q.    Other than those four licenses, are there any

24 other licenses that you have ever held that you don't

Kenneth S. Mitchell

33

1   attorney?

2       A.    No.

3       Q.    Do you use e-mail?

4       A.    Yes.

5       Q.    How many e-mail accounts do you have?

6       A.    At Wachovia?

7       Q.    Generally.

8       A.    I have one at Wachovia.

9       Q.    How many do you have outside of Wachovia?

10      A.    One.

11      Q.    Have you ever used your non-Wachovia e-mail to

12  discuss this case with anyone?

13      A.    No.

14      Q.    After you left active service with the Navy as

15  opposed to the reserve, where were you first employed

16  after that?

17      A.    Merrill Lynch.

18      Q.    What was your position at Merrill Lynch?

19      A.    Financial adviser.

20      Q.    Was this your first employment as a financial

21  adviser?

22      A.    Yes.

23      Q.    What were your responsibilities there?

24      A.    Provide investment services to clients.

Kenneth S. Mitchell

34

1    Q.    When you started at Merrill Lynch, did you have

2    a book of accounts?

3    A.    No.

4    Q.    How did you get accounts?

5    A.    Cold calling.

6    Q.    Anything else?

7    A.    Mailings, seminars, and referrals.

8    Q.    How long were you at Merrill Lynch?

9    A.    About seven years, I believe.

10    Q.    If I have my dates right, that would be 1995 or

11    so?

12    A.    '96.

13    Q.    To 2002?

14    A.    Right.  So that's about six years.

15    Q.    Focusing on the end of the time that you worked

16    at Merrill Lynch, do you recall what your total assets

17    under management were at that point?

18    A.    I can't recall.

19    Q.    Can you estimate?

20    A.    Around 38, 40 million maybe.

21    Q.    Do you recall approximately what your trailing

22    12 was?

23    A.    I can't recall.

24    Q.    How were you compensated at Merrill Lynch?

Kenneth S. Mitchell

35

1    A.    I was compensated by commissions from

2    investments.

3    Q.    Did you have a regular draw?

4    A.    Yes, I think that we had a regular draw there.

5    Q.    Were you eligible for bonuses?

6    A.    Yes.  Well, let me rephrase that.  I'm not

7    sure.  I'm not clear if we were or not.

8    Q.    At some point while you were working at Merrill

9    Lynch, did you apply for a position at First Union?

10    A.    I was contacted by someone from First Union.  I

11    did not apply.

12    Q.    Do you recall who contacted you?

13    A.    Suzanne Dwyer.

14    Q.    Who is Suzanne Dwyer?

15    A.    She was the sales manager for First Union.

16    Q.    Did she contact you in person or by phone or

17    some other way?

18    A.    I was contacted by phone.

19    Q.    Did Ms. Dwyer contact you herself?

20    A.    I believe so.

21    Q.    Do you recall when this was?

22    A.    I think it may have been sometime in 2000, 2001

23    maybe.

24    Q.    Do you recall what you discussed with

Kenneth S. Mitchell

36

1    Ms. Dwyer?

2        A.    Only talked about opportunities at First Union.

3        Q.    What did she say to you about that, if you

4    recall?

5        A.    She just thought that I could have a much

6    better career at First Union than Merrill Lynch.

7        Q.    Did she explain why she thought you could have

8    a better career?

9        A.    I can't recall that conversation from back

10   then, everything that was discussed.

11       Q.    Did she tell you anything about First Union,

12   the company, more generally?

13       A.    She just gave me an overview of working as a

14   financial adviser with First Union and their bank

15   channel, saying that it would be a lot better than

16   working in a warehouse environment.

17       Q.    Did she tell you why she was contacting you in

18   particular?

19       A.    No.

20       Q.    Did you ask her why?

21       A.    No.

22       Q.    Following the conversation that you had with

23   Ms. Dwyer, did you have any other contact with anyone at

24   First Union?

Kenneth S. Mitchell

37

1    A.    Not to my recollection.

2    Q.    Did you fill out an application for First

3    Union?

4    A.    I may have.  I'm not sure.

5              MS. MISHRA:  Let's make this Mitchell

6    Exhibit 1.

7              (Mitchell Deposition Exhibit No. 1 was

8    marked for identification.)

9    BY MS. MISHRA:

10    Q.    I'm showing you what's been marked as Mitchell

11    Exhibit 1, and feel free to take your time and look at

12    the document.

13    A.    Sure.

14    Q.    Let me know whether you recognize it.

15    A.    Yes, I do.

16    Q.    For the record, can you identify what it is?

17    A.    It's an application for First Union.

18    Q.    It looks like parts of this document are filled

19    out in handwriting.  Do you recognize the handwriting?

20    A.    Yes.

21    Q.    Whose handwriting is that?

22    A.    That's mine.

23    Q.    Going to the last page, is that your signature?

24    A.    Yes.

Kenneth S. Mitchell

38

1    Q.    Do you recall filling out this application?

2    A.    Now that I see it I do.

3    Q.    Did you fill it out at a First Union office or

4    somewhere else?

5    A.    I'm not sure.

6    Q.    Do you know if this application was faxed to

7    you to fill out at your convenience or if it was

8    delivered to you some other way?

9    A.    I can't recall.

10    Q.    After you filled out this application did you

11    have any further contact with First Union after that?

12    A.    Not until I spoke with Todd Gauthier.

13    Q.    Did you decide not to pursue a position with

14    First Union after filling out this application?

15    A.    I decided not to go to First Union after I had

16    filled this out.

17    Q.    Why did you decide not to go?

18    A.    I'm not sure why I decided not to.  I just

19    decided to stay with Merrill Lynch.

20    Q.    Did you communicate to anyone at First Union

21    that you had decided not to pursue a position there?

22    A.    I have no recollection as to what I spoke to

23    someone about.

24    Q.    Are you familiar with an individual named

Kenneth S. Mitchell

39

1   Louis Pannucci?

2       A.      Yes.

3       Q.      Who is Louis Pannucci?

4       A.      He was a financial adviser that used to work

5   for Wachovia.

6       Q.      Do you know whether Mr. Pannucci ever worked

7   for First Union?

8       A.      Yes, I guess he did work for First Union when

9   he first left Merrill.

10      Q.      Had you known him while he was at Merrill?

11      A.      Yes.

12      Q.      Had you ever spoken to Mr. Pannucci about

13  working at First Union?

14      A.      I had spoken to him about working at First

15  Union.

16      Q.      When was that?

17      A.      It was probably in about 2001 or could have

18  been the same time frame this application was done.  I'm

19  not sure.

20      Q.      What did you speak to Mr. Pannucci about in

21  connection with First Union?

22      A.      Mr. Pannucci was wanting -- was trying to

23  recruit me to come over to First Union.

24      Q.      What did you talk about in that regard?

Kenneth S. Mitchell

40

1    A.    I don't have any recollection exactly what was

2    talked about.

3    Q.    Did Mr. Pannucci compare Merrill and First

4    Union in any way that you can recall?

5    A.    Say again.

6    Q.    Did Mr. Pannucci compare working at Merrill

7    versus working at First Union in any way that you can

8    recall?

9    A.    He said that it was -- the banking environment

10   was good because you had a bank partner to work with to

11   help you find new business, find customers, which was

12   something that you didn't have at Merrill.

13   Q.    By "bank partner," are you referring to the

14   retail banking?

15   A.    Right.

16   Q.    Do you recall anything else that Mr. Pannucci

17   told you about First Union?

18   A.    I can't recall.

19   Q.    Do you recall anything that you said to him

20   regarding the possibility of going to First Union or

21   leaving Merrill?

22   A.    Say that again.

23   Q.    Do you recall anything that you said to

24   Mr. Pannucci, as opposed to what he said to you,

Kenneth S. Mitchell

42

1       A.      Repeat that once again.

2       Q.      Sure.  Leaving aside the question of whether

3   you spoke to Mr. Pannucci or anyone else about it, do you

4   ever recall coming to the conclusion yourself that you

5   had made a mistake by not leaving Merrill and pursuing a

6   position with First Union?

7       A.      No, I don't think I -- uh-uh.

8       Q.      At some point did you begin speaking with

9   anyone at Wachovia about the possibility of leaving

10  Merrill and going there?

11      A.      Probably.  Yes.

12      Q.      When was that?

13      A.      I'm not sure, like I said, the time frame.

14  It's whenever I was contacted by Todd Gauthier.

15      Q.      Do you recall how long, roughly, before you

16  began working at Wachovia you were first contacted by

17  Mr. Gauthier?

18      A.      I don't know exactly when.

19      Q.      You said you were contacted by him.  How did he

20  contact you?

21      A.      I think it would have been by phone, I believe.

22      Q.      Did he explain how he got your contact

23  information?

24      A.      He got it from Mr. Pannucci.



Kenneth S. Mitchell

43

1    Q.    Do you recall what you discussed in this

2  conversation?

3    A.    No, I'm not sure.  I don't have any

4  recollection of what we discussed.

5    Q.    Did he tell you that he was interested in

6  recruiting you to Wachovia?

7    A.    Well, that's one thing that came up.

8    Q.    Did he tell you why he was interested in

9  recruiting you to Wachovia?

10    A.    I have no recollection of why.

11    Q.    Did he tell you anything about what type of

12  position he thought you might be interested in holding at

13  Wachovia?

14    A.    He explained coming over as a financial

15  adviser, working in the bank channel.

16    Q.    Do you recall what Mr. Gauthier's position was

17  at the time that you first started speaking about the

18  possibility of you coming to First Union?

19    A.    He was the regional sales manager.

20    Q.    And that was for Wachovia Securities?

21    A.    Yes.

22    Q.    Was he talking about recruiting you to Wachovia

23  Securities?

24    A.    Yes.

Kenneth S. Mitchell

44

```
 1       Q.    During the time that you have been with
 2   Wachovia, have you ever worked with the retail bank?
 3       A.    Yes.
 4       Q.    Have you ever worked for the retail bank?
 5       A.    I worked with the retail bank.
 6       Q.    Are you an employee of the retail bank?
 7       A.    I'm an employee of Wachovia Securities.  No,
 8   not the retail bank.
 9       Q.    To your knowledge, have you ever been employed
10   by Wachovia Services?
11       A.    No.
12       Q.    How about Wachovia Corporation?
13       A.    I take Wachovia Securities to be an affiliate
14   of Wachovia Corporation.  If you work for one, you work
15   for the corporation.
16       Q.    You said that Mr. Gauthier was a regional bank
17   manager?
18       A.    Regional sales manager for Wachovia Securities.
19       Q.    Other than what you have already described, do
20   you recall anything else that you discussed in this first
21   conversation when you spoke to Mr. Gauthier?
22       A.    I can't recall all of the things that we spoke
23   about.
24       Q.    Did he talk to you about who you would be
```

Kenneth S. Mitchell

46

1      A.     I'm not sure how we spoke about the

2   compensation.

3      Q.     Following this phone conversation when was the

4   next contact that you had with anyone from Wachovia?

5      A.     Following the phone conversation?  Repeat that

6   once again.

7      Q.     Sure.  Following this phone conversation with

8   Mr. Gauthier, what was the next contact that you had with

9   any person at Wachovia, meeting, phone call,

10  communication of any kind?

11     A.     I don't recall talking with anyone else other

12  than Mr. Gauthier.

13     Q.     Okay.  So after this first conversation did you

14  contact him next or did he contact you?

15     A.     I'm not sure.  It's possible he could have

16  called me or I could have called him.

17     Q.     At some point in time did you decide that you

18  were going to leave Merrill Lynch?

19     A.     Yes, I did.

20     Q.     What were the reasons for your decision to

21  leave Merrill Lynch?

22     A.     A better opportunity.  Mr. Gauthier said that

23  in one of the conversations, from my recollection, I

24  would have -- I would be able to make more money at

Kenneth S. Mitchell

47

1   Wachovia, I wouldn't have to cold call anymore for new

2   business because I would have a bank partner making

3   appointments for me, and that it would be very good for

4   me; I'd have a very bright future at Wachovia Securities.

5        Q.    Do you recall whether you decided to leave

6   Merrill Lynch before or after you had an offer from

7   Wachovia?

8        A.    Repeat that once again.

9        Q.    Sure.  Do you recall whether you decided to

10   leave Merrill Lynch before or after you had an offer from

11   Wachovia, which is to say, if you hadn't had the offer

12   from Wachovia, had you already decided to leave Merrill

13   Lynch independently?

14       A.    I don't think I would have left without having

15   an offer.

16       Q.    When did you actually leave Merrill Lynch?

17       A.    August of 2002.

18       Q.    Do you recall filling out an employment

19   application for Wachovia at some point?

20       A.    Yes.

21       Q.    Do you recall when that was in relation to when

22   you left Merrill?

23       A.    No.  I'm not sure when I filled it out.

24            MS. MISHRA:  Let's make this Mitchell 2.

Kenneth S. Mitchell

49

1    A.    I think I probably -- when I filled this out,

2    it was probably after I had left Merrill on that day.

3    Q.    Probably after you left Merrill, meaning left

4    work for the day or left Merrill overall?

5    A.    Right.

6    Q.    Prior to the time that you filled out this

7    employment application did you ever meet with

8    Mr. Gauthier personally; that is, in person?

9    A.    Yes.

10    Q.    When was that?  When was the first time you met

11    with him in person?

12    A.    I'm not sure of the date when I first met with

13    Mr. Gauthier.

14    Q.    Is this something that would be recorded in the

15    calendar that you mentioned?

16    A.    I'm not sure if it would be.  I don't think so.

17    Q.    Where did you meet with him on the first

18    occasion, if you recall?

19    A.    I believe I met with him once in a Hilton in

20    Wilmington.

21    Q.    Do you think that was the first meeting?

22    A.    I'm not sure.

23    Q.    What do you recall about your first in-person

24    meeting with Todd Gauthier?

Kenneth S. Mitchell

50

1      A.    The meeting I remember from the Hilton, we met

2   and that's when he gave me the overview of Wachovia

3   Securities and how much better things would be for me at

4   Wachovia than at Merrill.

5      Q.    You said that Mr. Gauthier previously mentioned

6   the retail bank channel.  Did he mention any other reason

7   that things would be better at Wachovia than at Merrill?

8      A.    I can't recall, not other than what I have

9   already stated.

10     Q.    Do you recall what else you spoke with him

11  about at this in-person meeting at the Hilton?

12     A.    I spoke with him about a couple of personal --

13  one personal matter I had and also told him about an

14  unauthorized trading complaint that was made against me

15  while at Merrill Lynch.

16     Q.    Was that the complaint by Nicholas Pawlyk?

17     A.    Yes.

18     Q.    What did you tell him about this complaint?

19     A.    I told him that I had been accused of

20  unauthorized trading on Mr. Pawlyk's account and that it

21  was -- it wasn't -- something I never did.

22     Q.    At the time that you were speaking to

23  Mr. Gauthier, had this complaint been resolved already?

24     A.    No.



Kenneth S. Mitchell

57

Q.    Do you recall receiving this letter on or about August 6 of 2002?

A.    I remember seeing this, yes.  I think.

Q.    Looking at the second page of this, there's a number of bullet points under "Compensation" and the third point under "Compensation," it discusses the loan in the amount of $40,000.  Is that part of what you were referring to as far as the front-end bonus?

A.    Yes.

Q.    Was this set up as a forgivable draw?

A.    Yes.

Q.    While you were working at Wachovia and earning commissions, the loan would be forgiven over time.  Is that the basic idea?

A.    Yes.

Q.    Do you recall whether you, in fact, filled out a promissory note in connection with that loan?

A.    Yes.

Q.    Are you continuing to repay that loan or have you completed that obligation?

A.    That obligation is completed.

Q.    Looking at the next bullet point, it refers to your being eligible to receive a back-end bonus.  Is that the back-end bonus that you were describing earlier?

Kenneth S. Mitchell

58

1    A.    Yes.

2    Q.    To your recollection, was this offer letter

3    ever revised?

4              MR. MONES:  Can I just note that this says

5    it's a revised offer?

6              MS. MISHRA:  After this one.

7    A.    I don't know if it was or not.

8              MS. MISHRA:  This is Exhibit 4.

9              (Mitchell Deposition Exhibit No. 4 was

10   marked for identification.)

11   BY MS. MISHRA:

12   Q.    I'm showing you what's been marked Exhibit 4,

13   and feel free to take your time and look through that

14   document.

15              Do you recognize this document?

16   A.    I remember seeing this a while after being

17   hired at Wachovia, yes.

18   Q.    Looking at the very last page, is that your

19   signature?

20   A.    Yes.

21   Q.    Does this in any way affect your recollection

22   as to whether there was any dispute between Wachovia and

23   Merrill concerning your coming over to Wachovia?

24              MR. MONES:  I'm going to make a continuing

Kenneth S. Mitchell

59

1    objection to the line of questioning about this document

2    on the ground of relevance, but the witness can answer.

3        A.    Yes.  Let me get you to repeat that question

4    once again to make sure I answer it.

5        Q.    Sure.  Having reviewed this document, do you

6    recall whether there was any dispute between Wachovia and

7    Merrill Lynch concerning your coming over to Wachovia?

8        A.    Okay.  Yes.  This document does speak to that

9    effect.  I cannot dispute that.

10       Q.    Again, I previously stipulated that you're not

11   a medical professional.  I'll also stipulate that you're

12   not a lawyer.  So I'm only asking for your own

13   recollection and knowledge.

14            Do you recall what the dispute was?

15       A.    No.

16       Q.    Do you know whether Wachovia, in fact, paid

17   Merrill some sum of money in order for you and another

18   financial adviser to be able to work at Wachovia?

19       A.    Well, I know that this is what this document

20   alludes to.  I didn't know that beforehand until after I

21   had received this in the mail.

22       Q.    After receiving this document in the mail, did

23   you ever learn that Wachovia would be paying Merrill

24   Lynch money in order for you to be able to work at

**W&F**

Kenneth S. Mitchell

60

1   Wachovia?

2       A.      Yes.

3       Q.      Did you ever learn how much money?

4       A.      Not other than what was listed here.

5       Q.      Looking at the first page of this document,

6   paragraph 1 --

7       A.      It says $152,812.50.

8       Q.      It says there Wilson, Mitchell, and Wachovia

9   would pay to Merrill Lynch.  Did you ever have to pay

10  anything to Merrill Lynch yourself?

11      A.      No.

12      Q.      As far as this document goes, and only looking

13  at what the document says, Wachovia paid Merrill, or at

14  least promised to pay Merrill, the sum of $152,812.  Is

15  that correct?

16      A.      Are you asking me --

17      Q.      Do you know whether Wachovia, in fact, paid

18  Merrill that sum of money?

19      A.      I don't know.

20      Q.      But you did sign this agreement, correct?

21      A.      Yes.

22      Q.      Do you know whether Mr. Gauthier had any

23  involvement in reaching this agreement with Merrill in

24  order for you to be able to work at Wachovia?

Kenneth S. Mitchell

62

1    settlement agreement and release sometime before April of

2    2003?

3        A.    I don't recall.

4        Q.    Do you know who made the decision to hire you

5    at Wachovia?

6        A.    I thought it was Mr. Gauthier.

7        Q.    Do you know when he made the decision to hire

8    you?

9        A.    No, I don't know when.

10        Q.    When you began working at Wachovia, where were

11    you assigned?

12        A.    Capitol Trail branch and the Price's Corner

13    branch.

14        Q.    Prior to your coming to Wachovia who serviced

15    those branches?

16        A.    Ed Duffy.

17        Q.    Do you know who made the decision to remove

18    Ed Duffy from those branches?

19        A.    I don't know.

20        Q.    Do you know if it was voluntary by Mr. Duffy?

21        A.    I don't know.

22        Q.    Do you know why the decision was made to move

23    Ed Duffy from those branches?

24        A.    No.

Kenneth S. Mitchell

63

1    Q.    Did you ever speak to Mr. Duffy about the fact

2    that he had been removed from those branches prior to

3    your coming in?

4    A.    No.

5    Q.    Do you know who Ed Duffy's supervisor was when

6    he serviced the Capitol Trail and Price's Corner

7    branches?

8    A.    Todd Gauthier.

9    Q.    When you first began at Capitol Trail and

10   Price's Corner, what were your responsibilities?

11   A.    It was to provide investment services for both

12   of those branches, to also train and coach the financial

13   specialists, educate -- well, same thing, train and coach

14   the bank partners about investment services and

15   formulating a team to service clients of the bank.

16   Q.    You said that you reported to Mr. Gauthier.

17   Where was his office?

18   A.    In Philadelphia.

19   Q.    How often would you see Mr. Gauthier?

20   A.    Rarely.  Maybe once a month.

21   Q.    How often would you communicate with him apart

22   from seeing him?

23   A.    You say "communicate."  Communicate through

24   what means?

**W&F**

Kenneth S. Mitchell

64

1    Q.    Any means.

2    A.    I would say -- well, phone, very rare.  Hardly

3    ever by phone.  I would say maybe on occasion once a

4    month by phone or once every other month.  And the

5    e-mails would be general e-mails out to everybody in his

6    region.

7    Q.    Were there any regular meetings that you had

8    with Mr. Gauthier?

9    A.    No, not other than the quarterly sales meetings

10   with Mr. Gauthier and all of the financial advisers.

11   Q.    Do you know how many financial advisers

12   Mr. Gauthier was responsible for?

13   A.    Twenty-seven, twenty-eight.

14   Q.    Were those all in Delaware?

15   A.    Yes.  Well, no, I take that back.  There was a

16   few in Pennsylvania.

17   Q.    You said that you were responsible for two

18   branches.  How much time did you spend at each one of the

19   branches on average?

20   A.    I spent most of my time at Capitol Trail.

21   Q.    Did you have regular days of the week that you

22   were in each place?

23   A.    I was at Capitol Trail every day and would only

24   go to Price's Corner whenever a joint appointment was set

Kenneth S. Mitchell

65

1    up.

2        Q.    You mentioned the financial specialists.  Who

3    was the financial specialist at Capitol Trail?

4        A.    Lynn Montgomery.

5        Q.    Who was the financial specialist at Price's

6    Corner?

7        A.    Laddie Amini.

8        Q.    To your knowledge, is a financial specialist

9    licensed to sell securities?

10       A.    Yes.  Some of them are.

11       Q.    Was Ms. Montgomery licensed to sell securities?

12       A.    Yes.

13       Q.    Which ones?

14       A.    Mutual funds and annuities.

15       Q.    How about Ms. Amini, was she licensed?

16       A.    Yes.

17       Q.    Which licenses did she have?

18       A.    She had a Series 6 license.

19       Q.    Anything else?

20       A.    And the insurance license to sell annuities.

21       Q.    Did either Ms. Montgomery or Ms. Amini have a

22    Series 7 license?

23       A.    Not to my recollection.

24       Q.    How about a Series 63?

Kenneth S. Mitchell

66

1       A.      I think they may have had a Series 66 license,

2   which comprises the 65 and the 63, but I can't be certain

3   on that.

4       Q.      Other than you did either Capitol Trail or

5   Price's Corner have any other financial adviser?

6       A.      No.

7       Q.      Other than you did Ms. Montgomery have any

8   other financial adviser that she could work with during

9   the time that you were assigned to Capitol Trail?

10      A.      She would only work with advisers that she had

11  done business with other clients before I came.

12      Q.      Do you mean by that that where a client had an

13  existing relationship with a financial adviser, they

14  would keep that relationship?

15      A.      Right.

16      Q.      If she were referring new business, was there

17  any other financial adviser that she could refer that

18  business to?

19      A.      If I'm assigned to that branch, any new

20  business should be referred to me.

21      Q.      How about at Price's Corner, was there anyone

22  other than you that new business would be referred to as

23  an FA?

24      A.      No.  All the new business was supposed to be

Kenneth S. Mitchell

67

1    referred to me.

2        Q.    To your knowledge, when new business was

3    referred by the financial specialists to the financial

4    adviser, how was the compensation divided between the two

5    of them for the commission?

6        A.    There's a TBRK.

7        Q.    TV or TB?

8        A.    TB, as in boy.  TBRK is the portion of the

9    commission that goes to the financial specialist.  TBRK

10   stands for team brokerage.

11       Q.    Would that be the portion that would go to the

12   financial specialist when business was referred to you by

13   the financial specialist?

14       A.    When the business was executed, the trades were

15   executed, they would get credit.

16       Q.    In general, the financial specialists would

17   refer business to you and if that business resulted in

18   trades being executed, the financial specialist would

19   earn this team brokerage credit?

20       A.    Right.  Which is part of the commission.

21       Q.    Was there any other commission that they would

22   be eligible for in terms of referring new clients?

23       A.    Not that I'm aware of.

24       Q.    Was there any way to earn that team brokerage

Kenneth S. Mitchell

68

1    commission other than by referring clients to you that

2    ended up executing trades?

3        A.    No.

4        Q.    When you came on board with Wachovia, were you

5    provided with any training?

6        A.    No.

7        Q.    By "training" I mean both in terms of your job

8    responsibilities and training as to anything else.

9        A.    No.   The only training that we received was

10    training on the systems, the computer systems, the

11    different screens and that sort of thing.

12        Q.    Who provided that training?

13        A.    We basically received a handout and we used

14    that handout.

15        Q.    Were you trained along with other employees or

16    did you receive one-on-one training or something else?

17        A.    Did it on my own.

18        Q.    Was there a trainer?

19        A.    There was a trainer that would go around from

20    time to time to provide hands-on training in your office

21    or meet you at a centralized place and do some

22    computer-based training.

23        Q.    Did Wachovia Securities have the same systems

24    as the retail bank or were they separate systems?

Kenneth S. Mitchell

69

1    A.    Separate.

2    Q.    Were the financial specialists employees of the

3    retail bank or of Wachovia Securities, if you know?

4    A.    Repeat it.

5    Q.    Were the financial specialists, either then or

6    now, if you know, were they employed by the retail bank

7    or by Wachovia Securities?

8    A.    By the retail bank.

9    Q.    Other than you was there any person in either

10   Capitol Trail or Price's Corner who was employed by

11   Wachovia Securities?

12   A.    No.  Not unless the FS because of their

13   Series 6 license, they could have some obligation to

14   Wachovia Securities because of the securities portion of

15   their licenses.

16   Q.    Other than working with the financial

17   specialists, did you supervise any employees either at

18   Capitol Trail or Price's Corner?

19   A.    No.

20   Q.    Did you report to anyone other than

21   Mr. Gauthier at either Capitol Trail or Price's Corner?

22   A.    No.

23   Q.    During the time that you were at Capitol Trail

24   and Price's Corner, how were your performance

Kenneth S. Mitchell

73

1   of commission compensation that you would be achieving on

2   those transactions or was it measured in some other way?

3        A.    I think it was just measured in the commissions

4   that you received, the production.

5        Q.    When you were at Merrill Lynch, did you have

6   any coworker or colleague who would be equivalent to a

7   financial specialist?

8        A.    No.

9        Q.    When you came over to Wachovia, did you ever

10  receive any type of training or information as far as

11  what was expected of you as a financial adviser in

12  working with financial specialists?

13       A.    There may have been some documents or a

14  document, but mostly it was -- from my recollection, it

15  was verbalized from my manager, Todd Gauthier.

16       Q.    What did Todd verbalize on this subject?

17       A.    That we were to work together as a team, we

18  were to provide training and coaching in investments,

19  talk to them about financial planning, talk to them

20  about -- show them how to profile a client to find out

21  where all of their monies and assets were held and to try

22  to bring all those assets in-house to Wachovia.

23       Q.    When did Mr. Gauthier discuss this with you?

24       A.    Part of this was discussed before coming over

Kenneth S. Mitchell

75

1   that they could not sell and other securities.  They

2   couldn't do commodities, they couldn't do options and

3   things of that nature.

4        Q.    Could you do commodities and options?

5        A.    Yes.

6        Q.    Did you have to approve transactions that the

7   financial specialists put together?

8        A.    Yes.  We were given the authority to look over

9   their trades to make sure that they were suitable and

10  then approve them.

11       Q.    Did any financial specialists ever have the

12  ability to review and approve any of your trades?

13       A.    No.

14       Q.    Focusing on the period when you first got to

15  Price's Corner, was Laddie Amini the financial specialist

16  at that time?

17       A.    Yes.

18       Q.    Again, just focusing on the initial period of

19  2002 going into 2003, how would you describe your

20  interaction with Ms. Amini at that time?

21       A.    In the beginning very nice, very cordial.  We

22  tried -- we got together, we tried working together,

23  trying to formulate the team, and I thought things were

24  going very well throughout the beginning of 2002.  I

Kenneth S. Mitchell

76

1    helped her do a lot of trades on her own, which I didn't

2    do those trades, and give her the credit.  She actually

3    was able to do them herself.  She liked that.  It kept

4    her -- improved her personal production number for

5    investments and also her compensation.

6              So in the beginning I thought things were

7    going along quite fine.  Going into 2003, seemed like

8    things were getting better.  I mean, we had some growing

9    pains, and what I mean by "growing pains" were just two

10   people trying to understand each other's style.  I trying

11   to get her to educate me on her -- the bank platform and

12   provide me with all the stuff they needed and vice versa.

13   I would try and educate her on the investment side so we

14   could work together as a good cohesive team.

15             Great, great time.  I thought everything

16   was going great.

17   Q.    You said you would only be at Price's Corner

18   when you had something scheduled.  How often would you

19   see Ms. Amini?

20   A.    It varied.  There may be one week she may set

21   up three or four appointments and I would be there three

22   times that week.  The next week could be no appointments

23   and I wouldn't be there at all.  It was very sporadic.

24   Q.    When you were at Price's Corner, how long would

Kenneth S. Mitchell

77

1    you spend there apart from the time that you were

2    actually in the appointment with the client?

3        A.    Just for the appointment.  I would arrive for

4    the appointment.  When the appointment was over, I would

5    leave.

6        Q.    Do you recall an incident involving Ms. Amini

7    and a customer named Herrmann?

8        A.    I know the client, Mr. Herrmann.  What

9    incident?

10       Q.    Do you recall any type of incident that stands

11   out in your mind regarding a transaction or an issue with

12   Mr. Herrmann that involved you and Ms. Amini?

13               MR. MONES:  Could we go off the record?

14               MS. MISHRA:  Yes.

15               (Discussion off the record.)

16               MS. MISHRA:  We will break for lunch for

17   45 minutes and we will be back by 1:15.

18               (A lunch recess was taken at 12:30 p.m.)

19               (The deposition resumed at 1:15 p.m.)

20               (Mitchell Deposition Exhibit No. 5 was

21   marked for identification.)

22   BY MS. MISHRA:

23       Q.    Mr. Mitchell, generally speaking, what are the

24   factors that permit a financial adviser to have a better

Kenneth S. Mitchell

82

```
 1    financial adviser during the time that you knew him?

 2         A.    He was assigned to me.

 3         Q.    How did he become assigned to you?

 4         A.    When I started working out of Price's Corner

 5    and Capitol Trail, there were a number of clients with

 6    brokerage accounts that were assigned to me.

 7         Q.    How did they become assigned to you?

 8         A.    The manager, Todd Gauthier, would assign those

 9    accounts over to me.

10         Q.    So Mr. Herrmann was an account that

11    Mr. Gauthier assigned to you?

12         A.    He was an account that was assigned to me.

13         Q.    Do you recall a dispute at one point that

14    Mr. Herrmann raised regarding a charge on one of his

15    accounts?

16         A.    Yes.

17         Q.    What was the nature of that dispute?

18         A.    Mr. Herrmann was upset about a $6 fee on the

19    purchase of a mutual fund.

20         Q.    What was the fee?

21         A.    $6.

22         Q.    What was the fee for?

23         A.    Admin.  Administrative cost.

24         Q.    Was it in connection with a particular
```

Kenneth S. Mitchell

83

1    transaction like a load or something like that?

2        A.    It was in connection with that particular

3    transaction.

4        Q.    How was that fee imposed in the first place?

5        A.    That's a fee that's imposed by Wachovia

6    Securities.

7        Q.    Why was Mr. Herrmann upset about the fee?

8        A.    I have no -- I don't know.

9        Q.    How did you become aware that Mr. Herrmann was

10   upset about this fee?

11       A.    Laddie Amini called me and told me that he was

12   upset about the fee.

13       Q.    How did she find out, if you know?

14       A.    I don't know how she found out, if he called

15   her or if he came into the office.  I don't know.

16       Q.    What exactly did Ms. Amini tell you about

17   Mr. Herrmann being upset?

18       A.    She just said he was upset about the $6 fee.

19       Q.    What did you say?

20       A.    I said, well, you just have to talk to him.

21   It's a fee that's imposed on all mutual funds.

22       Q.    Do you know who within Wachovia Securities

23   imposes that fee?

24       A.    No, I don't.



Kenneth S. Mitchell

84

1     Q.    Do you know who has the authority to remove

2  that fee?

3     A.    I don't know who has the authority to remove

4  it, no.

5     Q.    Do you know if anyone has the authority to

6  remove it?

7     A.    I didn't know at that time, no.

8     Q.    What happened next with regard to this

9  situation?

10     A.    I got a call from Laddie who said that

11  Mr. Herrmann was at her branch and was upset about the

12  fee.  That could have been the first time she got

13  notified about it.  So she asked me to come over and talk

14  to him.  I went over and talked to Mr. Herrmann about it,

15  and I asked Laddie if she could rebate the fee back to

16  him.

17     Q.    And what did she say?

18     A.    She was at the computer typing and she threw

19  her hands up in the air and backed away from the computer

20  and says, "I can't give it to him."  And at that time

21  Mr. Herrmann became very agitated and frustrated and I

22  just took $6 out of my pocket, laid it on the table to

23  rebate him for the fee, and he said he didn't want to

24  take the money from me.

Kenneth S. Mitchell

85

1          So I had Laddie call my operations manager

2   in Philadelphia, Al Tedesco, and we had Al on the

3   speakerphone.  We told him what the situation was with

4   Mr. Herrmann, that he didn't want to pay the $6 fee and

5   how could we wipe the fee out, could we rebate it back to

6   him.  And Al stated, "Yes, we can rebate the fee back to

7   him, Ken, but it's going to come out of your pocket."

8          So I said, "Well, go ahead and rebate the

9   fee back to Mr. Herrmann and charge me for it."

10          After that Mr. Herrmann was satisfied and

11  that was the end of that.

12     Q.    Do you know if there are rules that relate to

13  giving cash to clients?

14     A.    I didn't know any of those rules at that time.

15     Q.    Do you currently know whether there are any

16  rules?

17     A.    I haven't seen any, but I have been told.  Was

18  told by my manager, Todd Gauthier, that that's something

19  that I shouldn't do.

20     Q.    What did Mr. Gauthier tell you about that?

21     A.    He said, "That's all right, Ken.  Just don't do

22  it again.  And besides, you saved a valuable client and

23  he still wants us to attend the meeting with his

24  attorney.  So don't worry about it no more.  It's

Kenneth S. Mitchell

86

1   history."  And I told him I'd never do it again.

2        Q.    When did Mr. Gauthier have this conversation

3   with you?

4        A.    I'm going to say sometime around -- I mean, I

5   don't know the exact date without having to go back and

6   maybe look through -- look on the calendar or something,

7   but probably around the end of June or first of July,

8   first week or two of July.

9        Q.    Of what year?

10        A.    Of 2003.

11        Q.    When you arrived at the branch and saw

12   Mr. Herrmann, what was his demeanor, as far as you

13   observed it?

14        A.    I would say he was -- seemed pretty just quiet.

15   He spoke and smiled when I came in.  I spoke back to him.

16   He was just concerned about he didn't want to pay the

17   fee.

18        Q.    Would you describe him as upset?

19        A.    I would describe him as not upset but concerned

20   about the fee.  He didn't seem to become upset until

21   after Laddie said, "I can't do it."  At that point in

22   time is when he seemed to -- got pretty agitated,

23   frustrated.

24        Q.    What did he do to indicate that he was agitated

Kenneth S. Mitchell

88

1    A.    I don't ever recall talking to anyone about

2  that.

3    Q.    Did you ever speak to Laddie herself about this

4  incident?

5    A.    I can't recall.

6    Q.    Do you know whether Laddie was aware of the

7  compliance rule that says you can't give cash to clients?

8    A.    I don't know because I didn't know about that

9  rule myself.

10    Q.    After you found out about the rule, did you

11  ever discuss or did you ever find out whether Ms. Amini

12  knew about that rule?

13    A.    No, I didn't bother to ask her about it.

14    Q.    Earlier you testified that part of your job

15  involved approving trades that Laddie set up.  Do you

16  recall ever refusing to approve any trades that she set

17  up?

18    A.    There was some trades she put through that I

19  did not approve right away.

20    Q.    How many times did that happen?

21    A.    Probably only twice, two times, two or three

22  times maybe.

23    Q.    Could it have been more often than two or three

24  times?

Kenneth S. Mitchell

89

1    A.    I'm not sure.  I don't think so.

2    Q.    What was the reason that you didn't approve her

3    trades on those two or three occasions?

4    A.    On one occasion we were instructed -- FAs were

5    instructed that FS's can do trades up to $30,000.

6    Anything over that amount they needed to bring the FA

7    into the meeting or discuss the transaction with the

8    financial adviser.

9         That particular trade that Laddie did for

10    $100,000 she did not consult with me.

11    Q.    Who was the client involved in that trade?

12    A.    I think that might have been Mr. Herrmann.

13    Q.    What was the nature of the trade?

14    A.    It was an annuity, fixed annuity.

15    Q.    When was the first time you became aware of the

16    trade?

17    A.    I'm not sure.

18    Q.    You're familiar with the Compliance Department,

19    correct?

20    A.    Yes.

21    Q.    What's the rule of the Compliance Department at

22    Wachovia, as far as you're concerned or as far as it

23    affects your responsibilities?

24    A.    Well, just to make sure that everything that we

Kenneth S. Mitchell

92

1  approve the trade?

2      A.    The only reason I saw at the time, like I said,

3  was earlier was $30,000, trades over $30,000, the

4  financial adviser was to be brought in to that

5  appointment with that customer.

6      Q.    If the FA was not brought in for that kind of

7  trade, then what would be the remedy for that?

8      A.    Then she would consult with me and set the

9  appointment and wait till there was a time we can meet

10 with the customer.

11     Q.    In the case of this particular trade, did you

12 tell her why you were not approving the trade?

13     A.    I didn't tell her why I was not approving the

14 trade.

15     Q.    Did you do anything to approve the trade?

16     A.    The trade ultimately got approved.  I don't

17 know what happened after a certain period of time.  I

18 can't recall.

19     Q.    Were you involved in approving it?

20     A.    Like I said, I can't recall right at the

21 moment.

22     Q.    Did you ever discuss with Laddie why you would

23 or would not approve this trade?

24     A.    I don't recall.



Kenneth S. Mitchell

93

1    Q.    Did you ever criticize the trade to Laddie?

2    A.    I don't recall ever criticizing the trade.

3    Q.    Did you ever reprimand her with regard to

4  setting up this trade without having the meeting with

5  you?

6    A.    I didn't reprimand her.  Never reprimanded her.

7    Q.    Did you ever say anything negative to her about

8  this trade?

9    A.    No.  I don't recall ever saying anything

10  negative at all.

11    Q.    You don't recall saying anything negative to

12  her about this issue or at all ever?

13    A.    At all ever about that issue or any other

14  issue.

15    Q.    Did you ever report that Laddie had tried to

16  set up this trade to anyone else?

17    A.    I spoke with Lou Pannucci about the trade.

18    Q.    When did you do that?

19    A.    Probably days after the trade went in.  A day

20  or two.  I'm not sure.

21    Q.    What did you speak to Mr. Pannucci about?

22    A.    I asked Mr. Pannucci what was the procedure and

23  how should these things be handled, and Mr. Pannucci

24  reiterated back to me $30,000 and over, they supposed to

Kenneth S. Mitchell

99

1   Compliance or suffer any consequences from Compliance?

2       A.    I mean, it's possible that may have.  I didn't

3   know that it would come back on her like it did.  I know

4   if a trade wasn't approved, I would get an e-mail from

5   Compliance in Philadelphia.  I didn't know that she got

6   the same e-mail or not.

7       Q.    Did she ever talk to you about how she felt

8   about your calling Compliance and reporting her trades?

9       A.    Never.

10      Q.    Did you ever ask her how she felt about it?

11      A.    No.  She never -- no, I never asked her.

12      Q.    Do you know during the time that you were

13  working together with Ms. Amini what her employee number

14  was?

15      A.    I didn't know what her employee number was

16  until she told me her employee number.

17      Q.    When she told you her employee number, do you

18  remember anything about what the number was?

19      A.    I asked her after a meeting for her employee

20  number so that I can give her credit for a trade and

21  that's when she communicated her employee number to me.

22      Q.    And what was the number, if you recall?

23      A.    I asked Laddie, I said, "Laddie, can I have

24  your production number so that I can give you credit for

Kenneth S. Mitchell

100

1    the trade or part of the commission?"

2             And she looked at me and she smiled and she

3    flashed her eyes in like a flirtatious kind of gesture

4    and says to me, "You ought to remember my number."

5             And I looked at her, and I said, "How so?"

6             And she said, "My number begins with 911."

7    And I'm waiting and 911, and she gives me the other three

8    numbers.

9             And I said, "Well, thank you, Laddie, and

10   great meeting.  I'll give you credit for the trade."  And

11   I left the building.

12   Q.    You said that she smiled and flashed her eyes

13   in a flirtatious way.  What do you mean by that?

14   A.    Flattering her eyes, turned her head to the

15   side and looked at me, smiling, "Oh, you ought to

16   remember my number."  So I thought it was -- it didn't

17   make me feel comfortable at all.

18   Q.    Why didn't it make you feel comfortable?

19   A.    Because of the flirtatious.

20   Q.    Other than that occasion, was there ever any

21   occasion when you thought that Laddie was being

22   flirtatious with you?

23   A.    No, I can't recall any other time other than

24   that time.



Kenneth S. Mitchell

102

1      Q.      What were the accusations that your manager

2   made to you?

3      A.      He called me up and said to me that -- and

4   asked me if I had said to Laddie that it was her people,

5   Iranian, that destroyed the World Trade Center buildings

6   in New York.

7      Q.      Where were you when he called you?

8      A.      I was at home.

9      Q.      What time of day was it?

10     A.      It was in the morning, about 7:00.  I don't

11  know if it was 6:45, 7:45.

12     Q.      Was that the first thing that he said in this

13  conversation?

14     A.      He asked me if I remembered a meeting that I

15  had with Laddie and about the 911 incident and I told

16  him, I said I remember a meeting about her production

17  number.

18     Q.      And what did you tell him about that meeting?

19     A.      I asked him if he was serious.  He says yes,

20  he's serious.  And I explained to him that I never said a

21  thing like that to anyone.

22     Q.      When you told him that you remembered a meeting

23  about her production number, what did you tell him about

24  that meeting?

Kenneth S. Mitchell

103

1    A.    I didn't tell him anything about that meeting.

2    Q.    Did you tell him that you thought that Laddie

3  was being flirtatious with you?

4    A.    No, I did not.

5    Q.    Did you ever tell anyone that you thought

6  Laddie was being flirtatious with you in that meeting?

7    A.    Not other than my attorney.

8    Q.    Up until the point that Mr. Gauthier called

9  you, was there anything about that what you called a

10  meeting about the production number that stuck out in

11  your mind as being unusual?

12    A.    Yes.  The flirtatious, that's how I remember

13  about the production number.

14    Q.    You said that Ms. Amini was fluttering her

15  eyes.  Do you recall whether she was crying?

16    A.    She was not crying.

17    Q.    Do you recall whether she had tears in her

18  eyes?

19    A.    Not at all.

20    Q.    Other than asking Mr. Gauthier if he was

21  serious, did you say anything else during that

22  conversation?

23    A.    I told Mr. Gauthier that I was not going to go

24  back and work over in the branch.

Kenneth S. Mitchell

104

1     Q.    So you told him that you would not go back to

2   Price's Corner?

3     A.    Right.  Because it appears somebody was trying

4   to make trouble for me, accusing me of saying something

5   that I didn't say.

6     Q.    What did he say to that?

7     A.    He says -- well, at first I told him, I said, I

8   would never say a thing like that to her because the

9   people who were accused of destroying those buildings

10  were of Saudi Arabian and Egyptian descent, not Iranian.

11  So I said.  "I'd never say nothing like that to her."

12  And after I said that I said, "I don't want to go back in

13  that building and work.  I'm hurt and I'm heartbroken.

14  I'm upset about it."

15          And he said to me, "I'm going to recommend

16  that they remove her from the Price's Corner branch."

17    Q.    What did you say to that?

18    A.    After he said that, I said, "I can't go back

19  over there."

20          He says, "Ken, there's a lot of opportunity

21  in that branch."

22          And I told him that -- and what I'm saying

23  now is probably in another meeting the same day with Todd

24  over the phone.  But I think at that point he told me

Kenneth S. Mitchell

105

1   that he was going to recommend that they remove her and I

2   told him I wasn't going back.

3           He says, "Well, I'm at your branch now and

4   I'm waiting for Carol Beam to show up, because she and I

5   were going to talk to you about it."

6           And I told him that I wouldn't be into the

7   branch until the afternoon because I had an appointment

8   in New Jersey that morning.  But he says, "I'm going to

9   wait for Carol and she and I are going to go over and

10  talk to Laddie about it."  He says, "I will call you back

11  after we speak with Laddie."  I said okay.

12      Q.     Then what happened next in relation to this

13  incident?

14      A.     Around 12:15 in the afternoon I received

15  another phone call from Todd and he stated, he says,

16  "Ken, Carol and I, we went, we talked with Laddie," and

17  he said, "First off let me start by saying that Laddie

18  says you are an awesome financial adviser, she likes

19  working with you, and that she does not want to work with

20  any other financial adviser."

21          I said, "Todd, let's not discuss that.

22  Let's get to the crux of the matter."

23          He says, "Okay.  I talked to Laddie at

24  length and I asked her three different times throughout

Kenneth S. Mitchell

106

1    our conversation and each time she said, 'Ken never said

2    that.'"

3              I said, "I told you I never said that."  So

4    I said, "How is it that Carol" -- well, in the morning

5    meeting I asked him, which I didn't say early, who was

6    accusing me of saying it.  He said, "Carol Beam said that

7    she spoke with Laddie and that's what Laddie told her."

8              So now I'm going to jump back to where I

9    was in the afternoon phone call.  When he says, "She said

10   that you never said that," and I told him, I said, "I

11   told you I never said that," then I said, "How is it that

12   Carol can say that that's what I said?"

13             And he says to me -- I'm not sure what his

14   exact words were, but he basically said, "But, Ken, now

15   that you have been exonerated, you should continue

16   working in the branch."

17             I stated to Todd, I said, "Todd, what if

18   Laddie had said to you that Ken did say that?"  He told

19   me I would be fired.  And I said, "That's what gives me

20   great concern as to why I don't want to go back over

21   there and work."

22   Q.    So after Mr. Gauthier told you that you had

23   been exonerated and you should continue working in the

24   branch, you told him that you were concerned and you

Kenneth S. Mitchell

107

1   didn't want to go back?

2       A.    Not until somebody had addressed that, why did

3   Carol say to him that it was me that said that.  At the

4   time I was frightened that somebody's trying to make

5   trouble for me.

6       Q.    Were you present when Laddie spoke to Carol

7   about this incident?

8       A.    About what incident?

9       Q.    About whatever she was alleging or not alleging

10  with relation to the 9/11 incident.

11      A.    No, I wasn't present at any meeting with Carol

12  or Laddie in regards to anything regarding the 911 stuff.

13      Q.    Do you know what Laddie and Carol spoke about?

14      A.    No.

15      Q.    Do you know what Carol and Todd spoke about?

16      A.    No.

17      Q.    Were you present when Todd spoke to Laddie?

18      A.    No.

19      Q.    Following this series of conversations that you

20  just testified to, did you ever speak to Laddie herself

21  about this incident, the 911 incident?

22      A.    No.

23      Q.    Do you know how she felt about this whole

24  series of conversations?



Kenneth S. Mitchell

108

1    A.    I have no idea.

2    Q.    When was the last time you spoke to Laddie?

3    A.    I don't know.

4    Q.    Did you ever speak directly to Carol Beam about

5    this allegation that you had made this comment?

6    A.    No.

7    Q.    Did you ever request a meeting with her?

8    A.    No.

9    Q.    Did she ever request a meeting with you?

10   A.    I don't know if she ever requested a meeting

11   with me or not.

12   Q.    Following this series of events concerning

13   these allegations about the 9/11 incident or 911

14   incident, did anything change with regard to your working

15   relationship with Laddie?

16   A.    I didn't work in the Price's Corner branch for

17   four months.

18   Q.    Why not?

19   A.    Because I spent four months trying to get HR,

20   Human Resources, to look into this matter and to find out

21   why this false and malicious accusation was made against

22   me.  Why were they attacking my credibility and my

23   reputation?  So I didn't work in that branch from

24   July 16th and didn't go back until sometime in November

Kenneth S. Mitchell

109

1   or December of 2003.

2       Q.    Did anyone tell you not to work there?

3       A.    Did anyone tell me not to?

4       Q.    During that period of time.

5       A.    No, nobody tell me not to.

6       Q.    How did you service clients who were in the

7   Price's Corner branch during that four-month period?

8       A.    Same as I had always serviced them.  They call;

9   I serviced them.

10      Q.    You spoke to them on the phone?

11      A.    On the phone, had joint appointments.  I

12  wouldn't say joint appointments.  Had appointments in my

13  office in Capitol Trail.

14      Q.    So those clients came over to where you were in

15  Capitol Trail?

16      A.    Some of them did.  You got to understand this

17  one thing.  Because those two branches were so close in

18  proximity, they had been in Price's Corner and Capitol

19  Trail, they go to both of those branches and have always

20  done that.  So it's not like because the account was

21  opened in Price's Corner, they never went to Capitol

22  Trail.  That's not true.  They frequented both branches

23  because they were so close.

24      Q.    So the clients that you worked with at Price's

Kenneth S. Mitchell

116

1   anyone who worked at Price's Corner between July and

2   November of 2003?

3       A.    Did I have any --

4       Q.    -- direct communications between yourself and

5   anyone who worked at Price's Corner between July and

6   November of 2003.

7       A.    No.

8       Q.    Who did you make this request of to have this

9   meeting that you just described?

10      A.    I think it was Marti Michalec I do believe.

11      Q.    Other than Todd speaking to you on that one

12  morning phone call, do you yourself know whether anyone

13  ever said that you had told Laddie that it was her people

14  who were responsible for the destruction of the World

15  Trade Center?

16      A.    Uh-uh.

17      Q.    You have to say "yes" or "no" for the record.

18      A.    Repeat your question again.  I want to make

19  sure I hear it right.

20      Q.    Sure.  Other than Todd speaking to you on that

21  phone call and asking you whether you had made that

22  comment, do you know whether any other person at Wachovia

23  ever actually said that you made that comment?

24      A.    No, I don't know.

Kenneth S. Mitchell

117

1    Q.    Do you have any reason to believe that anyone

2    ever said that?

3    A.    Well, I think it's obvious that somebody said

4    it, but do I have any reason to believe that somebody

5    said it?  It was said.

6    Q.    Who said it?

7    A.    I don't know.

8    Q.    You then said that HR refused to have this

9    meeting.  Who in HR refused to have the meeting?

10   A.    Let me back up to the question before, if I

11   could.

12   Q.    Sure.

13            THE WITNESS:  Would you read that question?

14            (The reporter read back as instructed.)

15            THE WITNESS:  I'm sorry.  Do I have any

16   reason to believe anyone said that?

17            MR. MONES:  Do you understand the question?

18            THE WITNESS:  I don't really understand

19   that question.

20   BY MS. MISHRA:

21   Q.    I understand that your manager called you and

22   asked you if you had made the comment.

23   A.    Correct.

24   Q.    And you told him no, correct?

Kenneth S. Mitchell

118

1  A.  That's right.

2  Q.  Later the same day Mr. Gauthier called you

3 again and said that you had been exonerated.

4  A.  Uh-huh.

5  Q.  After that point do you have any reason to

6 believe that anyone at Wachovia ever actually said that

7 you made the comment that Mr. Gauthier asked you about?

8  A.  Well, I believe that somebody did accuse me of

9 saying that.

10  Q.  But you don't know who that person is?

11  A.  I don't know who that person is.  Do I have --

12 it could have been either one of Dorothy, Carolyn.  I

13 have to go with Todd at the time.  Todd said it was

14 Carolyn Beam and that's what I believed at that time,

15 that it was Carolyn Beam.

16  Q.  Do you have any reason to believe that

17 Carolyn Beam actually said that?

18  A.  Yeah.  Because my boss Todd told me she said

19 that.

20  Q.  Did he ever explain to you that she did or

21 didn't say that --

22  A.  No.

23  Q.  -- in actuality?

24  A.  No, he never told me that.

Kenneth S. Mitchell

119

Q.    Did you ever ask him?

A.    I never asked him, no.

Q.    Did you ever try to contact Carolyn Beam and ask her whether she said that?

A.    No.

Q.    Do you know whether HR contacted Carolyn Beam and asked her about it?

A.    HR, they told me -- Marti Michalec said that she had spoke with Todd and Carolyn Beam and she said they spoke with Todd and Carol.

Q.    Did Marti communicate to you what she had spoken to either Todd or Carolyn about?

A.    No, she didn't tell me what she spoke to them about.  She said that Todd had spoke too soon and I explained to her that I don't know how Todd could speak too soon.  He spoke to me about something that he got from Carolyn Beam and he believed it to be true.  So therefore, I think the both of them had discussed it and felt that they needed to talk to me about it.

Q.    How do you know that Todd believed it to be true?

A.    Because he approached me with it.

Q.    Well, he asked you whether it was true, correct?

Kenneth S. Mitchell

120

1    A.    Well, he believed it when he heard it from

2  Carol, that Carol was telling him the truth that it

3  happened.

4    Q.    Did he tell you that he believed it?

5    A.    No, he didn't tell me that he believed it.

6    Q.    How do you know that he believed it?

7    A.    Let me rephrase what I said, because if

8  you're -- I believe that he believed it.  Carolyn told

9  him that's what I said.  He must have believed what she

10  said to be true enough that he came to me and asked me if

11  it was true.

12    Q.    But you weren't present when he spoke to

13  Carolyn, correct?

14    A.    No, I was not.

15    Q.    You never spoke to Carolyn yourself?

16    A.    No.

17    Q.    So you don't know what Carolyn said to Todd,

18  correct?

19    A.    That's absolutely correct.

20    Q.    You said that in November of '03 you requested

21  this meeting with everyone, Dorothy DiFebo, Carolyn Beam,

22  etcetera, to find out what was going on and that HR

23  refused to set up this meeting.

24         Who in HR refused to set up this meeting?

Kenneth S. Mitchell

122

1   firm?

2       A.      That's what she said.   That's what she said.

3       Q.      Did you have any understanding of where

4   Lynn Meyer had gone?

5       A.      No.   All I knew was that her position had been

6   eliminated and she was supposedly looking for another

7   job.

8       Q.      Other than saying Lynn Meyer was no longer with

9   the firm, did Ms. Michalec tell you anything else about

10  whether there would be a meeting or not?

11      A.      She said that they wasn't going to bring

12  everybody together for a meeting.

13      Q.      At any time when you were dealing with

14  Todd Gauthier concerning this incident or any incident,

15  did Todd ever say anything to you about your race?

16      A.      I can't recall, no.

17              Can we take a break?

18              MS. MISHRA:   Sure.

19              (A recess was taken.)

20  BY MS. MISHRA:

21      Q.      You testified earlier before lunch that

22  Mr. Gauthier's office was in Philadelphia, correct?

23      A.      Correct.

24      Q.      At any point in time that he supervised you did

Kenneth S. Mitchell

126

1  told you that she couldn't do the work herself and you

2  told her that she could do the work.  What did she say to

3  you in response to that, if anything?

4      A.    She said that she could not do the buy -- do

5  the sale of a mutual fund and I said, "Sure, you can.

6  Just as you can purchase a mutual fund for a customer,

7  you can also sell the mutual fund."

8      Q.    Did Laddie ever tell you that she was afraid

9  that you would criticize her trade if she executed it?

10      A.    No, she never --

11      Q.    Did she ever tell you that she was afraid that

12  you wouldn't approve a trade she tried to put through?

13      A.    No, she never tell me that.

14      Q.    Did you ever ask her why she had stopped doing

15  trades that she had done before?

16      A.    No.

17      Q.    When you say she didn't refer any more

18  business, was there any other FA that she could refer to

19  once you came back to Price's Corner?

20      A.    I'm sure she probably could, yes.

21      Q.    If new clients came in the door, was there an

22  FA she could refer them to?

23      A.    I wouldn't know because, like I said, I'm not

24  there.  She could very well refer business to another FA

Kenneth S. Mitchell

127

1    and I would never know it.

2        Q.    Do you know whether she ever did that?

3        A.    I can't say with any amount of certainty.

4        Q.    Do you have any reason to believe that there

5    was any new business coming in that she was referring to

6    some other FA instead of you?

7        A.    Well, I can see that there was some business

8    being done that I knew I wasn't doing.

9        Q.    How much business?

10       A.    I'm not sure.  I can't put an exact number on

11   it.  Not even an approximate number.

12       Q.    How do you know that there was other business

13   being done?

14       A.    When you look at the sales summary for a

15   particular branch and you see the investment dollars

16   going up, you know that there's some business being done.

17       Q.    Would that tell you whether this was new

18   clients coming in the door or clients that had already

19   been existing?

20       A.    No, it wouldn't tell you that.

21       Q.    So as you sit here today, do you have any

22   reason to believe that there was any new business coming

23   into Price's Corner while you were working there that

24   wasn't being referred to you?

Kenneth S. Mitchell

128

1    A.    Yes.

2                MR. MONES:  I thought he just answered

3    that.

4                THE WITNESS:  That's what I'm saying.  I

5    thought I just answered that.

6    BY MS. MISHRA:

7    Q.    Just so that the record is clear, what is the

8    answer to that question?

9                THE WITNESS:  Can you back up?  What was my

10   answer to that?

11               (The reporter read back as instructed.)

12               MR. MONES:  Ask your question again.

13   BY MS. MISHRA:

14   Q.    Do you have any reason to believe that there

15   was new business that was coming in to Price's Corner

16   during the time that you were assigned there that was

17   being given to any financial adviser other than you?

18   A.    Yes.

19   Q.    What is the reason that you believe that?

20   A.    When I go to the sales summary and pull up the

21   investment numbers for that particular branch, I can see

22   an increase in the investment production numbers.

23   Q.    Does the increase in the investment production

24   numbers necessarily mean that there's new business coming

Kenneth S. Mitchell

129

1   in as opposed to more business from existing clients who

2   might be assigned to somebody else?

3       A.      It could be.   There's no way to distinguish

4   whether it's new business or if it's existing business

5   unless you were to look at -- I guess even looking at

6   those numbers you couldn't tell.   There's no way you

7   could really tell it's new business or not unless you

8   actually went and looked under a broker's worker screen

9   and you could trace the customer back to a particular

10  branch.

11      Q.      Have you ever done that?

12      A.      I think I may have noticed it on one or two

13  occasions.

14      Q.      When did you look into that, that you looked

15  under the worker screen and traced the customer back?

16      A.      I can't be exactly sure.   Sometime during 2004.

17      Q.      What record were you looking at?

18      A.      Just looking at the worker screen.

19      Q.      If Laddie was referring new business to FAs

20  outside of Price's Corner, would she get the TRBK

21  compensation that you talked about earlier?

22      A.      You mean TBRK.

23      Q.      TBRK.

24      A.      If she referred business, did business, she

Kenneth S. Mitchell

130

1   would get TBRK if the representative put the trade

2   through and put her production number on it.

3       Q.    Do you know what Laddie's TBRK compensation was

4   during 2004?

5       A.    Not off the top of my head, no.

6       Q.    Do you know whether the fact that Laddie

7   stopped referring business to you affected her own

8   compensation?

9       A.    I don't know because I couldn't see her

10  numbers.

11      Q.    I believe you said you did not ask Laddie why

12  she was not referring business to you.  Correct?

13      A.    No, I did not ask her why she was not, that is

14  correct.

15      Q.    Did you have any understanding of why she was

16  not?

17      A.    No, I didn't have any understanding other than

18  because of the things that had transpired in the past and

19  the fact that nothing was never done by HR, it was never

20  really resolved.  I felt afraid to even ask them

21  anything.

22      Q.    You felt afraid to ask Laddie anything?

23      A.    Yeah.  Any of them.

24      Q.    If Laddie wasn't referring you any business

Kenneth S. Mitchell

131

1    when you returned to Price's Corner, what were you doing

2    there?

3        A.    I was still doing business as much as I could

4    on my own.

5        Q.    How many days a week were you there?

6        A.    I was not there unless an appointment was made,

7    and no appointments were made in the time frame of

8    November, from my recollection, up through December of

9    2004.

10       Q.    So for 13 months there were no appointments

11   made for you at Price's Corner?

12       A.    Right.

13       Q.    Did you ever speak to Todd about the fact that

14   Laddie wasn't referring business to you?

15       A.    I didn't speak to him about it.  I think he

16   very well knew that she --

17       Q.    How do you know that he knew?

18       A.    Well, he could see the numbers that are being

19   generated for investments in each branch that was under

20   him.

21       Q.    But did Todd actually know that Laddie wasn't

22   referring business to you?

23       A.    I don't know.  I can't answer that.

24       Q.    Did Todd ever speak to you about the numbers

132

```
 1   from Price's Corner?

 2        A.    The only time -- yes, he did.

 3        Q.    When did he speak to you about the numbers from

 4   Price's Corner?

 5        A.    July 16th, 2004.

 6        Q.    That would be exactly one year after the first

 7   time that you stopped working for Price's Corner?

 8        A.    Exactly.

 9        Q.    How is that, just coincidence?

10        A.    I guess you'd have to -- I'm not sure.

11        Q.    How do you know it was July 16th, 2004?

12        A.    Because he came to my branch at Capitol Trail

13   along with Carolyn Beam.

14        Q.    Did you know that they were coming to Capitol

15   Trail?

16        A.    Yes, I think he -- let me see.  Yes, I think he

17   did say he was coming.

18        Q.    What was the purpose of him coming to Capitol

19   Trail with Carolyn Beam?

20        A.    They came, they congratulated me for my

21   production numbers, doing a great job, Capitol Trail

22   branch was far exceeding in its investment goals, as well

23   as its deposits and loans, and stated that I was doing --

24   80 percent of my production was coming out of the Capitol
```

Kenneth S. Mitchell

133

1    Trail branch, 20 percent was coming out of the Price's

2    Corner, and asked me what could I do to help the Price's

3    Corner staff get their investment numbers up.

4         Q.    What did you tell them?

5         A.    I told them based on the things that had

6    happened in the past a year ago that day, things hadn't

7    been good, but I thought that, if we could get some

8    office space in that branch where I could have a physical

9    presence there, it would probably help mend the

10   relationship and make it easier for the bank staff there

11   to refer the business to me since I would actually be

12   there, and that I needed their help, he and Carol, to get

13   the bank staff there to implement the investment prospect

14   and referral strategy and those numbers would go up.

15        Q.    When you refer to the investment prospecting

16   and referral strategy, had you tried to get the Price's

17   Corner branch to adopt that strategy?

18        A.    Yes.

19        Q.    What had you done to try to get them to adopt

20   the strategy?

21        A.    Well, we all signed on the dotted line that

22   that's what we would do, that's how we agreed that we

23   were going to try and increase the investment revenue.

24        Q.    When did you sign on the dotted line?

Kenneth S. Mitchell

134

1    A.    That was done I think around February of 2004.

2    Q.    Was this at a meeting, during a training?

3    Where was this done that you all signed?

4    A.    This was a meeting that was held in my Capitol

5    Trail -- in the Capitol Trail branch.  In attendance of

6    that meeting was Todd Gauthier, Carolyn Beam,

7    Gloria Sharp, Lynn Montgomery, Dorothy DiFebo, Laddie was

8    there, and also the small business banker in the Price's

9    Corner branch.

10    Q.    So all of these individuals attended this

11    meeting in February of 2004?

12    A.    Right.

13    Q.    What happened at this meeting?

14    A.    We reviewed that investment prospect and

15    referral strategy document and basically agreed that

16    that's how we were going to do it and used that as our

17    strategy for getting the investment numbers up.

18              MS. MISHRA:  Make this No. 6.

19              (Mitchell Deposition Exhibit No. 6 was

20    marked for identification.)

21    BY MS. MISHRA:

22    Q.    I'm showing you what's been marked as

23    Exhibit 6.  Is this the strategy document that you were

24    just talking about?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Kenneth S. Mitchell

135

1    A.    Yes.

2    Q.    Do you know who wrote this?

3    A.    No, I don't.

4    Q.    Do you know who wrote "Lynn" on the top of

5  this?

6    A.    I'm not sure, unless it was Lynn Montgomery.

7    Q.    Who conducted this meeting?

8    A.    Todd Gauthier and Carolyn Beam.

9    Q.    Did they conduct an actual training to go with

10  the document?  Did they just go through the document?

11  How did the meeting go?

12    A.    I can't recall exactly.  I know we went through

13  the document, what it was, because we all had to sign off

14  on it.  That's as much as I know about it.

15    Q.    Did you speak at all during this meeting?

16    A.    I'm not sure if I did or not.

17    Q.    Did Laddie speak during this meeting?

18    A.    I'm not sure if she did or not.

19    Q.    How about Dorothy DiFebo?

20    A.    I'm not sure.  I can't recall because it's so

21  far back.

22    Q.    Did anyone other than Todd and Carolyn speak

23  during the meeting that you can recall?

24    A.    I can't recall.

Kenneth S. Mitchell

136

1      Q.    Other than this document, did you speak with

2   Todd about anything else during this meeting or after the

3   meeting?

4      A.    The only other thing we talked about was I gave

5   him recommendations on how we could achieve me getting an

6   office space in that branch and if they could talk to the

7   business banker to get her to basically swap days with me

8   from week to week, one week she's over in my branch for

9   three days, I'm over at Price's Corner for three days and

10  the next week I'm there two days and vice versa, to try

11  to provide some space for me to have a presence, a

12  physical presence over there and could hopefully

13  implement this strategy with Price's Corner branch.

14             And I also made the recommendation that

15  perhaps if the business small banker wanted, after

16  talking with the financial center manager at Capitol

17  Trail, we had an empty office space in Capitol Trail, as

18  well as an empty cubicle, she could either move her

19  office there or she could easily use one of those spaces

20  on days that she could let me be in the Price's Corner

21  branch.

22             He and Carol -- we're talking about the

23  July 16th, 2004, right?  Or are we talking about the

24  February --

Kenneth S. Mitchell

138

1   customers in their branch who were affluent.  They didn't

2   provide an affluent list of clients to me to call or

3   didn't attempt to -- even attempt to get together with me

4   to say, here are some people to call who we find are

5   affluent to try to do business.  That never happened.

6               But as I said earlier, I didn't get over

7   there during that time frame, and that meeting in July of

8   2004 was what was discussed on how we could make space

9   for me over there so that we could implement this,

10  because obviously before it wasn't happening.

11      Q.    Between February and the meeting in July with

12  Todd and Carolyn, did you take any steps to try to

13  implement any part of this document, Mitchell Exhibit 6?

14      A.    Yes.  I implemented it in Capitol Trail along

15  with the team there, but not with the Price's Corner

16  folks.

17      Q.    Did you ever contact anyone at Price's Corner

18  to talk about implementing any part of this document

19  between February and July of 2004?

20      A.    No.  I don't recall talking to nobody.

21      Q.    So then you said that you met with Todd and

22  with Carolyn in July of 2004.  I believe you testified

23  that they came to Capitol Trail.  They congratulated you

24  for your production and they asked what you could do to

Kenneth S. Mitchell

139

1  get the numbers up at Price's Corner.  Correct?

2      A.    Yes.   That was -- that was the second meeting I

3  had with Carol and Todd.

4      Q.    And you said that you spoke about a strategy

5  for swapping off space so that you could be at Price's

6  Corner more often.  Did you ask for Todd and Carolyn to

7  do anything else in order to support you in implementing

8  this strategy document at Price's Corner?

9      A.    I asked them if they would communicate with the

10  Price's Corner staff, Dorothy and Laddie, and get them to

11  get on board with me to do this and also about the space,

12  and they vowed that they would get on board with it and

13  provide the space, get the space thing settled and get

14  them to get on board to implement this strategy.

15      Q.    Did Todd say that he would communicate with

16  Laddie or Dorothy to talk about the strategy document?

17      A.    He didn't say that if he spoke -- he normally

18  would speak with Carol and Carol would be the one to

19  speak with Laddie and Dorothy.

20      Q.    Did Carol tell you that she would communicate

21  with Laddie or Dorothy about the strategy document?

22      A.    It was assumed that during our meeting, in our

23  discussion, that she would do that.

24      Q.    Did she say she would do that?

**W&F**

Kenneth S. Mitchell

140

1    A.    Yes.

2    Q.    What did she say?

3    A.    We all agreed that what was communicated in

4  that meeting, that they would take it for action.

5    Q.    Do you remember the specific words that Carolyn

6  used about talking to Laddie and Dorothy?

7    A.    I can't recall it right off.

8    Q.    Did either Todd or Carol recommend that you

9  speak directly with Laddie and Dorothy?

10   A.    No.

11   Q.    Following the July of 2004 meeting what was the

12  next thing that happened in relation to you working at

13  Price's Corner?

14   A.    What was the next thing that happened?

15   Q.    Yes.

16   A.    While I was waiting for an office space to

17  become available in Price's Corner branch, which is what

18  Carol and Todd was to be working on, I followed up with

19  both of them on a monthly basis, inquiring as to what's

20  the status of the space in the Price's Corner branch, and

21  at some point in time, in October I believe it was, we

22  got word that the small business banker who was in the

23  Price's Corner branch, her position was being eliminated.

24  So that freed up a space in the branch.

Kenneth S. Mitchell

141

1    Q.    Was that space assigned to you?

2    A.    Yes.  I took that space to be -- since it was

3    freed up, that it was going to be assigned to me.  That's

4    what Todd and Dorothy -- Todd and Carol had been working

5    towards, providing a space for me to work over there.

6    Q.    Other than checking on that office space on a

7    monthly basis, did you do anything else to try to

8    implement the referral strategy, the prospecting and

9    referral strategy with the Price's Corner branch?

10   A.    You have to understand that the environment

11   there was still rather chilly.  There was no

12   communication going on.  I was utilizing Todd and Carol,

13   who were the managers, to break the ice and get us back

14   on track.

15   Q.    I believe you said that you were not at the

16   Price's Corner branch between July and November of '03.

17   Correct?

18   A.    Between July and November of '03 I was not at

19   the Price's Corner branch.  After around November I

20   believe it was was when I went back over there.

21   Q.    Then you said in November of '03 to December of

22   '04 that you did not have any joint appointments

23   scheduled.  Is that correct?

24   A.    That's right.



Kenneth S. Mitchell

142

1    Q.    During that period of July of '03 to December

2    of '04, how many times were you in the Price's Corner

3    branch?

4    A.    November to July --

5    Q.    And July to December. July of '03 to December

6    of '04 how many times were you at the Price's Corner

7    branch?

8    A.    Well, let's put it this way: I was not there

9    at all from July '03 to November '03. November '03 to

10   July -- to December '04 I don't know how often I was

11   there. I started going over there on December 6, 2004,

12   after the office became available. That's when I moved

13   in. Prior to that maybe two, three times, give or take

14   two.

15   Q.    During those two to three occasions that you

16   were there between November of '03 and December of '04,

17   what is it about the environment there that you're

18   describing as chilly?

19   A.    You go over and they don't want to speak. I

20   would speak, would never get -- my greetings would never

21   get reciprocated.

22   Q.    Who didn't want to speak to you on those two to

23   three occasions?

24   A.    Dorothy.



Kenneth S. Mitchell

143

```
1      Q.      Anyone else?

2      A.      Maybe Patra.  And Laddie I spoke to because

3   usually during that time frame we had probably an

4   appointment and that was really the only reason I was

5   there.  So it wasn't a problem speaking with her because

6   I had to meet with Laddie.

7      Q.      Who was Patra?

8      A.      She's a teller manager over there.

9      Q.      So it's your testimony, then, on the two to

10  three occasions that you went over there, that you would

11  greet Dorothy and Patra and they would not reciprocate

12  your greeting?

13     A.      Right.

14     Q.      Was there anything else that happened that you

15  thought was chilly?

16     A.      I can't recall right at this time.

17     Q.      Do you recall anyone saying anything during

18  those two to three times that you were there that you

19  considered negative or derogatory?

20     A.      I was accused, I believe, by Dorothy or Laddie,

21  I'm not sure, of going in and out of the back door.

22     Q.      Were you going in and out of the back door?

23     A.      No.

24     Q.      Do you remember who said this?
```

Kenneth S. Mitchell

145

1    of the back door.

2        Q.    Did you ever speak to Dorothy about this?

3        A.    No.

4        Q.    Did you ever speak to Laddie about this?

5        A.    No.

6        Q.    How do you know that someone accused you of

7    going in or out of the back door?

8        A.    I remember it being stated in -- let me see.

9    When I reviewed the deposition.

10       Q.    Focusing on the time that you actually worked

11   at Price's Corner, the two to three times that you said

12   that you went there between November of '03 and December

13   of '04, do you remember anything that -- anyone actually

14   saying anything to you at that time that you thought was

15   negative or derogatory at that time?

16       A.    I can't recall at this time.

17       Q.    Once the office space opened up after the small

18   business banker was eliminated, how many times per week

19   were you at the Price's Corner branch?

20       A.    Three days.

21       Q.    Every week?

22       A.    No.  Three days, December 6, 7th, 8th, and on

23   December 9th I was told to cease going to the Price's

24   Corner branch.

**W&F**

Kenneth S. Mitchell

146

1    Q.    Who told you that?

2    A.    Todd Gauthier.

3    Q.    What did he tell you specifically?

4    A.    He told me he was taking the branch away from

5    me.

6    Q.    Are those the words he used, "I'm taking the

7    branch away from you"?

8    A.    Yes.  He said he made a decision and he wanted

9    to come out to see me, and I stated to him, "Just tell me

10   what your decision is.  There's no need to drive from

11   Philadelphia to here just to tell me what your decision

12   is."  And he said that he was taking the branch.  He had

13   made a decision to take the branch away from me.

14   Q.    So Mr. Gauthier wanted to come see you in

15   person and tell you about this and you told him that

16   wasn't necessary?

17   A.    Right.  To tell me what your decision is and

18   that's when he told me his decision.

19   Q.    Did he tell you why he had decided that?

20   A.    He told me he was taking the branch away

21   because it wasn't right for me.

22   Q.    Did he say why it wasn't right for you?

23   A.    He said the staff there don't like me and they

24   don't want to work with me.

Kenneth S. Mitchell

149

1      A.    No.

2      Q.    Up to July of 2003 how were you able to get

3   business at Price's Corner without an office?

4      A.    As I stated earlier in the testimony, Laddie

5   made and set joint appointments for she and I.   I only

6   went to Price's Corner whenever she made an appointment

7   for us.   And early on in the relationship Laddie made

8   many appointments, joint appointments, and that can be

9   verified by her production numbers, by her promotion.

10     Q.    During 2004, other than pursuing that office

11  space, did you ever do anything else to try to get Laddie

12  to set joint appointments for you?

13     A.    Whenever I had a conversation, if Laddie called

14  and wanted me to do something, I would be -- I tried to

15  do the conversation a way to show that there was

16  partnership, that we can work together, but it never

17  materialized from there.   And that's why I sought the

18  managers to intervene and help us to try and get back on

19  track.

20     Q.    Did Todd ever tell you that Wachovia had made a

21  business decision to have one FA per branch?

22     A.    Yes, he said that.

23     Q.    When did he tell you that?

24     A.    On November 18th, 2004.

Kenneth S. Mitchell

150

1    Q.    What did he tell you about that?

2    A.    He said that all the FAs are going to have one

3    branch, and I stated to him that because the two

4    branches, Price's Corner and Capitol Trail, were so close

5    together, that it only made sense that one adviser handle

6    both of those branches, and because they were so close

7    together, the same customers use both the branches.

8    Q.    What did he say to that?

9    A.    He says, "Well, we're going to one branch."  He

10   says, "You got to choose a branch."

11        I said I have had -- first he said he was

12   looking to put somebody in that Price's Corner branch

13   and, of course, that's when I told him about one adviser

14   for both branches.  I said, "If you put another adviser

15   in that branch and I stay here, we will be tripping over

16   each other with our customers because the same customers

17   go in both branches."

18        Then he stated to me that I should -- he

19   says, "You got to take one or the other branches."  He

20   says, "You have been doing 80 percent of your production

21   in Capitol Trail and about 20 percent over in Price's

22   Corner and we're all going to one branch."

23        He wanted me to take Capitol Trail.  And I

24   said, "Well, I have been in both of these branches.  They

Kenneth S. Mitchell

153

1    branch, did he tell you who made that decision?

2        A.    No.

3        Q.    Did he tell you what level that decision was

4    made at, i.e., whether it was made at his level or above

5    him?

6        A.    No.

7        Q.    Did he tell you whether that was specific to

8    Delaware or something that was going on in other regions?

9        A.    I don't recall.

10       Q.    Did you know of any other financial adviser at

11   the time who had to choose one branch?

12       A.    No.

13       Q.    Did you know of any other financial adviser at

14   the time in Delaware who had more than one branch?

15       A.    Most of the advisers, from my recollection, had

16   more than one branch.  We may have had one or two people

17   who may have only had more than one branch.  I'm not

18   certain as to who they are, though.

19       Q.    After the time you had this conversation with

20   Todd, do you recall learning that other financial

21   advisers had also been reduced to just one branch?

22       A.    I do know of a Nancy Sorg who was reduced to

23   one branch.  She's the only one that I know of.

24   Lou Pannucci maybe.

**W&F**

Kenneth S. Mitchell

154

```
 1       Q.    You mentioned Michael Schoenleber?

 2       A.    Right.

 3       Q.    Do you know if he was reduced to just one

 4   branch?

 5       A.    He may have been.

 6       Q.    How many branches did Ed Duffy have?

 7       A.    I think Ed Duffy only had one branch.  For a

 8   while he had two because he was taking care of the Dover

 9   branch and the Middletown branch.

10       Q.    Do you know whether Dave Reed was reduced to

11   just one branch?

12       A.    I don't know.  He may have been.

13       Q.    How about Christie Allen?

14       A.    Don't know.

15       Q.    How about Phil Saponaro?

16       A.    I don't know.

17       Q.    How about David Rash, do you know whether he

18   moved to just one branch?

19       A.    I don't know.

20       Q.    Allen Andis?

21       A.    I don't know.

22       Q.    Sergio Yakveto (phonetic)don't know?

23       Q.    Brett Mower?

24       A.    Don't know.
```

Kenneth S. Mitchell

155

1    Q.    Do you know whether Beatrice DuFort had to give

2    up any branches?

3    A.    I believe she said she had to give up a branch

4    or two.  I think she had three or four branches.  She did

5    give up a couple branches, I believe.

6    Q.    You said that Todd told you that he would have

7    to think about your request to be in Price's Corner as

8    opposed to Capitol Trail.  When was the next time that

9    you spoke to him after that?

10    A.    It wasn't until December 9th.

11    Q.    So that first conversation you said was

12    November 18th?

13    A.    Right.

14    Q.    Then you said December 6 you got an offer.  So

15    December 9th you spoke to Todd?

16    A.    Right.

17    Q.    What was that conversation?

18    A.    That was the conversation where he said he had

19    made a decision.

20    Q.    You said that he made a decision that you were

21    going to stay in Capitol Trail and you should not go back

22    to Price's Corner, correct?

23    A.    Right.  He was taking the Price's Corner branch

24    and I was to stay at Capitol Trail.

Kenneth S. Mitchell

157

1    about February 28, 2005.

2        Q.    What happened then?

3        A.    After I had filed a discrimination complaint

4    against Wachovia Securities.

5        Q.    Where did you file that complaint?

6        A.    I filed it with the Delaware Department of

7    Labor.

8        Q.    Were you on military leave at any point in

9    early 2005?

10        A.    Yes.

11        Q.    When was that?

12        A.    About February.

13        Q.    For the month of February?

14        A.    Yes, probably the whole month.  Just about.

15              MS. MISHRA:  That will be 7.

16              (Mitchell Deposition Exhibit No. 7 was

17    marked for identification.)

18    BY MS. MISHRA:

19        Q.    I'm showing you what's been marked as

20    Exhibit 7.  Is that the charge that you were just

21    referring to?

22        A.    Yes.

23        Q.    It looks like, based on the second page of this

24    document, that you submitted this around February 1st of

Kenneth S. Mitchell

158

1   2005?

2       A.    Yes.

3       Q.    Were you on military leave at the time that you

4   filed this complaint?

5       A.    No.

6       Q.    When were you on military leave?

7       A.    I don't think I was on military -- I'm not

8   sure.  I'd have to check.  I'm not sure.

9       Q.    You say here that Mr. Meehan was put in as the

10  financial adviser in the Price's Corner branch.  This is

11  at the last sentence of the paragraph that starts "Brief

12  statement of allegations."  Do you see that?

13      A.    Uh-huh.

14      Q.    Was Mr. Meehan given more than one branch or

15  just Price's Corner?

16      A.    I don't know.  I think he may have only had

17  just the Price's Corner branch.

18      Q.    Going down to the paragraph that begins

19  "Comparator or other specific reason for alleging

20  discrimination," it says there, "I feel that the position

21  of Financial Advisor for the Prices Corner location was

22  taken away from me because Mr. Gauthier wanted to put a

23  white male into this location."

24             What's the basis of your saying that?

Kenneth S. Mitchell

159

1    A.    Because the Price's Corner bank staff didn't

2    want to work with me.  They didn't -- he said it wasn't

3    right for me, first off, and that staff didn't want to

4    work with me and that they didn't like me.

5    Q.    Did he ever say anything about your race in any

6    conversation about moving you out of Price's Corner?

7    A.    Well, I can only assume -- I shouldn't say

8    "assume," but being the only black in the state of

9    Delaware that works for Wachovia Securities and I'm in a

10   branch, I don't understand why they don't like -- I can't

11   think of any other reason why they wouldn't like me or

12   wouldn't want to work with me or for him to say that the

13   branch isn't right for me, other than the fact that I am

14   black.

15   Q.    You're not the only black person who works for

16   Wachovia in the state of Delaware?

17   A.    Wachovia Securities, financial advisers, only

18   financial adviser working for Wachovia Securities in

19   Delaware at that time.

20   Q.    Mr. Gauthier hired you, correct?

21   A.    Yes.

22   Q.    He brought you on board from Merrill Lynch?

23   A.    That's right.

24   Q.    He got you the hiring bonus of $40,000?

Kenneth S. Mitchell

160

1    A.    That's right.

2    Q.    And he arranged for Wachovia to pay Merrill

3  Lynch $150,000 so that you could work for Wachovia?

4    A.    Uh-huh.

5    Q.    Going back to my question previously, did

6  Mr. Gauthier ever say anything to you about your race at

7  any time?

8    A.    Not that I can recall.

9    Q.    Did Mr. Gauthier ever say anything negative or

10  derogatory about black people?

11    A.    No.

12    Q.    Did anyone ever tell you that Mr. Gauthier had

13  said anything negative or derogatory about black people?

14    A.    No.

15    Q.    Did you ever hear Mr. Gauthier say anything

16  negative or derogatory about anybody's race?

17    A.    No.

18    Q.    Did Mr. Gauthier ever tell you he wanted to put

19  a white male into Price's Corner?

20    A.    No.

21    Q.    When you came on board at Price's Corner, you

22  replaced Ed Duffy, correct?

23    A.    That's correct.

24    Q.    Ed Duffy was a white male?

Kenneth S. Mitchell

161

1    A.    Right.

2    Q.    Mr. Gauthier made a decision to take him out of

3    Price's Corner and put you in?

4    A.    That's right.

5    Q.    What is the basis of your saying Mr. Gauthier

6    wanted to put a white male into Price's Corner?

7    A.    That's what he put there to replace me and

8    didn't have to, but that's what he did.

9    Q.    So the fact that he put a white male into the

10   location is what leads you to say that he wanted to put a

11   white male into the location because of race?

12   A.    Because of race because the staff at Price's

13   Corner didn't like me and didn't want to work with me and

14   as he says it's not right for me because of my race.  So

15   they didn't like me because of my race.  They didn't want

16   to work with me because of my race.

17   Q.    He told you that the staff didn't like you

18   because of your race?

19   A.    He told me the staff didn't like me and they

20   don't want to work with me.

21   Q.    Did he ever tell you that the staff at Price's

22   Corner didn't want to work with you because of your race?

23   A.    No, he did not state because of my race.

24   Q.    Did Dorothy DiFebo ever say anything to you

Kenneth S. Mitchell

162

1    about your race?

2        A.    No.

3        Q.    Did Dorothy DiFebo ever say anything to you

4    about African-Americans?

5        A.    No.

6        Q.    Did you ever hear anyone else say

7    Dorothy DiFebo had said anything negative about

8    African-Americans?

9        A.    I can't recollect it.

10       Q.    Did you ever hear Ms. DiFebo say anything

11   negative about any person's race?

12       A.    I can't recollect it.  No recollection.

13       Q.    How about Laddie Amini, did she ever say

14   anything about your race?

15       A.    No.

16       Q.    How about Patra, the teller manager, did she

17   ever say anything negative about your race?

18       A.    No.

19       Q.    Who at the Price's Corner branch are you

20   alleging didn't like you because of your race?

21       A.    Laddie Amini, Dorothy DiFebo.

22       Q.    Anyone else?

23       A.    No.

24       Q.    Other than the fact that Todd Gauthier told you

Kenneth S. Mitchell

163

1    that they didn't like you and didn't want to work with

2    you, do you have any other reason to believe that they

3    didn't want to work with you because of your race?

4         A.    No.

5         Q.    During the time that you were on military

6    leave, who was covering your clients at Capitol Trail?

7         A.    Which time period of military leave are you

8    referring to?

9         Q.    February of '05.

10        A.    February of '05, I'm not sure if it was

11   Ed Duffy or Nancy Sorg.  It would have been either one of

12   those two.  And, of course, I should say whenever I'm

13   away on military leave, the RBO, the regional bank

14   office, in Philadelphia covers my clients as well.

15        Q.    Going back to Mitchell Exhibit 7 for a minute.

16   Do you know when Wachovia received a copy of this charge?

17   I'm just asking if you know.

18        A.    No, I don't know when they received a copy of

19   it.

20        Q.    Do you know who at Wachovia received a copy of

21   the charge?

22        A.    I know it went out to 2701 Kirkwood Highway,

23   which was the Capitol Trail branch.  That's the address I

24   see on here.

Kenneth S. Mitchell

166

1    A.    Retaliation because I complained to HR.

2    Q.    Because you complained to HR about being

3 falsely accused, you thought you were being retaliated

4 against for that?

5    A.    Yes.    That and because I complained to HR, my

6 second time complaining about discrimination.

7    Q.    When was the first time that you complained

8 about discrimination?

9    A.    Well, I said that -- I didn't mean

10 discrimination from the first time -- that's when I

11 complained to HR about the accusation.

12    Q.    When you complained to HR about the accusation

13 concerning the 911 incident?

14    A.    Right.

15    Q.    Did you tell HR at that time that you thought

16 that accusation was discriminatory?

17    A.    No.

18    Q.    So this complaint to Lorie Helmuth in January

19 of '05 was your first complaint of discrimination,

20 correct?

21    A.    That is correct.

22    Q.    You said that you also felt that it was

23 harassment for you to be taken away from Price's Corner.

24 What about it was harassment?

Kenneth S. Mitchell

167

1    A.    I felt I was being harassed by the bank staff

2  because, as Mr. Gauthier stated, they didn't like me,

3  they didn't want to work with me, and --

4    Q.    Go ahead.

5    A.    Go ahead.

6    Q.    You said "and."

7    A.    And those accusations from a year and a half

8  ago came from the Price's Corner branch, from the staff

9  there.

10    Q.    You previously testified that you didn't know

11  who made the accusations, correct?

12    A.    No.

13    Q.    No?  So who made the accusations?

14    A.    They came from -- it was alleged Carol Beam

15  said that Laddie told her.  Todd said that this is what

16  Carol told him.  Somebody in that branch said something,

17  said it.

18    Q.    But you don't know who said it and you don't

19  know what they said, correct?

20    A.    I don't know who said it.  Don't know what they

21  said.  No, that is correct.

22    Q.    Other than that series of incidents, did

23  anybody at the bank at Price's Corner specifically say

24  anything to you that you considered harassing?

Kenneth S. Mitchell

168

1     A.    I can't recollect.

2     Q.    Did anyone do anything that you considered

3  harassing?

4     A.    All of the things that I had stated before with

5  the false accusations, the phone conversation I guess I

6  should say, harassment from Lynn Meyer.

7     Q.    Was Lynn Meyer part of the bank staff?

8     A.    Yes.

9     Q.    What was her position?

10    A.    Regional bank director at the time.

11    Q.    What about the phone conversation was

12  harassing?

13    A.    When she stated that I made Laddie fear for her

14  job by going to Compliance and said that I threw $6 down

15  on the desk at Mr. Herrmann and yelled at me, saying,

16  "Don't treat our customers like that" and threatened to

17  call Frank Consalo to let him know what I did and

18  wouldn't accept what I had told her when I gave her my

19  reasons for doing what I did.

20    Q.    Do you know what Lynn Meyer's basis was for

21  stating that you made Laddie fear for her job?

22    A.    Because she said that I -- when I told Laddie I

23  was going to Compliance, she got afraid.

24    Q.    Do you know whether Laddie got afraid?

Kenneth S. Mitchell

170

1    October 2002.

2        Q.    Have you ever met her since then?

3        A.    No.

4        Q.    Have you ever spoken since then besides this

5    one conversation?

6        A.    No.

7        Q.    During this conversation or when you first met,

8    did Lynn Meyer ever say anything to you that was negative

9    or derogatory about your race?

10       A.    No.  Not that I know of.

11       Q.    Have you ever heard of Lynn Meyer saying

12   anything negative or derogatory about anyone's race?

13       A.    No.

14       Q.    Do you have any reason to believe that

15   Lynn Meyer discriminated against you based on your race?

16       A.    Don't know.  I'm not sure.

17       Q.    Do you have any reason to believe that

18   Lynn Meyer discriminated against you based on your

19   gender?

20       A.    I'm not sure about that either.

21       Q.    When did this telephone conversation occur in

22   which you described that Lynn Meyer told you that you

23   made Laddie fear for her job and the other things that

24   you mentioned?

Kenneth S. Mitchell

171

1     A.    Around July 2003, early part of July, I

2 believe.  June or July.

3     Q.    Since July 2003 have you had any further

4 conversations with Lynn Meyer?

5     A.    No.

6     Q.    Are you aware that Lynn Meyer still works for

7 Wachovia?

8     A.    Yes.

9     Q.    You said earlier that someone told you that

10 Lynn was no longer with the company.  Do you know whether

11 Lynn ever actually left the company?

12     A.    I don't know.

13     Q.    In the course of your job responsibilities now,

14 do you have any dealings with Lynn Meyer?

15     A.    No.

16     Q.    Did you ever tell Todd that you were accusing

17 him of race discrimination?

18     A.    No.

19     Q.    Have you ever spoken to him about your

20 complaint of race discrimination against him?

21     A.    No.

22     Q.    You testified that you were concerned that you

23 were accused of making remarks as a way of threatening

24 your job.  Do you recall that testimony?

Kenneth S. Mitchell

172

1          MR. MONES:  Can you repeat that?

2          MS. MISHRA:  Strike that.

3   BY MS. MISHRA:

4      Q.    I believe you testified earlier that you were

5   afraid that someone was trying to get you fired by

6   accusing you of making remarks about Ms. Amini.

7      A.    Right.

8      Q.    When you accused Mr. Gauthier of

9   discrimination, were you trying to get him fired?

10     A.    No.

11     Q.    Did you think he might be fired?

12     A.    I don't know if he would or not.  I don't think

13  they would probably fire him.

14     Q.    Why not?

15          MR. MONES:  I object.  It calls for

16  speculation.  Something not within the witness's state of

17  mind.

18          MS. MISHRA:  Are you objecting to his

19  answer or my question?

20          MR. MONES:  Your question.

21  BY MS. MISHRA:

22     Q.    At any point since you made the complaint to

23  Lorie Helmuth about Mr. Gauthier, has he ever spoken to

24  you about the fact that you are accusing him of

Kenneth S. Mitchell

173

1    discrimination?

2       A.    No.

3       Q.    Do you recall Ms. Helmuth ever contacting you

4    by phone to discuss what she had found in her

5    investigation?

6       A.    Yes.

7       Q.    When was that?

8       A.    On around the end of January, I believe.

9       Q.    So within a couple weeks after when you

10   complained?

11      A.    Right.

12      Q.    What did she say to you in that conversation?

13      A.    She said I'd be pleased to know that they

14   didn't find discrimination and several other things that

15   she said.  I think we was on the phone for maybe

16   10 minutes or so, 15 minutes, thereabouts.  I can't

17   recall all the other things.  I do remember her saying

18   that, though.

19      Q.    Do you recall whether Ms. Helmuth tried to set

20   up another time to speak with you?

21      A.    Yes.

22      Q.    Did you ever make arrangements to speak with

23   her again after that?

24      A.    No.

Kenneth S. Mitchell

179

1  just -- what can I say?  I didn't trust him and anything

2  he wanted to say about branch assignments because earlier

3  he had said we're all going to one branch and I'm

4  thinking you told me two months ago everybody is going to

5  one branch and now here you come back three months later,

6  you want to give me two branches.  So I said that didn't

7  make sense.  So I didn't trust that.

8     Q.    Did Mr. Gauthier ever tell you that this was a

9  temporary coverage situation because someone had

10  resigned?

11    A.    No.  You mean this being temporary?

12    Q.    Yes.  Meadowood being temporary.

13    A.    I don't recall seeing that in here.

14    Q.    Looking at the end of the second paragraph, it

15  says, "The addition of the second branch would provide

16  you with additional opportunity to grow your practice and

17  service clients with the knowledge that any relationships

18  created in Meadowood would be retained by yourself as I

19  recruit a full time FA for the branch."

20         Do you recall him ever telling you that he

21  was going to recruit a full-time FA and you would be

22  filling in until that person came on board?

23    A.    No, he never said that.  Not in our

24  face-to-face meeting.

**W&F**

Kenneth S. Mitchell

181

1     Q.    On the bottom of that is an e-mail from

2   Bill Wolfe. Did you ever respond to that e-mail from

3   Bill Wolfe or write back to him?

4     A.    I don't recall.

5     Q.    Do you recall Mr. Gauthier ever talking to you

6   about bringing on a broker-funded assistant?

7     A.    Yes.

8     Q.    When was that?

9     A.    In April -- March or April of 2004. I believe

10  it might have been March 2004.

11     Q.    So while you were still assigned to Price's

12  Corner and Capitol Trail?

13     A.    Right.

14     Q.    What did he talk to you about in that regard?

15     A.    He lauded me for my performance, said I was

16  doing very well and that I was ranked at that time 3 --

17  out of 28 financial advisers, I was ranked No. 3, and

18  told me that I would be getting my bonus and my back-end,

19  and then spoke about a broker-funded assistant, hiring a

20  broker-funded assistant at $3,000 a month.

21     Q.    What else did he talk to you about as far as

22  broker-funded assistant was concerned?

23     A.    I have no recollection beyond that.

24     Q.    Did he talk about where the assistant's office

Kenneth S. Mitchell

182

1  would be?

2     A.    He spoke at that time it would be in Capitol

3  Trail.

4     Q.    Did he talk to you at all about using the

5  broker-funded assistant to pursue the investment

6  prospecting and referral strategy?

7     A.    No.

8     Q.    This was about a month after the meeting that

9  you said that he and Carol had with you concerning the

10  investment prospecting and referral strategy, correct?

11     A.    That's right.

12     Q.    Did you think that a broker-funded assistant

13  might help you pursue that strategy?

14     A.    No.

15     Q.    Why not?

16     A.    Because the strategy was designed for the FA

17  and the FS's in the branch.

18     Q.    Did you consider whether a broker-funded

19  assistant could help you reach out to the Price's Corner

20  branch?

21     A.    No.

22     Q.    Did you ever complain that Mr. Gauthier did not

23  offer you the opportunity to have a broker-funded

24  assistant?

Kenneth S. Mitchell

183

1       A.      Yes.

2       Q.      When was that?

3       A.      That was in January -- December/January of --

4    December 2004, January 2005.

5       Q.      So after he had this conversation with you

6    about a broker-funded assistant, you complained that he

7    had not offered you the opportunity?

8       A.      He offered me the opportunity in March of 2004

9    for Capitol Trail branch, to work out of my Capitol Trail

10   branch.  Eight months later when he took the Price's

11   Corner branch away from me, he also took a branch from

12   Nancy Sorg.  However, he stated to Nancy Sorg that she

13   could keep her second branch if she hired a broker-funded

14   assistant.  He didn't say to me that I could keep my

15   Price's Corner branch if I hired a broker-funded

16   assistant.  Instead, he told me it's not right for me,

17   the staff there don't like me and the staff there don't

18   want to work with me.

19      Q.      How many branches did Ms. Sorg have?

20      A.      She had two branches.

21      Q.      What was Ms. Sorg's race?

22      A.      White.

23      Q.      Did Ms. Sorg end up hiring a broker-funded

24   assistant?

Kenneth S. Mitchell

184

1 A. I don't think so.

2 Q. Was she allowed to keep the second branch?

3 A. No.

4 Q. At the time that Mr. Gauthier took Price's

5 Corner away from you, did you ask him whether you would

6 be allowed to keep it if you hired a broker-funded

7 assistant?

8 A. No. No.

9 Q. How did you learn that Ms. Sorg was offered the

10 opportunity to hire a broker-funded assistant?

11 A. I think Ms. Sorg may have told me that.

12 Q. When did she tell you that?

13 A. Around the same time frame, December or January

14 of '05.  December '04.

15 Q. Did you take Meadowood?

16 A. Under what circumstances?

17 Q. At any time.

18 A. When the Capitol Trail branch was closed up, I

19 went to work in the Meadowood branch.

20 Q. When was that?

21 A. October of 2006.

22 Q. Between March of '05 and October of '06, did

23 you work in any branch other than Capitol Trail?

24 A. March of '05?

Kenneth S. Mitchell

185

1     Q.    Right.  When you were getting those e-mails

2  concerning Meadowood and October of '06 when Capitol

3  Trail closed, did you work in any other branch?

4     A.    No.  I only worked in Capitol Trail.

5     Q.    At some point in time did you stop reporting to

6  Todd Gauthier?

7     A.    What do you mean when you say "stop reporting?"

8     Q.    Meaning that he was no longer your supervisor.

9     A.    When he left.

10    Q.    When was that?

11    A.    I think in April of 2005.

12    Q.    So about a month after he asked you to take

13  Meadowood?

14    A.    Right.

15    Q.    Why did he leave?

16    A.    I don't know.

17    Q.    Did you ever learn that he left because he had

18  a sick family member?

19    A.    Somebody stated that in a meeting.  I think

20  that's what was mentioned in the meeting when they said

21  he was stepping down from his management position and

22  moving to Mississippi to be closer to an ill family

23  member who was living in Louisiana.

24    Q.    Do you know whether he's still with the

Kenneth S. Mitchell

188

1    didn't care about whether or not how I felt emotionally

2    or how this affected me emotionally and financially.

3                    MS. MISHRA:  Off the record.

4                    (Discussion off the record.)

5    BY MS. MISHRA:

6        Q.    Other than that is there anything else that

7    Mr. Gauthier did that you think was retaliatory?

8        A.    No, I can't think of anything.

9        Q.    Is there anything that Mr. Gauthier did after

10   you accused him of race discrimination that you believe

11   was retaliatory?

12       A.    Is there anything that I --

13       Q.    -- that Mr. Gauthier did after you accused him

14   of race discrimination that you believe was retaliatory?

15       A.    I believe this whole -- all the stuff that has

16   happened, especially taking the branch from me the second

17   time, was all related to retaliatory action because of

18   all the stuff that began in 2003.

19       Q.    You accused Mr. Gauthier of race discrimination

20   in January of '05, correct?

21       A.    Right.

22       Q.    You called up the Alert Line and spoke to

23   Ms. Helmuth and then you filed a charge with the Delaware

24   Department of Labor?



Kenneth S. Mitchell

189

1       A.      Right.

2       Q.      After that did Mr. Gauthier do anything after

3  that time that you believe was retaliatory?

4       A.      No.   Just what's stated in that document there,

5  the Department of Labor.

6       Q.      Did Mr. Gauthier ever do anything that you

7  believe was gender discrimination?

8       A.      No.

9       Q.      Did anyone at Wachovia ever do anything that

10  you believe was gender discrimination?

11       A.      Only the bank staff at Price's Corner.

12       Q.      Who on the bank staff?

13       A.      Dorothy DiFebo, Laddie Amini, and Patra Rash.

14       Q.      What did Ms. DiFebo do that you believe was

15  gender discrimination?

16       A.      I just felt that she didn't want to have a male

17  in the office.   I think she resented the fact that I was

18  a male figure.   I feel Laddie resented the fact that I

19  was a male figure in a supervisory position and advising

20  them, as well as our clients, on investment matters

21  related to investments, and I don't think they liked

22  that.   I don't think it set well with them.   And probably

23  the fact that I was black, they didn't like that either.

24       Q.      What's the basis of your saying that Ms. DiFebo

Kenneth S. Mitchell

190

1    didn't want to have a male in the office?

2         A.     There was mostly females in the branch.  In

3    fact, it was all females in the branch at the time that I

4    was going over there.

5         Q.     What was Ms. DiFebo's position?

6         A.     Financial center manager.

7         Q.     As financial center manager, do you know

8    whether she was responsible for hiring the personnel in

9    the branch?

10        A.     I don't know.

11        Q.     Do you know whether she had anything to do with

12   the fact that it was all females in the branch?

13        A.     I don't know.

14        Q.     Did she ever say to you that she didn't want to

15   have a male in the office?

16        A.     I don't ever recall her saying that.

17        Q.     Did she ever say anything to you about the fact

18   that you were a male?

19        A.     No.

20        Q.     Did she ever say anything with reference to

21   your race?

22        A.     No.

23        Q.     So when you say you don't think it sat well

24   with her that you were a male, what are you basing that

Kenneth S. Mitchell

191

1   on?

2       A.      I'm basing it on all of the problems that

3   happened in 2000 and July 2003.

4       Q.      During the time that you were assigned to

5   Price's Corner, were there ever any other men working in

6   Price's Corner?

7       A.      Not from my recollection there weren't.

8       Q.      So during the two to three times that you were

9   there in 2004 --

10      A.      I take that back.  I think for one while there

11  was an FS by the name of Todd Savage was there for a

12  little while.  He may have been the only one.  He's a

13  white male.

14      Q.      Is that the same position as Laddie?

15      A.      Yes.

16      Q.      Did Laddie ever say that she didn't want to

17  have a male in the office?

18      A.      No.  I never heard her say that.

19      Q.      Did she ever refer to the fact that you were a

20  male?

21      A.      No.

22      Q.      Did she ever say that she resented the fact

23  that you were a male and you were in a supervisory

24  position?

Kenneth S. Mitchell

192

1    A.    No.

2    Q.    How about Patra, did she ever do or say

3 anything to indicate that she resented the fact that you

4 were a male?

5    A.    No.

6    Q.    Did Ms. DiFebo ever have supervisory role over

7 you while you were at Price's Corner?

8    A.    No.

9    Q.    How about Carolyn Beam, where was her office

10 while you were at Price's Corner?

11    A.    I don't know.

12    Q.    How often did you interact?

13    A.    Hardly any at all.

14    Q.    How many times did you interact during the time

15 that she still worked at Wachovia?

16    A.    I can't say.  After July of 2003 we didn't

17 interact at all except for the two meetings that we had

18 after I went back to work in Price's Corner.  That

19 October meeting where her and Todd Gauthier came to my

20 branch and apologized to me for the accusations that were

21 made in July and then again for the July 16th, 2004.

22    Q.    During that October 2004 meeting that you just

23 mentioned, did they approach you about having that

24 meeting or did you approach them?

Kenneth S. Mitchell

193

1      A.      They approached me.

2      Q.      How did they set that meeting up?

3      A.      Todd called and said he and Carol wanted to

4  come by, and that's just recollection.  I'd have to look

5  at my notes to see exactly how it was set up.  But I do

6  believe Todd made a phone call, said he and Carol wanted

7  to come by and see me.  And they came by; they

8  apologized.

9      Q.      What did they say specifically?

10     A.      Just apologized.

11     Q.      What did Todd say?

12     A.      Said, "I apologize.  We're sorry for all the

13  stuff that happened in July."  And was glad that I was

14  staying in Price's Corner branch.

15     Q.      So this was in October of 2003 or 2004?

16     A.      This was in -- I'm sorry, this was in November

17  of 2003.

18     Q.      What did Carolyn say during this meeting?

19     A.      She just apologized.

20     Q.      Did you accept their apology?

21     A.      I accepted their apologies.

22     Q.      Did you say anything during this meeting?

23     A.      Not very much.

24     Q.      Carolyn Beam ever say anything inappropriate to

Kenneth S. Mitchell

194

1    you about your race?

2        A.    No.

3        Q.    Did she ever say anything inappropriate about

4    your gender?

5        A.    No.

6        Q.    Did Carolyn Beam ever do anything that you

7    considered retaliatory?

8        A.    Unless you take the accusation of what Todd

9    told me, he said it was Carol that told him, I would have

10   to conclude that they considered that retaliatory because

11   of me making Laddie fear for her job.

12       Q.    Did Dorothy DiFebo ever do anything that you

13   considered retaliatory?

14       A.    I would say the same thing, because they felt

15   that I made Laddie fear for her job, so they were going

16   to retaliate against me by making false accusations.

17       Q.    Do you believe that you were accused of making

18   the comment to Laddie because of your race?

19       A.    I believe it was because they wanted me out of

20   that branch and partially because of my race as well.

21       Q.    What's the basis of your saying that the

22   accusation had to do with your race?

23       A.    Because they didn't like me, they didn't want

24   to work with me.



Kenneth S. Mitchell

195

1    Q.    As of July 2003 they didn't want to work with

2 you?

3    A.    There was no question that I feel in 2003,

4 July 2003, that they didn't want to work with me.  I

5 don't know, it could have been all along, but I can't

6 speculate like that.  I have to take it for the way I see

7 it, what actually happened.

8    Q.    Other than the fact that you are

9 African-American, do you have any reason to believe that

10 the reason that they didn't like you was because of your

11 race?

12        MR. MONES:  I'm not sure I understand your

13 question.  Do you?

14        THE WITNESS:  No.

15 BY MS. MISHRA:

16    Q.    I'm just looking for your understanding.  Do

17 you believe that there is a connection between the fact

18 that you are accused of making the comment to Laddie and

19 the fact that you're African-American?

20        MR. MONES:  I think he just answered that.

21 You can answer it again.

22    A.    Then let's go back to see what I said.

23    Q.    Actually it would be easier if you could answer

24 the question because the question is slightly differently

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Kenneth S. Mitchell

196

1   phrased.

2       A.    Do I feel because of my --

3       Q.    Do you think that your race has anything to do

4   with the fact that you were accused of making the comment

5   to Laddie?

6       A.    It could be.

7       Q.    Other than your own speculation, do you have

8   any basis for saying that it could be?

9       A.    The other basis would be I'm the only black

10  financial adviser Wachovia Securities had in Delaware.

11  There were no others.  And they probably didn't want any

12  black financial advisers at all.

13      Q.    When you say they didn't want any, who is the

14  "they" that you're referring to?

15      A.    The staff at Price's Corner.  They didn't want

16  a black financial adviser in their branch.

17      Q.    Other than anything you've already testified to

18  here today, is there anything that anyone on the staff at

19  Price's Corner did or said to indicate that they didn't

20  want a black financial adviser at Price's Corner?

21      A.    I can't think of anything else.

22      Q.    At any time while you worked at Wachovia, have

23  you ever been subjected to any corrective action or

24  discipline?

Kenneth S. Mitchell

197

1       A.      No.

2       Q.      Did Mr. Gauthier ever give you any verbal or

3  written counseling?

4       A.      No.

5       Q.      Did Mr. Gauthier give you performance

6  evaluations?

7       A.      I have never seen them.

8       Q.      Going back to Exhibit 5, which was the

9  complaint, in particular going to paragraph No. 58, which

10  is on page 12 and 13, you say that "As with Capitol

11  Trail, the client deposits at Meadowood are not as large

12  as at Prices Corner."

13              What is the basis of your saying that?

14      A.      I'm to make sure -- okay.  My basis for saying

15  that is there's more client deposits in Price's Corner

16  than there are in Meadowood.

17      Q.      Do you know what the current client deposits

18  are at Meadowood?

19      A.      Probably around 40, 48, 50 million, I believe.

20  48 million.  I would have to guess.

21      Q.      What are the current client deposits at Price's

22  Corner?

23      A.      Over $100 million.

24      Q.      When was the last time that you confirmed those

Kenneth S. Mitchell

204

1    Q.    What did Mr. Byrne did, Greg Byrne, that you

2    regarded as retaliatory?

3    A.    The same thing, after Mr. Gauthier left,

4    anything that Greg came down to do, it was all blessed

5    I'm sure by Frank Consalo.

6    Q.    I'm not asking you about Mr. Consalo.  I'm

7    asking you about Mr. Byrne.

8    A.    Mr. Byrne came down and tried to force me to

9    take a second branch.

10   Q.    Which branch?

11   A.    He didn't say.

12   Q.    When did he try to force you to take a second

13   branch?

14   A.    December 28th, 2006.

15   Q.    What do you mean he tried to force you to take

16   the branch?

17   A.    He came down and said he wanted me to -- wanted

18   to come talk to me about taking another branch after I

19   told him in meetings before it was clear to them that the

20   firm was going to one branch per FA and it didn't make

21   sense for me to take a second branch when you're

22   saying -- and hold me accountable for the production and

23   the things don't go right, then I get hammered for it.

24   Q.    So as of December of '06 you didn't want a

Kenneth S. Mitchell

205

1    second branch?

2        A.    As of December '06?

3        Q.    Yes.

4        A.    No, it's not that I didn't want a second

5    branch.  It didn't make sense to take a second branch

6    when you're telling me the firm's model is to go to one

7    branch per FA.

8        Q.    This was two years later, correct?

9        A.    Yes, two years later, and no ones's telling me

10    the firm is changing their model or anything.

11        Q.    So did you refuse to take a second branch?

12        A.    No, I didn't refuse -- I didn't want to discuss

13    anything about a second branch.

14        Q.    How is Mr. Byrne trying to talk to you about

15    taking a second branch retaliatory?

16        A.    Because I had told Mr. Byrne before -- one

17    second.  Let me clarify a couple things.

18                On the other incident Mr. Byrne came to me,

19    and I'm not sure when it was, and wanted me to sign a

20    poor performance sheet.

21        Q.    When was that?

22        A.    I'm not sure when that was.  I had never seen a

23    poor performance.  I had never performed poorly ever

24    before.  And to me that's retaliating.

Kenneth S. Mitchell

206

1   Q.    Retaliating for what?

2   A.    Because my performance numbers are not up and

3   they have taken the branch away from me and they wanted

4   to try to give me a second branch but because I won't

5   take a second branch.

6   Q.    So you're saying that Mr. Byrne retaliated

7   against you by giving you a poor performance sheet after

8   you said that you would not take a second branch?

9   A.    Yes.

10  Q.    Was there any other reason that you believe

11  Mr. Byrne was retaliating against you?

12  A.    None that I can think of at this time.

13  Q.    Is there anything else that Mr. Consalo did

14  that you believe was discriminatory based on your sex or

15  your race?

16  A.    No.

17  Q.    You said at the beginning that you're being

18  treated by Dr. Agard and Dr. Pereira-Ogan?

19  A.    That's correct.

20  Q.    What is Dr. Agard's field of expertise?

21  A.    My medical doctor.

22  Q.    Is he your primary care doctor?

23  A.    My primary care doctor, that's correct.

24  Q.    What's Dr. Pereira-Ogan's field of expertise?

Kenneth S. Mitchell

213

1    production would increase if you took on a second branch

2    in December of '06?

3        A.    I haven't done that.

4        Q.    Do you believe your compensation would increase

5    if you took on a second branch?

6        A.    I can't say that.  I don't think so at this

7    point in time.

8        Q.    Who replaced Greg Byrne as your manager?

9        A.    I don't know.  You said who replaced him?

10       Q.    Yes.

11       A.    Oh.  Jeffrey Springer.

12       Q.    That was earlier this year?

13       A.    It was in July of 2007.

14       Q.    Is there anything that Mr. Springer has done

15   while he's been your supervisor that you consider

16   retaliatory?

17       A.    No.

18       Q.    Is there anything that Mr. Springer has done

19   while he's been your supervisor that you consider

20   discriminatory?

21       A.    No.

22       Q.    Has Mr. Springer ever discussed with you in any

23   way the fact that you have a lawsuit against Wachovia?

24       A.    He's aware of it.

Kenneth S. Mitchell

214

1    Q.    How is he aware of it?

2    A.    We spoke on the phone.

3    Q.    When did you speak on the phone?

4    A.    It was about two weeks ago, three weeks ago,

5    right before Thanksgiving, I believe.

6    Q.    What did you speak about?

7    A.    About wanting to set up a meeting for him to

8    come see me.  He's been on board since July and he's

9    never met -- we have never seen each other.

10    Q.    How did your lawsuit come up in the context of

11    that conversation?

12    A.    I asked him if he was aware that I had a

13    lawsuit against the firm.  He said he was aware.

14    Q.    Did he tell you how he was aware?

15    A.    He said he was briefed on it when he first was

16    hired, but no details were discussed.

17    Q.    Other than that conversation, have you ever

18    spoken to Mr. Springer about the lawsuit?

19    A.    No.

20         MS. MISHRA:  Subject to any further

21    information being produced in discovery, no further

22    questions.

23    BY MR. MONES:

24    Q.    I just have one quick area.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KENNETH S. MITCHELL,    )
                            )
    Plaintiff,       )
                            )
      v.            ) C.A. No. 06-725 (GMS)
                            )
WACHOVIA CORPORATION, t/a )
WACHOVIA SECURITIES,     )
WACHOVIA SECURITIES,     )
L.L.C., WACHOVIA SERVICES,)
INC., WACHOVIA BANK OF   )
DELAWARE, N.A., TODD D.  )
GAUTHIER, LYNN G. MEYER,  )
CAROLYN J. BEAM, and     )
DOROTHY A. DIFEBO,       )
                            )
    Defendants.      )

        Deposition of KENNETH S. MITCHELL taken
pursuant to notice at the law offices of Morris James,
500 Delaware Avenue, 15th Floor, Wilmington, Delaware,
beginning at 10:05 a.m., on Friday, December 14, 2007,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.
APPEARANCES:

       STEVEN F. MONES, ESQUIRE
       BIGGS & BATTAGLIA
         921 North Orange Street
         Wilmington, Delaware 19801
         for the Plaintiff

       DEVJANI H. MISHRA, ESQUIRE
       SEYFARTH SHAW, LLP
         620 Eighth Avenue
         New York, New York 10018-1405
         for the Defendants

              WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com



JUL-17-2000  08:57    FIRSTUNION BROKERAGE OPS    2159857121   P.02/14



MITCHELL          KENNETH   STEVEN
Last Name              First           Middle

17 JUL 2000          /        /        /
Date                 Recruiter    Relog Recruiter  ε ς

Final Disposition
H_____ X _____ I _____ S_____

Log # _____ Logged ☐

DEPOSITION
EXHIBIT
*Mitchell 1*
*KAH 12/14/07*

# First Union Corporation

## Employment Application

**Should you need assistance in completing this application or at any other stage of the hiring process, please notify us immediately.**

### Please Read Before Completing Application

- First Union is an equal opportunity employer and does not discriminate in recruiting, hiring, compensation, promotion or other employment terms based upon race, color, religion, creed, sexual orientation, national origin, gender, age, disability, marital status, veteran status or any other legally protected status. The information requested in this application will be used in a nondiscriminatory manner.

- First Union will make every effort to provide disabled applicants and employees with reasonable accommodations necessary for the performance of the essential functions of a job. If you require a reasonable accommodation to complete this application, or any other phase of the application process, please let us know. Your request and/or need for an accommodation will be kept confidential and only shared with managers or supervisors with a business need to know of the request. Making a request for an accommodation will not subject you to any adverse treatment.

- First Union's Employment of Relatives policy states that qualified relatives of employees may be employed by the corporation as long as such employment does not create actual or potential conflicts of interest or disruption of the workplace. For purposes of this policy, "relative" is interpreted to include the following: spouse, parent, child, sibling, grandparent, grandchild, aunt, uncle, niece, nephew, first cousin or step, adoptive or in-law relationships in these categories, as applied to regular, full-time, part-time, peak time, zero hour, summer, temporary, agency and contract employees. No relatives of the following (collectively known as "senior officers") may be employed anywhere in the Corporation: 1) Members of the Board of Directors of First Union Corporation or First Union National Bank; 2) Direct reports to the CEO or President of First Union Corporation, or like positions; and 3) Members of the Key Managers Committee or any successor management committee known by a different name.

- Due to banking laws and bonding requirements, acts of dishonesty or breach of trust will prohibit employment. Some criminal convictions (i.e.: DUI) will not necessarily be a bar to employment, and First Union will consider factors such as time of the offense, the seriousness and nature of the violation, and any rehabilitation. However, failure to disclose or providing inaccurate or incomplete information in response to the questions in this section will be deemed a dishonest act and will preclude employment or constitute grounds for dismissal when such omission or misinformation is discovered.

- In accordance with the Immigration Reform and Control Act of 1986, proof of authorization to be employed in the United States will be required of all newly hired employees. Failure to establish such proof will prohibit or discontinue employment.

- In accordance with our alcohol and drug abuse policies, prospective employees will be asked to submit to a drug screen or alcohol blood test. Current employees may be asked to submit to a drug screen or alcohol blood test under certain circumstances such as where there is reasonable suspicion of substance use or abuse.

**An Equal Opportunity Employer**

**M/F/D/V**

521601 (25/pkg Rev 14)

WACH000518

JUL-17-2000  08:57    FIRSTUNION BROKERAGE OPS    2159857121    P.03/14



**FIRST UNION CORPORATION**

**Employment Application**

PLEASE PRINT, USE INK

| Last Name (include Jr., Sr., III, etc.) | First Name | Middle Name |
|---|---|---|
| MITCHELL | KENNETH | STEVEN |

Birth, Preferred, or Other Names Used Past and Present

| Home Address | City | State | Zip Code |
|---|---|---|---|
| 306 STONEBRIDGE BLVD | NEW CASTLE | DE | 19720 |

| Mailing Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Home Telephone (302) 328-3577 | May we contact you at work? ☑Yes ☐ No | Best Time to Reach You? | Social Security Number 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 |
|---|---|---|---|
| Business Telephone (302) 571-5561 | | | |

| Alternate Contact Name | Telephone ( ) | Willing To Travel? ☑Yes ☐ No | Willing To Relocate? ☐ Yes ☐ No |
|---|---|---|---|

**PREVIOUS RESIDENCE - LIST PREVIOUS PLACE(S) OF RESIDENCE DURING THE LAST SEVEN (7) YEARS.**

| Street Address | City | State | Zip Code | From Dates To |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| tiered By: | Have you ever been employed directly by First Union or any of its Subsidiaries or through a temporary agency or as an independent contractor? ☐ Yes ☑ No |
|---|---|
| Agency: _____ | |
| Employee Referral: _____ | If Yes, Where? ____ When? ____ |
| Advertisement: _____ | Date Available For Employment? SEP 2000 / Minimal Acceptable Pay Rate? |
| Other: _____ | Work Hours Preferred? |
| Employment Security Commission: _____ | Do you possess unlimited and unrestricted authorization to work in the United States? ☑ Yes ☐ No |
| Have you previously been in contact with a First Union representative regarding employment? ☐Yes ☐ No | |
| If yes, name of contact: _____ | |

**ARE YOU WILLING TO WORK:**
☐ Sunday  ☐ Monday  ☐ Tuesday  ☑ Wednesday  ☐ Thursday  ☐ Friday  ☐ Saturday  ☐ Holidays  ☐ Overtime

| Position Applied For (Only One Please) | | Shift |
|---|---|---|
| | ☐ Full Time    ☐ Regular | ☐ 1st  ☐ 2nd  ☐ 3rd |
| Vacancy Number | ☐ Part Time   ☐ Temporary | ☐ Split  ☐ Rotating |
| | ☐ Either      ☐ Either | |

| Geographic Preference | Are You Related To Any Employees, Temporaries, Sub-Contractors Or Board Members Of This Corporation Or Its Subsidiaries? ☐ Yes ☑ No |
|---|---|
| | Relative's Name | Relationship | Location Of Relative Within Corporation Or Subsidiary |

| Are You Age 18 Or Older? ☑ Yes ☐ No | Have you ever pled guilty or been convicted of any crime/offense excluding speeding tickets, traffic sign violations and parking violations? ☐ Yes ☑ No  If yes, explain. Any omission of information or inaccurate information provided in response to this question will be viewed as intentional and will render you ineligible for hire; and if hired, will subject you to dismissal when correct information is discovered. |
|---|---|
| If no, can you furnish a work permit? ☐ Yes ☐ No | Have you ever been enjoined from, or disciplined for engaging in or continuing any conduct or practice involving any aspect of the consumer finance, securities, commodities or real estate industries? ☐ Yes ☑ No   If yes, attach written explanation. |
| | Have you ever been the subject of an administrative order by any state agency or the Federal government? ☐ Yes ☑ No   If yes, attach written explanation. |

you applying for a position of courier, pilot or any other position which would require operation of a vehicle to perform job accountabilities which would require a ...lid operator's license? ☐ Yes ☑ No  If yes, give operator's license no. _____  State _____

WACH000519

JUL-17-2000  08:58     FIRSTUNION BROKERAGE OPS     2159857121   P.04/14

## Education and Training

| | School Name | Major Course of Study | Type of Degree ✓ |
|---|---|---|---|
| High School | Wichita Falls High School | | |
| Business Technical School | | | |
| College | Prairie View A&M Univ | MATHEMATICS | BS |
| Graduate School | Naval Postgraduate School | MANAGEMENT | MBA |

| List Business Courses Taken | | School Name |
|---|---|---|
| | | |

| List Honors or Awards Received | Grantor |
|---|---|
| | |

| List Licenses/Certifications | Issue Date | License # | Issued By | Expiration Date |
|---|---|---|---|---|
| | | | | |
| | | | | |

## Employment Record – List First The Most Recently Held Position

| Company Name | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| MERRILL LYNCH | 1261 MARKET ST | WILMINGTON | DE | 19801 |

| From MM/DD/YYYY | To MM/DD/YYYY | Telephone | Position | Supervisor |
|---|---|---|---|---|
| 11/06/96 | PRESENT | (302)571-5501 | FINANCIAL CONSULTANT | WILLIAM LECKEY |

Major Responsibilities: INVESTMENT ADVISOR

| Starting Salary & Incentives | Leaving Salary & Incentives | Reason For Leaving |
|---|---|---|
| | | |

| Company Name | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| | | | | |

| From MM/DD/YYYY | To MM/DD/YYYY | Telephone | Position | Supervisor |
|---|---|---|---|---|
| | | | | |

Major Responsibilities:

| Starting Salary & Incentives | Leaving Salary & Incentives | Reason For Leaving |
|---|---|---|
| | | |

| Company Name | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| | | | | |

| From MM/DD/YYYY | To MM/DD/YYYY | Telephone | Position | Supervisor |
|---|---|---|---|---|
| | | | | |

Major Responsibilities:

| Starting Salary & Incentives | Leaving Salary & Incentives | Reason For Leaving |
|---|---|---|
| | | |

| Company Name | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| | | | | |

| From MM/DD/YYYY | To MM/DD/YYYY | Telephone | Position | Supervisor |
|---|---|---|---|---|
| | | | | |

Major Responsibilities:

| Starting Salary & Incentives | Leaving Salary & Incentives | Reason For Leaving |
|---|---|---|
| | | |

## Skills

- ☐ Ten-Key Touch
- ☐ Data Entry
- ☐ CRT
- ☐ PC
- ☐ Bookkeeping/Accounting Transcription
- ☑ Customer Service
- ☐ Word Processing _____
- ☐ Spreadsheets _____
- ☐ Typewriter WPM _____
- ☐ Shorthand WPM _____
- ☐ Speed Writing WPM _____
- ☐ 10 Key KPH _____
- ☐ Other _____

WACH000520

## Confidential Pre-Employment Information Form
### (To Be Completed By Applicant)

In compliance with Federal and State equal employment opportunity laws, all qualified applicants will be considered for employment without regard to race, color, religion, sexual orientation, citizenship, marital status, gender, national origin, age, veteran status or disability. To help us comply with Federal and State equal employment record keeping, reporting and other obligations, please answer the questions below. The information provided will be kept confidential, and this form will be maintained in a separate location from your application. Providing this information is voluntary and neither disclosure of the information nor refusal to provide it will adversely affect consideration of your application. This information will be used only in accordance with the regulations implementing Executive Order 11246.

Print Full Name __KENNETH STEVEN MITCHELL__    Social Security # __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__

Position Applied For (Only One Please)_____    Vacancy # _____

SEX:    RACE/ETHNIC GROUP

[X] Male

[ ] Female

[ ] White (not Hispanic Origin)

[X] Black (not Hispanic Origin)

[ ] American Indian or Alaskan Native

[ ] Asian or Pacific Islander

[ ] Hispanic

__Kenneth Mitchell__
Signature of Applicant

__17 JUL 2000__
Date

**Attention Human Resources Contact:** Please detach entire sheet and use for entering applicant flow information. These pre-employment information sheets must be maintained for a minimum of two years from the date of application.

WACH000521

PAGE.02     515 KAH 4173

# Wachovia Corporation

DEPOSITION EXHIBIT
Mitchell 3
KAH 12-14-07

**Revised**

August 6, 2002

Mr. Kenneth Mitchell
306 Stonebridge Blvd
New Castle, DE  19720

Dear Kenneth:

Thank you for considering a career with Wachovia. We are impressed with your background and experience and look forward to the possibility of you joining our team as a Financial Advisor in Wachovia Securities, Inc., reporting to Todd Gauthier effective August 9, 2002.

Enclosed, you will find the summary of the terms of our offer as well as specifics regarding our benefits.

To prepare for your first day at Wachovia, please visit our Internet site, Your Journey Begins Here™ for new employees at www.wachovia.com/journey. This site includes information you will need to know prior to your first day of work. The site also provides an overview of our organization.

This offer of employment is contingent upon your securities license(s) **and** state registration(s) successfully transferring from your previous employer. Your continued employment at First Union is also contingent upon maintaining your license and registration in good standing at all times.

If you have any questions, please contact me at (704) 383-0692.   We are excited about the journey ahead and hope you will join us.

Sincerely,


Meredith McGough,  Recruiting Consultant
Human Resources Division

cc:     Todd Gauthier – PA 4355
        Brenda Brown – NC 1167
        Dot Brackett – NC 1167
        Nathan Heisler – NC 1167
        Personnel File

43

**Revised**

**OFFER SUMMARY**
**Kenneth Mitchell**
**August 6, 2002**

**Position Title:**
- Financial Advisor, in Wachovia Securities, Inc., initially reporting to Todd Gauthier.
- You will receive the title of Vice President.

**Compensation:**
- You will receive a forgivable draw of $3,000 for 3 months, you will revert to the standard compensation plan thereafter.

- You will receive a guaranteed minimum 36% payout for 12 months.

- In addition, a loan in the amount of $40,000 will be disbursed to you upon receipt of your documented trailing 12 months commissions as well as the successful transfer of your securities licenses to Wachovia. At the end of your first year of employment with Wachovia, Wachovia will forgive 1/24th of the original principal balance of the loan together with the interest accrued for that year. Beginning on the thirteenth month of your employment, Wachovia shall forgive $1,666.66 *plus interest* on the 10th day of each calendar month through August 9, 2005. The terms of the loan, and the interest rate and tax withholdings applicable therein, will be provided to you upon the commencement of your employment. At that time, you will be asked to carefully read and sign a Disclosure Statement, a Promissory Note and a Payroll Deduction Order. The forgivable loan will not be included as compensation for purposes of any Wachovia employee benefit plan, including, but not limited to, the savings plan, the pension plan, the deferred compensation plan, the Employee Stock Purchase Plan, or the stock incentive plan.

- You will be eligible to receive a back end bonus if in the best 12 of your first 15 months of employment you have done a minimum of $250,000 in personal production. This bonus will be a percentage of the personal production revenue levels as follows:
  $250,000 - $299,999 = 15%
  $300,000 - $349,999 = 20%
  $350,000 plus = 25%
  This will be paid in the form of a forgivable loan.

- Your eligible compensation for your pay related benefits will be based on 70% of your eligible functional incentive compensation. Wachovia's pay related benefits include the Wachovia savings plan, the Wachovia Pension plan, the short term and long term disability plans and the basic and supplemental life insurance plans.

44

- Each pay period your benefits-eligible compensation will be indicated on your pay stub. In addition, this information can be found on the "Review Paycheck History" screens on HR Online.

- You will be required to meet minimum production standards determined by tenure as follows:

| Tenure | Minimum | Fully Meets | Exceeds |
|---|---|---|---|
| 4-6 months | 10,000 | 15,000 | 20,000 |
| 7-9 months | 12,000 | 17,000 | 22,000 |
| 10-18 months | 15,000 | 20,000 | 25,000 |
| 19-30 months | 18,000 | 23,000 | 28,000 |
| 31+ months | 20,000 | 25,000 | 30,000 |

## OTHER:

- **Each Wachovia employee has a Corporate Employee Identification Number assigned to them. Your I.D. number will be assigned at a later date.** When using this number to login for mainframe system access, you will be required to input a password. The password is initially defaulted to the last 4 digits of your social security number, plus the last 2 digits of the year you were born. Once you login the first time, you will be prompted to change your password. It is recommended that you change your password to one that is unique and only known to you.

- Immigration Reform and Control Act (IRCA): Please read the enclosed IRCA letter pertaining to employment. Due to Federal guidelines, we will need to see your employment eligibility verification on your first day of employment.

- Self Identification Notice: As a part of our Affirmative Action Plan, Wachovia extends an invitation to all persons with job offers who may be disabled to identify themselves. If you have a disability or are a disabled veteran of the Vietnam Era and wish to be identified, please complete the Self Identification Notice.

- Basic Life Insurance: Coverage equal to one time your base salary. Coverage automatically begins on your first day of employment.

- Your eligible compensation for pay related benefits is your annual base salary of (need W-2 to calculate this amount). Wachovia's pay related benefits include the Wachovia savings plan, the Wachovia pension plan, the short term and long term disability plans and the basic and supplemental life insurance plans.

- Any reference in this document to a policy, plan or program is subject to the terms and conditions of such policy plan or program, as amended and applicable law. Wachovia reserves the right to modify, replace or eliminate any of its policies, plans and programs, at any time, without notice.

- You are instructed not to bring property or confidential information of any former employers to Wachovia and to refrain from sharing with Wachovia trade secrets of any former employers.

45

- Wachovia customers are the property of Wachovia Bank and you will not be permitted to contact them if your employment with Wachovia Bank / Wachovia Securities terminates.

## EMPLOYMENT AT WILL

*Your employment at Wachovia is based on mutual consent. You are not hired for any specified term or duration or pursuant to any contract of employment, written or oral. You have the right to end your relationship with Wachovia at any time and for any reason you deem appropriate. Similarly, the employment of any employee can be terminated at the discretion of Wachovia for any reason at any time. Our sincere hope is that your employment relationship with Wachovia will be mutually rewarding and satisfactory experience that both of us will want to continue.*

*If, at any time either before or after you begin your employment with our Corporation, we learn of an unsatisfactory result on any of the employment checks, your employment may be immediately terminated.*

Meredith McGough

46

# STARK & STARK
## A PROFESSIONAL CORPORATION

THOMAS B. LEWIS
DIRECT DIAL NUMBER
609-895-7321
DIRECT FAX NUMBER
609-895-7395

*reviewed.*
*G.*
*5/12/03*

ATTORNEYS AT LAW

OFFICE: 993 LENOX DRIVE  LAWRENCEVILLE, NJ  08648-2389
MAILING: PO BOX 5315  PRINCETON, NJ  08543-5315
609-896-9060 (PHONE)  609-896-0629 (FAX)
WWW.STARK-STARK.COM

April 25, 2003

Joseph A. Dougherty, Esq.
RUBIN & ASSOCIATES, P.C.
MCS Bldg.
10 S. Leopard Road
Suite 202
Paoli, PA  19301

> **DEPOSITION EXHIBIT** 4
> *Mitchell*
> *KAH 12/14/07*
> PENGAD 800-631-6989

RE:   Arlene C. Wilson & Kenneth S. Mitchell

Dear Joe:

Enclosed please find a copy of the Settlement Agreement and Release executed by Wachovia Securities, Inc., Arlene Wilson and Kenneth Mitchell.  Please have this document signed by Merrill Lynch and forward to me an executed copy.  I am in receipt of the settlement check which I will forward to your attention upon receipt of the signed Agreement.

Thank you.

Very truly yours,

STARK & STARK
A Professional Corporation

By: _____
   THOMAS B. LEWIS

TBL/nmm
Enclosure
c:   Wachovia Securities
      Attn: R. Stephen Camp, Esq.  (w/encl.)
      Attn: Todd Gauthier (w/encl.)

G:\DOCS\LIT\TBL\WHEATER\.ST\Wilson-Mitchell\Dougherty 04.25.03

## SETTLEMENT AGREEMENT AND RELEASE

NOW, this 15th day of August, 2002, MERRILL LYNCH, PIERCE, FENNER & SMITH INC. ("Merrill Lynch"), on the one hand, and ARLENE C. WILSON ("Wilson"), KENNETH S. MITCHELL ("Mitchell") and WACHOVIA SECURITIES, INC. ("Wachovia"), on the other hand, intending to be legally bound, and in consideration of the mutual covenants and other good and valuable consideration set forth hereinbelow, do hereby agree as follows:

(1)    Payment. Wilson, Mitchell and Wachovia shall pay to Merrill Lynch the sum of One Hundred Fifty Two Thousand Eight Hundred Twelve Dollars and Fifty Cents ($152,812.50). The check shall be made payable to "Merrill Lynch, Pierce, Fenner & Smith Inc." and transmitted to Rubin & Associates, P.C., 10 South Leopard Road, Paoli, Pennsylvania 19301, by no later than September 16, 2002.

(2)    Non-Solicitation of Customers. From 11:00 a.m. E.D.T., Monday, August 12, 2002 through and including 5:00 p.m. E.D.T., Wednesday, August 21, 2002, Wilson and Mitchell agree that they will not, whether directly or indirectly, and whether acting alone or in concert with any third party, including Wachovia, solicit any business or account transfers from, or initiate any contact or communication for purpose of soliciting or discussing any business or account transfers with, any client, customer, or account whom Wilson and/or Mitchell serviced at Merrill Lynch or whose name became known to them during their employment at Merrill Lynch including those customers listed on Schedule "A" attached hereto. This prohibition shall not apply to Wilson and Mitchell's family and relatives.

1

WACH000170

Wilson and Mitchell further agree that from 11:00 a.m. E.D.T. Monday, August 12, 2002 through and including 11:00 a.m. E.D.T. Wednesday, January 1, 2003, Wilson and Mitchell will not, whether directly or indirectly, and whether acting alone or in concert with any third party, including Wachovia, solicit any business or account transfers from, or initiate any contact or communication for purposes of soliciting or discussing any business or account transfers with any client, customer, or account serviced by the Wilson Group at Merrill Lynch under Financial Advisor production number 4033. This prohibition shall not apply to Wilson and Mitchell's family and relatives or to those customers listed on Schedule "A" attached hereto.

(3)    No Solicit for Hire/No Hire.  Wachovia agrees that, from August 12, 2002 through and including May 12, 2004, Wachovia Investor Services Group will not, directly or indirectly, solicit for hire or hire any Merrill Lynch registered employee who is currently employed or employed in the future in any of Merrill Lynch's Delaware offices.

In the event of any violation by Wachovia of this Paragraph 3, Wachovia agrees that it shall pay to Merrill Lynch the sum of $100,000 for each and every such violation (i.e., the first violation of Paragraph 3 would result in a payment of $100,000 to Merrill Lynch by Wachovia; the second such violation would result in Wachovia's payment to Merrill Lynch of an additional $100,000 - - or $200,000 in all; and the third and all subsequent such violations would each result in further additional payments by Wachovia to Merrill Lynch of $100,000 per violation - - or $300,000 or more in all).  As a prerequisite to any such payment by Wachovia, Merrill Lynch shall first provide Wachovia with (a) notification of any violation of this paragraph; and (b) one business day to cure any such violation. The foregoing payments shall be in addition to all of Merrill Lynch's other legal and/or equitable rights, remedies and claims,

2

WACH000171

including, but not limited to, any and all claims for injunctive relief, equitable relief and/or consequential or exemplary damages, etc., all of which are hereby expressly reserved.

    (4)   <u>No Proceedings</u>. The parties represent and warrant that they have filed no claims and know of no claims filed in court, arbitration, or in any other forum between these parties pertaining to the subject matter of this Agreement, and in the event that any such claims do exist, the parties agree to immediately withdraw and dismiss them with prejudice.

    (5)   <u>Mutual Release</u>. Merrill Lynch, on the one hand, and Wilson, Mitchell and Wachovia, on the other hand, hereby mutually release each other, their past, present, and future agents, representatives, shareholders, principals, attorneys, affiliates, parent corporations, subsidiaries, officers, directors, employees, predecessors and successors and heirs, executors and assigns, from any and all legal, equitable or other claims, counterclaims, demands, setoffs, defenses, contracts, accounts, suits, debts, agreements, actions, causes of action, sums of money, reckoning, bonds, bills, specialties, covenants, promises, variances, trespasses, damages, extents, executions, judgments, findings, controversies and disputes, and any past, present or future duties, responsibilities, or obligations, from the beginning of the world to the date hereof, which are now known or unknown and arise out of, or which may, can, or shall arise out of, or which have or ever had arisen out of, or which could have arisen out of, the employment and/or termination of employment of Wilson and Mitchell with Merrill Lynch and their subsequent affiliation with Wachovia, including, without limitation, any and all claims or counterclaims for breach of contract, misappropriation and conversion of trade secrets, interference with contractual and/or prospective relationships, breach of fiduciary duty and duty of loyalty, unfair competition, defamation, libel, slander, wrongful or unlawful discharge, constructive discharge, age discrimination, religious discrimination, gender

3

WACH000172

(16)    Counterparts. If this Agreement is executed in counterparts, each of counterpart shall be deemed an original, and all counterparts so executed shall constitute one Agreement binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the same counterpart.

(17)    Entire Agreement. All agreements, covenants, representations and warranties, express or implied, oral or written, of the parties hereto concerning the subject matter hereof are contained herein. No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other party concerning the subject matter hereof. All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereof are merged herein. This is an Integrated Agreement.

(18)    Past Attorneys' Fees and Costs. Each party shall bear its or his own attorneys' fees and costs incurred through the execution of this Agreement.

(19)    Signatures. The parties hereby signify their agreement to the above terms by their signatures below. Allan Dinkoff, Esquire represents that he is authorized to execute this Agreement on behalf of Merrill Lynch. R. Stephen Camp, Esquire represents that he is authorized to execute this Agreement on behalf of Wachovia. Arlene C. Wilson executes this Agreement on her own behalf and represents that she has read the Agreement, that she has had sufficient time to review this Agreement before signing it, and has had an opportunity to consult with an attorney prior to signing this Agreement. Kenneth S. Mitchell executes this Agreement on his own behalf and represents that he has read the Agreement, that he has had

7

WACH000176

sufficient time to review this Agreement before signing it, and has had an opportunity to

consult with an attorney prior to signing this Agreement.

MERRILL LYNCH, PIERCE, FENNER          WACHOVIA SECURITIES, INC.
& SMITH INC.

By: _____          By: _____
    ALLAN DINKOFF, ESQUIRE                R. STEPHEN CAMP, ESQUIRE
    COUNSEL FOR MERRILL LYNCH,            COUNSEL FOR
    PIERCE, FENNER & SMITH INC.           WACHOVIA SECURITIES, INC.


                                      _____
                                      ARLENE C. WILSON


                                      _____
                                      KENNETH S. MITCHELL



JAD/EAL



8

WACH000177

sufficient time to review this Agreement before signing it, and has had an opportunity to consult with an attorney prior to signing this Agreement.

MERRILL LYNCH, PIERCE, FENNER & SMITH INC.

WACHOVIA SECURITIES, INC.

By: _____
ALLAN DINKOFF, ESQUIRE
COUNSEL FOR MERRILL LYNCH,
PIERCE, FENNER & SMITH INC.

By: _____
R. STEPHEN CAMP, ESQUIRE
COUNSEL FOR
WACHOVIA SECURITIES, INC.

*Arlene C Wilson*
ARLENE C. WILSON

_____
KENNETH S. MITCHELL

JAD/EAL

8

WACH000178

Lynn.

Created 11/17/03

*For Internal Use Only*

## Investment Prospecting and Referral Strategy
## Training Materials

DEPOSITION
EXHIBIT
PENGAD 800-631-6989
Mitchell 6
KAH 12/14/07

### Table of Contents

I.   Team Meeting – to be held in conjunction with Performance 2004 rollout. Led by FSLs and ISG RSMs. Invitees should include: FSs, FAs, FCMs, SBBs.

II.  FS and FA Working Agreement – to be signed and returned

III. Leaders Working Agreement – to be signed and returned

IV.  Q&A document – to be reviewed

V.   Scenarios document – to be reviewed

VI.  Performance Expectations Leader's Guide – to be reviewed

VII. Professional Courtesy Policy – for reference

VIII. Monthly Leader Update – to be completed and turned in on a monthly basis starting 2/29/04.

235

Created 11.??

*For Internal Use Only*

# I. Team Meeting: Investment Prospecting and Referral Strategy

## Topic Overview

*Financial Specialist Leaders (FSLs) and ISG Regional Sales Managers (RSMs) to lead this meeting:*

The purpose of this meeting is to introduce the new Investment Prospecting and Referral Strategy between the Retail Bank and Wachovia Securities.

Upon completion of the team meeting, participants will:
- Understand the strategic business decision for implementing an Investment Prospecting and Referral Strategy
- Understand how the Customer Contact Protocol is to be used going forward
- Sign off on the Investment Prospecting and Referral Working Agreement – which details the process for both Financial Specialists (FS) and Financial Advisors (FA)

## Preparation:
- Invite your entire team (all FSs and FAs) to this meeting
- Be sure to also invite your Financial Center Manager (FCM) and Small Business Banker (SBB)
- Make copies as needed

## Materials Needed:
- A FS/FA Working Agreement –for each FS and FA to sign
- A Leader Working Agreement –for each leader to sign
- Copies of the Q&A document for each meeting attendee
- Copies of the Scenarios document for each meeting attendee
- Copy of the Professional Courtesy Policy (for reference)

| | |
|---|---|
| 1. Introduce Topic | 5 minutes |
| 2. Review Key Points | 10 minutes |
|    o What is the Investment Prospecting and Referral Strategy? | |
|    o What is the Customer Contact Protocol around the strategy? | |
|    o What is expected of you based on this new process? | |
| 3. Discuss the Working Agreement and have team members sign off on the document | 15 minutes |
| 4. Review Performance Management Leader's Guide | 10 minutes |
| **TOTAL MEETING TIME** | **40 minutes** |

236

Created 11/17/03

*For Internal Use Only*

| Time / Hints | Content | 5 minutes |

### Introduction

**Say:** Today we are going to discuss a new Investment Prospecting and Referral Strategy between the Retail Bank and Wachovia Securities.

**Say:** Several of you already have good practices in place for coordinating customer contact with your FA (or FS). The goal of the Investment Prospecting and Referral Strategy is to capitalize on these best practices and have a consistent method for contacting our customers.

Past experiences have shown that when we effectively combine our resources to better service our customers it's a win-win situation. As an example – think of the Privileges and 5STAR programs – both of which are very successful both for the customer and the bank.

The purpose of the Investment Prospecting and Referral Strategy is to:
- Approach the customer in a defined, consistent manner
- Cross-sell investments and deposits/loans
- Better meet and service our customers' needs

In order to accomplish these goals – we are instituting the following guidelines:

**FAs focus on selling to Affluent prospects, and referring prospects and customers without a bank relationship to the FS.**

**FSs focus on selling investments to non-Affluent prospects and referring Affluent customers and prospects to the FA.**

We want to provide our customers access to the appropriate level of investment expertise based on the complexity of their needs. Those customers who have more affluence typically have more complex investment needs – and may be better served by an FA. We want to capture more of our customers' investment dollars, while maintaining and growing deposit balances.

We also want our FSs and FAs to focus their time and energy on their highest potential customers. Therefore, we are working on a long-term solution to provide ongoing, targeted SOLD leads for FSs and FAs. We are still working towards this process. In the interim – we will use a defined **Customer Contact Protocol.**

23

Created 11/17/03

*For Internal Use Only*

## Time / Hints

## Content

*Elicit Responses. Supplement responses as needed to deliver key points (below).*

**Ask:** Who would like to give an example of a working agreement you have with your FA or FS for determining who is on point to contact customers about their investments. *(Allow volunteers to respond – look for good relationships and best practices to highlight later in the meeting.)*

*Leader delivers key points to the group, soliciting response when appropriate, depending on the audience.*

### Review Key Points                              **10 minutes**

**Customer Contact Protocol**
**Say:** The Retail Bank and Wachovia Securities have agreed to a **customer contact protocol** to ensure we match the correct salesperson with our customer based on the customer's level of complexity in their investment needs, as well as grow our corporate wallet share.

*Stress that BOTH job families must adhere to this protocol – and that both the Retail bank and Securities have agreed follow the same process.*

The contact protocol is basically a working agreement between Financial Specialists and Financial Advisors. The key to this contact protocol is defined criteria for determining whether the FS or FA should be the primary caller for proactive outbound calling efforts. We want to be clear that while we are asking for a change in how we proactively prospect for investments, the idea is not one of "limited access" for either job family. Instead – it's "coordinated access" in talking to our customers.

The reason we are doing this is that more affluent customers have more complex investing needs – and we want to offer them the correct level of expertise.

*State the facts of the contact protocol.*

**FSs will begin more formal referrals to the FA of clients who are considered "Affluent".**
We define Affluent customers as those who have $250K in investable assets. These customers will likely have more complex investing needs and may be better served by the expertise of an FA. Therefore the FS should introduce the FA to the customers.

*Ask group if they know criteria for Affluent customers.*

You may not always be able to identify a customer's investable assets – so how do you know when it's appropriate to make an FA introduction? These criteria can be indicators of affluence, and should be used as indicators that an FA introduction is appropriate.

➢ Income > $150K *or*
➢ Brokerage Account > $100K *or*          238
➢ Retirement Account > $50K

Note that these are good examples – but that there are other indicators in addition to these three. We want to ensure there

Created 11:17:01

For Internal Use Only

## Time / Hints

## Content

Stress that coordination and communication are the key. And that FSs are still expected to prospect/refer/sell investments.

Be sure the team understands that while they will introduce customers to the FAs when appropriate – the FAs will be doing the same thing.

We want to keep our FAs from using their valuable time in the mass market – and focus instead on those more profitable customers.

A reminder about small business customers – and bringing in the SBB when needed.

Ask for any questions before passing out the agreements.

Pass out copies of the FS/FA Working Agreement to each person present.

is significant reason to believe a prospect is affluent before any contact is made.

This doesn't mean, of course, that FAs will only talk to Affluent customers or that every customer who is Affluent MUST work with an FA. Nor should FSs stop selling investments – they are still expected to do so. It does mean that FSs should be having conversations with their FA about Affluent customers and making sure their needs are met.

**FAs will direct more referrals to FSs of clients who do not meet any of the above indicators** – suggesting that the customer's investment needs are less complex and therefore should be handled by an FS. This may match the clients to a more appropriate skill set and create time for the FA to focus more on the affluent prospects and their existing customers.

In addition, **FAs will begin referring those customers (regardless of affluence) who do not have a bank relationship to the FS.**

Remember that FAs will uncover customers who are also small business owners and will therefore need to be referred to the Small Business Banker as well. A good way to identify those clients that should be referred to an SBB are:

- Sales up to $3M
- Commercial Deposits of $50M to $250M
- Loans up to $1M

What do the FAs gain from this partnership?
> Increased number of quality prospects with more complex investment needs

What do FSs gain from this partnership?
> Growth in deposit and loan balances from investment customers without a deposit relationship
> Increased number of quality investment prospects

## Working Agreement                    *15 minutes*

**Say:** The Working Agreement more thoroughly details how we will service customers as part of the Investment Prospecting and Referral strategy. Both FSs and FAs are

Created ??

For Internal Use Only

| Time / Hints | Content |
|---|---|
| | accountable for adhering to the information included in the agreement – which we will sign and date as approval at the end of this meeting.<br><br>The agreement includes:<br><br>Customer Contact Protocol - guidelines on how to identify and contact customers going forward.<br><br>Revised Activities – details what we should be doing going forward, and what activities need to be stopped.<br><br>Let's review these documents now.<br>*(Step through the FS/FA agreement with meeting attendees).* |
| Pass out copies of Q&A document. | Say: I'm sure many of you have questions about what we've reviewed so far. Let's go through the Q&A that has been provided, and then we can discuss any additional questions you may have.<br>*(Review Q&A – take any additional questions as needed).* |
| Try to address existing situations that do not follow the suggested protocol and resolve them during the meeting. | Say: Understand that our goal is not to govern every individual instance of FS/FA crossover, but rather to set guidelines on how to better contact our customers – ultimately better serving them and us.<br><br>Certainly, there will be exceptions to these guidelines in our everyday business, and we will deal with those exceptions as needed. Are there any examples of exceptions that you can think of now? |
| Pass out "Scenarios to Avoid" handout and the Professional Courtesy Policy.<br><br>Solicit other scenarios the team might have.<br>*(Probe deeper on FAs moving deposits to investments if that's an issue in your region.)* | Say: Let's review some current scenarios that we are aware of – and how they should be handled going forward.<br><br>Ask: Does anyone have other scenarios that come to mind and ideas on how we might handle them?<br><br>For more details, refer to the Professional Courtesy Policy. |
| Share some of the inspection checks that you will be doing – as detailed in the Leader Working Agreement – so that your team knows what to expect. | Say: Retail Bank and Wachovia Securities leaders are also signing a Working Agreement, which details our role in the Investment referral strategy. |

240

Created 11/17/03

For Internal Use Only

| Time / Hints | Content |
|---|---|
| Review the Performance Management Leader's Guide for additional direction | Leaders will be inquiring about this process on impact calls, during coaching sessions, and in conversations with our brokerage partners.<br><br>**Ask:** Does anyone have any additional questions about the Investment Prospecting and Referral process?<br><br>**Say:** It is the expectation of the Retail Bank and Wachovia Securities that all employees will adhere to the established Customer Contact Protocol that is outlined in this agreement. Continued violation of these processes will result in disciplinary action. |

### Wrap-Up

**Say:** We have all agreed to sign this working agreement, as an indication that we understand and will adhere to the new Investment Prospecting and Referral Strategy.

Both the FS and FA need to sign and date their copy of the working agreement and hand them to your leader. We will make copies and return these to you for reference.

By using these guidelines, we can move towards our goal of the best, most effective service possible for our customer's investment needs.

Thank you for your time today.

241

Created 11.17.00

*For Internal Use Only*

## II. Investment Prospecting and Referral Strategy
## FS/FA Working Agreement

### Expectations

The purpose of this agreement is for the Financial Specialist (FS) and Financial Advisor (FA) to have a mutual understanding of and agree upon the overall Retail Bank – Wachovia Securities Customer Contact Protocol for investments. It is expected that this agreement will be reviewed and agreed upon no later than 01/31/04.

### Target Segment

The FS/FA prospecting and referral protocol targets customers who meet the new segmentation definition of "Affluent"($250K in investable assets), as well as those brokerage customers without a banking relationship. Investable assets include deposits and investments. Suggested indicators for identifying "Affluent" customers are:

- Income greater than $150K/year
- Brokerage account greater than $100K (internal or external)
- Retirement account greater than $50K

Note that these are good examples – but that there may be other indicators in addition to these. Other examples may include where the client lives, large checks to/from other brokerage firms, an unusually large deposit or withdrawal of $75K or higher, significant amount of securities in safe deposit box, etc.)

### Guidelines

- FSs should refer those prospects who have any of the above affluent indicators to FAs.
- FSs should introduce those customers who are affluent to the FA.
- FAs should refer those prospects who do not meet the indicators for Affluence to the FS.
- FAs should introduce those customers without a banking relationship to the FS.

Note that if an affluent customer with an FS has a clear investment need and is ready to buy – then the FS should make the sale and then refer to the FA – and vice versa for an FA with a non-affluent customer.

### Customer Contact Protocol

Prior to initiating a telephone call to a customer identified through a SOLD lead, FSs and FAs need to coordinate to determine who is on point contact what leads. One suggestion is that the FS and FA review the SOLD leads together every month. Or maybe you decide together that the FSL will be responsible for determining who takes what lead. The goal is to coordinate the customer contact.

In addition, the following steps should be completed prior to the call:

- Review all customer level and account level information in Emerald and SOLD to determine the customer's full financial relationship with Wachovia.
- Check SOLD Notes and CDI to determine if customer has outstanding or ongoing sales/service needs which should be addressed in the initial contact.
- Check SOLD Notes, SOLD Client Summary, and the ECA screen in Emerald to determine if the customer has an established relationship with another banker.

242

*For Internal Use Only*

➢ If established relationship exists, contact the banker/FS to discuss the lead and their involvement in contacting the customer.
*Note: Established relationship* is defined as a sale made or a detailed telephone conversation documenting future sales opportunity within the last six months.
  o Based on the existing relationship, it may be more appropriate to transfer the lead to the banker or set up a joint appointment.
  o If an investment relationship exists, refer to Professional Courtesy Policy (Handout #1) governing investment customers.
➢ Detail available Wachovia relationship data on Confidential Financial Profile and review with partner if needed.
*Note:* Customer information must be checked for Wachovia "do not solicit" restrictions on the CRI screen in CIS prior to calling.

## Revised Activities
Based on the Customer Contact Protocol, **the following activities should begin or continue:**

| FS | FA | FSL/ FCM/ ISG RSM |
|---|---|---|
| Ask questions during profiling process to identify customers with investment needs that should be referred to FA (ex: tax issues, retirement, college savings) | Offer Financial Plan for all affluent customers and customers currently assigned to your book | During impact calls, inquire if profiled customers/ prospects meet the suggested Affluent lens and if yes – what the next steps are. |
| Introduce the FA (via joint appointment) to all customers that meet the suggested Affluent criteria | Introduce all clients without a banking relationship to FS | During coaching sessions – look for those customers/ prospects who meet the Affluent lens – has their been an introduction to the FA? |
| For those customers who do not meet these guidelines, but have investment needs, the FS will take the lead and introduce the FA if/when appropriate | Share mass market client book with FS in order to sell bank products | Also in coaching sessions – identify data gathering as it relates to taxes, retirement, college, etc. |
| Coordinate Book of Business activity with FA and agree who is on point for customer contact (refer to Customer Contact Protocol document) | Coordinate Book of Business activity with FS and agree who is on point for customer contact (refer to Customer Contact Protocol document) | Use SOLD (TBRK#) to review the number of referrals made from FS to FA (TBRK) and vice versa using FA bank product information |
| Mandatory update of SOLD notes on each customer that is touched | Mandatory update of SOLD notes on each customer that is touched | Review Book of Business activity to ensure FS and FA are coordinating point of contact. |
| Proactively refer Affluent clients to the FA for Financial Planning advice. | Proactively call and offer Financial Plan for Affluent clients | |
| Notify your leader immediately of any issues that need to be escalated regarding not following these procedures | Notify your leader immediately of any issues that need to be escalated regarding not following these procedures | 243 |

Created 11/17/03

*For Internal Use Only*

In addition, the following activities that you may do today should be **stopped,** based on the Customer Contact Protocol.

| FS | FA | FSL/ FCM/ ISG RSM |
|---|---|---|
| Any undocumented access in SOLD (refer to Customer Contact Protocol document) | Any undocumented access in SOLD (refer to Customer Contact Protocol document) | Encouraging or suggesting moving deposit dollars into investments for the sole purpose of generating an investment sale. |
| Claiming and/or directing leads on a first come-first serve basis (i.e.: arriving very early in the morning before others have a chance to do so) | Claiming and/or directing leads on a first come-first serve basis (i.e.: arriving very early in the morning before others have a chance to do so) | FCM to stop partnering exclusively with FA or LFS. Going forward the FCM will introduce leads directly to the appropriate investment professional based on client/prospect segmentation. |
| Contacting Affluent prospects without first coordinating with the FA. | Calling deposit trigger leads less than $75K **unless** you have researched the customer to validate they are in the target segment and/or have coordinated the customer contact with the FS. | |
| Sorting and calling leads to move deposits dollar for dollar into investments | Sorting and calling leads for the sole purpose of moving deposits dollar for dollar into investments. *(See scenario document; complete Financial Profile to ensure appropriate product sell).* | |

**Determine Process for Referrals**

It is expected that FSs and FAs will work together to develop an appropriate referral process for their clients:

- Face-to-Face:
- Phone
- Email
- Fax
- SOLD/Rumba
- **Other**

244

Created 1176

*For Internal Use Only*

## Confirmation of the Working Agreement:

We have read and reviewed the above Investment Strategy Working Agreement for Financial Specialists/Financial Advisors. We will implement this process as instructed starting 01/31/04.

**FS NAME**_____

**REGION**_____  **DATE**_____

**FA NAME**_____

**REGION**_____  **DATE**_____

**Please return completed template to your leader(s) by 01/31/04.**

245

Created 11 ... 7 - 1

For Internal Use Only

## III. Investment Prospecting and Referral Strategy
### Leader Working Agreement

## Expectations

The purpose of this agreement is for leaders to have a mutual understanding of and agree upon the overall Retail Bank – Wachovia Securities Investment Referral Strategy and Customer Contact Protocol. It is expected that this agreement will be <u>reviewed and agreed upon no later than 01/31/04</u>.

## Target Segment

The FS/FA prospecting and referral protocol targets customers who meet the new segmentation definition of "Affluent"($250K in investable assets), as well as those brokerage customers without a banking relationship. Investable assets include deposits and investments. Suggested indicators for identifying "Affluent" customers are:

- Income greater than $150K/year
- Brokerage account greater than $100K (internal or external)
- Retirement account greater than $50K

Note that these are good examples – but that there may be other indicators in addition to these. Other examples may include where the client lives, large checks to/from other brokerage firms, an unusually large deposit or withdrawal of $75K or higher, significant amount of securities in safe deposit box, etc.)

## Guidelines

- FSs should refer those prospects who have any of the above affluent indicators to FAs.
- FSs should introduce those customers who are affluent to the FA.
- FAs should refer those prospects who do not meet the indicators for Affluence to the FS.
- FAs should introduce those customers without a banking relationship to the FS.

Note that if an affluent customer with an FS has a clear investment need and is ready to buy – then the FS should make the sale and <u>then</u> refer to the FA – and vice versa for an FA with a non-affluent customer.

## Suggested Checklists for Leaders

The success of the customer contact Protocol depends on leadership and their willingness to inspect the procedures around it. The following are suggested tactics to help in tracking the process and progress in your region:

### Financial Specialist Leader

- Review the Customer Contact Protocol with ISG RSM to ensure mutual understanding. <u>Sign agreement and return agreement to your RBD</u>.
- Conduct Team Meeting with entire team to review Investment Prospecting and Referral Strategy and obtain signed agreements from all team members.
- Work with your FCM to ensure below activities are being followed.

*For internal Use Only*

- On impact calls, ask FS if any of their profiled customers/prospects meet the affluent lens (i.e.: Income > $150K or Brokerage > $100K or 401k > $50K)
  - If YES – ask if they have had a conversation with their FA – about the next steps, and what the outcomes are.
- In a coaching session when reviewing profiles – look for customers who fit the affluent lens
  - Ask the FS if they have set an appointment with their FA.
  - If NO – what was the rationale– and did they share that rationale with the FA?
- Also in a coaching session - identify FS's data gathering as it relates to tax issues, retirement and college savings. In this discussion – ask about the customers' unperceived concerns
- During conversations with ISG RSM – ask how many joint appointments they received from their FSs?
  - What was the quality of those joint appointments and what are the next steps?
  - How many introductions/joint appointments has the FA set with their FS?
  - What was the quality of those joint appointments and what are the next steps?
- Closing out the book Session with the FCM
  - Review number of joint appointments or referrals from FS to FA and vice versa
  - Review number of profiles/financial plans completed
  - Determine amount of business generated from the partnership
  - Discuss obstacles/issues encountered during the referral process
  - Discuss next steps to improve upon learnings

<u>Note</u>: Although FAs are not "leaders", they do play a key partnership role with the FSL and should be integral in the review and management process.

**Retail Bank Director**
- Jointly review and sign this agreement with the ISG RSM and return to your RBE.
- Collect signed agreements from your FSLs.
- Meet monthly with your ISG RSM. Suggested activities to review include:
  - Determine amount of business generated from the partnership (INV2, TBRK)
  - Identify best practices – share success
  - Review Customer Contact Protocol to ensure mutual understanding, and confirm that FAs and FSs are following protocols.
  - Review number of joint appointments and/or referrals. Note that referrals (TBRK) **do not** require a joint appointment. Examples of a referral are:
    1) LFS sets an appointment for FA
    2) LFS pre-positions the customer to set an appointment with an FA
    3) LFS sets an appointment and asks the FA to attend for a joint call
    Additionally, only the Registered Representative who makes the presentation of the specific product can receive sales (INVT) vs. referral (TBRK) credit. Just introducing or attending a sales presentation does not warrant INVT.
  - Review number of financial plans done by the FA and number of profiles completed by the FS
- Discuss obstacles/issues encountered during the referral process
- Review with FSLs overall feedback on the referral process; how many appointments are being set, what learnings have they discovered thus far, etc.

247

Creation 11 .7 05

*For Internal Use Only*

> Work with ISG RSM to jointly submit end of month updates to RBEs and ISG Regional Presidents (see template attached).

## ISG Regional Sales Manager

> Jointly review and sign this agreement with the FSL/RBD and return to your ISG Regional President.
> Collect signed agreements from your FAs.
> Meet monthly with your RBD. Suggested activities to review include:
  - Determine amount of business generated from the partnership (INV2, TBRK)
  - Identify best practices – share success
  - Review Customer Contact Protocol to ensure mutual understanding, and confirm that FAs and FSs are following protocols.
  - Review number of joint appointments and/or referrals. Note that referrals (TBRK) **do not** require a joint appointment. Examples of a referral are:
    4) LFS sets an appointment for FA
    5) LFS pre-positions the customer to set an appointment with an FA
    6) LFS sets an appointment and asks the FA to attend for a joint call
    Additionally, only the Registered Representative who makes the presentation of the specific product can receive sales (INVT) vs. referral (TBRK) credit. Just introducing or attending a sales presentation does not warrant INVT.
  - Review number of financial plans done by the FA and number of profiles completed by the FS
> Use SOLD to review performance of appointments and referrals.
> Discuss obstacles/issues encountered during the referral process
> Review with FAs and FSLs overall feedback on the referral process; how many appointments are being set, what learnings have they discovered thus far, etc.
> Coordinate with RBD to submit end of month updates to RBE and ISG Regional Presidents (see template attached).

## Retail Bank Executive

> Collect signed leader agreements from your RBDs by 01/31/04.
> Review amount of business generated with RBDs during monthly meetings
> Discuss obstacles/issues encountered during the referral process
> Coordinate with ISG Regional President to submit end of month updates to Cece Sutton and Tony Saponaro (see template attached)

## ISG Regional President

> Collect signed leader agreements from your RSMs by 01/31/04.
> Review amount of business generated with RSMs during monthly meetings
> Discuss obstacles/issues encountered during the referral process
> Work with RBE to submit monthly updates to Cece Sutton and Tony Saponaro (see template attached).

248

Created 11/17/03

*For Internal Use Only*

## Confirmation of the Working Agreement:

We have read and reviewed the above Investment Strategy Working Agreement for Leaders. We will implement this process as instructed starting 01/31/04.

NAME_____ TITLE_____

REGION_____     DATE_____

NAME_____ TITLE_____

REGION_____     DATE_____

## Please return completed template to your leader(s) by 01/31/04

249

*For Internal Use Only*

# IV. Investment Prospecting and Referral Strategy
## Q&A

**Q:** Why are we creating this process?
**A:** To provide our customers access to the appropriate level of investment expertise base on their needs. And to capture more of our customers' investment dollars, in addition to growing deposit balances.

**Q:** What do we ultimately want to achieve?
**A:** Our goal is to 1) approach the customer in a consistent manner 2) cross-sell investments and deposits/loans and 3) better meet and service are customers' needs.

**Q:** Will there be SOLD leads sent to FSs and FAs?
**A:** Long-term, we want to have targeted SOLD leads for investments and deposits for FSs and FAs. We are still working on this process. In the interim, we will adhere to a leader-led Customer Contact Protocol between FSs and FAs as outlined in the training materials.

**Q:** What does the FA gain from this new strategy?
**A:** This gives the FA the opportunity to focus on the Affluent market and provides an increased number of quality prospects with more complex investment needs.

**Q:** What does the FS gain from this new strategy?
**A:** This allows the FS to grow deposit and loan balances from investment customers without a deposit relationship and provides an increased number of quality prospects from the mass market who have investments needs.

**Q:** What is the definition of an Affluent customer?
**A:** Affluent customers are those who have more than $250,000 in investable assets.

**Q:** How can I tell if a potential customer is Affluent?
**A:** Good indicators of Affluence are:
  ➢ Income > $150K <u>or</u>
  ➢ Brokerage Account > $100K <u>or</u>
  ➢ Retirement Account > $50K
Note that these are good examples – but that there may be other indicators in addition to these. Other examples may include where the client lives, large checks to/from other brokerage firms, an unusually large deposit or withdrawal of $75K or higher, significant amount of securities in safe deposit box, etc.)

**Q:** Is the Affluent lens a trade limit?
**A:** No. It is a possible profile of who might need the help of a Financial Advisor.

**Q:** Does this mean the FS has to give up all existing customers fitting the Affluent lens to an FA?
**A:** No. But the FS does need to introduce existing customers who meet the Affluent lens to the FA in case they have more complex investment needs.

250

Created 11/17/03

*For Internal Use Only*

**Q:** If an FS has an existing relationship with an Affluent client – what should they do?
**A:** They should coordinate a joint appointment with their client and the FA – to introduce the FA and determine if the customer has more complex needs. Often, customers with the Affluent profile have investments elsewhere. Therefore, we have a better chance of winning their investment business by introducing them to an FA.

**Q:** If during a profiling session with a prospect the FS determines the prospect meets the affluent criteria, can the FS still execute the request to buy investments? Or does a referral to the FA have to be made?
**A:** The FS should always handle the prospects' need/request to buy a product. However, the FS should explain the partnership with the FA and make an introduction/ referral, in addition to making the sale.
(Note: the FA should follow the same process if they uncover a prospect that does not meet the Affluent lens. Complete the buy as requested and make a referral/introduction to the FS).

**Q:** Why do we have to sign working agreements?
**A:** They key to this referral process is the FS and FA coordinating who should be the primary contact for outbound calling efforts. In order for the process to be effective, we must ensure that all FSs as well as FAs and their subsequent leadership reviews, understands and commits to making the process work.

**Q:** Whom does the Professional Courtesy policy apply to?
**A:** Since the referrals strategy relies on both retail and brokerage job families to be successful – the Professional Courtesy policy applies to FAs and FSs. A copy of the policy is included in the training materials. You can access the policy online from the LBE/LFS homepage on Infomax in the "Reference" section, or by clicking on the following link:
http://isg-infomax.wachovia.net/LBESALES/Reference/Broker%20LBE%20GuidelinesPost%20Conv0303.pdf

**Q:** What are the consequences if someone does not adhere to the new process?
**A:** The FSL and ISG RSM will review the execution of working agreements monthly. If an FA or FS is not following the agreements, coaching should occur to ensure correct behaviors are being followed. Continuous violations of the working agreements will result in disciplinary action for either the FS or FA.

**Q:** How will we ensure these guidelines and agreements are carried out properly?
**A:** It is the RBD and ISG RSM's responsibility to ensure that there are good partner relationships and to work through any obstacles - which should include coaching, revisiting the agreements as a group, and/or elevating the concerns to the next level of management.

251

Created 11/17/03

*For Internal Use Only*

# V. Investment Prospecting and Referral Strategy
## Scenarios to Avoid

**Scenario 1**
During FS/FA calling labs to reach out to customers about investing with Wachovia. FSs/FAs identify a customer who has a certain deposit amount with Wachovia and asks the customer if they're interested in moving their deposit balance to an investment.
**Do Not**
Use the deposit amount the customer has with Wachovia as a "hook" or the sole reason to move that money dollar for dollar into an investment. Do not use deposits as the criteria for one investment. The customer data drives the call.
**Do**
Use customer segment data as the primary criteria for selecting the customer.  Encourage the customer to come into the financial center for a financial profile to discuss their options.

**Scenario 2**
FA or FS goes into the center very early in the morning to be the first one to claim a lead.
**Do Not**
Contact these customers without coordinating with your FS/FA
**Do**
Follow the Customer Contact Protocol to identify the customer for indication of affluence - use the high level attributes to make sure that the right employee is on point for the out reach to the customer (i.e. – indications of an Affluent customer should go to an FA). Note that these are good examples – but that there may be other indicators in addition to these:
> ➤ Income > $150K *OR*
> ➤ Brokerage Account > $100K *OR*
> ➤ Retirement Account > $50K

**Scenario 3**
An FS has a good relationship with a current customer who is considered "Affluent".
**Do Not**
Keep this customer "for yourself" and/or refrain from introducing an FA.
**Do**
Coordinate with the FA about the customer and discuss if the FS should, in this instance, continue to be the primary contact – or if the customer would be better served by an FA.

**Scenario 4**
FA, or FS sorts the Book of Business Directory for outbound calling based on deposit balance increase, then calls the customer re: dollar for dollar movement from deposit account into investment account.
**Do Not**
Continue the practice of basing these calls solely on customers' balances.
**Do**
Call customer only after identification of market segment, FS relationship and profiling for additional assets.

**Scenario 5**
FA Assistant calls on the financial center's Book of Business customers outside their assigned target "Affluent" market
**Do Not**
Continue the practice of calling on non-Affluent customers without first communication with the FS and checking SOLD or identifying market segment and FS relationship (if any)
**Do**
Change from looking at deposits to looking at the segment criteria. Follow protocol outlined in Customer Contact Protocol document to partner with FS before making calls. If the customer is not considered affluent – coordinate any future contact with the FS.

252

Created 11/17/03

For Internal Use Only

## VI. Investment Prospecting and Referral Strategy
### Performance Expectations Leader's Guide

The new Investment Prospecting Referral Strategy is critical to ensuring that we are providing the appropriate level of service to our customers, while we continue to grow both deposit and investment dollars and increase corporate wallet share. It is the expectation of the Retail Bank and Wachovia Securities that all employees will adhere to the established Customer Contact Protocol that is outlined in the Working Agreement and the Professional Courtesy Policy.

### Performance Management
It is the responsibility of the Retail Bank Directors, Financial Sales Leaders, and ISG Regional Sales Managers to ensure that all Financial Specialists and Financial Advisors understand and are following this process. Leaders are expected to <u>model</u> and <u>support</u> this new strategy and coach employees to exhibit the appropriate activities based on the Customer Contact Protocol.

### Trend Based Coaching
As you review performance with your employees, it is always important to look for and identify trends. If you identify that an employee continuously does not follow the appropriate Investment Prospecting and Referral Protocols outlined in the Working Agreement you should initiate accelerated coaching. During your coaching session clearly communicate to the employee that by not following the appropriate protocols, they are not meeting performance expectations. Make sure you discuss and document the necessary action steps to improve performance.

### Corrective Action
If the employee continues not to follow the established working agreements after accelerated coaching, corrective action may be necessary. This process provides opportunity for and supports improved performance. In any documentation, be sure to clearly outline next steps, expectations and consequences if improvement is not recognized. Our Human Resource Advisor (HRA) department is available to help you work through the corrective action process with your employees.

### <u>Sample Scenarios</u>

#### *Financial Specialists*
Ellen Anderson is a Financial Specialist. She has participated in the Investment Referral Strategy meeting and has signed the appropriate working agreement. In a coaching session her FSL reviews several of Ellen's customer profiles. She determines that the customers should have been introduced to Ellen's FA partner based on the amount of investable assets the customers have. The leader initiates accelerated coaching. She reviews the contact strategy process and working agreements with Ellen to ensure that she clearly understands her expectations. She reminds Ellen that these customers will likely have more complex investing needs that may be better served by her FA partner. Ellen is also reminded that she will not be giving up her relationship with these customers because she will continue to service their bank product needs. The leader also confirms that a sale may be made by the LFS to this type of client. But the introduction to the FA is a necessity. Ellen may be rewarded through shared TBRK

253

*For Internal Use Only*

incentive if she sets up the appointment and a sale is made. Ellen commits to introducing all of her customers who meet the "affluent" lens to her FA partner. The leader documents this coaching session and holds in desk file.

In *the next* follow up coaching session, Ellen's Leader identifies that she has not introduced any of her affluent customers (who meet the criteria) to her FA. The leader moves forward with initial warning and completes the Corrective Action and Counseling Documentation. If Ellen shows no improvement her leader should move forward through the corrective action process.

### Financial Advisor

Randy Richardson is a Financial Advisor. He has participated in the Investment Referral Strategy meeting and has signed the appropriate working agreement. In a coaching session with Randy his leader reviews his portfolio. Randy's ISG RSM identifies several situations where Randy has sorted the Financial Center's Book of Business for outside calling based on deposit balance increase and called non-affluent customers. The ISG RSM initiates accelerated coaching. He reviews the contact strategy process and working agreements with Randy to ensure that he clearly understands his expectations. He reminds Randy that he should stop calling on non-affluent customers and should not call customers based solely on customer's deposit balances. Randy commits to following the protocols outlined in the Working Agreements including calling customer's in his target market and not targeting customers based on deposit balances. Randy's manager documents this coaching session and holds in Randy's desk file.

In *the next* follow up coaching session, Randy's Manager identifies that he continues to not follow the protocols outlined in the working agreement. The leader moves forward with initial warning and completes the Corrective Action and Counseling Documentation. If Randy shows no improvement his manager should move forward through the corrective action process.

254

Created 11/17/03

For Internal Use Only

# VII. PROFESSIONAL COURTESY POLICY

The goal of the policy is to provide the best possible service for our customers by ensuring the opportunity for clients to transact business with their original registered representatives (RR) as well as quickly eliminating any unnecessary impediments from the client executing a transaction when that RR is not available.

As such, it is the policy of WS-ISG that all RR's should ask every client/prospect if they already have a brokerage account with any RR at Wachovia Securities and redirect the client to that FA (or the FA's RBO) if the account already exists. The definition of "brokerage account" not only includes accounts with a position in BETA, but also off-BETA items such as fixed or variable annuities, 401K plans, Trusts referred by the FA, etc.

Checking the system for accounts is useful in this process. To be more specific:

1. **If there are brokerage positions in any brokerage account,** the client should be referred back to the FA of record. This includes cases where clients express "lack of service" or availability by their current rep. The client must be directed back to the original FA or his/her manager who has the option of reassigning the client to another RR in his or her region. If the client wants to trade immediately, see item 3 below.

2. **If there are not brokerage positions in the account and the account is at least 120 days old,** (which often occurs for CAP accounts), any RR may transact in that account and potentially have the account reassigned to him or her. It is up to the new RR to request that their manager change the rep code on the account after the trade – prior contact of the original FA is necessary. Once a trade/position is established, professional courtesy item 1 applies.

   **Notable Exceptions** to item 2 would include a documented ACATs in process, pending IRA rollovers, Trust distributions or other meaningful pending client activity that the original FA established, which should be referred back to the original FA. In no way should this be construed that WSI encourages one FA to interrupt (or take) another FA's account. It is meant only to ensure customers who have not previously established a relationship with a FA be proactively contacted by a WS-ISG FA.

3. If there are specific SOLD notes referring to the recommendation of a Fixed Annuity accompanied by an updated profile on BCPN both dates within the past 60 days, the client should be referred back to the representative who entered the SOLD notes and updated BCPN. As in point #1 above, all clients expressing concerns about "lack of service" or representative availability should be referred back to the original representative or their respective Regional Sales Manager; however, if a client wishes to trade immediately, see point #4 below.

Please note that the preferred policy, though not required for fixed annuities, is for the representative to open a brokerage account.

Created 11/17/03

*For Internal Use Only*

4. Finally, to ensure there are no impediments for a quick transaction by a customer (even in accounts with positions): if a customer requests to execute a suitable, unsolicited order and the original FA or his/her RBO can't be reached quickly, any properly licensed RR should execute the transaction for the customer on behalf of the original FA. Although certainly LBE's open accounts, recommend transactions and establish client relationships, all WS-ISG accounts are assigned to a FA. Therefore account assignment or reassignment is ultimately based on the actions of the FA who is assigned to the account (ACCT screen) and his/her manager.

A $25 nominal transaction fee will be paid to the FA (or LBE) that transacts the unsolicited trade. The fee is paid by the original FA on a monthly basis. It is critical to note that no rep code changes can be made without the original RR's manager's prior approval.

*Violation of the policy may result in loss of commission and further disciplinary action up to and including termination of license from WS-ISG. Strict adherence to the professional courtesy rules helps solidify customer relationships, maintains critical compliance checkpoints and helps deliver world-class customer service.*

**PROSPECTS -** In the case of a prospect that is internal to Wachovia, SOLD is the best source to determine if the prospect may already by working with an investment representative and to get a synopsis of recent customer activity/history. Therefore, all representatives are expected to check SOLD anytime they are working with a customer. If both WS-ISG and WS-PCG are talking to a particular prospect then the prospect must decide which individual FA can better serve his or her needs and open the account accordingly.

**NOTE:** FAs and LBEs are required to document all client activities on SOLD to minimize confusion related to professional courtesy.

256

Created 11/17/03

*For Internal Use Only*

## VIII. Investment Prospecting and Referral Strategy - Monthly Leader Update

**RBDs and ISG RMS** please complete jointly and return to your RBE and ISG Regional President via email on the last day of every month, beginning 2/29/04.

**RBEs and ISG Regional Presidents** please complete jointly and return to <u>Cece Sutton and Tony Saponaro</u> via email at the end every month, beginning February 2004.

Month Ending_____    Date Submitted_____

State _____

|  | | | Circle? Y/N |
|---|---|---|---|
| **Total INV2** | MTD Goal_____ | MTD Actual_____ | |
| | YTD Goal_____ | YTD Actual_____ | |
| **TBRK** | MTD Goal_____ | MTD Actual_____ | |
| | YTD Goal_____ | YTD Actual_____ | |
| **IVFA** | MTD Goal_____ | MTD Actual_____ | |
| | YTD Goal_____ | YTD·Actual_____ | |
| **IVFS** | MTD Goal_____ | MTD Actual_____ | |
| | YTD Goal_____ | YTD Actual_____ | |

Number of Referrals from FS to FA_____    Total Investment Dollars generated_____

What was the quality of these appointments?

Number of Deposit Referrals from FA to FS _____    Total Deposit Dollars generated_____

What was the quality of these appointments?

Number of Loan Referrals from FA to FS _____    Total Loan Dollars generated_____

What was the quality of these appointments?

Do you have any learnings to share based on the current protocol?

Have you encountered any issues based on the current process – either from your team or your partners' team?

Additional Comments:

297

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**Delaware Department of Labor**

| ENTER CHARGE NUMBER | |
|---|---|
| ☐ FEPA | 05020049W |
| ☐ EEOC | 17CA500213 |

and EEOC (if applicable)

**NAME (Indicate Mr., Mrs., Ms)**
Kenneth S. Mitchell

**HOME TELEPHONE NO. (Include Area Code)**
302-275-1363

**STREET ADDRESS**
306 Stonebridge Blvd.

**CITY, STATE AND ZIP CODE**
New Castle DE 19720  NC

**COUNTY**

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)**

**NAME**
Wachovia Securities

**NO. OF EMPLOYEES OR MEMBERS** +100

**TELEPHONE NUMBER (Incl. Area Code)**
302-636-4326

**STREET ADDRESS**
2701 Kirkwood Hwy.

**CITY, STATE AND ZIP CODE**
Wilmington, DE 19805

**NAME**

**TELEPHONE NUMBER (Include Area Code)**

**STREET ADDRESS**

**CITY, STATE AND ZIP CODE**

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

**DATE DISCRIMINATION TOOK PLACE**
**EARLIEST** 12/9/2004
**LATEST** 12/9/2004
☒ CONTINUING ACTION

**THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):**

Jurisdiction: The Charging Party is employed as a Financial Advisor with the Respondent at the Capitol Trail Branch in Wilmington, DE. The Charging Party has worked in this position since August of 2002.

Charging Party's protected class: Race

se employment action: Terms and Conditions

Brief statement of allegations: I was an Investment Advisor for this location. In the past year, I have also been in charge of the Prices Corner Branch. The Regional Sales Manager, Todd Gauthier, came to me one day in November of 2004 and said that he was going to take over operations at Prices Corner. I told Mr. Gauthier I had been running operations out of both locations that were approximately 1/4 mile frome one another and there were no complaints about my performance or abiltiy. We discussed the move, and I told him I again that I disagreed with his decision. At that time he told me that I "was not right" for this location. Then on December 9th, 2004 Mr. Gauthier installed James Meehan (white male) as the Financial Advisor in the Prices Corner branch.

Respondent's explanation: I was told that this branch was not "right for me."

Applicable law(s): Title VII of the Civil Rights Act of 1964 and the Delaware Discrimination in Employment Act, both as amended.

Comparator(s) or other specific reason(s) for alleging discrimination: I feel that the position the Financial Advisor for the Prices Corner location was taken away from me because Mr. Gauthier wanted to put a white male into this location. Because of this move Mr. Gauthier has adversely impacted my ability garner business prospects in that location. I am aware that Mr. Gauthier has offered a white female, Nancy Sorg, Financial Advisor of the Governers Sq. Branch and the Glasgow Branch, the opportunity to hire another Broker Funded Asst. to work in the Glasgow branch. This would enable Ms. Sorg ability to retain contol over her two branches without impacting her ability to retain or cultivate customers. Mr. Gauthier never offered this opportunity to me. As such, my position within the company is placed in jeopardy because of diminished earning potential.

Additional information and verification of these facts are provided by the attached Verification.

☒ I also want this charge filed with the EEOC. I will advise the agencies. if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

**SIGNATURE OF COMPLAINANT**
Kenneth S Mitchell

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

DOL    1-05
        -05

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

DEPOSITION EXHIBIT
Mitchell 7
KAH 12/14/07
PENGAD 800-631-6989

WACH000666

# VERIFICATION
Pursuant to Title 19 Del. C. § 712(c)(1)

State of Delaware )
)  ss:
_NCC_ County )
)

I, _Kenneth S. Mitchell_, swear or affirm that I have read the Charge of Discrimination and that it is true to the best of my knowledge, information and belief.

I further agree to advise the agencies involved if I change my address or telephone number, and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

In addition to the facts set forth in the Charge of Discrimination, I hereby aver the following: (optional; do not include witness information)

16 July 2003 @ 0745 - Phone call from Todd asking me if I remember a joint appointment I had with Ladan Amini, Financial Specialist, Prices Corner branch where I asked her for her A#. I replied yes I do. He then asked if I said to her that because her A# begins with 911 that it was her people (Iranian) who were responsible for the destruction of the WTC buildings in N.Y. To my surprise I said you got to be kidding. He said he was not kidding. I said Todd this is ridiculous. I would never say a thing like that to no one. Besides the people accused of destroying those buildings were of Saudi Arabian & Egyptian descents not Iranian. He said I am going to rec mend they move her out of the PC branch. I asked who is saying that's what I said. He said it was Carol Beam. I asked who told her that's what I said. He stated Carol said that Laddie told her that's what you said to her. He also said that he & Carol has come to talk to me bout it but since he was already at my branch, waiting on Carol to arrive he & Carol would go over the PC branch & talk to Laddie & he would call back later.

_____
Charging Party's Verification Signature

**SWORN TO AND SUBSCRIBED** before me this _1st_ day of _Feb_, 2005.

_____
Notary Public/Attorney at Law

JAMES P. RYAN JR.
Notary Public, State of Delaware
My Commission Expires Oct. 17 2007

6 July 2003 @ 1215 - Todd called said the spoke to Carol + she stated "Ken never said that". He said she was happy + glad to be working together with me and that she wanted to continue working with me and would rather work together with me than with another Financial Advisor. I then said how is it that Carol said that Laddie to her that's what I said and you yourself said that Carol was very emphatic in her statement to you that I did say that to her. I told Todd that I am very suddenly disappointed and hurt by this false accusation. This is not just an outright false accusation but is malicious and I don't feel comfortable in the Prices Corner branch becau- right now at this time because I now feel like somebody is trying to make trouble for me. He stated there was a lot of opportunity in the Prices Corner branch and I should continue working there now that I had been exonerated.

WACH000668



Wachovia Corporation
Human Resources Employee Relations
VA9605
1021 East Cary Street
Richmond, VA 23219



DEPOSITION
EXHIBIT
_Mitchell_
_KAH 12/14/07_



WACHOVIA

February 4, 2005

**VIA CERTIFIED MAIL**
Kenneth S. Mitchell
306 Stonebridge Boulevard
New Castle, Delaware 19720

Re:    **Conclusion of Employee Relations Investigation**

Dear Ken:

I am writing in follow-up to our telephone conversation of January 27, 2005. On that date I attempted to communicate to you the results of our investigation concerning your complaint about your manager's decision not to assign you the Prices Corner branch. After I informed you that my investigation did not reveal any unfair treatment or discrimination and began to communicate my understanding of why you were not assigned the Prices Corner branch, you stated that you did not think what I was saying was true and that you needed to get off the telephone to go to a meeting. Since you had called me and we had not been on the telephone more than a few minutes, I asked that you allow me to finish reporting the results of my investigation and answer any questions that you might have. You indicated that you did not have time for that. I then asked you if we could set up a time to continue our conversation to which you replied that you did not wish to set up a time but would call me back. To date, I have not heard back from you.

The purpose of this letter is to inform you that since our investigation is complete and we have found no evidence of unfair treatment or discrimination, we are closing our file on this matter. I strongly encourage you to follow up with your manager regarding your accounts at Prices Corner as well as current and future branch assignments. It is my hope that you can accept your manager's legitimate business decision to remove you from the Price Corners Branch and continue on with your work here at Wachovia.

Should you have any questions regarding this matter, please do not hesitate to contact me by telephone at 804.697.6894 or email at lorie.helmuth@wachovia.com.

Sincerely,

*Lorie N. Helmuth*        57

Lorie N. Helmuth
Employee Relations Consultant



**Todd Gauthier/CMG/USR/FTU**
02/11/2005 10:37 AM

To  William Keetley/GBG/WACH@WACHOVIA
cc  Kenneth Mitchell/CMG/WACH@WACHOVIA
bcc
Subject  Re: newark and meadowwood

Not sure yet.....want to give ken a couple of options.  he could be a good fit there however.
William Keetley/GBG/WACH

**William Keetley/GBG/WACH**
02/10/2005 01:28 PM

To  Todd Gauthier/CMG/USR/FTU@WACHOVIA
cc
Subject  Re: newark and meadowwood

who will be covering Rodney?  Will this be Ken as well?
Todd Gauthier

**Todd Gauthier**

02/10/2005 02:19 PM

To:   Bill M Wolfe/CMG/WACH@WACHOVIA,
cc:   William Keetley/GBG/WACH@WACHOVIA, Kenneth Mitchell/CMG/WACH@WACHOVIA, Frank
      Consalo/CMG/USR/FTU@WACHOVIA

Subject:  newark and meadowwood

With the resignation of Don Towe please continue to service his branches until ken mitchell returns on
3-1-05

I have intentions of asking ken mitchell to cover one of these two branches.

Todd

DEPOSITION
EXHIBIT 9
Mitchell
KAH 12/14/07
PENGAD 800-631-6989

267

 Todd Gauthier/CMG/USR/FTU

03/08/2005 01:48 PM

To  Kenneth Mitchell/CMG/WACH@WACHOVIA
cc  Frank Consalo/CMG/USR/FTU@WACHOVIA
bcc  Todd Gauthier/CMG/USR/FTU
Subject  meadowood branch

Ken: I hope you consider the meadowood branch. (as discussed it has a significant asset base for you to work and prospect.....and is very close to your current hub). Per my visit this am you prefer not to have any conversations about branches without Frank present (you also requested Tony Saponaro and Dwight Moody.....however they are clearly not likely to discuss branches with an fa typically and I could not commit to their participation).

As always the goal is for each FA to build a comprehensive practice in one branch (potentially even growing to a point that the branch is no longer looked upon as a needed asset.....and moving into a stand alone arrangement within ISG). The addition of the second branch would provide you with additional opportunity to grow your practice and service clients with the knowledge that any relationships created in Meadowood would be retained by yourself as I recruit a full time FA for the branch.

frank: i visited with Ken today to welcome him back from a month away serving on active duty and see if he could give me an indication if he wanted to cover the meadowood branch.

Todd



DEPOSITION
EXHIBIT
Mitchell 10
KAH 12/14/07
PENGAD 800-631-6989

# EXHIBIT D

LADAN AMINI

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

- - -

KENNETH S. MITCHELL,                      :
                                          :
                                          :
        Plaintiff,                        :
                                          : C.A. No. 06-725
        v.                                :
                                          :
WACHOVIA CORPORATION, t/a                 :
    WACHOVIA SECURITIES,                       :
WACHOVIA SECURITIES, L.L.C.,   :
WACHOVIA SERVICES, INC.,       :
WACHOVIA BANK OF DELAWARE,     :
    N.A.,                                       :
TODD D. GAUTHIER,              :
LYNN G. MEYER,                 :
CAROLYN J. BEAM, and           :
DOROTHY A. DIFEBO,             :
                                          :
        Defendants.                       :

- - -

October 23, 2007



- - -


        Deposition of LADAN AMINI, held in the
Law Offices of BIGGS & BATTAGLIA, located at
921 North Orange Street, Wilmington, Delaware,
commencing approximately at 10:00 a.m. on the above
date, before Holly J. Cross, a Registered
Professional Reporter and Notary Public for the
State of Delaware.


KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

LADAN AMINI

```
 1   APPEARANCES:

 2

     BIGGS & BATTAGLIA
 3   BY:   STEVEN F. MONES, ESQUIRE
     921 North Orange Street
 4   Wilmington, DE  19801
     Counsel for Plaintiff
 5

 6   SEYFARTH SHAW, LLP
     BY:  DEVJANI H. MISHRA, ESQUIRE
 7   BY:  TARA S. WILLIAMS, ESQUIRE
     620 Eighth Avenue
 8   New York, NY  10018
     Counsel for Defendants
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LADAN AMINI

Page 5

1      A      Yes.   I'm an employee of Wachovia Bank

2   of Delaware, N.A., and an employee of Wachovia

3   Securities.

4      Q      Okay.   Just for the purposes of this

5   deposition, unless I specifically refer to a

6   different entity, I'm just going to call all the

7   Wachovia companies just Wachovia.

8              You mentioned that you are a financial

9   specialist.   Is that an official title?

10     A      Yes.

11     Q      Are you also an assistant vice

12  president?

13     A      That is correct.

14     Q      Can you describe the relationship

15  between a financial specialist and an assistant

16  vice president of Wachovia?

17             MS. MISHRA:   Object to form.

18             You can answer the question.

19             THE WITNESS:   The assistant vice

20  president, I think, is just a title.   I mean, I

21  work as a financial specialist.   It's just a title.

22  I -- that's all I know.

23  BY MR. MONES:

24     Q      Okay.   Are all financial specialists at

25  Wachovia also assistant vice presidents?

LADAN AMINI

Page 11

1                    MR. MONES:   Okay.   Let's go back.

2    BY MR. MONES:

3        Q        Did you start with Wachovia as a

4    financial specialist?

5        A        No.

6        Q        What did you start as?

7        A        As a teller.

8        Q        At Painters Crossing?

9        A        No, Newark.

10       Q        And how long did you do that?

11       A        About five years.

12       Q        And did you then get a different

13   position?

14       A        Platform position, as a --

15       Q        Platform?

16       A        Yes, which is a customer service

17   representative.

18       Q        And which branch was that?

19       A        Newark.

20       Q        For how long?

21       A        Until 1998 when First Union bought

22   CoreStates.

23       Q        Now, First Union has been part of

24   Wachovia since you started?

25       A        Yes.

LADAN AMINI

Page 12

1       Q       And then they purchased CoreStates at
2  some point in 1998 or so?
3       A       First Union bought CoreStates; and then
4  a couple of years ago, First Union and Wachovia
5  merged.
6       Q       Okay.  So what did you do after customer
7  services at Newark?
8       A       With First Union we had a choice, either
9  to do service or sales; and I was picked for doing
10  the sales as a financial specialist.
11       Q       So a financial specialist is considered
12  part of the sales department at Wachovia?
13       A       Yes.
14       Q       And that would have started when?  About
15  1998 or 1999?
16       A       Yes.
17       Q       Which branch did you start as a
18  financial specialist?
19       A       At Painters Crossing.
20       Q       So you started at Newark, then you went
21  to Painters Crossing as a financial specialist?
22       A       Yes.
23       Q       How long were you there?
24       A       Less than a year.
25       Q       And why did you leave there?

LADAN AMINI

Page 13

1    A        It was too far to drive for me.   It was

2  almost 45 minutes, and I wanted to be in Prices

3  Corner.

4    Q        Did you request the change?

5    A        Yes, from the beginning.

6    Q        And where did you go?

7    A        Prices Corner.

8    Q        And that's where you've been since?

9    A        Yes.

10    Q        So you were there since about 2000?

11    A        '99.  No, it was before 2000.

12    Q        Okay.  Do you cover any branches other

13  than Prices Corner right now?

14    A        No.

15    Q        When you started as a financial

16  specialist at Prices Corner in about '99, did you

17  have any other offices that you covered, or was it

18  always strictly Prices Corner?

19    A        Only Prices Corner.

20    Q        Can you describe the duties of a

21  financial specialist in your own words?

22    A        We do all the banking, which is

23  deposits, loans, servicing customers, anything with

24  the banking -- you know, banking, and then I'll

25  also -- once you become licensed, which is the part

LADAN AMINI

Page 14

1  of it that you have to become licensed to sell

2  securities, and so that's -- you must be both.

3      Q      Can you describe to me the bank itself,

4  Wachovia at Prices Corner?  Is it a typical bank

5  where I could have a savings and checking account?

6  Is it securities?  Is it both?  Is it more?  Can

7  you describe that to me?

8              MS. MISHRA:  Object to the form.

9              You can answer the question.

10 BY MR. MONES:

11     Q      To the extent you understand.

12     A      Okay.  It's a bank.  It's a bank, but I

13 can -- I can also sell securities, but it's -- it's

14 a bank, and right now -- I work with the financial

15 advisor for anything with the investment, and it

16 could be housed in my office in Prices Corner, or

17 it could be housed in another office, like --

18     Q      So if I come in off the street as a

19 potential customer for Wachovia and I want to open

20 a savings account at Prices Corner, I can do that?

21     A      After I ask you a question, which we

22 call it a profiling, just to see -- then I will --

23 then I will start talking about investment and

24 then -- you know, if I -- and I tell them that I

25 have a partner, which is my financial advisor, and

LADAN AMINI

Page 15

1    we -- we can get together and have a joint meeting.

2    Or if it was something that I can do, I will do it,

3    because I have -- I'm licensed so I can do it.

4         Q      Okay.  You just went right into the area

5    that I was going to ask next, which is what a

6    financial advisor does.

7         A      Financial advisor, anything the

8    financial specialist, any -- if I drop a ticket,

9    what we call -- like I do the investment myself,

10   that means I actually take the check and put it in

11   and invest it.  Then the financial advisor has to

12   review it and then -- with the notes that I make on

13   that particular customer, that -- and then we have

14   it all in paper, also.  So then they have to review

15   it, and they have to approve it.

16        Q      So if I'm a customer and I have an

17   account, a savings account, let's say, and I want

18   to diversify my investments, would I talk to you

19   about buying shares in securities or a money market

20   or something like that, or would I talk to the

21   financial advisor or both?

22               MS. MISHRA:  Object to the form.

23               You can answer the question.

24               THE WITNESS:  Okay.  You can talk to me.

25   We are limited to sell what we sell and not to sell

LADAN AMINI

Page 16

1   to -- so it's only a couple of things right now

2   that we can sell.  I personally ask -- I mean, I

3   used to do it myself and I see it's right for the

4   customer, but since -- I just call my financial

5   advisor and make an appointment, and then we do it

6   like a joint meeting.

7   BY MR. MONES:

8       Q      Okay.  So would it be fair to say that a

9   financial advisor has more ability to trade in

10  securities than a financial specialist?

11      A      Absolutely, because they have more

12  variety to sell than the financial specialist.

13  What it is is like if there's 10 different

14  annuities, I can sell one or two, which a financial

15  advisor can sell a variety, different.

16             Now, if I think that that is right for

17  the customer, I can -- I can do that.  I am

18  licensed; and if I feel comfortable and if I have

19  all the information, yes, I can do that.

20      Q      Just to make sure I'm clear about this,

21  when you say, for example, that Wachovia offers 10

22  different annuities and you can sell two, is it

23  Wachovia that authorizes you to sell only two, or

24  is it the SEC or other regulatory body?

25      A      We have to be -- for each product, we

LADAN AMINI

Page 22

1    financial advisor; is that correct?

2                   MS. MISHRA:  Object to the form.

3                   You can answer.

4    BY MR. MONES:

5         Q       This is your understanding.

6         A       Okay.  Could you repeat that?

7         Q       Sure.  Are you familiar with the term

8    "chain of command"?

9         A       No.

10        Q       Okay.  What I'm looking at is the path

11   that would exist between you to your supervisor to

12   that person's supervisor versus a financial

13   advisor's supervisor and above.  In other words, if

14   you work in Prices Corner and there is a financial

15   advisor there, do you both report to the same

16   person, or do you report to different people?

17        A       To different people.

18        Q       Okay.  Are there two different sides or

19   two different entities that you each refer to?

20   Departments or however you would want to

21   characterize it.

22        A       Well, Wachovia Securities and Wachovia

23   Bank.

24        Q       You're Wachovia Bank?

25        A       Yes.

LADAN AMINI

Page 23

1              MS. MISHRA:  Objection.

2              THE WITNESS:  I report to my leader,

3    which is Wachovia Bank.  I don't report to Wachovia

4    Securities.

5    BY MR. MONES:

6         Q      What is the title of the person above

7    you?

8         A      Financial specialist lead -- I'm sorry.

9    FS leader, Financial Sales Leader -- sales leader,

10   they call it, yes, sales leader, FSL.

11        Q      Who is your sales leader at this time?

12        A      Yashika Mabry.

13        Q      I think you're going to have help me

14   spell that.

15        A      It's Y-A-S-H-I-K-A; last name is -- I'm

16   not -- I always have difficulty to say her last

17   name.  M-A-B-R-Y, Mabry, yes.

18        Q      She's your direct supervisor?

19        A      That is correct.

20        Q      Where is she located?

21        A      They really don't have a particular

22   office.  They have so many branches under them.  We

23   usually e-mail and a cell phone.

24        Q      Do you know how many branches Ms. Mabry

25   is responsible for?

LADAN AMINI

```
 1        A       All the tellers and their supervisors,

 2   they report to her.  She's the branch manager.

 3        Q       What interaction do you have with the

 4   financial center manager as a financial specialist?

 5        A       She refers customers to me.

 6        Q       Okay.  Does the financial center

 7   manager -- I'll call that the manager position to

 8   be shorter.  Does the manager have any direct

 9   supervisory control over you?

10        A       No.

11        Q       Does the manager have any direct

12   supervisory control over the financial advisor?

13        A       No.

14        Q       Do you know who Ms. DiFebo reported to?

15        A       Right now, Gerri -- Gerri Dougherty.

16        Q       Gerri Dougherty?

17        A       Yes.  She's a sales -- a service leader.

18   Mine is a sales leader and hers is a service

19   leader.

20        Q       So correct me if I'm wrong, but there

21   appear to be three chains of command that we've

22   talked about so far, if I can refer to it as that.

23   There's the financial advisor, who is in the

24   securities department; there's the financial

25   specialist, who reports to the sales leader; and
```

LADAN AMINI

Page 31

1    Q    So if you bring in a large customer with

2  a lot of assets or do a lot of trading and your

3  numbers are high that month, you still get just

4  your base salary?

5    A    I get -- if that customer does

6  anything -- anything financial advisor does, yes, I

7  get the commission plus my salary.

8    Q    Okay.  So you get a salary for doing

9  your work as a financial specialist, but you also

10  get a commission for what a financial advisor does?

11    A    That is correct.

12    Q    And that's based upon if you refer the

13  customer to the financial advisor?

14    A    If I refer or if I do it myself.

15    Q    So it would be in your financial

16  interest to, if possible, refer somebody to a

17  financial advisor to do some trading?

18    A    If I do it myself -- and I don't know

19  the numbers.  If I do it myself, what we call it,

20  there is more -- I get more pay than when it's

21  referred, but I get paid either way, commission.

22    Q    So you get a higher commission if you

23  actually do the trading or the investment yourself?

24    A    That's correct.

25    Q    Okay.  You touched upon this briefly,

LADAN AMINI

Page 59

1   have -- you know, working for him, my new financial

2   advisor.

3   BY MR. MONES:

4        Q       When Mr. Mitchell first started working

5   at Prices Corner, was that his exclusive branch, or

6   was he splitting time between several branches?

7        A       He had two branches, Capitol Trail and

8   Prices Corner.

9        Q       Where was the Capitol Trail branch

10  located?

11       A       About a mile across from the Prices

12  Corner office.

13       Q       Right down Kirkwood Highway?

14       A       Yes, both on Kirkwood Highway.  We are

15  in a shopping center, but they are not.

16       Q       Are you near a Sears?

17       A       Yes.

18       Q       What would be a business that's near

19  where the Capitol Trail bank was?

20               MS. MISHRA:  Objection.

21               You can answer.

22  BY MR. MONES:

23       Q       I'm just trying to pin down its

24  location.

25       A       What other businesses --

LADAN AMINI

Page 61

1              You can answer.

2              THE WITNESS:  I don't know.  I don't

3    know what you mean.

4    BY MR. MONES:

5         Q      Okay.  Would you describe Mr. Mitchell,

6    when you first met him, as being easy going or more

7    of a no-nonsense type?

8              MS. MISHRA:  Objection.

9              You can answer.

10             THE WITNESS:  At the beginning it was

11   very -- I mean good, very good.  I mean, there was

12   no problem.  It was very good.  I mean, we were

13   partners.  We had to be partners.

14   BY MR. MONES:

15        Q      Okay.  How often did you confer with

16   Mr. Mitchell in the beginning?

17        A      His base office was Capitol Trail, and

18   he would only come to our office if I had an

19   appointment for him.

20        Q      Do you know approximately how often that

21   would be?  Was it once a day?  Once or twice a

22   week?  More often?

23        A      No.  It could be maybe -- it varied.  It

24   could be only one in one month, or it could be just

25   for the review.  I mean, I -- I'm just looking for

LADAN AMINI

Page 63

1                    THE WITNESS:  Just business.

2    BY MR. MONES:

3        Q        Okay.  Did you ever go out to lunch or

4    talk about anything else or just business?

5        A        Just business.

6        Q        Did the two of you ever discuss how best

7    to foster the relationship between financial

8    specialist and financial advisor?

9        A        Not until the incident came.

10        Q        Okay.

11        A        So I was just doing what I -- how I used

12    to work with my other financial advisors.

13        Q        Did you do anything differently with

14    Mr. Mitchell in the beginning than you did with any

15    of the others?

16        A        No, no.

17        Q        Okay.  Do you remember a Wachovia

18    customer named Mr. Herrman?

19        A        Yes.

20        Q        What was Mr. Herrman's first name?

21        A        Richard.

22        Q        Do you know how to spell the last name

23    Herrman?

24        A        I'm not a good speller.  I think --

25    there must be two Ns or two Rs in between.  I'm not

LADAN AMINI

Page 64

1  sure.

2      Q      Do you know what kind of accounts

3  Mr. Herrman had at Wachovia Prices Corner?

4      A      At that time he only had a -- several

5  deposit accounts with a large amount of money.

6  We're talking with five grand, around that.

7      Q      Okay.

8      A      500,000 maybe on that.

9      Q      500,000?

10     A      And plus one annuity, that's all he had

11 with us, that I had done that annuity for him.

12     Q      How long had you been working with

13 Mr. Herrman?

14     A      The whole time that I was -- when I

15 started with Prices Corner, there were two

16 financial specialists at that time, and -- you

17 know, sometimes the customer will pick one person,

18 and he used to come to me and I was -- you know, he

19 had just lost a wife, and he was an elderly

20 gentleman; and he would just come and talk.

21             And I know the other financial

22 specialist had tried many times to make the

23 relation, but didn't -- he couldn't, and then -- so

24 we had just -- you know, coming in.  I was always

25 taking care of his account and --

LADAN AMINI

Page 65

1      Q      So he was an existing customer when you

2  came there, and he liked you and did work with you?

3      A      That's correct.

4      Q      Do you remember sometime around June

5  2003 a meeting between Mr. Herrman and you and

6  Mr. Mitchell?

7      A      I don't recall the date and the time,

8  but -- but, yes, we had a meeting with Mr. Herrman

9  and Ken, yes.

10     Q      Was Mr. Herrman upset about something?

11     A      Well, we had a meeting before that, to

12  introduce -- you know, we had a meeting and -- Ken

13  did -- after we talked together and, you know, a

14  joint meeting, Ken did -- I believe it was $50,000

15  in a mutual fund for him, and -- and then bought

16  maybe -- I guess a week or so, Mr. Herrman called

17  and said that he got fees. And I can't remember if

18  we had the meeting or at that time I called Ken.

19  And he was extremely upset of the fee.

20              And what it was, when we do a -- buy a

21  security or sell a security, there is a $6 fee.

22  And he was very upset, and he just -- why he even

23  got this paper, that there's a fee, because

24  Wachovia Securities asked to send a confirmation.

25  And he came to me and he wanted me to waive it.

LADAN AMINI

Page 66

1        Q        What did you say?

2        A        I told him that any bank fees, I can

3    waive.  Any security fees is when I have to call

4    Ken or the financial advisor.  And, again, I don't

5    recall if we had a joint meeting or -- I believe

6    Mr. Herrman came for that fee, so I called Ken, and

7    Ken was not far.

8        Q        Mr. Herrman actually came to the branch

9    to see you about the $6 fee?

10        A        That's right.

11        Q        Okay.

12        A        And I said any fees with the securities,

13    I or we call, as a financial specialist, we call --

14    that's the first person we -- the financial

15    advisor, and we get them involved, so I called Ken,

16    and Ken came.

17        Q        And what happened then?

18        A        And this gentleman was very upset, and

19    he said, "I got this fee, and you're going to waive

20    it."

21                And if I recall, Ken asked me if I can

22    waive it.  And I said I can't waive it because it's

23    not banking.  I can't waive a security.  So then he

24    told Mr. Herrman that if he waives this, it's like

25    money from his pocket.  He has to pay for it,

LADAN AMINI

Page 67

1    something like that.

2              And Mr. Herrman was very upset.  I can't

3    remember what he said, but he was absolutely, "You

4    got to get this done."

5              So then Ken put his hand in his pocket,

6    and I just looked at him and I just said no, no,

7    no.  Mr. Herrman is looking at Ken.  Ken is just

8    standing, so he couldn't see me.  And I'm just

9    like -- (indicating).

10       Q      You're waving your hands.  Just because

11   that won't show up in the transcript, it looks like

12   you're waving your hands in front of your face,

13   back and forth?

14       A      I was just saying that, no, that

15   don't -- like it's -- I was trying to tell him that

16   you can't give cash to a customer.

17              I mean, in the banking world, we are not

18   allowed to give money to a customer to take.  And

19   they say if you give money, that means you can take

20   money.  This is in the banking world.  If the

21   teller is short, it's short.  If it's over, it's

22   over.  That's how it is.  You don't -- you know, we

23   don't put this for that.  It's a no, no, no.

24   That's how I've been -- learned with, so --

25              And he took a $5 bill and a dollar bill

LADAN AMINI

Page 68

1    and gave it to Mr. Herrman, and Mr. Herrman pushed

2    it back to him.  He said, "Take your money.  I

3    don't want your money."

4         Q       Is it your belief that Mr. Mitchell had

5    the authority as an FA to waive that fee?

6         A       Yes.  He could go to his superior and --

7         Q       And you didn't -- as a financial

8    specialist, you didn't have the authority?

9         A       I have to go to my financial advisor.  I

10   do not call his boss.  I have to go to my financial

11   advisor.

12        Q       Were any other Wachovia employees

13   brought into that situation?

14        A       What do you mean by that?

15        Q       Well, there were three people present at

16   that meeting:  Mr. Herrman, you, and Mr. Mitchell.

17        A       That's right.

18        Q       At some point were other Wachovia people

19   involved in that?

20        A       You mean later on?

21        Q       Yes.

22        A       Well, when that was brought up -- I

23   mean, I -- I didn't talk about that, because I just

24   didn't want -- it was something done.  It wasn't

25   right, and I just -- I just -- I didn't want to

LADAN AMINI

Page 72

1    anybody else at the branch about it?

2        A        No.

3        Q        Okay.  Would you say that that's the

4    first time that you and Mr. Mitchell had some kind

5    of falling out?

6                MS. MISHRA:  Objection.

7                You can answer the question.

8                THE WITNESS:  No, it was not -- this

9    wasn't the first time.

10   BY MR. MONES:

11       Q        You just shook your head and you said

12   no.  Can you tell me other times when you had some

13   problems with Mr. Mitchell before the $6 incident?

14       A        Well, there was really no problem until

15   I did an annuity for that Mr. Herrman, and it was a

16   $100,000 annuity I did myself, which I had done it

17   before for Mr. Herrman, when Mr. Duffy was my

18   financial advisor.

19               And with working with all those

20   financial advisors, I would do the sale -- like,

21   you know, talking to the customer and get the

22   complete profile, and then make the calculation and

23   all that, and see if this is right for the customer

24   making the investment.

25               And then I would send an e-mail to my

LADAN AMINI

Page 73

1   financial advisor with the customer's name and

2   social, and what is their income, what is the total

3   of cash assets or assets, you know, and what is --

4   you know, I -- if they have an investment and how

5   much of an investment I did for them.  And then the

6   financial advisor will normally review that, review

7   the file.

8              Sometimes like Dave Rash would call me

9   and say, "Laddie, tell me more about it."  And I

10  will tell him, you know, if that e-mail wasn't

11  clear enough.  And then they would say the trade is

12  approved, and that would go through.

13       Q     I'm trying to go back to what question I

14  asked.  It was about whether you had had any

15  problems with Mr. Mitchell before the $6 incident.

16  You were talking just now about trading and so

17  forth.  Was there a particular problem with what

18  Mr. Mitchell was doing?  Maybe I didn't understand

19  your answer.

20       A     Okay.  This is how it was.  So what I

21  did, I did $100,000 for Mr. Herrman, and I did the

22  same thing that I had done with my other financial

23  advisors.  This was the first trade that I did

24  myself since he's my advisor.  So I send an e-mail,

25  and then he had never said how he would like me to

LADAN AMINI

Page 74

1    do it.  I mean, I would just refer and he will do

2    it and we're all very happy.

3                So I did the annuity and I sent the

4    e-mail to Mr. Mitchell, and I said that would you

5    please, you know, review this and -- and then the

6    past few days, four or five days, and I get an

7    e-mail from our compliances, which was Susan

8    Schwartz.  And that e-mail goes -- normally they

9    send it to me, to the financial advisor, Ken

10   Mitchell, to Ken's boss, which was Todd, and to my

11   boss, which is Carolyn Beam.  I don't know who else

12   went, but these I remember and I know.

13                And they wanted to know that -- why Ken

14   didn't put notes, and now they want to investigate

15   to see what's going on.  And usually -- to me, it's

16   not good.  When you get something from compliances,

17   it's like you did something wrong and you better --

18   you know, so --

19        Q        Are you saying that Mr. Mitchell did

20   something that instigated the letter from

21   compliance?

22        A        No, no.  This came, and when this comes,

23   that means the financial advisor has not reviewed

24   or put anything on this trade.

25        Q        Did he have to okay your trades?

LADAN AMINI

Page 75

1       A       Yes.  All my trades, all the financial

2  specialists' trades must have an okay from the

3  financial advisor.

4       Q       Mr. Rash and Mr. Duffy had routinely

5  done that before?

6       A       Yes.

7       Q       And this was your first trade with

8  Mr. Mitchell and it was a $100,000 annuity for

9  Mr. Herrman, and Mr. Mitchell had not okayed it?

10      A       He never put anything on it, yes.  He

11  never okayed it.  He never put any notes on it, or

12  he did not approve the trade.

13      Q       Did he reject it?

14      A       Well, the next thing was that my boss

15  called and said, "What is happening?"

16              I said, "I don't know.  Ken didn't

17  approve it."

18              Now, that's all I know.  And the next

19  thing -- I guess, Carol called, if I recall that,

20  or Todd called.  I don't know that.  I really don't

21  know who called who.  What I remember -- and, as I

22  said, it's four years ago, three years ago -- what

23  I remember, Carol called and said -- and now it's a

24  week, it's not -- no notes, nothing on it.

25              Carol said, "I'm coming with Ken to see

LADAN AMINI

Page 76

1  you."

2          And they both came, and -- just to see

3  why he's not putting notes, why he doesn't approve

4  my trade.

5      Q      Was it more than one or just the one

6  trade?

7      A      Just the first one, the very first one.

8      Q      What did Mr. Mitchell say?

9      A      He would like -- he would like it that I

10  had called him and I had brought him in the

11  meeting, and I told him I didn't know what his

12  style was until then.  I just did it the way I had

13  with my other financial advisors, and I never had a

14  problem that one of them didn't approve my trade,

15  and so I just followed the same thing.

16          It was a fixed annuity, which is very

17  safe.  Mr. Herrman is a very wealthy customer,

18  so -- and this was helping, because it's a

19  tax-deferred annuity.  It was helping.  And I had

20  done one when -- during Ed Duffy.

21          And Ed Duffy called and said, "You go

22  ahead.  You do it yourself."

23          And so I did the same thing the second

24  time and -- so he didn't approve.

25          And so I told him, "I didn't know your

LADAN AMINI

Page 86

```
 1       A      I did the sale, and then I sent the

 2  e-mail that, "Would you please approve this?  I

 3  added to the existing 3,000 and 5,000."

 4              And I got a call in the morning and that

 5  was Ken.

 6              And I said, "Ken, you didn't approve my

 7  trade?"

 8              And he said, "No, I'm not."

 9              I said, "Why?  It's only 3,000 and

10  5,000."

11              And he said -- I think this is how he

12  started -- "Do you go to court?"

13              I said, "Do I go to court?  For what?"

14              And he said, "Do you go to court and say

15  why you invest this money for the customer, because

16  you have to protect the customer?"

17              I said, "I made a calculation," and --

18  and then I said, "Well, if you don't approve it,

19  then it goes to compliances," and you're not

20  supposed to get anything from compliances.

21              And then he said, "No, I'm not approving

22  it."

23              I said, "You're not approving it?"

24              And he said, "No."

25       Q      Did he say why?
```

LADAN AMINI

Page 87

1        A        He said, "No, I'm not approving it."

2        Q        But did he say why he wasn't approving

3    it?

4        A        Well, I guess -- my understanding was he

5    was saying that I shouldn't, and I put more money

6    from the customer than what it is.  But he never

7    asked to come to see.

8                 He never offered to, "Should I come and

9    see?  What is it?  Let me see."

10                We're five minutes from here.

11       Q        Was he the FA on the account?

12       A        That's correct.  He was my FA.  No one

13   else would do it.

14       Q        So he could pull up on the computer and

15   see exactly what the breakdown of securities and

16   investments was for this person?

17       A        Okay.  The money outside of Wachovia, we

18   have it all in that paper.

19       Q        I'm not certain -- what do you mean,

20   "outside of Wachovia"?

21       A        Okay.  If you have money with WSFS, so I

22   would put it in the profile.  I don't know if those

23   times they could actually go to -- but I'm sure

24   they could go from the annuity, because we would

25   send a copy of this, so I don't know if that point

LADAN AMINI

Page 88

1  he had looked at something or -- I don't know, but

2  I remember that he called and he said he won't

3  approve it.

4       Q       I'm not sure you've answered the

5  question of what he said was the reason why he

6  specifically disapproved the transaction.

7       A       That I put -- he -- my understanding was

8  that he's saying that the calculation was wrong.

9       Q       Okay.

10      A       And I shouldn't do this investment.

11      Q       Did you go over the figures with him?

12      A       He just said that, and that was good-bye

13  and finished.

14      Q       What happened?  Did compliances get

15  involved?

16      A       I was very upset.  I was very upset for

17  such a small amount, after so many long times, that

18  he can't -- he won't even think I can do that.  I

19  mean, I was -- so I -- I really got very panicked

20  of just saying, you know, who goes to court and now

21  who goes to compliances and just very upset of what

22  did I do wrong.

23      Q       Did compliance get involved?

24      A       After that, yes, they got.

25      Q       What did they do?

Karasch & Associates
800-621-5689

LADAN AMINI

Page 89

1      A      They approved it.  It was approved.  Ken

2  never approved it.  They approved it.

3      Q      Maybe it's just because I don't know the

4  procedure within Wachovia, but the compliance is a

5  group that oversees or reviews, what, questionable

6  trades or all trades?

7              MS. MISHRA:  Objection.

8              You can answer.

9  BY MR. MONES:

10     Q      Your understanding.

11     A      Anything I do, yeah, they review all the

12  trades for financial specialists.  I don't know

13  about the financial advisors' work.

14     Q      Just to be sure I understand where we're

15  going on this, if I'm a compliance person at

16  Wachovia, do I get a printout of all of your trades

17  with a list of those that are approved by the FA

18  and those that are not, or what would I look at?

19     A      I don't know how the system is set up.

20  Is it when we send the paper or we have -- or the

21  computer.  Every trade that is done, they get a

22  sign or something that the trade is done, and then

23  they check the trade to make sure that all the

24  notes are there and my explanation is there and

25  then my financial advisor's explanation.  Because

LADAN AMINI

Page 94

1  through this, because it was sitting.  And then --

2  I mean, I knew that there's a lot of talks and back

3  and forth and --

4        Q      When compliance gets involved in a

5  transaction, how long does it typically take to

6  resolve?

7                MS. MISHRA:  Objection.

8                You can answer.

9                THE WITNESS:  As soon as they send an

10  e-mail, you know, which is usually a couple of

11  days, they send an e-mail to all these people, and

12  it had happened another time that -- I think it was

13  with -- it was with Ken, actually, but it's like if

14  you forgot.

15                And I called him and I said, "Ken, I got

16  the e-mail."

17                And he said, "Yeah, I got it, too,

18  Laddie.  Don't worry.  I'm going to put the notes

19  on there."

20                It was a different transaction.

21  BY MR. MONES:

22        Q      In this situation, after Lynn Meyer and

23  Tom Klein came to your office, did you get any

24  calls or e-mails from compliance?

25        A      No, just that -- I never got anything

LADAN AMINI

1   and how, but he got involved, too.

2        Q        Did you patch things up with

3   Mr. Mitchell and continue to send him referrals?

4        A        Absolutely.  It was -- I mean, he was

5   still my financial advisor, and I had my goal.

6        Q        Were you working with any other

7   financial advisor at that time?

8        A        No, just that -- as I said, Dave Rash,

9   which is -- it's now, what, four, five years.  We

10  have three or four customers that everybody knows,

11  and once in a while we have our appointment with

12  him.

13       Q        Did you ever talk to Ken Mitchell about

14  this situation and letting him know your feelings

15  about what happened?

16       A        After that telephone, no, but I can't

17  remember when it was after that time that -- you

18  know, I will still call him and say I set up an

19  appointment and I will meet him here or I will send

20  an e-mail with the appointment.

21       Q        Now, when Ken called you -- or did you

22  call --

23       A        He called.

24       Q        He called you, and he was at Capitol

25  Trail?

LADAN AMINI

Page 99

```
 1        A       Uh-huh.

 2                MS. MISHRA:  You have to say yes or no.

 3                THE WITNESS:  Yes.  I'm sorry.

 4   BY MR. MONES:

 5        Q       Okay.  And that was less than a mile

 6   away?

 7        A       That is correct.

 8        Q       Did the two of you specifically discuss

 9   this incident and how to resolve it?

10        A       Just that he said he will not approve

11   it.

12        Q       I'm talking about in the days or weeks

13   after this.  Did you talk about this incident in --

14        A       No.

15        Q       No?

16        A       Not in this, no.

17        Q       Okay.  At this time, which is June of

18   2003, how often was Ken Mitchell at Prices Corner,

19   just roughly?

20        A       He would only come by appointment.

21        Q       Did you call him and tell him, "Would

22   you come in so I can talk to you about this

23   situation"?

24        A       No.

25        Q       Did you ask him about your authority,
```

Karasch & Associates
800-621-5689

Page 102

1  incident that occurred -- and I'm going to refer to

2  as the 9/11 incident, for want of a better

3  expression.  You're smiling.  You know what this is

4  going to be about, too.

5          Did you ever tell anyone that

6  Mr. Mitchell made a disparaging remark about your

7  nationality with some kind of reference to the 9/11

8  terrorist incident?

9          MS. MISHRA:  Object to the form.

10          You can answer the question.

11          THE WITNESS:  No, I told Dorothy and --

12  I don't know if I told directly to Todd or -- I

13  can't remember, but, yes.

14  BY MR. MONES:

15      Q    What happened?

16      A    I think he was -- he was doing a trade

17  from the referral I had sent to him.  So he called

18  over the phone to ask for my employee number, and

19  my employee number starts with 911957.  This is my

20  employee number.

21      Q    911957?

22      A    That's my employee number with Wachovia

23  Bank, yes.  So I said -- oh, he said, "Yeah, we did

24  the trade, and now give me your employee number so

25  I can put it in so you can get a referral."

LADAN AMINI

Page 103

1          So I said 911, and he said, "911 and

2   September 11th."

3          And I said -- and, of course, you know

4   as being Iranian, it's just -- you don't want to

5   hear that at all.  This is -- for me, it's very --

6          And I turn around, and I said, "None of

7   those people were Iranian.  They were Arab."

8          That's my response, and then -- if I

9   don't -- if I recall it, I think he said, "Oh, just

10  joking."

11     Q     What exactly did Ken Mitchell say?

12     A     I said 911, and I was going to 957, and

13  he said, "Oh, 911 and September 11th," which to me

14  was relating that to that, and that was not -- not

15  from my coworker, something that is so important --

16  I mean, it's --

17     Q     He didn't say anything else other than,

18  "Oh, 911 is September 11th"?

19     A     That's right.

20     Q     Did he use the word Iran or say Iranian?

21     A     Nothing, nothing, that was -- that was

22  the word.

23          And I said, "None of those people were

24  Iranian.  They were Arab."

25          And, of course, I was very upset, just

LADAN AMINI

Page 104

```
 1   don't -- you know, that was a big tragedy and -- I

 2   mean, I don't know now what's going on today, but

 3   at that time no Iranian wanted to be any of those

 4   people.

 5        Q      Okay.  What did Ken say after that?

 6        A      Joking, just laugh and was joking, I

 7   guess.

 8        Q      Okay.  Who did you tell about that?

 9        A      As I said, I know I told Dorothy, and

10   I --

11        Q      Why?

12        A      Why I told her?

13        Q      Why did you tell her --

14        A      When you're upset and you're working

15   and -- I mean, I -- if anybody else had told me, I

16   would tell her.  If the customer would say it, I

17   would say it.  Anyone, I would just -- I

18   couldn't -- I couldn't accept it from my coworkers.

19   My coworkers, they know that I'm Iranian, and I'm

20   sensitive, you know.

21        Q      Did you understand Mr. Mitchell to be

22   making some kind of disparaging remark about you

23   being Iranian?

24        A      No.

25               MS. MISHRA:  Object to the form.
```

Karasch & Associates
800-621-5689

LADAN AMINI

Page 123

1   is no.  Either he doesn't like me or he doesn't --

2        Q      Well, the branch was taken away from

3   Mr. Mitchell in December 2004, which is a year and

4   a half after your incident with the trades.  During

5   that year and a half, you continued to work with

6   him; right?

7        A      Yes, but, you know, he left.  In between

8   there was -- I had Ed Duffy.

9        Q      Well, you said you had Ed Duffy for

10  three months, two to three months.

11       A      In between; and then after that, yes, I

12  was still trying to work with him.

13       Q      Did you have any more incidents where he

14  disallowed your trades?

15       A      From that time until today, I stopped.

16  I mean, this is how -- I lost all my confidence.  I

17  didn't want to get again with another financial

18  advisor to what I went through, and that's it.  I

19  stopped.

20              And many times Carol would tell me, "You

21  need to do your job," and I said no more.

22       Q      Well, you said a couple of times that

23  you changed your working policy about two years

24  ago, stopped doing the trades; but we're talking a

25  time frame that's four years in length.  So for the

# EXHIBIT E

FRANK CONSALO

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

- - -

KENNETH S. MITCHELL      :
    Plaintiff        :
                     :
    V.              :
                     :
WACHOVIA CORPORATION,  :
et al                  :
    Defendant        :
                     : NO. 06-12-725

Deposition of FRANK CONSALO, taken before
Maryanne S. Gorham, a Court Reporter and Notary
Public in and for the Commonwealth of
Pennsylvania at Wachovia Bank, 123 South Broad
Street, Philadelphia, Pennsylvania 19109, on
Friday, January 4, 2008 commencing approximately
at 2:56 p.m.

- - -

KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA AND DELAWARE
(800) 621-5689

FRANK CONSALO

Page 4

1              FRANK CONSALO, was called as a witness

2    and after having been first duly sworn according

3    to law, was examined and testified as follows:

4              -  -  -  EXAMINATION -  -  -

5    BY MR. MONES:

6       Q.        Good afternoon, Mr. Consalo.  My

7    name is Steve Mones.  I represent the plaintiff

8    in this case Ken Mitchell.  Could you state your

9    name for the record.

10      A.        Sure.  Frank Consalo.

11      Q.        Your address?

12      A.        Work or home?

13      Q.        Work.

14      A.        123 South Broad; Philadelphia 19109.

15      Q.        Your phone number?

16      A.        Work?

17      Q.        Yes.

18      A.        (215) 670-4116.

19      Q.        We appreciate you making yourself

20   available this afternoon for this deposition.

21   You are an employee of Wachovia?

22      A.        Wachovia Securities.

23      Q.        What is your title?

24      A.        Regional president.

25      Q.        What is your region?

FRANK CONSALO

Page 5

```
 1    A.          Mid Atlantic region.

 2    Q.          How many states does that encompass?

 3    A.          Pennsylvania, Delaware, Northern

 4  Virginia, Maryland, D.C.  Texas as well but

 5  that's not part of Mid Atlantic.

 6    Q.          How long have you been in that

 7  position?

 8    A.          I started May 1, 2000.  It was about

 9  seven and-a-half years.

10    Q.          Were you with Wachovia before that?

11    A.          I have never been -- I'm with

12  Wachovia Securities.  I was with First Union

13  Securities when initially hired.  Then became

14  Wachovia Securities.

15    Q.          For purposes of the deposition I am

16  not going to distinguish between Wachovia

17  Securities and any of the other --

18    A.          It is a distinguishing factor so you

19  know.  We're owned 68 percent by Wachovia, 67

20  percent.  38 percent by Prudential.  It's not a

21  fully owned subsidiary of Wachovia.  There is a

22  distinct difference between the two.

23    Q.          So Wachovia Securities is 67

24  percent --

25    A.          It's an LCC owned by Prudential and
```

FRANK CONSALO

Page 6

1  Wachovia.  I am making that distinction only

2  because the benefits are different for the two

3  companies.  Totally separate lines of business.

4      Q.          Wachovia Securities, LLC is 67

5  percent owned by Wachovia?

6      A.          It's 38 and -- what would that be?

7      Q.          62?

8      A.          62.

9      Q.          The other 38 percent is Prudential?

10     A.          Uh-huh.

11     Q.          You have to say yes or no.

12     A.          Yes.

13     Q.          So you came to Wachovia through a

14  merger with First Union?

15     A.          No.  I took a job May 1, 2000 with

16  First Union brokerage which became Wachovia

17  Securities after the merger.  Prior to that I was

18  with Citi Corp in Los Angeles.

19     Q.          So you have been in this position

20  with First Union and Wachovia since May 2000?

21     A.          Correct.

22     Q.          Before that you did not work for

23  First Union?

24     A.          That's right.

25     Q.          It's not like a normal

FRANK CONSALO

Page 10

1    Q.         Anything with respect to that
2    incident.
3    A.         I didn't do anything.  Ken worked
4    for Todd and Todd told me he had it under control
5    and he would take care of it.
6    Q.         Other than the fact that six dollars
7    was involved with respect to that ticket, do you
8    know of any details about what occurred?
9    A.         No.
10   Q.         Did you ever talk to Mr. Gauthier
11   about what the ultimate resolution was?
12   A.         No.  My comment was that Ken could
13   be terminated for that.
14   Q.         What exactly would be the basis for
15   the termination?
16   A.         There is a strict policy not only
17   within our company but in NESD rules it say you
18   cannot refund cash to clients in any amount.
19   Q.         Did you do any investigation to see
20   whether what was to have alleged to have occurred
21   actually did?
22   A.         No.  Did not.
23   Q.         Did you leave it up to Mr.
24   Gauthier's discretion?
25   A.         I left it up to him as the manager

FRANK CONSALO

Page 23

1   taking whatever precautions, not precautions, but

2   any type of follow-up and they need to do it on

3   the bank side and the issue had been resolved.

4       Q.        What is your understanding of how it

5   was resolved?

6       A.        We didn't really share any

7   information what to do with the individuals on

8   the bank side.  So I don't know what happened

9   there.  I wasn't told.  It was a different

10  business unit.  They said they were taking care

11  of it.  I do know on our end Todd went back, had

12  conversations with Ken and I had follow-up

13  conversations with Ken as well.

14      Q.        What did you and Mr. Mitchell

15  discuss?

16      A.        We met at once -- once, maybe twice,

17  I can't remember.  It was once or twice but we

18  met in person.  And that Ken was very upset.  He

19  thought his character had been maligned and that

20  he had been kind of tarred with something he had

21  said and he said he didn't say it.  He felt that

22  it would impact his or have an impact on his

23  reputation within the company, within the

24  community, within the area.  I remember telling

25  him it didn't impact my impression of him or his

FRANK CONSALO

Page 24

 1   ability.  I certainly didn't have any animosity

 2   toward him and that the issue as far as I know

 3   resolved.  He wanted to know what had taken place

 4   with the individuals on the bank side.  I really

 5   couldn't discuss that with him just like I

 6   wouldn't discuss HR issues with him or with

 7   someone else about his situation.  And so at that

 8   time Ken said it was a big distraction and I said

 9   well, I hear what you're saying.  It's been a

10   distraction, what can I do to help.  Give me an

11   idea.  And really Ken wasn't giving me much of an

12   answer and I said is it about money.  Is that

13   what it is.  He said yes.  I didn't hit my bonus

14   because I have been distracted.  We went back to

15   our finance group and went back to HR and rewrote

16   his offer letter.  We extended it and I don't

17   remember if it was 60 or 90 days.  It's been a

18   few years.  I just forget what it was.  But we

19   extended it for him.  We said would this make you

20   feel as though you're in a better position.  He

21   said yes.  So we did.  And he had a great quarter

22   and he hit his number and got his back end and we

23   also I think if I recall we extended the amount

24   of time where we increased his payout as well at

25   a guaranteed minimum versus having a drop down in

FRANK CONSALO

Page 25

1   red.

2      Q.        Do you remember the time frame month

3   and year of when the six dollar incident occurred

4   and the 9/11 incident?

5      A.        No.

6      Q.        Do you know whether it was 2003 or

7   2004 or 2005?

8      A.        Without looking I wouldn't venture a

9   guess in saying.

10      Q.        Did you take any action against

11   anybody in your department for this incident, the

12   9/11 incident?

13      A.        Absolutely not.

14      Q.        Did you mention to Mr. Mitchell

15   during your conversation that you were

16   reprimanding Todd Gauthier?

17      A.        I would never use the word

18   reprimand.  But I think I told him I would have a

19   discussion with Todd based on the fact that he

20   had had a discussion with Ken before actually

21   just talking to Carol Beam about it or getting

22   the facts with Carol.

23      Q.        What is your understanding of what

24   action Mr. Gauthier took?

25      A.        Action in terms of?

FRANK CONSALO

Page 47

1  Capital Trail branches.  Does that ring a bell?
2     A.        Yes.
3     Q.        At some point Mr. Mitchell was
4  relieved of his responsibilities at Prices Corner
5  and moved to a different branch.  Do you remember
6  that?
7     A.        We don't relieve anybody of
8  responsibility.
9                      MS. MISHRA:  Objection.
10    A.        We might change branch assignments.
11 But we never take relationships from an advisor.
12 BY MR. MONES:
13    Q.        You describe it as changing a branch
14 assignment?
15    A.        Sure.  We do that all the time.
16    Q.        Do you know what the circumstances
17 were that led to Mr. Mitchell having his branch
18 change from Prices Corner to some other place?
19    A.        I don't know the details around that
20 specific incident, but I know that our managers
21 are tasked to hire a minimum of four with a goal
22 of six to eight new hires every year.  And the
23 only way that we can hire people is to make
24 branch assignment changes just as when Ken
25 started, there was somebody covering that branch

FRANK CONSALO

Page 48

 1   at that time and we told whoever the advisor was

 2   that we hired a new advisor and this new advisor

 3   would cover these locations and now you're now

 4   going to be covering these locations.  It's a

 5   normal occurrence.  We do it all the time.

 6       Q.        Did the change have anything to do

 7   with Mr. Mitchell's performance?

 8       A.        I am not aware that it did.  It may

 9   have.  I don't recall.  I didn't have that

10   discussion with Todd.  Again the managers who was

11   making the changes, it could be recruiting.  It

12   could be if an advisor is covering more than one

13   location and the majority of their business is

14   coming from one location, not the other, we might

15   make a change and have them dedicate it to that

16   one branch.  The goal of the firm is to try to

17   get as many advisors hired as possible with the

18   ultimate goal of having one advisor in every

19   branch.

20       Q.        Were you expanding the number of

21   advisors or were advisors leaving and you had to

22   fill positions?

23       A.        We have been in constant expansion

24   since I got here.

25       Q.        Do you know what the turnover rate

FRANK CONSALO

Page 49

1   is for financial advisors?

2       A.          In my market is 4 percent.

3       Q.          How long does a typical financial

4   advisor stay in a typical branch?

5       A.          I don't know what you mean by

6   typical.

7       Q.          Just on average.

8       A.          I don't know how to answer that.

9   Multiple branch locations changes on a regular

10  basis.  In Susan Newman's world which is one of

11  our managers in the suburbs, she has I think 55

12  branches and she's got over 60 FAs.  There is

13  advisors that used to cover four branches.  Now

14  one cover one.  There's advisors that cover eight

15  branches and now they cover none.  It's very

16  normal for branch assignments to change over time

17  as we hire people and as we build out teams.  As

18  the advisors build out teams.  We are limited on

19  space.  So we don't have hubs where we can house

20  people.  They sit in a retail financial center.

21      Q.          Did Wachovia have any specific

22  policy about the number of branches a financial

23  advisor would serve in your region?

24      A.          Say that again.  Did Wachovia have

25  what?

FRANK CONSALO

Page 50

1    Q.         Have any specific policies.

2    A.         We didn't have a policy.  It's an

3  ultimate goal to have one or more in every branch

4  if we could.  We are limited by the physical

5  amount of space we have in there.

6    Q.         How close to that goal were you in

7  your region?

8    A.         Well, I have more advisors in some

9  markets than I have branches.  It's been -- we

10  have made constant growth every quarter for the

11  last seven years.

12    Q.         Did Mr. Gauthier ever advise you as

13  to why he was moving Mr. Mitchell?

14    A.         I remember a conversation that he

15  was making a change because of a new hire coming

16  on.  I believe, I'm saying I think it was Jim

17  Meehan at that time who was being hired and was

18  taking one of the branches to cover, that Ken had

19  covered and Ken was moving over to another

20  location.

21    Q.         Where did Mr. Meehan come from?

22    A.         I don't remember.  It might have

23  been H and R Block.  I don't recall.

24    Q.         Did you interview him before he was

25  hired?

FRANK CONSALO

Page 61

```
 1     A.          Recent in the last week.

 2     Q.          Which branch was it?

 3     A.          I don't know.

 4     Q.          Somebody has complained of gender

 5  discrimination within your region and you don't

 6  know which branch?

 7     A.          I don't know what branch he covers.

 8  No, I do not.  It's in Delaware.

 9     Q.          Do you know a gentleman by the name

10  of James Finney?

11     A.          Can you give me an idea?  It doesn't

12  sound familiar.

13     Q.          I'll represent to you I believe he

14  was a teller at Prices Corner at some point.

15     A.          No, I don't know him.

16     Q.          Do you know anything about whether

17  he has raised any claims for gender or racial

18  discrimination?

19     A.          I have never heard the name and I

20  have no clue who he is.

21     Q.          Just to make sure I understand

22  correctly, the decision to take Mr. Mitchell out

23  of Prices Corner was made by Mr. Gauthier alone;

24  is that correct?

25     A.          Yes.
```

FRANK CONSALO

Page 62

1    Q.        Did you have any input into that
2  whatsoever?
3    A.        I would say I was advised and we had
4  -- there was a discussion with Todd telling me
5  what his plan was and what he was going to do and
6  I agreed to it.
7    Q.        Was there any specific plan at that
8  point for Wachovia to implement one financial
9  advisor per branch?
10   A.        You mean Wachovia Securities?
11   Q.        Yes.
12   A.        As I mentioned before three separate
13  times the ultimate goal was to absolutely have
14  one or more people in a financial center.
15   Q.        How many financial centers are in
16  your region?
17   A.        Maybe 550, 600.
18   Q.        How many financial advisors are
19  there?
20   A.        Probably with juniors FAs in
21  training, broker fund and sales assistants, maybe
22  500 and I would tell you that over the 550
23  branches I mentioned a minute ago, maybe 50 are
24  probably service branches where they are like in
25  supermarkets or retirement homes, where it's just

FRANK CONSALO

Page 65

```
 1    A.          Every branch has coverage.  So I am
 2  sure there is someone responsible for covering
 3  that branch.
 4    Q.          You don't know whether anybody
 5  actually physically sits there?
 6    A.          That is correct.  I don't know if
 7  they do or not.
 8    Q.          When did you last speak to Mr.
 9  Gauthier?
10    A.          October maybe of last year.
11    Q.          What did you talk about?
12    A.          His father had died.  I called to
13  tell him that I was sorry to hear about his dad
14  dying.
15    Q.          Was there anything mentioned about
16  this case?
17    A.          For ten seconds he said he had a
18  conversation with an attorney he had from outside
19  counsel and that he was planning a date for a
20  deposition.  That was it.
21    Q.          Do you know where Mr. Gauthier is
22  now?
23    A.          He is in Georgia.
24    Q.          Do you know what his position is?
25    A.          He is a financial advisor.
```

Karasch & Associates
800-621-5689

FRANK CONSALO

Page 66

1    Q.        Do you know the circumstances of his
2  going from regional sales manager to financial
3  advisor?

4    A.        Sure do.

5    Q.        Can you tell me?

6    A.        Todd was working long hours.
7  Probably used to work 14 hours a day.  Would come
8  here at 7:00 in the morning he was here and 7:00
9  at night.  I pulled him aside one day and said
10  Todd, you look burnt out.  You look like you're
11  just overwhelmed in terms of your appearance.
12  You look -- he just didn't look good physically.
13  I said, you know, anything happen that you want
14  to talk about.  He told me his dad was ill.  He
15  was really struggling with that.  Because they
16  didn't know when it was going to be.  It was
17  cancer at the time.  He was going through some
18  tests.  And we just started talking about career,
19  long-term goals, what do you want to do.  He said
20  eventually he wanted to get back down south and
21  that he would like to be closer to his family.
22  His wife was from down there and he certainly
23  would like to have an opportunity to go back in
24  the Mississippi area at the time.  He wanted to
25  go on a boat, be closer to the water.  So the

FRANK CONSALO

Page 67

1   more we talked I said what do you like about your

2   job.  He started telling me.  I said it really

3   sounds to me what you like about it is the client

4   interaction.  You are a very successful FA before

5   you became a manager.  Why don't you go back and

6   do what you love to do.  And it was just a

7   discussion we had just in conversation.  And I

8   guess it was about a week later, he came back and

9   he said hey, can I talk to you.  He said I gave

10  some thought to what you said.  I think I want to

11  do that, I think I want to go back and be a

12  financial advisor, but can I do it down south.  I

13  said sure.  I put a call in.  Found out where

14  there was an opening for financial advisor and he

15  moved down to Mississippi and after the Hurricane

16  Katrina, the house was completely ruined.  He

17  moved to Atlanta because his wife had contacts

18  there.  Family.

19      Q.        As the regional sales manager, did

20  Mr. Gauthier or any of the other sales managers

21  have direct client input into investment

22  decisions?

23      A.        Client input into -- I don't know

24  what you mean by that.

25      Q.        That's a bad question.  Do regional

# EXHIBIT F

TODD E. GAUTHIER

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

- - - - - -

KENNETH S. MITCHELL          :C.A. NO. 06-12-725(GMS)
          Plaintiff          :
                             :
     vs.                     :JURY TRIAL DEMANDED
                             :
                             :
WACHOVIA CORPORATION, t/a    :
WACHOVIA SECURITIES          :
WACHOVIA SECURITIES, LLC     :
WACHOVIA SERVICES, INC.      :
WACHOVIA BANK OF DEL, N.A.   :
TODD D. GAUTHIER, LYNN G     :
MEYER, CAROLYN J. BEAM, and  :
DOROTHY A. DIFEBO            :
          Defendants         :



Video Conference deposition of TODD D.

GAUTHIER, taken by and before Joanne H. Gusler, Registered

Professional Reporter and Notary Public, at the Law

Offices of Morris, James, LLP., 500 Delaware Avenue, Suite

1500, Conference Room 15C, Wilmington, Delaware  19801, on

Tuesday, December 18, 2007, commencing at 10:12 a.m.

KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

TODD E. GAUTHIER

Page 25

```
 1      A.    I spent time with Jim specifically around

 2   building a business plan, partnership with the FS's, and I

 3   did explain to him that I wished for him to communicate in

 4   writing and verbally with Ms. Amini, yes.

 5      Q.    Well, from that answer I gather that you didn't

 6   specifically address anything unique about Ms. Amini but

 7   that it was more of general FA/FS relations; is that

 8   correct?

 9           MS. MISHRA:  Object to form.  You can

10       answer.

11           THE WITNESS:  I asked him to communicate

12       with her verbally and in writing.  I did not go into

13       specifics about prior issues if that's what you're

14       asking.  I asked him simply to, in her case, be very

15       vigilant on how he communicated and the frequency of

16       it and to be very communicative.

17   BY MR. MONES:

18      Q.    And just for the record, you referred to Jim.

19   Is that James Meehan?

20      A.    Yes, sir.

21      Q.    And Mr. Meehan is the individual who replaced

22   Mr. Mitchell as the financial advisor at Prices Corner?

23      A.    Mr. Meehan is the financial advisor I hired to

24   service that branch.

25      Q.    Is there a distinction about the specific
```

TODD E. GAUTHIER

Page 26

1    terminology you're using versus what I said?

2        A.    Well, sir, when we hire financial advisors,

3    branches can and do get moved.  Our goal is to have one FA

4    at every branch.  So Mr. Mitchell still had all of the

5    relationships.  He was allowed to keep any relationship he

6    had established out of that branch and still service that

7    client and monitor that client's performance and

8    investment work and communicate with them as frequently

9    and as often as necessary.

10       Q.    But just to be clear for the record.  When

11   Mr. Meehan was hired -- and let me back up a step.  He was

12   not a Wachovia employee before December '04, correct?

13       A.    That is correct.  He worked for A.G. Edwards if

14   I recall correctly.

15       Q.    And when he came on board with Wachovia, he was

16   immediately put into the FA slot at the Prices Corner

17   bank?

18       A.    Yes, sir.  That's correct.

19       Q.    This might be a good time to turn to a matter

20   you mentioned before which is the 9/11 incident.

21       A.    Yes, sir.

22       Q.    And you had alluded to some incidents or

23   conflicts that had arisen between Ms. Amini and

24   Mr. Mitchell prior to 2004; is that correct?

25       A.    Yes, sir.

TODD E. GAUTHIER

Page 27

1        Q.    Do you remember an incident in which it was

2    alleged that Mr. Mitchell made derogatory comments about

3    Ms. Amini's nationality?

4        A.    I do recall that.  Yes, sir.

5        Q.    Did that incident occur at about July, 2003?

6        A.    Yes, sir.  It did.

7        Q.    Were you present during the conversation that

8    occurred between Mr. Mitchell and Ms. Amini?

9        A.    No, sir.  I was not.

10        Q.    Did you overhear the conversation?

11        A.    No, sir.  I did not.

12        Q.    From whom did you first learn that something

13    had happened during a conversation between Ms. Amini and

14    Mr. Mitchell?

15        A.    Carol Beam.  Carol Beam called me.

16        Q.    Do you remember when she did that?

17        A.    I just know it was sometime in July of '03,

18    sir.  I can't recall the exact date and time.  No, sir.

19        Q.    What did Ms. Beam tell you happened?

20        A.    I don't know the specifics of exactly what she

21    said, but what the discussion was around there was a

22    conversation between Kenny and Laddie that involved a 9/11

23    comment that Laddie found offensive.

24        Q.    How much detail can you provide us about what

25    you knew at that time from Ms. Beam about exactly what was

TODD E. GAUTHIER

Page 28

1  said?

2           MS. MISHRA:  Object to the form.  You can

3      answer.

4           THE WITNESS:  Could you repeat the question

5      please, sir?

6  BY MR. MONES:

7      Q.    Sure.  How much detail can you give us about

8  the exact language that Ms. Beam told you occurred during

9  that conversation?

10     A.    I'm not going to be able to give you every

11 detail of the conversations.  It's been some time ago.

12     Q.    I understand.

13     A.    The concern she expressed was the conversation

14 occurred between Laddie and Kenny, Laddie was upset by it

15 and that's why Carol called me.

16     Q.    Did Ms. Beam tell you how she found out about

17 it?

18     A.    At the first phone call, no, sir.  She did not.

19     Q.    During later conversations or through other

20 sources, do you know how Ms. Beam found out about it?

21     A.    To the best of my knowledge, and this is

22 speaking directly to Carol, she had let me know that she

23 had found out through another leader in the bank.

24     Q.    Do you know who that was?

25     A..   To the best of my recollection, either -- I

TODD E. GAUTHIER

Page 30

1          A.    My first response was with Carol, that I found

2    it hard to believe knowing the quality and character of

3    Mr. Mitchell and the kind of individual he is.  My

4    practice is to then ask the individual employee that I'm

5    directly responsible for about their understanding of what

6    may or may not have occurred.  So I went to Kenny, spoke

7    to Kenny one morning.

8          Q.    Do you remember what time you called

9    Mr. Mitchell that morning?

10         A.    No, sir.  I don't recall exactly.  No.  It's

11   probably early.  I'm an early bird so it may have been

12   early.

13         Q.    Do you remember whether you called Mr. Mitchell

14   at home or at his office?

15         A.    I don't recall.  No, sir.

16         Q.    I'll represent to you that Mr. Mitchell has

17   testified that you called him I believe at about 7:45 at

18   his home.  Do you know whether that refreshes you or

19   whether that jives with your recollection?

20         A.    I'm not going to dispute that with

21   Mr. Mitchell.  I don't make it a practice to call FA's at

22   home.  I typically call their cell but I'm not going to

23   argue that point.  Could I have?  Yes.

24         Q.    You just raised what was going to be my next

25   question.  Was it your habit to call Mr. Mitchell at home

TODD E. GAUTHIER

Page 31

1    in the mornings?

2         A.    No, sir.  It's not my habit to call any FA at

3    home.

4         Q.    But you may have done so on this occasion?

5         A.    Could I have mistakenly dialed a home number

6    versus a cell number?  I have no recollection of that.

7         Q.    What did you say and what did the two of you

8    discuss?

9         A.    (Pause.)  I'm sorry.  I thought you were

10   talking to Kenny.  I let Kenny know that I needed to speak

11   to him.

12        Q.    Did your conversation extend to more than that?

13        A.    I don't believe it did over the phone.  I

14   believe we had a conversation face to face.

15        Q.    And when did that occur?

16        A.    I believe that same day.

17        Q.    And what was discussed --

18        A.    In there or soon thereafter.  I don't recall

19   the specific timeline.

20        Q.    I'm sorry.  I cut you off there.

21        A.    It's all right, sir.

22        Q.    What was said during that conversation that

23   occurred later?

24        A.    I let Kenny know the conversation that I had

25   had with Carol and what context could a conversation with

TODD E. GAUTHIER

Page 32

1  Laddie brought up the 9/11 comment that was discussed.

2      Q.    What was Mr. Mitchell's response?

3      A.    To the best of my recollection, he recalled

4  talking to her about her "A" number which was an employee

5  number that has 911 as part of its composition and some

6  other parts of that conversation, I don't recall exactly,

7  but that Mr. Mitchell clearly had no intent of causing any

8  harm to her or anguish.  You could see it in his face that

9  morning I spoke to him.

10     Q.    What did you then do?

11     A.    I had reason to be at the other branch and

12 Carol Beam happened to be there as well, because I would

13 never go directly to somebody else's direct report to ask

14 those types of questions.  But while Carol was there, I

15 asked her if we could speak to Laddie and we did.

16     Q.    What did Ms. Amini say?

17     A.    I asked her specifically about that

18 conversation about the 9/11 comments and at that time, she

19 would not confirm them.

20     Q.    When you say, "she would not confirm them,"

21 what did she say was actually said during that

22 conversation?

23     A.    She at that point told me nothing was said.

24     Q.    You mean literally nothing?

25     A.    Nothing that she found offensive.  I can't

TODD E. GAUTHIER

Page 33

1   recall the exact conversation but she would not -- she was

2   not forthcoming.

3        Q.   So would it be fair to say that she denied that

4   Mr. Mitchell had made any derogatory statements about her?

5             MS. MISHRA:   Object to form.   You can

6        answer.

7             THE WITNESS:   I'm not going to say she

8        denied it.   She was not forthcoming with me.

9   BY MR. MONES:

10       Q.   Well, can you elaborate on that?   If she wasn't

11  forthcoming and you present -- let me back up a step.   You

12  and Ms. Beam went to see Ms. Amini personally at Prices

13  Corner?

14       A.   Yes, sir.

15       Q.   And you spoke to Ms. Amini right there at

16  Prices Corner?

17       A.   Yes, sir.

18       Q.   And you told her this is what we've heard

19  Mr. Mitchell say to you?

20       A.   Yes, sir.

21       Q.   And when you say Ms. Amini was not forthcoming,

22  did she say no, that didn't happen or did she say

23  something else was said, I mean can you elaborate on that?

24       A.   I don't recall her specific response other than

25  she would not confirm that Kenny had said those things.

TODD E. GAUTHIER

Page 34

1       Q.    Isn't the not confirming from the person whom

2    the remarks were allegedly said to, doesn't that actually

3    constitute negation of the allegation?

4                MS. MISHRA:  Objection.  You can answer.

5                THE WITNESS:  In my mind, yes.  In fact, I

6       communicated that very subject and my understanding

7       what she said to Kenny.

8    BY MR. MONES:

9       Q.    Can you repeat that?  I'm sorry.  I'm a little

10   under the weather.

11      A.    Sorry.  I did let Kenny know in short order

12   that we had spoke to Laddie and that the original

13   conversation with Carol, I could not confirm and, in fact,

14   from what Laddie said, Kenny hadn't made.

15      Q.    Is it your --  I'm sorry.

16      A.    Sorry.  I'm done.

17      Q.    Is it your understanding that there were only

18   two individuals present during the conversation between

19   Ms. Amini and Mr. Mitchell when these comments were

20   allegedly said, and those two people would be Mr. Mitchell

21   and Ms. Amini, correct?

22      A.    I believe that's the case.  Yes, sir.

23      Q.    To the best of your knowledge, do you know of

24   anyone else who was actually either present or overheard

25   that conversation?

TODD E. GAUTHIER

Page 38

 1   during that conversation?

 2                MS. MISHRA:  Objection.  You can answer.

 3                THE WITNESS:  I don't.  No, sir.  I'm not

 4        aware of what the source was.

 5   BY MR. MONES:

 6        Q.   I just used the word "rumor" in that previous

 7   question.  Would you agree that the accusation you heard

 8   from Ms. Beam turned out to be essentially an unfounded

 9   rumor?

10                MS. MISHRA:  Objection.  You can answer.

11                THE WITNESS:  I'm not going to characterize

12        it as a rumor.  Were parts of a conversation, did

13        they occur?  Yes.  Do I know what the rumor was

14        specifically?  No.  Or what the chatter was?  No,

15        because I didn't participate in it other than the

16        conversation with Kenny and Laddie.

17   BY MR. MONES:

18        Q.   Do you know whether Wachovia made any ultimate

19   determination or conclusion about what was said during

20   that conversation between Ms. Amini and Mr. Mitchell?

21        A.   No, sir.  I don't know any specific details

22   about it at all.

23        Q.   Do you remember talking to Mr. Mitchell and

24   telling him that he had been exonerated?

25        A.   That's not a word I would use but I let

TODD E. GAUTHIER

Page 39

1  Mr. Mitchell know that I had spoken to Laddie and that she

2  did not confirm anything and I apologized to Kenny at that

3  time.  And I want to say that it was in pretty short order

4  from he and I's conversation.

5      Q.    I'll represent to you that Mr. Mitchell says

6  that in the conversation you had with him, you told him

7  that he had been exonerated of those allegations.  You

8  disagree with your use of the word, "exonerated"?

9      A.    What I told Kenny was, and again, I'm

10  paraphrasing because I don't recall the exact verbiage

11  that I used, what I told Kenny that what had been

12  discussed by Carol and I and he and I, I could find no

13  validity to it and Laddie could not or would not confirm

14  it, and I apologized for having broached the subject with

15  him.

16      Q.    Were you interested at all in how this

17  mischaracterization occurred?

18          MS. MISHRA:  Objection.  You can answer.

19          THE WITNESS:  Of course I have an interest

20      as to how that communication could be so off.

21  BY MR. MONES:

22      Q.    What did you do to determine how the

23  conversation got so off?

24      A.    I spoke to Kenny numerous times.

25      Q.    Well, let's look at this logically.  There were

Karasch & Associates
800-621-5689

TODD E. GAUTHIER

Page 46

1    to her, yes.  I spoke to a number of folks in that

2    department.  She could have clearly been one of them.

3           Q.   Do you know what you and Ms. Mihalec discussed?

4           A.   No, sir.  Again, I spoke to a number of HR

5    representatives.

6           Q.   Are you aware that Ms. Mihalec told

7    Mr. Mitchell that you had jumped the gun and not checked

8    the facts before you spoke to Mr. Mitchell?

9                MS. MISHRA:   Object to form.  You can

10        answer.

11               THE WITNESS:   I'm not aware of that comment.

12   BY MR. MONES:

13          Q.   Did Ms. Mihalec or anyone at HR use those words

14   or terms to you in any conversations?

15          A.   No, sir.  They did not.

16          Q.   Did HR in any way criticize your handling of

17   the 9/11 incident with respect to Mr. Mitchell and

18   Ms. Amini?

19          A.   Not to my recollection.  No, sir.

20          Q.   You testified earlier that you apologized to

21   Mr. Gauthier -- I'm sorry.  To Mr. Mitchell for this

22   incident, correct?

23          A.   Yes, sir.  I did.

24          Q.   You have to bear with me a little bit.  I have

25   the flu but I'll try to keep who's who here.

TODD E. GAUTHIER

Page 47

1      A.    That's all right.

2      Q.    Did you admit to Mr. Mitchell that you had

3   spoken to him too soon without checking the facts?

4      A.    I may have -- I'm sure I told Mr. Mitchell that

5   I felt badly that I relied on information that was given

6   to me by a bank partner.  It is my practice though to talk

7   to the employee that I directly supervise to validate

8   conversations of that nature to get their input and

9   insights.

10     Q.    Were you at all concerned or worried that

11  Mr. Mitchell might leave Wachovia over this incident?

12     A.    He expressed those concerns, yes, and I was

13  concerned as well.  I value Mr. Mitchell.  I worked hard

14  to recruit him, I wanted him to stay, I hold him in high

15  regard.

16     Q.    Do you know whether that conversation with

17  Mr. Mitchell occurred on or about July 31, 2003?

18     A.    Sir, I can't specify a date but that's soon

19  thereafter.  I'm sure that's a close time frame.

20     Q.    In the conversation you had with him when you

21  apologized, you were in person with him, correct?

22     A.    Yes, sir.

23     Q.    Do you remember breaking down at one point into

24  tears over the incident?

25     A.    I was emotional, yes, sir.  I was upset.  I'm

TODD E. GAUTHIER

Page 49

1    I were the issue specifically, that I was perfectly

2    willing to step aside as his manager and allow another

3    individual to manage him.  And Kenny specifically said it

4    wasn't about me.  He was more concerned about the bank's

5    management issues.

6         Q.    What was your title during the time period of

7    2002 to 2004?

8         A.    I can't recall the exact bank -- what do they

9    call it?  I don't know if I was a senior VP or a VP; I

10   can't recall.  There was a transition, but I was one of

11   those two titles with regional sales manager as my

12   functional title.

13        Q.    Would it be to the outside world, you were a

14   vice president or senior vice president; internally, as a

15   regional sales manager or vice-versa?

16        A.    I can't recall what my card said at the time,

17   but today I'm a senior vice president and towards the end

18   of my tenure as manager, I was senior vice president/

19   regional sales manager internal Wachovia Securities, the

20   ISG channel specifically.

21        Q.    What was Mr. Mitchell's Wachovia title as a

22   financial advisor or rank?

23        A.    Vice president.  Vice president/financial

24   advisor.

25        Q.    How many employees did you supervise?  And this

TODD E. GAUTHIER

Page 50

1    is during that same period, 2002-2004.

2         A.    It varied.  As I recruited and we had a

3    tradition that in general, there were some sales

4    assistants that worked in my offices that were Series 7

5    licensed, 10 or 12 of those at any given moment.  There

6    was a supervisory principal and an operations manager, and

7    then there were approximately anywhere from 25 to 35

8    financial advisors at any given time.

9                   Sometimes a little more depending on

10   the time frame you're discussing.

11        Q.    Of the 25 to 35 financial advisors, do you know

12   how many were actually present in let's say 2003?

13        A.    No, sir.  I'd have to go back and look at

14   records to be able to determine that.  I can't recall.

15        Q.    I believe the information produced by Wachovia

16   and also during the discovery in the case indicates that

17   there were either 27 or 28 financial advisors during that

18   time period.  Does that correspond to your understanding

19   of what it could be?

20        A.    That sounds about right.  Yes, sir.  I mean

21   there could have been a few more depending on the months

22   you looked at but that sounds reasonable.

23        Q.    What was the region you covered?

24        A.    I covered the state of Delaware, part -- I'm

25   sorry.  Delaware County and a tiny piece of Chester

TODD E. GAUTHIER

Page 51

1    County.  At one point I also covered the City of

2    Philadelphia, the metro city area.

3         Q.    Of the financial advisors that you supervised

4    in 2003-2004, how many were African-American?

5         A.    Financial advisors specifically?

6         Q.    Yes, sir.

7         A.    Not employees?

8         Q.    Just financial advisors.

9         A.    I believe two.

10        Q.    We know one would be Mitchell, correct?

11        A.    Absolutely.  Yes, sir.

12        Q.    And who was the other one?

13        A.    Walter Watson.

14        Q.    Where was Mr. Watson located?

15        A.    In Philadelphia.  I hired Mr. Watson in 2001 I

16   believe.

17        Q.    Is Mr. Watson still with the company?

18        A.    Yes, sir.  He is.

19        Q.    Is he still an FA in Philadelphia?

20        A.    I believe so.  Yes, sir.

21        Q.    During that time frame, 2002 to 2004, do you

22   know whether Wachovia was making any efforts to increase

23   minority representation among financial advisors?

24             MS. MISHRA:  Objection.  You can answer.

25             THE WITNESS:  They were just asking us to

TODD E. GAUTHIER

Page 52

1        hire the best folks we could find.

2   BY MR. MONES:

3        Q.   Were there any specific minority hiring goals

4   that you had imposed upon you by Wachovia as a manager or

5   as a regional sales manager?

6        A.   No, sir.

7        Q.   To the best of your knowledge during that time

8   period 2002 to 2004, were there any policies at all

9   concerning recruitment of African Americans or other

10  minorities as financial advisors?

11            MS. MISHRA:  Objection.  You can answer.

12            THE WITNESS:  No, sir.  Not that I'm aware

13       of, no.

14  BY MR. MONES:

15       Q.   Did you, in fact, recruit Mr. Mitchell to come

16  to Wachovia?

17       A.   Yes, sir.  I did.

18       Q.   How did that come about?

19       A.   As I recall, he had friends that worked at our

20  firm, Louis Pannuchi and Ed Duffy specifically knew

21  Mr. Mitchell from their days at Merrill Lynch.  They had

22  introduced him to me by virtue of asking me to call him.

23            I did.  We started a conversation and

24  over time, I recruited Mr. Mitchell to come on board.

25       Q.   So you specifically met him and interviewed him

TODD E. GAUTHIER

Page 53

1    before he came over to Wachovia?

2         A.   Yes, sir.   Absolutely.

3         Q.   Do you remember when Mr. Mitchell started with

4    Wachovia?

5         A.   August of '02 I believe.   Does that sound

6    right?  Sounds right.

7         Q.   Sounds right.   What Wachovia branch or branches

8    did Mr. Mitchell first work at?

9         A.   He originally covered the Capitol Trail branch

10   and the Prices Corner branch.

11        Q.   When Mr. Mitchell first came on, was he

12   presented with any choice of where to go or was he just

13   told these are the two places for you and good luck?

14        A.   I wouldn't be so cavalier as to say good luck

15   with someone I recruited very hard for a very long period

16   of time and spent a lot of money to recruit and battled

17   very, very hard to battle.   I would never be so cavalier.

18   No.

19        Q.   I apologize if I gave you the impression of

20   being cavalier.   It was basically -- what I'm getting at

21   is he wasn't presented with a menu of choices to:  You

22   could go here, here or here but was --

23        A.   No, sir.   I did show him those branches

24   specifically.   Yes, sir.

25        Q.   Prices Corner and Capitol Trail?

TODD E. GAUTHIER

1      A.    (Pause.)  Yes, sir.  I thought I heard the tape

2    machine stop.  Yes, sir.

3      Q.    Can you explain the difference between a

4    financial advisor and a financial specialist?  Because

5    we've been talking about them a lot.

6      A.    Yes, sir, I can.  A financial specialist is a

7    dual employee of the bank as well as the brokerage firm.

8    The financial specialist, if they're licensed, holds their

9    license to the brokerage firm.

10                Financial specialists had multiple roles.

11    They do bank products, checking accounts, CDs, loans, they

12    also have a limited product set in the mutual fund arena

13    they could market as well as if they're annuity licensed,

14    they can talk about fixed and variable annuities.

15                The financial advisor partners with those

16    financial specialists not in a supervisory capacity but

17    more of a mentoring capacity, sales practice, sales

18    capacity as the senior investment counselor on that team.

19                Most FA's are fully licensed Series 7.  I

20    would say all of them are fully licensed Series 7 and

21    Registered Investment Advisory Act and insurance licensed.

22      Q.    So am I correct from what you testified to that

23    the FA is considered somewhat the senior partner of the

24    relationship between FA and FS?

25      A.    In the investment arena, they were clearly more

TODD E. GAUTHIER

Page 55

1  senior in their knowledge and licensing.  Absolutely they

2  are.  They have no supervisory role over those folks

3  however.  It's not their role.  It's the bank's function

4  to supervise them.

5       Q.   Were there different levels of monetary

6  authority for FA's and FS's concerning trades?

7       A.   No, sir.

8       Q.   So there was no specific dollar amount set

9  above which an FS had to seek FA approval or vice-versa?

10      A.   No, sir.  We had some guidelines and

11 suggestions but there were no specific numbers that were

12 hard and fast that said they must.

13      Q.   Can you give me any examples of what guidelines

14 or suggestions you're referring to?

15      A.   If a client fit an affluent profile, should

16 they seek guidance with an FA, should they consult with

17 them?  But it didn't preclude them from doing business

18 with a client.

19      Q.   So if I came into Wachovia as a new customer

20 and wanted to buy or wanted to invest $50,000 in either

21 mutual funds or annuities or whatever, would I be dealing

22 specifically with an FA or an FS or both?

23      A.   Depending on the level of experience for that

24 FS, that you could deal with both or just the FS or just

25 the FA.

TODD E. GAUTHIER

1      Q.    And I believe you testified that you had no

2  direct supervisory responsibility over FS's?

3      A.    Other than supervising, I have their licenses

4  as a principal.  Clearly, I have an interest in making

5  sure they do clean business and good business, but I don't

6  have any HR responsibility or supervising of those folks.

7      Q.    I'm obviously not an insider at Wachovia but it

8  sounds as though there's essentially at least two, if not

9  more, parallel hierarchy in terms of who reports to whom.

10     A.    Yes, sir.  There are, in fact, more.

11     Q.    Can you describe the hierarchies starting with

12  the FS and going up to say a level or two?

13     A.    Yes, sir, I can.  An FS would report to an FSL,

14  FS sales leader.  In this case, we're talking about Carol

15  Beam, who would then report to somebody called a RBD,

16  regional bank director.  And I believe at any given time,

17  there's 25 or 30 of those folks in the company.

18                   And beyond who they report to,

19  candidly, I don't know.  I'd be speculating.

20     Q.    What about for the FA chain?

21     A.    The FA team?

22     Q.    Yes, sir.

23     A.    The FA team would report to a regional sales

24  manager such as myself at the time and then to a regional

25  president such as a Frank Consalo, and then from there,

TODD E. GAUTHIER

Page 57

1   Frank would report dually to our president as well as our

2   national sales manager.

3        Q.   Were you on roughly the same level as Carolyn

4   Beam?

5        A.   My peer was really Lynn Meyer or Sandy

6   Macanelli.  They're the regional bank directors.  I

7   frequently and often spoke to sales leaders however.

8        Q.   You testified you had no direct supervisory

9   role on a day-to-day basis with Ms. Amini, correct?

10        A.   Correct.

11        Q.   Did Ms. Beam have any supervisory authority

12   over Mr. Mitchell?

13        A.   No, sir.

14        Q.   How about Ms. Meyer or Ms. Macanelli who were

15   the regional bank directors, did they have any direct

16   supervisory role over Mr. Mitchell?

17        A.   No, sir.  They would not have any direct

18   supervisory role over Mr. Mitchell.

19        Q.   Are you familiar with a former Wachovia

20   customer who I believe was named Richard Herman who was

21   involved in an incident with Ms. Amini and Mr. Mitchell

22   back in about July, 2003?

23        A.   Yes, sir.  I'm aware of Mr. Herman.  I actually

24   spoke to Mr. Herman.

25        Q.   Did you speak to him before or after this

TODD E. GAUTHIER

Page 58

1  incident that we'll get into in a moment?

2      A.   I specifically remember speaking to him

3  afterwards.

4      Q.   Were you present during the incident that

5  occurred involving Mr. Herman, Mr. Mitchell and Ms. Amini?

6      A.   No, sir.  I was actually on vacation.

7      Q.   Can you give us your understanding of what

8  occurred?

9      A.   My understanding was that Mr. Herman had done

10  business with us and there was a $6 charge for a mutual

11  fund trade execution which we do that as a firm, and he

12  was upset to my understanding about the $6 charge.  And

13  during that appointment, Mr. Mitchell offered him cash to

14  settle his concerns --

15      Q.   Do you have --

16      A.   -- which is --

17      Q.   I'm sorry.  Go ahead.

18      A.   It's out of compliance and inappropriate.  And

19  from what I understand, it caused concern with Laddie as

20  well.

21      Q.   So this whole thing occurred over a $6 mutual

22  fund charge?

23      A.   I don't want to minimize the issue.  The issue

24  was over $6 but it really spoke more to violation of firm

25  policy.

TODD E. GAUTHIER

Page 62

1    certain amount that Wachovia gives you as an FA or is it

2    taken out right from dollar one?

3        A.   As I recall, sir depending on which year, and I

4    don't know specifically, this year and last year, for

5    example, the first $1,000 in errors or accommodations are

6    charged against your gross commission; meaning, the firm

7    shares in that with you.  After that, it becomes a net

8    accomodation; meaning, it's out of your paycheck.

9                    And again, I can't recall specifically

10   in '03 or '04 what that policy was.

11       Q.   Did you ever talk to Mr. Tedesco about this

12   incident?

13       A.   I don't believe so, sir.  Other than to make

14   sure the accommodation was taken care of.

15       Q.   Do you know whether it was in this case?

16       A.   I believe so.  I can't recall but I'm sure it

17   was.  If Al was asked to do it, then I'm sure it was done.

18       Q.   Did you talk to Mr. Mitchell about this

19   incident?

20       A.   Yes, sir.  I did.

21       Q.   What was the subject of those conversations?

22       A.   I let Kenny know that policy was don't give

23   cash to clients.  That's not unique to Wachovia

24   Securities, that's an industry standard.  You don't give

25   clients money as a rebate.

TODD E. GAUTHIER

Page 63

1                    I let him know I spoke to the client,

2   and that the client seemed fine and comfortable and ready

3   to still do business with us.

4        Q.   Mr. Mitchell wasn't subject to any discipline,

5   was he?

6        A.   No, sir.  I did not discipline Mr. Mitchell.

7   Didn't think it appropriate.  While he violated firm

8   policy, I didn't discipline him.  No, sir.

9        Q.   He didn't do anything illegal, did he?

10       A.   I'm not an attorney, sir but I know that our

11  firm policy clearly says that you don't give clients cash.

12  I'm not sure if that's a legal issue or firm policy but

13  clearly not -- it's outside of our firm policy.

14       Q.   Would you have considered Mr. Herman to be a

15  fairly big client with Wachovia?

16       A.   My recollection was he was a substantial client

17  and additional potential was there.  Yes, sir.

18       Q.   Is this individual someone that Mr. Mitchell

19  had been working with to improve the investment situation?

20       A.   I don't recall.  All I -- my role in calling

21  the client was to make sure we were okay, the client was

22  comfortable, and if there were any issues that were out-

23  lined from where we were.  And I got no indication that

24  the client and from what I recall, let Mr. Mitchell know

25  that and asked him to proceed as best he could.

TODD E. GAUTHIER

1        Q.    In fact, did Mr. Herman stay with Wachovia and,

2    in fact, with Mr. Mitchell?

3        A.    I really don't know, sir.

4        Q.    You probably would have remembered if he had

5    left, correct?

6                    MS. MISHRA:   Objection.  You can answer.

7                    THE WITNESS:   Would I have taken note at the

8            time?  Possibly.  But I do recall if he ever stayed

9            or didn't?  That's been so long ago.

10   BY MR. MONES:

11       Q.    A short time after this $6 incident occurred,

12   was there another conflict between Ms. Amini and

13   Mr. Mitchell?

14       A.    Could you be specific?

15       Q.    Sure.  Do you recall an incident where

16   Ms. Amini became angry when Mr. Mitchell wouldn't approve

17   two of her trades:  One for about $3,000 and one for about

18   $5,000 for the purchase of annuities?

19       A.    I know there were some disputes about approval

20   of trades.  I don't recall specifically this incident.

21                   Just to be clear.  Mr. Mitchell doesn't

22   approve trades.  That's a supervisory role.  Mr. Mitchell

23   reviews trades for sales contacts and mentoring

24   opportunity and coaching opportunity but he does not

25   approve the trades from a supervisory standpoint.  I just

TODD E. GAUTHIER

Page 65

1   want to be real clear there please, sir.

2       Q.   Am I correct from your testimony that Ms. Amini

3   could have placed these trades regardless of whether

4   Mr. Mitchell approved them or thought they were

5   appropriate or not?

6       A.   If Mr. Mitchell thought the trades were

7   inappropriate, he would elevate that concern to the RBO.

8       Q.   If Mr. Mitchell thought they were

9   inappropriate?

10      A.   If he thought they were inappropriate, yes,

11  sir.  Part of the reason we hire folks with Mr. Mitchell's

12  talent and integrity is they've got experience in the

13  market and have an understanding of what is good business

14  and not good business.

15              They are not, however, supervisors.

16  They have a concern, they elevate that at the time to

17  Susan Schwartz.

18      Q.   Do you have any specific knowledge or

19  information about what exactly those two trades were?

20      A.   No, sir.  I don't recall and it's been a long

21  time ago.

22      Q.   I'll represent to you these were two trades of

23  annuities of a client.

24      A.   Yes, sir.

25      Q.   Does that ring a bell?

TODD E. GAUTHIER

Page 69

1    how many employees worked in that branch?

2         A.   No, sir.  Typical complement of employees in a

3    branch and again, this is more universal, one to three

4    FS's, financial center manager, and a complement of

5    tellers which might be three to five or six.  That's

6    pretty standard staffing for a branch, but I can't tell

7    you how many.  No, sir.

8         Q.   Was Dorothy DiFebo the FCM or financial center

9    manager at that time?

10        A.   Yes, sir.  I believe so.

11        Q.   Do you know Ms. DiFebo?

12        A.   I've met her a couple times in the branch.

13        Q.   When you stopped by Prices Corner, did you make

14   it a typical habit to talk to the financial center manager

15   as part of your visit?

16        A.   I would always say hello to them and the

17   tellers and absolutely.

18        Q.   What is your understanding of the duties and

19   responsibilities of a financial center manager?  And

20   again, this is only your understanding.

21        A.   Again, as a bank side function, I will tell you

22   I have a fair understanding but I don't know how in-depth

23   it is.  A financial center manager had a responsibility

24   for service measurement scores --

25        Q.   Let me just stop you.

TODD E. GAUTHIER

Page 70

1    A.    There they had indirect --

2    Q.    Can I stop you there?  What is measurement

3  scores?

4    A.    Our firm uses a firm, I think it's called

5  Gallop, who surveys clients that come into our branches

6  after they've had a transaction at our branch and they ask

7  them specific questions about their experience at our

8  branch and they measure it on a scale of one to seven,

9  seven being the best.

10              And so the financial center manager has

11  responsibility for driving the appropriate behaviors to

12  achieve good scores.

13    Q.    Sorry for cutting you off.

14    A.    But that's their function.

15    Q.    I did it again.

16    A.    I apologize.  What, sir?

17    Q.    I apologize for cutting you off.  You can

18  continue now.  You were talking about the varied duties as

19  you understand them for an FCM.  I'll let you finish this

20  time.

21    A.    That's one of their functions.  I believe they

22  have some responsibility with helping coordinate the

23  staffing on the teller side with whoever the teller

24  coordinator is.  They're in general, responsible for the

25  customer experience as the customer walks in the door.

TODD E. GAUTHIER

Page 71

1    They stand at a kiosk in plain sight of clients as they

2    walk in, they help to facilitate meeting the client's

3    needs by figuring out which direction you need to go

4    whether it's to an FS or to the teller line.  They have an

5    indirect responsibility for the sales performance of the

6    branch, though not direct.  That's really the FSL's role.

7                    But they clearly partner with the FSL

8    to help drive the sales results to the branch.  And I

9    believe that's the bulk of what they're responsible for.

10   Could be more; I just don't know.

11        Q.    The measurement scores that you mentioned a

12   moment ago that the FCM would obtain through Gallop or

13   otherwise, were you privy to that information at some

14   point?

15        A.    I was privy to it at a high level for the

16   region.  I typically was not alerted to specific branches

17   unless I happened to attend a branch huddle which I did on

18   occasion but don't recall this specific branch.

19        Q.    You described the scores as basically a

20   customer satisfaction poll; is that correct?

21        A.    Yes, sir.  They are.

22        Q.    Would that include the FA's score?

23        A.    No, sir.  Typically it's just transactional

24   business in the branch on the bank side.  To the best of

25   my knowledge, it does not include FA scores.

TODD E. GAUTHIER

Page 82

1   appointments for Mr. Mitchell at Capitol Trail?

2       A.   I believe she was, yes.

3       Q.   As his manager, did you ever speak to anyone at

4   the branches about how Mr. Mitchell was doing in his first

5   months six months or so?

6       A.   I don't recall specifically the time frame or

7   whom but it's a normal check-in when I go to visit with

8   folks.

9       Q.   Do you have any specific recollection of

10  talking to Dorothy DiFebo about how Mr. Mitchell was doing

11  in his first six months?

12      A.   No, sir.  I don't recall.

13      Q.   Do you know who the manager, the FCM, financial

14  center manager was at Capitol Trail during that time

15  period?

16      A.   I believe it was Gloria.

17      Q.   Is that Gloria Sharps?

18      A.   Again, I believe.  I know Gloria.  I'd be

19  speculating on the last name.  I can picture in my mind's

20  eye but I don't remember her last name truthfully.

21      Q.   Do you recall speaking to Gloria about how

22  Mr. Mitchell was doing at his first six months at Capitol

23  Trail?

24      A.   I don't remember the time frame but I know when

25  I visited Kenny, Gloria was very happy with Kenny's

TODD E. GAUTHIER

Page 74

1  conversation with your attorney about what I might be

2  asking this afternoon?

3      A.   Yes, sir.

4      Q.   I'd like to turn to the chronology of

5  Mr. Mitchell's employment with Wachovia, so it would be a

6  bit of shifting of gears.

7      A.   Yes.  All right, sir.

8      Q.   Let's start with the branches to which

9  Mr. Mitchell was first assigned:  Prices Corner and

10  Capitol Trail.  Did Mr. Mitchell have physical offices at

11  both locations?

12      A.   He had a permanent hub office at Capitol Trail

13  and he had access to share offices at the other branch.

14      Q.   Who did he share with at Prices Corner?

15      A.   He would share with an FS if they were in a

16  joint appointment or I believe there was another office in

17  there that he could access if it wasn't being used.

18      Q.   Was there any conscious decision made not to

19  give him an office at Prices Corner full time or was there

20  an office space shortage or what was the basis for that?

21      A.   It's not uncommon there's a shortage of space

22  in the branches in general.

23      Q.   During this first year or so with Wachovia, do

24  you know how much time Mr. Mitchell spent at Prices Corner

25  and at Capitol Trail?  Just a relative percentage of time.

TODD E. GAUTHIER

Page 84

1    ever pick up that there was any tension between he and

2    anyone else at Prices Corner up until the time the

3    incidents occurred that we talked about earlier today?

4        A.    Not that I'm aware of.  I don't recall any

5    conversations specifically, no.

6        Q.    When you made your stops at Delaware to see

7    Mr. Mitchell, did you also have occasion to have any

8    conversations with Ms. Amini?

9        A.    They're at different branches and I normally

10   stop at the FA's hub branch unless there's a specific

11   reason to go to a different branch.  Probably not.

12       Q.    By hub branch, in this case with respect to

13   Mr. Mitchell, you mean Capitol Trail?

14       A.    Correct.  Yes, sir.  That's where he housed --

15   that's where his files were, his computer, that's where

16   his stuff was housed, his hub branch.

17       Q.    During his first six months or so, would you

18   have considered Mr. Mitchell to be a model Wachovia

19   employee?

20             MS. MISHRA:  Objection.  You can answer.

21             THE WITNESS:  What my expectations were when

22       I hired him, I would say he would fully meets.  He

23       was doing what I expected.

24   BY MR. MONES:

25       Q.    Prior to the conflicts developing between

TODD E. GAUTHIER

Page 96

1        A.    I would say he had issues with some rules we

2    had in place because he disagreed with them but do I

3    believe Kenny's intent and ethics were above reproach?

4    Yes.   But did he buck some of the rules I had in place?

5    Yes.

6                        Not to an extent that it caused me

7    alarm though.   He vocalized his concerns about some of the

8    things I had put in place; I will say appropriately.

9        Q.    From what you saw as his manager through

10   looking at his numbers and seeing the man himself, would

11   you characterize him as being serious about his career at

12   Wachovia as a financial advisor?

13       A.    Yes.

14       Q.    At some point, did Mr. Mitchell's production

15   figures begin to slip?

16       A.    Yes.

17       Q.    Let me back up a step.   At some point, did the

18   production figures between the two branches:   Capitol

19   Trail and Wachovia begin to change in terms of the

20   proportion for one or the other?

21       A.    The Capitol Trail branch was always very

22   strong.   The Prices Corner branch clearly began to drop

23   off, yes.

24       Q.    As his manager, did you ever discuss with

25   Mr. Mitchell what the cause was of that discrepancy?

TODD E. GAUTHIER

Page 97

1        A.    I expressed concerns about why we weren't doing

2    better at Prices Corner.

3        Q.    What did you discuss with him?

4        A.    How he was working leads from that branch, what

5    kind of appointments he was setting there to go, what kind

6    of interaction he had with the branch.

7        Q.    Aside from any interpersonal friction, did you

8    have any reason to believe that Mr. Mitchell was doing

9    things differently in Prices Corner than he was in Capitol

10   Trail?

11       A.    Results were different.  I don't know if he was

12   doing things different.  The branch was doing different,

13   the results were different.

14       Q.    But specifically, do you have any recollection

15   of anything he was doing differently between the two

16   branches?

17       A.    He wasn't as engaged with the branch.

18       Q.    Can you give me an example of that?

19       A.    We, Carol and I tried to develop a business

20   client meeting with he and some of the bankers in the

21   area.  Had some success but was a little bit not as

22   engaged as normally Kenny would be.

23       Q.    Did you as his manager come up with any

24   suggestions for Mr. Mitchell about how to improve his

25   number at Prices Corner?

TODD E. GAUTHIER

Page 99

1   he worked them?  Yes.  I don't know the effectiveness of

2   it.

3        Q.    But during your conversations with

4   Mr. Mitchell, did you determine that he was doing anything

5   specifically different between the two branches or was it

6   that you thought that in general he could do more?

7        A.    In general he could do more and he wasn't

8   nearly as engaged with the branch at Prices Corner.

9        Q.    Can you tell me what you mean by use of the

10  term, "Engaged with the branch"?

11       A.    Example, they hold a huddle every morning, the

12  branch does.  It's an opportunity for any partner other

13  than the local branch folks to participate and talk about

14  what they do and educate the staff.  It talks about sales

15  initiatives they may have, they may talk about success

16  stories they've had.  Give him a forum to talk about what

17  he does.

18       Q.    So you think Mr. Mitchell should have gone to

19  those huddles?

20       A.    Absolutely.  I do where I am now as an FA.  I

21  don't take it for granted that anybody in that staff

22  understands fully what I do in a comprehensive fashion.  I

23  want to hear it more than once and frequent.

24       Q.    Did they do those huddles at Capitol Trail

25  during this time period?

TODD E. GAUTHIER

Page 102

1        A.    One of Kenny's disagreements with me was we

2    asked him to produce a report on a weekly basis to help me

3    track that and Kenny as well as others didn't enjoy

4    writing that report out or sending it into us.  And as an

5    FA today, I wouldn't enjoy doing a report either.

6        Q.    Do you have to do them now?

7        A.    No, sir.  I do not.  My manager has not asked

8    me to do it.  It was really to try and help the FA's in my

9    region to drive some behavior.  My manager doesn't require

10   it of me and doesn't want the paperwork truthfully.

11       Q.    At some point, did Mr. Mitchell ever tell you

12   that he believed Ms. Amini had stopped referring customers

13   to him?

14       A.    Yes.  We had that conversation.  They were no

15   longer doing much work together.

16       Q.    Did you look into it and make any

17   determinations about what was going on?

18       A.    Based on my conversation with Kenny, he wasn't

19   going to the branch either to try and build a partnership

20   and drive that relationship.

21       Q.    If the FS at Prices Corner; namely, Laddie

22   Amini, wasn't arranging investment conferences with

23   Mr. Mitchell, do you know where those investments were

24   going:  Were they being lost, were they being diverted

25   somewhere else, was Ms. Amini claiming them, do you know?

TODD E. GAUTHIER

Page 103

1           MS. MISHRA:  Object to the form.  You can

2      answer.

3           THE WITNESS:  No other FA was assigned to

4      that branch.  It was Kenny's branch.  Were there

5      accounts that were assigned to other financial

6      advisors?  Absolutely.  Prior relationships that

7      existed were retained by those FA's, and as a

8      professional courtesy, we wouldn't refer those to

9      anybody else.

10  BY MR. MONES:

11      Q.   Did you have any conversations with Carolyn

12  Beam about the deteriorating relationship betweean

13  Ms. Amini and Mr. Mitchell?

14      A.   I know we would have had a conversation about

15  why there was no production and/or appointments in that

16  area and it does go back to relationship.

17      Q.   Now, if an FS sets up an appointment for an FA

18  and I'll use the specifics here.  If Ms. Amini sets up an

19  appointment with a bank customer with Mr. Mitchell at

20  Prices Corner, and that results in investment trades being

21  done, is it true that both the FA and FS both get some

22  credit or some commission on that arrangement?

23      A.   Yes, sir.  If the FS is licensed for the

24  product that was sold, the answer is yes.  They can share

25  that commission.  If they're not licensed, obviously they

TODD E. GAUTHIER

Page 105

1          do many things.  That was less of a focus for them.

2    BY MR. MONES:

3          Q.    In contrast, would it be more of a part of an

4    FA's concern about his evaluation and his review and

5    ultimately his economic progression?

6          A.    Absolutely, yes.  If an FA had broader

7    participation with FS's, would it and could it enhance

8    their income because by virtue of appointments being set

9    for them?  Absolutely.  However during that time, that was

10   not the norm.

11                    There were only pockets of success and

12   there were pockets where it was not successful.  And much

13   like today, it all goes back to creation of partnerships

14   that are solid and communicative.

15         Q.    At some time during either 2003 or 2004, was

16   there any kind of plan to give FA's only one branch as

17   opposed to two or more?

18         A.    That wasn't an 2003-2004 effort.  That's been a

19   mantra for as long as I've been here as an FA.  That's

20   been an aspiration and a hope that as a firm, we find a

21   qualified financial advisor who builds a practice and

22   grows to wanting to stay in only one branch and/or moving

23   out of branches.

24                    In fact, while I was in Philadelphia, I

25   had a couple of FA's who had no branches.  Worked their

TODD E. GAUTHIER

Page 106

1  book from the RBO or remote locations.

2       Q.   What's an RBO?

3       A.   I'm sorry.  It's a regional branch office.

4  It's where the compliance officers and whatnot sit.

5       Q.   So it was a long-standing goal to have each

6  branch have its own permanent FA?

7       A.   Yes, sir.

8       Q.   During the 2003-2004 time frame when you were

9  in that region and you had, just for the sake of this

10  question, assume that there's 28 financial advisors there.

11  Could be a few more, could be a few less --

12       A.   Understood.

13       Q.   -- but 28's a good round number.

14       A.   Yes.

15       Q.   How many of them had only one branch versus two

16  or more?

17       A.   There were a couple of FA's who had no

18  branches.  There were five or six, seven who had one

19  branch.  A number of them had two.  One or two had three,

20  but they had broker funded assistants to help them.

21              Again, I'd have to look at the exact

22  numbers but in round figures is that what I recall?  Yes.

23       Q.   Would you agree that the majority of FA's in

24  your region had two branches?

25       A.   Not without looking at the records.  No, sir.

TODD E. GAUTHIER

Page 109

1  whether you believe that during that time frame, more FA's

2  had two or more branches than had fewer?

3       A.   Looking at this list, I believe that's a fair

4  statement.  Yes.

5       Q.   Were you supportive of the idea of one branch

6  for one FA?

7       A.   Firmly believe that you give an opportune FA to

8  build a practice, market in one area, develop the team,

9  integrate their existing book they brought from their

10  prior employer.  It was the right decision, yes.

11       Q.   When presented with that idea, which branch did

12  you think Mr. Mitchell was going to select?

13       A.   Capitol Trail.

14       Q.   Why?

15       A.   Eighty percent of his business was coming from

16  there.

17       Q.   Do you believe you discussed that matter with

18  him during 2004?

19       A.   Absolutely.

20       Q.   Could it have been about July 16, 2004?

21       A.   I know we discussed it more than once but yes.

22  We could have discussed it then as well.

23       Q.   Did you ever put it in terms of an actual

24  proposition that he take one branch and decide which one

25  it would be:  Prices Corner or Capitol Trail?

TODD E. GAUTHIER

Page 110

1       A.    At that time he was doing more of his business,

2    80 percent of it at Capitol Trail.  I'm certain his

3    position at his Capitol Trail was the choice.

4                    I also offered him to help me cover

5    temporarily other branches from time to time when FA's

6    resigned or in one case, an FA was retiring, and in each

7    case he refused or didn't want to do it or felt it wasn't

8    the right opportunity.  On numerous occasions I did that.

9       Q.    Was this going to be short-term covering or a

10   long-term assignment?

11      A.    Just like any branch in our system, your hub

12   branch at some point, we hope you migrate out of where you

13   can sustain yourself working your book, but those were

14   short-term coverings.

15      Q.    I'm not sure I understand when you said that

16   the goal that you supported was one FA for one branch and

17   yet you were hoping that FA's would migrate out of their

18   hub.  I don't reconcile those.  Can you do that for me?

19      A.    Yes, sir.  If they migrate out of their hub and

20   are you able to sustain their practice without referrals

21   from the bank and then we can move another FA into that,

22   that would be wonderful.  That Mr. Mitchell could focus on

23   his preferred clients and no longer have to work within

24   the team environment.  That's their choice.  But would

25   that be ideal?  Absolutely.  Much like the environment he

TODD E. GAUTHIER

Page 111

1  came from at Merrill Lunch at eight years where he had no

2  branches.  He thrived at it.

3       Q.    Of course Merrill Lynch had no bank partners,

4  did they?

5       A.    I'm sorry.  What?

6       Q.    Merrill Lynch had no bank partners as Wachovia

7  referred to it, did they?

8       A.    No, sir.  They do not.  They have no bank

9  branches.  They have retail brokerage branches.

10      Q.    Am I correct in understanding from this, again

11  as a layman who is not part of Wachovia, that your ideal

12  model for an FA is that he or she doesn't have a branch at

13  all?

14      A.    For some FA's, that's the right decision.

15  Absolutely.  And we have some of those FA's today.  Not

16  every FA aspires to do that.  Some FA's will always enjoy

17  the branch environment and getting the leads, some do not.

18      Q.    The FA's that have no branch or during the time

19  you were their regional sales manager, did they come into

20  Wachovia with no branch or did they develop into that

21  status over years or whatever?

22      A.    Some of both.  Some of both.

23      Q.    Now, did you have a number of conversations

24  with Mr. Mitchell during 2004 about what branch he would

25  ultimately keep?

TODD E. GAUTHIER

Page 112

1    A.    Yes, sir.  My conversations were about Capitol

2  Trail.

3    Q.    What was Mr. Mitchell's response?

4    A.    He wasn't excited about that.  He wanted to try

5  and recover at Prices Corner.  He had not engaged with

6  that branch for some time, had not produced results there.

7                    His numbers for 2004 were under-

8  performance significantly.  There was a conversation about

9  you're doing 80 percent of your revenue at Capitol Trail.

10  That's where you need to be.

11    Q.    So Mr. Mitchell was making 80 percent of his

12  overall revenue from Capitol Trail?

13    A.    Yes, sir.

14    Q.    And he --

15    A.    Close proximity to that number, yes.

16    Q.    He was underachieving at Prices Corner which

17  was the branch with the higher bank or deposit asset base?

18    A.    And again, our conversation earlier was bank

19  deposit is not a prerequisite or a prescription for

20  success.  It's one ingredient.

21    Q.    You mentioned a couple of times that he wasn't

22  engaging with the bank personnel at Prices Corner; is that

23  correct?

24    A.    That's correct.

25    Q.    But would you agree that when we get to the

TODD E. GAUTHIER

Page 115

1    considered a personnel at Prices Corner because she wasn't

2    there regularly, correct?

3        A.    Fact.  Yes.  Correct.

4        Q.    And another fact would be that she had next to

5    no direct contact with Mr. Mitchell?

6        A.    Carol Beam, no.  They had quite a bit of

7    contact I would -- in our firm much like I was partners

8    with Lynn or Sandy, the peers of the FA's as far as a

9    partnership were the FSL's.  Should they be a partner with

10   those folks and developing strategies?  Absolutely.

11              So the frequency of that contact, I can't

12   speak to but was that how it was positioned?  Yes.

13       Q.    So is it your understanding that Carol Beam

14   would meet physically or speak on the phone frequently

15   with Mr. Mitchell?

16       A.    I don't know the frequency of it but was there

17   an expectation that they would do some work around a recap

18   of successes and places where they had opportunity for

19   improvement?  Yes.  We closed that -- we used to call that

20   process the-closing-of-the-books session.

21              If they did it, wonderful.  If they

22   didn't, that was really for their benefit and the

23   methodology and process they could use to try and ferret

24   out opportunity.

25       Q.    How would you characterize Mr. Mitchell's

TODD E. GAUTHIER

Page 116

1    working relationship with Dorothy DiFebo at Prices Corner?

2        A.    I don't believe there was much of a working

3    relationship.

4        Q.    Can you elaborate on that?

5        A.    He didn't visit the branch very often based on

6    Kenny's conversation with me, I don't think they had much

7    of a working relationship.

8        Q.    Did you ever talk to Dorothy DiFebo about that?

9        A.    I know there was some conversation once I'd

10   hired a new FA but nothing of any consequence.

11       Q.    Do you have any personal knowledge of anyone at

12   the branch at Prices Corner ever offering Mr. Mitchell an

13   olive branch so to speak?

14              MS. MISHRA:  Object to the form.  You can

15        answer.

16              THE WITNESS:  I'm not aware of them, and I'm

17        not aware of Kenny offering an olive branch either.

18   BY MR. MONES:

19       Q.    After your initial conversations with

20   Mr. Mitchell about potentially giving him only Capitol

21   Trail versus splitting his time between Capitol Trail and

22   Prices Corner, did things continue with him having both

23   for a period of time?

24       A.    Yes, sir.  I didn't hire the FA until December

25   of '04.

TODD E. GAUTHIER

Page 118

1      Q.   Did he ever express to you the thought that

2  having a more permanent, physical presence there would

3  enable him to both service Wachovia's customers and

4  improve his relationship with the Prices Corner staff?

5      A.   I think that would be anyone's expression at

6  any branch and yet, there are physical limitations at many

7  branches that don't allow an FA to have an permanent

8  office or must share one at the best with another partner

9  such as a business banker or a mortgage specialist or any

10 number of other partners who also need space in our

11 branches to foster the same sort of relationship with the

12 bank people.

13     Q.   When Mr. Mitchell initially expressed

14 reluctance about giving up Prices Corner, do you remember

15 saying anything to him about that was kind of throwing you

16 a curve?

17     A.   Our prior conversations were specifically about

18 his performance at Prices Corner as well as the Capitol

19 Trail being the preponderance of his business.

20     Q.   Now, at some time did the small business banker

21 at Prices Corner leave?

22     A.   Yes, she did.

23     Q.   Did that free up office space?

24     A.   That was December of '05 if I remember

25 correctly or '04.  It must have been '04.  December of

TODD E. GAUTHIER

Page 121

1  office there.

2       Q.   Is there something special about an FA office

3  versus a small banker office versus an FS office?

4       A.   No.  It's just been designated as such and the

5  bank actually charges us rent for that space.  So once

6  it's being charged rent, I have at least a financial claim

7  to it.

8       Q.   So if Mr. Mitchell were to acquire a physical

9  office at Prices Corner, it would come out of your budget?

10      A.   Any FA's office was charged -- I was charged

11 rent to my -- what do they call it?  RC.  My budget.  I

12 can't -- I don't remember what RC stands for but yes.

13 That rent was charged to my RC, yes.

14      Q.   Is it considered just a general charge accruing

15 weekly, monthly or whatever or is it based on a prorated

16 amount of time that the FA spends at the branch?

17      A.   No.  They actually charge it regardless on an

18 annual basis by square foot.

19      Q.   From what you've testified earlier that you

20 never approved of Mr. Mitchell having the office on

21 December 6th, would it be fair to say that you were

22 against him moving in?

23      A.   It would not be fair to say that, but at that

24 point, I know I had spoken to an FA and I was in the

25 process of hiring somebody for that branch.

TODD E. GAUTHIER

Page 122

1    Q.    So you'd --

2    A.    That's December '05.

3    Q.    You'd already made that decision --

4    A.    I was in the process of hiring someone.

5    Q.    Well, I mean we can talk about the semantics of

6    it, but you had already made a decision that you were

7    hiring someone to put into Prices Corner instead of Ken

8    Mitchell; is that correct?

9    A.    Yes, sir.

10    Q.    Did Ken Mitchell know that?

11    A.    I had conversations with Kenny about that

12    branch and his performance and his performance at Capitol

13    Trail and that's where Kenny would be at Capitol Trail.

14    Q.    Had you told him that he was going to be moved

15    up until December 9th, 2004?

16    A.    He was not being moved.  He already had a hub

17    branch at Capitol Trail.

18    Q.    Again, maybe we're just at odds on the

19    terminology.  Up until December 9th, 2004, had you told

20    Mr. Mitchell that he was not going to be servicing Prices

21    Corner anymore?

22    A.    I can't recall the specific date but I know it

23    was around that time frame that I was hiring another FA,

24    yes.

25    Q.    And you were hiring that FA specifically to

TODD E. GAUTHIER

Page 123

1    replace Mr. Mitchell at Prices Corner?

2         A.    I wasn't replacing him in a branch.  He had a

3    branch.  Prices Corner branch was underperforming, he was

4    not engaged with the employees there, I was going to hire

5    someone that could produce better results.

6         Q.    Do you remember calling Mr. Mitchell on

7    December 9, 2004?

8         A.    I can't recall the specific date but did I

9    speak to him?  Yes.  Frequently.

10        Q.    I'll represent to you that Mr. Mitchell has

11   testified that on December 9th, 2004, you called him at

12   Prices Corner.  Do you recall that?

13        A.    I don't recall a specific date.

14        Q.    Do you remember calling him at Prices Corner as

15   opposed to Capitol Trail or anywhere else?

16        A.    I don't recall where he was.  I mean I may have

17   used a cell phone.  I don't recall where he was at, at

18   that point.

19        Q.    During that telephone call, did you tell him,

20   Mr. Mitchell, that you had decided to remove him from the

21   Prices Corner office?

22        A.    I let him know I was hiring a financial advisor

23   to cover that branch, yes.

24        Q.    Did Mr. Mitchell ask you why you were doing

25   that?

TODD E. GAUTHIER

Page 129

1    removing Ms. Beam as a leader for his area but that was

2    not in my control and certainly I did make the ask and I

3    did make the request but it was denied.

4        Q.    Those --

5        A.    At no time --

6        Q.    Go ahead.

7        A.    At no time could I commit because again, it's

8    not in my authority to remove an FS from a branch.  She's

9    long-tenured here.  There's no way I could make that

10   commitment but I could ask about me or another leader.

11       Q.    Did you ever go to Carol Beam and go to bat for

12   Mr. Mitchell and say maybe you ought to think about the

13   problem from the other end which is Ms. Amini?

14       A.    Did I go to bat for Kenny?  Yes.  Endlessly.  I

15   offered him other branches to help me cover temporarily so

16   he could grow his business.  When I hired Mr. Mitchell, I

17   paid a significant fee to Merrill Lynch.

18                  When I hired Mr. Mitchell, I had to go

19   to bat because of the criminal issue on his U-4 with my

20   compliance officer.  I went to bat for Mr. Mitchell when

21   he wasn't able to meet his back-in number and asked my

22   manager to please extend it to help him to get to that

23   number which he did get to that number which was a

24   significant amount of money for him; if I recall correctly

25   50 or $60,000 that he earned because of those efforts.

TODD E. GAUTHIER

Page 132

```
 1              THE WITNESS:  No.
 2   BY MR. MONES:
 3        Q.    So you think you made the right call there?
 4        A.    Yes, sir.
 5        Q.    And after losing Prices Corner, Capitol Trail
 6   his main hub was now Mr. Mitchell's only branch, correct?
 7        A.    By choice.  He was offered other branches to
 8   help me temporarily cover but he decided not to.  That was
 9   his choice.
10        Q.    So what branches did you offer him?
11        A.    At one point Mr. Mitchell and I had a
12   conversation he had expressed a desire to move, in their
13   language from Delaware, the natives of Delaware, south of
14   the Canal.  So I knew that one of my FA's was going to
15   retire from Dover and I offered him to take that book and
16   that branch.  He said, "No.  Thank you."  And he had good
17   reason:  He didn't want to move at that point in time.
18              I also, while he was on military leave,
19   held two branches for him, one of which was within five or
20   ten miles of his existing branch from what I understand
21   where he's seated now, and another branch downtown called
22   Rodney Square, downtown Wilmington.
23        Q.    Do you know whether Mr. Mitchell expressed any
24   interest in the Wilmington branches?
25        A.    He declined them both.
```

TODD E. GAUTHIER

Page 133

1        Q.    Now, you were eagerly looking to place

2    Mr. Mitchell in a second branch?

3        A.    I was eagerly looking for anybody to help me

4    temporarily cover those branches after Don Tolly resigned

5    and service the clients and the branches, yes.

6        Q.    Did Mr. Mitchell ever ask to be put back into

7    Prices Corner?

8        A.    Not that I recall.

9        Q.    You don't recall him ever asking to go back to

10   Prices Corner?

11       A.    Not that I recall.  I mean no.

12       Q.    Did anyone but you have any authority or say in

13   the decision to take Mr. Mitchell out of Prices Corner or

14   was it solely your decision?

15       A.    My decision.

16       Q.    Do you need anyone else's approval to do that

17   or is that within a regional sales manager's decision-

18   making authority?

19       A.    That's within a regional sales manager's

20   decision-making authority.

21       Q.    Did you confer with Frank Consalo about it?

22       A.    No, sir.

23       Q.    Was that the type of decision that managers at

24   your level are expected to make in the regular course of

25   exercising your duties?

TODD E. GAUTHIER

Page 134

1       A.    Yes, sir.

2       Q.    What did you observe about Mr. Mitchell's

3  production figures after he was removed from Prices

4  Corner?

5       A.    Generally decline.

6       Q.    Did that trend continue through 2005 and six?

7       A.    I wasn't here in 2006.  I was only here half of

8  2005.

9       Q.    Are you still Mr. Mitchell's supervisor?

10      A.    No, sir.

11      Q.    When did you cease being his supervisor?

12      A.    I believe the conference call announcing my

13  transition to an FA role was mid to late May of 2005.  I

14  arrived in Mississippi in June of '06.  I'm sorry.  '05.

15  I'm sorry.  June of '05.

16      Q.    That was a long trip?

17      A.    Yeah, it was.  Sorry.  Katrina got in the way

18  and I lived six feet -- six houses off the beach when

19  Katrina hit so...

20      Q.    Was Katrina August '04 or August '05?

21      A.    August '05.  Bad timing.

22      Q.    What caused you to make the move to

23  Mississippi?

24      A.    I'd been a manager for the firm for about nine

25  years, I had been an FA in Atlanta, Georgia, had moved to

TODD E. GAUTHIER

Page 135

1    Greenville, South Carolina, and managed that region for

2    almost five years.  Moved to Philadelphia just after the

3    CoreStates merger and been there about four-and-a-half

4    years.  I had been an FA for about nine or ten years

5    before I was a manager, decided I had a lot better comfort

6    doing that.

7               My father had been very, very ill for a

8    long period of time.  We had just acquired a bank called

9    South Trust in Mississippi was part of their geography.

10              That region offered me the opportunity to

11   live about an hour and a half of my family, my wife's

12   family, and I wanted to go back into practice.  I had had

13   that conversation with Tony Sapanaro as well as Frank

14   Consalo, and they both agreed that that would be a fair

15   transition if I wanted to do that and I decided that I

16   wanted to and made the decision to do that after

17   conversation with my wife.

18       Q.   Was the decision to take the FA position in

19   Mississippi entirely yours voluntary or did Wachovia

20   pressure you into it or anything like that?

21       A.   It was completely my decision.  I approached

22   the firm about it when I realized we had lost some

23   branches in south Mississippi.

24       Q.   Were those branches affected by Katrina?

25       A.   By Katrina?

TODD E. GAUTHIER

Page 140

1      Q.   Let me ask the same question but from the flip

2  side.  During that entire period you were his manager,

3  2002 to 2005, did anybody at Capitol Trail ever come to

4  you reporting any interpersonal problems with

5  Mr. Mitchell?

6      A.   No, sir.

7      Q.   Do you believe that Mr. Mitchell was doing well

8  at Capitol Trail?

9      A.   Every indication said yes; production, no

10 issues.  Every time I visit the branch, they seemed happy

11 to see me and they didn't pull me aside and tell me things

12 were wrong.

13     Q.   And yet Mr. Mitchell during that same period of

14 time was, in your opinion, not doing well at Prices

15 Corner, correct?

16     A.   In my opinion and clearly by the numbers and

17 anybody else that viewed it objectively will tell you the

18 same thing:  He wasn't performing.

19     Q.   How far away physically were the offices Prices

20 Corner and Capitol Trail?  Just your estimate.

21     A.   If I were in Philadelphia, it was probably a

22 30, 40-minute ride from my home in Delaware County.  It

23 was probably approximately the same distance.

24     Q.   I'm sorry.  I'm talking about the physical

25 relationship between Capitol Trail and Prices Corner, how

TODD E. GAUTHIER

Page 141

1  far apart were those?

2      A.    Oh, they were less than a mile.

3      Q.    Would it be true that Wachovia customers could

4  meet with Mr. Mitchell at either branch really to talk

5  about their accounts?

6      A.    They could meet anywhere.  Yes, sir.

7      Q.    Were you at all curious as to why there was

8  such a discrepancy between Mr. Mitchell's interpersonal

9  relationship at Capitol Trail versus Prices Corner?

10              MS. MISHRA:  Objection.  You can answer.

11              THE WITNESS:  Curious.  The fact that the

12          relationship with that one individual and it seems

13          the branch, by virtue of him not going there to

14          engage them is a curiosity but in my experience,

15          that happens on ocasion with FA's in branches.

16  BY MR. MONES:

17      Q.    Did you ever ask Mr. Mitchell what he thought

18  the difference was or what accounted for it?

19      A.    Do I remember asking a specific question?  No,

20  sir.  Did we have conversations about the branch?  Yes.

21      Q.    Well, when you had those conversations about

22  the branch, did you ever compare his performance at

23  Capitol Trail versus Prices Corner and say what do you

24  think the difference is?

25      A.    No, I don't believe I ever did that.

TODD E. GAUTHIER

Page 156

1      Q.    Let's talk about the broker funded assistant

2  for a moment.

3      A.    Yes, sir.

4      Q.    Can you explain to us nonWachovia people what a

5  broker funded assistant is?

6      A.    Yes, sir.  A broker funded assistant is someone

7  that the FA hires, they hire that individual out of their

8  own commissions and earnings.  Most of the broker funded

9  served in either one of two major capacities.

10              One was more of a computer operator/

11  marketing person, more of a service individual.  Other

12  FA's designed that role to be more of a sales role and

13  reach out to clients and/or prospects to set appointments.

14  It could take either of those forms or both those forms.

15  Some folks hired more than one broker funded FA.

16      Q.    Did you ever have any conversations with

17  Mr. Mitchell about the topic of broker funded assistant?

18      A.    With Mr. Mitchell personally as well as my

19  group on a frequent basis.  Yes.

20      Q.    Can you tell me a little bit about what you and

21  Mr. Mitchell discussed concerning a broker funded

22  assistant?

23      A.    Yeah.  Much like I discuss with any FA:  I ask

24  them to help grow their business and service their clients

25  more effectively and control part of that growth by virtue

TODD E. GAUTHIER

Page 157

1   of having their own team.  And some of the FA's understood

2   that while it might be a financial sacrifice in the short

3   end, long term hopefully it worked, and the sum of the two

4   parts was greater than what they could do on their own.

5                        A number of the FA's for whatever

6   reason couldn't see it or weren't willing to take that

7   financial risk.

8       Q.   How much did a broker funded assistant

9   typically cost an FA in Delaware during the period of 2002

10  to 2004?

11      A.   Anywhere -- I can think of one, Sharmello we

12  hired, she was making about $18,000 a year at IDS,

13  American Express.  We hired her for a similar sum on an

14  hourly basis, part time actually.

15                       Another one was hired full time by Phil

16  Sapanaro.  He actually hired two:  One of them

17  unfortunately didn't work out.  It ranged depending on the

18  individual's experience, how many hours they were going to

19  work, if they were licensed, if they were going to share

20  revenue or not.  It just depended.

21      Q.   Do you remember ever discussing with

22  Mr. Mitchell that a broker funded assistant with him would

23  cost about $3,000 a month?

24      A.   Could.

25      Q.   Was that a typical figure give or take?

# EXHIBIT G

CAROLYN J. BEAM

Page 1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

KENNETH S. MITCHELL,                    :
                                        :
            Plaintiff,                  :       C.A. No.
                                        :       06-12-725 (GMS)
            v.                          :
                                        :
WACHOVIA CORPORATION, t/a               :
WACHOVIA SECURITIES, LLC,               :
WACHOVIA SECURITIES,                    :
WACHOVIA SERVICES, INC.,                :
WACHOVIA BANK OF DEL, N.A.,             :
TODD D. GAUTHIER,                       :
LYNN G. MEYER,                          :
CAROLYN J. BEAM, and                    :
DOROTHY A. DIFEBO,                      :
                                        :
            Defendants.                 :
                                        :

COPY

DEPOSITION of CAROLYN J. BEAM, taken pursuant to

notice before John Robert Hemenway, Registered Professional

Reporter and Notary Public, at Biggs & Battaglia, 921 North

Orange Street, Wilmington, Delaware, on Friday, December

28, 2007, beginning approximately at 10:00 a.m.

KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

CAROLYN J. BEAM

Page 11

1   postgraduate.

2        Q     I'd like to address the time period when you

3   served Wachovia as a Financial Sales Leader?

4        A     Um-hmm.

5        Q     Yes?

6        A     Yes.

7        Q     Is that abbreviated typically as FSL?

8        A     It is.  Yes.

9        Q     Just want to make sure we're on the same

10  page.  As a Financial Sales Leader, or FSL, did you

11  have Wachovia employees that you supervised?

12       A     Wachovia bank super, yes.

13       Q     And what categories of employees did you

14  supervisor?

15       A     Financial Specialists.

16       Q     Can you explain what an FS, or Financial

17  Specialist, was at Wachovia during the period that you

18  were an FSL?

19       A     A Financial Specialist is a sales individual

20  in the branches that handled the opening of new

21  accounts, deposits, loans, small business, small

22  business loans and deposits.  Financial.

23            Some of the Financial Specialists were

24  licensed.  So they were responsible for initiating

25  brokerage sales as well as referring brokerage sales

CAROLYN J. BEAM

Page 12

1    and financial advising products.

2            So it was really deposits, loans and

3    investments.

4        Q    Did you have occasion to work with any

5    Financial Advisors, or FAs, as Wachovia?

6        A    Yes.

7        Q    Can you explain what an FA does and how it's

8    different, if at all, from an FS?

9        A    Financial Advisor is an individual who has

10   the expertise to match financial products and services

11   to clients that are traditionally not bank products.

12   So it helps them with retirement planning, wealth

13   planning, estate planning.

14           And they have more licenses than the vast --

15   they have their seven and some other licenses besides

16   the six and sixty-three that the Financial Specialist

17   had.  So they were able to offer our clients a more

18   wide array of products.

19       Q    So a Licensed Financial Specialist would

20   have a Series 6 and 63 license.

21       A    Yes.  And their life insurance.

22       Q    And not all of the financial specialists

23   were licensed?

24       A    Not all of them were.

25       Q    Do you know how many within your territory

CAROLYN J. BEAM

Page 14

1  Financial Specialist and Financial Sales Leader?

2      A    They were my direct reports, Financial

3  Specialists were.  We worked closely as far as goals,

4  accountabilities, my setting them for them.  Working

5  with them to help them achieve those.  Working with

6  them as far as improving skills to help them achieve

7  those goals.  Working with them and their clients if

8  needed.  So we had a working relationship.

9      Q    During the period of 2002 to 2005, who did

10  you report to?

11      A    Lynn Meyer for a portion of that time.

12  Sandy Macanelli(phonetic) for the remainder.

13      Q    Do you know when the change occurred?

14      A    I think it was 2003.

15      Q    Can you describe for me, if you can, the

16  working relationship between a Financial Specialist

17  and a Financial Advisor.

18      A    The working relationship?

19      Q    Yes, if you can.

20      A    It needed to be a good relationship, because

21  it was a team.  The Financial Advisor and the

22  Financial Specialist had to be on the same -- worked

23  with each other with their clients.  So there had to

24  be a respect as far as working relationship goes.

25          The Financial Specialist would pull the

CAROLYN J. BEAM

Page 19

1      Q      How did the credit for brokerage or sales

2    get distributed or attributed between a Financial

3    Specialist and a Financial Advisor if both were

4    involved?

5      A      It was called "Team Brokerage," TBRK.  And

6    it was a percentage.  There was a formula that would

7    be distributed.  The FS would get TBRK from the trade

8    that was dropped, the ticket that was dropped.

9             I don't remember what that percentage, how

10   that was formulated.  But they did get TBRK, which

11   rolled up into their investment -- total investment

12   goal.

13     Q      Was the TBRK uniform among all the Wachovia

14   branches, to the best of your knowledge?

15           MS. MISHRA:  Object to form.  You can

16      answer.

17           THE WITNESS:  Uniform as far as the dollar

18      goal?

19     Q      (By Mr. Mones) How it was calculated.

20     A      Yes.

21     Q      As FSL did you keep track of the production

22   figures of your Financial Specialists?

23     A      They were on the score card.  And also we

24   had a system called "Sold" that we were able to pull

25   the numbers off of.

CAROLYN J. BEAM

Page 37

1      A     What do you mean by "bearing?"

2      Q     Well did he have -- I represent to you that

3   he was in the military.  And you knew that, correct?

4      A     Yes.

5      Q     Would you say that he was a military type,

6   sort of, by-the-book type, or was he easy going?

7   Whatever term you would use for describing

8   Mr. Mitchell base upon your interaction with him.

9      A     I would say that Ken was always professional

10  with the clients.  I would say that he was -- I would

11  not describe Ken as warm.  All business.

12     Q     When he started there at Prices Corner, did

13  he seem to get along with the employees?

14           MS. MISHRA:  Objection.  You can answer.

15           THE WITNESS:  At Prices Corner?

16     Q     (By Mr. Mones) Yes.

17     A     Yes.

18     Q     Do you know of any business Mr. Mitchell

19  brought from a former employer?

20     A     No, I don't know.

21     Q     Are you in position to describe

22  Mr. Mitchell's initial period with other employees and

23  so forth at Prices Corner?

24     A     Can you repeat that?

25     Q     Sure.  Are you in a position to be able to

CAROLYN J. BEAM

Page 38

1    describe us to Mr. Mitchell's initial period at Prices

2    Corner?  How did he get along, how was he doing with

3    customers, other employees and so forth?

4            MS. MISHRA:  Objection.  You can answer.

5            THE WITNESS:  I really -- the interaction

6        that I'm familiar with is really with Laddie.

7        And I will say that I don't recall the -- I don't

8        recall the exact time frame.  But there -- the

9        interaction started off typical for an FA and FS

10        and became more strained as the time period

11        developed.

12        Q    (By Mr. Mones) The Laddie you mentioned, is

13    that Ladon or Laddie Amini?

14        A    That is, yes.

15        Q    In his initial months at Wachovia, are you

16    personally aware of any complaints by any customers

17    about Mr. Mitchell?

18        A    In the first few months?

19        Q    Yes.

20        A    No.

21        Q    Same question:  In the first few months

22    Mr. Mitchell was at Prices Corner, are you aware of

23    any complaints from any other employees?

24        A    No.

25        Q    Are you familiar with a former Wachovia

CAROLYN J. BEAM

Page 40

1       Q       Did you ever talk to Mr. Mitchell about it?

2       A       No.

3       Q       Did Laddie explain any more detail about

4   what occurred than what you just said?

5       A       I know that she called Tom Cline, Thomas

6   Cline.  I was on vacation when this happened.

7       Q       Is Cline with a K or a C?

8       A       I think it's with a C.

9       Q       Do you know why Ms. Amini called Mr. Cline?

10      A       She was -- Thomas was a very experienced

11  Licensed Financial Specialist.  He came from American

12  Express.  Laddie had confidence in his experience.

13              And when this interaction occurred, she

14  called to find out what she should do.  And Lynn Meyer

15  was with Thomas at the time and got involved.

16      Q       Where were you when this was going on?

17      A       I was in Ocean City, New Jersey.

18      Q       For work or personal?

19      A       Vacation.

20      Q       Did you have any direct involvement in the

21  incident or what happened afterwards?

22      A       No.

23      Q       Do you know what was done or what the

24  outcome was?

25      A       I know that Lynn called Ken regarding that

CAROLYN J. BEAM

Page 41

1  situation.

2     Q    Do you know what was said in that

3  conversation?

4     A    No, I don't.

5     Q    Do you recall the approximate value of

6  Mr. Herman's account?

7     A    No, I don't.

8     Q    Do you know how it was that the six-dollar

9  service charge came up in the first place?

10    A    I don't recall.

11    Q    Do you know whether Ms. Amini or Mr. Herman

12  contacted the Operations Manager at Wachovia?

13    A    I don't know about Mr. Herman.  I don't

14  believe Laddie did.  But I don't recall.

15    Q    Do you remember the name of the Operations

16  Manager for Wachovia at that period of time?

17    A    No.

18    Q    If I represent to you that it was a

19  Mr. Tedesko, would that ring a bell?

20    A    Al Tedesko?  I know the name.  I don't

21  remember the period of when he was -- I don't remember

22  if he was there at that time.  I do know he was the

23  operations compliance individual.

24    Q    It's your understanding that Ms. Amini did

25  not contact Mr. Tedesko about this incident?

CAROLYN J. BEAM

Page 56

1       Q    Let me just finish the question again.   My

2   question is, did you personally ever hear Mr. Mitchell

3   make any disparaging comments about Ms. Amini's

4   nationality?

5       A    No.

6       Q    Do you have any knowledge about an incident

7   where Mr. Mitchell allegedly made some disparaging

8   remarks about Ms. Amini's nationality?

9       A    Yes.

10      Q    Were you personally privy to any

11  conversations between Mr. Mitchell and Ms. Amini about

12  that incident?

13      A    No.

14      Q    What did you hear and how did you find about

15  out about it?

16      A    Laddie made me aware.  She was very upset

17  about a situation where Ken and Laddie were working on

18  something where Ken needed Laddie's employer number.

19  And Laddie told me that as she said the -- her

20  employer number starts with 911.

21           As she said the 911 portion, Ken made a

22  comment to her about that she should remember that

23  based on her nationality or ethnic background.  And

24  Laddie took strong offense to the implication.

25      Q    Do you remember the exact words or as close

CAROLYN J. BEAM

Page 57

1    as you can get to the exact words that Laddie Amini

2    told you?

3         A    It was regarding 911 -- her employer number

4    having 911 in it and she should remember that.  No, I

5    don't remember exact words, no.

6         Q    Are you sure you heard that directly from

7    Laddie Amini, or it could have been somebody else?

8         A    It was from Laddie Amini.

9         Q    When did she tell you about this?  Was it

10   when it happened or afterwards?

11        A    It wasn't when it happened.  I wasn't in the

12   room for that.  So it was after it happened.

13        Q    Do you know how long after?

14        A    Not long.  I don't remember whether it was

15   same day or within days.  I don't remember the

16   specific time.  But it was quickly after.

17        Q    Did anyone else contact you or tell you

18   about what was allegedly said in that conversation?

19        A    No.

20        Q    I'll represent to you that Ms. DiFebo, who

21   is the Financial Center Manager for that branch,

22   testified that she spoke you to about this.  Do you

23   remember anything about that?

24        A    She was in the room, if I recall, when

25   Laddie was talking to me about this.

CAROLYN J. BEAM

Page 58

```
 1       Q     So when --

 2       A     In Laddie's office.

 3       Q     So when you learned about this, were you

 4   actually physically present with Ms. Amini?

 5       A     Yes.

 6       Q     How did you happen to be present that day?

 7   Was it a routine call or did somebody call you about

 8   this?

 9       A     No.  It was a routine call.

10       Q     Is that when you first learned of this

11   incident?

12       A     Yes.

13       Q     And it was directly from Ms. Amini with

14   Ms. DiFebo present?

15       A     That's what I recall.

16       Q     Why was Ms. DiFebo present at the time?

17       A     Because Laddie was upset.

18       Q     Did Ms. DiFebo tell you anything or

19   elaborate on what Mr. Mitchell allegedly said?

20       A     I don't recall.

21       Q     And what was it specifically that Ms. Amini

22   was upset about?

23       A     The reference in the comment with 911.

24       Q     Do you have --

25       A     And again, the impact that that comment had
```

CAROLYN J. BEAM

Page 59

1  on Laddie.

2      Q    What was the impact?

3      A    She was very upset.  She was very upset.

4      Q    Did you speak to Mr. Mitchell about it?

5      A    I did not.

6      Q    Again, is your knowledge of that incident or

7  that conversation based entirely upon what

8  Laddie Amini told you?

9      A    It is.  With Dorothy in the room.

10     Q    But do you know whether Dorothy overheard or

11 was privy to the actual conversation between Ms. Amini

12 and Mr. Mitchell?

13     A    I don't believe so.  But I don't know that

14 for sure.

15     Q    Do you know whether anyone other than

16 Ms. Amini or Mr. Mitchell has actual firsthand

17 knowledge of what was said?

18     A    I don't believe anybody else does.

19     Q    And I don't remember if I asked you, did you

20 call Mr. Mitchell about this?

21     A    I did not call.

22     Q    Did you call anyone about this?

23     A    I spoke with Todd about this.

24     Q    When you say you spoke with him, did you

25 personally call him?

CAROLYN J. BEAM

Page 60

1       A       I was in the office with Laddie.  Todd was

2   in Prices Corner branch as well.  I can't remember if

3   it was a meeting or a conference call he was involved

4   in.

5               After Laddie and I had been talking about

6   building the relationship with Ken and what she needed

7   to do to build this relationship, that this is when

8   the conversation came out about the 911 comment.

9               Again, I was sticking to my guns around the

10  building of the relationship had to be done between

11  the two of them.  Then the comment came out.  Todd

12  came -- was walking by the office, and I asked if we

13  could have a minute of his time.

14              It was Todd, Laddie and I talking.  I did

15  not bring up the 911 at this time because I didn't

16  have all the facts.  And it wasn't the appropriate

17  venue to uncover those facts with Todd in the room.  I

18  was catching Todd as he was leaving to talk to him

19  about the building of the relationship with Ken and

20  Laddie.

21              As we -- as Todd was leaving, I followed

22  Todd to the vestibule out the front door and told him

23  that I had been made aware of a comment that Todd --

24  or that Ken had allegedly made to Laddie.  I said I

25  don't have the facts.  I will get the facts and then

CAROLYN J. BEAM

Page 61

1  we can take it to the next step.

2          I asked him -- I told him right then I

3  didn't have the facts and that, you know, it was

4  between he and I.

5      Q    What do you mean he and I?

6      A    Todd and I, at that point.

7      Q    What facts did you then get?

8      A    I was going to go back and talk with Laddie

9  regarding the situation.  And at that point Laddie was

10  very concerned of the repercussions of her comment.

11      Q    Did you have occasion to talk to Ms. Amini

12  after that?

13      A    Um-hmm.

14      Q    Yes?

15      A    Yes.  Sorry.

16      Q    And what did she say?

17      A    She was concerned of the repercussions of

18  her telling me.

19      Q    What repercussions?

20      A    What was going to -- the strain that was

21  going to come now from her sharing that with me.

22      Q    You mentioned that you told Mr. Gauthier you

23  were going to get the facts.  Other than that second

24  conversation with Ms. Amini, did you have any other

25  occasion to get the facts from anyone?

CAROLYN J. BEAM

Page 65

1    was very upset that we would make an allegation

2    without finding out the facts.

3        Q    What did you think about that?

4        A    I totally agreed with him.  It was

5    inappropriate.

6        Q    What was the disposition of this?

7        A    What do you mean by that?

8        Q    What ultimately happened, do you know?

9        A    We -- Ken was very concerned.  He reported

10   it to HR.  We were all -- HR spoke with all of us to

11   find out what happened.  And Ken and -- Todd and I

12   apologized to Ken.  In person.

13       Q    So you apologized to Ken in person?

14       A    I absolutely did.

15       Q    Where was that, Capital Trail?

16       A    Capital Trail.

17       Q    Did you have any conversations with

18   Laddie Amini about this after you apologized to Ken?

19       A    Yes.

20       Q    What did you say?

21       A    I just told Laddie that she needs to be very

22   careful saying something like that.

23       Q    What is --

24       A    My interaction with Ken was not discussed

25   with Laddie.

# EXHIBIT H

LYNN C. MEYERS, M.D.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY


KENNETH S. MITCHELL,                    :
                                        :
            Plaintiff,                  :       C.A. No.
                                        :       06-12-725 (GMS)
            v.                          :
                                        :
WACHOVIA CORPORATION, t/a               :
WACHOVIA SECURITIES, LLC,               :
WACHOVIA SECURITIES,                    :
WACHOVIA SERVICES, INC.,                :
WACHOVIA BANK OF DEL, N.A.,             :
TODD D. GAUTHIER,                       :
LYNN G. MEYER,                          :
CAROLYN J. BEAM, and                    :
DOROTHY A. DIFEBO,                      :
                                        :
            Defendants.                 :


        DEPOSITION of LYNN G. MEYER, taken pursuant to

notice before John Robert Hemenway, Registered Professional

Reporter and Notary Public, at Morris, James, Hitchens &

Williams, 500 Delaware Avenue, Suite 1500, Wilmington,

Delaware, on Thursday, December 20, 2007, beginning

approximately at 12:00 p.m.



KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

LYNN C. MEYERS, M.D.

Page 5

1      Q     What is your title or position at this time?

2      A     Senior Vice President Retail Banking

3   Director.

4      Q     How long have you been in that position?

5      A     In this position since December 1, 2004.

6   No, I take that back.  2003, I'm sorry.

7      Q     So you became retail banking director on

8   December 1, 2003?

9      A     Retail banking director in Raleigh.

10     Q     So you're currently stationed in Raleigh,

11   North Carolina?

12     A     Yes, I am.

13     Q     Is that where you are today?

14     A     Yes.

15     Q     Are you at a Wachovia office today?

16     A     Yes, we are.

17     Q     Prior to becoming the retail banking

18   director in December 2003, what was your position and

19   title with Wachovia?

20     A     It was about a four month span in which I

21   was displaced, which means in between, transition

22   between jobs.  Prior to that I was retail banking

23   director based out of Media, Pennsylvania.

24     Q     What does it mean when you say displaced?

25   Do you mean in the literal sense that you're between

LYNN C. MEYERS, M.D.

Page 6

1   jobs; as in, leaving Wachovia?  Or you're between

2   offices within the company?

3        A    No.  It means that we had had a

4   reorganization, and my position with Wachovia was to

5   be eliminated as of -- and my employment was to have

6   been terminated as of the end of 2003 hadn't I found a

7   comparable position with Wachovia.

8        Q    So you were able to do so?

9        A    Yes.

10       Q    And you continued in the same type of

11  position, just in a different office.

12       A    That's correct.

13       Q    Did Wachovia in fact do away with the retail

14  banking director position in Media?

15       A    Yes.

16       Q    Prior to being retail banking director in

17  Media, can you give us your background with Wachovia,

18  kind of working background until you first started?

19       A    Certainly.  Prior to being a retail banking

20  director in Media I was a Financial Specialist Sales

21  Leader in Tampa, Florida.

22       Q    And how long were you there?

23       A    I did that for about four and a half years.

24       Q    And before that?

25       A    Prior to that I was in a position called

LYNN C. MEYERS, M.D.

Page 10

1    A    Um-hmm.

2    Q    Can you explain what a Financial Specialist

3  is at Wachovia?

4    A    Sure.  There are different types of the

5  financial specialists.

6         There's a financial specialists that sells

7  only bank products with the primary focus being on the

8  individual consumer.  There is a small business

9  financial specialist that sells only bank products

10  with a combination of sales to business owners and to

11  consumers.  And there is a licensed financial

12  specialist that sells both bank products and a limited

13  array of brokerage products.

14    Q    Can you distinguish for me what the

15  difference is between a bank product and a brokerage

16  product?

17    A    Certainly.  Bank products are traditional

18  bank products; such as, checking accounts, loans,

19  certificates of deposit, savings accounts.  The

20  brokerage products are annuities, mutual funds.

21    Q    Okay.  What does it take to become a

22  licensed financial specialist to be able to sell those

23  additional investment products?

24    A    The FS needs to successfully pass the

25  Series 6 exam and the Series 63 exam.  And in some

LYNN C. MEYERS, M.D.

Page 11

1    states we have them now passing the 65.

2            And they also need to get their Life and

3    Annuities License.

4        Q    Can you briefly explain without going into

5    all the legalese what a 63 and 65 license is?

6        A    Series 6, 63 and 65.

7        Q    Yes.

8        A    They just give you the license to sell

9    mutual funds, not individual stocks.

10       Q    So I wouldn't go to a financial specialist

11   if I wanted to buy a hundred shares of DuPont?

12       A    No.

13       Q    But if I wanted to buy a mutual fund product

14   advertised or put out by Wachovia, I could do that?

15       A    Yes.  And Wachovia allows the licensed

16   financial specialist to sell, not every mutual fund,

17   but only a certain limited offering of mutual funds.

18       Q    So what is the role of the financial

19   specialist at Wachovia?

20       A    The role, they are to meet with bank

21   clients.  Do what we call a customer needs assessment,

22   where they ask a series of questions to uncover

23   financial needs.  And then recommend or provide the

24   appropriate solutions to those while at the same time

25   providing excellent customer service.

LYNN C. MEYERS, M.D.

Page 12

1      Q      In view of what you've just answered about

2   the role and what a financial specialist is at

3   Wachovia, I'd like to address the same types of

4   questions concerning a financial advisor.

5      A      Okay.

6      Q      Can you tell me what a financial advisor is

7   at Wachovia, what role they play, and so forth?

8      A      Because financial advisor don't report to

9   me, I'll tell you my perspective on it.

10      Q      Correct.  You understanding.

11      A      My understanding on it is that they are all

12   Series 7 license, which gives them the authority to

13   sell individual stocks, bonds, things our licensed

14   financial specialists typically do not sell.

15          And they sell brokerage products to our

16   customers, to any customers they meet.  So theirs is a

17   more narrow focus on the brokerage products.

18      Q      You mentioned that during your career you

19   served as a financial specialist sales leader.

20      A      Right.

21      Q      What is that position?

22      A      Okay.  That position is one that the

23   financial specialists report to.  And their role is to

24   coach the financial specialists on the sale of bank

25   products and on just sales techniques in general and

LYNN C. MEYERS, M.D.

Page 20

1   advisor?  And this would be to the best of your

2   understanding because I know you didn't directly

3   supervise a financial advisor.

4        A    My understanding is that financial advisors

5   also make outbound calls to prospects, customers to

6   try and schedule appointments.  They sit in on

7   appointments that an FS may have set up and asked them

8   to join them.

9             And that's exclusively for brokerage product

10  sales as opposed to bank product sales.

11       Q    Are you able to describe for us what your

12  interaction would be as the retail bank director with

13  respect to the interaction of a financial specialist

14  and financial advisor?

15       A    I'll have to take each of those separate if

16  that's okay.

17       Q    That's fine?

18       A    My interaction with a financial specialist

19  would typically be, if I'm out in the field coaching

20  an FSL, I would observe the FSL coaching the financial

21  specialist.  And so my involvement would be typically

22  third hand; in that, my primary interaction is with

23  the person that reports to me, which is the FSL, or

24  the financial specialist leader.  And so that would be

25  how I would interact with an FS.

LYNN C. MEYERS, M.D.

Page 25

1    our chairman, Ken Thompson.

2        Q    So they're completely separate?

3        A    Um-hmm.

4        Q    Is that a "yes"?

5        A    Yes.

6        Q    Sorry.  A deposition is a little more

7    formalized then a normal composition.  We just have to

8    make sure the transcript is readable.

9        A    Sure.

10       Q    A financial specialist would be on the

11   so-called banking side?

12       A    Like I said earlier, they are dual employees

13   of both the brokerage and the bank side.

14       Q    How are they compensated?  If there's a

15   licensed financial specialist that has been selling

16   products, kind of, from the brokerage side every other

17   week or month or however when they're paid, do they

18   get one check?  Or do they get two checks?  Or how

19   does that work, if you know?

20       A    Well, their incentive report shows two

21   different calculations.  It shows how much they made

22   on the brokerage side, how much they're paid on the

23   bank side, and then the pay stub shows the two

24   different amounts as well.

25       Q    Now, a financial specialist leader, would

LYNN C. MEYERS, M.D.

Page 26

1   that individual be on the banking side only, or again,

2   split?

3        A    It depends.  There are some financial

4   specialist leaders who are licensed and they are dual

5   employees and they get paid on the bank side and the

6   brokerage side.

7             We have some financial specialist leaders

8   who are not licensed and they only get paid on the

9   bank side.

10       Q    How about an FA?  Is it easier there?  Are

11  they simply brokerage side?

12       A    I think they're simply brokerage side.  I

13  don't know of any FAs that are also bank employees.

14       Q    As the retail bank director would you be at

15  the approximate level of a regional sales manager,

16  such as something like Todd Gauthier that used to be

17  Mr. Mitchell manager, or at a different level higher

18  or lower?

19       A    No, I would say we were peers.

20       Q    Are there any licensing requirements to be a

21  retail bank director?

22       A    No, not that I'm aware of.  I still have my

23  Series 6 and 63 licenses from when I was a financial

24  specialist leader.

25       Q    That was my next question, is what licenses

LYNN C. MEYERS, M.D.

Page 60

1   Mr. Mitchell.

2       A    Not that I remember.

3       Q    You never initiated any kind of disciplinary

4   action or reprimand action or anything like that

5   concerning that incident, to the best of your

6   knowledge?

7       A    Because Mr. Mitchell doesn't report to me, I

8   had no authority to reprimand him or discipline him.

9   Because I'm responsible for the service levels in the

10  financial centers, that's why I took it upon myself to

11  call him.

12      Q    Did --

13      A    But I have no authority to reprimand or

14  discipline him.

15      Q    Did you consider that phone call to be a

16  form of reprimand?

17          MS. MISHRA:  Objection.  You can answer.

18          THE WITNESS:  I don't consider it to be a

19      form of reprimand.  I saw it as just me telling

20      him don't do that again in the financial centers.

21      Q    (By Mr. Jones) I've been using the word

22  "reprimand" a couple times in this definition.  Does

23  reprimand have a specific defined meaning within the

24  Wachovia organization?

25      A    No.  That term is not really used with the

# EXHIBIT I

DOROTHY DI FEBO

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

- - -

KENNETH S. MITCHELL,                    :
                                        :
                                        :
     Plaintiff,                         :
                                        : C.A. No. 06-725
     v.                                 :
                                        :
WACHOVIA CORPORATION, t/a               :
   WACHOVIA SECURITIES,                     :
WACHOVIA SECURITIES, L.L.C.,            :
WACHOVIA SERVICES, INC.,                :
WACHOVIA BANK OF DELAWARE,              :
   N.A.,                                    :
TODD D. GAUTHIER,                       :
LYNN G. MEYER,                          :
CAROLYN J. BEAM, and                    :
DOROTHY A. DIFEBO,                      :
                                        :
     Defendants.                        :

- - -

October 23, 2007



- - -

        Deposition of DOROTHY DI FEBO, held in
the Law Offices of BIGGS & BATTAGLIA, located at
921 North Orange Street, Wilmington, Delaware,
commencing approximately at 2:30 p.m. on the above
date, before Holly J. Cross, a Registered
Professional Reporter and Notary Public for the
State of Delaware.


KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

DOROTHY DI FEBO

Page 2

```
 1   APPEARANCES:

 2

         BIGGS & BATTAGLIA
 3       BY:  STEVEN F. MONES, ESQUIRE
         921 North Orange Street
 4       Wilmington, DE  19801
         Counsel for Plaintiff

 5

 6       SEYFARTH SHAW, LLP
         BY:  DEVJANI H. MISHRA, ESQUIRE
 7       BY:  TARA S. WILLIAMS, ESQUIRE
         620 Eighth Avenue
 8       New York, NY  10018
         Counsel for Defendants

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DOROTHY DI FEBO

Page 7

1     **A**     Yes.

2     **Q**     What are your hours as the FCM?

3     **A**     Varied, depends on a given day, the

4 tasks; no set hours.

5     **Q**     What branches or offices of Wachovia

6 have you worked at over the years?

7     **A**     Prices Corner.

8     **Q**     The whole time?

9     **A**     Yes.

10     **Q**     So you must know the place inside and

11 out.

12     MS. WILLIAMS:  Objection.

13     You can answer.

14     THE WITNESS:  Yes.

15 BY MR. MONES:

16     **Q**     What activities does the branch do?  In

17 other words, is it a regular bank that also does

18 trading and securities, or is it just securities or

19 investments or -- can you describe it to me?

20     **A**     It's retail and securities.

21     **Q**     So customers could go there with

22 checking and savings accounts and also do

23 securities?

24     **A**     Yes.

25     **Q**     What are your duties as the financial

DOROTHY DI FEBO

Page 8

1    center manager?

2         A        Customer service basically.

3         Q        Okay.  Customer service, what does that

4    involve?

5         A        Dealing with the customers on a

6    day-to-day basis.

7         Q        Who do you supervise?

8         A        Really, the tellers basically, but the

9    tellers do have a direct report of their own, which

10   is the teller manager.  I more or less just run the

11   day-to-day operations of the office.

12        Q        So you run the operations and the

13   personnel are run by other people?

14        A        Yes.

15        Q        It sounds like Wachovia has in place a

16   matrix-type system for management?

17        A        Yes.

18        Q        I understand that there are different

19   chains of command for the bank practices, for the

20   financial specialist, and for the financial

21   advisor; is that correct?

22        A        Say your question again.  There's

23   different what?

24        Q        Different chains of command or lines or

25   reporting, I guess --

DOROTHY DI FEBO

Page 26

1   because it's come up a couple of times -- can you

2   tell me the sequence of events that lead from

3   Delaware Trust to Wachovia?  Just in general, who

4   merged into who?

5        A       Delaware Trust to Meridian, Meridian to

6   CoreStates, CoreStates, First Union, Wachovia.

7        Q       That's very helpful.  Do you know what

8   the typical longevity was for a financial advisor

9   at Prices Corner?

10       A       No.

11       Q       How about for a financial specialist?

12       A       It depends on whether they stayed or --

13   what do you mean by longevity?

14       Q       How long did people typically stay in

15   those positions at your branch?

16       A       Some, for many years; some, as a

17   stepping stone.

18       Q       Okay.  Did you have any input into the

19   evaluations of either a financial specialist or

20   financial advisor?

21       A       No.

22       Q       So, for instance, Ms. Beam, who was the

23   supervisor of Ms. Amini, or Mr. Gauthier, who was

24   the supervisor of Mr. Mitchell, wouldn't call you

25   or have you submit anything as part of their

DOROTHY DI FEBO

Page 27

1    subordinates' annual evaluations?

2        A        No.

3        Q        Did any part of your evaluation depend

4    upon the performance of a financial advisor or a

5    financial specialist?

6        A        Indirectly.

7        Q        Can you elaborate on that?

8        A        I was responsible for set goals for the

9    whole financial center.

10       Q        What kind of goals?

11       A        It changes through the years, but basic

12   ones were loan goals, deposit goals, investment

13   goals.  The onset of the year, there was a certain

14   percentage that you had to meet in terms of saying

15   you met your goal.

16       Q        So the people that worked in your branch

17   had to meet certain quotas or figures for loans to

18   customers?

19       A        Yes.

20       Q        And for deposits by customers?

21       A        Yes.

22       Q        And for investments by customers?

23       A        Yes.

24       Q        Did you monitor those figures?

25       A        Explain monitor.  What do you mean?

DOROTHY DI FEBO

Page 36

1    initially coming to Wachovia and the fact that he

2    was based out of Capitol Trail primarily; is that

3    correct?

4         A      You're asking me if he was based out of

5    Capitol Trail primarily?  Yes.

6         Q      Okay.  How often do you think he came to

7    Prices Corner?

8         A      Only came to Prices Corner if he had an

9    appointment with a client.

10        Q      Do you have an estimate how often that

11   was, or was it just completely random?

12        A      Random.

13        Q      Did you and Laddie Amini have any

14   conversations about Mr. Mitchell's initial period

15   of working for Wachovia?

16              MS. WILLIAMS:  Objection.

17              MR. MONES:  Why?

18              MS. WILLIAMS:  You can answer.

19              MR. MONES:  What are you objecting to?

20              MS. WILLIAMS:  The initial period.

21   That's too many days.  What does that mean?

22              MR. MONES:  It's not.  It's when he

23   first got there.

24              MS. WILLIAMS:  Well, you can say that,

25   first two months, first one month.