UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

KENNETH S. MITCHELL,                    )
                        Plaintiff,      )
                                        )
        v.                              )        C.A. No. 06-12-725 (GMS)
                                        )
WACHOVIA CORPORATION,  t/a              )        JURY TRIAL DEMANDED
    WACHOVIA SECURITIES,                )
WACHOVIA SECURITIES, L.L.C.,            )
WACHOVIA SERVICES, INC.,                )
WACHOVIA BANK OF DEL, N.A.,             )
TODD D. GAUTHIER,                       )
LYNN G. MEYER,                          )
CAROLYN J. BEAM, and                    )
DOROTHY A. DIFEBO,                      )
                        Defendants.     )

PLAINTIFF'S ANSWERING BRIEF
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BIGGS AND BATTAGLIA
Victor F. Battaglia, Sr. (Del. Bar #156)
Steven F. Mones (Del. Bar #2611)
921 N. Orange Street
P.O. Box 1489
Wilmington, DE  19899-1489
Tel:  302-655-9677
Fax:  302-655-7924
smones@batlaw.com
Attorneys for Plaintiff

January 22, 2008

## TABLE OF CONTENTS

Table of Citations ................................................................................................................. iii

Introduction ...................................................................................................................... 1

Nature and Stage of Proceedings ...................................................................................... 2

Summary of Argument ...................................................................................................... 3

Statement of Facts ............................................................................................................ 4

Argument:

       DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
       SHOULD BE DENIED AS THERE ARE MATERIAL FACTS
       IN DISPUTE AS TO THE SUBSTANCE OF PLAINTIFF'S
       CLAIMS AND AS TO THE DEFENDANTS THEMSELVES ..................................... 19

       I.     PLAINTIFF HAS LEGITIMATE CLAIMS AGAINST DEFENDANTS
               WACHOVIA CORPORATION, WACHOVIA BANK, AND
               WACHOVIA SERVICES ................................................................................ 19

       II.    PLAINTIFF HAS MET HIS BURDEN OF ESTABLISHING A
               *PRIMA FACIE* CASE OF RACE AND GENDER DISCRIMINATION
               AND RETALIATION ........................................................................................22

       III.   SUFFICIENT EVIDENCE EXISTS TO CREATE A JURY QUESTION
               CONCERNING THE LIABILITY OF THE INDIVIDUAL DEFENDANTS
               UNDER 42 *U.S.C.* SECTION 1981 ..................................................................... 34

       IV.   PLAINTIFF HAS STATED A VALID CLAIM FOR CIVIL
               CONSPIRACY UNDER DELAWARE STATE LAW ..................................... 38

       V.    PLAINTIFF'S CLAIMS UNDER SECTION 1985 AND 1986, FOR
               STATE LAW FRAUD AND *PRIMA FACIE* TORT, AND ALL CLAIMS
               AGAINST DEFENDANT MEYER ARE WITHDRAWN ............................. 40

Conclusion ...................................................................................................................... 40

TABLE OF CITATIONS

<u>Cases</u>

*Al-Khazraji v. Saint Francis College*,
784 F.2d 505 (3d Cir. 1986) ................................................................. 35

*Andrews v. City of Philadelphia*,
895F.2d 1469 (3d Cir. 1990) ................................................................. 27

*Brown v. Philip Morris, Inc.*,
250 F.3d 789 (3d Cir. 2001) ................................................................. 35

*Burlington Northern and Santa Fe Ry. Co. v. White*,
126 S.Ct. 2405(2006) ................................................................. 34

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................. 19

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
450F.3d 130 (3d Cir. 2006) ................................................................. 34

*Cole v. Delaware Technical & Com. College*,
459 F.Supp. 2d 296 (D.Del. 1996) ................................................................. 22

*Edwards v. Concord EFS, Inc.*,
2004 U.S. Dist. LEXIS 13942 (D.Del. Jul 20, 2004) ................................................................. 38

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998) ................................................................. 29

*Gallo v. Prudential Residential Services, Ltd. Partnership*,
22 F.3d 1219 (2d Cir. 1994) ................................................................. 19

*Gonzalez v. Comcast Corp.*,
2004 U.S. Dist. LEXIS (D.Del. Jul. 30, 2004) ................................................................. 19, 20, 22, 35

*Goosby v. Johnson & Johnson Medical, Inc.*
228 F.3d 313 (3d Cir. 2000) ................................................................. 19

*Hall v. Pennsylvania Dept. of Corrections*,
2006 WL 2772551 (M.D. Pa. Sep. 25, 2006) ................................................................. 25, 32

*Harris v. Forklift Systems, Inc.*,
510 U.S. 17 (1993) ................................................................. 23

*Knowlton v. Teltrust Phones, Inc.*,
189 F.3d 1177 (10th Cir. 1999) ................................................ 20

*Marzano v. Computer Science Corp.*,
91 F.3d 497 (3d Cir. 1996) ................................................ passim

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ................................................ 22

*Mongelli v. Red Clay Consol. School Dist. Bd. of Ed.*,
491 F.Supp. 2d 467 (D.Del. 2007)................................................ 34

*Nesbit v. Gears Unlimited, Inc.*,
347 F.3d 72 (3d Cir. 2003) ................................................ 20, 21

*Nicolet, Inc. v. Nutt,*
*525 A.2d 146 (Del. 1987)* ................................................ 38

*Petrocelli v. DaimlerChrysler Corp.*,
2006 U.S. Dist. LEXIS 11972 (D.Del. Mar. 22, 2006) ................................................ 27

*Price v. Delaware Dept. of Correction*,
40 F.Supp. 544 (D.Del. 1999) ................................................ 34

*Seldomridge v. Uni-Marts, Inc.*,
2001 U.S. Dist. LEXIS 9491 (D.Del. July 10, 2001) ................................................ 23, 31, 38

*Spain v. Gallegos*,
26 F.3d 439 (3d Cir. 1994) ................................................ 32

Statutes

42 *U.S.C.* §1981 ................................................ 3, 35

42 *U.S.C.* §1985 ................................................ 3, 40

42 *U.S.C.* §1986 ................................................ 3, 40

42 *U.S.C.* §2000e ................................................ 2, 3

19 *Del.C.* §710 ................................................ 2, 3

Rules
Federal Rule of Civil Procedure 56 ................................................ 19

iv

<u>INTRODUCTION</u>

This case involves the racial and gender discrimination claims of Kenneth S. Mitchell ("Mitchell"), an African-American male employed as a Financial Advisor with Wachovia.

Mitchell was the victim of a campaign of discrimination and harassment by a group of white female employees at Wachovia's Prices Corner branch. Dorothy DiFebo ("DiFebo"), Carolyn Beam ("Beam"), and Ladan Amini ("Amini") made or deliberately spread malicious accusations against Mitchell that were completely false. Wachovia management acquiecsed in the racial and gender discrimination and took no steps to discipline the individuals responsible for such conduct. Despite being exonerated of all the false and malicious accusations, Mitchell was removed from the Prices Corner branch by his manager, Todd D. Gauthier ("Gauthier"), and replaced by a white male. Gauthier told Mitchell that Prices Corner was not right for him, and that the staff did not like him and did not want to work with him. In effect, the victim, not the perpetrators, was punished.

Defendants argue that Mitchell's problems at Prices Corner were simply trivial personality conflicts. Mitchell had no such conflicts with personnel at either the Capitol Trail or Meadowood branches. Both of those branches were managed by African-American women. Prices Corner, by contrast, was managed by a white woman, DiFebo, who went out of her way to isolate and cause conflict with Mitchell. Beam, who was Amini's supervisor, also took no action against Amini's demonstrably false accusations and antagonism. The white female employees stopped referring business to Mitchell and generally interfered with his ability to do his job.

At this stage, with the facts viewed in a light most favorable to Mitchell, sufficient evidence exists to warrant submission of the case to the jury.

<u>NATURE AND STAGE OF PROCEEDINGS</u>

On December 1, 2006, plaintiff Kenneth S. Mitchell filed a Complaint against the individual and entity defendants alleging racial and gender discrimination under Title VII, 42 *U.S.C.* §2000e *et seq*. and 19 *Del.C.* §710 *et seq.,* and related violations of federal and state law in connection with his employment.

On February 23, 2007, 2007, defendants filed an Answer to the Complaint.   At a scheduling conference with the Court, trial in this case was set for May 12, 2008.

On January 7, 2008, defendants filed a Motion for Summary Judgment as to all claims in plaintiff's Complaint.

This is plaintiff's Answering Brief in opposition to defendants' motion.

SUMMARY OF ARGUMENT

I.      Sufficient evidence exists as to the inter-relationship of the Wachovia entities to warrant denial of summary judgment.  The entities operated in essence as departments within a common company, including the handling of personnel matters by a common Human Resources Department.

II.     Mitchell has met his burden of establishing a *prima facie* case of race and gender discrimination under Title VII, 42 *U.S.C.* Section 2000e and the corresponding Delaware state statute, 19 *Del.C.* Section 710.  The combination of the direct evidence, plus legitimate inferential evidence, supports Mitchell's claims and is sufficient to warrant denial of summary judgment.

III.    Sufficient evidence exists as to the liability of the individual defendants under 42 *U.S.C.* Section 1981 to defeat defendants' motion for summary judgment.

IV.     Mitchell has stated legitimate claims for civil conspiracy against the individual defendants under Delaware law.  The combination of direct evidence and inferential evidence is sufficient to defeat defendants' motion for summary judgment on this issue.

V.      Mitchell does not contest summary judgment as to his claims under 42 U.S.C. Sections 1985 and 1986, for common law fraud and *prima facie* tort, and as to all claims against defendant Meyer.

## STATEMENT OF FACTS

### Background: Wachovia Structure and Job Titles

Mitchell, an African-American male, has been an employee of Wachovia Securities, L.L.C. ("Wachovia Securities" - successor to Wachovia Securities, Inc.) since August 2002. Mitchell Dep. Exhibit-3.  In addition to being a financial professional, Mitchell serves in the United States Naval Reserve with the rank of Commander.  Mitchell Dep. 26:13-17.  Wachovia Securities is an affiliate of various other Wachovia entities including defendants Wachovia Corporation, Wachovia Bank of Delaware, Inc. ("Wachovia Bank"), and Wachovia Services, Inc.  The distinctions between the above entities are anything but clear.  For instance, Mitchell filled out a "Wachovia Corporation" employment application, and his job offer was communicated to him on "Wachovia Corporation" letterhead.  Mitchell Dep. Exhibits-2 and -3. Mitchell's 2003 W2 form was from Wachovia Services.  Mitchell Affidavit Exhibit-A.

The above entities share employees, services, and resources on a day-to-day basis. Mitchell, a Financial Advisor ("FA") with Wachovia Securities, physically works out of a Wachovia financial center ("branch") operated by Wachovia Bank, and works as part of a team with Wachovia Bank employees such as Financial Specialists ("FSs").  An FS in turn is nominally considered employed by Wachovia Bank, but is considered "dually employed" by Wachovia Securities to the extent that the FS' work involves securities.  Opening Brief at 7; Gauthier Dep. 54:6-9 (An FS "is a dual employee of the bank as well as the brokerage firm."); Meyer Dep. 25:12-13 (FSs "are dual employees of both the brokerage and the bank side").  In addition, Wachovia Bank and Wachovia Securities used a common e-mail system with employee e-mail addresses uniformly ending in "wachovia.com."  *See, e.g.*, Amini Dep. Exhibit-1.

4

Mitchell was hired as an FA, at the level of a Vice President, to serve under Gauthier, Regional Sales Manager and Senior Vice President for Wachovia Securities. Mitchell was initially assigned to work out of the Wachovia Prices Corner and Capitol Trail branches. Gauthier Dep. 53:3-10. Those two branches were located about one mile apart on Kirkwood Highway between Wilmington and Newark, Delaware. Gauthier Dep. 140:24-141:2.

A Wachovia branch is managed by a Financial Center Manager ("FCM"). The Prices Corner branch was managed by DiFebo, a white woman. DiFebo Dep. 4:24-5:1. A typical Wachovia branch is comprised of an FCM who manages the branch, a Teller Manager who manages bank tellers, a variable number of bank tellers, an FS, and an FA. DiFebo Dep. 32:11-33:25. There may be other employees such as a small business banker. DiFebo Dep. 32:23.

The Capitol Trail branch was managed by Gloria Sharp. DiFebo Dep. 33:9-13; Mitchell Dep. 70:18-23; Amini Dep. 143:25-144:2. Ms. Sharp is an African-American woman. Beam Dep. 101:8-10; Other than with respect to personnel, there were no inherent differences in the operations of the Prices Corner and Capitol Trail branches. Meyer Dep. 58:10-16 ("Both of them I saw as just typical offices.").

Mitchell reported directly to Gauthier, who in turn reported to Frank Consalo, a Regional President for Wachovia Securities. Consalo Dep. 4:21-24; Gauthier Dep. 19:1-3.

A Financial Specialist (*e.g.*, Amini) reported to a Financial Sales Leader (*e.g.*, Beam), who in turn reported to a Retail Bank Director (*e.g.*, Lynn G. Meyer ("Meyer")). Meyer Dep. 20:18-25; Beam Dep. 13:25-14:12.

Wachovia FAs were expected to work closely with FSs in a "partnering" relationship. Beam Dep. 16:2-18:1; Gauthier Dep. 20:1-23; Amini Dep. 18:1-6. This "partnering" concept is at the heart of the FS/FA relationship and it is an example of the common bonds between the

banking and securities sides of Wachovia.  The "partnering" was fundamental not just to the relationship between an FS and an FA, but also to their financial compensation.  Wachovia employed the concept of "Team Brokerage" ("TBRK") which was a formula that apportioned financial credit between an FS and an FA on joint trades.  Beam Dep. 19:1-12;  Mitchell Dep. 67:2-20.  The compensation of both an FS and the individuals in his or her chain of command hinged on the partnering with an FA.  Meyer Dep. 54:16-55:3 (Meyer, two levels above Amini, testified: "The more production an FA does, the more incentive I earn too.").

Although an FA did not have direct supervisory authority over an FS, the FA was expected to mentor the FS.  Gauthier Dep. 54:15-18.  The FA was considered the more senior of the two positions with respect to knowledge of securities practices, and they had higher levels of securities licensing.  Gauthier Dep. 54:22-55:1.

To the extent that an FS held any securities licenses, they were held through Wachovia Securities.  Gauthier Dep. 56:3-4 ("I have their licenses as a principal.").  Amini, who was the FS at Prices Corner, holds Series 6 and 63 securities licenses and is deemed a "Licensed Financial Specialist" with Wachovia.  Amini Dep. 32:3-11.  Not all Wachovia FSs are licensed, but holding securities licenses enables an FS to offer a customer a wider variety of Wachovia financial products.  Beam Dep. 12:9-20.  During the time period she supervised Amini and other FSs as a Financial Sales Leader ("FSL"), Beam also held Series 6, 63, and life insurance licenses.  Beam Dep. 30:4-11.

An FA was deemed to have the authority to "review" trades proposed by an FS.  Gauthier Dep. 64:21-25.  These "reviews" were deemed mentoring opportunities for an FA vis-à-vis an FS.  Gauthier Dep. 64:23-24.  If an FA had reservations about the appropriateness of a trade proposed by an FS, the FA could contact Wachovia's compliance department.  Mitchell Dep.

89:21-90:2.  Gauthier Dep. 65:2-7 (*cf.* Gauthier Dep. 106:2-4 ("RBO" - Regional Branch Office - is where the Wachovia compliance officer is located)).

Mitchell's Conflicts at Prices Corner

When Mitchell started working for Wachovia, he was assigned to both the Prices Corner and Capitol Trail branches.  Mitchell Dep. 62:10-13.  As a newly-hired FA, Mitchell was told that his duties were to provide investment services for Wachovia customers and to "train and coach the financial specialists ... about investment services and formulating a team to service clients of the bank."  Mitchell Dep. 63:9-15.

Although he was assigned to work out of both branches, Mitchell had a physical office only at Capitol Trail.  When he was notified of customer appointments at Prices Corner, Mitchell would share office space with someone there.  Gauthier Dep. 74:8-17.  Mitchell worked hard to have a good working relationship with Amini at Prices Corner.  Mitchell Dep. 75:18-24.  In order to cement their working relationship, Mitchell even let Amini have full credit for certain trades in which he could have claimed partial credit.  Mitchell Dep. 74:24-75:5.

Amini's antagonism towards Mitchell was demonstrated in 2003 through a series of incidents that culminated in Amini making a serious, and false, accusation against Mitchell that has affected Mitchell's career with Wachovia to this date.

The first sign of friction between Amini and Mitchell arose from a matter that occurred in June 2003, involving $6.00.  Mitchell Affidavit.  Among the accounts Mitchell acquired upon joining Wachovia were those of a wealthy customer named Mr. Herrmann, an elderly gentlemen (now deceased) who had several accounts with Wachovia.  Mitchell became his FA as the accounts were at Prices Corner.  Mitchell Dep. 81:10-82:12.

Amini set up a joint meeting to introduce Mitchell to Mr. Herrmann.  At the meeting, Mr.

7

Herrmann decided to deposit $50,000.00 in a mutual fund account. Amini Dep. 65:11-15. About one week later, on or about June 20, 2003, Mr. Herrmann came back to see Amini because he was upset about being charged a transaction fee of $6.00. Amini Dep. 65:15-25. Mr. Herrmann asked Amini to waive the fee, and Amini replied that she did not have the authority to do so. Amini Dep. 65:20-66:4. Amini called Mitchell at Capitol Trail, and he came to Prices Corner. Amini Dep. 66:15-16; Mitchell Dep. 84:10-14.

When Mitchell arrived, Mr. Herrmann stated "I got this fee and you're going to waive it." Amini Dep. 66:18-20. Amini reiterated that she could not waive the fee. Mitchell Dep. 84:15-20; Amini Dep. 66:21-23. Mr. Herrmann was very upset, so Mitchell took $6.00 out of his pocket and put it on the table. Mitchell Dep. 84:21-24; Amini Dep. 66:25-68:1. Mr. Herrmann refused the money. Mitchell Dep. 84:23-24; Amini Dep. 68:1-3.

Mitchell asked Amini to call Wachovia's Operations Manager, Al Tedesco, to see if the fee could be deleted from the account. Mitchell Dep. 85:1-2. Mr. Tedesco advised Mitchell that the fee could only be removed if it were charged to Mitchell himself. Mitchell Dep. 85:1-7. Mitchell authorized this charge and Mr. Herrmann was satisfied. Mitchell Dep. 85:8-11. This type of "accommodation" by an FA was not unusual, and Wachovia had a procedure to account for such customer refund matters. Gauthier Dep. 61:11-62:17.

Amini was upset about this incident, and she reported it to Prices Corner's FCM, DiFebo even though DiFebo was not in her chain of command. Amini Dep. 69:3-21. Within about one week of the $6.00 incident, on or about June 25, 2003, there occurred another incident, this time involving several trades proposed by Amini which she had submitted to Mitchell for review. The trades ($3,000 and $5,000) were for annuities in customer accounts in which more than 70% of the customers' funds were invested in annuities. Mitchell Dep. 94:9-24. Mitchell suggested

8

that Wachovia's Compliance Department be consulted to ensure that both Amini and Wachovia were protected. Mitchell Affidavit. The legitimacy of this concern was borne out by Mr. Consalo's response to a question of whether about 70% of a customer's account should be invested in a particular type of annuity:

> I think it would be safe to say they shouldn't have that much in any investment. Not just an annuity. I'm not saying it's right or wrong. It would give you cause to look further and review the particular trades in question.

Consalo Dep. 17:18-17:2.

Amini was "very upset" even though the Compliance Department ultimately approved the transactions. Amini Dep. 88:16; 88:23-89:2. Amini was so upset that she called several FS colleagues, including Thomas Klein. She reached Mr. Klein on his cell phone in his car, and he told Ms. Amini that he was with Meyer. Mr. Klein and Meyer drove directly to Prices Corner to see Amini. Amini Dep. 91:2-92:17. On July 9, 2003, Meyer spoke to Mitchell and told him that he made Amini "fear for her job" because of his suggestion that they call the Compliance Department. Meyer also criticized Mitchell for the earlier $6.00 incident, and she told him that she had called Mr. Consalo about the matter. Mitchell Dep. 168:6-19; Consalo Dep. 10-13. Mitchell then called Gauthier to discuss the matter. Gauthier told Mitchell that offering any amount of cash to a customer was a violation of Wachovia's policies. Gauthier Dep. 58-24-25, 62:22-25. Gauthier did not believe discipline was "appropriate" in this instance, and he told Mitchell that he had "saved" a Wachovia customer. Gauthier Dep. 63:4-8; 85:20-24.

9/11 Incident

On the morning of July 16, 2003, as he was preparing to leave for an appointment out of th office, Mitchell received a telephone call at his home from Gauthier. Mitchell Dep. 102:10. Gauthier generally did not call FAs at their homes in the morning. Gauthier Dep. 30:13-23.

9

Gauthier asked Mitchell if he remembered a meeting with Amini in which he had said something about Amini's "people" having destroyed the World Trade Center in New York on September 11. Mitchell Dep. 102:3-6. Mitchell was shocked, and he asked if Gauthier was serious. Mitchell Dep. 102:19. Gauthier replied that he was serious, and Mitchell stated categorically that he never said anything like that to anyone. Mitchell Dep. 102:19-21.

Gauthier had learned from Beam that Mitchell had made inappropriate comments about Amini's nationality (Iranian). Gauthier Dep. 27:12-15, 20-23. The genesis of the incident was a coincidence involving the first three digits of Amini's employee number. Amini's six digit employee number began with 9-1-1. Mitchell testified that he was with Amini, and when he asked for her employee number to document a trade for TBRK purposes, Amini said something to the effect of "you ought to remember my number ... my number begins with 911." Mitchell Dep. 99:19- 100:8. Amini testified that Mitchell called her on the telephone, asked for her employee number, and as she started saying "9-1-1 ...," Mr. Mitchell said "911 and September 11th." Amini Dep. 102:16-103:2.

Regardless of which of the above two scenarios is correct, the fact remains that both individuals confirmed that nothing further was said between them. Nevertheless, by the time Gauthier heard the story, Mitchell had been accused of saying that Amini's "people" had blown up the World Trade Center in New York City. Mitchell Dep. 102:3-6.

The conversation between Mitchell and Amini occurred in April or May 2003, which is several months before Mitchell received the telephone call from Gauthier. Mitchell Dep. 101:18-24. Amini remembers having told DiFebo about the conversation. Amini Dep. 104:8-9; 105:22-23. DiFebo recalls Amini being "very upset" about the reference to 9/11 and her nationality. DiFebo Dep. 56:13-16; 56:21-57:8.

10

DiFebo escalated the situation by urging Amini to call "somebody, to call human resources, to do anything." DiFebo Dep. 57:18-20. DiFebo then took matters into her own hands by calling Beam. DiFebo Dep. 57:9-15; 58:8-10. When asked if she had just assumed that what Amini said was true, DiFebo responded "I didn't assume. I just repeated what I was told." DiFebo Dep. 58:16-19.

Beam recalls being told that Mitchell said Amini should remember 9/11 "based on her nationality or ethnic background." Beam Dep. 56:14-24. Beam then called Gauthier, who called Mitchell. Beam Dep. 59:22-23; 62:1-3 ("Todd had made a phone call to Ken immediately and brought this up to Ken *prior to anybody having the facts*.") (emphasis added). Mitchell "was denying it and was very upset." Beam Dep. 61:8-9.

Beam testified that she had asked Gauthier not to call Mitchell until the matter had been investigated "because I didn't have the facts." Beam Dep. 62:12-14. Beam recognized that this was a "serious allegation," and that it "needed support." Beam Dep. 62:14-15. Beam admitted that she called Gauthier, but she hoped he would not share it with Mitchell until she "got the full story from Laddie and had the opportunity to really understand what happened." Beam Dep. 62:17-20. When pressed about what she would have done other than speak to Amini and Gauthier, which is what she had done, Beam was at a loss for a coherent response. Beam Dep. 63:1-616.

Gauthier and Beam spoke to Amini and confirmed that Mitchell had not said anything about the World Trade Center, "her people," terrorists, or anything of that nature. Gauthier then called Mitchell and told him that he had been "exonerated." Mitchell Dep. 106:8-16.

Mitchell's life had been turned upside down through the actions of individuals who had passed along allegations that were not even supported by Amini. Beam acknowledged that

Mitchell was "very upset that we would make an allegation without finding out the facts," and she added "I totally agreed with him.  It was inappropriate."  Beam Dep. 64:17-65:5.  Beam apologized to Mitchell, and she told Amini that "she needs to be very careful about saying something like that."  Beam Dep. 65:11-14, 17-22.  Gauthier also confirmed that he apologized to Mitchell "for having broached the subject with him."  Gauthier Dep. 39:14-15.  That is the extent of what Wachovia management did in response to the proven false accusations made against Mitchell.

Investigation of the 9/11 Incident

Mitchell pursued the matter with Wachovia's Human Resources Department.   Mitchell Dep. 108:19-22.  Mitchell had nearly lost his job over the false accusations. Mitchell Dep. 106:17-19 (Gauthier told him that he could have been fired).  On October 20, 2003, Mr. Consalo met with Mitchell and Gauthier, and he advised Mitchell that he had reprimanded Gauthier for his handling of the 9/11 incident.   Mitchell Affidavit.   In fact, Gauthier had not been reprimanded.  Gauthier Dep. 45:13-16;  Consalo Dep. 32:2-7 ("No.  I didn't reprimand him.").

No action of any kind was ever taken against Amini for making false accusations against Mitchell, against DiFebo for embellishing or fabricating false accusations against Mitchell, against Beam for propagating false accusations before investigating them, or against Gauthier for failing to investigate the validity of what turned out to be false accusations before acting on the accusations.

Mitchell after the 9/11 Incident

Mitchell was deeply affected by the both the 9/11 incident itself and its handling by Wachovia employees who were ostensibly his colleagues and partners.  Mitchell stayed away from Prices Corner from July 2003 to November 2003 while the matter was being investigated

12

by Wachovia's Human Resources Department.  Mitchell Dep. 108:16-17.  Mitchell handled all business from Capitol Trail.  Mitchell Dep. 109:6-13.  Mitchell "was fearful of going back there to work because an accusation of such magnitude had been made against me."  Mitchell Dep. 113:6-11.  It was evident that Amini, DiFebo, and Beam did not like working with and having their transactions questioned by black male.  Mitchell Affidavit.

Mitchell asked Wachovia's Human Resources Department to arrange a meeting of all the persons involved in the 9/11 incident including himself, Amini, DiFebo, Beam, and Meyer to "iron out" their differences.  Mitchell Dep. 114:23-115:9,  121:4-7.  That request was denied. Mitchell Dep. 115:10-11.

Mitchell returned to Prices Corner in November 2003.  Mitchell Dep. 124:12-14.  Amini was essentially no longer referring any business to him, not executing any trades with him, and not setting up any joint customer appointments.  Mitchell Dep. 124:18-22;  141:21-24.  Amini had withdrawn from working with Mitchell.

Mitchell's performance as an FA with Wachovia had been excellent before the 9/11 incident, and it remained that way during 2004.  Mitchell had been near the top of the approximately 27-28 FAs in Gauthier's region.  Mitchell Affidavit.  During March or April 2004, Gauthier told Mitchell that he was ranked third of the 28 FAs in his region for production. Mitchell Dep. 181:5-20.  Nevertheless, Gauthier pressed Mitchell to hire a "broker funded assistant" which is an employee hired to provide assistance to an FA, but whose salary came directly out of the FA's income.  Mitchell Affidavit.  Mitchell would have been charged $3,000 a month for a broker funded assistant.  Mitchell did not wish to do that as the broker funded assistant would be based at Capitol Trail, where he was already exceeding his goals, and the proposal would not address the situation at Prices Corner where his production was falling due to

13

his problems with the personnel at that branch.  Mitchell Dep. 181:5-183:18.

In February 2004, Wachovia proposed a new "investment prospecting and referral strategy" program.  Mitchell Dep. 134:14-17.  On July 16, 2004, Gauthier and Beam met with Mitchell.  By that time, the new program had been implemented successfully at Capitol Trail by both the FA and FS, and the production figures were increasing.  Mitchell was congratulated as his production figures still placed him near the top of FAs in the region.  Mitchell Affidavit.  There was some lagging of the production figures from Prices Corner due to  Amini's resistance to implementing the plan by cooperating with Mr. Mitchell.  Gauthier Dep. 102:11-15.  Mitchell Affidavit.

Prices Corner is taken away from Mitchell

Mitchell had been seeking an office at the Prices Corner branch.  He believed that having a more significant physical presence there would help his relationship with the staff.  Mitchell Dep. 133:5-14.  At the meeting held on July 16, 2004, a form titled *Monthly FA/FSL Meeting "Closing the Books"* was filled out by Mitchell and Beam.    Beam, the FSL, agreed to the following:  "Office space @ Prices Corner."  Beam Dep. Exhibit-6.

During late 2004, the small business banker left Prices Corner and an office became vacant.  Mitchell Dep. 140:20-24.  Gauthier and Beam approved his moving into the space.  Mitchell Dep. 141:2-5.  Gauthier denies that he ever approved office space for Mitchell at Prices Corner.  Gauthier Dep. 120:7-10.  However, on August 19, 2004, Gauthier sent an e-mail message to Mitchell and Beam asking the following:  "Carol: have we got the space item resolved at prices corner?"  Mitchell Affidavit.

Mitchell also attempted to improve the relationships at Prices Corner.  Mitchell took the lead in arranging "f-troop" meetings involving FAs and FSs at the various branches.  Beam Dep.

14

Exhibits-4 and -5.  Amini was part of this group.  Beam Dep. Exhibit-6.

Mitchell moved into a vacant office at Prices Corner on December 6, 2004.  Mitchell Dep. 145:17-24.  To the best of his knowledge no one had objected to his use of the office.  However it appears that DiFebo, Beam, and Amini had told Gauthier that they did not not want Mitchell in the office.  Mitchell Affidavit Exhibit-A.  Three days later, on December 9, 2004, Gauthier called Mitchell and told him that he was taking Prices Corner away from him.  Mitchell Dep. 146:1-8.  Gauthier said that the Prices Corner branch "wasn't right for him," and that the staff did not like him and did not want to work with him.  Mitchell Dep. 146:19-24.  Gauthier denied that performance had anything to do with this decision.  Mitchell Dep. 147:4-7.

Gauthier later testified that Mitchell was removed from Prices Corner entirely for performance reasons, specifically, that he had "not made our numbers for an entire year, he was not engaged with the staff, and I was going to hire someone to place in there that could produce better results."  Gauthier Dep. 124:3-6.  Gauthier did not tell Mitchell that at the time.  Also, Gauthier had already recruited and hired a new white FA, James Mehan, specifically to replace Mitchell at Prices Corner.  Gauthier Dep. 144:4-7.

Gauthier agreed that, during 2003 and 2004, the aggregate of Mitchell's overall production numbers looked "solid" despite his problems at Prices Corner.  Gauthier Dep. 125:2-17.  About 80% of Mitchell's production was from Capitol Trail, with the balance from Prices Corner.  Gauthier Dep. 112:11-13.  That figure does not reflect the whole story, however, as it represents only the relative production between the two branches.  In fact, as discussed in detail in Mitchell's accompanying affidavit, Mitchell achieved 283% of his personal goal at Capitol Trail and 82% of his personal financial goal at Prices Corner during 2004.  Mitchell's total production was down somewhat (66% of overall goal) at Prices Corner because Ms. Amini's

15

production was also down.  The total figures represent personal goal plus the team borkerage ("TBRK") contribution from the FS.  When considered in context, Mitchell's Prices Corner figures were not significantly different from figures other FAs were achieving in other branches. *See* Mitchell Affidavit Exhibit-C.  Mitchell finished 2004 ranked sixth of the 27 FAs in the region.  Mitchell Affidavit.

Mitchell wanted to stay at Prices Corner.  Among his reasons were that Prices Corner had a higher deposit base than Capitol Trail, providing more opportunity for an FA. At that time, the deposit base figures were about $57 million at Prices Corner versus about $27 million at Capitol Trail.  Mitchell Dep. 151:10-18

Gauthier also told Mitchell that Wachovia was adopting a policy of one branch per FA. Mitchell Dep. 149:20-150:10.  Gauthier wanted Mitchell to cover only Capitol Trail, but, Mitchell wanted to stay at Prices Corner.  Mitchell Dep. 150:10-151:4;  Gauthier Dep. 112:4-5. Gauthier had offered at least one other FA, Nancy Sorg, a second branch if she hired a broker funded assistant.; that opportunity was not presented to Mitchell at that time.  Mitchell Dep. 183:8-18.  Moreover, the "one FA per branch" plan was nothing new, but had been merely "an aspiration and a hope" for a long time.  Gauthier Dep. 105:15-20.

On November 18, 2004, Mitchell was involved in a telephone conference with Amini concerning the details of a trade.  Amini then sent an e-mail communication to Beam complaining about Mitchell.  Beam Dep. Exhibit-1.  Beam sent Amini's e-mail communication to Gauthier, and he responded as follows:

> I was with ken yesterday when he took the call from laddi.  he and i were discussing the branch moves.  i heard the conversation.  what she describes below is not even close to the facts.  some of it is complete fabrication and misrepresentation of what was said.  i will fix the trades today however if this is how she described what i heard yesterday it causes me great concern based on past experiences with her and ken.

16

Beam Dep. Exhibit-2.

Notwithstanding his concerns about Amini's truthfulness, Gauthier did nothing about this situation. Instead, he followed through on his decision to remove Mitchell from Prices Corner. On December 15, 2004, Gauthier sent an e-mail to Beam asking "when do we address the e-mail i sent about laddi and ken's communication around mrs. laxton's trade." Gauthier Dep. Exhibit-2. Beam responded that she would follow up with "sandy"- Sandy McInally - who was Meyer's replacement as Retail Bank Director. Gauthier Dep. Exhibit-2. Gauthier then sent Beam the comment that:

> maybe we should include frank [Consalo] was well. schedule a time for us all to review jointly. my concern is the new fa and how i coach him around communicating with her to avoid any pitfalls.

Gauthier Dep. Exhibit-2.

Mitchell had already been removed from Prices Corner, yet Gauthier and Beam had never addressed the issue involving Amini's truthfulness. Both of them felt the matter was important enough to warrant bringing in their supervisors, yet such a meeting never occurred; indeed, Mr. Consalo was never even advised of the situation. Consalo Dep. 82:13-18.

No one in Wachovia management investigated the charge of "fabrication and misrepresentation" on the part of Amini. Amini confirmed that Beam never spoke to her about it, and she never saw Gauthier's e-mail until her deposition. Amini Dep. 148:16-20. Beam took no action against Amini despite the fact that this was at least the second documented instance of her having leveled false accusations against Mitchell. Gauthier removed Mitchell, the victim, from Prices Corner.

Mitchell again reported the matter to Wachovia's Human Resources Department, and he alleged discrimination and retaliation with respect to losing Prices Corner. Human Resources found nothing improper about Mitchell's treatment. Mitchell Dep. Exhibit-8. There is no evidence that Human Resources knew anything about Amini's fabrications and misrepresentations against Mitchell. Wachovia Human Resources provided the *denouement* of this tale when it told Mitchell it was "closing our file on this matter." Mitchell Dep. Exhibit-8.

<u>Mitchell is Transferred from Capitol Trail to Meadowood</u>

After being removed from Prices Corner, Mitchell continued to get along with all the personnel at Capitol Trail, as he had in the past. Mitchell Affidavit. As noted above, Capitol Trail was managed by an African-American woman, Gloria Sharp. Ms. Sharp was "very happy" with Mr. Mitchell's initial performance. Gauthier Dep. 82:21-83:4.

In October 2006, Wachovia closed the Capitol Trail office, and Mitchell was reassigned to the Meadowood office (several miles west on Kirkwood Highway). Mitchell Dep. 184:18-21. The Meadowood branch is managed by an African-American woman, Gracie Santana-Williams (who succeeded another African-American woman, Gwendolyn Washington) Mitchell Affidavit. Mitchell has had no problems with personnel at Meadowood. Mitchell Affidavit. Mitchell has not asserted any claims against personnel at Capitol Trail or Meadowood. The discrimination and harassment he experienced from the personnel at Prices Corner are in stark contrast with his experiences at the other branches.

No one in Wachovia management has ever taken any interest, or shown any curiosity, as to why Mitchell's experiences with the personnel at Prices Corner were so diametrically different from his experiences at both Capitol Trail and Meadowood. No action was ever taken against Amini, DiFebo, or Beam for generating or propagating false accusations against Mitchell.

## ARGUMENT

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
SHOULD BE DENIED AS THERE ARE MATERIAL FACTS
IN DISPUTE AS TO THE SUBSTANCE OF PLAINTIFF'S
CLAIMS AND AS TO THE DEFENDANTS THEMSELVES.**

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate only when there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986). All factual inferences are drawn in favor of the non-moving party. *Gonzalez v. Comcast Corp.*, 2004 U.S. Dist. LEXIS at 3 (D.Del. Jul. 30, 2004) (Defendants' Compendium of Unreported Cases). Moreover, in an action involving employment law claims, a trial court "must be cautious about granting summary judgment to an employer when ... intent is at issue." *Id*. (citing *Goosby v. Johnson & Johnson Medical, Inc*. 228 F.3d 313, 321 (3d Cir. 2000), and quoting *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994)).

The evidence demonstrates numerous issues of material fact in dispute as to both the claims and the parties. Accordingly, Mitchell respectfully submits that defendants are not entitled to summary judgment and their motion should be denied.

I.    PLAINTIFF HAS LEGITIMATE CLAIMS AGAINST DEFENDANTS
WACHOVIA CORPORATION, WACHOVIA BANK, AND
WACHOVIA SERVICES.

Mitchell, who is employed by Wachovia Securities, is pursuing claims against the other Wachovia entities that are interrelated with Wachovia Securities. The evidence suggests that all four Wachovia entities have played various roles during the course of Mitchell's employment

with Wachovia. Defendants do not dispute that Wachovia Securities is a proper party defendant, but Mitchell submits that legitimate issues exist as to the other entities so as to preclude summary judgment.

Although issues involving labyrinthine corporate structures are not amenable to a one-size-fits-all analysis, courts focus on four factors in evaluating the inter-relationships between affiliated entities:

(1)    Inter-relations of operations;
(2)    Common management;
(3)    Centralized control of labor or employee relations; and
(4)    Common ownership or financial control.

*Marzano v. Computer Science Corp.*, 91 F.3d 497, 513 (3d Cir. 1996); *Gonzalez,* 2004 LEXIS at 4.

No single factor is determinative, and the matter has been described as "whether there is an absence of an arm's length relationship among the companies." *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 84 (3d Cir. 2003) (quoting *Knowlton v. Teltrust Phones, Inc*., 189 F.3d 1177, 1184 (10th Cir. 1999)). In this case, an overall review of the relationships between the Wachovia entities, in view of the particular claims asserted, leads to the conclusion that all are potentially liable.

First, although Wachovia Securities is nominally Mitchell's employer, the following factors are relevant to the analysis ("integrated enterprise test"):

○    Mitchell filled out a Wachovia Corporation application, and his job offer was on Wachovia Corporation letterhead (Mitchell Dep. Exhibits-2 and -3);

○    Mitchell's 2003 W2 form was issued by Wachovia Services (Mitchell Affidavit Exhibit-A);

○    Wachovia employees shared a computer network and "wachovia.com" e-mail addresses (Amini Dep. Exhibit-1); Mitchell Affidavit.

20

○ Mitchell works out of office space provided by Wachovia Bank;

○ Mitchell was expected to "partner" with the Wachovia Bank FSs at each branch (Beam Dep. 16:2-18:1; Gauthier Dep. 20:1-23; Amini Dep. 18:1-6);

○ Mitchell was expected to engage in an "investment prospecting and referral strategy" prepared jointly by Wachovia Securities and Wachovia Bank (Mitchell Dep. 134:14-17).

○ Personnel holding securities licenses, such as Amini, were dual employees of both Wachovia Bank and Wachovia Securities (Gauthier Dep. 54:6-9);

○ The "team brokerage" (TBRK) concept implemented by Wachovia involved sharing of commissions on trades by personnel from both Wachovia Bank and Wachovia Securities (Beam Dep. 54:16-55:3; Mitchell Dep. 67:2-20);

○ Mitchell received communications from Wachovia Bank personnel, specifically Meyer, concerning his alleged conduct (Mitchell Dep. 168:6-19);

○ Mitchell was subjected to false accusations by several Wachovia Bank personnel, including DiFebo, Beam, and Amini;

○ Mitchell's complaints about personnel in both Wachovia Securities and Wachovia Bank were handled as one issue by the Human Resources Department of Wachovia Corporation. Mitchell Dep. Exhibit-8.

In essence, the entities were treated on a day-to-day basis as if they were simply different departments within a common company.

The last factor noted above, the handling of Mitchell's complaints by Wachovia Corporation's Human Resources Department, shows there was centralized control over labor and employee relations. That factor is often considered the most important of the integrated enterprise factors. *Nesbit*, 347 F.3d at 84; *see also* Defendants' Opening Brief at 20 ("centralized control of labor relations factor is the most important of the four factors").

This Court has held that issues similar to those existing in this case were sufficient to justify denial of a motion for summary judgment. *Gonzalez*, 2004 U.S. Dist. LEXIS 14989 at 5. Under the circumstances here, defendants' motion on this issue should be denied.

II.    PLAINTIFF HAS ESTABLISHED *PRIMA FACIE* CASES
       OF RACE AND GENDER DISCRIMINATION AND RETALIATION

Under the standard established by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), an employee asserting race and gender discrimination claims under Title VII in the context of a hostile work environment must make a *prima facie* showing of the following elements:

> (1)    He suffered intentional discrimination because of his race;
>
> (2)    The discrimination was pervasive and regular;
>
> (3)    The discrimination detrimentally affected plaintiff;
>
> (4)    The discrimination would detrimentally affect a reasonable person
>        of the same race in that position; and
>
> (5)    The existence of *respondeat superior* liability.

*Cole v. Delaware Technical & Com. College*, 459 F.Supp. 2d 296, 307 (D.Del. 1996).

Notwithstanding this initial "burden shifting," courts have recognized that employment discrimination cases present special challenges for employee plaintiffs because of the difficulty or outright impossibility of establishing direct evidence of the intent behind an employer's conduct. *Marzano*, 91 F.3d at 507. Based on the realities of the situation, courts acknowledge that a plaintiff employee may rely on inference to establish an employer's motives and intent. *Id*.

22

The *prima facie* showing "is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent - i.e., that discrimination *could* be a reason for the employer's action." *Id*. at 508 (emphasis in original).

In addition, courts look at "all the circumstances ... [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 23 (1993); *cf.* S*eldomridge v. Uni-Marts, Inc*., 2001 U.S. Dist. LEXIS 9491 at 7 (D.Del. July 10, 2001) (Defendants' Compendium of Unreported Cases) (Court looks at "totality of the circumstances").

Mitchell respectfully submits that the evidence identified to date meets the above standard and that his case should proceed to a jury trial.


A.    Mitchell suffered discrimination due to his race and gender

The only logical inference that fits the evidence is that Mitchell suffered discrimination based on his status as an African-American male. Mitchell does not dispute that there is no evidence of racial epithets or other blatant and obvious conduct directed at him. That is not unusual in racial discrimination cases, and courts do not base legal decisions on the absence of such direct evidence. *See, e.g*., *Marzano*, 91 F.3d at 507 ("our legal scheme against discrimination would be little more than a toothless tiger if the courts were to require such direct evidence of discrimination").

In this case, Mitchell has shown that he initially worked at two Wachovia branches, Prices Corner and Capital Trail, that were located less than one mile apart. Both offices have been described as typical Wachovia branches (Meyer Dep. 58:10-16), yet Mitchell had

absolutely no problems or complaints, either by him or against him, with respect to Capitol Trail. The only tangible difference between the two offices is in management: the Capitol Trail branch was managed by an African-American woman (Ms. Sharp), while the Prices Corner branch was managed by a white woman (DiFebo).

Corroboration of the above conclusion is found in the fact that Mitchell has had absolutely no problems or complaints, either by him or against him, with respect to his work at the Meadowood. Meadowood is managed by an African-American woman.

No one at Wachovia even seemed to be interested in the stark difference between Mitchell's experiences at Prices Corner versus at either Capitol Trail or Meadowood. All three offices are (or were) on Kirkwood Highway within a span of approximately five miles. There are no obvious reasons for the disparity in treatment of Mr. Mitchell. Only one factor stands out, and that is the documented banding together of a group of white women at Prices Corner (Amini, DiFebo, and Beam) to harass Mitchell with reckless disregard for the truth and for the adverse consequences to Mitchell.

Mitchell has confirmed that he felt DiFebo did not like him and was cold in her demeanor towards him. Mitchell Dep. 142:17-24. He had no such comments about anyone at the other branches. DiFebo was at the heart of the 9/11 incident even though she had no firsthand knowledge of what was said between Mitchell and Amini. It was DiFeo, *not Amini*, who called Beam to report the alleged statements of Mitchell. DiFebo Dep. 57:9-15. Beam then called Gauthier without first having checked the facts with Amini. Beam Dep. 59:22-23. At the time Gauthier called Mitchell and told him that he was in trouble, not one Wachovia manager had checked the facts from the person to whom the alleged comments were directed - Amini.

24

Moreover, no one apparently ever wondered why the 9/11 incident was first raised as an issue months after the conversation between Amini and Mitchell.  An inference can be drawn by the nature and timing of the complaint about Mitchell - Gauthier was contacted in July 2003 which is only weeks after both the $6.00 incident (June 20, 2003) and annuity incident (June 25, 2003).  Mitchell Affidavit.  By then, Amini, DiFebo, and Beam had decided they no longer wanted to work with Mitchell, so they dredged up the 9/11 conversation from months before in order to place Mitchell's job in jeopardy.

When he advised Mitchell that he had been "exonerated," Gauthier told Mitchell that he could have been fired if he had in fact made the alleged comments to Amini.    Despite the seriousness of the situation, Wachovia never determined, and indeed never seemed to even care, who had propagated or spread the rumor.  To this day, the person who accused Mitchell of saying that Amini's people had destroyed the World Trade Center has never been identified despite the universe of possible suspects being either DiFebo or Beam.  A sham or flawed investigation without any remedial action is equivalent to no investigation.  *Hall v. Pennsylvania Dept. of Corrections*, 2006 WL 2772551 at 10 (M.D. Pa. Sep. 25, 2006).  When white women made complaints about an African-American male, Wachovia acted swiftly.  However, when the African-American male was exonerated, Wachovia did nothing to the white women who had brought the false accusations.  Wachovia simply characterized Mitchell's complaints as trivial.

DiFebo spoke to Amini shortly after the 9/11 conversation, she urged Amini to call Human Resources.  DiFebo Dep. 57:18-20.  Ms. DiFebo called Ms. Beam, who in turn called Mr. Gauthier.  DiFebo Dep. 57:9-15;  Beam Dep. 59:22-23.  Neither DiFebo nor Beam received any disciplinary action for spreading a false and malicious rumor without any justification.  Beam apologized to Mr. Mitchell for the way the matter was handled, but the apology was for

calling Gauthier before she spoke to Amini, not for making the comments themselves. DiFebo never apologized at all despite the fact that she is the most likely source of the malicious escalation of the rumor. This matter involves any number of disputes about material facts, yet the subject is ignored completely in defendants' Opening Brief. The jury should decide.

After living with the hostile environment at Prices Corner for another 18 months or so, Mitchell was again subjected to a false and malicious charge by Amini - and once again Wachovia did nothing to her or her managers on the "bank" side. On November 19, 2004, Gauthier informed Beam that he had actually heard her subordinate, Amini, fabricate and misrepresent charges against Mitchell. Beam Dep. Exhibit-1. Nothing was done about it. Even one month later, when Gauthier asked Beam to address the matter, nothing was done about it. Beam Dep. Exhibit-2.

It appears incredible that a Wachovia Senior Vice President could inform another Wachovia manager that her subordinate fabricated statements against another employee, and the matter not be investigated, yet that is exactly what occurred. The only logical reason was that the problem, from the Wachovia "bank" side, had already been resolved - Mitchell had already been removed from Prices Corner so there was no need for any investigation.

It is enlightening to compare the treatment of Mitchell by his supervisor, with that afforded Amini by hers. When apprised of a possible serious comment by his subordinate (alleged 9/11 statements by Mitchell), Gauthier immediately telephoned Mitchell even though it was 7:45 a.m. and he was calling Mitchell at home. On the other hand, when apprised of serious charges against her subordinate (fabrication by Amini), Beam never even bothered to speak to Amini. A conceivable inference, one that is "compatible with" a discriminatory intent, is that Beam had no reason to investigate Amini as their purpose had been accomplished in getting rid

26

of the only Africa-American male in a position of authority at the Prices Corner branch.  *Cf.*
*Marzano*, 91 F.3d at 508.   "A discrimination analysis must concentrate not on individual
incidents, but on the overall scenario."  *Andrews v. City of Philadelphia*, 895F.2d 1469, 1484 (3d
Cir. 1990).  Here, the overall scenario at Prices Corner is consistent with Mitchell's claims of
discrimination based on his race and gender.


### B.     Defendants' hostile conduct was severe and pervasive

Defendants argue that what Mitchell underwent at the hands of DiFebo, Beam, and
Amini was simply a "personality conflict." Opening Brief at 23.  Defendants assert that Mitchell
"fails to understand" that such innocuous interpersonal problems do not implicate violations of
Title VII.  *Id*.  Mitchell respectfully submits that defendants have intentionally underplayed the
seriousness and invidiousness of the discriminatory conduct, and have failed to make any effort
at all to explain the stark differences in his treatment at Prices Corner versus Capitol Trail and
Meadowood.   In effect, defendants have taken the same approach, focusing on each alleged
incident in isolation, that has been expressly rejected by this Court.   *Petrocelli v.*
*DaimlerChrysler Corp.* 2006 U.S. Dist. LEXIS 11972 at 4 (D.Del. Mar. 22, 2006) (Defendants'
Compendium of Unreported Cases) ("the analysis must consider the circumstances as a whole
and not focus on each event individually").

An issue of fact exists as to the reason Mitchell was first isolated and then removed from
the Prices Corner branch only to be replaced by a white FA.  However, the matter goes much
deeper than that.  Defendants completely ignore the pervasiveness of the hostile conduct and the
fact that Mitchell suffered serious consequences of the conduct during the more than 18 months
that it persisted.

In their Opening Brief, defendants recite numerous examples of relatively mild conduct that has been ruled by the courts not to constitute actionable discrimination or harassment. Opening Brief 25-26. Defendants then attempt to shoehorn the conduct directed against Mitchell into conduct that falls below the threshold of being legitimately actionable. For instance, defendants minimize the nature of the 9/11 comments he allegedly made by asserting that he was "exonerated" within hours and that he received apologies from Gauthier and Beam. Opening Brief at 26. That ignores several facts that are material to the issues in the case.

First, Gauthier denies that he described Mitchell as being "exonerated. Mitchell Dep. 106:14-15. Next, the apologies to Mitchell were for management jumping the gun by contacting him before the facts had been checked. The apologies were *not* for the escalation in the nature of the words between Mitchell and Amini; in fact, Wachovia never determined who said the things that were reported to Gauthier by Beam despite the fact that the only two individuals who conceivably could have been responsible for the escalation were DiFebo and Beam. In effect, Wachovia failed to do a proper investigation in a matter involving two persons.

Defendants admit that the accusations against Mitchell were false. Opening Brief at 26. Mitchell testified that he was told by Gauthier that he could have been fired if it were determined he in fact made the alleged statements to Amini. Mitchell Dep. 106:17-19. At the end of the day, Mitchell was falsely accused, and threatened with termination, but when he was "exonerated," no action was taken against his tormentors. Mitchell had to live with that reality for the next 18 months during which time he received no referrals from Amini, had no joint appointments scheduled, and watched his Prices Corner production slip. Apparently that does not qualify as "serious" to defendants. Mitchell respectfully submits that a jury would take a different view of those facts.

Defendants also paint Mitchell's treatment in the same light as, in the words of the Supreme Court, "simple teasing, offhand comments, and isolated incidents." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Defendants state that when Mitchell testified that DiFebo and others created a "chilly" atmosphere at the Prices Corner branch, and did not reciprocate his routine greetings, that was "precisely the sort of trivial accusations that courts should not entertain." Opening Brief at 26. That ignores the fact that Mitchell was not reciting those facts in a vacuum; those allegations of fact relate to the overall hostile environment created by DiFebo, Amini, and Beam. One drop of water may not sink a boat, but a large number of drops will.

Defendants also refer to Mitchell as having a "subjective reaction to a temporary misunderstanding." Opening Brief at 26. Being accused of bigoted comments and having one's job placed in jeopardy is more than just a "temporary misunderstanding." Again, defendants focus entirely on the individual trees rather than on the forest as a whole. Defendants also completely ignore Mitchell's testimony that Gauthier specifically told him that he was "not right for" that branch and that the employees at Prices Corner did not like him or want to work with him. Mitchell Dep. 146:19-24. Obviously, the Prices Corner staff preferred working with a white FA. Those are objective facts, not subjective perceptions. In addition, in a memorandum he prepared for the Human Resources Department in response to Mitchell's charge of discrimination before the Delaware Department of Labor, Gauthier identified a number of other FAs who had been moved from branches and stated: "to clarify, ken had interpersonal relationship issues with fcm, fsl that covered the prices corner branch as well ... not just laddi." Mitchell Affidavit Exhibit-C. No FAs have ever been identified as having been moved due to interpersonal relationship issues other than Mitchell. Mitchell Affidavit.

29

Defendants assert that, prior to being removed from the Prices Corner branch, Mitchell was earning 80% of his production at Capitol Trail and only 20% from Prices Corner. Defendants' Opening Brief at 13. Those figures represent only relative production, however, not the actual production figures themselves. In fact, Mr. Mitchell had achieved 283% of his personal goal at Capitol Trail and 82% of his personal goal at Prices Corner. Mitchell Affidavit Exhibit-B. When the TBRK (joint production with the FSs) is factored in, Mr. Mitchell achieved 259% of his total goal at Capitol Trail and 66% of his total goal at Prices Corner. The difference is the amount contributed by the FS, and the fact that his total production was less than his personal production shows that Amini was not meeting her goals at Prices Corner (Amini achieved only about 10% of her personal goal). Mitchell Affidavit. Moreover, Mitchell was not alone among FAs in failing to meet all of his production goals at all branches. Mitchell Affidavit. Defendants' pretext of a performance reason for moving Mitchell does not hold up.

Mitchell had no joint appointments with customers at Prices Corner because Amini did not set up any appointments. The matter was blamed entirely on Mitchell - even after the November 2004 incident where Gauthier actually overheard Amini fabricating charges against Mitchell. By then, the die had been cast and Gauthier was actively recruiting a new FA (James Mehan, a white male) to fill the FA slot at Prices Corner.

When viewed in their entirety, the facts indicate the following:

- ○ A chilly work environment towards Mitchell was created at the Prices Corner branch by the persons in authority at that branch;

- ○ Lack of support from Wachovia "bank" personnel with respect to the teamwork called for in the FS/FA relationship;

- ○ False allegations by Amini and/or DiFebo and Beam about the 9/11 incident;

30

○    Incomplete or sham investigation of the 9/11 incident by Wachovia management, including Human Resources Department, and lack of any determination as to who passed along the false rumors of what Mitchell said;

○    Lack of referrals from Amini during the end of 2003 and throughout 2004 following the 9/11 incident;

○    Further false accusations by Amini about Mitchell in November 2004 that were actually overheard by Gauthier, yet nothing was done in response;

○    Removal of Mitchell from Prices Corner within weeks of the further demonstrably false statements by Amini;

○    Further incomplete investigation by Wachovia Human Resources Department, including the statement that it was "closing its file" on the matter.

○    At the same time he was being treated so negatively by the employees at the Prices Corner branch (all white women), Mitchell was both exceeding his financial goals at Capitol Trail and working without any friction with other employees at that branch which was managed by an African-American woman;

○    Immediately after closure of the Capitol Trail branch, Mitchell was transferred to the Meadowood branch which is managed by an African-American woman; he has experienced no problems or friction with other employees.

The above facts describe a pattern of wrongful conduct that materially altered the terms and conditions of Mitchell's employment. This Court has described the necessity of looking at the "totality of the circumstances" when viewing facts alleging discriminatory conduct. *Seldomridge,* U.S. Dist. LEXIS 9491 at 7. This is exactly that type of situation.

C.    The discrimination detrimentally affected Mitchell

Mitchell's entire working life at Wachovia has been affected by the discriminatory

31

conduct he has experienced. He has lost the branch he considered his number one opportunity, he has been persecuted by other Wachovia employees, he has suffered financial harm, and his health has suffered. It should be noted that, in the introductory paragraph of Section III A. of their Opening Brief, defendants make the general assertion that the alleged discrimination "did not detrimentally affect Mitchell." However, this element of the multi-part test is not expressly addressed in detail in defendants' brief.

Mitchell respectfully submits that there can be no doubt that he has suffered harm as a result of defendants' conduct. As noted above, he has suffered financial harm in that his production figures since losing the Prices Corner branch have not rebounded due to his depression over the situation.. Mitchell has been diagnosed with clinical depression for which he is receiving treatment and taking medication. Mitchell Dep. 207:4-7, 15-19. Mitchell is able to function, but he has not been able to return to his earlier psychological attitude and financial production figures. Mitchell Affidavit. Mitchell's integrity has been impugned, he was embarrassed, his relationships with coworkers at Prices Corner deteriorated, and his overall performance has suffered. *Hall,* 2006 WL 2772551 at 8; *Spain v. Gallegos*, 26 F.3d 439 (3d Cir. 1994) (plaintiff's reputation damaged by false rumors).

The bottom line is that there can be no legitimate dispute that this situation has had a serious and detrimental effect on Mitchell.


D.    The discrimination would affect a reasonable person in that position

Defendants do not expressly argue this point, so the point appears to be conceded. Mitchell submits that the "totality of circumstances" establishes that any reasonable African-American person in his position would find Wachovia's conduct harassing, discriminatory, and

unjustifiable.  Mitchell was shunted out of a higher deposit base branch, managed by a white woman, into lower deposit base branches managed by African-American women.  The only interpersonal friction experienced by Mitchell in his more than five years with Wachovia has been at Prices Corner which is managed by DiFebo - who has been at the heart of the false and malicious rumors about Mitchell.  It would be hard to imagine a reasonable African-American placed in Mitchell's situation who would not be affected detrimentally.

        E.       <u>Existence of Respondeat Superior Liability</u>

Defendants do not argue this point either as it appears beyond dispute that the individual defendants were acting in the course and scope of their employment with Wachovia.  There are no facts present which would serve to remove any of the individual defendants' actions from the doctrine of *respondeat superior*.

        F.       <u>Mitchell has Set Forth a Legitimate Retaliation Claim</u>

Mitchell complained to Wachovia's Human Resources Department shortly after the 9/11 incident in July 2003.  Mitchell Dep. 108:19.  There is no genuine dispute that DiFebo, Beam, and Amini, all white women, did not want to work with Mitchell.  There is also no genuine dispute that Mitchell had excellent interpersonal relations with the staff at both Capitol Trail and Meadowood where the managers were African-American.  Mitchell Affidavit Exhibit-B.  Mitchell did not want to believe that he was the victim of racial and gender discrimination by his colleagues, yet that is the conclusion he reached and it is supported by the circumstantial and inferential evidence.

When Mitchell was removed from Prices Corner, he again contacted Wachovia's Human Resources Department.  Mitchell again described the situation to Lori Helmuth of Human

Resources. Mitchell was told that Wachovia would conduct another investigation, but there would be no finding of discrimination. Mitchell Affidavit.

Mitchell's act of reporting the hostile conduct to Human Resources in July 2003 constitutes a "protected activity" for purposes of a retaliation claim. Wachovia, through Gauthier, responded by removing him from Prices Corner. The causal connection is the link between the actions of Prices Corner's staff in attempting to have Mitchell removed from that branch, and the fact that he was in fact removed despite the demonstrably false and malicious nature of the accusations against him (including the November 2004 incident). *Price v. Delaware Dept. of Correction*, 40 F.Supp. 544, 551-552 (D.Del. 1999). The nature of the discrimination itself is not the key factor in analyzing retaliation; the focus is on the retaliatory act. *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2416 (2006).

In this case, Mitchell insisted on following up with Human Resources. He insisted that Wachovia take action against the individuals who had made the false accusations against him. He refused to stand by and accept his role as victim. In response, based on the fact that the Prices Corner staff "did not like him," he was removed from the branch providing him with the greatest opportunity for achievement. There is no "hard and fast" rule as to what constitutes retaliation. *Mongelli v. Red Clay Consol. School Dist. Bd. of Ed*., 491 F.Supp. 2d 467, 482 (D.Del. 2007) (citing *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc*., 450F.3d 130, 135 (3d Cir. 2006). The facts are that Mitchell reported the wrongful conduct, he suffered an adverse employment action (losing Prices Corner), and the two are related. Accordingly, the matter should proceed to the jury.

III.    SUFFICIENT EVIDENCE EXISTS TO CREATE A JURY QUESTION
         CONCERNING THE LIABILITY OF THE INDIVIDUAL DEFENDANTS
         UNDER 42 *U.S.C.* SECTION 1981

Under 42 *U.S.C.* §1981, all persons within the United States have "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."    Courts have held that Section 1981 applies to individuals as well as to employers.    *Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986);    *Gonzalez v. Comcast Corp.*, No. 03-445 (KAJ), 2004 U.S. Dist. LEXIS 14989 at 3 (D.Del. Jul. 30, 2004).

A plaintiff must show the following three elements in order to prevail on a claim under Section 1981: (1) he belongs to a racial minority; (2) defendant intended to discriminate on the basis of plaintiff's race; and (3) the discrimination concerned one of the activities listed in Section 1981.    *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001).    There is no dispute that Mitchell satisfies the first element of the above test, and defendants do not argue the third element.    Opening Brief at 33.    Instead, defendants focus their arguments on the second element concerning defendants' intent to discriminate based on Mitchell's race.    Mitchell respectfully submits that the evidence satisfies this element.

As noted above, Mitchell need not proffer direct evidence of defendants' intent to discriminate, inferential evidence is legally sufficient to establish this claim.    *Marzano*, 91 F.3d at 507-508.    the evidence shows that Mitchell was the subject of false and malicious rumors concerning the 9/11 incident that could have lead to his termination.    Those rumors originated with Amini, but were propagated and embellished by DiFebo and/or Beam.    Both of those individuals were in managerial positions with Wachovia, and both were in a position to curtail the harassment of Mitchell had they so wished.

35

In addition, Beam was privy to Gauthier's concern that Amini was engaging in fabrications and misrepresentations concerning Mitchell. Beam was in a direct position to address the matter. Instead, Beam took no action of any kind with respect to this serious matter. Inexplicably, Beam never even spoke to Amini about the matter.

Beam also never took any affirmative steps with Amini to increase her engagement with her FA, Mitchell. Throughout the testimony of the various Wachovia employees, they alleged that Mitchell had failed to engage with Amini. Not one Wachovia witness could point to any steps taken to improve Amini's engagement with Mitchell. Instead, the two white females at the Prices Corner branch, DiFebo and Amini, and the white female supervisor of Amini, Beam, continually disparaged Mitchell and made no attempts to improve his relations at that branch.

Gauthier, who was Mitchell's direct supervisor, supported this discriminatory conduct. Instead of supporting his subordinate with respect to the continual attacks by the three white women, Gauthier routinely supported the women and ultimately removed Mitchell from the Prices Corner branch despite the weight of evidence showing that Mitchell had been the victim. Gauthier clearly jumped the gun in immediately contacting Mitchell about what proved to be false charges in the 9/11 incident. He then compounded the error by failing to take any action against those who originated or propagated the false rumor. Gauthier never even took any steps to determine how he came to learn the false details.

Later, in the face of what he described as fabrication and misrepresentation by Amini, Gauthier removed the victim rather than the perpetrator. Gauthier sent a follow up e-mail message to Beam asking what had been done about the situation, but that is the total extent of his action. By then, Mitchell had been removed from the Prices Corner branch even though he had not done anything wrong.

Mitchell testified unequivocally that Gauthier told him that the Prices Corner branch "was not right for him" and that the staff there, *ie*., Amini, DiFebo, and the Teller Manager Petra Rash, did not like him and did not want to work with him. Those are loaded words, and the inference is perfectly clear - the women at Prices Corner did not want to work with the only African-American male in a position of authority at that branch. As addressed above, the pretext of performance issues cannot mask the fact that the true reason Mitchell was removed from Prices Corner is that the staff did not want to work with him.

It should be noted that another African-American male who worked at Prices Corner, albeit in a lower level position, also complained of racial and gender discrimination and a hostile environment towards African-Americans. *See* Affidavit of James K. Finney. Although the incidents Mr. Finney complained about occurred in the branch managed by DiFebo, she was not able to offer any meaningful testimony about his claims in her branch. DiFebo Dep. 68:16-69:20. DiFebo testified that she believed Mr. Finney had filed an unemployment compensation claim, not a discrimination claim. DiFebo Dep. 81:25-83:1. That testimony is simply incorrect, and it seems inconceivable that a bank manager would not know any details of one of the only two racial and gender discrimination claims at her branch. That is a credibility issue for the jury.

At Mitchell's other branch, Capitol Trail, the manager was an African-American and the work environment was fair. The same can be said of the branch to which Mitchell was transferred when Capitol was closed, Meadowood, which was also managed by two African-American women. Mitchell Affidavit.

Mitchell has showed by direct evidence that DiFebo and Beam actively participated in the false and malicious rumors about him, and Beam additionally failed to take any action with respect to further false and malicious statements made against him. Based on the "totality of the

37

circumstances" approach utilized by courts in discrimination claims, Mitchell has further met his burden of showing that DiFebo and Beam had an improper motivation for their discriminatory conduct. *Seldomridge*, 2001 U.S. Dist. LEXIS 9491 at 7.

Therefore, Mitchell respectfully submits that defendants' motion should be denied.


IV.     PLAINTIFF HAS STATED A VALID CLAIM FOR CIVIL
        CONSPIRACY UNDER DELAWARE STATE LAW


Mitchell respectfully submits that he has stated a legitimate claim for civil conspiracy under Delaware state law, and that there is sufficient evidence supporting this claim to warrant a jury trial on the issue.

There are three elements to a claim for civil conspiracy under Delaware state law:

(1)     An agreement between two or more individuals;

(2)     The agreement has an improper or unlawful purpose; and

(3)     Actual damage to plaintiff.

*Nicolet, Inc. v. Nutt, 525 A.2d 146, 149-150 (Del. 1987);  Edwards v. Concord EFS, Inc.*, 2004 U.S. Dist. LEXIS 13942 at 6 (D.Del. Jul 20, 2004) (Defendants' Compendium of Unreported Cases).

Contrary to defendants' assertions, Mitchell's allegations of civil conspiracy are not mere speculation.  The record establishes that Amini made a number of false accusations about Mitchell and those accusations were repeated and embellished by Beam and/or DiFebo.  Even when it was determined that the accusations were false, nothing was done about it.  In fact, the false accusations continued.  With respect to the 9/11 incident, Amini told DiFebo that Mitchell

38

had made some type of remark, involving "9-1-1" that she found offensive. From that, DiFebo called Beam, and Beam called Gauthier. Gauthier told Mitchell that it was alleged that he had told Amini words to the effect that "your people destroyed the World Trade Center." Mitchell Dep. 102:3-6. Beam testified that she later apologized to Mitchell because the matter had not been handled correctly, but not because the allegations themselves proved false. Beam Dep. at 67:24-68:2..

Later, when told that Amini had engaged in fabrications and misrepresentations about Mitchell once again, Beam did absolutely nothing. Beam had passed along Amini's e-mail message without any investigation. Then, she refused to take any action to correct the falsehood when it was pointed out to her by Gauthier who had actually heard the conversation between Amini and Mitchell. Beam actively supported her subordinate in the face of a clear falsehood by deliberately taking no action. That constitutes working in concert, and the jury should be permitted to hear this evidence and weigh the appropriate consequences.

Also, Gauthier and Beam knew that Mitchell was being removed from the Prices Corner branch, yet neither changed their mind on the matter after it was established that Amini was still engaged in making false accusations against Mitchell. Again, that constitutes working in concert.

A "smoking gun" document setting forth all the details of an extensive civil conspiracy is not available in this case. However, such a document rarely comes to light, and the law takes that into account by permitting a plaintiff to offer inferential evidence of discriminatory actions and conduct. *Marzano*, 91 F.3d at 507-508. Such is the case here with the conspiracy claims, and Mitchell respectfully submits that defendants' motion on this claim should be denied.

39

IV.    PLAINTIFF'S CLAIMS UNDER SECTION 1985 AND 1986, FOR
       STATE LAW FRAUD AND *PRIMA FACIE* TORT, AND ALL CLAIMS
       AGAINST DEFENDANT MEYERS ARE WITHDRAWN

Plaintiff withdraws his claims under 42 U.S.C. Sections 1985 and 1986, his claims for

state law fraud and *prima facie* tort, and all claims against defendant Meyers.

<u>CONCLUSION</u>

For the foregoing reasons, plaintiff Kenneth S. Mitchell respectfully requests that the

Court deny defendants' motion for summary judgment.

BIGGS AND BATTAGLIA

/s/  Steven F. Mones
Victor F. Battaglia  (Del. Bar #156)
Steven F. Mones  (Del. Bar #2611)
921 N. Orange Street
P.O. Box 1489
Wilmington, DE  19899-1489
302-655-9677
smones@batlaw.com
Attorneys for Plaintiff Kenneth S. Mitchell

January 22, 2008

40