UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

KENNETH S. MITCHELL,  )
　　　　　　　　Plaintiff,  )
　　　　　　　　　　　　　)
　　　v.　　　　　　　　　)　　C.A. No. 06-12-725 (GMS)
　　　　　　　　　　　　　)
WACHOVIA CORPORATION,  t/a  )　　JURY TRIAL DEMANDED
　　WACHOVIA SECURITIES,  )
WACHOVIA SECURITIES, L.L.C.,  )
WACHOVIA SERVICES, INC.,  )
WACHOVIA BANK OF DEL, N.A.,  )
TODD D. GAUTHIER,  )
LYNN G. MEYER,  )
CAROLYN J. BEAM, and  )
DOROTHY A. DIFEBO,  )
　　　　　　　　Defendants.  )

APPENDIX TO
PLAINTIFF'S ANSWERING BRIEF
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BIGGS AND BATTAGLIA
Victor F. Battaglia, Sr. (Del. Bar #156)
Steven F. Mones (Del. Bar #2611)
921 N. Orange Street
P.O. Box 1489
Wilmington, DE  19899-1489
Tel:  302-655-9677
Fax:  302-655-7924
smones@batlaw.com
Attorneys for Plaintiff

January 22, 2008

## CONTENTS OF PLAINTIFF'S APPENDIX

1. Excerpts of Transcript of Deposition of Kenneth S. Mitchell

2. Exhibits from Deposition of Kenneth S. Mitchell

3. Excerpts of Transcript of Deposition of Todd D. Gauthier

4. Exhibits from Deposition of Todd D. Gauthier

5. Excerpts of Transcript of Deposition of Ladan Amini

6. Exhibit from Deposition of Ladan Amini

7. Excerpts of Transcript of Deposition of Dorothy DiFebo

8. Excerpts of Transcript of Deposition of Carolyn Beam

9. Exhibits from Deposition of Carolyn Beam

10. Excerpts of Transcript of Deposition of Lynn G. Meyer

11. Excerpts of Transcript of Deposition of Frank Consalo

12. Affidavit of Kenneth S. Mitchell

13. Affidavit of James K. Finney

14. *Hall v. Pennsylvania Dept. of Corrections*, 2006 WL 277551 (M.D. Pa. Sep. 25, 2006)

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KENNETH S. MITCHELL,     )
                         )
    Plaintiff,      )
                         )
      v.        ) C.A. No. 06-725 (GMS)
                         )
WACHOVIA CORPORATION, t/a )
WACHOVIA SECURITIES,     )
WACHOVIA SECURITIES,     )
L.L.C., WACHOVIA SERVICES,)
INC., WACHOVIA BANK OF   )
DELAWARE, N.A., TODD D.   )
GAUTHIER, LYNN G. MEYER,  )
CAROLYN J. BEAM, and     )
DOROTHY A. DIFEBO,       )
                         )
    Defendants.     )

Deposition of KENNETH S. MITCHELL taken pursuant to notice at the law offices of Morris James, 500 Delaware Avenue, 15th Floor, Wilmington, Delaware, beginning at 10:05 a.m., on Friday, December 14, 2007, before Kimberly A. Hurley, Registered Merit Reporter and Notary Public.

APPEARANCES:

        STEVEN F. MONES, ESQUIRE
        BIGGS & BATTAGLIA
          921 North Orange Street
          Wilmington, Delaware 19801
          for the Plaintiff

        DEVJANI H. MISHRA, ESQUIRE
        SEYFARTH SHAW, LLP
          620 Eighth Avenue
          New York, New York 10018-1405
          for the Defendants

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Kenneth S. Mitchell

Page 26

1    still hold?

2        A.    That I have that I --

3        Q.    That you had at one time but that you do not

4    have currently.  Have you ever had any other licenses of

5    any kind?

6        A.    No.  Those licenses I just gave you, I still

7    have those.

8        Q.    Right.  Mr. Mitchell, have you ever been

9    convicted of a crime?

10       A.    No.

11       Q.    Have you ever filed for bankruptcy?

12       A.    No.

13       Q.    I understand that you're currently a member of

14   the naval reserves?

15       A.    That's correct.

16       Q.    And that you hold the rank of commander?

17       A.    That's correct.

18       Q.    How long have you been a member of the naval

19   reserves?

20       A.    About 11 years.

21       Q.    Prior to that am I correct that you were

22   actually in the Navy itself?

23       A.    Yes.

24       Q.    How long were you in the Navy?

Kenneth S. Mitchell

1      A.    Fourteen years of active duty.

2      Q.    What was your highest rank in the Navy?

3      A.    Commander.

4      Q.    When you left the Navy, what were the

5  circumstances under which you left?

6                MR. MONES:  Are you talking about active

7  duty versus reserves?

8                MS. MISHRA:  Active duty versus reserves.

9      A.    What was the circumstances I left?

10     Q.    Right.

11     A.    Career change, I wanted to...

12     Q.    Upon leaving the Navy did you immediately join

13  the reserves?

14     A.    Yes.

15     Q.    Since joining the reserves, I understand that

16  you have been called up for active service a number of

17  times.  Correct?

18     A.    That's correct.

19     Q.    How many times have you been called up for

20  active service during the time that you have been in the

21  reserves?

22     A.    When you say "called up," it's not been called

23  up.  I have annual obligations to do, and those annual

24  obligations are the times when I have went to the Navy.

d3fc868e-c374-48dd-927e-ef94d2572

Kenneth S. Mitchell

Page 62

1   settlement agreement and release sometime before April of

2   2003?

3        A.    I don't recall.

4        Q.    Do you know who made the decision to hire you

5   at Wachovia?

6        A.    I thought it was Mr. Gauthier.

7        Q.    Do you know when he made the decision to hire

8   you?

9        A.    No, I don't know when.

10       Q.    When you began working at Wachovia, where were

11   you assigned?

12       A.    Capitol Trail branch and the Price's Corner

13   branch.

14       Q.    Prior to your coming to Wachovia who serviced

15   those branches?

16       A.    Ed Duffy.

17       Q.    Do you know who made the decision to remove

18   Ed Duffy from those branches?

19       A.    I don't know.

20       Q.    Do you know if it was voluntary by Mr. Duffy?

21       A.    I don't know.

22       Q.    Do you know why the decision was made to move

23   Ed Duffy from those branches?

24       A.    No.

d3fc868e-c374-48dd-927e-ef94d25

Kenneth S. Mitchell

Page 63

1    Q.    Did you ever speak to Mr. Duffy about the fact

2    that he had been removed from those branches prior to

3    your coming in?

4    A.    No.

5    Q.    Do you know who Ed Duffy's supervisor was when

6    he serviced the Capitol Trail and Price's Corner

7    branches?

8    A.    Todd Gauthier.

9    Q.    When you first began at Capitol Trail and

10   Price's Corner, what were your responsibilities?

11   A.    It was to provide investment services for both

12   of those branches, to also train and coach the financial

13   specialists, educate -- well, same thing, train and coach

14   the bank partners about investment services and

15   formulating a team to service clients of the bank.

16   Q.    You said that you reported to Mr. Gauthier.

17   Where was his office?

18   A.    In Philadelphia.

19   Q.    How often would you see Mr. Gauthier?

20   A.    Rarely.  Maybe once a month.

21   Q.    How often would you communicate with him apart

22   from seeing him?

23   A.    You say "communicate."  Communicate through

24   what means?

d3fc868e-c374-48dd-927e-ef94d257

Kenneth S. Mitchell

Page 67

1    referred to me.

2        Q.    To your knowledge, when new business was

3    referred by the financial specialists to the financial

4    adviser, how was the compensation divided between the two

5    of them for the commission?

6        A.    There's a TBRK.

7        Q.    TV or TB?

8        A.    TB, as in boy.   TBRK is the portion of the

9    commission that goes to the financial specialist.   TBRK

10   stands for team brokerage.

11       Q.    Would that be the portion that would go to the

12   financial specialist when business was referred to you by

13   the financial specialist?

14       A.    When the business was executed, the trades were

15   executed, they would get credit.

16       Q.    In general, the financial specialists would

17   refer business to you and if that business resulted in

18   trades being executed, the financial specialist would

19   earn this team brokerage credit?

20       A.    Right.   Which is part of the commission.

21       Q.    Was there any other commission that they would

22   be eligible for in terms of referring new clients?

23       A.    Not that I'm aware of.

24       Q.    Was there any way to earn that team brokerage

d3fc868e-c374-48dd-927e-ef94d25

Kenneth S. Mitchell

1    expectations set?

2        A.    They were set by branch goals for investments.

3    How they set -- what criteria was used to set those

4    goals, I don't know.

5        Q.    Do you know who set the goals?

6        A.    I can only say Wachovia Securities and Wachovia

7    Bank.

8        Q.    Do you know that Wachovia Securities and

9    Wachovia Bank set the goals together or are you

10    speculating?

11        A.    I don't know.

12        Q.    Do you know whether the goals were set at

13    Mr. Gauthier's level or whether they were set higher than

14    his level?

15        A.    I don't know.

16        Q.    How would you find out what your goals were?

17        A.    You can go on the system and pull up to see

18    what the branch goals were, or in some cases, in my case,

19    the financial center manager in the Capitol Trail branch

20    communicated to me what the goals were for the branch in

21    terms of investments.

22        Q.    Who was that person?

23        A.    That would be Gloria Sharp.

24        Q.    So Ms. Sharp communicated to you what the goals

Kenneth S. Mitchell

Page 74

1    to Wachovia and probably very soon after getting to

2    Wachovia.  The first couple weeks of employment at

3    Wachovia Securities.

4         Q.    Other than Mr. Gauthier, did anyone else

5    discuss with you any expectations from Wachovia as far as

6    working with financial specialists?

7         A.    I have no recollection.

8         Q.    You mentioned training and coaching the

9    financial specialists.  Did the financial specialists

10   formally report to you?

11        A.    No, I wouldn't call it formally reporting.  We

12   were working together as a team as each other's equal.

13   That's how I viewed it.

14        Q.    The financial specialists didn't supervise you,

15   correct?

16        A.    No.

17        Q.    Did you have the ability to make certain trades

18   that they didn't have?

19        A.    Yes.

20        Q.    Which trades were those?

21        A.    Not that they didn't have.  That they couldn't

22   document.  And what were those trades?

23        Q.    Yes.

24        A.    Individual stocks and there were mutual funds

Kenneth S. Mitchell

1   that they could not sell and other securities.  They

2   couldn't do commodities, they couldn't do options and

3   things of that nature.

4        Q.    Could you do commodities and options?

5        A.    Yes.

6        Q.    Did you have to approve transactions that the

7   financial specialists put together?

8        A.    Yes.  We were given the authority to look over

9   their trades to make sure that they were suitable and

10  then approve them.

11       Q.    Did any financial specialists ever have the

12  ability to review and approve any of your trades?

13       A.    No.

14       Q.    Focusing on the period when you first got to

15  Price's Corner, was Laddie Amini the financial specialist

16  at that time?

17       A.    Yes.

18       Q.    Again, just focusing on the initial period of

19  2002 going into 2003, how would you describe your

20  interaction with Ms. Amini at that time?

21       A.     In the beginning very nice, very cordial.  We

22  tried -- we got together, we tried working together,

23  trying to formulate the team, and I thought things were

24  going very well throughout the beginning of 2002.   I

d3fc868e-c374-48dd-927e-ef94d257

Kenneth S. Mitchell

1    the beginning Laddie was making lots of joint

2    appointments.  She was making more in 2002 going into

3    2003.  That was my point in this statement here.

4        Q.    So did you mean to say that you spent less time

5    at Price's Corner or more time at Price's Corner over

6    time?

7        A.    Over time it would be less time at Price's

8    Corner.

9        Q.    You can put that aside for now.

10              Prior to lunch we were beginning to talk

11    about a client named Mr. Herrmann.  You're familiar with

12    Mr. Herrmann I believe you were saying.  Who is

13    Mr. Herrmann?

14        A.    Mr. Herrmann was a very nice, elderly

15    gentleman, in his 80s, I believe, and who's now deceased

16    and had accounts at Wachovia and also had accounts

17    outside of Wachovia.

18        Q.    What kind of accounts did he have at Wachovia?

19        A.    He had one or two brokerage accounts, money

20    market account, an annuity.

21        Q.    Were his accounts through the retail bank or

22    through the securities piece?

23        A.    Both.

24        Q.    Was Mr. Herrmann assigned to any particular

Kenneth S. Mitchell

1    financial adviser during the time that you knew him?

2        A.    He was assigned to me.

3        Q.    How did he become assigned to you?

4        A.    When I started working out of Price's Corner

5    and Capitol Trail, there were a number of clients with

6    brokerage accounts that were assigned to me.

7        Q.    How did they become assigned to you?

8        A.    The manager, Todd Gauthier, would assign those

9    accounts over to me.

10        Q.    So Mr. Herrmann was an account that

11    Mr. Gauthier assigned to you?

12        A.    He was an account that was assigned to me.

13        Q.    Do you recall a dispute at one point that

14    Mr. Herrmann raised regarding a charge on one of his

15    accounts?

16        A.    Yes.

17        Q.    What was the nature of that dispute?

18        A.    Mr. Herrmann was upset about a $6 fee on the

19    purchase of a mutual fund.

20        Q.    What was the fee?

21        A.    $6.

22        Q.    What was the fee for?

23        A.    Admin.   Administrative cost.

24        Q.    Was it in connection with a particular

Kenneth S. Mitchell

Page 84

1     Q.    Do you know who has the authority to remove

2   that fee?

3     A.    I don't know who has the authority to remove

4   it, no.

5     Q.    Do you know if anyone has the authority to

6   remove it?

7     A.    I didn't know at that time, no.

8     Q.    What happened next with regard to this

9   situation?

10    A.    I got a call from Laddie who said that

11  Mr. Herrmann was at her branch and was upset about the

12  fee.  That could have been the first time she got

13  notified about it.  So she asked me to come over and talk

14  to him.  I went over and talked to Mr. Herrmann about it,

15  and I asked Laddie if she could rebate the fee back to

16  him.

17    Q.    And what did she say?

18    A.    She was at the computer typing and she threw

19  her hands up in the air and backed away from the computer

20  and says, "I can't give it to him."  And at that time

21  Mr. Herrmann became very agitated and frustrated and I

22  just took $6 out of my pocket, laid it on the table to

23  rebate him for the fee, and he said he didn't want to

24  take the money from me.

Kenneth S. Mitchell

1          So I had Laddie call my operations manager

2   in Philadelphia, Al Tedesco, and we had Al on the

3   speakerphone.  We told him what the situation was with

4   Mr. Herrmann, that he didn't want to pay the $6 fee and

5   how could we wipe the fee out, could we rebate it back to

6   him.  And Al stated, "Yes, we can rebate the fee back to

7   him, Ken, but it's going to come out of your pocket."

8          So I said, "Well, go ahead and rebate the

9   fee back to Mr. Herrmann and charge me for it."

10          After that Mr. Herrmann was satisfied and

11  that was the end of that.

12      Q.    Do you know if there are rules that relate to

13  giving cash to clients?

14      A.    I didn't know any of those rules at that time.

15      Q.    Do you currently know whether there are any

16  rules?

17      A.    I haven't seen any, but I have been told.  Was

18  told by my manager, Todd Gauthier, that that's something

19  that I shouldn't do.

20      Q.    What did Mr. Gauthier tell you about that?

21      A.    He said, "That's all right, Ken.  Just don't do

22  it again.  And besides, you saved a valuable client and

23  he still wants us to attend the meeting with his

24  attorney.  So don't worry about it no more.  It's

Kenneth S. Mitchell

1    A.    I'm not sure.  I don't think so.

2    Q.    What was the reason that you didn't approve her

3 trades on those two or three occasions?

4    A.    On one occasion we were instructed -- FAs were

5 instructed that FS's can do trades up to $30,000.

6 Anything over that amount they needed to bring the FA

7 into the meeting or discuss the transaction with the

8 financial adviser.

9              That particular trade that Laddie did for

10 $100,000 she did not consult with me.

11    Q.    Who was the client involved in that trade?

12    A.    I think that might have been Mr. Herrmann.

13    Q.    What was the nature of the trade?

14    A.    It was an annuity, fixed annuity.

15    Q.    When was the first time you became aware of the

16 trade?

17    A.    I'm not sure.

18    Q.    You're familiar with the Compliance Department,

19 correct?

20    A.    Yes.

21    Q.    What's the rule of the Compliance Department at

22 Wachovia, as far as you're concerned or as far as it

23 affects your responsibilities?

24    A.    Well, just to make sure that everything that we

Kenneth S. Mitchell

Page 90

1    do, we are in compliance and we're not breaking any rules

2    or regulations or any industry policies.

3        Q.    Do you know whether the rule about giving cash

4    to clients or not giving cash to clients is a compliance

5    rule?

6        A.    I didn't know that at the time that that was

7    done.

8        Q.    Do you know that now?

9        A.    Yes.

10       Q.    Do you know whether compliance would become

11   involved if it took too long to execute a trade?

12       A.    I didn't know that they received anything that

13   Compliance would -- I didn't know that they could find

14   out that -- if a trade was not approved by me.

15       Q.    When you say you didn't know, do you mean you

16   didn't know it before, but you know it now, or do you

17   mean something else?

18       A.    What I mean is when a trade is put through,

19   after so many days, probably two to three days, sold

20   notes should go on the system.  If there are no sold

21   notes, then we get an e-mail from the compliance

22   principal out of Philadelphia.

23       Q.    So if a client does a trade for or worth

24   $100,000 and the sold notes don't go on the system

d3fc868e-c374-48dd-927e-ef94d257

Kenneth S. Mitchell

1    bring you in, and that's my recollection from there.   Go

2    ahead.

3          Q.    You were still finishing your answer.

4          A.    I finished.

5          Q.    You said that there were two or three cases in

6    which you think you didn't approve Ms. Amini's trade, and

7    you mentioned this one involving Mr. Herrmann.   Do you

8    know what the other situations involved?

9          A.    Well, let me state this for the record:   It's

10   not that I did not -- I didn't approve the trades in the

11   beginning.   The other two trades was the same thing.   She

12   put the trades through.   I went through the profiles to

13   review the customer profile and saw where over 70 percent

14   of the customers' assets were invested already in an

15   annuity.   My concern was with over 70 percent of the

16   assets invested in an annuity would create a liquidity

17   problem for the customer.

18                So I communicated to Laddie that, before I

19   approve those trades and the annuities, I was going to

20   contact the compliance principal and to get approval from

21   them to see what they thought, if the trades should stay

22   because it's over 70 percent or should we consider an

23   alternative investment for that client.   And that's what

24   I communicated to Laddie.

Kenneth S. Mitchell

Page 99

1   Compliance or suffer any consequences from Compliance?

2        A.    I mean, it's possible that may have.  I didn't

3   know that it would come back on her like it did.  I know

4   if a trade wasn't approved, I would get an e-mail from

5   Compliance in Philadelphia.  I didn't know that she got

6   the same e-mail or not.

7        Q.    Did she ever talk to you about how she felt

8   about your calling Compliance and reporting her trades?

9        A.    Never.

10       Q.    Did you ever ask her how she felt about it?

11       A.    No.  She never -- no, I never asked her.

12       Q.    Do you know during the time that you were

13  working together with Ms. Amini what her employee number

14  was?

15       A.    I didn't know what her employee number was

16  until she told me her employee number.

17       Q.    When she told you her employee number, do you

18  remember anything about what the number was?

19       A.    I asked her after a meeting for her employee

20  number so that I can give her credit for a trade and

21  that's when she communicated her employee number to me.

22       Q.    And what was the number, if you recall?

23       A.    I asked Laddie, I said, "Laddie, can I have

24  your production number so that I can give you credit for

d3fc868e-c374-48dd-927e-ef94d25

Kenneth S. Mitchell

Page 100

1    the trade or part of the commission?"

2            And she looked at me and she smiled and she

3    flashed her eyes in like a flirtatious kind of gesture

4    and says to me, "You ought to remember my number."

5            And I looked at her, and I said, "How so?"

6            And she said, "My number begins with 911."

7    And I'm waiting and 911, and she gives me the other three

8    numbers.

9            And I said, "Well, thank you, Laddie, and

10   great meeting.  I'll give you credit for the trade."  And

11   I left the building.

12       Q.    You said that she smiled and flashed her eyes

13   in a flirtatious way.  What do you mean by that?

14       A.    Flattering her eyes, turned her head to the

15   side and looked at me, smiling, "Oh, you ought to

16   remember my number."  So I thought it was -- it didn't

17   make me feel comfortable at all.

18       Q.    Why didn't it make you feel comfortable?

19       A.    Because of the flirtatious.

20       Q.    Other than that occasion, was there ever any

21   occasion when you thought that Laddie was being

22   flirtatious with you?

23       A.    No, I can't recall any other time other than

24   that time.

Kenneth S. Mitchell

Page 101

1    Q.    Did you ever speak to her about this particular
2    conversation?
3    A.    No.
4    Q.    Other than what you have already testified to,
5    do you remember anything else about that conversation?
6    A.    No.
7    Q.    After that conversation did you ever speak to
8    Laddie again about her employee number?
9    A.    No.  Not from my recollection at all.
10    Q.    After this conversation did your working
11    relationship with Laddie change in any way?
12    A.    No.
13    Q.    Did your working relationship with Laddie ever
14    change?
15    A.    It changed a few months after that had -- about
16    the production number.
17    Q.    How did it change?
18    A.    Well, there were accusations that my manager
19    had made to me in July and I think the time when I asked
20    her for her production number that occurred a couple
21    months prior to that.  Could have been April/May time
22    frame.
23    Q.    Of what year?
24    A.    Of 2003.

d3fc868e-c374-48dd-927e-ef94d25

Kenneth S. Mitchell

Page 102

1      Q.    What were the accusations that your manager

2   made to you?

3      A.    He called me up and said to me that -- and

4   asked me if I had said to Laddie that it was her people,

5   Iranian, that destroyed the World Trade Center buildings

6   in New York.

7      Q.    Where were you when he called you?

8      A.    I was at home.

9      Q.    What time of day was it?

10     A.    It was in the morning, about 7:00.  I don't

11   know if it was 6:45, 7:45.

12     Q.    Was that the first thing that he said in this

13   conversation?

14     A.    He asked me if I remembered a meeting that I

15   had with Laddie and about the 911 incident and I told

16   him, I said I remember a meeting about her production

17   number.

18     Q.    And what did you tell him about that meeting?

19     A.    I asked him if he was serious.  He says yes,

20   he's serious.  And I explained to him that I never said a

21   thing like that to anyone.

22     Q.    When you told him that you remembered a meeting

23   about her production number, what did you tell him about

24   that meeting?

Kenneth S. Mitchell

Page 103

1    A.    I didn't tell him anything about that meeting.

2    Q.    Did you tell him that you thought that Laddie

3  was being flirtatious with you?

4    A.    No, I did not.

5    Q.    Did you ever tell anyone that you thought

6  Laddie was being flirtatious with you in that meeting?

7    A.    Not other than my attorney.

8    Q.    Up until the point that Mr. Gauthier called

9  you, was there anything about that what you called a

10  meeting about the production number that stuck out in

11  your mind as being unusual?

12    A.    Yes.  The flirtatious, that's how I remember

13  about the production number.

14    Q.    You said that Ms. Amini was fluttering her

15  eyes.  Do you recall whether she was crying?

16    A.    She was not crying.

17    Q.    Do you recall whether she had tears in her

18  eyes?

19    A.    Not at all.

20    Q.    Other than asking Mr. Gauthier if he was

21  serious, did you say anything else during that

22  conversation?

23    A.    I told Mr. Gauthier that I was not going to go

24  back and work over in the branch.

d3fc868e-c374-48dd-927e-ef94d25

Kenneth S. Mitchell

1   our conversation and each time she said, 'Ken never said

2   that.'"

3               I said, "I told you I never said that."  So

4   I said, "How is it that Carol" -- well, in the morning

5   meeting I asked him, which I didn't say early, who was

6   accusing me of saying it.  He said, "Carol Beam said that

7   she spoke with Laddie and that's what Laddie told her."

8               So now I'm going to jump back to where I

9   was in the afternoon phone call.  When he says, "She said

10  that you never said that," and I told him, I said, "I

11  told you I never said that," then I said, "How is it that

12  Carol can say that that's what I said?"

13              And he says to me -- I'm not sure what his

14  exact words were, but he basically said, "But, Ken, now

15  that you have been exonerated, you should continue

16  working in the branch."

17              I stated to Todd, I said, "Todd, what if

18  Laddie had said to you that Ken did say that?"  He told

19  me I would be fired.  And I said, "That's what gives me

20  great concern as to why I don't want to go back over

21  there and work."

22       Q.    So after Mr. Gauthier told you that you had

23  been exonerated and you should continue working in the

24  branch, you told him that you were concerned and you

d3fc868e-c374-48dd-927e-ef94d25

Kenneth S. Mitchell

1    A.    I have no idea.

2    Q.    When was the last time you spoke to Laddie?

3    A.    I don't know.

4    Q.    Did you ever speak directly to Carol Beam about

5    this allegation that you had made this comment?

6    A.    No.

7    Q.    Did you ever request a meeting with her?

8    A.    No.

9    Q.    Did she ever request a meeting with you?

10   A.    I don't know if she ever requested a meeting

11   with me or not.

12   Q.    Following this series of events concerning

13   these allegations about the 9/11 incident or 911

14   incident, did anything change with regard to your working

15   relationship with Laddie?

16   A.    I didn't work in the Price's Corner branch for

17   four months.

18   Q.    Why not?

19   A.    Because I spent four months trying to get HR,

20   Human Resources, to look into this matter and to find out

21   why this false and malicious accusation was made against

22   me.  Why were they attacking my credibility and my

23   reputation?  So I didn't work in that branch from

24   July 16th and didn't go back until sometime in November