Kenneth S. Mitchell

1    A.    I have no idea.

2    Q.    When was the last time you spoke to Laddie?

3    A.    I don't know.

4    Q.    Did you ever speak directly to Carol Beam about

5    this allegation that you had made this comment?

6    A.    No.

7    Q.    Did you ever request a meeting with her?

8    A.    No.

9    Q.    Did she ever request a meeting with you?

10    A.    I don't know if she ever requested a meeting

11    with me or not.

12    Q.    Following this series of events concerning

13    these allegations about the 9/11 incident or 911

14    incident, did anything change with regard to your working

15    relationship with Laddie?

16    A.    I didn't work in the Price's Corner branch for

17    four months.

18    Q.    Why not?

19    A.    Because I spent four months trying to get HR,

20    Human Resources, to look into this matter and to find out

21    why this false and malicious accusation was made against

22    me.  Why were they attacking my credibility and my

23    reputation?  So I didn't work in that branch from

24    July 16th and didn't go back until sometime in November

Kenneth S. Mitchell

1    or December of 2003.

2        Q.    Did anyone tell you not to work there?

3        A.    Did anyone tell me not to?

4        Q.    During that period of time.

5        A.    No, nobody tell me not to.

6        Q.    How did you service clients who were in the

7    Price's Corner branch during that four-month period?

8        A.    Same as I had always serviced them.  They call;

9    I serviced them.

10       Q.    You spoke to them on the phone?

11       A.    On the phone, had joint appointments.  I

12   wouldn't say joint appointments.  Had appointments in my

13   office in Capitol Trail.

14       Q.    So those clients came over to where you were in

15   Capitol Trail?

16       A.    Some of them did.  You got to understand this

17   one thing.  Because those two branches were so close in

18   proximity, they had been in Price's Corner and Capitol

19   Trail, they go to both of those branches and have always

20   done that.  So it's not like because the account was

21   opened in Price's Corner, they never went to Capitol

22   Trail.  That's not true.  They frequented both branches

23   because they were so close.

24       Q.    So the clients that you worked with at Price's

Kenneth S. Mitchell

Page 113

1    around the end of November or the beginning of December

2    of 2003.

3        Q.    When you say that you did not go to Price's

4    Corner, did you tell anyone at Price's Corner that you

5    would not go there?

6        A.    I told my boss, Todd Gauthier, that I will not

7    go back in to work there until they had investigated the

8    accusation and why was it made against me.  I didn't feel

9    comfortable going back there to work.  I was afraid.  I

10   was fearful of going back there to work because an

11   accusation of such magnitude had been made against me.

12       Q.    Did you tell Laddie not to schedule any more

13   appointments?

14       A.    No, I did not.

15       Q.    Did you speak to her during the four months

16   that you weren't going to Price's Corner?

17       A.    No.

18       Q.    Did you ask her why she wasn't scheduling joint

19   appointments for you?

20       A.    No.

21       Q.    How would you have handled joint appointments

22   if you weren't working there for four months?

23       A.    Because I'd get joint appointments with

24   Lynn Montgomery in the Capitol Trail branch.

d3fc868e-c374-48dd-927e-ef94d2572

Kenneth S. Mitchell

Page 114

1    Q.    If Laddie had set up a joint appointment for

2    you during that four months, how would you have handled

3    that?

4    A.    During that four months Ed Duffy took over the

5    Price's Corner branch.  She would have set joint

6    appointments with Ed Duffy, not myself.

7    Q.    So between July and November of 2003 you were

8    formally not assigned to Price's Corner.  Is that what

9    you're saying?

10    A.    Right.

11    Q.    That was after you told Mr. Gauthier that you

12    would not go there?

13    A.    Yes.

14    Q.    What happened in November of '03?

15    A.    As I said earlier, there were repeated attempts

16    with HR for some kind of resolve, because I didn't feel

17    comfortable.  It had affected me from a financial

18    standpoint.  I wasn't doing any investments and

19    beforehand Laddie was setting nice appointments, we were

20    making money.  And go back to your question again.

21    Q.    You said that it was from July to November that

22    you didn't go there.  What happened in November?

23    A.    In November, after all those repeated times of

24    trying to get Human Resources to help us to come

d3fc868e-c374-48dd-927e-ef94d25

Kenneth S. Mitchell

1    together, I requested a meeting of all the parties there,

2    myself, Lynn Meyer, Dorothy DiFebo, Carolyn Beam, and

3    Laddie, to get around the table to try to iron out if

4    there was something that I was doing that they did not

5    like, to let me know, or if -- and there was something

6    that -- I just wanted to be a team.  I wanted to be a

7    team, a partner with them, and I didn't want them

8    thinking -- making these accusations against me because

9    of something I'm doing that's impeding their progress.

10                  So HR said, yeah, it's a great idea, but

11    flat out refused to do it and said they wasn't going to

12    do it.  So they didn't let us have a meeting.

13        Q.    During the four months that you were not

14    working at Price's Corner, did you ever try to set up a

15    meeting with Laddie?

16        A.    No.

17        Q.    Did you ever try to set up a meeting with

18    Lynn Meyer directly?

19        A.    No.

20        Q.    How about Carolyn Beam?

21        A.    No.

22        Q.    Did you ever ask Todd to set up a meeting?

23        A.    No.  I tried to get HR to set up the meeting.

24        Q.    Did you have any communications directly with

Kenneth S. Mitchell

Page 121

1    A.    Well, first off, it was in October when that

2    was requested, and it was with Marti Michalec.

3    Q.    How did you make the request?

4    A.    I said to her that, since we are both working,

5    supposed to be partners, why can't we arrange a meeting

6    where we all get around the table and air out our

7    differences so that we can continue on working together.

8    She says, "That sounds like a very good idea."

9    Q.    Was this a telephone conversation?

10   A.    Yes.

11   Q.    Did you ever meet Ms. Michalec in person?

12   A.    Never.

13   Q.    What was the next communication you had with

14   her?

15   A.    I'm not sure.  It might have been weeks after

16   that.  I don't know.

17   Q.    What was the next communication?  What was the

18   substance of it?

19   A.    There would be no meeting.  She said -- as a

20   matter of fact, when I did ask her about setting the

21   meeting with everybody and including Lynn Meyer, she told

22   me then that Lynn Meyer -- I don't have to worry about

23   Lynn Meyer anymore; she's no longer with the firm.

24   Q.    She told you Lynn Meyer was no longer with the

Kenneth S. Mitchell

Page 124

1     A.    Yes.

2     Q.    What did he say to you?

3     A.    He said -- I can't recall what he said at the

4  time.

5     Q.    Did he accept your decision not to go back to

6  Price's Corner?

7     A.    He accepted it until such time I told him that

8  right now let Ed Duffy go back there to work until we get

9  matters resolved and when we do, then I'll go back.

10     Q.    Did you ever go back?

11     A.    Yes.

12     Q.    When did you go back?

13     A.    As I stated earlier, in November/December time

14  frame of 2003.

15     Q.    What happened to Mr. Duffy?

16     A.    He went back and he didn't cover the branch

17  at -- Price's Corner branch anymore.

18     Q.    When you came back to the branch in November or

19  December of 2003, what was your working relationship like

20  with Laddie?

21     A.    As I also stated earlier, she didn't refer any

22  more business.  We had very little contact with one

23  another.  All the -- whenever a customer wanted to sell a

24  mutual fund or something of that nature or have something

d3fc868e-c374-48dd-927e-ef94d257

Kenneth S. Mitchell

Page 133

1    Trail branch, 20 percent was coming out of the Price's

2    Corner, and asked me what could I do to help the Price's

3    Corner staff get their investment numbers up.

4         Q.    What did you tell them?

5         A.    I told them based on the things that had

6    happened in the past a year ago that day, things hadn't

7    been good, but I thought that, if we could get some

8    office space in that branch where I could have a physical

9    presence there, it would probably help mend the

10   relationship and make it easier for the bank staff there

11   to refer the business to me since I would actually be

12   there, and that I needed their help, he and Carol, to get

13   the bank staff there to implement the investment prospect

14   and referral strategy and those numbers would go up.

15        Q.    When you refer to the investment prospecting

16   and referral strategy, had you tried to get the Price's

17   Corner branch to adopt that strategy?

18        A.    Yes.

19        Q.    What had you done to try to get them to adopt

20   the strategy?

21        A.    Well, we all signed on the dotted line that

22   that's what we would do, that's how we agreed that we

23   were going to try and increase the investment revenue.

24        Q.    When did you sign on the dotted line?

d3fc868e-c374-48dd-927e-ef94d257

Kenneth S. Mitchell

Page 134

1    A.    That was done I think around February of 2004.

2    Q.    Was this at a meeting, during a training?

3  Where was this done that you all signed?

4    A.    This was a meeting that was held in my Capitol

5  Trail -- in the Capitol Trail branch.   In attendance of

6  that meeting was Todd Gauthier, Carolyn Beam,

7  Gloria Sharp, Lynn Montgomery, Dorothy DiFebo, Laddie was

8  there, and also the small business banker in the Price's

9  Corner branch.

10    Q.    So all of these individuals attended this

11  meeting in February of 2004?

12    A.    Right.

13    Q.    What happened at this meeting?

14    A.    We reviewed that investment prospect and

15  referral strategy document and basically agreed that

16  that's how we were going to do it and used that as our

17  strategy for getting the investment numbers up.

18                    MS. MISHRA:  Make this No. 6.

19                    (Mitchell Deposition Exhibit No. 6 was

20  marked for identification.)

21  BY MS. MISHRA:

22    Q.    I'm showing you what's been marked as

23  Exhibit 6.  Is this the strategy document that you were

24  just talking about?

Kenneth S. Mitchell

Page 140

1    A.    Yes.

2    Q.    What did she say?

3    A.    We all agreed that what was communicated in

4    that meeting, that they would take it for action.

5    Q.    Do you remember the specific words that Carolyn

6    used about talking to Laddie and Dorothy?

7    A.    I can't recall it right off.

8    Q.    Did either Todd or Carol recommend that you

9    speak directly with Laddie and Dorothy?

10    A.    No.

11    Q.    Following the July of 2004 meeting what was the

12    next thing that happened in relation to you working at

13    Price's Corner?

14    A.    What was the next thing that happened?

15    Q.    Yes.

16    A.    While I was waiting for an office space to

17    become available in Price's Corner branch, which is what

18    Carol and Todd was to be working on, I followed up with

19    both of them on a monthly basis, inquiring as to what's

20    the status of the space in the Price's Corner branch, and

21    at some point in time, in October I believe it was, we

22    got word that the small business banker who was in the

23    Price's Corner branch, her position was being eliminated.

24    So that freed up a space in the branch.

d3fc868e-c374-48dd-927e-ef94d257

Kenneth S. Mitchell

Page 141

1      Q.     Was that space assigned to you?

2      A.     Yes.  I took that space to be -- since it was

3  freed up, that it was going to be assigned to me.  That's

4  what Todd and Dorothy -- Todd and Carol had been working

5  towards, providing a space for me to work over there.

6      Q.     Other than checking on that office space on a

7  monthly basis, did you do anything else to try to

8  implement the referral strategy, the prospecting and

9  referral strategy with the Price's Corner branch?

10     A.     You have to understand that the environment

11 there was still rather chilly.  There was no

12 communication going on.  I was utilizing Todd and Carol,

13 who were the managers, to break the ice and get us back

14 on track.

15     Q.     I believe you said that you were not at the

16 Price's Corner branch between July and November of '03.

17 Correct?

18     A.     Between July and November of '03 I was not at

19 the Price's Corner branch.  After around November I

20 believe it was was when I went back over there.

21     Q.     Then you said in November of '03 to December of

22 '04 that you did not have any joint appointments

23 scheduled.  Is that correct?

24     A.     That's right.

Kenneth S. Mitchell

Page 142

1    Q.    During that period of July of '03 to December

2    of '04, how many times were you in the Price's Corner

3    branch?

4    A.    November to July --

5    Q.    And July to December.  July of '03 to December

6    of '04 how many times were you at the Price's Corner

7    branch?

8    A.    Well, let's put it this way:  I was not there

9    at all from July '03 to November '03.  November '03 to

10   July -- to December '04 I don't know how often I was

11   there.  I started going over there on December 6, 2004,

12   after the office became available.  That's when I moved

13   in.  Prior to that maybe two, three times, give or take

14   two.

15   Q.    During those two to three occasions that you

16   were there between November of '03 and December of '04,

17   what is it about the environment there that you're

18   describing as chilly?

19   A.    You go over and they don't want to speak.  I

20   would speak, would never get -- my greetings would never

21   get reciprocated.

22   Q.    Who didn't want to speak to you on those two to

23   three occasions?

24   A.    Dorothy.

d3fc868e-c374-48dd-927e-ef94d2572

Kenneth S. Mitchell

1    of the back door.

2         Q.    Did you ever speak to Dorothy about this?

3         A.    No.

4         Q.    Did you ever speak to Laddie about this?

5         A.    No.

6         Q.    How do you know that someone accused you of

7    going in or out of the back door?

8         A.    I remember it being stated in -- let me see.

9    When I reviewed the deposition.

10        Q.    Focusing on the time that you actually worked

11   at Price's Corner, the two to three times that you said

12   that you went there between November of '03 and December

13   of '04, do you remember anything that -- anyone actually

14   saying anything to you at that time that you thought was

15   negative or derogatory at that time?

16        A.    I can't recall at this time.

17        Q.    Once the office space opened up after the small

18   business banker was eliminated, how many times per week

19   were you at the Price's Corner branch?

20        A.    Three days.

21        Q.    Every week?

22        A.    No.  Three days, December 6, 7th, 8th, and on

23   December 9th I was told to cease going to the Price's

24   Corner branch.

d3fc868e-c374-48dd-927e-ef94d257260c

Kenneth S. Mitchell

Page 146

1    Q.    Who told you that?

2    A.    Todd Gauthier.

3    Q.    What did he tell you specifically?

4    A.    He told me he was taking the branch away from

5    me.

6    Q.    Are those the words he used, "I'm taking the

7    branch away from you"?

8    A.    Yes.  He said he made a decision and he wanted

9    to come out to see me, and I stated to him, "Just tell me

10    what your decision is.  There's no need to drive from

11    Philadelphia to here just to tell me what your decision

12    is."  And he said that he was taking the branch.  He had

13    made a decision to take the branch away from me.

14    Q.    So Mr. Gauthier wanted to come see you in

15    person and tell you about this and you told him that

16    wasn't necessary?

17    A.    Right.  To tell me what your decision is and

18    that's when he told me his decision.

19    Q.    Did he tell you why he had decided that?

20    A.    He told me he was taking the branch away

21    because it wasn't right for me.

22    Q.    Did he say why it wasn't right for you?

23    A.    He said the staff there don't like me and they

24    don't want to work with me.

d3fc868e-c374-48dd-927e-ef94d2572

Kenneth S. Mitchell

1      Q.     Did he say anything else?

2      A.     No.  That's all he said.

3      Q.     Did you ask him anything about this?

4      A.     I told him -- I asked him why was he taking the

5  branch several times and asked him if it was for my

6  performance, and he says, "No, it's not for your

7  performance."

8              I said, "Have I done something wrong?"

9              He said, "No, you haven't done anything

10  wrong."

11             "Are any customers complaining about me?"

12             "No, no customers are complaining about

13  you."

14             "Are there any compliance issues?"

15             He says, "No, no compliance issues."

16             I said, "Then why are you taking the branch

17  after we had been working since July 16th, 2004, to get

18  me space in that branch?"

19             And he told me I had to talk to HR or

20  somebody about it.  I stated, "The staff not liking me

21  and not wanting to work with me is no reason to take the

22  branch away from me.  We're there to take care of our

23  customers."

24      Q.     Based on your understanding of the business

Kenneth S. Mitchell

Page 149

1        A.    No.

2        Q.    Up to July of 2003 how were you able to get

3    business at Price's Corner without an office?

4        A.    As I stated earlier in the testimony, Laddie

5    made and set joint appointments for she and I.  I only

6    went to Price's Corner whenever she made an appointment

7    for us.  And early on in the relationship Laddie made

8    many appointments, joint appointments, and that can be

9    verified by her production numbers, by her promotion.

10       Q.    During 2004, other than pursuing that office

11   space, did you ever do anything else to try to get Laddie

12   to set joint appointments for you?

13       A.    Whenever I had a conversation, if Laddie called

14   and wanted me to do something, I would be -- I tried to

15   do the conversation a way to show that there was

16   partnership, that we can work together, but it never

17   materialized from there.  And that's why I sought the

18   managers to intervene and help us to try and get back on

19   track.

20       Q.    Did Todd ever tell you that Wachovia had made a

21   business decision to have one FA per branch?

22       A.    Yes, he said that.

23       Q.    When did he tell you that?

24       A.    On November 18th, 2004.

Kenneth S. Mitchell

Page 150

1    Q.    What did he tell you about that?

2    A.    He said that all the FAs are going to have one

3  branch, and I stated to him that because the two

4  branches, Price's Corner and Capitol Trail, were so close

5  together, that it only made sense that one adviser handle

6  both of those branches, and because they were so close

7  together, the same customers use both the branches.

8    Q.    What did he say to that?

9    A.    He says, "Well, we're going to one branch."  He

10  says, "You got to choose a branch."

11        I said I have had -- first he said he was

12  looking to put somebody in that Price's Corner branch

13  and, of course, that's when I told him about one adviser

14  for both branches.  I said, "If you put another adviser

15  in that branch and I stay here, we will be tripping over

16  each other with our customers because the same customers

17  go in both branches."

18        Then he stated to me that I should -- he

19  says, "You got to take one or the other branches."  He

20  says, "You have been doing 80 percent of your production

21  in Capitol Trail and about 20 percent over in Price's

22  Corner and we're all going to one branch."

23        He wanted me to take Capitol Trail.  And I

24  said, "Well, I have been in both of these branches.  They

d3fc868e-c374-48dd-927e-ef94d2572

Kenneth S. Mitchell

1  have been under me for the past two years except for the

2  four months that I wasn't in Price's Corner." I said, "I

3  should have first choice of which branch I would like to

4  have."

5  And he stated, "Well, you're going to have

6  to take one or the other." But he figured -- thought

7  that I was going to take Capitol Trail because I guess he

8  knew the situation I had in Price's Corner with the

9  incidents.

10  So I said, "Let's look at the deposit

11  numbers in both branches." And we pulled up the deposit

12  numbers for Capitol Trail and Price's Corner. Price's

13  Corner deposit numbers were in excess of 57, 58 million.

14  Capitol Trail was about 27.

15  I said, "It's very clear to me that the

16  most opportunity is in the Price's Corner branch;

17  therefore, that's where I would prefer to be where there

18  was more opportunity."

19  At that point in time he says that he was

20  going to have to think about it and that he felt I was

21  throwing him a curve. What he meant by that I don't

22  know.

23  Q.    When you say "look at the deposit numbers,"

24  you're talking about the deposit numbers in the retail

Kenneth S. Mitchell

Page 168

1    A.    I can't recollect.

2    Q.    Did anyone do anything that you considered

3  harassing?

4    A.    All of the things that I had stated before with

5  the false accusations, the phone conversation I guess I

6  should say, harassment from Lynn Meyer.

7    Q.    Was Lynn Meyer part of the bank staff?

8    A.    Yes.

9    Q.    What was her position?

10   A.    Regional bank director at the time.

11   Q.    What about the phone conversation was

12  harassing?

13   A.    When she stated that I made Laddie fear for her

14  job by going to Compliance and said that I threw $6 down

15  on the desk at Mr. Herrmann and yelled at me, saying,

16  "Don't treat our customers like that" and threatened to

17  call Frank Consalo to let him know what I did and

18  wouldn't accept what I had told her when I gave her my

19  reasons for doing what I did.

20   Q.    Do you know what Lynn Meyer's basis was for

21  stating that you made Laddie fear for her job?

22   A.    Because she said that I -- when I told Laddie I

23  was going to Compliance, she got afraid.

24   Q.    Do you know whether Laddie got afraid?

d3fc868e-c374-48dd-927e-ef94d2572

Kenneth S. Mitchell

Page 181

1    Q.    On the bottom of that is an e-mail from
2    Bill Wolfe.  Did you ever respond to that e-mail from
3    Bill Wolfe or write back to him?

4    A.    I don't recall.

5    Q.    Do you recall Mr. Gauthier ever talking to you
6    about bringing on a broker-funded assistant?

7    A.    Yes.

8    Q.    When was that?

9    A.    In April -- March or April of 2004.  I believe
10   it might have been March 2004.

11   Q.    So while you were still assigned to Price's
12   Corner and Capitol Trail?

13   A.    Right.

14   Q.    What did he talk to you about in that regard?

15   A.    He lauded me for my performance, said I was
16   doing very well and that I was ranked at that time 3 --
17   out of 28 financial advisers, I was ranked No. 3, and
18   told me that I would be getting my bonus and my back-end,
19   and then spoke about a broker-funded assistant, hiring a
20   broker-funded assistant at $3,000 a month.

21   Q.    What else did he talk to you about as far as
22   broker-funded assistant was concerned?

23   A.    I have no recollection beyond that.

24   Q.    Did he talk about where the assistant's office

d3fc868e-c374-48dd-927e-ef94d257

Kenneth S. Mitchell

1   would be?

2        A.    He spoke at that time it would be in Capitol

3   Trail.

4        Q.    Did he talk to you at all about using the

5   broker-funded assistant to pursue the investment

6   prospecting and referral strategy?

7        A.    No.

8        Q.    This was about a month after the meeting that

9   you said that he and Carol had with you concerning the

10  investment prospecting and referral strategy, correct?

11       A.    That's right.

12       Q.    Did you think that a broker-funded assistant

13  might help you pursue that strategy?

14       A.    No.

15       Q.    Why not?

16       A.    Because the strategy was designed for the FA

17  and the FS's in the branch.

18       Q.    Did you consider whether a broker-funded

19  assistant could help you reach out to the Price's Corner

20  branch?

21       A.    No.

22       Q.    Did you ever complain that Mr. Gauthier did not

23  offer you the opportunity to have a broker-funded

24  assistant?

Kenneth S. Mitchell

Page 183

1    A.    Yes.

2    Q.    When was that?

3    A.    That was in January -- December/January of --

4  December 2004, January 2005.

5    Q.    So after he had this conversation with you

6  about a broker-funded assistant, you complained that he

7  had not offered you the opportunity?

8    A.    He offered me the opportunity in March of 2004

9  for Capitol Trail branch, to work out of my Capitol Trail

10  branch.  Eight months later when he took the Price's

11  Corner branch away from me, he also took a branch from

12  Nancy Sorg.  However, he stated to Nancy Sorg that she

13  could keep her second branch if she hired a broker-funded

14  assistant.  He didn't say to me that I could keep my

15  Price's Corner branch if I hired a broker-funded

16  assistant.  Instead, he told me it's not right for me,

17  the staff there don't like me and the staff there don't

18  want to work with me.

19    Q.    How many branches did Ms. Sorg have?

20    A.    She had two branches.

21    Q.    What was Ms. Sorg's race?

22    A.    White.

23    Q.    Did Ms. Sorg end up hiring a broker-funded

24  assistant?

Kenneth S. Mitchell

Page 184

1      A.    I don't think so.

2      Q.    Was she allowed to keep the second branch?

3      A.    No.

4      Q.    At the time that Mr. Gauthier took Price's

5  Corner away from you, did you ask him whether you would

6  be allowed to keep it if you hired a broker-funded

7  assistant?

8      A.    No.  No.

9      Q.    How did you learn that Ms. Sorg was offered the

10  opportunity to hire a broker-funded assistant?

11      A.    I think Ms. Sorg may have told me that.

12      Q.    When did she tell you that?

13      A.    Around the same time frame, December or January

14  of '05.  December '04.

15      Q.    Did you take Meadowood?

16      A.    Under what circumstances?

17      Q.    At any time.

18      A.    When the Capitol Trail branch was closed up, I

19  went to work in the Meadowood branch.

20      Q.    When was that?

21      A.    October of 2006.

22      Q.    Between March of '05 and October of '06, did

23  you work in any branch other than Capitol Trail?

24      A.    March of '05?

Kenneth S. Mitchell

Page 207

1    A.    Psychiatrist.

2    Q.    How often do you see Dr. Pereira-Ogan?

3    A.    Probably once a month, once every other month.

4    Q.    Has Dr. Pereira-Ogan given you any diagnosis?

5    A.    Yes.

6    Q.    What's the diagnosis?

7    A.    Depression.

8    Q.    Has Dr. Pereira-Ogan communicated to you any

9    opinion as to the cause of your depression?

10    A.    It's the stuff I'm going through with Wachovia,

11    the false accusations.

12    Q.    Is that how Dr. Pereira-Ogan said it, the stuff

13    you're going through with Wachovia?

14    A.    Yes.

15    Q.    Has Dr. Pereira-Ogan prescribed any treatment

16    for you aside from the Wellbutrin and the Paxil?

17    A.    Like I said, there's another one or two other

18    meds that he's prescribed, but I can't recall the names

19    of them.

20    Q.    I thought you said those were Dr. Agard?

21    A.    No.  I think there's one with Dr. Pierre-owing

22    and that I think he also prescribed.  I can't recall the

23    name of it.  There's only two from Dr. Agard.

24    Q.    Has Dr. Pereira-Ogan recommended any treatment

d3fc868e-c374-48dd-927e-ef94d257

EXHIBIT 2

FROM : KSM and Associates          PHONE NO. : 302 3283377          Aug. 08 2002 04:54PM P2

**WACHOVIA CORPORATION**
**Employment Application**

DEPOSITION
EXHIBIT 2
*Mitchell*
*KAH 12/14/07*

**PLEASE PRINT, USE INK**

| Last Name (include Jr., Sr., III, etc.) | First Name | Middle Name |
|---|---|---|
| Mitchell | Kenneth | Steven |

List any names you are known by or have used

| Home Address | City | State | Zip Code |
|---|---|---|---|
| 306 Stonebridge Blvd | New Castle | DE | 19720 |

Mailing Address / City / State / Zip Code

| Home Telephone | | | |
|---|---|---|---|
| Business Telephone | May we contact you at work? ☒ Yes ☐ No | Social Security Number | E-mail Address |
| Cellular | Best Time to Reach You? MORNING | | |
| Alternate Contact Name | Telephone ( ) | Willing To Travel? ☒ Yes ☐ No | Willing To Relocate? ☐ Yes ☒ No |

**PREVIOUS RESIDENCE - LIST PREVIOUS PLACE(S) OF RESIDENCE DURING THE LAST SEVEN (7) YEARS.**

| Street Address | City | State | Zip Code | From | To |
|---|---|---|---|---|---|
| Same as above | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Referred By: | | Have you ever been employed directly by Wachovia or any of its Subsidiaries or through a temporary agency or as an independent contractor? ☐ Yes ☒ No |
|---|---|---|
| Employee Referral: Louis Pannucci | | |
| Agency: | | If Yes, Where? / When? |
| Advertisement: | | Date Available For Employment? / Minimal Acceptable Pay Rate? Negotiable |
| Internet: | | Work Hours Preferred? |
| Employment Security Commission: | | Do you possess unlimited and unrestricted authorization to work in the United States? ☐ Yes ☒ No |
| Other: | | Have you ever been discharged or asked to resign from any employer? ☐ Yes ☒ No |
| Have you previously been in contact with a Wachovia representative regarding employment? ☒ Yes ☐ No | | |
| If yes, name of contact Louis Pannucci | | If yes, attach written explanation. |

**ARE YOU WILLING TO WORK:**
☐ Sunday  ☐ Monday  ☐ Tuesday  ☐ Wednesday  ☐ Thursday  ☐ Friday  ☐ Saturday  ☐ Holidays  ☐ Overtime

| Position Applied For (Only One Please) Financial Advisor | Requisition # (if available) | ☒ Full Time ☐ Part Time ☐ Either | ☐ Regular ☐ Temporary ☐ Either | Shift ☐ 1st ☐ 2nd ☐ 3rd ☐ Split ☐ Rotating |
|---|---|---|---|---|
| Geographic Preference | Are You Related To Any Employees, Temporaries, Sub-Contractors Or Board Members Of This Corporation Or Its Subsidiaries? ☐ Yes ☒ No | | | |
| | Relative's Name | Relationship | Location Of Relative Within Corporation Or Subsidiary | |

| Are You Age 18 Or Older? ☒ Yes ☐ No | Have you ever admitted responsibility to, pled guilty or been convicted of any crime/offense excluding speeding tickets, traffic sign violations and parking violations? ☐ Yes ☒ No  If yes, attach written explanation. Any omission of information or inaccurate information provided in response to this question will be viewed as intentional and will render you ineligible for hire; and if hired, will subject you to dismissal when correct information is discovered. |
|---|---|
| If no, can you furnish a work permit? ☐ Yes ☐ No | Have you ever been enjoined from, or disciplined for engaging in or continuing any conduct or practice involving any aspect of the financial services, securities, or real estate industries? ☐ Yes ☒ No  If yes, attach written explanation. |
| | Have you ever been the subject of an administrative order by any state agency or the Federal government? ☐ Yes ☐ No  If yes, attach written explanation. |
| | Are you applying for a position of courier, pilot or any other position which would require operation of a vehicle to perform job and/or duties which would require a valid operator's license? ☐ Yes ☒ No  If yes, give operator's license no. _____ State _____ |

WACH000546

PAGE.02                315 629 4133

# Wachovia
# Corporation

DEPOSITION
EXHIBIT
Mitchell 3
KAH 12-14-07

**Revised**

August 6, 2002

Mr. Kenneth Mitchell
306 Stonebridge Blvd
New Castle, DE 19720

Dear Kenneth:

Thank you for considering a career with Wachovia. We are impressed with your background and experience and look forward to the possibility of you joining our team as a Financial Advisor in Wachovia Securities, Inc., reporting to Todd Gauthier effective August 9, 2002.

Enclosed, you will find the summary of the terms of our offer as well as specifics regarding our benefits.

To prepare for your first day at Wachovia, please visit our Internet site, Your Journey Begins Here™ for new employees at www.wachovia.com/journey. This site includes information you will need to know prior to your first day of work. The site also provides an overview of our organization.

This offer of employment is contingent upon your securities license(s) **and** state registration(s) successfully transferring from your previous employer. Your continued employment at First Union is also contingent upon maintaining your license and registration in good standing at all times.

If you have any questions, please contact me at (704) 383-0692.   We are excited about the journey ahead and hope you will join us.

Sincerely,

Meredith McGough, Recruiting Consultant
Human Resources Division

cc:     Todd Gauthier – PA 4355
        Brenda Brown – NC 1167
        Dot Brackett – NC 1167
        Nathan Heisler – NC 1167
        Personnel File

43