LADAN AMINI

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

- - -

KENNETH S. MITCHELL,                    :
                                        :
                                        :
    Plaintiff,                          :
                                        :  C.A. No. 06-725
                                        :
    v.                                  :
                                        :
WACHOVIA CORPORATION, t/a               :
    WACHOVIA SECURITIES,                    :
WACHOVIA SECURITIES, L.L.C.,            :
WACHOVIA SERVICES, INC.,                :
WACHOVIA BANK OF DELAWARE,              :
    N.A.,                                   :
TODD D. GAUTHIER,                       :
LYNN G. MEYER,                          :
CAROLYN J. BEAM, and                    :
DOROTHY A. DIFEBO,                      :
                                        :
    Defendants.                         :

- - -

October 23, 2007



- - -

Deposition of LADAN AMINI, held in the
Law Offices of BIGGS & BATTAGLIA, located at
921 North Orange Street, Wilmington, Delaware,
commencing approximately at 10:00 a.m. on the above
date, before Holly J. Cross, a Registered
Professional Reporter and Notary Public for the
State of Delaware.


KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

LADAN AMINI

1    Q        Okay.  You described your relationship a

2  moment ago with the financial advisor as being a

3  partnership; is that correct?

4    A        That is correct.

5    Q        In fact, I think you used that word.

6    A        That's correct.

7    Q        How closely and how often do you work

8  with financial advisors?

9              MS. MISHRA:  Object to the form.

10             You can answer.

11             THE WITNESS:  Okay.  What I'm not sure

12  is it -- are we talking about today's, or are we

13  talking about the past?

14  BY MR. MONES:

15    Q        Has it changed?

16    A        In the past I would decide to do it; and

17  if it's not a large amount, I will do it myself.

18    Q        What do you consider a large amount?

19    A        The largest I had done, like $100,000.

20  Once I have all the profiling and I decided that it

21  was right for the customer, I was able to do it.  I

22  mean -- but anything usually smaller, I always did

23  it.  I haven't been doing it myself anymore.  I

24  just refer it, since two years ago.

25             I just -- when I meet a customer, I will

Karasch & Associates
800-621-5689

LADAN AMINI

1   and I want to go into it in a little bit more

2   detail now, and that's the licensing that you hold.

3   Are there any licensing requirements to be a

4   financial specialist?

5        A        We have to be licensed 6 and 63, an

6   annuity.

7        Q        What does 6 and 63 mean?

8        A        That means we will be able to do -- 63

9   is the state of Delaware for -- and then 6 is for

10  mutual fund, and you have to be 6 before to be

11  able -- life insurance and annuity.

12       Q        Okay.  Do you hold any professional

13  licenses other than what you've just discussed?

14       A        No.

15       Q        Okay.  Have you ever had any

16  professional or business licenses revoked or

17  suspended?

18       A        No.

19       Q        Do you have to attend any continuing

20  education classes or seminars?

21       A        Every year, yes.

22       Q        What's the requirement?

23       A        We have to have 25 credits for annuity,

24  life insurance; and every two years we have to go

25  to the test center to do the test; and also every

LADAN AMINI

Page 65

1    Q        So he was an existing customer when you

2  came there, and he liked you and did work with you?

3    A        That's correct.

4    Q        Do you remember sometime around June

5  2003 a meeting between Mr. Herrman and you and

6  Mr. Mitchell?

7    A        I don't recall the date and the time,

8  but -- but, yes, we had a meeting with Mr. Herrman

9  and Ken, yes.

10   Q        Was Mr. Herrman upset about something?

11   A        Well, we had a meeting before that, to

12  introduce -- you know, we had a meeting and -- Ken

13  did -- after we talked together and, you know, a

14  joint meeting, Ken did -- I believe it was $50,000

15  in a mutual fund for him, and -- and then bought

16  maybe -- I guess a week or so, Mr. Herrman called

17  and said that he got fees. And I can't remember if

18  we had the meeting or at that time I called Ken.

19  And he was extremely upset of the fee.

20            And what it was, when we do a -- buy a

21  security or sell a security, there is a $6 fee.

22  And he was very upset, and he just -- why he even

23  got this paper, that there's a fee, because

24  Wachovia Securities asked to send a confirmation.

25  And he came to me and he wanted me to waive it.

LADAN AMINI

1    Q        What did you say?

2    A        I told him that any bank fees, I can

3  waive.  Any security fees is when I have to call

4  Ken or the financial advisor.  And, again, I don't

5  recall if we had a joint meeting or -- I believe

6  Mr. Herrman came for that fee, so I called Ken, and

7  Ken was not far.

8    Q        Mr. Herrman actually came to the branch

9  to see you about the $6 fee?

10   A        That's right.

11   Q        Okay.

12   A        And I said any fees with the securities,

13  I or we call, as a financial specialist, we call --

14  that's the first person we -- the financial

15  advisor, and we get them involved, so I called Ken,

16  and Ken came.

17   Q        And what happened then?

18   A        And this gentleman was very upset, and

19  he said, "I got this fee, and you're going to waive

20  it."

21            And if I recall, Ken asked me if I can

22  waive it.  And I said I can't waive it because it's

23  not banking.  I can't waive a security.  So then he

24  told Mr. Herrman that if he waives this, it's like

25  money from his pocket.  He has to pay for it,

LADAN AMINI

1   and gave it to Mr. Herrman, and Mr. Herrman pushed

2   it back to him.  He said, "Take your money.  I

3   don't want your money."

4        Q        Is it your belief that Mr. Mitchell had

5   the authority as an FA to waive that fee?

6        A        Yes.  He could go to his superior and --

7        Q        And you didn't -- as a financial

8   specialist, you didn't have the authority?

9        A        I have to go to my financial advisor.  I

10  do not call his boss.  I have to go to my financial

11  advisor.

12       Q        Were any other Wachovia employees

13  brought into that situation?

14       A        What do you mean by that?

15       Q        Well, there were three people present at

16  that meeting:  Mr. Herrman, you, and Mr. Mitchell.

17       A        That's right.

18       Q        At some point were other Wachovia people

19  involved in that?

20       A        You mean later on?

21       Q        Yes.

22       A        Well, when that was brought up -- I

23  mean, I -- I didn't talk about that, because I just

24  didn't want -- it was something done.  It wasn't

25  right, and I just -- I just -- I didn't want to

LADAN AMINI

Page 69

1    talk about it, but there was another incident came

2    that this was also said.

3         Q       Okay.  We'll get to other incidents in a

4    moment, but this incident, did you report it to

5    anyone or talk to anybody about it?

6         A       At that time, no, no.

7         Q       Okay.

8         A       I did tell -- actually or maybe they

9    even -- because you can -- any talk in my office,

10   my teller can even hear.  When we were talking,

11   some of them, they could hear very well.  This is

12   not -- the door was open and -- now, if other

13   people saw the transaction, I don't know; but after

14   that I did mention to -- because Dorothy, I think,

15   she's very close to my office.

16              And she would say, "What's that all

17   about?"

18              And I said, "There was a $6 fee.  He was

19   trying to give it to Mr. Herrman.  Mr. Herrman

20   pushed it back, and said take your money," which

21   is --

22        Q       Do you know whether Mr. Mitchell called

23   anyone to see if he could waive the fee?

24        A       At that time, no.

25        Q       So you were present --

LADAN AMINI

1   he had looked at something or -- I don't know, but

2   I remember that he called and he said he won't

3   approve it.

4       Q       I'm not sure you've answered the

5   question of what he said was the reason why he

6   specifically disapproved the transaction.

7       A       That I put -- he -- my understanding was

8   that he's saying that the calculation was wrong.

9       Q       Okay.

10      A       And I shouldn't do this investment.

11      Q       Did you go over the figures with him?

12      A       He just said that, and that was good-bye

13  and finished.

14      Q       What happened?  Did compliances get

15  involved?

16      A       I was very upset.  I was very upset for

17  such a small amount, after so many long times, that

18  he can't -- he won't even think I can do that.  I

19  mean, I was -- so I -- I really got very panicked

20  of just saying, you know, who goes to court and now

21  who goes to compliances and just very upset of what

22  did I do wrong.

23      Q       Did compliance get involved?

24      A       After that, yes, they got.

25      Q       What did they do?

LADAN AMINI

Page 89

1    A    They approved it.  It was approved.  Ken

2    never approved it.  They approved it.

3    Q    Maybe it's just because I don't know the

4    procedure within Wachovia, but the compliance is a

5    group that oversees or reviews, what, questionable

6    trades or all trades?

7              MS. MISHRA:  Objection.

8              You can answer.

9    BY MR. MONES:

10    Q    Your understanding.

11    A    Anything I do, yeah, they review all the

12    trades for financial specialists.  I don't know

13    about the financial advisors' work.

14    Q    Just to be sure I understand where we're

15    going on this, if I'm a compliance person at

16    Wachovia, do I get a printout of all of your trades

17    with a list of those that are approved by the FA

18    and those that are not, or what would I look at?

19    A    I don't know how the system is set up.

20    Is it when we send the paper or we have -- or the

21    computer.  Every trade that is done, they get a

22    sign or something that the trade is done, and then

23    they check the trade to make sure that all the

24    notes are there and my explanation is there and

25    then my financial advisor's explanation.  Because

LADAN AMINI

1    I never said what I needed.

2                    Then I called another financial

3    specialist, Thomas Klein.  He was a very good

4    successful financial specialist at the Hockessin

5    office.

6                    And so I called him, and I said, "Hi,

7    Tom."

8                    And then he said, "Yeah, hi."

9                    And I said, "I just need you to help me

10   on something, you know, you can make a" -- I don't

11   think I could finish the sentence.

12                    And I heard somebody say, "Oh, hi,

13   Laddie."

14                    And I said, "Where are you, Tom?"

15                    And he said, "I'm in the car with

16   Lynn Meyer."

17                    I said, "Oh, my God, Lynn Meyer," which

18   is -- Lynn Meyer is Carol's boss, which is the boss

19   of my boss.

20                    And I said -- I just -- honestly, I

21   panicked.  I didn't want this to get all the way up

22   to there.  There was no -- you know, we could

23   resolve it down here, don't want to get anything --

24                    I said, "Okay.  Okay.  I'm sorry.  I'm

25   sorry.  Don't worry.  Nothing."

LADAN AMINI

1          And he said, "No, you sound very upset.

2   Are you upset?"

3          And I think, like, first and second

4   time, "Are you upset?  Are you upset?  There's

5   something wrong.  Laddie, what's wrong?"

6          I start crying.  I just lost it.  I was

7   very upset.

8          I said, "It's nothing."

9          He said, "All right.  We'll come."

10          I don't know where they were going, and

11   they came to my office.

12      Q      Both of them?

13      A      Both of them, yes.  They were both in

14   the car and -- and not that I want to say -- I

15   should say that I was, but I was one of the good

16   performers, so I guess for supporting me that I was

17   upset, so they both came to my office.

18          And when I told them that and not --

19   they know -- they are all aware about the 100,000

20   before, because, as I said, this went to everybody,

21   to all the -- so --

22          And I said, "This is what I did, a 3,000

23   and a 5,000, and he's not approving it."

24      Q      What did they say?

25      A      I think they -- I said, "I have done all

LADAN AMINI

Page 102

1  incident that occurred -- and I'm going to refer to

2  as the 9/11 incident, for want of a better

3  expression.  You're smiling.  You know what this is

4  going to be about, too.

5           Did you ever tell anyone that

6  Mr. Mitchell made a disparaging remark about your

7  nationality with some kind of reference to the 9/11

8  terrorist incident?

9           MS. MISHRA:  Object to the form.

10           You can answer the question.

11           THE WITNESS:  No, I told Dorothy and --

12  I don't know if I told directly to Todd or -- I

13  can't remember, but, yes.

14  BY MR. MONES:

15      Q      What happened?

16      A      I think he was -- he was doing a trade

17  from the referral I had sent to him.  So he called

18  over the phone to ask for my employee number, and

19  my employee number starts with 911957.  This is my

20  employee number.

21      Q      911957?

22      A      That's my employee number with Wachovia

23  Bank, yes.  So I said -- oh, he said, "Yeah, we did

24  the trade, and now give me your employee number so

25  I can put it in so you can get a referral."

LADAN AMINI

1           So I said 911, and he said, "911 and

2   September 11th."

3           And I said -- and, of course, you know

4   as being Iranian, it's just -- you don't want to

5   hear that at all.  This is -- for me, it's very --

6           And I turn around, and I said, "None of

7   those people were Iranian.  They were Arab."

8           That's my response, and then -- if I

9   don't -- if I recall it, I think he said, "Oh, just

10  joking."

11      Q    What exactly did Ken Mitchell say?

12      A    I said 911, and I was going to 957, and

13  he said, "Oh, 911 and September 11th," which to me

14  was relating that to that, and that was not -- not

15  from my coworker, something that is so important --

16  I mean, it's --

17      Q    He didn't say anything else other than,

18  "Oh, 911 is September 11th"?

19      A    That's right.

20      Q    Did he use the word Iran or say Iranian?

21      A    Nothing, nothing, that was -- that was

22  the word.

23           And I said, "None of those people were

24  Iranian.  They were Arab."

25           And, of course, I was very upset, just

LADAN AMINI

Page 104

1   don't -- you know, that was a big tragedy and -- I

2   mean, I don't know now what's going on today, but

3   at that time no Iranian wanted to be any of those

4   people.

5       Q       Okay.   What did Ken say after that?

6       A       Joking, just laugh and was joking, I

7   guess.

8       Q       Okay.   Who did you tell about that?

9       A       As I said, I know I told Dorothy, and

10  I --

11      Q       Why?

12      A       Why I told her?

13      Q       Why did you tell her --

14      A       When you're upset and you're working

15  and -- I mean, I -- if anybody else had told me, I

16  would tell her.  If the customer would say it, I

17  would say it.  Anyone, I would just -- I

18  couldn't -- I couldn't accept it from my coworkers.

19  My coworkers, they know that I'm Iranian, and I'm

20  sensitive, you know.

21      Q       Did you understand Mr. Mitchell to be

22  making some kind of disparaging remark about you

23  being Iranian?

24      A       No.

25              MS. MISHRA:  Object to the form.

LADAN AMINI

Page 105

1          You can answer.

2          THE WITNESS:  No.  We never -- it was

3  always very formal, you know.  It was never -- I

4  mean, I have more closer, you know, relationship --

5  you know, it was very formal:  Come get the trade

6  done, go, good-bye, finished.  It was -- that's how

7  it was.  It wasn't like, you know, talk and, you

8  know, and -- you know.

9  BY MR. MONES:

10         Q     Okay.  So Ken Mitchell was in his office

11  at Capitol Trail --

12         A     Really very formal, very formal,

13  formally business, you know.

14         Q     So Mr. Mitchell was in Capitol Trail,

15  and he called you at Prices Corner to get your

16  employee number and that's how this happened?

17         A     Uh-huh.

18         Q     So you told directly --

19         MS. MISHRA:  You have to say yes or no.

20         THE WITNESS:  Yes.  I'm sorry.

21  BY MR. MONES:

22         Q     You told Dorothy DiFebo?

23         A     Yes.

24         Q     Do you know who she spoke to?

25         A     I have no idea.

Karasch & Associates
800-621-5689

LADAN AMINI

Page 143

1   nice -- they had a meeting room, which we don't

2   have this, a conference room.  It was a prettier

3   branch than my office.

4          Q       Did you know the employees there?

5          A       Yeah.

6          Q       Did you know the financial specialist or

7   specialists at Capitol Trail?

8          A       Lynn Montgomery.

9          Q       Was there one FS there or more than one?

10         A       I believe they tried a couple of times,

11  they put two, but that was years ago, and it

12  didn't -- Lynn was there at that time, and she's

13  not in my office.

14         Q       Are there two financial specialists now

15  at --

16         A       At Prices Corner.  There's always two

17  financial specialists at Prices Corner.

18         Q       Did you ever talk to the branch manager

19  or anyone else at Capitol Trail about Ken Mitchell?

20         A       Say it again.  I'm sorry.

21         Q       Sure.  Did you ever talk to the branch

22  manager at Capitol Trail or anyone else there about

23  Ken Mitchell?

24         A       No.

25         Q       Do you know who the manager was -- I

LADAN AMINI

1   guess the FCM -- at Capitol Trail?

2        A        Gloria Sharp.

3        Q        Where did she go when the office closed?

4        A        Newark office.  She asked for that

5   office.  It's close to her house.

6        Q        Are you aware of anyone who has ever

7   complained of racial discrimination or harassment

8   at Capitol Trail?

9        A        I don't know.

10       Q        Are you aware of anyone who ever

11  complained of gender discrimination or harassment

12  at Capitol Trail?

13       A        I don't know.

14       Q        Do you remember an incident back in

15  November of 2004, which is shortly before

16  Mr. Mitchell left the Prices Corner office, where

17  you complained about his work to Carol Beam?

18       A        If Ken complained to Carol Beam?

19       Q        No, where you complained about Ken to

20  Carol.

21       A        And that was when?

22       Q        November of 2004.

23       A        When is that, November -- is it before

24  he left or --

25       Q        Yeah, a month before he left.

LADAN AMINI

Page 148

1    A    Right.  I said I won't do it.

2    Q    Okay.  Now, have you seen what

3  Mr. Gauthier responded?

4    A    No.

5    Q    At the top is his response to Carol

6  Beam.  It says, "I was with Ken yesterday when he

7  took the call from Laddie.  He and I were

8  discussing the branch moves.  I heard the

9  conversation.  What she describes below is not even

10  close to the facts.  Some of it is complete

11  fabrication and misrepresentation of what was said.

12  I will fix the trades today.  However, if this is

13  how she described what I heard yesterday, it causes

14  me great concern based upon past experiences with

15  her and Ken."

16    Have you ever seen this before?

17    A    No.

18    Q    Did Carolyn Beam ever discuss this with

19  you?

20    A    No.  But that's not really -- I don't

21  believe that up there, no.  He called, and he

22  wanted me to do the trade.

23    And I said, "I don't do it without the

24  profile.  No, I won't do it."  That's all.

25    Q    Do you think you were a little hard on

EXHIBIT 6



Todd Gauthier/CMG/USR/FTU    To  carolyn.beam1@wachovia.com
11/19/2004 08:31 AM    cc
                       bcc  Todd Gauthier/CMG/USR/FTU
                    Subject  Re: mutual fund ticket

i was with ken yesterday when he took the call from laddi. he and i were discussing the branch moves. i
heard the conversation. what she describes below is not even close to the facts. some of it is complete
fabrication and misrepresentation of what was said. i will fix the trades today however if this is how she
described what i heard yesterday it causes me great concern based on past experiences with her and ken.

Todd
carolyn.beam1@wachovia.com

carolyn.beam1@wachovia.co    To  todd.gauthier@wachovia.com
m                            cc
11/19/2004 07:52 AM        Subject  mutual fund ticket



would you pls get involved in this one since I am not to go to Ken directly.
Laddie was very uncomfortable since a signed profile was not obtained.

i am sorry to dump this on you, but i am interviewing all day.  thanks
-------------------( Forwarded letter 1 follows )-------------------
Date: Thursday, 18 November 2004 5:15pm ET
To: CAROLYN.BEAM
From: LADAN.AMINI
Subject: mutual fund ticket

cust info judith laxton ss# 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
Cust has been in fc numerous times to get name change due to marriage.
ken also wanted me to drop ticket for ev asset allocation without a profile.
i refused & we went back & forth with each other as to who was going to drop
ticket. I told him cust would have to come in again for me to do profile &
he wouldn't send me a copy of his profile. i refuse do drop ticket if i'm
not going to follow compliance guidelines. I have been trying to work with ken
but he makes it difficult for me. it it not conveint for cust to come back for
the third time. thaks laddie

ForwardSourceID:NT000190EA

EXHIBIT 7

DOROTHY DI FEBO

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

- - -

KENNETH S. MITCHELL,               :
                                   :
                                   :
      Plaintiff,                   :
                                   : C.A. No. 06-725
   v.                              :
                                   :
WACHOVIA CORPORATION, t/a          :
    WACHOVIA SECURITIES,                :
WACHOVIA SECURITIES, L.L.C.,       :
WACHOVIA SERVICES, INC.,           :
WACHOVIA BANK OF DELAWARE,         :
    N.A.,                               :
TODD D. GAUTHIER,                  :
LYNN G. MEYER,                     :
CAROLYN J. BEAM, and               :
DOROTHY A. DIFEBO,                 :
                                   :
      Defendants.                  :

- - -

October 23, 2007

COPY

- - -

        Deposition of DOROTHY DI FEBO, held in
the Law Offices of BIGGS & BATTAGLIA, located at
921 North Orange Street, Wilmington, Delaware,
commencing approximately at 2:30 p.m. on the above
date, before Holly J. Cross, a Registered
Professional Reporter and Notary Public for the
State of Delaware.

KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

DOROTHY DI FEBO

Page 4

1                         - - -

2              DOROTHY DI FEBO, having been duly sworn,

3    was examined and testified as follows:

4                         - - -

5                    EXAMINATION

6    BY MR. MONES:

7         Q      Good afternoon, Ms. DiFebo.

8         A      Hi, how are you?

9         Q      Good.  My name is Steve Mones.  I

10   represent the plaintiff, Ken Mitchell, in this

11   case.

12              Can you spell your name for the court

13   reporter, please?

14        A      Sure.  D-O-R-O-T-H-Y, D-I, capital

15   F-E-B-O.

16        Q      And your home address?

17        A      17 Champlain Avenue, Wilmington,

18   Delaware.

19        Q      What is your title with Wachovia?

20        A      Financial center manager.

21        Q      Okay.  And how long have you been with

22   Wachovia?

23        A      22 years.

24        Q      How long have you been the financial

25   center manager at Prices Corner?

DOROTHY DI FEBO

Page 32

1    Q    The time frame we're looking at here is
2  from 2003 to the present.  So I don't know whether
3  it has changed over time, but you can indicate
4  that.  You can either start from manager and work
5  down or start from, I guess, teller or whatever and
6  work up, whichever way you prefer.
7    A    And what time frame are you going to?
8    Q    Why don't you start at 2003 and then
9  tell me if there are any changes.
10    A    All right.
11    Q    What categories of personnel work there?
12  How many?  In other words, who did you supervise?
13  Who worked in your branch?
14    A    Gee, I'm trying to think.  2003, I was
15  the manager.  Laddie was a financial specialist.  I
16  can't -- I'm not sure if Bill Keetly was the other
17  financial specialist in 2003.  I can't really
18  recall when he left Wachovia.  He didn't leave
19  Wachovia at first.  He was transferred to a service
20  leader down south.  The teller line would have
21  been --
22    Q    I'm sorry?
23    A    You want me to go on to the tellers, who
24  were the tellers there, or just --
25    Q    Sure.

DOROTHY DI FEBO

Page 33

1    A    -- just plain -- or are you just going

2 with manager and financial specialists?

3    Q    No, all employees. I mean, how many

4 people were there? We're not talking hundreds.

5    A    Sometimes on the teller line it would be

6 a revolving door, depending on if, you know, if

7 somebody was going to a different career path. So

8 it's really hard to say. Most times we had 10

9 tellers.

10    Q    Were they all there at the same time, or

11 do they have different shifts and days?

12    A    Oh, different shifts.

13    Q    Okay.

14    A    Part time, full time.

15    Q    How many did you have there at any one

16 time on a typical day?

17    A    Typical day, average would be seven.

18    Q    Who else other than tellers, financial

19 specialists, and you? What other categories of

20 personnel?

21    A    One time -- and I can't be sure on the

22 time frame -- we had a small business banker in one

23 of the offices; and at one time prior to that small

24 business banker, there were three financial

25 specialists in the office.

DOROTHY DI FEBO

Page 56

1  nationality?

2      A      No.

3      Q      Did you ever personally hear

4  Mr. Mitchell make any comments at all about the

5  9/11 terrorist attack?

6      A      No.

7      Q      Have you heard of an incident in which

8  Mr. Mitchell allegedly made a disparaging remark

9  about Ms. Amini's nationality?

10     A      Yes.

11     Q      What did you hear, and can you tell me

12 about it?

13     A      Okay.  Laddie was very upset that he

14 made a reference to our tragic 9/11 versus her

15 employee number, which is 911957.  It really upset

16 her that someone would make a reference to that.

17     Q      Is that all you know about it, or did

18 she give more details about what allegedly was

19 said?

20     A      They were conducting business.  He

21 needed her employee number.  He asked for her

22 employee number.  She started to say 911, and he

23 made a reference to, "Oh, our 9/11," in terms of

24 that, exactly the -- that she -- you know, the

25 tragedy, "Oh, like the tragedy and your

DOROTHY DI FEBO

Page 57

1   nationality," and she just -- it just very much

2   upset her.

3          Q      So Ms. Amini told you he said something

4   about the 9/11 incident and her nationality?

5          A      Well, not her nationality in retrospect

6   to her, but the situation and alluding to the fact

7   that possibly at that time we weren't sure what

8   country was responsible for the tragedy.

9          Q      Okay.  Did you pass along this

10  information to anybody else at Wachovia?

11         A      Yes, I did.

12         Q      Who did you speak to?

13         A      Carolyn Beam.

14         Q      Did you call her?

15         A      Yes, I did.

16         Q      When?

17         A      Maybe a week or so afterwards, because

18  Laddie just couldn't -- I tried to encourage Laddie

19  to call somebody, to call human resources, to do

20  anything, to -- you know, because she was just

21  beside herself.  And then her -- Carolyn called the

22  office one day.

23                And I just said, "Laddie is not in a

24  good spot.  You know, here's the situation she told

25  me that happened."

DOROTHY DI FEBO

Page 58

1    Q    Let's clear this up.  I asked you
2  whether you called Carolyn Beam, and you said yes;
3  and just now you said that Carolyn Beam called the
4  office one day and you mentioned it.  Which is it?

5    A    She called the office.  I didn't pick up
6  the phone to call her to tell her that, so in
7  conversation --

8    Q    Did you ever talk to Mr. Mitchell about
9  this before you spoke to Carolyn Beam?

10    A    No.

11    Q    Why didn't you go to Ken Mitchell and
12  discuss this with him?

13    A    Because I felt that Laddie should have
14  been the one to discuss it with him, and she should
15  have taken it to her direct report.

16    Q    So you assumed that what Laddie Amini
17  told you was verbatim of what Mr. Mitchell said?

18    A    I didn't assume.  I just repeated what I
19  was told.

20    Q    And you repeated it to Laddie Amini's
21  supervisor?

22    A    Yes.

23    Q    Do you know whether Laddie called
24  Carolyn Beam before you spoke to her?

25    A    No.  I'm not sure.

DOROTHY DI FEBO

Page 68

1    with him?

2                    MS. WILLIAMS:  Objection.

3                    You can answer.

4    BY MR. MONES:

5        Q      Is that a yes?  You're nodding your head

6    up and down.

7        A      I'm thinking.  Yes.

8        Q      Do you know of anyone other than

9    Mr. Mitchell who has complained of racial

10   discrimination or harassment at Prices Corner?

11       A      Yes.

12       Q      Who would that be?

13       A      Only because I've heard it from someone

14   else, not directly to me; and I think -- ask me

15   your question again.

16       Q      Sure.  Do you know anyone other than

17   Mr. Mitchell who has complained of racial

18   discrimination or harassment at Prices Corner?

19       A      Not racial discrimination, no.

20       Q      What kind of discrimination have you

21   heard?

22       A      Gender.

23       Q      That was my next question.  So you have

24   heard of someone that's complained of gender

25   discrimination or harassment at Prices Corner?

DOROTHY DI FEBO

1      A      Yes.

2      Q      And do you know that individual's name?

3      A      James Finney.

4      Q      What was Mr. Finney's position with

5  Wachovia?

6      A      Teller.

7      Q      At Prices Corner?

8      A      Yes.

9      Q      Do you know how long he was there?

10     A      Less than a year.

11     Q      Do you know who he complained to?

12     A      I'm sorry.  What do you mean who -- by

13  whom he complained to?  Someone in the office?

14  Outside the office?

15     Q      Well, you said that you knew that he had

16  complained of gender discrimination.  Do you know

17  to whom he complained?

18     A      Not exactly.  I just was told that he

19  had made a complaint.  What type -- to whom and

20  what it entailed, no.

21     Q      Do you know whether it was an informal

22  complaint or a formal complaint, something like the

23  Delaware Department of Labor or the EEOC?

24     A      Is that informal or formal?

25     Q      The latter two would be formal.

DOROTHY DI FEBO

Page 81

1    there.  Gracie, but I'm not sure what her last name

2    is.  I have not met her.

3        Q        It sounds like Wachovia moves people

4    around frequently.  How have you managed to stay in

5    one place for 22 years?

6        A        Dedicated employee.

7        Q        Do you know how Mr. Mitchell is doing at

8    Meadowood?

9        A        No.

10       Q        You've never talked to any of the branch

11   managers at Meadowood about Mr. Mitchell?

12       A        No.

13       Q        Bear with me just a second.

14       A        Sure.

15                MR. MONES:  That's all I have,

16   Ms. DiFebo.  Thank you.

17                MS. WILLIAMS:  I do have a few follow-up

18   questions.

19                        EXAMINATION

20   BY MS. WILLIAMS:

21       Q        A few minutes ago there was a few

22   questions about James Finney.  Do you remember that

23   part of your deposition?

24       A        Yes.

25       Q        Can you tell us what kind of claim -- to

DOROTHY DI FEBO

Page 82

1    the best of your knowledge, what kind of claim he

2    filed?  What kind of complaint he filed?

3         A      Only by what I was told.

4         Q      What were you told?

5         A      That he was filing -- that because --

6    how did she say it to me -- I'm trying to think how

7    she put it.  In other words, in her words, that he

8    was being picked upon because he was the only male

9    in the office.

10        Q      Okay.  Did he make that complaint only

11   to someone at Wachovia?

12        A      I don't think it was made to somebody at

13   Wachovia.  I think she said it came from

14   unemployment.  I'm not quite sure, because I didn't

15   really -- it was one of those things like do you

16   believe that --

17        Q      Do you believe, based on your

18   conversation with this individual who told you the

19   story, that the complaint was made in the context

20   of Mr. Finney trying to obtain unemployment

21   benefits?

22        A      I think so.

23        Q      Do you know if the complaint was made in

24   any other context outside of him trying to secure

25   unemployment benefits?

DOROTHY DI FEBO

Page 83

1      A      No.

2             MS. WILLIAMS:  Okay.  No further

3  questions.  Thank you.

4             MR. MONES:  Just a follow-up to that.

5             FURTHER EXAMINATION

6  BY MR. MONES:

7      Q      Have you ever seen any of the charges of

8  discrimination or claims or any documents or

9  pleadings filed by Mr. Finney?

10     A      No.

11     Q      So do you have any actual firsthand

12  knowledge of what it is that he is asserting

13  happened at Prices Corner?

14     A      No, not exactly.

15     Q      A moment ago when you were thinking back

16  on what you knew about it, you said, "She told me

17  something."  Who was it that told you about this?

18     A      Petra.

19     Q      Petra.  Okay.  Do you know whether she

20  was served with any kind of pleadings or documents?

21     A      That -- she said she was served with

22  something.

23     Q      And you don't know whether the case is

24  still active or has been resolved?

25     A      No, I don't.

Karasch & Associates
800-621-5689