EXHIBIT 14

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

KENNETH S. MITCHELL, )
        Plaintiff, )
)
v. )   C.A. No. 06-12-725 (GMS)
)
)   JURY TRIAL DEMANDED
WACHOVIA CORPORATION, t/a )
WACHOVIA SECURITIES, )
WACHOVIA SECURITIES, L.L.C., )
WACHOVIA SERVICES, INC., )
WACHOVIA BANK OF DELAWARE, )
N.A., )
TODD D. GAUTHIER, )
LYNN G. MEYER, )
CAROLYN J. BEAM, and )
DOROTHY A. DIFEBO, )
        Defendants. )

## AFFIDAVIT

James K. Finney, being duly sworn according to law, states as follows:

1. I make this affidavit on personal knowledge, and the information in this affidavit is true and correct to the best of my knowledge.

2. I was employed by Wachovia as a bank teller at Wachovia's Prices Corner financial center ("branch") from March 2006 through December 2006.

3. During the time I served as a teller at Prices Corner, I was the only male, and only African-American male working as a teller in the branch.

4. During the time I worked at Prices Corner, I was subjected to harassing and discriminatory conduct by Petra Rash, a white woman serving as the Wachovia Teller Manager, as well as by other white female tellers. Such conduct including being touched inappropriately and being struck with papers.

1

5. I made complaints to Mattie Owens in Wachovia's Human Resources Department, and to Gerri Dougherty a Service Leader, but Wachovia took no action to stop the inappropriate conduct directed at me. At no time did the Financial Center Manager ("FCM"), Dorothy DiFebo, take any action to stop the inappropriate conduct directed at me despite the fact that she was aware of it.

6. Prior to my working at Prices Corner, I had worked as a "rover" (roving temporary teller) at Wachovia's Capitol Trail branch. The Prices Corner and Capitol Trail branches were only about one mile apart on Kirkwood Highway, in Wilmington. However, the general atmosphere I experienced was completely different at the two branches. I experienced no conflicts at Capitol Trail, but I experienced inappropriate and harassing conduct at Prices Corner based on the fact that I was an African-American male. The FCM, Ms. DiFebo, did not seem to care about how I was treated by the other employees.

7. Wachovia failed to take any steps to remedy the inappropriate treatment directed at me, and I was forced to resign in December 2006. When notified of my resignation, Teller Manager Ms. Rash threw my resignation letter at me.

8. On January 22, 2007, I filed a Charge of Discrimination with the Delaware Department of Labor/Equal Employment Opportunity Commission alleging that I suffered racial and gender discrimination. A true and correct copy of my Charge of Discrimination is attached as Exhibit-A to this affidavit.

9. I understand that Kenneth S. Mitchell has asserted race and gender discrimination claims against Wachovia in connection with conduct directed towards him at the Prices Corner branch. I did not discuss my complaints with him, and he did not discuss his complaints with me, until recently during the course of his lawsuit against Wachovia.

_____
James K. Finney

Sworn to and subscribed before me
this ____ day of January, 2008.

_____
Notary Public

3

| EEOC Form 5 (5/01) | | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|---|
| **CHARGE OF DISCRIMINATION**<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | | [X] FEPA<br>[X] EEOC | 17C-2007-00183 |

**Delaware Department of Labor** and EEOC
*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. James K. Finney** | (302) 377-6324 | 03-29-1986 |

Street Address: **1110 Graylyn Road, Wilmington, DE 19803**
City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **WACHOVIA** | 15 - 100 | (302) 636-4307 |

Street Address: **2701 Kirkwood Hwy, Newark, DE 19711**
City, State and ZIP Code

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address / City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

[X] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
[ ] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **11-13-2006**  Latest: **11-13-2006**
[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):
**Jurisdiction:** Charging Party was employed at Respondent's Pennsylvania Branch #95086 and Delaware Branch # 95073 as a Teller since 6/05
**Charging Party's protected class:** Race (Black), Gender (male)
**Adverse employment action:** Discipline, Harassment, Terms and Conditions of Employment, constructive Discharge
**Brief statement of allegations:** Charging Party alleges that based on race and sex he was discriminated against when he was subjected to harassment, different terms and conditions of employment and discipline by the Respondent. Specifically, Charging Party alleges that he found Assistant Manager/Teller (Jill Altervolt-W/F) statement of "bite me" to be quite offensive. Additionally, on 9/29/06, Teller manager (Petra Rash-W/F), who is Charging Party supervisor, pressed her finger against Charging Party's forehead and said "use your head!". Moreover, Charging Party stated that on 11/13/06 he was struck on the hand with a stack of papers by a white female co-worker (Nancy Valiante). Charging Party states that these acts have been directed towards him for no reason and states that if he does make a mistake, he should not be subjected to these actions. Charging Party states that he reported the incident's to the Respondent specifically, (Mattie Owens in a recorded conversation and Gerri Doucherty W-F). Further, Charging Party states that at a later date during conversation Doucherty stated to him that the incidents were grounds for termination but nothing was done. Furthermore, Charging Party alleges that his treatment continued with other acts of harassment specifically, by Petra Rash that included Rash angrily throwing a copy of his notice of resignation onto his desk. Charging Party states that because of his race and being the only male Teller he was forced to resign.
**Respondent's explanation:** None given
**Applicable law(s):** Title VII of the Civil Rights Act of 1964, Delaware Discrimination Employment Act
**Comparators(s) or other specific reason(s) for alleging discrimination:** Charging Party alleges that based on race and sex he was discriminated against when his treatment by the Respondent was different then his similarly situated co-workers. Charging Party states after he made his complaints to Doucherty but Doucherty during a meeting held on 12/6/06 only attempted to minimize the impact of his treatment. Charging Party states after approximately three weeks nothing was done and he was forced to resign. Additionally, Charging Party alleges that his treatment and Doucherty's actions are a continuation of Respondent's unwillingness to address gender/racially motivated treatment by his co-workers. Charging Party states that these latest acts of Gender/ racially motivated treatment are not the first acts of discrimination. Charging Party states that he was transferred by Doucherty from Pennsylvania Branch 95086 because a co-worker had made racial comments towards him.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

I declare under penalty of perjury that the above is true and correct.

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)

**Jan 22, 2007**
Date / *James Finney* / Charging Party Signature

EXHIBIT 13



Page 1

Slip Copy
Slip Copy, 2006 WL 2772551 (M.D.Pa.)
(Cite as: Slip Copy)

Hall v. Pennsylvania Dept. of Corrections
M.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,M.D. Pennsylvania.
Debra HALL, Plaintiff
v.
Commonwealth of PENNSYLVANIA DEPARTMENT OF CORRECTIONS, Defendant.
No. 3:CV-02-1255.

Sept. 25, 2006.

Peter G. Loftus, Loftus Law Firm, P.C., Waverly, PA, for Plaintiff.
Daniel J. Doyle, Office of the Attorney General, Harrisburg, PA, for Defendant.

## MEMORANDUM

THOMAS I. VANASKIE, District Judge.

*1 Before the Court is Defendant Commonwealth of Pennsylvania, Department of Corrections' ("Department") Motion for Judgment as a Matter of Law or, alternatively, Motion for a New Trial, as well as its Motion for a Remittitur. Plaintiff Debra Hall alleged that the Department engaged in unlawful employment discrimination in violation of federal and state anti-discrimination laws. Following a trial, the jury returned a verdict in favor of Ms. Hall on her retaliation and hostile work environment claims and awarded her compensatory damages for emotional distress of $1,000,000, a sum reduced to $300,000 in accordance with statutory limitations. Unwilling to accept this verdict, the Department filed the instant post-trial motions. For the reasons that follow, the motion for judgment as a matter of law will be granted in part; the motion for a new trial will be denied; and the motion to remit damages will be granted.

## I. BACKGROUND

Ms. Hall began working for the Department in 1990 at SCI-Graterford. She was transferred to the Department's training academy and then to SCI-Mahanoy and its security section. At all times material to this matter, Ms. Hall was stationed at SCI-Mahanoy. (Transcript of Trial, Day One ("TR-1"), Dkt. Entry 97, at 27-28.) She was promoted to Sergeant in December 1993 or January 1994.(Id. at 28.)

Ms. Hall alleged that almost from the beginning of her tenure with the Department she was subjected to discriminatory treatment on account of her gender. From comments that women had no place at the Department to sexually explicit pictures and language to generally abusive conduct, Ms. Hall claims she was the victim of a hostile work environment.

In 1998, she applied for, and was denied, a promotion to Lieutenant at SCI-Mahanoy. Ms. Hall filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") alleging that the failure to promote was premised on gender, rather than a legitimate employment-related concern. Subsequent to the PHRC complaint, which eventually led to a state court action in 2000, Ms. Hall claims the Department retaliated against her because of her decision to file the discrimination complaints. The retaliatory animus crescendoed through the years and culminated in 2002, Ms. Hall alleged, when she was denied a promotional transfer to SCI-Frackville.

Ms. Hall filed two complaints that were consolidated for trial. On July 22, 2002, Ms. Hall initiated an employment discrimination suit against the Department alleging sex discrimination under Title VII of the Civil Rights Act of 1964. Ms. Hall alleged she was denied a promotion to Lieutenant in 1998 at SCI-Mahanoy in violation of 42 U.S.C. § 2000e-2(a)(1).[FN1] The docket number of this case is 3:CV-02-1255.

FN1. Throughout the Memorandum, citations to cases and statutes include hyperlinks to the Westlaw research database. As such, the citation format on a printed copy of this Memorandum opinion will appear different from the Uniform System of Citation in that the entire hyperlinked citation will be underscored.

On May 22, 2003, Ms. Hall initiated a second complaint against the Department alleging violations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2772551 (M.D.Pa.)
(Cite as: Slip Copy)

of Title VII and the Pennsylvania Human Relations Act ("PHRA"). In Count I, Ms. Hall alleged she was denied a promotion to Lieutenant at SCI-Frackville in 2002 because of sex in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1). She also asserted a hostile work environment claim under § 2000e-2(a)(1). Count II alleged that the refusal to promote in 2002 was also in retaliation for the sex discrimination lawsuits she previously filed against the Department, in violation of Title VII, 42 U.S.C. § 2000e-3(a). Counts III and IV alleged similar gender discrimination (and hostile work environment) and retaliation claims under the PHRA, 43 Pa. Stat. Ann. § 955(a), (d). The docket number of this case was 3:CV-03-0841.

*2 On June 18, 2003, the two cases were consolidated under docket number 3:CV-02-1255.[FN2] The cases were tried before a jury and, on July 23, 2004, the jury returned a verdict in favor of Ms. Hall and against the Department on Ms. Hall's retaliation and hostile work environment claims. The jury awarded Ms. Hall $1,000,000 in damages for her emotional distress,[FN3] a sum reduced by the Court to $300,000 in accordance with the statutory cap on compensatory damages.[FN4](Order of Court, July 26, 2004, Dkt. Entry 85, at 3.) See 42 U.S.C. § 1981a(b)(3)(D).

FN2. The Court had jurisdiction over the Title VII claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3), and supplement jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

FN3. Ms. Hall did not present any evidence of lost wages due to the failure to be promoted or any other evidence of economic harm.

FN4. Judgment was entered with respect to the Title VII retaliation and hostile work environment claims only. The Court dismissed Ms. Hall's state law claims-Counts III and IV in No. 3:CV-03-0841-without prejudice. (Order of Court, July 26, 2004, Dkt. Entry 85, at 2-3.) The Eleventh Amendment deprives federal courts of jurisdiction to entertain suits brought by citizens against a state or state agency. See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99 n. 8 (1984). The Commonwealth of Pennsylvania has not waived Eleventh Amendment immunity from suit in federal court under the PHRA. See, e.g., Dennison v. Pensylvania Department of Corrections, 268 F.Supp.2d 387, 404-05 (M.D.Pa.2003). As such, Ms. Hall's PHRA claims were dismissed. (See Dkt. Entry 85, at 3.)

The Department has moved for judgment as a matter of law on both the retaliation and hostile work environment claims. (See Dkt. Entry 93.) Alternatively, the Department has moved for a new trial on the basis of several grounds, and also has sought a remittitur of the compensatory damage award.(Id.) The motions have been briefed, and oral argument has been presented.

II. DISCUSSION

A. Defendant's Motion for Judgment as a Matter of Law

A district court may grant a motion for judgment as a matter of law [FN5] if, and only if, "viewing the evidence in the light most favorable to [the nonmoving party] and giving [it] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability."*Wittekamp v. Gulf & Western, Inc.,* 991 F.2d 1137, 1141 (3d Cir.), cert. denied, 510 U.S. 917 (1993). See also Fed.R.Civ.P. 50(b). The court may not weigh the evidence or otherwise adjudge the credibility of the witnesses. See *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000); *McDaniels v. Flick,* 59 F.3d 446, 453 (3d Cir.1995). Moreover, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."*Reeves,* 530 U.S. at 151."If the record contains even the 'minimum quantum of evidence upon which a jury might reasonably afford relief,' the verdict must be sustained."*Shesko v. City of Coatesville,* 324 F.Supp.2d 643, 647 (E.D.Pa.2004) (quoting *Keith v. Truck Stops Corp. Of America,* 909 F.2d 743, 745 (3d Cir.1990)).

FN5.Federal Rule of Civil Procedure 50(b) provides, in part:
If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence [pursuant to Fed.R.Civ.P.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2772551 (M.D.Pa.)
**(Cite as: Slip Copy)**

50(a)], the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its motion no later than 10 days after the entry of judgment....

Fed.R.Civ.P. 50(b). The Department moved for judgment as a matter of law on the retaliation and hostile work environment claims at the close of all the evidence, thereby satisfying its threshold obligation in order to renew its motion. (See Transcript of Trial, Day Three ("TR-3"), Dkt. Entry 99, at 213-14.)

**1. The Retaliation Claim**

The Department argues that it is entitled to judgment as a matter of law on Ms. Hall's retaliation claim. Ms. Hall asserted that the denial of a promotional transfer to the position of Lieutenant at SCI-Frackville in 2002 was in retaliation for her previous complaints of sexual discrimination. The jury returned a verdict in Ms. Hall's favor, and judgment was entered thereon. The Department contends the evidence was insufficient to establish the causal connection between Ms. Hall's discrimination complaints and the subsequent denial of the promotion.

Under Title VII, employers are prohibited from discriminating against any of its employees because the employee has "opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."42 U.S.C. § 2000e-3(a). Our Court of Appeals has enumerated three elements that a plaintiff must demonstrate for a prima facie case of retaliation:

*3 (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action.

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir.2000). The parties do not dispute that Ms. Hall engaged in "protected employee activity"- filing a PHRC complaint in 1998 and related state court civil lawsuit in 2000-nor that the denial of the promotion was an adverse employment action. Therefore, the dispositive issue is whether there was sufficient evidence upon which to premise a reasonable conclusion that there was a "causal link" between the filing of the discrimination complaints and the subsequent denial of the promotion.

The Third Circuit has noted that the inquiry into whether a causal connection exists is fact-specific. *Farrell*, 206 F.3d at 280.In some circumstances, the temporal proximity between the protected activity and adverse employment action may suffice on its own to establish the causal connection. *See, e.g., Jalil v. Advel Corp.*, 873 F.2d 701 (3d Cir.1989). In *Jalil*, a Chilean employee filed a complaint with the New Jersey Division of Civil Rights and the Equal Employment Opportunity Commission alleging impermissible discrimination on account of national origin. *Id.* at 703.Jalil was fired two (2) days after his employer received a copy of the discrimination complaint. *Id.* The court concluded the employee established the causal connection because "the discharge followed rapidly, only two days later, upon [the employer's] receipt of notice of [the] EEOC claim."*Id.* at 708.

In the absence of an "unduly suggestive" temporal proximity, the timing of the retaliatory action, on its own, cannot support the causal connection. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir.1997). In the absence of unduly suggestive timing, a plaintiff may point to a pattern of antagonism during the intervening time period. *See Robinson v. Southeastern Pennsylvania Transportation Authority*, 982 F.2d 892 (3d Cir.1993). In *Robinson*, a black employee complained to management about a racially offensive comment uttered by a co-worker. *Id.* at 895.Approximately five months later in February 1984, the employee complained to the same manager of racial discrimination arising from a shift transfer. *Id.* The employee filed a union grievance and a PHRC complaint. *Id.* Subsequent thereto, the employee's relationship with his direct supervisors degenerated rapidly as the employee was subjected to repeated discipline for trivial matters and a concerted effort to provoke him to rebellion. *Id.* The conduct abated briefly, but resumed in October and continued until the employee's termination over one year later in December 1985. *Id.* The court concluded the evidence was sufficient on the issue of causal connection to sustain the retaliation claim. The court acknowledged the absence of temporal proximity and that it would "be hard pressed to uphold the trial judge's finding were it not for the intervening pattern

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2772551 (M.D.Pa.)
(Cite as: Slip Copy)

of antagonism that SEPTA demonstrated." *Id.* The Third Circuit ruled, however, that the trial court could reasonably conclude that the employee's initial complaint spurred the retaliatory behavior, including the harsh discipline, that culminated in his termination. *Id.*

*4 Our Court of Appeals has emphasized that temporal proximity and an antagonistic pattern of behavior are not the exclusive means to prove causal connection. *See Farrell, 206 F.3d at 280-81.* For instance, a plaintiff may demonstrate the connection with evidence that the employer proffered inconsistent reasons to justify the adverse employment action. *See, e.g., E.E.O.C. v. L.B. Foster Co.,* 123 F.3d 746, 753-54 (3d Cir.1997), *cert. denied,* 522 U.S. 1147 (1998); *Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 73 (3d Cir.1986). Moreover, the court has not hesitated to "explore the record in search of evidence," and has admonished the district courts to consider any "evidence gleaned from the record as a whole from which causation may be inferred." *Farrell,* 206 F.3d at 281; *see also Woodson v. Scott Paper Co.,* 109 F.3d 913, 921 (3d Cir.1997) ("While each piece of evidence alone is not sufficient to support an inference of a pattern of antagonistic behavior, taken together the evidence is sufficient."); *id.* at 922 ("[E]ven if Zolman's statement was a mere stray remark, it can constitute evidence of the atmosphere in which the forced ranking was carried out, and would, therefore, be relevant to the question whether Scott retaliated against Woodson...."). This searching inquiry, however, will not cure the absence of any evidence that the decision-makers were aware of the employee's protected activity and were motivated, at least in part, by a desire to retaliate. *See Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir.1997) (no causal connection between protected activity and decision to restrict plaintiff's previously unrestricted computer access where no evidence presented to show that the only individual involved in the decision took the action in response to the E.E.O.C. complaint), *abrogated on other grounds, Burlington Northern and Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405 (U.S.2006).

With these precepts in mind, the record will be examined to determine whether the jury could reasonably find a causal connection between Ms. Hall's protected activity and the Department's decision to deny her promotion to Lieutenant. Certainly, timing alone will not suffice to establish the causal link. Ms. Hall filed her PHRC complaint alleging sex discrimination on June 24, 1998. (*See* TR-1, at 76; Plaintiff's Exhibit 56.) The amended complaint in the state court action, which arose from the PHRC complaint, was filed on February 11, 2000. (*See* TR-3, at 198-99; Defendant's Exhibit 100.) The denial of the promotional transfer did not occur until the spring of 2002, approximately four years after the PHRC complaint, and two years subsequent to the amended complaint. (*See* Transcript of Trial, Day Two ("TR-2"), at 12-14, 17-19.) The timing of the decision not to promote Ms. Hall fails to support an inference of retaliation.

Acknowledging this fact, Ms. Hall argues that the evidence demonstrates a clear pattern of antagonism throughout the intervening period from which the jury could reasonably infer a retaliatory motive behind the Department's decision not to promote Ms. Hall. (*See* Plaintiff's Brief in Opposition to the Defendant's Post-Trial Motions, Dkt. Entry 111, at 3.) The Department counters that any evidence of the intervening antagonism, which occurred at SCI-Mahanoy, cannot be connected to the decisionmakers at SCI-Frackville who denied Ms. Hall the promotion. (*See* Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 7-8.)

*5 Ms. Hall's evidence of an abusive work environment concerns only events occurring at SCI-Mahanoy, and has no connection to the promotion decision-makers-Miller and Kerestes. For instance, in December 1998, Ms. Hall received an unflattering Christmas greeting making a derogatory reference to the female anatomy. (*See* TR-1, at 77-79.) In April 1999, Ms. Hall's co-workers awarded her a certificate in recognition of her ascension to "complete a-hole." (*Id.* at 79-81.) Ms. Hall was subjected to a pat-down by a male corrections officer in the presence of higher ranking Department officials, which was clearly contrary to the Department's regulations. (*Id.* at 88-90; TR-3, at 88-89.) One of those officers, Captain Shipley, was amused by the incident. (TR-1, at 89.) Ms. Hall also expressed interest in the position of Property Sergeant, a highly coveted position. Ms. Hall was previously assigned to that position on three separate occasions, none of which involved strip searches of male inmates. (*Id.* at 85.) The Department changed the position so that it could only be staffed by male corrections officers due to privacy concerns for male inmates who would be strip-searched. (*Id.* at 86; TR-3, at 168-70.) However, this change appeared to have transpired after Ms.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2772551 (M.D.Pa.)
(Cite as: Slip Copy)

Hall expressed interest in the position. (TR-1, at 86, 96-98.)

The Department's disciplinary oversight of Ms. Hall was more scrupulous following the PHRC complaint and the amended state court complaint. Ms. Hall was chastised by Lieutenant Richards simply because another employee, working overtime, filled up a Department vehicle with gasoline while Ms. Hall attended to other matters. (*Id.* at 104-08.) Another Lieutenant reported Ms. Hall for her refusal to complete a form relating to an incident which Ms. Hall did not personally observe. (*Id.* at 117-18.) Following an illness over Christmas in 2001, Ms. Hall obtained a physician's note to explain her absence from work. (*Id.* at 121-23.) The physician's note was insufficient because the note omitted required information. (*Id.* at 124.) Ms. Hall was directed to submit a second note, and the Department convened a factfinder to investigate the incident. (*TR-2,* at 4-5.) Similar incidents involving male officers submitting noncomplying physician's notes, however, did not result in the convening of factfinders. (*Id.* at 5.)

From this evidence, the jury could conclude that the Department engaged in a pattern of antagonistic behavior following Ms. Hall's PHRC complaint and the later amended complaint in state court. The treatment Ms. Hall experienced was similar to the conduct directed towards the employee in *Robinson v. Southeastern Pennsylvania Transportation Authority,* particularly the disciplinary measures inflicted upon the employee. Ms. Hall, however, failed to show how her discrimination complaints, and the resulting antagonism, which occurred solely at SCI-Mahanoy, are connected to the decision by Major Joseph Miller and Deputy Superintendent John Kerestes, both of SCI-Frackville, to deny Ms. Hall the promotion to Lieutenant at SCI-Frackville.

*6 Ms. Hall advances three arguments in an effort to link Major Miller and Deputy Superintendent Kerestes to the discrimination complaints and antagonistic behavior. First, Ms. Hall asserts that Major Miller falsely disclaimed knowing of the discrimination complaints she had filed in Schuylkill County at the time he interviewed her in early 2002. (*See* Plaintiff's Brief in Opposition to the Defendant's Post-Trial Motions, Dkt. Entry 111, at 2.) If a decision-maker was shown to have testified falsely that he did know that the plaintiff had engaged in protected conduct when the adverse employment action was taken, a jury could infer that the decision-maker's deliberate falsehood was meant to shield the actual reason for the adverse action. Indeed, Ms. Hall's retaliation claim was allowed to go to the jury precisely because this Court believed that the evidence was sufficient to allow the jury to conclude that during his trial testimony Major Miller falsely denied knowledge of the Schuylkill County case at the time he interviewed Ms. Hall. A close examination of the trial record, however, shows that this was error.

On cross-examination, the following exchange occurred:

[Plaintiff's Attorney]. You were aware when you did the interviews, were you not, that Sergeant Hall had filed a complaint *in this Court* concerning discrimination?
[Major Miller]. No, no, I was not.
Q. You weren't aware of that?
A. No, sir.
Q. Nobody told you?
A. No, sir.
Q. Were you aware that she had filed complaints with the EEOC and Pennsylvania Human Relations Commission?
A. No, sir, I wasn't.

(TR-3, at 59 (emphasis added).) Contrary to Plaintiff's assertion, the context of the questioning does not suggest that counsel was referring to the Schuylkill County case, in which Major Miller was deposed. The question plainly pertained to the action in this Court, which was not commenced until July 22, 2002, after the interview process was concluded. Furthermore, Plaintiff introduced no evidence to show that Major Miller knew or should have known of any discrimination complaints filed with an administrative agency. Thus, the evidence does not support a conclusion that Major Miller testified falsely concerning knowledge of the Schuylkill County case at the time he considered Ms. Hall for a promotion.

Moreover, the Court's search of the entire record in this case has not revealed any link between Major Miller and the antagonistic behavior that occurred at SCI-Mahanoy. The record is devoid of any evidence that Major Millier participated in, or supervised the malefactors responsible for, the Christmas greeting or certificate of "recognition"; that Major Miller was present or supervised the officers responsible for the pat-down of Ms. Hall; that Major Miller participated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2772551 (M.D.Pa.)
(Cite as: Slip Copy)

in the decision to make the position of Property Sergeant a male-only position; that Major Miller supervised any of the officers who disciplined Ms. Hall; or that Major Miller participated in, or otherwise knew of, the decision in 1998 not to promote Ms. Hall at SCI-Mahanoy. *Compare Robinson v. Southeastern Pennsylvania Transportation Authority,* 982 F.2d at 895 (employee's immediate supervisors who unleashed a wave of retaliatory behavior reported directly to the superintendent of the garage, whose confrontation with the employee precipitated the union grievance).

*7 Second, Ms. Hall asserts that Major Miller and Deputy Superintendent Kerestes gave inconsistent testimony as to whether they had agreed to provide identical ratings on the interview evaluation forms. (*See* Plaintiff's Brief in Opposition to the Defendant's Post-Trial Motions, Dkt. Entry 111, at 4-5.) Again, however, the cross-examination to which Ms. Hall refers is too indefinite to support an inference of a deliberate falsehood by either witness. Major Miller testified that his ratings and Kerestes' ratings were identical because Ms. Hall's poor performance during the interviews was obvious. (*See* TR-3, at 55.) During the cross-examination of Deputy Superintendent Kerestes, the following exchange took place:

[Plaintiff's Attorney]. Let's take a look at the Defendant's Exhibits now. You and Major Miller had both interviewed Sergeant Hall on at least two occasions during 2002, had you not?

[Kerestes]. Yes, sir.

Q. And you got together afterwards and came to a conclusion about who you were going to promote?

A. Yes, sir.

Q. And how you were going to rate everybody, didn't you?

A. Yes, sir.

Q. As a matter of fact, you rated Ms. Hall-and I'm showing you Defendant's Exhibit 68 and 67-identically?

A. Well, no not identically. It looks like the Major missed one column at the bottom there. I signed off on all the columns, so overall, yes.

Q. And in the interview in April of that year-and I'll show you what has been marked as Defendant's Exhibit 73 and 74-you did the same thing, didn't you?

A. Yes, sir, it's the same rating, two months after the initial interview.

(TR-3, at 68-69.) This questioning does not support a rational inference that Miller and Kerestes colluded to assure that each gave Ms. Hall identically poor ratings. It merely shows that each gave her the identical evaluation. In context, the cross-examination simply shows that the two conferred with respect to the promotion decision, which is consistent with Major Miller's testimony that the two discussed each candidate. (*See* TR-3, at 55.) The evidence is too indefinite to show an inconsistency sufficient to cast doubt on their testimony that retaliation was not a motivating factor in the decision not to promote Ms. Hall.[FN6]

FN6. Furthermore, Ms. Hall presented no evidence that Deputy Superintendent Kerestes himself was aware of the discrimination complaints at the time of the SCI-Frackville promotion decisions.

Finally, Ms. Hall argues that the record of disciplinary actions prepared for SCI-Mahanoy Superintendent Robert Shannon establishes the necessary causal connection. (*See* Plaintiff's Brief in Opposition to the Defendant's Post-Trial Motions, Dkt. Entry 111, at 2-3.) On March 27, 2002, Major Michaels of SCI-Mahanoy prepared a memorandum for Superintendent Shannon summarizing disciplinary action received by Ms. Hall during her tenure at SCI-Mahanoy. (*See* Plaintiff's Exhibit 109.) The memorandum, prepared on SCI-Mahanoy stationary, was delivered to Superintendent Shannon prior to Ms. Hall's April 4 and May 23, 2002, interviews at SCI-Frackville, and several months before Superintendent Shannon's transfer to SCI-Frackville, where he became the Superintendent of that institution. (TR-2, at 16-17, 19.) Ms. Hall contends that Superintendent Shannon met with Major Miller and Deputy Superintendent Kerestes prior to their decision and, since the Department has not explained the purpose behind the Michaels' memorandum to Shannon, the memorandum's only purpose was to justify the decision not to promote Ms. Hall.

*8 While Ms. Hall, as the verdict winner, is entitled to every advantageous inference and to have the evidence viewed in her favor, an evidential abyss cannot be bridged by conjecture and speculation. Ms. Hall has not offered any evidence that this meeting actually occurred or that Major Miller and Deputy Superintendent Kerestes were even aware of the Michaels' memorandum. Ms. Hall has failed to present sufficient evidence on this essential element of a retaliation claim, and no reasonable jury could

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.