IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                           :

KENNETH S. MITCHELL,             :

          Plaintiff,           :

     v.                      :       Civil Action No. 06-725 (GMS)

WACHOVIA CORPORATION, t/a  :
   WACHOVIA SECURITIES,     :
WACHOVIA SECURITIES, L.L.C., :
WACHOVIA SERVICES, INC.,    :
WACHOVIA BANK OF DELAWARE, N.A., :
TODD D. GAUTHIER, LYNN G. MEYER, :
CAROLYN J. BEAM, and      :
DOROTHY A. DIFEBO,       :
                        :

        Defendants.       :
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPENDIUM OF UNREPORTED DECISIONS CITED IN THE REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

P. Clarkson Collins, Jr., (Bar I.D. #739)
pcollins@morrisjames.com
David H. Williams (Bar I.D. #616)
dwilliams@morrisjames.com
James H. McMackin, III (Bar I.D. #4284)
jmcmackin@morrisjames.com

MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800

David Bennet Ross (admitted *pro hac vice*)
dross@seyfarth.com
Devjani Mishra (admitted *pro hac vice*)
dmishra@seyfarth.com
Tara Smith Williams (admitted *pro hac vice*)
tawilliams@seyfarth.com

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Dated: January 29, 2008

Attorneys for Defendants

**TABLE OF CONTENTS**

Calloway v. E.I. DuPont de Nemours and Co.,
C.A. No. 98-669-SLR, 2000 U.S. Dist. LEXIS 12642 (D. Del. Aug. 8, 2000)..............................1

Carter v. Delaware State University,
C.A. No. 99-642-GMS, 2002 U.S. Dist. LEXIS 3116 (D. Del. Feb. 27, 2002) ............................2

Childress v. Dover Downs, Inc.,
C.A. No. 98-206-SLR, 2000 U.S. Dist. LEXIS 4881 (D. Del. Mar. 31, 2000) ..............................3

Fantazzi v. Temple University Hospital, Inc.,
C.A. No. 00-CV-4175, 2002 WL 32348277 (E.D. Pa. Aug. 22, 2002)..........................................4

Johnson v. Diamond State Port Corp.,
C.A. No. 99-153-GMS, 2001 WL 873229 (D. Del. Aug. 2, 2001) .................................................5

Koschoff v. Henderson,
C.A. No. 98-2736, 1999 WL 907546 (E.D. Pa. Oct. 7, 1999).......................................................6

Lacy v. National Railroad Passenger Corp.,
C.A. No. 07-3374, 2007 U.S. App. LEXIS 27279 (3d Cir. Nov. 26, 2007)...................................7

Love v. United Parcel Service,
C.A. No. 2:04-CV-964, 2006 WL 2806565 (W.D. Pa. Sept. 28, 2006) ........................................8

McKay v. Delaware State University,
C.A. No. 99-219-SLR, 2000 U.S. Dist. LEXIS 14653 (D. Del. Sept. 29, 2000)...........................9

McLaughlin v. Diamond State Port Corp.,
C.A. No. 03-617 (GMS), 2004 WL 3059543 (D. Del. Dec. 30, 2004) .......................................10

Mosca v. Cole,
C.A. No. 05-4350, 2007 U.S. App. LEXIS 3286 (3d Cir. Feb. 14, 2007)....................................11

Rajoppe v. GMAC Corp. Holding Corp.,
C.A. No. 05-2097, 2007 U.S. Dist. LEXIS 18956 (E.D. Pa. Mar. 19, 2007)...............................12

Sharp v. Whitman Council, Inc.,
C.A. No. 05-CV-4297, 2006 U.S. Dist. LEXIS 54582 (E.D. Pa. Aug. 7, 2006)..........................13

Thimons v. PNC Bank, N.A.,
C.A. No. 06-3815, 2007 U.S. App. LEXIS 24895 (3d Cir. Oct. 23, 2007)..................................14

Tucker v. Merck & Co.,
   C.A. No. 04-3023, 2005 U.S. App. LEXIS 9087 (3d Cir. May 19, 2005) ...................................15

Wimberly v. Severn Trust Services, Inc.,
   C.A. No. 05-2713, 2006 U.S. Dist. LEXIS 59938 (E.D. Pa. Aug. 22, 2006)...............................16

1688704/1

# EXHIBIT 1

**Citation # 5**
**2000 us dist lexis 12642**

◆ Positive , As of Jan 29 , 2008

CATHERINE L. CALLOWAY, Plaintiff, v. E.I. DUPONT DE NEMOURS AND COMPANY, a Delaware corporation, Defendant.

C.A. No. 98-669-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2000 U.S. Dist. LEXIS 12642

August 8, 2000, Decided

**NOTICE:** **[*1]** FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendant's motion for summary judgment granted.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff filed an action against defendant employer, asserting a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., for hostile work environment and retaliation. Defendant filed a motion for summary judgment.

**OVERVIEW:** Defendant employer requested summary judgment on plaintiff's claims of violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., for hostile work environment and retaliation. The court found plaintiff failed to demonstrate that gender was a substantial factor in the discrimination. Plaintiff did not get along with co-workers or supervision and was the target of unwelcome attention. But no evidence indicated that the facially gender-neutral conduct was based on gender. Unprofessional and spiteful behavior by co-workers did not suffice. None of the conduct concerned overtly offensive, sexually oriented behavior. The conduct was also not sufficiently "pervasive and regular" to constitute a hostile work environment. The evidence demonstrated plaintiff was put on probation because she falsified records and she was terminated because she was not released to return to work after her disability leave. She failed to demonstrate directly or circumstantially any weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in defendant's reasons for probation and termination. Summary judgment entered for defendant.

**OUTCOME:** Defendant's motion for summary judgment was granted. None of the conduct concerned overtly offensive, sexually oriented behavior. The conduct was also not sufficiently "pervasive and regular" to constitute a hostile work environment. Plaintiff was put on probation because she falsified records and she was terminated because she was not released to return to work after her disability leave.

**CORE TERMS:** hostile, harassment, co-worker, retaliation, supervisor, sex, work environment, sexual, pervasive, spinning machine, disability, probation, genuine, summary judgment, payroll, sexual harassment, offensive, abusive, regular, female, issue of material fact, retaliatory, assigned, nylon, discriminatory, intimidation, supervision's, terminated, derogatory, factfinder

### LexisNexis® Headnotes

Civil Procedure > Discovery > Methods > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality

**HN1** A court shall grant summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Evidence > Procedural Considerations > Burdens of Proof > Allocation

**HN2** On a motion for summary judgment, the moving party bears the burden of proving that no genuine issue of material fact exists. Facts that could alter the outcome are material, and disputes are genuine if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. If the moving party has demonstrated an absence of material fact, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial.

Civil Procedure > Summary Judgment > Evidence
Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > Summary Judgment > Opposition > General Overview

**HN3** On a motion for summary judgment, the court will view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.

Civil Procedure > Summary Judgment > Standards > General Overview
Labor & Employment Law > Discrimination

**HN4** With respect to summary judgment in discrimination cases, the court's role is to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

**HN5** See 42 U.S.C.S. § 2000e-2(a)(1).

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

**HN6** Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000(e) et seq., covers more than "terms" and "conditions" of employment in the narrow contractual sense. The statute evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment. Consequently, a plaintiff may establish a violation of Title VII by proving that gender-based discrimination was so pervasive it created a hostile or abusive work environment.

Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Employee Burdens
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

In order for a plaintiff to succeed in a hostile work environment claim, a plaintiff is required to prove five elements: (1) the employee suffered intentional discrimination because of his or her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*HN7*

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Coercion > Elements
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., affords employees the right to work in an environment free from discriminatory intimidation, ridicule and insult. Prevailing case law does not limit this right to freedom from ridicule or intimidation of only an explicitly sexual nature. To constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee. Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances.

*HN8*

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*HN9*

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

There are no talismanic expressions of discrimination which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination. The words themselves are only relevant for what they reveal--the intent of the speaker.

*HN10*

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

A plaintiff need not allege overt sexual harassment in order to establish a hostile work environment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq. However, a plaintiff does need to show that gender is a substantial factor in the discrimination, and that if the plaintiff had been a man she would not have been treated in the same manner. Thus, harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women may serve as evidence of a hostile or abusive work environment.

*HN11*

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

The pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment.

*HN12*

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

Any unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the Harris standard, constitute a hostile environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq.

*HN13*

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

HN14 Many forms of offensive behavior may be included within the definition of hostile environment sexual harassment. However, the overtones of such behavior must be, at the very least, sex-based so as to be a recognizable form of sex discrimination.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

HN15 Any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

HN16 Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000(e) et seq., does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of sex. The court has never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue, Title VII's test indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

HN17 Discrimination on the basis of sex is implicit, and thus should be recognized as a matter of course, where a case involves sexual propositions, innuendo, pornographic materials, or sexual derogatory language, but a more fact intensive analysis is necessary where the actions are not sexual by their very nature.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

HN18 For a hostile work environment to be actionable under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., the workplace must be permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

HN19 In considering whether a work environment is hostile or abusive, courts are directed not to examine the scenario on an incident-by-incident basis but to consider all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The totality-of-the-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., violation.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., is not meant to be a general civility code for the workplace. The statute, therefore, provides no redress for genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. Nor does it protect an individual from

HN20 occasional teasing, sporadic use of abusive language or gender-related jokes, offhand comments, or isolated or single incidents of harassment (unless extremely serious). As the United States Supreme Court has made clear, conduct must be extreme to amount to a change in the terms and conditions of employment.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

HN21 The Andrews "pervasive and regular" test is the governing standard for Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., cases in the Third Circuit.

Labor & Employment Law > Discrimination > Retaliation > General Overview

HN22 Title VII of the Civil Rights Act of 1964 (Act), 42 U.S.C.S. § 2000(e) et seq., prohibits discrimination against an employee who has exercised her rights under the Act.

Labor & Employment Law > Discrimination > Retaliation > General Overview

HN23 See 42 U.S.C.S. § 2000e-3(a).

Labor & Employment Law > Discrimination > Retaliation > General Overview

HN24 Claims of retaliation brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., are analyzed under a burden-shifting framework, the particulars of which vary depending on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Where there is no direct evidence of retaliation, a court analyzes a plaintiff's retaliation claim using the burden-shifting framework for "pretext" suits set forth in McDonnell Douglas Corp.

Labor & Employment Law > Discrimination > Retaliation > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

HN25 Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq. In order to do so, a plaintiff must demonstrate by a preponderance of the evidence that: (1) she engaged in protected activity; (2) that defendant took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action.

Labor & Employment Law > Discrimination > Retaliation > General Overview

HN26 Once plaintiff has established a prima facie case of retaliation under the McDonnell Douglas framework, the burden shifts to defendant to clearly set forth through the introduction of admissible evidence reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. If defendant rebuts the prima facie showing by demonstrating a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination drops from the case, and plaintiff must present sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision. To successfully rebut the defendant's proffered explanation, the plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination.

Labor & Employment Law > Discrimination > Retaliation > General Overview

HN27 The adverse employment element of a retaliation claim requires that the retaliatory conduct rise to the level of a violation of 42 U.S.C.S. § 2000e-2(a)(1), (2). Those provisions makes it an unlawful employment practice for an employer: (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's sex; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's sex.

Labor & Employment Law > Discrimination > Retaliation > General Overview

**HN28** 42 U.S.C.S. § 2000e-2(a) proscribes retaliatory conduct other than discharge or refusal to rehire only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee. A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

Labor & Employment Law > Discrimination > Retaliation > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

**HN29** Not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.

Civil Procedure > Summary Judgment > Standards > Materiality
Labor & Employment Law > Discrimination > Retaliation > General Overview

**HN30** A defendant employer's intent in terminating a plaintiff's employment and placing her on probation is a factual question. Therefore, a plaintiff can call into question defendant's intent only if she raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment on a retaliation claim.

**COUNSEL:** Catherine L. Calloway, Pro se.

For defendant: Kathleen Furey McDonough, Esquire, William J. Dorgan, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, Chief Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

**Dated: August 8, 2000**

**Wilmington, Delaware**

**ROBINSON, Chief Judge**

## I. INTRODUCTION

Plaintiff, Catherine L. Calloway, filed this action on December 2, 1998 against defendant E.I. DuPont de Nemours and Company ("DuPont"), asserting a claim under the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., for hostile work environment and retaliation. (D.I. 1) Plaintiff alleges that her co-workers' and supervisors' actions were willful and intentional, were based on discriminatory animus, and resulted in emotional and psychological stress that disabled her from

work. (D.I. 1) Plaintiff further alleges that she was subject to retaliation because of her complaints to supervisors about harassment. (D.I. 1) Plaintiff began her employment with DuPont on March 26, 1990 and, on November 18, 1993, was **[\*2]** assigned to the Textile Department in DuPont's nylon plant in Seaford, Delaware, where she became a qualified spinning machine operator ("SMO"). ¹ (D.I. 99 at A19) Her employment with DuPont was terminated on July 31, 1997, when her health care provider refused to release her to return to work after six months of disability leave. (D.I. 90 at A10) The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

1 The spinning machines at the Seaford Nylon Plant turn nylon thread into nylon yarn. Each spinning machine has a variety of positions, and the SMOs are assigned a series of positions along a particular spinning machine. (D.I. 90 at A151-52) The SMOs are responsible for the operation of their assigned spinning machine. Their job duties include performing routine preventive maintenance work, performing quality checks, packing the completed yarn, and keeping required records of break delay time. (D.I. 90 at A89-92, A145)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Currently before the court is defendant's motion **[\*3]** for summary judgment. (D.I. 88) For the reasons that follow, the court shall grant defendant's motion.

## II. STANDARD OF REVIEW

*HN1* ☐A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *HN2* ☐The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a **[\*4]** genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). *HN3* ☐The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). *HN4* ☐With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most **[\*5]** favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Indus.*, 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

## III. DISCUSSION

## A. Plaintiff's Allegations of Harassment and Retaliation

On December 29, 1997, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against her former employer, defendant. In her complaint, plaintiff asserted the following:

> I. After complaining of sexual harassment in November of 1996, I was continuously harassed by supervision up until my discharge. On July 31, 1997, I was discharged from E.I. DuPont.
>
> II. I was informed by the personnel office that I was discharged because my six months of disability had run out.
>
> III. I believe I have been discriminated against based upon my race (white), sex (female), age (44), disability, and retaliated against, because:
>
> 1. I was verbally harassed by my supervisors after making a sexual harassment complaint against [*6] a co-worker in 1996.
>
> 2. In January of 1997, I was taken out of work by my physician and placed on disability for one year. On July 31, 1997, I was discharged. I believe my disability time was cut short due to my sex (female), race (white), age (44), the type of disability I have, and because I placed a sexual harassment complaint against a co-worker.

(D.I. 90 at A149) She further asserted that the alleged discrimination took place, at the "earliest," in November 1996 and, at the "latest," on July 31, 1997. (D.I. 90 at A149)

Taking her EEOC complaint as the framework for this litigation, [2] the record assembled for these summary judgment proceedings, taken in a light most favorable to plaintiff, demonstrates that the following incidents took place during the time period November 1, 1996 through July 31, 1997: [3]

> . On a number of occasions, individuals, both male and female, used plaintiff's payroll number without apparent authorization when making entries into the Textile Spinning Information System ("TSIS") [4] and when operating plaintiff's assigned spinning machine. (D.I. 99 at A104-08)
>
> . Plaintiff's supervisor reprimanded her on a number of occasions for "writing [*7] notes" in the spinning machine aisles despite the fact that she had been instructed to do so by another supervisor. (D.I. 90 at A21, A39-40; D.I. 99 at A162)
>
> . Plaintiff's supervisors were unresponsive to her complaints of harassment and misuse of her payroll number. [5] (D.I. 90 at A11, A22, A43)
>
> . A co-worker, whose employment with DuPont was terminated as a result of his actions, used plaintiff's payroll number to enter an offensive comment [6] into TSIS. [7] (D.I. 99 at A43, A49, A92)
>
> . On approximately six (6) different occasions, derogatory remarks (calling out her name followed by either "boo hoo" or "cry baby") directed at plaintiff were announced over the intercom system. (D.I. 90 at A53-56)
>
> . On December 14, 1996, plaintiff and her husband were placed on probation for falsification of records. (D.I. 90 at A13; D.I. 99 at A122, A124, A126, A129)
>
> . On or about December 18, 1996, a female co-worker hit plaintiff's back with her fist. (D.I. 90 at A19, A36-37, A47, A61-62; D.I. 99 at A63, A159)

. One of the co-workers plaintiff had identified as harassing her kept wandering around the spinning machine aisles near her machine although he was not assigned **[*8]** to the area. (D.I. 90 at A47, A58-61)

. A card bearing the image of a crying baby and the words "Cry Baby" was left on plaintiff's tool belt. (D.I. 90 at A28, A52, A63; D.I. 99 at A52)

. On one occasion, plaintiff's waste tub was moved out of position, requiring her to leave her assignment unattended while she realigned the tub. (D.I. 90 at A49, A62)

. A co-worker plaintiff had identified as harassing her was assigned to a nearby work station. (D.I. 90 at A20; D.I. 99 at A160)

. When plaintiff's supervisor directed her to return a copy of the job assignment chart, which she had removed "to study," two of her co-workers laughed at her. (D.I. 90 at A46-47, A57; D.I. 99 at A55-56)

. Plaintiff returned from lunch one day and discovered a hole in the palm of her leather work glove; she suspects the glove was cut by a co-worker. (D.I. 90 at A20, A50-51; D.I. 99 at A160)

. Plaintiff received an unsatisfactory performance rating on January 14, 1997. (D.I. 90 at A38; D.I. 99 at A123, A125)

. In contravention of her counselor's alleged instructions, plaintiff's supervisors attempted to contact her to inquire when she would be returning to work approximately **[*9]** four or five times between January 14, 1997 and July 31, 1997 (while she was out on disability leave). (D.I. 90 at A14, A25; D.I. 99 at A59, A153)


- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

2 See the court's December 1, 1999 order. (D.I. 56)

3 The court notes that plaintiff filed discovery requests and received responses from defendant. Although not satisfied with said responses, the court has reviewed the discovery material and denies plaintiff's motions to compel (D.I. 85, 91), given her refusal to discuss with defendant and the court the entry of a protective order in this case, as well as the parameters of the case established by her EEOC complaint and the court's December 1, 1999 order. The court notes as well that plaintiff's hostile work environment and retaliation claims are based particularly on her observations and experiences, as she has related them on the record.

4 TSIS is a computer system that tracks the efficiency of each spinning machine and SMO. (D.I. 90 at A151) It identifies each spinning machine by number and each SMO by his or her payroll number. (D.I. 90 at A151-52) TSIS can be used to generate reports that detail spinning machine downtime by machine number, position number, and payroll number of the SMO credited with the downtime as well as reports that provide the total downtime, average break delay time, and total number and types of breaks for each identified SMO. (D.I. 90 at A152) **[*10]**

5 Plaintiff contends that on approximately six (6) different occasions her supervisor told her she was the "problem" and instructed her to be "more social." (D.I. 90 at A16-17, A22-24; D.I. 99 at A50-51, A155-58)

6 The comment at issue read: "Can't operate without my old man!!!!!"

7 Although other profane comments were entered into TSIS during the relevant time period, these comments were neither directed at plaintiff nor entered using her payroll number.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

## B. Hostile Work Environment

In her complaint, plaintiff contends that the aforementioned conduct created a hostile and abusive work environment. **HN5** Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has construed **HN6** Title VII as covering more than "'terms' and 'conditions' **[*11]** in the narrow contractual sense," _Oncale v. Sundowner Offshore Servs., Inc.,_ 523 U.S. 75, 78, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998), finding the statute "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment," _Meritor Savings Bank, FSB v. Vinson,_ 477 U.S. 57, 64, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) (citations and internal quotation marks omitted). Consequently, a plaintiff may establish a violation of Title VII by proving that gender-based discrimination was so pervasive it created a hostile or abusive work environment. See _id._ at 66. Consistent with this standard, **HN7** in order for a plaintiff to succeed in a hostile work environment claim, the Court of Appeals for the Third Circuit requires a plaintiff to prove five elements:

> (1) the employee suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior **[*12]** liability.

_Andrews v. City of Philadelphia,_ 895 F.2d 1469, 1482 (3d Cir. 1990) (footnote omitted); _accord Kunin v. Sears Roebuck & Co.,_ 175 F.3d 289, 293 (3d Cir. 1999).

## 1. Gender-Based Discrimination

In the instant action, defendant contends that plaintiff's allegations do not amount to sexual harassment within the purview of Title VII. In so arguing, defendant focuses on the non-sexual nature of the conduct in question, contending that plaintiff's allegations are "not the types of claims that Title VII was enacted to address." (D.I. 89 at 20)

The Supreme Court has interpreted **HN8** Title VII as affording "employees the right to work in an environment free from discriminatory intimidation, ridicule and insult." _Meritor,_ 477 U.S. at 65. Contrary to defendant's argument, prevailing case law does not limit this right to freedom from ridicule or intimidation of only an explicitly sexual nature. See, e.g., _Andrews,_ 895 F.2d at 1485 ("To constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently **[*13]** severe to detrimentally affect a female employee."); _Hall v. Gus Constr. Co.,_ 842 F.2d 1010, 1014 (8th Cir. 1988) ("Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances."). As the Supreme Court recently recognized,

> **HN9** the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to

distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

523 U.S. at 81-82. The Third Circuit has noted that "intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Andrews*, 895 F.2d at 1485 (internal citations and quotations omitted). According to the Third Circuit, *HN10*☐"there are no talismanic expressions which must be invoked as a **[*14]** condition-precedent to the application of laws designed to protect against discrimination. The words themselves are only relevant for what they reveal--the intent of the speaker." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996).

*HN11*☐A plaintiff, therefore, need not allege overt sexual harassment in order to establish a hostile work environment claim under Title VII. However, a plaintiff does need to "'show that gender is a **substantial factor** in the discrimination, and that if the plaintiff had been a man she would not have been treated in the same manner." *Andrews*, 895 F.2d at 1485 (internal citations and quotations omitted) (emphasis added). Thus, harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women may serve as evidence of a hostile or abusive work environment. *See, e.g., Andrews*, 895 F.2d at 1485 (holding that *HN12*☐"the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment"); *see also Williams v. General Motors Corp.*, 187 F.3d 553, 564-65 (6th Cir. 1999) **[*15]** (holding that *HN13*☐"**any** unequal treatment of an employee **that would not occur but for the employee's gender** may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII"); *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 441 (1st Cir. 1997) (stating *HN14*☐that "many forms of offensive behavior may be included within the definition of hostile environment sexual harassment. . . . However, the overtones of such behavior must be, at the very least, sex-based so as to be a recognizable form of sex discrimination."); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 905 (1st Cir. 1988) (stating that a "[verbal] attack, although not explicitly sexual, was nonetheless charged with anti-female animus, and therefore could be found to have contributed significantly to the hostile environment"); *McKinney v. Dole*, 246 U.S. App. D.C. 376, 765 F.2d 1129, 1138 (D.C. Cir. 1985) (holding "that *HN15*☐any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or **[*16]** pervasive, comprise an illegal condition of employment under Title VII"). The Supreme Court has cautioned, however, that

*HN16*☐Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "discrimination . . . because of . . . sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical issue, Title VII's test indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

*Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25, 126 L. Ed. 2d 295, 114 S. Ct. 367).

In the instant action, plaintiff has failed to demonstrate that gender was a substantial factor in the alleged discrimination. The Third Circuit has directed *HN17*☐that discrimination on the basis of sex "is implicit, and thus should be recognized as a matter of course," where a case involves sexual propositions, innuendo, pornographic materials, or sexual derogatory language, but that "[a] more fact intensive analysis [is] necessary **[*17]** where the actions are not sexual by their very

nature." *Andrews, 895 F.2d at 1482 n.3.* It is apparent from the allegations at bar that plaintiff did not get along with co-workers or supervision and that she was the target of unwelcome attention. There is no evidence in the record, however, indicating that the facially gender-neutral conduct [8] plaintiff alleges was based on perceptions about womanhood or gendered stereotypes of appropriate female behavior rather than factors individual to plaintiff. Although plaintiff alleges instances of unprofessional and spiteful behavior on the part of her co-workers and supervisors, her allegations are devoid of any incidents wherein she was confronted with negative, gender-related comments. Nor does she complain of the use of insulting or derogatory language relating to women generally or herself as a women specifically. Evaluating the record as a whole and in a light most favorable to plaintiff, the court finds no evidence from which a reasonable jury could infer that the harassment plaintiff suffered was motivated by gender-based animus.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[8] None of the conduct plaintiff has identified concerned overtly offensive, sexually-oriented behavior. The only conduct plaintiff considered to be sexual in nature was her supervisor's admonishment that she be "more social." Although she interpreted this comment as implying she should "flirt" with her male co-workers, plaintiff concedes that her supervisor never explicitly said such.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

### [*18] 2. Pervasive and Regular

Even if the court were to assume that the alleged conduct was motivated by gender-based animus, that conduct is not sufficiently "pervasive and regular" [9] to constitute a hostile work environment. [HN18] To be actionable under Title VII, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993) (citations and internal quotation marks omitted). [HN19] In considering whether a work environment is hostile or abusive, courts are directed not to examine the scenario on an incident-by-incident basis but to consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23; *see also Andrews,* 895 F.2d at 1485; *Williams,* 187 F.3d at 563 **[*19]** ("The totality-of-the-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation."). The Supreme Court has cautioned, however, that [HN20] Title VII is not meant to be a "general civility code for the workplace." *Oncale,* 118 S. Ct. at 1002. The statute, therefore, provides no redress for "'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'" *Faragher v. Boca Raton,* 524 U.S. 775, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (quoting *Oncale,* 118 S. Ct. at 1003). Nor does it protect an individual from occasional teasing, sporadic use of abusive language or gender-related jokes, offhand comments, or isolated or single incidents of harassment (unless "extremely serious"). 118 S. Ct. at 2283-84. As the Supreme Court has "made . . . clear[,] . . . conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 2284.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[9] The court recognizes that the "pervasive and regular" requirement of *Andrews* differs slightly from that set forth in *Meritor,* wherein the Supreme Court stated that alleged sexual harassment must be "severe or pervasive." *Meritor,* 477 U.S. at 67 (emphasis added). In light of the fact that the Third Circuit has recently cited *Andrews* with approval in *Kunin* and *Bonenberger v. Plymouth Township,* 132 F.3d 20, 25 (3d Cir. 1997), the court will assume that [HN21] the *Andrews* "pervasive

and regular" test is the governing standard for Title VII cases in this Circuit. In the case at bar, the distinction is not significant, however, as plaintiff has failed to meet the standards of either *Andrews* or *Meritor*.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

   **[\*20]**  While the comments and conduct of plaintiff's co-workers and supervisors may have been unprofessional and offensive, they collectively do not rise to the level of unlawfulness within the purview of Title VII. Unlike other cases involving hostile work environments, there is no evidence here that plaintiff was subjected to inquiries into her sex life, unwanted sexual propositioning, the display of sexual or pornographic material, significantly intrusive obscene language or gestures, improper touching, unreasonable criticism, pervasive antifemale commentary, or misogynist epithets. *Compare Andrews*, 895 at 1486 (holding that the court on remand should view name calling, pornography, displaying sexual objects on desks, recurrent disappearance of plaintiffs' work product, anonymous phone calls, and destruction of property when considering whether the work environment was hostile); *Gares v. Willingborough Township*, 90 F.3d 720, 723-24 (3d Cir. 1996) (upholding jury verdict for plaintiff where supervisor referred to her as "Township slut" and "tramp," touched her in a degrading manner, referred to her breasts as "bazooka-size," and laughed when her co-worker joked about **[\*21]**  plaintiff's "dildo"); *Spain v. Gallegos*, 26 F.3d 439, 449-50 (3d Cir. 1994) (holding *Andrews* requirements were satisfied where plaintiff alleged she was the subject of pervasive rumors that she was involved in a sexual relationship with her superior which arose due to the superior's conduct); *Glickstein v. Neshaminy Sch. Dist.*, 1999 U.S. Dist. LEXIS 727, No. Civ. A. 96-6236, 1999 WL 58578, at *8 (E.D. Pa. Jan. 26, 1999) (finding that evidence was sufficient to raise genuine issue of material fact as to whether conduct was pervasive and regular where plaintiff alleged that she was subjected to a nearly daily routine of harassment, including inappropriate sexual advances, being kissed against her will, having her buttocks grabbed and threatening behavior that interfered with her ability to perform her job); *Konstantopoulos v. Westvaco Corp.*, 893 F. Supp. 1263, 1277 (D. Del. 1994) (upholding jury verdict for plaintiff where plaintiff offered evidence that her locker was vandalized, that she endured crude gestures and remarks, and that she received sexually demeaning letters from co-workers) *with Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 715-18 (3d Cir. 1997) **[\*22]**  (finding that a hostile or abusive working environment did not exist where plaintiff was required to work in the proximity of employees who had previously harassed her and was subjected to mute gestures, squinting stares, and shaking fists); *Gautney v. Amerigas Propane, Inc.*, 107 F. Supp. 2d 634, 2000 U.S. Dist. LEXIS 10664, 2000 WL 1053563 (E.D. Pa. 2000) (allegations that plaintiff was subjected to "unprofessional, offensive, and callow" conduct and comments, including discussions concerning the size of a male co-worker's "sex organs and his escapades with other women" and comments "that men did not like aggressive women, that [plaintiff] was only using 1/3 of her assets and that she should dress in a skirt and heels," did not amount to severe and pervasive harassment); *Bishop v. National R.R. Passenger Corp.*, 66 F. Supp. 2d 650, 664 (E.D. Pa. 1999) (finding inactionable under Title VII conduct "consisting merely of staring, leering and 'stud muffin' comments, with no physical touching or threats and no sexual overtones"); *Pittman v. Continental Airlines, Inc.*, 35 F. Supp. 2d 434, 442 (E.D. Pa. 1999) (allegations that plaintiff occasionally encountered **[\*23]**  individuals who inquired about her personal life and extended conversations about relationships to a "graphic" level did not rise to the level of sexual hostility proscribed by Title VII); *LaRose v. Philadelphia Newspapers, Inc.*, 21 F. Supp. 2d 492, 500 (E.D. Pa. 1998) (allegations that supervisor raised hand at plaintiff, followed her into an office, denied her overtime and computer training, and stood too close to her were insufficient to establish hostile work environment); *McGraw v. Wyeth-Ayerst Labs., Inc.*, 1997 U.S. Dist. LEXIS 20813, No. Civ. A. 96-5780, 1997 WL 799437, at *6 (E.D. Pa. Dec. 30, 1997) (allegation that supervisor repeatedly asked plaintiff out on dates and kissed her against her will insufficient to establish hostile work environment); *Cooper-Nicholas v. City of Chester*, 1997 U.S. Dist. LEXIS 20810, No. Civ. A. 95-6493, 1997 WL 799443 (E.D. Pa. Dec. 30, 1997) (finding plaintiff's work environment not severely hostile although plaintiff's supervisor consistently made disparaging, vulgar, and offensive comments in public). At most, the evidence shows that over a two-month period [10] plaintiff was subjected to sporadic, unwelcome conduct and disparaging utterances. In sum,  **[\*24]**  a rational

factfinder could not reasonably conclude that the conduct complained of amounts to the "pervasive and regular" harassment that Title VII was enacted to redress.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

10 In fact, according to plaintiff, the majority of the alleged incidents occurred during a one week period in December.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Having determined that plaintiff has failed to present a triable issue of fact with respect to two essential elements of the *prima facie* case for her hostile work environment claim, summary judgment as to this claim is appropriate. 11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

11 Having so decided, the court need not address defendant's argument that plaintiff has failed to establish the fifth element of the *prima facie* case, respondeat superior liability.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## B. Retaliation

Plaintiff further alleges that after she complained to supervision of harassment by a co-worker she suffered [*25] reprisals at work. *HN22* Title VII prohibits discrimination against an employee who has exercised her rights under the Act:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because she [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title.

*HN23* 42 U.S.C. § 2000e-3(a). *HN24* Claims of retaliation brought pursuant to the Act are analyzed under a burden-shifting framework, the particulars of which vary depending on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Since review of the record does not reveal any direct evidence of retaliation and plaintiff does not purport to assert such, the court will analyze plaintiff's retaliation claim using the burden-shifting framework for "pretext" suits set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). [*26] *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

*HN25* Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case for retaliation under Title VII. In order to do so, a plaintiff must demonstrate by a preponderance of the evidence that: (1) she engaged in protected activity; (2) that defendant took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action. *See Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1999). *HN26* Once plaintiff has established a *prima facie* case, the burden shifts to defendant to "clearly set forth through the introduction of admissible evidence" reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. *See Burdine*, 450 U.S. at 254-55. If defendant rebuts the *prima facie* showing by demonstrating a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination drops from the case, and plaintiff must present [*27] sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993); _Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 L. Ed. 2d 105, 120 S. Ct. 2097, 2106 (2000)_. To successfully rebut the defendant's proffered explanation, "the plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination." _Bray v. Marriott Hotels_, 110 F.3d 986, 990 (3d Cir. 1997) (citations omitted); _see also Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)_ (in banc) ("The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible.").

In the instant action, defendant does not dispute that plaintiff engaged in protected activity within the purview of Title **[*28]** VII when she reported acts of harassment to supervision. Defendant argues, however, that the retaliatory acts alleged by plaintiff do not amount to "adverse employment actions" as that term has been defined by the Third Circuit. In _Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)_, the Third Circuit held that **HN27**◻the "adverse employment element" of a retaliation claim requires that the "retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e-2(a)(1) or (2)." _Id. at 1300-01_. That provision makes it "an unlawful employment practice for an employer"

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . .;
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's . . . . sex . . . .

42 U.S.C. § 2000e-2 **[*29]** (a). As interpreted in _Robinson_, **HN28**◻this provision proscribes retaliatory conduct other than discharge or refusal to rehire "only if it alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect[s] his [or her] status as an employee.'" _Robinson, 120 F.3d at 1300; see Burlington Indus. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998)_ ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Consistent with this interpretation, the _Robinson_ court found that allegations of "unsubstantiated oral reprimands" and "unnecessary derogatory comments" did not rise to the level of "adverse employment action" required for a retaliation claim because, while such conduct might constitute harassment, it did not affect the "terms, conditions, or privileges of employment" or future employment opportunities. 120 F.3d at 1301.

Plaintiff **[*30]** at bar alleges she was retaliated against by her co-workers and supervisors because she complained about harassment at work. (D.I. PP 9, 12, 14) For the most part, the acts that plaintiff identifies as retaliatory are the same as those she claims constitute harassment. They include: (1) being reprimanded for excessive downtime; (2) being reprimanded for "writing notes" in the machine aisle; (3) being told she was the "problem"; (4) being placed on probation for falsifying records; (5) being forced to work adjacent to a co-worker she felt harassed her; (6) being given an "unsatisfactory" rating on January 14, 1997 while on probation; and (7) being terminated from employment with DuPont. (D.I. 90 at A39-43) She also cites as retaliatory behavior supervision's perceived failure to stop the harassment. (D.I. 90 at A39-43) Of these allegations, only those relating to plaintiff's probation and termination could rise to the level of an "adverse employment action" as defined by the Third Circuit. Plaintiff's remaining allegations, although they may constitute harassment, are not sufficient to qualify as retaliation under Title VII. As the Third Circuit has noted, **HN29**◻"not everything that makes **[*31]** an employee unhappy'

qualifies as retaliation, for 'otherwise, minor and even trivial employment actions that an 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Id.* (quoting *Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996)).* Plaintiff's allegations of oral reprimands and minor employment actions constitute "trivial employment actions" not "serious and tangible enough" to cause a significant change in employment status. [12] *Id.*

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[12] Whether plaintiff's placement on probation constitutes a "significant change in employment status" is a question the court need not address at this juncture since defendant does not dispute plaintiff's characterization of this act as an "adverse employment action."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

To the extent that plaintiff's allegations concerning her probation and termination constitute adverse employment actions, defendant has come forward with evidence which, if taken as true, demonstrates there were legitimate, **[*32]** nonretaliatory reasons for both actions. Specifically, defendant contends that plaintiff and her husband were place on probation for falsifying records. Plaintiff was terminated because she was not released to return to work after six months of disability leave. In reply, plaintiff contends that she has proffered evidence sufficient to create a genuine issue of material fact by demonstrating that defendant's putative justifications are unworthy of credence and that retaliation for her complaints of harassment in fact motivated both decisions.

*HN30* Defendant's intent in terminating plaintiff's employment and placing her on probation is a factual question. *See Walton v. Mental Health Assoc., 168 F.3d 661, 668 (3d Cir. 1999).* Therefore, plaintiff can call into question defendant's intent only if she "'raises an issue of material fact that which, if genuine, is sufficient to preclude summary judgment.'" *Id.* (quoting *Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 899 (3d Cir. 1987)* (in banc)). In the case at bar, however, plaintiff's evidence is insufficient to meet this burden. In her attempt to show that defendant's enunciated reason for placing her on probation **[*33]** was pretextual, plaintiff first questions the accuracy of TSIS, proffering the affidavit of a former colleague at the Seaford Nylon Plant who avers that TSIS "had many problems," was inaccurate, and was not password protected. Regardless of the veracity of these allegations, plaintiff's collateral attack on the reliability of TSIS does not raise a triable issue of fact concerning the issue of retaliation. When questioned by DuPont management, plaintiff's husband admitted that on a number of occasions he had substituted his payroll number for that of his wife's and that these substitutions often occurred with respect to lengthy break delay periods. (D.I. 99 at 201) Therefore, the accuracy of TSIS is not an issue. Nor does plaintiff's assertion that others used her payroll number without reprisal demonstrate that defendant's treatment of plaintiff was inconsistent with its treatment of other spinning machine operators. There is no indication in the record that any of the individuals cited by plaintiff used her payroll number for the purpose of creating a false impression as to her efficiency as a spinning machine operator, the charge levied by DuPont management against plaintiff and **[*34]** her husband and which formed the basis for plaintiff's probation. Consequently, comparison with these alleged instances of misuse does not raise an issue of material fact sufficient to preclude summary judgment.

Similarly, plaintiff has failed to demonstrate that defendant's enunciated reason for terminating her employment was pretextual. Plaintiff does not dispute that DuPont's disability plan provides for a "maximum period [of] six months for any single disability." (D.I. 90 at A119) Nor does she contest that her health care provider refused to release her to return to work after six months of disability leave. (D.I. 90 at A10; D.I. 99 at A136) Instead, she asserts that there were many instances where employees at the Seaford Nylon Plant "received additional benefits of disability or special treatment." (D.I. 99 at 33-35) The record, however, is devoid of any objective evidence in support of this allegation. Likewise, there is no evidence in the record to support plaintiff's claim that her low performance review in January 1997 was unwarranted. Thus, there is no evidence of record

from which a reasonable jury could infer that plaintiff's probationary review and termination were **[\*35]** the result of retaliation for her filing complaints of harassment.

In sum, the evidence demonstrates that plaintiff was placed on probation because she falsified records and her employment was terminated because she was not released to return to work after her disability leave. The court concludes that plaintiff has failed to demonstrate directly or circumstantially any "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in defendant's enunciated legitimate reasons for plaintiff's probation and termination from which a reasonable factfinder could rationally find the reasons "'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non[retaliatory] reasons.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (internal citations omitted). Consequently, summary judgment in favor of defendant is proper because plaintiff has failed to present evidence raising a triable issue of material fact concerning the issue of retaliation.

## IV. CONCLUSION

For the reasons stated above, the court concludes that there are no genuine issues of material fact relating to plaintiff's claims of hostile work environment **[\*36]** and retaliation under Title VII. Therefore, defendant's motion for summary judgment shall be granted. An appropriate order shall issue.

# EXHIBIT 2

**Citation # 10**
**2002 us dist lexis 3116**

✦ Positive , As of Jan 29 , 2008

DR. KATHLEEN CARTER, Plaintiff, v. DELAWARE STATE UNIVERSITY, DR. WILLIAM B. DELAUDER, PRESIDENT, DR. JOHNNY TOLLIVER, DEAN JACQUELYN W. GORUM, DR. ALETA HANNAH and DELAWARE STATE UNIVERSITY BOARD OF TRUSTEES, Defendants.

C.A. No. 99-642 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2002 U.S. Dist. LEXIS 3116

February 27, 2002, Decided

**SUBSEQUENT HISTORY:** Affirmed by Carter v. Del. State Univ., 2003 U.S. App. LEXIS 7219 (3d Cir. Del., Apr. 16, 2003)

**DISPOSITION:** [*1] Plaintiff's Motion for Partial Summary Judgment DENIED. Defendant's Motion for Summary Judgment GRANTED in part and DENIED in part. Summary Judgment ENTERED in favor of defendants in part.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff, a professor, motioned for partial summary judgment on her breach of contract claim against defendants, university and related individuals. Meanwhile, defendants motioned for summary judgment on all of the professor's claims including allegations of race and gender discrimination under Title VII, 42 U.S.C.S. § 2000(e), et seq., due process violations and causes of action under 42 U.S.C.S. §§ 1985 and 1986.

**OVERVIEW:** The professor alleged that her employer, the university and the individual defendants improperly denied her application for tenure at the university. Specifically, in her motion for partial summary judgment, she asserted that the parties' collective bargaining agreement (CBA) clearly stated that only "documented" evidence could be considered in granting or denying tenure and that the defendants violated the terms of the CBA by considering oral, hearsay evidence in making their tenure decision. The district court found that the professor's state law breach of contract and intentional infliction of emotional distress claims were barred by the Eleventh Amendment. Further, the court concluded that there was no direct evidence of racial animus, that the university had provided non-discriminatory reasons for its tenure decision, (namely, that the professor was ineffective as the education department chair), and that the professor had failed to prove that these reasons were pretextual. However, where the parties agreed that the § 1983 claim was only for prospective injunctive relief against the individual defendants in their official capacity, those claims were allowed to proceed.

**OUTCOME:** Professor's motion for summary judgment was denied except as to the extent the Eleventh Amendment did not prevent the professor from obtaining prospective injunctive relief against individual defendants in their official capacity.

**CORE TERMS:** tenure, summary judgment, injunctive relief, chair, racism, animus, direct evidence, racist, official capacity, conspiracy, gender, non-discriminatory, promotion, punitive damages, subjective, racially, pretext, civil conspiracy, conspiracy claims, candidate, discovery,

state law claims, causes of action, intentional infliction of emotional distress, parties agree, prima facie case, nonmovant's, investigate, faculty, admits

## LexisNexis® Headnotes

Civil Procedure > Summary Judgment > Standards > Appropriateness
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality

HN1 Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. The nonmoving party, however, must demonstrate the existence of a material fact -- not mere allegations -- supplying sufficient evidence for a reasonable jury to find for the nonmovant. The nonmovant need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the "mere scintilla" of evidence standard. The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof.

Civil Rights Law > General Overview
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Circumstantial & Direct Evidence

HN2 A case for racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e), et seq., can be made under the PriceWaterhouse analysis, when a plaintiff produces direct evidence that race was a motivating factor in the employment decision. Direct evidence is evidence which, if believed, proves the fact without inference or presumption.

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting
Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof

HN3 Under the McDonnell-Douglas analysis, a Title VII plaintiff can attempt to demonstrate, through indirect evidence, that the defendants' actions were racially motivated. Under this framework, the plaintiff must first establish a prima facie case of disparate treatment. To prove a prima facie case, the plaintiff must establish that: (1) she is a member of a protected class; (2) she was qualified for the position; and (3) she was subject to an unfavorable employment action under circumstances that give rise to an inference of unlawful discrimination. Once she has established this, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. If the defendants can offer such a non-discriminatory reason, the presumption of discrimination created by establishment of the prima facie case is dispelled, and the plaintiff must prove that the employer's proffered reason or reasons were pretextual and that the real reason for the employment decision was discriminatory.

Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > General Overview
Civil Rights Law > Section 1983 Actions > Scope

HN4 The Eleventh Amendment bars 42 U.S.C.S. § 1983 claims against state entities and state officials sued in their official capacity. This is because only "persons" can be sued under § 1983, and the state is not considered a person. However, where the plaintiff is seeking prospective injunctive relief against defendants in their official capacities, the defendant will be considered a person.

Civil Rights Law > Conspiracy > Knowing Nonprevention

Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview

*HN5* If there is no violation of 42 U.S.C.S. § 1985, there can be no violation of 42 U.S.C.S. § 1986. 42 U.S.C.S. § 1986.

Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > Elements

*HN6* Civil conspiracy is not an independent cause of action, but requires proof of underlying wrong that would be actionable absent conspiracy.

Civil Rights Law > Conspiracy > Elements
Labor & Employment Law > Discrimination > Reconstruction Statutes (secs. 1981, 1983 & 1985)

*HN7* A conspiracy claim under 42 U.S.C.S. § 1985 requires a clear showing of invidious, purposeful and intentional discrimination between classes or individuals. Additionally, that intentional discrimination must occur on the basis of an impermissible criterion such as race or gender.

Civil Rights Law > Conspiracy > Official Conspirators
Civil Rights Law > Conspiracy > Private Conspirators
Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > General Overview

*HN8* In order to be actionable under 42 U.S.C.S. § 1985, a conspiracy must involve more than one state or private agency. A person cannot conspire with himself and therefore for the agents of a single corporation to conspire among themselves and not with outsiders does not state a cause of action under 42 U.S.C.S. 1985(3).

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN9* In the failure to promote context, in order to establish a procedural due process violation, an employee must prove that she was objectively entitled to the promotion and did not merely have an expectation of promotion.

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims
Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > General Overview
Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview

*HN10* Pendent state law claims against state entities and officers are barred by the Eleventh Amendment.

Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > General Overview
Civil Procedure > Judgments > Relief From Judgment > General Overview

*HN11* The Eleventh Amendment is no bar to the prospective injunctive relief which was ordered by the district court insofar as that relief is predicated on constitutional or federal statutory claims.

Civil Procedure > Remedies > Damages > Punitive Damages
Torts > Damages > Punitive Damages > Availability > Employers

*HN12* In order to recover punitive damages under Delaware law, a plaintiff must show that the defendants acted with malice or reckless indifference to her federally protected rights.

**COUNSEL:** For KATHLEEN CARTER, Dr., plaintiff: Laurence V. Cronin, Smith, Katzenstein, & Furlow, Wilmington, DE.

For DELAWARE STATE UNIVERSITY, WILLIAM H. DELAUDER, Dr., JOHNNY TOLLIVER, Dr., JACQUELYNE W. GORUM, ALETA HANNAH, Dr., DELAWARE STATE UNIVERSITY BOARD OF TRUSTEES, defendants: John D. Balaguer, White & Williams, Wilmington, DE.

For DELAWARE STATE UNIVERSITY, WILLIAM H. DELAUDER, Dr., JOHNNY TOLLIVER, Dr., JACQUELYNE W. GORUM, defendants: Christian J. Singewald, White & Williams, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM AND ORDER**

## I. INTRODUCTION

On September 28, 1999, Dr. Kathleen Carter filed a **[*2]** complaint alleging that her employer, Delaware State University ("DSU"), and the above named defendants improperly denied her application for tenure at the university. Carter's complaint asserts various causes of action. Count One alleges race and gender discrimination under Title VII, 42 U.S.C. § 2000e, *et seq.* Counts II and III allege causes of action under 42 U.S.C. § 1981 and 42 U.S.C. § 1983. Count IV asserts claims under 42 U.S.C. §§ 1985 and 1986, as well as civil conspiracy. In Count V, Carter alleges that the defendants violated the Delaware Discrimination in Employment Act. Count VI asserts a violation of Fourteenth Amendment, based on a lack of due process in the tenure decision. Count VII alleges violations of the Delaware Constitution. Count VIII asserts breach of contract based on Carter's allegation that the defendants failed to adhere to the procedures in the collective bargaining agreement ("CBA"). Count IX alleges intentional infliction of emotional distress against all defendants. Finally, Count X requests punitive damages against all defendants.

Presently before **[*3]** the court are two motions - Carter's motion for partial summary judgment on Count VIII and the defendants' motion for summary judgment on all claims. In her motion for partial summary judgment, Carter asserts that the CBA clearly states that only "documented" evidence may be considered in granting or denying tenure. Carter argues that the defendants violated the terms of the CBA by considering oral, hearsay evidence in making their tenure decision. The defendants argue that Carter's claim is barred by the Eleventh Amendment's prohibition of pendent state law claims, or alternatively, that the CBA permits the consideration of oral evidence.

In their motion for summary judgment, the defendants assert that the remaining claims should be dismissed for various reasons. First, they argue that Count I should be dismissed because there is no direct evidence of racial or gender animus on the part of the university. Moreover, the defendants assert that there were valid, non-discriminatory reasons for the denial of tenure, such as Carter's deficiencies on certain projects. Second, the defendants assert that the Eleventh Amendment limits the claims under sections 1981, 1983, 1985, and 1986 to **[*4]** prospective injunctive relief against the individual defendants. The defendants further argue that the § 1983 claims should be dismissed because state officers cannot be sued in their official capacity under § 1983. Moreover, the defendants assert that the civil conspiracy claims under § 1985 and § 1986 should be dismissed because there is no racially motivated conspiracy, and a conspiracy cannot exist where only one state agency is implicated.

The defendants also assert that Counts V and VII are legally invalid. [1] The defendants defend Count VI by noting that there was no due process violation because Carter was not guaranteed tenure, and the tenure process is inherently subjective. The defendants argue that the court should dismiss the intentional infliction of emotional distress claim in Count IX because pendent state law claims against state entities are barred by the Eleventh Amendment. Finally, the defendants argue there is no malice present that would justify the award of punitive damages.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

1 In her answering brief, the Plaintiff concedes that the claims under Counts V and VII are invalid. (D.I. 107 at 33, 37.) Thus, summary judgment for the defendants is appropriate on these claims. The court will not, therefore, discuss these claims.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*5] Upon review of the briefs, the record, and the law, the court agrees with the defendants that certain of the claims should be dismissed. The court will, therefore, grant the defendants' motion for summary judgment for DSU on all claims. However, the court will only grant summary judgment for the individual defendants on Count I and Counts IV-X. Summary judgment is not appropriate for Counts II and III as to the individual defendants. Nevertheless, the court accepts the view of both parties that the § 1981 and § 1983 claims in Counts II and III must be limited to prospective injunctive relief. 2 Thus, after the grant of summary judgment, all that will remain is § 1981 and § 1983 claims against the individual defendants in their official capacities for prospective injunctive relief. The court will now explain the reasoning for its ruling.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

2 The plaintiff concedes that the claims under § 1981 and § 1983 are not viable against DSU and must be limited to prospective injunctive relief against the individual defendants. (D.I. 107 at 33.)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## [*6] II. FACTS

In 1993, Dr. Kathleen Carter was hired as an Associate Professor of Education at DSU. DSU is a land grant college. It is, therefore, a public university operated by the State of Delaware. DSU is also a Historically Black College or University ("HBCU"). Thus, the majority of the administrators, faculty, and students at DSU are African American. Carter is white.

In 1995, Carter was appointed as chair of the DSU Education Department. According to Carter, several of her African American colleagues did not appreciate the fact that she, a white woman, was appointed to that position. Carter claims that she was told she was "usurping black persons' rights to govern themselves," and that she was "trying to make the black people [in the department] look bad." (D.I. 107 at 4.) Carter also alleges that Dr. Aleta Hannah accused her of polarizing the department along racial lines. Hannah alleges that during one department meeting, Carter told all of the professors - African American and white - that they should put everything in writing. Although Carter denies she made the statement, all parties agree that Hannah felt there was a racial overtone to the statement.

In September [*7] of 1995, Carter evaluated Hannah and the other professors in her department. Using a 1 to 5 scale, Carter gave Hannah a score of 3. Carter alleges that Hannah felt there was a racial bias involved in the evaluation.

At some point after the meeting and the evaluation, the six African American faculty members met and decided that Dr. Hannah should be chair. Dr. Hannah prepared an anonymous memo - "Concerns about the Chair." The memo listed several concerns about Carter's leadership. Carter's race is not mentioned in the memo. However, the memo does note the faculty's belief that Carter "fostered dissension within the department, something along the lines of race." Soon after, Carter met with the dean of her school, Dr. Jacquelyne Gorum, who told Carter that she did not believe she was racist. The department then had a meeting to remove Carter as chair. Although Carter won the "no-confidence" vote, she resigned shortly thereafter.

After a brief time with an interim chair, Hannah was appointed as chair. On October 15, 1997, with

Dr. Hannah as chair, Carter filed her initial application for tenure. Hannah recommended Carter for tenure and promotion. Her application was then forwarded **[*8]** to the Departmental Promotion and Tenure Committee, which also recommended her for tenure, but not promotion. The application was then forwarded to Dean Gorum for review. Dean Gorum also recommended Carter for tenure. The application was then forwarded to Provost Johnny Toliver, who added his positive recommendation. The application was finally given to President DeLauder.

According to Carter, Hannah then met with President DeLauder multiple times, and gave the president negative information about Carter. Carter alleges that Hannah told DeLauder that Carter was difficult to work with and had said negative things about the university and the department to her students while class was in session. (Carter admits that statements were made regarding course scheduling and registration.) Additionally, Dr. Tossie Taylor told DeLauder that Carter was perceived to be racist by some members of the department. DeLauder did not investigate these allegations, defendants state, because he felt there was no basis for the allegations. DeLauder maintains that the unfounded allegations of racism in no way influenced his review of Carter's application.

Also during this time, Dr. Tolliver told DeLauder **[*9]** that Carter's performance on the National Council for Accreditation of Teacher Education program ("NCATE") was insufficient. The NCATE committee was required to prepare an accreditation report for review. Dr. Tommy Frederick was the chair of the NCATE committee. Carter admits that the entire report - including her portion - was heavily criticized by a mock review board. Although Carter asserts that her portion received fewer criticisms, Frederick noted that Carter's portion of the accreditation report was inadequate and needed to be rewritten. Carter does not refute this fact.

DeLauder admits that he considered the statements of Frederick, Tolliver, Taylor, and Hannah. According to section 8.1.2 of the CBA, however, although value judgments are permissible in the tenure process and persons other than the candidate may be consulted, "documented evidence" must be used to support the decision. (D.I. 99, Ex. A at 22.) None of the statements DeLauder considered were placed in writing. Section 8.2.4 of the CBA further states that "where oral testimony contradicts written evaluations, the affected [tenure applicant] shall be informed of the unit testimony and given an opportunity to respond **[*10]** to it." (*Id.* at 24.) Carter was apparently not given an opportunity to respond to the statements of the other three professors.

In light of all of the evidence, including the oral statements of the three professors, DeLauder remanded - but did not deny - Carter's application for tenure. Upon remand, Hannah, Tolliver, and Gorum all reversed their positive recommendations, based in part on DeLauder's assurance that they could consider the totality of their experience with Carter. Carter was subsequently denied tenure. When Carter met with DeLauder, he informed her that his decision was based upon ineffective service as chair of her department, ineffective service on the NCATE committee, and the fact that she was rated as "3" on her evaluation. Although these are the official reasons, Carter alleges that DeLauder told Tolliver that tenure was denied because Carter said negative things about the university. Carter further asserts that the "3" she received on her evaluation was a direct product of Dr. Hannah's racism. Carter exhausted her appeals process at the university, and the decision to deny tenure was upheld. Carter subsequently filed this lawsuit.

## III. STANDARD OF REVIEW

**[*11]** HN1 Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.,* 13 F.3d 674, 679 (3d Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,* 193

F.3d 766, 772 (3d Cir. 1999). The nonmoving party, however, must demonstrate the existence of a material fact -- not mere allegations -- supplying sufficient evidence for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not **[*12]** match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co.,* 998 F.2d 1224, 1230 (3d Cir. 1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson, 477 U.S. at 249-50.*

## IV. DISCUSSION

The facts related above are either undisputed, or where disputed, the non-moving party's (Carter) version of the facts. Nevertheless, the court concludes that, even accepting plaintiff's version of the facts as true, she cannot prevail as a matter of law on Count I or Counts IV-X. The court will discuss each of the remaining claims in turn.

## A. Count I - Title VII Racial and Gender Discrimination

Carter claims disparate treatment under Title VII. *HN2* A case for racial discrimination under Title VII can be made in one of two ways. In the *PriceWaterhouse* analysis, a plaintiff must produce direct evidence that race was a motivating factor in the employment decision. *See Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir. 1994). **[*13]** "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Nixon v. Runyon*, 856 F. Supp. 977, 983 (E.D. Pa. 1994).

Carter has not proven that race was directly involved in her tenure decision. Although Carter alleges that she has direct evidence to prove that both Hannah and DeLauder were racist, the record does not support her contention. Carter urges that the court should find DeLauder was racist because he believed Hannah - an African American woman - over Carter and because he failed to investigate the allegations by Dr. Taylor that Carter was racist. Carter maintains that had he investigated, he would have discovered that Hannah was the true racist. First, as noted above, direct evidence does not permit inferences. It is a large leap of logic to conclude that DeLauder believed Hannah simply because she is African American. There are a number of reasons why a person might believe another person, and there is scant evidence in this record to support the conclusion that race was the only factor - if it was a factor at all - in DeLauder's decision to credit Hannah's statements. Moreover, the fact that DeLauder did not investigate **[*14]** the allegations of racism against Carter does not prove that he is a racist. He simply could have believed that the allegations were unfounded. ³ Again, direct evidence does not permit speculation, and there are any number of non-racial reasons why DeLauder might have declined to investigate. ⁴

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

3 In fact, if DeLauder wanted to show true racial animus, he could have used the allegations of racism as a slim excuse to launch into a wholesale investigation of Carter, discredit her, and dredge up reasons to deny her tenure, if that was his goal. Rather, DeLauder wisely decided to take with a grain of salt allegations from faculty that apparently had difficult experiences with Carter.

4 Moreover, even if DeLauder had investigated the allegations as Carter suggests he should have, there is no guarantee that he would have "uncovered" Hannah's racism as Carter suggests. His focus would have been on *Carter's* alleged racism, not Hannah's. Any discovery of bigotry on Hannah's part would likely have been fortuitous, at best.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

**[*15]** Carter has similarly failed to present direct evidence of Hannah's racism. The gist of

Carter's allegation against Hannah rests on the fact that Hannah interpreted Carter's alleged statements regarding "putting things in writing" as racist. Carter alleges that Hannah's interpretation was unreasonable and "shows that Hannah's primary focus when considering Carter was her race." (D.I.. 107 at 23.) Hannah's interpretation of Carter's words cannot be considered direct evidence that she harbored racism animus. The court supposes that it is possible that one might infer that simply because an individual identifies a particular trait or tendency in another, they must also possess that trait or tendency. Again, however, this would only be an inference -- and, perhaps, an unreasonable one at that. Moreover, it seems entirely reasonable that a person might be able to point out the racism of another without being racist herself. Thus, Carter's argument is logically flawed because, if accepted, it would mean that an employer could never take a bigoted employee to task about his or her behavior without running afoul of Title VII. This is a result that the court is unwilling to sanction. [5]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[5] The court notes that Carter's brief focuses solely on racial discrimination and that the record is completely devoid of any facts that would permit the court to conclude that gender was implicated here. For instance, Carter has not alleged that white men or other non-African American men were promoted while she was not. (The only man she mentions is also African American.) Carter has also failed to provide one shred of evidence that would permit the court to properly conclude that any of the parties involved considered gender in their decision making process. Therefore, summary judgment on the gender discrimination claims under Title VII is appropriate.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

 **[*16]**  Finally, Carter asserts that the fact that four white women left the department during Hannah's term as chair is direct evidence of Hannah's racism. The record contains no testimony from any of these women regarding their relationship with Dr. Hannah. The only evidence on this point is Carter's affidavit. However, in her own affidavit, Carter acknowledges that one of the professors retired, another professor was denied tenure, and another did not want to accept the assignment Hannah gave her upon return from sabbatical. (D.I. 108 at B-120.) Carter has failed to adduce any evidence of record that demonstrates that any of these women's decisions were directly influenced by Hannah in any way whatsoever - proper or improper. Thus, Carter is essentially asking the court to assume that Hannah was motivated by racism and that these white professors left as a result of that racism. The court is not permitted to, and will not, assume that Hannah's actions were racist in the absence of direct evidence, which Carter has failed to provide. For all of the foregoing reasons, Carter has failed to demonstrate direct evidence of racial animus. [6]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[6] The court further notes that Carter's brief is completely devoid of authority that would permit the court to find that either DeLauder or Hannah's actions were racially motivated.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

 **[*17]**  Alternatively, $^{HN3}$ under the *McDonell-Douglas* analysis, the plaintiff can attempt to demonstrate, through indirect evidence, that the defendants' actions were racially motivated. Under the *McDonell-Douglas*, or "pretext" framework, Carter must first establish a prima facie case of disparate treatment. To prove a prima facie case, Carter must establish that: (1) she is a member of a protected class; (2) she was qualified for the position; and (3) she was subject to an unfavorable employment action "under circumstances that give rise to an inference of unlawful discrimination." *Waldron v. SL Industries, Inc.,* 56 F.3d 491, 494 (3rd Cir.1995). Once Carter has established this, "the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision." *Id.* If the DSU defendants can offer such a non-discriminatory reason, "the presumption of discrimination created by establishment of the prima facie case is dispelled, and the plaintiff must prove that the employer's proffered reason or

reasons were pretextual -- that is, that they are false and that the real reason for the employment decision was discriminatory. **[*18]** " *Id.*

The Court will assume that Carter can make out her prima facie case. Thus, the burden shifts to DSU to demonstrate non-discriminatory reasons for the decision. At least four reasons were given for the denial of Carter's tenure; her ineffectiveness as department chair; her unfavorable classroom commentary on the university, her ineffectiveness on the NCATE committee, and her neutral evaluation. These reasons have nothing to do with Carter's race in particular, and would be relevant to the tenure of a candidate of any race. Thus, DSU has provided non-discriminatory reasons for its decision.

Since DSU has provided non-discriminatory reasons, Carter must demonstrate that DSU's explanations were false, and the decision was actually improperly motivated by racial considerations. Carter has failed to do so. Carter alleges that pretext can be found based upon: (1) the fact that DeLauder inappropriately considered her service as department chair; (2) DeLauder's conflicting reasons for denying tenure; (3) the fact that African Americans were tenured with performance evaluations similar to hers; (4) the fact that Dr. Hannah acted with racial animus in evaluating her; and (5) the fact **[*19]** that the president lauded her for her participation on the NCATE committee, and then "reversed himself."

First, the court will accept Carter's contention that DeLauder could not consider her service as chair. [7] The court might be concerned if this were the only basis for the denial of tenure. However, DeLauder considered at least three other factors in making his decision. Second, the mere fact that DeLauder asserted three reasons for the denial of tenure to Carter and allegedly added another in a conversation Tolliver will not - standing alone - create pretext. This is so because Carter has yet to prove that any of the reasons are related to her race, or that these factors could not properly be taken into consideration when evaluating an African American candidate.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[7] The court will accept this contention although it is based upon deposition testimony and not a written university policy. (D.I. 108 at B-77.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Third, Carter's contention that African Americans with similar evaluations were tenured is without merit. **[*20]** Assuming that Carter's allegations are true, the fact that an equally qualified candidate - or even a less qualified candidate - was promoted while she was not is insufficient to support a finding of pretext. *See e.g.,* *Odom v. Frank,* 3 F.3d 839, 845 (5th Cir. 1993) ("Generally, a court's belief that an unprotected applicant who has been promoted is less qualified than a protected applicant who has been passed over, will not, in and of itself support a finding of pretext for discrimination."); *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988) (same). Moreover, as defendants point out, tenure is not an entirely objective process. Both parties agree that the tenure process also contains a subjective element. Indeed, the CBA clearly states that judgmental factors may be considered. (D.I. 99, Ex. A at 24.) The CBA further states that "promotion and tenure are not automatic." (*Id.* at 23). Thus, assuming Carter met all of the objective criteria, DSU was not obligated to grant her tenure. It was free to base its decision on subjective criteria.

Fourth, there is no reason to believe that Dr. Hannah's evaluation of Dr. Carter was racially **[*21]** motived. If Carter was given an exceedingly poor evaluation, a "1" or a "2" perhaps, the court might be inclined to consider whether racial animus was involved. However, all parties agree that an evaluation of "3" is considered neutral. An evaluation is an inherently subjective mechanism, and Carter has failed to demonstrate that DSU evaluations were based on objective criteria. Moreover, Carter has failed to demonstrate why the "3" was deserved or undeserved. The court did not work with Dr. Carter on a daily basis. Thus, in the absence of some evidence to suggest that

the "3" was clearly unwarranted, and therefore may have been racially motivated, the court will not second guess Hannah's assessment. Most important, Carter herself admits that persons with neutral, "3" evaluations were tenured. In light of this fact, Hannah's neutral evaluation cannot be considered as a deliberate attempt to hinder Carter's career at the university based on her race.

Finally, the fact that President DeLauder commended Carter on her NCATE efforts does not outweigh the fact that her end product was apparently inadequate. If DeLauder's letters had expressly commented on the quality of Carter's work, or **[*22]** if he had supervised her on the project, the court might take his "reversal" more seriously. However, the facts do not indicate that DeLauder worked with, supervised, or otherwise had reason to know of the allegedly defective nature of the plaintiff's work product. At the time he was writing his note of thanks, he had no reason to know that Dr. Frederick had to re-write Carter's portion of the project. Once DeLauder was made aware of this information, he changed his recommendation. Thus, DeLauder's changed assessment was based upon newly acquired - and relevant - information, rather than racial bias. [8]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[8] The court notes that Dr. Hannah's work on the NCATE project was also criticized, as was the work of the entire NCATE committee. However, what distinguishes Carter from Hannah is that there is no record evidence indicating that Hannah's portion had to be completely rewritten as was Carter's.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In sum, the court concludes based on the record before it, there is no direct evidence of racial animus. Furthermore, **[*23]** DSU has provided non-discriminatory reasons for its tenure decision. Carter has failed to prove that these reasons were a mere pretext. Thus, she has also failed to prove indirect racial animus. Therefore, the court will grant summary judgment for the defendants on this claim.

**B. Counts II, III, and IV - <u>Section 1981</u>, <u>Section 1983</u>, <u>Section 1985</u>, <u>Section 1986</u> and Civil Conspiracy**

The plaintiff concedes that the <u>Eleventh Amendment</u> prevents her from suing DSU on any of the statutory claims. The court will, therefore, grant summary judgment for DSU on these claims. However, the <u>Eleventh Amendment</u> will not prevent Carter from obtaining prospective, injunctive relief against the individual defendants in their official capacity. The court must therefore determine whether the individual defendants are entitled to summary judgment on any of these claims. [9]

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[9] The individual defendants have not moved for summary judgment on the <u>section 1981</u> claims. Thus, the court will not discuss this claim or grant summary judgment for the defendants on this claim.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[*24]** 1. <u>Section 1983</u>



The <u>§ 1983</u> claims are not barred. *HN4*The <u>Eleventh Amendment</u> bars <u>§ 1983</u> claims against state entities and state officials sued in their official capacity. *See <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989).* This is because only "persons" can be sued under <u>§ 1983</u>, and the state is not considered a person. However, where the plaintiff is seeking prospective injunctive relief against defendants in their official capacities, the defendant will be considered a person. *See id.* n. 10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under <u>§ 1983</u> because official-capacity actions

for prospective relief are not treated as actions against the State."). In the present case, the parties agree that the § 1983 claim is for prospective injunctive relief against the defendants in their official capacity. Thus, according to the Supreme Court's reasoning in *Will*, those claims should be allowed to proceed. The court will, therefore, deny summary judgment on this claim.

2. Section 1985, Section 1986 & Civil Conspiracy

The defendants are entitled **[*25]** to summary judgment on the § 1985, § 1986, and civil conspiracy claims. At the outset, the court notes that *HN5* if there is no violation of § 1985, there can be no violation of § 1986. *See* 42 U.S.C. § 1986 (limiting liability to those who fail to prevent any of the wrongs "mentioned in section 1985 of this title."). *See also Boykin v. Bloomsburg University of Pennsylvania*, 893 F. Supp. 409, 418 (M.D. Pa.1995) (noting that § 1986 violation is premised on violation of § 1985). Similarly, if neither of these statutes are implicated, the claim for civil conspiracy must be dismissed because civil conspiracy claims cannot stand alone without some independent statutory violation. *See Phoenix Canada Oil Co. Ltd. v. Texaco Inc.*, 560 F. Supp. 1372, 1388 (D.Del. 1983) ("Delaware courts do not recognize independent actions for civil conspiracies."); *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 2001 Del. Ch. LEXIS 154, 2001 WL 1671441, at *18 (Del.Ch. 2001) ("*HN6* Civil conspiracy is not an independent cause of action, but requires proof of underlying wrong that would be actionable absent conspiracy."). Since the viability of all three **[*26]** claims turns on the validity of the § 1985 claim, the court will focus on that issue.

The § 1985 claim is not viable for two reasons. First, assuming that Carter could prove that a conspiracy took place, *HN7* "a conspiracy claim [under § 1985] requires a clear showing of invidious, purposeful and intentional discrimination between classes or individuals." *Johnson v. University of Pittsburgh*, 435 F. Supp. 1328, 1370 (W.D. Pa. 1977). Additionally, that intentional discrimination must occur on the basis of an impermissible criterion such as race or gender. *See id.* (noting that gender is an acceptable form of animus). For the reasons discussed above, however, Carter has failed to clearly demonstrate that racial animus motivated the defendants' decision. Since Carter cannot meet this burden, her claim must fail.

Additionally, assuming Carter could prove a racially motivated conspiracy, *HN8* in order to be actionable under § 1985, a conspiracy must involve more than one state or private agency. *See id.* ("[A] person cannot conspire with himself and therefore for the agents of a single corporation to conspire among themselves and not with outsiders does not state a **[*27]** cause of action under 1985(3).") *Id.* In the present case, each of the defendants is a member of the same institution - DSU. There are no allegations that other state officials or private persons were involved in this alleged conspiracy. Therefore, the court finds that the defendants are entitled to summary judgment on the § 1985 claim, as well as the § 1986 and civil conspiracy claims.

**C. Count VI - Fourteenth Amendment/Due Process**

The gist of Carter's claim is that DSU failed to follow established procedure, and in so doing deprived her of constitutional due process rights. Again, Carter's claim must fail. As the Carter notes, *HN9* in order to establish a procedural due process violation, she must prove that she was objectively entitled to tenure and did not merely have an expectation of promotion. Carter cites *Gronowicz v. Pennsylvania State University*, 1997 U.S. Dist. LEXIS 20811, No. 97-656, 1997 WL 799438 (E.D. Pa. 1997), in support of her argument.

The record does not reveal that Carter was objectively entitled to tenure. The defendants point out that the *Gronowicz* court also stated that a plaintiff must demonstrate that "the procedures at issue so limit the University's discretion **[*28]** that he was objectively entitled to tenure and did not merely subjectively expect a promotion." 1997 U.S. Dist. LEXIS 20811, [WL] at *5. As previously noted, the DSU tenure process permitted subjective, judgmental decisions. Again, the CBA specifically mentions judgmental factors and notes that "promotion and tenure are not

automatic." (D.I. 99, Ex. A at 23). Thus, the court cannot conclude that the DSU tenure process was so objective as to give plaintiff more than a mere, subjective expectancy of tenure. The court will, therefore, grant summary judgment on this issue.

### D. Count VIII - Breach of Contract Count IX - Intentional Infliction of Emotional Distress

Counts VIII and IX will be considered together because they present the same issue - namely whether state law claims such as breach of contract and intentional infliction of emotional distress are barred by the Eleventh Amendment. The court concludes that they are. As the defendants note, "**HN10**pendent state law claims against state entities and officers are barred by the Eleventh Amendment." *McKay v. Delaware State University*, 2000 U.S. Dist. LEXIS 14653, C.A.No. 99-219, 2000 WL 1481018, at *12 (D. Del. Sept. 29, 2000). The claims for intentional infliction of [**29**] emotional distress and breach of contract clearly arise under state law. Although plaintiff asserts that the Eleventh Amendment will not bar prospective injunctive relief on these claims, a district court may only order prospective injunctive relief for claims arising under the Constitution or a federal statute. *See Halderman v. Pennhurst State School & Hospital*, 673 F.2d 647, 656 (3d Cir. 1982), rev'd on other grounds, 465 U.S. 89, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984) ("[**HN11**The] Eleventh Amendment is no bar to the prospective injunctive relief which was ordered by the district court insofar as that relief is predicated on *constitutional* or *federal statutory* claims.") (emphasis added). As previously mentioned, these claims do not arise under federal statutory or constitutional law, and therefore do not fit into this narrow exception. Thus, the court will grant summary judgment for all defendants on both claims. [10]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[10] The court notes that Carter suggests that there has been insufficient discovery and therefore, the defendants' motion for summary judgment is premature. Although a court can reserve judgement on a motion for summary judgment under Federal Rule of Civil Procedure 56(f), the party seeking such relief must request present affidavits to the court explaining why further discovery is necessary. *See Mid-South Grizzlies v. National Football League*, 720 F.2d 772, 779 (3d Cir. 1983) ("Where Rule 56(f) affidavits have been filed, setting forth specific reasons why the moving party's affidavits in support of a motion for summary judgment cannot be responded to, and the facts are in the possession of the moving party, we have held that a continuance of the motion for purposes of discovery should be granted almost as a matter of course."). In the present case, Carter has failed to submit affidavits demonstrating why more discovery is necessary. Thus, the court sees no bar to the grant of summary judgment.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

### [*30] E. Count X - Punitive Damages

Carter is not eligible for punitive damages. As the defendants noted, **HN12**in order to recover punitive damages, Carter must show that DSU and the defendants "acted with malice or reckless indifference to [her] federally protected rights." *Lafate v. Chase Manhattan Bank (USA)*, 123 F. Supp. 2d 773, 784 (D. Del. 2000). The record is devoid of any facts that would permit the court to find that the defendants acted maliciously. In fact, Carter did not brief this issue, and therefore has failed to direct the court to facts that would support a finding of malice. A careful review of the record shows that it does not support a finding that the defendants acted with racial animus, and thus purposefully deprive Carter of her constitutional rights. Therefore, Carter cannot recover punitive damages.

## V. CONCLUSION

For all of the foregoing reasons, Carter's motion for summary judgment is denied. The court will, therefore, grant summary judgment for all defendants on Count I and Counts IV-X. Although DSU

is also entitled to summary judgment on Counts II and III, the court will deny summary judgment on those claims as to the individual **[\*31]** defendants. Nevertheless, the § 1981 and § 1983 claims in Counts II and III will be limited to prospective injunctive relief against the individual defendants in their official capacities.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

    1. The plaintiff's Motion for Partial Summary Judgment (D.I. 98) is DENIED;

    2. The defendant's Motion for Summary Judgment (D.I. 95) is GRANTED in part and DENIED in part;

    3. Summary Judgment BE AND HEREBY IS ENTERED in favor of the defendant Delaware State University on all claims;

    4. Summary Judgement BE AND HEREBY IS ENTERED in favor of the defendants DeLauder, Tolliver, Hannah, and Gorum, the Board of Trustees on all claims EXCEPT the section 1981 claims stated in Count II of the complaint and the section 1983 claims stated in Count III of the complaint;

    5. The claims in Count II and Count III will be limited to prospective injunctive relief.

Dated: February 27, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT 3

**Citation # 4**
**2000 us dist lexis 4881**

◆ Positive , As of Jan 29 , 2008

DONNA CHILDRESS, Plaintiff, v. DOVER DOWNS, INC., Defendant.

C.A. No. 98-206-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2000 U.S. Dist. LEXIS 4881

March 31, 2000, Decided

**NOTICE:**   **[*1]**   FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendant's motion for summary judgment granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant filed a motion for summary judgment on claims filed against it alleging discrimination pursuant to the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq.

**OVERVIEW:** Plaintiff submitted an "application for employment" to work for defendant as a mutuel teller. While participating in a training session and later during her employment, plaintiff alleged she was sexually harassed. As a result, she filed suit pursuant to the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq. Defendant moved for summary judgment. The court granted summary judgment in favor of defendant on plaintiff's hostile work environment claim, reasoning that plaintiff failed to show that she suffered intentional discrimination because of her sex. The court also found that there was no causal connection between the protected activity and the adverse employment action to fulfill element three of a prima facie case of retaliation. Next, the court found that plaintiff failed to establish a prima facie case of disparate treatment. The court reasoned that plaintiff failed to show that similarly situated males were treated more favorably and did not suffer adverse employment actions.

**OUTCOME:** Defendant's motion for summary judgment granted; there were no genuine issues of material fact relating to plaintiff's claims of discrimination under Title VII.

**CORE TERMS:** teller, female, supervisor, night, prima facie, male, protected activity, retaliation, mutuel, ticket, work environment, training, summary judgment, discriminatory, counseling, hostile, customer, disparate treatment, genuine, sexual, fired, score, employment practice, retaliatory, harassment, favorably, abusive, sex, manager, burden of proof

## LexisNexis® Headnotes

Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality
**HN1** A party is entitled to summary judgment only when the court concludes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants

Civil Procedure > Summary Judgment > Evidence
Evidence > Procedural Considerations > Burdens of Proof > Allocation

HN2 On a motion for summary judgment, the moving party bears the burden of proving that no material issue of fact is in dispute. Once the moving party has carried its initial burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue.

Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > Summary Judgment > Opposition > General Overview
Civil Procedure > Summary Judgment > Standards > General Overview

HN3 On a motion for summary judgment, the court must view all the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. With respect to summary judgment in discrimination cases, the court's role is to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964

HN4 Generally, to state an employment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., a plaintiff may present either direct evidence of discriminatory intent or indirect evidence of discrimination.

Evidence > Procedural Considerations > Burdens of Proof > Allocation
Labor & Employment Law > Discrimination > Disability Discrimination > Proof > General Overview
Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions > General Overview

HN5 In a mixed motives case, once the plaintiff has produced direct evidence that an illegitimate criterion was a motivating factor in an adverse employment decision, both the burden of production and the burden of persuasion shift to the defendant. The defendant must show by a preponderance of the evidence that it would have made the same employment decision regardless of its discriminatory animus. To come within the Price Waterhouse framework, the evidence presented by the plaintiff must directly reflect a discriminatory animus on the part of a person involved in the decision making process.

Evidence > Procedural Considerations > General Overview

HN6 Direct evidence is evidence which, if believed, proves the fact without inference or presumption.

Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions > General Overview

HN7 In pretext or indirect evidence cases, a plaintiff must first make a prima facie showing of discrimination. A prima facie case is established when a plaintiff demonstrates the following: (1) she is a member of a protected class; (2) she was qualified for the employment position held or desired; (3) she suffered some form of adverse employment action; and (4) circumstances that give rise to an inference of unlawful discrimination. Once the plaintiff has established a prima facie case of employment discrimination, the burden of going forward shifts to the defendant who then is required to articulate a legitimate, nondiscriminatory reason for the challenged employment action.

Evidence > Procedural Considerations > Burdens of Proof > Allocation

Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion
Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage &
Definitions > General Overview

**HN8** In pretext or indirect evidence cases, the defendant need only present enough evidence to raise a genuine issue of fact as to whether it discriminated against the plaintiff. If the defendant is successful in meeting its burden of production, the presumption of discrimination created by the prima facie showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely pretext for discriminatory animus. The plaintiff can satisfy her burden of proof either directly by persuading the fact finder that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff.

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964

**HN9** Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., is violated by a work environment abusive to employees because of their race, gender, religion, or national origin.

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964

**HN10** To be cognizable within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of
Proof > Employee Burdens
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work
Environment

**HN11** In order to establish a hostile work environment, a plaintiff must establish by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee. Specifically, a plaintiff must demonstrate that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

Torts > Vicarious Liability > Employers > Activities & Conditions > General Overview

**HN12** An employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of the plaintiff victim.

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964

**HN13** Under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., a plaintiff must file a complaint with the Equal Employment Opportunity Commission within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if the person has initially instituted proceedings with a state or local agency with authority to grant or seek relief form such practice. 42 U.S.C.S. § 2000e-5(e).

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964

**HN14** Title VII of the Civil Rights Act of 1964 (the Act), 42 U.S.C.S. § 2000(e) et seq., prohibits discrimination against an employee who has exercised his rights under the Act: It shall be an unlawful employment practice for an employer to discriminate against any of his employees because she (the employee) has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title. 42 U.S.C.S. § 2000e-3(a)(1997).

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964
Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities
Labor & Employment Law > Discrimination > Retaliation > General Overview

*HN15* Courts analyze Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000(e) et seq., retaliation claims under a burden-shifting framework. A plaintiff must first establish a prima facie case for retaliation under Title VII. In order to state a prima facie case of retaliation under the statute, the plaintiff must show (1) she engaged in a protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.

Labor & Employment Law > Wrongful Termination > Constructive Discharge > General Overview

*HN16* Constructive discharge may be an adverse employment action. Constructive discharge is found where an employer knowingly permits conditions of discrimination in employment so unpleasant or difficult that a reasonable person would have felt compelled to resign.

Labor & Employment Law > Discrimination > Disparate Treatment > Exhaustion of Remedies
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview

*HN17* Courts generally are empowered to hear only those employment discrimination claims that have been the subject of a charge timely filed with the Equal Employment Opportunity Commission (EEOC). 42 U.S.C.S. § 2000e-5(f)(1), (3). However, the parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, regardless of the actual scope of the EEOC investigation. Therefore, a court may assume jurisdiction over additional charges only if the acts alleged in the subsequent Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000(e) et seq., suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom. This standard must be applied in accord with the sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the merits.

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof
Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Employee Burdens
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

*HN18* Generally, to state a disparate treatment in employment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., a plaintiff must demonstrate that she was singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion. Plaintiff must first state a prima facie case of gender discrimination. She can do so by showing by a preponderance of the evidence that: (1) she is a member of the protected class, (2) she suffered an adverse employment action, and (3) that similarly situated members of the opposite sex were treated more favorably.

**COUNSEL:** Stephen A. Hampton, Esquire, Grady & Hampton, P.A., Dover, Delaware, for plaintiff.

James J. Sullivan, Jr., Esquire, and Katherine R. Witherspoon, Esquire, Klett, Lieber, Rooney & Schorling, Wilmington, Delaware, for defendant.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

Dated March 31, 2000

Wilmington, Delaware

Sue L. Robinson

**District Judge**

## I. INTRODUCTION

Plaintiff Donna Childress filed this action on April 23, 1998 against defendant Dover Downs, Inc. asserting injuries under the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*. (D.I. 1) This court has jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e-5(f). Before this court is defendant's motion for summary judgment. (D.I. 38)

For the reasons stated below, defendant's motion for summary judgment shall be granted. [1]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[1] The court's decision in this case has rendered defendant's argument for summary judgment as to punitive damages moot and, therefore, such will not be discussed in this memorandum opinion.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[*2] II. BACKGROUND [2]**

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[2] The record reviewed for purposes of this summary judgment proceeding includes defendant's opening brief and appendix, plaintiff's answering brief, and defendant's reply brief and appendix. Plaintiff's appendix to her answering brief was excluded from the record by the prior judicial officer for failure to comply with time limitations. The background section, therefore, is mainly comprised of plaintiff's allegations taken from her complaint and various deposition excerpts.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Plaintiff is a white female who is married with two children. (D.I. 40 at A-31) On September 9, 1995 plaintiff submitted an "application for employment" to work for defendant as a mutuel teller. (D.I. 40 at A-1-3) In order to become a mutuel teller, an applicant has to take a teller training class and pass an examination. (D.I. 45, P 2) An applicant would "learn to use the teller computers to properly place bets and pay winning ticket holders" during these training sessions. (D.I. 45, P 2) Plaintiff attended a **[*3]** training course in November of 1995. (D.I. 40 at A-75) On December 17, 1995 she began working for defendant as a part-time mutuel teller, primarily on the night shift. (D.I. 1, PP 7,8) As a mutuel teller, plaintiff's job was to "sell tickets to customers who placed bets on horse races, either held at Dover Downs' racetrack or 'simulcast' via television from other racetracks." (D.I. 45, P 2) Adam Wise ("AW") was the mutuel manager who supervised the tellers at the time plaintiff began her job. (D.I. 1, P 9)

## A. Alleged Incidents During Plaintiff's Training Session

On the first night of her training session in November 1995, AW greeted plaintiff "by looking her up and down from head to toe in a way that she found rude and disconcerting." (D.I. 1, P 10) On the second night of training, AW allegedly lingered around plaintiff all night and kept trying to talk to her. (D.I. 1, P 11) That same night AW allegedly kicked the back of plaintiff's boots and asked her if she had spurs at home. (D.I. 1, P 12; D.I. 40 at A-45) Also that night, AW "started to massage her back and run his hands down her back." (D.I. 1, P 12; D.I. 40 at A-41) Plaintiff claims she shrugged AW's hands off her back **[*4]** and he replied, "What, am I making you melt?" (D.I. 1, P 12; D.I. 40 at A-41) Plaintiff's reply was "No, call me crazy but I'm one of those people who doesn't like to be touched." (D.I. 1, P 12; D.I. 40 at A-41) During the rest of the training session AW displayed a "bad attitude" toward plaintiff and and belittled her when she posed questions to him regarding her training. (D.I. 1 at P13)

## B. Alleged Incidents During Plaintiff's Employment

Plaintiff alleges that the problems did not stop after she began working for defendant as a mutuel teller on the night shift in December of 1995.

## 1. December 1995 to April 1996

Plaintiff's allegations during this time period continue to involve AW and the way he treated her and other female tellers. From January to April 1996, AW attempted on numerous occasions to hold plaintiff's hand. (D.I. 1, P 14; D.I. 40 at A-42) He would attempt to reach over the counter to touch plaintiff's hand. (D.I. 40 at A-42) Plaintiff would pull her hand away, saying nothing at all. (D.I. 40 at A-42) AW would become irritated with plaintiff, ask her why she was so miserable, and comment that she always had an "attitude." (D.I. 1 at P17) AW also would **[*5]** hold other tellers' hands while talking to them. (D.I. 40 at A-42) AW never tried to touch plaintiff after April 1996. (D.I. 40 at A-43)

On one occasion, AW asked plaintiff and another teller, Rebecca Thomas ("RT"), what color bras they were wearing. (D.I. 1, P 18; D.I. 40 at 45-46) Plaintiff did not respond, but RT answered his question. (D.I. 1, P 19; D.I. 40 at A-46) AW again told plaintiff that she was "always so miserable." (D.I. 1, P 19) AW also would tell "off-color sexual jokes" and jokes about minorities, especially blacks, around plaintiff and other female tellers. (D.I. 1, P 27; D.I. 40 at A-46) Plaintiff approximated that this happened between five to ten times. (D.I. 40 at A-46)

On other occasions, AW allegedly would make derogatory comments to the female tellers. (D.I. 1, P 28; D.I. 40 at A-46) For example, plaintiff claims AW would critique her attire or hairstyle. (D.I. 40 at A-46) Plaintiff alleges that some of AW's comments had a double meaning and that it was obvious he wanted female tellers to take a sexual meaning from what he said. (D.I. 1, P 28; D.I. 40 at A-46)

During this time period, plaintiff claims that AW tried to touch many of the female tellers and **[*6]** give them "special attention." (D.I. 1, P 20; D.I. 43 at B-10-19, 761, 770, 778, 785) The female tellers who went along with his behavior were treated with favoritism and were treated favorably. (D.I. 1, P 21; D.I. 43 at B-10-19, 770, 774, 775, 778, 798) For example, AW frequently would come up behind RT while she was working to rub her shoulders or put his chin on her shoulder. (D.I. 1, P 23; D.I. 40 at A-111) He told RT that he wished he were the father of her baby. (D.I. 1, P 24; D.I. 40 at A-117) Plaintiff asserts that RT acquiesced in such treatment and, as a result, she received special privileges. (D.I. 1, P 25; D.I. 43 at B-10-19) RT was "permitted to leave her work station and spend time upstairs in the office area even though she was supposed to be working on the line." (D.I. 1, P 25; D.I. 43 at B-10-19) Plaintiff claims that AW did not treat the male tellers in the same manner that he treated the female tellers. (D.I. 1, P 29; D.I. 43 at B-770)

## 2. April 1996 to July 1996

Plaintiff was laid off in April 1996 at the end of the live season and returned to work at the end of July 1996. (D.I. 40 at A-61) In June 1996 ten female tellers from the day shift had a meeting **[*7]** with Denis McGlynn ("DMcG") (President of Dover Downs) and Frank Wise ("FW") (a general manager and also AW's father) to voice their complaints about the work environment. (D.I. 43 at B-10-19) The tellers present at the meeting included a teller named Susan Keeler ("SK"). (D.I. 43 at B-10)

Many of the complaints made at the meeting involved AW's conduct. (D.I. 43 at B-10-19) Many of the women complained about the AW's favorable treatment of RT. (D.I. 43 at B-10, B-12-16) They objected to AW's repeated threats to fire them for different reasons, e.g., if they had too many cancellations. (D.I. 43 at B-11) They complained that AW would yell at tellers in front of customers and allow customers to call the tellers vulgar names. (D.I. 43 at B-14-15) They also expressed dissatisfaction with the supervisors' attitudes since RT had quit, asserting that the supervisors had been rude and nasty to the tellers. (D.I. 43 at B-15, B-18-19) DMcG delegated the resolution of this situation to FW. (D.I. 43 at B-625)

In July 1996, FW implemented new mutuel employee guidelines. (D.I. 43 at B-31-39) Changes included, but were not limited to, [3] the modification of the dress code, the installment of a **[*8]** time clock, the addition of head tellers for the night and weekend shifts, and the disallowance of mutuel employees in the Casino and Simulcast Area while in uniform. (D.I. 43 at B-30-39) Employees were "required to treat all others, (patrons, co-workers), in a courteous manner." (D.I. 43 at B-31) In a memorandum dated July 9, 1996, FW informed the tellers of the new chain of command, i.e., head teller, supervisors, general manager harness, and president. (D.I. 43 at B-37) If any of the tellers on the line had a problem, they were to report it to the head teller; if the head teller could not help, he or she would notify a supervisor. (D.I. 43 at B-33)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[3] Plaintiff, in her complaint, lists the following changes:

(a) tellers were told that now they [had] to keep their canceled tickets separate from the paid tickets, and that if they had too many cancellations, they could be fired. This, despite the fact that cancellations were generally because the customer changed [his] mind and decided to cancel the ticket.

(b) tellers were told that management was watching their ticket sales and that if they [did] not sell as many tickets as the other tellers, they [could] be fired. However, every window is not equally busy and the number of tickets sold depends on the location of the ticket window.

(c) the tellers now [had] to punch a time clock and[,] in fact, were the only department at Dover Downs that had one.

(d) tellers [were] no longer allowed to eat behind the line.

(e) tellers who smoke had been able to split up their fifteen minute break so they could smoke a cigarette, now they had to take the entire fifteen minutes at one time.

(f) the tellers were told that they [had] to button their shirts one button down from the top and their shirts had to be tucked in.

(g) the pregnant tellers were told they had to wear the uniform with black maternity pants, but female employees who worked on the line [and] handled money [were] allowed to wear maternity clothes.

(h) the tellers [were] told they could no longer read behind the line, even on the days when there [were] no tracks running and they [were] not busy. The other people in the line such as program sellers and the people who handled money [were] allowed to read on the line.

(i) the reading material in the tellers break room was taken away and they were only permitted to read racing forms.

(j) tellers were told that they [were] not allowed to fraternize with customers . . . .

(k) tellers were told that if they did not use the employee parking they could be fired.

(l) tellers were told they could have no chewing gum or hard candy.

(m) the night shift tellers had their hours changed and had to work more shifts to maintain full[-]time hours.

(n) the tellers were told that they [could] not leave their terminal without signing in and out.

(D.I. 1, P 35(a)-(n))

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

 **[*9]**  Plaintiff returned to work in late July 1996. (D.I. 1, P 31; D.I. 40 at A-61) On July 31, 1996, plaintiff signed the new mutuel department regulations put into effect by FW. (D.I. 40 at A-60, A-12) Plaintiff and other tellers were told that the rule changes and the installation of head tellers were a result of the meeting the day shift women had had with management in June 1996. (D.I. 1, P 33; D.I. 43 at B-761) This information created some hostility on the part of the night and weekend shift tellers towards the day shift tellers. (D.I. 43 at B-761) Shortly thereafter, SK, one of the day shift women who had met with management, had her hours changed from day shift to night shift. (D.I. 43 at B-772) Plaintiff was the only night shift teller who would associate with her; no other tellers would speak to her because of the hostility. (D.I. 43 at B-772)

### 3. August 1996 to December 1996

Plaintiff worked with SK intermittently throughout the time period from July 1996 to November 1996, when SK was fired. (D.I. 1, P 49) While they worked together, SK shared with plaintiff many of her complaints about defendant. [4] SK had similar complaints to those made by plaintiff and, on occasion,  **[*10]**  she brought them to the attention of management. (D.I. 43 at B-770-776) According to SK, management did not make any effort to address the problems and in October of 1996, she informed management she was going to file a complaint with the Labor Board. (D.I. 43 at B-772) On November 22, 1996, SK was fired, allegedly because she was not doing a good job and because of absenteeism. (D.I. 43 at B-772) Shortly before SK's termination, SK and plaintiff had lunch together. (D.I. 43 at B-772) The friendly relationship plaintiff and SK shared was closely watched by management. (D.I. 43 at B-772)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

4 SK told plaintiff:

(a) From the time she began working at Dover Downs, she became the object of unwanted attention from AW.

(b) On one occasion, AW grabbed SK's hair and said "you mean to tell me you actually got your hair cut like that."

(c) On another occasion AW grabbed SK's finger and bent it back causing her severe pain.

(d) AW would swear at SK.

(e) That the stress at work had caused her health problems resulting in a leave of absence from work.

(D.I. 1, P 49(a)-(e))

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*11]** In October of 1996 a co-worker, Kristy Tyler ("KT"), became angry with plaintiff over a change in the work schedule. (D.I. 1, P 55; D.I. 40 at A-21) Plaintiff alleges that later in the month, KT's boyfriend "keyed" her car while it was parked in the parking lot. (D.I. 40 at A-56) On the night plaintiff noticed her car had been keyed, KT's boyfriend came in to where they worked, looked at plaintiff, looked at KT, nodded in a "yes" motion, and walked back out. (D.I. 40 at A-21, 56) No words were spoken between KT and her boyfriend. (D.I. 40 at A-21, 56) After her boyfriend had left, KT announced to everyone that they had better watch their cars because she heard "cars are getting tore up in the parking lot." (D.I. 1, P 56; D.I. 40 at A-21, 56)

Plaintiff reported this incident to FW on October 28, 1996. (D.I. 1, P 57; D.I. 40 at A-21, 56) Management was supportive of plaintiff, and FW even offered to allow her to park in a space that was monitored by a video camera. (D.I. 1, P 57; D.I. 40 at A-21) A few days later, plaintiff and KT passed each other on the main line and KT said to plaintiff, "you asshole." (D.I. 40 at A-21) Plaintiff reported this incident to Jean Rawlings ("JR"), one **[*12]** of the supervisors. (D.I. 40 at A-21) JR never said another word to plaintiff about this incident, so plaintiff called FW about it two weeks later. (D.I. 40 at A-21) FW knew nothing about the incident when plaintiff called. (D.I. 40 at A-21)

Sometime in late November 1996, Carl Anderson ("CA"), a supervisor, asked plaintiff to write a letter about a male teller who CA thought was gay. (D.I. 43 at B-790) CA told plaintiff what he wanted her to say in the letter, but plaintiff had never seen or heard the teller do any of the things CA had mentioned. (D.I. 43 at B-790) CA became angry with plaintiff when she refused to write the letter he had requested. (D.I. 43 at B-790-791)

After SK was fired, she wrote a letter dated December 6, 1996 to defendant's president, DMcG. (D.I. 1, P 53; D.I. 40 at A-5-7; D.I. 43 at B-773) In her letter, not only did SK express her own complaints, she let DMcG know that other female tellers had similar complaints. (D.I. 40 at A-5-7) SK did not name plaintiff in her letter, but she did make reference to situations that involved plaintiff. (D.I. 40 at A-5-7; D.I. 43 at B-773) For example, she wrote about a teller who recently had had her car "keyed." (D.I. **[*13]** 40 at A-7; D.I. 43 at B-773) Plaintiff is the only teller who had had this happen to her. (D.I. 43 at B-773) SK was referring to plaintiff when she wrote about a teller who "told [AW] she didn't like to be touched and that she didn't want him to hold her hand." (D.I. 40 at A-7; D.I. 43 at B-773) Plaintiff was not aware that SK had written this letter until after she had left defendant's employ. (D.I. 1, P 54; D.I. 40 at A-25)

In early to mid-December 1996, plaintiff's problems with KT began to resurface. (D.I. 40 at A-22) Laura Kenton ("LK"), another teller, was working with LK and plaintiff when KT called LK a "bitch." (D.I. 40 at A-21) Plaintiff did not hear this, but when LK reported the incident to JR she implicated plaintiff. (D.I. 40 at A-21-22) Another time that LK went to JR to complain about KT, JR told LK to "stay out of it. The whole thing was between [KT] and [plaintiff]." (D.I. 40 at A-22) JR began to take KT and KT's sister under her wing, and the more she favored them, the more

plaintiff suffered. (D.I. 40 at A-22)

## 4. January 1997 to March 1997

Plaintiff claims that she always was one of the "most productive tellers and had been told by management that **[*14]** she was one of the fastest tellers and that she was pleasant to get along with." (D.I. 1 at P60) During this time period, plaintiff was not aware that her file contained any written documentation of deficiencies in her performance or that she had ever been disciplined by management. (D.I. 1 at P60)

Plaintiff was given a yearly evaluation in the first or second week of January 1997. (D.I. 40 at A-22, A-49) Her evaluation score was only one point above satisfactory. (D.I. 1, P 63; D.I. 40 at A-22) As a result of this score, plaintiff was given a raise of twenty-five cents, rather than fifty cents. (D.I. 40 at A-22) Plaintiff felt as though the evaluation was not a fair assessment and, therefore, questioned it, although she never asked for it to be changed. (D.I. 40 at A-49) CA and JR, plaintiff's supervisors, told plaintiff the reason for her low score was the problems involving KT and the complaints they had been receiving about plaintiff for months. (D.I. 40 at A-22) Plaintiff was never called into the office regarding these complaints. (D.I. 40 at A-22) Plaintiff only signed the evaluation after she was told she could have a copy of it. (D.I. 40 at A-22) After all the evaluations **[*15]** were done, plaintiff was told that no one could receive a copy of his/her evaluation. (D.I. 40 at A-22)

During the months of January through March 1997, plaintiff alleges that management constantly harassed her by calling her to the office every week with new complaints about her behavior. (D.I. 1, P 102; D.I. 40 at A-32) According to plaintiff, whenever she would file a complaint, management would just sigh, roll their eyes, and stare at the wall. (D.I. 40 at A-44)

When plaintiff reported to work on January 22, 1997, there was a mandatory meeting for the employees. (D.I. 1 at P68, D.I. 40 at A-22) Prior to this day, CA had told plaintiff that plaintiff could not attend the meeting because she needed to remain working on the line. (D.I. 1, P 68; D.I. 40 at A-22) The head teller that night, Joan Biddle ("JB"), asked the tellers whether they wanted to attend the meeting. (D.I. 40 at A-22) Plaintiff responded that CA had told her to remain working and, therefore, she could not attend the meeting. (D.I. 40 at A-22) About forty-five minutes after the meeting had started, plaintiff was told to hurry up and turn her machine off as she was wanted upstairs. (D.I. 1, P 69; D.I. 40 at A-22) **[*16]** Plaintiff thought she was wanted in the office. (D.I. 1, P 69; D.I. 40 at A-22) Instead, plaintiff was brought into the middle of the meeting, where everyone looked at her when she walked in. (D.I. 1, P 69; D.I. 40 at A-22) One of the topics discussed at the meeting was the willingness of employees to face the person about whom they make an accusation. (D.I. 1, P 70; D.I. 40 at A-22-23)

After the meeting was over, plaintiff returned to the line. (D.I. 1, P 71; D.I. 40 at A-23) While she was working, JB began to recap the meeting, especially making reference to discussions concerning gossiping, starting rumors, and the need for employees who make accusations to face the accused. (D.I. 1, P 71, 72; D.I. 40 at A-23) At that point, plaintiff interjected "that management would not tell her who had been accusing her of things or allow her to face them." (D.I. 1, P 73; D.I. 40 at A-23) JB began to scream loudly at plaintiff. (D.I. 1, P 74; D.I. 40 at A-23) Immediately, JB began accusing plaintiff of constantly walking up and down the line gossiping about KT. (D.I. 1, P 75; D.I. 40 at A-23) Plaintiff denied these allegations and offered that her computer printouts as proof that she was at **[*17]** her machine punching tickets and not walking up and down the line. (D.I. 1, P 76; D.I. 40 at A-23)

After the screaming incident, plaintiff went up to the third floor office to speak with her supervisors, CA and JR. (D.I. 1, P 77; D.I. 40 at A-23) She told them about JB bringing her into the middle of the meeting and screaming at her in front of customers. (D.I. 1, P 78; D.I. 40 at A-23) CA called JB to the office to find out what happened. (D.I. 1, P 78; D.I. 40 at A-23) JB told CA that plaintiff was gossiping about KT, and "she had to shout to snap [her] out of it." (D.I. 1, P 78; D.I.

40 at A-23) Eventually, although JB attempted to prevent him from doing so, CA agreed to go downstairs to speak with the other tellers who were present when the screaming incident occurred. (D.I. 1, P 79; D.I. 40 at A-23) When CA returned, he stated that the two witnesses confirmed plaintiff's story; this angered JB. (D.I. 1, P 80; D.I. 40 at A-23) JB pointed her finger at plaintiff and yelled, "I see how you are," then gave plaintiff a dirty look and stormed out of the room. (D.I. 1, P 81; D.I. 40 at A-23) Plaintiff, JB, and the eye witnesses were told by management to pretend the whole thing had **[*18]** never happened and not to talk about it to anyone. (D.I. 1, P 82; D.I. 40 at A-23) When everyone returned to the line, JB was slamming things and tried to close plaintiff's arm in her drawer every chance she could get. (D.I. 40 at A-23)

Throughout the months of January to March 1997, JB would elbow plaintiff in the back at least once a night whenever they worked together. (D.I. 1, P 66; D.I. 40 at A-44) Plaintiff and JB worked together approximately every other week. (D.I. 40 at A-44) Plaintiff spoke with CA twice about these incidents. (D.I. 40 at A-44) The first time plaintiff spoke with CA, he told her he would talk to JB, but the elbowing did not stop. (D.I. 40 at A-44) The second time plaintiff spoke to CA was her last day at work. (D.I. 40 at A-44)

Another incident occurred in February 1997. (D.I. 1, PP 87, 97; D.I. 40 at A-43) As plaintiff and a male manager were passing each other in the hallway, he "headed towards [her] at full speed [,] took his shoulders and forcibly hit [her] . . . like a hockey player would give a body check." (D.I. 40 at A-43) He neither apologized, nor looked back at plaintiff. (D.I. 40 at A-43) Plaintiff did not report the incident to management. **[*19]** (D.I. 40 at A-43)

Sometime between January and March, most likely February, plaintiff was brought to the management office by this same male manager because he believed her to have been seven hundred and some dollars short when she turned in her money bag. (D.I. 40 at A-51) He told plaintiff, "Luckily, for you, I went to your machine and you had left all your money at your machine and you only turned in change." (D.I. 40 at A-51) Plaintiff insists that she did not forget to put the money in the bag, that her husband witnessed her putting the money in the bag, and that the entire story was fabricated. (D.I. 40 at A-51)

Plaintiff worked the whole day on March 17, 1997. (D.I. 40 at A-24) AW was giving plaintiff dirty looks the entire day and plaintiff could not understand why. (D.I. 40 at A-24) That day she said "hello" to FW, and he just turned his head. (D.I. 40 at A-24) AW was flirting with another teller throughout the day. (D.I. 40 at A-24) AW was hugging and touching this teller, who allegedly was receptive to his advances. (D.I. 40 at A-24) For example, she handed AW a rolled up napkin and when he opened it a quarter fell out; the napkin read, "if you can't come call." (D. **[*20]** I. 40 at A-24) This teller was willing to go along with AW; therefore, she received more hours a week than others who had been there for over a year, such as plaintiff. (D.I. 40 at A-24)

At the end of the day, plaintiff was told to go up to the office after she finished work. (D.I. 40 at A-24) When she got to the office, CA handed her a counseling sheet. (D.I. 40 at A-10, A-24) The sheet stated that plaintiff had used foul language about a fellow teller and that she was spreading rumors about fellow tellers. (D.I. 40 at A-24) When plaintiff asked for an explanation, CA told her that JB had heard plaintiff call her a "black bitch." CA also told plaintiff that JB said plaintiff was talking about the incident that had occurred between the two of them in January and that there were other complaints regarding rumors about fellow tellers. (D.I. 40 at A-24) Plaintiff insisted that she never said these things and that JB was lying. (D.I. 40 at A-24) Plaintiff asked for a meeting to face her accusers, and CA said he would arrange it, but he never did. (D.I. 40 at A-24) Plaintiff did not want to sign the counseling sheet, but CA told her signing it was not an admittance of guilt but only an **[*21]** acknowledgment that he had spoken with her. (D.I. 40 at A-24) Plaintiff signed the letter and left the office crying. (D.I. 40 at A-24) When plaintiff called CA later that night to discuss her counseling sheet, she informed him that she felt she needed to contact a lawyer to find out her rights. (D.I. 40 at A-25)

On March 20, 1997 plaintiff went to Dr. John Asman's office to ask for a new medication for her

stomach pain. [5] (D.I. 40 at A-25) Plaintiff explained to the doctor what she had endured at work and that the stress had worsened not only her stomach problem but also her neck and back problem. (D.I. 40 at A-25) The doctor advised plaintiff not to go back to her position and wrote a letter containing this advice. (D.I. 40 at A-25) Later that same day, plaintiff, accompanied by her husband, went to work. (D.I. 40 at A-25) As she and her husband walked in, AW was standing midway down the main line. (D.I. 40 at A-25) When he saw the two of them, AW ran back to the office and announced their arrival. (D.I. 40 at A-25) When plaintiff arrived at the office, plaintiff handed CA the note her doctor had written. She asked him to put it in her file as it was the reason she would not be **[*22]** back to work. (D.I. 40 at A-25)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[5] Since approximately the spring of 1996, plaintiff has had a problem with her stomach. (D.I. 40 at 77-80) Her medication for this condition has changed three times since January 1997. (D.I. 40 at A-25) Beginning in January 1997, plaintiff also began taking muscle relaxers and anti-inflammatory pills for stress and tension in her back. (D.I. 40 at A-25)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## III. STANDARD OF REVIEW

*HN1* A party is entitled to summary judgment only when the court concludes "that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *HN2* The moving party bears the burden of proving that no material issue of fact is in dispute. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" **[*23]** *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). *HN3* This court, however, must "view all the underlying facts and all reasonable inferences therefrom in the light most favorable **[*24]** to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Industries, Inc.*, 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

*HN4* Generally, to state an employment claim under Title VII, a plaintiff may present either direct evidence of discriminatory intent under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989) ("mixed motives" cases) or indirect evidence of discrimination under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981) **[*25]** ("pretext" cases). *HN5* In a mixed motives case under *Price Waterhouse*, once the plaintiff has produced direct evidence that an illegitimate criterion was a

motivating factor in an adverse employment decision, both the burden of production and the burden of persuasion shift to the defendant. *See id.*, 490 U.S. 228 at 277. The defendant must show by a preponderance of the evidence that it would have made the same employment decision regardless of its discriminatory animus. *See id.* at 244-46. To come within the *Price Waterhouse* framework, the evidence presented by the plaintiff "must directly reflect a discriminatory . . . animus on the part of a person involved in the decision making process." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir. 1994); *see also Ostrowski v. Atlantic Mutual Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992). "**HN6**☐"Direct evidence is evidence which, if believed, proves the fact without inference or presumption.'" *Nixon v. Runyon*, 856 F. Supp. 977, 983 (E.D. Pa. 1994) (quoting *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993) **[*26]** ("Evidence [of discrimination] is direct when it is sufficient to prove discrimination without inference or presumption.").

*HN7*☐In contrast, in pretext or indirect evidence cases, a plaintiff must first make a *prima facie* showing of discrimination. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). A *prima facie* case is established when a plaintiff demonstrates the following: (1) she is a member of a protected class; (2) she was qualified for the employment position held or desired; (3) she suffered some form of adverse employment action; and (4) circumstances that give rise to an inference of unlawful discrimination. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410-412 (3d Cir. 1999). Once the plaintiff has established a *prima facie* case of employment discrimination, the burden of going forward shifts to the defendant who then is required to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *See McDonnell Douglas*, 411 U.S. at 802-03; *Burdine*, 450 U.S. at 252-55; *Bellissimo v. Westinghouse Elec. Corp.*, 764 F.2d 175, 179 (3d Cir. 1985). **[*27]** *HN8*☐The defendant need only present enough evidence to raise a genuine issue of fact "as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55. If the defendant is successful in meeting its burden of production, the presumption of discrimination created by the *prima facie* showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely pretext for discriminatory animus. *See id.* at 256. The plaintiff can satisfy her burden of proof "either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.; see also Armbruster*, 32 F.3d at 783. At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).

## IV. DISCUSSION

It is difficult to discern exactly what plaintiff claims **[*28]** in this lawsuit. Although she has enumerated in great detail a great number of facts, plaintiff has left it to defendant and, ultimately, the court to characterize the facts as legal causes of action. The court, as did the defendant, construes the facts and their legal consequences liberally.

## A. Hostile Work Environment (Sexual Harassment)

The Supreme Court has recognized that *HN9*☐Title VII is violated by a "work environment abusive to employees because of their race, gender, religion, or national origin." [6] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) ("[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."). *HN10*☐To be cognizable within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB*, 477 U.S. at 67 (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). **[*29]** *HN11*☐In order to establish a hostile work environment,

a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee."

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990) (quoting *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1510 (11th Cir. 1989)). Specifically, a plaintiff must demonstrate that:

> (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*Id.; see Faragher v. City of Boca Raton*, 524 U.S. 775, 786-88, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998). **HN12** An "employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of the plaintiff **[*30]** victim." *Faragher*, 524 U.S. at 775.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

6 It shall be an unlawful employment practice for an employer

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**HN13** Under Title VII, a plaintiff must file a complaint with the EEOC within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if the person has initially instituted proceedings with a state or local agency with authority to grant or seek relief form such practice. *See* 42 U.S.C. § 2000e-5(e). In the instant action, plaintiff filed her charge of discrimination on March 31, 1997 with the Delaware Department of Labor. Her Title VII action, therefore, would normally include only those incidents alleged to **[*31]** have occurred in the preceeding three hundred day period, i.e., those events occurring after June 4, 1996. Events occurring prior to this date are considered untimely. Therefore, plaintiff is precluded from averring in support of her hostile work environment claim any allegations of sexual harassment that occurred prior to June 4, 1996. (D.I. 40 at A-27) As a result, plaintiff's allegations that AW sexually harassed her from the time she started her training in November 1995 to the time defendant terminated her employment in April 1996 are time barred. 7 Plaintiff admits that AW never tried to touch her after April 1996, a concession that is supported by the record.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

7 Plaintiff does not allege a continuing violation, and even if she were to do so, the acts alleged to have occurred outside the limitations period are not continuous in time with the timely acts alleged. This discontinuity is fatal to a continuing violation argument.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In light of the above, the only remaining basis for plaintiff's hostile work environment **[*32]** claim is her assertion that she was subjected to a continuing pattern of retaliation from management and

supervisors. Plaintiff contends that this retaliation was a result of the meeting management had with female tellers in June 1996, regarding the alleged sexual harassment by AW. (D.I. 43 at B-10-19) Although the discriminatory conduct forming the basis of a hostile work environment claim is "not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee," *Andrews*, 895 F.2d at 1485, the court finds that plaintiff has not established a *prima facie* case. Plaintiff did not participate in, and her name was never mentioned during, the June 1996 meeting. Moreover, the alleged retaliatory conduct did not begin until December 1996, six months after the tellers met with management. [8] Furthermore, the conduct plaintiff complains about involves treatment she received from female supervisors. Plaintiff has not provided the court with any evidence from which it could be reasonably inferred that the alleged retaliatory actions were taken by defendant merely because of her gender. **[*33]** Therefore, plaintiff has failed to establish the first element of a *prima face* case. Accordingly, the court shall grant summary judgment in favor of defendant on plaintiff's hostile work environment claim.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[8] Plaintiff admits that in October 1996 management was supportive when she went to them to complain about her car being keyed in the parking lot. (D.I. 40 at A-21) Plaintiff's first allegation that involves retaliatory conduct by management or a supervisor concern conduct that occurred in mid-December 1996. (D.I. 40 at A-22)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

## B. Retaliation

**HN14** Title VII prohibits discrimination against an employee who has exercised her rights under the Act:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because she [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this **[*34]** title.

42 U.S.C. § 2000e-3(a)(1997); *Price v. Delaware Dep't of Correction*, 40 F. Supp. 2d 544, 551 n.5 (D. Del. 1999). **HN15** Courts analyze Title VII retaliation claims under the same burden-shifting framework outlined earlier. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). A plaintiff, therefore, must first establish a *prima facie* case for retaliation under Title VII. In order to state a *prima facie* case of retaliation under the statute, the plaintiff must show (1) she engaged in a protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *See id.; Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1289 (3d Cir. 1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997); *Price*, 40 F. Supp. 2d at 551-52.

In the case at bar, plaintiff has failed to establish a *prima facie* showing of retaliation. Plaintiff provides no evidence that she engaged in a protected **[*35]** employee activity, the touchstone element of a retaliation claim. The record demonstrates that plaintiff never "opposed any practice made an unlawful employment practice by [Title VII];" moreover, plaintiff never "made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a). Plaintiff did not complain to management that she was being sexually harassed; she was not one of the female tellers who went to management in April 1996 and her name was never mentioned in that meeting. (D.I. 43 at B-10) Although filing a charge of discrimination with the EEOC is a protected activity, plaintiff did not do so until after she resigned

in March 1997. See Robinson, 120 F.3d at 1300; Woodson, 109 F.3d at 920.

Plaintiff contends that her "involuntary involvement" in SK's letter to the president of defendant was a protected activity. In her December 1996 letter, SK made reference to plaintiff, but never mentioned her by name. (D.I. 40 at A-5-7; D.I. 43 at B-773) There is no evidence to show that management had any idea the letter was referencing plaintiff. [*36] (D.I. 47 at P5; D.I. 48 at P2) Although plaintiff was friendly with SK and SK's sister, that does not make her a participant, in any form, in a protected activity. (D.I. 43 at B-772) Plaintiff argues that she engaged in a protected activity when she refused to write a letter for management about a gay male teller. (D.I. 43 at B-790-791) The court finds that this single nonevent does not constitute "opposition to any practice made an unlawful employment practice" by Title VII.

Even if the court were to assume that plaintiff engaged in a protected activity, the court finds that plaintiff has not shown an adverse employment action taken by defendant sufficient to fulfill the second element of a prima facie case. "The Third Circuit has articulated that 'retaliatory conduct other than discharge or refusal to rehire is ... proscribed by Title VII only if it alters the employees' compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affect[s] his status as an employee.'" Price, 40 F. Supp. 2d at 552 (citing Robinson, 120 F.3d at 1300)(emphasis added). According to the Third Circuit [*37] in Robinson, "not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Robinson, 120 F.3d at 1300. The employer's retaliatory conduct must be both "serious and tangible." Id.

Plaintiff alleges that she received an unwarranted low performance review from defendant in January 1997. (D.I. 40 at A-49) There is no evidence to support plaintiff's claim that her review was unwarranted other than her own belief that she deserved a higher score. As a result of this review, plaintiff received a satisfactory score and a twenty-five cent raise. (D.I. 40 at A-22) Plaintiff did not quit when she received her evaluation. Although plaintiff did question management about her score, she never requested that it be changed. (D.I. 40 at A-49)

HN16[ ]Constructive discharge may be an adverse employment action. See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999). Plaintiff at bar does not argue directly that she was constructively discharged; however, the court will address [*38] the issue, construing the claims and record liberally. Constructive discharge is found where an employer knowingly permits "conditions of discrimination in employment so unpleasant or difficult that a reasonable person would have felt compelled to resign." Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998). Plaintiff alleges that she was subjected to the following acts of reprisal: she received an unwarranted low performance review; she received several verbal counselings and one written counseling from management; her supervisor (a female) brought her into the middle of a meeting to embarrass her; her supervisor (a female) elbowed her in the back and tried to close her arm in the drawer approximately ten times; and another supervisor (a male) tried to "body check" her in the hallway. These incidents, coupled with her doctor's advice not to return to work, prompted plaintiff to resign. (D.I. 40 at A-25) The court finds that these allegations do not rise to the level of employer action that would "compel a reasonable person to resign." See generally Robinson, 120 F.3d 1286, 1300-01 (finding that plaintiff's alleged "unsubstantiated oral [*39] reprimands" and "unnecessary derogatory comments" did not rise to the level of what the Third Circuit has described as "adverse employment action").

Even if the court were to find that plaintiff was constructively discharged, there is no causal connection between what she claims to have been the protected activity (her alleged involvement in SK's letter) and the problems that led to her resignation. Plaintiff argues that the substantial and continuous harassment she alleges was at the request of management, because of the letter sent by SK. However, as mentioned above, there is no evidence to suggest that management knew plaintiff was referenced in this letter. Therefore, even if plaintiff were to have met element one by her "involuntary involvement" in SK's letter, and to have met element two through constructive

discharge, this court finds that there is no causal connection between the protected activity and the adverse employment action to fulfill element three of a *prima facie* case of retaliation. [9]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[9] The Third Circuit has stated that "temporal proximity between the protected activity and the termination is sufficient to establish a causal link." <u>Woodson, 109 F.3d at 920-21</u>. The timing as alleged by plaintiff is SK's December 6, 1996 letter and plaintiff's March 20, 1997 resignation.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

   **[\*40] C. Disparate Treatment**

In an effort to predict what causes of action plaintiff might assert at trial, defendant has addressed the theory of disparate treatment. Plaintiff did not directly address a claim of disparate treatment in her charge of discrimination to the EEOC. (D.I. 40 at A-27) *HN17*□Courts generally are empowered to hear only those employment discrimination claims that have been the subject of a charge timely filed with the EEOC. *See* <u>42 U.S.C. § 2000e-5(f)(1), (3)</u>. However, the parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are "'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination,'" regardless of the actual scope of the EEOC investigation. <u>Hicks v. ABT Assocs., Inc., 572 F.2d 960, 966 (3d Cir. 1978)</u> (quoting <u>Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976))</u>. Therefore, a court may assume jurisdiction over additional charges only if "the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation **[\*41]** arising therefrom." <u>Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)</u> (quoting <u>Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984))</u>. This standard must be applied in accord with the "sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the merits." <u>Revis, 814 F. Supp. at 1216</u> (quoting <u>Gooding v. Warner-Lambert Co., 744 F.2d 354, 358-59 (3d Cir. 1984))</u>.

Where the allegations in the complaint were sufficiently distinct from those presented in the EEOC charge and were not part of the EEOC investigation, courts have refused to entertain the expanded claims until administrative procedures have been exhausted. *See* <u>Sandom v. Travelers Mortgage Servs., Inc., 752 F. Supp. 1240, 1246-48 (D.N.J. 1990)</u>; <u>Zalewski v. M.A.R.S. Enters., Ltd., 561 F. Supp. 601, 604-05 (D. Del. 1982)</u>. Nonetheless, courts have heard claims not specifically mentioned in the prior EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaints. *See* <u>Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984)</u>; **[\*42]** <u>Ostapowicz, 541 F.2d at 398-99</u>.

Courts often have stated that "'the nature of the required showing' to establish a *prima facie* case of disparate treatment based on indirect evidence 'depends on the circumstances of the case.'" <u>Marzano v. Computer Science Corp.,, 91 F.3d 497, 503 (3d Cir. 1996)</u>(citing <u>Torre v. Casio, Inc., 42 F.3d 825, 830 (3d Cir. 1994)</u>(citation omitted)). *HN18*□Generally, to state a disparate treatment in employment claim under Title VII, a plaintiff must demonstrate that she was "singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion." <u>Equal Employment Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990)</u>. Plaintiff must first state a *prima facie* case of gender discrimination. *See* <u>McDonnell Douglas, 411 U.S. at 802.</u>; <u>Marzano, 91 F.3d at 503</u>. She can do so by showing by a preponderance of the evidence that: (1) she is a member of the protected class, (2) she suffered an adverse employment action, and (3) that similarly situated members of the opposite sex were treated more favorably. **[\*43]** *See* <u>McDonnell Douglas, 411 U.S. at 802</u>; <u>Stinson v. Delaware River Port Auth., 935 F. Supp. 531, 539 (D.N.J. 1996)</u>.

Plaintiff at bar fails to establish a *prima facie* case. Although plaintiff, a female, is a member of a protected class, she has failed to show that similarly situated males were treated more favorably and did not suffer adverse employment actions. Plaintiff generally alleges that male tellers were

not treated in the same disrespectful manner that female tellers were, but she fails to provide sufficient evidence for comparison of the treatment of similarly situated female and male employees.

Plaintiff argues that she received several verbal counselings and one written counseling, but the record reveals that both males and females received oral and written counselings. (D.I. 40 at A-113) Plaintiff argues that qualified females were passed up for promotions while less qualified males were promoted. (D.I. 1 at PP 37-40) As to this issue, the record reveals that both male and female tellers received promotions to head teller. Additionally, plaintiff alleges that her supervisors failed to oust abusive customers at female tellers' requests, **[*44]** but did so when male tellers so requested. (D.I. 1 at PP 93-94) There is no evidence supporting this allegation. In sum, aside from plaintiff's conclusory allegations, there is no evidence in the record that males were treated more favorably than females while employed by defendant. Therefore, plaintiff, has not met her burden of proof to establish a *prima facie* case for a Title VII disparate treatment claim.

Even assuming plaintiff has established a *prima facie* case, defendant has provided a legitimate, non-discriminatory reason for its actions, shifting the burden back to the plaintiff. *Burdine*, 450 U.S. at 254-56. Defendant has stated that management received complaints about plaintiff from other tellers, two of whom reduced their complaints to writing and, therefore, had reason to counsel plaintiff. (D.I. 40 at A-8,9) The record shows that plaintiff and other tellers violated some of the mutuel department's regulations by being discourteous to co-workers and, therefore, defendant had reason to counsel them. The burden then shifts back to plaintiff to show by a preponderance of the evidence that defendant's reasoning is pretextual. *Burdine*, 450 U.S. at 256. **[*45]** Plaintiff failed to address this claim in her answering brief and, therefore, has failed to meet her burden of showing defendant's proffered reason was merely pretext for discriminatory animus. *See id.*

## V. CONCLUSION

For the reasons stated above, the court concludes that there are no genuine issues of material fact relating to plaintiff's claims of discrimination under Title VII. Therefore, defendant's motion for summary judgment shall be granted. An appropriate order shall issue.

# EXHIBIT 4

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 32348277 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
Fantazzi v. Temple University Hosp., Inc.
E.D.Pa.,2002.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Anthony FANTAZZI and Gail Fantazzi
v.
TEMPLE UNIVERSITY HOSPITAL, INC. and
Lilla Cervino
**No. Civ.A. 00-CV-4175.**

Aug. 22, 2002.

Lynn Malmgren, Ralph David Samuel, Ralph D.
Samuel & Co., P.C., Philadelphia, PA, for Plaintiffs.
Kristine Grady Derewicz, Littler Mendelson, PC,
Philadelphia, PA, Marguerite S. Walsh, Littler
Mendelson Prof. Corp., Joe H. Tucker, Jr., Booth &
Tucker LLP, Kenneth A. Murphy, Miller, Alfano &
Raspanti PC, Wendy M. Staton, Yvonne Y. Barnes,
Booth & Tucker, LLP, Philadelphia, PA, for
Defendants.

*MEMORANDUM AND ORDER*

KAUFFMAN, J.
*\*1* When Plaintiffs Anthony Fantazzi and Gail
Fantazzi commenced this employment
discrimination action, they named Temple
University ("the University") and Lilla Cervino as
defendants. On June 13, 2001, with the approval of
the Court, the parties stipulated to the substitution
of Temple University Hospital, Inc. ("the Hospital"
) for the University. Now before the Court is
Plaintiffs' Motion to Vacate Order of June 13, 2001
Approving a Stipulation and to Designate Both
Temple University and Temple University Hospital,
Inc. as Named Defendants. For the following
reasons, the Court will deny the Motion.

*I. Background*

On January 25, 2001, Plaintiffs filed a First
Amended Complaint, naming the University and
Lilla Cervino as defendants.[FN1] The Amended
Complaint asserted twelve causes of action:
violation of 42 U.S.C. § 1983 (Count One);
discrimination, harassment, and retaliation in
violation of the Pennsylvania Human Relations Act (
"PHRA"), 43 Pa. Cons.Stat. § 951, *et seq.* (Counts
Two, Four, Seven, and Nine); discrimination,
harassment, and retaliation in violation of Title VII
of the Civil Rights Act of 1964 ("Title VII"), 42
U.S.C. § 2000e, *et seq.* (Counts Three, Five, and
Six); discrimination, harassment, and retaliation in
violation of the Age Discrimination in Employment
Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (Count
Eight); loss of consortium (Count Ten); intentional
infliction of emotional distress (Count Eleven); and
Negligent Supervision and Retention (Count
Twelve).

> FN1. Plaintiffs had filed their original
> Complaint, which also named Temple
> University and Lilla Cervino as
> defendants, on August 16, 2000.

On February 14, 2001, Defendants filed a
Motion to Dismiss Count Twelve as well as an
Answer to the First Amended Complaint. In their
Answer, Defendants stated that "the correct name of
the defendant is Temple University-Of the
Commonwealth System of Higher Education."
(Answer ¶ 3.) On April 2, 2001, however, counsel
for Defendants wrote a letter to counsel for
Plaintiffs:
Please be advised that in reviewing the
Complaint and our Answer to the Complaint, I
noted that you sued the wrong entity. Additionally,
my Answer to your Complaint further identifies the
wrong entity. The correct corporate Defendant that
employs Mr. Fantazzi is Temple University
Hospital, Inc. Please advise if you will allow me to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 32348277 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

amend our Answer to paragraphs three (3) and eight (8) of your Amended Complaint by Stipulation instead of seeking leave of Court so that we may correctly identify the appropriate Defendant in this matter.

(Mot.Ex. 3.)

By Order dated June 8, 2001, the Court granted Defendants' Motion to Dismiss Count Twelve of the First Amended Complaint.[FN2]On June 13, 2001, the Court approved the parties' Stipulation to Amend Caption of Complaint and References in Defendants' Answer to Reflect Proper Corporate Defendant, which substituted the Hospital for the University in the caption and Defendants' Answer.

> FN2. A Motion for Reconsideration of this Order was denied on November 1, 2001.

Extensive discovery concluded on March 15, 2002. Discovery included Plaintiffs' depositions of two employees of the University, Sandra Foehl and Richard Lutman, which were conducted between May 24, 2001 and June 15, 2001.

**\*2** On April 1, 2002, the parties filed cross-motions for summary judgment. On May 23, 2002, after oral argument, the Court allowed Defendants to file an Amended Answer, denied the pending motions as moot, and permitted limited additional discovery.[FN3]This additional discovery is scheduled to end on September 30, 2002, and the case will enter the Court's trial pool on December 6, 2002.

> FN3. In their Motion for Summary Judgment, Defendants asserted the affirmative defense set forth in *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). This affirmative defense was not raised in Defendants' original Answer, but the Court allowed Defendants to plead it in their Amended Answer. The Court also

permitted additional discovery limited to the *Ellerth-Faragher* defense.

On June 4, 2002, Plaintiffs filed this Motion to Vacate Order of June 13, 2001 Approving a Stipulation and to Designate Both Temple University and Temple University Hospital, Inc. as Named Defendants. In the Motion, Plaintiffs assert that "[t]he deposition testimony of Ms. Foehl and Mr. Lutman show that Temple University, not Temple University Hospital, Inc., assumes responsibility for and jurisdiction over matters of employment discrimination and labor relations for Temple University Hospital, Inc." (Mot.¶ 9.) The parties attempted to reach a new stipulation, but were unsuccessful, and Defendants filed a Response in Opposition to the Motion on July 26, 2002. Defendants contend that the University is not Anthony Fantazzi's employer, and as such is not subject to liability in this case. (Resp.¶ 12.) Plaintiffs filed a Reply on August 6, 2002, and Defendants filed a Sur-Reply on August 14, 2002.

## II. *Analysis*

"[V]alid stipulations entered into freely and fairly should not be lightly set aside."*Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.,* 222 F.3d 123, 129 n .7 (3d Cir.2000)."Allowing parties easily to set aside or modify stipulations would defeat this purpose, wasting judicial resources and undermining future confidence in such agreements."*Waldorf v. Shuta,* 142 F.3d 601, 616 (3d Cir.1998). Still, " '[i]n exceptional circumstances,' courts will free a party from a stipulation to prevent a manifest injustice."*Id.* at 617 (quoting *Kohn v. Am. Metal Climax, Inc.,* 458 F.2d 255, 307 (3d Cir.1972)).

In determining whether there will be manifest injustice unless a party is relieved from a stipulation, courts have focused on such factors as: (1) the effect of the stipulation on the party seeking to withdraw the stipulation; (2) the effect on the other parties to the litigation; (3) the occurrence of intervening events since the parties agreed to the stipulation; and (4) whether evidence contrary to the stipulation is substantial.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2002 WL 32348277 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Id.* at 617-18 (citations omitted).

Upon review of these factors, the Court concludes that manifest injustice would not result if Plaintiffs are not relieved from their Stipulation. If Plaintiffs are not allowed to withdraw the Stipulation, and if they prevail in this action, they will be able to enforce a judgment only against the Hospital, not the University. They have not alleged any reason why the Hospital could not provide them with complete relief.

Withdrawal of the Stipulation would, however, have a significant effect on the University, which would again become a party to an action from which it was removed over one year ago. Although Plaintiffs argue that "Temple University cannot claim prejudice because it had notice as the named defendant in the original complaint in August of 2000" (Mot.¶ 15), Defendants assert that if the Stipulation is withdrawn, "discovery will have to be opened so that [the University] will be able to properly defend itself in this matter" (Resp.¶ 15).

**\*3** With regard to intervening events that occurred since the parties agreed to the Stipulation, Defendants note that "the alleged knowledge of the ' appropriate' Defendant has been known to [P]laintiffs" since June 15, 2001, after the depositions of Foehl and Lutman. (Resp.¶ 12.) The only intervening event identified by Plaintiffs is Defendants' new assertion of the *Ellerth-Faragher* affirmative defense, "which specifically places at issue in this case the conduct of Temple University," in that Foehl conducted the investigation into Anthony Fantazzi's allegations of sexual harassment. (Mot.¶ 13.) Plaintiffs, however, have known about Foehl's involvement in the sexual harassment investigation at least since her deposition, long before Defendants raised their affirmative defense.

Finally, there is not substantial evidence contrary to the Stipulation. "Title VII authorizes a cause of action only against employers, employment agencies, labor organizations, and training programs. ..."*Fullman v. Philadelphia Int'l Airport,* 49 F.Supp.2d 434, 441 (E.D.Pa.1999). The same is true for the ADEA. *SeeZiegler v. Del. County Daily Times,* 128 F.Supp.2d 790, 794 n. 11 (E.D.Pa.2001). FN4 Plaintiffs argue that the University and the Hospital are "so interrelated and integrated in their activities, labor relations, and management" that they should be treated as a single employer. *See Marzano v. Computer Sci. Corp. Inc.,* 91 F.3d 497, 513, 514 (3d Cir.1996) (quoting *Ratcliffe v. Ins. Co. of N. Am.,* 482 F.Supp. 759, 764 (E.D.Pa.1980)).

> FN4. The PHRA does include provisions that impose liability on non-employers. *See* 43 Pa. Cons.Stat. §§ 955(d), (e); *see also Dici v. Pennsylvania,* 91 F.3d 542, 552-53 (3d Cir.1996); *Phillips v. Heydt,* 197 F.Supp.2d 207, 223 (E.D.Pa.2002). Plaintiffs, however, urge that the University is liable as Anthony Fantazzi's employer, not as a non-employer.

To determine whether an integrated enterprise exists, a court should consider these factors:
(1) Interrelation of operations, i.e. common offices, common record keeping, shared bank accounts and equipment.
(2) Common management, common directors and boards.
(3) Centralized control of labor relations.
(4) Common ownership and financial control.

*Kemether v. Pa. Interscholastic Athletic Ass'n,* 15 F.Supp.2d 740, 749 n. 5 (E.D.Pa.1998) (citing *Stair v. Lehigh Valley Carpenters Local Union No. 600,* Civ. A. No. 91-1507, 1993 U.S. Dist. LEXIS 8668, at \*65-\*66 (E.D.Pa. July 24, 1993), *aff'd,*43 F.3d 1463 (3d Cir.1994)).

The University and the Hospital are separate corporate entities with separate articles of incorporation and bylaws.FN5(Resp.Exs.A, B.) Plaintiffs, however, allege that (1) the University and the Hospital have an integrated telephone directory; (2) the Hospital is subject to the University's sexual harassment policy; (3) the Hospital's human resources department is part of the University's human resources department; (4) the University and the Hospital have the same labor relations staff; (5) Anthony Fantazzi's job is covered by a collective bargaining agreement with the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 32348277 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

University, not the Hospital; and (6) legal counsel for the University, not the Hospital, has coordinated this action with Defendants' outside counsel. (Reply at 7.)

> FN5. The Hospital's Articles of Incorporation provide that in the event of the Hospital's dissolution, its assets shall be distributed to the University. (Resp. Ex. A at 3.) At most, this establishes that the University is a parent corporation of the Hospital.

*4 Upon examination, however, the facts do not support a finding of an integrated enterprise. The Hospital is not subject to the University's sexual harassment policy; rather, the Hospital independently adopted the same policy as the University. (Koob Aff. ¶ 12.) Also, the Hospital's human resources department is separate from the University's human resources department. (Koob Aff. ¶ 13.) Furthermore, it is the Hospital's Chief Counsel, Beth C. Koob, who is "ultimately responsible for the handling of the instant litigation." (Koob Aff. ¶ 4.)

It is true that University and Hospital employees are listed in an integrated telephone directory. (Mot.Ex. 1.) Additionally, Defendants concede that labor relations for the University and Hospital "are coordinated and handled by the same persons, some of whom currently are Temple Hospital employees and some of whom are Temple University employees," and that "[i]n certain instances, Temple Hospital utilizes the services of Temple University's Office of Affirmative Action and Sandra Foehl to investigate formal complaints of sexual harassment."(Moore Aff. ¶¶ 16-17.)

The existence of an integrated telephone directory, however, does not establish a sufficient degree of "interrelation of operations," especially considering that the University and the Hospital have separate payroll, benefits, and human resources departments and separate financial records and budgets. (Koob Aff. ¶¶ 12-13; Moore Aff. ¶¶ 12-13, 16.) Indeed, only certain aspects of labor relations are centralized, and, as discussed

below, this centralization does not rise to the level required for an integrated enterprise. Finally, the fact that Foehl conducted an investigation on the Hospital's behalf does not give rise to an employment relationship between Anthony Fantazzi and the University: employers often retain outside individuals to conduct investigations into alleged discrimination. *See, e.g.,Steff v. Township of Salisbury,* Civ. A. No. 99-2931, 2000 U.S. Dist. LEXIS 1777, at *1 (E.D.Pa. Feb. 14, 2000), *aff'd,* 261 F.3d 493 (3d Cir.2001).

The University and the Hospital have separate boards and officers. (Koob Aff. ¶ 8; Moore Aff. ¶ ¶ 9, 11.) Defendants concede that "the Hospital may have Board members who are employed by the University" (Sur-Reply at 3), but even so, "the fact that two corporations share a manager is insufficient evidence of an integrated enterprise."*Martin v. Safeguard Scientifics, Inc.,* 17 F.Supp.2d 357, 368 (E.D.Pa.1998).[FN6]

> FN6. The Hospital's Bylaws provides that the University's President shall be an ex-officio member of the Hospital's Board. (Resp. Ex. A at 8.) This fact alone, however, does not make Anthony Fantazzi an employee of the University any more than the fact that there is also an ex-officio seat for the Mayor of Philadelphia (Resp. Ex. A. at 8) makes Anthony Fantazzi a city employee.

As noted above, there is some centralization of labor relations, presumably including the collective bargaining agreement. Despite this fact, "Temple University can neither discipline nor terminate a Temple Hospital employee for violation of Temple Hospital's policies or procedures."(Koob Aff. ¶ 19.) "To satisfy the 'centralized control of labor' prong of the 'integrated enterprises' test, 'a parent must control the day to day employment decisions of the subsidiary." ' *Martin,* 17 F.Supp.2d at 367 (quoting *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1363 (10th Cir.1993)). Because the University lacks authority to control the Hospital's day to day employment decisions, any centralized labor relations functions do not support a finding of an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 2002 WL 32348277 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

integrated enterprise.

**\*5** Finally, the University and Hospital do not have "common ownership and financial control." Rather, they are separate corporate entities with separate budgets. (Resp. Exs. A, B; Koob Aff. ¶ 7; Moore Aff. ¶¶ 11-14.) Indeed, "[i]f neither of the entities is a sham then the [common ownership and financial control] test is not met."*Kemether,* 15 F.Supp.2d at 749 n. 5 (quoting *EEOC v. Wooster Brush Co. Employees Relief Ass'n,* 727 F.2d 566, 572 (6th Cir.1984)).

Thus, there is not substantial evidence contrary to the Stipulation. Considering this along with the other *Waldorf* factors, the Court concludes that manifest injustice would not result from enforcement of the Stipulation. Accordingly, the Court will not vacate its Order approving the Stipulation.

Even were it not for the Stipulation, however-if Plaintiffs merely sought to amend the caption to add a party defendant-the Court would not grant Plaintiffs' request. "[C]ourts may deny leave to amend on grounds such as undue delay, dilatory motive, bad faith, prejudice, and futility."*Breyer v. Meissner,* 214 F.3d 416, 431 (3d Cir.2000) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997)).[FN7]

> FN7. In addition to arguing that an amendment would be futile and unduly delayed, Defendants claim that Plaintiffs' Motion was made in bad faith. (Mem. Opp. Mot. at 2.) Because Defendants offer no evidence of bad faith apart from their conclusory allegation, the Court will disregard this argument. *But see* Fed.R.Civ.P. 11(b) ("By presenting to the court ... a pleading, written motion, or other paper, an attorney ... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, ... (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are

likely to have evidentiary support after a reasonable opportunity for further investigation or discovery....").

"Leave to amend may be denied ... if amendment would be futile."*Alvin v. Suzuki,* 227 F.3d 107, 121 (3d Cir.2000). As discussed above, because Plaintiffs cannot establish that the University and the Hospital should be treated as an integrated employer, amendment of the caption would ultimately prove futile.

Additionally, Plaintiffs' delay in moving for an amendment weighs against allowing a change. "The mere passage of time does not require that a motion to amend a complaint be denied on grounds of delay. In fact, delay alone is an insufficient ground to deny leave to amend."*Cureton v. Nat'l Collegiate Athletic Ass'n,* 252 F.3d 267, 273 (3d Cir.2001) (citations omitted)."However, 'at some point, the delay will become undue, placing an unwarranted burden on the court, or will become prejudicial, placing an unfair burden on the opposing party."*Id.* (quoting *Adams v. Gould Inc.,* 739 F.2d 858, 868 (3d Cir.1984) (internal quotation marks omitted))." Delay may become undue when a movant has had previous opportunities to amend a complaint."*Id.*

As Defendants observe, Plaintiffs could have requested a change to the caption as early as June 2001. (Resp.¶ 12.) Yet, Plaintiffs waited until nearly one year later-until after the close of discovery and after summary judgment motions were filed-to file their Motion. They have provided no explanation for their delay other than their accusation that they were misled by counsel for Defendants. (Reply at 2.) Even if Plaintiffs were misled-and the above discussion shows that they were not-they realized their mistake, at the very latest, two days after the Stipulation was approved. Thus, any imagined deception on the part of Defendants' counsel does not excuse Plaintiffs' delay.

### III. *Conclusion*

**\*6** For the foregoing reasons, the Court will

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 32348277 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**


deny Plaintiffs' Motion to Vacate Order of June 13, 2001 Approving a Stipulation and to Designate Both Temple University and Temple University Hospital, Inc. as Named Defendants. An appropriate Order follows.

E.D.Pa.,2002.
Fantazzi v. Temple University Hosp., Inc.
Not Reported in F.Supp.2d, 2002 WL 32348277 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Not Reported in F.Supp.2d                                                                              Page 1

Not Reported in F.Supp.2d, 2001 WL 873229 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Johnson v. Diamond State Port Corp.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Kerry W. JOHNSON, Plaintiff,
v.
DIAMOND STATE PORT CORPORATION,
Defendant.
**No. CIV. A. 99-153-GMS.**

Aug. 2, 2001.

MEMORANDUM AND ORDER

SLEET, District J.
**\*1** On March 12, 1999, Kerry W. Johnson ("Johnson") filed a complaint with the court pursuant to Title VII of the Civil Rights Act of 1964. In his complaint, Johnson alleged that Diamond State Port Corporation ("DSPC") discriminated against him on the basis of his race. On April 23, 2001, DSPC moved for summary judgment. Because Johnson has failed to establish a prima facie case of discrimination under Title VII, the court will grant DSPC's motion for summary judgment.

I. Standard of Review

"Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact that can be resolved at trial and that the moving party is entitled to judgment as a matter of law."*House v. New Castle County,* 824 F.Supp. 477, 481 (D.Del.1993) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986))."In this inquiry, [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

*Id.* (internal quotations omitted)."When considering a motion for summary judgment, the court must view all facts and inferences in the light most favorable to the party opposing the motion."*Id.*

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to prove that there is more than "some metaphysicaldoubt as to the material facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Jacobs v. Arvonio,* No. CIV. A. 91-2473, 1993 WL 285854, at \*2 (D.N.J. July 27, 1993). Summary judgment shall be granted if in opposition, the non-moving party rests solely "upon mere allegations, general denials, or ... vague statements."*Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.1991); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) ("unsupported allegations in a [non-moving party's] memorandum and pleadings are insufficient to repel summary judgment").

II. Background

In August of 1972, Kerry Johnson ("Johnson"), who is African-American, began working as a crane operator at the Port of Wilmington ("the Port"). During that time, the Port was owned and operated by the City of Wilmington. In August of 1995, the Port was sold to the DSPC.

On July 31, 1995, Johnson was injured in an automobile accident unrelated to his employment at DSPC. Johnson's physician, Dr. Moore, determined that Johnson was unable to work due to the injuries he sustained in the accident.[FN1]On February 8, 1996, Johnson's physician stated that Johnson could return to work, but that should be restricted to light duty work. In working light duty, Johnson was to be restricted from heavy lifting, pulling, or pushing. DSPC advised Johnson that no light duty work was available. Therefore, Johnson remained out of work

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 873229 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

until August of 1996.

> FN1. On November 6, 1995, Dr. Moore did permit Johnson to return to full duty work. A few weeks later, however, Dr. Moore again concluded that Johnson was unable to work. D.I. 22, Exhibit A. It is not clear from the record how long Johnson actually worked in November of 1995.

On August 19, 1996, after Johnson sufficiently recovered, Dr. Moore cleared Johnson's return to work without restrictions. As a result, Johnson resumed work as a full-time crane operator.

*2 After his return to work, Johnson alleges that he witnessed a pattern of reassignments to light duty for Caucasian DSPC's employees who had physical injuries or physician-prescribed restrictions. Specifically, Johnson noticed that on April 14, 1997, a white DSPC employee, Ken Swann ("Swann"), was given a light duty work assignment after he injured his foot. DSPC does not dispute this. It explains, however, that this situation was unique because DSPC needed someone with mechanic's skills to help transfer the mechanic's storeroom to a computerized inventory system. DSPC further explained that Swann possessed the requisite skills and was available to fill this one-time position. Once the transfer was completed, Swann returned to his normal position. In October of 1997, Swann was again restricted to light duty, however, this time he was laid off because of DSPC's lack of light duty work.

Johnson also alleges [FN2] that he witnessed several other Caucasian employees receive light duty work. Specifically, he alleges that 1) as a result of a back injury, Andrew Markow, a crane operator like Johnson, was allowed to work on cranes with restrictions on heavy lifting, pulling, or pushing from May 19, 1997 to May 23, 1997; 2) Donald Zimmerman was given light duty as a result of a back injury; 3) Arthur Walls was assigned to his regular position, but was exempted from lifting as a result of an arm injury; 4) Joseph Cathcart, another crane operator, was assigned to light maintenance as a result of a neck injury; 5) Charles Hill, a forklift

operator, was reassigned to a floating position as a result of a hand injury from a saw; 6) James Peltz was reassigned to an office position from the warehouse as a result of a broken foot; 7) John Reese was allowed to work as a port engineer, despite having to wear a surgical shoe as a result of foot surgery; and 8) Malcolm Cutler worked full time, despite having a pin in his thumb.[FN3]

> FN2. All of the information concerning Johnson's allegations of preferential treatment of white employees comes from his own affidavit, which he submitted in support of his answering brief on the motion.

> FN3. The court notes that, according to Johnson's allegations, it appears that Reese and Cutler were neither assigned light duty, nor permitted to perform their regular duties with restriction, but rather, allowed to work with a medical condition.

In response to the Johnson's charges of discrimination, the DSPC claims that Johnson's allegations are inaccurate. In affidavits submitted in support of their motion, five of the seven white employees identified by Johnson as receiving preferential treatment stated that they had never received light duty work. DSPC's director of Human Resources, Philip J. Immediato, stated in his affidavit that two of the remaining seven had never received light duty work. The sole remaining employee stated that he had received light duty work while at the Port, however, it was in 1985 when the Port was owned and operated by the City of Wilmington and not by DSPC.

As a result of being denied light duty, but allegedly witnessing his Caucasian co-workers receive such assignments, Johnson filed a charge of discrimination with the EEOC on November 18, 1997. In his EEOC complaint, Johnson alleged that DSPC did not assign him light duty because of his race. Specifically, Johnson alleged that he was treated differently than Ken Swann and Andrew Markow who were white. On February 24, 1998, DSPC responded to Johnson's allegations. In their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 873229 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

response, DSPC denied Johnson's claims as inaccurate. On December 11, 1998, the EEOC closed the case without a finding of discrimination and issued a right to sue letter.

III. Discussion

*3 In their motion for summary judgment, the DSPC contends that it is entitled to judgment as a matter of law because Johnson cannot establish a prima facie case of discrimination.

In order to establish a *prima facie* case of discrimination, Johnson must prove:
    (1) that he belongs to a protected class;
    (2) that he was qualified for the job benefit;
    (3) that he was denied the benefit;
    (4) and that similarly situated employees outside the protected class received the benefit.

*McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973); *Pivirotto v. Innovation Systems, Inc.,* 191 F.3d 344, 351 (3d Cir.1999); *Ezold v. Wolf, Block, Schorr and Solis-Cohen,* 983 F.2d 509, 522 (3d Cir.1992); *Turgeon v. Marriott Hotel Services, Inc.,* No. CIV. A. 99-4401, 2000 WL 1887532, at *5 (E.D.Pa. Dec. 27, 2000).

In this case, the parties' agree that Johnson has satisfied the first three prongs; Johnson is a member of a protected class, was qualified for light duty work,[FN4] and he was denied light duty. The parties' disagree, however, as to whether Johnson's claim that white employees in comparable situations were given "light duty," and that he was denied that opportunity because of his race. In particular, DSPC claims that none of the white employees, with the exception of Swann, named by Johnson actually received light duty assignments. As to Swann, DSPC claims that while it is true that Swann was given a light duty assignment, Johnson was not similarly situated to him. The court will address both of these contentions in turn.

    FN4. Because of Johnson's medical restriction to only preform light duty work,

Johnson would have qualified for the benefit.

Despite Johnson's allegations to the contrary, DSPC has established, with the exception of Swann, through testimonial evidence that each individual alleged to have received light duty assignments, in fact, did not. Specifically, six of the eight employees identified by Johnson as receiving light duty testified that they had never received light duty work while DSPC's Director of Human Resources testified that the remaining two were never assigned light duty. There is nothing in the record to dispute this evidence.

Although Johnson has submitted an affidavit claiming that these employees were reassigned to light duty, this affidavit does not create a genuine issue of material fact because it rests upon mere allegations and not specific facts.[FN5] In order to withstand a motion for summary judgment, Johnson must produce "specific tangible evidence showing a disparity in the treatment of similarly situated employees."*Lowry v. Powerscreen USB, Inc.,* 72 F.Supp.2d 1061, 1071 (E.D.Mo.1999) (internal quotations omitted) (holding that plaintiff's "sheer conjecture" and "guessing" in her deposition could not establish that she was treated differently than any similarly situated employee who was not a member of her protected class); *Matthews v. City of Gulfport,* 72 F.Supp.2d 1328, 1337 (M.D.Fla.1999) (holding that plaintiff who "[did] not provide any evidence to support her contention, other than her own opinion that it was on the basis of her gender," could not establish prima facie case). In other words, Johnson "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or such vague statements."*Quiroga v. Hasbro, Inc.,* 934 F.2d at 500;*see also*Fed.R.Civ.P. 56(e). Thus, in light Johnson's failure to raise a genuine issue of material fact, the court concludes that he cannot establish a prima facie case of discrimination.

    FN5. The court notes that there is nothing in Johnson's affidavit which establishes that he is competent to testify with respect to other employees' medical histories and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 873229 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

restrictions imposed by their respective doctors.

**\*4** The court finds also that Johnson has failed to establish a prima facie case as to Ken Swann because Johnson was not similarly situated to Swann. Johnson has not disputed DSPC's claim that Swann had specialized knowledge that made it possible for him to work light duty. *See Ross v. GTE Directories Corp.,* 73 F.Supp.2d 1342, 1350 (M.D.Fla.1999) (holding that African-American plaintiff claiming discrimination where Caucasian employee allegedly received light duty work, but he was denied such assignments because of race, failed to establish a prima facie case where it was shown that he was not similarly situated with Caucasian employee). In this case, undisputed evidence in the record demonstrates that the position offered to Swann was a unique, one-time position that resulted from DSPC transferring the mechanic's storeroom to a computer inventory system. Moreover, DSPC has shown that Swann is not similarly situated to Johnson in that Swann had intimate knowledge of the mechanic's storeroom from being a mechanic which Johnson, a crane operator, lacked. Therefore, the court concludes, that Johnson's prima facie case cannot succeed.

## IV. Conclusion

After reviewing the record and the submissions of the parties, the court concludes that Johnson has failed to demonstrate that similarly situated Caucasian employees received a benefit he was denied because of his race. As a result, he has failed to establish a prima facie case of discrimination. Therefore, the court will grant DSPC's motion for summary judgment.

For these reasons, IT IS HEREBY ORDERED that:
1. The Defendant DSPC's Motion for Summary Judgment (D.I.20) is GRANTED;
2. Summary Judgment be and hereby is ENTERED in favor of DEFENDANT and against plaintiff on all claims in the complaint.

D.Del.,2001.
Johnson v. Diamond State Port Corp.
Not Reported in F.Supp.2d, 2001 WL 873229 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Koschoff v. Runyon
E.D.Pa.,1999.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Susan J. KOSCHOFF, Plaintiff,
v.
William J. HENDERSON, Postmaster General U.S.
Postal Service, Defendant.
**No. Civ.A. 98-2736.**

Oct. 7, 1999.

Joan E. London, Rhoda, Stoudt and Bradley,
Reading, PA, for Susan J. Koschoff, Plaintiff.
James G. Sheehan, U.S. Attorney's Office, Phila,
PA, for Marvin Runyon, Postmaster General,
United States Postal Service, Defendant.
Benjamin R. Barnett, U.S. Attorney's Office, Phila,
PA, for William J. Henderson, Postmaster General,
Postmaster General, Respondent.

*MEMORANDUM AND ORDER*

VAN ANTWERPEN, J.

I. INTRODUCTION

*1 Plaintiff, Susan J. Koschoff, has brought this
action against Defendant, William J. Henderson,
Postmaster General for the United States Postal
Service. She claims to have suffered sexual
discrimination, retaliation, and a hostile work
environment while employed at the Postal Service,
in violation of the Civil Rights Act of 1964. 42
U.S.C. § 2000e*et seq.* Plaintiff filed her Complaint
on May 29, 1998, and discovery was complete on
June 18, 1999. On August 2, 1999, both sides
moved for summary judgment, and those motions
are now before us. After reviewing the briefs, and

attached exhibits, we grant partial summary
judgment for Defendant, but deny summary
judgment for Plaintiff.

II. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil
Procedure provides that a motion for summary
judgment shall be granted where all of the evidence
available shows "that there is no genuine issue of
material fact and the moving party is entitled to
judgment as a matter of law."A genuine issue of
fact is present, precluding summary judgment, "
when a reasonable trier of fact, viewing all the
evidence, could rationally find in favor of the
non-moving party in light of the burden of proof
placed on the non-mover."*U.S. v. Premises Known
as RR No.1 Box 224, Dalton Tp. and North
Abington Tp., Lackawanna County, Pa.,* 14 F.3d
864, 870 (3d Cir.1994) (citations omitted)."Only
disputes over facts that might affect the outcome of
the suit under the governing law will properly
preclude the entry of summary judgment."*Anderson
v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct.
2505, 91 L.Ed.2d 202 (1986); *seealsoKowalski v. L
& F Products,* 82 F.3d 1283, 1288 (3d Cir.1996).

Of course, we must view all inferences in a
light most favorable to the non-moving party, and
facts asserted by the non-moving party, if supported
by sufficient affidavits and other evidentiary matter,
must be regarded as true.*United States v. Diebold,
Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d
176 (1962); *Aman v. Cort Furniture Rental,* 85
F.3d 1074, 1080 (3d Cir.1996). However, the
non-moving plaintiff's burden is more than
insignificant. "The mere existence of a scintilla of
evidence in support of the plaintiff's position will be
insufficient; there must be evidence on which the
jury could reasonably find for the plaintiff."
*Anderson,* 477 U.S. at 252;*Coolspring Stone*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993).

Therefore, summary judgment must be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**\*2** Where, as here, cross-motions for summary judgment have been presented, the court must consider each party's motion separately. Each side bears the burden of establishing a lack of genuine issues of material fact. The Third Circuit has repeatedly said that:

Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

*Rains v. Cascade Industries, Inc.,* 402 F.2d 241, 245 (3d Cir.1968).*See also Coolspring Stone Supply, Inc.,* 10 F.3d at 150;*Bencivenga v. Western Pennsylvania Teamsters and Employers Pension Fund,* 763 F.2d 574, 576 (3d Cir.1985); 10A C. Wright and A. Miller and M. Kane Federal Practice and Procedure, § 2720 (1983) ("the fact that both parties simultaneously are arguing that there is no genuine issue of fact does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit").

### III. FACTS

### A. *Reading General Mail Facility*

On March 16, 1985, The U.S. Post Office in Reading, Pennsylvania, hired Plaintiff as a part-time carrier. (Plaint.Mem.Exh. 2) During her probationary period, she received positive reviews from her supervisor, John Forlini.(*Id.* at Exh. 4) In December 1985, she applied for a Postmaster position in both Colebrook and Pequea, Pennsylvania, and again received a positive recommendation from Forlini, with a sole reservation about her experience "in the financial aspects of the Postal Service."(*Id.* at Exh. 5) On April 26, 1986, Plaintiff was made a full-time carrier, and was assigned to the Reading General Mail Facility. (*Id.* at Exh. 6)

In May 1986, Plaintiff submitted [FN1] three " Applications for Promotion or Assignment" for Postmaster positions in Trevorton, Mary D, and Locust Gap, Pennsylvania. (Koschoff Depo. Exh. 162-64) However, Plaintiff's supervisors, Jay Forlini, and Jeremy Brennan, did not recommend her for the positions, citing unsatisfactory work, and lack of "window training," for their reasons.(*Id.*) Plaintiff claims that she never saw her supervisors's recommendations, and also claims her supervisors told her that a "woman would not be promoted" to those positions. (Koschoff Depo. p. 453) She claims further that her supervisors denied her requests for training aimed at advancement (*Id.* at p. 454), even though Brennan wrote on her recommendation that she should be given the opportunity for such training. (*Id.* at Exh. 162-64) Finally, Plaintiff alleges that her supervisors harassed her; but she forgets how. (*Id.* at p. 468)

FN1. It is unclear whether Plaintiff ever actually submitted these applications. Plaintiff never signed the applications, and does not remember actually submitting them. (Koschoff Depo. pp. 449-464 and attached exhibits therein) However, in a letter to Congressman Gus Yatron dated October 20, 1986, she wrote that she had submitted an application for Postmaster on March 3, 1986. (Koschoff Depo. Exh. 165)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

Because her supervisors allegedly harassed, and did not recommend her, Plaintiff filed a pre-complaint with the Equal Employment Opportunity Commission ("EEOC"). (Koschoff Depo. p. 466; Exh. 165) Plaintiff says she eventually dropped the complaint because her supervisor, Bill Sheehan, and EEOC counselors, told her it would be "beneficial" to her job to do so, and because her supervisors eventually stopped harassing her. (*Id.* at p. 468)

### B. *West Lawn Post Office*

*\*3 On March 17, 1987, the Postal Service transferred Plaintiff to West Lawn, Pennsylvania. Plaintiff claims that from approximately 1989 through 1992, her co-worker, Mr. Terry Davis, continually harassed her. According to Plaintiff, Davis called her names like "bitch," "lesbian bitch," "asshole," and "maggot," during work hours. (Koschoff Depo. p. 473) Plaintiff also claims that Davis would bump into her shoulder. (*Id.* at p. 475) Apparently, management was aware of Davis's behavior because supervisors stood within earshot of his comments, and because Plaintiff complained to them, and to her shop steward. (*Id.* at pp. 473-74)

On January 14, 1991, Plaintiff wrote to the Reading Postmaster complaining about Davis's behavior, and demanding that disciplinary action be taken. (Koschoff Depo. Exh. 166) Furthermore, Plaintiff filed an EEO pre-complaint, but never filed a formal one. (*Id.* at p. 480) Finally, Plaintiff even filed a state court action against Davis, which the judge apparently dismissed as groundless. (*Id.* at 479-80) Ultimately, Davis was disciplined with a letter of warning. (*Id.* at p. 477)

### C. *Reading Downtown Station*

In late 1992, the Postal Service transferred Plaintiff to the Reading, Pennsylvania, Downtown Station Postal Facility ("Downtown Station"). As the voluminous record reflects, much allegedly transpired during that time period. Plaintiff filed

numerous complaints (some dismissed) against her employers, and was disciplined with letters of warning and suspension (some withdrawn in the course of settlement). Plaintiff also filed more than thirty union grievances during this time. (*See* Def. Exh. E and F) Most of the discriminatory acts that Plaintiff alleges, took place between June 28, 1995 and November 4, 1996, are material to this case, hotly disputed between the parties, and comprise the bulk of Plaintiff's claims.[FN2]

FN2. In her brief, Plaintiff claims she was discriminated against by one of her supervisors, Mark Adams, as far back as 1992. However, Plaintiff testified in her deposition that she has three claims -sex discrimination, retaliation, and harassment- and that these claims arise out of events which transpired beginning in June 1995. (Koschoff Depo. pp. 13-15; 86; 133) We credit Plaintiff's deposition testimony and consider irrelevant any newly alleged discrimination dating before June 1995, at the Downtown Station. *See* note 13 *infra.*

1. Management's Treatment of Plaintiff

We will not attempt here to list each instance of conduct Plaintiff alleges in support of her claim, because they are just too many. Briefly, however, Plaintiff alleges, among other things, that she was not permitted to take bathroom breaks while making deliveries, and was disciplined for using the bathroom without seeking permission, even though male employees were not disciplined for doing so. Plaintiff alleges that her supervisor, Judith Pelka, followed her into the bathroom, and made demands to meet alone with Plaintiff, even though Plaintiff cited health and safety reasons for not wanting to do so. (Koschoff Depo. Exh 25) Plaintiff claims Pelka also complained that Plaintiff took too long in the bathroom, and took too many bathroom breaks, and that told Plaintiff that she (Pelka) was going to be watching her. Plaintiff alleges that she was not allowed to glance up or talk while she was working at her mail case. (Koschoff Depo. p. 110) Pelka allegedly made belittling comments to Plaintiff,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

such as "you're stupid," "you don't know what you're doing," "what's your problem," "you're ill," " you're taking too long," and made gestures to Plaintiff, such as pointing a finger to her head and making a circle, suggesting that Plaintiff was "crazy. " Furthermore, Pelka allegedly waved her fingers in Plaintiff's face while talking to her. (*Id.* at pp. 95; 109; 122; 124) Plaintiff also claims that Jeffery Schoch, Plaintiff's supervisor, harassed her by smirking and laughing at her. (Id. at pp. 143-44).

**\*4** Plaintiff's co-workers also testified about Plaintiff's treatment at the Downtown Station. George Cook, the union shop steward, testified that "there was a campaign against [Plaintiff] by [her] managers," and they were doing "everything possible to make her life unbearable ..." (Cook Depo. pp. 30-34) Cook cited instances in which Plaintiff was denied permission to use the bathroom, FN3 and said her managers discussed Plaintiff's bathroom habits in front of other employees. (*Id.*) Cook also testified that Plaintiff's manager, Kevin Moyer, referred to Plaintiff in a vulgar manner, and on various occasions, as "muff diver," "dyke," and " the little dyke," (*Id.* at p. 54), and that he (Moyer) would "teach her a lesson" or "get her" for being a " feminist militant, lesbian" (Id. at pp. 92-93) Finally, Cook testified that this conduct continued consistently, on a daily basis, for a year (in 1995) (" It was like we were consumed with this.") (*Id.*)

> FN3. Cook admits there was a rule whereby all employees had to ask for permission to use the facilities, but claims that it was only enforced against Plaintiff.

Kim McKnight-Jimenez, a clerk at the Downtown Station, testified that female employees, including Plaintiff, Kathy Veranno, and herself, were treated in a harsher manner than male employees by management, with more criticism about quality of work; and that only female employees were ever disciplined, or threatened with discipline, over using the bathroom without permission. (McKnight-Jimenez Depo. pp. 21-33) Plaintiff's co-worker, Bonnie Sterling, observed changes in Plaintiff's personality during this time period (1995-1996), as well as Plaintiff's nearly

daily crying spells after being allegedly harassed by her supervisors. (Sterling Depo. pp. 15-17)

2. Plaintiff's Employment Record and Privileges

Plaintiff has testified that she received all of her scheduled pay increases, that she was never placed on limited duty assignments, that no one in the Postal Service interfered with her right to take sick leave, and that her benefits were not reduced in any manner. (Koschoff Depo. pp. 169, 398, 428, 438-42) However, Plaintiff has other claims.

In late January 1996, Plaintiff requested four weeks of consecutive vacation time for that August. (Koschoff Depo. Exh. 37) The Postal Service's leave program only permits letter carriers to select two weeks of continuous annual leave, and only a single week during the so-called summer "choice time period," and for this reason her request was denied (*Id.*)She, however, did get to travel abroad, on vacation, from April 14, 1996, until May 5, 1995. (Koschoff Depo. p. 273) Nevertheless, Plaintiff filed a formal EEO discrimination claim dated June 9, 1997, regarding her denial of the four consecutive weeks. (Koschoff Depo. Exh. 38)

In 1995, Plaintiff received a letter of warning (dated July 11) and a letter of suspension (dated September 26), both for failure to follow instructions and/or improper conduct. (Koschoff Depo. Exh. 13) However, pursuant to an October 24, 1995, settlement conference, Postal Service management withdrew those letters with the promise that the letters would "[n]ever be used against" Plaintiff. (*Id.* at Exh. 14) On October 21, 1996, Plaintiff was issued another letter of warning for failure to follow instructions and/or improper conduct. (Id. at Exh. 15) However, none of the aforementioned letters were an active part of Plaintiff's personnel file as of April 23, 1999. (Koschoff Depo. Exh 11)

**\*5** Between 1995 and 1996, Plaintiff filed approximately thirty-seven grievances against the Postal Service with the National Association of Letter Carriers. (*See* Plaint. Mem. Exh. E and H)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff's grievances generally concerned the alleged denial of union representation, denial of time to file grievances, pre-disciplinary discussions between Plaintiff and her supervisors, the tone of voice used by various supervisors, being required to notify management when she left her work case to use the bathroom, and being required to meet alone with Judith Pelka, her supervisor. (*See* Koschoff Depo. pp. 326-353 and exhibits attached thereto; Plaint. Exh. E and H) Plaintiff's own time records and written notes reflect that she was given more than over ten hours off from work time, between January and June 1996 to file, or assist in the filing of, one or two page grievance forms. (Koschoff Depo. p. 362; *Id.* at Exh. 103)

Plaintiff alleges that, as a result of work-related stress, she began suffering from the following symptoms, which persist to date: migraine headaches , panic attacks, memory loss, difficulty in concentration, disturbed sleep patterns, severe digestive ailments, including nausea and diarrhea, nightmare about work, anxiety, and depression. (Plaint.Mem.Exh. 17) Therefore, Plaintiff stopped reporting to work on November 4, 1996.

Plaintiff alleges discriminatory conduct against her even after she stopped reporting to work. First, Plaintiff alleges that when she would go to the Post Office to pick up her pay check (while receiving pay for accumulated vacation and sick time), she was forced to wait between twenty and thirty minutes before she received it. (Koschoff Depo. p. 79-80) While she was waiting, she was required to complete a notification of absence form without union representation. Next, Plaintiff alleges that the Postal Service ignored her request to forward correspondence regarding personnel matters to her lawyer. Third, Plaintiff alleges she was required to undergo disability retirement counseling or face termination, even though such counseling is generally voluntary. (Plaint.Mem. p. 17)

D. *Plaintiff's Discharge for Disability*

Plaintiff last reported for work on November 4, 1996. (Koschoff Depo. Exh. 4) On July 28, 1997,

Postmaster Sandra Williams wrote Plaintiff to advise her that if she could not return to work within a reasonable time (generally, within a year), that the Postal Service would have to replace her. ( *Id.*) ("[the Postal Service] must take actions to permanently replace the employee so that operations can proceed in a cost effective manner and we can meet service commitments to our customers.") Williams gave Plaintiff the option of returning to work, applying for disability retirement, optional retirement, or retirement with a deferred annuity, or resigning. (*Id.*) In August 1997, Plaintiff, and her lawyer, met with Edward Allison, a Postal Service Counselor, to discuss disability retirement, and Allison provided Plaintiff with the necessary forms for her application. (Koschoff Depo. pp. 193-94)

   *6 On November 14, 1997, Postmaster Williams again wrote Plaintiff, acknowledging Plaintiff's submission of medical documentation revealing that "she suffers from a plethora of ailments that prevent her from returning to work," and that her prognosis is "poor." (Koschoff Depo. Exh. 6) Furthermore, at that point Plaintiff still had not exercised any retirement options, or retired from the Postal Service, as per Williams's July 1997 letter. (*Id.*) Accordingly, Williams gave Plaintiff ten days to submit a disability application or resign. (*Id.*) Although Plaintiff ignored Williams's order, she was not removed from the Postal Service. (Koschoff Depo. pp. 197-98)

   Plaintiff finally applied for disability retirement in December 1997. (Koschoff Depo. pp. 188-89) However, on February 25, 1999, Donna Loos,[FN4] Manager of the Downtown Station, informed Plaintiff that the Office of Personnel Management had denied her application for disability retirement. (Koschoff Depo. Exh. 8) Therefore, Loos presented Plaintiff with four options: return to full duty, apply for optional retirement, apply for retirement with a deferred annuity, or resign. (*Id.*) Plaintiff had until March 10, 1999, to elect an option (*Id.*), however she does not remember responding to Loos's letter (Koschoff Depo. p. 204).

   FN4. Plaintiff never met, nor worked for,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

Loos. (Koschoff.Depo. p. 203)

Finally, on March 17, 1999, Michael Melnyk, FN5 Reading Postmaster, sent Plaintiff a Notice of Proposed Separation for Disability, based on Plaintiff's inability to perform her duties.FN6 (Koschoff Depo. Exh. 9) This decision was confirmed on April 23, 1999, by Michael Benson, District Manager of the Lancaster District of the Postal Service. (*Id.* at Exh. 11) In reaching the decision to separate Plaintiff from service based on disability, Benson considered "[t]he documentation from [Plaintiff's] medical doctor [that] he does not expect [she] will ever be able to return to work," as well as Plaintiff's "past record which indicates ... [no] prior adverse actions as a live element of record," and that Plaintiff had not worked in over two years.(*Id.*) Separation was to become effective on April 30, 1999, but Plaintiff requested her union representative, George Cook, to file a grievance on her behalf. (Koschoff Depo. p. 215) It appears that the grievance is still pending. (*Id.* at p. 216)

FN5. Plaintiff never met, nor worked for, Melnyk. (Koschoff.Depo. p. 205)

FN6. The Notice cited Section 365.342 of the Postal Service's Employment and Labor Relations Manual, providing that: " [e]mployees may be separated for disability if they can no longer perform the duties of the position."(Koschoff Depo. Exh. 9)

### IV. DISCUSSION

A. *Pre-Downtown Station Claims*

For the first time in this action, in her Motion for Summary Judgment, Plaintiff claims she suffered sexual discrimination and harassment at the Reading General Mail Facility in 1986. (Plaint.Mem. p. 4) Likewise, for the first time, Plaintiff also alleges in her Motion that her

co-worker at the West Lawn Post Office harassed her from 1989 to 1992. (*Id.* at 5) (We will hereinafter refer to these two claims as Plaintiff's " pre-Downtown Station" claims.) In an effort to tie these claims to those alleged in her Complaint, which arise out of events that had occurred from June 1995 onward, Plaintiff characterizes these early claims as the "first wave of what would prove to be a decade-long campaign by Postal Service management against" her. (*Id.* at p. 4) As discussed below, we dismiss these claims because Plaintiff failed to exhaust her administrative remedies in a timely fashion.FN7

FN7. We may also have reason to dismiss these claims based on Plaintiff's own deposition testimony. In her deposition, she affirmatively testified that the alleged discrimination began in 1995. (Koschoff Depo. pp. 13-15) Bringing up these claims now, seems little more than an after-thought, tangential to the more immediate issues presented in this case.

1. Exhaustion Requirements

*7 It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief. *Robinson v. Dalton,* 107 F.3d 1018, 1020 (3d Cir.1997) (*citingMcKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Questions of whether a plaintiff has timely exhausted the administrative remedies in Title VII actions "are in the nature of statutes of limitation. They do not affect the district court's subject matter jurisdiction."*Robinson,* 107 F.3d at 1021 (*quoting Hornsby v. United States Postal Service,* 787 F.2d 87, 89 (3d Cir.1986).

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, establishes the exclusive remedy for federal employees who allege discrimination in the workplace. Under EEOC Regulations, an aggrieved federal employee is required to initiate contact with an agency counselor, for pre-compliant counseling, within

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 7

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

forty-five days of the alleged discriminatory action. 29 C.F.R. § 1614.105(a).[FN8] If a formal EEO complaint is going to be filed, it must be filed with fifteen days of the complainant's final interview with the EEO counselor. 29 C.F.R. § 1614.106(b). Once the agency issues a final decision, an employee has ninety days to file suit in federal court; if a final decision is not issued, the employee then has one-hundred-and-eighty days from filing her complaint to do so. 29 C.F.R. § 1614.408. *See Crumpton v. Runyon*, Civ. Action No. 97-3814, 1998 WL 125547*2 (E. D.Pa. March 19, 1998) Thus, exhaustion requires the filing of a formal EEO complaint within the required time. *Robinson*, 107 F.3d at 1021.

> FN8. Although the precise wording of the Regulations has changed between 1986, when the alleged incidents occurred, and the present, the substance of the Regulations remains the same. Furthermore, since Plaintiff never bothered to file a formal complaint, we need not deal with the issue of whether or not the Regulations concerning timing apply retroactively. Furthermore, even if they did, it would not affect our analysis.

The filing of a pre-complaint, however, "does not constitute the sort of administrative exhaustion contemplated by Congress as a precondition to the judicial resolution of a federal employee's Title VII claim."*Algea v. Schweiker*, 529 F.Supp. 163, 166 (D.Md.1981) (citing *Brown v. General Services Administration*, 425 U.S. 820, 832-33, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *seealsoProud v. United States*, 872 F.2d 1066, 1068 (D.C.Cir.1989) (initiation of informal administrative remedies, such as pre-complaints, do not satisfy exhaustion requirements); *Heid v. Department of the Navy*, Civ. Action No. 95-3858, 1997 WL 14474 (E.D.Pa. Jan.16, 1997) (pre-complaints do not satisfy exhaustion requirements). Plaintiff never filed a formal complaint. Therefore, it appears that, as a matter of law, she has failed to timely exhaust her administrative remedies as to her pre-Downtown Station claims.

2. Equitable Tolling

In Title VII cases, courts are permitted, in certain limited circumstances, to equitably toll filing requirements, even if there has been a complete failure to file. *Robinson*, 107 F.3d at 1021. In *Oshiver v. Levin et. al.*, 38 F.3d 1380, 1387 (3d Cir.1994), the Third Circuit explained that in the context of employment discrimination cases, that the equitable tolling doctrine may excuse the plaintiff's non-compliance with the statutory limitations provision in three cases: (1) where the defendant has actively mislead the plaintiff respecting her cause of action; (2) plaintiff has been prevented in an extraordinary way from filing; and (3) plaintiff mistakenly asserted her rights in the wrong forum.

*8 Plaintiff claims that while she was a carrier at the Reading General Mail Facility, she was harassed by her supervisors, and discriminated against, when they failed to recommend her for the position of Postmaster, because she is a woman. Although she filed a pre-complaint with the EEOC, she claims she dropped it (*i.e.*, never filed a formal one), because her supervisor told her it would be beneficial to do so, and because her supervisors ceased harassing her.

We do not find that Plaintiff is entitled to equitable tolling. There is no evidence that her supervisors actively mislead her respecting her pre-Downtown Station claims. Even if her supervisor, Bill Sheehan (and perhaps EEOC counselors), told her it would be beneficial to her job if she dropped the complaint, this standing alone does not convince us to toll Plaintiff's filing requirements. Sheehan's remarks never amounted to a direct threat (*see* Koschoff Depo. p. 468-69), and can hardly be characterized as a deceptive act that would have caused Plaintiff's non-compliance. If we made a practice of tolling filing requirements based on scant innuendo, it would very quickly obviate the need for timely filing of all complaints. Furthermore, Plaintiff said herself that she dropped her complaint because her supervisors stopped harassing her. (*See* Koschoff Depo. p. 468)

Plaintiff claims that a co-worker, Terry Davis,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 8

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

harassed her, at the West Lawn Post Office, from 1989 through 1992, by calling her names like "bitch, " "maggot," etc ... He would also bump her on the shoulder. Davis was eventually disciplined with a letter of warning for his behavior. Although Plaintiff filed an pre-complaint, regarding his behavior, she never filed a formal one. Therefore, she has failed to exhaust her administrative remedies with respect to her claim. Furthermore, nothing in the record would support the finding that Plaintiff's failure to file should be equitably tolled. There is no evidence that she was in any way deceived, or lulled, into abandoning this pre-Downtown Station claim.

### 3. Continuing Violations

Plaintiff has never claimed the alleged acts constituted a continuing violation, and we deem this argument waived. Even if this claim had been made it would not apply. For one thing, Plaintiff not only utterly failed to file a formal complaint with respect to the alleged pre-Downtown Station complaints, she also failed to include such allegations in subsequently filed formal complaints. *See Crumpton,* 1998 WL 125547 at *2; *Mestopulos v. Runyon,* 918 F.Supp. 851, 858 (D.N.J.1996).

In *West v. Philadelphia Elec. Co.,* 45 F.3d 744 (3d Cir.1995), the Third Circuit recognized an equitable exception to the timely filing requirement - the "continuing violations theory." Under this theory, a plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period, if she can demonstrate that the act is part of an ongoing practice or pattern of defendant's discrimination. *Id.* at 754. To establish that the claims fall under the continuing violations theory, the plaintiff must do two things. First, she must demonstrate that at least one act occurred within the filing period. Next, the plaintiff must show "more than the occurrence of isolated or sporadic acts of intentional discrimination;" she must demonstrate a persistent, on-going pattern. *Id.* at 754-55 (citations omitted).

*9 The Third Circuit has followed *Berry v.*

*Board of Supervisors of Louisiana State Univ.,* 715 F.2d 971, 981 (5th Cir.1983), in identifying several factors relevant to the determination of whether a plaintiff has demonstrated a continuing violation: (1) subject matter -whether the violations constitute the same type of discrimination; (2) frequency -whether the alleged acts are recurring, or more in the nature of an isolated work assignment, or employment decision; and (3) permanence -whether the nature of the violations should trigger the employee's awareness of the need to assert her rights, and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. *See West,* 45 F.3d at 755 n. 9.

In *Rush v. Scott Speciality Gases, Inc.,* 113 F.3d 476 (3d Cir.1997), an employee named Rush sued her employer, Scott, for sexual discrimination, retaliation, and hostile work environment. In June 1991, Scott promoted three men, with less seniority then Rush, to a position she wanted. Rush filed a charge with the EEOC soon after, which was settled. She also claimed that her male co-workers and supervisors began harassing her after she filed the charge. After several problems with her supervisors, Rush quit in June 1993, and filed an EEOC claim in November of that year. In its motion for summary judgment, Scott argued that Rush's promotion-discrimination claim was time barred. The Third Circuit reversed the district court's finding that the promotion-discrimination claim was part of Scott's continuing violation of Rush's Title VII rights. The Court of Appeals reasoned that Rush's promotion-discrimination claim was distinct from her sexual harassment claim, and could not be seen as part of a continuing violation. Rush's promotion-discrimination claim addressed discrete instances of alleged discrimination that were not even susceptible to continuing violation analysis, because sexual harassment and failure to promote claims address different kinds of discriminatory conduct. *Id.* at 483-84.

Here, Plaintiff alleged that in May 1986, her supervisors at the Reading General Mail Facility gave her a poor recommendation for the Postmaster positions she was applying for, and as a result, the Postal Service denied her the positions. However, Plaintiff did not file a formal complaint until

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 9

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

February 20, 1996 (and she even overlooked her promotion-discrimination claim in that complaint).[FN9] When Plaintiff's supervisors allegedly told her that a woman would not be promoted to Postmaster, she was put on notice to file a charge for discrimination. Although she filed a pre-complaint, she never pursued her complaint beyond that. If she was serious about her claim, she should have filed a formal complaint within the required time. To allow a stale claim to proceed would be inconsistent with the administrative procedure established by Title VII, which contemplates prompt filing of formal charges, so discrimination controversies may be resolved promptly.[FN10]*Rush,* 113 F.3d at 476.

> FN9. This fact alone may render continuing violations analysis moot, but we will proceed. *Crumpton,* 1998 WL 125547 at *2.

> FN10. Additionally, Plaintiff never alleged *quid pro quo* discrimination in her Complaint, which has not been amended.

**\*10** Plaintiff's hostile work environment, discrimination, and retaliation claims, which allegedly arise out of later acts, are not sufficiently related to Plaintiff's promotion-discrimination claim to constitute a single continuing violation, because they address different types of conduct. Plaintiff's promotion-discrimination claim focuses on her supervisors's poor recommendation for her promotion to Postmaster. By contrast, her hostile work environment, discrimination, and retaliation claims focus on demeaning comments, denial of time to file grievances, and inappropriate management techniques. We find that these are distinct claims, and are unamenable to a continuing violations theory.[FN11]

> FN11. Plaintiff does allege that her supervisors at the Reading General Mail Facility harassed her, however she forgets how. Since Plaintiff has no evidence to support this harassment charge, we will dismiss it. *SeeCelotex,* 477 U.S. at 322.

We also refuse to find that the harassment that Plaintiff alleges took place at the West Lawn Post Office was a continuing violation, because of the time that separated the events at West Lawn with those complained of in the February 1996 formal complaint. In *Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710 (3d Cir.1997), a plaintiff who was employed by the defendant for two distinct time periods, with a seven-month interruption between them, argued "that the district court improperly evaluated the events that occurred during her second period of employment in isolation and that instead the court should have viewed them as a continuation of the harassment that had taken place seven months earlier."*Id.* at 715.The Third Circuit rejected that argument, in part because the seven-month gap allowed the effects of the earlier incidents to dissipate. *Id.* at 716.*SeealsoLesko v. Clark Publisher Services,* 904 F.Supp. 415, 420 (M.D.Pa.1995) (passage of two years between incidents rendered them separate and distinct).

Plaintiff claims that between 1989, and 1991, her co-worker, Terry Davis, called her offensive names and bumped her on the shoulder. In January 1991, Plaintiff filed an EEO pre-complaint, but never filed a formal one until February 1996 (which failed to allege Davis's conduct).[FN12] Plaintiff cannot tack Davis's alleged acts to the events alleged in her February 1996 filing, which covers activity dating only as far back as June 1995. Since Plaintiff transferred out of West Lawn in late 1992, over two and a half years had past between Davis's alleged conduct, and the alleged acts of discrimination complained of in the February 1996 formal EEO complaint.[FN13] Finally, the alleged discrimination occurred at two different work sites, with unrelated employees and supervisors involved. Therefore, we find that the time gap between the events allowed the effects of the earlier West Lawn incidents to dissipate, and we reject the notion that those events are connected to the alleged discrimination that took place at the Downtown Station in 1995 through 1996. Accordingly, both pre-Downtown Station claims must be dismissed for untimeliness and/or failure to exhaust.[FN14]

> FN12.*See* note 9 *supra.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 10

FN13. On April 19, 1993, Plaintiff made an informal complaint to the EEOC, alleging that her supervisor, Mark Adams, discriminated against her by comparing her work performance with her two male predecessors's. However, it seems that shortly thereafter (approximately late summer 1993), the matter was settled through grievance procedure, and Adams stopped bothering Plaintiff about her work. (Koschoff Depo. pp. 268-270; Exh. 24) *See also* note 2 *supra.* In any case, enough time has elapsed between the summer of 1993, and the summer of 1995, to find that Adams's alleged conduct does not amount to a continuing violation with, respect to the claims alleged in the February 1996 filing.

FN14. We also have serious doubts about the timeliness of Plaintiff's remaining claims, discussed below. After reviewing exhibits 25 through 56 in Plaintiff's Deposition, we note that Plaintiff does not seem to have fulfilled many administrative requirements in the prosecution of these claims. Nevertheless, we will not dismiss, *sua sponte,* her remaining claims, for the following reasons. First, all we have are the documents attached to the parties's briefs, which may not tell the complete story of Plaintiff's administrative claims. Second, Defendant has not expressly raised the failure to exhaust argument as an affirmative defense to Plaintiff's " Downtown Station" claims, which arise out of conduct that began in 1995, in neither its brief, nor its answer. *Cf. Williams v. Runyon,* 130 F.3d 568, 573-74 (3d Cir.1997). Finally, there are potential " continuing violation" arguments which could counter such defenses. Accordingly, we reserve judgment on these exhaustion issues until we hear further argument from counsel.

B. *Plaintiff's Discrimination and Retaliation Claims*

1. Standards of Proof

*11 Plaintiff claims that she suffered sexual discrimination, and suffered retaliation for filing EEOC complaints. (Plaint.Mem. p. 19-20) Plaintiff's discrimination claim [FN15] is governed by 42 U.S.C. § 2000e-16. *SeeBrown,* 425 U.S. at 835. That section reads, in relevant part: "[a]ll personnel actions affecting employees ... in the United States Postal Service ... shall be made free from any discrimination based on ... sex ..."42 U.S.C. § 2000e-16. Both parties agree, that to establish a " pretext" sex discrimination suit, a plaintiff must make a *prima facie* case under the familiar standards originally set-out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Therefore she must demonstrate that: (1) she was a member of a protected class; (2) she was performing her job in a satisfactory manner; (3) she suffered an adverse employment action; and (4) similarly situated employees outside her protected class were treated more favorably. *SeePoli v. Septa,* Civ. Action No. 97-6766, 1998 WL 405052*5 (E.D.Pa. July 7, 1998); *Burks v. City of Philadelphia,* 974 F.Supp. 475, 480 (E.D.Pa.1997).

FN15. Plaintiff alleges only disparate treatment in her Complaint. However, in her deposition, she indicated a disparate impact claim as well. (Koschoff Depo. p. 246) ("On page five of the [Complaint], it says disparate treatment. Thinking about it for a minute, I feel that it does include disparate impact.") However, Plaintiff has not amended her Complaint to include disparate impact, and her brief addresses only the disparate treatment claim. (Plaint. Mem. p. 1; Plaint. Reply p. 3) (We doubt the merits of such a claim, if it were brought under the present facts.) Therefore, we will not address a disparate impact claim at this time. We will deal with this issue in the future, if Plaintiff attempts to amend her Complaint.

To establish discriminatory retaliation under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 11

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Title VII, a plaintiff must demonstrate that: (1) she engaged in Title VII protected activity; (2) the employer took a materially adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity, and the adverse employment action. *SeeRobinson v. City of Pittsburgh,* 120 F.3d 1286, 1299 (3d Cir.1997) (*citingNelson v. Upsala College,* 51 F.3d 383, 386 (3d Cir.1995); *seealso McDonnell v. Cisneros,* 84 F.3d 256, 258 (7th Cir.1996)

2. No Adverse Employment Decision

Neither party disputes that Plaintiff is a member of a protected class, or that she engaged in protected Title VII activity by filing the formal EEO complaint which resulted in this case. However, both discrimination, and retaliation claims, each require that a plaintiff suffer a " materially adverse employment action." [FN16]We have previously held that the kind of conduct that amounts to a materially adverse employment action is rather limited.*SeeKidd v. Commonwealth of Pennsylvania,* 1999 WL 391496,[*]7 (E.D.Pa. May 20, 1999). In *Kidd* we quoted the Third Circuit's decision in *Robinson,* 120 F.3d at 1300, as follows:

FN16. The "adverse employment action" requirement is the same for both discrimination and retaliation claims. *Robinson,* 120 F.3d at 1300-01.

[C]onduct other than discharge or refusal to hire is thus proscribed by Title VII only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives her of employment opportunities, or adversely affect[s] [her] status as an employee. It follows that not everything that makes an employee unhappy qualifies as retaliation [or discrimination], for [o]therwise, minor and even trivial employment actions that an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit

[*]12 *Id.*(citations and internal quotes omitted).

Here, Plaintiff does not make a timely claim that she was discriminatorily denied a promotion, a detail, training, or a transfer. Similarly, Plaintiff has not asserted that the Postal Service impaired her pay, or benefits, or reduced her job responsibilities. To the contrary, Plaintiff has testified that she received all of her scheduled pay increases, that she was never placed on limited duty assignments, that no one in the Postal Service interfered with her right to take sick leave, or that her benefits were reduced in any manner.

In fact, Plaintiff fails to address, in any substantive way, what actions by the Postal Service she believes constituted adverse employment actions. There is only passing reference, in her brief, to "sustained threats of discipline, taunts when requesting assistance and intensive, close supervision."[FN17](Plaint.Mem. p. 23) It seems Plaintiff is claiming that the harsh treatment she suffered at the hands of her managers amounts to an adverse employment action. Such treatment includes, among a litany of allegations, calling her " stupid," "ill," "crazy," following her into the bathroom, waving fingers in her face, requiring permission to use the bathroom, and being criticized to taking to many bathroom visits.

FN17. In her Complaint, Plaintiff complains about her treatment by the Postal Service's management. These complaints include Postmaster Williams's letter advising Plaintiff regarding her options to apply for retirement or resign (Compl. at ¶ 15); threats of discipline (Compl. at ¶¶ 19 and 22); singling Plaintiff out for disparate treatment and discipline (Compl. at ¶ 20); and disparate applications of personnel policies (Compl. at ¶ 22).

However, courts have consistently held that such actions do not rise to the level of an adverse employment action, because they effectuate no real change in the employee's compensation, terms, conditions, or privileges of employment, nor do they inflict economic harm. For example, in *Robinson,* plaintiff alleged that her employer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 12

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

retaliated against her for filing an EEOC complaint by restricting her job duties, reassigning her, failing to transfer her out of an assignment where she worked for an alleged harasser, and issuing her several unsubstantiated oral reprimands and derogatory comments. The Third Circuit ruled that the alleged "unsubstantiated oral reprimands, and unnecessary derogatory comments" were not adverse employment actions. *Robinson,* 120 F.3d at 1300;*seealsoKidd,* 1999 WL 391496 at *7 (derogatory comments, a claim that harasser pointed a gun at plaintiff, and investigation of plaintiff's " alleged acts of illicit tape recording" did not amount to adverse employment action); *DeCesare v. National Railroad Passenger Corp.,* Civ. Action No. 98-3851, 1999 WL 330258*4 (E.D.Pa. May 24, 1999) (assignment of more difficult work does not constitute a tangible employment action because it "did not cause any direct economic harm" to plaintiff); *Crawley v. Runyon,* Civ. Action No. 96-6862, 1998 WL 355529*11 (E.D. Pa. June 30, 1998) (supervisor following employee into bathroom, and asking him what he was doing, telling a co-worker not to have a conversation with employee, and pointing a finger at employee and threatening with discipline were "not serious and tangible enough" to be characterized as an "adverse employment action") (*quotingRobinson,* 120 F.3d at 1300);*Valentin v. Crozer-Chester Medical Center,* 986 F.Supp. 292, 303 (E.D.Pa.1997) ("[an] employer's decision to advise an employee about the company's sick leave policy, without more does not amount to an 'adverse employment action'); *Seely v. Runyon,* 966 F.Supp. 1060 (D.Utah 1997), *aff'd,*166 F.3d 348, 1998 WL 863974 (10th Cir.1998), *cert. denied,*526 U.S. 1069, 119 S.Ct. 1464, 143 L.Ed.2d 549 (1999) (threats of removal, harassment, and bickering in the workplace is not actionable). Therefore, we find that Plaintiff's claims of disciplinary threats, taunts, and other alleged harsh treatment do not amount to an adverse employment action.[FN18]

FN18. However, such complaints, if true, may support a hostile work environment claim.

In any case, we remain very doubtful about the merits of Plaintiff's litany of complaints against the

Postal Service. *See e .g.,* EEO Complaint 4C-175-1052-95 (denial of time to complete route, denial of grievance time, denial of union representation, improper street supervision, being required to meet alone with female supervisor, discipline). Documents obtained in discovery reveal that Plaintiff received ample auxiliary assistance and/or was granted overtime to complete her work. (Koschoff Depo. Exh. 110) The volume of Plaintiff's grievances-over thirty between 1995 and 1996-belies any arguments that she was denied time to file grievances or union representation. *Seesupra* page 26.Article 15 of the National Agreement between the Postal Service and the National Letter Carriers Association seems to suggest that having to meet alone with a supervisor to discuss grievances or minor offenses by an employee is proper. (Cook Depo. p. 76-77 and Exh. 10; Def. Reply Exh. J) Finally, the street supervision Plaintiff complains of in her EEO Complaint also seems proper according to Postal Service manuals that govern the actions of Postal Service managers. (Plaint. Mem. Exh. 11 pp. 1; 49)

*13 The only adverse employment actions Plaintiff could possibly claim are: (1) the decision denying her four consecutive weeks of vacation in January 1996; (2) her three letters of warning, and letter of suspension; (3) her alleged denial of union representation, and time to file grievances; and (4) the Postal Service's decision to remove Plaintiff for disability reached two years after Plaintiff stopped reporting to work. We deal with these decisions in turn.

In late January 1996, Plaintiff requested four weeks of consecutive vacation time for that August. The request was denied, and Plaintiff filed a formal EEO discrimination claim dated June 9, 1997.[FN19] The Postal Service's leave program only permits letter carriers to select two weeks of continuous annual leave, and only a single week during the so-called "choice time period." Obviously, Plaintiff's request exceeded that time limit, and conflicted with current, and planned, staffing. Besides, Plaintiff testified in her deposition that she was out of the country, on vacation, from April 14, 1996 until May 5, 1995. Since Plaintiff got her vacation that year, we cannot make light of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

requirements entailed in discrimination claims, by holding that an employer has made an "adverse employment action," if the employee is denied her vacation time, when, and how, she wants it.

> FN19. On August 4, 1997, the EEOC dismissed her complaint for untimeliness. Under 29 C.F.R. 1614.106, a complaint must be filed within fifteen days after receipt of the notice of the right to file a discrimination complaint issued by the EEO counselor. However, Plaintiff neglected to file her complaint until forty days after her receipt of the notice of right to file a complaint. (*Id.* Exh. 40) Once Plaintiff received her dismissal notice she had -and the EEOC informed her of thisthirty days to appeal to the EEOC, or ninety days to file a civil action in district court. Plaintiff chose to do neither, and we see no reason to equitably toll (see pages 14-15 *supra* ) the time limit requirements, because she claimed that she was " emotionally unable" to fulfill them. (Koschoff Depo. Exh. 39)

In 1995, Plaintiff received a letter of warning (dated July 11), and a letter of suspension (dated September 26), both for failure to follow instructions and/or improper conduct. However, pursuant to an October 24, 1995, settlement conference, Postal Service management withdrew those letters with the promise that the letters would " [n]ever be used against" Plaintiff.[FN20]On October 21, 1996, Plaintiff was issued another letter of warning, for failure to follow instructions and/or improper conduct. However, none of the aforementioned letters were an active part of Plaintiff's personnel file as of April 23, 1999. Therefore, even viewing the record in the light most favorable to Plaintiff, these letters of discipline, and/or suspension, are not materially adverse employment actions.

> FN20. Such a resurrection of settled claims would also run afoul of "the established principle that one who agrees to settle

[her] claim cannot subsequently seek both the benefit of the settlement and the opportunity to press the claim [s]he agreed to settle."*Martin v. Frank,* 788 F.Supp. 821, 826 n. 4 (D.Del.1992) (*quotingKirby v. Dole,* 736 F.2d 661, 664 (11th Cir.1984).

Plaintiff cannot seriously claim that she was denied time to file union grievances.[FN21]Between 1995 and 1996, Plaintiff filed approximately thirty-seven grievances against the Postal Service, with the National Association of Letter Carriers. Plaintiff's grievances generally concern the alleged denial of union representation, denial of time to file grievances, pre-disciplinary discussions between Plaintiff and her supervisors, the tone of voice used by various supervisors, being required to notify management when she left her work case to use the bathroom, and being required to meet alone with Judith Pelka, her supervisor. Plaintiff's own time records and written notes reflect that she received more than ten hours off from work time, between January and June 1996 to file, or assist in the filing of, one or two page grievance forms. Therefore, we conclude that Plaintiff had ample opportunity to file grievances, and her claim that she suffered an adverse employment action, in this regard, is untenable.

> FN21. We are not at all certain that denial of time to file grievances amounts to an adverse employment decision, because there seems to be no direct economic harm. However, in so far as time to file grievances is probably a term in the collective bargaining agreement between Plaintiff's union and the Postal Service, we will give Plaintiff the benefit of the doubt.

3. The Postal Service's Attempt to Discharge Plaintiff for Disability Not Discriminatory Under *McDonnell Douglas*

**\*14** The Postal Service's decision to remove Plaintiff is not an adverse employment action, at this point. That decision, reached nearly two and a half years after Plaintiff ceased reporting to work, is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 14

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

the subject of a pending grievance, and as Defendant admits in its brief, has not yet been carried out. (*See* Def. Mem. at p. 32) Therefore, we consider the issue unripe for litigation.

However, even if Plaintiff's discharge had been carried out, we could not find it to be a discriminatory act, under the *McDonnell Douglas* burden shifting scheme. The *McDonnell Douglas* scheme has three steps. First, the plaintiff must produce evidence that is sufficient to convince a reasonable fact finder to find all of the elements of a *prima facie* case, discussed on page 20 *supra.* If the plaintiff offers sufficient proof of these elements, she reaches step two. The burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, non-discriminatory reason for the discharge. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-07, 113 S.Ct. 2742, 125 L.Ed.2d 407. If the defendant cannot satisfy this burden, judgment must be entered for the plaintiff. *Id.* at 509. On the other hand, if the defendant satisfies this burden, we reach step three. The plaintiff may then survive summary judgment by submitting evidence " from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994).

To satisfy the first prong of *Fuentes,* a plaintiff must show, not merely that the employer's proffered reason for the discharge was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason. *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3d Cir.1997). To do this, plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Fuentes,* 32 F.3d at 765. To meet prong two, a plaintiff must point to evidence that proves sex discrimination based solely on the natural probative force of the evidence. *Keller,* 130

F.3d at 1111.

Returning to the case at bar, even if we were to assume for a moment, that Plaintiff's separation due to disability was an adverse employment action, and that Plaintiff had made-out a *prima facie* case of sex discrimination, Defendant has legitimate non-discriminatory reasons for Plaintiff's separation. It is the Postal Service's policy to replace employees who cannot return to full duty within a reasonable time (generally within a year), so that its operations can proceed in a cost effective manner and meet its service commitments to its customers. It is also Postal Service policy to separate for disability employees who can no longer perform their duties. Plaintiff ceased to report for duty on November 4, 1996. She was unable (or refused) to return to full duty within a reasonable time, even though the Postal Service provided Plaintiff with the opportunity to return to work as late as February of 1999; her doctor indicated that she would probably never return to work. Furthermore, the Postal Service gave her, on more than one occasion, the option of applying for disability retirement, optional retirement, or retirement with a deferred annuity, or resigning. Plaintiff never elected any of these options in a timely manner, but applied for disability retirement over a year after Postmaster Williams put her on notice to do so.

**\*15** Viewing the above facts in the light most favorable to Plaintiff, we still conclude that Defendant had a legitimate non-discriminatory reason for discharging Plaintiff. As a result, we arrive at leg three of *McDonnell Douglas,* and the *Fuentes'* s two-pronged test, whereby Plaintiff must prove that Defendant's articulated legitimate reasons for discharge are pretextual. However, Plaintiff offers us no evidence or reason to doubt Defendant's articulated legitimate reasons for her discharge. Plaintiff never worked for, or even met, the people who apparently made the decision to discharge Plaintiff -Ms. Loos and Messrs. Melnyk and Benson. In fairness to the Postal Service, it appears that its managers gave Plaintiff ample opportunity to return to work, and provided her with several options regarding her separation for disability, and Plaintiff ignored these options at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 15

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

every turn. Furthermore, the Postal Service's policy -to discharge those who cannot perform their duties within a reasonable timeseems facially undiscriminatory and legitimate, if not reasonable. Therefore, we do not see any evidence that would cause us, or a reasonable fact finder, to doubt that the Postal Service discharged Plaintiff for legitimate reasons. Nor do we find any reason to believe that invidious discrimination motivated the Postal Service's decision to dismiss Plaintiff for disability. [FN22]

> FN22. However, we reserve judgment pending a showing by Plaintiff that Defendant's decision was, in fact, discriminatory.

### 3. No Causal Link Established

Nor do we find that the Postal Service's attempt to remove Plaintiff for disability to be an unlawful retaliation, under Title VII. First, we reiterate that Plaintiff's discharge is the subject of a pending grievance, and is therefore, an incomplete act. Second, as discussed on page 28-29 *supra,* under the *McDonnell Douglas* burden shifting scheme, Plaintiff cannot show that Defendant's articulated legitimate reasons for discharging Plaintiff were a pretext for discrimination.[FN23]Third, as discussed below, Plaintiff cannot establish the causal link between her protected activity, and the alleged retaliatory employment decision, necessary to make out a *prima facie* case.

> FN23. The McDonnell Douglas burden shifting scheme has been applied to claims of retaliation as well as discrimination. *e.g., Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3d Cir.1991) (citing*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

As discussed on page 21 *supra,* a plaintiff must show that a causal link exists between her protected conduct, and the employer's action, to establish a

*prima facie* case of discriminatory retaliation. There is no evidence that the Postal Service dismissed Plaintiff in retaliation for her EEO filings. Plaintiff testified that she had never even met, much less worked for, Donna Loos or Michael Melnyk, who appear to be involved in the decision to release her from the Postal Service. Neither did Plaintiff identify either Loos or Melnyk as individuals that she contended had retaliated against her. While Plaintiff seemed to have identified Michael Benson as an individual who had retaliated against her, it seems unlikely that she had much, if any, contact with him, since she forgot his name during her deposition. (Koschoff Depo. p. 86) Plaintiff offers no evidence to show that these three Postal Service employees based their decision to release her on anything other than her extended absence, and failure to report for duty, within the required time period.

**\*16** Temporal proximity of the adverse action to a plaintiff's protected activity can give rise to an inference of causation sufficient to satisfy plaintiff's burden. *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989). The general rule, followed in this district, see*Woods v. Bentsen,* 889 F.Supp. 179, 187-88, (E.D.Pa.1995), and by most courts,[FN24] is that if at least four months pass after the protected action, without employer reprisal, there is no inference of causation. The "four-month clock" begins ticking when a plaintiff files her EEO complaint. See*Woods,* 889 F.Supp. at 188.[FN25]

> FN24.*See,e.g.,Hughes v. Derwinski,* 967 F.2d 1168, 1174 (7th Cir.1992) (disciplinary letter issued four months after discrimination charge filed not causally linked to employer action); *Lees v. Case-Hoyt Corp.,* 779 F.Supp. 717, 727 (W.D.N.Y.1991) (suspension four months after filing of discrimination complaint not causally linked to adverse employer action).

> FN25.*See also* cases cited in note 24 *supra.*

Plaintiff clearly engaged in activities protected by Title VII, by filing a complaint on February 5,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

1998, alleging she was unfairly "forced to accept disability counseling," and forced to elect within ten days of Postmaster Williams's November 1997 letter, whether she wanted to retire with disability or resign. (Koschoff Depo. Exh. 55) [FN26] However, District Manager Benson, did not author his Letter of Decision, concerning Plaintiff's separation for disability until April 23, 1999, and separation did not become effective until April 30, 1999. Therefore, well over a year passed between the filing of Plaintiff's complaint, and Defendant's alleged employment action, and no inference of causation can be made between Plaintiff's filing and her eventual discharge.[FN27]

> FN26. Plaintiff also filed, on January 26, 1998, an information for pre-complaint counseling that apparently arose from the same letter sent by Postmaster Williams. (Koschoff Depo. Exh. 56) We do not believe that an act short of a formal complaint should start the four-month clock running. However, we need not decide that issue because, as discussed *infra,* the clock would have expired even if it triggered on January 26, 1998.

> FN27. However, we reserve judgment pending a showing by Plaintiff that Defendant's decision was, in fact, retaliatory.

Finally, Plaintiff has produced no other evidence of an intervening pattern of retaliation, which would support a causal link. *See Woods,* 889 F.Supp. at 188. Plaintiff claims the Postal Service harassed and discriminated against her, even after she stopped reporting for duty, in three ways. First, Plaintiff alleges that when she would go to the Post Office to pick up her pay check (while receiving pay for accumulated vacation and sick time), she was forced to wait between twenty and thirty minutes before she received it. (Koschoff Depo. p. 79-80) While she was waiting, she was required to complete a notification of absence form without union representation. Next, Plaintiff alleges that the Postal Service ignored her request to forward correspondence regarding personnel matters to her

lawyer. Third, Plaintiff alleges she was required to undergo disability retirement counseling or face termination, even though such counseling is generally voluntary. (Plaint.Mem. p. 17)

Plaintiff's allegations, even if true, are at best *de minimis.* Having to wait a few minutes, and fill out forms before collecting a pay check, seem more of a bureaucratic annoyance than retaliatory acts. Next, while some letters concerning personnel matters were sent directly to Plaintiff, others were sent to her lawyer, and the documents show that her lawyer was aware of these letters, in any case. (Koschoff Depo. Exh 4-11) Finally, Postmaster Williams's letter of July 28, 1997, which discusses disability counseling appears to merely advise Plaintiff that she is "entitled" to counseling, and asks that a convenient time be established; it does not require it. (*Id.* at Exh. 4) Even if they are true, the actions Plaintiff alleges above are insufficient as a matter of law to constitute a pattern of antagonism and retaliation under Title VII.[FN28] *Cf.Kidd,* 1999 WL at 391496 at *7 (alleged derogatory comments, supervisor pointing gun at employee, and investigation of plaintiff did not support retaliation claim"); *Woods,* 889 F.Supp. at 188 (being watched more closely by management not proof of retaliation or antagonism).

> FN28. These claims could not, in and of themselves, support a hostile work environment claim, because they are not severe or pervasive enough to be abusive. Furthermore, we do not believe that these claims could support a continuing violations theory, that might tie them to Plaintiff's earlier claims, because they are too isolated and sporadic.

**C. Plaintiff's Hostile Work Environment Claim**

**\*17** Plaintiff has alleged that she suffered sexual harassment because of a hostile work environment.[FN29] The United States Supreme Court has concluded that a Plaintiff may establish a Title VII violation if she can show that gender-based discrimination created a hostile or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

abusive working environment. *Meritor Sav. Bank FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Title VII is implicated where the conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."*Id.* at 67.

> FN29. At the outset, we note that there is some disagreement regarding Plaintiff's hostile work environment claim. The Complaint alleges only "harassment," not hostile work environment. (Compl.¶¶ 20, 22) As Defendant correctly points out, there is no cognizable claim for garden variety harassment, under federal law. (Def.Mem. p. 42) Rather, the alleged harassment must be tied to one of the prohibited decisional factors set forth in Title VII. *SeeHarris v. Forklift Systems, Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). However, a hostile work environment claim may be brought, even if not strictly mentioned in the four corners of the complaint. *SeeHarper v. Robert J. Casey, Jr. & Assoc.,* 74 E.D.P. ¶ 45,558 (E .D. Pa. Sept. 9, 1998) Plaintiff's deposition testimony reveals that she is bringing a hostile work environment claim, but not a claim of *quid pro quo* sexual harassment. (Koschoff Depo. p. 166-67) Therefore, we will construe her complaint of harassment as a hostile work environment claim.

To establish a hostile work environment claim, Plaintiff must show five things: (1) that the employee suffered intentional discrimination because of her sex; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *SeeAndrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990). A court must look at all the circumstances to determine whether a work environment is "hostile." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126

L.Ed.2d 295 (1993). These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening, or humiliating; or a mere offensive utterance; and whether it interferes with an employee's work performance. *Id.* Furthermore, the offensive conduct need not be sexually explicit in nature (and it is not so alleged in the instant case).*Andrews,* 895 F.2d at 1485. It is enough that a woman suffers hostility or intimidation *because* she is a woman. *Id.* (citations omitted).

The documents and deposition testimony produced in discovery show that Plaintiff states a claim for hostile work environment, based management's harsh treatment of her. *See* pages 6-7 *supra.*George Cook testified that Plaintiff's supervisor, Kevin Moyer, told him he was out "to get [Plaintiff]" for being a "feminist lesbian, militant." Kim McKnight-Jimenez also testified that Downtown Station management treated females more harshly than males. If a jury believed these statements, it could find that Plaintiff suffered intentional discrimination because of her sex. George Cook and Bonnie Sterling also suggested that Plaintiff's alleged harassment occurred on a near daily basis. Such testimony could support the allegation that the discrimination against Plaintiff was pervasive and regular. Plaintiff's doctor reports indicate that the discrimination may have detrimentally affected Plaintiff's health. A reasonable jury may be able to find that such alleged daily harassment, if true, might detrimentally affect a reasonable woman in Plaintiff's position. Finally, since management was allegedly involved in the harassment, *respondeat superior* liability would seem to exist. Therefore, viewing the evidence in the light most favorable to Plaintiff, we conclude that material issues of fact exist as to whether the Downtown Station management subjected Plaintiff to a hostile work environment. Accordingly, we deny summary judgment on that claim.

### V. CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*18** In conclusion, and for all the aforementioned reasons, we will grant partial summary judgment for Defendant, and deny summary judgment for Plaintiff. An appropriate order follows.

### ORDER

AND NOW, on this 7th day of October 1999, upon consideration of Plaintiff's Motion for Summary Judgment and exhibits attached thereto, and upon Defendant's Motion for Summary Judgment and exhibits attached thereto, both filed on August 2, 1999, and upon Plaintiff's Reply Brief, and Defendant's Reply Brief and exhibits attached thereto, both filed on August 16, 1999, we hereby order, consistent with the foregoing Memorandum, as follows:

(1) Plaintiff's Motion for Summary Judgment is DENIED, in its entirety;

(2) Defendant's Motion for Summary Judgment is GRANTED, in part, as follows-
(a) With respect to Plaintiff's claims of discrimination and/or harassment, arising out of conduct that allegedly occured at the Reading General Mail Facility, during or around 1986, Defendant's Motion for Summary Judgment is GRANTED;
(b) With respect to Plaintiff's claims of sexual harassment, arising out of conduct that allegedly occurred at the West Lawn Post Office, from approximately 1989 through 1992, Defendant's Motion for Summary Judgment is GRANTED;
(c) With respect to Plaintiff's claim of sexual discrimination at the Reading Downtown Station, arising out of conduct that allegedly occurred before June 1995, Defendant's Motion for Summary Judgment is GRANTED;
(d) With respect to Plaintiff's claims of disparate treatment and/or retaliation, arising out of any conduct that allegedly occurred after June 1995, save her separation from the Postal Service on April 30, 1999, Defendant's Motion for Summary Judgment is GRANTED;

(3) Defendant's Motion for Summary Judgment is DENIED, in part, as follows-
(a) With respect to Plaintiff's hostile work environment claim, arising out of conduct that allegedly occurred between June 1995 and November 1996, Defendant's Motion for Summary Judgment is DENIED;
(b) With respect to Plaintiff's discrimination and/or retaliation claims, arising out of her termination on April 30, 1999, Defendant's Motion for Summary Judgment is DENIED.

E.D.Pa.,1999.
Koschoff v. Runyon
Not Reported in F.Supp.2d, 1999 WL 907546 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

**Citation # 9**
**2007 us app lexis 27279**

🅐 Analysis , As of Jan 29 , 2008

ALVIA LACY, Appellant v. NATIONAL RAILROAD PASSENGER CORPORATION

No. 07-3374

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

2007 U.S. App. LEXIS 27279

November 1, 2007, Submitted for Possible Dismissal Pursuant to 28 U.S.C. § 1915(e)(2)(B) or
Summary Action Pursuant to Third Circuit LAR 27.4 and I.O.P. 10.6
November 26, 2007, Opinion Filed

**NOTICE:** NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING
PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE
COURT.

PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE
CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:  [*1]**
On Appeal from the United States District Court for the District of Delaware. (D.C. Civil No. 06-cv-
00068). District Judge: Honorable Joseph J. Farnan, Jr.
Lacy v. AMTRAK, 507 F. Supp. 2d 438, 2007 U.S. Dist. LEXIS 54683 (D. Del., 2007)

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Appellant employee filed a pro se suit against defendant employer
alleging that it discriminated and retaliated against her and subjected her to a hostile work
environment in violation of Title VII of the Civil Rights Act of 1964 (Title VII). The employee filed a
pro se and in forma pauperis appeal after the United States District Court for the District of
Delaware granted summary judgment to the employer as to all of her claims.

**OVERVIEW:** The employee, an African-American woman, alleged that the employer violated her
rights under Title VII, 42 U.S.C.S. § 2000e et seq., by failing to promote her to management
positions, by subjecting her to a hostile work environment, and by retaliating against her for filing
job discrimination claims in 1998 and 1999. She also claimed that the employer improperly denied
her relief under a 1999 class action settlement. The district court found that some of the
employee's claims were time-barred under 42 U.S.C.S. § 2000e-5(e), because she failed to file a
discrimination charge with the Equal Employment Opportunity Commission (EEOC) within 300 days
of the alleged unlawful conduct, and that she failed to establish a prima facie case with regard to
any of her timely-asserted claims. The court found that the appeal lacked merit. All of the claims
that were based on events occurring before May 8, 2004, were time-barred. The employee failed
to timely seek relief under the class action settlement. She did not show that she was qualified for
any of the management positions, nor did she show a causal connection between her earlier
protected activity and actions taken by the employer in 2004.

**OUTCOME:** The court dismissed the employee's appeal pursuant to 28 U.S.C.S. § 1915(e)(2)(B).

**CORE TERMS:** summary judgment, hiring, genuine issue, limitations period, prima facie, protected

activity, discriminatory, challenging, retaliation, harassment, pro se, improperly denied, hostile work environment, class action suit, time barred, genuine issue of material fact, intentional discrimination, causal connection, nondiscriminatory, settlement, conclusory, promotion, arguable, gender, verbal

## LexisNexis® Headnotes

Civil Procedure > Summary Judgment > Appellate Review > Standards of Review
Civil Procedure > Appeals > Standards of Review > De Novo Review
HN1 The United States Court of Appeals for the Third Circuit's review of a district court's decision to grant summary judgment is plenary.

Civil Procedure > Summary Judgment > Standards > Appropriateness
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Legal Entitlement
HN2 Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no material issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants
Civil Procedure > Summary Judgment > Evidence
Civil Procedure > Summary Judgment > Opposition > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality
HN3 When determining whether a genuine issue of material fact exists, a court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. However, the party opposing summary judgment must present more than just bare assertions, conclusory allegations, or suspicions to show the existence of a genuine issue.

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Statutes of Limitations > General Overview
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > Filing of Charges
Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview
HN4 A Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., plaintiff in a "deferral state" such as Delaware must file a charge of discrimination with the Equal Employment Opportunity Commission within 300 days of the alleged unlawful conduct. 42 U.S.C.S. § 2000e-5(e).

Civil Procedure > Summary Judgment > Standards > Legal Entitlement
Labor & Employment Law > Discrimination > Racial Discrimination > Employment Practices > Failures to Hire
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Burden Shifting
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens
HN5 To establish a prima facie case of racial discrimination in hiring under the burden-shifting analysis set forth in McDonnell Douglas, a Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., plaintiff must show, inter alia, that she was qualified for a job for which the employer was seeking applicants. Even assuming that a plaintiff can establish a prima facie case of discrimination, summary judgment will still be appropriate where the plaintiff does not address the legitimacy of her employer's nondiscriminatory reasons for the

hiring decisions.

Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > Employee Burdens
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Employee Burdens
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

HN6 A plaintiff must show that she suffered intentional discrimination because of her race or sex in order to establish a hostile work environment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.

Civil Procedure > Summary Judgment > Opposition > Supporting Materials
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > Employee Burdens
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Employee Burdens
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

HN7 Affidavits submitted by a Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., plaintiff which do not refer to specific instances of harassment and merely set forth conclusory statements regarding discriminatory motive, are insufficient to withstand a motion for summary judgment as to the plaintiff's hostile work environment claim.

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof
Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions
Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link
Labor & Employment Law > Discrimination > Retaliation > Elements > Protected Activities
Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview

HN8 To establish discriminatory retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.

Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Evidence > Inferences & Presumptions > Inferences
Evidence > Procedural Considerations > Circumstantial & Direct Evidence
Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link
Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview

HN9 A plaintiff may establish the requisite causal connection to support a retaliation claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., by showing a close temporal proximity between the protected activity and the alleged retaliatory conduct or by submitting circumstantial evidence that gives rise to an inference of causation. Where a plaintiff does not submit any evidence in support of her belief that there is a nexus between her protected activities and the alleged adverse actions taken against her, there is no genuine issue for summary judgment purposes as to whether the alleged misconduct amounts to discriminatory retaliation.

**COUNSEL:** ALVIA LACY, Appellant, Pro se, Belcamp, MD.

For NATL RR PASSENGER, Appellee: Darrell R. VanDeusen, Venable, Baltimore, MD.

**JUDGES:** Before: SLOVITER, FISHER and HARDIMAN, Circuit Judges.

**OPINION**

PER CURIAM

Appellant, Alvia Lacy, filed an employment discrimination suit in the United States District Court for the District of Delaware against her employer, the National Railroad Passenger Corporation ("Amtrak"). The District Court granted Amtrak's motion for summary judgment, and Lacy now appeals *pro se* and *in forma pauperis*. We will dismiss the appeal pursuant to 28 U.S.C. § 1915(e) (2)(B) because it lacks an arguable basis in law or fact. See *Neitzke v. Williams*, 490 U.S. 319, 325, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989).

Lacy, an African-American woman, has worked for Amtrak since 1983 and is employed at its maintenance facility in Bear, Delaware. After receiving a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"), she filed a *pro se* complaint against Amtrak alleging racial and gender discrimination in violation of Title VII of the Civil Rights Act of 1964 **[\*2]** ("Title VII"), 42 U.S.C. § 2000e, *et seq.* Specifically, she claimed that Amtrak improperly denied her a promotion to a management position, subjected her to a hostile working environment, and retaliated against her for filing previous job discrimination claims. She also challenged Amtrak's decision to deny her relief pursuant to a 1999 settlement of a class action suit alleging racial discrimination in promotions. The District Court granted Amtrak's motion for summary judgment, concluding that some of Lacy's claims were time barred and that she failed to demonstrate a genuine issue of material fact as to any of her timely claims. Lacy now appeals that decision.

We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. *HN1* Our review of the District Court's decision to grant summary judgment is plenary. *Turner v. Hershey Chocolate U.S.A.*, 440 F.3d 604, 611 (3d Cir. 2006). *HN2* Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). **[\*3]** *HN3* When determining whether a genuine issue of material fact exists, we must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

First, we agree with the District Court that the claims which are based on events that occurred prior to May 8, 2004 are time barred. *HN4* A Title VII plaintiff in a "deferral state" such as Delaware must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful conduct. See 42 U.S.C. § 2000e-5(e); *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000); *Ohemeng v. Delaware State Coll.*, 643 F. Supp. 1575, 1580 (D. Del. 1986). The record indicates that Lacy filed a charge with the EEOC on March 4, 2005. She has provided no evidentiary support for her claim that she filed a charge on July 21, 2004. Accordingly, she **[\*4]** is barred from challenging any of the hiring decisions that took place prior to May 8, 2004. Nor may she proceed with her claim that Amtrak improperly denied her relief pursuant to the class action

settlement, as the alleged wrongdoing took place prior to December 31, 2003, which was the deadline for obtaining relief under the consent decree. [1]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[1] Assuming *arguendo* that the challenged conduct occurred within the limitations period, summary judgment on this claim would still be appropriate because Lacy did not address Amtrak's nondiscriminatory reasons for withholding the desired relief. These reasons are detailed in the letter from class counsel to Lacy dated April 26, 2004.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

As to Lacy's claims challenging Amtrak's hiring decisions, the District Court correctly determined that she did not make a *prima facie* showing of discrimination under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). [HN5] To establish a *prima facie* case of racial discrimination in hiring, she must show, *inter alia*, that she was "qualified for a job for which the employer was seeking applicants." Id. at 802. Lacy indicated in her filings that she was challenging ten hiring [*5] decisions, five of which took place during the limitations period. For the reasons given in the District Court's opinion, we conclude that the record establishes that Lacy did not meet the qualifications for any of these five jobs. Furthermore, even assuming that Lacy could establish a *prima facie* case of discrimination, summary judgment would still be appropriate because she did not address the legitimacy of Amtrak's nondiscriminatory reasons for the hiring decisions. See Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

We also agree with the District Court's reasons for granting summary judgment on Lacy's hostile work environment claim. As the District Court explained, Lacy failed to [HN6] show that she suffered intentional discrimination because of her race or sex, which she was required to do in order to establish a hostile work environment claim under Title VII. See Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007). The District Court focused its analysis on two discrete incidents of verbal harassment that allegedly occurred during the limitations period and properly concluded that Lacy did not sufficiently demonstrate that the offending behavior amounted to intentional discrimination [*6] under Title VII. Specifically, she did not submit evidence from which a reasonable factfinder could infer that the incidents of verbal harassment were motivated by animus towards Lacy's race or gender. The co-worker [HN7] affidavits submitted by Lacy, which do not refer to specific instances of harassment and merely set forth conclusory statements regarding discriminatory motive, are insufficient to withstand the summary judgment motion. See Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002).

Finally, we agree that summary judgment was appropriate as to the retaliation claim. [HN8] "To establish discriminatory retaliation under Title VII, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995). [HN9] A plaintiff may establish the requisite causal connection by showing a close temporal proximity between the protected activity and the alleged retaliatory conduct, or by submitting "circumstantial evidence . . . that [*7] give[s] rise to an inference of causation." Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007). The District Court acknowledged that Lacy engaged in activities protected under Title VII by joining the class action suit filed against Amtrak in 1998 and filing a federal job discrimination suit in 1999. However, the District Court properly determined that Lacy did not submit any evidence in support of her belief that there was a nexus between her protected activities and the alleged adverse actions that occurred in 2004. Thus, there is no genuine issue as to whether the alleged misconduct amounted to discriminatory retaliation.

For the foregoing reasons, we conclude that the appeal is without arguable merit. Accordingly, we will dismiss the appeal pursuant to 28 U.S.C. § 1915(e)(2)(B).

# EXHIBIT 8

Westlaw.

Slip Copy                                                                        Page 1

Slip Copy, 2006 WL 2806565 (W.D.Pa.)
**(Cite as: Slip Copy)**

C

Love v. United Parcel Service
W.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,W.D. Pennsylvania.
Peggy LOVE, Plaintiff,
v.
UNITED PARCEL SERVICE, Defendant.
**No. 2: 04-cv-964.**

Sept. 28, 2006.

Joel S. Sansone, Scanlon & Sansone, Pittsburgh, PA, for Plaintiff.
Joseph P. Milcoff, Kathy K. Condo, Reed Smith, Pittsburgh, PA, for Defendant.

### MEMORANDUM OPINION AND ORDER OF COURT

McVERRY, J.
  *1 Pending before the Court for consideration and disposition is Defendant's MOTION FOR SUMMARY JUDGMENT *(Document No. 22).* Plaintiff Peggy Love ("Love") alleges discrimination based on gender with respect to a decision by Defendant United Parcel Service ("UPS") to transfer her from a downtown Pittsburgh sales territory to the Bethel Park territory. After a thorough review of Defendant's Memorandum in Support of UPS' Motion for Summary Judgment *(Document No. 23),* Plaintiff's Brief in Opposition *(Document No. 29),* Defendant's Reply Brief *(Document No. 31),* the Statement of Material Undisputed Facts *(Document No. 24),* Plaintiff's Counterstatement of Material Facts and Additional Facts *(Document No. 30),* UPS' Counterstatement *(Document No. 32),* and the appendices attached thereto, the Court concludes that the motion will be GRANTED.

### BACKGROUND

  Ms. Love has been employed in the Laurel Mountain District of UPS since 1985. Each district within UPS has its own staff and operating functions. Love worked in a series of clerical positions until she earned a degree in Human Resources in August 2000. At that time, Love received a promotion to a job as Sales Representative. Love was promoted again in October 2001 to a position as an Account Representative and assigned to a specific geographic sales territory in downtown Pittsburgh. Account Representative compensation is 80% fixed salary plus 20% non-discretionary bonus based on sales volume. Love reported to Scott Guldin, who in turn reported to Barry Kastner, the district sales manager. Plaintiff states that Kastner would routinely "high-five" men in the department and say things like "my boy, Jim Demarco." Kastner asked UPS security to investigate Plaintiff's entries into a company database, while similar accusations Love made against Demarco were not investigated by security. Plaintiff states that all three of the investigations pursued by Kastner during his tenure in the district were agaisnt women.

  At issue in this case is UPS' decision, effective January 1, 2003, to assign Love to the Account Representative position in the Bethel Park territory. In January 2004, Love was reassigned again, from Bethel Park to the Human Resources department. [FN1] Love was, at latest report, still employed by UPS in Human Resources.

    FN1. Love does not challenge the reassignment to Human Resources.

  Plaintiff contends that her performance in the downtown Pittsburgh territory during 2003 was satisfactory. She states that the territory was in a deteriorated condition due to the poor performance

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                       Page 2

Slip Copy, 2006 WL 2806565 (W.D.Pa.)
**(Cite as: Slip Copy)**

and falsification of records of her predecessor, William Trimble.[FN2]Love was able to restore business from several customers alienated by Mr. Trimble. Plaintiff concedes that she failed to meet two UPS initiatives, Project Brown and Project Brown Tail, but asserts that she was hampered by Trimble's conduct and that numerous other salespersons also failed to meet their goals. Love was below standard by six minutes per day in customer visits and failed to complete one of six required self-assessments. Love met her volume and revenue goals for every quarter she worked the downtown territory. Her growth rate in the fourth quarter of 2002 was 5.1% and in December 2002, it was 5.9%. Love's growth rate for all of 2003 was 1.1%, compared to 3.2% for the region as a whole. Scott Guldin believed that Love's performance in the territory was not satisfactory. Guldin cited deficiencies in actual sales, sales initiatives, sales skills, sales planning and responsiveness. Love's Quality Performance Review indicated that improvements were needed in revenue growth, assessments and critical skills. By the end of the third quarter of 2002, Guldin recommended to Kastner that Love be reassigned to Bethel Park, a less-demanding region where she could better progress as a salesperson. Kastner agreed to a lateral transfer, based on Guldin's recommendation, Love's lack of performance on sales initiatives, weak Making Major Sales ("MM S") scores, downward trend in sales, low percentage effectiveness, low percentage growth, and poor assessments. Love cites to several angry exchanges with Kastner, in which he was very critical of her performance. Love also cites to alleged flaws in Guldin's performance.

> FN2. Trimble had been promoted to a position as Major Account Executive.

**\*2** Essentially, Love and James Demarco, the male Account Representative in Bethel Park, switched territories.[FN3]In March 2003, Love's base pay was increased from $3,075 to $3,525. Love had previously acknowledged that she could be transferred to meet UPS needs, at the discretion of UPS management. Demarco preferred to remain in the Bethel Park territory. In fact, after Love

transferred in Human Resources, Demarco returned to the Bethel Park territory. While the downtown territory provided a greater number of potential sales opportunities, those potential clients were harder to penetrate. Demarco's actual experience was that his sales-related bonuses from Bethel Park exceeded his bonuses during the year he was assigned to the downtown region. There is no record evidence which indicates that Love's actual bonuses or total compensation declined while she was in the Bethel Park territory.

> FN3. UPS management stated that Demarco was more "seasoned." While Demarco performed significantly better on selling skills assessments, his sales experience was less lengthy than Love's and Demarco had not met his sales targets in 2002.

## STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-49 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989)*(citing Liberty Lobby,* 477 U.S. at 249). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id. (citing Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury."*Liberty Lobby,* 477 U.S. at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2806565 (W.D.Pa.)
**(Cite as: Slip Copy)**

251-52.

## DISCUSSION

Plaintiff does not contest dismissal of her claim under the Equal Pay Act. However, Plaintiff continues to assert causes of action under Title VII and the Pennsylvania Human Relations Act (PHRA), based on the January 2003 transfer from downtown to Bethel Park. The same legal standards govern the Title VII and PHRA claims. *Stultz v. Reese Brothers, Inc.,* 835 A.2d 754, 759 (Pa.Super.2003). The familiar McDonnell-Douglas burden-shifting approach applies. Under the *McDonnell Douglas* burden-shifting framework, plaintiff must first make out a *prima facie* case of discrimination, by establishing that: (1) she was a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *Sarullo v. United States Postal Service,* 352 F.3d 789, 797 (3d Cir.2003).[FN4] If accomplished, the burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the alleged adverse employment action. If the employer proffers a legitimate reason for its action, the plaintiff must then show that the proffered legitimate reason(s) are merely a pretext for discrimination. *Simpson v. Kay Jewelers Div. of Sterling, Inc .,* 142 F.3d 636, 644 n. 5 (3d Cir.1998).

> FN4. In *Jones v. School District of Philadelphia,* 198 F.3d 403 (3d Cir.1999), the U.S. Court of Appeals for the Third Circuit explained that "the elements of a *prima facie* case depend on the facts of the particular case[,]" and that "a *prima facie* case cannot be established on a one-sizefits-all basis."*Jones,* 198 F.3d at 411.

**\*3** The Court concludes that Love cannot make out the elements of a prima facie case because Love cannot establish that she suffered an adverse employment action. An "adverse employment action " is one that is serious and tangible enough to alter the terms, conditions, privileges or compensation of the employment. *Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir.2001). In *Langley v. Merck & Co.,* 2006 WL 1647015 (3d Cir. June 15, 2006) (unpublished), the Third Circuit recently held: " Minor actions, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions."In *Wardle v. County of Montgomery,* 2006 WL 2171976 (E.D.Pa.2006), the Court explained that while a lateral transfer might sometimes qualify as an adverse employment action, the burden is on the plaintiff to produce enough evidence to allow a reasonable jury to conclude that the transfer caused harm sufficiently serious to be a constitutional injury. *Id.* at \*7-8 (citing *Serna v. City of San Antonio,* 244 F.3d 479 (5th Cir.2001)). Plaintiff's subjective belief that a transfer is less desirable or demeaning cannot suffice. *Id.* A reassignment can become an adverse employment action under Title VII only if the plaintiff can show a significant detrimental impact. *Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir.1999).*See also Burlington Northern & Santa Fe R.R. Co. v. White,* 126 S.Ct. 2405 (2006) (discussing whether reassignment constituted an adverse action in context of Title VII retaliation claim).

The record clearly demonstrates that Love received a lateral move, switching territories with another Account Representative. Love has not produced evidence to show *any* adverse impact, let alone an adverse impact significant enough to constitute a constitutional injury. Love retained the same title, responsibilities and salary. After only a few months in the Bethel Park territory, Love's base salary increased significantly. Love argues that the transfer to Bethel Park deprived her of additional bonuses, which reduced her earning potential. On the record evidence before the Court, no reasonable fact-finder could reach this conclusion. Demarco testified, without contradiction, that the actual bonuses he received in the Bethel Park territory were greater than his bonuses from the downtown territory. While downtown offered more *potential,* those potential customers were more difficult to penetrate. *See Martin v. Dupont Flooring Sys.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2806565 (W.D.Pa.)
**(Cite as: Slip Copy)**

2004 WL 1171208 *3 (D.Conn. May 25, 2004) (requiring evidence from which a reasonable jury could find that earning potential was materially diminished). Love has not proven that her bonuses were markedly higher in the downtown territory. Further evidence that the transfer to Bethel Park was not an adverse employment action is the fact that Demarco preferred to remain in that territory. In fact, Demarco left the downtown territory and returned to Bethel Park when that territory became available after Love was assigned to Human Resources. Accordingly, there is no genuine issue of material fact regarding whether Love suffered an adverse employment action and UPS is entitled to summary judgment.

**\*4** Even assuming, arguendo, that Love could demonstrate that she suffered an adverse employment action, UPS would still be entitled to summary judgment because Love cannot meet her burden to prove the disparate treatment element of her prima facie case.[FN5]Disparate treatment under Title VII can be proven when a person in a protected group is singled out and treated less favorably than a similarly situated comparator on the basis of an impermissible criterion. *E .E.O. C. v. Metal Service Co.,* 892 F.2d 341, 346-47 (3d Cir.1990). Proof of an employer's discriminatory motive is a critical component of this analysis. *Id.* The employer's discriminatory intent may be shown by direct or circumstantial evidence. *Id.* at 347.In this case, Love has failed to produce any evidence of disparate treatment by UPS. The person assigned to the Bethel Park territory, both prior to and subsequent to Love's tenure, was a male. The persons assigned to the downtown territory, both prior to and subsequent to Love's tenure, were males. UPS points out that position transfers within UPS are extremely common and that 31 individuals in the Laurel Mountain District business development department, mostly male, transferred territories in 2002-2003. There is no evidence that Plaintiff was singled out for reassignment due to her gender. Accordingly, no reasonable factfinder could conclude that similarly situated male employees were treated any differently or more favorably and UPS is entitled to summary judgment.

FN5. There is no dispute that Love is a member of a protected class. The Court agrees with Plaintiff that Love was qualified for the position. At the prima facie case stage, Love has demonstrated that she has the necessary experience and qualifications to hold the Account Representative position. Indeed, UPS' argument is severely undercut by the fact that UPS transferred Love to another Account Representative position.

Even assuming, arguendo, that Love could establish a prima facie case, UPS would still be entitled to summary judgment because Love has not met her burden to produce evidence that shows that UPS' reasons for the transfer were pretextual. Both Guldin and Kastner recited a litany of legitimate, non-discriminatory reasons for the transfer. Thus, the burden would shift back to Plaintiff to show pretext. To show pretext, plaintiff must point to some evidence from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the discharge. *Simpson,* 142 F.3d at 644;*see also Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions that a factfinder could conclude that employer's reasons are unworthy of credence).

In this case, both of Love's superiors deemed her performance to be unsatisfactory. Love testified in her deposition that she realized that they were unhappy with her performance. There is undisputed evidence that UPS failed to meet certain sales initiatives and that her sales growth for the year was below the district average. The person chosen to replace her, Demarco, received the maximum score of 11 on the assessment for Making Major Sales, while Love's score was a 5-moderate. Thus, under UPS' evaluation, Demarco was viewed as being far more able to make major sales than Love. In response, Plaintiff points only to the fact that Demarco had less experience as an Account Representative and that he had failed to meet his volume and revenue numbers in the Bethel Park

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 5

Slip Copy, 2006 WL 2806565 (W.D.Pa.)
**(Cite as: Slip Copy)**

territory. Love contends that she was performing satisfactorily and that UPS had no real reason for transferring her.

**\*5** The Court of Appeals has made clear that disagreements regarding an employer's business judgment cannot suffice to establish a claim for discrimination. *Kautz v. Met-Pro Corp.,* 412 F.3d 463, 468 (3d Cir.2005); *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3d Cir.1997). The disputes between Love and UPS boil down to differing perceptions about Love's job performance and whether the aspects of the job that Love performed acceptably outweighed the areas in which she was admittedly deficient. For example, Love focuses on her performance in the last quarter and last month of 2003, while UPS focuses on her sales for the entire year. The Court has been instructed to closely evaluate the evidence as a pretext for discrimination, but to be cautious about interfering with employers' subjective evaluations of their employees. The anti-discrimination laws do not transform this Court into a super-personnel department vested with the authority to second-guess the wisdom of business decisions. *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 781 (8th Cir.1995). On this evidentiary record, no reasonable factfinder could conclude that UPS' reasons were so implausible that they must have been a pretext for discrimination.

## CONCLUSION

Plaintiff does not contest the entry of summary judgment on the Equal Pay claim. Summary judgment must be granted on the Title VII and PHRA claims, as well. The evidence of record does not provide any reasonable basis to conclude that UPS' business decision to transfer Love to the Bethel Park territory was an adverse employment action, constituted disparate treatment due to Love's gender, or was a pretext for discrimination.

An appropriate order follows.

## ORDER OF COURT

AND NOW, this 28th day of September, 2006, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the Defendant's MOTION FOR SUMMARY JUDGMENT *(Document No. 17)* is **GRANTED.**The clerk shall docket this case closed.

W.D.Pa.,2006.
Love v. United Parcel Service
Slip Copy, 2006 WL 2806565 (W.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

**Citation # 8**
**2000 us dist lexis 14653**

◆ Positive , As of Jan 29 , 2008

MARGARET MCKAY, Plaintiff, v. DELAWARE STATE UNIVERSITY, DR. WILLIAM B. DeLAUDER, HENRY TISDALE, DR. JOHNNY TOLLIVER, DR. TOSSIE TAYLOR, AND DR. WILLIAM FLAYHART, Defendants.

Civ. A. No. 99-219-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2000 U.S. Dist. LEXIS 14653

September 29, 2000, Decided

**NOTICE:**  **[*1]**  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendants' motion for summary judgment denied in part and granted in part.

### CASE SUMMARY

**PROCEDURAL POSTURE:** In an employment discrimination action alleging claims for disparate treatment, discriminatory discharge and retaliation under 42 U.S.C.S. §§ 1981, 1983 and 1985, Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000(e), et seq., defendant state university and defendant officials moved for summary judgment under Fed. R. Civ. P. 56.

**OVERVIEW:** Plaintiff, caucasian and a former political science professor at defendant university, alleged inter alia claims for disparate treatment, discriminatory discharge and retaliation under 42 U.S.C.S. §§ 1981, 1983 and 1985, Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. §§ 2000 (e), et seq., and the Age Discrimination in Employment Act. Defendants moved for summary judgment. The court granted and denied defendant's motion in part. The court denied defendant's motion with respect to plaintiff's Title VII claims since there existed genuine issues of material fact as to whether defendant university disparately treated and terminated plaintiff because of her race or gender. The court also denied defendant's motion with respect to plaintiff's retaliation claim since there was sufficient evidence for a reasonable jury to find that the proffered reason for discharge was pretextual and that retaliation was the real reason for plaintiff's dismissal. The court also denied defendant's motion with respect to plaintiff's civil conspiracy claims.

**OUTCOME:** Defendants' motion for summary judgment was denied in part and granted in part. Plaintiff's alleged disparate treatment was continuous and ongoing during her employment at defendant university. Plaintiff's claims were sufficient to constitute a "pattern of discrimination" and were not barred by any statute of limitations.

**CORE TERMS:** tenure, promotion, internship, summary judgment, personnel, retaliation, prima facie case, teaching, grievance, faculty, political science, recommended, chair, genuine, gender, recommendation, grades, harassment, lawsuit, peers, Employment Act, official capacities, protected activity, discriminatory, recommending, recommend, state law claims, conspiracy claim, full professor, statutes of limitations

### LexisNexis® Headnotes

Civil Procedure > Discovery > Methods > General Overview
Civil Procedure > Summary Judgment > Opposition > General Overview
Evidence > Procedural Considerations > Burdens of Proof > Allocation

A court shall grant summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. Facts that could alter the outcome are material, and **HN1**☐disputes are genuine if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. If the moving party has demonstrated an absence of material fact, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial. The court will view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion.

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants
Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants
Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview

The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the **HN2**☐burden of proof, the moving party is entitled to judgment as a matter of law. With respect to summary judgment in discrimination cases, the court's role is to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.

Civil Procedure > Pleading & Practice > Service of Process > Time Limitations > General Overview
**HN3**☐See Fed. R. Civ. P. 4(m).

Labor & Employment Law > Discrimination > Actionable Discrimination
**HN4**☐See 42 U.S.C.S. § 2000e-2(a).

Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Burden Shifting
Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Employee Burdens
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens

Claims of discrimination brought pursuant to Title VII are analyzed under a burden-shifting framework, the particulars of which depend on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Under the McDonnell Douglas burden-shifting framework, plaintiff must first establish a prima facie case of race or gender discrimination under Title VII. In order to state a case based on discrimination, plaintiff must prove: (1) that **HN5**☐she is a member of a protected class; (2) that she suffered some form of adverse employment action; and (3) that this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly-situated person not of the protected class is treated differently. The Third Circuit recognizes, however, that the elements of a prima facie case may vary depending on the facts and context of the particular situation.

Labor & Employment Law > Discrimination > Actionable Discrimination

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the employee's rejection. If the

HN6 defendant carries this burden, the presumption of discrimination drops from the case, and the plaintiff must cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated.

Labor & Employment Law > Discrimination > Retaliation > General Overview
HN7 See 42 U.S.C.S. § 2000e-3(a).

Labor & Employment Law > Discrimination > Retaliation > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

As with discrimination claims, a plaintiff claiming retaliation must first establish a prima facie case for retaliation under Title VII. For this, a plaintiff must demonstrate by a preponderance of the evidence: (1) that she engaged in protected activity; (2) that the defendant took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action. Once a plaintiff has established a prima facie case, HN8 the burden shifts to the defendant to clearly set forth through the introduction of admissible evidence reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. If the defendant successfully rebuts the plaintiff's prima facie showing, the presumption of discrimination drops from the case, and plaintiff must present sufficient evidence for a reasonable factfinder to conclude that the proffered reason was not the true reason for the employment decision.

Labor & Employment Law > Discrimination > Retaliation > General Overview
HN9 See 42 U.S.C.S. § 2000e-3(a).

Labor & Employment Law > Discrimination > Retaliation > General Overview

The causal link between protected activity and a plaintiff's termination is not limited to HN10 timing and demonstrative proof, such as actual antagonistic conduct or animus. Rather, it can be other evidence gleaned from the record as a whole from which causation can be inferred.

Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Remedies
Constitutional Law > State Autonomy > General Overview
Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview

HN11 The Eleventh Amendment limits 42 U.S.C.S. §§ 1981, 1983, 1985 and civil conspiracy claims against states and state officials to prospective injunctive relief.

Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination
Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties
Labor & Employment Law > Discrimination > Public Contracts > General Overview

42 U.S.C.S. § 1981 prohibits race-based discrimination in the making and enforcement of contracts. Claimants are required to prove intentional discrimination under the same burden-shifting framework used in Title VII cases. Therefore, plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) plaintiff is a member of a racial HN12 minority; (2) defendants intended to discriminate against plaintiff on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in Section 1981. Upon a prima facie showing by plaintiff, the burden shifts to defendants to assert a legitimate, nondiscriminatory reason for their actions, which plaintiff may rebut with evidence of pretext.

Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) >
General Overview
Constitutional Law > Equal Protection > Full & Equal Benefit
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 >
Amendments
*HN13* See 42 U.S.C.S. § 1981.

Civil Rights Law > Contractual Relations & Housing > Civil Rights Act of 1866
*HN14* In order to show intentional discrimination, plaintiff must point to facts of record which, if
proved, would establish that defendants actions were racially motivated and intentionally
discriminatory, or, at least, support an inference that defendants intentionally and
purposefully discriminated against her on the basis of her race.

Civil Rights Law > Section 1983 Actions > Elements > Protected Parties
Civil Rights Law > Section 1983 Actions > Scope
Constitutional Law > Equal Protection > Scope of Protection
*HN15* Section 1983 imposes liability on any person who, under color of state law, deprives another
of any rights secured by the Constitution or the laws of the United States. 42 U.S.C.S. §
1983.

Constitutional Law > State Autonomy > General Overview
*HN16* The Eleventh Amendment bars 42 U.S.C.S. § 1983 claims against state entities and state
officials sued in their official capacities.

Civil Rights Law > Section 1983 Actions > Scope
*HN17* As for the claims against a defendant in her individual capacity, the test for discriminatory
intent under 42 U.S.C.S. § 1983 is the same as that under Title VII.

Civil Rights Law > Conspiracy > Elements
Civil Rights Law > Contractual Relations & Housing > Civil Rights Act of 1866
Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > General
Overview
*HN18* To plead a cognizable 42 U.S.C.S. § 1985(3) claim, a plaintiff must allege facts to show a
conspiracy for the purpose of depriving a person or class of persons of equal protection of
the laws or equal privileges and immunities, and an act in furtherance of the conspiracy
whereby a party is injured in his person or property or is deprived of a right or privilege of a
citizen of the United States. Section 1985(3) prohibits only conspiracies predicated on racial,
or perhaps otherwise class-based, invidiously discriminatory animus.

Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > State Immunity
Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Defenses &
Exceptions
Public Health & Welfare Law > Social Services > Disabled & Elderly Persons > Advocacy &
Protection > Discrimination > Americans With Disabilities Act
*HN19* Congress did not abrogate states' Eleventh Amendment sovereign immunity when enacting
the Americans with Disabilities Act.

Civil Procedure > Parties > Capacity of Parties > Agents
Civil Procedure > Parties > Real Parties in Interest > General Overview
Civil Rights Law > Section 1983 Actions > Elements > Color of State Law > General Overview
*HN20* When state official is sued in official capacity, real party in interest is government entity of
which official is an agent.

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent
Claims

Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > State Immunity
Constitutional Law > Equal Protection > Gender & Sex

*HN21* Pendent state law claims against state entities and officers are barred by the Eleventh Amendment. A plaintiff may still bring these claims against defendants in their individual capacities, however.

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964
Governments > Legislation > Statutes of Limitations > Extension & Revival
Labor & Employment Law > Discrimination > Racial Discrimination > Defenses & Exceptions > General Overview

*HN22* The Third Circuit recognizes a continuing violation exception to the timely filing requirement. Under this exception, a plaintiff may pursue a discrimination claim for conduct that began prior to the filing period if plaintiff can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant. To successfully argue a continuing violation theory, the plaintiff will have to show a present violation, i.e., one within the statute of limitations period, that is reasonably related to previous discriminatory acts that, standing alone, would be barred by the statute of limitations.

**COUNSEL:** For Plaintiff: Laurence V. Cronin, Esquire, Smith, Katzenstein, & Furlow, Wilmington, Delaware.

For Plaintiff: Mark B. Frost, Esquire, Of Counsel, Frost & Zeff, Philadelphia, Pennsylvania.

For Defendants: John D. Balaguer, Esquire, Marc S. Casarino, Esquire, White & Williams, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, Chief Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

Dated: September 29, 2000

Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

Plaintiff Dr. Margaret McKay filed this action on April 7, 1999 against defendant Delaware State University [1] ("DSU"), its President, Dr. William B. DeLauder ("DeLauder"), its Vice President of Academic Affairs until 1994, Henry Tisdale ("Tisdale"), its Dean of the School of Arts and Sciences, Dr. Johnny Tolliver ("Tolliver"), its Vice President of Academic Affairs from 1994 to 1996, Dr. Tossie Taylor ("Taylor"), and Chairman of its History, Political Science and Philosophy Department, Dr. William Flayhart ("Flayhart"). Plaintiff alleges disparate treatment, discriminatory [*2] discharge and retaliation under 42 U.S.C. §§ 1981, 1983 and 1985, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.*, the Age Discrimination in Employment Act and the Delaware Discrimination in Employment Act. [2] Plaintiff also alleges breach of contract, civil conspiracy and violation of the Delaware Constitution. (D.I. 22) The court has jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. The court has supplemental jurisdiction over plaintiff's state claims pursuant to 28 U.S.C. § 1367. Currently before the court is defendants'

motion for summary judgment on all counts of the complaint. (D.I. 74) For the reasons that follow, the court will grant in part and deny in part defendants' motion for summary judgment.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

1 Prior to the fall of 1993, DSU was known as Delaware State College.

2 Plaintiff filed an Amended Complaint on September 13, 1999 in which she added claims under the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and the Delaware Discrimination in Employment Act. (D.I. 22)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## [*3] II. BACKGROUND

This is a case of alleged employment discrimination brought by a former tenured professor against DSU and several members of its administration and faculty in their individual and official capacities. Plaintiff contends that she was discriminated against based on her race, gender, age and perceived disability in connection with her performance as a faculty member, her repeated requests for promotion and tenure, and her ultimate dismissal from DSU. In order to assess plaintiff's claims, a review of the facts is necessary.

### A. The Early Years of Employment

Plaintiff is a 71-year old Caucasian female. She was first employed in August 1983 as an Assistant Professor of Political Science by DSU, a predominantly African-American educational institution. Shortly after arriving at DSU, plaintiff received critical evaluations from her peers. On October 25, 1983, Associate Professor of Political Science Dr. Joseph Spina ("Spina") expressed his "extreme . . . disappointment" in plaintiff's performance, including her failure to begin developing the Political Science Internship Program ("Internship Program"), neglect in preparing a requested brochure for the Political **[*4]** Science curriculum, and her failure to post office hours and to spend sufficient time on campus. (D.I. 75 at A1) Spina also noted that the two classes plaintiff taught, Introduction to Political Science and Contemporary Political Ideologies, covered the same subject matter, and students had complained about plaintiff's disorganized teaching methods. (D.I. 75 at A2) Plaintiff received similar critical evaluations from Flayhart and Dr. James Valle ("Valle"), the Department Chair at that time. (D.I. 75 at A4-A10) Valle placed plaintiff on probationary status and postponed a recommendation for reappointment until the next scheduled evaluation in light of plaintiff's short time at DSU. (D.I. 75 at A10) In an October 31, 1983 letter, Valle informed plaintiff of the negative evaluation and provided her with suggestions on how to correct the deficiencies. 3 (D.I. 75 at A11)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

3 Valle also informed plaintiff that "some of our disquiet is clearly rooted in intangible eccentricities of behavior, missed and cancelled appointments, apparent inability to grasp the importance of the cooperative efforts we are asking of you, bare minimum adherence to office hours, and a general lack of the professional maturity and self-starting abilities that we had expected of a person of your experience and qualifications." (D.I. 75 at A12)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## [*5] B. Promotion to Associate Professor and First EEOC Complaint

In the fall of 1985, plaintiff sought promotion from Assistant to Associate Professor. On November 15, 1985, the Promotion and Tenure Committee of the History and Political Science Department ("Tenure Committee") recommended plaintiff for promotion to Associate Professor. In its report, the Tenure Committee, composed of Valle, Spina, Flayhart, and Chairman Dr. John Gardner

("Gardner"), noted that plaintiff is "willing to work with students far beyond her required office hours," "unusually vigilant in enforcing academic standards on such matters as plagiarism," "quite innovative in her teaching methods," and "interacts with her colleagues [and is] well-liked by members of the department." (D.I. 75 at A37-38) However, the Tenure Committee also cited three weaknesses: plaintiff's need to publish, her lack of organizational ability in the classroom, and her need to pursue long-term projects such as the Internship Program. (D.I. 75 at A38) The Tenure Committee concluded that plaintiff's strengths "substantially outweighed" her weaknesses and thus recommended her for a promotion. (*Id.*) Despite this recommendation, **[*6]** plaintiff's application for promotion was rejected by the DSU Board of Trustees in the spring of 1986 because of the negative teaching evaluations in her file. (D.I. 75 at A40)

Plaintiff reapplied for promotion in the fall of 1986. On November 10, 1986, plaintiff filed an EEOC complaint against DSU alleging age and sex discrimination in connection with the denial of her 1985 application. (D.I. 75 at A41) On November 14, 1986, then-Department Chair Dr. James Hartnett ("Hartnett") and the Department Personnel Committee ("Personnel Committee") consisting of Flayhart, Gardner and Spina, recommended plaintiff for promotion to Associate Professor pursuant to her 1986 request. (D.I. 75 at A43) The Board of Trustees agreed and promoted plaintiff to Associate Professor beginning on September 1, 1987. (D.I. 75 at A44)

In July of 1987, plaintiff added the charge of race discrimination to her EEOC complaint, alleging that some of her black colleagues had received tenure or promotion even while having negative evaluations in their files or not fulfilling the necessary requirements. (D.I. 75 at A46) On November 27, 1987, the EEOC issued its decision on the complaint, finding no evidence of discrimination **[*7]** surrounding the denial of plaintiff's 1985 request for promotion. [4] (D.I. 75 at A54) This decision was later upheld by the EEOC upon review. (D.I. 75 at A57)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[4] The EEOC found that during the same academic year, four others were considered for promotion: two black females over age 40 were promoted; one white male much younger than plaintiff was denied promotion for reasons of merit; and one white female under 40 was denied a promotion on technical grounds but was later granted the promotion on appeal. (D.I. 75 at A53-54)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## C. Tenure Application, First Federal Lawsuit and Second EEOC Complaint

In the fall of 1987, plaintiff applied for tenure. The Personnel Committee recommended that plaintiff be denied tenure, as did Hartnett, who cited plaintiff's lack of organizational ability [5] and combative temperament. (D.I. 75 at A52) Similarly, the Tenure Committee voted not to recommend plaintiff for tenure because of deficiencies in teaching and scholarly publication. [6] (D.I. 75 at A58) In response, plaintiff **[*8]** submitted a lengthy statement to Tisdale, who was then Vice President and Dean of Academic Affairs, rebutting the negative evaluation by Hartnett. [7] (D.I. 75 at A60) On June 9, 1988, an Ad Hoc Appeals Committee of plaintiff's peers ("Appeals Committee") voted to uphold the Tenure Committee's decision not to recommend her for tenure. [8] (D.I. 75 at A76) On July 7, 1988, the DSU Board of Trustees rejected plaintiff's tenure application. (D.I. 75 at A77)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[5] Specifically, Hartnett referred to problems with students due to lack of communication and classroom organization, poor handling of the Internship Program, and failure to meet deadlines in administrative matters, such as textbook orders and submission of course syllabi. (D.I. 75 at A51-52)

[6] The Tenure Committee specifically referred to Section 8.5.2a of the DSU Collective Bargaining

Agreement ("CBA"), which states in part, "Competence in teaching is an absolute necessity for promotion or tenure," and Section 8.5.2b of the CBA, which states in part, "Publication of scholarly books, monographs, and articles in publications recognized by and within the discipline . . . are worthy of professional recognition." (D.I. 75 at A59) **[*9]**

7 Plaintiff claimed that Hartnett directly contradicted his March 1987 chair evaluation, in which he gave plaintiff high scores in these areas. (D.I. 75 at A60)

8 The Appeals Committee, however, noticed many "disturbing" administrative factors, including a lack of department leadership to make plaintiff formally aware of inadequacies, poor counseling to assist plaintiff in remedying any deficiencies, an unwillingness by the Personnel Committee to share its reasons for a negative recommendation, and a conflict between written and verbal recommendations by the chair and faculty. (D.I. 75 at A76)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Meanwhile, on March 18, 1988, plaintiff filed a pro se lawsuit in federal court against DSU and several administrators and professors, claiming discrimination based on race, age and sex surrounding plaintiff's 1985 request for promotion. (D.I. 75 at A67) On February 2, 1989, plaintiff voluntarily withdrew the lawsuit. (D.I. 75 at A101) Plaintiff also filed a union grievance under the CBA regarding her denial of tenure. (D.I. 75 at A71)

In June 1988, plaintiff filed a second EEOC complaint, alleging **[*10]** that she was denied tenure in retaliation for filing her first EEOC complaint. (D.I. 75 at A78) The EEOC found this complaint also to be without merit. 9 (D.I. 75 at A79)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

9 The EEOC determined that during the year in which plaintiff applied for tenure, there were eleven applicants for tenure, and only three, all white females and two over the age of 40, were granted tenure. Those who did not get tenure included 4 blacks and 3 whites (including plaintiff), and ten of the eleven were over age 40. (D.I. 75 at A79)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

On January 9, 1989, plaintiff wrote a letter to President DeLauder requesting an alternate evaluation panel due to the allegedly "prejudicial" nature of the Personnel Committee. (D.I. 75 at A84) Plaintiff requested guidance on how to remedy the situation of "silence" from the Dean, "inactivity" from the Chair, and "hostility" from the Personnel Committee. (D.I. 75 at A84) On March 21, 1989, the Personnel Committee's vote on whether to recommend plaintiff for reappointment resulted in a tie, but Department **[*11]** Chair Frederick Lauter supported reappointment so plaintiff remained on the faculty. 10 (D.I. 75 at A88)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

10 Valle and Flayhart submitted negative evaluations, to which plaintiff offered rebuttal statements. Plaintiff characterized Valle's criticisms as conclusory, vague and in contradiction of good evaluations he gave her in prior years. (D.I. 75 at A90-93) Plaintiff also stated that her request for clarification from Valle was met with a repeat of the vague criticisms he already submitted. (D.I. 75 at A90) Plaintiff directly contradicted most of Flayhart's account of the class that he evaluated and attributed his criticisms to "the inappropriateness of having a historian assess the pedagogical and disciplinary substance of a political scientist's work." (D.I. 75 at A94)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**D. Second Federal Lawsuit**

In April 1989, plaintiff filed a second pro se lawsuit alleging discrimination in connection with the denial of her application for tenure. This lawsuit was dismissed in October of that year. (D.I. 75 at A103)  **[*12]**  On November 3, 1989, DeLauder found that technical procedural violations occurred in plaintiff's tenure review, so he ordered the process to be repeated in the fall of 1990. [11] (D.I. 75 at A105) Plaintiff's Union appealed this decision to binding arbitration as provided for in the CBA, but subsequently withdrew its request for arbitration. (D.I. 75 at A107) Plaintiff reapplied for tenure in 1991 and received it in 1992. (D.I. 78 at B112)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

[11] DeLauder determined that the chairperson's evaluation was not provided in a timely fashion, the Tenure Committee chairperson did not notify plaintiff that the file was in the office and it contained negative comments, and the Department did not develop criteria for promotion or tenure prior to considering all applications that year. (D.I. 75 at A105)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## E. Initial Applications for Promotion to Full Professor

In the fall of 1992, plaintiff applied for promotion to full professor. The Personnel Committee (Department Chair Valle, Flayhart and Professor Jean Smith) supported **[*13]** the application, as did the Tenure Committee. (D.I. 75 at A110-A111) However, neither the Acting Dean of the School of Arts and Sciences, Warren Rhodes, nor Tisdale recommended plaintiff for promotion. [12] (D.I. 75 at A112, A116) On March 21, 1994, plaintiff's request for promotion was rejected by DeLauder, who cited lack of an "outstanding record in both teaching and research." (D.I. 75 at A118)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

[12] Rhodes specifically cited plaintiff's deficiency in scholarly publication. (D.I. 75 at A112)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Plaintiff applied again for promotion in the fall of 1993 and was again recommended by the Personnel Committee. (D.I. 75 at A119) Flayhart disagreed because of deficiencies in research, stating that "failure to provide specific evidence of this has blocked consideration for promotion for other members of the faculty." (D.I. 75 at A120) Although the Appeals Committee recommended promotion, the Tenure Committee, Tolliver and DeLauder agreed with Flayhart, and plaintiff was not promoted to professor that year. It was also at **[*14]** this time that Flayhart recommended plaintiff for an award for meritorious research for the 1992-93 academic year and, as a result, plaintiff was given a salary increase. (D.I. 75 at A122-A123)

Plaintiff applied for promotion to full professor again in fall 1995. The Personnel Committee supported her promotion, [13] as did the Appeals Committee upon review, but the Tenure Committee, Flayhart, Tolliver, Taylor and DeLauder disagreed, once again citing a lack of outstanding research. (D.I. A128-A139) On May 21, 1996, Flayhart sent plaintiff a memo explaining his reasons for not recommending her, specifically, his view that the CBA requirement of outstanding research for promotion refers to articles that are already published, not articles that are merely accepted for publication, like those plaintiff cited in her application. (D.I. 75 at A135)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

[13] The Personnel Committee lauded plaintiff's strengthening of the political science curriculum, especially as Pre-Law and Internship Coordinator, her "stimulating and challenging" teaching, her research that has led to "widespread professional recognition" and her "extensive" community involvement. (D.I. 75 at A128)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[\*15]**  In June of 1995, plaintiff was awarded a parity salary increase, and on January 16, 1996, plaintiff was awarded professional development funds in support of her project, "Sexual Harassment in the Workplace." (D.I. 75 at A132, A138)

## F. The Internship Program and Union Grievances

Since the fall of 1993, Flayhart periodically encouraged plaintiff to accelerate development of the Internship Program. (D.I. 75 at A140-A145) In particular, Flayhart requested plaintiff to place an intern in Senator Biden's Washington office, which she was unable to do because of the expense of living in Washington and time that the intern would spend away from school. (D.I. 78 at B103) In the fall of 1995, Flayhart permitted a student who was the grandson of a former president of DSU to retroactively receive Internship Program credit for a summer internship, and plaintiff rejected this arrangement as against the policy of the Internship Program. (D.I. 75 at A146, D.I. 78 at B123) On November 28, 1995, Flayhart requested that all student files be submitted to him by the following day for review. (D.I. 75 at A147) Plaintiff failed to do this [14] and Flayhart removed her as director of the Internship **[\*16]**  Program on November 29, 1995. (D.I. 75 at A148)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[14] Plaintiff alleges that upon receipt of the request for the documents, she sought guidance from the DSU grievance officer, who suggested that plaintiff ask for clarification of Flayhart's request. Plaintiff claims she sent a memorandum to Flayhart, but was removed from her position the next day and never received a response. (D.I. 78 at B125)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Flayhart then requested plaintiff to provide him with all grades for students in the Internship Program, and plaintiff did so in a memorandum in which she addressed herself as "Internship Coordinator." (D.I. 75 at A150) On January 2, 1996, Flayhart sent a letter to the DSU Office of Records stating that he was the only professor authorized to enter grades for the Internship Program and that "illegal" grades had been recorded into the system by plaintiff. [15] (D.I. 75 at A152)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[15] According to Flayhart, plaintiff submitted grades for her students as well as students supervised by other professors. (D.I. 75 at A174) These grades were inconsistent with those she provided to Flayhart. (D.I. 75 at A155) Plaintiff alleges that other professors supervised interns while she was on sabbatical and would expect her to submit grades for those students when she returned. (D.I. 78 at B119-120)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[\*17]**  In April 1996, plaintiff filed two union grievances over her removal as Internship Director and her claim that Flayhart substituted grades. These grievances were denied at both levels of review. (D.I. 75 at A158-159) In October of 1996, the Union's Executive Committee denied plaintiff's request to advance the grievances to arbitration. (D.I. 75 at A161)

## G. Annual Reports, Student Complaints and Alleged Verbal Abuse

DSU publishes annual reports in which department chairs list the achievements and development of their academic programs and faculty. Plaintiff alleges that Flayhart included false statements in the Department's annual reports, including that plaintiff was very ill during the 1993-1994 academic

year which resulted in many incomplete grades, cancellation of over one-third of her classes, and numerous student complaints. [16] (D.I. 78 at B301, B306) Flayhart also included that plaintiff was removed as Internship Director and resigned as Pre-Law Advisor, and characterized her grants and research from Queen's University in Ireland as not recognized by DSU. (D.I. 78 at B306, B310)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

[16] In his deposition, Gardner states that he did not recall plaintiff having any more student complaints than her peers. (D.I. 78 at B57)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*18]  Plaintiff also alleges that Flayhart publicly berated her on several occasions. For instance, plaintiff claims that Flayhart ordered her to alphabetize the law catalogs, a job she felt was appropriate for a student worker, scolded her for cancelling a field trip at which only one student showed up, and humiliated her during departmental meetings by criticizing her for raising issues for discussion. (D.I. 78 at B185, B193, B298) Plaintiff described Flayhart's "pattern of discrimination, harassment and deliberate interference with [her] professional responsibilities" in a letter to DeLauder on December 18, 1996. [17] (D.I. 78 at B431) These alleged events were also brought to the attention of Tolliver and the DSU Affirmative Action Officer, Drexel Ball. (D.I. 78 at B434, B453)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

[17] In addition to the aforementioned incidents, plaintiff described Flayhart's refusal to recommend her for merit pay two years in a row (while recommending her peers), improperly informing personnel of her sick days when she was not sick, forcing her to teach an overload of courses in order to accommodate his administrative error, scolding her in front of her students, refusing to meet with her to discuss his evaluations of her performance, demanding that she pay for incoming fax usage while not requiring her peers to do the same, and refusing to honor her requests for course preferences while doing so for other faculty members. (D.I. 78 at B431-432)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

### [*19] H. 1996 Request for Promotion to Full Professor

Plaintiff applied again for promotion to Professor in fall 1996. As part of the application process, classroom evaluations were performed by plaintiff's peers. Although the evaluations by Dr. Samuel Hoff ("Hoff") and Gardner were favorable, Flayhart gave the plaintiff very low scores and did not recommend her for tenure, promotion or reappointment on the faculty. (D.I. 75 at A164) This evaluation was never placed in plaintiff's tenure file. (D.I. 75 at A192)

On October 9, 1996, the Personnel Committee recommended plaintiff for promotion, but without notice of Flayhart's negative recommendation. (D.I. 78 at B381) On October 14, 1996, Flayhart wrote to both the Tenure Committee and Tolliver, recommending against promotion. (D.I. 75 at A183)

On October 16, 1996, Flayhart met with the Union to discuss pending grievances, and the next day he composed two letters -- one to plaintiff and one to DeLauder -- outlining his intention to seek plaintiff's dismissal. (D.I. 75 at A172, A175) After consultation with the DSU attorney, however, the letters were never sent. (D.I. 75 at A178)

On November 20, 1996, the Tenure Committee informed [*20]  plaintiff that it had voted not to recommend her for promotion. (D.I. 75 at A191) The Appeals Committee upheld the decision, and Tolliver agreed. (D.I. 75 at A193)

In late January 1997, DeLauder determined that certain procedural violations had occurred in plaintiff's 1996 promotion application process, [18] so he directed Flayhart to meet with plaintiff and review his classroom evaluation with her and then for the Tenure Committee to reconsider the matter. [19] (D.I. 75 at A196) On March 4, 1997, plaintiff and Flayhart met for 1.5 hours to discuss the evaluation pursuant to DeLauder's request, and plaintiff subsequently expressed her dissatisfaction with the meeting and the entire process to the Union President and DSU's Contract Administrator. (D.I. 75 at A218) On April 10, 1997, plaintiff provided the Tenure Committee with a lengthy rebuttal to Flayhart's evaluation, repeatedly stating that his criticisms lacked "specific, concrete details." (D.I. 75 at 219)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[18] The CBA violations included: Flayhart's failure to review the fall evaluation with plaintiff or provide her with a copy; Flayhart's failure to consult with plaintiff before making a negative recommendation; and failure of the Tenure Committee to inform plaintiff that she received a negative recommendation and to allow her to submit a rebuttal. (D.I. 75 at A196) **[*21]**

[19] Flayhart attributes not speaking to plaintiff to her request on April 1996 that he never speak to her again because he was the source of her work-related stress. (D.I. 75 at A192)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In response to plaintiff's objection to the reconsideration process, on September 30, 1997, the Union President advised plaintiff to either accept the process as is, or to appear directly before the DSU Board of Trustees. (D.I. 75 at A255) Plaintiff rejected both options and instead suggested recusal of those Tenure Committee members who were involved in the prior evaluations. (D.I. 75 at A265) The Union President rejected the suggestion of recusal without specific evidence of bias, and the reconsideration process continued as before. (D.I. 75 at A267)

## I. Events Leading to Dismissal

On September 24, 1997, plaintiff removed two female students from her Introduction to Political Science class, allegedly due to their repeated disruptive behavior. The students were sent to counseling with Vice President of Student Affairs, Ms. Lowan Pitt ("Pitt"). The students were instructed to return to class on October 3, **[*22]** but when they did, plaintiff required them to make an apology and they refused. [20] After giving a quiz, plaintiff cancelled the remainder of the class. When class met again on October 6, plaintiff summoned a campus security officer and asked him to remove the two students, but he did not do so. The next day, plaintiff requested assistance from Tolliver in addressing the disciplinary problem because her "effort . . . to resolve this problem through an informal process has failed" and she "feared for [her] own personal safety." (D.I. 78 at B471) Flayhart sent a memo requiring plaintiff to hold class, but when at least one of the two students arrived at the next class, she cancelled class again. (D.I. 75 at A269) Flayhart sent plaintiff another memo removing her from the class and reassigning it to Hoff. (D.I. 75 at A269) Plaintiff replied to Flayhart, challenging his authority to remove her as professor. [21] Flayhart wrote to Tolliver, then Acting Provost, recommending plaintiff's dismissal for cause. (D.I. 75 at A288) The class met again on October 10, 1997, and after plaintiff refused to leave the class, Flayhart directed a security officer to move the students to another classroom **[*23]** where Hoff continued teaching the class. (D.I. 75 at A291)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[20] Plaintiff was under the mistaken impression that the students were required to apologize before returning to class as was the case with prior students whom she had removed from her class. This apparently was not the arrangement that Pitt made with the students here. (D.I. 75 at A296)

[21] Plaintiff informed Flayhart that she intended to continue teaching the class since he, as a

department chair/administrator, did not have the authority to remove instructors from classes, and would continue to teach until she received "written notification from a University administrator to the contrary." (D.I. 78 B476-477)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On October 7, 1997, Flayhart sent a memorandum to DeLauder regarding plaintiff's alleged deterioration, stating that "beyond a shadow of a doubt . . . the health of [the plaintiff] continues to deteriorate . . . [The plaintiff] represents a 'clear and present danger' to the Delaware State University academic community." (D.I. 75 at A256)  **[*24]**  On October 16, 1997, Tolliver wrote a letter to DeLauder recommending McKay's immediate suspension from DSU pending a hearing before the Ad Hoc Dismissal Committee ("Dismissal Committee") composed of fellow professors from throughout the University. (D.I. 75 at A292) On October 17, 1997, DeLauder suspended plaintiff with pay, pending appearance before the Dismissal Committee. (D.I. 75 at A293)

On November 24, 1997, plaintiff filed a union grievance alleging a violation of academic freedom which was later denied. (D.I. 75 at A295-297) On April 29, 1998, plaintiff filed a complaint with the Delaware Department of Labor and the EEOC alleging race and gender discrimination surrounding her suspension. (D.I. 75 at A298) On August 27, 1999, she filed a supplemental complaint with the EEOC expanding her allegations to include claims under the ADEA and ADA. (D.I. 75 at A300)

The hearing before the Ad Hoc Dismissal Committee was conducted over a period of four days on March 22-24 and March 29, 1999. In January 2000, the Committee issued a 51-page opinion recommending that plaintiff be dismissed from employment. (D.I. 75 at A303) On March 16, 2000, the DSU Board of Trustees accepted the Ad **[*25]** Hoc Dismissal Committee's recommendation and dismissed plaintiff from the faculty. [22] (D.I. 75 at A349)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[22] DeLauder stated in a deposition that plaintiff was the first tenured professor suspended or terminated during his presidency, which began in 1987. (D.I. 78 at B213) Plaintiff's brief cited letters documenting alleged incidents where other professors physically assaulted students or yelled threats of bodily harm at their peers and were not ultimately terminated. (D.I. 78 at B420-428)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## III. STANDARD OF REVIEW

A **HN1**☐court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See _Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)._ **[*26]**  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." _Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)_ (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" _Matsushita, 475 U.S. at 587_ (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." _Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)._ **HN2**☐The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See _Anderson v. Liberty Lobby, Inc., 477_

U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). If the nonmoving **[*27]** party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Indus.*, 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

## IV. DISCUSSION

As a preliminary matter, the court agrees that defendants Taylor and Tisdale were not served within 120 days of the filing of the complaint in this case, and dismisses them from this action pursuant to Federal Rule of Civil Procedure 4(m). [23]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[23] *HN3* Federal Rule of Civil Procedure 4(m) provides that "if service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate procedure." To this date, plaintiff has neither served Tolliver and Tisdale nor requested additional time for service from the court.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## [*28] A. Title VII Claims

Plaintiff alleges that defendant DSU [24] discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[24] Although defendants argue, and plaintiff concedes, that there is no individual liability under Title VII, plaintiff has brought her Title VII claims against only DSU, making this issue moot. See *Dici v. Commonwealth of Pa.*, 91 F.3d 542, 552 (3d Cir. 1996) (holding that there is no individual liability under Title VII).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## 1. Race and Gender Discrimination [25]

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[25] *HN4* The anti-discrimination provision of Title VII provides: "It shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[\*29]** *HN5*

Claims of discrimination brought pursuant to Title VII are analyzed under a burden-shifting framework, the particulars of which depend on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Since review of the record does not reveal any direct evidence of race or gender discrimination and plaintiff does not purport to assert such, the court will analyze plaintiff's discrimination claim using the burden-shifting framework for "pretext" suits set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). See *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

Under this framework, plaintiff must first establish a prima facie case of race or gender discrimination under Title VII. In order to state a case based on discrimination, plaintiff must prove: (1) that she is a member of a protected class; (2) that she suffered some form of adverse employment action; and (3) that this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly-situated person not of **[\*30]** the protected class is treated differently. See *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 409 (E.D. Pa. 2000) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)). The Third Circuit recognizes, however, that the elements of a prima facie case may vary depending on the facts and context of the particular situation. See *Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).

*HN6* Once a plaintiff has established a prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If the defendant carries this burden, the presumption of discrimination drops from the case, and the plaintiff must "cast sufficient doubt" upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc). See also *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996) (citations omitted) (stating that a plaintiff **[\*31]** can demonstrate "sufficient doubt" by showing "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence").

Defendant at bar concedes that plaintiff has established a prima facie case of discrimination regarding her disparate treatment on the job, her applications for promotion and tenure, and her dismissal from DSU. (D.I. 74 at 29) Thus, the burden shifts to defendant, who has cited "legitimate" reasons for its actions, including numerous student complaints, plaintiff's disorganized teaching methods, neglect of the Internship Program, lack of scholarly research, a combative temperament, and the dispute over allegedly disruptive students that ultimately led to plaintiff's suspension and dismissal from DSU. (D.I. 75) Plaintiff has countered with evidence that casts doubt upon the legitimacy of these reasons. For instance, plaintiff received merit awards for her research at the same times she was denied promotion and tenure for deficiencies in that area. (D.I. 75 at A122, A132, A138) At every request for promotion or **[\*32]** tenure, plaintiff received contradicting evaluations from various DSU faculty and at least twice, technical procedural violations occurred during the review process. (D.I. 75 at A105, A196) Plaintiff also alleges that other tenured DSU professors committed more egregious behavior and were never terminated. (D.I. 78 at B420-428)

The court concludes, therefore, that there exist genuine issues of material fact as to whether DSU disparately treated and terminated plaintiff because of her race or gender. Accordingly, the court shall deny defendants' motion for summary judgment as to the Title VII discrimination claims.

## 2. Retaliation [26]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

26 *HN7* The anti-retaliation section of Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3 (a).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

  **[*33]**  Claims of retaliation brought pursuant to Title VII are analyzed under the same burden-shifting framework described above. In the present case, plaintiff has presented only indirect evidence of retaliation, thus, the *McDonnell-Douglas* pretext framework applies.

*HN8* As with a discrimination claim, a plaintiff claiming retaliation must first establish a prima facie case for retaliation under Title VII. In order to do so, a plaintiff must demonstrate by a preponderance of the evidence: (1) that she engaged in protected activity; 27 (2) that the defendant took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action. *See Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir. 1999). Once a plaintiff has established a prima facie case, the burden shifts to the defendant to "clearly set forth through the introduction of admissible evidence" reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. *Burdine,* 450 U.S. at 254-55. If the defendant successfully **[*34]** rebuts the plaintiff's prima facie showing, the presumption of discrimination drops from the case, and plaintiff must present sufficient evidence for a reasonable factfinder to conclude "that the proffered reason was not the true reason for the employment decision." *Id.* at 256. *See also Bray v. Marriott Hotels,* 110 F.3d 986, 990 (3d Cir. 1997) ("The plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination.").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

27 *HN9* Title VII defines a "protected activity" as an instance when an employee has "opposed any practice made an unlawful employment practice by this subchapter, or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In the instant action, defendant argues that plaintiff **[*35]**  has not established a prima facie case of retaliation because she did not engage in any protected activity after the late 1980s, nor has she established a link between the protected activity and defendant's adverse employment action. (D.I. 74 at 29-30) On the contrary, the record indicates that plaintiff filed union grievances, an EEOC charge, a complaint with the Delaware Department of Labor, and various informal complaints in the late 1990s. (D.I. 75) Furthermore, plaintiff has sufficiently stated a causal link between her protected activities and her termination by DSU. According to the Third Circuit, *HN10* this causal link is "not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus. Rather, it can be other evidence gleaned from the record as a whole from which causation can be inferred." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir. 2000). Plaintiff alleges numerous instances of harassment, procedural violations and inconsistent evaluations by defendant after she filed her various complaints; therefore, a causal link can reasonably be inferred. Plaintiff has sufficiently stated a prima facie case of retaliation.

  **[*36]**  The remaining analysis is similar to that of Title VII race and gender discrimination as

stated above. The court concludes that there is sufficient evidence for a reasonable jury to find that the proffered reason for discharge was pretextual and that retaliation was the real reason for plaintiff's dismissal. Defendants' motion for summary judgment on the Title VII retaliation claim is denied.

**B.** Sections 1981, 1983, 1985 **and Civil Conspiracy Claims**

As an initial matter, *HN11* the Eleventh Amendment limits the following claims against states and state officials to prospective injunctive relief. *See Edelman v. Jordan,* 415 U.S. 651, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974). Since DSU is a state institution, [28] the following claims against DSU and defendants in their official capacities are limited to prospective injunctive relief.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[28] DSU is a corporation created and funded by the Delaware General Assembly, whose Board of Trustees is appointed by and includes the Governor. *See* Del. Code Ann. tit. 14, § 6501, *et seq.* Thus, DSU is an instrumentality of the State of Delaware for 11th Amendment purposes. *See also Chapman v. Trs. of Del. State Coll.,* 101 F. Supp. 441, 444 (D. Del. 1951) (dismissing complaint because "a Federal Court should not interfere with The Trustees of Delaware State College, a state agency, which is a body corporate of the State of Delaware"); *Lewis v. Del. State Coll.,* 455 F. Supp. 239, 245 (D. Del. 1978) (Delaware State College's personnel decisions "constituted state action within the meaning of the Fourteenth Amendment" to the United States Constitution).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*37] **1.** Section 1981 **Claim**

*HN12* Section 1981 prohibits race-based discrimination in the making and enforcement of contracts. [29] Claimants are required to prove intentional discrimination under the same burden-shifting framework used in Title VII cases. Therefore, plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) plaintiff is a member of a racial minority; (2) defendants intended to discriminate against plaintiff on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in Section 1981. *See Lewis v. J.C. Penney Co.,* 948 F. Supp. 367, 371 (D. Del. 1996). Upon a prima facie showing by plaintiff, the burden shifts to defendants to assert a "legitimate, nondiscriminatory" reason for their actions, which plaintiff may rebut with evidence of pretext. *See McDonnell Douglas,* 411 U.S. at 802.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[29] *HN13* Section 1981, as amended by the Civil Rights Act of 1991, provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). The coverage of the statute "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). These rights are protected from encroachment by both private and state actors. *See* 42 U.S.C. § 1981(c).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*38] As a member of a racial minority at a predominantly African-American university, plaintiff satisfies the first prong of the prima facie case. *HN14* In order to show intentional discrimination under the second prong, plaintiff "must point to facts of record which, if proved, would 'establish that defendants' actions were racially motivated and intentionally discriminatory,' or, at least,

'support an inference that defendants intentionally and purposefully discriminated' against her on the basis of her race." *Ackaa v. Tommy Hilfiger Co.*, 1998 U.S. Dist. LEXIS 3570, *8-9, No. 96-8262, 1998 WL 136522, at *3 (E.D. Pa. Mar. 24, 1998) (citations omitted). Plaintiff's allegations that her black colleagues were treated differently, combined with defendants' inconsistent reasons for their denials of promotion and tenure, sufficiently support an inference of intentional racial discrimination. Finally, plaintiff satisfies the third prong of the prima facie showing because defendants' alleged discrimination resulted in plaintiff's dismissal from her tenured position at DSU.

The remaining analysis is similar to that under Title VII, thus, the court denies defendants' motion for summary judgment with regard to plaintiff's **[*39]** Section 1981 claim.

**2.** Section 1983 **Claims**

**HN15** Section 1983 imposes liability on any person who, under color of state law, deprives another of any rights secured by the Constitution or the laws of the United States. *See* 42 U.S.C. § 1983. Specifically, plaintiff asserts that defendants' discriminatory actions violated her rights under the First Amendment and Equal Protection Clause of the Fourteenth Amendment. (D.I. 20 at A16)

As an initial matter, **HN16** the Eleventh Amendment bars Section 1983 claims against state entities and state officials sued in their official capacities. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989). The court therefore grants summary judgment with respect to the Section 1983 claims against DSU and defendants in their official capacities.

**HN17** As for the claims against defendants in their individual capacities, the test for discriminatory intent under Section 1983 is the same as that under Title VII. *See Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997) (citation omitted). The court finds that there exist genuine issues of material fact as to whether defendants unconstitutionally **[*40]** discriminated against plaintiff so as to deprive her of her Fourteenth Amendment right to equal protection. Similarly, there is a genuine dispute as to whether defendants deprived plaintiff of her First Amendment right to petition by interfering with her right to file lawsuits and other grievances against defendants. Therefore, summary judgment is denied with respect to plaintiff's Section 1983 claims against defendants in their individual capacities.

**3.** Section 1985 **and Civil Conspiracy Claims** [30]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[30] Plaintiff asserts a claim under 42 U.S.C. § 1985 and a separate "civil conspiracy" claim which the parties later characterize in their briefs as pursuant to Sections 1983 and 1985. For efficiency purposes, the court considers these claims together.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Defendants argue that plaintiff has insufficiently pled her conspiracy claims and, therefore, they should be dismissed. **HN18** To plead a cognizable Section 1985(3) claim, a plaintiff must allege facts to show a conspiracy for the purpose of depriving **[*41]** a person or class of persons of equal protection of the laws or equal privileges and immunities, and an act in furtherance of the conspiracy whereby a party is injured in his person or property or is deprived of a right or privilege of a citizen of the United States. *See United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 829, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983). Section 1985(3) prohibits only conspiracies predicated on "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971).

In her complaint, plaintiff alleges that defendants perpetrated an unlawful scheme to "fabricate false claims and poor teaching against [her]; . . . dismiss [her] due to her reporting the

harassment by defendants; and . . . terminate [her] in retaliation for having opposed defendants' practice of harassment." (D.I. 20 at A19) To support these claims, plaintiff states that her requests for review of her denial of promotion were ignored by several of the defendants, that the many enumerated instances of harassment by Flayhart were "administratively sanctioned," and that the acts of retaliation against her were "known, **[*42]** authorized, and approved by . . . DeLauder, Tisdale, Taylor, Tolliver and Flayhart." (D.I. 20 at A7-9). In alleging the various instances of harassment by Flayhart and the indifference of the DSU administration that ultimately led to her termination, plaintiff's complaint sufficiently states a claim for conspiracy under Section 1985(3). The court, therefore, denies summary judgment with respect to plaintiff's conspiracy claims.

## C. Eleventh Amendment **Immunity Against the ADEA and ADA Claims**

31

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

31 Although the parties argue the merits of an Eleventh Amendment bar of the ADA claim, the court finds no such claim in the Complaint or Amended Complaint. Since both parties address the issue in their briefs, the court will address it as well.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Plaintiff has conceded that her claims under the ADEA are barred by the Eleventh Amendment pursuant to the Supreme Court's decision in Kimel v. Florida Board of Regents, 528 U.S. 62, 120 S. Ct. 631, 145 L. Ed. 2d 522 (2000). Although the issue of whether claims under the ADA against a **[*43]** state entity are barred by the Eleventh Amendment was not directly addressed by the Supreme Court, the Third Circuit has recently decided that they are so barred. See Lavia v. Pennsylvania Dept. of Corrections, 224 F.3d 190, 2000 WL 1121553, at *11 (3d Cir. 2000) (holding that [HN19]☐Congress did not abrogate states' Eleventh Amendment sovereign immunity when enacting the ADA). Therefore, the court grants defendants' motion for summary judgment with respect to both the ADEA and the ADA claims. [32]

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

32 Plaintiff has conceded that there is no individual liability under the ADEA or the ADA. These claims are also barred against defendants in their official capacities pursuant to the Eleventh Amendment. See Hafer v. Melo, 502 U.S. 21, 26, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991) (holding that [HN20]☐when state official is sued in official capacity, real party in interest is government entity of which official is an agent).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## D. State Law Claims

Plaintiff also alleges state law claims of discrimination based on race, **[*44]** gender and age in violation of the Delaware Discrimination in Employment Act, Del. Code Ann. tit. 19, § 710, et seq., violation of the Delaware Constitution, [33] and common law breach of contract. [HN21]☐Pendent state law claims against state entities and officers are barred by the Eleventh Amendment. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984). Plaintiff may still bring these claims against defendants in their individual capacities, however. See Lloyd v. Jefferson, 53 F. Supp. 2d 643, 680 (D. Del. 1999) (holding that Eleventh Amendment sovereign immunity is no defense to state law claims brought against state officials in their individual capacities). Therefore, the court grants summary judgment as to plaintiff's state law claims against DSU and the remaining defendants in their official capacities.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

33 Plaintiff mistakenly alleges a violation of Article XVI, Section 10 of the Delaware Constitution, which is a non-existent provision. The court assumes that plaintiff is alleging a violation of Article XV, Section 10, which provides, "No citizen of the State of Delaware shall be disqualified to hold and enjoy any office, or public trust, under the laws of this State, by reason of sex."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## [*45] E. Statute of Limitations

Defendants argue that several of plaintiff's claims are barred by their respective statutes of limitations. 34 Although defendants are technically correct, *HN22*☐the Third Circuit recognizes a continuing violation exception to the timely filing requirement. *See West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995). Under this exception, a plaintiff may pursue a discrimination claim for "conduct that began prior to the filing period if [plaintiff] can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *Id.* "To successfully argue a continuing violation theory, the plaintiff will have to show a present violation, i.e., one within the statute of limitations period, that is reasonably related to previous discriminatory acts that, standing alone, would be barred by the statute of limitations." *Cuffy v. Getty Ref. & Mktg. Co.*, 648 F. Supp. 802, 810 (D. Del. 1986).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

34 Defendants argue that certain of plaintiff's claims arising under Sections 1981 and 1983, Delaware's Discrimination in Employment Act, and Title VII are barred by their statutes of limitations. (D.I. 74 at 35) Specifically, defendants contend that plaintiff's claims based on her failure to be promoted to full professor in 1993, 1994, 1995 and 1996, as well as her failure to receive merit pay in 1995 and 1996, are time-barred. (*Id.*)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

 [*46]  Plaintiff's termination on March 16, 2000 falls within the statute of limitations. That decision was based on a 51-page report by the DSU Ad Hoc Dismissal Committee that discussed plaintiff's entire fourteen-year history at DSU. (D.I. 75 at A349) Moreover, at every denial of promotion or tenure, defendants have cited the same reasons for their decisions. It is fair to say that plaintiff's alleged disparate treatment was continuous and ongoing during her employment at DSU. The court concludes that plaintiff's claims are sufficient to constitute a "pattern of discrimination" and are not barred by any statute of limitations.

## V. CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied in part and granted in part. An appropriate order shall issue.

# EXHIBIT 10

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
McLaughlin v. Diamond State Port Corp.
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Dannette G. MCLAUGHLIN Plaintiff,
v.
DIAMOND STATE PORT CORP. Defendant.
**No. C.A.03-617(GMS).**

Dec. 30, 2004.

Laurence V. Cronin, Smith, Katzenstein, & Furlow, Wilmington, DE, for Plaintiff.
Donald E. Reid, Jason A. Cincilla, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Defendant.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 Presently before the court is defendant Diamond State Port Corp.'s ("Diamond State") motion for summary judgment. (D.I.36.) This is an action brought by plaintiff Dannette McLaughlin on July 1, 2003, in which she alleges one count of unlawful gender discrimination in violation of Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e *et seq.* ("Title VII"), and one count of unequal pay in violation of the Equal Pay Act, 29 U.S.C. § 206 (1998). (D.I.1.) On October 14, 2004 McLaughlin sought to amend her complaint for the first time by adding a retaliation claim under Title VII, and an equal protection claim under 42 U.S.C. § 1983 (2003). (D.I.34.) The court denied her motion (D.I.56), so only the counts of the original complaint are the proper subject of Diamond State's motion. For the following reasons, the court will grant summary judgment in favor of Diamond State.

II. JURISDICTION

The court has jurisdiction pursuant to 28 U.S.C. § 1331 (1993).

III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56©; *see also Boyle v. County of Allegheny Pa.,* 139 F.3d 386, 392 (3d Cir.1998). Thus, summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *Boyle,* 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Bobby, Inc.,* 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-74 (3d Cir.1999).

IV. BACKGROUND

Defendant Diamond State is a corporation-like arm of the State of Delaware created to operate the Port of Wilmington. Del.Code Ann., tit. 29, § 8735(a) (2003). It assumed control of the Port of Wilmington in 1995. (Markow Dep. at 7:10, D.I. 42 Ex. B at 4.) Diamond State has three classes of employees: A, B, and C. A and B class employees are the subject of a collective bargaining agreement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

between Diamond State and the International Longshoreman's Assoc. AFL-CIO, Local 1694-1. (See generally D.I. 42 Ex. C.) Employees begin as C class and graduate to B class once they have worked 800 hours. (Immediato Dep. at 48:12-15, D.I. 42 Ex. A at 14.) A and B class employees perform the same work, however, A class employees are guaranteed 40 hours per week. (Markow Dep. at 18:11-14, D.I. 42 Ex. B at 7.) B class employees work as needed to fill in the gaps left by the A class employees. (Id.) Although various positions are available at Diamond State, only the positions of lift-truck operator and laborer/checker are relevant in this case.

*2 Whenever there is an A class opening, it is posted and B class employees may apply. The list of interested employees is then sent to individual supervisors, who rate the employees based on certain criteria. (Markow Dep. at 56:19-577:, D.I. 42 Ex. B at 16-17.) These criteria include good work ethic, punctuality, strong port knowledge, and ability to perform the particular position. (See, e.g., D.I. 42 Ex. G at DSPA4187.) Each supervisor ranks his or her top five choices and assigns each top-five candidate anywhere from one to five points, with the top candidate receiving five points and the fifth candidate receiving one point. (Stansbury Dep. at 40:8-20, D.I. 42 Ex. D at 12.) Each supervisor then returns his or her score sheet to labor relations hiring manager Andrew Markow and terminal manager William Stansbury, who tally the candidates' points. (Markow Dep. at 57:6-13, D.I. 42 Ex. B at 17.) This tallying usually reveals a grouping of just a few candidates with a high number of points. (Id.) The employees in that group are granted interviews with Markow and Stansbury (and sometimes HR manager Philip Immediato). (Markow Dep. at 57:15-58:10, D.I. 42 Ex. B at 17.) These interviews result in a final recommendation and offer of employment. (Id.)

Plaintiff McLaughlin, a woman, was hired in 1998 as a C class employee and graduated to B class in 1999. (D.I. 40 at 7.) During her time as a B class employee, she applied for six A class openings as either a lift truck operator or as a laborer. (D.I. 38 Ex. F at DSPA2502, DSPA4208, DSPA2514, DSPA2908, DSPA4135, DSPA4168.) In all but one

case, a man was chosen for promotion over McLaughlin.

McLaughlin believes that she was passed over because of her gender. Therefore, on May 28, 2002, she filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). (D.I. 42 Ex. J.) However, she continued to work for Diamond State even after filing the EEOC charge. Of the six promotions, three were offered before the EEOC complaint and three were offered after. The EEOC issued a right-to-sue letter on April 3, 2003. (D.I. 1 ¶ 8.) McLaughlin filed the present action on July 1, 2003.(Id.)

## V. DISCUSSION

### A. Count I-Title VII Gender Discrimination

Title VII prohibits an employer from discriminating against any individual on the basis of race, color, religion, sex or national origin:

It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin.

42 U.S.C. § 2000e-2(a).

Discrimination claims under Title VII are analyzed under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case by demonstrating that she is a member of a protected class. The plaintiff must then establish that she was qualified for an employment position, but was not hired for the position "under circumstances that give rise to an inference of unlawful discrimination." *See Waldron v. SL Indus., Inc.,* 56 F.3d 491, 494 (3d Cir.1995). When the plaintiff establishes this prima facie showing, the burden shifts to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. *Id.* If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons for its employment decision were pretextual-that is, that they are false and that the real reason for the employment decision was discriminatory. *Id.* If the plaintiff cannot carry the burden of proof under the shifting-framework established in *McDonnell-Douglas,* the defendant is entitled to summary judgment.*Stafford v. Noramco of Delaware, Inc.,* 2000 WL 1868179, at *1 (D.Del. Dec.15, 2000).

**\*3** In its opening brief, Diamond State concedes for the purposes of this motion that McLaughlin is a member of a protected class, that she applied for and was qualified for a number of promotions, and that she did not receive any of the promotions. (D.I. 37 at 13.) However, Diamond State vigorously disputes that the circumstances give rise to an inference of unlawful discrimination.(Id.) Obviously, McLaughlin disagrees with Diamond State's characterization of the evidence. She contends that the circumstances give rise to an inference of discrimination for four reasons: (1) Diamond State's pattern and practice of discriminating against women, (2) its supervisors' comments and conduct toward McLaughlin based specifically on her gender, (3) its disparate treatment of McLaughlin with regard to training and opportunities, and (4) its subjective promotion process. (D.I. 40 at 17.)

1. Pattern and Practice of Discriminating Against Women

McLaughlin first argues that the circumstances give rise to an inference of discrimination because Diamond State has a pattern and practice of discriminating against women. She points to Diamond State's response to Interrogatory No. 11, in which it admits that prior to March 31, 2004, the last time a woman was hired to an A class A full-time position was on June 7, 1982. (Def.'s

Resp. to Interrogs., No. 11, D.I. 42 Ex. F at 5.) And, although Diamond State hired Tina Woolford to a Chapter A full-time position in May 2004 (D.I. 38 Ex. F at DSPA4134), McLaughlin speculates that Woolford's promotion was either the result of some sort of nepotism, because her "father and two uncles are currently A class employees" (D.I. 40 at 6 n. 3), or a deliberate attempt by Diamond State to defend itself in this lawsuit (Id. at 23 n. 12). McLaughlin also points to an apparent conflict between Immediato's testimony, in which he says he tried to implement a solution to the gender gap (Immediato Dep. at 57:13-59:16, D.I. 42 Ex. A at 17), and Markow's testimony, in which he says he made promotion decisions based only on the ranking numbers he was given by the supervisors (Markow Dep. at 61:13-21, D.I. 42 Ex. B at 18). She argues this conflict is a basis from which a reasonable factfinder could infer that the dearth of female promotions remains unaddressed. Finally, McLaughlin argues that the Port of Wilmington was not amenable to women based on Immediato deposition testimony, in which he described the intensely physical nature of the job, the vulgarity and lack of professionalism among the employees, and the lack of a women's restroom at the work site as of 1997.[FN1] (Immediato Dep. at 52:15-54:10, D.I. 42 Ex. A at 15-16.)

> FN1. It is unclear from the record whether there was a women's restroom. To be precise, Immediato testified that the "rest room facilities needed upgrading." (Immediato Dep. at 53:17-18, D.I. 42 Ex. A at 16.)

The court does not believe that this is sufficient evidence from which a reasonable factfinder could infer a pattern and practice of gender discrimination. Although a twenty-two year drought between female A class employees is disconcerting, McLaughlin skims over the fact that Diamond State did not purchase the Port of Wilmington until September 1995. (Castagna Dep. at 10:18-21, D.I. 38 Ex. B at APP24.) Thus, any gender discrimination prior to that date is not attributable to Diamond State. And even if it were so attributable, McLaughlin presents no evidence as to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the number of female employees who applied for promotion to A class full-time positions from 1982 until 2000, or as to the number of female employees overall during this period. Without such evidence, any statistically-based inference of discrimination would be unreasonable. Furthermore, McLaughlin's attempt to discount Woolford's promotion as an act of nepotism is pure conjecture because she offers no evidence of a connection between Woolford's father and two uncles to the promotion process. Further, to the extent McLaughlin argues that Woolford's promotion was a deliberate attempt to defend itself in this lawsuit, the court considers such an inference impermissible. Just as subsequent remedial measures are generally inadmissible under Fed.R.Evid. 407, a defendant's attempt to reverse allegedly discriminatory practices should also be inadmissible. It would be perverse indeed if attempts to reverse discrimination could be used to condemn a defendant. Such use of evidence would only serve to discourage reform, and the court will not permit it.[FN2]

> FN2. McLaughlin's brief refers to an incident in which she was abruptly assigned to work on a larger machine "as soon as Plaintiff filed her EEOC charge." (D.I. 40 at 9.) Her point in raising this seems to be along the same lines as her point about Diamond State promoting Woolford as an attempt to defend itself. If so, the court is of the same opinion about the appropriateness of such an inference.

*4 McLaughlin's argument that a conflict between the testimony of Immediato and Markow permits an inference that the twenty-two year drought remains unaddressed is similarly unsupported by the evidence. Immediato testified at length about his efforts beginning around 1997 to increase the number of women in the A class:

BY MS. CALO:

Q: Did you ever take any initiative to determine why there were no women in A class other than Ms. Wilhelmania Archie?

A: The initiative I took was since the route to A was through B, the initiative that I took was to make sure that the feeder source, namely B, had

representation of females, which, frankly, overall at the port when I first got there, there was very few females even attempting to be hired at the hiring hall. Frankly, it-I believe the number was like 27 percent when I left that there were some-across including the office and whatever. There were a, certainly a representative. It had come a long way in terms of women.

Q: In the B class or throughout the facility?

A: Well, both. In the B class there were-because in order to get to B you had to have 800 hours of work. So there has to be an initiative to, first of all, get hired in order to get your 800 in order to get in B. And then it was-it's an evolutionary process just by virtue of the union structure, because then, even though you were in B-and I don't recall specifically as a matter when Dannette came on board, but it was probably 2001, somewhere around there, that you came at the bottom of B by virtue of their structure.

So now as work slowed down, you were, for lack of a better term, you were subject to the seniority hiring process, because the Bs actually, they had a seniority right after the As were hired. A's were guaranteed 40 hours if there was any work. So the top part of B was largely male. Shirley Taylor might be the highest one and she was like whatever number.

But as the Bs-the good news is as we started establishing and the Bs grew in number, there were more females. Certainly there were a fair amount of female, "fair amount" being I'd say 18 percent, 15 percent, 15 to 18 percent, where before there was one in the A. So it's an evolutionary process....

(Immediato Dep. at 47:22-49-10, D.I. 42 Ex. A at 14-15.)

McLaughlin contrasts this with Markow's testimony:

BY MS. CALO:

Q:.... Over the course of time that you've been involved in the process of hiring B members into the A classification, has there been any initiative on your part to try to interview more women?

A: Any initiative? On my part, on my personal part?

Q: Correct.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

A: No. The numbers are what they are.
Q: Numbers being the ranks?
A: Yes.

(Markow Dep. at 61:13-21, D.I. 42 Ex. B at 18.)

In spite of McLaughlin's assertion to the contrary, these two pieces of testimony are not in conflict. Immediato testified that he took a bottom-up approach, by bringing women in first as C class, then promoting them to B class once they worked 800 hours. From there, promotion to A class was done by the ranking system. Markow merely testified that he adhered strictly to the " numbers" (or ranks) when considering promotions from B class to A class. His testimony sheds no light on the efforts of Immediato to bring women up through the system.

**\*5** McLaughlin's final assertion that the unrefined nature of the Port of Wilmington shows that Diamond State engaged in discrimination is also unfounded. Immediato testified to the following:
BY MS. CALO:
Q:.... Did you take any actions to try to entice women to join the port, for example?
A: In my own way, by providing structure and providing discipline in the ranks, I tried to make the port more of a place where women would want to work. Quite frankly, prior to my arrival I'm not sure that was the case. I tried to be on top of enough things and develop enough structure and performance standards, including attendance and treatment of each other, employee interaction, to the point that we would not tolerate a number of things that were in place prior to Diamond State Port Corporation.
Q: What things did you witness when you first joined Diamond State that would be either a barrier or inhospitable, if you will, to women?
...
A: Well, it was like the wild west down there, so to speak, when I joined. I mean, I was scared, I mean, I was offended just in terms of, you know, what I witnessed. There were no-in my view there were very few standards that were in place, that people knew they needed to be on time even, things

of that nature. There was no standards of performance that were acceptable. There was no drug or alcohol program as an example. There was a number of things. It's too much for me to get into, but it was basically free wheeling from all respects.
...
There were times when I first got there that people would ride down to the street and ride down to the corner and try to put people in to get work down there. You didn't know whether you were getting drug free people or not. It was pretty tough, rough. Not that it's a piece of cake now. It was a lot rougher when I got there than when I left.
Q: What you are describing it seems to me is an environment that was probably hard or difficult for everyone?
A: Yes.
...
Q: Were there things in particular that you saw that would be harder for women to deal with or manage than men?
...
A: Well, it's an immensely physically environment. It's a labor intensive environment. I don't think I'm speaking out of turn by saying that that certainly would, in my view, influence certain things around, you know, the female end of it because it was very labor intensive. Certain women would respond to it and do well and other women perhaps would choose another course because it was clearly extremely labor intensive....
...
Q: We talked about this at the very beginning. When you first got there, through your employment with Diamond State, was there rough kind of cursing language used in the facility that you observed?
A: The language was different. As I described earlier, it was more street. I didn't sense that it was offensive to the population, largely. It may not have been appropriate for this office, but in that environment I would say it was rough language, but it wasn't necessarily totally offensive language....

**\*6** (Immediato Dep. at 50:2-54:7, D.I. 42 Ex. A at 15-16.)

This testimony does not implicate Diamond State in a pattern and practice of gender

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

discrimination. Attorney Calo, on behalf of McLaughlin, specifically elicited testimony that the environment was difficult for everyone, *regardless of gender.*Furthermore, Immediato was describing the Port of Wilmington as it existed just after Diamond State assumed control. So even if the environment was once gender biased, such bias is not attributable to Diamond State. As to the physical environment, it is certainly not evidence of discrimination to elicit testimony that the nature of the work tends to attract more men than women. Thus, McLaughlin's evidence is inadequate to permit a reasonable factfinder to conclude that Diamond State had a pattern and practice of discriminating against women.

**2. Supervisors' Comments and Conduct Toward McLaughlin Based Specifically on Her Gender**

McLaughlin's second argument is that she was subjected to hostility based on her gender. In particular, she was (a) told she could not work on larger machines because she was a woman, (b) told by supervisor Johnson that women should be at home having men pay their bills rather than working at the port, © romantically propositioned by Johnson, and (d) written up by supervisor Betts after she rejected his sexual suggestions. (D.I. 40 at 19.) However, as explained below, none of her evidence is sufficient to support an inference that discrimination was a factor in the promotion process.

The record evidence that she was told she could not work on larger machines because she was a woman comes entirely from McLaughlin's own deposition testimony, from which very little can be reasonably inferred:

BY MR. CINCILLA:

Q:.... Now, I understand that you believe you have been denied machinery training, experience and promotion. But what specifically is your basis for that is because of your gender?

A:..... When I first arrived there, like I stated, they told me that, you know, you are not going to be able to do this. You are not going to be able to do that. They don't say that to a man. Like I stated,

don't tell me I can't do anything....

(McLaughlin Dep. at 137:8-138:1, D.I. 42 Ex. H at 37.) First, McLaughlin does not specify who " they" are. Second, even though they said she could not "do this" or "do that," their motivation for coming to that conclusion is unclear; there is no evidentiary basis for assuming the motivation was gender-based animus. Finally, her assertion that " they don't say that to a man" is pure speculation given that Diamond State has hundreds of employees. Thus, the court does not find sufficient evidence to support McLaughlin's contention that she was told she could not work on large machines on account of her gender.

McLaughlin also contends that "Johnson has made the statement to me and other female workers, 'I don't think that women should be employed at Diamond State Port because women should be sitting at home having men pay their bills.' ' (D.I. 42 Ex. J.) Although this sort of comment might serve as a reasonable basis from which to infer discrimination, McLaughlin has not offered any corroborating evidence, e.g., the testimony of other female workers. The absence of corroboration is noteworthy for at least two reasons; (1) McLaughlin's testimony is self-serving, and (2) as already noted, and discussed further below, the other evidence offered by McLaughlin to support her claim that Diamond State engaged in a pattern and practice of gender discrimination has difficulty passing close scrutiny. In other words, even assuming, as the court must, that Johnson made the statement to McLaughlin and other female workers, the statement alone, particularly when viewed in light of the totality of this summary judgment record, is not enough to raise a genuine issue for a jury's resolution.

*7 McLaughlin's further assertion that Johnson romantically propositioned her also proves very little. At her deposition, she said Johnson asked her to dinner once in 1999, while she was still a C class employee. She turned him down, and that seems to be the end of the story. (McLaughlin Dep. at 132:7-133:8, D.I. 42 Ex. H at 35-36.) Without more, a man asking a woman out to dinner is simply insufficient to support an inference of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

discrimination.

Finally, McLaughlin presents evidence that she was written up by Betts after she rejected his sexual suggestions. In her brief, McLaughlin points to two pieces of deposition testimony to support this assertion. In the first, she describes an incident in which she was doing some work for Betts and told him she needed to use the bathroom. He followed her and began yelling at her when she stepped out of the bathroom, apparently for taking too long (although it is not entirely clear). (McLaughlin Dep. at 122:11-15, D.I. 42 Ex. H at 33.) The court fails to understand how this first piece of evidence supports her assertion that Betts made sexual suggestions.

The other piece of evidence is more clear. On an unspecified number of occasions, Betts asked McLaughlin out to dinner. She consistently turned him down. Then sometime in March 2004, McLaughlin says she was listening to gospel music at lunch when Betts said, "gospel songs, it's nothing like doing it off gospel songs." In response, McLaughlin says, "I looked at him and I cussed him out because I thought that was disrespectful to God and me." (McLaughlin Dep. at 133:19-134:14, D.I. 42 Ex. H at 36.) This exchange was followed by an email from Betts to Markow on March 16, 2004:

Apparently Net feels as if she's only suppose to operate the 21's only. I was informed that she going to try to get me fired because I'm mistreating her. This is the way I run my ship. If the ship starts at 8am everyone who is there at 8 starts on the truck they are on. Someone shows up at 8:15 they gets what left. This is another one of her ways of using her femalism to get a job. Andy, you can send her to Russle from now on. I've worked to hard to get the people I want on the ship. It is hard enough tring to get the stuff to the right place without a disgrundle employee to disrupt my operation.

(D.I. 42 Ex. O.)

The court agrees with McLaughlin insofar as she argues that Betts' comment about "doing it off gospel songs" could reasonably be construed as offensive. However, the court does not agree that this is sufficient evidence from which to infer

discrimination. Of the six promotions for which McLaughlin applied, Betts rated applicants in three-one in 2003 and two in 2004. (D.I. 38 Ex. F at DSPA2908, DSPA4135, DSPA4168.) [FN3] And, of those three, only two of the 2004 ratings processes took place after the gospel-music incident and subsequent email. Moreover, in the second of those, not only did a woman (Woolford) win the promotion (D.I. 39 Ex. F at DSPA4134), but Betts ranked her as his third choice out of twenty-nine applicants. (Id. at DSPA4135). Therefore, while Betts' comment may have been inappropriate and offensive, the evidence does not establish that he harbored any gender-based animus.[FN4]

> FN3. The ratings sheets for the 2003 promotion are missing from Diamond State's records. (D.I. 37 at 9 n. 10.) However, Diamond State admits that Betts was one of the rating supervisors involved in that promotion. (D.I. 43 at 10.)

> FN4. The email could be evidence of retaliation, however, the court recently denied McLaughlin's request to add a retaliation claim (among other things). (D.I.56.) Therefore, the evidence is only being analyzed by the court insofar as it is relevant to the two counts in the original complaint.

3. Disparate Treatment With Regard to Training and Opportunities

*8 McLaughlin's third argument that the circumstances give rise to an inference of discrimination is that she was not "allowed to train on the heavy machines like other less qualified male employees." (D.I. 40 at 20.) McLaughlin claims that when she signed up for formal training, the classes were cancelled. (Id.) At her deposition, she implied that when her supervisors saw her name on the training sign-up sheet, they would make an excuse to cancel the class. (McLaughlin Dep. at 81:13-15, D.I. 42 at 23.) Aside from the fact that her assertion is purely speculative, she presents no evidence showing that training tended to be canceled when

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

women signed up. At best, her speculation about the motives of her supervisors would only support an inference that they did not like her in particular, as opposed to women generally. But even that inference is dubious because it is undisputed that McLaughlin received training on several other processes and pieces of machinery. (D.I. 38 Ex. F at DSPA2395, DSPA2434, DSPA2437; McLaughlin Dep. at 79:19-80:10, D.I. 42 Ex. H at 22.)

McLaughlin says that unlike her male co-workers, she was even prevented from training on the heavy machinery on her own:

BY MR. CINCILLA:

Q:.... Now, I understand that you believe you have been denied machinery training, experience and promotion. But what specifically is your basis that that is because of your gender?

A:.... One day I'm there on a 21,000-pound machine practicing on empty pallets. Security pulls up. They made this big stink. Hey made me get off the lift truck and I was escorted up to the office by security.

I go to Dave Castagna and Dave Castagna told me I have to have someone with experience sitting there watching me. I said, well, in training they never told me that. They just said the way they learned was through them, they themselves practicing by themselves. So he told me, well, you have to have someone with experience or whatever to stand there with you. I said like someone is going to take off on a weekend and watch me play with a truck or take their lunch break and watch me operate a truck.

Now, when I was here, they told me to do this. They did it. And then when I told some people what happened, it never happened to them. I went to Freeman, Russell Corbin, Timothy Miller, Darry Dillard. I told them all, why did they do that? They said they don't know because they never experienced that when they practiced on the larger machines. They never had a problem.

(McLaughlin Dep. at 137:8-139:13, D.I. 42 Ex. H at 37.) Even if requiring a person to be supervised while practicing on heavy machinery was unreasonable, McLaughlin fails to present the affidavits or testimony of the men (i.e., Freeman, Corbin, Miller and Dillard) who were allowed to train in this manner. Furthermore, McLaughlin's testimony as to the statements of those men is inadmissible hearsay. Fed.R.Evid. 802. Thus, the court once again finds her unsupported assertions incapable of raising a genuine issue of material fact.

**\*9** McLaughlin also says that on the one occasion she was able to work on a heavy machine, supervisor Gamble told her to get down and she was replaced her with a male C class employee. (McLaughlin Dep. at 137:13-19, D.I. 42 Ex. H at 37.) Gamble could have had any number of motivations for replacing her on a piece of heavy equipment, including McLaughlin's admitted inexperience with such machines. Thus, the court will not permit McLaughlin to characterize Gamble's motives without some evidence-either direct, circumstantial or a combination of the two-as to his actual motivation.

### 4. Subjective Promotion Process

McLaughlin's final argument is that the supervisors are given no training on the ratings criteria, that no checks are in place to ensure that the suggested criteria are actually used by the supervisors, and that there is no discussion with the supervisors as to the reasons for their ratings. (D.I. 40. at 5-6, 20.) Because of this subjectivity, McLaughlin claims she was passed over for promotion in favor of less-qualified men. In particular, she says she is more qualified than (1) Harold Goodridge "because he only knows how to be a laborer and she is more experienced," (2, 3) Alfie Zimmerman and Lyndon Henry "because they only know how to operate a lift truck," (4) Tina Woolford "because [she] was not dependable or reliable during the two years prior to her promotion and no supervisors wanted her to work for them," and (5) Steve Hinkle "because he only knows how to check."(D.I. 40 at 10.) McLaughlin further points out that supervisor Corbin rated her as his first choice for promotion among all the candidates for the class A lift-truck operator position in early 2004 (D.I. 38 Ex. F at DSPA4188), but the position was ultimately awarded to Lyndon Henry. (D.I. 42 Ex. G at DSPA4192.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

The evidence shows that McLaughlin applied for six promotions (D.I. 38 Ex. F at DSPA2502, DSPA4208, DSPA2514, DSPA2908, DSPA4135, DSPA4168). She argues that she was more qualified than five of the six successful candidates. However, McLaughlin's qualifications relative to those of Woolford are not probative on the issue of gender discrimination because both McLaughlin and Woolford are women. Therefore, only the relative qualifications of Goodridge, Zimmerman, Henry and Hinkle are relevant. But McLaughlin's criticisms of the qualifications of these four men do not show they were less qualified than her. She criticizes Goodridge because he only knows how to be a laborer, but he was promoted to class A *laborer.*(D.I. 38 Ex. F at DSPA4197.) Similarly, she criticizes Henry because he only knows how to operate a lift truck, but he was promoted to class A *lift-truck operator.*(D.I. 42 Ex. G at DSPA4192.) The fact that one supervisor rated her highly is not evidence that she was more qualified than Henry because he had several supervisors rate him higher than her. (See D.I. 42 Ex. G at DSPA4172-DSPA4191.) She criticizes Hinkle because he only knows how to check, but by her own admission McLaughlin "very seldom" works as a laborer or checker (McLaughlin Dep. at 52:7, D.I. 42 Ex. H at 15) thereby undercutting her claim to be more qualified than Hinkle. Finally, she criticizes Zimmerman because, like Henry, he only knows how to operate a lift truck. Although Diamond State asserts that Zimmerman was hired as a lift-truck operator (D.I. 43 at 5), the portion of the record to which it cites for this proposition gives the impression that he was actually hired as a laborer (D.I. 38 Ex. F at DSPA4197). If he was hired as a lift-truck operator, then McLaughlin's criticism is without merit because he would have been hired for precisely the skill set McLaughlin says he has. If he was hired as a laborer, McLaughlin's criticism would be meritorious if not for her admission that she "very seldom" works as a laborer. Thus, either way her claim that Zimmerman only knows how to operate a lift truck does not prove she was more qualified than he. Since McLaughlin has not presented evidence that she was more qualified than the people who ultimately prevailed, her argument that the subjective promotion process gives rise to an inference of discrimination must fail.

**\*10** In sum, the court is presented with a record consisting both of evidence that does not support the inferences for which McLaughlin argues, and of the McLaughlin's uncorroborated statements. Of course, the court is cognizant of *Weldon v. Kraft, Inc.,* 896 F.2d 793, 800 (3d Cir.1990), and *Jackson v. Univ. of Pittsburgh,* 826 F.2d 230, 236 (3d Cir.1987), where the Third Circuit held that no rule of law prevents a plaintiff from surviving a motion for summary judgment in a discrimination case based solely on his or her own self-serving testimony. However, those cases must be read in light of their facts, lest they be allowed to "undermine the entire *McDonnell-Douglas* framework by drastically limiting the possibility that summary judgment could be granted because virtually any contrary testimony by a plaintiff would preclude a grant of summary judgment to the defendants."*Pamintuan v. Nanticoke Mem'l Hosp.,* 192 F.3d 378, 387 (3d Cir.1999).

In *Weldon,* the plaintiff contended that (1) he and other black trainees endured unfair treatment from a particular white supervisor, (2) he was required-unlike his white co-workers-to adhere strictly to medical documentation and advance-money policies, and (3) statistical evidence showed a disproportionate number of involuntary terminations among minority employees during a four-year span. 896 F.2d at 799. Although the Third Circuit believed the plaintiff's case presented "a close case," it held:

> If a factfinder were to credit [the plaintiff's] testimony regarding the harshness of the treatment he and other blacks received as well as his view of the statistical evidence, it could conclude that the performance evaluations were unfair and that [the defendant's] explanations were pretextual.

> *Id.*

In *Jackson,* the plaintiff presented "nearly 700 transcript pages" in which he made specific allegations regarding the issue of pretext. 826 F.2d at 234. In particular, he rebutted the defendant's contention that he was terminated for performance deficiencies by pointing to (1) the fact that he never received a single complaint about his performance, (2) the compliments he received regarding his work,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 10

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

(3) information that was withheld from him, (4) his supervisor's solicitation of complaints about the plaintiff's work *after* he was terminated, and (5) threats communicated to the plaintiff's lawyer and others that the plaintiff's supervisor intended to ruin the plaintiff's reputation and "destroy" him. *Id.* The plaintiff also testified that he was not even assigned to some of the allegedly mishandled matters, that he was not permitted the benefit of outside consultants on specialty matters, and that, unlike his white colleagues, he was given neither a secretary nor less-experienced staff for support. *Id.* at 234-35.The Third Circuit reversed the district court's granting of summary judgment for the defendant because the plaintiff's extensive and detailed testimony contained both circumstantial and direct evidence from which a jury could infer pretext. *Id.* at 236.

*11 The court is mindful of its role in this case, as it tries to be in every case brought before it for summary resolution. In other words, the court understands that, when determining the propriety of summary judgment, its job is not to weigh the evidence or to make credibility determinations. On the other hand, the Third Circuit in *Pamintuan* clearly established that there is a threshold of sufficiency which the plaintiff must surpass before she can survive summary judgment. In contrast to both *Weldon* and *Jackson,* McLaughlin's single piece of admissible evidence that might support an inference of discrimination is Johnson's uncorroborated statement that women should not be "employed at Diamond State Port because women should be sitting at home having men pay their bills. "Simply put, the court does not believe this one statement crosses the sufficiency threshold. In other words, the court does not believe it would be reasonable, in light of the entire record, for a factfinder to infer that McLaughlin was the victim of gender-based discrimination based on Johnson's statement alone.

Therefore, McLaughlin has failed to establish a prima facie case as required by *McDonnell-Douglas,* and consequently, summary judgment on Count I of the complaint in favor of Diamond State is appropriate.

B. Count II-Equal Pay Act

The Federal Equal Pay Act provides:
No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1) (1998).

Aside from the fact that the class system at Diamond State probably fits into one of the enumerated exceptions of § 206(d)(1), it is an explicit statutory requirement that liability under this statute depends on finding a pay differential " on the basis of sex." In this case, McLaughlin has failed to present evidence from which a reasonable factfinder could infer gender-based discrimination. Therefore, it is axiomatic that she has also failed to present evidence sufficient to support finding a pay differential "on the basis of sex." Thus, summary judgment is appropriate on Count II of the complaint as well.

VI. CONCLUSION

*12 Because McLaughlin was unable to establish a prima facie case of gender discrimination through the introduction of admissible evidence, the court will grant summary judgment in favor of Diamond State on all counts in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 11

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the complaint.

*ORDER*

IT IS HEREBY ORDERED that:

1. The defendant's Motion For Summary
Judgment (D.I.36) be GRANTED; and

2. The plaintiff's complaint be DISMISSED on
all counts.

D.Del.,2004.
McLaughlin v. Diamond State Port Corp.
Not Reported in F.Supp.2d, 2004 WL 3059543
(D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 11

**Citation # 6**
**2007 us app lexis 3286**

◈ Positive , As of Jan 29 , 2008

MICHAEL R. MOSCA, Appellant v. AVIS COLE; BILLIE MOORE; LORENZO LANGFORD; BENJAMIN R. FITZGERALD; CITY OF ATLANTIC CITY; JOHN DOES 1-10, Jointly, Severally and in the Alternative

No. 05-4350

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

217 Fed. Appx. 158; 2007 U.S. App. LEXIS 3286

September 26, 2006, Submitted Under Third Circuit LAR 34.1 (a)
February 14, 2007, Filed

**NOTICE: [**1]** NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT.

PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** On Appeal from the United States District Court for the District of New Jersey. District Court No. 03-cv-00168. District Judge: Honorable Joseph E. Irenas. Mosca v. Cole, 384 F. Supp. 2d 757, 2005 U.S. Dist. LEXIS 18025 (D.N.J., 2005)

### CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant employee sued appellees, including his former city employer, its mayor, and other individuals, for racial discrimination and other violations of federal and state law. The United States District Court for the District of New Jersey granted partial judgment against the employee on his federal claims and declined to exercise supplemental jurisdiction on the state claims. The employee appealed.

**OVERVIEW:** The employee worked in an at-will position for the city, but was terminated by a newly elected mayor. The mayor indicated that the employee was let go so the mayor could bring in a trusted campaign worker he wanted to hire. The employee's complaint alleging reverse racial discrimination and other violations was dismissed on summary judgment. On appeal, the employee argued that the district court erred in finding he had not presented sufficient evidence to survive summary judgment on (1) a prima facie case of employment discrimination on the basis of race, (2) a violation of his First Amendment rights, (3) a prima facie case of denial of equal protection, and (4) failure to train in violation of 42 U.S.C.S. § 1983. The court affirmed the district court decision because it agreed that the employee failed to meet even minimal proof requirements. For example, the record contained no evidence that the employee's intended replacement was objectively less qualified than the employee, particularly in a situation where one of the required qualifications was enjoying the mayor's trust. The fact that the replacement was of a different race, without more, was not enough.

**OUTCOME:** The court affirmed the judgment of the district court.

**CORE TERMS:** summary judgment, equal protection, failure to train, prima facie case, derogatory, rumor, terminated, liberty interest, termination, state law, racial discrimination, similarly situated,

free speech, discriminatory, prosecutor, municipal, supplemental jurisdiction, fact finder, campaign worker, sufficient evidence, treated differently, sexual harassment, constitutional violations, non-discriminatory, replacement, motivating, workplace, survive, pretext, appointment

## LexisNexis® Headnotes

Civil Procedure > Summary Judgment > Appellate Review > Standards of Review
Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants
Civil Procedure > Summary Judgment > Standards > General Overview

*HN1* A federal appellate court's review of a grant of summary judgment is plenary. Summary judgment is only appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In reviewing a district court's grant of summary judgment, the appellate court views the facts in a light most favorable to the non-moving party. However, to survive summary judgment, the non-moving party must present more than a mere scintilla of evidence supporting its claims.

Labor & Employment Law > Discrimination > Reverse Discrimination

*HN2* The United States Court of Appeals for the Third Circuit applies a modified version of the familiar McDonnell Douglas burden-shifting analysis to claims of reverse discrimination in employment. Under this analysis, the plaintiff must first establish a prima facie case of discrimination by presenting sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based on a trait that is protected under Title VII. Once the plaintiff makes this showing, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its adverse action. If the employer meets its burden of production by offering some evidence of a legitimate, non-discriminatory reason, the plaintiff can survive summary judgment by showing that the stated reason was a pretext. In order to show pretext, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens

*HN3* In an employment discrimination case based on race, just as the race of selecting officials is not a sufficient circumstance to establish a prima facie case of employment discrimination by itself, the fact that a plaintiff's replacement is of a different race, without more, is not enough.

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting

*HN4* To defeat summary judgment on an employment discrimination claim, where the employer has supplied legitimate reasons for its action, the plaintiff has to point to some evidence from which a fact finder could reasonably either disbelieve the employer's articulated legitimate reasons, or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting

*HN5* In an employment discrimination case, it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus.

Civil Rights Law > Section 1983 Actions > Elements > Color of State Law > General Overview

*HN6* To establish a claim under 42 U.S.C.S. § 1983, a plaintiff must demonstrate a violation of a right secured by the Constitution and the laws of the United States and that the alleged deprivation was committed by a person acting under color of state law.

Constitutional Law > Substantive Due Process > Scope of Protection
Labor & Employment Law > Employee Privacy > Disclosure of Employee Information > Public Employees

HN7  An employment action implicates a Fourteenth Amendment liberty interest only if it (1) is based on a charge against the individual that might seriously damage his standing and associations in the community, for example, by implying that he had been guilty of dishonesty, or immorality, or (2) imposes on him a stigma of other disability that forecloses his freedom to take advantage of other employment opportunities. To state a valid claim of a protected liberty interest, a plaintiff must plead that the allegedly stigmatizing information was published or otherwise disseminated by his government employer to the public. That is, the discharge of a public employee whose position is terminable at the will of the employer does not violate the employee's liberty interests when there is no public disclosure of the reasons for the discharge.

Constitutional Law > Equal Protection > Scope of Protection

HN8  The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike. Under a class of one theory, a plaintiff states a claim for violation of the Equal Protection clause when he alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. At the very least, to state a claim under that theory, a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees

HN9  In order to establish that an employer retaliated against him for exercising his First Amendment right to free speech, a plaintiff must prove (1) that his speech was protected, (2) that he suffered an adverse employment action, and (3) that his protected speech was a substantial or motivating factor for the adverse employment action. If the plaintiff meets this burden, the employer can still defeat the claim by establishing that it would have taken the same action even absent the plaintiff's exercise of free speech.

Civil Rights Law > Immunity From Liability > Respondeat Superior Distinguished

HN10  There is no respondeat superior liability under 42 U.S.C.S. § 1983, but municipalities can be held liable if officials act pursuant to policy or custom.

**COUNSEL:** For MICHAEL R. MOSCA, Appellant: Louis M. Barbone, Jacobs & Barbone, Atlantic City, NJ.

For AVIS COLE; BILLIE MOORE; LORENZO LANGFORD; BENJAMIN R. FITZGERALD; CITY OF ATLANTIC CITY, Appellees: Gary A. DeVito, Zarwin, Baum, DeVito, Kaplan, Schaer & Toddy, Philadelphia, PA.

**JUDGES:** Before: RENDELL, CHAGARES, and ROTH, Circuit Judges.

**OPINION BY:** ROTH

**OPINION**

[*159]  **ROTH**, Circuit Judge:

Michael Mosca sued his former employer, the City of Atlantic City, its Mayor, and other individuals for racial discrimination and other violations of federal and state law. The District Court granted partial judgment against Mosca on his federal claims and declined to exercise supplemental jurisdiction on the state claims. For the reasons set forth below, we will affirm the judgment of the District Court.

## I. Background and Procedural History

Because the parties are **[\*\*2]** familiar with the facts and procedural posture, we will provide only a brief synopsis of the events leading up to this appeal.

From 1992 to February 2002, Mosca, a Caucasian attorney, was employed under a series of term contracts by the Municipal Prosecutor's Office of the City of Atlantic City.

In 1999-2000, while working as a prosecutor for the City, Mosca was involved in the prosecution of the Reverend Al Sharpton for acts of civil disobedience. The prosecution resulted in a ten-day sentence, of which Sharpton served only a few hours. Mosca claims that two African-American Atlantic City councilmen, defendant Lorenzo Langford and non-party Ernest Coursey, attempted to pressure him into dropping the case and apologizing for the prosecution, but Mosca refused to do so.

In November 2001, Langford was elected Mayor of Atlantic City and immediately began to plan the replacement of certain at-will municipal employees with individuals of his choice. In mid-December, he notified all four attorneys of the Municipal **[\*160]** Prosecutor's Office, including Mosca, that they would be terminated on December 31, 2001 (the day before Langford's swearing-in). Later, Mosca was told instead that his contract **[\*\*3]** would not be renewed when it expired in February 2002.

Mosca spread the word that he wanted to continue working for the city, but nothing materialized until April of 2002, when a long-time social acquaintance, Stephen Smoger, took the position of City Solicitor. Smoger was short-staffed and believed Mosca's experience at the Municipal Prosecutor's office made him a good candidate for a part-time position as police liaison in the Solicitor's office. He approached Langford at a social event and proposed Mosca's appointment. Langford agreed but made clear that the decision could be reevaluated. Langford claims he considered Mosca's appointment a temporary measure and that he expected to hire a candidate of his choice later; Smoger recalls being told that he should stress to Mosca that he served at Langford's pleasure and would be reevaluated within the year.

According to Smoger, he then contacted Mosca and spoke to him about what he considered a significant obstacle to his hiring, namely the rapidly spreading rumor that Mosca had made a derogatory and possibly racist remark about Langford-reportedly that Langford was a "bow-tie-wearing, bean-pie-eating Muslim." Smoger recalls that Mosca **[\*\*4]** denied he had made the remark, pointing out that he was married to a minority.

On May 13, 2002, Mosca, Smoger, and now-Deputy Mayor Coursey met in Smoger's office for Mosca's interview. According to Smoger and Coursey, Coursey raised the issue of the derogatory comment and Mosca denied making it. Mosca, in contrast, remembers being asked only about his political ties to the previous city administration. Eventually, Coursey left the room, then returned and told Smoger he could hire Mosca. It is not clear whether Coursey consulted Langford during his absence or whether Langford knew of the rumor at this point.

Mosca started part-time employment in the Solicitor's Office two days later. His termination and new hiring were processed as a transfer so he could keep his benefits. Mosca was listed as an "Unclassified Employee" with no civil service protection; he understood that he served at the pleasure of the mayor and was subject to termination without cause.

Some time later, Langford apparently became interested in learning more about Mosca's alleged derogatory statement. Langford summoned Smoger, told him he had completed his investigation of the Mosca matter, and instructed him to **[\*\*5]** terminate Mosca's employment. Smoger did so on June 10, 2002. Subsequently, an African-American attorney, Jackie Abdur Razzaq, was appointed to a full-time position in the Solicitor's Office, with duties different from the ones Mosca performed. Langford claims he had decided to terminate Mosca mainly to open up a position for a Caucasian campaign worker who, however, declined the appointment; he acknowledges that the rumor of the alleged statement was also a factor in his decision.

Mosca filed an action in state court against the City of Atlantic City, Langford, Fitzgerald (Langford's chief of staff), Avis Cole, Billie Moore, and ten "John Does." The action was removed to federal court, and Mosca filed an amended complaint alleging violation of equal protection, under 42 U.S.C. § 1983; violation of procedural due process, under 42 U.S.C. § 1983; conspiracy, under 42 U.S.C. § 1983 and § 1985; racial discrimination, under 42 U.S.C. § 1981; violation of Mosca's First Amendment rights; and "refusing or neglecting to prevent" (i.e., failure to train) **[\*161]** under 42 U.S.C. § 1983 **[\*\*6]** , and a number of state law claims.

Upon the defendants' motion, the District Court granted summary judgment against Mosca on all the federal law claims and declined to exercise supplemental jurisdiction over the state claims. Mosca appealed. [1]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[1] Mosca presents no argument about the dismissal of the conspiracy count (Count XI); thus, this opinion discusses only the claims of racial discrimination, procedural due process, equal protection, and failure to train.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction over this case under 28 U.S.C. § 1331, with supplemental jurisdiction over Mosca's claims based on state law. We have jurisdiction to review the District Court's grant of partial summary judgment under 28 U.S.C. § 1291.



*HN1* Our review of a grant of summary judgment is plenary. *Gottshall v. CONRAIL*, 56 F.3d 530, 533 (3d Cir.1995). Summary judgment is only appropriate if there are no genuine issues **[\*\*7]** of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In reviewing the District Court's grant of summary judgment, we view the facts in a light most favorable to the non-moving party. *Gottshall*, 56 F.3d at 533. However, to survive summary judgment, the non-moving party must present more than a mere scintilla of evidence supporting its claims. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## III. Analysis

On appeal, Mosca argues the District Court erred in finding he had not presented sufficient evidence to survive summary judgment on (1) a *prima facie* case of employment discrimination on the basis of race, (2) a violation of his First Amendment rights, (3) a *prima facie* case of denial of equal protection, and (4) failure to train in violation of 42 U.S.C. § 1983.

### A. Employment Discrimination

*HN2* We apply a modified version of the familiar *McDonnell Douglas* burden-shifting analysis to claims of reverse discrimination in employment. *Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999); **[\*\*8]** *see* *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d

668 (1973). Under this analysis, the plaintiff must first establish a *prima facie* case of discrimination by presenting "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based on a trait that is protected under Title VII." *Iadimarco*, 190 F.3d at 161. Once the plaintiff makes this showing, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its adverse action. *See id.* at 157. If the employer meets its burden of production by offering some evidence of a legitimate, non-discriminatory reason, the plaintiff can survive summary judgment by showing that the stated reason was a pretext. In order to show pretext, the plaintiff must point to "*some* evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 166 (emphasis **[**\*\*9**]** in original; internal citation and quotation marks omitted).

Mosca contends that he has made out a *prima facie* case of reverse racial discrimination because he was qualified for his position in the City Solicitor's Office, he suffered an adverse employment action **[**\*162**]** by being terminated, and there was evidence from which a factfinder could believe that Mosca was treated differently because of his race, namely, an African American attorney (Razzaq) was hired to replace him even though she was less qualified and Mosca was terminated without a formal investigation.

Although there is very little evidence in the record that Razzaq interviewed for Mosca's position or in fact replaced Mosca, the District Court assumed for purposes of deciding the motion for summary judgment that she did. We will do the same.

**HN3** Just as "the race of the selecting officials is not a sufficient circumstance to establish a prima facie case of discrimination by itself," *Iadimarco, 190 F.3d at 156,* the fact that a plaintiff's replacement is of a different race, without more, is not enough. Although Smoger, Mosca's Caucasian superior and long-time social acquaintance, believed Mosca to be a stronger **[**\*\*10**]** addition to the office than Razzaq, the record contains no evidence that Razzaq was objectively less qualified than Mosca for a position in the Solicitor's Office, particularly in a situation where one of the required qualifications was enjoying the Mayor's trust. Mosca's own theory is that "Razzaq was not a mere African-American who happened upon a job in . . . Atlantic City, but rather, was an African-American with unquestionable [social] ties to Defendant Moore, who was alleged to have defamed Mosca." Under Mosca's own scenario, Billie Moore and Avis Cole, two African-American attorneys, started a false rumor about Mosca to favor a friend. However, even if this were true, Mosca's employment discrimination claim would still fail.

Mosca also fails in his contention that the absence of a formal investigation into the alleged rumor shows his employer's tendency to treat Caucasians less well than others. Mosca grounds his allegation of discriminatory treatment on the fact that three city employees, two Caucasians and one African-American, had earlier been afforded more formal investigations. In the case of the two Caucasians, they were accused of harassment of their subordinate administrative **[**\*\*11**]** staff; the African-American employee had been accused of calling a co-worker an "old lady." However, Mosca's alleged comment - a remark disrespectful to a superior, made outside the workplace to witnesses who were not, at the time, employed by the City - is not equivalent to the allegations of sexual harassment and other discrimination that he claims underwent formal investigations.

Even if Mosca could establish a prima facie case, the City has proffered legitimate, non-discriminatory reasons for his discharge, Langford's desire to create a position for a Caucasian campaign worker and Mosca's alleged derogatory comment. **HN4** To defeat summary judgment, Mosca would have to point to some evidence from which a fact finder could reasonably either disbelieve the employer's articulated legitimate reasons, or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Iadimarco, 190 F.3d at 165-66.*

Mosca attempts to prove pretext by arguing that he did not make the alleged remark, but this is

immaterial. The question is whether the Mayor believed Mosca had made it. Mosca can point to nothing in the record **[\*\*12]** that suggests otherwise. *See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 283 (3d Cir. 2001)* (*HN5*☐)"it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus"). Mosca also does not attempt to rebut the City's contention that Langford intended to open a position for a campaign worker, **[\*163]** who eventually declined the offer. There is no evidence that Mosca's replacement was motivated by anything other than Langford's desire to surround himself with people he trusted.

## B. Constitutional Violations Under 42 U.S.C. § 1983

*HN6*☐"To establish a claim under 42 U.S.C. § 1983, [a plaintiff] must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law."*Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)*. For purposes of the motion for summary judgment, Langford and Fitzgerald do not dispute that they are persons acting under color of state law. The issue, **[\*\*13]** then, is whether Mosca can establish that there is a genuine issue of fact as to whether they violated his constitutional rights. He cannot.

## 1. Procedural Due Process

Mosca contends that the City deprived him of a liberty interest without due process of law in violation of the Fourteenth Amendment of the Constitution of the United States. [2] He relies on our opinion in *Anderson v. City of Philadelphia, 845 F.2d 1216, (3d Cir. 1988)*. In *Anderson*, we wrote that

> *HN7*☐an employment action implicates a fourteenth amendment liberty interest only if it (1) is based on a charge against the individual that might seriously damage his standing and associations in the community[,] for example, by implying that he had been guilty of dishonesty, or immorality, or (2) imposes on him a stigma of other disability that forecloses his freedom to take advantage of other employment opportunities. We have also held that to state a valid claim of a protected liberty interest, a plaintiff must plead that the allegedly stigmatizing information was 'published' or otherwise disseminated by his government employer to the public.

*Id. at 1221-22* (citations, **[\*\*14]** quotation marks, and alterations omitted). *See also Bishop v. Wood, 426 U.S. 341, 348, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976)* (the discharge of a public employee whose position is terminable at the will of the employer does not violate the employee's liberty interests when there is no public disclosure of the reasons for the discharge).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

2 Mosca no longer argues that he had a property interest in his at-will employment.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Mosca contends Langford, Fitzgerald, and the City deprived him of the liberty interest described in *Anderson* by disseminating the information that he was terminated for making aversion of the alleged comment that included the word "nigger." However, there is no evidence that Langford or Fitzgerald told anyone that Mosca was terminated for making the comment in any form, let alone one that apparently had not reached their ears at all. In fact, Mosca himself told a number of people about the alleged comment and stated to potential employers and eventually a newspaper that he believed it **[\*\*15]** was the reason for his termination. Because there is no issue of fact as to whether Langford, Fitzgerald, or the City "published" the alleged remark, summary judgment was appropriate as to Mosca's due process claim.

## 2. Equal Protection

Mosca contend she was denied the benefit of the equal protection of the laws when he was "singled out for selective treatment" by being denied a formal investigation into the allegation that he had made a derogatory remark about the incoming Mayor.

[*164] <sup>HN8</sup> "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). Mosca's theory appears to be that regulations requiring the investigation of allegations of harassment or discrimination were selectively not applied to him. [3] He does not allege he is a member of a suspect class, but rather invokes the "class of one" theory announced in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) [**16] (per curiam). [4] Under that theory, a plaintiff states a claim for violation of the Equal Protection clause when he "alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id. at 564*. As this Court has recently noted, "at the very least, to state a claim under that theory, a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[3] This is essentially a restatement in equal protection terms of Mosca's claim of denial of procedural due process.

[4] Mosca's own references are to *Levenstein v. Salafsky*, 164 F.3d 345, 352 (7th Cir. 1998).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Mosca's claim fails because he cannot identify a similarly situated individual who was treated differently. [**17] He points most forcefully to one Caucasian attorney who "was City Solicitor after Langford was elected and . . . received a thorough and complete investigation into allegations of sexual harassment made against him." Mosca was not accused of sexual harassment by a coworker; he was alleged to have made a derogatory comment about the incoming Mayor, outside the workplace, to individuals who were not at the time employed by the City. As the District Court correctly noted, "this hardly translates into [a] charge of workplace discrimination requiring some kind of fact-finding investigation." *Mosca v. Cole*, 384 F. Supp. 2d 757, 769 (D.N.J. 2005). [5]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[5] Langford, at whose pleasure Mosca served when he was terminated, appears to have taken whatever steps he believed sufficient to satisfy himself of the truth of the rumor.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## 3. First Amendment Right to Free Speech

Mosca argues the City, Langford and Fitzgerald retaliated against him for his 1999-2000 prosecution of Sharpton, which they opposed.

[**18] <sup>HN9</sup> In order to establish that an employer retaliated against him for exercising his First Amendment right to free speech, a plaintiff must prove (1) that his speech was protected, (2) that he suffered an adverse employment action, and (3) that his protected speech was a substantial or

motivating factor for the adverse employment action. *Swineford v. Snyder County*, 15 F.3d 1258, 1270 (3d Cir. 1994). If the plaintiff meets this burden, the employer can still defeat the claim by establishing that it would have taken the same action even absent the plaintiff's exercise of free speech. *Id.*

Mosca can establish the first two elements of this claim but cannot produce sufficient evidence that his exercise of free speech was a cause of his termination. First of all, the prosecution of Sharpton occurred before he was hired into the Solicitor's office; he fails to explain why **[*165]** those who wanted to punish him for prosecuting Sharpton would not simply have refused to hire him to begin with. Second, there is no evidence that his involvement with the Sharpton prosecution played any role in his termination. Summary judgment was properly granted on this claim.

## 4. Failure  [**19]  To Train

Mosca argues the District Court erred in granting summary judgment on his *Monell* claim against the City based on its alleged failure to train Langford and Fitzgerald with regard to its anti-discrimination policies, thus allowing the alleged constitutional violations. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (holding that *HN10* there is no *respondeat superior* liability under § 1983, but municipalities can be held liable if officials act pursuant to policy or custom); *Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir. 2000) (recognizing that a municipality's failure to train that results in a constitutional violation can establish a *Monell* claim).

Since Mosca has not established any constitutional violations, his *Monell* claim fails as a matter of course. The District Court committed no error.

## IV. Conclusion

For the reasons set forth above, we will affirm the judgment of the District Court.

# EXHIBIT 12

**Citation # 1**
**2007 us dist lexis 18956**

◈ Positive , As of Jan 29 , 2008

ANTHONY RAJOPPE v. GMAC CORPORATION HOLDING CORP.

CIVIL ACTION NO. 05-2097

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2007 U.S. Dist. LEXIS 18956

March 19, 2007, Decided

**CORE TERMS:** subsidiary, jurisdictional, labor relations, formal charge, centralized, day-to-day, email, interrelation, questionnaire, integrated, vice, declaration, staff, employment decisions, discrimination claim, foreign subsidiary, employer controls, subject-matter, threshold, genuine, Civil Rights Act, administrative remedies, present case, common ownership, subject matter jurisdiction, human resources, insufficiently, disciplinary, interrelated, attributed

**COUNSEL:** [*1] ANTHONY RAJOPPE, AN INDIVIDUAL, Plaintiff, Pro se, SAN DIEGO, CA.

For GMAC COMMERCIAL HOLDING CORP, DAVID E. GREAMER, CHAIRMAN OF THE BOARD OF DIRECTORS GMAC COMMERCIAL HOLDING CORP, YOSHITOMO TAJIMA, EVP AND CHIEF OPERATING OFFICER OF GMAC COMMERCIAL MORTGAGE JAPAN, NIRAJ PATEL, EVP AND CIO, GMAC COMMERCIAL HOLDING CORP, Defendants: MICHAEL J. EAGLES, MORGAN, LEWIS & BOCKIUS LLP, PHILADELPHIA, PA.

**JUDGES:** MARY A. McLAUGHLIN, J.

**OPINION BY:** MARY A. McLAUGHLIN

**OPINION**

*MEMORANDUM AND ORDER*

McLaughlin, J.

This is an employment discrimination suit filed pro se by Anthony Rajoppe ("Rajoppe") against GMAC Commercial Holding Corp. ("GMACCH"). Rajoppe is a Caucasian male and United States citizen who was employed by GMAC Commercial Mortgage Japan, K.K. ("GMACCM Japan"), a foreign subsidiary of GMACCH. The plaintiff alleges that he was terminated based upon his race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), <u>42 U.S.C. § 2000e *et seq.*</u>

GMACCH has moved to dismiss the plaintiff's complaint for lack of subject-matter jurisdiction on the ground that the plaintiff was employed by GMACCM Japan, a foreign corporation to which Title VII does **[*2]** not apply. The plaintiff opposes the motion by arguing that Title VII does apply to the conduct of GMACCM Japan because GMACCM Japan is controlled by GMACCH, and therefore, any conduct by GMACCM Japan that violates Title VII will be attributed to GMACCH. In his opposition, the plaintiff also requests that the Court reconsider its previous dismissal of his age discrimination claim for failure to exhaust administrative remedies. The Court will deny both the defendant's motion to dismiss and the plaintiff's request for reconsideration.

## I. *FACTS*

In July of 2002, the plaintiff was invited to GMACCM Japan's Tokyo office, where he was interviewed by various officers and employees. The plaintiff was also interviewed over the telephone by Niraj Patel ("Patel"), GMACCH's Executive Vice President and Chief Information Officer. On July 26, 2002, the plaintiff was offered the position of Vice President, Head of Technology, at GMACCM Japan. The plaintiff accepted the offer.

Before he began working at GMACCM Japan, the plaintiff traveled to GMACCH's headquarters in Horsham, Pennsylvania, to meet with Patel and to go over strategy with managers from GMACCH and its global subsidiaries. On **[*3]** September 1, 2002, the plaintiff began working at GMACCM Japan. Throughout his employment at GMACCM Japan, the plaintiff alleges that he reported to both Patel and Yoshitomo Tajima ("Tajima"), the Chief Operating Officer of GMACCM Japan.

The plaintiff claims that, while serving as GMACCM Japan's Head of Technology, he received many complaints from his non-Japanese staff about racist attitudes at the corporation. The plaintiff also alleges that when he attempted to use disciplinary action against a Japanese staff member, Tajima responded by promoting the staff member to a manager position in the plaintiff's department.

On January 15, 2004, the plaintiff was summoned to an unscheduled morning meeting. At the meeting, Tajima allegedly informed the plaintiff that he could either accept a settlement or be fired. The plaintiff eventually accepted the settlement and resigned.

Shortly after the plaintiff was removed, Tajima allegedly removed all other non-Japanese managers at GMACCM Japan in an effort to promote company harmony. The plaintiff claims that most non-Japanese staff were also pressured into leaving.

Upon leaving GMACCM Japan, the plaintiff filed a complaint with the EEOC. The **[*4]** EEOC ruled that the plaintiff had accepted a settlement and declined to proceed further. The plaintiff responded by filing the present complaint, alleging various Title VII and state law claims against GMACCH, Tajima, Patel, and David Creamer, the chairman of GMACCH's board of directors.

On July 14, 2005, the Court dismissed all the plaintiff's claims except for his Title VII claim for race discrimination against GMACCH. The Court also granted a ninety-day period of limited discovery concerning the relationship between GMACCH and GMACCM Japan. The defendant has filed a renewed motion to dismiss, arguing that GMACCH does not "control" GMACCM Japan for purposes of Title VII, and therefore GMACCM Japan's conduct cannot be attributed to GMACCH.

## II. *STANDARD OF REVIEW*

This motion presents the threshold question of whether the applicability of Title VII to foreign corporations that are controlled by American employers constitutes an issue of subject-matter jurisdiction or an issue of the merits of the claim. The defendant has styled its motion as one to dismiss for lack of subject-matter jurisdiction. The Court, however, concludes that the control issue relates to the merits of **[*5]** the Title VII claim.

In 1991, Congress amended Title VII to extend its protections to American citizens working overseas for foreign corporations that are "controlled" by American employers. See *Asplundh Tree Expert Co. V. N.L.R.B.,* 365 F.3d 168, 174 n.5 (3d Cir. 2004). This amendment was prompted by the Supreme Court's decision in *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991), where the Court concluded that Title VII did not apply to extraterritorial conduct. The amended statute provides that when an American employer "controls" a foreign corporation, any conduct by the foreign corporation that violates Title VII will be presumed to be engaged in by the American employer. [1] See Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 1077 (1991) (codified as amended at 42 U.S.C. § 2000e-1(c)).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

1 The relevant provision of Title VII reads, in pertinent part:

(2) If an employer controls a corporation whose place of incorporation is a foreign country, any practice prohibited by section 2000e-2 or 2000e-3 of this title engaged in by such corporation shall be presumed to be engaged in by such employer. . . .

(3) For purposes of this subsection, the determination of whether an employer controls a corporation shall be based on --

    (A) the interrelation of operations;

    (B) the common management;

    (C) the centralized control of labor relations;

    (D) the common ownership or financial control, of the employer and the corporation. 42 U.S.C. § 2000e-1(c) (2006).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[\*6]** The Supreme Court recently set forth a test to determine whether a threshold limitation on a statute's scope, such as this one, constitutes a jurisdictional prerequisite or a substantive element of a claim. _Arbaugh v. Y & H Corp._, 546 U.S. 500, 126 S. Ct. 1235, 1245, 163 L. Ed. 2d 1097 (2006). The issue before the Supreme Court in _Arbaugh_ was whether Title VII's fifteen-employee minimum is a jurisdictional requirement or a substantive element of a Title VII claim. _Id. at 1238_. The Court began its analysis by noting that Title VII contains its own jurisdiction-conferring provision, which makes no mention of the fifteen-employee minimum. _Id. at 1245_. That provision provides: "Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter." 42 U.S.C. § 2000e-5(f)(3) (2006). The Court explained that Congress could have made the employee-numerosity requirement expressly "jurisdictional," as it has expressly made the amount-in-controversy requirement an ingredient of federal subject-matter jurisdiction **[\*7]** under § 1332, but Congress did not. _See id._ Congress placed the fifteen-employee minimum in the "definitions" section of Title VII -- a provision of Title VII that does not speak in jurisdictional terms or refer in any way to federal-court jurisdiction. _Id._ The Court, therefore, concluded that the numerosity requirement is not jurisdictional.

In the course of rendering this decision, the Supreme Court set out a bright line rule:

    If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

_Id._ (internal citations omitted).

Applying this "readily administrable bright line," _id._, to the present case, the Court concludes that Title VII's "control" requirement is not jurisdictional. Like the employee-numerosity requirement, the "control" requirement appears in a section of Title VII that does not refer in any way to federal-

court jurisdiction. *See* **[*8]** 42 U.S.C. § 2000e-1(c) (2006). Nor does the control requirement speak in jurisdictional terms. It simply states that if an American employer "controls" a foreign corporation, conduct by the foreign corporation that violates Title VII will be attributed to the American employer. [2] Indeed, when Congress extended Title VII's protections in 1991, it not only added the "control" requirement, but it also amended the "definitions" section -- the very same section that the *Arbaugh* court found to be substantive -- so that the term "employee" includes American citizens employed in foreign countries. *See* Civil Rights Act of 1991, 105 Stat. at 1077 (1991) (codified as amended at 42 U.S.C. § 2000e(f)).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[2] Title VII's control requirement is fundamentally different from the provisions cited in *Arbaugh* as examples of Congressional restrictions of the subject matter jurisdiction of federal courts. *See id.* at 1245 n.11.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The defendant submits various **[*9]** arguments as to why Title VII's control requirement is jurisdictional. These arguments fail, however, because they ignore the bright-line rule announced in *Arbaugh* . The defendant's arguments also fail because they rely on cases decided prior to *Arbaugh* and cases that did not consider the precise issue of jurisdiction versus merits. This latter course of action was expressly foreclosed by *Arbaugh*, where the Supreme Court dismissed such cases as "drive-by jurisdictional rulings" that should be accorded no precedential effect on the question of whether the federal court has authority to adjudicate the claim. *Arbaugh*, 126 S. Ct. at 1242-43. The Court explained that cases such as *Arabian American Oil Co.* obscured the jurisdiction versus merits issue by stating that the Court was dismissing for "lack of jurisdiction" when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim. *Id.* at 1242.

The Court's decision that the control limitation is not jurisdictional has consequences for the Court's standard of review. When **[*10]** subject matter jurisdiction turns on contested facts, the Court may review the evidence and resolve the factual dispute. If, on the other hand, satisfaction of an essential element of a claim for relief is at issue, the jury is the proper trier of contested facts. *Arbaugh*, 126 S. Ct. at 1244. Consequently, if there are material issues of fact on the control issue in dispute, the Court must deny the motion and submit the issue to the jury. In effect, the Court must analyze this motion as if it were a motion for summary judgment. [3]

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[3] Under Fed. R. Civ. Pro. 56, summary judgment may be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) (2006). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The Court will review the record in the light most favorable to the plaintiff, non-moving party, who is entitled to all reasonable inferences that can be drawn therefrom. *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 788 (3d Cir. 2000).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*11]** III. *ANALYSIS*

A. *The Defendant's Motion*

Title VII sets forth four factors to be considered in assessing whether a foreign corporation is "controlled" by an American employer: (i) interrelation of operations, (ii) common management, (iii) centralized control of labor relations, and (iv) common ownership or financial control. 42 U.S.C.

§ 2000e-1(c)(3) (2006).

Although few courts have applied this provision of Title VII, there is a substantial body of case law applying the same four-factor test in other contexts. Most relevant to this case is the use of the four-factor test to determine whether related entities constitute an "integrated enterprise" for purposes of assessing liability under various other employment statutes. _Watson v. CSA, Ltd._, 376 F. Supp. 2d 588, 594 (D. Md. 2005). The section of the EEOC Compliance Manual that discusses Title VII's "control" requirement uses "integrated enterprise" cases to illustrate how the requirement should be applied. _See_ Enforcement Guidance on Application of Title VII and ADA to American Firms Overseas and to Foreign Firms in the United States, Notice 915.002, EEOC [*12] Compl. Man., at § I.B.2 (Oct. 20, 1993) [hereinafter EEOC Enforcement Guidance]. The Compliance Manual also indicates that the EEOC's policy statement on the concept of "integrated enterprise" can be consulted for guidance on applying the "control" requirement. _Id._ The Court will therefore look to authorities that apply the four-factor test in both the foreign employment and "integrated enterprise" contexts.

According to this body of law, the presence or absence of any single factor is not dispositive; rather, the approach is holistic, looking at all the circumstances of the case. _E.g._, _Ferrell v. Harvard Ind., Inc._, No. CIV.A. 00-2707, 2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461, at *22 (E.D. Pa. Oct. 23, 2001). Courts typically focus, however, on the third factor of this test --- centralized control of labor relations. _E.g._, _Nesbit v. Gears Unlimited, Inc._, 347 F.3d 72, 84 (3d Cir. 2003); _see also_ EEOC Enforcement Guidance at § I.A.2.

1. _Interrelation of Operations_

Under the "interrelation of operations" factor, courts typically examine whether the two corporations shared administrative or purchasing services, employees, equipment, and/or finances. [*13] _E.g._, _Ferrell_, 2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461, at *22. For example, in _Ferrell_, the court found the requisite interrelation of operations where the subsidiary's budget required the parent's approval, and the subsidiary's sales and marketing were handled by the parent. 2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461 at *23. Likewise, in _Watson_, the court found this factor satisfied where the domestic parent and foreign subsidiary utilized the same offices, equipment, policies, procedures, business forms, and disciplinary proceedings. _Id._ at 595. The court also noted that many of the subsidiary's employees were "dual employees" of both the parent and the subsidiary. _Id._

By contrast, courts have found that operations were insufficiently interrelated where the parent and subsidiary shared little or no infrastructure and few or no employees. _See, e.g._, _Fantazzi v. Temple Univ. Hosp., Inc._, No. CIV.A. 00-CV-4175, 2002 U.S. Dist. LEXIS 16269, 2002 WL 32348277, at *3-*4 (E.D. Pa. Aug. 22, 2002). For example, in _Fantazzi_, the court held that the existence of an integrated telephone directory and the shared use of employees to investigate formal complaints of sexual harassment were not sufficient. 2002 U.S. Dist. LEXIS 16269, 2002 WL 32348277 at *3-*4. [*14] Similarly, in _Duncan v. American International Group, Inc._, No. 01 Civ. 9269, 2002 U.S. Dist. LEXIS 24552, 2002 WL 31873465 (S.D.N.Y. Dec. 31, 2002), the court found that operations were insufficiently interrelated where the foreign subsidiary provided administrative services to two other subsidiaries but not to the domestic parent. 2002 U.S. Dist. LEXIS 24552, 2002 WL 31873465 at *4.

In the present case, the defendant relies heavily on the declaration of Linda Pickles ("Pickles"), its Executive Vice President, for its contention that the two companies are not sufficiently interrelated. Pickles states that GMACCM Japan operated independently from GMACCH and was run on a day-to-day basis by a Tokyo-based executive management committee. Pickles Supp. Decl. P 3. [4]

- - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[4] A copy of Linda Pickles' supplemental declaration is attached to the defendant's motion to dismiss

as Exhibit A and cited herein as "Pickles Supp. Decl. P    ."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The plaintiff responds by submitting evidence suggesting that GMACCH did, in fact, play a substantial role in the day-to-day operations [*15] of GMACCM Japan. According to the plaintiff's evidence, GMACCM Japan's budget required GMACCH's approval. Def. Ans. to Inter. No. 20. [5] GMACCM Japan was required to follow corporate information technology ("IT") guidelines. Pl. Dep. at 41-42. [6] And, all GMACCM Japan IT projects had to be entered into an American project database. Catalano Decl. P 5. [7]

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[5] A copy of the defendant's answers and objections to the plaintiff's first request for interrogatories is attached to the plaintiff's opposition as Exhibit N and cited herein as "Def. Ans. to Inter. No.    ."

[6] A copy of the plaintiff's deposition is attached to the plaintiff's opposition as Exhibit F and cited herein as "Pl. Dep. at    ."

[7] A copy of John Catalano's declaration is attached to the plaintiff's opposition as Exhibit L and cited herein as "Catalano Decl. P    ."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The plaintiff has also submitted evidence indicating that all GMACCH subsidiaries, including GMACCM Japan, were required to use GMACCH's Professional [*16]  Services Agreement ("PSA") when doing business with IT contractors and consultants. 10/8/02 Email from Kim to Rajoppe. [8] And finally, the plaintiff's evidence shows that an employee of GMACCH managed GMACCM Japan's IT department for several months before Rajoppe assumed the position. Catalano Decl. at PP 3, 4.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[8] A copy of Elizabeth Kim's October 8, 2002, email to Rajoppe and Charmaine Cheuk is attached to the plaintiff's opposition as Exhibit I and cited herein as "10/8/02 Email from Kim to Rajoppe."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

2. *Common Management*

Under the "common management" factor, courts typically examine whether the two nominally separate corporations (i) have the same people occupying officer or director positions, (ii) repeatedly transfer management-level personnel between each other, or (iii) have officers and directors of one company occupying some sort of formal management position with respect to the other. *See, e.g., Ferrell, 2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461, at *24*. For example, in *Ferrell*, the court found [*17]  this factor satisfied where the two corporations' officers were identical, and where the human resources officer in charge of most personnel decisions relevant to the case was transferred from the parent to the subsidiary. *Id.* Likewise, where the parent appointed all management members of the subsidiary's board, the court held that a genuine issue of material fact existed as to common management. *Lavrov v. NCR Corp., 600 F. Supp. 923, 928 (S.D. Ohio 1984)*.

By contrast, at least one court has found that two corporations do not share "common management" where the sole commonality consisted of one director from the parent exercising management responsibilities at the subsidiary. *See Duncan, 2002 U.S. Dist. LEXIS 24552, 2002 WL 318734465, at *4*. Similarly, in *Martin v. Safeguard Scientifics, Inc., 17 F. Supp. 2d 357 (E.D. Pa. 1998)*, the court found this factor lacking where the sole commonality consisted of a vice president

of the parent acting as a consultant to the subsidiary. *Id.* at 368.

In the present case, the plaintiff has submitted undisputed evidence that two of GMACCM Japan's five directors were also directors of GMACCH and that GMACCM **[*18]** Japan's CEO was a member of GMACCH's executive committee. Def. Ans. to Inter. Nos. 3, 4, 16.

3. *Centralized Control of Labor Relations*

Under the "centralized control of labor relations" factor -- the most important factor of the "control" test -- courts typically look for situations where the parent either (i) controlled the day-to-day employment decisions of the subsidiary, or (ii) directed the subsidiary to take the employment action that gave rise to the discrimination claim. *See, e.g., Martin*, 17 F. Supp. 2d at 367; *Ferrell*, 2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461, at *25. In *Ferrell*, for example, the court found this factor satisfied where the parent promulgated the subsidiary's anti-discrimination and anti-harassment policies, and where the parent trained the subsidiary's employees regarding the relevant anti-discrimination policies. 2001 U.S. Dist. LEXIS 17358, 2001 WL 1301461 at *26. The court also noted that the parent controlled the subsidiary's employee benefits. *Id.* Likewise, in *Watson*, the court found this factor satisfied where the domestic parent retained full discretion to make exceptions to any of the foreign subsidiary's disciplinary procedures, established and approved **[*19]** the foreign subsidiary's compensation/benefits plans, and prescribed policies regarding outside training opportunities. *Watson*, 376 F. Supp. 2d at 598.

By contrast, courts have found this factor lacking where the parent only retains control over certain important employment decisions, but not over the day-to-day employment decisions of the subsidiary. *See, e.g., Fantazzi*, 2002 U.S. Dist. LEXIS 16269, 2002 WL 32348277, at *4. For example, in *Fantazzi*, the court found that the control of labor relations was insufficiently centralized where the "controlling" entity lacked the ability to discipline or terminate employees of the "controlled" entity. *See id.* Similarly, in *Martin*, the court found this factor lacking where the subsidiary controlled all hiring and firing of employees, but where the CEO of the subsidiary consulted with the parent's attorneys before terminating the plaintiff. *See Martin*, 17 F. Supp. 2d at 365.

In this case, the defendant relies on Pickles' declaration for the argument that control over the two corporations' labor relations was not sufficiently centralized. In her declaration, Pickles states that GMACCM Japan controlled **[*20]** its own labor relations by maintaining its own human resources department and promulgating its own employment policies and benefit plans. Pickles Supp. Decl. P 4. Pickles also states that GMACCM Japan made its own personnel decisions relating to hiring and firing, as it did with respect to the plaintiff. *Id.* at PP 4-6.

The plaintiff responds by submitting evidence suggesting that GMACCH played a role both in the day-to-day employment decisions of GMACCM Japan, as well as in the corporation's hiring and firing of the plaintiff himself. The plaintiff stated in his deposition that before being hired by GMACCM Japan, he was interviewed by Patel, GMACCH's Executive Vice President and Chief Information Officer. Pl. Dep. at 14, 23. Patel was similarly consulted when the issue of the plaintiff's termination was being discussed. *See* Pickles Supp. Decl. P 6. The plaintiff has also submitted evidence indicating that the human resources departments of the two corporations worked closely together. Catalano Decl. P 6 (stating that yearly reviews were required to be sent to GMACCH and that Pickles and other executives routinely traveled to the Japan office). And finally, the defendant has **[*21]** submitted evidence of various day-to-day labor relations issues that were controlled by GMACCH, including the payment of yearly bonuses to Rajoppe's staff, Def. Ans. to Inter. No. 21, and the ability to hire a new full-time employee in GMACCM Japan's IT department. *See* 3/26/03 Email from Wisniewski to Rajoppe. [9]

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

[9] A copy of Wendy Wisniewski's March 26, 2003, email to Rajoppe and Stephen Lin is attached to

the plaintiff's opposition as Exhibit Z-11 and cited herein as "3/26/03 Email from Wisniewski to Rajoppe."

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

4. *Common Ownership*

GMACCH concedes that it is the sole owner of GMACCM Japan. Def. Ans. to Inter. Nos. 1, 2.

5. *Weighing the Four Factors*

The Court concludes that the plaintiff has raised a genuine issue of material fact regarding whether GMACCH "controlled" GMACCM Japan for purposes of Title VII. The Court will accordingly deny the defendant's motion. [10]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[10] The plaintiff argues that the Court should deny the motion because Pickles' employee relations directory was destroyed, thereby preventing the plaintiff from obtaining information that might have aided him in his attempt to show that GMACCH "controlled" GMACCM Japan. Because the Court will deny the motion on the merits, it will decline to consider this argument.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[*22]** B.

*Rajoppe's Request for Reconsideration of Age Discrimination Claim*

The plaintiff requests that the Court reconsider its July 14, 2005, dismissal of his age discrimination claim on the ground that he exhausted his administrative remedies by checking the box for "age discrimination" on his EEOC intake questionnaire. The Court will deny the request.

To determine whether a plaintiff has exhausted his administrative remedies, courts examine whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the EEOC's formal charge of discrimination or the investigation arising therefrom. *See Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996). Courts in this circuit have uniformly held that a plaintiff fails to exhaust where he checks off a claim on an intake questionnaire but then omits the claim from the formal EEOC formal charge. *See, e.g., Johnson v. Chase Home Fin.*, 309 F. Supp. 2d 667, 672 (E.D. Pa. 2004); *Rogan v. Giant Eagle, Inc.*, 113 F. Supp. 2d 777, 786 (W.D. Pa. 2000). The Court agrees with these cases. Intake questionnaires do not serve the same function as the formal charge and are not part **[*23]** of the formal charge. A questionnaire, therefore, does not satisfy the exhaustion requirement where a claim marked off in the questionnaire is omitted from the charge and where the EEOC does not investigate the omitted claim.

The plaintiff did not include any allegations of age discrimination in his formal charge. *See* Formal Charge. [11] Indeed, the plaintiff does not argue, or even mention, that he was discriminated against because of his age in any of the supporting documents he submitted to the EEOC. *See* Docs. Sub. to EEOC. [12]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[11] A copy of the plaintiff's formal charge of discrimination is attached to the plaintiff's opposition as Exhibit C and cited herein as "Formal Charge."

[12] A copy of the documents submitted by the plaintiff to the EEOC is attached to the plaintiff's opposition to the defendant's June 23, 2005, motion to dismiss and cited herein as "Docs. Sub. to

EEOC."

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

An appropriate Order follows.

*ORDER*

AND NOW, this 19th day of March, 2007, upon consideration of the defendant's **[*24]** motion to dismiss (Doc. No. 23), the plaintiff's opposition thereto (Doc. No. 27), the defendant's reply thereto (Doc. No. 28), and the defendant's supplemental brief pursuant to the court's December 4, 2006, order (Doc. No. 31), IT IS HEREBY ORDERED that the defendant's motion to dismiss is DENIED for the reasons stated in the accompanying memorandum. IT IS FURTHER ORDERED that the plaintiff's request for reconsideration is DENIED.

BY THE COURT:

/s/ Mary A. McLaughlin

J.

# EXHIBIT 13

**Citation # 3**
**2006 us dist lexis 54582**

✛ Positive , As of Jan 29 , 2008

☐ View Available Briefs and Other Documents Related to this Case

JANET M. DEGIOVANNI SHARP vs. WHITMAN COUNCIL, INC., ROBERT C. BLACKBURN, HENRY LEWANDOWSKI and MICHAEL SULLIVAN

NO. 05-CV-4297

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2006 U.S. Dist. LEXIS 54582

August 3, 2006, Decided
August 4, 2006, Filed; August 7, 2006, Entered

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by Sharp v. Whitman Council, Inc., 2007 U.S. Dist. LEXIS 73848 (E.D. Pa., Oct. 1, 2007)

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff, the director of a nonprofit organization, filed a suit against defendants, the organization and three board members, alleging common law claims and claims under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 1981a, the Pennsylvania Human Relations Act (PHRA), and the Pennsylvania Whistleblower Law (PWL). Defendants filed a dismissal motion. It was partially treated as a Fed. R. Civ. P. 56 summary judgment motion.

**OVERVIEW:** The director alleged that the board members harassed and took steps to fire her due to her relationship with a former board member. In addition to her statutory claims, she asserted civil conspiracy, publication of private information, invasion of privacy, breach of contract, negligent and/or intentional interference with contractual relationships, and negligent and/or intentional misrepresentation claims. The court held that the director could pursue only her breach of contract, civil conspiracy, intentional interference with a contractual relationship, and publication of private facts claims. The organization was not an "employer" as defined in 42 U.S.C.S. § 2000e (b) of Title VII, 42 U.S.C.S. § 2000e et seq., or 43 Pa. Stat. Ann. § 954(b) of the PHRA, 43 Pa. Stat. Ann. § 951 et seq. It employed only three persons, and it did not have a "single employer" relationship with the municipality that funded it. The director's Title VII-related 42 U.S.C.S. § 1981a claim failed. She failed to state a claim under the PWL, 43 Pa. Stat. Ann. § 1421 et seq. The complaints that she filed about the board members' conduct did not concern "wrongdoing" as defined in 43 Pa. Stat. Ann. § 1422.

**OUTCOME:** The court granted defendants' converted summary judgment motion as to all of the director's statutory claims. It partially granted and partially denied the remained of defendants' dismissal motion. It dismissed, with prejudice, the director's false light invasion of privacy, negligent interference with contractual relationships, and misrepresentation claims. The court ordered defendants to file an answer as to the director's remaining claims.

**CORE TERMS:** misrepresentation, wrongdoing, entity, publicity, invasion of privacy, false light, causes of action, whistleblower, conspiracy, personnel, Whistleblower Law, summary judgment, termination, housing, matter of law, executive director, reasonable person, community

development, private facts, contractual relations, material fact, good faith, discriminatory, offensive, genuine, inappropriate, responded, priest, contractual relationship, legal damage

**LexisNexis® Headnotes**

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employers

HN1 The U.S. Supreme Court's decision in Arbaugh holds that the threshold number of employees for application of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., is an element of a plaintiff's claim for relief, not a jurisdictional issue. This holding is in keeping with the law previously established by the United States Court of Appeals for the Third Circuit, that the 15-employee threshold is a substantive element of a Title VII claim and is not jurisdictional.

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims

HN2 In considering motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the district courts must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. A motion to dismiss may only be granted where the allegations fail to state any claim upon which relief may be granted. The inquiry is not whether the plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims. Dismissal is warranted only if it is certain that no relief can be granted under any set of facts which could be proved. Courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint, and legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. A court may, however, look beyond the complaint to extrinsic documents when the plaintiff's claims are based on those documents.

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims
Civil Procedure > Summary Judgment > Standards > General Overview

HN3 The principles for consideration of Fed. R. Civ. P. 56 motions are similar but not identical to those applicable to Fed. R. Civ. P. 12(b)(6) motions.

Civil Procedure > Summary Judgment > Standards > Appropriateness

HN4 Summary judgment is appropriate where, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The standards to be applied by district courts in ruling on motions for summary judgment are clearly set forth in Fed. R. Civ. P. 56(c).

Civil Procedure > Summary Judgment > Standards > General Overview

HN5 See Fed. R. Civ. P. 56(c).

Civil Procedure > Summary Judgment > Standards > Need for Trial

HN6 Under Fed. R. Civ. P. 56(c), a court is compelled to look beyond the bare allegations of the pleadings to determine if they have sufficient factual support to warrant their consideration at trial.

Civil Procedure > Summary Judgment > Evidence
Civil Procedure > Summary Judgment > Standards > Materiality

HN7 In considering a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party and all reasonable inferences from the facts must be drawn in favor of that party as well. In so doing, the court must be mindful that "material" facts are those facts that might affect the outcome of the suit under the substantive law governing the claims made.

Civil Procedure > Summary Judgment > Standards > Genuine Disputes

HN8 An issue of fact is "genuine" for summary judgment purposes only if the evidence is such that a reasonable jury could return a verdict for the non-moving party in light of the burdens of proof required by substantive law.

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality

HN9 A non-moving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employers

HN10 Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., defines an "employer" as a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service, or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under I.R.C. § 501(c). 42 U.S.C.S. § 2000e(b).

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Amendments
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Remedies > General Overview

HN11 The great weight of authority holds that 42 U.S.C.S. § 1981a does not create an independent cause of action, but only serves to expand the field of remedies for plaintiffs in Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., suits. Accordingly, relief under 42 U.S.C.S. § 1981a may only be afforded if a plaintiff's Title VII claim is permitted to go forward.

Labor & Employment Law > Discrimination > Disparate Treatment > Coverage & Definitions
Labor & Employment Law > Discrimination > Disparate Treatment > Statutory Application > General Overview

HN12 Under the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 et seq., an "employer" is defined to include the Commonwealth of Pennsylvania, or any political subdivision or board, department, commission, or school district thereof, and any person employing four or more persons within the Commonwealth, but except as thereinafter provided, does not include religious, fraternal, charitable or sectarian corporations or associations, except such corporations or associations supported, in whole or in part, by governmental appropriations. The term "employer" with respect to discriminatory practices based on race, color, age, sex, national origin or non-job related handicap or disability, includes religious, fraternal, charitable and sectarian corporations and associations employing four or more persons within the Commonwealth. 43 Pa. Stat. Ann. § 954(b).

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employees
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employers
Labor & Employment Law > Employment Relationships > General Overview

The precise contours of an employment relationship can only be established by a careful factual inquiry, and thus a plaintiff's status as an employee under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., can be determined only upon careful analysis of

the myriad facts surrounding the employment relationship in question. A "single employer" relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a single employer. The question in the "single employer" situation is whether the two nominally independent enterprises in reality constitute only one integrated enterprise.

HN13

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employers

In the Third Circuit, single employer treatment is appropriate: (1) when a company has split itself into separate entities for the purpose of evading Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq.; (2) when a parent company directed a subsidiary's discriminatory acts; and (3) where two or more entities' affairs are so interconnected that they collectively caused the alleged discriminatory employment practice. Although courts should consider financial entanglement in determining when substantively to consolidate two entities, the focus of the inquiry for Title VII purposes should be on the degree of operational entanglement --whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another. Relevant operational factors include: (1) the degree of unity between the entities with respect to ownership, management, (both directors and officers), and business functions (e.g., hiring and personnel matters); (2) whether they present themselves as a single company, such that third parties dealt with them as one unit; (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary; and (4) whether one entity does business exclusively with the other.

HN14

Governments > Local Governments > Employees & Officials
Governments > State & Territorial Governments > Employees & Officials
Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > Coverage & Definitions > General Overview

The Pennsylvania Whistleblower Law, 43 Pa. Stat. Ann. § 1421 et seq., makes it unlawful for a public employer to discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste. 43 Pa. Stat. Ann. § 1423(a). The Whistleblower Law is not primarily designed to punish an employer for harboring retaliatory motives, but is rather a remedial measure intended to enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing.

HN15

Governments > Local Governments > Employees & Officials
Governments > State & Territorial Governments > Employees & Officials
Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > Coverage & Definitions > Employees
Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > Coverage & Definitions > Employers

The Pennsylvania Whistleblower Law, 43 Pa. Stat. Ann. § 1421 et seq., applies only to public employees who are discharged or otherwise discriminated or retaliated against by governmental entities. The statute defines an "employer" as: a person supervising one or more employees, including the person in question; a superior of that supervisor; or an agent of a public body. 43 Pa. Stat. Ann. § 1422. Section 1422 defines an "employee" as a person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied, for a public body.

HN16

Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > Burdens of Proof

Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > Coverage & Definitions > General Overview

HN17 The plain intent of the Pennsylvania Whistleblower Law, 43 Pa. Stat. Ann. § 1421 et seq., is to protect from retaliation employees who make good-faith efforts to alert authorities to governmental waste and wrongdoing. In order for an employee to succeed on a claim under the Law, he must show not only that he filed a good faith report of wrongdoing or waste, he must also establish by concrete facts and circumstances that the report led to some retaliatory action against him. Two requirements must be met for a plaintiff to prove a prima facie case of retaliatory termination and receive protection under the Whistleblower Law: (1) wrongdoing; and (2) a causal connection between the report of wrongdoing and dismissal.

Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > Coverage & Definitions > Protected Activities

HN18 See 43 Pa. Stat. Ann. § 1422.

Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > Coverage & Definitions > Protected Activities

HN19 See 43 Pa. Stat. Ann. § 1422.

Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > Coverage & Definitions > Protected Activities

HN20 See 43 Pa. Stat. Ann. § 1422.

Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > Coverage & Definitions > Protected Activities

HN21 Within the definition of "wrongdoing" in 43 Pa. Stat. Ann. § 1422 of the Pennsylvania Whistleblower Law, 43 Pa. Stat. Ann. § 1421 et seq., there is a requirement that the violation of the law or regulation be one that is designed to protect the interest of the public or employer. While the definition uses the phrase, to protect the interest of the public, which could be interpreted to apply to any statute or ordinance as used in the context of retaliation taken by an employer because of an employee's work performance, that requirement means that a statute or regulation is of the type that the employer is charged to enforce for the good of the public or is one dealing with the internal administration of the governmental employer in question.

Labor & Employment Law > Wrongful Termination > Whistleblower Protection Act > Coverage & Definitions > Protected Activities

HN22 To constitute wrongdoing, the Pennsylvania Whistleblower Law, 43 Pa. Stat. Ann. § 1421 et seq., requires that the matter complained of be one which concerns the violation of a law or regulation that is designed to benefit or protect the general public, which the employer is charged with implementing or enforcing, or which involves the internal administration of the governmental employer. While the questioning of a public employee regarding matters of a purely personal and intimate nature is inappropriate, it does not rise to the level of wrongdoing within the meaning of the Whistleblower Law.

Torts > Intentional Torts > Invasion of Privacy > General Overview

HN23 Pennsylvania recognizes the tort of invasion of privacy. The action for invasion of privacy is actually comprised of four analytically distinct torts: 1) intrusion upon seclusion; 2) appropriation of name or likeness; 3) publicity given to private life; and 4) publicity placing a person in false light.

Torts > Intentional Torts > Invasion of Privacy > Public Disclosure of Private Facts > Elements

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy if the matter publicized is of a kind that (a)

would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public. Thus, the elements of the tort are (1) publicity, given to (2) private facts, (3) which **HN24** would be highly offensive to a reasonable person and (4) are not of legitimate concern to the public. "Publicity" means that the matter is made public, by communicating it to the public at large or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. Disclosure to only one person is insufficient.

Torts > Intentional Torts > Invasion of Privacy > Public Disclosure of Private Facts > Elements
For purposes of the tort of giving publicity to private facts, a "private fact" is one that has not already been made public, as liability cannot be based upon that which the plaintiff himself leaves open to the public eye or when the publicity given involves facts with which the recipient is already familiar. In determining whether a reasonable person of ordinary **HN25** sensibilities would find such publicity highly offensive, the customs of the time and place, occupation of the plaintiff and habits of his neighbors and fellow citizens are material. Common law has long recognized that the public has a proper interest in learning about many matters. When the subject-matter of the publicity is of legitimate public concern, such as matters of the kind customarily regarded as "news," there is no invasion of privacy.

Torts > Intentional Torts > Invasion of Privacy > False Light Privacy > General Overview
**HN26** The tort of false light invasion of privacy involves publicity that unreasonably places the other in a false light before the public.

Torts > Intentional Torts > Invasion of Privacy > False Light Privacy > Elements
One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other is placed would be highly offensive to a reasonable person, and (b) the actor has knowledge of, or acts in reckless disregard as to, the falsity of the **HN27** publicized matter and the false light in which the other will be placed. The tort applies only when defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity. Stated otherwise, a cause of action for invasion of privacy will be found where a major misrepresentation of a person's character, history, activities or beliefs is made that could reasonably be expected to cause a reasonable man to take serious offense.

Labor & Employment Law > Employment Relationships > Employment Contracts > Formation
Under Pennsylvania law, provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her **HN28** duties. However, an employment manual or other workplace rules will be deemed a binding contract only where the benefit is extended at the time of hire and where there is evidence by which a reasonable person would conclude that the employer intends to be bound by its terms.

Contracts Law > Breach > Causes of Action > Elements of Claims
Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action **HN29** must establish (1) the existence of a contract, including its essential terms, (2) breach of a duty imposed by the contract, and (3) resultant damages.

Torts > Business Torts > Commercial Interference > Contracts > Elements
Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements
Torts > Procedure > Statutes of Limitations > Accrual of Actions > Occurrence of Tort

To state a claim for interference with existing contractual relationships under Pennsylvania state law, a plaintiff must plead the following elements: (1) the existence of a contractual or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on

the part of the defendant; and (4) the occasioning of legal damage as a result of the defendant's conduct. A tortious interference claim does not accrue until, at least, the plaintiff suffers injury (i.e., actual legal damage) as a result of the defendant's conduct. The tort (interference with contractual relation) is an intentional one: the actor is acting as he does for the purpose of causing harm to the plaintiff; negligent action that interferes with another's ability to contract is not enough.

*HN30*

Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements
To sustain a negligent misrepresentation claim, a plaintiff must show: a misrepresentation of a material fact; that the defendant either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or made the representation under circumstances in which he ought to have known of its falsity; that the defendant intended the representation to induce plaintiff to act on it; and that the plaintiff was injured by acting in justifiable reliance on the misrepresentation.

*HN31*

Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements
To sustain an intentional misrepresentation claim, a plaintiff must show: a misrepresentation; a fraudulent utterance; that the defendants intended to induce action by him; that he justifiably relied on the misrepresentation; and that he was injured as a proximate result.

*HN32*

Contracts Law > Defenses > Fraud & Misrepresentation > Material Misrepresentation
Torts > Business Torts > Fraud & Misrepresentation > General Overview
A misrepresentation is considered to be "material" if the party would not have entered into an agreement or transaction but for the misrepresentation.

*HN33*

Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > Elements
Torts > Procedure > Statutes of Limitations > Accrual of Actions > Occurrence of Tort
In order to state a cause of action for civil conspiracy under Pennsylvania law, a complaint must allege the existence of all elements necessary to such a cause of action. Thus, it is incumbent upon a plaintiff to plead and prove that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. A conspiracy is not actionable until some overt act is done in pursuance of a common purpose or design and actual legal damage results.

*HN34*

☐**Available Briefs and Other Documents Related to this Case:**

U.S. District Court Motion(s)
U.S. District Court Pleading(s)

**COUNSEL: [*1]** For JANET M. DEGIOVANNI SHARP, Plaintiff: LYNANNE B. WESCOTT, THE WESCOTT LAW FIRM PC, PHILADELPHIA, PA

For WHITMAN COUNCIL, INC., Defendant: DIANE LEE NEWMAN, JANE G. O'DONNELL, SAND & SAIDEL P.C., PHILADELPHIA, PA

For ROBERT C. BLACKBURN, Defendant: SCOTT P. SIGMAN, BOCHETTO & LENTZ, PC, PHILADELPHIA, PA

For HENRY LEWANDOWSKI, Defendant: SCOTT P. SIGMAN, BOCHETTO & LENTZ, PC, PHILADELPHIA, PA

For MICHAEL SULLIVAN, Defendant: SCOTT P. SIGMAN, BOCHETTO & LENTZ, PC, PHILADELPHIA, PA.

**JUDGES:** J. CURTIS JOYNER, J.

**OPINION BY:** J. CURTIS JOYNER

**OPINION**

*MEMORANDUM AND ORDER*

**JOYNER, J. August 3, 2006**

August 3, 2006

This employment action is now before the Court for disposition of the defendants' motion for summary judgment [1] on Plaintiff's Title VII, PHRA and Section 1981a claims. For the reasons which follow, the motion shall be granted and judgment entered as a matter of law in favor of the defendants on Count I of the plaintiff's First Amended Complaint. Given that no ruling was previously issued on the defendants' motion to dismiss the other counts of that complaint, we shall address the arguments raised therein and shall partially grant that motion as well.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[1] Defendants initially sought to dismiss Plaintiff's complaint via Rule 12(b)(1) and 12(b)(6) motions. Prior to February 22, 2006, a conflict existed among the Circuit Courts of Appeals as to whether the numerical qualification contained in Title VII's definition of "employer" affected federal court subject matter jurisdiction or instead delineated a substantive ingredient of a Title VII claim for relief. This conflict was resolved on that date by [HN1] the U.S. Supreme Court's decision in Arbaugh v. Y & H Corp., 546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006) that "the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue." Arbaugh, 126 S. Ct. at 1245. This holding was in keeping with the law previously established by the Third Circuit Court of Appeals in Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 83 (3d Cir. 2003) that "the fifteen-employee threshold was a substantive element of a Title VII claim and [was] not jurisdictional." Thus, by order dated December 22, 2005, we converted the motion to a Rule 56 motion and gave the parties until February 6, 2006 to take discovery on the issue of whether the individually named defendants were Plaintiff's supervisors and whether the Office of Housing and Community Development was Plaintiff's de facto employer.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*2] *Factual Background***

Plaintiff, Janet Degiovanni Sharp has been employed as the Executive Director of Defendant Whitman Council, Inc. since September, 1991. Whitman Council, Inc. ("Whitman") is a Pennsylvania Non-Profit Corporation which is funded as a Neighborhood Advisory Committee organization ("NAC") by the City of Philadelphia's Office of Housing and Community Development ("OHCD") and which provides services to the Whitman section of South Philadelphia. Whitman is governed by a Board of Directors composed of up to thirteen elected Class "A" members and up to three Class "B" Directors who are chosen by the Class "A" members. Four of the thirteen Class "A" Board members serve as the President, Vice-President, Secretary and Treasurer of the Board. The Board of Directors supervises the Executive Director.

Each year, Whitman enters into a contract, known as an NAC Provider Agreement with OHCD, pursuant to which Whitman agrees to provide housing and community development services and activities for Whitman area residents and OHCD agrees to provide the funding necessary to allow Whitman to provide those services.

According to the allegations of the plaintiff's First Amended **[*3]** Complaint, until August, 2004, one of the Whitman Board Members was a local Catholic pastor. At that time, the pastor "made the difficult decision to leave the active ministry of priesthood and because he moved from the area, he was no longer eligible to be a member of the Whitman Board." (First Am. Compl., P17). Plaintiff, who at that time was divorced, "formed a deep friendship with the former pastor and they ultimately married in June, 2005." (First Am. Compl., P18). It was this relationship between Plaintiff and the former priest which was the apparent catalyst for this lawsuit as Plaintiff alleges that also in August, 2004, defendant Robert Blackburn, the President of the Whitman Council Board, called the Director of Neighborhood Coordination for OHCD claiming that Plaintiff was having an affair with a priest and that Whitman wanted grounds to terminate her. Mr. Blackburn purportedly followed that up with a letter asking that OHCD examine its personnel policies. According to the plaintiff, Mr. Blackburn then "proceeded to question community members, church authorities and otherwise spread rumor and innuendo." (First Am. Compl. P20).

In October, 2004, Mr. Blackburn and defendant **[*4]** Henry Lewandowski, Whitman's Vice-President went to the Whitman office ostensibly to discuss Plaintiff's 2004 performance evaluation. At that time, however, defendant Blackburn "demanded plaintiff's 'side of the story,'" and "asked personal, inappropriate questions about plaintiff's private life." Plaintiff refused to answer these questions because she believed they were neither job nor performance related. Defendant Blackburn responded by telling Plaintiff that her refusal to answer constituted a violation of Whitman's employment policies and giving her 24 hours to resign or he would "go public" with some unspecified information. (First Am. Compl., P22). Plaintiff, however, refused to resign and Mr. Blackburn then called an emergency meeting of the Whitman Board regarding Plaintiff's employment status. The Board agreed to form a special investigating committee and appropriated $ 2,000 of Whitman's funding to conduct an investigation.

Thereafter, in November, 2004, defendant Michael Sullivan, another Whitman Board member who had apparently been appointed the chairman of the newly-created personnel investigation committee, presented Plaintiff with a list of questions to which he wanted **[*5]** immediate answers. Plaintiff asked for a copy of and time to read the questions which, she alleges were of a very personal nature and included inquiries into whether she had had any physical contact with any Board member and asking her to describe the "full nature" of her relationship with Board members including any "intimate association." Plaintiff was advised that failure to answer any of the questions would be considered insubordination and grounds for termination. (First Am. Compl., Ps25-26). Plaintiff responded by writing a letter of complaint to OHCD on November 10, 2004 in which she included a copy of the questions and asking that the letter be considered a "formal grievance regarding my employment status as Executive Director." She copied all of the members of the Whitman Council Board of Directors on that letter. OHCD apparently never responded to Plaintiff and did not respond to Mr. Blackburn until January 20, 2005 by which time Mr. Blackburn had denied the plaintiff's grievance as groundless via correspondence dated December 6, 2004. In its letter of January 20, 2005, OHCD Neighborhood Program Director Belinda Mayo merely reiterated that under the OHCD NAC contract, all **[*6]** employee grievances were to be submitted to the NAC Board of Directors and that the Board's decision in such matters would be final.

Shortly before Christmas 2004, Plaintiff injured her back lifting food baskets while doing community food distribution for Whitman. As a result of that injury and the "mental stress put upon her by defendants," she was unable to work for several months. (First Am. Compl., P36). Although Plaintiff applied for workers' compensation benefits, her claim was denied and she eventually returned to work in June, 2005 having exhausted all of her leave time. Plaintiff further alleges that the defendants "had a part in that Worker's Compensation denial" and that when she returned to work she "found that a younger woman had been hired to replace her" although "[t]hat woman was eventually terminated." (First Am. Compl. Ps 39, 40). Shortly after Plaintiff and her new husband were married, a reunion gathering was held at her church at which some of the attendees "wore badges and T-shirts mocking Mrs. Sharp and her husband and invading her privacy." Plaintiff avers that those people were "acting in concert with some or all of the defendants." (First Am. Compl., P31).

[*7] Additionally, Plaintiff alleges that on her first day back on the job in the Whitman Council office, she found the same list of questions originally presented to her in late 2004, with another demand that she answer the questions or face termination. This time, Plaintiff answered each question, responding to those she found inappropriate by noting that they violated her rights to a workplace free of harassment, intimidation and discrimination and requesting that an investigation be undertaken into the actions of Messrs. Blackburn, Sullivan and Lewandowski, among others. Defendant Sullivan thereafter responded by claiming her answers to the questions were vague and requesting that she sign a waiver/release of Whitman and its Board and threatening that she would be deemed insubordinate, that a written warning would be placed into her personnel file and that she would face possible termination.

Apparently, plaintiff did not respond to Mr. Sullivan's threats but no further action was forthcoming on the part of the Board as Ms. Degiovanni Sharp continues in her employment as the Whitman Council Executive Director to this day. Nevertheless, after exhausting her administrative remedies [*8] with the EEOC and the PHRC, Plaintiff instituted this lawsuit for having been "subjected to rumor and innuendo", "held up to public ridicule", suffering a loss of "professional status and reputation" as well as of "pay, benefits and other employee remunerations," and "emotional distress, humiliation and loss of life's pleasures." (First Am. Compl., Ps44-46). Ms. Degiovanni Sharp brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., 42 U.S.C. § 1981a, the Pennsylvania Human Relations Act, 43 P.S. § 951 et. seq. ("PHRA"), the Pennsylvania Whistleblower Law, 43 P.S. § 1421 et. seq., and under the common law theories of publication of private information, false light invasion of privacy, breach of contract, negligent and/or intentional interference with existing contractual relationship, negligent and/or intentional misrepresentation and conspiracy. As previously noted, Defendants initially sought to dismiss Plaintiff's First Amended Complaint via Rule 12(b)(1) and 12(b)(6) motions on the grounds that they did not have the requisite number of employees [*9] to sustain the federal causes of action or the claim asserted under the Pennsylvania Human Relations Act and that the plaintiff's pleadings otherwise failed to state causes of action on which relief could be granted. By order dated December 22, 2005, we converted the motion to a Rule 56 motion and gave the parties until February 6, 2006 to take discovery on the issue of whether the individually named defendants were Plaintiff's supervisors and whether the Office of Housing and Community Development was Plaintiff's de facto employer. Discovery on this issue has now been completed and the motion is ripe for disposition.

### Standards Governing Rule 12(b)(6) and Rule 56 Motions

It has long been the rule that [HN2] in considering motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the district courts must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." Allah v. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000)(internal quotations omitted). See Also: Ford v. Schering-Plough Corp., 145 F.3d 601, 604 (3d Cir. 1998). A motion to dismiss may only [*10] be granted where the allegations fail to state any claim upon which relief may be granted. See, Morse v. Lower Merion School District, 132 F.3d 902, 906 (3d Cir. 1997). The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims. In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 215 (3d Cir. 2002). Dismissal is warranted only if it is certain that no relief can be granted under any set of facts which could be proved. Alston v. Parker, 363 F.3d 229, 233 (3d Cir. 2004); Klein v. General Nutrition Companies, Inc., 186 F.3d 338, 342 (3d Cir. 1999)(internal quotations omitted). It should be noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint and legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. In re Rockefeller, 311 F.3d at 216. A court may, however, look beyond the complaint to extrinsic documents when the plaintiff's claims are based on those [*11] documents. GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004); In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1426. See Also, Angstadt v. Midd-West School District, 377 F.3d 338, 342 (3d Cir. 2004).

*HN3* The principles for consideration of Rule 56 motions are similar but not identical. *HN4* Summary judgment is appropriate where, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Michaels v. New Jersey*, 222 F.3d 118, 121 (3d Cir. 2000); *Jones v. School District of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999). Indeed, the standards to be applied by district courts in ruling on motions for summary judgment are clearly set forth in Fed.R.Civ.P. 56(c), which states, in pertinent part:

> "…. *HN5* The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue **[*12]** as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

*HN6* Under this rule, a court is compelled to look beyond the bare allegations of the pleadings to determine if they have sufficient factual support to warrant their consideration at trial. *Liberty Lobby, Inc. v. Dow Jones & Co.*, 267 U.S. App. D.C. 337, 838 F.2d 1287 (D.C.Cir. 1988), cert. denied, 488 U.S. 825, 109 S. Ct. 75, 102 L. Ed. 2d 51 (1988); *Aries Realty, Inc. v. AGS Columbia Associates*, 751 F. Supp. 444 (S.D.N.Y. 1990). *HN7* In considering a summary judgment motion, the court must view the facts in the light most favorable to the non-moving party and all reasonable inferences from the facts must be drawn in favor of that party as well. *Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 126 (3rd Cir. 1994); *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3rd Cir. 1989); *United States v. Kensington Hosp.*, 760 F. Supp. 1120 (E.D.Pa. 1991). **[*13]** In so doing, the court must be mindful that "material" facts are those facts that might affect the outcome of the suit under the substantive law governing the claims made. *HN8* An issue of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" in light of the burdens of proof required by substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252, 106 S. Ct. 2505, 2510, 2512, 91 L. Ed. 2d 202 (1986); *Philadelphia Musical Soc., Local 77 v. American Federation of Musicians*, 812 F. Supp. 509, 514 (E.D.Pa. 1992). Thus, *HN9* a non-moving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 138 (3d Cir. 2001).

## Discussion

## A. Plaintiff's Claims Under Title VII, § 1981a and the PHRA

As discussed, Plaintiff claims that the defendants' actions had the effect of harassing, discriminating and retaliating against her on the basis of her sex and her religion (Catholic) in violation of Title **[*14]** VII, Section 1981a and the PHRA. Defendants, in turn, contend that they are entitled to judgment as a matter of law on those claims because the Whitman Council does not employ a sufficient number of employees to render it an "employer" within the meaning of either of those Acts. ² Indeed, *HN10* Title VII defines an "employer" as:

> "… a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service … or (2) a bona

fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of the Internal Revenue Code of 1954 ?


- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

2 *HN11*☐The great weight of authority holds that § 1981a does not create an independent cause of action, but only serves to expand the field of remedies for plaintiffs in Title VII suits. *Pollard v. Wawa Food Market*, 366 F. Supp. 2d 247, 251 (E.D.Pa. 2005); *Rotteveel v. Lockheed Martin Corp.*, Civ. A. No. 01-6969, 2003 U.S. Dist. LEXIS 12329 at *10 (E.D. Pa. July 15, 2003); *Singh v. Wal-Mart Stores, Inc.*, Civ. A. No. 98-1613, 1999 U.S. Dist. LEXIS 8531 at *21-*22 (E.D.Pa. June 10, 1999); *Presutti v. Felton Brush Co.*, 927 F. Supp. 545, 550 (D.N.H. 1995); *Swartzbaugh v. State Farm Ins. Cos.*, 924 F. Supp. 932, 934 (E.D. Mo. 1995). Accordingly, relief under Section 1981a may only be afforded if Plaintiff's Title VII claim is permitted to go forward.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[\*15]**  42 U.S.C. § 2000e(b).

*HN12*☐Under the PHRA, an "employer" is defined in the following manner:

> The term "employer" includes the Commonwealth or any political subdivision or board, department, commission or school district thereof and any person employing four or more persons within the Commonwealth, but except as Thereinafter provided, does not include religious, fraternal, charitable or sectarian corporations or associations, except such corporations or associations supported, in whole or in part, by governmental appropriations. The term "employer" with respect to discriminatory practices based on race, color, age, sex, national origin or non-job related handicap or disability, includes religious, fraternal, charitable and sectarian corporations and associations employing four or more persons within the Commonwealth.

43 P.S. § 954(b). The record in this matter reflects that the Whitman Council itself had no more than three employees during the relevant time frame. Plaintiff, however, asserts that as the Whitman Council is funded by and many of its operations and activities are regulated by the Philadelphia OHCD, OHCD **[\*16]** is in actuality also her employer.

*HN13*☐The precise contours of an employment relationship can only be established by a careful factual inquiry and thus a plaintiff's status as an employee under Title VII can be determined only upon careful analysis of the myriad facts surrounding the employment relationship in question. *Graves v. Lowery*, 117 F.3d 723, 729 (3d Cir. 1997), citing *NLRB v. Browning-Ferris Indus. Of Penn.*, 691 F.2d 1117, 1121 (3d Cir. 1982); *Magnuson v. Peak Tech. Servs., Inc.*, 808 F. Supp. 500, 510 (E.D.Va. 1992) and *Miller v. Advanced Studies*, 635 F. Supp. 1196 (N.D. Ill. 1986). For example, a "single employer" relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a "single employer." *LaFata v. Raytheon Co.*, No. 04-1560, 147 Fed. Appx. 258, 262, 2005 U.S. App. LEXIS 16952 (3d Cir. Aug. 12, 2005). The question in the "single employer" situation then, is whether the two nominally independent enterprises in reality constitute only one integrated enterprise. *Id.*

*HN14*☐In the Third Circuit, **[\*17]** single employer treatment is appropriate: (1) when a company has split itself into separate entities for the purpose of evading Title VII; (2) when a parent company directed a subsidiary's discriminatory acts; and (3) where two or more entities' affairs are so interconnected that they collectively caused the alleged discriminatory employment practice. *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 85-86 (3d Cir. 2003); *EEOC v. Foodcrafters Distrib. Co.*, 2006 U.S. Dist. LEXIS 11426 at *42-*45 (D.N.J. Feb. 24, 2006). ³ Although courts should

consider financial entanglement in determining when substantively to consolidate two entities, the focus of the inquiry for Title VII purposes should be on the degree of operational entanglement -- whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another. *Nesbit*, 347 F.3d at 87. Relevant operational factors include (1) the degree of unity between the entities with respect to ownership, management, (both directors and officers), and business functions (e.g., hiring and personnel matters), (2) whether they present themselves **[*18]** as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other. *Id.*; *Daniel v. City of Harrisburg*, No. 1:05-2126, 2006 U.S. Dist. LEXIS 18529 at *10 (M.D. Pa. March 6, 2006); *Fishman v. La-Z-Boy Furniture Galleries of Paramus, Inc.*, No. 04-749, 2005 U.S. Dist. LEXIS 18088 at *21 (D.N.J. Aug. 17, 2005).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

3 It should be noted that prior to the Third Circuit's decision in *Nesbit*, a number of courts in this circuit had borrowed the four-part "single employer" or "integrated-enterprise" test formulated for application to the National Labor Relations Act in *NLRB v. Browning-Ferris Indus., Inc., supra.*, for use in Title VII actions. Under that test, the following four factors are assessed to ascertain whether multiple entities are so interrelated that they could be treated as one employer: (1) the functional integration of operations, (2) centralized control of labor relations, (3) common management and (4) common ownership. *See, e.g.*, *Battistone v. Sam Jon Corp.*, No. 00-CV-5196, 2002 U.S. Dist. LEXIS 19399 at *16 (E.D.Pa. Oct. 4, 2002) citing, inter alia, *Podsobinski v. Roizman*, Civ. A. No. 97-4976, 1998 U.S. Dist. LEXIS 1743 (E.D.Pa. Feb. 13, 1998), *Daliessio v. DePuy, Inc.*, No. 96-5295, 1998 U.S. Dist. LEXIS 605 (E.D.Pa. Jan. 23, 1998) and *Zarnoski v. Hearst Bus. Communications, Inc.*, No. 95-3854, 1996 U.S. Dist. LEXIS 181 (E.D.Pa. Jan. 11, 1996). The Court in *Nesbit*, however, specifically rejected the use of that test in Title VII actions because the NLRA and Title VII ask whether entities are a single enterprise for different reasons and because "the NLRA's policy goals point in a different direction than Title VII's." *Nesbit*, 347 F.3d at 85. ("As discussed, a significant purpose of the fifteen-employee minimum in the Title VII context is to spare small companies the considerable expense of complying with the statute's many-nuanced requirements ... This goal suggests that the fifteen-employee minimum should be strictly construed. By contrast, the NLRB's jurisdiction was intended to be expansive, suggesting a more lenient test for labor cases...Thus we deem there is little reason to refer to the NLRB's test in deciding whether two entities should together be considered an 'employer' for Title VII purposes ..." *Id.*(citations omitted)).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

  **[*19]** In applying the foregoing test and considering the relevant operational factors delineated above, we cannot find that the Whitman Council and the City of Philadelphia's Office of Housing and Community Development are so inter-related as to constitute one entity for Title VII purposes. For one, there is absolutely no evidence whatsoever on this record that OHCD and Whitman Council were ever at one time a single entity or that they split for the express purpose of evading Title VII. There is likewise no evidence that OHCD directed Whitman Council's allegedly discriminatory actions or that they collectively caused the alleged discriminatory employment practice at issue. At most, the record reflects that while Plaintiff sent two letters to OHCD reporting what she believed to be the inappropriate treatment which she had received from the Whitman Board, OHCD never responded directly to her but instead referred her complaints to Mr. Blackburn for handling. (Defendants' Exhibit 17). The record also evinces that Defendant Blackburn contacted OHCD on behalf of Whitman Council to confirm that Whitman had "broad authority in dealing with personnel matters" and that Belinda Mayo, the Director **[*20]** of OHCD's Neighborhood Programs confirmed that the Whitman Board in fact had this broad authority in dealing with personnel matters and that the decision of the Board in all personnel matters is final. However, Ms. Mayo cautioned that despite this authority, "it is very important that the Board follows not only its own procedures, but also insures that its actions are not a violation of fair labor practices and do not violate laws

governing the employer/employee relationship." (See Exhibit 15 to Defendants' Exhibits in Support of Motion to Dismiss/Motion for Summary Judgment). Thus we conclude that single employer treatment is inappropriate here.

Likewise, our examination of the operational factors results in a finding that although OHCD covers the salaries, expenses and/or losses of the Whitman Council in that Whitman's operations are nearly 100% funded by OHCD, that is the only factor supported by the evidence presented here. Indeed, there does not appear to be any degree of unity between the two entities in so far as their Boards of Directors or management is concerned and while OHCD does indeed provide the funding for Whitman, as is clear from a review of Whitman's articles of **[*21]** incorporation and bylaws, Whitman is a non-profit corporation within the meaning of Section 501(c)(3) of the Internal Revenue Code in which OHCD does not have any ownership interest. As is further clear from the NAC contract between OHCD and Whitman, Whitman is designated an independent contractor and is not to represent itself as being a part of OHCD or its agent. Although the NAC contract does outline the personnel policies to be followed by Whitman, Whitman has complete discretion in the hiring, termination and discipline of its employees. (Defendants' Exhibits 10, 11; Mayo Dep., pp. 11-12, 17-22). There is no evidence that Whitman exclusively does business with OHCD and no evidence that either Whitman or OHCD holds themselves out to the public at large as being a single entity. For all of these reasons, we find that the plaintiff is employed only by Whitman itself and that Whitman is not an "employer" within the contemplation of either Title VII or the PHRA. Judgment is therefore properly entered in favor of the defendants as a matter of law on Counts I, II and III of Plaintiff's First Amended Complaint.

## B. Plaintiff's Claim under the Pennsylvania Whistleblower **[*22]** Law, 43 P.S. § 1421, et. seq.

Plaintiff next alleges in Count IV of the First Amended Complaint that the defendants retaliated against her when she "reported wrongdoing to the appropriate authorities." **HN15** The Pennsylvania Whistleblower Law 43 P.S. § 1421, et. seq. makes it unlawful for a public employer to:

" ... discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste."

Denton v. Silver Stream Nursing and Rehabilitation Center, 1999 PA Super 251, 739 A.2d 571, 575 (Pa. Super. 1999); 43 P.S. § 1423(a). It should be noted that the Whistleblower Law is not primarily designed to punish an employer for harboring retaliatory motives, but is rather a remedial measure intended to "enhance openness in government and compel the government's compliance **[*23]** with the law by protecting those who inform authorities of wrongdoing." O'Rourke v. Pennsylvania Department of Corrections, 566 Pa. 161, 175, 778 A.2d 1194, 1202 (2001) quoting Davis v. Ector County, 40 F.3d 777, 785 (5th Cir. 1994)(articulating purpose of similar Texas whistleblower law).

As a threshold matter, **HN16** the Whistleblower Law applies only to public employees who are discharged or otherwise discriminated or retaliated against by governmental entities. Halstead v. Motorcycle Safety Found., Inc., 71 F. Supp. 2d 464, 471 (E.D.Pa. 1999) citing, inter alia, Clark v. Modern Group, Inc., 9 F.3d 321, 326, n.4 (3d Cir. 1993) and Holewinski v. Children's Hospital of Pittsburgh, 437 Pa. Super. 174, 649 A.2d 712, 715 (1994). Indeed, the statute defines an "employer" to be:

A person supervising one or more employees, including the employee in question; a superior of that supervisor; or an agent of a public body.

43 P.S. § 1422. Under that same statute, an "employee" is "[a] person who performs a service for wages or other remuneration under a contract of hire, **[\*24]** written or oral, express or implied, for a public body." Although Defendants argue that Plaintiff does not allege that she is a governmental employee or that Whitman is a governmental employer, the complaint does aver that Whitman is a federally funded Neighborhood Advisory Council that receives funds from Housing and Urban Development through the Office of Housing and Community Development of the City of Philadelphia and that Plaintiff is the Executive Director of Whitman Council. (First Am. Compl., Ps1-2). We find that these averments are sufficient to bring the plaintiff and the defendants within the confines of the Whistleblower Act.

However, Defendants also seek dismissal of plaintiff's Whistleblower claims on the grounds that the amended complaint fails to state any facts with regard to how Plaintiff made a "good faith report" to the "appropriate authority" of an "instance of wrongdoing or waste." Again, *HN17* the plain intent of the Whistleblower Law is to protect from retaliation employees who make good-faith efforts to alert authorities to governmental waste and wrongdoing. *Caprina v. Lycoming County Housing Authority, 177 F. Supp. 2d 303, 329 (M.D.Pa. 2001)*, citing **[\*25]** *Podgurski v. Pennsylvania State University, 722 A.2d 730, 732 (Pa.Super. 1998)*. Thus, in order for an employee to succeed on a claim under the Law, he must show not only that he filed a good faith report of wrongdoing or waste, he must also establish by concrete facts and circumstances that the report led to some retaliatory action against him. *Id.*, citing *Lutz v. Springettsbury Township, 667 A.2d 251, 253 (Pa. Cmwlth. 1995)* and *Gray v. Hafer, 168 Pa. Cmwlth. 613, 651 A.2d 221, 225 (1994)*. See Also, *Cavicchia v. Phila. Hous. Auth.*, No. 03-CV- 0116, 2003 U.S. Dist. LEXIS 20311 at \*46 (E.D.Pa. Nov. 7, 2003), citing *Golaschevsky v. Department of Envtl. Resources, 554 Pa. 157, 720 A.2d 757, 759 (1998)*("Two requirements must be met for a plaintiff to prove a prima facie case of retaliatory termination and receive protection under the Whistleblower Statute: (1) wrongdoing; and (2) a causal connection between the report of wrongdoing and dismissal.")

Turning to the definitions section of the Act, 43 P.S. § 1422, we note that *HN18* an "appropriate authority" **[\*26]** is:

> A Federal, State or local government body, agency or organization having jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or waste; or a member, officer, agent, representative or supervisory employee of the body, agency or organization. The term includes, but is not limited to, the Office of Attorney General, the Department of the Auditor General, the Treasury Department, the General Assembly and committees of the General Assembly having the power and duty to investigate criminal law enforcement, regulatory violations, professional conduct or ethics, or waste.

*HN19* "Wrongdoing" is:

> A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer.

And finally, *HN20* a "good faith report" is:

> A report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true.

As observed **[\*27]** by the Commonwealth Court in *Gray, supra.,*

> *HN21* Within the definition of 'wrongdoing,' there is a requirement that the violation of

the law or regulation be one that is designed to protect the interest of the public or employer. While the definition uses the phrase 'to protect the interest of the public,' and that could be interpreted to apply to any statute or ordinance as used in the context of retaliation taken by an employer because of an employee's work performance, that requirement means that a statute or regulation is of the type that the employer is charged to enforce for the good of the public or is one dealing with the internal administration of the governmental employer in question.

*Gray*, 651 A.2d at 224. *See Also, Caprina*, 177 F. Supp. 2d at 330.

Although Count IV of the First Amended Complaint in this case summarily alleges only that "Defendants violated the provisions of the Pennsylvania Whistleblower Law ... in that defendants retaliated against plaintiff when she reported wrongdoing to the appropriate authorities," it appears that the gravamen of Plaintiff's Whistleblower claim is her alleged complaints **[*28]** to OHCD regarding the defendants' investigation into her private relationship with Mr. Sharp and the written personal questions which Defendants demanded that she answer or face termination. (First Am. Compl., Ps 22-28, 42).

Even giving Plaintiff the benefit of the doubt that OHCD is an "appropriate authority" within the meaning of the statute, we cannot find that Plaintiff has alleged the facts necessary to enable this Court to find that her complaint concerned "wrongdoing" or that her complaint resulted in an adverse employment action against her within the contemplation of the Whistleblower Law. To be sure, *HN22* to constitute wrongdoing, the statute requires that the matter complained of be one which concerns the violation of a law or regulation that is designed to benefit or protect the general public and which the employer is charged with implementing or enforcing or which involves the internal administration of the governmental employer. While we would certainly agree with the plaintiff that questioning her regarding matters of a purely personal and intimate nature is inappropriate, it does not rise to the level of wrongdoing within the meaning of the Whistleblower Law.

Furthermore, **[*29]** we find that the elements of retaliation and causal connection are also missing here. For one, it appears that Plaintiff first suffered the alleged retaliatory actions and then complained to OHCD about those actions. There is thus nothing to suggest that Plaintiff suffered the alleged harassment and retaliation as the result of her having complained. Although Plaintiff alleges that "[a]fter one of those complaints, Plaintiff subsequently received a personal letter from Mr. Lewandowski on his law firm's letterhead, which plaintiff felt was an attempt to intimidate her," she provides no details whatsoever of what the letter said. (First Am. Compl., P29). Additionally, although Ms. Sharp was purportedly threatened with termination if she failed and/or refused to answer the written questions and if she failed to sign a waiver/release of the Whitman Board, she also avers that she eventually did answer the questions and that despite having been advised by Mr. Sullivan that the answers were vague and despite her refusal to sign any waiver, she received a $ 1,000 pay raise and continues to be employed by the Whitman Council to this day.

Finally, we likewise cannot find that plaintiff has **[*30]** pled that she made a "good faith report." Indeed, while there is nothing to suggest that Plaintiff's complaints were made maliciously, it does appear that Plaintiff made them in an effort to realize a personal benefit, to wit, to put an end to the Whitman Council's questioning and investigation into her personal affairs. For all of these reasons, we find that the plaintiff has failed to allege a claim entitling her to relief under Pennsylvania's Whistleblower law and hence Count IV of the First Amended Complaint will also be dismissed.

## C. Plaintiff's Remaining State Law Claims.

In addition, at Counts V-IX of her First Amended Complaint, Ms. Degiovanni Sharp brings claims for what appears to be invasion of privacy, breach of contract, negligent and/or intentional

interference with existing contractual relations, misrepresentation and conspiracy. Defendants again argue that the complaint fails to plead causes of action on which relief can be granted under any of these state law theories.

1. *Invasion of Privacy*

It is clear that <sup>HN23</sup> Pennsylvania recognizes the tort of invasion of privacy. *Vogel v. W.T. Grant Co., 458 Pa. 124, 126, 327 A.2d 133 (1974)*. The action **[*31]** for invasion of privacy is actually comprised of four analytically distinct torts: 1) intrusion upon seclusion, 2) appropriation of name or likeness, 3) publicity given to private life, and 4) publicity placing a person in false light. *Marks v. Bell Telephone Co., 460 Pa. 73, 85-86, 331 A.2d 424, 430 (1975)* citing *Vogel, 458 Pa. at 129, 327 A.2d at 136*. In Pennsylvania, most of the decisions dealing with invasions of privacy have involved either publicity given to private facts or the appropriation of one's likeness. *Id.*; Restatement (Second) of Torts §§ 652A-652D.

In this case, it appears that Plaintiff is endeavoring to state a claim under Sections 652D and 652E of the Second Restatement of Torts. Section 652D states:

> <sup>HN24</sup> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
> (a) would be highly offensive to a reasonable person, and
>
> (b) is not of legitimate concern to the public.

Thus, the elements of the tort are: (1) publicity, **[*32]** given to (2) private facts, (3) which would be highly offensive to a reasonable person and (4) are not of legitimate concern to the public. *Harris by Harris v. Easton Publishing Co., 335 Pa. Super. 141, 154, 483 A.2d 1377, 1384 (1984)*. "Publicity" means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. *Vogel, 458 Pa. at 131-132, 327 A.2d at 137*. Disclosure to only one person is insufficient. *Harris, 335 Pa. Super. at 155, 483 A.2d at 1384*.

<sup>HN25</sup> A "private fact" is one that has not already been made public, as liability cannot be based upon that which the plaintiff himself leaves open to the public eye or when the publicity given involves facts with which the recipient is already familiar. *Id.*, citing Restatement (Second) of Torts § 652D, Comment B. Moreover, in determining whether a reasonable person of ordinary sensibilities would find such publicity highly offensive, the customs of the time and place, occupation of the plaintiff and habits of his neighbors **[*33]** and fellow citizens are material. *Id.*, citing Restatement (Second) of Torts § 652D, Comment C and *Aquino v. Bulletin Company, 190 Pa. Super. 528, 154 A.2d 422 (1959)*.

Finally, the common law has long recognized that the public has a proper interest in learning about many matters. When the subject-matter of the publicity is of legitimate public concern, such as matters of the kind customarily regarded as "news," there is no invasion of privacy. *Culver v. Port Allegany Reporter Argus, 409 Pa. Super. 401, 404, 598 A.2d 54, 56 (1991)*.

<sup>HN26</sup> The tort of false light invasion of privacy involves "publicity that unreasonably places the other in a false light before the public." *Keim v. County of Bucks, 275 F. Supp. 2d 628, 637 (E.D.Pa. 2003)* citing *Rush v. Philadelphia Newspapers, Inc., 1999 PA Super 141, 732 A.2d 648, 654 (Pa. Super. 1999)*. Section 652E of the Second Restatement of Torts delineates the tort of false light invasion of privacy as:

> <sup>HN27</sup> One who gives publicity to a matter concerning another that places the other

before the public **[\*34]** in a false light is subject to liability to the other for invasion of his privacy, if

> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and

> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

See, _Williams v. Univ. of the Scis._, No. 02-7085, 2004 U.S. Dist. LEXIS 21799 at *6-*7 (E.D.Pa. Oct. 27, 2004); _Curran v. Children's Service Center_, 396 Pa. Super. 29, 39, 578 A.2d 8, 12 (1990). The tort applies only "when defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity." _Lin v. Rohm and Haas, Co._, 293 F. Supp. 2d 505, 522 (E.D.Pa. 2003), citing _Curran, supra. See also, Martin v. Municipal Publications_, 510 F. Supp. 255, 259 (E.D.Pa. 1981). Stated otherwise, a cause of action for invasion of privacy will be found where a major misrepresentation of a person's character, history, activities or beliefs **[\*35]** is made that could reasonably be expected to cause a reasonable man to take serious offense. _Keim, supra._

In this case, although she does not specify what false and fabricated statements she is referring to in Count V of her First Amended Complaint, Ms. DeGionvanni Sharp does allege that Defendant Blackburn called the Director of Neighborhood Coordination for OHCD and claimed that Plaintiff was having an affair with a priest and that he thereafter "proceeded to question community members, church authorities and otherwise spread rumor and innuendo." (First Am. Compl., Ps19-20). The complaint further alleges that the defendants called an emergency board meeting to discuss Plaintiff's employment, that at that board meeting they agreed to appropriate $ 2,000 of funding to undertake an investigation into the full nature of her relationship with past and present board members and that several weeks after her marriage to the former board member and Catholic priest, Plaintiff and her new husband were confronted by people wearing badges and t-shirts mocking them at a church reunion. While we cannot find that these averments sufficiently allege "a major misrepresentation **[\*36]** of Plaintiff's character, history, activities or beliefs that could reasonably be expected to cause a reasonable man to take serious offense," we do find them to be sufficient to plead a cause of action upon which relief could plausibly be granted for invasion of privacy under the publication of private facts theory. Indeed, we find that the issue of whether the plaintiff did or did not have an intimate relationship with a former board member who happened to be a Catholic priest is truly a private matter in which we can discern no legitimate public interest, the publication of which would be highly offensive to any reasonable person or anyone in the position of the plaintiff or her now-husband. So saying, Count V shall be permitted to stand but only to the extent that it pleads a claim for improper publication of private facts.

2. _Breach of Contract_

Count VI of the First Amended Complaint charges that "[t]here was a contract between plaintiff and Whitman Council, Inc., …[which] contained promises and contractual terms that Whitman would not discriminate in any way against anyone including plaintiff and would observe all federal and state anti-discrimination laws." (First **[\*37]** Am. Compl., Ps72-73). Defendants suggest that Plaintiff may be mistakenly thinking that Whitman Council's employment policies and procedures handbook constitute a contract of employment and they likewise move to dismiss this claim pursuant to Rule 12(b)(6). (See, p. 31 of Defendants' Brief in Support of Motion to Dismiss Plaintiff's Amended Complaint).

_HN28_ Under Pennsylvania law, provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties. _Bauer v. Pottsville Area Emergency Medical Services, Inc._, 2000 PA Super 252, 758 A.2d 1265,

1269 (2000) citing, inter alia, _Luteran v. Loral Fairchild Corp._, 455 Pa. Super. 364, 688 A.2d 211, 214-215 (1997). _See Also, Difiore v. PPG Indus._, No. 2:05-1469, 2006 U.S. Dist. LEXIS 7818 at *5 (W.D.Pa. March 1, 2006)(same). However, an employment manual or other workplace rules would be deemed a binding contract only where the benefit was extended at the time of hire and where there is evidence by which a reasonable person would conclude that the employer intended to be bound by its terms. **[*38]** _Garcia v. Matthews_, No. 02-3318, 66 Fed. Appx. 339, 2003 U.S. App. LEXIS 7967 (April 25, 2003). **HN29** Pennsylvania law also clearly requires that a plaintiff seeking to proceed with a breach of contract action must establish (1) the existence of a contract, including its essential terms (2) breach of a duty imposed by the contract and (3) resultant damages. _Sampathachar v. Fed. Kemper Life Assur. Co._, No. 05-3433, 186 Fed. Appx. 227, 2006 U.S. App. LEXIS 14979 at *6 (3d Cir. June 16, 2006); _Ware v. Rodale Press_, 322 F.3d 218, 225 (3d Cir. 2003).

In this case, while we find the allegations of the complaint adequate to outline the general terms of the purported contract and the defendants' alleged breach thereof, the complaint is silent as to whether the benefits outlined therein were extended to plaintiff when she was hired. In addition, we frankly cannot conceive how Plaintiff would be able to prove any resultant damages given that she admittedly received a $ 1,000 merit raise and continues to be employed by Whitman. Nevertheless, since dismissal is warranted only if it is certain that no relief can be granted under any set of facts which could be proved, **[*39]** we shall likewise deny the motion to dismiss as to this claim at this time to permit Plaintiff the opportunity to develop a record on the measures of her damages and into the circumstances surrounding the making of the alleged contract. Defendants are free to revisit this claim by filing a motion for summary judgment following the close of discovery, if it appears appropriate.

3. _Interference with Existing Contractual Relationship_

In Count VII, Plaintiff alleges that by their actions as discussed above, Defendants Sullivan, Blackburn and Lewandowski negligently and/or intentionally interfered with her existing contractual relationship with Whitman Council.

It is axiomatic that **HN30** to state a claim for interference with existing contractual relationships under Pennsylvania state law, a plaintiff must plead the following elements:

> (1) the existence of a contractual or prospective contractual relation between the complainant and a third party;

> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

> (3) the absence of privilege or justification on the part of the **[*40]** defendant; and

> (4) the occasioning of legal damage as a result of the defendant's conduct.

_CGB Occupational Therapy v. RHA Health Services, Inc._, 357 F.3d 375, 384 (3d Cir. 2004); _Intervest, Inc. v. Bloomberg, L.P._, 340 F.3d 144, 168, n.10 (3d Cir. 2003). Thus, a tortious interference claim does not accrue until, at least, the plaintiff suffers injury (i.e., "actual legal damage") as a result of the defendant's conduct. _CGB, supra._

It must be emphasized that the tort (interference with contractual relation) is an intentional one: the actor is acting as he does for the purpose of causing harm to the plaintiff; negligent action that interferes with another's ability to contract is not enough. _Peoples Mortgage Co., Inc. v. Federal National Mortgage Association_, 856 F. Supp. 910, 935 (E.D.Pa.1994), citing, inter alia, _Glenn v. Point Park College_, 441 Pa. 474, 481, 272 A.2d 895, 899 (1971).

In reviewing Count VII, we find that it too adequately pleads a cause of action for intentional interference with an existing contractual relation, to wit, the plaintiff's employment with the Whitman **[*41]** Council. To be sure, the gravamen of Plaintiff's complaint is the efforts which Messrs. Blackburn, Lewandowski and Sullivan undertook to have her terminated from her position as the Council's executive director. Thus, notwithstanding that it may be difficult for Plaintiff to prove actual legal damage as a result of the defendants' actions, we shall permit this claim to go forward but again only to the extent that it involves the intentional tort. Plaintiff's claim for negligent interference with contractual relations is dismissed as not cognizable under Pennsylvania law.

### 4. Misrepresentation

In Count VIII, Plaintiff complains that the defendants negligently and/or intentionally "concealed or otherwise misrepresented certain material facts, including facts involving the true reason for actions defendants were taking in regard to plaintiff's employment and monies spent on investigating plaintiff." (See, e.g., First Am. Compl., P88). As noted by the late Judge Waldman in _Puchalski v. School District of Springfield_, 161 F. Supp. 2d 395 (E.D.Pa. 2001):

> **HN31** To sustain a negligent misrepresentation claim, a plaintiff must show a misrepresentation of a material **[*42]** fact; that the representor either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or made the representation under circumstances in which he ought to have known of its falsity; that the representor intended the representation to induce plaintiff to act on it; and that he was injured by acting in justifiable reliance on the misrepresentation …. **HN32** To sustain an intentional misrepresentation claim, a plaintiff must show a misrepresentation; a fraudulent utterance; that defendants intended to induce action by him; and that he justifiably relied on the misrepresentation and was injured as a proximate result.

_Puchalski, at 404_, citing _Pacitti v. Macy's_, 193 F.3d 766, 778 (3d Cir. 1999); _Weisblatt v. Minnesota Mut. Life Ins. Co._, 4 F.Supp.2d 371, 377 (E.D.Pa. 1998); _Gibbs v. Ernst_, 538 Pa. 193, 647 A.2d 882, 890 (1994) and _Banks v. Jerome Taylor & Assocs._, 700 A.2d 1329, 1333 (Pa. Super. 1997). **HN33** A misrepresentation is considered to be "material" if the party would not have entered into an agreement or transaction but for the misrepresentation. _Eigen v. Textron Lycoming Reciprocating Engine Division_, 2005 PA Super 141, 874 A.2d 1179, 1186 (2005); **[*43]** _Lind v. Jones, Lang, LaSalle Americas, Inc._, 135 F. Supp. 2d 616, 620 (E.D.Pa. 2001).

In this case, while Plaintiff conclusorily alleges that the defendants "misrepresented certain material facts, including facts involving the true reason for actions [they] were taking in regard to plaintiff's employment and monies spent on investigating plaintiff," that "[d]efendants intended that by these representations plaintiff would be induced to act," that "[d]efendants knew or should have known of the falsity of the representations and that plaintiff and others would rely on the representations," and that "[d]efendants had a duty to disclose the misrepresentation and failed to exercise reasonable care" resulting in damage to the plaintiff, she fails to aver either justifiable reliance or what transaction or agreement she was induced to enter because of the defendants' purported misrepresentations. Even after closely scrutinizing the amended complaint and giving Plaintiff the benefit of the broadest interpretation possible, we simply cannot discern that Plaintiff was coerced into entering any such transaction or undertaking any action as the result of the defendants' **[*44]** having allegedly misrepresented the true reason for their investigation into her employment. Accordingly, Count VIII of the first amended complaint must also be dismissed.

### 5. Conspiracy

Finally, Count IX of the first amended complaint seeks to recover damages from the defendants under the state law theory of civil conspiracy. Of course, **HN34** in order to state a cause of action

for civil conspiracy under Pennsylvania law, a complaint must allege the existence of all elements necessary to such a cause of action. *Burnside v. Abbott Laboratories*, 351 Pa. Super. 264, 277, 505 A.2d 973, 980 (1985). Thus, it is incumbent upon the plaintiff to plead and prove that "two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Rutherfoord v. Presbyterian-University Hospital*, 417 Pa. Super. 316, 612 A.2d 500, 507 (1992) quoting *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979). Furthermore, a conspiracy is not actionable until "some overt act is done in pursuance of a common purpose or design ... and actual legal damage results." *Id.*, quoting *Baker v. Rangos*, 229 Pa. Super. 333, 351, 324 A.2d 498, 506 (1974). **[*45]** *See Also*, *Puchalski*, 161 F. Supp. 2d at 410.

Here, Ms. DeGiovanni-Sharp contends that the defendants' actions "were a conscious, intentional and concerted effort to gain from misleading OHCD and the Whitman community despite defendants' knowledge that such would cause economic harm," and that "[b]eginning at least as early as 2004, the defendants reached a common agreement and engaged in a conspiracy to commit unlawful or tortious acts, or to use unlawful or tortious means to commit acts not themselves illegal, and did commit those acts or use those means as described herein, in furtherance of the common agreement and conspiracy." Although these averments are extremely vague, in reviewing them in conjunction with all of the other factual allegations contained in the complaint, we can extrapolate that the plaintiff is trying to allege that the defendants conspired to unlawfully discriminate against her. Once again, in light of the liberal pleading requirements of the Federal Rules of Civil Procedure and given that we cannot say with absolute certainty that the plaintiff will not be able to make out a cause of action under this theory, we shall permit this claim **[*46]** to survive. The motion to dismiss Count IX is denied.

For all of the reasons set forth above, the defendants' motion to dismiss is granted in part and denied in part. An order follows.

### *ORDER*

AND NOW, this 3rd day of August, 2006, upon consideration of Defendants' Motion to Dismiss and/or for Summary Judgment and Plaintiff's Response thereto, it is hereby ORDERED that the Motion for Summary Judgment is GRANTED and Judgment in favor of Defendants and against Plaintiff is hereby entered as a matter of law on Counts I, II and III of the Plaintiff's First Amended Complaint.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART and Counts IV and VIII of the First Amended Complaint are DISMISSED with prejudice as are those portions of Counts V and VII which endeavor to state claims for false light invasion of privacy and negligent interference with contractual relations.

IT IS STILL FURTHER ORDERED that Defendants shall file their Answer to the remaining Counts of the First Amended Complaint within fifteen (15) days of the entry date of this Order.

BY THE COURT:

J. CURTIS JOYNER, J.

# EXHIBIT 14

LEXSEE 2007 US APP LEXIS 24895



Analysis
As of: Jan 29, 2008

THOMAS A. THIMONS, Appellant, v. PNC BANK, N.A., Appellees.

No. 06-3815

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*2007 U.S. App. LEXIS 24895*

September 24, 2007, Submitted Under Third Circuit LAR 34.1(a)
October 23, 2007, Opinion Filed

**NOTICE:** NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT.

PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [*1]
On Appeal from the Order of the United States District Court for the Western District of Pennsylvania. (D.C. Civ. No. 04-cv-01770). District Judge: Hon. Gary L. Lancaster.
*Thimons v. PNC Bank, N.A., 2006 U.S. Dist. LEXIS 50877 (W.D. Pa., July 17, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant terminated employee filed a suit against appellee, his former bank employer, alleging that he was fired in violation of his rights under the Americans with Disabilities Act (ADA), the Age Discrimination in Employment Act (ADEA), and the Pennsylvania Human Relations Act (PHRA). The employee appealed after the United States District Court for the Western District of Pennsylvania granted summary judgment to the employer.

**OVERVIEW:** The employee alleged that he was fired because of his alcoholism and his age, that his alcoholism was a disability, and that his termination violated his rights under the ADA, *42 U.S.C.S. §§ 12101-12213*, the ADEA, *29 U.S.C.S. § 621 et seq.*, and the PHRA, 43 Pa. Stat. Ann. §§ 951-963 . The employer presented evidence showing that: coverage under a fidelity bond was a requirement for employment; that coverage under the bond ended once an employee was suspected of committing a fraudulent or dishonest act, including making misrepresentations during an investigation; and that the employee was fired after he made inconsistent statements during an overdraft investigation and the bank was unable to verify the excuses he provided regarding the acts he took in connection with the overdrafts. The court found no error. It did not have to decide whether the employee's alcoholism was a disability under the ADA because he failed to rebut the legitimate, nondiscriminatory reason proffered by the employer for its termination decision. The employee also failed to establish a prima facie case of discrimination under the ADEA. He did not present any evidence showing he was fired because of his age.

**OUTCOME:** The court affirmed the district court's order granting summary judgment to the employer.

**LexisNexis(R) Headnotes**

*Civil Rights Law > Civil Rights Acts > General Overview*
*Governments > Legislation > Interpretation*
*Labor & Employment Law > Discrimination > General Overview*
[HN1] The Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. §§ 951-963, is to be interpreted as identical to federal anti-discrimination laws, except where there is something specifically different in its language requiring that it be treated differently.

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] The United States Court of Appeals for the Third Circuit's review of a district court's grant of summary judgment is plenary.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
[HN3] Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Civil Procedure > Summary Judgment > Appellate Review > General Overview*
*Civil Procedure > Summary Judgment > Evidence*
[HN4] In reviewing a grant of summary judgment, the United States Court of Appeals for the Third Circuit views all the facts in the light most favorable to the non-moving party and draws all reasonable inferences in his favor.

*Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Employee Burdens*
[HN5] In order to establish a prima facie case of discrimination under the Americans with Disabilities Act (ADA), *42 U.S.C.S. §§ 12101-12213*, a plaintiff must demonstrate: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to

perform the essential functions of the job with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Absence of Essential Element of Claim*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Evidence > Procedural Considerations > Burdens of Proof > Burden Shifting*
*Labor & Employment Law > Discrimination > Age Discrimination > Proof > Burdens of Proof*
*Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Burden Shifting*
[HN6] Claims under the Americans with Disabilities Act (ADA), *42 U.S.C.S. §§ 12101-12213*, the Age Discrimination in Employment Act (ADEA), *29 U.S.C.S. § 621 et seq.*, and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Stat. Ann. §§ 951-963, all follow the familiar burden-shifting analysis set forth in McDonnell Douglas. The plaintiff-employee bears the initial burden of proving a prima facie case of discrimination. The burden then shifts to the employer to present a nondiscriminatory reason for the adverse decision. Once an employer presents a nondiscriminatory reason under the ADA, ADEA, or PHRA, the employee must present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision. The plaintiff's claim will not survive a summary judgment motion if he/she fails to fulfill the third step.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Evidence > Inferences & Presumptions > Inferences*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN7] To survive summary judgment at the third stage of the McDonnell Douglas analysis, a plaintiff must present sufficient evidence to allow a factfinder to conclude that the employer's nondiscriminatory reason was a post hoc fabrication, or pretext. The plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the

2007 U.S. App. LEXIS 24895, *1

employer's action. The plaintiff cannot simply show that the employer's decision was wrong or mistaken. Rather, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.

*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN8] One can not create an issue of fact for summary judgment purposes merely by submitting an affidavit denying averments in conflicting affidavits, without producing any supporting evidence of the denials.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof*
[HN9] A plaintiff can not avoid summary judgment simply by arguing that a factfinder need not believe the defendant's proffered legitimate explanations for an adverse employment decision.

*Labor & Employment Law > Discrimination > Age Discrimination > Employment Practices > Discharges & Failures to Hire*
*Labor & Employment Law > Discrimination > Age Discrimination > Proof > Burdens of Proof*
[HN10] To establish a prima facie case of age discrimination, a plaintiff must show that he: (1) was forty years old or older; (2) was terminated; (3) was qualified for the job; (4) and was replaced by a person sufficiently younger to provide the inference of discrimination. A plaintiff can not satisfy the final, most important prong when, although he was replaced by a younger employee, he presents no evidence that age played any part in his firing.

**COUNSEL:** For THOMAS A. THIMONS, Appellant: Samuel P. Kamin, Walter G. Bleil, Goldberg, Kamin & Garvin, Pittsburgh, PA.

For PNC BANK, Appellee: Maria G. Danaher, Dickie, McCamey & Chilcote, Pittsburgh, PA.

**JUDGES:** Before: McKEE, BARRY, & FISHER, Circuit Judges.

**OPINION BY:** McKEE

**OPINION**

McKEE, Circuit Judge.

Thomas A. Thimons appeals a grant of summary judgment in favor of his former employer, PNC Bank. Thimons alleged discrimination under the Americans with Disabilities Act ("ADA"), *42 U.S.C. §§ 12101 - 12213* and the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 621 et seq.* as well as under the Pennsylvania Human Relations Act ("PHRA") [1], *43 P.S. §§ 951-963* . For the reasons that follow, we will affirm.

> 1  [HN1] "[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002).*

**I.**

Since we write primarily for the parties who are familiar with this case, we need [*2] not discuss the procedural or historical background. We have jurisdiction pursuant to *28 U.S.C. § 1291.* [HN2] Our review of the district court's grant of summary judgment is plenary. *See Turner v. Hershey Chocolate U.S.A., 440 F.3d 604, 611 (3d Cir. 2006).* [HN3] Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* [HN4] In reviewing a grant of summary judgment, we view all the facts in the light most favorable to Thimons as the non-moving party, and draw all reasonable inferences in his favor. *See Bowers v. NCAA, 475 F.3d 524, 535 (3d Cir. 2007).*

**II.**

[HN5] In order to establish a *prima facie* case of discrimination under the ADA, Thimons must demonstrate: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to

perform the essential functions of the job with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998).*

Thimons contends that he was fired because of his [*3] age and alcoholism, and that summary judgment was not appropriate because material facts were in dispute concerning whether he was a "qualified individual" under the ADA as well as his honesty during the two interviews at PNC.

[HN6] Claims under the ADA, ADEA, and PHRA all follow the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* The plaintiff-employee bears the initial burden of proving a *prima facie* case of discrimination. *Id.* The burden then shifts to the employer to present a non-discriminatory reason for the adverse decision. *Id.* Once an employer presents a non-discriminatory reason for termination under the ADA, ADEA, or PHRA, the employee must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." *Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005). See also Smith v. Davis, 248 F.3d 249 (3d Cir. 2001)* (reversing a grant of summary judgment for an alcoholic because defendants did not present a sufficient legitimate reason for his termination). The plaintiff's claim will not survive a summary judgment motion if he/she fails to fulfill the third step. *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).* [*4]

[HN7] To survive summary judgment at the third stage of the *McDonnell Douglas* analysis, the plaintiff must present sufficient evidence to allow a factfinder to conclude that the employer's non-discriminatory reason was a *post hoc* fabrication, or pretext. *Id.* "[T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998).*

[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . Rather, the non-moving

plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence" and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Fuentes, 32 F.3d at 765* (internal citations omitted).

Here, PNC maintains a "fidelity [*5] bond" which covers all employees and protects the company from theft. An employee's coverage under that bond ends when he/she is suspected of committing a fraudulent or dishonest act, "including making misrepresentations during an investigation." A41.

PNC submitted evidence that Thimons was fired because he made inconsistent statements during investigatory interviews into overdrafts that were only discovered while he was on leave. The evidence established that Thimons' responses during the interviews caused PNC to have a good faith and reasonable belief that Thimons may have committed fraud and he therefore no longer qualified for coverage under its fidelity bond. It is uncontested that eligibility for coverage under that bond is a condition of employment with PNC.

Thimons devotes a substantial part of his brief to arguing that there is a genuine issue of material fact about his alcoholism, any resulting impairment, and whether he was "disabled" within the meaning of the ADA, ADEA, or PHRA, as well as the extent to which his age was a motivating factor in his termination. *See* Appellants' Br. at 18 to 25. However, nothing he has proffered refutes PNC's explanation for his termination, [*6] a termination that has nothing to do with any protected classification or disability. Indeed, it is significant that, in refuting PNC's concerns about his failing to call PNC's relations manager about overdrafts, Thimons "responded that his phone was broken for a period of time and produced evidence of that fact." *Id.* at 7. Given the omnipresence of telephones in this society, such an explanation could only have exacerbated and reinforced PNC's concerns about Thimons' veracity and candor regarding the overdrafts. It is difficult to understand how a single "broken" telephone could prevent an employee from contacting his employer if the employee truly wanted to speak to the employer.

The "excuse" certainly does not negate the force of PNC's affidavits.

Similarly, Thimons' affidavit denying dishonesty is not enough to defeat PNC's motion for summary judgment. [HN8] One can not create an issue of fact merely by submitting an affidavit denying averments in conflicting affidavits without producing any supporting evidence of the denials. *Fuentes, 32 F.3d at 764* ("[w]e can reject out of hand . . . that the [HN9] plaintiff can avoid summary judgment simply by arguing that the factfinder need not believe [*7] the defendant's proffered legitimate explanations. . . .").

Moreover, the issue is not Thimons' culpability for the overdrafts; it is his inability to qualify for coverage under PNC's fidelity bond, a condition of employment that he does not deny. PNC, on the other hand, has provided evidence supporting its contention that Thimons was fired for nondiscriminatory reasons. Rhodes and Calhoun stated that Thimons' termination was due to his perceived dishonesty while being questioned and subsequent ineligibility for coverage under the fidelity bond. To its credit, PNC checked Thimons' phone and computer records and attempted to verify his excuses for failing to approve the overdrafts. PNC was not able to verify any of Thimons' excuses. It was not able to corroborate them.

The uncontradicted evidence suggests that PNC did everything it could reasonably have been expected to do to help Thimons with his unfortunate personal problems and to maximize the chances that he could continue his employment with the company. This included helping him contact a counselor, offering time off, and meeting with him about returning to work. Accordingly, the court clearly did not err in granting PNC summary [*8] judgment on his claim of disability discrimination under the ADA or PHRA. [2]

> 2  Because Thimons failed to carry his burden, we need not decide if alcoholism is a "disability" under the ADA.

Thimons' ADEA claim fares no better. [HN10] To establish a *prima facie* case of age discrimination, Thimons must show that he: (1) was forty years old or older; (2) was terminated; (3) was qualified for the job; (4) and was replaced by a person sufficiently younger to provide the inference of discrimination. *See Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 234 (3d Cir. 1999)*. Although Thimons is able to satisfy the first three prongs, he can not satisfy the final, most important prong. Although he was replaced by a younger employee, Thimons presents no evidence that age played any part in his firing. Thimons himself conceded that he was fired "because I'm an alcoholic and I didn't get along with [Rhodes]." (A82).

Although we are not unsympathetic to the personal tragedy that appears to have befallen Thimons, his attempt to parlay his alcoholism and regrettable loss of employment into a lawsuit borders on frivolity, and the district court correctly ended it by granting PNC's motion for summary [*9] judgment on all of his claims.

## III.

For the reasons above, we will affirm the district court's order granting summary judgment.

# EXHIBIT 15

**Citation # 7**
**2005 us app lexis 9087**

✦ Positive , As of Jan 29 , 2008

TROY TUCKER, Appellant v. MERCK & CO, INC.

NO. 04-3023

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

131 Fed. Appx. 852; 2005 U.S. App. LEXIS 9087

April 19, 2005, Submitted Under Third Circuit LAR 34.1(a)
May 19, 2005, Filed

**NOTICE: [**1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal From the United States District Court For the Eastern District of Pennsylvania. (D.C. No. 03-cv-05015). District Judge: Honorable James T. Giles.
Tucker v. Merck & Co., 2004 U.S. Dist. LEXIS 11222 (E.D. Pa., June 17, 2004)

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee filed a suit against defendant employer under 42 U.S.C.S. § 1981, alleging that he was subjected to a racially hostile work environment and to numerous instances of disparate-treatment racial discrimination. The employee appealed after the United States District Court for the Eastern District of Pennsylvania found that he had not established a prima facie case on either claim and granted summary judgment to the employer.

**OVERVIEW:** The employee alleged several incidents of alleged racial discrimination, including the employer's refusal to simultaneously pay for two outside courses of study, its requirement that he provide additional documentation to support a disability leave, a restriction on the number of personal leave days the employee could take, two unsatisfactory employment evaluations, and the employer's alleged failure to satisfactorily investigate his discrimination claims. The employee relied on these same incidents to support his hostile work environment claim. The district court found that the employee had failed to establish a prima facie case because none of the incidents cited in his complaint constituted an adverse employment action, he failed to show that any similarly situated employees were treated differently than he was, and there was no evidence of discriminatory intent on the employer's part. The court found no error. The employer had, in fact, paid for the outside courses, the disability leave, and 17 personal days; the employee received raises despite the unsatisfactory evaluations. The employee produced no evidence that any of the employer's decisions were racially motivated.

**OUTCOME:** The court affirmed the district court's judgment.

**CORE TERMS:** hostile, work environment, supervisor, disability, prima facie case, favorably, attend, deposition, racial discrimination, similarly situated, significant change, tangible, vacation, harassment, racially, analyst, documentation, nursing, manager, racial groups, employment status, employment decision, employee's compensation, privileges of employment, intentional discrimination, disparate-treatment, detrimentally, subjected, offensive, pervasive

**LexisNexis® Headnotes**

Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties
Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Burden Shifting
Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Employee Burdens

HN1⬜ A plaintiff's 42 U.S.C.S. § 1981 employment discrimination claim is analyzed under the same framework as sexual discrimination claims under Title VII of the Civil Rights Act of 1964. This framework is set out in McDonnell Douglas. Under this test, the plaintiff bears the responsibility of making a prima facie case of discrimination. This is done by showing (1) that he is a member of a protected class, (2) that he was subject to an adverse employment action, and (3) that similarly situated members of other racial classes were treated more favorably.

Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > Compensation
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

HN2⬜ A tangible employment action constitutes a significant change in employment status, such as hiring, firing failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. A tangible employment action in most cases inflicts direct economic harm. The United States Court of Appeals for the Third Circuit has defined an "adverse employment action" under Title VII of the Civil Rights Act of 1964 as an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.

Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > General Overview

HN3⬜ Several cases hold that requiring an employee to take a vacation day rather than a personal day does not constitute an adverse employment action.

Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > Compensation

HN4⬜ A negative evaluation, by itself, is not an adverse employment action. Indeed, even a negative evaluation that leads to a lower than expected merit wage increase or bonus probably does not constitute an adverse employment action.

Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > General Overview
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions

HN5⬜ Even if an employer's investigation of a plaintiff's race discrimination claims is inadequate, the United States Court of Appeals for the Third Circuit does not think that it can constitute an adverse employment action.

Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Reconstruction Statutes (secs. 1981, 1983 & 1985)

To bring an actionable claim for racial harassment because of an intimidating and offensive work environment, a plaintiff must establish by the totality of the circumstances, the

existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee. Five constituents must converge to bring a successful claim for a hostile work environment under 42 U.S.C.S. § 1981: (1) the employees *HN6* suffered intentional discrimination because of their race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.

Evidence > Procedural Considerations > Burdens of Proof > General Overview
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Reconstruction Statutes (secs. 1981, 1983 & 1985)
*HN7* Isolated incidents of racial harassment will not create a hostile work environment claim.

Evidence > Procedural Considerations > Burdens of Proof > General Overview
Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions
Labor & Employment Law > Discrimination > Reconstruction Statutes (secs. 1981, 1983 & 1985)
     A plaintiff's subjective disagreement with an employer's employment-related decisions, and
*HN8* even his opinion that they were racially motivated and were offensive, is insufficient as a matter of law to establish a hostile work environment.


**COUNSEL:** For TROY TUCKER, Appellant: Robert T. Vance, Jr., Philadelphia, PA.

For MERCK & CO INC, Appellee: Judith E. Harris, Bacardi E. Jackson, Morgan, Lewis & Bockius, Philadelphia, PA.

**JUDGES:** Before: ROTH, FUENTES and BECKER, Circuit Judges.

**OPINION BY:** BECKER

**OPINION**


 [*854]  BECKER, *Circuit Judge*.

Troy Tucker sued Merck, his employer, under 42 U.S.C. § 1981, claiming numerous instances of disparate-treatment racial discrimination, in addition to a claim that he was subjected to a racially hostile work environment. The District Court for the Eastern District of Pennsylvania found that Tucker had not made out a prima facie case of race discrimination or a hostile work environment, and granted summary judgment to Merck. Tucker now appeals, and we affirm.

I

Tucker's *HN1* § 1981 employment discrimination claim is analyzed under the same framework as [**2] sexual discrimination claims under Title VII of the Civil Rights Act of 1964. *Schurr v. Resorts Int'l Hotel Inc.*, 196 F.3d 486, 499 (3d Cir. 1999). This framework was set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). Under this test, the plaintiff bears the responsibility of making a prima facie case of discrimination. This is done by showing (1)  [*855] that he is a member of a protected class, (2) that he was subject to an adverse employment action, and (3) that similarly situated members of other racial classes were treated more favorably.

An adverse employment action has been defined by the Supreme Court:

> **HN2** A tangible employment action constitutes a significant change in employment status, such as hiring, firing failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. . . . A tangible employment action in most cases inflicts direct economic harm.

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761-62, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998). Our Court has defined an "adverse employment action" under Title VII as "an action **[**3]** by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001); and *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).

We have jurisdiction pursuant to 28 U.S.C. §§ 1291, 1331 & 1343.

II

Tucker, who is African-American, alleges that a number of decisions taken by Merck constituted adverse employment actions.

A

Merck has a policy of providing educational assistance to its employees. The policy allows employees to get tuition money for degree and non-degree courses that are relevant to their current work at Merck, or to other Merck jobs for which management thinks they might be qualified. Eligibility is at the discretion of management.

In May 2002, Tucker requested assistance to attend computer network certification courses. Tucker's supervisor denied the request because the courses did not relate to Tucker's current position at Merck, or to a potential future position for him. Tucker **[**4]** then asked for assistance to attend a Pharmaceutical MBA program. This request was approved. Because the course included classes during work hours, Tucker's supervisor asked Tucker to sign an "Alternative Work Arrangement" ("AWA") document drafted by a human resources employee. Tucker refused. Merck nonetheless continued to pay for his Pharmaceutical MBA.

In the summer of 2003, Tucker requested approval to obtain a nursing degree. This request was approved, but his supervisors informed Tucker that he could only receive assistance for one program at a time. Tucker had never planned to do both programs at a time; he was going to "put the MBA on hold in order to fulfill the [nursing] program." (App. 139.) He then did exactly that. No other Merck employee ever seems to have been approved for educational assistance to pursue two degree programs at the same time.

Tucker claims that the AWA and the refusal to fund both the MBA and the nursing degree at the same time are adverse employment actions. We disagree. Neither cost Tucker anything--he never signed the AWA (and even if he had it would not have been an adverse action), and he never had any plans to pursue both degrees at the same **[**5]** time. The denial of funding for the network certificate also was not an adverse employment decision, as it was not a significant change in employment status or a "significant change in benefits." No negative action was taken; Tucker was simply denied a discretionary **[*856]** benefit worth some $ 2,197. The MBA courses that he eventually took instead cost Merck some $ 3,855, more than the cost of his original request. Even if the denial of funding was an adverse action, however, Tucker has not made out a prima facie case of discrimination. Tucker's supervisors were following Merck's stated policy, and Tucker has not even alleged that any members of other racial groups were treated more favorably.

B

Tucker went on short-term disability leave on September 17, 2002, allegedly due to stress caused by a hostile work environment. His doctor submitted documentation on October 4, which his Merck disability case manager determined was insufficient. On October 25, 2002, more than a month after Tucker went on disability, he received a letter noting the lack of documentation and demanding that Tucker's doctor and therapist provide documentation that day in order to avoid termination. Tucker's medical **[\*\*6]** professionals did so, and he did not come back to work. He was not terminated.

In November 2002, Tucker's disability case manager learned that Tucker was attending his classes while still on disability leave. Concerned that this might indicate fraud, she contacted Tucker's therapist, who told her that this was consistent with his disability. The case manager, who had never met Tucker, took no further action. Tucker remained on short-term disability for about four and a half months, returning to work on February 3, 2003. He received all the disability benefits that he claimed during this time.

Tucker claims that these incidents show an intent to discriminate against him. None of them are even arguably adverse employment actions, however, and he has provided no evidence that anyone else was treated more favorably. Therefore, he has not made out a prima facie case of a § 1981 violation.

C

Merck allows employees to take paid leave days without using vacation time. Four types of paid personal absence are typically allowed: death in the immediate family, care for a sick relative, medical or dental appointments, and "legal or civic obligations," such as "closing on a house, jury duty, **[\*\*7]** etc.," that are "unable to be arranged during non-working times." (App. 414.) The employee's immediate supervisor determines whether to grant a personal day. There is no maximum, but supervisors are advised to limit use of personal days. On average, Merck employees take four or five personal days each year.

Tucker took seventeen personal days in 2003. In part, this was because of a lawsuit that he and his wife had previously filed against Merck, alleging defamation and invasion of privacy in connection with Merck's decision to terminate Tucker's wife. *See Tucker v. Merck & Co., Inc.*, 102 Fed. Appx. 247 (3d Cir. 2004) (not precedential opinion) (affirming summary judgment against the Tuckers). Tucker requested paid personal days to attend his own deposition, and those of other witnesses in that case. Tucker's supervisor granted Tucker a personal day for his own deposition, but not for the others. Similarly, when he filed the instant suit, Tucker requested seven or eight personal days to attend depositions. Merck again granted him a personal day to attend his own deposition, but not others. Tucker attended all of the depositions, taking vacation days when he was denied **[\*\*8]** personal days.

Tucker's supervisor testified that he generally did not require a reason for an employee to take a personal day, but he did require reasons of Tucker, who had **[\*857]** taken an unusual number of personal days. (App. 182.) Indeed, Tucker apparently took five personal days in his first month back from work after medical leave (App. 31), and missed a total of nine and a half of his first nineteen days back from disability leave (App. 25). At some point in summer or fall 2003, after taking 17 personal days, Tucker was told that he would not be granted any more paid personal days in 2003 for any reason, and that he would need to take vacation or unpaid time to attend to any more personal matters.

Tucker claims disparate treatment, pointing out that seven other employees in his division accumulated more than five personal days in 2003, and none were subjected to similar monitoring. Merck replies that none of those seven employees took more than 8.5 personal days, and argues that they were thus not similarly situated. We agree with Merck: Tucker was allowed *twice* as many personal days as any other employee in his division, and therefore cannot point to anyone, of any racial group, **[\*\*9]** who was treated more favorably than he was. Moreover, [HN3] several cases

hold that requiring an employee to take a vacation day rather than a personal day does not constitute an adverse employment action. See _Cantrell v. Jay R. Smith Mfg. Co._, 248 F. Supp. 2d 1126, 1138 n.29 (M.D. Ala. 2003); _Montgomery v. City of Birmingham_, 2000 U.S. Dist. LEXIS 11491, No. 98-AR-2100-S, 2000 WL 1608620, *7 (N.D. Ala. Jan. 20, 2000). At least in this case, such a requirement is not "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment," especially given that Tucker was in fact allowed seventeen personal days.

D

Tucker's 2002 and 2003 employment evaluations were unsatisfactory: Tucker was in the bottom half of his group in 2002, and was the lowest ranked analyst in 2003. Tucker alleges that these evaluations were unfair and motivated by racism.

Tucker points to the fact that his supervisor, Timothy Lynch, kept notes of his interactions with Tucker, which he did not do with any other analyst. Tucker considers this evidence of Lynch's racism, which he thinks tainted his evaluations. Lynch testified that he took the notes because he "was aware **[**10]** that Troy was involved with litigation with the company and I felt a bit threatened by him. I felt like I needed to keep some records to protect myself." (App. 185.) Tucker was suing Merck at the time, and had also sent various letters to Merck officers alleging racial discrimination. Lynch's explanation is perfectly reasonable, and Tucker offers no reason to think that Lynch's notes were made for any purpose but to protect himself from a litigious employee.

It is also far from clear that these evaluations constituted adverse employment actions. The District Court found that they did not, noting that Tucker received raises of over $ 5,000 in each of those years; that he received bonuses of $ 2,088 in 2002 and $ 1,356 in 2003; and that Tucker presented no evidence that these amounts were different either from what white contract analysts got or from what Tucker got prior to his 2002 evaluation. (App. 32.) There is thus no evidence that the negative evaluations had any impact on Tucker's compensation or terms of employment. **_HN4_** ☐A negative evaluation, by itself, is not an adverse employment action. See _Weston v. Pennsylvania_, 251 F.3d 420, 431 (3d Cir. 2001). Indeed, even **[**11]** a negative evaluation that leads to a lower than expected merit wage increase or bonus probably does not constitute an adverse employment action. See _Rabinovitz v. Pena_, 89 F.3d 482, 488-489 (7th Cir.1996); EEOC v. Wyeth Pharm., 2004 U.S. Dist. LEXIS 4382, No. Civ. A. 03-2967, 2004 WL 503417, *2 n.3 (E.D. Pa. 2004).

**[*858]** Even if the evaluations were adverse employment actions, Tucker presented no evidence that anyone similarly situated had been treated more favorably. As Merck puts it, "all that Mr. Tucker offers in support of his claim is his belief that his ratings should have been higher." Merck has offered detailed descriptions of how the evaluations were created and justified. [1] Here, again, Tucker has failed to present a prima facie case.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[1] The evaluations contain specific criticisms of Tucker's timeliness, responsiveness, thoroughness, and depth of knowledge. Lynch found numerous errors in his spreadsheets and criticized him for taking a passive and minor role in various projects. Lynch also noted that Tucker was often late for work, not at his desk, reading school textbooks during work hours, or actually asleep at his desk. (App. 388-408.)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[**12]** E

In December 2002, Tucker sent a memorandum to various Merck executive officers alleging racial discrimination and demanding an investigation. This letter was referred to Michael Cavalier, a

Senior Director of Human Resources, who wrote to Tucker to tell him that he would handle the investigation. Cavalier also told Tucker that he should address his correspondence about the investigation only to Cavalier. Tucker continued to address correspondence to Merck executive officers; Cavalier warned him that this could result in discipline, although Tucker was never actually disciplined. Tucker argues that the requirement that he address his concerns to Cavalier, not the executives, violated Merck's "Open Door Policy" (which "encouraged employees to bring their concerns directly to management"). Tucker provides little support for this argument, and at all events such a violation would not constitute an adverse employment action.

Cavalier's inquiry found no evidence of racial discrimination. Tucker alleges that the investigation was insufficient, but he has not pointed to any evidence of discrimination that Cavalier missed or undervalued. *HN5*☐Even if Tucker were right, however, that Cavalier's **[\*\*13]** investigation was inadequate, he does not explain how that could constitute an adverse employment action. We think it cannot.

III

In addition to his disparate-treatment claims, Tucker alleges that the incidents discussed above created a hostile work environment. We have explained the hostile environment cause of action as follows:

> *HN6*☐To bring an actionable claim for [racial] harassment because of an intimidating and offensive work environment, a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working *environment* which is severe enough to affect the psychological stability of a minority employee." We hold that five constituents must converge to bring a successful claim for a . . . hostile work environment under [§ 1981]: (1) the employees suffered intentional discrimination because of their [race]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same [race] in that position; and (5) the existence of respondeat superior liability.

*Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990) **[\*\*14]** (citation omitted).

Tucker alleges that the facts outlined above constituted pervasive and regular discrimination, which occurred regularly since June 2002 and which caused him stress and anxiety. He alleges no facts **[\*859]** other than those set forth above; in particular, he does not allege that anyone ever said or did anything overtly racist to or about him.

The District Court reviewed the caselaw and determined that Tucker had no evidence to support a hostile work environment claim. *HN7*☐Isolated incidents of racial harassment will not create such a claim. *See, e.g., Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 482 (3d Cir. 1997). We find the District Court's conclusions here persuasive:

> In his hostile work environment claim, plaintiff cannot cite a single incident involving the utterance of a racial epithet, the use of a racist symbol, or *any* direct comment concerning race. Rather, plaintiff raises eight separate incidents where Merck made determinations regarding benefits issues raised by him. These incidents were each employment decisions or actions not linked directly with conduct regarding race. As discussed earlier, plaintiff failed to establish a **[\*\*15]** prima facie case of intentional discrimination for each of the decisions. He has no direct evidence of discrimination and points to no similarly situated individual treated more favorably. *HN8*☐Plaintiff's subjective disagreement with these decisions, and even his opinion that they were racially motivated and were offensive, is insufficient as a matter of law to establish a hostile work environment.

(App. 35.) Tucker has not produced any evidence that any decision ever taken by Merck was racially motivated; indeed, several of the actions he complains of were taken by Merck employees who had never met Tucker and were unaware of his race. Tucker cannot contend that the benefits decisions he complains about constituted harassment, intimidation, or hostility. Thus he has not made a prima facie case of hostile-work-environment discrimination.

The judgment of the District Court will be affirmed.

# EXHIBIT 16

**Citation # 2**
**2006 us dist lexis 59938**

(A) Analysis , As of Jan 29 , 2008

CHRISTINA V. WIMBERLY, Plaintiff, v. SEVERN TRENT SERVICES, INC. and SEVERN TRENT WATER PURIFICATION, INC., Defendants.

CIVIL ACTION, NO. 05-2713

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2006 U.S. Dist. LEXIS 59938

August 22, 2006, Decided

**SUBSEQUENT HISTORY:** Motion granted by, Judgment entered by Wimberly v. Severn Trent Servs., 2007 U.S. Dist. LEXIS 13365 (E.D. Pa., Feb. 26, 2007)

**CORE TERMS:** reporting, purchasing, discrimination claims, summary judgment, termination, prima facie case, prong, sex, purchasing manager, discrete, manager, nondiscriminatory reason, cause of action, inconsistencies, factfinder, genuine issue, statute of limitations, supervision, engineer, discriminatory acts, material fact, protected class, articulated, pretext, skills, age discrimination, employment practice, legitimate reasons, discriminatory, subordinate

**COUNSEL:** [*1] For CHRISTINA V. WIMBERLY, Plaintiff: FRANK FINCH, III, PHILA, PA.

For SEVERN TRENT SERVICES, INC., SEVERN TRENT SERVICES-WATER PURIFICATION SOLUTIONS, INC., Defendants: MICHAEL J. EAGLES, MORGAN, LEWIS & BOCKIUS LLP, PHILADELPHIA, PA.

**JUDGES:** LAWRENCE F. STENGEL, J.

**OPINION BY:** LAWRENCE F. STENGEL

**OPINION**

**STENGEL, J.**

This case involves claims of race, sex, and age discrimination. Plaintiff, Christina Wimberly, an African-American woman born on December 12, 1946, alleges Severn Trent Services, Inc. ("STS, Inc.") and Severn Trent Water Purification, Inc. ("Severn Trent") (collectively "Defendants"), [1] discriminated against her in employment actions that occurred between October 2002 and January 2004. Defendants have moved for summary judgment on all counts of Plaintiff's Amended Complaint.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

1 Both Defendants are a subsidiary of Severn Trent, Plc, a British company.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**BACKGROUND**

Severn Trent manufactures and sells water disinfectant and filtration equipment to municipalities and private companies. **[*2]** This cause of action arose from events in Severn Trent's facility in Colmar, Pennsylvania. The Colmar facility has two business units: (1) Gas Feed, which generates a majority of the facility's revenues and profits, and (2) Engineered Products & Services ("EP&S").

Severn Trent hired Plaintiff on December 1, 1998. Joseph Walsh ("Walsh"), Manager of Materials Planning/Procurement at the time, offered Plaintiff the position of Senior Purchasing Agent. The position reported directly to Walsh. Walsh is a Caucasian man, born on March 16, 1945. Walsh previously supervised Plaintiff at their former employer, CMS Gilbreth. Plaintiff accepted the position with Severn Trent because she "felt comfortable working for Walsh and because she believed he would promote her to purchasing manager, as he promised." Pl.'s Resp. to Defs.' Statement of Undisputed Facts P24.

In May 1999 Walsh promoted Plaintiff to Purchasing Manager. The new position included an increase in salary and an increase in responsibility. As Purchasing Manager, Plaintiff oversaw the purchasing of materials for all of Severn Trent's product lines. In addition, she supervised the two other members of the Purchasing Department, Don **[*3]** Gerhart ("Gerhart"), a Caucasian man born on February 1, 1943, and Ellin Stadnycki, a Caucasian woman born on August 5, 1961.

On or about October 4, 2002, Walsh reassigned Plaintiff so that she reported directly to Joseph Tischler ("Tischler"), a Caucasian man born on December 20, 1965. The reassignment did not affect Plaintiff's title or salary; however, as a result of the reassignment, Plaintiff no longer was included in management meetings. Tischler held the position of Materials Manager at the time of the reassignment. Severn Trent hired Tischler in a non-managerial position at the same time as Plaintiff. Severn Trent also promoted Tischler to manager at the same time as Plaintiff.

In July 2003, Severn Trent reorganized its EP&S unit. As part of the reorganization plan, Severn Trent decided to dedicate a Purchasing Department employee to the EP&S unit. Severn Trent chose Plaintiff to fill the new role. As a result of the transfer to EP&S, Plaintiff's title changed from Purchasing Manager to Senior Purchasing Manager, she no longer supervised any other employees, and she lost her entitlement to management bonuses. Plaintiff's salary remained unchanged.

In the last quarter of **[*4]** 2003, the EP&S unit experienced a significant decline in its revenue and earnings. As a result, Severn Trent decided to eliminate nine positions at the company, effective January 14, 2004, to reduce costs. Plaintiff's position was eliminated. Of the other eight employees to lose their jobs, seven are Caucasian and one is Asian, five are men and three are women, and only one was younger than 40. Plaintiff was the only member of the Purchasing Department to be laid off.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 30, 2003. On March 19, 2004, Plaintiff filed an Amended Charge of Discrimination with the EEOC to incorporate her termination from Severn Trent. The EEOC filed a copy of the charge with the Pennsylvania Human Relations Commission ("PHRC"). Plaintiff initiated this case on June 8, 2005, and filed an amended complaint on June 14, 2005 ("Amended Complaint"). Plaintiff alleges race and sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"), race discrimination under 42 U.S.C. § 1981 (" § 1981"), **[*5]** age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. ("ADEA"), and race, sex, and age discrimination under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. §§ 951 et seq. ("PHRA") against Defendants. Defendants moved for summary judgment on April 7, 2006, on the race, sex, and age discrimination claims, with respect to the following actions taken by Defendants: (1) retaining Plaintiff in a position subordinate to Tischler from October 2002 to July 2003; (2) transferring Plaintiff to the EP&S business unit in July 2003; and (3) terminating Plaintiff's position in January 2004.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). **[*6]**  A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

In this case, Defendants bear the initial responsibility of informing the court of the basis for their motion and identifying those portions of the record that they believe demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). While Plaintiff bears the burden of proof on a particular issue at trial, Defendants' initial Celotex burden can be met simply by pointing out to the court that there is an absence of evidence to support Plaintiff's case. Id. at 325. After Defendants have met their initial burden, Plaintiff's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). That is, summary judgment is appropriate if Plaintiff fails to rebut Defendants' assertions by making a factual showing sufficient to establish the existence of an element essential to her case, and on which she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. at 322. **[*7]**  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to Plaintiff. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. If Plaintiff has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the Court cannot credit Defendants' version of events against Plaintiff, even if the quantity of Defendants' evidence far outweighs that of Plaintiff's. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## DISCUSSION

2

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

2 I have looked at the record in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences derived from the evidence.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## I. STS, Inc. as a Defendant

Initially, Defendants move to grant STS, Inc. summary judgment on all counts of the Amended Complaint because STS, Inc. is not a proper party to this cause of action. Defendants contend STS, Inc. was not Plaintiff's employer. Plaintiff **[*8]**  counters that STS, Inc. is the parent company of her employer, Severn Trent, and, therefore, is a properly named defendant.

Title VII and the ADEA create causes of actions only against employers, employment agencies, labor organizations, and training programs. See Fantazzi v. Temple Univ. Hosp., Inc., No. 00-CV-4175, 2002 U.S. Dist. LEXIS 16269, at *8 (E.D. Pa. August 22, 2002). PHRA creates causes of action for both employers and non-employers. See 2002 U.S. Dist. LEXIS 16269, at *8 n.4. Plaintiff asserts each Defendant was an "employer" of Plaintiff under the applicable statutes. Plaintiff, as part of her prima facie case, carries the "burden of proving th[is] most essential element[] of her Title VII claims - employment by defendants." Vega Pacheco v. Kazi Foods of N.J., Inc., No. 03-CV-02186, 2004 U.S. Dist. LEXIS 11280, at *7 (E.D. Pa. April 7, 2004).

It is undisputed that Plaintiff was an employee of Severn Trent. See Defs.' Statement of Undisputed Facts in Supp. for Mot. for Summ. J. ("Defs.' State. of Undis. Facts") P23; Am. Compl. P10. ³ In

order to hold STS, Inc. liable for the actions of Severn Trent, Plaintiff must present evidence that these two separate **[\*9]** corporate entities were "'so interrelated and integrated in their activities, labor relations, and management'" that they should be regarded as a single employer for Title VII, § 1981, the ADEA, and PHRA purposes. Marzano v. Computer Sci. Corp., 91 F.3d 497, 513 (3d Cir. 1996) (quoting Ratcliffe v. Ins. Co. of N. Am., 482 F. Supp. 759, 764 (E.D. Pa. 1980)). The factors this court should consider to determine if an integrated enterprise existed between STS, Inc. and Severn Trent are: "1) the interrelation of operations; 2) common management, directors, and boards; 3) centralized control of labor relations; and 4) common ownership and financial control." See Fantazzi, 2002 U.S. Dist. LEXIS 16269, at \*9.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

3 Plaintiff was hired by Capital Controls Company, Inc. and eventually became an employee of Severn Trent. See Pl. Dep. 12-13. However, no evidence has been presented to explain the exact relationship between Capital Controls Company, Inc. and Severn Trent.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[\*10]** Defendants contend Plaintiff has produced no evidence to justify application of the integrated enterprise theory. Plaintiff asserts Severn Trent is a subsidiary of STS, Inc. Am. Compl. P9. Her basis for this assertion is that it was "common knowledge" in the workplace that STS, Inc. was the parent company of Severn Trent. Pl. Dep. 13-14. Plaintiff does not support this "common knowledge" with factual proof of the corporate structure of either of the two entities. The only support for her contention that a parent-subsidiary relationship existed between the two Defendants is reference to the records of the Pennsylvania Corporation Bureau ("Bureau"). Pl. Mem. of Law in Opp. to Defs.' Mot. for Summ. J. ("Pl. Mem. of Law"), at 41 n.9. The information on file with the Bureau, however, does not establish any connection between the two Defendants.

Regardless of the existence of a parent-subsidiary relationship between the two Defendants, Plaintiff provides minimal evidence that addresses the four factors listed in Fantazzi. The only evidence in the record that can support her claim of an integrated enterprise is the severance letter she received on January 14, 2004. Pl. App. to Pl.'s **[\*11]** Resp. to Defs.' State. of Undisp. Facts, Ex. A. The letter is on "Severn Trent Service" letterhead, with Exhibit A to the letter discussing "benefits under the terms of the Severn Trent Services, Inc. Severance Place." The existence of this one letter may provide some evidence of centralized control of labor relations, but it does not demonstrate an interrelation of operations, common management, or common ownership and financial control between the two Defendants.

STS, Inc. is not an employer of Plaintiff under Title VII, § 1981, the ADEA, or PHRA, and Plaintiff has failed to adduce evidence to create a genuine issue of material fact regarding the interrelatedness of the two entities. Accordingly, Defendants' summary judgment motion to dismiss all Plaintiff's claims against STS, Inc. will be granted.

## II. Overview of Claims Against Severn Trent

The parties agree that no direct evidence exists of disparate treatment discrimination. Therefore, the three part burden-shifting analysis of McDonnell Douglas applies to this summary judgment motion on Plaintiff's race, sex, and age discrimination claims under Title VII, § 1981, the ADEA, and the PHRA. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); **[\*12]** Jones v. School Dist., 198 F.3d 403 (3d Cir. 1999); Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). See also Weston v. Pennsylvania, 251 F.3d 420, 425 n.3 (3rd Cir. 2001) (holding claims under the PHRA are analyzed under the same framework as Title VII claims); Schurr v. Resorts International Hotel Inc., 196 F.3d 486, 499 (3d Cir. 1999) (holding that the elements of employment discrimination under Title VII are identical to the elements of discrimination under § 1981); Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 646 (3d Cir. 1998) (holding claims under the ADEA are analyzed under the McDonnell Douglas

framework).

Under the first part of McDonnell Douglas, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. If plaintiff meets this initial burden, "the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.' If the defendant meets this burden, the presumption of discriminatory action raised by the prima facie case is rebutted. The plaintiff then must establish **[\*13]** by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (quoting McDonnell Douglas, 411 U.S. at 802) (citations omitted).

## III. Race Discrimination Claims under Title VII, § B1981, and the PHRA

### A. Plaintiff's Reporting Change in October 2002 - Title VII, § 1981, and PHRA

#### 1. Title VII [4]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

4 Under the statutory language of Title VII, "[i]t shall be an unlawful employment practice for an employer to. . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

*a. Statute of Limitations*

Under Title VII, a plaintiff ordinarily must file a charge of employment **[\*14]** discrimination with the Equal Employment Opportunity Commission ("EEOC") "within 180 days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). In a state with an agency with the authority to investigate employment discrimination claims, "a charge under Title VII must be filed with the EEOC within 300 days of when the alleged unlawful employment practice occurred." Seredinski v. Clifton Precision Prods. Co., 776 F.2d 56, 61 (3d Cir. 1985). See also Zdziech v. DaimlerChrysler Corp., 114 Fed. Appx. 469, 470 n.1 (3d Cir. 2004). "Pennsylvania is a deferral state, as the PHRC's jurisdiction substantially overlaps with the EEOC's." Seredinski, 776 F.2d at 61. In this case, since EEOC forwarded Plaintiff's charges to the PHRC, Plaintiff is entitled to the 300 day filing period. See id. at 61-62 (construing 42 U.S.C. § 2000e-5(e)(1)).

*b. Calculation of Applicable Statute of Limitations*

In AMTRAK v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), the Supreme Court articulated how to determine when the statute **[\*15]** of limitations for adverse employment actions begins to run. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. . . . Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." Id. at 114.

*c. Plaintiff's Reporting Change as a Discrete Act*

Severn Trent argues that more than 300 days passed between the time Plaintiff was placed under Tischler's supervision and when Plaintiff filed her EEOC charge reporting the alleged adverse employment action. Therefore, Plaintiff's discrimination claims relating to the reporting change are

time barred.

Plaintiff contends that "by *retaining* Plaintiff in a position organizationally subordinate to Tischler, . . . Defendants **[\*16]** discriminated against Plaintiff . . . in the terms, conditions and privileges of her employment." Pl. Mem. of Law, at 39. She claims that reporting to Walsh was a material term or condition of her employment. Severn Trent altered the condition when she was required to report to Tischler. Plaintiff also argues that between October 2002 and July 2003, when she was reporting to Tischler, she requested to be returned to Walsh's supervision. Pl. Mem. of Law, at 37. Each such request was denied by her employer and each denial was a separate and discrete act. The last request was in April 2003.

Plaintiff's reporting change occurred on or about October 4, 2002. Plaintiff filed her charges with the EEOC on October 30, 2003, well over 300 days after Plaintiff was informed of the change. The change in Plaintiff's reporting requirement falls into the category of employment actions the Supreme Court listed as "discrete discriminatory acts," i.e., "termination, failure to promote, denial of transfer, or refusal to hire." Morgan, 536 U.S. at 114. The reporting change, like the events listed, was a specific, distinct event that occurred on a given day. It was "a separate actionable **[\*17]** unlawful employment practice" and the clock to file a charge with the EEOC relating to that event began to run on October 4, 2002. Plaintiff failed to file the charge within the statutorily required 300 day period.

Plaintiff tries to salvage this claim by arguing that each denial of her request to return to Walsh's supervision was a new discriminatory discrete act and gave rise to a new limitation period. ⁵ The Third Circuit has rejected a similar argument before. "The repeated refusal of an employer to reinstate an employee to a formerly held position . . . does not give rise to a new claim of discrimination. The failure to act upon receipt of a letter requesting reinstatement is not a discrete act of discrimination and does not restart the statute of limitations. . . . To permit a person to reset the statutory requirements for the timely filing of a complaint merely by writing a new letter to his former employer would clearly vitiate the intent behind the 300-day time limit. Zdziech v. DaimlerChrysler Corporation, 114 Fed. Appx. 469, 472 (3d Cir. 2004) (discussing Americans with Disabilities Act claim ⁶ arising out of employer placing plaintiff on disability **[\*18]** leave). See also Hart v. J.T. Baker Chem. Co., 598 F.2d 829, 833 (3d Cir. 1979) (noting that the "primary consideration underlying statutes of limitations is that of fairness to the defendant"). Here, Plaintiff's repeated requests to Severn Trent to return to Walsh's supervision cannot successfully restart the limitation period. The requests relate to the employment action that occurred in October of 2002. Plaintiff's continuos requests did not give present effect to her employer's past discriminatory act.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

⁵ Evidence of these requests are notes Plaintiff alleges she took contemporaneously with her requests. Defendants argue the notes are inadmissible hearsay and therefore cannot form the basis for Plaintiff's opposition to the summary judgment motion. The admissibility of the notes do not need to be determined by the Court because Plaintiff's alleged requests are not discrete acts and are not actionable.

⁶ Under 42 U.S.C. § 12117, the enforcement provisions of Title VII, namely § 2000e-5(e), govern the enforcement of the ADEA.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

 **[\*19]** Plaintiff's claims relating to her reporting change are time-barred under § 2000e-5(e). Her rights under Title VII fully ripened on or around October 4, 2002, when Severn Trent reassigned her to report to Tischler. Because Plaintiff failed to file a charge with the EEOC within the 300 day statutory time frame, Severn Trent is entitled to summary judgment on Plaintiff's Title VII race discrimination claim relating to the October 4, 2002 reporting change.

## 2. Section 1981 Claim

Section 1981 states in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981 (a). Plaintiff's § 1981 cause of action arises from her employment relationship with Severn Trent. It is brought under the right "to make and enforce contracts," which has "broad applicability [*20] beyond the mere right to contract." Mahone v. Waddle, 564 F.2d 1018, 1028 (3d Cir. 1977).

### a. Statute of Limitations

Plaintiff asserts that her § 1981 claim relating to her reporting change was timely filed. She contends 28 U.S.C. § 1658 is the applicable statute of limitation. Therefore, she had four years to bring suit under § 1981 for Defendants "retaining Plaintiff in a position organizationally subordinate to Tischler." Severn Trent puts forth no argument to dispute Plaintiff's claim.

Section 1658 states: "Except as provided by law, a civil action arising under an Act of Congress enacted after [December 1, 1990] may not be commenced later than 4 years after the cause of action." 28 U.S.C. § 1658(a). With regard to § 1981, § 1658's applicability is only to the 1991 Amendment to § 1981. [7] The 1991 Amendment redefined "make and enforce contracts" so it included "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). See Baldwin v. Twp. of Union, Civ. No. 02-1822, 2005 U.S. Dist. LEXIS 37534, at *7-8 (D.N.J. Dec. 29, 2005) [*21] . The 1991 Amendment was "deemed necessary only because the pre-existing § 1981(a) statutory right to make and enforce contracts did not protect against conduct that occurred after the formation of the contract." Id. Accordingly, a cause of action that arises after the formation of the employment agreement falls within the purview of the 1991 Amendment and § 1658's statute of limitation.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

7 See Jones v. R. R. Donnelley & Sons Co., 541 U.S. 369, 381, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004) ("An amendment to an existing statute is no less an 'Act of Congress' than a new, stand-alone statute. What matters is the substantive effect of an enactment-the creation of new rights of action and corresponding liabilities-not the format in which it appears in the Code.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

In this action, Plaintiff's claim of racial discrimination in retaining her in her position subordinate to Tischler falls under the post-1990 § 1981(b) amendments. It relates to an action that occurred after the formation [*22] of the employment agreement between Plaintiff and Severn Trent. Therefore, the four-year statute of limitation of § 1658 applies. The reporting change occurred on October 4, 2002. Plaintiff commenced this action on June 8, 2005, well within the four-year time limit.

### b. Plaintiff's Prima Facie Case

Plaintiff's disparate treatment race discrimination claims under § 1981 require the application of the McDonnell Douglas framework. See Langley v. Merck & Co., 186 Fed. Appx. 258, 2006 U.S. App. LEXIS 14958, at * 7 n.2 (3d Cir. 2006). Initially, Plaintiff must establish a prima facie case of discrimination. A prima facie case requires a showing that: "(1) she is a member of a protected class; (2) she satisfactorily performed the duties required by her position; (3) she suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably or the adverse job action occurred under circumstances that give rise

to an inference of discrimination." 2006 U.S. App. LEXIS 14958, at *4 (citing Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)).

The first two elements of Plaintiff's **[*23]** prima facie case are not disputed. She is an African-American and her qualifications as the Purchasing Manager are not in dispute. However, Plaintiff has failed to establish that the reporting change was an adverse employment action under the third element.

In her Amended Complaint, Plaintiff contends the adverse employment action occurred "[b]y retaining Plaintiff in a position organizationally subordinate to Tischler." In Plaintiff's reply brief to the Defendants' motion for summary judgment, she explains that a term and condition of her employment was reporting directly to Walsh. She accepted the job with Severn Trent, and turned down another employment opportunity, because Walsh would be her supervisor. Finally, in Plaintiff's deposition, she contends the reporting change was a demotion because her reporting status was dropped down a level in the hierarchy of Severn Trent. Severn Trent counters Plaintiff's arguments by suggesting that reporting to Tischler did not alter any material terms of Plaintiff's employment because her title, compensation, and responsibilities remained unchanged.

An adverse employment action is "one which is 'serious and tangible enough to alter an **[*24]** employee's compensation, terms, conditions, or privileges of employment.'" Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)). "Minor actions, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions." Langley v. Merck & Co., No. 05-3205, 2006 U.S. App. LEXIS 14958, at * 7 (3d Cir. June 15, 2006).

In this case, regardless of how Plaintiff classifies the employment action, no evidence has been put forward to demonstrate that the position she held with Severn Trent after the reporting change was inferior to the position she held before the change. It is undisputed that Plaintiff maintained the same title, compensation, benefits, and responsibilities after the change. Plaintiff makes no claim that Tischler created an unfavorable work environment. In October 2002, Tischler was the Materials Manager at Severn Trent. Therefore, the reporting change resulted in a return to the structure that existed less than six months earlier when Walsh was the Materials Manager, i.e., the **[*25]** Purchasing Department reporting to the Materials Manager. [8] The only possible negative impact of this employment action was Plaintiff no longer was included in management meetings. Such a consequence is insufficient to make an employment action adverse.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

[8] Walsh was promoted from Materials Manager to Director of Operations in June 2002. At the same time, Tischler's title was changed to Materials Manager.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In addition, Plaintiff's deposition and hiring letter fail to indicate that reporting to Walsh was a material term or condition of her employment. In response to a question at her deposition asking why she accepted the position at Severn Trent, Plaintiff responded : "Perfectly candid, I knew Joe Walsh. I believed he would promote me to purchasing manager." Pl. Dep. 48. In the confirmation letter sent to Plaintiff by Severn Trent, regarding Severn Trent's offer of employment, the letter stated: "[T]his position reports to Joe Walsh, the Materials Manager." Defs.' App. to Defs.' State. of Undis. Facts, Ex. **[*26]** G. The letter does not indicate that Plaintiff required Walsh to be her supervisor as a condition of employment.

Although Plaintiff may have disagreed with or disliked the decision, Plaintiff has failed to produce some evidence from which a reasonable factfinder could conclude the reporting change qualifies as an adverse employment action. "Minor or trivial actions that merely make an employee unhappy are not sufficient" to qualify as an adverse employment action, "for otherwise every action that an

irritable, chip-on-the shoulder employee did not like would form the basis of a discrimination suit." Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3d Cir. 1998) (internal quotations omitted) (discussing discrimination in the context of the Americans with Disabilities Act) . Therefore, I will grant Severn Trent's motion for summary judgment on Plaintiff's § 1981 claim relating to her reporting change in October of 2002.

### 3. PHRA Race Claim

"To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination. If a plaintiff fails to file a timely complaint **[*27]** with the PHRC, then he or she is precluded from judicial remedies under the PHRA." Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997) (citing 43 Pa. Cons. Stat. §§ 959(a), 962 ). A plaintiff satisfies his or her filing requirement under the PHRA if the EEOC transmits the claim to the PHRC. Id. at 926 n.12.

As noted above, Plaintiff filed her initial charge of discrimination pertaining to her reporting change with the EEOC on October 30, 2003. Although the record is unclear as to when EEOC forwarded Plaintiff's charge to the PHRC, see Am. Compl. PP100, 101, the earliest possible date was October 30, 2003. In other words, a complaint was not filed with the PHRC for over a year after the alleged act of discrimination. Therefore, Plaintiff's reporting change falls outside the 180 day statutory period established by the PHRA. The employment action is time-barred from forming a basis for a racial discrimination claim under the PHRA.

In addition, "[c]laims of race discrimination under the Pennsylvania Human Relations Act are analyzed under the same framework as a Title VII claim, 'as Pennsylvania courts have construed **[*28]** the protection of the two acts interchangeably.'" Woodard v. PHB Die Casting, No. 04-141 (Erie), 2005 U.S. Dist. LEXIS 28673, at *25-26 (D. Pa. Nov. 18, 2005) (quoting Weston v. Pennsylvania, 251 F.3d 420, 425 n.3 (3rd Cir. 2001)). Therefore, Plaintiff's argument that each request to return to Walsh's supervision was a discrete discriminatory act with a new statute of limitation cannot succeed for the same reasons listed under Section III.A.1.c. above.

For the reasons stated, I will grant Severn Trent's motion for summary judgment with respect to Plaintiff's PHRA cause of action for race discrimination relating to her reporting change in October 2002.

### B. Transfer of Plaintiff to EP&S unit in July 2003

### 1. Plaintiff's Prima Face Case

The parties do not dispute that the Court should apply the McDonnell Douglas analysis to Plaintiff's race discrimination claims relating to her transfer to Severn Trent's EP&S unit in July 2003. Under McDonnell Douglas, Plaintiff first must establish a prima facie case of race discrimination with respect to Severn Trent's decision. The first two prongs of the prima facie case are **[*29]** easily satisfied. Plaintiff is African-American and neither party disputes her qualifications as the Purchasing Manager.

Under the third prong, Plaintiff must demonstrate the transfer was an adverse employment action, i.e., "one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)). As a result of the transfer, Plaintiff was demoted from Purchasing Manager to Senior Purchasing Manager, she was placed in a financially struggling division of the company, she no longer had employees directly reporting to her, and she no longer was entitled to management bonuses. Although Plaintiff's salary remained unchanged, the other effects of the transfer provide enough evidence from which a reasonable factfinder could conclude the transfer qualifies as an adverse employment action.

Finally, under the last prong of Plaintiff's prima facie case, Plaintiff must show "the adverse job action occurred under circumstances that give rise to an inference of discrimination." **[*30]** See Langley v. Merck & Co., 186 Fed. Appx. 258, 2006 U.S. App. LEXIS 14958, at * 4 (3d Cir. 2006). Plaintiff argues that an inference of racial discrimination can be based on the following: (1) she was the only African-American employee in the Purchasing Department; (2) Severn Trent could have transferred Gerhart, a Caucasian man, instead of her to the EP&S unit; and (3) she heard Tischler comment after her transfer that "from now on, I am only hiring people who look like me." See Defs.' State. of Undis. Facts P87. If the Court views the first two factors in the light most favorable to Plaintiff, Plaintiff has raised an inference of racial discrimination. 9 Severn Trent performed the adverse employment action against a member of the protected class when a member of a non-protected group, Gerhart, was equally qualified to be transferred. 10 See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous."); Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 646 (3d Cir. 1998) (finding that an "inference of **[*31]** discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group . . . may be acceptable at the prima facie stage of the analysis").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

9 Since the first two factors are sufficient to raise an inference of discrimination, the Court does not need to determine the effect of Tischler's comments, if any, on satisfying the fourth prong of the prima facie case.

10 Gerhart and Plaintiff were "similarly situated" for purposes of this comparison. They "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or employer's treatment of them for it." Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994). Both individuals performed the same, relevant purchasing role for Severn Trent. They both purchased for the EP&S unit before the transfer. Plaintiff's manager position is not a mitigating circumstance because her lack of supervision of the other purchasing employees allowed her to be considered for the transfer. Plaintiff's multiple attempts to compare herself to Tischler are misplaced in the context of her transfer and termination. At the time of those employment actions, Plaintiff and Tischler were not "similarly situated" within Severn Trent. Tischler managed several departments, including Plaintiff's department, and supervised at least fourteen people.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## [*32]  2. Severn Trent's Legitimate, Nondiscriminatory Reasons for Transfer

Severn Trent articulates several legitimate, nondiscriminatory reasons for Plaintiff's transfer to EP&S and meets its burden under the McDonnell Douglas framework. According to Severn Trent, Plaintiff's transfer to EP&S was part of its reorganization effort to increase EP&S's productivity. In particular, "Severn Trent decided to dedicate a member of the Purchasing Department to EP&S because project engineers previously had been doing some of their own purchasing, which was causing delays in their engineering projects and resulting in high purchasing costs." Defs.' State. of Undis. Facts P62. In addition, Walsh recommended Plaintiff for the EP&S purchasing position because she had experience with purchasing for EP&S and he believed her negotiating skills would help reduce costs. Id. P63.

## 3. Plaintiff's Proof of Pretext

Since Severn Trent carried its burden, the final step under McDonnell Douglas requires Plaintiff to prove the legitimate reasons offered by Severn Trent were a pretext for discrimination. In Jones v. School Dist., 198 F.3d 403 (3d Cir. 1999), **[*33]** the Third Circuit explained a plaintiff's burden at summary judgment with respect to this aspect of McDonnell Douglas. A plaintiff can defeat a

motion for summary judgment

by pointing to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. . . . To satisfy the first prong of . . . [the] standard, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence. . . . [A] plaintiff may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason **[*34]** was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason.

[Under the second prong], the plaintiff also may survive summary judgment by pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. For example, the plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.

Jones, 198 F.3d at 413 (3d Cir. 1999) (internal citations and quotations omitted).

Under the first prong, Plaintiff asserts sufficient inconsistencies and contradictions exist in Severn Trent's nondiscriminatory reasons that this Court should deny the summary judgment motion relating to the transfer claims. First, the Purchasing Department already handled some of EP&S's purchasing. Gerhart and Plaintiff were available and placed purchase orders for EP&S engineers before **[*35]** the transfer. Second, Plaintiff contends the transfer was part of a scheme to eliminate her position. She alleges Walsh made comments in October 2002 that Severn Trent planned to sell or drop EP&S. Therefore, when he made the decision to transfer Plaintiff to EP&S, he knew her purchasing position would eventually be eliminated. Third, Plaintiff compares Severn Trent's explanation for her transfer to Severn Trent's explanation for her eventual termination. In justifying Plaintiff's termination, Severn Trent claims EP&S's revenue and earnings declined substantially in the last quarter of 2003. As a result, Severn Trent decided it was necessary to reduce costs. It accomplished that goal by terminating nine positions at the company, including Plaintiff's position. Walsh decided to eliminate Plaintiff's position because "he believed that project engineers and the remaining employees in the Purchasing Department could assume Ms. Wimberly's responsibilities." Defs.' State. of Undis. Facts P74. Plaintiff contends this reason for her elimination contradicts Severn Trent's nondiscriminatory reason for her transfer, namely, that Plaintiff and her skills were needed in the EP&S unit to bring down **[*36]** the costs associated with engineer purchasing. ¹¹

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

11 Plaintiff also bases her pretext argument on alleged contradictory statements made by Walsh regarding her change in title and on an allegation that Severn Trent desired to have Tischler, a Caucasian man, in full control of an entire unit. A fair reading of the record reveals no contradiction in Walsh's statements. In addition, the allegations relating to Tischler are nothing more than Plaintiff's unsupported beliefs.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Severn Trent explains the two decisions in question by relying on the financial numbers of EP&S. In the fiscal quarter that encompassed Plaintiff's transfer to EP&S, the unit made a profit and almost hit its targeted revenue numbers. In the next fiscal quarter, EP&S revenues were 300% below projections and it lost $ 200,000. See Defs.' State. of Undis. Facts P71. Severn Trent decided to eliminate Plaintiff's position because she earned the highest compensation among Severn Trent's purchasing employees and her termination resulted in the **[*37]** greatest cost savings. Although Severn Trent denies Walsh ever made the October 2002 statement about EP&S, it contends the statement has no relevance because it was remote in time and the EP&S unit was never sold. Finally, Severn Trent points to the fact that Walsh was responsible for hiring Plaintiff and to suggest any type of discriminatory animus in his transfer decision is "preposterous."

Drawing all reasonable inferences in Plaintiff's favor, I think enough inconsistencies exist in Severn Trent's proffered reasons "that a reasonable factfinder could rationally find them unworthy of credence." First, the transfer was not necessary. At the time of the transfer, the Purchasing Department under Plaintiff's supervision was already placing orders for the EP&S unit. In addition, after Severn Trent terminated Plaintiff, Walsh determined that the Purchasing Department could handle the role previously performed by Plaintiff at EP&S.

Second, Walsh's alleged 2002 statement about the future of EP&S suggests Walsh had the inside track on decisions relating to EP&S. Walsh made the decision to transfer Plaintiff to EP&S. He also made the decision less than six months later to terminate her **[*38]** position at EP&S. These decisions and the short time between them further suggests Walsh knew a layoff at EP&S was imminent and chose to transfer Plaintiff to that unit so it would affect her.

Third, Severn Trent does not explain why Walsh, who had so much faith in Plaintiff's purchasing skills when he transferred her, would give her less than six months to bring down costs in the unit. If the purchasing costs of the EP&S unit were so inflated that they required the dedication of the best purchasing employee, her termination less than six months later raises sufficient doubts as to the legitimacy of the transfer. And although Severn Trent claims her termination was due to her high compensation, a reasonable factfinder could find that a purchasing employee of Plaintiff's skills could save Severn Trent enough money to justify her salary.

Fourth, Severn Trent fails to adequately explain how the EP&S engineers' purchasing skills changed in less than six months. In July 2003, the EP&S engineers lacked the purchasing skills to cost effectively buy for the unit. In December 2003, after Plaintiff's termination, Walsh believed the engineers and the Purchasing Department could satisfactorily **[*39]** purchase for the EP&S unit. In reality, given that Plaintiff and Gerhart were purchasing for the EP&S unit in July 2003, Walsh returned the purchasing structure to how it was prior to Plaintiff's transfer. Such a short lived experiment that results in the termination of the "guinea pig" calls into question the basis for the transfer.

Finally, although the financial picture of the EP&S unit in the last half of 2003 supports Severn Trent's claims, the numbers alone are not as persuasive as a complete financial picture. In other words, the Court cannot determine whether the reduction in earnings in the last quarter of 2003 reflects a poor performance by the sales department or the purchasing department. The low revenue number justifies the reduction in force, but it does not explain why a member of the Purchasing Department, who has little effect on a company's revenue, was terminated. [12]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[12] Defendants include in their Appendix to their Statement of Undisputed Facts in Support of their Motion for Summary Judgment spreadsheets that contain financial information. See Defs.' App. to Defs.' State. of Undis. Facts, Ex. K, L. The exhibits are illegible.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[*40]**  This determination is a close call, especially given the fact that Walsh was responsible for the transfer and he was the person that initially hired Plaintiff. But see Waldron v. SL Indus., 56 F.3d 491, 496 n.6 (3d Cir. 1995) ("[W]here . . . the hirer and firer are the same and the discharge occurred soon after the plaintiff was hired, the defendant may of course argue to the factfinder that it should not find discrimination. . . .[It] is simply evidence like any other and should not be accorded any presumptive value."). But given the inconsistencies in the reasons for the transfer and termination and the short time between the two events, I must deny Severn Trent's motion for summary judgment on the race discrimination claims that relate to Plaintiff's transfer to the EP&S unit. Plaintiff has presented enough evidence to create a genuine issue of material fact as to the legitimacy of Severn Trent's nondiscriminatory reasons.

## C. Elimination of Plaintiff's Position in January 2004

In assessing Plaintiff's race discrimination claims that relate to her termination by Severn Trent in January 2004 under McDonnell Douglas, the parties do not **[*41]**  contest that Severn Trent can establish a prima face case of racial discrimination. In addition, Severn Trent has satisfied its burden. It put forth legitimate nondiscriminatory reasons for Plaintiff's termination that are detailed above. The parties only dispute whether Plaintiff has met her burden at this stage of the case by demonstrating the legitimate reasons offered by Severn Trent were a pretext for discrimination. In light of the discussion above and the interrelatedness between the transfer and the termination of Plaintiff, I will deny Severn Trent's motion for summary judgment on the race discrimination claims that relate to Plaintiff's termination. The inconsistencies that exist in the context of Plaintiff's transfer apply equally to Plaintiff's termination.

## IV. Sex Discrimination Claims under Title VII and the PHRA

For the reasons stated above, Plaintiff's sex discrimination claims under Title VII and the PHRA, that relate to her reporting to Tischler in October 2002, are time-barred. See supra Part III.A.1, III.A.3. Therefore, I will grant Severn Trent's summary judgment motion on these claims.

As for the sex discrimination claims of Plaintiff that relate **[*42]**  to her transfer and termination, the parties do not dispute Plaintiff's ability to establish a prima facie case. In addition, Severn Trent has articulated legitimate, nondiscriminatory reasons for the transfer and termination. The only unresolved question is whether Plaintiff has adduced enough evidence to show "the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action," under the third part of the McDonnell Douglas framework. Whereas the reasons proffered by Severn Trent are the same as the reasons under Plaintiff's race discrimination claims, the same contradictions and inconsistencies exist. Therefore, I will deny Severn Trent's motion for summary judgment on the sex discrimination claims that relate to Plaintiff's transfer and termination.

## V. Age Discrimination Claims under the ADEA and the PHRA

Plaintiff does not raise in her Amended Complaint an age discrimination claim relating to her October 2002 reporting change. See Am. Compl. Counts IV, VII. Plaintiff, however, attempts to assert a PHRA age discrimination claim relating to her reporting change in her Memorandum of Law in Opposition **[*43]**  to Defendants' Motion for Summary Judgment. See Pl. Mem. of Law, at 37 n.6. Even if the court were to allow Plaintiff to amend her complaint by footnote, a claim under the PHRA for age discrimination relating to Plaintiff's reporting change would fail because it would be time-barred. See supra Part III.A.3.

As for Plaintiff's age discrimination claims relating to her transfer to the EP&S unit and eventual termination, the parties do not contest the first two parts of the McDonnell Douglas framework. [13] As for the third part of the McDonnell Douglas analysis, Plaintiff has presented enough evidence

from which a factfinder could "reasonably disbelieve the employer's articulated legitimate reasons." Much like the race and sex discrimination claims, the inconsistencies in Severn Trent's reasons for Plaintiff's transfer and termination raise a genuine issue of material fact. Accordingly, I will deny Severn Trent's motion for summary judgment on the age discrimination claims that relate to Plaintiff's transfer and termination.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

13 For a prima facie case under the ADEA, Plaintiff must show she "(1) is a member of the protected class, i.e. at least 40 years of age, 29 U.S.C. § 631(a), (2) is qualified for the position, (3) suffered an adverse employment decision, and (4) in the case of a demotion or discharge, was replaced by a sufficiently younger person to create an inference of age discrimination." Simpson v. Kay Jewelers, 142 F.3d 639, 644 (3d Cir. 1998). See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 n.6 (3d Cir. 2003). See also Marzano v. Computer Sci. Corp., 91 F.3d 497 (3d Cir. 1996) (discussing the relaxation of the fourth prong of the prima facie case when the employee's layoff occurs in the context of a reduction in force).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

 [*44]  Plaintiff and Severn Trent raise additional arguments under the second prong articulated in Jones, i.e., "pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Jones v. School Dist., 198 F.3d 403, 413 (3d Cir. 1999). However, since the two prongs are not conjunctive, Plaintiff can survive summary judgment by satisfying only one of the prongs in Jones. Plaintiff satisfied the first prong by exposing the inconsistencies in Severn Trent's nondiscriminatory reasons. Therefore, this Court does not need to consider the second prong in deciding this motion.

## CONCLUSION

Based on the foregoing, I will grant Defendants' motion for summary judgment in part and deny it in part. In particular, I will grant the motion with respect to the dismissal of STS, Inc. as a defendant and all discrimination claims relating to Plaintiff's reporting change in October 2002. I will deny the motion with respect to all discrimination claims relating to Plaintiff's July 2003 transfer to the EP&S unit and Plaintiff's termination in January 2004. An **[*45]** appropriate Order follows.

## ORDER

**AND NOW**, this 22nd day of August, 2006, upon consideration of Defendants' Motion for Summary Judgment (Document No. 22) and Plaintiff's response thereto (Docket No. 27), it is hereby **ORDERED** that the motion is **GRANTED** in part and **DENIED** in part.

The Defendants' motion for summary judgment is **GRANTED** with respect to (1) the dismissal of Severn Trent Services, Inc. as a defendant in this case and (2) all discrimination claims that relate to Plaintiff's reporting change in October 2002.

The Defendants' motion for summary judgment is **DENIED** with respect to (1) all discrimination claims that relate to Plaintiff's transfer to the EP&S unit in July 2003 and (2) all discrimination claims that relate to Plaintiff's termination in January 2004.

BY THE COURT:

LAWRENCE F. STENGEL, J.