IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KENNETH S. MITCHELL,                    )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        Civil Action No. 06-725 GMS
                                        )
WACHOVIA CORPORATION, t/a               )
    WACHOVIA SECURITIES,                )
WACHOVIA SECURITIES, L.L.C.,            )
WACHOVIA SERVICES, INC.,                )
WACHOVIA BANK OF                        )
    DELAWARE, N.A.,                     )
TODD D. GAUTHIER, LYNN G. MEYER,        )
CAROLYN J. BEAM, and DOROTHY A.         )
DIFEBO,                                 )
                                        )
                Defendants.             )

**<u>MEMORANDUM</u>**

## I.    INTRODUCTION

On December 1, 2006, the plaintiff, Kenneth S. Mitchell ("Mitchell"), filed the present lawsuit against the Wachovia Corporation, trading as Wachovia Securities; Wachovia Securities, L.L.C.; Wachovia Securities, Inc. (collectively, "Wachovia Securities"); Wachovia Bank of Delaware, N.A. ("Wachovia Bank"); Todd D. Gauthier ("Gauthier"); Lynn G. Meyer ("Meyer"); Carolyn J. Beam ("Beam"); and Dorothy A. DiFebo ("DiFebo") (collectively, the "defendants"), alleging that the defendants discriminated against him on based on his race and gender in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), and the Delaware State Discrimination Act (the "DDA"), 19 Del. C. §§ 710 *et seq*. Mitchell, an African-American male, further alleges that the defendants' actions deprived him of equal rights under the law in violation of 42 U.S.C. § 1981, and that those acts together constituted a conspiracy in

violation of 42 U.S.C. §§ 1985 and 1986. Mitchell also brings fraud, deceit, *prima facie* tort, and conspiracy claims under Delaware law.

Now before the court is the defendants' motion for summary judgment on all claims. For the reasons that follow, the court will grant the motion.

## II.    BACKGROUND

The record presents the following facts, viewed in the light most favorable to Mitchell. In August 2002, Gauthier recruited Mitchell to join Wachovia Securities from Merrill Lynch, where Mitchell then worked as a financial investment advisor. Gauthier, who is Caucasian and male, hired Mitchell as a Vice President and Financial Advisor and assigned him to two Wachovia Bank branch offices ("branches"), Capitol Trail and Prices Corner, located less than a mile apart.[1] Prices Corner, the larger branch, had a deposit base of approximately $57 million, more than twice the approximately $27 million deposit base at Capitol Trail. Mitchell replaced Ed Duffy, a Caucasian male, as the Financial Advisor at both branches. While assigned to both, Mitchell had an office only at the Capitol Trail office due to a space shortage at Prices Corner. Mitchell drove the mile to Prices Corner when necessary to meet with clients of that branch.

Both Capitol Trail and Prices Corner were typical Wachovia Bank branches, in that they comprised various employees of Wachovia Bank – a Financial Center Manager responsible for customer services at the branch, various bank tellers supervised by a teller manager, and a Financial Specialist – along with one employee of Wachovia Securities, a Financial Advisor. The Financial Advisor assigned to a branch collaborates with the branch's employees, particularly a branch's Financial Specialist, to provide investment advice and market products to clients of the branch. This "team brokerage" relationship between the Financial Advisor and the

---

[1] Mitchell's terms of employment, as contained in his offer letter, specified his compensation package but did not guarantee a position at any particular Wachovia branch office.

Financial Specialist involves working together to set up trades for clients as well as generating new business. Because a Financial Advisor has more securities licenses and generally knows more about securities, he or she often mentors the Financial Specialist regarding such financial instruments and business generation. Wachovia policy also provides for sharing compensation. For example, Ladan Amini ("Amini"), the Financial Specialist at Prices Corner, could jointly enter a trade, and both she and Mitchell, the Financial Advisor assigned to Prices Corner, would receive compensation credit. A Financial Specialist could also earn compensation for referring new clients and business to the Financial Advisor. The relationship was exclusive: a branch's Financial Specialist could refer trades or new business only to the Financial Advisor assigned to that branch.

There were three separate hierarchies at the branches in question. The first was the Wachovia Securities hierarchy. Mitchell, as a Financial Advisor employed by Wachovia Securities, reported to Gauthier, a Wachovia Securities Regional Sales Manager, who in turn reported to Frank Consalo ("Consalo"), a Wachovia Securities Regional President. The second was the Financial Specialist hierarchy. Both branches' Financial Specialists, Amini at Prices Corner and Lynn Montgomery ("Montgomery") at Capitol Trail, were employed by Wachovia Bank and reported to Beam, a Wachovia Bank Financial Sales Leader. Beam answered to a Wachovia Bank Regional Bank Director, first Meyer and then, after Meyer left Wachovia Bank, Sandy McAnally ("McAnally"). The third hierarchy was that of the individual branch, where the branch's Financial Center Manager -– DiFebo at Prices Corner, and Gloria Sharp ("Sharp") at Capitol Trail – managed the remaining employees, such as tellers, and other aspects of the branch.

In this way Mitchell, as a Financial Advisor, did not have direct authority over the Financial Specialists Amini and Montgomery. But Financial Advisors do exercise authority over trades submitted by Financial Specialists. Generally speaking, a Financial Advisor reviews those trades and must approve them before their execution. Absent such approval, the trades are referred to Wachovia Securities' Compliance Department (the "compliance department"), which notifies the Financial Specialist's supervisor of the referral, reviews the trades, and determines whether the trades comply with applicable rules. Thus, Mitchell had the authority to review those trades submitted by Amini and Montgomery.

The conflicts at issue in this case center on the Prices Corner branch, where Amini and DiFebo worked. DiFebo, like Beam, is a Caucasian woman. Amini is a woman of Iranian heritage. Because he lacked an office at Prices Corner, Mitchell went to the branch only for joint appointments with a customer and Amini. At first, according to Mitchell, he developed a positive working relationship with Amini by, for example, letting Amini receive full credit for certain trades for which he could have claimed partial credit.

In June 2003, however, Mitchell's and Amini's working relationship began to deteriorate. One conflict involved a client's objection to a $6.00 fee resulting from his deposit of $50,000 into a Wachovia mutual fund account. The client requested the fee be waived. Mitchell agreed and instructed Amini to waive the fee. Amini declined because she did not have the authority to do so. Mitchell then offered to pay the client $6.00 in cash from his own pocket to resolve the dispute, which the client refused. As Amini knew, Mitchell's offer of cash violated various NASD and Wachovia Securities compliance rules. Mitchell eventually succeeded in having the fee deleted from the customer's account through an administrative process, much to the

customer's satisfaction.  But the way that Mitchell had handled the matter with her upset Amini, who reported it to DiFebo.  Both Gauthier and Meyer spoke afterward with Mitchell about the policies and rules he had violated, although neither took formal disciplinary action against him.

A few weeks later, Mitchell and Amini again clashed, this time over certain trades submitted by Amini for Mitchell's approval.  As described above, if Mitchell did not approve Amini's trades, the trades would be referred to the compliance department, which would then notify Beam and review the propriety of the trades.  In one case, Mitchell referred two of Amini's trades to the compliance department because the trades were purchases of annuities, when the customers' accounts were already predominantly invested in annuities.  Beam, Amini's supervisor, contacted her about the referral.  Although the compliance department ultimately approved the trades, Amini was "very upset" by Mitchell's referral.  In other cases, Mitchell withheld approval of trades submitted by Amini, resulting in those trades, after a certain time, being automatically referred to the compliance department.  These referrals to the compliance department upset Amini, who felt the referrals might result in her termination.  Amini later gave up trading entirely to avoid the risk of future referrals.

The most serious conflict between Mitchell and Amini involved a conversation occurring in April or May 2003.  The conversation was about Amini's six-digit employee number, the first three digits of which were 9, 1, 1.  On the morning of July 16, 2003, Gauthier telephoned Mitchell at his home regarding this conversation.  At the time of his call, Gauthier believed Mitchell to have made a racially derogatory statement regarding Amini's employee number.  Specifically, Gauthier believed that Mitchell had told Amini that her number reminded Mitchell of how Amini's people, i.e., the Iranian people, had committed the terrorist attacks of September

11, 2001.[2]    Gauthier's understanding was hardly first-hand, however.    Rather, the account

reached Gauthier through a process resembling the children's game of telephone.  Gauthier heard

of the alleged comment from Beam, who had heard from DiFebo, who had heard from Amini.

According to Amini and DiFebo, Amini was very upset by the alleged comment.  Upon hearing

about the statement from Amini, DiFebo had urged her to complain to Beam, Amini's

supervisor.  When Amini did not, DiFebo later told Beam about the incident herself.  Beam then

notified Gauthier of the alleged comment, and Gauthier had called Mitchell.

    Speaking with Gauthier that morning, Mitchell recalled a conversation with Amini about

her employee number and the digits 9-1-1 in the context of attributing credit for certain trades.

But Mitchell categorically denied making any comment relating Amini's ethnicity to the

September 11th attacks.  Mitchell, upset, insisted that he was being falsely accused and refused to

return to the Prices Corner branch.  Later that day, Beam and Gauthier met with Amini to discuss

the allegations.  The story had apparently grown in the telling; Amini did not confirm the

allegation that Mitchell had made racially offensive statements relating to her ethnicity and

September 11th.  Gauthier then called Mitchell and told Mitchell that he had been exonerated.

    Mitchell continued to refuse to return to Prices Corner, however, and complained to

Wachovia Securities' Human Resources Department (the "human resources department") about

the accusation.   Mitchell did not claim that the accusation was discriminatory based on his race

or gender.  Rather, Mitchell complained that he had been falsely accused of making a racist

comment, which could have cost him his job.  The human resources department investigated the

matter.  On July 24, 2004, the department notified Mitchell of its conclusion: Gauthier should not

have spoken with Mitchell before personally confirming the facts.  Both Gauthier and Beam later

---

[2] In fact, none of the hijackers who committed the terrorist attacks of September 11, 2001, were reported to be
Iranian.

apologized to Mitchell for bringing the accusation without confirming or disproving the facts with Amini first. Mitchell accepted their apologies. No formal disciplinary action was taken against Beam, DiFebo, or Amini for their involvement in what Mitchell and the defendants both call the "9/11 incident."

After the 9/11 incident, Mitchell did not return to Prices Corner until November 2003. According to Mitchell, he was afraid to return to where people were out to cause trouble for him. This meant, of course, that Mitchell attended no appointments with clients at the branch. During this time, Amini also stopped referring him business, entering trades on his behalf, or setting up joint meetings with clients or potential clients.[3] Mitchell did not discuss this with Amini, despite its effect on both of their production.

During 2003, Mitchell's job performance at Capitol Trail was excellent relative to his performance goals. At Prices Corner, however, Mitchell failed to meet those goals. Nonetheless, in late 2003 Gauthier and Consalo extended a deadline for Mitchell's performance goals so that Mitchell would be eligible for a performance-related $62,000 bonus. Mitchell's performance at Prices Corner remained poor in 2004. In all, Mitchell went to Prices Corner only two or three times between November 2003 and December 2004. Like the previous year, Mitchell's performance in 2004 at Prices Corner fell well below expectations; that year, his total production at the branch was only 66% of his overall goal.[4]

Mitchell did not explicitly address his poor performance with his supervisors or attribute it to his deteriorated relationship with the people at Prices Corner. During a meeting in February 2004 among Prices Corner and Capitol Trail employees regarding performance expectations,

---

[3] Mitchell cites to no evidence in the record that Amini referred new business to other Financial Advisors during this time.
[4] The figures for the overall goal included Amini's contribution to Mitchell's production as part of the team brokerage program. Amini's performance, like Mitchell's, fell below expectations.

Mitchell requested a regular office at Prices Corner, but did not suggest other ways to improve his performance. In March 2004, Mitchell declined Gauthier's suggestion that Mitchell hire a broker-funded sales assistant, whose salary would be paid by Mitchell, as one way to increase Mitchell's productivity.

On November 18, 2004, Gauthier met with Mitchell in Mitchell's office at Capitol Trail to discuss Wachovia Securities' ongoing efforts to assign only one branch to each Financial Advisor. Since certain Financial Advisors such as Mitchell were assigned to two branches, the plan involved removing those Financial Advisors from their extra branches, and assigning new Financial Advisors to the unoccupied branches as needed. During the time in question, Gauthier removed Financial Advisors Nancy Sorg and Beatrice Dufort, both Caucasian women, as well as Ed Duffy and Lou Pannucci, both Caucasian men, from extra branches as part of the plan.

At his meeting with Mitchell, Gauthier suggested that Mitchell should be assigned to Capitol Trail, rather than Prices Corner, because 80% of Mitchell's production came from clients of Capitol Trail. Mitchell wanted to stay assigned to Prices Corner because of its larger deposit base. During the meeting, Mitchell received a telephone call from Amini regarding proposed trades, and discussed those trades with her while Gauthier waited. Amini later wrote an email to Beam complaining about the telephone call with Mitchell. Beam forwarded the email to Gauthier, who, based on his firsthand knowledge of Mitchell's side of the conversation, concluded that Amini had misrepresented what had occurred. Although Amini's potential dishonesty concerned Gauthier, Wachovia did not formally investigate the matter or take formal disciplinary action against her.

On December 6, 2004, Mitchell moved into a newly vacated office at Prices Corner after his extended absence.  On December 9, 2004, three days later, Gauthier informed Mitchell that he was no longer assigned to Prices Corner as part of Wachovia Securities' plan to assign each Financial Advisor to only one branch.[5]  According to Mitchell, Gauthier told him that Prices Corner "wasn't right for him" and that the staff there did not want to work with Mitchell. According to Gauthier, he removed Mitchell from Prices Corner because Mitchell had performed poorly there for more than one year, Mitchell had alienated the Prices Corner staff, and Gauthier wanted to place another Financial Advisor there who would achieve better results.  Gauthier had already recruited and hired Mitchell's replacement, James Mehan, who is a Caucasian male. Gauthier also contacted Beam to discuss Amini's November 2004 misrepresentation and how Beam and Gauthier should prepare Mehan to manage his relationship with Amini at the branch.

In January 2005, Mitchell entered an internal complaint of discrimination with the human resources department, claiming that Gauthier removed Mitchell from Prices Corner because of Mitchell's race.  On January 27, 2005, the department advised Mitchell that, after an investigation and review, it had found no evidence of unfair treatment or discrimination.  On February 1, 2005, a few days later, Mitchell filed a charge of discrimination with the Delaware Department of Labor, claiming that Gauthier had removed him from Prices Corner because of his race and gender.

In October 2006, Wachovia closed the Capitol Trail branch and reassigned Mitchell to the Meadowood branch less than ten miles away.  Unlike Prices Corner, both Capitol Trail and Meadowood were managed by African-American women.  Mitchell asserts no claims regarding

---

[5] Following Wachovia Securities policy, Mitchell retained all of his existing client accounts at Prices Corner.

the Meadowood or Capitol Trail branches, where he performed well and maintained good relationships with his coworkers.

## III.     STANDARD OF REVIEW

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Biener v. Calio*, 361 F.3d 206, 210 (3d Cir. 2004).  In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant.  *See Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 180 (3d Cir. 1999).  Accordingly, a trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If a moving party has demonstrated the absence of a genuine issue of material fact – meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole – concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Liberty Lobby*, 477 U.S. at 257.  Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor.  In this situation, it may be said that the record as a whole points in one direction and the

dispute is not "genuine." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.    DISCUSSION

The defendants filed a motion for summary judgment, asserting that there are no genuine issues of material fact as to any of Mitchell's claims. Mitchell concedes this to be true for certain claims, and withdrew those claims in his answering brief. Specifically, Mitchell has withdrawn his claims under 42 U.S.C. § 1985 and § 1986; his claims for state law fraud and *prima facie* tort; and all claims against Meyers. Thus, the court now addresses those claims that remain: race and gender discrimination in violation of Title VII and the DDA, race discrimination in violation of 42 U.S.C. § 1981, and conspiracy under Delaware law.

### A.    Race and Gender Discrimination

Mitchell alleges that the defendants have discriminated against him based on his race and gender in violation of Title VII.[6] Title VII prohibits an employer from discriminating against any individual on the basis of race, color, religion, sex or national origin:

> [i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin.

42 U.S.C. § 2000e-2(a). Discrimination claims under Title VII are analyzed under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination by "presenting sufficient evidence to allow a fact finder to conclude that the employer is treating

---

[6] Mitchell also brings claims pursuant to the DDA. To establish a prima facie case of discrimination under the DDA, Mitchell must make the same showing as required by a claim under Title VII. *Giles v. Family Court of Delaware*, 411 A.2d 599, 601-02 (Del. 1980) (because language of DDA is substantially the same as Title VII, *McDonnell Douglas* test also appropriate for claims under §711(a) of DDA). As discussed below, the court finds that Mitchell has failed to raise triable issues of fact as to his Title VII discrimination claims. Thus, the court will grant the defendants' motion for summary judgment on Mitchell's DDA claims as well.

some people less favorably than others based on a trait that is protected under Title VII." *Mosca v. Cole et al.*, 217 Fed. Appx. 158 (3d Cir. February 14, 2007); *see Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995). Once the plaintiff has made this prima facie showing, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. *Waldron*, 56 F.3d at 494. If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons for its employment decision were pretextual – that is, that they are false and that the true reason for the employment decision was discriminatory. *Id.* To show pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Mosca*, 217 Fed. Appx. at 161 (internal citations omitted). If the plaintiff cannot carry the burden of proof under the shifting framework established in *McDonnell*, the defendant is entitled to summary judgment. *Stafford v. Noramco of Delaware, Inc.*, No. Civ. 97-376 GMS, 2000 WL 1868179, at *1 (D. Del. Dec. 15, 2000).

### 1. Disparate Treatment Based on Race or Gender

A prima facie discrimination case under Title VII requires the plaintiff to show that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action despite being qualified; and (4) the action occurred under circumstances giving rise to an inference of unlawful discrimination, such as when non-members of the protected class are treated more favorably than the plaintiff. *Sarullo v. United States Postal*

*Servs.*, 352 F.3d 789, 797 (3d Cir. 2003), *cert. denied*, 541 U.S. 1064 (2004); *Miller v. Delaware Dep't of Prob. & Parole*, 158 F. Supp. 2d 406, 410-11 (D. Del. 2001).

The evidence in the record reveals that Mitchell has satisfied the first three elements of the burden-shifting regime of *McDonnell Douglas*. Mitchell, an African American, is a member of a protected class and was qualified for his position at both branches. Moreover, Mitchell's removal from the Prices Corner branch was an adverse employment action because the removal potentially affected his compensation and conditions of his employment. *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006). The court, therefore, must determine whether this adverse action occurred under circumstances giving rise to an inference of unlawful discrimination.

Mitchell concedes that "there is no evidence of racial epithets or other blatant or obvious conduct directed at him." In other words, there is no evidence that anyone at Wachovia Securities or Wachovia Bank ever said or wrote anything to anyone directly expressing racial or gender bias against Mitchell. In the absence of overt bias, Mitchell argues that the circumstances of his case raise an inference of discrimination. A plaintiff may demonstrate the circumstantial inference of discrimination in many ways, but must produce "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion. . . ." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 355 (3d Cir. 1999) (quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)) (alterations in original). "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race . . . ." *Sarullo*, 352 F.3d 789, 798 (quoting *Pivirotto*, 191 F.3d at 352).

13

Here, Mitchell claims that Wachovia Securities' decision to remove him from the Prices Corner branch as part of its general one-branch-per-Financial Adviser strategy was discriminatory. Wachovia argues that similarly situated employees outside Mitchell's protected class were treated no better than Mitchell: white and female Financial Advisers lost second branch assignments as part of the plan, just as Mitchell did. Mitchell counters that the "only logical inference" as to why Prices Corner branch was taken from him is because he is an African-American male. In support, Mitchell notes that a white female Financial Adviser was offered a two-branch placement. Yet this single employee was not similarly situated: she employed a broker-funded assistant, something that Mitchell had earlier chosen not to do because it would have been at his own expense. The record reflects that Wachovia assigned similarly situated Financial Advisers – those without assistants – who were white, women, or both, to single branches. Beyond his race and gender as such, Mitchell cites to no record evidence supporting an inference of discriminatory animus in Gauthier's decision to assign him to only one branch.

Similarly, Mitchell points to no evidence that Gauthier's decision to assign Mitchell only to Capitol Trail rather than Prices Corner, the branch with a higher deposit base of the two, was based on Mitchell's race. But even if Mitchell could establish a prima facie case of discrimination based on his removal from Prices Corner, rather than Capitol Trail, Wachovia has proffered legitimate, non-discriminatory reasons for assigning Mitchell exclusively to one branch, and to Capitol Trail in particular. These include Mitchell's vastly superior performance at Capitol Trail and his pervasive personality conflicts with the employees at Prices Corner. Thus, beyond Mitchell's race and gender per se, Mitchell has not cited to sufficient, indeed, any

evidence that could cause a reasonable fact finder to disbelieve Wachovia's legitimate reasons or to believe that discriminatory animus more likely than not motivated or determined Wachovia's, and Gauthier's, decision. *Cf. Mosca*, 217 Fed. Appx. at 162. In other words, there is no record evidence that could cause a factfinder to reasonably conclude that Mitchell's removal from Prices Corner was motivated by race or gender, rather than by Wachovia's general business policy and a business decision to keep Mitchell at a Capitol Trail, a branch where he excelled.

Mitchell also argues that the discrepancy between various investigations into conflicts at the Prices Corner branch was discriminatory. Specifically, Mitchell claims that Wachovia's investigation into Mitchell's alleged statements to Amini regarding her Iranian heritage – the 9/11 incident – was much more thorough than the investigation into Mitchell's July 2003 complaint of being falsely accused and harassed, or the disciplinary response to Amini's alleged misrepresentation in November 2004. According to Mitchell, this discrepancy in treatment is evidence of discriminatory animus.

Contentions based on the absence or inadequacy of a formal investigation into Amini's apparently false accusations, however, are insufficient to establish a prima facie case of discrimination. *Mosca*, 217 Fed. Appx. at 162 (absence of formal investigation into alleged statement, when other dissimilar allegations received formal investigations, did not establish prima facie case of discrimination). Mitchell did not complain of discrimination to the human resources department in July 2003. Rather, his complaint was one of being falsely accused. Complaining of Mitchell's purported 9/11 comment, by contrast, constituted an allegation of racial harassment. Wachovia's different investigations or responses to these various incidents thus do not circumstantially establish disparate treatment because of Mitchell's race; Mitchell's

complaints as to generally unfair treatment or false accusations were not equivalent to allegations of racial harassment at work. Thus, the discrepancy between Wachovia's investigations into Mitchell's alleged statements with racially discriminatory animus versus its investigations into Mitchell's complaints of being falsely accused does not establish a prima facie case of disparate treatment. *Mosca*, 217 Fed. Appx. at 162. As such, the defendants are entitled to summary judgment on Mitchell's disparate treatment discrimination claim.

### 2. Hostile Work Environment

Mitchell also alleges that the defendants violated Title VII by creating a hostile work environment with respect to Mitchell's race and sex. To establish a claim under Title VII based on a hostile work environment, a plaintiff must show: (1) that he or she suffered intentional discrimination because of race or gender; (2) the discrimination was pervasive and severe; (3) it detrimentally affected him or her; (4) it would have detrimentally affected a reasonable person of the same protected class in the plaintiff's position; and (5) there is a basis for vicarious liability. *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996). In making its determination, the court must examine all of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Put differently, the court must evaluate the record as a whole to determine whether Mitchell has proven his case, because "'[p]articularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities . . . . [A] discrimination analysis

must concentrate not on individual incidents, but on the overall scenario.'" *Cardenas*, 269 F.3d at 261 (quoting *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999)).

Discrimination in the workplace manifests itself in two forms, overtly discriminatory conduct and facially neutral conduct; either form can support a plaintiff's claim for hostile work environment. *Cardenas*, 269 F.3d at 260-61. A plaintiff alleging discrimination through facially neutral conduct, however, must show some "surrounding circumstances that would expose the purportedly discriminatory nature of what is otherwise racially neutral conduct." *Brooks v. CBS Radio, Inc.*, Civil Action No. 07-0519, 2007 WL 4454312, at *12 (E.D. Pa. Dec. 17, 2007).

According to Mitchell, the specific conduct that contributed to his hostile work environment was DiFebo's, Beam's, and Amini's "chilly" interactions with him, Amini's failure to support him in the context of the Financial Adviser-Financial Specialist relationship, and Amini's false accusations.[7] Mitchell asserts that "it was evident that Amini, DiFebo, Beam, and Meyer did not like working with him and having their transactions questioned by a black male." But the record evidence fails to raise a triable issue of fact as to whether the defendants' alleged conduct was intentionally based on race or gender. Mitchell does not point to any overtly racist or sexist comments made to him or about him. Nor can Mitchell raise an inference of discrimination that his treatment, while facially neutral, was in fact discriminatory. Mitchell is African American and male, and the employees at Prices Corner Caucasian or Iranian-American and female. But beyond the parties' ethnicities and genders as such, the evidence reveals no surrounding circumstances indicating that the facially neutral conduct of which Mitchell complains – the chilly atmosphere, the way disputes between Amini and Mitchell were handled,

---

[7] As discussed above, Mitchell cannot establish that he suffered intentional discrimination because of his race with respect to his removal from Prices Corner or the defendants' reactions to and investigations into various incidents at the branch.

and Amini's failure to send business Mitchell's way after the 9/11 incident –  was in fact discriminatory.  Indeed, the overall situation suggests one of interpersonal discord based on personal dislike and perhaps the suspicion that Mitchell himself was racist.  DiFebo, Amini, and Beam's treatment of Mitchell may have been rude, spiteful, or hostile, but Mitchell fails to demonstrate record evidence that such conduct was motivated by Mitchell's race or gender. *Anderson v. Potter*, 895 F.2d 1469, 1485 (3d Cir. 1990) (membership in protected class must be substantial factor in discrimination).  Mitchell's belief that Wachovia and its employees would have acted differently had Mitchell been white or a woman, in the absence of record evidence, is based on Mitchell's speculation and is thus insufficient to prove discrimination.  *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 490 (E.D. Pa. 1999).  Accordingly, the facts of this case fail to establish that Mitchell suffered intentional discrimination because of race or sex, and Mitchell's hostile work environment claim cannot survive summary judgment.

### 3.    Retaliation

Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  To survive summary judgment, Mitchell must establish genuine issues as to each of the elements of a claim of retaliation under Title VII: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Berry v. Delaware*, 2008 U.S. Dist. LEXIS 26754, at *7-8 (D. Del. April 1, 2008) (citing *Kachmar v. SunGard Data Sys.,* 109 F.3d 173, 177 (3d Cir. 1997)).

Mitchell alleges that Wachovia removed him from Prices Corner in December 2004 because Mitchell had complained to Wachovia Securities' human resources department in July 2003 about his treatment at the branch, particularly as to the 9/11 incident. Mitchell claims that these complaints in July 2003 constitute a "protected activity" within the meaning of a Title VII retaliation claim. But Mitchell's general complaints in 2003 as to unfair or hostile treatment did not allege racial or gender discrimination. Indeed, Mitchell did not complain of racial or gender discrimination until January 2005. Thus, the July 2003 complaint was not an activity protected under Title VII. *Slagle v. County of Clarion*, 435 F.3d 262, 265 (3d Cir. 2006) (internal citations omitted). Because Mitchell cannot raise a triable issue as to his protected activity that occurred before or contemporaneous with his removal from Prices Corner, Mitchell's retaliation claim fails as a matter of law.

**B.    Mitchell's 42 U.S.C. § 1981 Claims**

Mitchell also claims that several of the individual defendants discriminated against him based on his race in violation of 42 U.S.C. § 1981. Specifically, Mitchell claims that the defendants interfered with his livelihood and employment by spreading or failing to investigate rumors designed to cost him his position at Prices Corner. Section 1981 prohibits race discrimination in, among others, the context of making or enforcing contracts and transactions of property:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  To avoid summary judgment on his § 1981 claim, Mitchell must show triable issues as to the each of the following: "(1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts. . . ."  *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001).

Mitchell satisfies the first element.  But, as discussed above, Mitchell has failed to raise a triable issue as to the defendants' intent to discriminate against him on the basis of his race.  Thus, the defendants are entitled to summary judgment on Mitchell's § 1981 claim as well.

## C.    Conspiracy Claims Under Delaware Law

Mitchell has failed to create a triable issue as to invidious discrimination.  In addition, Mitchell withdrew his 42 U.S.C. §§ 1985 and 1986 claims.  Mitchell's civil conspiracy claims require some independent statutory violation; they cannot stand alone.  *Carter v. Delaware State Univ.*, 2002 U.S. Dist. LEXIS 3116, at *25 (D. Del. Feb. 27, 2002), *aff'd* 65 Fed. Appx. 397 (3d Cir. 2003).  Thus, Mitchell's civil conspiracy claim fails as a matter of law, and the court will grant summary judgment to the defendants on this claim as well.

## D.    Claims Against Separate Corporate Entities

The defendants argue that Mitchell's claims against all named corporate entities except Wachovia Securities should be dismissed because only Wachovia Securities was his employer. (D.I. 38 at 20.)  The court need not address this issue because, as just discussed, it will grant the defendants' motion for summary judgment as to all defendants.

20

## V.      CONCLUSION

For the aforementioned reasons, the court will grant the defendants' motion for summary

judgment and dismiss all of the plaintiff's claims.


Dated: May 5, 2008                          /s/ Gregory M. Sleet
                                            CHIEF, UNITED STATES DISTRICT JUDGE

21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KENNETH S. MITCHELL,       )
                               )
        Plaintiff,        )
                               )
        v.                 )      Civil Action No. 06-725 GMS
                               )
WACHOVIA CORPORATION, t/a     )
   WACHOVIA SECURITIES,      )
WACHOVIA SECURITIES, L.L.C.,     )
WACHOVIA SERVICES, INC.,      )
WACHOVIA BANK  OF         )
   DELAWARE, N.A.,         )
TODD D. GAUTHIER, LYNN G. MEYER, )
CAROLYN J. BEAM, and DOROTHY A.   )
DIFEBO,              )
                               )
        Defendants.       )

## ORDER

      For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

      1.       The defendants' Motion for Summary Judgment (D.I. 37) is GRANTED.

      2.       The Clerk of Court is directed to close this case.

Dated: May 5, 2008             /s/ Gregory M. Sleet
                                  CHIEF, UNITED STATES DISTRICT JUDGE